**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

ROBYN KRAVITZ,
3606 Stewart Road
District Heights
Prince George's County, MD 20747;

MICHAEL KRAVITZ,
3606 Stewart Road
District Heights
Prince George's County, MD 20747;

CATHERINE NWOSU,
8004 18th Avenue
Hyattsville
Prince George's County, MD 20783;

NNABUGWU NWOSU,
8004 18th Avenue
Hyattsville
Prince George's County, MD 20783;

T. CARTER ROSS,
3915 Longfellow Street
Hyattsville
Prince George's County, MD 20781;

JOANNE WILSON,
3806 Viser Court
Bowie
Prince George's County, MD 20715;

ALEJANDRO CHAVEZ,
6170 W. Pierce Street
Phoenix, AZ 85043;

RICHARD McCUNE,
455 West Crawford Street
Nogales, AZ 85621;

JOSE MORENO,
443 East Ramona Street

Case No. 18-cv-01041

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

Box 3293
Somerton, AZ 85350;

DIANA ALEXANDER,
10238 Rothbury Street
Houston, TX 77043;

LAUREN RACHEL BERMAN,
3890 Dunhaven Road
Dallas, TX 75220;

SARAH BRYAN,
1348 Shania Twain Drive
Edinburg, TX 78541;

VIRGINIA GARCIA,
1520 Farragut Street
Laredo, TX 78040;

LINDA RIVAS,
3301 Piedmont Drive
El Paso, TX 79902;

MARTHA SANCHEZ,
2104 Goldcrest Avenue
McAllen, TX 78504;

SONIA CASAREZ SHAFER,
7017 Chris Drive
Pharr, Texas 78577;

MICHAEL KAGAN,
1909 Plaza de Cordero
Las Vegas, NV 89102;

YAMILE LABORI,
5556 Azalea Circle
West Palm Beach, FL 33415;

LAZARA YOELVIS MAGADAN,
14910 SW 82nd Terrace, Apt. 104
Miami, FL 33193;

     Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE,
1401 Constitution Avenue NW
Washington, DC 20230;

UNITED STATES CENSUS BUREAU,
4600 Silver Hill Road
Suitland
Prince George's County, MD 20746;

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230;

KAREN DUNN KELLEY in her official capacity
as the Under Secretary for Economic Affairs,
performing the nonexclusive duties of the Deputy
Secretary of Commerce,
1401 Constitution Avenue NW
Washington, DC 20230;

RON JARMIN in his official capacity as an
employee of the U.S. Census Bureau performing
the non-exclusive functions and duties of the
Director of the U.S. Census Bureau,
4600 Silver Hill Road
Suitland
Prince George's County, MD 20746;

ENRIQUE LAMAS in his official capacity as an
employee of the U.S. Census Bureau performing
the non-exclusive duties and functions of the
Deputy Director and Chief Operating Officer of
the U.S. Census Bureau,
4600 Silver Hill Road
Suitland
Prince George's County, MD 20746;

                         Defendants.

## INTRODUCTION

1.       On March 26, 2018, in an abrupt reversal of 60 years of policy and

practice, U.S. Secretary of Commerce Wilbur L. Ross, Jr., ordered the U.S. Census Bureau (the

"Bureau" or "Census Bureau") to add a question to the 2020 decennial census ("2020 Census") questionnaire that requires respondents to report to the government whether they and their household members are United States citizens. Coming amidst what the Bureau itself has identified as a widespread climate of fear among citizen and noncitizen immigrants, the belated addition of a citizenship question will significantly depress response rates in certain communities, thereby undermining the completeness and accuracy of the 2020 Census. The Secretary insisted on the addition of a citizenship question despite expressly conceding that it could lead to a disproportionate undercount and without having conducted a single test, in almost seven years of pre-Census preparation, to assess the impact that a citizenship question would have on the accuracy of the census count.

2.      The Secretary's action violates the paramount constitutional objective of the decennial census—to count every person residing in the United States, citizen and noncitizen alike. It also contravenes binding legal requirements and the Bureau's own policies and procedures for ensuring an accurate and complete census count. Defendants' action not only violates the Census Clause of the U.S. Constitution, as amended by the Fourteenth Amendment, but also must be set aside under the Administrative Procedure Act ("APA") as arbitrary, capricious, an abuse of discretion, and otherwise in contravention of applicable law.

3.      Plaintiffs—individual citizens residing in Prince George's County, Maryland and the States of Arizona, Texas, Nevada, and Florida—bring this action under the Constitution and the APA to block this unlawful assault on the integrity of the decennial census and to prevent the harm that each of the Plaintiffs will suffer if this final agency action taken by the U.S. Department of Commerce (the "Commerce Department" or "Department") is permitted to stand.

4.      The U.S. Constitution requires the federal government to conduct a decennial census counting the total number of "persons"—regardless of citizenship status—residing in each state. The population data collected through this decennial census determines the apportionment of seats in the U.S. House of Representatives among the states. States also use these data to draw congressional and state legislative districts. And over $675 billion in federal funding for a wide array of programs is allocated to individual states and localities every year based upon decennial census data.

5.      From 1960 until March 26, 2018, the Bureau had steadfastly determined, in census after census, *not* to ask about citizenship status on the standard census questionnaire used to count all persons in the United States. Bureau personnel have repeatedly found that such a question was unnecessary to count total population and would undermine the accuracy and completeness of the census by causing disproportionate levels of non-participation among certain demographic groups.

6.      As a federal statistical agency within the Commerce Department, the Census Bureau is held to stringent regulations on impartiality, objectivity, and statistical reliability, requiring decisions about census content and collection methodologies to be insulated from political considerations and based on rigorous pre-testing. The Census Bureau is nearly seven years into the preparation process for the 2020 Census and has already completed numerous tests to inform the final content, design, and operation of the 2020 Census.

7.      None of the testing for the 2020 Census to date has evaluated the impact of a citizenship question on response rates to the 2020 Census questionnaire, or on the accuracy and completeness of 2020 Census data. The final pre-census test, a "dress rehearsal" that is the

culmination of the Bureau's research and testing efforts, is now underway and will not assess the impact of a citizenship question.

8.      The Secretary's last-minute decision to add a citizenship question—which reportedly overruled both top Bureau officials and the Bureau's own scientific advisory committee—was purportedly made to satisfy a belated December 2017 request from the Department of Justice ("DOJ"), which claimed that it needed "census block"-level citizenship data to enforce Section 2 of the Voting Rights Act ("VRA"). The DOJ's claim, however, had no valid foundation. In over half a century of the VRA's existence, census block-level citizenship data have never been available to or used by the government to enforce Section 2, nor have Congress or the courts required such data.

9.      In reality, the VRA rationale is a mere pretext. The circumstances of the Secretary's decision show that the addition of an untested citizenship question is a partisan act aimed at advancing the Trump Administration's anti-immigration political agenda, heedless of legal requirements. Even before the Secretary announced his decision, President Trump's reelection campaign sent a mass email declaring that the President "wants the 2020 United States Census to ask people whether or not they are citizens" and asking "if you're on his side." Within two days of the Secretary's decision, the Trump campaign sent out another mass e-mail asserting that President Trump had personally "mandated" the decision and soliciting political support on that basis.

10.     As the Bureau's own prior research and investigation demonstrate, Defendants' reckless addition of a citizenship question to the 2020 Census questionnaire will increase fear and distrust, depress response rates, and produce a disproportionate undercount of residents in states and localities with high numbers of certain demographic groups, including

noncitizens, immigrants, non-English speakers, and individuals of Hispanic or Latino origin. This undercount will have harmful, decade-long effects for *everyone* who lives in these communities—citizens and noncitizens, native and foreign-born. Voters will be denied their constitutionally guaranteed rights to equitable political representation based on actual population, and billions of dollars in federal funding—for education, infrastructure, health care, and countless other pressing needs—will be unlawfully misallocated.

11.    The 2020 Census must be carried out in accordance with the highest standards of statistical reliability, accuracy, and completeness, to ensure that the Constitution's mandate to conduct an "actual Enumeration" of all "persons" is fulfilled. Plaintiffs bring this action to enjoin Defendants' unlawful action and prevent severe injuries to themselves and to innumerable other citizens and noncitizens in states and localities across the country.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims arising under the U.S. Constitution and federal statutes. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief against the Defendants pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

13.    Defendants' decision to add a citizenship question to the 2020 Census, *see* Ex. 1, and its submission of the final census questions to Congress on March 29, 2018, *see* Ex. 2, constitute final agency action that is judicially reviewable under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 704, 706.

14.    Venue is proper under 28 U.S.C. §1391(e)(1). First, Defendants United States Census Bureau, Ron Jarmin (in his official capacity), and Enrique Lamas (in his official capacity) reside in Prince George's County within this District. Second, a substantial part of the

events or omissions giving rise to Plaintiffs' claims occurred in this District. Third, Plaintiffs

Robyn Kravitz, Michael Kravitz, Catherine Nwosu, Nnabugwu Nwosu, Joanne Wilson, and T.

Carter Ross reside in Prince George's County within this District, and no real property is

involved in this action.

## PARTIES

15.    Plaintiff Diana Alexander resides in Houston, Texas, a city located in

Harris County. Ms. Alexander is eligible to vote and intends to vote where she resides in

elections after 2020. Houston falls within an "urbanized area" for purposes of federal

transportation funding. Ms. Alexander regularly drives on highways and roads in and around

Houston and Harris County.

16.    Plaintiff Lauren Rachel Berman resides in Dallas, Texas, a city located in

Dallas County. Ms. Berman is eligible to vote and intends to vote where she resides in elections

after 2020. Ms. Berman has applied to the Texas Department of Family and Protective Services

for a license to foster children. Once she obtains this license, she will be eligible to receive funds

under the Federal Foster Care Program (Title IV-E). The children Ms. Berman fosters will also

be eligible to receive health insurance under the federal-state Medicaid program. Dallas falls

within an "urbanized area" for purposes of federal transportation funding. Ms. Berman regularly

drives on highways and roads in and around Dallas and Dallas County, including for her daily

commute to work.

