**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

|  |  |  |
|---|---|---|
| | * | |
| **ROBYN KRAVITZ,** *et al.,* | | |
| | * | |
| **Plaintiffs,** | | **Case No.: GJH-18-1041** |
| | * | |
| **v.** | | |
| | * | |
| **UNITED STATES DEPARTMENT OF** | | |
| **COMMERCE,** *et al.,* | * | |
| | | |
| **Defendants.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

Every ten years, the Census Bureau takes on the herculean task of counting the entire

population of the United States. The Census Bureau expends considerable resources on this task,

presumably to ensure that the count is as accurate as possible because an accurate count is

essential to ensure, among other things, equal representation—a hallmark of our Constitution. As

the 2020 Census approaches, the Census Bureau continues to refine its plans and prepare for the

next count. As a part of that refinement, earlier this year, the Census Bureau formally added a

new question to the census questionnaire, one that asks respondents to indicate whether each

household member is a citizen of the United States by birth or naturalization, or not a U.S.

citizen. Nineteen individual residents of Texas, Arizona, Nevada, and Florida (collectively,

"Plaintiffs")[1] allege that this question will dramatically depress census response rates in their

---

[1] Individual named Plaintiffs are: Diana Alexander (Houston, Texas); Lauren Rachel Berman (Dallas, Texas); Sarah
Bryan (Edinburg, Texas); Alejandro Chavez (Phoenix Arizona); Virginia Garcia (Laredo, Texas); Michael Kagan
(Las Vegas, Nevada); Robyn Kravitz (District Heights, Maryland); Michael Kravitz (District Heights, Maryland);
Yamile Labori (West Palm Beach, Florida); Lazara Yoelvis Magadan (Miami, Florida); Richard McCune (Nogales,
Arizona); Jose Moreno (Somerton, Arizona); Catherine Nwosu (Langley Park, Maryland); Nnabugwu Nwosu
(Langley Park, Maryland); Linda Rivas (El Paso, Texas); T. Carter Ross (Hyattsville, Maryland); Martha Sanchez
(McAllen, Texas); Sonia Casarez Shafer (Pharr, Texas); and Joanne Wilson (Bowie, Maryland).

local communities and disproportionally affect the overall accuracy of the population count. Plaintiffs seek to enjoin the Census Bureau from including the citizenship question in the 2020 Census and assert claims pursuant to the Census Clause of the United States Constitution (Count I) and the Administrative Procedure Act ("APA") (Count II). ECF No. 17.[2] Presently pending before the Court is Defendants' Motion to Dismiss, ECF No. 24, and Plaintiffs' Motion for Discovery, ECF No. 43. The Court held a Motions Hearing on July 18, 2018. *See* ECF No. 45. For the following reasons, Defendants' Motion to Dismiss is denied and Plaintiffs' Motion for Discovery is granted.

## I.   BACKGROUND[3]

### A.  Census Background

The United States Constitution mandates that the Congress conduct an "actual Enumeration" of "the whole number of persons in each state" every ten years. U.S. Const., Art. I, § 2, cl. 3 and Am. XIV § 2 (hereinafter, "Census Clause" or "Enumeration Clause"). Through the Census Act, 13 U.S.C. § 141 *et seq.*, Congress has delegated the duty of conducting the decennial census to the Secretary of Commerce, "in such form and content as he may determine." *Id.* § 141(a). In addition to counting the population, "the Secretary is authorized to obtain such other information as necessary." *Id.* The "actual Enumeration" resulting from the decennial census is used to apportion representatives in the U.S. House of Representatives, draw

---

[2] Named Defendants include the United States Department of Commerce, United States Census Bureau ("Census Bureau"), and the following officials sued in their official capacity: Wilbur L. Ross, Jr., Secretary of Commerce (the "Secretary"), Karen Dunn Kelley, Under Secretary for Economic Affairs, Ron Jarmin, Director of the Census Bureau, and Enrique Lamas, Deputy Director of the Census Bureau (collectively, "Defendants" or "Census Bureau").

[3] Unless noted otherwise, the facts are taken from the Amended Complaint, ECF No. 17, and assumed to be true. The Court may also take judicial notice of matters of public record and consider documents attached to the Amended Complaint or Motion to Dismiss, to the extent that they are integral to the Amended Complaint and authentic. *See Phillips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004) (taking judicial notice of published stock prices when considering a motion to dismiss).

intra-state congressional and state legislative districts of equal proportion, and allocate more than $675 billion in federal funding for over 130 different federal programs. *See* ECF No. 17 ¶¶ 41–43. Plaintiffs are either eligible to vote or are currently applying for U.S. citizenship and intend to vote in elections following the 2020 decennial census. Collectively, Plaintiffs utilize government services funded, in part, through federal expenditures for roads and highways, the Federal Foster Care Program ("Title IV-E"), Medicaid, and Title I of the Elementary and Secondary Education Act ("Act"). *See, e.g., id.* ¶¶ 16, 17.

While the primary purpose of the decennial census is to count the population for apportionment purposes, "the decennial census has grown considerably over the past 200 years" and is also used to collect demographic data on the population. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 341 (1999) (citations and internal quotations omitted). Since the 1820 enumeration, the decennial censuses have included questions related to foreign birth, naturalization, and citizenship in varying forms. *See* ECF No. 24-1 at 12 (citing U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6, https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf (hereinafter, "Measuring America")).[4] With the exception of the 1840 Census, all censuses from 1820 through 1950 asked all respondents for information relating to citizenship, birthplace, or both. *See* Measuring America at 9, 11, 13, 15. For example, the 1830 Census asked whether individuals were "foreigners not nationalized." *Id.* at 7. The 1930 Census asked for the place of birth of all individuals and his or her parents, the year of immigration and naturalization for all foreign-born individuals, and whether he or she was able to speak English. *Id.* at 59. In 1940, the Census

---

[4] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

Bureau began the practice of sampling a portion of the population for more detailed information.[5]

Starting in 1970, the Census Bureau asked respondents to complete and mail back the census questionnaire. Most households received a short form questionnaire asking a minimum number of questions ("short form"), while a smaller number received a long-form questionnaire that included additional questions ("long form"). *See* U.S. Census Bureau, Questionnaires, https://www.census.gov/history/www/through_the_decades/questionnaires/; *see also* ECF No. 17 ¶¶ 63, 75. In 1970, 20% of the population were asked to provide their birthplace, 15% were asked to provide their parents' birthplace, and 5% were asked whether the individual respondent, if foreign born, had been naturalized. Measuring America at 78. In the 1980–2000 Censuses, one in six households received the long form questionnaire and were asked whether they had been naturalized (1980) or whether they were citizens (1990, 2000). *Id.* at 86, 91–92, 97. Following the 2000 Census, the Census Bureau stopped using the long form questionnaire. Instead, starting in 2005, the Census Bureau began collecting monthly demographic data, including citizenship and national origin information, through the American Community Survey ("ACS"). The ACS is sent to approximately one in thirty-eight households each year. *See* U.S. Census Bureau, Archive of American Community Survey Questions, available at https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html; *see also* ECF No. 17 ¶ 63.

