**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBYN KRAVITZ, *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, *et al.*,<br><br>       Defendants. | No. 8:18-cv-01041-GJH |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.      Constitutional and Statutory Authority for the Census ................................................. 2

II.     Procedural History ......................................................................................................... 6

LEGAL STANDARDS ......................................................................................................... 6

ARGUMENT ......................................................................................................................... 7

I.      Defendants Are Entitled to Summary Judgment Because Plaintiffs Cannot Establish
        Their Standing ................................................................................................................. 7

        A.      Plaintiffs Bear the Burden of Establishing Their Article III Standing. .......... 8

        B.      Plaintiffs Cannot Show That the Citizenship Question Will Result in an
                Undercount ................................................................................................... 10

                1.      Individuals Are Prompted Multiple Times to Respond to the Census,
                        and Their Responses Are Counted Even If They Are Incomplete or
                        Do Not Respond to the Citizenship Question. .................................. 11

                2.      Any Households that Do Not Self-Respond Will Be Enumerated by
                        NRFU Efforts. .................................................................................. 12

                3.      The Census Bureau's Combined Enumeration Efforts (Encouraging
                        Self-Response, NRFU, Imputation and Proxy Data) Will Correct Any
                        Possible Decline in Initial Self-Response and Completely Enumerate
                        the Population. .................................................................................. 13

        C.      Even if an Undercount Occurred, Plaintiffs Cannot Show that It Would
                Affect Them Through Any Material Impact on Apportionment or Federal
                Funding. ........................................................................................................ 15

        D.      If Any Potential Injuries Existed, Plaintiffs Cannot Show that They Are
                Traceable to the Citizenship Question or Redressable by That Question's
                Removal. ....................................................................................................... 16

II.     Defendants Are Entitled to Summary Judgment on the Enumeration and
        Apportionment Clause Claims Because the Secretary Will Conduct a Person-by-
        Person Enumeration. ..................................................................................................... 17

III.    The Court Should Grant Judgment to Defendants on the APA Claims Because the
        Secretary's Decision Was Reasonable and Within His Lawful Discretion. ................. 19

A.     The Secretary's decision was reasonable and easily survives arbitrary-and-capricious review under the APA.......................................................................20

     1.     Agency actions are reviewed only for reasonableness......................20

     2.     The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census......................................................22

     3.     The Secretary engaged in an appropriate process, including the consideration of alternatives, and explained his rationale...............................24

B.     The Secretary's decision was not otherwise unlawful. ...................................................27

CONCLUSION...........................................................................................................................29

**INTRODUCTION**

Following a formal request from the Department of Justice, the Secretary of Commerce made a reasonable decision to reinstate a question about citizenship on the decennial census, consistent with historical practice dating back to 1820 and the Secretary's nearly unfettered discretion over the format and content of the census.  If included, the citizenship question will be one of several demographic questions (including questions inquiring about race, gender, and relationship status) on the census form sent to every household.  Plaintiffs lack standing to bring this challenge seeking to vacate that decision, and their claims regarding that decision are belied by the record.

As a threshold matter, Plaintiffs have suffered no Article III injury traceable to the Secretary's decision.  They cannot definitively show that the reinstatement of a citizenship question will result in a differential undercount of the population (and thus putative detrimental effects on apportionment and federal funding).  Indeed, their lengthy and attenuated chain of causation is rendered particularly speculative after accounting for the Census Bureau's extensive follow-up operations, massive outreach communications plan, and processes for imputation and does not establish that any potential decline in self-response will result in any material effect on apportionment or federal funding.  Plaintiffs' claims of injury are impermissibly speculative and remote, and their claims are not fit for resolution by an Article III court.

But even assuming the Court finds it has jurisdiction, Defendants are entitled to summary judgment on the merits.  Plaintiffs' claim under the Enumeration Clause that the inclusion of a citizenship question will interfere with an "actual" Enumeration fails because the Secretary will conduct a person-by-person headcount, and the Enumeration Clause is not at all implicated by the inclusion of demographic questions, any of which may implicate their own sensitivity concerns and which have appeared uninterrupted since the first census.  Plaintiffs' claims under the Administrative Procedure Act ("APA") also fail because the Secretary of Commerce articulated a reasonable explanation for his decision to reinstate a citizenship question based on the record before him—that

obtaining more precise citizenship data via the decennial census will be useful to DOJ in enforcing the Voting Rights Act.  That decision falls well within the Secretary's broad discretion in overseeing the decennial census and is fully in compliance with the Constitution and applicable laws.  The APA requires no more.  Even if the Court were to look behind the Secretary's decision for any additional motivations, there is no evidence that the Secretary acted with any improper motivation.

Defendants are therefore entitled to summary judgment.

## BACKGROUND

### I.   Constitutional and Statutory Authority for the Census

The Constitution requires that an "actual Enumeration" of the population be conducted every ten years in order to allocate representatives in Congress among the States and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct."  U.S. Const. art. I, § 2, cl. 3.  The Census Act, 13 U.S.C. § 1 *et seq.*, delegates to the Secretary of Commerce the responsibility to conduct the decennial census "in such form and content as he may determine," and "authorize[s] [him] to obtain such other census information as necessary."  *Id.* § 141(a).  The Census Bureau assists the Secretary in performing this duty.  *See id.* §§ 2, 4.  The Act directs that the Secretary "shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title."  *Id.* § 5.  Nothing in the Act directs the content of the questions included on the decennial census.

With the exception of 1840, decennial censuses from 1820 to 1880 asked for citizenship or birthplace in some form, and decennial censuses from 1890 through 1950 specifically requested citizenship information.[1]   In 1960, the Census Bureau asked 25% of the population for the

---

[1] Beginning in 1820, the census was used to tabulate citizenship by inquiring of each household the number of "foreigners not naturalized."  *See* U.S. Census Bureau, Measuring America: The Decennial Censuses From 1790 to 2000, at 6-7, https://www2.census.gov/library/publications/ 2002/dec/pol_02-ma.pdf ("Measuring America").  No question regarding birthplace or citizenship status was included in the 1840 Census.  *Id.* at 8.  In the 1850, 1860, and 1880 enumerations, the

respondent's birthplace and that of his or her parents. Measuring America at 72-73. Between 1970 and 2000, the Bureau distributed a more detailed "long-form questionnaire" to a sample of the population in lieu of the "short-form questionnaire" sent to the majority of households. U.S. Census Bureau, Questionnaires, https://www.census.gov/history/www/through_the_decades/ questionnaires/. The long-form questionnaire, which was generally sent to 1 in 6 households, included questions about the respondent's citizenship or birthplace; the short form did not. Measuring America at 78, 91-92.

