# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| ROBYN KRAVITZ, *et al.* | |
| Plaintiffs, | |
| v. | **Case No. 18-cv-01041** |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| Defendants. | |

## MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ..................................................................................... 3

I. The Secretary's Unlawful Decision to Add Citizenship as a Subject on the 2020
Decennial Census Questionnaire. .................................................................... 3

    A. The Commerce Department and Census Bureau Do Not Include
Citizenship in Their Report to Congress Identifying the 2020 Census
Subjects. ............................................................................................... 4

    B. The Secretary Engineers a Belated DOJ Request to Add Citizenship to the
2020 Decennial Census. ........................................................................ 5

    C. The Census Bureau Advises the Secretary That Adding Citizenship to the
2020 Census Subjects Will Harm Data Quality and Was Not Needed to
Respond to DOJ's Request. ................................................................... 8

    D. The Secretary Issues an Error-Ridden Decision Memorandum That
Contradicts the Evidence Before the Agency. ...................................... 11

II. Plaintiffs Will Be Harmed by Secretary Ross's Decision. ............................... 12

    A. The Addition of a Citizenship Question Will Cause a Differential Drop in
Self-Response Among Certain Subpopulations. .................................... 13

    B. The Differential Decline in Self-Response for Certain Subpopulations Will
Result in a Differential Undercount of Those Subpopulations. ............. 15

    C. Plaintiffs Will Be Harmed by a Differential Undercount in Their
Communities. ......................................................................................... 17

ARGUMENT ........................................................................................................... 19

I. Plaintiffs Have Established Genuine Issues of Fact As to Standing. ................. 19

    A. The Citizenship Question Will Cause a Differential Decline in Response
Rates Among Specific Sub-Populations. ............................................... 20

    B. The Evidence Clearly Establishes That the Differential Drop in Self-
Response Rates Will Lead to a Differential Undercount. ....................... 22

    C. It Is Undisputed That a Differential Undercount Will Harm Plaintiffs. ............... 25

II.    Defendants' Motion for Summary Judgment on the Merits of Plaintiffs' APA and Enumeration Clause Claims Should be Denied. ............................................................. 27

    A.    The Merits of Plaintiffs' Claims Should be Resolved at Trial After a Full Presentation of the Evidence. ................................................................................. 27

    B.    The Secretary's Decision Was Arbitrary and Capricious Under APA § 706(2)(A). ..................................................................................................... 30

        1.    The Secretary's Decision Was Arbitrary and Capricious Because It Contradicted the Evidence That Was Before the Agency. ...................... 31

        2.    The Secretary's Decision Was Arbitrary and Capricious Because It Was Impermissibly Pretextual, Predetermined, and Politically Influenced. ................................................................................................ 34

    C.    The Secretary's Decision Violated the APA Because No "New Circumstance" Existed "Necessitating" the Addition of the CQ, Nor Did the Secretary Purport to Find One. ..................................................................... 36

    D.    The Secretary's Decision Violated the APA Because It Flouted the Census Bureau's Mandatory Testing Requirements and Statistical Standards. ................ 38

    E.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Enumeration Clause Claim. ................................................................................. 44

CONCLUSION ............................................................................................................... 45

# TABLE OF AUTHORITIES

CASES                                                                     Page(s)

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
    326 F.3d 505 (4th Cir. 2003) .............................................................19

*Block v. Community Nutrition Institute*,
    467 U.S. 340 (1984).........................................................................37

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980).........................................................26, 27

*Carey v. Population Services Int'l*,
    431 U.S. 678 (1977)........................................................................20

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971)........................................................................28

*City of Alexandria v. Fed. Highway Admin.*,
    756 F.2d 1014 (4th Cir. 1985) .......................................................28

*City of Detroit v. Franklin*,
    4 F.3d 1367 (6th Cir. 1993) ...........................................................27

*City of Kansas City, Mo. v. Dept. of Housing and Urban Dev.*,
    923 F.2d 188 (D.C. Cir. 1991).......................................................30

*City of Los Angeles v. Dep't of Commerce*,
    307 F.3d 859 (9th Cir. 2002) .........................................................37

*City of Philadelphia v. Klutznick*,
    503 F. Supp. 663 (E.D. Pa. 1980) .................................................27

*Clapper v. Amnesty Int'l, USA*,
    568 U.S. 398 (2013).......................................................................19

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999).......................................................................25

*District of Columbia v. U.S. Dep't of Commerce*,
    789 F. Supp. 1179 (D.D.C. 1992) .................................................37

*Dow Agrosciences v. Nat'l Marine Fisheries Svc.*,
    707 F.3d 462 (4th Cir. 2013) .........................................................31

*Friends of the Earth Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000) .........................................................28

*Glavin v. Clinton*,
   19 F. Supp. 2d 543 (E.D. Va. 1998) ......................................................................27

*Home Box Office, Inc. v. F.C.C.*,
   567 F.2d 9 (D.C. Cir. 1977) ................................................................................30

*Kravitz v. U.S. Dep't of Commerce*, 2018 WL 4005229 (D. Md. Aug. 22, 2015) ............... *passim*

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ............................................................................28

*Latecoere Int'l Inc. v. U.S. Dept. of Navy*,
   19 F.3d 1342 (11th Cir. 1994) .......................................................................34, 35

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 ......................................................................................................19, 27

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mur. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................................30

*Munoz-Mendoz v. Pierce*,
   711 F.2d 421 (1st Cir. 1983) ............................................................................27

*Nat'l Audubon Society v. Dep't of Navy*,
   422 F.3d 174 (4th Cir. 2005) ............................................................................28

*New York Immigration Coalition v. U.S. Department of Commerce*,
   18-cv-5025 (S.D.N.Y.) ....................................................................................3, 29

*NRDC v. Watkins*,
   954 F.2d 974 (4th Cir. 1992) ............................................................................24

*Ohio Valley Envt'l Coal., Inc. v. United States Army Corps of Engineers*,
   828 F.3d 316 (4th Cir. 2016) ............................................................................30

*Raritan Baykeeper v. NL Industries, Inc.*,
   No. 09-4117 (MAS) (DEA), 2016 WL 7381715 (D.N.J. July 29, 2016) ................27

*Sierra Club v. United States Department of Interior*,
   899 F.3d 260 (4th Cir. 2018) ............................................................................28

*State of New York v. U.S. Dep't of Commerce*,
   No. 18-cv-02921, Dkt. 405 ................................................................................29

*State of New York v. U.S. Department of Commerce*,
   18-cv-2921 (S.D.N.Y) ....................................................................................3, 29

*State of New York v. U.S. Department of Commerce*,
   No. 18-cv-2921 (S.D.N.Y.) ................................................................................12

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ...................................................................................................27

*Tech-Sonic Inc. v. Sonics & Materials, Inc.,*
    No. 3:12–cv–01376 (MPS), 2015 WL 4715329 (D. Conn. 2015) ...........................27

*Tummino v. Torti,*
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ..............................................................34, 35

*U.S. v. F/V Alice Amanda,*
    987 F.2d 1078 (4th Cir. 1993) .........................................................................30, 31

*Water Quality Ins. Syndicate v. United States,*
    225 F. Supp. 3d 41, 68 (D.D.C. 2016) ...................................................................30

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) ...................................................................................................44

**Statutes**

5 U.S.C. § 706(2) ...........................................................................................................30, 36

13 U.S.C. § 6(c) ....................................................................................................................38

13 U.S.C. § 141(f)(1) ........................................................................................................4, 36

13 U.S.C. § 141(f)(3) ......................................................................................................37, 38

44 U.S.C. § 3504(e)(3), (4), 3506(e)(1), (4) ........................................................................38

42 U.S.C. § 1973 .................................................................................................................7, 33

**Other Authorities**

5 C.F.R. § 1320.18(c) ............................................................................................................39

71 Fed. Reg. 55,522 (Sept. 22, 2006) ...................................................................................39

2020 Census Program Memorandum Series: 2016.05 (Apr. 29, 2016) ............................39, 40

Census Bureau Statistical Quality Standards (rev. July 2013) .........................................39, 40

Census Operational Plan v3.0 (Sept. 2017) ...........................................................................43

July 1, 2016 Letter from Arthur Gary to John Thompson .........................................................5

OMB Statistical Programs of the United States Government: Fiscal Year 2018 ....................38

OMB Statistical Policy Directive No. 1., Fundamental Responsibilities of Fed.
   Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610,
   71,615 (Dec. 2, 2014) ...........................................................................................39

 OMB Statistical Policy Directive No. 2, Standards and Guidelines for Statistical
   Surveys (2006)......................................................................................................39

TR. OF A HEARING BEFORE THE COMMITTEE ON WAYS AND MEANS, U.S. House of
   Representatives, March 22, 2018, Serial no. 115-FC09 ...........................................3

## PRELIMINARY STATEMENT

Defendants' Motion for Summary Judgment has no merit and should be denied because discovery in this case has plainly established the existence of numerous fact-intensive disputes as to both the threshold issue of Plaintiffs' standing and the merits of Plaintiffs' Administrative Procedure Act ("APA") and constitutional claims. As to standing—an issue of subject matter jurisdiction that this Court is required to decide before addressing the merits of Plaintiffs' claims—Defendants' motion amounts to little more than a conclusory rehash of the same legal and factual arguments that this Court rejected in denying their earlier Motion to Dismiss. *See Kravitz v. U.S. Dep't of Commerce*, --- F. Supp. 3d ----, No. 18-cv-1041, 2018 WL 4005229, at *5-9 (D. Md. Aug. 22, 2018). Defendants fail to grapple with, much less refute as a matter of law, the voluminous factual and expert evidence supporting Plaintiffs' proof of the injuries they will suffer as a result of the Secretary of Commerce's unlawful decision to add citizenship as a subject on the 2020 Census questionnaire. As shown below, the evidence in the record is amply sufficient to require a trial on the merits of Plaintiffs' standing claim.

Because Plaintiffs are entitled to present their evidentiary proof on the jurisdictional question of standing, this Court cannot reach the merits of Defendants' arguments without first adjudicating that threshold issue after a trial or full evidentiary hearing. Even if that alone did not preclude summary judgment as to Plaintiffs' APA and Enumeration Clause claims, Defendants' breezily one-sided and superficial description of the Administrative Record (the "AR") cannot wish away the powerful factual evidence that the Secretary's decision was arbitrary and capricious, contrary to law, and in violation of his constitutional mandate.

Defendants contend that the Court may consider only the AR in adjudicating Plaintiffs' claims. But as this Court found in ordering extra-record discovery—and as the AR and extra-record discovery have borne out—serious factual issues exist as to whether the officially stated

rationale for the Secretary's decision was a mere pretext manufactured in bad faith by the Secretary and other officials at the Commerce Department and the Department of Justice ("DOJ") acting in concert with him. Furthermore, as a result of the irregularities involved in the Secretary's decision, the very scope of the AR is disputed. In the parallel New York Census cases, Defendants' failure to disclose material agency documents within the AR resulted in multiple court-ordered supplementations; and the gaps and other shortcomings in the AR produced by Defendants remain glaring. This Court should not rule on summary judgment based on the AR alone when expert evidence and testimony are needed to fully understand the issues raised by that record and the exact scope of the factual evidence to be considered on this Court's review is itself in dispute.