17.    Plaintiff Sarah Bryan resides in Edinburg, Texas, a city located in Hidalgo

County. Ms. Bryan is currently applying for United States citizenship and intends to vote where

she resides in elections after 2020. Ms. Bryan has two daughters who attend public schools in

Hidalgo County that receive funding under Title I of the Elementary and Secondary Education

Act ("Title I"). Ms. Bryan's daughters receive health insurance under the federal-state Medicaid

program. Edinburg falls within an "urbanized area" for purposes of federal transportation funding. Ms. Bryan regularly drives on highways and roads in and around Edinburg and Hidalgo County, including for her daily commute to work.

18.    Plaintiff Alejandro Chavez resides in Phoenix, Arizona, a city located in Maricopa County. Mr. Chavez is eligible to vote and intends to vote where he resides in elections after 2020. Mr. Chavez's son currently attends a public school in Maricopa County that receives Title I funding. Mr. Chavez's daughter currently goes to a special needs childcare facility in Maricopa County that is part of a public school that receives Title I funding. She will be starting pre-kindergarten at a school that receives Title I funding this fall. Phoenix falls within an "urbanized area" for purposes of federal transportation funding. Mr. Chavez regularly drives on highways and roads in and around Phoenix and Maricopa County.

19.     Plaintiff Virginia Garcia resides in Laredo, Texas, a city in Webb County. Ms. Garcia is eligible to vote and intends to vote where she resides in elections after 2020. Laredo falls within an "urbanized area" for purposes of federal transportation funding. Ms. Garcia regularly drives on highways and roads in and around Laredo and Webb County.

20.    Plaintiff Michael Kagan resides in Las Vegas, Nevada, a city in Clark County. Mr. Kagan is eligible to vote and intends to vote where he resides in elections after 2020. Mr. Kagan's daughter attends a public school in Clark County that receives Title I funding. Las Vegas falls within an "urbanized area" for purposes of federal transportation funding. Mr. Kagan regularly drives on highways and roads in and around Las Vegas and Clark County.

21.    Plaintiff Robyn Kravitz resides in District Heights, Maryland, a city located in Prince George's County. Ms. Kravitz's daughter currently attends a public school in Prince George's County. Her son recently attended, and is expected to re-enroll soon, in a public

school in Prince George's County that receivesTitle I funding. District Heights falls within an "urbanized area" for purposes of federal transportation funding. Ms. Kravitz regularly drives on highways and roads, and uses other modes of transportation, in and around District Heights and Prince George's County, including for her daily commute to work.

22.     Plaintiff Michael Kravitz resides in District Heights, Maryland, a city located in Prince George's County. Mr. Kravitz's daughter currently attends a public school in Prince George's County. His son recently attended, and is expected to re-enroll soon, in a public school in Prince George's County that receives Title I funding. District Heights falls within an "urbanized area" for purposes of federal transportation funding. Mr. Kravitz regularly drives on highways and roads, and uses other modes of transportation, in and around District Heights and Prince George's County, including for his daily commute to work.

23.     Plaintiff Yamile Labori resides in West Palm Beach, Florida, a city in Palm Beach County. Ms. Labori is eligible to vote and intends to vote where she resides in elections after 2020. Ms. Labori's daughter currently attends a public school in Palm Beach County that receives Title I funding. West Palm Beach falls within an "urbanized area" for purposes of federal transportation funding. Ms. Labori regularly drives on highways and roads in and around West Palm Beach and Palm Beach County, including as part of her job.

24.     Plaintiff Lazara Yoelvis Magadan resides in Miami, Florida, a city located in Miami-Dade County. Ms. Magadan is eligible to vote and intends to vote where she resides in elections after 2020. Miami falls within an "urbanized area" for purposes of federal transportation funding. Ms. Magadan regularly drives on highways and roads in and around Miami and Miami-Dade County, including to drop her son to school.

25.     Plaintiff Richard McCune resides in Nogales, Arizona, a city located in Santa Cruz County. Mr. McCune is eligible to vote and intends to vote where he resides in elections after 2020. Mr. McCune regularly drives on highways and roads in and around Nogales and Santa Cruz County and other parts of Arizona.

26.     Plaintiff Jose Moreno resides in Somerton, Arizona, a city located in Yuma County. Mr. Moreno is eligible to vote and intends to vote where he resides in elections after 2020. Mr. Moreno is the Vice Principal at Somerton Middle School, a public school that receives Title I funding. He has three children who attend public schools that receive Title I funding. Mr. Moreno regularly drives on highways and roads in and around Somerton and Yuma County.

27.     Plaintiff Catherine Nwosu resides in Langley Park, Maryland, an unincorporated area in Prince George's County. Ms. Nwosu is eligible to vote and intends to vote where she resides in elections after 2020. Ms. Nwosu's son attends a public school in Prince George's County that receives Title I funding. Langley Park falls within an "urbanized area" for purposes of federal transportation funding. Ms. Nwosu regularly drives on highways and roads, and uses other modes of transportation, in and around Langley Park and Prince George's County, including for her daily commute to work.

28.     Plaintiff Nnabugwu Nwosu resides in Langley Park, Maryland, an unincorporated area in Prince George's County, Maryland. Mr. Nwosu is eligible to vote and intends to vote where he resides in elections after 2020. Mr. Nwosu's son attends a public school in Prince George's County that receives Title I funding. Langley Park falls within an "urbanized area" for purposes of federal transportation funding. Mr. Nwosu regularly drives on highways

and roads, and uses other modes of transportation, in and around Langley Park and Prince George's County, including for his daily commute to work.

29.    Plaintiff Linda Rivas resides in El Paso, Texas, a city located in El Paso County. Ms. Rivas is eligible to vote and intends to vote where she resides in elections after 2020. Ms. Rivas's son attends a public school in El Paso County that receives Title I funding. El Paso falls within an "urbanized area" for purposes of federal transportation funding. Ms. Rivas regularly drives on highways and roads in and around El Paso and El Paso County.

30.    Plaintiff T. Carter Ross resides in Hyattsville, Maryland, a city located in Prince George's County. Mr. Ross is eligible to vote and intends to vote where he resides in elections after 2020. Two of Mr. Ross's children attend a public school in Prince George's County that receives Title I funding. Hyattsville falls within an "urbanized area" for purposes of federal transportation funding. Mr. Ross regularly drives on highways and roads, and uses other modes of transportation, in and around Hyattsville and Prince George's County, including for his daily commute to work.

31.    Plaintiff Martha Sanchez resides in McAllen, Texas, a city located in Hidalgo County. Ms. Sanchez is eligible to vote and intends to vote where she resides in elections after 2020. McAllen falls within an "urbanized area" for purposes of federal transportation funding. Ms. Sanchez regularly drives on highways and roads in and around McAllen and Hidalgo County, including for her daily commute to work.

32.    Plaintiff Sonia Casarez Shafer resides in Pharr, Texas, a city located in Hidalgo County. Ms. Shafer is eligible to vote and intends to vote where she resides in elections after 2020. Ms. Shafer's children attend public schools in Hidalgo County that receive Title I funding. Ms. Shafer's children receive health insurance under the federal-state Medicaid

program. Pharr falls within an "urbanized area" for purposes of federal transportation funding. Ms. Shafer regularly drives on highways and roads in and around Pharr and Hidalgo County.

33.    Plaintiff Joanne Wilson resides in Bowie, Maryland, a city located in Prince George's County. Ms. Wilson is eligible to vote and intends to vote where she resides in elections after 2020. Two of Ms. Wilson's children attend public school in Prince George's County. Bowie falls within an "urbanized area" for purposes of federal transportation funding. Ms. Wilson regularly drives on highways and roads, and uses other modes of transportation, in and around Bowie and Prince George's County, including for her daily commute to work.

34.    Defendant United States Department of Commerce is a cabinet-level department of the United States federal government. It oversees the development, content, and implementation of the federal decennial census, including the 2020 Census, by the United States Census Bureau.

35.    Defendant United States Census Bureau is an agency within the Commerce Department. It is responsible for developing and implementing the 2020 Census, subject to oversight by the Commerce Department.

36.    Defendant Wilbur L. Ross, Jr., is the Secretary of Commerce. He has responsibility for overseeing the Bureau, including with respect to the Bureau's responsibility to develop and implement the 2020 Census. Secretary Ross is sued in his official capacity.

37.    Defendant Karen Dunn Kelley is the Under Secretary for Economic Affairs, performing the nonexclusive duties of the Deputy Secretary of Commerce. She oversees the Department's statistical programs, including the United States Census Bureau. She is sued in her official capacity.

38.     Defendant Ron Jarmin is performing the non-exclusive functions and duties of the Director of the United States Census Bureau. He has responsibility for the development and implementation of the 2020 Census. He is sued in his official capacity.

39.     Defendant Enrique Lamas is performing the non-exclusive duties and functions of the Deputy Director and Chief Operating Officer of the United States Census Bureau. He has responsibility for the development and implementation of the 2020 Census. He is sued in his official capacity.

## LEGAL BACKGROUND

**A.     The Constitutional Mandate to Count All "Persons"**

40.     Article I, Section 2, Clause 3 (the "Census Clause") of the United States Constitution mandates that the federal government shall conduct an "actual Enumeration" of the United States population every ten years. As amended by Section 2 of the Fourteenth Amendment, this "Enumeration" must count "the whole number of persons in each state," regardless of such persons' status as citizens or noncitizens.

41.     Pursuant to the Census Clause, representatives in the U.S. House of Representatives "shall be apportioned among the several States . . . according to their respective Numbers," based upon the decennial census. U.S. Const. Art. I, § 2, cl. 3. Apportionment must be "based on total population," regardless of citizenship. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2015). An "actual Enumeration" for purposes of apportionment is the sole constitutional objective of the decennial census.

42.     States also use population data from the decennial census to draw congressional and state legislative districts of equal population, as required by the U.S. Constitution.

43.     In addition, federal government agencies utilize data from the decennial census, including population data, to allocate more than $675 billion in federal funds involving over 130 different federal programs.[1] This includes funding for public schools under Title I of the Elementary and Secondary Education Act and for federal transportation planning programs, some of which is calculated based on the population of urbanized areas. Decennial census data also impacts funding for a wide range of other programs, including special education, Head Start, Medicaid, the Children's Health Insurance Program, child care assistance, foster care, adoption assistance, home energy assistance, and the supplemental nutrition program for women, infants, and children.