---

[5] In the 1940 and 1950 Censuses, all individuals were asked to provide information regarding their place of birth and citizenship or naturalization status. The sampling question in the 1940 and 1950 Censuses asked 5% or 20% of respondents, respectively, for the birthplaces of their parents. Measuring America at 62–63; 66, 68. In 1960, naturalization status was not requested, but 25% of respondents were asked to provide his or her birthplace, as well as the birthplace of his or her parents. *Id.* at 72–73. In these years, census enumerators obtained the requisite information from each household in-person. *Id.* at 72.

**B. Preparation for the 2020 Census**

On March 28, 2017, the Census Bureau submitted a report to Congress (the "March 2017 Report") indicating that the 2020 Census would ask respondents to answer questions on behalf of themselves and household members about their age, gender, race/ethnicity, and whether they owned or rented their residence. ECF No. 17 ¶¶ 72–73.[6] Plaintiffs allege that the March 2017 Report did not include citizenship-related questions because, according to the Census Bureau, doing so "would depress response rates, particularly among certain historically undercounted groups, and would compromise the accuracy and completeness of the census count." ECF No. 17 ¶ 74; *see also id.* ¶¶ 76–81.

On March 26, 2018, Secretary Ross issued a memorandum setting forth his decision to include a citizenship question on the 2020 Census. *Id.* ¶ 88; ECF No. 1-2 ("Ross Memorandum"). Per the Ross Memorandum, the Secretary's decision was prompted by a December 12, 2017 request from the Department of Justice ("DOJ") to include the question so that DOJ could utilize census block level citizenship voting age population ("CVAP") data in order to better enforce Section 2 of the Voting Rights Act ("VRA"), which protects the voting rights of minority populations. ECF No. 1-2 at 1. According to the Ross Memorandum, the Census Bureau performed a comprehensive review of DOJ's request and found "that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate." *Id.* at 6.

Shortly thereafter, on March 29, 2018, the Census Bureau submitted its report to Congress in accordance with § 141(f)(2) (the "March 2018 Report") and indicated that the 2020 Census would include the citizenship question. ECF No. 17 ¶ 102; ECF No. 1-3 at 12. On June

---

[6] Pursuant to the Census Act, the Secretary must, within two and three years of the census, submit to Congress "a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census." 13 U.S.C. § 141(f)(1),(2).

21, 2018, after Plaintiffs filed their Amended Complaint, the Secretary clarified statements made in the earlier Ross Memorandum and indicated that he began considering the citizenship question, "which other senior Administration officials had previously raised," "[s]oon after [his] appointment as Secretary of Commerce." ECF No. 26-1 ("Ross Supplemental Memorandum"). The Secretary clarified that he and his staff "inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act." *Id.*[7]

### C.  Alleged Impact of the Citizenship Question

Plaintiffs allege that the Secretary's justification for adding the citizenship question is a pretext for its true aim—"to press the 2020 Census into the service of [President Trump's] anti-immigration political agenda." ECF No. 17 ¶ 82. Specifically, Plaintiffs allege that by January 31, 2017, the Trump Administration had prepared a draft Executive Order that, among other things, directed the Census Bureau to ask a citizenship question. *Id.* ¶ 83. Without any reference to the VRA, the Order justified the citizenship question as "fulfill[ing] several campaign promises by aligning immigration policies with the national interest" and addressing "the flow of illegal entries and visa overstays" and the "unlawful employment of aliens." *Id.* Additionally, President Trump's re-election campaign acknowledged that "President Trump [had] officially mandated that the 2020 United States Census ask people living in America whether or not they are citizens." ECF No. 17 ¶ 89; *see also id.* ¶ 87.

Plaintiffs further allege that the Ross Memorandum "contained no evaluation of the asserted legal or statistical foundation for the DOJ request and no independent assessment by the Commerce Department or Census Bureau of the asserted governmental benefit of adding a

---

[7] The Ross Memorandum and Supplemental Memorandum are included with the Administrative Record. *See* AR 1313–1320; 1321.

citizenship question to the 2020 Census questionnaire." *Id.* ¶ 90. Plaintiffs contend that Secretary

Ross' decision was deficient for a number of reasons: the Census Bureau previously concluded

that the VRA did not require block-level CVAP data, and the ACS already provides DOJ with

sufficient VRA-related data, *id.* ¶¶ 91, 92; the Ross Memorandum failed to identify any post-

March 2017 circumstances necessitating the question, ¶ 93; the use of a citizenship question has

not been well tested, ¶¶ 94, 95; and, by the Secretary's own explicit admission, the Census

Bureau did not know, and was unable to determine, the impact such a question would have on

nonresponse rates and the potential undercounting of immigrants, ¶ 98. Ultimately, Plaintiffs

contend that Secretary Ross had no basis to find the citizenship question necessary to enforce the

VRA or that the benefits of collecting citizenship data outweigh potential adverse effects on

response rates. *Id.* ¶ 101 (quoting ECF No. 1-2 at 8).

      Instead, Plaintiffs allege that compelling evidence, including evidence from the Census

Bureau itself, makes clear that "the inclusion of a citizenship question will result in a

disproportionate undercount of persons belonging to or sharing a household with certain

demographic groups, including immigrants, noncitizens, those with limited English proficiency,

and individuals of Hispanic or Latino Origin" (collectively, "Undercount Groups"). ECF No. 17

¶ 105.[8] The Undercount Groups are more likely to be suspicious about the purpose of the

decennial census and the government's use of census data than other population groups, a

suspicion allegedly exacerbated by the current political environment. *Id.* ¶¶ 106, 108. As a result,

the citizenship question is expected to "reduce participation and depress response rates among

the Undercount Groups." *Id.* ¶ 106; *see also id.* ¶ 114 (alleging that since issuance of the Ross

---

[8] The Court interchangeably refers to this problem as a 'disproportionate' or 'differential' undercount. *See Wisconsin v. City of New York*, 517 U.S. 1, 7 (1996) ("Some segments of the population are 'undercounted' to a greater degree than are others, resulting in a phenomenon termed the 'differential undercount.'").

Memorandum, Defendant Jarmin has publicly acknowledged in Congressional testimony that the inclusion of the citizenship question may disproportionally affect the Undercount Groups).

Plaintiffs further allege that these depressed response rates will result in a disproportionate undercount in their local communities—areas of the country with a higher percentage of individuals belonging to Undercount Groups. ECF No. 17 ¶¶ 115–124. The disproportionate undercount will, in turn, reduce the number of congressional seats expected to be apportioned to Arizona, Florida, Texas, and Nevada, *id.* ¶ 125, and affect the drawing of "equal population" intra-state legislative districts in Arizona, Florida, Texas, Nevada, and Maryland so as to over-populate Plaintiffs' districts and dilute their vote. *Id.* ¶ 126. Additionally, the disproportionate undercount will reduce the federal government's allocation of funding to Plaintiffs and their local communities. *Id.* ¶¶ 128–142.