Beginning in 2005, the Census Bureau began collecting the more extensive long-form data— including citizenship—through the American Community Survey (ACS), which is sent yearly to about one in 38 households. *See* U.S. Census Bureau, Archive of American Community Survey Questions, https://www.census.gov/programs-surveys/acs/methodology/questionnaire-archive.html (noting citizenship questions on every ACS questionnaire). The introduction of the yearly ACS enabled the 2010 census to be a "short-form-only" census. The 2020 census will also be a "short-form-only" census. The ACS will continue to collect additional data each year, including information on the citizenship status of respondents. Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tracts" and "census-block groups." The decennial census is designed to undertake a full count of the people and produces other, limited information down to the smallest geographic level, known as the "census block." As in past years, the 2020 census will pose a number of questions beyond the total number of individuals residing at a location, including questions regarding sex, Hispanic origin, race, and relationship status.

On March 26, 2018, the Secretary of Commerce issued a memorandum reinstating a

---

questionnaires asked for place of birth. *Id.* at 9, 11, 13. The census included an express question regarding citizenship in 1870. *Id.* at 13, 15. Decennial censuses from 1890 through 1950 specifically requested citizenship information more consistently, including asking for place of birth and (for some respondents) naturalization status and birthplace of parents. *Id.* at 22-62.

citizenship question on the 2020 census questionnaire.  Administrative Record ("AR") 1313-20.[2]  The Secretary's reasoning and the procedural background are set out in that memorandum and in a supplemental memorandum issued on June 21, 2018.  *Id.* 1321.  The Secretary explained that, "[s]oon after [his] appointment," he "began considering various fundamental issues" regarding the 2020 census, including whether to reinstate a citizenship question.  *Id.*  As part of his deliberative process, he and his staff "consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for the enforcement of the Voting Rights Act."  *Id.*

In a December 12, 2017 letter, DOJ responded that citizenship data is critical to its enforcement of Section 2 of the Voting Rights Act ("VRA") for several reasons, and that the decennial census would provide more-useful citizenship voting age population ("CVAP") data than that provided by the annual ACS survey.  AR 663-665 [hereinafter Gary Letter].  In the letter DOJ "formally request[ed] that the Census Bureau reinstate into the 2020 Census a question regarding citizenship."  *Id.* 665.

After receiving DOJ's formal request, the Secretary "initiated a comprehensive review process led by the Census Bureau," AR 1313, and asked the Bureau to evaluate the best means of providing the data identified in the letter.  The Census Bureau initially presented three alternatives.  *Id.* 1277-85.  After reviewing those alternatives, the Secretary asked the Census Bureau to consider a fourth option, which would combine two of the options the Bureau had presented.  *Id.* 1316.  Ultimately, the Secretary concluded that this fourth option—reinstating a citizenship question on the census while simultaneously linking available administrative-record data to Census Bureau files—would "provide DOJ with the most complete and accurate CVAP data in response to its request."  *Id.* at 1317.

---

[2] The Administrative Record ("AR") can be found at ECF Nos. 25 & 26.

The Secretary also observed that collecting citizenship data in the decennial census has a long history and that the ACS has included a citizenship question since 2005.  AR 1314.  The Secretary therefore found, and the Census Bureau confirmed, that "the citizenship question has been well tested."  *Id.*  He further confirmed with the Census Bureau that the census-block-level citizenship data requested by DOJ are not available from the ACS.  *Id.*  The Secretary "carefully considered," but was unpersuaded by, concerns that reinstating a citizenship question would negatively impact the response rate for non-citizens.  AR 1317.  While the Secretary agreed that a "significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ('NRFU') operations," he concluded that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially" as a result of a citizenship question.  *Id.* 1315.  Based on his extensive process of consultation and review, the Secretary determined that, to the best of everyone's knowledge, there is limited empirical data on how reinstating a citizenship question might affect response rates.  *Id.* 1316.

The Secretary also emphasized that "[c]ompleting and returning decennial census questionnaires is required by Federal law," meaning that concerns regarding a decline in response rates were premised on speculation that some will "violat[e] [a] legal duty to respond."  AR 1319.  Despite the hypothesis "that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief."  *Id.* 1316.  The Secretary further explained that the Census Bureau intends to take steps to conduct respondent and stakeholder outreach in an effort to mitigate any impact on response rates of including a citizenship question.  *Id.* 1318.  The Secretary also determined that even a decline in self-response several orders of magnitude greater than that estimated by the Census Bureau would still be remediated by the substantial contingency funding he had secured from Congress as part of the revised Lifecycle Cost Estimate.  *Id.* 1319.  In light of these considerations, the Secretary concluded that "even if there is some impact on responses, the value of more complete and accurate [citizenship] data derived from surveying the

entire population outweighs such concerns." *Id.* 1319.

## II.   Procedural History

Plaintiffs[3] filed suit against Defendants on April 11, 2018, and filed their first amended complaint on May 3, 2018.  Compl., ECF No. 1; 1st Am. Compl., ECF No. 17.  Defendants sought dismissal based on Plaintiffs' lack of standing, the political question doctrine, lack of justiciability under the APA, and Plaintiffs' failure to state an Enumeration Clause claim.  *See* Defs.' Mot. Dismiss, ECF No. 24-1.  The Court denied this motion to dismiss.  Order Denying Mot. Dismiss, ECF No. 49. Plaintiffs subsequently amended their complaint again on September 5, 2018.  2d Am. Compl. (SAC), ECF No. 55-2.  This Motion for Summary Judgment is filed pursuant to the schedule entered by the Court on September 7, 2018.  Corrected Scheduling Order, ECF No. 57.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Claims seeking review of an agency action under the APA 'are adjudicated without a trial or discovery, on the basis of an existing administrative record . . . [and accordingly] are properly decided on summary judgment.'"  *Johnson v. Sessions*, No. CV RDB-15-3317, 2018 WL 2762562, at *5 (D. Md. June 8, 2018) (citation omitted), *appeal filed* No. 18-1737 (4th Cir. Jul. 2, 2018).  The court must uphold an agency decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by

---

[3] Plaintiffs are individuals residing in Maryland, Arizona, Texas, Nevada, and Florida: Robyn Kravitz, Michael Kravitz, Catherine Nwosu, Nnabugwu Nwosu, Joanne Wilson, Alejandro Chavez, Richard McCune, Jose Moreno, Diana Alexander, Lauren Rachel Berman, Sarah Bryan, Virginia Garcia, Linda Rivas, Martha Sanchez, Sonia Casarez Shafer, Michael Kagan, Yamile Labori, Lazara Yoelvis Magadan, Elizabeth Buchanan, Jacob Cunningham, and Maegan Ortiz.  *See generally* SAC & ¶ 3.

law."  5 U.S.C. § 706(2).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*).