Indeed, even if this Court limited its review solely to the agency AR that Defendants acknowledge as such, Defendants' summary judgment motion would fail. The documents undisputedly within the AR clearly demonstrate that the Secretary's decision—as memorialized in his March 26, 2018 decision memorandum—ignored important aspects of the problem before him; relied upon extraneous factors for which the AR provided no plausible support; failed to comport with legal requirements governing the Census Bureau and the conduct of the Census; and was arbitrary and capricious in multiple respects under the APA. As the voluminous post-trial findings of fact and conclusions of law recently filed by plaintiffs in the New York Census cases make plain, *see* Grant Decl. Ex. 1 (New York Plaintiffs' Proposed Findings of Fact); Ex. 2 (New York Plaintiffs' Proposed Conclusions of Law), the record here is replete with factual evidence sufficient to substantiate Plaintiffs' claims. Trial in this case will likewise demonstrate that—irrespective of the scope of extra-record evidence, if any, that the Court considers—

Plaintiffs are entitled to judgment on their APA and Enumeration Clause claims, and the Secretary's decision to shoehorn citizenship questions into the 2020 Census must be overturned.

In light of the necessity of a trial and the urgent need to adjudicate this case to conclusion before June 2019—when the content of 2020 Census questionnaires must be finalized for printing—by far the most efficient way to proceed is for the parties to present all of their evidence as to both standing and the merits issues at a single trial, as scheduled, commencing January 22, 2018. Trial on this basis in the New York cases required less than two weeks. After hearing all the evidence, this Court can determine the scope of the evidence it may consider and how, if at all, that impacts its final judgment on Plaintiffs' claims. By contrast, a narrow summary judgment ruling based on disputed issues of law could lead to a protracted series of appeals and remands that would preclude a timely resolution of Plaintiffs' claims on the merits.

## FACTUAL BACKGROUND

I.  **The Secretary's Unlawful Decision to Add Citizenship as a Subject on the 2020 Decennial Census Questionnaire.**

On March 22, 2018—days before releasing his decision memorandum to insert a set of citizenship questions into the 2020 Census questionnaire (collectively, the "CQ")—Secretary Ross testified under oath before the U.S. House of Representatives Ways and Means Committee that "[the Department of Justice (DOJ)] . . . *initiated* the request for inclusion of the citizenship question."[1] This statement was objectively false. As Secretary Ross admitted in a supplement to the AR after this litigation commenced, *he* initiated the request. *See* Grant Decl. Ex. 28 at 1321.[2]

---

[1] TR. OF A HEARING BEFORE THE COMMITTEE ON WAYS AND MEANS, U.S. House of Representatives, March 22, 2018, Serial no. 115-FC09, *available at* https://docs.house.gov/meetings/WM/WM00/20180322/108053/HHRG-115-WM00-Transcript-20180322.pdf.

[2] AR refers to Administrative Record as stipulated by the parties in *State of New York v. U.S. Department of Commerce*, 18-cv-2921 (S.D.N.Y) and *New York Immigration Coalition v. U.S.*

The AR further details how the Secretary and his staff persuaded DOJ to send a letter that could

be used to justify adding the CQ and then insisted on the CQ despite the Census Bureau's

detailed findings that it would not be the best option for meeting DOJ's stated needs and would

compromise the quality and accuracy of the Census count.

**A.      The Commerce Department and Census Bureau Do Not Include Citizenship
in Their Report to Congress Identifying the 2020 Census Subjects.**

Under the Census Act, 13 U.S.C. § 141, the Commerce Department was required to

provide Congress with a final list of "subjects" to be included in the 2020 Census by no later

than March 31, 2017. *See* 13 U.S.C. § 141(f)(1). Pursuant to this requirement, in March 2017, the

Department and the Census Bureau submitted a report to Congress identifying five subjects that

would be included in the 2020 Census: age, gender, race/ethnicity, relationship, and homeowner

status. *See* "Subjects Planned for the 2020 Census and American Community Survey," Grant

Decl. Ex. 5, at AR202-213. Citizenship was *not* included as a 2020 Census subject. *Id.*

DOJ did not request the collection of citizenship data through the 2020 Census at any

time prior to November 2017. To the contrary, it is a matter of public record that in July *2016*

Arthur E. Gary, General Counsel of the DOJ Justice Management Division, transmitted a letter

to the Census Bureau advising that, in the context of DOJ's review of ACS content, "I have

consulted the Civil Rights Division and the Office of Justice Programs and confirm to you that

there are no needs to alter or amend the current content and uses, nor any needs at this time for

---

*Department of Commerce*, 18-cv-5025 (S.D.N.Y.) (the "New York cases"). The parties in this
case have not yet entered into a comparable stipulation identifying the scope of the AR.

new content." [3] A few months later, Gary supplemented his July 2016 letter, but again did not mention citizenship or any need for changes to existing data. Grant Decl. Ex. 3, at AR311.

### B.     The Secretary Engineers a Belated DOJ Request to Add Citizenship to the 2020 Decennial Census.

Although citizenship was not included in the 2020 Census subjects reported to Congress, "[s]oon after [his] appointment," Secretary Ross was prompted by "other senior Administration officials" to consider whether to "reinstate" a citizenship question on the 2020 Census. Grant Decl. Ex. 28, at AR1321. These officials included former White House Chief Strategist Steve Bannon and Kris Kobach, former Vice-Chairman of President Trump's Presidential Advisory Commission on Election Integrity. *Id.* Ex. 6, at AR2561; Ex. 8, at AR763. Emails among Secretary Ross, Kobach, and the Secretary's staff show that the impetus for adding a citizenship question related to a desire to exclude noncitizens from the population count for purposes of apportioning Congressional representation.[4]

By no later than May 2, 2017, the Secretary had committed to instituting a CQ and had already taken steps to make it happen. The Secretary complained to Director of Policy and Strategic Planning Earl Comstock that he was "mystified why nothing has been done in response to *my months['] old request that we include the citizenship question*." *Id.* Ex. 7, at AR3710

---

[3] *See* July 1, 2016 Letter from Arthur Gary to John Thompson, available at p.4 of https://www.carper.senate.gov/public/_cache/files/de7e0915-ea9f-4c51-a2d5-f3ee4abe0bf3/2017-05-22-carper-harris-letter-to-census-bureau-re-new-subjects-press-.pdf, and referred to at Grant Decl. Ex. 3 at AR311.

[4] Kobach told the Secretary that the absence of the citizenship question on the Census gives rise to the "problem" that "aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." Grant Decl. Ex. 8, at AR764. In March 2017, Comstock emailed the Secretary in response to "Your Question on the Census" with a link to a Census Bureau website stating, "Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts." *Id.* Ex. 4, at AR2521.

(emphasis added). Comstock responded by assuring the Secretary: "On the citizenship question, *we will get that in place.*" *Id.* (emphasis added). However, Comstock told the Secretary that "[w]e need to work with Justice to *get them to request* that citizenship be added back as a census question, and *we* have the court cases to illustrate that DOJ has a legitimate need for the question to be included." *Id.* (emphases added).

Thereafter, Comstock and other Commerce officials sought to identify a willing agency to adopt a request to add a CQ. In early May 2017, Comstock met with a DOJ White House liaison and conferred several times with the Acting Director of DOJ's Executive Office of Immigration Review. *Id.* Ex. 11, at AR12756. On September 8, 2017, however, Comstock informed the Secretary that "Justice staff did not want to raise the question . . . ." *Id.* Comstock then turned to the Department of Homeland Security ("DHS") and held several phone calls with a DHS official concerning the matter. *Id.* But DHS also declined to get involved.[5] *Id.* At that point, Comstock told the Secretary that he had gone so far as to ask a Commerce Department attorney, James Uthmeier, to "look into the legal issues and *how Commerce could add the question to the Census itself.*" *Id.* (emphasis added).

Subsequently, on September 13, 2017, John Gore, the acting head of DOJ's Civil Rights Division, emailed the Secretary's Chief of Staff, Wendy Teramoto, to discuss "a DOJ-DOC

---

[5] During extra-record discovery, Comstock summarized his efforts to enlist the help of another government agency: "In order to implement the process that had been outlined to us, you needed an agency. So that was my task at the time." Grant Decl. Ex. 39 (Comstock Dep. Tr.) at 181-82. Comstock further testified that he "had several phone calls to discuss the matter" with a DHS official, Gene Hamilton. *Id.* at 180. He told Hamilton that the Commerce Department was interested in adding a citizenship question and asked whether this was information that DHS "would need or use." *Id.*

issue." *Id.* Ex. 12, at AR2652.[6] By September 17, 2017, the Secretary spoke directly with

Attorney General Jeff Sessions concerning the matter. *Id.* at AR2651. That same day, a

representative of the Attorney General's office, Danielle Cutrona, assured the Secretary by email

to his Chief of Staff that, with regard to the citizenship question, "we can do whatever *you all*

*need us* to do." *Id.* (emphasis added). On November 27, 2017, the Secretary wrote to Commerce

Department General Counsel Peter Davidson, demanding: "We are out of time. Please set up a

call for me tomorrow with whoever is the responsible person at Justice. We must have this

resolved." *Id.* Ex. 13, at AR11193. Davidson responded, "I can brief you tomorrow . . . no need

for you to call." *Id.*

Two weeks later, on December 12, 2017, DOJ issued a letter (the "DOJ Letter") under

Gary's signature, formally requesting that the Census Bureau "reinstate on the 2020 Census

questionnaire a question regarding citizenship." *Id.* Ex. 14, at AR663.[7] The DOJ Letter asserted

that citizenship data is "critical" to its enforcement of Section 2 of the Voting Rights Act

("VRA"), 42 U.S.C. § 1973. *Id.* at AR663.[8] DOJ noted that, from 1970 to 2000, the Census

Bureau collected citizenship data through the "long form" questionnaire sent to a sample of the

---

[6] Extra-record discovery suggests that Mark Neuman, a former member of President Trump's Transition Team and an external adviser to Secretary Ross on census-related issues, had met with Gore in the intervening time. Grant Decl. Ex. 37 (Neuman Dep. Tr.) at 101-02, 110.

[7] Gore, who oversaw the drafting of the December 12 Letter and provided the final version to Gary to send to the Census Bureau, testified that it was in response to the Commerce Department's request. *See* Grant Decl. Ex. 32, at DOJ2738, DOJ3740, DOJ14798, DOJ14821, DOJ14834, DOJ14840, DOJ28354, DOJ28385; *Id.* Ex. 40 (Gore Dep. Tr.), at 64-67, 94-95. Indeed, Secretary Ross' staff was closely involved in the preparation of the letter. A draft was produced in discovery by Neuman, who recalled that he and numerous Commerce Department officials "review[ed] and offer[ed] thoughts on draft versions of the letter." Grant Decl. Ex. 37 (Neuman Dep. Tr.) at 278-280, 283-284; Grant Decl. Ex. 38 (Neuman Dep. Ex. 18) (draft letter).

[8] Although Gore was the primary drafter of the DOJ Letter, he admitted at his deposition that "CVAP data collected through the census questionnaire is *not* necessary for DOJ's VRA enforcement efforts." Grant Decl. Ex. 40 (Gore Dep. Tr.) at 300:8-11 (emphasis added).

U.S. population in conjunction with the decennial census. *Id.* at AR664. As of the 2010 Census, the "long form" was discontinued and the ACS replaced it as the source of citizenship data used by DOJ for VRA enforcement. *Id.* The DOJ Letter claimed that the ACS "does not yield the ideal data for such purposes," noting that unlike decennial census data, ACS data is not "reported to the Census block level." *Id.* at AR664-65. Though DOJ stated its belief that "decennial census questionnaire data regarding citizenship" would be "more appropriate for use" than ACS citizenship data, it did not claim that census citizenship data was "necessary" for its purposes. *Id.* at AR665.

### C.     The Census Bureau Advises the Secretary That Adding Citizenship to the 2020 Census Subjects Will Harm Data Quality and Was Not Needed to Respond to DOJ's Request.