## B.     The Statutory and Regulatory Framework

### (1)     Congress's Specification of the Bureau's Duties Under the Census Act

44.     Pursuant to its constitutional authority to prescribe the "Manner" in which the decennial census is taken, Congress has delegated the duty of conducting the census to the Secretary of Commerce under the Census Act, 13 U.S.C. § 141. Although the Secretary has authority to determine the "form and content" of the census, *id.* § 141(a), this discretion is not unlimited.

45.     In particular, the preparation for the decennial census is a decade-long undertaking subject to interim statutory deadlines and congressional oversight. The Census Act, 13 U.S.C. § 141(a), directs the Secretary to take a decennial census of "population as of the first day of April" in 1980 "and every ten years thereafter" (the "Census Date"). This "tabulation of

---

[1] Marisa Hotchkiss and Jessica Phelan, Uses of Census Bureau Data in Federal Funds Distribution at 3 (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

total population by State" must be completed within nine months of the Census Date. *Id.*
§ 141(b).

46.     Not later than three years before the Census Date, the Secretary must
submit a report containing his "determination" as to the subjects to be included and the types of
information to be compiled in the next decennial census. *Id.* § 141(f)(1). The deadline for
submission of this report for the 2020 Census was March 31, 2017.

47.     Not later than two years before the Census Date, the Secretary must
submit another report to Congress setting forth his "determination" as to the questions to be
asked in the next decennial census. *Id.* § 141(f)(2). The deadline for submission of this report for
the 2020 Census was March 31, 2018.

48.     The Secretary may not modify the subjects, types of information, or
questions contained in a report under § 141(f)(1) or (f)(2) without finding that "new
circumstances exist which necessitate" such a modification and reporting that finding to
Congress. *Id.* § 141(f)(3).

**(2)     The Requirements of Independence, Impartiality, and Statistical
        Rigor in Conducting the Decennial Census**

49.     The Secretary's discretion is also limited by the statutory and regulatory
framework that Congress has established to ensure that the Census Bureau provides impartial,
unbiased, and objective data consistent with the highest standards of statistical accuracy and
reliability.

50.     The Census Bureau is a "statistical agency" within the "Federal statistical
system" subject to the standards and directives of the Office of Management and Budget
("OMB") under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501-21. The PRA directs
OMB to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information

collected for statistical purposes" by federal statistical agencies, *id.* § 3504(e)(1)(B), including by issuing "[g]overnment-wide policies, principles, standards, and guidelines" governing "statistical collection procedures and methods," *id.* § 3504(e)(3)(A).

51.    Under the PRA, the Census Bureau must adhere to OMB's "statistical policy and coordination" standards, including with respect to data collection and analysis. *Id.* § 3506(e)(4); *see also* 5 C.F.R. § 1320.18(c) (OMB regulation requiring agency compliance with "the information policies, principles, standards, and guidelines prescribed by OMB" under the PRA).

52.    Through the Information Quality Act ("IQA"), Congress further underscored the importance of the PRA's requirement that agencies disseminate objective and accurate information.[2] The IQA instructs OMB and federal agencies to issue guidance for "ensuring and maximizing the quality, objectivity, utility, and integrity of information they disseminate."[3]

53.    Pursuant to its authority over the Federal statistical system under 44 U.S.C. § 3504(e), OMB has issued directives defining the statistical standards that agencies, including the Census Bureau, must follow. In particular, OMB's Statistical Policy Directive No. 1, entitled "Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units," requires the Census Bureau to "apply sound statistical methods to ensure statistical products are accurate," and to "produce data that are impartial, clear, and complete and

---

[2] Consol. Appropriations Act of 2001, Pub. L. No. 106-554, § 515, 114 Stat. 2763 (2000) (amending PRA).

[3] *Id.* § 515(a).

are readily perceived as such by the public."[4] To guarantee such impartiality, statistical agencies including the Census Bureau "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments" and "must be able to conduct statistical activities autonomously when determining what information to collect and process."[5]

54.    Further, OMB's Statistical Policy Directive No. 2, entitled "Standards and Guidelines for Statistical Surveys," requires the Census Bureau, *inter alia*, to (i) design its surveys "to achieve the highest practical rates of response, commensurate with the importance of survey uses"; (ii) pretest the survey components, if they have not been successfully used before, to "ensure that all components of a survey function as intended when implemented *in the full-scale survey*" and that "measurement error is controlled"; and (iii) administer the survey in a way that "maximiz[es] data quality" while "minimizing respondent burden and cost."[6]

55.    Consistent with OMB directives, the Census Bureau has issued its own Statistical Quality Standards that "address[] the Census Bureau's unique methodological and operational issues" and "apply to all information products released by the Census Bureau and the activities that generate those products."[7]

---

[4] Office of Mgmt. and Budget, Statistical Policy Directive No. 1., *Fundamental Responsibilities of Fed. Statistical Agencies and Recognized Statistical Units*, 79 Fed. Reg. 71,610, 71,615 (Dec. 2, 2014).

[5] *Id.*

[6] Office of Management and Budget, Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys* at §§ 1.3, 1.4, 2.3 (2006), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/statpolicy/standards_stat_s urveys.pdf (emphasis added); *see also* 71 Fed. Reg. 55,522 (Sept. 22, 2006).

[7] U.S. Census Bureau, Statistical Quality Standards at ii (Reissued Jul. 2013), https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/ quality/statistical-quality-standards/Quality_Standards.pdf.

56.     Pursuant to its obligations under the IQA, the Census Bureau has also issued stringent Information Quality Guidelines that require the Bureau to "provide information that is accurate, reliable and unbiased."[8]

57.     As federal administrative agencies, the Commerce Department and the Census Bureau are also subject to the APA, 5 U.S.C. §§ 701-06. Under the APA, agency action is unlawful and courts must set such action aside if it is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "contrary to constitutional right, power, privilege or immunity," *id*. § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); or "without observance of procedure required by law," *id*. § 706(2)(D).

**(3)     The Necessity of Rigorous Pretesting of Census Questions and Other Content**

58.     Rigorous pretesting of all survey questions and questionnaires as a whole is an essential component of the Census Bureau's preparations for the decennial census, including the 2020 Census. Consistent with the pretesting requirement set forth in OMB's Statistical Policy Directive No. 2, the Bureau's own Statistical Quality Standards specify that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems" and must then be "refined, prior to implementation, based on pretesting results."[9] The Bureau's pretesting must consider problems related not only to the content of a question, but also to "order/context effects, skip instructions, formatting, [and] navigation";

---

[8] U.S. Census Bureau, Information Quality: Objectivity, https://www.census.gov/about/policies/quality/guidelines/objectivity.html (last revised Apr. 17, 2015).

[9] U.S. Census Bureau, Statistical Quality Standards at 8.

pretesting must also verify that a question does not cause "undue burden" and is not "unduly sensitive."[10]

59.     Furthermore, additions or changes to the questions contained in the decennial census questionnaire must be pretested to ensure that they are necessary and will not compromise the impartiality, accuracy, and reliability of census data. As stated by the Bureau at its January 2018 quarterly Program Management Review:

> Adding a question or making a change to the Decennial Census . . . involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality useful information for the nation . . . . Final proposed questions result from extensive cognitive and field testing to ensure they result in the proper data with an integrity that meets the Census Bureau's high standards.[11]

60.     This pretesting process takes many years to complete. For example, the Census Bureau spent nine years developing a combined race and ethnicity question for the 2020 Census. This included several years of designing and testing different alternatives for the language, layout, and instructions regarding the revised question in order to assess the accuracy and reliability of respondents' answers to various wording and layout options. The Census Bureau concluded its process at the end of 2017 because it "needed to make a decision on the design of the race and ethnicity questions by December 31, 2017 in order to prepare for the 2020

---

[10] *Id.*

[11] U.S. Census Bureau, Jan. 26, 2018 Program Mgmt. Review Tr. at 20, https://www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/01-26-2018/transcript-2018-01-26-pmr.pdf. *See also Review of 1990 Decennial Census Questionnaire: Hr'g Before the Subcomm. on Census & Population of the Comm. on Post Office and Civil Serv.*, 100th Cong. 69 (April 1988) (Statement of John Keane, Dir. Bureau of the Census) (highlighting sensitivity of question wording and arrangement, and noting that without pretesting the Bureau "wouldn't know the technical problems and uncertainty worries us as much as a negative test result").

Census systems, and deliver the final 2020 Census question wording to Congress by March 31, 2018."[12]

61.     Because the Census Bureau will provide language support for the 2020 Census in multiple foreign languages, such pretesting must be conducted not only in English but also in multiple other languages. The Bureau's Statistical Quality Standards require that "[d]ata collection instruments in any languages other than English must be pretested in the languages that will be used to collect data during production."[13] Both questionnaires and non-questionnaire materials must be prepared in multiple languages.

## **FACTUAL ALLEGATIONS**

A.     **The Census Bureau's Extensive Pretesting of the 2020 Census Questionnaire Without Any Question or Other Inquiry Regarding Citizenship**

62.     In light of the pretesting and other requirements imposed by the above legal framework, and the operational demands of preparing for a nationwide survey of every U.S. household, the Census Bureau began preparing for the 2020 Census in 2011. None of the Bureau's preparations over the last seven years contemplated the inclusion of a citizenship question on the 2020 Census questionnaire. Indeed, the Bureau has done nothing to test the use of a citizenship question in the context of the 2020 Census questionnaire, including the impact that such a question would have on response rates.

63.     The 2020 Census will utilize a single questionnaire, which contains only a limited number of questions designed to collect basic demographic information from every

---

[12] Memorandum, U.S. Census Bureau, 2020 Census Program Memorandum Series: 2018.02, Using Two Separate Questions for Race and Ethnicity in 2018 End-to-End Census Test and 2020 Census (Jan. 26, 2018), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2018_02.pdf.