## II.   STANDARD OF REVIEW

### A.  Motion to Dismiss Pursuant to Rule 12(b)(1)

Defendants move to dismiss the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting that Plaintiffs lack standing. A challenge to a plaintiff's standing is, in effect, a challenge to the Court's subject-matter jurisdiction. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76 (1982). Plaintiffs have the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). The district court should grant the

8

Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

### B.  Motion to Dismiss Pursuant to Rule 12(b)(6)

Defendants also move to dismiss the Amended Complaint, in part, pursuant to Rule 12(b)(6), asserting that Count I fails to state a claim upon which relief can be granted. To state a claim that survives a Rule 12(b)(6) motion, a complaint, relying on only well-pled factual allegations, must state at least a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a claim has crossed "the line from conceivable to plausible," the Court must employ a "context-specific inquiry," drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 679–80.  When performing this inquiry, the Court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), nor must it agree with legal conclusions couched as factual allegations, *Iqbal,* 556 U.S. at 678, or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009).

### III.    DISCUSSION

#### A.  Standing

"One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). At its "irreducible constitutional minimum," the standing doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016).

The plaintiff bears the burden of supporting each of the required elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof." *Defs. of Wildlife*, 504 U.S. at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, so long as they plausibly identify an injury. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017); *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990) ("it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' . . . 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute'" (citation omitted)). "[P]laintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (emphasis in original). "[W]hat may perhaps be speculative at summary judgment can be plausible on a motion to dismiss," and courts should not "recast[] 'plausibility' into 'probability'" by demanding predictive certainty. *Wikimedia Found. v. Nat'l Sec. Agency*, 857

F.3d 193, 208–12 (4th Cir. 2017); *see also District of Columbia v. Trump*, 291 F. Supp. 3d 725,

738 (D. Md. 2018) (alleging injury-in-fact at the pleading stage is not akin to climbing "Mount

Everest"). However, the Court does not "apply the same presumption of truth to 'conclusory

statements' and 'legal conclusions.'" *Beck*, 848 F.3d at 270.

Defendants argue that Plaintiffs have not alleged a concrete injury-in-fact and that, even

if they have sufficiently alleged concrete injury-in-fact, it is not fairly traceable to the

Defendants. The Court will address both arguments in turn.

### 1. Concrete Injury-in-fact

The injury-in-fact requirement ensures "that the plaintiff has a 'personal stake in the

outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)

(quoting *Clapper v. Amnesty Intern. USA*, 133 S. Ct. 1138, 1150 n.5 (2013)). "To establish injury

in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest

that is concrete and particularized and actual or imminent, not conjectural or hypothetical."

*Wikimedia Foundation v. National Security Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (internal

citations omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and

individual way." *Id.* "The purpose of the imminence requirement 'is to ensure that the alleged

injury is not too speculative for Article III purposes.'" *Id.* (quoting *Clapper*, 133 S. Ct. at 1147).

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or

there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 134 S. Ct at 2341

(quoting *Clapper*, 133 S. Ct. at 1150, n.5).

Plaintiffs allege that they face a concrete injury in that their states and communities will

be disproportionately undercounted as a result of the addition of the citizenship question to the

2020 Census. Plaintiffs rely on "recent ACS data" as indicating that the states and areas in which

Plaintiffs reside contain "a higher percentage of individuals belonging to Undercount Groups than the United States as a whole." *E.g.*, ECF No. 17 ¶ 121. As a result of living in areas with a higher percentage of individuals in the Undercount Groups, Plaintiffs claim that they will likely suffer a number of injuries. Specifically, they argue that the undercount will result in a loss of representation in the House of Representatives, as well as a loss of federal funding for their communities' schools and roads. *See generally* ECF No. 17 ¶ 10 ("Voters will be denied their constitutionally guaranteed rights to equitable political representation based on actual population, and billions of dollars in federal funding—for education, infrastructure, health care, and countless other pressing needs—will be unlawfully misallocated.").

Regarding Plaintiffs' vote-dilution injury, the Supreme Court has previously held that plaintiffs possess standing in census cases where they face an "expected loss of a Representative to the United States Congress" and that this "undoubtedly satisfies the injury-in-fact requirement of Article III standing." *U.S. House of Representatives*, 525 U.S. at 331–32. The loss of a Representative means that Plaintiffs' "votes will be diluted," and faced with the loss of a Representative, the harm of vote dilution "is 'concrete' and 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)) (quotation missing in original). Thus, assuming all facts in the Amended Complaint as true, Plaintiffs have plausibly pleaded that the Plaintiffs who reside in Arizona, Florida, Texas, and Nevada will likely lose a congressional seat as a result of the addition of the citizenship question which, pursuant to *U.S. House of Representatives*, satisfies the injury-in-fact requirement.

As to Plaintiffs' remaining injury-in-fact arguments regarding the dilution of Plaintiffs' votes within states and their loss of federal funding, a number of courts have found such claims sufficient to establish injury-in-fact. *See, e.g., Carey v. Kutznick*, 637 F.2d 834, 838 (2d Cir.

1980); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998); *City of Philadelphia v.*

*Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980).

In *Carey*, the Second Circuit reasoned that individual plaintiffs had "alleged concrete

harm in the form of dilution of their votes and decreased federal funds flowing to their city and

state, thus establishing their standing." 637 F.2d at 838. Similarly, in *City of Philadelphia*, the

District Court reasoned that plaintiffs had met the standing requirement where they alleged that

Philadelphia would lose "millions of dollars in revenue-sharing aid . . . ." 503 F. Supp. at 672.

The court went on to reason that:

> Even if none of the named plaintiffs personally receives a dollar of state or federal aid, all
> enjoy the benefits yielded when the City is enabled to improve quality of life through the
> receipt of this money. Improved transportation, more jobs, cleaner streets however the
> money is spent the results benefit all.  Consequently, a loss of a portion of that money is
> an injury suffered by all. The Court holds, therefore, that on either ground, the individual
> plaintiffs have alleged injury in fact sufficient to establish standing.

*Id.* Finally, according to the *Glavin* court, it has been recognized "that there is a direct correlation

between decennial census population counts and federal and state funding allocations," and that

"allegations of decreased federal and state funding is fairly traceable to population counts

reported in the decennial census." 19 F. Supp. 2d at 550 (citing cases).

Defendants argue that Plaintiffs' claims of injury are "entirely speculative" and devoid of

"definitive, empirical evidence." Specifically, Defendants argue that the Court is left to speculate

about whether the citizenship question will result in a net decrease in response rate for the 2020

Census, that such a decrease would lead specific states to lose representation in Congress, and

that Plaintiffs' states will be among those states to suffer a loss of federal funding that will

eventually impact Plaintiffs. Defendants' arguments fail.

In arguing that Plaintiffs have not established that there will be an undercount,

Defendants proffer evidence that measures are in place to rectify any potential undercount.

Specifically, they claim that the 2020 Census will be the first to rely extensively on digital methods; each household will receive up to six mailings, and the enumerators will personally visit all households; and the Census Bureau will mount an extensive publicity and outreach campaign. ECF No. 24-1 at 18.

But Plaintiffs have sufficiently alleged that such measures would not be effective. For example, in the Amended Complaint it is alleged that in 2009, former Census Bureau Directors declared that "inclusion of a citizenship question would create 'problems during door-to-door visits to unresponsive households, when legalized 'head of household' would avoid enumerators because one or more other household members are present unlawfully.'" ECF No. 17 ¶ 80. Additionally, it is alleged that in 2016, four former Census Bureau Directors referred to a reduced rate "overall." *Id.* 81.[9] Discovery, and potential expert testimony, may later make it clear that these efforts will suffice to eliminate any potential undercount, but Plaintiffs have plausibly alleged that they will not. Similarly, while Defendants dispute the factual underpinnings of Plaintiffs' assertions that funding or representation will be impacted, at this juncture, it is sufficient that Plaintiffs have plausibly alleged them, and as discussed above, courts have determined such claims to be concrete injuries-in-fact.