## ARGUMENT

### I.   Defendants Are Entitled to Summary Judgment Because Plaintiffs Cannot Establish Their Standing.

Plaintiffs claim that they will be injured because the citizenship question will result in a decrease in self-response rates on the census, which will result in an undercount, which will lead to the states they live in being apportioned fewer congressional seats than they should otherwise have, the legislative districts in which they reside in those states being incorrectly sized, and the communities they live in receiving less federal funding.  SAC ¶¶ 10, 118-49, 155-61, 168-73.

At summary judgment, Plaintiffs must bring forward specific evidence about the harms on which they seek to rely.  Plaintiffs cannot meet this burden because there is no evidence that any of the feared harms will actually come to pass with sufficient certainty.  Plaintiffs could only be harmed if (1) the citizenship question itself *causes* individuals to neglect their legal duty to respond to the 2020 census, such that a decrease in the initial self-response rate occurs because of the reinstatement of the citizenship question, (2) such a decline is not corrected by the Census Bureau's repeated efforts to encourage self-response, (3) such a decline is not corrected by the Census Bureau's extensive non-response follow up ("NRFU") efforts, (4) such a decline is not corrected by the Census Bureau's use of imputation for any remaining uncounted households after NRFU, (5) to the extent that any net undercount remains after these comprehensive operations, Plaintiffs' *particular states and localities* are undercounted more than others (*i.e.*, there is a differential net undercount), and (6) any such differential net undercount actually changes the apportionment or funding of Plaintiffs' specific states and localities in light of both the magnitude of the differential net undercount and the national distribution of the differential net undercount.  This long chain of necessary events before Plaintiffs

are injured strains credulity and demonstrates both the very speculative nature of their purported injuries and their inability to directly attribute those hypothetical injuries to the addition of the citizenship question.

A.  Plaintiffs Bear the Burden of Establishing Their Article III Standing.[4]

The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (internal citation omitted).  At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The standing inquiry is "especially rigorous" where "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).

---

[4]  In an APA case, "the district judge sits as an appellate tribunal," *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and claims are typically "properly decided on summary judgment" because they are "adjudicated without a trial or discovery, on the basis of an existing administrative record." *Johnson v. Sessions*, No. CV RDB-15-3317, at *5 (quoting *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007)).  This case should be no different.  In the event that the Court concludes an evidentiary hearing on standing is appropriate, that hearing should be limited to standing only (rather than the merits).  The question on the merits, of course, is whether the Secretary's action was supported by the administrative record and consistent with the APA standard of review, and Plaintiffs should not be permitted to import their experts' post hoc criticisms of the Secretary's decision.  *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978) (stating the question in an APA case as "whether the challenged rule . . . finds sufficient justification in the administrative proceedings that it should be upheld by the reviewing court").

The standing requirement of "injury in fact" requires a plaintiff to establish that it "'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted). The injury must be "concrete and particularized," *Lujan*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Lujan*, 504 U.S. at 560). Thus, an alleged future injury must be "certainly impending"; "'[a]llegations of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), emphasis in *Clapper*).

The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). In the census context, merely a showing of differential net undercount is not enough, as there has never been a perfect census count. *See Carey v. Klutznick*, 653 F.2d 732, 735 (2d Cir. 1981). Plaintiffs instead must prove by a preponderance of the evidence that there will be an increase in the differential net undercount specifically attributable to the citizenship question.

"[T]here can be no genuine issue as to any material fact" where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which [it] [bears] . . . the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, at the summary judgment stage, plaintiff must "'set forth' by affidavit or other evidence 'specific facts'" establishing standing" rather than merely presenting general factual allegations of injury, *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Lujan*, 504 U.S. at 561), or else "Rule 56(c) mandates the entry of summary judgment" against them, *Celotex*, 477 U.S. at 322 (quoting Fed. R. Civ. P. 56(e)).

B.     Plaintiffs Cannot Show That the Citizenship Question Will Result in an Undercount.

As an initial matter, Plaintiffs cannot show that the months-long census process, which includes aggressive and targeted advertising campaigns that not only educate the public on the census but also reinforce that all responses remain confidential under the law, will result in an undercount even assuming, *arguendo*, that the citizenship question resulted in any additional hesitancy to respond among certain individuals.  First, those who choose not to respond to the citizenship question alone, or who cease completing questions on the census after they reach the citizenship question, will still be enumerated and, thus, would not contribute to any undercount.  Second, the Census Bureau has extensive techniques to encourage individuals who did not initially respond, and provides at least five additional opportunities to self-respond.  Third, for those who still have not responded, the Census Bureau will employ its NRFU process, one of the largest peacetime mobilizations in our Nation's history, which includes sending enumerators out to collect information from non-responders in person.  Fourth, where enumeration efforts still fail, the Census Bureau uses high-quality administrative records from other federal agencies to enumerate individuals.  As the Census Bureau's Chief Scientist and Associate Director for Research and Methodology therefore concluded, "there is no credible quantitative evidence that the addition of the citizenship question would affect the accuracy of the count."  Declaration of John M. Abowd, Ph.D. ¶ 13 ("Abowd Decl."), Ex. A; *see also id.* ¶ 20 ("It is important to stress that the estimated decrease in self-response rates does not translate into an increase in net undercount, and the use of our estimates as if they did is wholly inappropriate.").  As discussed below, these extensive procedures will ameliorate any risk of injury to Plaintiffs.  Plaintiffs' speculative claimed injuries are far from "certainly impending" because they could come to pass only if every step described below fails.  *Clapper*, 568 U.S. at 409.

This Court has previously held that Plaintiffs sufficiently alleged standing to survive a motion to dismiss, but that "[d]iscovery, and potential expert testimony, may later make it clear that these efforts [by the Census Bureau] will suffice to eliminate any potential undercount."  Mem. Op. (MTD

Order) at 14, ECF No. 48 at 14.  Discovery has now closed, and Defendants present such evidence from their expert, Dr. Abowd.  Plaintiffs will be unable to meet their burden at summary judgment to "set forth evidence of an injury in fact in addition to that provided in the complaint." *Pye v. United States*, 269 F.3d 459, 467 (4th Cir. 2001).

> 1. Individuals Are Prompted Multiple Times to Respond to the Census, and Their Responses Are Counted Even If They Are Incomplete or Do Not Respond to the Citizenship Question.