By December 22, 2017, a "SWAT team" of Census Bureau scientists under the supervision of the Bureau's Chief Scientist, Dr. John Abowd, had prepared a technical memorandum and an accompanying white paper analyzing DOJ's request. *See* Grant Decl. Ex. 18, at AR11634-45; *id.* Ex. 17, at AR11646-49. Based on the white paper's analysis, the technical memorandum recommended meeting the DOJ's request for block-level CVAP data through the use of existing federal government administrative records, and advised *against* adding a CQ to the 2020 Census questionnaire on the grounds that it would not only have a "potential negative impact on voluntary cooperation with the census" but also would result in "poorer quality citizenship data than would be available through administrative records." *Id.* Ex. 17, at 11647.

On or about January 19, 2018, Dr. Abowd produced a more detailed memorandum (the "January 19 Memo") for the Secretary, which considered three potential "Alternatives" for meeting DOJ's request for block-level citizenship data: (A) no change in data collection (*i.e.*, continued reliance on ACS citizenship data), (B) adding a citizenship question to the decennial

Census questionnaire, and (C) combining ACS citizenship data with data from federal administrative records for the whole population. Grant Decl. Ex. 19, at AR1277. The January 19 Memo concluded that asking the citizenship question (Alternative B) was the *worst* option among these three because it would be "very costly, harm[] the quality of the census count," and would result in substantially *less* accurate citizenship status data than are available from administrative sources. *Id.* In particular, the Bureau concluded that the addition of a citizenship question would lead to a differential drop in self-response among households with at least one noncitizen, compared to all other households. *Id.* at AR1280-81. The Bureau also explained that self-reported citizenship data is much less reliable than data from administrative records because of high rates of misreporting and non-response. *Id.* at AR1278, AR1283-85. Because serious doubt exists as to whether the addition of the CQ to the 2020 Census would result in more accurate citizenship data, the Bureau recommended adopting either Alternative A or Alternative C, which it identified as the "[b]est option for block-level citizenship data." *Id.* at AR1277-78.[9]

In response, the Secretary ordered the Census Bureau to conduct additional analysis of a fourth option: "Alternative D," which would *both* add a decennial Census CQ (Alternative B) *and* use administrative records (as with Alternative C) to provide CVAP data at the block level. *Id.* Ex. 27, at AR 1316. Abowd presented the Census Bureau's "[p]reliminary analysis of Alternative D (Combined Alternatives B and C)" in a memorandum to the Secretary dated March 1, 2018 (the "March 1 Memo"). *Id.* Ex. 25 at AR9812-9816. In no uncertain terms, the Bureau concluded that Alternative D would have "all the negative cost and quality implications" of just

---

[9] The professional staff at the Census Bureau repeatedly sought to meet with representatives of DOJ to understand their request, Grant Decl. Ex. 15, at AR3289; *id.* Ex. 16, at AR8651, but "DOJ leadership" decided against such a meeting, *id.* Ex. 22, at AR3460. Extra-record discovery revealed that Attorney General Sessions directed DOJ staff not to meet with the Census Bureau regarding the DOJ's data request. Grant Decl. Ex. 40 (Gore Dep. Tr.) at 271:21-272:13.

adding the citizenship question alone, and would also "result in poorer quality citizenship data than" just using administrative records along with existing ACS data. *Id.* at AR9816.

Prior to the Secretary's decision, senior Commerce political staff drafted a set of 35 questions for the Census Bureau regarding its conclusions. *Id.* Ex. 21 at AR5216. The Census Bureau's responses steadfastly supported reliance on administrative records without the addition of a Census CQ. *See id.* Ex. 25, at AR9822-9833. In response to question 31, the Census Bureau included a step-by-step summary of the "well-established process" for adding questions to the decennial census or the ACS, citing OMB and Census Bureau procedures. *Id.* Ex. 25 at AR9832-33. The Bureau laid out a six-step process, which included that "proposed questions result from extensive cognitive and field testing," "several opportunities for public comment," and making the final decision "in consultation with OMB." *Id.* In adding a CQ to the Census, Commerce did not follow these steps.[10] The response to Question 31 was subsequently modified by senior political staff at the Commerce Department; the detailed steps in the "well-established process" were removed, and the new response noted that the Census Bureau "did not feed [*sic*] bound by past precedent when considering the Department of Justices' [*sic*] request." *Id.* Ex. 26 at AR1296.[11] Notably, this revised version was the only version included in the original AR.

---

[10] *See* Grant Decl. Ex. 34 (Jarmin Dep. Tr.) at 45-54.

[11] Dr. Abowd, who was responsible for the Census Bureau's responses to these questions, testified that he had never seen this version of the answer. Grant Decl. Ex. 35 (Abowd Dep. Tr.) at 281:1-282:16. Sahra Park-Su testified that she and Commerce Deputy General Counsel Mike Walsh made initial revisions to the response, but she does not know who made the final revisions. *See* Grant Decl. Ex. 41 (Park-Su Dep. Tr.) at 141:14-143:1, 159:19, 160:4, 169:16-21.

**D.     The Secretary Issues an Error-Ridden Decision Memorandum That Contradicts the Evidence Before the Agency.**

Despite the Bureau's consistent and well-supported recommendation[12] against adding a

CQ, the Secretary went on to do just that in his March 26, 2018 memorandum (the "Decision

Memo"). The Decision Memo claimed that this would provide DOJ with citizenship data "at the

census block level," thereby permitting more effective enforcement of the VRA. Ex. 27 at

AR1313.[13] However, the Decision Memo ignored or mischaracterized key findings by the

Census Bureau suggesting that the citizenship question would (i) harm the quality of the Census

count and (ii) would not actually be the best option for meeting DOJ's request for accurate

block-level citizenship data. For example, the Decision Memo:

- asserted that "no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did," *id.* Ex. 27 at AR1317, when in fact the Census Bureau consistently reported that the citizenship question would lead to a decline in self-response among noncitizen households, *see id.* Ex. 19 at AR1280-81;[14]

- claimed that Alternative D would provide the most "complete and accurate" citizenship data and "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," *id.* Ex. 27 at AR1317-18, in contradiction of the Census Bureau's explanation that the inclusion of a CQ under Alternative D would *reduce* the Bureau's ability to match individuals to administrative records and would not result in reliable self-reported citizenship data for individuals lacking administrative records, *id.* Ex. 25 at AR9815-16;

- concluded that the "citizenship data provided to DOJ will be more accurate with the question than without it," *id.* Ex. 27 at AR1319, despite the fact that the Census Bureau's analysis

---

[12] During extra-record discovery, the Bureau confirmed that it still believes that adding a citizenship question is a bad idea. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 139.

[13] As Plaintiffs' expert David Ely explains, block-level citizenship data from the decennial census have never been available since the enactment of the VRA, and their absence has not hindered VRA enforcement or the redistricting process. Ely Decl. Ex. A at 5-6.

[14] As Jarmin explained at his deposition, "the Census Bureau's analysis suggested that there would be some folks who would have . . . responded via self-response that would now have to go to" the Bureau's non-response follow-up operations as a result of the citizenship question. Grant Decl. Ex. 34 (Jarmin Dep. Tr.) at 308:11-15.

concluded that the Census CQ would result in "substantially less accurate citizenship status data than are available from administrative sources," *id.* Ex. 19, at AR1277; and

- asserted that the citizenship question had been "well tested" because it had been included on the ACS, Grant Decl. Ex. 27 at AR1314, while failing to account for the fact that a significant percent of respondents may be providing inaccurate responses to the question on the ACS, *see id.* Ex. 19 at AR1283-84. [15]

The Decision Memo cited no evidence contradicting these aspects of the Census Bureau's analysis. The only evidence cited to support the Secretary's view consisted of two conversations that Secretary Ross claimed to have had with Dr. Herman Habermann, a census official in the Bush administration, and with an executive at Nielsen, *see id.* Ex. 27 at AR1315, 1318. In fact, both Dr. Habermann and the Nielsen executive have reported that the Secretary materially mischaracterized both conversations, and that they did not support his conclusions. [16]

II.     **Plaintiffs Will Be Harmed by Secretary Ross's Decision.**

As the Census Bureau warned the Secretary, adding a CQ to the 2020 Census will "harm[] the quality of the census count." Grant Decl. Ex. 19, at AR1277. The number of noncitizen and Hispanic households that either choose not to self-respond to the 2020 Census questionnaire at all, or choose to respond but omit certain household members, will increase. Because the Bureau's non-response follow up ("NRFU") procedures will not ensure that these

---

[15] Bureau officials have explained that there are problems with how the citizenship question performs on the ACS in light of the high rate of inconsistencies between self-reported citizenship status and administrative records. Grant Decl. Ex. 36 (Abowd Expert Dep.) at 172:10-183:6. In fact, the Census Bureau has prioritized the question for its ACS content review process scheduled for 2021. *Id.* at 182:2-7.

[16] Christine Pierce, the Nielsen executive with whom the Secretary spoke, filed a sworn affidavit in *State of New York v. U.S. Department of Commerce*, No. 18-cv-2921 (S.D.N.Y.) disputing the Secretary's account of their conversation. *See* Grant Decl. Ex. 42 (Pierce Aff.). Dr. Hermann Habermann, the Bush administration official referenced in the Secretary's memo, has similarly stated that the memo mischaracterizes his conversation with Secretary Ross. *See* Jeffrey Mervis, Trump officials claim they can avoid 2020 census problems caused by controversial citizenship question. Experts are very skeptical. Science (April 13, 2018), http://www.sciencemag.org/news /2018/04/trump-officials-claim-they-can-avoid-2020-censusproblems-caused-controversial

individuals are enumerated, there will be a differential undercount of areas containing significant noncitizen and Hispanic populations—including the communities in which Plaintiffs reside.

## A. The Addition of a Citizenship Question Will Cause a Differential Drop in Self-Response Among Certain Subpopulations.

The Census Bureau's own analysis, including the January 19, 2018 memo, demonstrated that because of the CQ, households with at least one noncitizen member will choose to respond to the 2020 Census at a differentially lower rate compared to the rest of the population. *See, e.g.*, Grant Decl. Ex. 19, at 1280-81 (calculating a 5.1% differential decline in self-response for noncitizen households); *see also id.* Ex. 31, at COMD1S_00009871 (updating the analysis and providing conservative estimate of 5.8% differential decline). As Defendants' expert Dr. John Abowd explains: "The Census Bureau produced credible quantitative evidence that the addition of a citizenship question to the 2020 Census could be expected to lower the self-response rate in an identifiable and large sub-population—households that may contain non-citizens." Abowd Decl. ¶ 12, Dkt. 67-2.

The CQ will also cause a decline in the number of Hispanic households that respond to the 2020 Census. The Bureau's analysis revealed that the percent of Hispanic respondents who failed to respond to the citizenship question on the ACS, or broke off responding upon encountering the citizenship question was significantly higher than for non-Hispanic whites. Grant Decl. Ex. 19, at 1280-81. Subsequent analyses further confirmed that the citizenship question is especially sensitive for Hispanics and that the sensitivity of the question for Hispanics has been growing over time. *Id.* Ex. 31, at COMDIS_00009842. Focus groups of Spanish speakers conducted by the Census Bureau  revealed that "the citizenship question is a determining factor for participation." *Id.* Ex. 30 at 13046.

Plaintiffs' expert Dr. Nancy Mathiowetz also looked at Census data and found additional evidence that the citizenship question will lead to a differential decline in self-response among Hispanics of approximately 8-10 percentage points. Mathiowetz Decl., Ex. A (Oct. 5 Report) at 33; Ex. B (Oct. 26 Report) at 7-8. For example, Dr. Mathiowetz analyzed the drop-off in response rates between the 2010 decennial census and 2010 ACS for Hispanic versus non-Hispanic households—an approach analogous to the Census Bureau's analysis of the differential non-response rate for noncitizens—and found that the drop-off in response rate was 8.7 percentage points greater for households with at least one Hispanic member than for all other households. *Id.* Ex. B at 7-8. A nationwide public opinion survey of 6,309 respondents conducted by Plaintiffs' expert Dr. Matthew Barreto independently corroborated the projected decline in self-response for noncitizens and Hispanic households predicted by Census Bureau data. Dr. Barreto's survey asked respondents whether they would participate in the census given the inclusion of a citizenship question. Barreto Decl. Ex. A (Oct. 5 Report) ¶¶ 9, 60-75. His survey revealed that the expected drop-off in self-response is likely to be between 11.3% and 17.8% for immigrants, and between 14.1% and 16.6% for Latinos. *Id.* ¶¶ 18, 85.