[13] U.S. Census Bureau, Statistical Quality Standards at 10.

resident and determine the total population of persons residing in each state within the United States.[14] Prior to 2010 and for much of the 20th century, the decennial census used both a "short-form" and a "long-form" questionnaire. The short-form questionnaire, sent to the vast majority of U.S. households, was similar to the single questionnaire that will be used in the 2020 Census. The long-form questionnaire was sent only to a limited random sample of U.S. households and was designed to collect more detailed social, housing, and economic information. Beginning with the 2010 decennial census, the long-form questionnaire was dropped and the decennial census was taken using a single short-form questionnaire sent to all U.S. households. In 2005, the Bureau began using the American Community Survey ("ACS") to gather, on an ongoing, monthly basis, the more detailed population data from a sample of U.S. households that were previously collected on a decennial basis through the long-form questionnaire.

64.    As part of its preparation for the 2020 Census, the Bureau and OMB conducted a "comprehensive review" of the content to be included in the 2020 Census questionnaire.[15] In accordance with the Bureau's rigorous testing protocols, this review included extensive testing of the wording, content, and layout of the 2020 Census questionnaire.

65.    The Bureau has conducted an annual census test of various questions and technologies in every year since 2012. These tests are used to assess methods to improve the 2020 Census, including by identifying potential wording changes to questionnaire content, procedures to improve self-response rates, and follow-up procedures for residents who do not respond. For example, the 2012 National Census Test assessed self-response rates and evaluated the performance of a combined race and origin question. The 2013 Census Test considered

---

[14] Under 13 U.S.C § 221, United States residents are legally required to respond to the questionnaire.

[15] U.S. Census Bureau, Jan. 26, 2018 Program Mgmt. Review Tr. at 21.

methods to improve non-response follow-up procedures. The 2014 Census Test evaluated various technologies for enumeration and census responses, including the Internet and mobile devices. As part of the 2014 test, the Census Bureau examined respondents' reactions, including privacy and confidentiality concerns.

66.    In 2015, the Bureau conducted the National Content Test, which represented "the only opportunity to test [decennial census] content with a nationally representative sample prior to the 2020 Census."[16] The Bureau emphasized that, without the results of the 2015 National Content Test, it "would lack some of the key quantitative evidence needed to improve upon the current decennial census design."[17] The Bureau announced the results of this test in March 2017.[18]

67.    The Census Bureau also has conducted cognitive testing of potential questionnaire content for the 2020 Census since at least 2015. These tests are used to understand how respondents interpret census questions and instructions, in the context of the entire questionnaire, in order to determine whether the questionnaire as a whole is interpreted as intended and to evaluate question sensitivity, including the potential impact on the rates and accuracy of responses.

---

[16] U.S. Census Bureau, Supporting Statement for 2015 National Content Test at 15, https://www.census.gov/content/dam/Census/programs-surveys/decennial/2020 census/ 2015_census_tests/nct/2015-nct-omb-package.pdf.

[17] *Id.* at 17.

[18] For each decennial census since 1970, "the Census Bureau has conducted content tests to research and improve the design and function of different questions." U.S. Census Bureau, *Content Research* (Jan. 11, 2017), https://www.census.gov/programs-surveys/decennial-census/2020-census/research-testing/content-research.html. This thorough vetting process included testing of the language of specific questions in decennial National Content Tests in 1976, 1986, 1996, 2005, and 2015, as well as testing the performance of proposed topics and specific questions in the field with actual respondents.

68.    In addition, the Bureau has conducted extensive testing of non-English materials in order to "[o]ptimize the non-English content of questionnaires and associated non-questionnaire materials across data collection modes."[19]

69.    The Bureau is now conducting its 2018 End-to-End Census Test. In past censuses, the End-to-End Census Test was referred to as the "dress rehearsal": it is "the final test to help prepare for the 2020 Census"[20] and marks the "culmination" of the Bureau's "extensive research and testing to inform census design."[21] The primary objective of the test is to "confirm" key features that will be deployed in the 2020 Census.[22]

70.    The Census Bureau conducts testing specific to the decennial census questionnaire throughout the decade and does not rely on data imported from testing on other surveys to support decennial census testing. In particular, the Bureau has specifically emphasized that testing data from other surveys cannot substitute for the 2018 End-to-End Test, which is the final dress rehearsal for the 2020 Census:

> [M]ost survey results cannot be directly applied to a decennial census environment. The size, scope, mandatory nature, importance of results (for such things as congressional apportionment, state redistricting efforts, and the allocation of billions of dollars in federal funds each year), and timing constraints (legal deadlines for producing apportionment and redistricting data) of the decennial census are unique. Thus, thorough and separate research and integrated testing must be conducted to ensure that new methods and

---

[19] U.S. Census Bureau, 2020 Census Operational Plan Version 3.0, at 72 (Sept. 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf.

[20] U.S. Census Bureau, 2018 Census Test, Frequently Asked Questions for the 2018 Census Test, https://www.census.gov/programs-surveys/decennial-census/2018-census-test/faqs.html (last revised Mar. 16, 2018).

[21] U.S. Census Bureau, 2018 Census Test, About this Test, https://www.census.gov/programs-surveys/decennial-census/2018-census-test/about.html (last revised Mar. 16, 2018).

[22] *Id.*

operations will work in a decennial census environment.[23]

71.    None of the above-mentioned pretesting for the 2020 Census—including but not limited to the 2012 National Census Test, the 2013 Census Test, the 2014 National Census Test, the 2015 National Content Test, and the ongoing 2018 End-to-End Test—has included a citizenship question or gathered statistical data on the impact of a citizenship question in the context of the 2020 Census questionnaire.

**B.    The Secretary's 2017 Determination Not to Include Citizenship as a Subject of the 2020 Census**

72.    Under the Census Act, 13 U.S.C. § 141(f)(1), the Secretary was required to submit a report to Congress by March 31, 2017, containing his determination as to the subjects and types of information to be collected on the 2020 Census. Pursuant to this provision, the Census Bureau submitted its report of the Subjects Planned for the 2020 Census and American Community Survey ("March 2017 Report") to Congress on March 28, 2017.

73.    The March 2017 Report set forth the Secretary's determination that the only subjects to be included on the 2020 Census questionnaire are age, gender, race/ethnicity, relationship to head of household, and tenure (*i.e.*, whether the respondent is an owner or renter).[24] The March 2017 Report made no reference to inclusion of citizenship as a subject for the 2020 Census.

74.    The Secretary's determination *not* to include citizenship as a subject of the 2020 Census was consistent with long-standing agency policy and practice going back nearly 60

---

[23] U.S. Census Bureau, Supporting Statement for 2018 End-to-End Census Test—Peak Operations (Jan. 23, 2018), available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201801-0607-002.

[24] U.S. Census Bureau, Subjects Planned for 2020 Census at 5-15 (Mar. 2017), https://www2.census.gov/library/publications/decennial/2020/operations/planned-subjects-2020-acs.pdf.

years. The Census Bureau has consistently taken the position that asking all households and respondents to report their citizenship status as part of the decennial census would depress response rates, particularly among certain historically undercounted groups, and would compromise the accuracy and completeness of the census count.

75.    In the 1950s, the Census Bureau determined that information on citizenship was not important enough to seek from every household and consequently removed the citizenship question from the short-form questionnaire for the 1960 decennial census. As noted above, since 1960, citizenship information has been collected only through the long-form questionnaire or the ACS, each administered only to a limited sample of the U.S. population. No question concerning citizenship appeared on the short-form questionnaire used to conduct the decennial census in 1960, 1970, 1980, 1990, 2000, and 2010.

76.    Prior to the 1980 decennial census, an interagency council including Bureau officials was tasked with examining the content and coverage of the census questionnaire, and it expressly recommended that a citizenship question *not* be included on the short-form questionnaire.[25]

77.    Prior to the 1990 decennial census, the Bureau publicly opposed the inclusion of any question concerning citizenship on the 1990 short-form questionnaire. The Bureau's then-Director warned that a census question on citizenship and legal status could cause the Census Bureau to be adversely "perceived as an enforcement agency," with "a major effect

---

[25] Aff. of Daniel B. Levine, Deputy Dir. of the Census Bureau at ¶ 5, Ex. A to Defs.' Mot. to Dismiss the Action or, in the Alt., for Summ. J., Fed'n for Am. Immigr. Reform v. Klutznick, No. 79-3269 (D.D.C. filed Jan. 9, 1983); *see also* U.S. Census Bureau, 1980 Census of Population and Housing History at 1-23 (Aug. 1989) (statement to Congress that inquiries about respondents' legal status "would have seriously hampered its efforts to achieve a complete count").

on census coverage."[26] The Director stated the Bureau's conclusion that both undocumented

immigrants and legal residents might "misunderstand or mistrust the census and fail or refuse to

respond," resulting in reduced census counts for some cities and states.[27]

78.     In 2010, the Director of the Census Bureau, Robert Groves, explained that

"we don't ask citizenship or documentation status, all of the things that may make people

uncomfortable are gone from [the census] form."[28]

79.     Echoing the Bureau's long-standing policy, numerous former Census

Bureau directors have emphasized the deleterious impact that a citizenship question would have

in depressing response rates and diminishing the accuracy and completeness of the census. In

2005, Kenneth Prewitt, who served as Census Bureau Director for the 2000 decennial census,

explained that any proposed question to distinguish noncitizens from citizens "will be treated

with suspicion" and cause "many American citizens as well as noncitizens" to avoid the

question.[29]

80.     In 2009, eight former Census Bureau Directors who served both

Republican and Democratic administrations jointly declared that inclusion of a citizenship

question would create "problems during door-to-door visits to unresponsive households, when a

---

[26] *Enumeration of Undocumented Aliens in the Decennial Census: Hr'g Before the Subcomm, on Energy, Nuclear Proliferation, and Gov't Processes of the S. Comm. on Governmental Affairs*, 99th Cong. 32 (1985) (Statement of John Keane, Dir., Bureau of the Census).

[27] *Exclude Undocumented Residents from Census Counts Used for Apportionment: Hr'g Before the Subcomm. on Post Office & Civil Serv.*, 100th Cong. 50 (June 1988) (Statement of John Keane, Dir., Bureau of the Census).

[28] *Video of Robert Groves*, C-SPAN (Mar. 26, 2010), https://www.c-span.org/video/?292743-6/2010-us-census&start=1902.