## 2.  Causal Connection

The parties next dispute whether Plaintiffs' alleged injuries resulting from a potential census undercount would be "fairly traceable" to Defendants' addition of the citizenship question. Specifically, Defendants argue that any undercount would be caused not by the

---

[9] At oral argument, the parties differed on whether the reference to an "overall" count necessarily referenced the resulting count after all follow-up measures had been taken or could be a reference to an undercount before such measures were taken. At this juncture, the Court will interpret this in the light most favorable to the non-movant and infer that it does refer to the final count after remedial measures were attempted.

citizenship question, but by "third parties' unlawful choices in failing to respond to the census . . . ." ECF No. 40 at 6.

For an injury to be "fairly traceable" to the defendant, the defendant's actions need not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). While a plaintiff may not have standing where the alleged injury is solely "th[e] result [of] the independent action of some third party not before the court," *Defs. of Wildlife*, 504 U.S. at 560, "the causation element of standing is satisfied . . . where the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendants' conduct 'upon the action of someone else.'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett*, 520 U.S. at 169).

*Lansdowne* is instructive. There, a homeowners' association sued OpenBand, a network of cable providers, alleging that OpenBand had entered into an exclusivity arrangement that prevented their ability to seek services from competing providers in violation of an order of the Federal Communications Commission. *Id*. at 191. When the homeowners' association investigated alternative providers, those providers expressed concern that the exclusivity provisions would prevent them from accessing the property for the purpose of providing services. *Id*. at 194. OpenBand argued that any injury suffered by the homeowners association was the result of the independent, intervening actions of the third party companies who refused to offer services. *Id*. at 197. The Fourth Circuit rejected that argument, noting that the argument ignored the reason why competing cable providers would not offer services—the exclusivity agreement entered into by OpenBand. *Id*. Thus, the causation element of standing was satisfied because plaintiff had suffered an injury that was produced by the "determinative or coercive

effect of the defendant's conduct upon the action of someone else." *Id.* (internal citations omitted).

Similarly, here, while it is true that if an undercount occurs it will occur only because private individuals choose not to respond to the census surveys, Plaintiffs have plausibly alleged that the citizenship question will have a "determinative or coercive effect" on those individuals' decision not to respond. Plaintiffs cite statements by former Census Bureau officials indicating that the citizenship question may cause the Census Bureau to be "perceived as an enforcement agency" which would cause respondents to "misunderstand or mistrust the census and fail or refuse to respond." ECF No. 17 ¶ 77; *see also id.* ¶¶ 78–81. Plaintiffs allege that the Census Bureau's own internal findings revealed that, in response to citizenship questions, respondents were more likely to fail to respond or falsify responses. *Id.* ¶¶ 109–12.

Relying on *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1541 (2018), Defendants argue that Plaintiffs cannot establish standing by relying on a third parties' refusal to respond to the census, as such a refusal would be a criminal violation. ECF No. 40 at 7. This case is distinguishable. In *Sanchez-Gomez*, pretrial detainees challenged the constitutionality of a District Court's use of full restraints on detainees during pretrial proceedings. Two of the detainees were no longer in pretrial custody by the time their case arrived at the Supreme Court; thus, the Court considered whether their cases were moot. 138 S. Ct. at 1540. The detainees argued that their case was not moot because they would "again violate the law, be apprehended, and be returned to pretrial custody." *Id.* at 1541. In rejecting this argument, the Court reasoned that it had "consistently refused to find the case or controversy requirement satisfied where, as here, the litigants simply 'anticipate violating lawful criminal statutes.'" *Id.* at 1542 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). Thus, *Sanchez-Gomez* held that prisoners could

16

not challenge a policy on the grounds that they *themselves* were independently likely to violate a law in the future; there was no allegation that it was the challenged practice that would cause them to violate the law. Here, however, Plaintiffs allege that it is the very government act being challenged, the addition of the citizenship question, that will directly cause individuals to refuse to answer the census.

Thus, Plaintiffs have plausibly pleaded that the addition of the citizenship question to the 2020 Census will determinatively or coercively cause individuals to "fail or refuse to respond." As such, they have pleaded that their alleged injuries are "fairly traceable" to the Census Bureau's conduct. Taken together, Plaintiffs have standing.[10]

### B. Violation of the Census Clause (Count I)

Turning to Count I of the Amended Complaint, Plaintiffs allege a violation of the Census Clause. Pursuant to the Census Clause, "[t]he actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct." U.S. Const., Art. I, § 2, cl. 3. Defendants contend that because the Clause allows Congress to conduct the census "in such Manner" as Congress directs, the method by which the census is conducted, including the formulation of specific questions, is textually committed to Congress and therefore barred from judicial review under the political question doctrine. ECF No. 24 at 22. Alternatively, Defendants contend that even if the Secretary's conduct is subject to judicial review, his decision to include the citizenship question does not violate the Clause.

---

[10] The Government does not dispute that Plaintiffs' alleged injury can be sufficiently redressed by a favorable decision here. Previous census cases have typically found that this prong of the standing requirement is met in such challenges because a "permanent injunction against the proposed [change in the census] will redress the alleged injury." *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332 (1999); *see also Adams v. Clinton*, 90 F. Supp. 2d 35, 43–44 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940, and *aff'd*, 531 U.S. 941 (2000) (noting that the Government had not "suggested that they would refuse to follow a decision of this court" and thus concluding that "plaintiffs satisfy the redressability prong of the standing inquiry").

### 1.   Political Question Doctrine

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). However, this is a "narrow exception" to judicial review. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). Whether a case presents a non-justiciable political question depends on a number of factors, the most important of which are whether there exists a "textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217 (1962).[11]

While the Court is not aware of a similar challenge to the composition of the census questionnaire, other than cases currently pending in various jurisdictions, the Supreme Court has repeatedly made clear that challenges under the Census Clause are justiciable, and a brief review of these cases is in order.

In *U.S. Dept. of Commerce v. Montana*, 503 U.S. 442 (1992), the Supreme Court upheld a 1941 federal statute that set forth the method by which congressional seats would be apportioned following each decennial census. In doing so, the Court held that "[a]s our previous rejection of the political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary." *Id.* at 458. As the government then conceded, the "political" issue presented was not whether the

---

[11] Also relevant is "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr*, 369 U.S. 186, 217 (1962)

Census Clause creates the existence of a judicially enforceable right; rather, the issue was how to define the rights established under the Census Clause, a question the Court found to be justiciable. *Id.* at 457–58 ("In invoking the political question doctrine, a court acknowledges the possibility that a constitutional provision may not be judicially enforceable. Such a decision is of course very different from determining that specific congressional action does not violate the Constitution.") (footnotes omitted). While *Montana* focused on how representatives were "apportioned among the several States" pursuant to Art. I § 2, cl. 3 and Am. XIV § 2, and not how Congress conducted an "actual Enumeration," the Court subsequently considered the method by which the Census Bureau conducted an "actual Enumeration" in *Franklin v. Massachusetts*, 505 U.S. 788 (1992).