Even before its NRFU efforts begin, the Census Bureau has comprehensive plans in place to maximize self-response.  Instructions to complete the census online or by telephone will initially be sent to most households, with the remaining households (those deemed less likely to have Internet access) receiving a paper questionnaire in the first mailing.  2020 Census Operational Plan: A New Design for the 21st Century, at 18, 21, 91, 95 (Sept. 2017, v.3.0), https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf ("2020 Census Operational Plan"); Abowd Decl. ¶¶ 25-29.  All households will receive a letter as a second contact reminding them to respond.  Abowd Decl. ¶ 29.  If households still do not self-respond, they will receive a postcard as the third contact, a letter and the paper version of the questionnaire as the fourth contact, and another postcard as the fifth contact.  *Id.* ¶ 30; 2020 Census Operational Plan at 99.  Each household can thus receive up to six mailings.  2020 Census Operational Plan at 99; *see also* Abowd Decl. ¶ 30.  In addition to online instructions, all mailings include a toll-free number that provides assistance in self-responding.  Abowd Decl. ¶ 30.  Moreover, the 2020 census will be the first to rely extensively on digital methods and automation, and it will be the first census where individuals are encouraged to respond online.  2020 Census Operational Plan at 15, 18-19, 26, 88.  The Census Bureau also engages in advertising and outreach efforts to inform people about the census and encourage them to self-respond.  2020 Census Operational Plan at 21, 92-94; Abowd Decl. ¶ 61 & n.52.

Furthermore, the actual enumeration could only be affected by households that completely choose not to respond—if a household simply skips the citizenship question (*i.e.*, so-called "item

nonresponse," where a particular item on the questionnaire is left blank) or stops filling out the census questionnaire once they reach the citizenship question (*i.e.*, "breakoff") they will nonetheless be fully counted. *See* Abowd Decl. ¶ 35-38.

> 2. Any Households that Do Not Self-Respond Will Be Enumerated by NRFU Efforts.

If a household does not self-respond during the steps described above, which span six weeks, it does not mean that that household will not be enumerated. Instead, the Census Bureau's extensive NRFU operations will kick in, starting with the assignment of an enumerator to each nonresponding household address. Abowd Decl. ¶¶ 38-39; 2020 Census Operational Plan at 114. Enumerators physically visit housing unit addresses in order to enumerate households through an in-person interview. Abowd Decl. ¶ 39. Enumerators are dispatched utilizing a state-of-the-art optimizer that efficiently assigns cases and provides routes for field work.[5] Census Operational Plan at 114; *see also* Abowd Decl. ¶¶ 45-51. The Census Bureau "considers the demographic characteristics of each unique geographic area" in selecting enumerators, and works to retain local enumerators, as well as enumerators with the language skills required to communicate with residents in each area. Abowd Decl. ¶¶ 49-50. Enumerators also have access to remote translation services for 59 non-English languages. *Id.* ¶ 50. If an enumerator is not able to connect with a resident during an in-person visit, the enumerator will leave a Notice of Visit form providing information about how the household can complete the 2020 census. *Id.* ¶ 51. A household may be visited by an enumerator up to 6 times. *Id.* ¶ 53 & n.43.

If the enumerator is unable to make contact with a household, and the household does not complete the 2020 census questionnaire as per the Notice of Visit, the Census Bureau will still enumerate that household. The Census Bureau will use administrative records if reliable records are

---

[5] The increased efficiency from these technological advances will enable the Census Bureau to target advertising and NRFU resources toward areas with low response rates.

available.  Census Operational Plan at 22, 114, 117; Abowd Decl. ¶ 53.  If such reliable data is not available, then the enumerator will attempt to contact a nearby proxy (such as a neighbor or building manager), and will enumerate the non-responding household through data provided by that proxy. Abowd Decl. ¶ 53 & n.41.  As necessary, the most experienced and effective enumerators will be tasked to identify proxies.  Census Operation Plan at 22, 114, 117; Abowd Decl. ¶ 53.  Although proxy efforts, as well as imputation, may result in lower quality data for *demographic* questions relative to data from self-responses, they should not cause an undercount.  *See* Abowd Decl. ¶ 53 ("The Census Bureau is not aware of any credible quantitative evidence suggesting that proxies in the census provide a greater net undercount or differential net undercount in comparison to self-response or in-person interviews."); *id.* ¶ 56 ("The Census Bureau is not aware of any credible quantitative data suggesting that imputation in the census leads to a greater net undercount or differential net undercount in comparison to self-response or in-person interviews.").

The Census Bureau's NRFU operations are dynamic and, based on self-response rates, will be adjusted in real-time to ramp up media efforts and hire additional enumerators in areas of demonstrated need.  *Id.* ¶¶ 64-67.  If necessary, the Census Bureau can also assign enumerators to work overtime, shift enumerators between geographic regions, and even extend the NRFU period to obtain a full enumeration.  *Id.* ¶¶ 66-67.

3. The Census Bureau's Combined Enumeration Efforts (Encouraging Self-Response, NRFU, Proxy Data, and Imputation) Will Correct Any Possible Decline in Initial Self-Response and Completely Enumerate the Population.

The Census Bureau expects that the completion of the exhaustive NRFU efforts described above "will result in a complete enumeration."  *Id.* ¶ 24.  In other words, there will be no undercount, differential or not.  And, the Census Bureau has more than sufficient resources available to complete these steps, even in a worst-case scenario for self-response.  *Id.* ¶ 78 ("The Census Bureau is prepared to conduct the 2020 Census NRFU operation and believes that those efforts will result in a complete enumeration.").

-13-

The 2020 Census Life Cycle Cost Estimate ("LCCE") includes an estimated fiscal year 2020 cost for NRFU of approximately $1.5 billion.  *Id.* ¶ 58.  This estimate is based on numerous factors, including the self-response rate at the start of the operation; self-responses received after the start of the operation; occupied, vacant and non-existent cases in the workload that are removed using administrative information; late additions to the workload; the number of days worked by enumerators; the average hours the enumerators work per day; the number of contact attempts to conduct the interview; training hours for enumerators; mileage travelled by enumerators; and other miscellaneous expenses. *Id.* ¶ 58.  In fiscal year 2020, there will also be an additional $1.7 billion in contingency funding that may be spent on NRFU.  *Id.* ¶ 59.

The self-response rate built into the LCCE is in the range of 55.5% to 65.5%.  And although the Census Bureau expects a self-response rate of 60.5%, all NRFU planning—including hiring of field staff and enumerators—is based on the lower bound of this estimate, 55.5%.  For each percentage point increase or decrease in the overall self-response rate, the LCCE estimates $55 million will be saved or spent.  *Id.* ¶ 60.  This estimate includes, for example, the cost of additional or less numerous field supervisors and enumerators, hours in the field, mileage, training costs, provisioning and usage of handheld devices, and impacts on printing, postage, and paper data capture operations.[6]

Under any conceivable scenario in which self-response rates may decline due to the citizenship question, the Census Bureau is fully equipped and funded to enumerate all those who would be enumerated absent a citizenship question.  For example, even if there is a 10% decline in self-response among potential noncitizen households in 2020, and if 28.6% of households in the country match that description (a high estimate), *id.* ¶ 69, then the predicted increase in the NRFU workload would be

---

[6] The estimate assumes that the increased or decreased percentage of housing unit addresses self-responding is not easier or harder to count than a representative percentage of those not responding to the census.