In addition to the increase in non-citizen and Hispanic households that entirely fail to self-respond to the 2020 Census as a result of the citizenship question, a significant number of noncitizen and Hispanic households will respond to the Census but omit certain individuals from the household count. These "rostering omissions" occur where households choose to conceal individual members out of fear of the consequences of providing sensitive information. Mathiowetz Decl. Ex. A at 33; Ex. B at 5. Based on the Census Bureau's data and analyses and available empirical literature, Dr. Mathiowetz has concluded that the incidence of rostering omissions among noncitizen and Hispanic households will be on the order of 5 percent.

Mathiowetz Decl. Ex. A at 31; Ex. B at 5. The Census Bureau has not disputed this; in fact it has acknowledged that the available evidence is consistent with the phenomenon of rostering omissions. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 396:2-11.

**B.      The Differential Decline in Self-Response for Certain Subpopulations Will Result in a Differential Undercount of Those Subpopulations.**

When a household does not self-respond to the census, the Bureau uses four principal means to try to count the household: (1) sending enumerators to the housing unit to attempt to contact the household; (2) asking neighbors, landlords, or other individuals to enumerate the non-responding household (so-called "proxy responses"); (3) using high-quality administrative records; and (4) imputing the count for the household through statistical modeling. *Id.* at 223:9-18. However, these procedures will not ameliorate the decline in self-response among non-citizen and Hispanic households induced by the citizenship question.

Historically, a lower self-response rate has been linked to a higher net undercount and adverse effects on data quality. Dr. Mathiowetz's examination of self-response rates and undercounts and omissions in the 1990, 2000, and 2010 censuses—each of which included NRFU operations—found that lower self-response rates are tied to higher net undercounts and higher omission rates. Mathiowetz Decl. Ex. A, at 21-25. In 1990, a 10 percentage point drop in the mail return rate was associated with an approximate 2 percentage point increase in the net undercount. *Id.* at 32. In 2010, areas with lower self-response had statistically significantly higher net undercounts than areas with high self-response rates. *Id.* at 25.

In addition, the NRFU process is particularly unlikely to ameliorate the adverse effects of the citizenship question on self-response for several reasons.

- *First*, none of the NRFU procedures will be able to remedy rostering omissions caused by the CQ. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 397:19-399:2.

- *Second*, there is no evidence suggesting that individuals who choose not to self-respond due to the citizenship question will respond in a face-to-face encounter with an enumerator. *Id.* at 251:15-21. Indeed, available data suggest the opposite. Data from the ACS, which includes a citizenship question, shows that household follow-up is less successful in areas with higher noncitizen populations. Grant Decl. Ex. 29, at AR10408. In a memo prepared for Secretary Ross, the Bureau warned that "[t]hose refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well, resulting in a proxy response." *Id.* Ex. 25, at AR 9815; *see also id.* Ex. 31, at COMD1S_00009874 (warning that "it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on their door"). This conclusion is supported by the "best evidence we have." *Id.* Ex. 33 (Census 30(b)(6) Dep. Tr.) at 425:5-19. The enumeration errors brought about by the citizenship question thus "may not be avoidable by spending more money on field work." *Id.*; *see also id.* at 380:16- 381:13.

- *Third*, the use of proxies will not lead to a complete and accurate count. As a general matter, proxy responses are less accurate than self responses, *see id.* Ex. 19 at AR1282 (correct enumerations obtained from proxies was approximately 27 percentage points lower than correct enumerations obtained from self responses), and are more likely to result in the omission of household members, *see id.* Ex. 33 (Census 30(b)(6) Dep. Tr.) at 382:18-383:4. This is particularly true for Hispanic and noncitizen households. *See* Mathiowetz Decl. Ex. A at 28 (explaining that noncitizens and Hispanics are more likely to live in complex households, which are harder to enumerate by proxy); Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 461:2-21 (recognizing inaccuracy of proxy responses for subpopulations where multigenerational housing is common).

- *Fourth*, administrative records are less likely to exist—and therefore will be less effective for enumerating—noncitizens compared to citizens. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 233:3-11; 391:21-392:5; *see also id.* Ex. 34 (Jarmin Dep. Tr.) at 271:3-272:7; 285-8.

- *Fifth*, imputation cannot ensure a complete and accurate count of the noncitizen and Hispanic households that do not self respond because of the citizenship question. Even with imputation, the 2010 Census had a statistically significant differential net undercount of Hispanics, and the Census Bureau is likely to use similar imputation procedures in 2020. *Id.* Ex. 36 (Abowd Expert Dep. Tr.) at 65:7-9 (stating that the hot-deck method used in 2010 "will probably be used for the 2020 census"). Moreover, because imputation relies on data from surrounding households that respond to the census, differences in household size and makeup between responding and nonresponding units can affect the accuracy of imputation. *See* Mathiowetz Decl. Ex. A at 29; *see also* Barreto Decl. Ex. A ¶¶ 50-59.

Because of the limits of the Bureau's non-response follow-up efforts and the unique challenges posed by the citizenship question, Dr. Mathiowetz estimates that the citizenship question will result in *at least* a 2 percent differential net undercount of noncitizen and Hispanic households. Mathiowetz Decl. Ex. A at 32, 34.

16

**C.     Plaintiffs Will Be Harmed by a Differential Undercount in Their Communities.**

A differential undercount in Plaintiffs' communities will result in the dilution of Plaintiffs' votes and a loss of federal funding to their states and communities, including for programs on which they directly rely.

Plaintiffs' votes will be diluted in two ways. *First*, because Plaintiffs' states have larger noncitizen and Hispanic populations compared to the rest of the United States, a differential undercount of noncitizens and Hispanics will translate to a differential net undercount in Plaintiffs' states relative to rest of the country, thereby putting those states at risk of losing a Congressional seat. Plaintiffs' expert Kimball Brace, an expert on reapportionment and redistricting, has found that a 2% differential undercount of noncitizens and Hispanics—the minimum net undercount Dr. Mathiowetz projected—will cause California to lose a Congressional seat. Larger undercounts will cause Texas and Arizona also to lose Congressional seats. Brace Decl. Ex. A (Oct. 5 Report) at 7-11, Tables 2A, 2B, 2C.

*Second*, because Plaintiffs reside in area of their states with larger noncitizen and Hispanic populations relative to the rest of their states, those areas will be disproportionately undercounted relative to the rest of their states as a result of the citizenship question. Because of this differential undercount, Plaintiffs' communities' reported share of the statewide population will be artificially lower. When this flawed data is used to draw legislative districts of equal size in Plaintiffs' states, Plaintiffs' districts will in fact have a greater population compared to other districts—thus diluting Plaintiffs' votes. This effect occurs regardless of the magnitude of the undercount. Brace Decl. Ex. A at 8-9. Indeed, based on county and state population projections and under a wide range of undercount scenarios--including scenarios consistent with the analyses of Defendants' own experts--Mr. Brace found that the citizenship question will dilute the votes

of almost all Plaintiffs by causing a disproportionate reduction in their county's reported share of the statewide population. *See id.* Ex. B at 2-3, Tables 4 Reformatted.[17]

*Third*, as explained in detailed expert reports submitted by Plaintiffs, a differential undercount will result in the loss of federal funding to Plaintiffs' states and communities under several federally-funded programs, including Medicaid, the Surface Transportation Block Grant program ("STBG") and set-aside for transportation alternatives ("TA set-aside"), and Title I—all programs on which Plaintiffs rely[18]—because these programs allocate funds based on formulas that depend on the census count for a particular community.

- With respect to the Medicaid program, a differential undercount of 2% for both the Hispanic and/or noncitizen populations will result in a loss of federal Medicaid funding to Arizona, Florida, Nevada, New Mexico, and Texas. Carruth Decl. Ex. A at 7. For Texas, the loss may be as great as $153.84 billion by FY2025, assuming a 2 percent undercount. *Id.* at 8.

- With respect to STBG and TA set-aside funds, a differential undercount of the Hispanic and/or noncitizen populations will result in a loss of federal STBG and TA set-aside suballocation funds for many of the urbanized areas where Plaintiffs reside. *See* Mingo Decl. Ex. A (Oct. 26, 2018 Report) at 1-2, 7-10.

- With respect to Title I funding, based on Dr. Mathieowetz's projection of the minimum undercount that will result from a citizenship question, Plaintiffs' expert Dr. Nora Gordon has found many of Plaintiffs' school districts would experience a decline in Title I funding. Gordon Decl. Ex. A at 2, 8, Appendix.

---

[17] This vote dilution effect is "even stronger" for many Plaintiffs when considering the effect of the citizenship question on the specific area of the county in which they reside. *Id.* Ex. B at 3, Tables 3A.1, 3B.1, and 3C.1.

[18] *See* Alexander Decl. ¶5, Berman Decl. ¶5, Bryan Decl. ¶¶ 5-7, Buchanan Decl. ¶¶ 5-6, Chavez Decl. ¶¶ 5-7, Cunningham Decl. ¶¶ 5-6, Garcia Decl. ¶ 5, Kagan Decl. ¶¶ 5-6, M. Kravitz Decl. ¶¶3-4, R. Kravitz Decl. ¶¶ 3-4, Magadan Decl. ¶ 5, McCune Decl. ¶ 5, Moreno Decl. ¶¶ 5-7, C. Nwosu Decl. ¶ 5, N. Nwosu Decl. ¶ 5, Ortiz Decl. ¶¶ 5-6, Ross Decl. ¶¶ 5-6, Sanchez Decl. ¶ 5, Shafer Decl. ¶¶ 5-7, Wilson Decl. ¶ 5. Plaintiffs will supplement their filing with affidavits from the remaining Plaintiffs.

**ARGUMENT**

**I.      Plaintiffs Have Established Genuine Issues of Fact As to Standing.**

To establish standing, Plaintiffs need only demonstrate "(1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is fairly trace[able] to the challenged action of the defendant; and (3) a likelihood that the injury suffered will be redressed by a favorable decision." *Kravitz v. U.S. Department of Commerce*, --- F. Supp. 3d ----, 2018 WL 4005229, at *5 (D. Md. Aug. 22, 2018) (citations omitted).

For purposes of the injury-in-fact requirement, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or there is a 'substantial risk that the harm will occur.'*" *Id.* at *6 (quoting *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014)) (emphasis added); *see also Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 n.5 (2013) (recognizing that standing does not require plaintiffs to "demonstrate that it is literally certain that the harms they identify will come about"). "[T]he causation element of standing is satisfied . . . where the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendants' conduct 'upon the action of someone else." *Kravitz*, 2018 WL 4005229 at *8 (quoting *Landsowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Landsowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013)). In denying Defendants' motion to dismiss, the Court found that traceability would be met here by facts demonstrating that "the citizenship question will have a 'determinative or coercive effect' on individuals' decision not to respond." *Id.*

Plaintiffs' burden at summary judgment is merely to set forth sufficient evidence to establish a genuine issue of material fact as to each of these standing elements. To do so, Plaintiffs may rely on affidavits and other evidence, both within and outside the AR, including expert testimony. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561(1992); *Am. Canoe*

19

*Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). So long as the Court determines that one of the plaintiffs has standing, all of the plaintiffs may proceed with their claims. *See Carey v. Population Services Int'l*, 431 U.S. 678, 682 (1977).