[29] *Counting the Vote: Should Only U.S. Citizens Be Included in Apportioning Our Elected Rep.*, *Hr'g Before the Subcomm. on Federalism and the Census of the Cmte on Gov't Reform*, 109th Cong. 72 (Dec. 6, 2005) (Statement of Kenneth Prewitt).

legalized 'head of household' would avoid enumerators because one or more other household members are present unlawfully."[30]

81.    In 2016, four former Census Bureau Directors appointed by presidents of both parties stated in an amicus brief to the U.S. Supreme Court that "a one-by-one citizenship inquiry would invariably lead to a lower response rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states."[31] Citing increased suspicion of government collection of information in general, and particular anxiety among noncitizens, they stated that the addition of a citizenship question would result in "a reduced rate of response overall and an increase in inaccurate responses."[32]

### C.    The Trump Administration Plays Politics With the 2020 Census

82.    Immediately upon taking office in January 2017, President Trump revealed his intention to press the 2020 Census into the service of his anti-immigration political agenda, by shoehorning a citizenship question into the 2020 Census questionnaire.

83.    By January 31, 2017, less than two weeks after President Trump's inauguration, the administration had prepared a draft Executive Order which, among other things, directed the Census Bureau to ask "questions to determine U.S. citizenship and

---

[30] Statement of Former Census Directors on Adding a New Question to the 2010 Census at 1-2 (Oct. 16, 2009), https://web.archive.org/web/20100718133124/https://thecensusproject.org/ letters/cp-formerdirs-16oct2009.pdf.

[31] Amicus Br. of Former Directors of the U.S. Census Bureau at 25, *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) (No. 14-940).

[32] *Id.* at 5.

immigration status" through the decennial census.[33] A background memo accompanying the draft order stated that its purpose was to "fulfill several campaign promises by aligning immigration policies with the national interest."[34] The memo further indicated that the provisions of the draft order were meant to address "the flow of illegal entries and visa overstays" and the "unlawful employment of aliens."[35] Neither the draft order, which to date has not been issued, nor the background memo detailing its objectives made any mention of the VRA.

84.     Kris Kobach, who advised President Trump on immigration issues during the 2016 Presidential campaign and served on the Trump transition team, has acknowledged that in the early days of the Trump presidency he urged the President to add a citizenship question to the 2020 Census questionnaire.

85.     On December 12, 2017, Arthur Gary, general counsel for the DOJ's Justice Management Division, sent a letter addressed to Defendant Jarmin (the "DOJ Letter"), requesting that the Census Bureau include a question about citizenship status on the 2020 Census questionnaire.[36] The DOJ Letter asserted that obtaining citizenship data from the decennial

---

[33] Abigail Hauslohner and Janell Ross, *Trump administration circulates more draft immigration restrictions, focusing on protecting U.S. jobs*, Wash. Post (Jan. 31, 2017), https://www. washingtonpost.com/world/national-security/trump-administration-circulates-more-draft-immigration-restrictions-focusing-on-protecting-us-jobs/2017/01/31/38529236-e741-11e6-80c2-30e57e57e05d_story.html?utm_term=.4d2d4847755a; The White House, Memorandum from Andrew Bremberg to the President at 7 (Jan. 23, 2017), https://cdn0.vox-cdn.com/ uploads/chorus_asset/file/7872567/Protecting_American_Jobs_and_Workers_by_Strengthening_ the_Integrity_of_Foreign_Worker_Visa_Programs.0.pdf [hereinafter "January 2017 Memorandum"].

[34] January 2017 Memorandum at 1.

[35] *Id.*

[36] Letter from Arthur E. Gary, General Counsel, Justice Management Division to Dr. Ron Jarmin (Dec. 12, 2017), https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html [hereinafter "DOJ Letter"].

census was "critical to the [DOJ's] enforcement of Section 2 of the Voting Rights Act" because the ACS allegedly does not yield "ideal" data on citizen voting age population ("CVAP"),[37] a relevant data point for certain Section 2 cases.

86.    Emails released by the DOJ in response to a Freedom of Information Act request show that the DOJ Letter was sent at the request of DOJ leadership. The U.S. Attorney General, Jeff Sessions, has in the past expressed public support for including a citizenship question in the decennial census as a tool to assist law enforcement in locating undocumented immigrants.

87.    While the DOJ Letter was still under review by the Secretary and the Census Bureau, and only days before the Secretary's announcement of his decision, the President's reelection campaign sent a mass fundraising email declaring: "The President wants the 2020 United States Census to ask people whether or not they are citizens. . . . The President wants to know if you're on his side."[38] The email then provided survey response buttons that linked to a page seeking campaign contributions.

88.    On March 26, 2018, Defendant Ross issued a memorandum to Defendant Kelley (the "Ross Memorandum") advising the Census Bureau of his determination to reverse nearly 60 years of Census Bureau policy and practice in 2020 by including a citizenship question on the census questionnaire to be sent to every U.S. household. *See* Ex. 1, attached, at 8.

---

[37] *Id.* at 1-2.

[38] Tierney Sneed, *Trump Fundraising Off Controversial Push To Include Citizenship Question In Census*, Talking Points Memo (Mar. 19, 2018), https://talkingpointsmemo.com/muckraker/ trump-fundraising-off-controversial-push-to-include-citizenship-question-in-census.

Secretary Ross' decision was reportedly opposed by career officials at the Census Bureau and the Bureau's own scientific advisory committee.[39]

89.    Two days later, on March 28, 2018, the President's reelection campaign released yet another mass fundraising email, announcing that "President Trump has officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens." The email asked respondents to sign a petition supporting "the President's decision" to "make citizenship a question on the 2020 United States Census."[40]

**D.    The Secretary's Unlawful Failure to Identify Any Valid Basis for the Belated Insertion of a Citizenship Question Into the 2020 Census Questionnaire**

90.    The Ross Memorandum asserted that the Secretary had taken a "hard look" at the request in the DOJ Letter and considered "all facts and data relevant" to making an informed decision regarding the DOJ request. Ex. 1 at 1. However, the Memorandum contained no evaluation of the asserted legal or statistical foundation for the DOJ request and no independent assessment by the Commerce Department or Census Bureau of the asserted governmental benefit of adding a citizenship question to the 2020 Census questionnaire.

---

[39] Justin Elliott, *Wilbur Ross Overruled Career Officials at Census Bureau to Add Citizenship Question*, ProPublica (Mar. 27, 2018), https://www.propublica.org/article/wilbur-ross-overruled-career-officials-at-census-bureau-to-add-citizenship-question; Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*, N.Y. Times (Mar. 30, 2018), https://www.nytimes.com/2018/03/30/us/census-bureau-citizenship.html; Census Scientific Advisory Committee Meeting, Day 1, video at 1:56:25-2:17:42 (Presentation of Dr. D. Sunshine Hillygus, Member of the Scientific Advisory Committee) (Mar. 29, 2018), https://youtu.be/JlxZ16qRo9s; *id.* at 2:28:15-2:28:22 (Statement of Dr. Barbara Anderson, Chair of the Scientific Advisory Committee).

[40] Ray Schultz, *Trump Campaign Exploits Citizenship Question In Email*, Elite Marketing Daily Mar. 29, 2018), https://www.mediapost.com/publications/article/316863/trump-campaign-exploits-citizenship-question-in-em.html.

91.    In particular, the Ross Memorandum accepted at face value the DOJ Letter's assertion that "census block level" CVAP data are needed to enforce Section 2 of the VRA and determined, on that basis, that a citizenship question should be added to the 2020 Census questionnaire. In fact, enforcement of Section 2 of the VRA has *never* depended on block-level CVAP data. The sampling of citizenship information collected through the long-form questionnaire and the ACS never provided data at that level, yet courts have consistently recognized the reliability of citizenship data from the long-form questionnaire and ACS for purposes of Section 2 enforcement.[41]

92.    In 2000, the Census Bureau conducted its own analysis of the VRA's implications for the decennial census and concluded that the VRA required data on the "number of persons by age, race, and Hispanic origin at the [census] block level," but did *not* require block-level CVAP data.[42] The Ross Memorandum failed to cite the Bureau's prior conclusion that the VRA only required block-level data on age, race, and Hispanic origin. Nor did it identify any relevant recent change to the legal requirements for the enforcement of Section 2 of the VRA, or suggest that the Bureau had made any finding that its prior determination was flawed.

93.    The Ross Memorandum also did not acknowledge that the addition of a citizenship *question* to the 2020 Census questionnaire would result in the addition of a new *subject* for the 2020 Census not reported to Congress in the Bureau's March 2017 Report pursuant to 13 U.S.C. § 141(f)(1). The Memorandum failed to identify any "*new* circumstances" arising since March 2017 that necessitated this expansion of the 2020 Census subjects previously

---

[41] *See, e.g.*, *Cisneros v. Pasadena Indep. School Dist.*, No. 4:12-CV-2579, 2014 WL 1668500, at *8 (S.D. Tex. Apr. 25, 2014) ("This Court, like others, finds the ACS's estimates of CVAP sufficiently reliable for use in voting rights litigation."); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 727-28 (S.D. Tex. 2013); *Meza v. Galvin*, 322 F. Supp. 2d 52, 61-62 (D. Mass. 2004).

[42] U.S. Census Bureau, 2000 Census of Population and Housing History at 39 (Dec. 2009).

reported to Congress in March 2017—as required under 13 U.S.C. § 141(f)(3) to justify such a modification.

94.     Although none of the Bureau's testing for the 2020 Census contemplated or evaluated the inclusion of a citizenship question on the census questionnaire, the Ross Memorandum claimed that "the citizenship question has been well tested" because it has been used in sample surveys, including the ACS. Ex. 1 at 2. However, this claim is contradicted by the Ross Memorandum itself, which dismissed evidence that noncitizens and Hispanics and Latinos had lower response rates to sample surveys asking about citizenship status on the ground that "the decennial census has differed significantly in nature from the sample surveys." *Id.* at 3.