In that case, Massachusetts challenged the reapportionment following the 1990 Census and argued that the method used by the Census Bureau to count federal employees serving overseas violated "the constitutional requirement that the apportionment of Representatives be determined by an 'actual Enumeration' of persons 'in each State.'" *Id.* at 795. In a footnote, the Court, relying on *Montana*, acknowledged that the political question doctrine did not prevent it from rendering judgment. *See id.* at 801 n.2.

Thereafter, in *Wisconsin v. City of New York*, 517 U.S. 1 (1996), the Supreme Court relied on *Franklin* and *Montana* in upholding the Census Bureau's decision not to statistically adjust the 1990 Census results in order to correct for a differential undercount of certain racial and ethnic minority groups. The Court did not explicitly mention the political question doctrine, but its holding makes clear the Census Clause does not create a "textually demonstrable constitutional commitment" to Congress such that its actions are not subject to judicial review. Even as the Court recognized that "the text of the Constitution vests Congress with virtually

unlimited discretion in conducting the decennial 'actual Enumeration,'" *id.* at 19, it applied the following standard in its review of the Secretary's action:

> so long as the Secretary's conduct of the census is 'consistent with the constitutional language and the constitutional goal of equal representation,' *Franklin*, 505 U.S., at 804, it is within the limits of the Constitution. In light of the Constitution's broad grant of authority to Congress, the Secretary's decision not to adjust *need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population*, keeping in mind the constitutional purpose of the census.

*Id.* at 19–20 (emphasis added). The Supreme Court subsequently reaffirmed that the Census Clause itself creates limits on Congress' discretion, noting that whatever "the precise methodological limits foreseen by the Census Clause" may be, those limits are not exceeded "where all efforts have been made to reach every household, where the methods used consist not of statistical sampling but of inference, where that inference involves a tiny percent of the population, where the alternative is to make a far less accurate assessment of the population, and where consequently manipulation of the method is highly unlikely . . . ." *Utah v. Evans*, 536 U.S. 452, 479 (2002) (holding that use of "hot deck" imputation to obtain census data was permissible).

Likewise, a number of lower courts have also reviewed the legality of Census Bureau actions. *See, e.g., District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1181–82 (D.D.C. 1992) (reviewing challenge to Census Bureau's decision on how to count prison inmates); *State of Texas v. Mosbacher*, 783 F. Supp. 308, 312 (S.D. Tex. 1992) (reviewing challenge to census methodology resulting in an undercount of persons with Hispanic origin); *Carey v. Klutznick*, 508 F. Supp. 404, 411 (S.D.N.Y. 1980), *aff'd*, 637 F.2d 834 (2d Cir. 1980) (reviewing challenge to "manner in which the census was conducted" and Census Bureau's failure to  correct for an undercount of "hard to enumerate" persons); *City of Philadelphia*, 503

F. Supp. at 674 (reviewing challenge to statistical adjustment of census results and holding that

Enumeration Clause "does not constitute the textually demonstrable commitment intended" by

*Baker*); *see also Tucker v. U.S. Dept. of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992) ("We

have our doubts whether, as the district judge believed, the political questions doctrine is a bar to

such a suit. . . . The accuracy of the decennial census is not, in any sense apparent to us, one of

those questions . . .").

Defendants attempt to distinguish the cases cited above by arguing that the Census

Clause has two distinct prongs—an "actual Enumeration" prong and a "Manner" prong. Under

Defendants' interpretation, the Census Clause only requires Congress or, by extension, the

Census Bureau, to conduct an actual, person-by-person headcount. The "Manner" prong leaves

the "way of performing or executing" that headcount to the Census Bureau's discretion. ECF No.

24-1 at 32. Therefore, Defendants contend that courts may review claims challenging the

calculation methodology applied to raw census data but may not review pre-count information

gathering functions, including the selection of census questions, because doing so implicates

policy-based determinations requiring the balancing of factors such as cost, effectiveness,

accuracy, and timing. *Id.* at 30 ("This case implicates only the ['Manner'] question because it

does not involve whom to count, how to count them, or where to count them.").

Defendants' interpretation of the Census Clause is unpersuasive. While one could

certainly categorize the Supreme Court cases discussed above as "calculation-methodology"

challenges, ECF No. 24-1 at 33 n.10, nothing in the Supreme Court's holdings suggests that

courts can review the sufficiency of the "actual Enumeration" but not the "Manner" in which the

count is conducted. Put differently, reviewing the "actual Enumeration" necessarily involves

looking into the "Manner" in which the count is conducted. *See Wisconsin*, 517 U.S. at 24 ("we

hold that the Secretary's decision was well within the constitutional bounds of discretion over the *conduct* of the census") (emphasis added); *id.* at 13 ("In recent years, we have twice considered constitutional challenges to the *conduct* of the census.") (emphasis added).

The "in such Manner as [Congress] shall by Law direct" portion of the clause "suggest[s] the breadth of congressional methodological authority." *Utah*, 536 U.S. at 474. It does not set forth a requirement distinct from the requirement that the Secretary conduct an "actual Enumeration." Therefore, the standard of review set forth in *Wisconsin*—that the Secretary's decision "bear[s] a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census"—can be applied to the way in which the Secretary collects the data just as it can be applied to the way in which the Secretary processes that data. *See Wisconsin*, 517 U.S. at 19–20. Whether or not Congress or the Census Bureau has violated their expansive breadth of authority is, therefore, a justiciable question. *See Montana*, 503 U.S. at 458.

### 2. Failure to State a Claim

Finding Plaintiffs' constitutional challenge justiciable, the Court must determine whether Defendants' alleged conduct amounts to a violation of the Census Clause. Defendants argue that the Census Clause only requires that the "population is to be determined through a person-by-person headcount, rather than through estimates or conjecture." ECF No. 24-1 at 39. Accordingly, because there is no allegation that the Census Bureau is estimating the enumeration, Defendants contend that there is no constitutional violation. As Defendants point out, the Census Clause provides little by way of specific requirements in directing the completion of the decennial census; rather, "[t]he text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration.'" *See Wisconsin*,

517 U.S. at 19. This discretion clearly applies to how the Census Bureau formulates and administers the census questionnaire, and prior censuses suggest that the Secretary's citizenship question may be permissible.

Courts have long recognized that the census accomplishes more than just a person-by-person headcount:

> the decennial census is not *only* used for apportionment purposes. Although originally established for the sole purpose of apportioning Representatives, the decennial census has grown considerably over the past 200 years. It now serves as a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country.

*U.S. House of Representatives*, 525 U.S. at 341 (citations and internal quotations omitted) (emphasis in original); s*ee also Legal Tender Cases*, 79 U.S. 457, 536 (1870) ("Congress has repeatedly directed . . . not only an enumeration of persons but the collection of statistics respecting age, sex, and production. Who questions the power to do this?"), *abrogated on other grounds by Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002). Notably, the government has asked some or all respondents to identify their citizenship in varying forms since the 1820 Census, *see supra* I.A, so, to a certain extent, the Secretary's inclusion of a citizenship question on the 2020 Census has the blessings of history. *See Wisconsin*, 517 U.S. at 21 (noting "the importance of historical practice" in determining whether the Secretary's decision not to statistically adjust the census data was constitutional).