-14-

approximately 3.6 million addresses, which would increase NRFU costs by $137.5 million, far below the $1.7 billion in fiscal year 2020 contingency funding.

      C.    <u>Even if an Undercount Occurred, Plaintiffs Cannot Show that It Would Affect Them Through Any Material Impact on Apportionment or Federal Funding.</u>

As discussed in detail above, the Census Bureau's plans to encourage self-response and to use NRFU efforts—including personal visits by enumerators and, eventually, imputation—to supplement that self-response will result in a complete enumeration, and thus Plaintiffs will not be injured.  Even if, however, there was an undercount, Plaintiffs cannot show that it would be differential such that their specific states and localities would suffer a negative effect in apportionment or funding.

Indeed, to the contrary, Defendants' expert Dr. Stuart Gurrea has shown that there would likely be no effect on apportionment, and a highly uncertain, and minimal, effect on funding.  Dr. Gurrea concluded that if the 2020 NRFU efforts were as successful as the 2010 NRFU efforts, using the scenarios put forth by Plaintiffs, "congressional apportionment does not change due to reinstatement of a citizenship question," even without considering additional mitigation efforts, such as imputation.  Rule 26(A)(2)(B) Expert Report and Declaration of Stuart D. Gurrea, Ph.D. ¶¶ 12, 65-67 ("Gurrea Decl."), Ex. B.  Similarly, assuming the 2010 NRFU success rate, Dr. Gurrea examined the funding scenarios put forth by Plaintiffs and estimated the funding decreases for the programs identified by Plaintiffs (Medicaid, CHIP, Supplemental Food Grants, WIC, Social Services Block Grants, Title I funding, and Surface Transportation Block grants) at most between one-hundredth of one percent and three tenths of one percent, again, without considering additional mitigation efforts, such as imputation.  *Id.* ¶¶ 12, 64-97.  This would hardly represent a material change.  In light of this evidence, Plaintiffs cannot meet their burden to show an imminent, nonspeculative injury by a preponderance of the evidence based on either apportionment or funding.

D.      If Any Potential Injuries Existed, Plaintiffs Cannot Show that They Are Traceable to the Citizenship Question or Redressable by That Question's Removal.

Finally, Plaintiffs cannot show that any injury—if one existed—is traceable to the addition of the citizenship question or would be redressed if the question were removed. First, Plaintiffs' supposition that the citizenship question will cause an undercount relies on individuals violating their legal duty to respond to the census. As the Secretary emphasized in his decision memo, "[c]ompleting and returning decennial census questionnaires is required by Federal law." AR 1319; 13 U.S.C. § 221. Defendants should not be held to blame for such hypothetical illegal acts.

Second, Plaintiffs must show that their claimed concerns will lead households which would respond to the census if it did not include a citizenship question to not respond to any part of the census because of the inclusion of a citizenship question at the end of the form. In other words, if households have confidentiality concerns in the current political climate such that they will decide not to respond to the census with or without a citizenship question, any resulting undercount cannot be deemed to be attributable to the Secretary's decision to add a citizenship question. And, as discussed above, households that leave the citizenship question blank but otherwise respond or break off at the citizenship question will still be enumerated, avoiding Plaintiffs' purported harms. "An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 226 (4th Cir. 2009)). Indeed, Plaintiffs refer to concerns about a pre-existing "widespread climate of fear among citizen and noncitizen immigrants" and that certain groups "have become even more suspicious and distrustful of government efforts to collect personal data since President Trump took office." SAC ¶¶ 1, 111. Of course, concerns driven by the overall political climate, current immigration policy, or any other event except the presence of a citizenship question

on the census are not traceable to Secretary Ross's actions and would not be redressed by the outcome of this lawsuit.

II.     **Defendants Are Entitled to Summary Judgment on the Enumeration and Apportionment Clause Claims Because the Secretary Will Conduct a Person-by-Person Enumeration.**

Even if the Court concludes that Plaintiffs have established standing, the Court should grant judgment in favor of Defendants on the Enumeration Clause claim.  Plaintiffs allege that Defendants violate the Enumeration Clause by including the citizenship question on the 2020 census because the question will diminish the response rates of non-citizens and their citizen relatives.  SAC ¶¶ 151-56. This Court has already concluded "that when the Census Bureau unreasonably compromises the distributive accuracy of the census, it may violate the Constitution."  MTD Order at 24.  Defendants respectfully disagree with that conclusion.[7]  But even applying the Court's standard, Plaintiffs cannot meet their burden at summary judgment.  Rather than challenging the 2020 census for unreasonably failing to conduct a person-by-person headcount of the population, Plaintiffs argue that reinstatement of a citizenship question will interfere with the actual enumeration by causing a differential undercount

---

[7] *Wisconsin*, the authority cited by the Court for this proposition, is inapposite here.  As Judge Furman recognized:

> To read *Wisconsin* as Plaintiffs suggest would, therefore, lead ineluctably to the conclusion that each and every census—from the Founding through the present—has been conducted in violation of the Enumeration Clause.  That would, of course, be absurd, and leads the Court to conclude instead that the Wisconsin standard applies only to decisions that bear directly on the actual population count. Notably, the Supreme Court's own language supports that limitation, as it held only that "the Secretary's decision not to adjust" the census count "need bear only a reasonable relationship to the accomplishment of an actual enumeration of the population." [Wisconsin,] 517 U.S. at 20 (emphasis added). That is, the Court did not purport to announce a standard that would apply to a case such as this one.

*New York, et al. v. Dep't of Commerce, et al.*, 18-cv-2921 (S.D.N.Y. July 26, 2018), ECF No. 215 at 58; *NYIC, et al. v. Dep't of Commerce, et al.*, 18-cv-5025 (S.D.N.Y. July 26, 2018), ECF No. 70 at 58. This Court should likewise reject *Wisconsin* for this proposition.

of certain demographic groups.  SAC ¶¶ 108, 111.  But as this Court has made clear, the mere

contention "that the citizenship question will affect the accuracy of the census does not automatically

render the question unconstitutional" because "[t]he Census Bureau is not obligated, nor expected, to

conduct a perfectly accurate count of the population."  MTD Order at 23.  Instead, Plaintiffs must

establish, under this Court's prior ruling, that inclusion of a citizenship question on the 2020 census

"*unreasonably compromises* the distributive accuracy of the census."  MTD Order at 24 (first emphasis

added).  This they cannot do.