Here, the record evidence overwhelmingly establishes that Plaintiffs will be injured by the addition of a citizenship question because (1) it will lead to a differential decrease in self-response rates, which (2) will lead to a differential undercount, which (3) will lead to vote dilution and a loss of federal funding in the communities in which Plaintiffs reside. Defendants summarily dismiss the possibility that Plaintiffs could establish this chain of events at trial as "strain[ing] credulity," but Defendants' motion willfully ignores the relevant evidence, almost all of which is undisputed in favor of *Plaintiffs'* position. At a minimum, Plaintiffs have easily cleared the hurdle of establishing a genuine factual dispute as to standing. Defendants' request for summary judgment on this issue is wholly meritless and should be summarily denied.

### A.     The Citizenship Question Will Cause a Differential Decline in Response Rates Among Specific Sub-Populations.

It is undisputed that the citizenship question will cause a disproportionate drop in response rates among certain subpopulations.

*First*, as Defendants' expert Dr. Abowd has explained, the Census Bureau itself produced "credible quantitative evidence as that the addition of a citizenship question to the 2020 Census could be expected to lower the self-response rates" for households with noncitizens. Abowd Expert Decl. ¶ 12, Dkt. 67-2. Indeed, the Census Bureau warned Secretary Ross that the citizenship question would have this effect in recommending against its addition to the Census questionnaire, Grant Decl. Ex. 19, at AR1281, and has only re-affirmed that conclusion since, *see id.* Ex. 31, at COMDIS_00009865-73. Specifically, the Bureau has projected that households with a noncitizen will respond at a rate 5.8% lower than all other households. *Id.*

*Second,* Dr. Mathieowetz and Dr. Barreto have independently concluded that the citizenship question will lead to a differential decline in self-response among Hispanics. Mathiowetz Decl. Ex. A at 33; Ex. B at 7-8; Barreto Decl. Ex. A ¶¶ 18, 85. Defendants have not presented any contrary view. Indeed, the Bureau's own analyses revealed that the citizenship question is especially sensitive for Hispanics, Grant Decl. Ex. 19, at at AR1280-81, and that this sensitivity has increased over time, *id.* Ex. 31, at COM_DIS00009842-44. Recent focus groups of Spanish-speakers have confirmed that the citizenship question is a "determining factor for participation" in the Census. *Id.* Ex. 30 at 13046.

*Third*, as Dr. Mathieowetz has explained, in addition to causing certain noncitizen and Hispanic households not to respond to the Census at all, the citizenship question will lead to rostering omissions—*i.e.*, where a household responds but omits individuals from its response. Mathiowetz Decl Ex. B at 5. Defendants have not disputed this. To the contrary, Dr. Abowd has conceded that the available evidence is consistent with an increase in rostering omissions in light of the citizenship question. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 396:5-11.

Defendants contend that Plaintiffs cannot show that the citizenship question, rather than broader concerns of trust and confidentiality, will cause a decline in self-response in these sub-populations. Defs. Mem. at 16. This argument flies in the face of the evidence presented, including the Bureau's own documents stating that the citizenship question "would lead to" a differential decline in self-response for non-citizens, Grant Decl Ex. 19, at AR1281, and is a "determining factor for participation" among Spanish-speakers *id.* Ex. 30, at 13046, Defendants' expert witness's statement that the citizenship question "could be expected to lower self-response rates" for non-citizens, Abowd Expert Decl. ¶ 12, Dkt. 67-2, and the Acting Director's acknowledgment that there are people who would otherwise have participated in the census but

will choose not to in light of the citizenship question, Grant Decl. Ex. 34 (Jarmin Dep. Tr.) at

308:11-15. Moreover, that these subpopulations are more likely to doubt the administration's

willingness to maintain the confidentiality of survey response date is precisely why the

citizenship question is likely to trigger a disproportionate drop in self-response rates among these

groups. There is ample evidence demonstrating that the citizenship question is sensitive for

noncitizen and Hispanic households, and will lead them not to respond, for the very reason that it

evokes concerns regarding the current administration's immigration policies. *See, e.g.*, Grant

Decl. Ex. 30, at AR13046 (Spanish-speaking focus group participants linked citizenship question

to fears about deportation); *id.* Ex. 35 (Abowd Dep. Tr.) (political context can impact sensitivity

of question); Barreto Decl. Ex. A ¶¶ 100-01 (demonstrating that immigrants and Latinos are

particularly sensitive to citizenship question out of fear that information will be provided to

immigration enforcement).[19]

### B.   The Evidence Clearly Establishes That the Differential Drop in Self-Response Rates Will Lead to a Differential Undercount.

Defendants' motion baldly asserts that any decline in self-response rates will not lead to a

differential undercount. But the overwhelming evidence—which Defendants simply ignore—

establishes the opposite. Defendants' reliance on a conclusory, unsubstantiated prediction that

the "combined enumeration efforts (encouraging self-response, NRFU, proxy data, and

imputation) will correct any possible decline in initial self-response and completely enumerate

---

[19] Defendants also contend that Plaintiffs' injuries are not traceable to the citizenship question because the differential undercount "relies on individuals violating their legal duty to respond to the census." Defs. Mem. at 16. The Court has already rejected this argument, finding that Plaintiffs' injury is fairly traceable to Defendants' conduct where "the citizenship question to the 2020 Census will determinatively or coercively cause individuals to 'fail or refuse to respond.'" *Kravitz*, 2018 WL 4005229, at *9. As discussed above, the record before the Secretary, and the evidence developed through discovery, clearly show that the citizenship question will determinatively cause individuals not to respond to the census.

the population" may generate the bare thread of a factual dispute such that trial on this issue—rather than summary judgment in *Plaintiffs'* favor—is warranted. Defs. Mem. at 13. But that assertion is contravened by all of the credible evidence developed by the parties.

*First*, the Census Bureau has conceded that none of the available Census follow-up procedures can remedy the phenomenon of rostering omissions, whereby households respond to the Census but simply omit noncitizens from their response. Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 397:19-399:2. Because these households will be identified as having responded to the Census, they will not be subject to *any* of the follow-up enumeration efforts that Defendants rely on to argue that the citizenship question will not cause an undercount. There will be no "repeated efforts to encourage self-response," no "extensive non-response follow up," and no "imputation." Defs. Mem. at 7.

*Second*, the Bureau's categorical assertion that those areas that have a disproportionately low self-response rate will not experience any net undercount is implausible in light of the available data. As Dr. Mathieowetz has shown, data from the past three censuses show a consistent relationship between lower household response rates and higher net undercounts for a given geographic area. Mathiowetz Decl. Ex. A at 21-25. Defendants have not presented any contrary evidence. In addition, in past censuses, the Census Bureau has consistently undercounted certain populations, including Hispanics, at a disproportionately higher rate. By further discouraging self-response by Hispanics and noncitizens, the citizenship question will exacerbate the historically persistent undercounts of these groups.[20]

---

[20] Thus, Dr. Abowd's statement that there is no "credible quantitative evidence" of a differential undercount is simply incorrect. Moreover, as Dr. Abowd has admitted, the Census Bureau made the conscious decision _not_ to look for credible quantitative data regarding the citizenship question's effect on an undercount. While Dr. Abowd proposed conducting additional analyses to produce such quantitative evidence, he admitted that they were not implemented because the

Thus, there is no credible dispute that the citizenship question, by causing certain subpopulations to omit certain household members from their Census response or to avoid responding altogether, will cause a differential undercount among those groups and in the geographic areas where they are disproportionately concentrated. At best, Defendants' arguments regarding their follow-up efforts to enumerate non-responding individuals suggest that there may be a genuine dispute of fact regarding the *magnitude* of the differential undercount. As explained below, a differential undercount of *any* magnitude is sufficient to establish injury to Plaintiffs based on vote dilution from intrastate redistricting and a loss of federal funding.

Regardless, even if the size of the undercount were critical to establishing Plaintiffs' standing, Defendants have established, at best, that there is a genuine dispute of fact regarding this issue that should be resolved at trial rather than on a summary judgment motion. *See NRDC v. Watkins*, 954 F.2d 974, 980-81 (4th Cir. 1992) (reversing district court's grant of summary judgment for lack of standing where plaintiffs' and agencies' experts provided conflicting conclusions, and remanding for a factual hearing). As Plaintiffs' experts have explained at length, the Census Bureau's follow-up efforts will fall far short of remedying the differential drop in self-response that the citizenship question will cause. Mathiowetz Decl. Ex. A at 25-29; Barreto Decl. Ex A ¶¶ 43-59, 89-94. Based on an extensive review and analysis of the available data, Dr. Mathiowetz estimates that accounting for the various follow-up efforts that Defendants cite, the anticipated decline in self-response among noncitizens and Hispanics, including rostering omissions, will translate to a differential undercount among these groups of *at least* 2%. Mathiowetz Decl. Ex. A at 32, 34.

---

Bureau "didn't believe that credible quantitative information about net undercounts was necessary for" their recommendation to Secretary Ross *not* to add the citizenship question. Grant Decl. Ex. 36 (Abowd Expert Dep. Tr.) at 288:10-290:7.

### C.   It Is Undisputed That a Differential Undercount Will Harm Plaintiffs.

Defendants argue that even if there is an undercount, Plaintiffs cannot show that it would

harm Plaintiffs. But Plaintiffs have provided substantial expert evidence demonstrating at least

three different injuries that will result from the differential undercount caused by the citizenship

question, two of which will result from an undercount of any size.

- Vote Dilution from Apportionment of Congressional Seats: Plaintiffs' expert Kimball Brace has opined that a 2% differential undercount of noncitizens and Hispanics will cause California to lose a Congressional seat, and larger undercount rates will cause Texas and Arizona to lose Congressional seats as well. Brace Decl. Ex. A at 7, Tables 2A, 2B, 2C; Ex. B at 4, Tables 2A.1, 2B.1, and 2C.1.

- Vote Dilution from Intra-State Redistricting: Mr. Brace further found that a differential undercount of the Hispanic and non-citizen population—of any magnitude—will result in a disproportionate reduction in the share of the statewide population for the counties in which Plaintiffs reside. Brace Decl. Ex. A at 8-9, Tables 3A, 3B, and 3C.[21] Because states use Census data to meet the Constitutional requirement to draw districts of equal population, this will result in the dilution of Plaintiffs' votes. *Id.* at 9.

- Federal Funding: Plaintiffs' experts have also established that a differential undercount of the Hispanic and noncitizen population will result in a loss of funding to Medicaid, transportation, and Title I funding to the communities where Plaintiffs reside. *See* Carruth Decl. Ex. A at 7-8 (2% differential undercount results in loss of federal Medicaid funding to Arizona, Florida, Nevada, New Mexico, and Texas); Mingo Decl. Ex. A at 1-2, 7-10 (loss of federal STBG suballocation funds and TA set-aside suballocation funds for a number of Plaintiffs' urbanized areas); Gordon Decl. Ex. A at 2, 8, App'x (2% and 2.5% differential undercount results in loss of Title I funding to many of Plaintiffs' school districts). At least with respect to transportation funding, the injury does not depend on the size of the undercount. Mingo Decl. Ex. A at 8.

Each of these injuries has been recognized as constituting an adequate basis for Article III

standing in cases challenging decennial census practices. *See, e.g.*, *Dep't of Commerce v. U.S.*

*House of Representatives*, 525 U.S. 316, 332 (1999) (finding that plaintiffs had standing based

on expert testimony regarding effects on congressional apportionment and intra-state

---

[21] Mr. Brace also showed that for many plaintiffs who live in counties that comprise an especially large percentage of the statewide population, this effect is even more pronounced if one focuses on smaller geographical units in which they reside. *Id.* Ex. B at 3, Tables 3A.2, 3B.2, and 3C.2.

redistricting, and noting that the Court need not wait until the census been conducted because such a delay may result in "extreme—possibly irremediable—hardship"); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (evidence of vote dilution and reduced funding to plaintiffs' cities and states sufficient for standing).