95.     Furthermore, use and testing of the citizenship question in the context of the ACS or long-form sample surveys do not make the question "well tested" for purposes of the 2020 Census for several reasons. First, the Census Bureau's Statistical Quality Standards require it to test not only the wording of questions in isolation, but also the order and context effects, the instructions, and the formatting of the entire questionnaire. Second, the experience with prior sample surveys will understate the extent of non-response because, as the Census Bureau's own scientific advisory committee explained in a March 30, 2018 letter, the earlier sample surveys were conducted "in a different data collection context, in a different political climate, before anti-immigrant attitudes were as salient and consequential" as they are today.[43] Third, the procedures for collecting data as part of the ACS survey differ from the decennial census procedures in ways that could impact how certain questions affect response rates and data quality. For example, the

_____

[43] Michael Wines, *Census Bureau's Own Expert Panel Rebukes Decision to Add Citizenship Question*, N.Y. Times (Mar. 30, 2018).

ACS is conducted only by experienced Bureau personnel whereas the much larger decennial census relies upon a cohort of temporary survey workers to count the entire U.S. population.

96.    In the Memorandum, Secretary Ross claims that the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush confirmed that "no empirical data existed on the impact of a citizenship question on responses." Ex. 1 at 3. But that official, Hermann Habermann, has since stated that he told Secretary Ross that he did not "think the case has been made that [the citizenship question] is so important that it's worth endangering this fragile instrument."[44]

97.    The Ross Memorandum also purports to rely on information from the Nielsen survey agency and consultations with its Senior Vice President for Data Science. Ex 1 at 3. For example, the Memorandum states that Nielsen found that adding sensitive questions to the ACS did not lower rsponse rates. But in fact, Nielsen apparently found that adding some sensitive questions—including for example on religion and sexuality—does depress response rates. Nielsen has issued a statement indicating that it "does not support the inclusion of a question on citizenship for the 2020 U.S. census because we believe its inclusion could lead to inaccuracies in the underlying data."[45]

98.    Ultimately, the Secretary decided to add an untested citizenship question to the 2020 Census despite his explicit admission that the Department did not know, and was unable to determine, the impact such a question would have on nonresponse rates and the potential undercounting of immigrants and other hard-to-count populations. The Ross

---

[44] Jeffrey Mervis, *Trump officials claim they can avoid 2020 census problems caused by controversial citizenship question. Experts are very skeptical.* Science (April 13, 2018), http://www.sciencemag.org/news/2018/04/trump-officials-claim-they-can-avoid-2020-census-problems-caused-controversial.

[45] *Id.*

Memorandum asserted that "no empirical data existed on the impact of a citizenship question on responses," and the Department "is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness." *Id.* at 3, 7.

99.     In contrast to the nine years that the Census Bureau spent evaluating and testing the possible inclusion of a combined race and ethnicity question, the decision to add a citizenship question was made after only four months of consideration, almost all of which occurred after the Bureau's internal deadline of December 31, 2017 for adding questions to the 2020 Census.

100.    Having conducted no independent review of the value of CVAP data for VRA enforcement, and having made no findings concerning the impact on nonresponses, the Secretary lacked any valid basis to evaluate and compare the potential benefits and harms of adding a citizenship question to the 2020 Census at this late stage in the preparation process, after years of census pretesting had been completed and with the 2018 End-to-End Census Test already underway.

101.    Nonetheless, the Secretary declared in the Ross Memorandum that the data would be "more complete and accurate," and the "value" of a citizenship question "outweighs such concerns [about nonresponses]" and "is of greater importance than any adverse effect that may result," regardless of its "impact on responses." *Id.* at 7.

102.    On March 29, 2018, the Census Bureau submitted its report (the "March 2018 Report") to Congress pursuant to the Census Act, 13 U.S.C. § 141(f)(2), identifying the questions to be asked in the 2020 Census. *See* Ex. 2, attached. The March 2018 Report confirmed that the Census Bureau has made a final determination to include an additional question in the 2020 Census questionnaire asking respondents to provide U.S. citizenship information for each

household member. *Id.* at 7. The March 2018 Report asserts, without explanation, that

citizenship statistics "are essential for enforcing the Voting Rights Act and its protections against

voting discrimination." *Id.*

103.    The Ross Memorandum asserts, and the March 2018 Report confirms, that

the specific citizenship question used in the ACS survey will be included on the 2020 Census

questionnaire. This question requires respondents not only to disclose whether they are citizens,

but also requires them to answer whether they were born in United States territories, whether

they were born "abroad" to U.S. parents, or if and when they were "naturalized." Ex. 2 at 7. The

March 2018 Report asserts that the Census Bureau only collects information that is "truly

necessary." Ex. 2 at 2. Yet neither the DOJ Letter, the Ross Memorandum, nor the March 2018

Report explain why determining the manner in which an individual acquired U.S. citizenship is

relevant or necessary for enforcing the Voting Rights Act, or for any other purpose.

104.    The Census Bureau's determination to insert a citizenship question into

the 2020 Census questionnaire contravenes the Bureau's legal obligations as a federal statistical

agency and violates the regulatory directives and standards that require the Bureau to design the

decennial census to maximize response rates. Defendants failed to identify any valid basis for

deviating from decades of consistent policy and practice. Without the mandatory pretesting of a

citizenship question—which it is now too late to complete—the Bureau cannot correct those

errors before the 2020 Census proceeds.

E.    **The Disproportionate Undercount That Will Result From Use of a Citizenship Question**

105.    The Ross Memorandum claimed to have found that "limited empirical

evidence exists about whether adding a citizenship question would decrease response rates

materially." Ex. 1 at 5. In fact, the evidence is compelling that the inclusion of a citizenship

question will result in a disproportionate undercount of persons belonging to or sharing a household with certain demographic groups, including immigrants, noncitizens, those with limited English proficiency ("LEPs"), and individuals of Hispanic or Latino origin (the "Undercount Groups").

106.    Research and testing on census participation, including work conducted by the Bureau, have shown that the Undercount Groups are traditionally "hard to count" for purposes of the decennial census. This is in part because they are more likely to be suspicious about the purpose of the decennial census and the government's use of census data. The Bureau itself has found that questions about citizenship in government surveys are especially "sensitive" and are likely to trigger and exacerbate these concerns about the confidentiality and use of respondent data.[46] The inclusion of a citizenship question in the 2020 Census is therefore expected to reduce participation and depress response rates among the Undercount Groups.

107.    To the extent that the Bureau's experience with the citizenship question in sample surveys is helpful in understanding its likely impact on the 2020 Census, the available data referred to in the Ross Memorandum actually substantiate concerns that a citizenship question will depress response rates among certain demographic groups. For example, the Bureau has measured the relative response rates for citizens and noncitizens to the 2000 short-form census questionnaire, which did not ask about citizenship status, and the 2000 long-form questionnaire, which did. For noncitizens, as the Ross Memorandum notes, the decline in the response rate to the long form relative to the short form was 3.3% greater than it was for citizens. In other words, noncitizens were disproportionately more non-responsive than citizens to a

---

[46] U.S. Census Bureau, DS-16: Policy on Respondent Identification and Sensitive Topics in Dependent Interviewing (Dec. 9, 2014), https://www2.census.gov/foia/ds_policies/ds016.pdf.

census survey that inquired about citizenship status. Similarly, in the ACS surveys conducted

from 2013 through 2016, nonresponse rates for the specific question about citizenship were

materially higher for Hispanics than for non-Hispanic whites, suggesting that Hispanics are less

likely to respond to survey questions about citizenship.

108.    Furthermore, the current political environment has substantially increased

the risk of census nonresponse to a citizenship question among the Undercount Groups. Recent

census field-testing has shown that these groups have become even more suspicious and

distrustful of government efforts to collect personal data since President Trump took office in

2017.

109.    In September 2017, the Bureau's own Center for Survey Measurement

("CSM") reported that survey-testing efforts undertaken by the Bureau in 2017 revealed an

unprecedented climate of fear among certain hard-to-count populations, including noncitizens,

immigrants, LEPs, and Latinos.[47] Survey respondents repeatedly expressed concerns about the

confidentiality and use of survey response data and fears related to ongoing issues involving

immigration enforcement policy. CSM found that these concerns were raised to a much greater

degree than in previous years.

110.    Furthermore, such fears led many respondents to deliberately falsify

survey responses or refuse to respond at all. In one instance, a Bureau field representative

reported on her experience conducting a health survey interview (unrelated to the decennial

census) that included questions about citizenship status. A Spanish-speaking respondent initially

acknowledged that he was not a citizen, but then appeared to lie about his country of origin.

---

[47] Memorandum from Ctr. for Survey Measurement (CSM) to Assoc. Dir. for Research and
Methodology (Sept. 20, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Memo-
Regarding-Respondent-Confidentiality-Concerns.pdf.

When the field representative started asking about his year of entry into the United States, he stopped responding to her questions and eventually walked out and left the field representative alone in his apartment, which the representative noted "had never happened to her during an interview before."[48]

111.    In another set of interviews testing an internet self-response instrument in English and Spanish, numerous respondents "intentionally provided incomplete or incorrect information about household members due to concerns regarding confidentiality, particularly relating to perceived negative attitudes towards immigrants."[49] On the basis of its extensive research, CSM found that the "level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes toward immigrants" was "largely unprecedented."[50]

112.    The Bureau itself concluded that the CSM findings demonstrated "an unprecedented groundswell in confidentiality and data-sharing concerns among immigrants or those who live with immigrants" that could "present a barrier to participation in the 2020 Census" and "impact data quality and coverage for the 2020 Census."[51] According to the Bureau, this is "[p]articularly troubling due to the disproportionate impact on hard-to-count [immigrant] populations."[52]

---

[48] *Id.* at 5.

[49] *Id.* at 2.

[50] *Id.* at 3.

[51] *See* U.S. Census Bureau, Nat'l Advisory Comm. on Racial, Ethnic, and Other Populations, Respondent Confidentiality Concerns and Possible Effects on Response Rates and Data Quality for 2020 Census, 15 (Nov. 2, 2017), https://www2.census.gov/cac/nac/meetings/2017-11/Meyers-NAC-Confidentiality-Presentation.pdf.