Additionally, Plaintiffs' allegation that the citizenship question will affect the accuracy of the census does not automatically render the citizenship question unconstitutional. The Census Bureau is not obligated, nor expected, to conduct a perfectly accurate count of the population. *See id.* at 6 ("Although each [decennial census] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly

successful in achieving that goal."). And despite efforts to continually improve the quality of the count, errors persist, resulting in a net undercount of the population; often disproportionally affecting some racial and ethnic minority groups. *Id*. This may be the unfortunate reality of an imperfect process.

However, even as the Census Clause contains few specific requirements, it sets forth matters of general principle, and "certain basic constitutional choices may prove relevant" in evaluating the validity of the Census Bureau's action. *See Utah*, 536 U.S. at 478. "The decisions, for example, to use population rather than wealth, to tie taxes and representation together, to insist upon periodic recounts, and to take from the States the power to determine methodology all suggest a strong constitutional interest in accuracy." *Id.* And the type of accuracy that most directly implicates the constitutional purpose of the census is the need for distributive accuracy. *See Wisconsin*, 517 U.S. at 20 ("a preference for distributive accuracy (even at the expense of some numerical accuracy) would seem to follow from the constitutional purpose of the census, viz., to determine the apportionment of the Representatives among the States").[12]

Therefore, it must follow that when the Census Bureau unreasonably compromises the distributive accuracy of the census, it may violate the Constitution. *See id.* at 19–20 ("so long as the Secretary's conduct of the census is 'consistent with the constitutional language and the constitutional goal of equal representation,' it is within the limits of the Constitution" (quoting *Franklin*, 505 U.S. at 804)); *see also Evans*, 536 U.S. at 500 (Thomas, J., concurring in part and dissenting in part) (observing that "[d]ebate about apportionment and the census . . . focused for the most part on creating a standard that would limit political chicanery").

---

[12] The *Wisconsin* court described "distributive accuracy" as "getting most nearly correct the proportions of people in different areas." *Wisconsin*, 517 U.S. at 11.

As alleged, the citizenship question will reduce participation and depress response rates among the Undercount Groups, resulting in a disproportionate undercount that adversely affects Plaintiffs' congressional apportionment, intra-state representation, and access to federally-funded programs. Furthermore, the Census Bureau allegedly ignored clear evidence that the question would lead to such an undercount. Therefore, Plaintiffs have alleged that the citizenship question unreasonably compromises the distributive accuracy of the census.

Defendants contend that "Plaintiffs' theory, taken to its logical conclusion, would mean that the Enumeration Clause prohibits any demographic questions on the census questionnaire that may theoretically reduce response rates and cause some entirely speculative undercount." ECF No. 24-1 at 41. Arguably, that would imply that the use of a citizenship-related question over the past 200 years was unconstitutional. But the slope is not nearly as slippery as this argument claims it to be, given that plaintiffs' allegations give rise to notable exceptions between the claim herein and otherwise permissible inclusions of demographic questions on the decennial census. First, Plaintiffs do not allege that an undercount is merely possible, they allege that the Census Bureau disregarded evidence indicating that the citizenship question will actually lead to a disproportionate undercount of the Undercount Groups. Second, as alleged, the inclusion of other demographic questions has been well tested to ensure that there are no adverse impacts on response rates, *see* ECF No. 17 ¶¶ 58–65—an action not taken by the Census Bureau here. Third, the Court is not aware of any prior demographic questions that would, allegedly, be viewed by a specific segment of the population as an attempt to further an administration's law enforcement objectives related to that population. While a nominal portion of the populace may be turned off by having to answer any demographic question, there is no reason to believe that their reluctance would disproportionally affect any specific demographic. For example, there is no basis to

believe that as a result of questions requesting the identification of participants' gender, women in a particular state would be less likely to respond. A male respondent in Michigan would be no more or less likely to respond than a female respondent in New York. Thus, there would be no disruption to distributive accuracy.

Nor does the fact that this citizenship question was asked in the past foreclose Plaintiffs' claim. Here, it is alleged that the addition of the citizenship question in the *current* political climate will cause an undercount of a specific population that is concentrated in specific areas, thus disturbing the distributive accuracy of the 2020 Census. Apart from merely seeking to accomplish a task beyond counting the population, as a standard demographic question would permissibly do, it is alleged that, here, the citizenship question will actively hinder the census' primary purpose. Thus, as alleged, it cannot be said that the Census Bureau's use of the citizenship question bears a "reasonable relationship to the accomplishment of an actual enumeration of the population," *Wisconsin*, 517 U.S. at 20, and Defendants' Motion to Dismiss will be denied.

### C.  Violation of the APA (Count II)

Similar to its political question argument, Defendants argue that Count II is not justiciable because the selection of specific census questions is "committed to agency discretion by law." *See* 5 U.S.C. § 701(a)(2). The APA requires courts to hold unlawful and set aside any final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," § 706(2)(A); "contrary to constitutional right, power, privilege or immunity," § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," § 706(2)(C); or "without observance of procedure required by law,"

§ 706(2)(D).[13] However, aggrieved persons are not entitled to judicial review of final agency action "to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." § 701(a). "Since there is no statutory provision explicitly prohibiting judicial review of the Bureau's actions, the Court must determine whether the challenged agency actions are 'committed to agency discretion by law.'" *City of Philadelphia*, 503 F.Supp. at 674–75.

There is a strong presumption favoring judicial review of agency action. *See Speed Mining, Inc. v. Fed. Mine Safety and Health Review Com'n*, 528 F.3d 310, 316–17 (4th Cir. 2008) (internal citations and quotation marks omitted); *see also Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). An action is committed to agency discretion by law "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Speed Mining*, 528 F.3d at 317 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)), or when there are "no judicially manageable standards . . . for judging how and when an agency should exercise its discretion." *Id.* (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).

Defendants argue that the Census Act "contains *no* standards against which to assess the Secretary's exercise of discretion, particularly with regard to a matter as fundamental as the form and content of the questionnaire itself." ECF No. 24-1 at 36 (emphasis in original). Section 141(a) provides that:

> The Secretary shall . . . take a decennial census of population . . . in such form and content as he may determine, including the use of sampling procedures and special surveys. In connection with any such census, the Secretary is authorized to obtain such other census information as necessary.

---

[13] Plaintiffs allege, and Defendants do not dispute, that the Secretary's March 2018 Report including the citizenship question constitutes final agency action. ECF No. 17 ¶ 13.

The Supreme Court precedent cited *supra* has not clearly established whether the

Secretary's acts made pursuant to the Census Act "are permitted to agency discretion by law."

However, a majority of courts considering the issue have found that APA claims related to the

completion of the decennial census are reviewable. *See District of Columbia*, 789 F.Supp. at n.16

("there is no dispute over the ability of the court to review these actions of the Census Bureau

under the [APA]. . . .  almost every court that has considered the issue has held that 13 U.S.C.