As discussed above, the undisputed material evidence shows that the Census Bureau's

comprehensive NRFU procedures will attempt to contact nearly every person in the country, utilizing

up to six mailings and multiple in-person visits by an enumerator.  2020 Census Operational Plan, at

88-92, 112-21.  The operations in place for 2020 are more wide-ranging and more advanced than the

operations performed in any previous census.  Moreover, the Census Bureau is fully prepared and

budgeted to conduct its extensive NRFU operations.  As discussed above, Plaintiffs cannot sufficiently

establish that—even if the citizenship question caused a decline in initial self-response—the Census

Bureau's NRFU efforts, including imputation and proxy data, would not correct the decline and result

in a complete enumeration.

While the possibility of an undercount exists in every census, the Constitution does not require

perfection.  *See Utah v. Evans*, 536 U.S. 452, 504 (2002) (Thomas, J., concurring in part and dissenting

in part) (canvassing the history of census undercounts, including the first census in 1790); *Wisconsin v.

City of N.Y.*, 517 U.S. 1, 6 (1996) ("Although each [of the 20 past censuses] was designed with the goal

of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been

wholly successful in achieving that goal."); *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973) (census data

"are inherently less than absolutely accurate"); *Senate of the State of Cal. v. Mosbacher*, 968 F.2d 974, 979

(1992) (describing the 1990 census as "one of the best ever taken in this country" despite counting

"approximately 98 percent of the population"); *City of L.A. v. Evans*, No. 01-cv-1671, 2001 WL

34125617, at *2 (C.D. Cal. Apr. 25, 2001) ("Like all of its predecessors, Census 2000 produced less than perfect results."). As long as the Secretary has established procedures for counting every resident of the United States and there is no "unreasonable" impact on distributive accuracy, any undercount is a constitutionally permissible result of attempting to enumerate upwards of 325 million people across 3.8 million square miles. *See* U.S. & World Population Clock, https://www.census.gov/popclock/.

Thus, given the history of including demographic questions—including about citizenship—on the census and the Census Bureau's extensive outreach campaign and NRFU operations to counteract any decline in self-response rates, Plaintiffs cannot establish that the citizenship question "*unreasonably* compromises the distributive accuracy of the census." MTD Order at 24. To the extent Plaintiffs' Enumeration Clause claim hinges on the contention that the decisionmaking *process* for reinstating a citizenship question "*unreasonably* compromises the distributive accuracy of the census," MTD Order at 24, that contention simply duplicates their claim that the Secretary's decision was arbitrary and capricious under the Administrative Procedure Act. Accordingly, the Court should grant judgment in favor of Defendants on Plaintiffs' Enumeration Clause claim.

III.   **The Court Should Grant Judgment to Defendants on the APA Claims Because the Secretary's Decision Was Reasonable and Within His Lawful Discretion.**

The Court should grant judgment in favor of Defendants on the Plaintiffs' claims under the APA. The complaint alleges that the Secretary's decision to reinstate a citizenship question was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law." 5 U.S.C. § 706(2); *see, e.g.*, SAC ¶ 163. But Plaintiffs' claims fail because the Secretary's decision was reasonable and fully in accord with the Constitution and relevant statutes.

A.    The Secretary's decision was reasonable and easily survives arbitrary-and-capricious review under the APA.

1.   Agency actions are reviewed only for reasonableness.

In deciding an arbitrary-and-capricious claim under the APA, the question for the Court is whether the agency's decision "was the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). "Review under the APA is highly deferential," and "the agency action enjoys a presumption of validity and regularity." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, No. 16-cv-1015 (ELH), 2018 WL 4361800, at *9 (D. Md. Sept. 12, 2018) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)). The question before the Court is limited to "whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). "That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.*, 419 U.S. 281, 286 (1974)). "[T]he Court may not substitute its policy judgment for that of the agency when the policy is rational." *Johnson v. Dep't of Educ.*, No. 17-cv-2104 (RDB), 2018 WL 3420016, at *3 (D. Md. July 13, 2018); *see also FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016) ("A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives.").

The Court's review must be particularly deferential here because Plaintiffs challenge the Secretary's wide discretion over the census. "The text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides." *Wisconsin v. City of N.Y.*, 517 at 19 (quoting U.S. Const. art. 1, § 2, cl. 3) (emphasis added); *see also, e.g., Baldridge v. Shapiro*, 455 U.S. 345, 361 (1982) (discussing the broad congressional authority in the area

of the census). Congress, in turn, "has delegated its broad authority over the census to the Secretary."

*Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)). The Census Act authorizes the Secretary to "take

a decennial census of population . . . in such form and content as he may determine" and "obtain such

other census information as necessary." 13 U.S.C. 141(a); *see also, e.g.*, *Utah*, 536 U.S. at 472. Given

this broad grant of discretion, "so long as the Secretary's conduct of the census is 'consistent with the

constitutional language and the constitutional goal of equal representation,' it is within the limits of

the Constitution." *Wisconsin*, 517 U.S. at 19-20 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804

(1992)).

Lastly, the Court's review of Plaintiffs' APA claim should be confined to the record before

the Secretary and resolved on summary judgment. "[W]hen a party seeks review of agency action

under the APA, the district judge sits as an appellate tribunal." *Doe v. Tenenbaum*, 127 F. Supp. 3d 426,

436 n.2 (D. Md. 2012) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). Thus, "the

Court would appropriately dispose of the case on summary judgment even if, as a general matter, [a]

dispute [of fact] were genuine." *Id.*; *see also Klock v. Kappos*, 731 F. Supp. 2d 461, 465 (E.D. Va. 2010)

("[I]n an action brought under the APA, there is no material fact at issue but only a question of law[.]").

That is because "a court must only consider the record made before the agency at the time the agency

acted" and "may look only to [the agency's] *contemporaneous* justifications in reviewing the agency

action," which means that "facts and justifications for agency action provided to a reviewing court for

the first time are generally not to be considered." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*,

707 F.3d 462, 467-68 (4th Cir. 2013); *see also Fort Sumter Tours v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir.

1995) ("Judicial review of administrative action is generally confined to the administrative record.").