Defendants nonetheless argue that Plaintiffs cannot show that a differential undercount would affect them, but their argument again relies on the bare, unsubstantiated assertion that "the Census Bureau's plans to encourage self-response and to use NRFU efforts . . . to supplement that self-response *will result in a compute enumeration*." Defs.' Mem. at 15 (emphasis added). As explained above, this implausible claim is contrary to the overwhelming evidence in this case, which Defendants simply ignore.

Defendants then note the conclusion of their expert, Stuart Gurrea, that if Defendants' NRFU efforts are as successful as they were in 2010, there would be no impact on Congressional apportionment and a minimal impact on federal funding. Defs.' Mem. at 15. But this does not remotely support granting summary judgment to Defendants with respect to any of the injuries that Plaintiffs assert. *First*, Plaintiffs have presented substantial evidence, including detailed expert analyses, disputing that Defendants' NRFU efforts will in fact successfully resolve the problems posed by the citizenship question such that there is no impact on Congressional apportionment. *See* Factual Background Part II.B, Argument Part I.B, *supra*. *Second*, Defendants do not even attempt to argue that NRFU efforts will prevent any impact on vote dilution resulting from *intrastate redistricting*. Indeed, even if NRFU efforts are largely successful in redressing differential self-response rates—which Plaintiffs dispute—even a slight differential undercount will injure Plaintiffs by causing them to be drawn into overpopulated legislative districts. Brace Decl. Ex. A at 9. *Third*, even under Dr. Gurrea's assumptions that NRFU efforts will be highly

successful—which Plaintiffs dispute—Defendants concede that Plaintiffs' states and localities will lose federal funding but claim that the amount of the funding loss would not be "material" and is therefore insufficient to establish standing. *See* Defs.' Mem. at 15. But Defendants provide no legal authority for the notion that Plaintiffs must prove a particular degree of funding loss, and courts have not erected such a materiality barrier to standing. *See, e.g.*, *City of Detroit v. Franklin*, 4 F.3d 1367, 1374-75 (6th Cir. 1993); *Carey*, 637 F.2d at 838-39; *Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998); *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 671-72 (E.D. Pa. 1980). At best, Defendants offer a contrary account regarding Plaintiffs' injuries based on conflicting expert testimony, creating a factual dispute that cannot be resolved at summary judgment.

## II.     Defendants' Motion for Summary Judgment on the Merits of Plaintiffs' APA and Enumeration Clause Claims Should be Denied.

### A.     The Merits of Plaintiffs' Claims Should be Resolved at Trial After a Full Presentation of the Evidence.

As a threshold matter, in light of the parties' dispute regarding Plaintiffs' standing, the Court should deny Defendants' motion for summary judgment without reaching the merits of Defendants' arguments. It is well-established that a court must first resolve jurisdictional issues, including standing, before it may rule on the merits of a claim. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). Where, as here, factual disputes as to standing exist, the court may deny a motion for summary judgment. *See Tech-Sonic Inc. v. Sonics & Materials, Inc.*, No. 3:12–cv–01376 (MPS), 2015 WL 4715329, at *7 (D. Conn. 2015); *Raritan Baykeeper v. NL Industries, Inc.*, No. 09-4117 (MAS) (DEA), 2016 WL 7381715, at *7 (D.N.J. July 29, 2016). Issues of standing may be resolved at trial, even in cases challenging agency action. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (standing "(if controverted) must be 'supported adequately by the evidence adduced at trial'" (citation omitted)); *Munoz-Mendoz*

*v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) ("court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or at trial itself"); *see also Friends of the Earth Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000) (standing resolved after 6-day bench trial in Clean Water Act case).

Should this Court reach the merits of Defendants' motion for summary judgment on Plaintiffs' APA and Enumeration Clause claims, however, Defendants' arguments should be rejected. Defendants' request for summary judgment is largely predicated on the notion that the Court is confined to the evidence in the AR in adjudicating Plaintiffs' claims. However, there is ample basis for the Court to receive and consider extra-record evidence, including the discovery that it permitted in this case, in order to perform the "'searching and careful' review" of the Secretary's decision mandated by the APA, *Sierra Club v. United States Department of Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)); *see Nat'l Audubon Society v. Dep't of Navy*, 422 F.3d 174, 188 n.4 (4th Cir. 2005) ("While review of an agency decision is usually confined to [the administrative] record, 'there may be circumstances to justify expanding the record or permitting discovery.'") (quoting *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995)). Here, extra-record evidence is appropriate both to illuminate gaps and other infirmities in the AR and to buttress the strong inference raised by the AR alone that the Secretary's decision was improperly pretextual, predetermined, and infected by political influence.[22]

---

[22] *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (court may look outside record to determine if Secretary's action was justifiable where "bare record" does not "disclose the factors that were considered or the Secretary's construction of the evidence"); *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (extra-record evidence admissible, *inter alia*, if necessary to determine whether the agency has considered all relevant factors, where agency relied on documents not in the record, to explain technical terms or complex subject matter, and when plaintiffs make a showing of agency bad faith (citation omitted)); *City*

Even if the Court were not permitted to consider extra-record evidence in ruling on the merits of Plaintiffs' claims, it should deny Defendants' motion for summary judgment. As detailed in the following sections, if anything, the undisputed AR demonstrates that Plaintiffs– not Defendants–are entitled to relief on their claims as a matter of law. However, given the parties' disagreement regarding the court's ability to consider extra-record evidence and the merits of Plaintiffs' claims, Plaintiffs respectfully submit that the most efficient course would be for the Court to resolve all these issues at trial, rather than through a summary judgment ruling. At trial, the Court may hear both evidence from the AR and extra-record evidence. The Court may then determine whether to consider the extra-record evidence and, if appropriate, how that evidence would impact its ruling on the merits of Plaintiffs claims.[23] As Plaintiffs explained in the status report submitted to the Court on November 2, this approach would avoid the risk of piecemeal rulings, appeals, and remands that may unnecessarily delay the ultimate resolution of the litigation, perhaps beyond the Census Bureau's June 2019 deadline for finalizing the census questionnaire. Dkt. 66, at 1-4.[24]

---

*of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1017 (4th Cir. 1985) (consideration of extra-record evidence appropriate where record was "unilluminating on several important issues").

[23] Judge Furman, who is presiding over the New York cases, adopted such an approach, ruling that Defendant may argue at trial that the Court should disregard all evidence outside the administrative record and ordering the parties to differentiate between arguments in their trial briefing that are based solely on the AR and those based on materials outside the record. *See State of New York v. U.S. Dep't of Commerce*, No. 18-cv-02921, Dkt. 405 at 3.

[24] Given Defendants' propensity for seeking interlocutory petitions for appellate review in the New York cases, this risk is hardly speculative. *See New York*, 18-cv-02921, Dkt. 544 at 1 n.1 (noting that Defendants have sought twelve stays of proceedings between Labor Day and Thanksgiving in an attempt to "halt the orderly progress of this litigation").

**B.     The Secretary's Decision Was Arbitrary and Capricious Under APA § 706(2)(A).**

Under § 706(2)(A) of the APA, a court must hold unlawful and set aside any final agency action that is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2). Agency action is considered arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court's review must be "searching and careful," *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 35 (D.C. Cir. 1977) (citation omitted), to ensure that there is a "rational connection between the facts found and the choice made," *Ohio Valley Envt'l Coal., Inc. v. United States Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016) (citation omitted).

Moreover, "[a]lthough [a court] should not venture into the area of agency expertise, [it] need not 'accept without question administrative pronouncements clearly at variance with established facts.'" *U.S. v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993) (quoting *Nat'l Labor Rel. Bd. v. Morganton Full Fash. Hos. Co.*, 241 F.2d 913, 915-16 (4th Cir. 1957)). "Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decision-making, and cannot survive review under the arbitrary and capricious standard." *City of Kansas City, Mo. v. Dept. of Housing and Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991); *see also Home Box Office, Inc.*, 567 F.2d at 37. Courts "ha[ve] not hesitated to reject agency determinations under [the APA] when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C.

2016) (citing cases); *see, e.g.*, *Dow Agrosciences v. Nat'l Marine Fisheries Svc.*, 707 F.3d 462, 471-72 (4th Cir. 2013); *F/V Alice Amanda*, 987 F.2d at 1087.

Under this standard of review, and even considering the AR alone, the Secretary's decision was arbitrary and capricious for two independent reasons. *First*, the Secretary's Decision Memo and related documents in the AR demonstrate that the Secretary's stated reasoning and factual assumptions ran directly contrary to the evidence before him—including the Census Bureau's uncontroverted expert analysis explaining that the addition of the CQ would harm census data quality and would be more burdensome, more expensive, and a statistically inferior option for providing accurate block-level citizenship data to DOJ. *Second*, the decision was impermissibly pretextual, predetermined, and politically influenced.

### 1.    The Secretary's Decision Was Arbitrary and Capricious Because It Contradicted the Evidence That Was Before the Agency.

Defendants contend that the Secretary appropriately weighed the evidence before him, balancing the need and utility of adding a citizenship question to the decennial census against the negative impacts it would have on the constitutionally-mandated purpose of the census. Defs.' Mem. at 22-27. This assertion cannot withstand scrutiny because critical factual statements and assumptions on which the Decision Memo relied were objectively incorrect or illusory. Indeed, the uncontroverted evidence before the Secretary showed that the CQ was the worst option available to him both because it would fail to provide DOJ with accurate block-level citizenship data *and* because it would undermine the accuracy of the Census count.

*First*, the Decision Memo's assertion that "no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates," Grant Decl. Ex. 27, at AR1317, is inaccurate and contradicted by the record. Among other things, a team of Census Bureau personnel provided the Secretary with a lengthy empirical analysis as to

why the addition of a CQ would have "an adverse impact on self-response and, as a result, on the accuracy and quality of the 2020 Census." *Id.*, Ex. 19, at AR1280; *see also* Ex. 25 at AR9812-16. In contrast, the Decision Memo failed to identify any evidence—nor is there any in the AR—to support the assumption that this adverse impact would *not* result from the addition of the CQ. Rather than any reasoned weighing of contrary data, the Decision Memo simply discounted the only evidence in the AR on this point.[25]

*Second*, there is no basis in the AR for the Secretary's asserted "judgment" that Alternative D (combining a new Census CQ with use of administrative records) "will provide DOJ with the most complete and accurate" citizenship data. *Id.* Ex. 27, at AR1317. In fact, the Census Bureau's uncontroverted analysis was to the contrary, and there is no other evidence in the AR to gainsay the Census Bureau's own experts. The Decision Memo incorrectly asserted that adding the CQ "would maximize the Census Bureau's ability to match the decennial census responses with administrative records," *id.* Ex. 27 at AR1316. In fact, the Census Bureau concluded that Alternative D would actually *reduce* the Bureau's ability to match individuals to administrative records and would not result in reliable self-reported citizenship data for individuals lacking administrative records, *id.* Ex. 25 at AR9815-16. The Decision Memo cited no evidence contradicting these key components of the Census Bureau's analysis.