[52] *Id.*

113.    In light of these findings, the Secretary's determination to order the Bureau to include a citizenship question on the 2020 Census is particularly arbitrary, capricious, and in violation of the Bureau's fundamental obligations as a statistical agency. While failing to acknowledge or consider the Bureau's own findings above, the Ross Memorandum openly admits that the Department has no idea what impact adding a question about citizenship to the 2020 Census will have on response rates among the Undercount Groups.

114.    Since the issuance of the Ross Memorandum, Defendant Jarmin has publicly acknowledged in Congressional testimony that the inclusion of a citizenship question will cause more than a "minimal" decline in 2020 Census participation, and that "in some communities, [the decline] might be important."[53] He further admitted that the decline in participation as a result of the citizenship question "would be largely felt in various sub-groups, in immigrant populations [and] Hispanic populations."[54] He also noted that the Census Bureau had recommended that "the best approach" to meet the DOJ's request "would be to use administrative records" rather than adding a citizenship question.[55] However, Secretary Ross rejected the Census Bureau's recommendation.

**F.    Plaintiffs' Injury Resulting From Defendants' Unlawful Distortion of the 2020 Census**

115.    As explained above, the inclusion of a citizenship question will result in a disproportionate undercount of individuals in the Undercount Groups.

---

[53] *Hearing Before the House Appropriations Subcomm. on Commerce, Justice, Science and Related Agencies on Fiscal 2019 Budger Request for the Census Bureau*, 115th Cong. 20 (Apr. 18, 2018) (statement of Ron Jarmin), https://plus.cq.com/doc/congressionaltranscripts-5304446?3.

[54] *Id.* at 23.

[55] *Id.* at 13.

116.    According to recent ACS data, the population of Arizona has a higher percentage of individuals belonging to Undercount Groups than the United States as a whole. As a result, the inclusion of a citizenship question will result in a disproportionate undercount of Arizona residents relative to the rest of the country.

117.    Plaintiffs Richard McCune, Jose Moreno, and Alejandro Chavez reside in areas of Arizona in which, according to recent ACS data, the population has a higher percentage of individuals belonging to Undercount Groups than the population of Arizona as a whole. As a result, the inclusion of a citizenship question will result in a disproportionate undercount of residents of these areas of Arizona relative to the rest of the state.

118.    According to recent ACS data, the population of Prince George's County, Maryland has a higher percentage of Undercount Groups than both the United States and Maryland as a whole. As a result, the inclusion of a citizenship question will result in a disproportionate undercount of Prince George's County residents relative to the rest of the country and the rest of the state.

119.    According to recent ACS data, the population of Texas has a higher percentage of individuals belonging to Undercount Groups than the United States as a whole. Consequently, the inclusion of a citizenship question will result in a disproportionate undercount of Texas residents relative to the rest of the country.

120.    Plaintiffs Diana Alexander, Lauren Rachel Berman, Sarah Bryan, Virginia Garcia, Linda Rivas, Martha Sanchez, and Sonia Casarez Shafer reside in areas of Texas in which, according to recent ACS data, the population has a higher percentage of individuals belonging to Undercount Groups than the population of Texas as a whole. Consequently, the

inclusion of a citizenship question will result in a disproportionate undercount of residents of these areas of Texas relative to the rest of the state.

121.    According to recent ACS data, the population of Nevada has a higher percentage of individuals belonging to Undercount Groups than the United States as a whole. Consequently, the inclusion of a citizenship question will result in a disproportionate undercount of Nevada residents relative to the rest of the country.

122.    Plaintiff Michael Kagan resides in an area of Nevada in which, according to recent ACS data, the population has a higher percentage of individuals belonging to Undercount Groups than the population of Nevada as a whole. Consequently, the inclusion of a citizenship question will result in a disproportionate undercount of residents of this area of Nevada relative to the rest of the state.

123.    According to recent ACS data, the population of Florida has a higher percentage of individuals belonging to Undercount Groups than the United States as a whole. Consequently, the inclusion of a citizenship question will result in a disproportionate undercount of Florida residents relative to the rest of the country.

124.    Plaintiffs Yamile Labori and Lazara Yoelvis Magadan reside in areas of Florida in which, according to recent ACS data, the population has a higher percentage of individuals belonging to Undercount Groups than the population of Florida as a whole. Consequently, the inclusion of a citizenship question will result in a disproportionate undercount of residents of these areas of Florida relative to the rest of the state.

125.    Under Article I, Section 2, Clause 3 of the U.S. Constitution, as amended by the Fourteenth Amendment, the decennial census population counts are used to determine the number of congressional representatives apportioned to each state. Based on recent population

growth trends, there is a substantial likelihood that Arizona, Florida, and Texas will each gain additional congressional seats following the 2020 Census. The disproportionate undercount that will result from use of a citizenship question in the 2020 Census is expected to deprive these states of at least one additional congressional seat. Although, based on recent population growth trends, Nevada is more likely than not to maintain the same number of congressional seats following the 2020 Census, the disproportionate undercount that will result from use of a citizenship question nonetheless creates a significant risk that Nevada will suffer a reduction in the number of congressional seats that would otherwise be apportioned to the state.

126.    Arizona, Florida, Nevada, Maryland, and Texas each use decennial census data to draw congressional and state legislative districts of equal population. Plaintiffs reside in areas of those states where the residents will be disproportionately undercounted relative to the rest of the state due to the inclusion of a citizenship question. Thus, if a citizenship question is used in the 2020 Census, the drawing of "equal population" districts based on 2020 Census data will result in the over-population of Plaintiffs' congressional and state legislative districts, thereby diluting Plaintiffs' votes.

127.    As described above, *see supra* ¶ 43, U.S. census population data are essential in determining the federal government's allocation of hundreds of billions of dollars in funding to states and localities under more than 130 federal programs.

128.    The disproportionate undercount caused by the use of a citizenship question on the 2020 Census questionnaire will reduce the amount of these federal funds that are distributed to Arizona, Florida, Nevada, and Texas, to the localities within these states where Plaintiffs reside, and to Prince George's County, including for programs and projects on which Plaintiffs directly rely.

129.     For example, under Title I of the Elementary and Secondary Education Act, the federal government distributes funding to school districts to enhance teaching and learning outcomes in public schools. In fiscal year 2016, the program distributed more than $15 billion, including $333.8 million to schools in Arizona, $813 million to schools in Florida, $120 million to schools in Nevada, $1.38 billion to schools in Texas, and $38.6 million to schools in Prince George's County. The amount of funding provided to a school district is determined, in part, by the number of individuals and school-age children counted in the decennial census.

130.     Plaintiffs Jose Moreno and Alejandro Chavez send their children to public schools that receive Title I funding. The population of the school district in which Plaintiff Moreno's children attend school has a higher percentage of Undercount Groups than the entire populations of the United States and Arizona, respectively. The population of the school district in which Plaintiff Chavez's children attend school has a higher percentage of Undercount Groups than the entire population of the United States. A disproportionate undercount in these school districts in the 2020 Census will therefore result in reduced Title I funding for schools in those districts.

131.     Plaintiffs Catherine and Nnabugwu Nwosu and Plaintiff T. Carter Ross send their children to public schools in Prince George's County that receive Title I funding. A disproportionate undercount in Prince George's County in the 2020 Census will result in reduced Title I funding for schools in the county.

132.     Plaintiffs Sarah Bryan, Linda Rivas, and Sonia Casarez Shafer send their children to public schools that receive Title I funding. The populations of the school districts in which these children attend school have a higher percentage of Undercount Groups than the entire populations of the United States and Texas, respectively. A disproportionate undercount in

these school districts in the 2020 Census will therefore result in reduced Title I funding for schools in those districts.

133.    Plaintiff Michael Kagan sends his daughter to a public school that receives Title I funding. The population of the school district in which Plaintiff Kagan's daughter attends school has a higher percentage of Undercount Groups than the entire populations of the United States and Nevada, respectively. A disproportionate undercount in this school district in the 2020 Census will therefore result in reduced Title I funding for schools in the district.

134.    Plaintiff Yamile Labori sends her daughter to a public school that receives Title I funding. The population of the school district in which Plaintiff Labori's daughter attends school has a higher percentage of some Undercount Groups than the entire populations of the United States and Florida, respectively. A disproportionate undercount in this school district in the 2020 Census is, therefore, substantially likely to result in reduced Title I funding for schools in the district.

135.    The allocation of federal transportation funding, including funds available under the Surface Transportation Block Grant Program and the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs, depends on the decennial census population count. The amount of funding provided to a state under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs is based on the population of urbanized areas in that state compared to those of other states, as determined by the decennial census. The amount of funding provided to an area within a state under the Surface Transportation Block Grant Program is based, in part, on the relative share of the population in that area, as determined by the decennial census.

136.    Plaintiffs Richard McCune, Jose Moreno, and Alejandro Chavez regularly drive on highways and roads in Arizona, including the areas of the state in which they reside. A disproportionate undercount in the areas of the state in which Plaintiffs McCune, Moreno, and Chavez reside will result in reduced transportation funding in those areas under the Surface Transportation Block Grant Program. A disproportionate undercount in urbanized areas in Arizona in the 2020 Census will result in reduced transportation funding in Arizona under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs.

137.    Plaintiffs Robyn Kravitz, Michael Kravitz, Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, and Joanne Wilson regularly drive on highways and roads, and use other modes of transportation, in Prince George's County, Maryland. A disproportionate undercount in Prince George's County in the 2020 Census will result in reduced transportation funding in Prince George's County under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs and the Surface Transportation Block Grant Program.

138.    Plaintiffs Diana Alexander, Lauren Rachel Berman, Sarah Bryan, Virginia Garcia, Linda Rivas, Martha Sanchez, and Sonia Casarez Shafer regularly drive on highways and roads in Texas, including the areas of the state in which they reside. A disproportionate undercount in the areas of the state in which Plaintiffs Alexander, Berman, Bryan, Garcia, Rivas, Sanchez, and Shafer reside will result in reduced transportation funding in those areas under the Surface Transportation Block Grant Program. A disproportionate undercount in urbanized areas in Texas in the 2020 Census will result in reduced transportation funding in Texas under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs.