§ 141 does not preclude judicial review"); *City of New York v. U.S. Dept. of Commerce*, 713

F.Supp. 48, 53 (E.D.N.Y. 1989) ("the overwhelming majority of cases considering this issue[]

have concluded that § 701(a)(2) of the APA is inapplicable to the census statute").[14] Justice

Stevens' concurring opinion in *Franklin* also supports the view that  APA claims related to the

completion of the decennial census are reviewable.[15]

Defendants point to *Webster v. Doe*, 486 U.S. 592 (1988) as support for their position. In

*Webster*, the Supreme Court found that the Director of the Central Intelligence Agency's

decision to terminate an employee was immune from judicial review because section 102(c) of

the National Security Act provided that the CIA Director could terminate an employee whenever

he "shall deem such termination necessary or advisable in the interests of the United States." 486

---

[14] A non-exhaustive list of such cases includes: *Carey v. Klutznick*, 637 F.2d 834, 838–39 (2d Cir. 1980); *City of Willacoochee, Ga. v. Baldrige*, 556 F.Supp. 551, 555 (S.D. Ga. 1983); *Young v. Klutznick*, 497 F.Supp. 1318, 1335 (E.D. Mich. 1980), *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981), *cert. denied*, 455 U.S. 939 (1982); *City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 674–75 (E.D. Pa. 1980); *City of Camden v. Plotkin*, 466 F.Supp. 44, 52 (D.N.J. 1978); *Borough of Bethel Park v. Stans*, 319 F.Supp. 971 (W.D. Pa. 1970), *aff'd*, 449 F.2d 575 (3d. Cir. 1971); *West End Neighborhood Corp. v. Stans*, 312 F.Supp. 1066, 1068 (D.D.C. 1970). Additionally, in connection with a criminal matter against a defendant that refused to answer specific census questions, one court has found that "in the absence of a clear showing . . . that the Secretary's exercise of discretion [in framing the census question] was irrational, arbitrary, or capricious, his actions will not be disturbed." *United States v. Little*, 321 F.Supp. 388, 391 (D. Del. 1971).

[15] Writing for the majority, Justice O'Connor held, in Part IV of the opinion, that the plaintiff's challenge to the Secretary's allocation of overseas federal employees to their designated home state of record was not reviewable under the APA because "the final action complained of is that of the President, and the President is not an agency within the meaning of the [APA]." *See Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Justice Stevens disagreed and considered the APA claim on the merits. 505 U.S. at 807 (Stevens, J., concurring in part and concurring in the judgment). After concluding that the decision was final agency action, Justice Stevens found that the action was not "committed to agency discretion by law."

U.S. at 600 (citing 50 U.S.C. § 403(c)). There, the Supreme Court found that the language "deem

. . . advisable" provided no meaningful standard of review, *id.*, which Defendants contend is

analogous to the Secretary's broad grant of statutory discretion provided under the Census Act.

However, Defendants' argument was squarely and persuasively rejected in Justice Stevens'

concurrence in *Franklin*, who found that "it is difficult to imagine two statutory schemes more

dissimilar than the National Security Act and the Census Act" and noted that the Census Act

presents "no indication that Congress intended the Secretary's own mental processes, rather than

other more objective factors, to provide the standard for gauging the Secretary's exercise of

discretion." 505 U.S. at 817–18 (Stevens, J., concurring in part and concurring in the judgment).

"While the operations of a secret intelligence agency may provide an exception to the norm of

reviewability, the taking of the census does not." *Id.* at 818 (footnote omitted). Furthermore,

Justice Stevens recognized that the Supreme Court has limited the 5 U.S.C. § 701(a)(2)

exception to judicial review to national security cases or the executive branch's refusal to pursue

enforcement actions, *id.* at 818–19, whereas the "reviewability of decisions relating to the

conduct of the census bolsters public confidence in the integrity of the process and helps

strengthen this mainstay of our democracy." *Id.* at 818; *see also City of New York*, 713 F.Supp. at

53 (distinguishing *Webster* to find the Secretary's conduct reviewable under the Census Act).

As discussed herein, *supra* II.B.1, the Constitution imparts a judiciable standard on

Congress when conducting an 'actual Enumeration'—it must bear "a reasonable relationship to

the accomplishment of an actual enumeration of the population." *Wisconsin*, 517 U.S. at 18–19.

And that standard is, in essence, what Congress has passed along to the Secretary. *See* 13

U.S.C.A. § 141 Note; PL 105-119, November 26, 1997, HR 2267, Departments of Commerce,

Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, 11 Stat 2440,

Section 209(a)(6) ("it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States"); *see also Franklin*, 505 U.S. at 819–20 (Stevens, J., concurring in part and concurring in the judgment) (finding law to apply because the "statutory command also embodies a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment"). Contrary to Defendants' argument that *Wisconsin* grants "virtually unlimited discretion" to the political branches such that the Secretary's exercise of that discretion is not subject to judicial review, ECF No. 24-1 at 37, *Wisconsin* does not suggest that the Secretary's discretion is boundless. "To hold that the agency charged with its tabulation is not subject to judicial review is to hold that the Bureau is free to adopt any numbers, regardless of bias, manipulation, fraud or similarly grave abuse, which is exactly the type of conduct and temptation the Framers wished to avoid by entrusting the census to the federal government. This cannot be." *City of Philadelphia*, 503 F. Supp. at 667; *see also Carey*, 637 F.2d at 838–39 ("[plaintiffs] allege an impairment of their 'right to a vote free of arbitrary impairment' . . . a matter which cannot, of course, be foreclosed from judicial review by operation of the Administrative Procedure Act") (citations omitted).

Because the census is not committed to agency discretion by law, the standard of review set forth in § 706(a)(2) can be applied to the Secretary's decision to add the citizenship question. Under such a standard, the Court will not review the Secretary's decision de novo; rather, the Court will only consider whether there was a rational basis for the Secretary's action or whether it was arbitrary, capricious, and an abuse of discretion. *See District of Columbia*, 789 F. Supp. at 1188; *see also City of Philadelphia*, 503 F. Supp. at 667 ("So, while the Bureau may not fulfill

its duty arbitrarily, capriciously or fraudulently, it nevertheless should be afforded wide latitude to select its methods, techniques and by those means to arrive at its own result.").[16]

Alternatively, even if the Census Bureau's decision to add the citizenship question is "committed to agency discretion by law," the Court may still review it "if there is a claim that the agency has violated constitutional, statutory, regulatory or other restrictions." *Garcia v. Neagle*, 660 F.2d 983, 988 (4th Cir. 1981). This exception is normally reserved to allow courts to consider the legality of a category of agency action, not the legality of a specific action. *See id.* (finding that the district court could not review the Parole Commission's substantive decision on a presumptive parole date under the Parole Act but could review a claim that Parole Commission's guidelines themselves violated the Parole Act). However, the Court may still hear a claim that a decision, otherwise committed to the agency's discretion by law, rested on "[political] considerations that Congress could not have intended to make relevant." *See Electricities of North Carolina, Inc. v. Southeastern Power Admin.*, 774 F.2d 1262, 1267 (4th Cir. 1985) (citations omitted); *see also id.* (noting, for example, that "an agency decision that violates a statutory or constitutional command or is prompted by a bribe is not immune from judicial review even when a lawful exercise of an agency's discretion has that immunity" (citing *Heckler*, 470 U.S. at 839 (Brennan, J., concurring))). And that is exactly what Plaintiffs allege herein—that the Secretary's action was not based upon a desire to obtain either an accurate census headcount or citizenship data necessary to better enforce the VRA but rather "a partisan

---

[16] Plaintiffs allege that in addition to its obligations under the Census Clause and Census Act, the Secretary's decision violated a number of statutory and regulatory requirements established to ensure that the Census Bureau provides accurate and reliable statistical data as set forth in the Paperwork Reduction Act, Information Quality Act, Office of Management and Budget Statistical Policy Directives, and Census Bureau Statistical Quality Standards. *See* ECF No. 17 ¶¶49–61. Because Plaintiffs' APA claim is justiciable, the Court need not determine whether Plaintiffs have adequately alleged a violation of any of these specific statutory or regulatory requirements at this time. Such an evaluation goes to the merits of Count II, which is not challenged herein.

act aimed at advancing the Trump Administration's anti-immigration political agenda." ECF No.