To the extent Plaintiffs seek to introduce expert testimony going to the merits, that testimony

is not a proper subject of APA review. The opinions of these experts cannot properly be considered

part of that record because they were not before the Secretary at the time of his decision and irrelevant

to his decisionmaking process. *Camp*, 411 U.S. at 142; *see also, e.g.*, *San Luis & Delta-Mendota Water*

*Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (concluding that the district court abused its discretion "when it used several extra-record declarations to question [the agency's] scientific judgments" and "open[ed] the administrative record as a forum for the experts to debate the merits"). Indeed, courts cannot "simply substitute the judgment of plaintiff's experts for that of the agency's experts." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009). Moreover, the Court "cannot . . . determine who among competing experts presents the most reliable information or reaches the most correct conclusions." *Hart & Millers Islands Area Envtl. Grp., Inc. v. Corps of Eng'rs of the U.S. Army*, 505 F. Supp. 732, 747 (D. Md. 1980) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

2. The Secretary reasonably explained his decision to reinstate a citizenship question on the decennial census.

Here, the record establishes that the Secretary articulated a satisfactory explanation for his reasonable decision, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The Secretary explained in his decision memorandum that the census is an accepted means of collecting citizenship data. AR 1313-20. The Commerce Department's review of the issue showed "that collection of citizenship data by the census has been a long-standing historical practice," including through regular inclusion in the decennial census through 1950, in the long-form census through 2000, and in the ACS since 2005. *Id.* 1314. As the Secretary observed, "the decision to collect citizenship information from Americans through the decennial census was first made centuries ago." *Id.* 1319. Further, the inclusion of a citizenship question is far from unusual in comparative perspective; the United Nations recommends that nations inquire about citizenship and other countries include a citizenship question on their censuses. *Id.* Given the ubiquity of citizenship questions, the reinstatement of a question on the 2020 census was a subject under consideration by various government officials. *Id.*

Against this backdrop, the Secretary solicited DOJ's views on the subject and, in December 2017, received DOJ's formal request "that the Census Bureau reinstate on the 2020 Census

questionnaire a question regarding citizenship." AR 663. The Gary Letter explains that citizenship data is "critical" to DOJ's Voting Rights Act enforcement because DOJ "needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected." *Id.* According to the Gary Letter, collecting such data through the decennial census, which would provide block-level CVAP data, is preferable to currently available ACS data. *Id.* 664-65. The Gary Letter therefore concluded that "the decennial census questionnaire is the most appropriate vehicle for collecting [citizenship] data, and reinstating a question on citizenship will best enable the Department to protect all American citizens' voting rights under Section 2." *Id.* 663.

The Secretary "set out to take a hard look at the request" and ensure that he "considered all facts and data relevant to the question." AR 1313. The Commerce Department and the Census Bureau "began a thorough assessment that included legal, program, and policy considerations." *Id.* This review included, for example, the preparation by the Census Bureau of a technical review of the request, *id.* 1277-85; a detailed exchange between the Commerce Department and the Census Bureau about the technical review, *id.* 1286-97; multiple meetings between the Secretary and Census Bureau leadership to discuss the Census Bureau's "process for reviewing the DOJ request, their data analysis, [the Secretary's] questions about accuracy and response rates, and their recommendations," *id.* 1313; and extensive engagement with stakeholders, *id.* 763-1276. At the conclusion of this process, the Secretary determined that the "census-block-level citizenship data requested by DOJ [was] not available" from existing surveys conducted by the Census Bureau. *Id.* 1314. The Secretary also reasonably accepted DOJ's determination that, because "DOJ and the courts use CVAP data for determining violations of Section 2" of the VRA, "having these data at the census block level will permit more effective enforcement." *Id.* 1313.

The Secretary thus proceeded to evaluate the available options. AR 1317. Through extensive consultation with the Census Bureau, the Secretary identified four alternatives: making no change in data collection but assisting DOJ with statistical modeling ("Option A"); reinstating a citizenship

question on the decennial census ("Option B"); obtaining citizenship data from administrative records for the whole census population ("Option C"); and, at the request of the Secretary after receiving the Census Bureau's analysis, a combination of reinstating a question on the census and utilizing administrative-record data ("Option D"). *Id.* 1314-17. With the goal of "obtaining complete and accurate data" on citizenship, *id.* 1313, the Secretary concluded that Option D—"placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records"—would "provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.* 1317.

Thus, the Secretary traced the steps from the facts found during the agency's extensive review of DOJ's request to his ultimate decision. AR 1313-20. Despite Plaintiffs' allegations that the Secretary failed to conduct an adequate review or adequately explain his reasoning, SAC ¶ 166, this reasonable explanation of the decisionmaking process is all that is required to survive arbitrary-and-capricious review. Even if the Court doubts that the Secretary's conclusions necessarily follow from the facts found, the Court "should 'uphold a decision of less than ideal clarity if the [Secretary's] path may reasonably be discerned.'" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quoting *Bowman Transp., Inc.*, 419 U.S. at 286); *see also, e.g.*, *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 514-15 (4th Cir. 2011). And here, the Secretary's path is readily understood from his memorandum, including a "rational connection between the facts found and the choices made." *State Farm*, 463 U.S. at 43.

> 3. The Secretary engaged in an appropriate process, including the consideration of alternatives, and explained his rationale.

To the extent Plaintiffs suggest that the Secretary's decision was arbitrary and capricious because he "relied on factors which Congress has not intended [him] to consider," "failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency," *id.*, those claims are clearly belied by the record. The Secretary

engaged in a process that identified various issues, considered alternative proposals, and explained his

rationale for rejecting or accepting the different options presented based on the evidence before him.

What matters for APA review is that the Secretary engaged in this process and deliberately considered

the options—not whether his decision was "the best one possible or even whether it [was] better than

the alternatives." *Elec. Power Supply Ass'n*, 136 S. Ct. at 782.

First, Plaintiffs cannot show that the Secretary failed to consider alternatives to reinstating a

citizenship question. SAC ¶ 166. The Secretary considered four proposals and reasonably concluded

that Option D would provide DOJ with the most complete and accurate CVAP data. AR 1314-17.

That the Census Bureau recommended Options A or C, *id.* 1277, and expressed reservations about

Option D, *id.* 1312, does not render the Secretary's decision unreasonable. Given the broad deference

afforded the Secretary by virtue of the congressional delegation of broad discretion over the census,

"the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself

of no moment in any judicial review of his decision." *Wisconsin*, 517 U.S. at 23. The Secretary, "like

all agency heads, usually makes decisions after consulting subordinates, and those subordinates often

have different views." *St. Marks Place Hous. Co. v. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 83 (D.C.

Cir. 2010). All that is required is that the Secretary consider the important issues—including those

highlighted by his subordinates—and provide a rational explanation for his decision. *State Farm*, 463

U.S. at 43.