*Third*, the Secretary relied upon a subjective, unsupported assessment of the DOJ request's "importance" as a basis for his decision, even though the Decision Memo and the AR

---

[25] The Decision Memo relies solely on two conversations that the Secretary claimed to have had with a former Census Bureau official in the Bush administration, Dr. Herman Habermann, and an unidentified executive at Nielsen, a private-sector survey firm. *See id.* Ex. 27 at AR1315, 1318. Even assuming that the Secretary could properly rely on such conversations as a basis for agency decision-making, both individuals have directly disputed the Decision Memo's substantive account of these conversations. *See supra* n.17.

reflect no independent agency analysis by the Secretary or the Census Bureau of either the validity or the gravity of the DOJ Letter's request. The AR plainly establishes that this request did not originate with DOJ at all: it was engineered by Commerce officials including Uthmeier and Comstock, who told the Secretary that "*we* have the court cases to illustrate that DOJ has a legitimate need for the question to be included." Grant Decl. Ex. 7, at AR3710. In reality, the DOJ Letter fails to cite any case that failed because of inadequate block-level CVAP data, or any case that DOJ failed to bring for lack of such data. As the Census Bureau itself recognized, the purported statistical challenges of working with existing data referred to in the DOJ Letter could easily be overcome by adding information on citizenship from administrative records to the data file used to derive redistricting data. Grant Decl. Ex. 17 at 11646-47.

In short, there is no support in the AR, including the DOJ Letter itself, for the Decision Memo's conclusory assertion that adding the CQ is "necessary" to provide DOJ with the data required to enforce Section 2 of the VRA. Grant Decl. Ex. 27, at AR1320. In fact, CVAP data reported at the block level have *never* been available since the VRA was enacted in 1965.[26] And the DOJ Letter carefully avoids making any such assertion, instead relying on vague claims that the ACS does not "yield the *ideal* data for such purposes," and that "decennial census questionnaire data regarding citizenship" would be "more appropriate for use" than ACS citizenship data. *Id.* Ex. 14, at AR664-65. The AR—which clearly shows that DOJ never requested this data before Commerce "got them" to request it, even feeding DOJ case law to make the request appear "legitimate," *id.* Ex. 7, at AR3710—reflects that the addition of the CQ to the 2020 Census was, for DOJ purposes, anything but "necessary."

---

[26] *See* Ely Decl. Ex. A at 5-6.

There are not enough pages available in this brief to detail every instance in which—as Plaintiffs' presentation at trial will demonstrate—the Secretary's decision contradicted or ignored evidence in the AR or other facts that would have been readily available to the Secretary but for the biased manipulation and deliberate short-circuiting of normal deliberative process. *See* Grant Decl. Ex. 1 (New York Plaintiffs' Proposed Findings of Fact) ¶¶ 196-303 (summarizing New York trial evidence). At a minimum, however, genuine issues of material fact plainly exist on this issue, and Defendants' motion should be denied.

> **2.    The Secretary's Decision Was Arbitrary and Capricious Because It Was Impermissibly Pretextual, Predetermined, and Politically Influenced.**

Both the AR and extra-record discovery provide stark evidence demonstrating that the Secretary's decision was also arbitrary and capricious because his stated justification was a mere pretext for a predetermined action improperly infected by extraneous political influence. The AR itself contains abundant evidence supporting Plaintiffs' allegations in the Amended Complaint, and bearing out this Court's statement, based on the Complaint's allegations, that the CQ was "an answer in search of a problem." *Kravitz*, 2018 WL 4005229, at *17. The extra-record discovery obtained by Plaintiffs in this case only amplifies and confirms this sinister narrative.

Courts regularly invalidate actions as arbitrary and capricious under the APA when, as here, an agency predetermines an outcome and then articulates a pretextual justification for its decision. *See, e.g., Latecoere Int'l Inc. v. U.S. Dept. of Navy*, 19 F.3d 1342, 1364-65 (11th Cir. 1994); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544-47 (E.D.N.Y. 2009). In *Latecoere*, for example, the court rejected the Navy's pretextual justification for contract award based on "costs and technical merits," holding that the administrator's "actions evidencing bias speak louder than his words denying it," and identifying fear of the political consequences of selecting a foreign company as the real motivation for the decision. *Latecoere*, 19 F.3d at 1361, 1365. Much like the

Census Bureau's unequivocal recommendation here, the Navy's technical experts had all agreed that Latecoere's proposal was acceptable (and the American competitor's was not); but the administrator overrode them. *Id.* at 1365. The court did not require direct proof of improper motivation, but rather relied on the "strongly support[ed] . . . inference" of the administrator's bias supported by the evidence. *Id.*

Similarly, in *Tummino*, the court reversed the FDA's denial of a citizen petition seeking nonprescription availability of "Plan B" to women of all ages, holding that the denial was motivated by pressure from the White House and certain constituencies who opposed OTC availability of Plan B. 603 F. Supp. 2d at 546. Once again, the agency's expert technical staff (and its advisory committee) "strongly recommended approving Plan B OTC without age restriction," *id.* at 545, but the administrator overrode them. Although the agency masked its rationale in terms of a "concern about the inadequacy of data available for young adolescents" and "'enforcement' concerns," the court rejected those justifications as pretextual, emphasizing that the FDA's purported enforcement concerns were "wholly unsubstantiated" and it had made the decision "before the scientific reviews were complete." *Id.* at 546. The court found further evidence of bad faith in the agency's departure from its normal procedures in evaluating the petition. *Id.* at 547-49.

Here, the AR itself provides compelling evidence of improper political influence and prejudgment by the Secretary, and it strongly validates this Court's order allowing Plaintiffs to obtain extra-record discovery based on the bad-faith allegations in the Amended Complaint. Many months before the DOJ requested block-level CVAP data in November 2017, the Secretary and his staff were in communication with key Trump Administration political operatives, including Steve Bannon and Kris Kobach, concerning the addition of the CQ to the

2020 Census. *See* Grant Decl. Ex. 6, at AR2561 (Bannon, April 2017); *id.* Ex. 8, at AR763

(Kobach, July 2017). In May 2017, the Secretary complained to Comstock about the lack of

progress on "my months['] old request *that we include the citizenship question*," *id.* Ex 7, at

AR3710 (emphasis added)—wording that plainly reflected the Secretary's predetermination to

achieve that result. The Secretary's senior deputy, Comstock, understood his mandate, assuring

the Secretary: "On the citizenship question, we *will* get that in place." *Id.* (emphasis added). It is

clear from the AR that the entire impetus for adding the CQ to the decennial census originated

with the Secretary and other political actors outside the Commerce Department—not from DOJ.

The extra-record discovery obtained in this case, only a fraction of which is cited in the

footnotes in the Factual Background section of this brief, powerfully confirms the predominance

of politics and prejudgment infecting the administrative process of a federal statistical agency—

the Census Bureau—whose autonomy and insulation from politics is meant to be guaranteed by

federal statute and regulation. While Plaintiffs submit that the AR alone is sufficient to invalidate

the Secretary's decision on grounds of bad faith under the APA, this extra-record evidence—too

voluminous to recite in detail here, *see* Grant Decl. Ex. 1 (New York Plaintiffs' Proposed

Findings of Fact) at 41-66, 110-11—certainly raises genuine factual issues that preclude

summary judgment as to this issue.

### C. The Secretary's Decision Violated the APA Because No "New Circumstance" Existed "Necessitating" the Addition of the CQ, Nor Did the Secretary Purport to Find One.

The Secretary's decision also must be overturned because it was "not in accordance with

law" under APA § 706(2)(A) and was made "without observance of procedure required by law,"

in violation of APA §706(2)(D). After failing to list citizenship as a subject for the 2020 Census

questionnaire in the statutorily-required report delivered to Congress in March 2017, *see* Grant

Decl. Ex. 5, at AR194 AR204-13; 13 U.S.C. § 141(f)(1), the Secretary could not by law change

the 2020 Census subjects to include citizenship without a finding of "new circumstances" that "necessitate[d]" such a modification, *see* 13 U.S.C. § 141(f)(3). The Secretary, however, failed to make such a finding, and the AR does not support the existence of new circumstances necessitating the Secretary's decision.

Defendants' attempt to diminish § 141(f)(3) as a mere reporting requirement is spurious. Logically, the mandated report to Congress cannot be made without a specific finding that the required grounds for a modification have arisen; and such a finding cannot be made without a rational basis in the AR for doing so. Even if Defendants' protestation that a failure to submit a report to Congress is not reviewable under the APA had merit—which it does not[27]—it nonetheless misses the point. Section 141 of the Census Act imposes a rigorous timeline for making content decisions regarding the decennial census, and the legal standard for subject modifications after the three-year deadline is clearly incorporated into the statutory provision. Whether Congress received enough information from the Decision Memo to be "fully informed," *see* Defs.' Mem. at 28, simply ignores the statutory standard incorporated into § 141(f)(3) and is therefore irrelevant to whether that standard was or could be met.

As the AR demonstrates—and the extra-record evidence powerfully amplifies—there were no "new circumstances" necessitating a modification of the data sources DOJ has traditionally relied upon for VRA enforcement. The DOJ Letter does not cite or suggest any recent change in the law or other new development requiring the addition of citizenship as a

---

[27] The APA contains a strong presumption of reviewability, *Block v. Community Nutrition Institute*, 467 U.S. 340, 349 (1984) and Courts have repeatedly found the Secretary's actions under the Census Act to be reviewable. *See, e.g.*, *City of Los Angeles v. Dep't of Commerce*, 307 F.3d 859, 874-77 (9th Cir. 2002) (reviewing Secretary decision pursuant to § 195 of the Census Act under the APA); *see also District of Columbia v. U.S. Dep't of Commerce*, 789 F. Supp. 1179, 1188 n.16 (D.D.C. 1992) (collecting cases).

Census subject. In reality, the only "new circumstance" before the Secretary after November 2017 was the DOJ Letter itself—which Commerce, not DOJ, initiated and orchestrated to provide an ostensibly "legitimate" figleaf for the Secretary's "months old request" that a citizenship question be added to the 2020 Census. Grant Decl. Ex. 7, at AR3710. Moreover, the DOJ Letter did not identify any new circumstances "necessitating" the addition of the CQ to the 2020 Census, and the Secretary conducted no independent analysis of the validity, much less the urgency, of the DOJ request. He merely assumed the "importance" of the request and never acknowledged or addressed the legal standard set forth in § 141(f)(3).[28]

**D.    The Secretary's Decision Violated the APA Because It Flouted the Census Bureau's Mandatory Testing Requirements and Statistical Standards.**

The Secretary's decision was also "not in accordance with the law" and made "without observation of procedure required by law" for another reason: it violated the well-established, mandatory procedures by which the Census Bureau alters content to its surveys, including the decennial census. As a principal statistical agency[29] in the federal statistical system, the Bureau is required under the Paperwork Reduction Act to "ensure the relevance, accuracy, timeliness, integrity, and objectivity of information collected" and to follow "federal standards and practices for data collection" promulgated by the Office of Management and Budget ("OMB"). 44 U.S.C.

---

[28] The Secretary's decision to add the CQ to the 2020 Census also violates the APA by exceeding the statutory limitation of his authority under 13 U.S.C. § 6(c), which provides that "the Secretary shall acquire and use information available" from other government agencies "instead of conducting direct inquiries."  Given the Census Bureau's analysis, section 6(c) required the Secretary to address DOJ's request for citizenship data by using administrative records alone.

[29]  *See* OMB, Statistical Programs of the United States Government: Fiscal Year 2018 at 6, https://www.whitehouse.gov/wp-content/uploads/2018/05/statistical-programs-2018.pdf.

§ 3504(e)(3), (4), 3506(e)(1), (4); 5 C.F.R. § 1320.18(c).[30] Under the OMB's standards, the

Bureau must, *inter alia*:

- "function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments";

- design surveys "to achieve the highest practical rates of response, commensurate with the importance of survey uses";

- pretest survey components, if they have not been successfully used before, to "ensure that all components of a survey function as intended when implemented in the full scale survey"; and

- administer surveys in a way that "maximiz[es] data quality" while "minimizing respondent burden and cost."[31]

In addition, the Census Bureau has its own binding Statistical Quality Standards governing the

development of Census surveys.[32] These Standards impose rigorous pretesting requirements,

including, *inter alia*:

- "Pretesting must be performed when . . . . An existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)."