139.    Plaintiff Michael Kagan regularly drives on highways and roads in Nevada, including the area of the state in which he resides. A disproportionate undercount in the

area of the state in which Plaintiff Kagan resides will result in reduced transportation funding in this area under the Surface Transportation Block Grant Program. A disproportionate undercount in urbanized areas in Nevada in the 2020 Census will result in reduced transportation funding in Nevada under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs.

140.    Plaintiffs Yamile Labori and Lazara Yoelvis Magadan regularly drive on highways and roads in Flordia, including in the areas of the state in which they reside. A disproportionate undercount in the areas of the state in which Plaintiffs Labori and Magadan reside will result in reduced transportation funding in those areas under the Surface Transportation Block Grant Program. A disproportionate undercount in urbanized areas in Florida in the 2020 Census will result in reduced transportation funding in Florida under the Metropolitan and Statewide and Nonmetropolitan Transportation Planning Programs.

141.    Medicaid provides health coverage to eligible low-income adults, children, pregnant women, and people with disabilities. Medicaid is jointly funded by the federal government and the states. The amount of federal government reimbursement a state receives under Medicaid is based on the per capita income of the state compared to the per capita income of the United States as a whole. A higher state per capita income results in a lower federal reimbursement. The calculation of a state's per capita income depends, in part, on the population of the state as determined by the decennial census. A disproportionate undercount in Texas will falsely inflate the state's per capita income, result in reduced federal Medicaid funding for Texas, and likely impact Medicaid beneficiaries' health care benefits and costs.

142.    The Federal Foster Care Program, administered under Title IV-E of the Social Security Act, helps to provide safe and stable out-of-home care for children until they can

safely be returned home or are placed with adoptive families. The Program provides funds to states for monthly maintenance payments for the daily care and supervision of eligible children, administrative costs to manage the program, and training for staff and foster care providers. The amount of funds a state receives from the federal government under the Federal Foster Care Program is based, *inter alia*, on the per capita income of the state compared to the per capita income of the United States as a whole. A higher state per capita income results in a lower federal reimbursement. The calculation of a state's per capita income depends, in part, on the population of the state as determined by the decennial census. A disproportionate undercount in Texas will falsely inflate the state's per capita income, result in reduced Federal Foster Care Program funding for Texas, and likely impact the maintenance payments and training and support services available to the Program's beneficiaries.

## CLAIMS FOR RELIEF

### COUNT I

### (Violation of Census Clause)

143.    Plaintiffs incorporate the allegations above as if fully made herein.

144.    Article I, Section 2, Clause 3 of the Constitution and Section 2 of the Fourteenth Amendment to the Constitution, require that the Census Bureau conduct an "actual Enumeration" of "the whole number of persons in each State."

145.    The federal government must conduct the decennial census in a manner "consistent with the constitutional language and the constitutional goal of equal representation." *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992). The paramount objective of the Census Clause, as amended, is to ensure that all "persons" residing in each state are counted in the decennial census, regardless of their citizenship status. Decisions regarding the conduct of the

census must therefore bear "a reasonable relationship to the accomplishment of an actual enumeration of the population." *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996).

146.    Defendants' decision to add a citizenship question on the 2020 Census questionnaire without regard to its potential to cause a disproportionate undercount of certain demographic groups is inconsistent with the constitutional purposes of the census and does not bear a reasonable relationship to the accomplishment of an actual enumeration of the population.

147.    The inclusion of a citizenship question as part of the 2020 Census will result in a disproportionate undercount of certain population groups, including immigrants, noncitizens, those with limited English proficiency, and individuals of Hispanic or Latino origin.

148.    This undercount will disproportionately affect the states and/or localities in which Plaintiffs reside by, *inter alia*, depriving those states of representation in the U.S. House of Representatives to which they are entitled and causing under-allocations of federal funding to those states and/or localities.

149.    Plaintiffs Richard McCune, Jose Moreno, and Alejandro Chavez will be harmed by the disproportionate undercount because it will, *inter alia*, (i) dilute their vote by depriving Arizona of an additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

150.    Plaintiffs Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, and Joanne Wilson will be harmed because the disproportionate undercount will, *inter alia*, (i) dilute their vote by overpopulating their congressional and legislative districts, and (ii) reduce federal funding to their localities, including for programs on which they directly rely. Plaintiffs Robyn

Kravitz and Michael Kravitz will be harmed because the disproportionate undercount will reduce federal funding to their locality, including for programs on which they directly rely.

151.    Plaintiffs Diana Alexander, Lauren Rachel Berman, Sarah Bryan, Virginia Garcia, Linda Rivas, Martha Sanchez, and Sonia Casarez Shafer will be harmed by the disproportionate undercount because it will, *inter alia*, (i) dilute their vote by depriving Texas of at least one additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

152.    Plaintiff Michael Kagan will be harmed because the disproportionate undercount will, *inter alia*, (i) dilute his vote by overpopulating his congressional and legislative districts, and (ii) reduce federal funding to his state and locality, including for programs on which he directly relies.

153.    Plaintiffs Yamile Labori and Lazara Yoelvis Magadan will be harmed by the disproportionate undercount because it will, *inter alia*, (i) dilute their vote by depriving Florida of at least one additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

## COUNT II

### (Violation of Administrative Procedure Act)

154.    Plaintiffs incorporate the allegations above as if fully made herein.

155.    The Administrative Procedure Act ("APA") requires courts to hold unlawful and set aside any final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A); "contrary to

constitutional right, power, privilege or immunity," *id*. § 706(2)(B); "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," *id*. § 706(2)(C); or "without

observance of procedure required by law," *id*. § 706(2)(D).

156.    Defendants' decision to add a citizenship question to the 2020 Census

questionnaire, as set forth in the March 26, 2018 Ross Memorandum and confirmed by the

Census Bureau in its March 29, 2018 Report to Congress, constitutes final agency action.

157.    Defendants' decision to add a question on citizenship to the 2020 Census

questionnaire is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance

with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory

jurisdiction and authority; and without observance of procedure required by law.

158.    Defendants, *inter alia*, failed to conduct an adequate independent review

of the need to collect citizenship data through the decennial census alleged in the DOJ Letter;

failed to provide a reasoned explanation for why such data are necessary to enforce Section 2 of

the Voting Rights Act; failed to reasonably assess the impact of including a citizenship question

on the 2020 Census questionnaire on the response rates of various population groups; departed,

without any reasoned basis, from the Bureau's own policy and practice of not asking about the

citizenship status of every individual; departed, without any reasoned basis, from the Bureau's

own statistical quality standards; made its decision regarding the inclusion of a citizenship

question based on improper political considerations; violated binding law and regulations

regarding statistical collection procedures and methods; breached the Constitutional duty to

conduct an "actual Enumeration" of the population; and failed to identify or report to Congress

any new circumstances that could justify modification of Defendants' prior decision not to

include citizenship as a subject matter for the 2020 Census, as required under 13 U.S.C.

§ 141(f)(3). Defendants' action is therefore unlawful and must be set aside pursuant to APA § 706(2)(A)-(D).

159.    Defendants' determination to add a citizenship question to the 2020 Census questionnaire will result in a disproportionate undercount of certain population groups, including immigrants, noncitizens, those with limited English proficiency, and individuals of Hispanic or Latino origin, in the 2020 Census.

160.    Plaintiffs Richard McCune, Jose Moreno, and Alejandro Chavez will suffer a legal wrong and be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will, *inter alia*, (i) dilute their vote by depriving Arizona of an additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

161.    Plaintiffs Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, and Joanne Wilson will suffer a legal wrong and be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will, *inter alia*, (i) dilute their vote by overpopulating their congressional and legislative districts, and (ii) reduce federal funding to their localities, including for programs on which they directly rely. Plaintiffs Robyn Kravitz and Michael Kravitz will suffer a legal wrong and be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will reduce federal funding to their locality, including for programs on which they directly rely.

162.    Plaintiffs Diana Alexander, Lauren Rachel Berman, Sarah Bryan, Virginia Garcia, Linda Rivas, Martha Sanchez, and Sonia Casarez Shafer will suffer a legal wrong and

will be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will, *inter alia*, (i) dilute their vote by depriving Texas of at least one additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

163.   Plaintiff Michael Kagan will suffer a legal wrong and will be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will, *inter alia*, (i) dilute his vote by overpopulating his congressional and legislative districts, and (ii) reduce federal funding to his state and locality, including for programs on which he directly relies.

164.   Plaintiffs Yamile Labori and Lazara Yoelvis Magadan will suffer a legal wrong and will be adversely affected by the Defendants' decision to add a citizenship question to the 2020 Census because the resulting disproportionate undercount will, *inter alia*, (i) dilute their vote by depriving Florida of at least one additional congressional representative, (ii) dilute their vote by overpopulating their congressional and legislative districts, and (iii) reduce federal funding to their state and localities, including for programs on which they directly rely.

165.   Plaintiffs will therefore be harmed by Defendants' unlawful action unless such action is set aside pursuant to § 706 of the APA.

## PRAYER FOR RELIEF

166.   WHEREFORE, Plaintiffs pray that the Court:

a)     Declare that Defendants' decision to add a citizenship question to the questionnaire used for all households and individuals in the

2020 Census is unauthorized by, and contrary to, Article I, Section 2, Clause 3 of the United States Constitution;

b)    Declare that Defendants' decision to add a citizenship question to the questionnaire used for all households and individuals in the 2020 Census is arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction and authority; and without observance of procedure required by law, in violation of § 706(2)(A)-(D) of the APA;

c)    Enjoin Defendants and all those acting in concert with them from including a citizenship question on the 2020 Census questionnaire, and from taking any irreversible steps to include a citizenship question on the 2020 Census questionnaire;

d)    Award Plaintiffs reasonable costs, expenses, and attorney's fees, pursuant to 28 U.S.C. § 2412; and

e)    Award such additional relief as the interests of justice may require.


Date: May 3, 2018                              Respectfully submitted,


                                    _____/s/_____

                                    Daniel Grant (Bar Number: 19659)
                                    Shankar Duraiswamy*
                                    Dustin Cho*
                                    Bianca Nunes*
                                    Tina M. Thomas*
                                    Karun Tilak*
                                    COVINGTON & BURLING LLP

One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
bnunes@cov.com
tthomas@cov.com
ktilak@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (212) 841-1010
pbduke@cov.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*