17 ¶ 9; *see also id.* ¶¶ 82–89. Therefore, Defendants' Motion to Dismiss Count II will be denied.

### D.  Additional Discovery

Having denied Defendants' Motion to Dismiss, the Court must next determine to what

fact discovery Plaintiffs are entitled. In a letter submitted to the Court on July 13, 2018, Plaintiffs

request "the same discovery that Defendants were recently ordered to provide in two related

actions, pending in the Southern District of New York, that likewise challenge Defendants'

addition of a citizenship question to the 2020 Census questionnaire" and are "prepared to

coordinate discovery efforts with the plaintiffs in the New York Cases, so as not to subject

Defendants to cumulative or duplicative requests." ECF No. 43 at 1. In those actions, "the court

authorized plaintiffs to obtain fact discovery from the Department of Commerce and [DOJ],

including ten depositions of fact witnesses, and authorized the parties to engage in expert

discovery." *Id.* (citing *State of New York, et al. v. United States Department of Commerce, et al.*,

Case No. 18-2921 (S.D.N.Y.) and *New York Immigration Coalition, et al. v. United States

Department of Commerce, et al.*, Case No. 18-5025 (S.D.N.Y.) (collectively, the "New York

Cases").

Generally, "claims brought under the APA are adjudicated without a trial or discovery,

on the basis of an existing administrative record . . . ." *Audubon Naturalist Soc'y of the Cent. Atl.

States, Inc. v. U.S. Dep't of Transp.,* 524 F. Supp. 2d 642, 660 (D. Md. 2007) (citing *Citizens for

the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,*

1992 WL 180138, (4th Cir. July 29, 1992)). In this context, "review of the administrative record

is primarily a legal question . . . ." *Skinner,* 802 F. Supp. at 1332. In APA cases, "the agency is

entitled to a strong presumption of regularity that it properly designated the administrative

32

record." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, No. ELH-16-1015, 2017 WL 3189446, at *12 (D. Md. July 27, 2017). There is a "strong presumption against general discovery into administrative proceedings" that is "born out of the objective of preserving the integrity and independence of the administrative process." *NVE, Inc. v. Dep't of Health & Human Servs.*, 436 F.3d 182, 195 (3d Cir. 2006); *see also Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008) ("Because judicial review of agency action is generally limited to the administrative record, discovery is typically not permitted.").

Courts permit parties to seek discovery in APA claims where the plaintiffs "contend[] the record was incomplete" or where they "seek to demonstrate bad faith, bias, or improper behavior on the part of the agency." *Outdoor Amusement Bus. Ass'n Inc.*, 2017 WL 3189446, at *18; *see also Tafas*, 530 F. Supp. 2d at 797. However, mere allegations of "bad faith" are inadequate to overcome the presumption that government officials have acted "properly and in good faith." *Mullins v. U.S. Dept. of Energy,* 50 F.3d 990, 993 (Fed. Cir. 1995). Instead, to obtain discovery beyond the administrative record on the basis of bad faith, there must be a "strong preliminary showing" of impropriety. *Nat'l Nutritional Foods Assoc. v. Food & Drug Admin.,* 491 F.2d 1141, 1145 (2d Cir. 1974); *see also Friends of the Shawangunks, Inc. v. Watt,* 97 F.R.D. 663, 667–68 (N.D.N.Y. 1983).

Here, Plaintiffs have made a strong preliminary showing that Defendants have acted in bad faith, and that Defendants' stated reason for adding the citizenship question—to further enforce the VRA—was pretextual. In March of 2018, Secretary Ross repeatedly stated publicly and privately that he was considering reinstating the citizenship question in response to a December 12, 2017 letter from DOJ requesting the reinstatement of the question to assist in the enforcement of the VRA. ECF No. 17 ¶ 85. In addition to the Ross Memorandum, at a March 22,

2018 House Ways and Means Committee Hearing, Secretary Ross testified that the citizenship

question was being considered because "the Department of Justice . . . initiated the request for

inclusion of the citizenship question." *Commerce Secretary Wilbur Ross testifies at March 22*

*House Ways and Means Committee Hearing*, C-SPAN (March 22, 2018), https://www.c-

span.org/video/?c4736903/commerce-secretary-wilbur-ross-testifies-march-22-house-ways-

means-committee-hearing (last accessed July 30, 2018).[17]

Documents contained in the Administrative Record, including the supplemental materials

provided by Defendants on July 25, 2018, paint a different picture, however, and arguably

suggest that (1) the addition of the citizenship question was prompted by senior administration

officials and Kansas Secretary of State Kris Kobach; and (2) the "request" from DOJ was in fact

manufactured by senior Department of Commerce officials as a pretextual reason for reinstating

the citizenship question. *See* AR 763-64, 3699, 3710.

The Court finds that Plaintiffs have made the requisite showing of bad faith on the part of

Defendants. The Administrative Record suggests that the citizenship question was an answer in

search of a problem. There is evidence indicating that the Secretary and other senior

administration or campaign officials were determined to include the citizenship question in the

2020 Census and sought out DOJ to provide a legally-defensible reason to do so. All of this

appears to be at odds with the Secretary's public explanation for his decision. Such conduct

provides sufficient evidence of bad faith to warrant additional discovery, and the Court grants

---

[17] The Court may take judicial notice of facts that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Wireless Buybacks, LLC v. Hanover Am. Ins. Co.*, 223 F. Supp. 3d 443, 451 (D. Md. 2016) (quoting Fed. R. Evid. 201(b)). The Court may take judicial notice on its own. Fed. R. Evid. 201(c)(1). Secretary Ross' public congressional testimony was televised on C-Span, and saved on their website. Thus, the Court takes judicial notice of the Secretary's testimony. This testimony was also referenced in the July 3, 2018 hearing transcript for the New York Cases provided by Plaintiffs. ECF No 43 at 68.

Plaintiffs' request that they be given the same discovery as has been ordered in the New York Cases.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, ECF No. 24, shall be denied, and Plaintiffs' Motion for Discovery, ECF No 43, shall be granted. A separate Order follows.

Dated: <u>August  22 , 2018</u>                                    <u>            /s/                                     </u>

                                                                                 GEORGE J. HAZEL
                                                                                 United States District Judge