Plaintiffs also cannot show, for example, that the Secretary failed to consider effects on the

response rates. SAC ¶¶ 108-17, 166. The Secretary reviewed the available materials and concluded

that "no one provided evidence that reinstating a citizenship question on the decennial census would

materially decrease response rates." AR 1315, 1317. The Secretary further explained that the Bureau

could address any nonresponse through NRFU and, in any event, "the value of more complete and

accurate data derived from surveying the entire population outweighs such concerns." *Id.* 1319. That

judgment was informed by the fact that there is a legal duty to respond to the census, 13 U.S.C. § 221,

and the Secretary concluded that the value of providing accurate data to DOJ was "of greater importance than any adverse effect that may result from people violating their legal duty to respond." AR 1319.  Regardless, to help minimize any effect on response rates, the Secretary decided that the citizenship question should be the last question on the form.  *Id.* 1320.

Plaintiffs also cannot show that the Secretary failed to consider the issue of testing for the reinstatement of a citizenship question.  SAC ¶¶ 97-98, 166.  When the Census Bureau receives a request from other agencies for a new question on the ACS, the Bureau typically "work[s] with the other agencies to test the question (cognitive testing and field testing)."  AR 1296.  In reviewing DOJ's request to reinstate a citizenship question, the Bureau concluded that, "[s]ince the question is already asked on the American Community Survey, [it] would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question."  *Id.* 1279.  In his memorandum, the Secretary thus reasonably concluded that "the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions."  *Id.* 1319.

Lastly, to the extent Plaintiffs suggest the Secretary's decision was pretextual, SAC ¶ 166, they cannot demonstrate that he did not believe the rationale set forth in his decision memorandum or that his initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious.  Even if the Secretary had additional reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the APA analysis would remain unchanged.  *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").  It is utterly unremarkable for an agency head to enter office with predispositions toward certain policy choices.  That the Secretary thought reinstatement of a citizenship question "could be warranted," AR 1321, asked his staff to explore such an action, and decline to accept some of his other staff's recommendations is neither unexpected nor evidence of improper decisionmaking.  *Wisconsin*, 517 U.S. at 23 ("[T]he mere

fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision.").  As Justice Gorsuch explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."  *In re Dep't of Commerce*, __ S. Ct. __, 2018 WL 5259090, at *1 (Oct. 22, 2018) (Gorsuch, J., concurring in part and dissenting in part).

      B.    <u>The Secretary's decision was not otherwise unlawful.</u>

    Plaintiffs also argue that the Secretary's decision was unlawful because it did not conform to the requirements of the Constitution or federal statute.  To the extent Plaintiffs again argue that the Secretary will fail to conduct an actual enumeration, or otherwise violated constitutional mandates, SAC ¶ 166, those claims are unavailing for the reasons set forth above.  Plaintiffs also contend that the Secretary violated the Information Quality Act (IQA), Pub. L. No. 106-554, § 1(a)(3) (Dec. 21, 2001) (published at 44 U.S.C. § 3516 note); directives issued by the Office of Management and Budget (OMB) pursuant to the Paperwork Reduction Act (PRA), 44 U.S.C. §§ 3501-21; and a provision of the Census Act governing the contents of certain reports to Congress, 13 U.S.C. § 141(f)(3).  SAC ¶¶ 96, 105-07, 166.

    First, as to the IQA and the relevant OMB directives, neither provides a basis for judicial review of the Secretary's decision to reinstate a citizenship question.  The Fourth Circuit rejected just such a claim that an agency violated the IQA in *Salt Institute v. Leavitt*, 440 F.3d 156 (4th Cir. 2006), *aff'g Salt v. Thompson*, 345 F. Supp. 2d 589, 602 (E.D. Va. 2004).  "By its terms, this statute creates no legal rights in any third parties," the court explained, and consequently Plaintiffs cannot "establish an injury in fact sufficient to satisfy Article III."  *Id.* at 159.  Any putative injury is not properly traced to information-quality standards, nor would an order from this Court directed at those standards remedy any of Plaintiffs' alleged injuries.  In any event, as courts have repeatedly held, the IQA and relevant OMB guidelines do not provide the substantive standards necessary to review under the APA, *see* 5

U.S.C. § 701(a)(2), and this Court has no basis by which to judge a putative violation of information-quality standards.  *See, e.g.*, *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 82 (D.D.C. 2013); *Family Farm All. v. Salazar*, 749 F. Supp. 2d 1083, 1092 (E.D. Cal. 2010); *Ams. for Safe Access v. Dep't of Health & Human Servs.*, No. 07-cv-1049 (WHA), 2007 WL 4168511, at *4 (N.D. Cal. Nov. 20, 2007).  There is therefore no APA cause of action.  *See, e.g.*, *Habitat for Horses v. Salazar*, No. 10-cv-7684, 2011 WL 4343306, at *7 (S.D.N.Y. Sept. 7, 2011).  Thus, Plaintiffs' information-quality claims are unreviewable and, in any event, they lack standing to bring them.

Plaintiffs' allegations of purported violations of 13 U.S.C. § 141(f)(3), meanwhile, are factually incorrect and beyond the scope of this Court's jurisdiction.  As an initial matter, the Secretary notified Congress of Defendants' intent to reinstate a citizenship in March 2018 after the Secretary received DOJ's request, satisfying any reporting obligation the Secretary may have had under § 141(f) and negating any suggestion that Congress was not fully informed.  In any event, the APA "does not provide judicial review for everything done by an administrative agency," *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (quoting *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)), and the adequacy of Defendants' § 141(f) reports is not subject to judicial review.  Under the APA, a plaintiff "must identify some 'agency action' that affects him in the specified fashion," *Lujan* , 497 U.S. at 882, and "agency action" is a term of art, defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Here, a report to Congress is none of the enumerated actions subject to judicial review, nor is it "the equivalent . . . thereof."  *Id.*  A report does not determine Plaintiffs' rights or obligations; rather, it conveys information to Congress.  *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *see also, e.g.*, *Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988).  In any event, any purported defects in Defendants' reports do not create the sort of redressable Article III injury necessary to sustain the Court's jurisdiction.  Any relief addressed at a putative violation of a reporting requirement cannot be shown to have any concrete effect on Congress that would redress an alleged injury.

*Guerrero*, 157 F.3d at 1194 (explaining that "nothing that [the Court] could order with respect to the reports or their adequacy can make Congress do anything"); *see also, e.g., Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006). There is no dispute of material fact that prevents the Court from entering judgment for Defendants on these purely legal issues.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in Defendants' favor on Plaintiffs' claims, and this case should be dismissed with prejudice.

Dated: November 12, 2018

<div style="margin-left:50%">

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

CARLOTTA P. WELLS
Assistant Branch Director

*/s/ Carol Federighi*
KATE BAILEY
STEPHEN EHRLICH
CAROL FEDERIGHI
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530
Tel.: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendants*

</div>