- "Data collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then be refined, prior to implementation."

---

[30] The 2020 Census preparations are governed by the PRA. 2020 Census Program Memorandum Series 2016:05 at 3-4 (Apr. 29, 2016), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memoseries/2020-memo-2016_05.pdf (describing PRA compliance requirements for the 2020 Census).

[31] OMB Statistical Policy Directive No. 1., Fundamental Responsibilities of Fed. Statistical Agencies and Recognized Statistical Units, 79 Fed. Reg. 71,610, 71,615 (Dec. 2, 2014); OMB, Statistical Policy Directive No. 2, Standards and Guidelines for Statistical Surveys at §§ 1.3, 1.4, 2.3 (2006), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/statpolicy/standards_stat_surveys.pdf; *see also* 71 Fed. Reg. 55,522 (Sept. 22, 2006).

[32] U.S. Census Bureau, Statistical Quality Standards at ii (Reissued Jul. 2013), https://www.census.gov/content/dam/Census/about/about-the-bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf.

- "Data collection instruments and supporting materials must be verified and tested to ensure that they function as intended."[33]

In addition to rigorous pretesting, the Census Bureau's well-established process involves interagency consultation with the requesting agency, as well as consultation with the Bureau's advisory committees. *See* 2020 Census Program Memorandum Series: 2016.05, at 4 (Apr. 29, 2016) (noting that "OMB, the Census Bureau, and interagency committees (with federal agency representation) consider" proposals to add questions and solicit "input from advisory committees"); *see also* Grant Decl. Ex. 34 (Jarmin Dep. Tr.) at 33:7-36:19, 59:3-7, 255:22-256:8 (describing well-established process of agency consultation and advisory committee input).[34]

The Secretary caused the Census Bureau to flout all of the above requirements in order to satisfy his eleventh-hour insistence that the CQ be added to the 2020 Census. As discussed in Part II.B.2, *supra*, the pretextual and political origins of the citizenship question undermine any claim that the Bureau is conducting the 2020 Census "autonomously" from political influence. Further, as the Bureau's own analysis concluded, adding the citizenship question does not "maximize data quality" while "minimizing respondent burden and cost." *See* Grant Decl. Ex. 19 at AR1277, *id.* Ex. 25 at 9812. Given the absence of any reasonable basis for the Secretary's dismissal of the Bureau's conclusion that the question will reduce response rates while generating data *inferior* to administrative records, the question does not ensure "the highest practical response rates, commensurate with the survey's use." *Id.* To the contrary, the AR leaves no reasonable basis to doubt that the CQ will lower response rates and degrade overall data

---

[33] *Id.* at 8, 10; *see* Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 157-60 (noting that the Census Bureau abides by the Statistical Quality Standards).

[34] Defendants cite several cases for the proposition that guidelines issued pursuant to the Information Quality Act do not provide a basis for judicial review. Defs.' Mem. 27-28. None of these cases, however, address the Paperwork Reduction Act directives or Statistical Quality Standards at issue here.

quality.

The Bureau also failed to conduct adequate tests of the citizenship question in preparation for the decennial census, as required under the OMB's Directives and the Bureau's Statistical Quality Standards. The Census Barriers, Attitudes, and Motivators Study ("CBAMS") conduct by the Census Bureau in 2018 showed that the ACS citizenship question module is sensitive and problematic to an unprecedented degree, with Spanish-speaking participants identifying it as a "determining factor for participation" and raising concerns about deportation in relation to the question. Grant Decl. Ex. 31, at AR13046. In its nearly decade-long preparation for the 2020 Census, the CBAMS is the sole test of the citizenship question in the context of the decennial census questionnaire that the Census Bureau has conducted, and its findings are therefore uncontroverted. *See* Grant Decl. Ex. 34 (Jarmin Dep. Tr.) at 259:7-262:13; *id.* Ex. 35 (Abowd Dep. Tr.) 209:4-15.

Nonetheless, the Secretary asserted that the CQ could be inserted into the decennial Census because it had been "well tested" as a component of the ACS and "performs adequately" in that context. This assertion fails to provide any valid justification for sidestepping the Census Bureau's exacting procedural standards.

*First,* the Bureau and the Secretary's belief that the performance of the citizenship question on the ACS was adequate to justify its inclusion on the 2020 Census is entirely irrational in light of the evidence before the agency. The Bureau's own analyses showed that the inclusion of a citizenship question on the ACS led to a differential decline in self-response among non-citizens and that potentially a third of noncitizens incorrectly reported their citizenship. This militates against including a citizenship question on the decennial census, where, unlike the ACS, an accurate enumeration of the population is the paramount objective.

Indeed, further underscoring the irrationality of the Bureau and the Secretary's conclusion, the Bureau itself has stated that there are problems with how the citizenship question performs on the ACS, and it plans to review the question in 2021. *See* Grant Decl. Ex. 36 (Abowd Expert Dep. Tr.) at 172:10-183:6. The Bureau has also concluded that the citizenship question has not been adequately cognitively tested on the decennial census questionnaire. *Id.* Ex. 33 (Census 30(b)(6) Dep. Tr.) at 142:18:-143:4. Despite these concerns, the Secretary determined to plough ahead with a massive expansion in the use of this question, by adding it to the decennial census without any context-specific testing.

*Second*, as the Secretary himself recognized, the ACS is a completely different survey. *See id.* Ex. 27, at AR1315 (noting the decennial census "differ[s] significantly" from sample surveys such as the ACS, which has "over 45 questions on numerous topics"). As the Census Bureau standards recognize, the sequencing, context, and formatting all affect how a question performs. *See* Census Bureau, Statistical Quality Standards at 9 (rev. July 2013). Indeed, the ACS and Census are different in key ways.[35] The AR provides no factual basis to support the assumption that the CQ's performance as part of the ACS sample survey reliably predicts its performance as part of a full-person enumeration on the decennial Census.

*Third*, the Bureau's testing program is not just used to refine census content, but also to ensure that the Bureau's systems and procedures—including Non-Response Follow-Up ("NRFU") protocols, enumerator questionnaires and scripts, Census Questionnaire Assistance Center materials, and staffing projections—are ready for the once-a-decade undertaking of the

---

[35] *See* Mathiowetz Decl. Ex. A at 38-40 (explaining differences between decennial census and ACS and the relevance of these differences for assessing the performance of the CQ).

census. *See* Census Operational Plan v. 3.0 (Sept. 2017), at pp. 33-52[36]; *see also* Grant Decl. Ex. 33 (Census 30(b)(6) Dep. Tr.) at 192:10-198:5. The ACS testing of the citizenship question cannot substitute for the decennial census-specific systems and preparations. Given the Bureau's own admission that the addition of the CQ is likely to reduce self-response and place a greater strain on NRFU resources, the lack of testing of the citizenship question in Bureau field tests may seriously compromise the Bureau's efforts to ensure its systems were adequately prepared.

In addition to a complete lack of testing, the record reveals that despite repeated attempts by Acting Director of the Census Bureau to set up a meeting with DOJ subject-matter experts—as would be typical for agency data requests—he was unable to do so. Grant Decl. Ex. 22, at AR3460. Extra-record discovery reveals that in fact the Attorney General himself directed DOJ staff not to meet with the Census Bureau. *Id.* Ex. 40 (Gore Dep Tr.) at 271:21–272:13, 290:12-15. There is no indication in the AR or elsewhere that the Secretary made any attempt to prevent this short-circuiting of established Census Bureau procedures for addressing other agencies' information requests. In further deviation from standard practice, the Bureau also failed to consult with the Census Scientific Advisory Committee and the National Advisory Committee about the citizenship question, despite the fact that the addition of the question fell within both committees' mandates. *Id.* Ex. 34 (Jarmin Dep. Tr.) at 244:7-13, 255:22-256:11.

The Decision Memo's assertion that the Commerce Department was unable to determine "definitively how inclusion of a citizenship question on the decennial census will impact responsiveness," Grant Decl. Ex. 27, at AR1319, is therefore a consequence of procedural deficiency disguised as an affirmative excuse for uninformed action. Defendants' own failure to

---

[36] Available at https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-oper-plan3.pdf

follow the rigorous testing and consultation procedures required by OMB and Census directives and Bureau practice cannot make the Secretary's decision any less arbitrary and capricious.

### E.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Enumeration Clause Claim.

The Enumeration Clause requires the Secretary's conduct of the census to bear "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purposes of the census," *i.e.*, the "constitutional goal of equal representation." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992)). Although this does not require Defendants to achieve a perfect count, as the Court held in denying Defendants' motion to dismiss, it requires Defendants to conduct the census in a manner that does not "unreasonably compromise[] the distributive accuracy of the census." *Kravitz*, 2018 WL 4005229, at 13. Here, Plaintiffs have presented ample evidence that Defendants violated this constitutional mandate.

As detailed above, Plaintiffs have marshaled substantial evidence, based on the Census Bureau's own data and analyses, showing that the citizenship question will lead to a differential undercount that will dilute Plaintiffs' votes. Given that the core constitutional purpose of the Census is to ensure equal representation, this by itself is sufficient to sustain Plaintiffs' Enumeration Clause claim. *See Wisconsin*, 517 U.S. at 19-20; *see also Utah*, 536 U.S. at 478. Defendants argue that "Plaintiffs cannot sufficiently establish that—even if the citizenship question caused a decline in initial self-response—the Census Bureau's NRFU efforts, including imputation and proxy data, would not correct the decline and result in a complete enumeration." Defs.' Mem. at 18. But, as discussed in Part I.C, s*upra*, there is ample record and expert evidence that Census Bureau will not be able correct the damage that the CQ will cause by throwing money, people and technology at the NRFU process.

44

The unreasonableness of the Secretary's decision is underscored by the flawed reasoning and bizarre process on which he relied in insisting on a citizenship question despite compelling evidence that it would produce a differential undercount. As explained above, there was no genuine need for the data that was sought that could justify undermining the distributive accuracy of the Census count. DOJ's request for block-level citizenship data would have been better satisfied through the use of administrative records.[37] Furthermore, the Secretary's decision was made at the eleventh hour, after the deadline for identifying subjects to be included on the 2020 Census and without even a single test that would support disregarding concerns regarding the impact that the CQ would have on the accuracy of the Census count.

Taken together, the evidence suggests that *Plaintiffs* may be entitled to summary judgment on their Enumeration Clause claim. At a minimum, Plaintiffs have more than met their burden of establishing a genuine factual dispute such that Defendants' motion as to the Enumeration Clause claim should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Date: November 27, 2018                    Respectfully submitted,


                                            */s/ Daniel Grant* _____
                                            Daniel Grant (Bar Number: 19659)
                                            Shankar Duraiswamy*
                                            Dustin Cho*
                                            Bianca Nunes*
                                            Tina M. Thomas*

---

[37] Defendants also seek to re-litigate this Court's ruling regarding the applicable legal standard. Without citing any legal authority, Defendants assert that the Enumeration Clause requires only that the population be determined through a "person-by-person headcount of the population." Defs. Mem. at 17. As the Court previously ruled, courts "have long recognized that the census accomplishes more than just a person-by-person headcount." 2018 WL 4005229, at *12.

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
bnunes@cov.com
tthomas@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (212) 841-1010
pbduke@cov.com

Lawrence A. Hobel*
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
*Attorneys for Plaintiffs*

\* Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 27th day of November, 2018, I caused a copy of the foregoing document and all accompanying attachments to be sent to all parties receiving CM/ECF notices in this case.

*/s/ Daniel Grant*
Daniel Grant (Bar Number: 19659)