# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT<br>OF COMMERCE, et al.,<br><br>     Defendants. | 18-CV-2921 (JMF) |
| THE NEW YORK IMMIGRANT<br>COALITION et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES DEPARTMENT<br>OF COMMERCE, et al.,<br><br>                    Defendants. | 18-CV-5025 (JMF) |

## PLAINTIFFS' JOINT PROPOSED POST-TRIAL FINDINGS OF FACT

# TABLE OF CONTENTS

I.   Parties and Witnesses ...........................................................................................................1

   A.   Plaintiffs .........................................................................................................................1

      1.   The Governmental Plaintiffs ....................................................................................1

      2.   The New York Immigration Coalition .....................................................................1

      3.   Make the Road New York ........................................................................................3

      4.   American-Arab Anti-Discrimination Committee & ADC Research Institute.............3

      5.   CASA de Maryland ("CASA") .................................................................................5

   B.   Defendants and Key Players ...........................................................................................7

      1.   Census Bureau .........................................................................................................7

      2.   Commerce Department .............................................................................................8

      3.   Department of Justice ("DOJ") ................................................................................9

      4.   Other Key Players ....................................................................................................9

   C.   Witnesses ......................................................................................................................10

      1.   Fact Witnesses .......................................................................................................10

      2.   Expert Witnesses ...................................................................................................14

   D.   Administrative Record and Written Discovery ..............................................................17

      1.   Administrative Record ...........................................................................................17

      2.   Document Requests ................................................................................................18

      3.   Interrogatories .......................................................................................................19

      4.   Requests for Admission .........................................................................................21

II.  Background on the Census, the Citizenship Question, and Census Bureau Processes .........22

   A.   Decennial Census Overview ..........................................................................................22

   B.   The Long Form and the American Community Survey....................................................26

   C.   History of a Citizenship Question on the Census ...........................................................28

   D.   The Census Bureau Has Had a Long Standing Objection to the Inclusion of a
       Citizenship Question on the Decennial Census ..............................................................29

   E.   Standards for Changing the Content of a Question Prior to Its Addition to the
       Decennial Census ..........................................................................................................30

      1.   Census Bureau Quality Standards ..........................................................................30

      2.   Blumerman Memorandum ......................................................................................33

      3.   Census Bureau's Process ........................................................................................34

      4.   Guidance Governing Statistical Agency Independence ...........................................36

   F.   Examples of Testing Questions on Other Surveys .........................................................37

III.   Process of Adopting Citizenship Question ..........................................................41

A.   Secretary Ross' Spring 2017 Communications with Steve Bannon, Kris Kobach and Others About Adding a Citizenship Question to the Decennial Census (February 2017—April 2017) ..........................................................42

B.   Secretary Ross' Demand for a Citizenship Question and His Staff's Efforts to Enlist Another Agency to Request the Addition of a Citizenship Question..................45

C.   Secretary Ross' Staff Investigates Whether the Commerce Department Can Add a Citizenship Question On Its Own While Mr. Kobach and Capitol Hill Allies Press for a Citizenship Question ..........................................................49

D.   Secretary Ross and His Staff Discuss Mr. Kobach's Request and Decide to Redouble Their Efforts to Solicit the Department of Justice to Request Addition of a Citizenship Question (September 2017) ..........................................................54

E.   Origins of December 12 Letter from Department of Justice to Census Bureau (September 2017—December 2017) ..........................................................58

F.   Final Revisions to and Delivery of the December 12 Letter (November 2017 - December 2017) ..........................................................66

G.   The Census Bureau Consistently Recommended Against Adding a Citizenship Question (December 2017 - March 2018) ..........................................................70

H.   The Census Bureau Repeatedly Communicated Its Recommendation Against Adding a Citizenship Question to Secretary Ross (December 2017 - March 2018)......73

1.   The Attorney General Directs the Department of Justice to Rebuff the Census Bureau's Attempts to Discuss the December 12 Letter ..........................................................74

2.   Census Bureau Analyses Recommended Against the Addition of a Citizenship Question ..........................................................78

I.   Department of Commerce and Department of Justice Discussed the Addition of a Citizenship Question with Outside Stakeholders (January 2018 - February 2018) .......97

IV.   The March 26 Decision Memo ..........................................................110

A.   Political Interference in the Decision to Add a Citizenship Question ........................110

B.   Deviations from Census Bureau Standard Pre-Testing Processes in the Decision to Add a Citizenship Question ..........................................................111

C.   The March 26 Memo Was Prepared Without Adequate Consultation of Census Bureau Officials ..........................................................120

D.   Secretary Ross' Congressional Testimony Just Prior to the Decisional Memo (March 2018) ..........................................................121

E.   The Conclusions in the Decisional Memorandum..........................................................122

1.   Statements Concerning the Genesis of a Citizenship Question ..............................122

2.   Statements Concerning the Secretary's Process ..........................................................123

3.   Conclusions Regarding Sufficiency of Testing..........................................................125

4.   Conclusions Regarding Decline in Response Rate and Expense..............................133

5.    Conclusions Regarding Respondent Burden ..........................................................139

6.    Conclusions Regarding Data Quality ..................................................................140

7.    Important Aspects of the Problem Not Discussed in Secretary Ross' March 26 Decision Memo..........................................................................................144

V.   Lawsuit and Post-Lawsuit Disclosures.............................................................................148

VI.  The Addition of a Citizenship Question is Closely Linked With The Trump Administration's Wider Nativist Agenda. ........................................................................153

   A.   Department of Commerce's Admissions Regarding President Trump, Attorney General Sessions, and Other Senior Administration Officials' Statements of Animus Toward Immigrant Communities of Color and Secretary Ross's Support.....153

   B.   These Expressions of Animus Evidently had an Impact on Immigrant Communities of Color and their Willingness to Participate in Government....................................157

VII. Effect of Citizenship Question on Response Rates ...........................................................161

   A.   Census Bureau Analyses of Decline in Response Due to a Citizenship Question .......162

   B.   Effect of Question on Noncitizen Response Rates ........................................................164

   C.   Effect of Question on Hispanic Response Rates ...........................................................167

      1.    Item Non-Response Rates...............................................................................167

      2.    Breakoff Rates..................................................................................................168

   D.   Expert Testimony on Reduced Self-Response Rates Attributable to a Citizenship Question ..........................................................................................................169

      1.    Dr. Jennifer L. Van Hook ...............................................................................169

      2.    Dr. D. Sunshine Hillygus ................................................................................173

      3.    Dr. Matthew Barreto........................................................................................176

      4.    Dr. Christopher Warshaw ................................................................................179

   E.   The Census Bureau's Estimates of the Decline in Self-Response Rates are Conservative...................................................................................................180

   F.   The Macro-Environment ...............................................................................................183

      1.    CBAMS Results ..............................................................................................183

      2.    Center of Survey Measurement Memoranda ...................................................187

      3.    Plaintiffs' Experts Agree that the Current Macro-Environment Heightens Concerns that a Citizenship Question will Substantially Reduce Response Rates ..188

VIII. Effect of A Citizenship Question on Undercount...........................................................189

   A.   Hard-to-Count Populations and Undercount ...............................................................190

   B.   The Parties' Responses to the Expected Undercount ..................................................193

   C.   The Defendants' Planned Integrated Communications and Partnership Campaign.....196

   D.   Household and Household Member Omissions - There is Agreement that Not All Individuals Missed in the Census Will Be Covered by NRFU Processes...................202

E.    The Defendants' Planned Non-Response Follow-up (NRFU) Operations .................205

1.    The Limitations on NRFU to Address Undercount in Prior Decennial Censuses ....206

2.    The Expected Increase in NRFU Caseload for the 2020 Decennial Census ............208

3.    The Relationship Between Reduced Self-Response and Undercount ......................209

4.    Planned NRFU Operations Will Not Totally Eliminate Impact of Reduced Self-
Response Resulting in Higher Undercount ............................................................211

5.    The Components of NRFU Will Not Off-Set the Decline in Self-Response. ..........216

6.    Recap of Key Points on Self-Response and NRFU ...............................................240

IX.   Absence of a Legitimate VRA Enforcement Rationale.....................................................245

A.    Qualifications of Dr. Handley ...............................................................................246

B.    The Department of Justice's Need for Decennial Census CVAP Data .......................248

1.    VRA Enforcement and the Use of Census Survey Data...........................................248

2.    The Department of Justice Did Not See a Need for Decennial Census Data Prior to
Being Contacted By Secretary Ross' Staff .........................................................251

3.    There is No Evidence in the Administrative or Evidentiary Record to Support the
Claims in the Gary Letter About the Purported Problems with Existing ACS CVAP
Data ........................................................................................................................253

4.    There is No Evidence in the Administrative or Evidentiary Record Indicating that
CVAP Data Collected through the Decennial Census Will Be an Improvement for
VRA Enforcement Purposes over Existing ACS CVAP Data ...............................258

5.    The Administrative and Evidentiary Record Indicate the Decision to Include a
Citizenship Question on the Census Will Produce Less Accurate CVAP Data for
VRA Enforcement Purposes than Using Administrative Records .........................262

X.    Injury to Organizations and Governmental Plaintiffs .....................................................270

A.    Organizational Injuries to NGO Plaintiffs...............................................................270

1.    NYIC ..................................................................................................................271

2.    Make the Road New York ...................................................................................275

3.    ADC/ADCRI........................................................................................................277

4.    CASA ..................................................................................................................278

B.    Organizational Injuries to Governmental Plaintiffs .................................................279

C.    Injuries Stemming from Undercount ......................................................................282

1.    Apportionment and Political Power .....................................................................282

2.    Impact of Undercount on Federal Funding............................................................294

a.    Financial Harm to NGO Plaintiffs........................................................................298

b.    Financial Harm to Governmental Plaintiffs .........................................................300

D.    Injuries Independent from Undercount—Data Quality ...............................................307

1.  Adding a Citizenship Question to the Census Will Cause More Respondents to Be Enumerated through NRFU Processes, Resulting in Worse-Quality Census Data ..................................................................................307

2.  Secretary Ross's Choice of Alternative D, which Will Produce Worse Data Quality, Violates OMB Standards ..........................................................308

3.  Adding a Citizenship Question to the Census Will Damage the Quality of Census Data Relating to Population Characteristics.................................309

4.  The Governmental Plaintiffs Require Accurate Characteristics Data to Make Decisions Regarding the Distribution of Resources ...............................311

5.  Federal Funding Programs Rely on Accurate Census Data Relating to Characteristics ...............................................................................312

6.  Omissions and Data Quality ...............................................................313

7.  Children are Particularly Vulnerable to Being Omitted from the Census ...............315

E.  Injury Based on Risk to Privacy ...............................................................318

## I.     PARTIES AND WITNESSES

### A.     Plaintiffs

#### 1.     The Governmental Plaintiffs

1.     The governmental plaintiffs include 18 states (New York, Colorado, Connecticut, Delaware, Illinois, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia and Washington), 15 cities and counties (the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; city and county of San Francisco; counties of Cameron, El Paso, Hidalgo, and Monterey), the District of Columbia, and the United States Conference of Mayors. Docket No. 210.

2.     The governmental plaintiffs are diverse.  They comprise large and small states, urban centers and rural areas, communities from North to South and coast to coast.  Collectively, the state and local governments challenging the Defendants' decision collectively represent more than 39% of the population of the United States.  These jurisdictions are each home to immigrant and Hispanic communities; as detailed more fully below, they will be directly and deleteriously affected by Defendants' demand for citizenship information. *See*, *e.g.*, Warshaw Aff. (Docket No. 526-1) ¶¶ 39, 54, Tables 5, 7.

#### 2.     The New York Immigration Coalition

3.     Plaintiff New York Immigration Coalition ("NYIC") is an umbrella policy and advocacy organization for nearly 200 groups in New York State, representing the collective interests of New York's diverse immigrant communities and organizations.  Choi Aff. (Docket No. 489-1) ¶ 2; Plum Aff. (Docket No. 498-19) ¶ 2.

4.     As a statewide organization, NYIC and its members serve a community of approximately four million immigrants across New York.  Choi. Aff. ¶ 23.

5.     NYIC's mission is to unite immigrants, members, and allies so that all New Yorkers can thrive; it envisions a New York State that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

6.     NYIC pursues solutions to advance the interests of New York's diverse immigrant communities and advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

7.     NYIC seeks to build the power of immigrants and the organizations that serve them to ensure their sustainability, improve people's lives, and strengthen New York State.  Choi Aff. ¶ 3; Plum Aff. ¶ 3.

8.     NYIC's nearly 200 members are dues-paying, nonprofit organizations that are committed to advancing work on immigrant justice, empowerment, and integration and they are located throughout New York State and beyond, all sharing NYIC's mission to serve and empower immigrant communities.  Choi Aff. ¶ 4; Plum Aff. ¶ 4.

9.      NYIC's members include grassroots community groups, social services providers, large-scale labor and academic institutions, and organizations working in economic, social, and racial justice; representatives of NYIC's member organizations serve on the NYIC Board of Directors. Choi Aff. ¶ 4; Plum Aff. ¶ 4.

10.    As an organization, NYIC has an ongoing commitment to promoting engagement in the Decennial Census among individuals served by its member organizations—in large part because of how critical the population count determined by the Census is for NYIC's member organizations' levels of governmental funding and political representation at the federal, state, and local levels.  Plum Aff. ¶ 10.

11.    For example, NYIC partnered with the New York Community Media Alliance to launch an outreach campaign to boost immigrant participation in the 2010 Census.  *Id.*

12.    As part of that effort, NYIC coordinated public service announcements in 24 languages that appeared in 69 newspapers and held press briefings with elected officials, helping to increase New York City's mail-in 2010 Census participation rate by approximately 3%.  *Id.*

### 3.    Make the Road New York

13.    Make the Road New York ("MRNY") is a nonprofit membership organization with offices and service centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains.  Altschuler Aff. (Docket No. 503-1) ¶ 2.

14.    MRNY's mission is to build the power of immigrant and working-class communities, which it advances by engaging in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation.  *Id.* ¶ 3.

15.    MRNY has more than 23,000 members who reside in New York City, Nassau County, Suffolk County, and Westchester County.  *Id.* ¶ 4

16.    These members lead multiple organizing committees across numerous issues and program areas of concern to the organization, take on leadership roles in the campaigns, determine priorities, and elect the representatives who comprise most of the Board of Directors.  *Id.*

### 4.    American-Arab Anti-Discrimination Committee & ADC Research Institute

17.    Plaintiff American-Arab Anti-Discrimination Committee ("ADC"), a civil rights membership organization committed to defending and promoting the rights and liberties of Arab-Americans and other persons of Arab heritage, is the largest American-Arab grassroots civil rights organization in the United States.  Khalaf Aff. (Docket No. 498-16) ¶ 6.

18.     Senator James G. Abourzek founded ADC in 1981 in response to stereotyping, defamation, and discrimination directed at Americans of Arab origin.  *Id.* ¶ 4.

19.     In 1981, Senator Abourzek founded Plaintiff ADC Research Institute ("ADCRI"), a 501(c)(3) corporation.  *Id.* ¶ 5.

20.     ADCRI sponsors a wide range of programs on behalf of Arab Americans and of consequence to the wider American community.  *Id.*

21.     ADC's mission includes focuses on combating stereotypes and discrimination against and affecting the Arab-American community in the United States, serving as its public voice on domestic policy issues, and promoting greater understanding of Arab history and culture.  *Id.* ¶ 7.

22.     ADC advocates, educates, and organizes to defend and promote human rights and civil liberties of Arab-Americans and other persons of Arab heritage, from recent immigrants to citizens born in the United States.  *Id.*

23.     ADC also has a legal department, which focuses on issues that impact the Arab-American community such as immigration, employment discrimination, and educational discrimination. *Id.* ¶ 9.

24.     ADC serves as a membership organization, with several thousand dues-paying members who reside in all 50 states and the District of Columbia.  *Id.* ¶¶ 8, 31, 33-35.

25.     Many of these members are active in ADC's 28 local chapters, which are in 20 states and the District of Columbia.  *Id.* ¶¶ 8, 32.

26.     This includes active chapters with members leading local efforts, including in Tucson and Phoenix, Arizona, Los Angeles and Orange County, California, Miami and Orlando, Florida, New York, New York, and Austin and Dallas, Texas.  *Id.* ¶¶ 8, 32-33.

27. ADC's members play a key role in the organization's operations, leading chapter-based activities and electing a majority of the organization's Board of Directors. *Id.* ¶¶ 31, 33.

28. ADCRI sponsors programs in support of the constitutional rights of Arab-Americans, as well as research studies, publications, seminars, and conferences that document discrimination faced by Arab-Americans in the workplace, schools, media and government agencies. *Id.* ¶ 10.

29. Since the 1980s, ADC has served in numerous capacities on the Census Bureau advisory committees, and both ADC and ADCRI have actively promoted Arab-American census participation. *Id.* ¶ 13.

30. For example. in the months leading up to and during the 2010 Decennial Census, ADC and ADCRI conducted outreach work with the Arab-Americans community regarding completing census forms, holding outreach events to counter concerns of sharing of information with government and law enforcement agencies, and engaged in efforts to "get out the count" in that community by hosting townhalls and symposiums in select cities across the country. *Id.* ¶ 14.

31. Because of the importance of having Arab-Americans accurately counted in the 2020 Decennial Census, ADC and ADCRI have already begun preparations for outreach to the Arab-American community by educating community members about the Decennial Census and its importance and now have increased their spending and efforts due to the addition of a citizenship question. *Id.* ¶¶ 15–16.

### 5. CASA de Maryland ("CASA")

32. Plaintiff CASA de Maryland, Inc. ("CASA") is a nonprofit 501(c)(3) membership organization headquartered in Prince George's County, Maryland with offices in Maryland, Virginia and Pennsylvania. Escobar Aff. (Docket No. 498-3) ¶ 4.

33.     Founded in 1985, CASA is the largest membership-based immigrants' rights organization in the mid-Atlantic region, with more than 90,000 members, including members in Prince George's County and Baltimore, Maryland.  *Id.* ¶ 4.

34.     CASA's mission is to create a more just society by increasing the power of and improving the quality of life of low-income immigrant communities.  *Id.* ¶ 5.

35.     To advance this mission, CASA offers social, health education, job training, employment, and legal services to immigrant communities.  *Id.*

36.     CASA helps nearly 20,000 people a year providing services in its offices, by phone, and through email.  *Id.*

37.     CASA has an ongoing commitment to promoting engagement in the Decennial Census among its members, constituents, and communities.  *Id.* ¶ 7.

38.     CASA supports member participation in the Decennial Census as a means to advance CASA's overall mission by increasing recognition of low-income immigrant populations, which increases both the political power of those communities and the government funding directed to those communities, in turn improving the quality of life for those communities.  *Id.*

39.     With a thirty-year history working with immigrant communities, CASA has cultivated a position of trust with these communities that has made CASA a "go-to" organizational partner for outreach and education surrounding the Decennial Census.  *Id.* ¶ 8.

40.     In 2010, CASA partnered with various local government campaigns related to the census throughout Maryland, receiving dedicated funding to conduct door-to-door outreach, facilitate group educational sessions, and work with local, ethnic media to inform, engage, and encourage participating in the Census among Limited English Proficient immigrant communities in the region.  *Id.* ¶ 9.

41.    Beyond the Decennial Census, CASA provides various services to help members navigate public benefits including health, education, and legal services.  *Id.* ¶ 5.

42.    Through its Health and Social Service Program, CASA provides assistance to members navigating Supplemental Nutritional Assistance Program (SNAP) and Special Supplemental Nutrition Program for Women Infants and Children (WIC).  *Id.* ¶ 11.

43.    CASA's Legal Program further provides legal counseling related to employment discrimination, wage theft, and other employment related issues.  *Id.* ¶ 14.

44.    Through other programs, CASA assists members enrolling in Medicaid, Children's Health Insurance Program (CHIP), Title I funded public schools, early education programs, and unemployment insurance.  *Id.* ¶¶ 12–13.

**B.    Defendants and Key Players**

**1.    Census Bureau**

45.    Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency responsible for planning and administering the Decennial Census. Thompson Aff. (Docket No. 516-1) ¶ 17.

46.    Defendant Dr. Ron Jarmin is performing the nonexclusive duties of Director or Acting Director of the Census Bureau. PX-26 (AR).

47.    Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United Stated Census Bureau. Nov. 13 Trial Tr. at 876.

48.    Enrique Lamas is performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau. PX-26 (AR).

49.    Burton Reist is the Chief of the Decennial Communications and Stakeholder Relations at the Census Bureau. PX-4 at AR 3772 (AR).

50.     Victoria Velkoff is Division Chief of the American Community Survey Office at the U.S. Census Bureau. PX-164.

51.     Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question on the 2020 Decennial Census between December 2017 and March 2018. PX-147 (AR); Nov. 13 Trial Tr. at 882–83.

## 2.     Commerce Department

52.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f). The Commerce Department is responsible for planning, designing, and implementing the 2020 Decennial Census. 13 U.S.C. § 4.

53.     Defendant Wilbur Ross is the Secretary of Commerce. *See* PX-26 (AR).

54.     Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross. Comstock Dep. (Docket No. 491-2) at 35.

55.     Karen Dunn Kelley is the Presidentially appointed Under Secretary For Economic Affairs at the U.S. Department of Commerce responsible for the operations of the Census Bureau. Kelley Dep. (Docket No. 493-2) at 25:8-12.

56.     James W. Uthmeier is Senior Counsel to the General Counsel, Regulatory Reform Officer, Department of Commerce. PX-33 (AR).

57.     Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross. Teramoto Dep. (Docket No. 509-2) at 78.

58.     Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock. Park-Su Dep. (Docket No. 494-2) at 26-28.

59.     David Langdon is a Policy Advisor within the Office of Policy and Strategic Planning, reporting to Mr. Comstock. Langdon Dep. (Docket No. 510-2) at 54–55.

60.     Tad Kassinger was the former General Counsel of the Commerce Department who is one of Secretary Ross' personal attorneys. Comstock Dep. at 226–29.

61.     Peter Davison is the General Counsel for the Department of Commerce. Gore Dep. (Docket No. 491-2) at 97-98.

62.     Mike Walsh is the Deputy General Counsel for the Department of Commerce. Park-Su Dep. at 40.

### 3.      Department of Justice ("DOJ")

63.     Jeff Sessions was Attorney General of the United States. Gore Dep. at 77-78.

64.     John Gore is the Acting Assistant Attorney General for Civil Rights at the U.S. DOJ. Gore Dep. at 18:16-22.

65.     Arthur E. Gary is General Counsel for the Justice Management Division in the U.S. DOJ. PX-32 (AR).

### 4.      Other Key Players

66.     Stephen Bannon was the White House Chief Strategist and Senior Counselor to the President.

67.     Kris Kobach was the Kansas Secretary of State, and served as Vice Chair of the Presidential Commission on Election Integrity. PX-19 (AR), PX-614 (AR).

68.     A. Mark Neuman was the point person for the Trump transition team on Census issues. Teramoto Dep. at 126–127.

C.      Witnesses

1.      Fact Witnesses

69.      Evelyn Rodriguez is an employee of the City of Chicago who submitted testimony

regarding the effects of a citizenship question on the 2020 Decennial Census on the City of

Chicago. Rodriguez Aff. (Docket No. 488-1); Supp. Rodriguez Aff. (Docket No. 488-2).

70.      Monica Sarmiento is the Executive Director of Virginia Coalition for Immigrant Rights

(VACIR) who submitted testimony regarding the effects of a citizenship question on the 2020

Decennial Census on immigrant communities and organizations that support those communities.

Sarmiento Aff. (Docket No. 488-3); Supp. Sarmiento Aff. (Docket No. 488-4).

71.      Stephen K. Choi is the Executive Director of the New York Immigrant Coalition (NYIC)

who submitted testimony regarding the effects of a citizenship question on the 2020 Decennial

Census on NYIC and the immigrant communities it serves. Choi Aff. ¶ 1; Supp. Choi Aff.

(Docket No. 489-2) at ¶ 1.

72.      Susan Brower is the State Demographer for the State of Minnesota who submitted

testimony on Minnesota's Census outreach efforts, Minnesota's redistricting processes, and

Minnesota's desire not to have block-level citizenship data provided or published. Brower Aff.

(Docket No. 498-1); Supp. Brower Aff. (Docket No. 498-2).

73.      George Escobar is the Chief of Programs and Services at CASA who submitted testimony

regarding the effects of a citizenship question on the 2020 Decennial Census on CASA and the

immigrant and Hispanic communities it serves. Escobar Aff. ¶ 1; Supp. Escobar Aff. (Docket

No. 498-4) at ¶ 1.

74.      Marchelle Franklin is the Human Services Director for the City of Phoenix who submitted

testimony regarding the effects of a differential undercount on services provided by the City of

Phoenix. Franklin Aff. (Docket No. 498-5); Supp. Franklin Aff. (Docket No. 498-6).

10

75.     Emily Freedman is the Director of Community Development for the City of Providence who submitted testimony regarding the effect of a differential undercount and inaccurate census count on funding Providence receives under certain federal programs. Freedman Aff. (Docket No. 498-7); Supp. Freedman Aff. (Docket No. 498-8).

76.     Jesús G. García is the Cook County Board Commissioner for the 7th District, located in Chicago, Illinois, who submitted testimony regarding a survey issued to constituents evaluating views on a citizenship question on the 2020 Decennial Census, other evidence of community fears of a citizenship question on the 2020 Decennial Census, outreach efforts for the 2020 Decennial Census, the effect of an undercount on funding and distribution of County services, and the effect of an undercount on redistricting within Cook County. Garcia Aff. (Docket No. 498-9); Supp. Garcia Aff. (Docket No. 498-10).

77.     Katherine Harvell Haney is the Chief Financial Officer at the Massachusetts Office of Health and Human Services who provided testimony regarding the effect of a differential undercount and inaccurate census count on funding received by Massachusetts under several federal programs. Haney Aff. (Docket No. 498-12); Supp. Haney Aff. (Docket No. 498-13).

78.     Jason Harmon is the Director of the Office of Every Student Succeeds Act (ESSA) Funded Programs at the New York State Education Department (NYSED) who provided testimony regarding the effect of a differential undercount on Title I, Title II, and Title IV education funding on the State of New York and on local school districts. Harmon Aff. (Docket No. 498-14); Supp. Harmon Aff. (Docket No. 498-15).

79.     Samer E. Khalaf is the National President of the American-Arab Anti-Discrimination Committee (ADC) and ADC Research Institute (ADCRI) who provided testimony regarding the

effects of a citizenship question on the 2020 Decennial Census on ADC and ADCRI and Arab-American communities they serve. Khalaf Aff. ¶ 1; Supp. Khalaf Aff. (Docket No. 498-17).

80.     Christine Pierce is the Senior Vice President of Data Science for the Nielsen Company (US) LLC ("Nielsen") who provided testimony regarding her conversation with Secretary Ross that contradicts the description of the conversation Secretary Ross used to justify his decision to add a citizenship question in his March 26 Memorandum. Pierce Aff. (Docket No. 498-18).

81.     Elizabeth Plum is the Vice President of Policy for the NYIC who provided testimony regarding NYIC's census outreach efforts and the effects of a citizenship question on the 2020 Decennial Census on NYIC and the immigrant communities it serves. Plum Aff. ¶ 1; Supp. Plum Aff. (Docket No. 498-20).

82.     Arturo Vargas is the Chief Executive Officer of the NALEO Educational Fund who provided testimony regarding NALEO's usual role in census operations, its role with respect to the decision to add a citizenship question, and its opposition to adding a citizenship question to the 2020 Decennial Census. Vargas Aff. (Docket No. 498-21); Supp. Vargas Aff (Docket No. 498-22).

83.     Jacqueline Tiema-Massie is the Director of Planning, Research, and Development as well as the Director of Grants Management for the Chicago Department of Family and Support Services ("DFSS") who provided testimony regarding the effects of an inaccurate Census enumeration and a differential undercount on services provided by DFFS to the Chicago community, and federal funding programs overseen by DFFS. Tiema-Massie Aff. (Docket No. 501-1); Supp. Tiema-Masse Aff. (Docket No. 501-2).

84.     Daniel Altschuler is the Director of Civic Engagement and Research for Plaintiff Make the Road New York ("MRNY") who provided testimony regarding the effects of a citizenship

question on the 2020 Decennial Census on MRNY and the immigrant communities it serves. Altschuler Aff.; Supp. Altschuler Aff. (Docket No. 503-2).

85.  Todd A. Breitbart was until his retirement a Senior Research Analyst working on redistricting for successive Minority (Democratic) Leaders of the New York State Senate, who provided testimony regarding the redistricting process in New York and the effects of a differential undercount resulting from a citizenship question on the 2020 Decennial Census on redistricting. Breitbart Aff. (Docket No. 504-1); Supp. Breitbart Aff. (Docket No. 504-2).

86.  Sarah Cullinane is the Director of Make the Road New Jersey who provided testimony regarding the effects of anti-immigrant rhetoric by the Trump Administration on immigrant communities and the likelihood that such rhetoric would impact their decision to respond to a 2020 Decennial Census with a citizenship question. Cullinane Aff. (Docket No. 505-1); Supp. Cullinane Aff. (Docket No. 505-2).

87.  Gregory E. Lucyk is a member of the Board of Directors of One Virginia 2021: Virginians for Fair Redistricting who provided testimony regarding a differential undercount on Virginia redistricting, and the effects of inaccurate districts on Virginia residents. Lucyk Aff. (Docket No. 506-1).

88.  Dr. John Abowd is the Chief Scientist at the United States Census Bureau and Associate Director for Research and Methodology at the United States Census Bureau who testified as a fact witness generally regarding Census Bureau testing and enumeration processes and specifically regarding the processes and analyses presented to the Department of Commerce in response to the DOJ's request to add a citizenship question to the 2020. *See* Census. Nov. 13 Trial Tr. at 876:8-877:4.

## 2. Expert Witnesses

89.   Dr. Dione Sunshine Hillygus is a Professor of Political Science and Public Policy and Director of the Initiative on Survey Methodology at Duke University. Nov. 5 Trial Tr. at 24:18-26:9. Generally, Dr. Hillygus provided expert testimony in this case evaluating: the likely impact of a citizenship question on the participation of Hispanics and noncitizen households; the claims made by Secretary Ross in his memo; the potential effectiveness or not of the census efforts to mitigate their predicted differential and self-response through the nonresponse follow up operations and the outreach campaign; and the extent to which this process has, in fact, followed Census Bureau guidelines. Nov. 5 Trial Tr. at 29:9-17.

90.   Dr. Hermann Habermann is the former Chief Statistician of the United States (1988–1992), Deputy Director and Chief Operating Officer of the United States Census Bureau (2002–2007), and Director of the United Nations Statistics Division (1994–2002). Habermann Aff. (Docket No. 498-11). Dr. Habermann submitted testimony regarding the lack of need for block-level citizenship data, insufficient coordination between the Census Bureau and DOJ, the superiority of administrative records for obtaining block-level citizenship data, the need for pretesting of a citizenship question on the 2020 Decennial Census, the likely damage to the credibility of the Census and Census Bureau by the inclusion of a citizenship question, and the lack of support in United Nations recommendation for Secretary Ross's decision. *Id*.

91.   Dr. Jennifer Van Hook is the Roy C. Buck Professor of Sociology and Demography at the Pennsylvania State University who gave expert testimony regarding unit and item nonresponse rates of Hispanics and immigrants to citizenship and place of birth questions, including increases in such nonresponse rates since 2016. Van Hook Aff. (Docket No. 489-3).

92.   Dr. William P. O'Hare a professional demographer and researcher with four decades of experience utilizing Census Bureau data for a variety of purposes, and who provided expert

testimony regarding the likelihood that reduced self-response rates as a result of the addition of a citizenship question to the 2020 Decennial Census would result in an undercount. O'Hare Aff. (Docket No. 507-1).

93.     Dr. Andrew Reamer is a research professor in the George Washington Institute of Public Policy (GWIPP) at George Washington University who provided expert testimony regarding the effect of a Census undercount on distribution of federal funding. Reamer Aff. (Docket No. 508-1).

94.     Dr. Christopher Warshaw is an Assistant Professor of Political Science at George Washington University who provided expert testimony regarding the effects of a Census undercount differentially affecting specific demographic groups on the population of the fifty states and of selected cities and counties, on apportionment of representatives across states for the U.S. House of Representatives, on distribution of voting power within states, and on the distribution of political power within the United States.  Warshaw Aff. ¶¶ 1–2.

95.     John Thompson is the former Director of the United States Census Bureau from August 2013 to June 2017 who provided expert testimony regarding the adequacy of testing of a citizenship question on the 2020 Decennial Census, the effectiveness of NRFU, and the likelihood of a differential net undercount. Thompson Aff. (Docket. No. 516-1).

96.     Dr. Joseph J. Salvo is the Director of the Population Division at the New York City Department of City Planning (essentially, the city's chief demographer). November 6 Trial Tr. at 289:6-19. Dr. Salvo provided expert testimony regarding the the effect of decreased self-response rates on the components of net undercounts, NRFU operations, such as proxies, the use of administrative records and imputation at the local level, and the effect of decreased self-response rates on the provision of services in New York City. Nov. 6 Trial Tr. at 298:23-301:5,

304:5-13.  In addition, Dr. Salvo provided fact testimony on the efforts of New York City to mitigate the expected decrease in self-response resulting from a citizenship question.  Nov. 6 Trial Tr. at 399:9–400:17.

97.     Dr. Matthew A. Barreto is a professor of political science and Chicano studies at the University of California, Los Angeles. Nov. 9 Trial Tr. at 580:14-17. Dr. Barreto surveyed social science literature and conducted a survey experiment designed to ascertain the impacts of a citizenship question on the Decennial Census.  Nov 9 Trial Tr. at 588:18–23.

98.     Dr. Barreto provided expert testimony evaluating the expected effects of a citizenship question on the 2020 Decennial Census, from its effects on initial response rates, through non-response follow up and imputation, and ultimately to the quality of data that would be gathered in 2020; the net differential impact of each of these areas on Hispanic and immigrant communities in particular; and the expected impacts of a citizenship question on the differential net undercount.  Nov. 9 Trial Tr. at 590:2–591:12.

99.     Dr. Lisa Handley is a consultant who specializes in voting rights in redistricting and in electoral district design more generally. Nov. 13 Trial Tr. at 787:5-10. Dr. Handley provided expert testimony regarding the sufficiency of ACS data for purposes of ascertaining whether an electoral system or redistricting plan dilutes minority votes.  Nov. 13 Trial Tr. at 796:22–797:12.

100.    Dr. John Abowd is the Chief Scientist at the United States Census Bureau and Associate Director for Research and Methodology at the United States Census Bureau. Nov. 13 Trial Tr. at 876:8–877:4.

101.    Dr. Abowd provided expert testimony regarding the testing of a citizenship question on the ACS, the effect of a citizenship question on self-response rates on the 2020 Decennial Census, and the effectiveness of NRFU. Nov. 14 Trial Tr. at 1075:14–1078:7.

### D. Administrative Record and Written Discovery

#### 1. Administrative Record

102.   Defendants produced an Administrative Record along with a certification and index on June 8, 2018 with only 1,320 pages.  Docket No. 173; PX-1 (AR).  These materials allude to but contain little documentation of internal deliberations before December 2017 or communications between the Departments of Commerce and Justice. PX-1 (AR).

103.   On June 21, 2018, Secretary Ross filed a supplemental memorandum significantly revising the narrative as to the origin and genesis of how a citizenship question came to be placed on the Decennial Census. Docket No. 189; PX-2 (AR).

104.   On July 3, 2018, and memorialized in the July 5, 2018 order, this Court ordered the Defendants to produce a complete Administrative Record by July 23, 2018, and authorized limited extra record discovery.  Docket No. 199.  The Court granted additional time to produce a complete Administrative Record on July 23, 2018. Docket No. 211.

105.   Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (Bates 0003736-0012464). Docket Nos. 212, 216, 217; PX-3 (AR); PX-4 (AR).  The productions of July 23, 2018 and July 27, 2018 contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between Commerce and DOJ. PX-3 (AR); PX-4 (AR).

106.   Defendants released additional Administrative Record documents after review by the Disclosure Review Board ("DRB") on August 28, 2018 and September 4, 2018, without Bates numbers. PX-5 (AR); PX-6 (AR).

107.   Defendants produced additional small supplements to the Administrative Record on September 11, 2018 (Bates 0012464-0012543). PX-7 (AR).

108.    Defendants produced additional sets of documents, including in responses to motions to

compel, on various dates (Bates 00012544-0012826). PX-8 (AR); PX-9 (AR); PX-10 (AR); PX-

11 (AR); PX-12 (AR).

109.    Defendants produced an additional Administrative Record production on October 1, 2018

(Bates 0012827-0013022), PX-13 (AR), along with further documents (Bates 0013023-0013024)

on October 1, 2018, PX-14 (AR).

110.    The parties agreed that all documents bearing prefix-less Bates stamps between 000001

and 0013024 are part of the Administrative Record. Parties' Stipulation No. 63 (Docket No.

523).

111.    Defendants produced focus group materials on October 3, 2018 (Bates 0013025-0013099

and a native file titled "noisy_7"). PX-15; PX-16 (AR, excluding "noisy_7").  The parties

disputed whether the focus group materials, including the native file titled "noisy_7," are

properly part of the Administrative Record. Parties' Stipulations No. 63; Parties' Stipulations

No. 64 (Docket No. 524).

## 2.    Document Requests

112.    Plaintiffs requested documents from Defendants Secretary Ross, Director Jarmin, the

Department of Commerce, and the Census Bureau on July 12, 2018.

113.    Defendants responded in ten productions of documents bearing the Bates numbers with

the prefix "COM_DIS," along with additional piecemeal documents between August 13, 2018

and October 16, 2018.

114.    A substantial number of the documents produced bearing the Bates prefix "COM_DIS"

were stipulated to be a part of the Administrative Record. Parties' Stipulations. No. 63.

115.    Plaintiffs requested documents from DOJ on July 20, 2018.

116. DOJ responded in eight productions with additional piecemeal documents, particularly documents for which the deliberative process privilege claim was overturned, between August 3, 2018 and October 23, 2018.

### 3. Interrogatories

117. On July 12, 2018, Plaintiffs served its first set of interrogatories on Defendants Ross and Department of Commerce.

118. Plaintiff's First Interrogatory read:

> "With regard to the document found in the Administrative Record at 1321, please IDENTIFY:
>
> a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;
>
> b. the "various discussions with other government officials about reinstating a citizenship question to the Census";
>
> c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";
>
> d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject; and
>
> e. all PERSONS with whom the "senior Administration officials had previously raised" reinstating the citizenship question.

PX-302.

119. On August 13, 2018, Defendants responded to Plaintiff's first set of interrogatories. PX-300.

120. Defendants initially responded to Plaintiffs' first interrogatory by stating, "Defendants have not to date been able to identify individuals responsive to subpart a," but provided "Mary Blanche Hankey, James McHenry, Gene Hamilton, John Gore, Danielle Curtrona, Jefferson Sessions, Kris Kobach, Steve Bannon, and Wilbur Ross," in response to subparts b and c. PX-300.

121.    On August 29, 2018, Plaintiffs served a second set of interrogatories asking an additional interrogatory of Defendants regarding the existence of a RCT proposal for the addition of a citizenship question to the 2020 Decennial Census. PX-303.

122.    On August 30, 2018, Defendants Ross and Department of Commerce initially responded to Plaintiffs' first interrogatory by saying they "construed subparts a, b, and c, as coextensive," and identified Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore, and Jefferson Sessions, along with Kris Kobach and Steve Bannon.  PX-511 at 2–3.

123.    With regard to conversations between Secretary Ross and the Attorney General, Defendants in the August 30, 2018 initial response to Plaintiffs' first interrogatory stated that "Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 decennial census with Attorney General Sessions in August 2017. In addition, it is possible that the two had an additional discussion concerning the issue, and although the date of that conversation is unknown, Defendants believe it took place earlier in 2017." PX-511 at 3.

124.    In their August 30, 2018 initial response to Plaintiffs' first interrogatory, Defendants further stated that "Defendants cannot confirm that the Secretary spoke to Steve Bannon regarding the Citizenship Question." PX-511 at 3.

125.    On September 5, 2018 Plaintiffs further supplemented their response to Plaintiffs' first interrogatory, but the response remained substantially the same. PX-301.

126.    On September 11, 2018, Plaintiffs served a third set of interrogatories asking two additional questions of Defendants, one regarding Question 31 of the Census Bureau's response to questions from the Department of Commerce and the other regarding Defendants responses to Requests for Admission.

127.    On September 28, 2018, Defendants responded to Plaintiff's second set of interrogatories. PX-303.

128.    On October 11, 2018, Defendants again supplemented their responses to Plaintiffs' first interrogatory and made substantial changes to the September 5 response. PX-302.

129.    For the first time, on October 11, 2018, Defendants stated definitively in response to Plaintiffs' first interrogatory that "Secretary Ross discussed the possible reinstatement of citizenship question on the 2020 decennial census with Attorney General Sessions in the Spring of 2017 and at subsequent times." PX-302.

130.    On October 11, 2018, Defendants also added for the first time that "Secretary Ross recalls that Steven Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census." PX-302.

131.    On October 23, 2018, Defendants responded to Plaintiffs' third set of interrogatories.

### 4.    Requests for Admission

132.    On September 7, 2018, Plaintiffs served Requests for Admission on Defendant Department of Commerce.

133.    On September 11, 2018, Plaintiffs served Requests for Admission on Defendant Census Bureau.

134.    On October 23, 2018 Defendants Department of Commerce and Census Bureau Provided Reponses to Plaintiffs' Requests for Admission. PX-297; PX-298(R).

## II.     BACKGROUND ON THE CENSUS, THE CITIZENSHIP QUESTION, AND CENSUS BUREAU PROCESSES

### A.     Decennial Census Overview

135.    The U.S. Constitution requires the federal government to conduct a Decennial Census counting the total number of "persons"—with no reference to citizenship status—residing in each state. Parties' Stipulations (Docket No. 480-1) ¶ 1.

136.    The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers"; which requires "counting the whole number of persons in each State." *Id.* ¶ 2.

137.    The Constitution requires that this count be an "actual Enumeration" conducted every ten years. *Id.* ¶ 3.

138.    Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce. *Id.* ¶ 4.

139.    The Census Act also created the Census Bureau within the Department of Commerce to spearhead the effort to conduct the enumeration. Thompson Aff. (Docket No. 516-1) ¶ 17.

140.    The Secretary of Commerce is charged with the responsibility to take a Decennial Census to create an actual enumeration of the United States population. Parties' Stipulations ¶ 5.

141.    The central constitutional purpose of the Census Bureau in taking the Decennial Census is to conduct an accurate enumeration of the population. *Id.* ¶ 6.

142.    The Secretary of Commerce must comply with legal requirements established by the Constitution, statutes, and regulations governing the census. For example, the Secretary's decisions must be consistent with the "constitutional goal of equal representation" and that bear a "reasonable relationship to the accomplishment of any actual enumeration of the population." *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996).

143. To enable a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States, which is directed to every person living in the United States and all persons living in the United States are legally required to respond. Parties' Stipulations ¶ 7.

144. For the 2020 Decennial Census, households will also be given the option to complete the questionnaire via the internet. Thompson Aff. ¶ 18.

145. If the Census Bureau does not receive a response to the questionnaire it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data. This process is called Non Response Follow Up ("NRFU"). Parties' Stipulations ¶ 8.

146. If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. *Id.* ¶ 9.

147. For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person. *Id.* ¶ 10.

148. If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." *Id.* ¶ 11.

149. A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. *Id.* ¶ 12.

150. For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview. *Id.* ¶ 13.

151.  After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, to determine the population count in each state. *Id.* ¶ 14.

152.  Data from the Decennial Census is reported down to the census block level. *Id.* ¶ 15.

153.  The population data collected through the Decennial Census determines the apportionment of seats in the U.S. House of Representatives among the states. *Id.* ¶ 16.

154.  Apportionment in the U.S. House of Representatives is based on total population, including both citizens and non-citizens. *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128-29 (2016).

155.  The population data collected through the Decennial Census also determines the number of electoral votes each state has in the Electoral College. Parties' Stipulations ¶ 17.

156.  States also use Decennial Census data to draw congressional, state, and local legislative districts. Parties' Stipulations ¶ 18.

157.  The federal government also uses Decennial Census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments. *Id.* ¶ 19.

158.  At least $900 billion from 320 different census-derived federal grant and funding programs is distributed annually to states and localities for a variety of purposes, including education, public housing, transportation, health care and other services. Thompson Aff. ¶ 27; Reamer Aff. (Docket No. 508-1) ¶ 9.

159.  These funds determine the ability of state and local governments to provide for quality education, public housing, transportation, health care and other services, for all their residents, citizens and non-citizens alike. Thompson Aff. ¶ 27; Reamer Aff. ¶¶ 13, 40, 45, 48, 50 , 53, 55–60, 63, 66–68, 72, 75; Franklin Aff. (Docket No. 498-5) ¶¶ 6-10; Freedman Aff. (Docket No.

498-7) ¶¶ 9, 11, 13; Haney Aff. (Docket No. 498-12) ¶¶ 5, 7, 8; Harmon Aff. (Docket No. 498-14) ¶¶ 5, 9, 13, 15–17; Tiema-Massie Aff. (Docket No. 501-1) ¶¶ 9–12, 15, 17–18, 20.

160.    The population of the United States as a whole has been over-counted in the Decennial Census; for example, in 2000 there was a measured net overcount. Thompson Aff. ¶ 21.

161.    Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count." Parties' Stipulations ¶ 21.

162.    Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census. *Id.* ¶ 22.

163.    Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census. *Id.* ¶ 23.

164.    The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals. *Id.* ¶ 24.

165.    The Census Bureau describes the "differential undercount" for a particular racial and ethnic population as the difference between the measured net undercount for that group and the measured net undercount for the White non-Hispanic population. Thompson Aff. ¶ 23.

166.    The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. Parties' Stipulations ¶ 26.

167.   In the 2000 and 2010 Decennial Censuses, the Census Bureau designed and implemented

public advertising campaigns to reach hard-to-count immigrant communities, including using

paid media in over a dozen different languages to improve responsiveness. *Id.* ¶ 27.

168.   For the 2000 and 2010 Decennial Censuses, the Census Bureau also partnered with local

businesses, faith-based groups, community organizations, elected officials, and ethnic

organizations to reach these communities and improve the accuracy of the count. *Id.* ¶ 28.

### B.      The Long Form and the American Community Survey

169.   From at least the 1970 Decennial Census through the 2000 Decennial Census, in lieu of

the short-form questionnaire the Census Bureau sent a long form questionnaire to approximately

one in six households. *Id.* ¶ 31.

170.   For the 1970 Decennial Census, the long form questionnaire, which contained additional

questions, was sent to approximately one in five households. *Id.* ¶ 32.

171.   For the 2000 Decennial Census, the long form questionnaire, which contained additional

questions, was sent to approximately one in six households. *Id.* ¶ 33.

172.   Data collected from the sample households surveyed with the long form were used to

generate statistical estimates. *Id.* ¶ 34.

173.   After the 2000 Decennial Census, the long form questionnaire was replaced by the

American Community Survey ("ACS"). *Id.* ¶ 37.

174.   The ACS began operating in 2000 and was at full sample size for housing units in 2005,

and for group quarters in 2006. *Id.* ¶ 39.

175.   The ACS is a yearly survey of approximately 2% of households—about 3.5 million—

across the United States. *Id.* ¶ 40.

176.   The data collected by the ACS allows the Census Bureau to produce estimates of Citizen

Voting Age Population ("CVAP"). *Id.* ¶ 44.

177.   CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level. *Id.* ¶ 45.

178.   Margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate. Parties' Stipulations ¶ 46.

179.   The ACS is intended to provide information on characteristics of the population, and the social and economic needs of communities. Parties' Stipulations ¶ 47.

180.   Unlike the Decennial Census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates. *Id.* ¶ 48.

181.   Because ACS estimates are statistical estimates based on a sample, the tabulations are weighted to reflect sampling probabilities and eligibility for NRFU, as well as well as to control to official population totals as established by the Population Estimates program. *Id.* ¶ 49.

182.   Because the ACS collects information from only a small sample of the population, it produces annual estimates only for "census tract[s]" and "census-block groups." *Id.* ¶ 50.

183.   Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3-year" or "5-year" estimates depending on the number of years aggregated together). *Id.* ¶ 51.

184.   Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in–every-eight household sample. *Id.* ¶ 52.

185.   Multi-year ACS estimates have greater levels of statistical precision for estimates concerning smaller geographical units. *Id.* ¶ 53.

186.   1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1-year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+", 3-year ACS

estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-year estimates, and 5-year ACS estimates produce "[d]ata for all areas." *Id.* ¶ 54.

### C. History of a Citizenship Question on the Census

187. The 1950 Decennial Census asked for the individual's place of birth, and whether a foreign-born individual had been naturalized. Parties' Stipulations ¶ 29.

188. A question concerning citizenship did not appear on the Decennial Census questionnaire sent to every household in the United States (commonly referred to as the "short form") in 1970, 1980, 1990, 2000, or 2010. *Id.* ¶ 30.

189. In the 1970, 1980, 1990, and 2000 Decennial Censuses, the long form Decennial Census questionnaire contained a question about citizenship status. *Id.* ¶ 35.

190. In the 1990 and 2000 Decennial Censuses, the citizenship status question on the long form questionnaire was preceded by a question about place of birth. *Id.* ¶ 36.

191. The citizenship data collected from the long form questionnaire in 2000 were made available by the Census Bureau at the census block group level. Thompson Aff. ¶ 39.

192. Citizenship data broken down by race collected from the 2000 Census long form were not made available by the Census Bureau at the census block level. *Id.*

193. The 2000 Decennial Census short form questionnaire did not include a question on citizenship. Parties' Stipulations ¶ 55.

194. The 2010 Decennial Census questionnaire did not include a question on citizenship. *Id.* ¶ 56.

195. A question concerning citizenship status currently appears as among one of more than 50 questions on the 28-page ACS questionnaire. Parties' Stipulations ¶ 41.

196.   The citizenship status question on the ACS is preceded by a question asking where the person was born. *Id.* ¶ 42.

197.   The citizenship question that appears on the ACS is not a binary yes/no question. The ACS citizenship question, asks whether the person was born in the United States, a U.S. territory, or abroad. *Id.* ¶ 43.

198.   For U.S. citizens, the ACS citizenship question also asks more detailed information about a person's place of birth; and for some U.S. citizens, it also requests information about the citizenship status of their parents, and whether they became a U.S. citizen by naturalization. Thompson Aff. ¶ 41.

199.   A planned question on the 2020 Decennial Census questionnaire asks, "Is this person a citizen of the United States?," with the answer options:

"Yes, born in the United States";

"Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas";

"Yes, born abroad of U.S. citizen parent or parents";

"Yes, U.S. citizen by naturalization – Print year of naturalization"; and

"No, not a U.S. citizen".

Parties' Stipulations ¶ 57.

> **D.** **The Census Bureau Has Had a Long Standing Objection to the Inclusion of a Citizenship Question on the Decennial Census**

200.   In 1980, the Census Bureau opposed adding a citizenship question to the Decennial Census, arguing in federal court that "any effort to ascertain citizenship will inevitably jeopardize the overall accuracy of the population count. . . . Questions as to citizenship are particularly sensitive in minority communities and would inevitably trigger hostility, resentment

and refusal to cooperate." *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 568 (D.D.C. 1980).

201.    Prior to the 1990 Decennial Census, the Census Bureau once again opposed the addition of inquiries into immigration status on the Decennial Census. PX-306 at 7–9, 13–17.

202.    In 2016, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that "a [person-by-person] citizenship inquiry would invariably lead to a lower response rate to the Census in general," and would "seriously frustrate the Census Bureau's ability to conduct the only count the Constitution expressly requires: determining the whole number of persons in each state in order to apportion House seats among the states." PX-309 at 25.

### E.    Standards for Changing the Content of a Question Prior to Its Addition to the Decennial Census

#### 1.    Census Bureau Quality Standards

203.    The Census Bureau's Quality Standards lay out the necessity to conduct pre-testing. PX-260.

204.    Dr. Hillygus testified that the Census Bureau must follow these standards. Nov. 5 Trial Tr. at 135:23–136:5.

205.    Dr. Abowd testified that if the Census Bureau did not comply with these standards, then OMB would evaluate that noncompliance in deciding whether to grant clearance for the inclusion of a citizenship question on the 2020 Decennial Census. Nov. 14 Trial Tr. at 1253:9–1254:3.

206.    Dr. Abowd testified that these quality standards apply to the addition of a citizenship question to the 2020 Decennial Census. Nov. 14 Trial Tr. at 1105:9–1105:11; 1276:19–1277:2.

207.   Sub-Requirement A2-3.3 requires that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (*e.g.*, problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." PX-260 at 8.

208.   Pursuant to A2-3.3-1c and A2-3.3-1d of these same Census Quality Standards, pretesting must be performed when "c. Review by cognitive experts reveals that adding pretested questions to an existing instrument may cause potential context effects" and "d. An existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)." *Id.*

209.   The Census Bureau's Statistical Quality Standards also state that "an existing data collection instrument has substantive modifications" when "existing questions are revised or new questions added." *Id.*

210.   Dr. Abowd testified that, generally speaking, survey questionnaires must be pretested under the Census Bureau Quality Standards. Nov. 14 Trial Tr. at 1278:5-11.

211.   Dr. Abowd testified, therefore, that pretesting of a citizenship question on the Decennial Census was required under the Census Bureau Quality Standards unless one of two exceptions applied. Nov. 14 Trial Testimony at 1279:13-1280:8.

212.   One exception is that "On rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting. In such cases, subject matter and cognitive experts must discuss the need for and feasibility of pretesting. The program manager must document any decisions regarding such pretesting, including the reasons for the decision. If no acceptable options for pretesting can be identified, the program manager must apply for a waiver." PX-260 at 8.

213.    The Census Bureau never applied for a waiver pursuant to this exception before a

citizenship question was decided to be added to the 2020 Decennial Census. Nov. 14 Trial Tr. at

1279:6–1279:12.

214.    Another exception is that "Pretesting is not required for questions that performed

adequately in another survey." PX-260 at 8.

215.    In January of 2018, the Census Bureau reported to the Commerce Department that 29.9%

of all people identified as noncitizens by administrative records reported themselves as citizens

on the 2000 long-form census questionnaire. PX-22 (AR).

216.    In January of 2018, the Census Bureau reported to the Commerce Department that 32.7%

of all people identified as noncitizens by administrative records reported themselves as citizens

on the 2010 ACS. PX-22 (AR).

217.    In January of 2018, the Census Bureau reported to the Commerce Department that 34.7%

of all people identified as noncitizens by administrative records reported themselves as citizens

on the 2016 ACS. PX-22 (AR).

218.    In August of 2018, the Census Bureau reported that between 30% and 37% of all people

identified as noncitizens by administrative records reported themselves as citizens on the ACS.

PX-162.

219.    The Census Bureau views this "disagreement" between administrative records and ACS

survey responses as a "problem with the ACS citizenship question." Nov. 14 Trial Tr. at

1282:15-19.

220.    There is no consensus view within the Census Bureau on how to deal with this problem.

Nov. 14 Trial Tr. at 1282:20-22.

221.   Given this problem, the Census Bureau plans on conducting a content review process to determine how the citizenship question is performing on the ACS. Nov. 14 Trial Tr. at 1282:23-1283:6; 1284:25-1285:8.

222.   Dr. Abowd testified that in light of the disagreement rate, he does not believe that the citizenship question on the ACS performs adequately.  November 14 Trial Tr. at 1287:20-1288:2.

223.   Dr. Hillygus testified that in light of the disagreement rate, there is a real need to do pretesting prior to adding a citizenship question to the decennial short form. Nov. 5 Trial Tr. at 169:19-23.

224.   Dr. Hillygus testified that, even if applicable on its face, this exception would not make sense to apply to the Decennial Census in these circumstances. Nov. 5 Trial Tr. at 167:2-17.

225.   Application of this exception would mean that the Census Bureau Quality Standards mandate less testing for the Decennial Census than for the ACS, and also that a question could be added to the Decennial Census without pretesting. Nov. 5 Trial Tr. at 167:2-17.

## 2.    Blumerman Memorandum

226.   Lisa Blumerman was Associate Director of Decennial Census Programs on April 29, 2016. PX-271; Nov. 13 Trial Tr. at 995:12-15.

227.   Associate Director Blumerman is the signatory for a memorandum dated April 29, 2016 (the "Blumerman Memorandum"). PX 271.

228.   The Blumerman Memorandum  "officially documents the U.S. Census Bureau's plan to develop and transmit to Congress" questions planned for the 2020 Decennial Census. PX-271.

229.   The Blumerman Memorandum provides a description of how content review was conducted and presented to members of the 2020 Decennial Census executive steering committee. Nov. 13 Trial Tr. at 995:18-996:3.

230.    That description reads: "Federal agencies with known uses of the 2020 Census or ACS content, and select other agencies, will receive a letter with instructions for how federal data users may provide updates to the documentation of data uses. Responses should be received before July 1, 2016. Census Bureau staff may follow up with federal users directly if more clarification is required." PX-271.

231.    The Blumerman Memorandum contains a description of how the Census Bureau determines the content of the 2020 Decennial Census. PX-271.

232.    As part of that description, the Blumerman Memorandum states that "Final proposed questions are based on the results of extensive cognitive testing, field testing, other ongoing research, and input from advisory committees." PX-271.

233.    This sentence describes the process for the 2020 Decennial Census that was presented to the Census Bureau's 2020 executive steering committee. Nov. 13 Trial Tr. at 995:25-996:10.

234.    Consistent with the Blumerman Memorandum, all questions on the 2010 census were the subject of extensive cognitive testing. Nov. 13 Trial Tr. at 997:11-14.

235.    Consistent with the Blumerman Memorandum, all questions on the 2010 Census were field tested. Nov. 13 Trial Tr. at 997:19-23.

### 3.    Census Bureau's Process

236.    The Census Bureau has a well-established process for adding or modifying questions to the Decennial Census.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867-3891 (AR); Docket No. 516-1 at ¶ 45.

237.    The Census Bureau follows this established process when adding or changing content on the Decennial Census to ensure that the data fulfill legal and regulatory requirements established by Congress.  PX-4 at AR 3890 (AR).

238.   One step in the process is for the Department of Commerce to receive requests from the Congress or other agencies in the Executive Branch.  PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR); Thompson Aff. ¶ 57.

239.   After receipt, the Department of Commerce must work with OMB to determine whether the requested data fulfill legal, regulatory, or Constitutional requirements. PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR).

240.   As part of the established process, the Department of Commerce must notify Congress of the subjects to be covered by the census.  For the 2020 Decennial Census, this notification was required by March 28, 2017. PX-4 at AR 3890 (AR).

241.   Another step in the established process is for the Department of Commerce to notify Congress of its intent to add the question. PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR).

242.   For the 2020 Decennial Census, this notification must occur by March 31, 2018. PX-4 AR at 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR).

243.   Another step in the established process is to for the Department of Commerce to notify the public with a Federal Register Notice and invite comments on the proposed question. PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR).

244.   Another step in the established process is for the Census Bureau to field test the wording of the new question.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR); Thompson Aff. ¶ 62.

245.   Testing requires approval from OMB, which requires providing notice to the public and inviting comments through a Federal Register Notice.  PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 AR 3890, 9867 (AR).

246.    The OMB must respond to comments from the public after 30 days.  Subsequently, the OMB may issue final approval.  PX-4 at AR 3891, 9867 (AR); PX-134 (AR).

247.    Another step in the established process is for the Census Bureau to make operational adjustments, including re-designing paper questionnaires, adjusting the paper data capture system, and redeveloping training modules for enumerators and Census Questionnaire Assistance Agents.  PX-3 at AR 3560 (AR); PX-4 at AR 3891, 9865, 9867 (AR).

248.    The Census Bureau has described this well-established process consistently over time.  PX-4 at AR 3890-3891, 9867 (AR); PX-3 at AR 2304, 3560 (AR).

249.    Not all of these steps were followed prior to the addition of a citizenship question to the 2020 Decennial Census. November 14 Trial Tr. at 1264:20-25.

### 4.    Guidance Governing Statistical Agency Independence

250.    The Census Bureau is a federal statistical agency; OMB has designated the Census Bureau as a "principal statistical agency." Nov. 14 Trial Tr. at 1102:2-11: PX-355 at 23; Habermann Aff. (Docket No. 498-11) ¶ 19.

251.    The Census Bureau and the Department of Commerce are subject to OMB Statistical directives. Habermann Aff. ¶ 20; PX-354; PX-359.

252.    These directives recognize the importance of trust and the critical role that agency independence plays in maintaining public trust. Habermann Aff. ¶¶ 70-72; PX-354.

253.    To ensure trust, OMB Statistical Directive Number 1 requires that "a Federal statistical agency must be independent from political and other undue external influence in developing, producing, and disseminating statistics." PX-354 at 4.

254.    The Committee on National Statistics (CNSTAT) is a standing unit of the National Academies of Sciences, Engineering, and Medicine. PX-355 at 10.

255.   CNSTAT publishes a document titled "Principles and Practices for a Federal Statistical Agency: Sixth Edition." PX-355.

256.   The purpose of Principles and Practices is to assist officials in various cabinet departments and independent agencies, as well as the statistical agencies' leadership and staff, to be fully aware of the standards and ideals that are fundamental to the agencies' work. PX-355 at 10.

257.   Principle 4 is titled "Independence from Political and Other Undue External Influence" and reads as follows:

> To be credible, trustworthy, and unhindered in its mission, a statistical agency must maintain a position of independence from undue external influences (even as it proactively seeks input on its program and priorities). It must avoid even the appearance that its collection, analysis, or dissemination processes might be manipulated for political or partisan purposes or that individually identifiable data collected under a pledge of confidentiality might be turned over for administrative, regulatory, or law enforcement uses. Protection from undue outside influences requires that a statistical agency have authority for professional decisions on its programs, including authority over the selection and promotion of staff; the processing, secure storage, and maintenance of data; and the timing and content of data releases, accompanying press releases, and documentation. The credibility that comes from independence is essential for users to maintain confidence in the accuracy and objectivity of a statistical agency's data and for data providers to be willing to cooperate with agency requests.

PX-355 at 24.

**F.   Examples of Testing Questions on Other Surveys**

258.   After the 1990 Census, the Census Bureau investigated the possibility of adding a question regarding respondents' social security numbers (SSNs) on the census short form. Nov. 13 Trial Tr. at 998:25-999:4.

259.   The Census Bureau conducted an RCT comparing a version of the short form with and without a question asking for a social security number. Nov. 13 Trial Tr. at 999:5-8.

260.   That RCT assessed the impact on self-response rates of a social security question. Nov. 13 Trial Tr. at 999:9-11.

261.   In the RCT, the self-response rate fell off in the group that had the social security number question by 3.4 percent. Nov. 13 Trial Tr. at 999:12-15.

262.   The conclusion that was drawn from the RCT was that asking for a social security number would be sensitive.  Nov. 13 Trial Tr. at 999:16-18.

263.   For certain subpopulations, the citizenship would be more sensitive than the SSN question. Nov. 13 Trial Tr. at 999:25-1000:8.

264.   This RCT to assess the effect of the SSN question was performed before any decision was made to add a question requiring respondents to provide their social security number to the census. Nov. 13 Trial Tr. at 1000:9-13.

265.   Today, the census does not ask for individuals' social security numbers, in part because of concerns about self-response rates. Nov. 13 Trial Tr. at 999:19- 999:24.

266.   Dr. Thompson provided the example that, following the 1990 Decennial Census, there was a proposal to revise the questionnaire to allow respondents to indicate that they identified with multiple races. Thompson Aff. ¶ 48.

267.   In response, a review was conducted over four years and included extensive cognitive and field testing conducted by the Census Bureau. Thompson Aff. ¶ 48.

268.   This review also included the development and extensive testing of a question to be included on the 2000 Decennial Census questionnaire. Thompson Aff. ¶ 48.

269.   Dr. Thompson described how planning for the 2020 Decennial Census included an extensive research and testing program to determine how the questions on race and ethnicity could be improved. Thompson Aff. ¶ 49.

270.   This research started more than ten years prior to the 2020 Decennial Census in 2008 when the design of the Alternate Questionnaire Experiment for the 2010 Decennial Census began. Thompson Aff. ¶ 49.

271.   This testing involved three components: 1) a questionnaire sent by mail; 2) a telephone re-interview of the mail respondents; and 3) a series of focus groups. Thompson Aff. ¶ 49.

272.   The proposed changes were then subjected to additional testing through the 2015 National Content Test. Thompson Aff. ¶ 51.

273.   The 2015 National Content Test included a nationally representative sample of 1.2 million housing units in the United States, including Puerto Rico and a re-interview with 75,000 respondents. Thompson Aff. ¶ 52, 53.

274.   Despite all of this extensive testing and research, in January 2018, Albert Fontenot, the Associate Director for Decennial Census Programs announced that the Census Bureau would not be making a change to the race and ethnicity questions for the 2020 questionnaire because a final decision had to be made by December 31, 2017 in order to allow the Census Bureau adequate time to deliver the final question wording for the 2020 Decennial Census to Congress by March 31, 2018. Thompson Aff. ¶ 54.

275.   Dr. Abowd gave an example of what he described as another question that had been taken form a different survey and added to the Decennial Census. Nov. 14 Trial Tr. at 1112:20-24.

276.   The example was a change made to the question about Hispanic ethnicity in 1970 that was imported from the Current Population Survey into the 5% sample long form decennial questionnaire. Nov. 14 Trial Tr. at 1112:5-24.

277.   The Census Bureau's statistical quality standards were not in effect in 1970. Nov. 14 Trial Tr. at 1257:20-23.

278.   This change was made to only a sample of census forms sent out in the 1970 census. Nov. 14 Trial Tr. at 1257:24-1258:5.

279.   This change had been tested one or two years prior. Nov. 14 Trial Tr. at 1258:11-17.

280.   Subsequent testing reflected that the 1970 Hispanic ethnicity question included on the 5% sample long form decennial questionnaire engendered substantial cognitive misunderstanding. Nov. 9 Trial Tr. at 738:23-739:22; PX-475.

281.   The citizenship question on the ACS was most recently tested in 2006, 14 years prior to the Secretary's decision in 2018. Nov. 14 Trial Tr. at 1258:18-23.

282.   There is evidence that there is a different political macro-environment between 2006 and 2018, and that 2018 will be a difficult macro-environment for a citizenship question in the census in 2020. Nov 9 Trial Tr. at 617:21-620:13; 630:7-631:12, 737:8-737:16; Nov. 14 Trial Tr. at 1258:25-1259:7.

283.   Dr. Abowd gave another example in his testimony of what was described as an "untested" question that had been added to the Decennial Census. Nov. 14 Trial Tr. at 1111:9-24.

284.   Dr. Abowd's example was the alteration to the race question on the 1990 census with respect to Asian and Pacific Islander (API) race category.  Nov. 14 Trial Tr. at 1111:9-24.

285.   The Census Bureau's current statistical quality standards were not in effect in 1990. Nov. 14 Trial Tr. at 1259:13-15.

286.   As proposed in 1988, the race question would have consisted of seven pre-listed categories and a write in space where a respondent could indicate their race was API. PX-380.

287.   The 1990 Decennial Census was changed to include a pre-listed category for API. PX-380.

288.    The Census Bureau had strongly recommended the change in form to the race question. PX-380; Nov. 14 Trial Tr. at 1260:1-10.

289.    The Census Bureau does not recommend the change to the 2020 Decennial Census to include a citizenship questionnaire. Nov. 14 Trial Tr. at 1260:11-23.

290.    The change to the race question was supported by the API community. PX-380; Nov. 14 Trial Tr. at 1260:24-1261:4.

291.    The change to include a citizenship question is not supported by the Hispanic or immigrant communities. Nov. 14 Trial Tr. at 1261:5-9.

## III.    PROCESS OF ADOPTING CITIZENSHIP QUESTION

292.    As set forth below, the overwhelming evidence shows that Secretary Ross wanted to add a citizenship question to the 2020 Decennial Census prior to, and independent of, DOJ's December 12 request.  The Secretary and his aides pursued this goal vigorously for the better part of a year, with no apparent interest in promoting more vigorous enforcement of the Voting Rights Act ("ACT"). Secretary Ross and his staff had many meetings on the subject, the Secretary demanded repeated status updates, and openly worried that he had run out of time to add the question.  None of the emails in which the Secretary expressed deepening concern that Commerce might not be able to add the question explained *why* he cared so much about adding the question.  Nor have his aides been able to explain the Secretary's interest.  Initially, the Secretary and his aides tried to get other agencies to request addition of a citizenship question. When that failed, they considered having the Commerce Department request the change.  In the end, and notwithstanding its earlier refusal, they persuaded DOJ to make the request.

A.   **Secretary Ross' Spring 2017 Communications with Steve Bannon, Kris Kobach and Others About Adding a Citizenship Question to the Decennial Census (February 2017—April 2017)**

293.   Shortly after his appointment to Secretary of Commerce, Secretary Ross "began considering" whether to add to the Decennial Census questionnaire "a citizenship question, which other senior Administration officials had previously raised."  PX-2 (AR).

294.   Secretary Ross' interest in adding a citizenship question began after the issue was raised by "senior Administration officials." *Id.*  According to the Secretary, questions about the census were "in the air," in these early days of the Administration and so it was "natural" for him to discuss a citizenship question with high ranking Administration officials.  PX-688.

295.   It appears that Secretary Ross heard about a citizenship question from other senior Administration officials as well.  According to his own June 21, 2018 memorandum, "senior Administration officials" had raised a citizenship question "previously" to his first considering the question.  PX-2 (AR).  The conversations the Secretary admits that he has had with Attorney General Sessions and Mr. Bannon, as far as Defendants have disclosed, occurred after the Secretary first began considering a citizenship question.  *Compare* PX-30 (AR), PX-55 at 1 (AR), *and* PX-79 (AR) (Secretary's February and March consideration) *with* PX-19 at 1-2 (AR), PX-58 (AR), *and* PX-302 at 1-3 (Subsequent conversations with Sessions and Bannon).

296.   Although the Secretary's own June 21 memo expressly states that the other senior Administration officials had raised a citizenship question "previous[]" to the Secretary's initial consideration of the issue, in discovery the Secretary and the Commerce Department claim that they now do not distinguish between the "other senior Administration officials," who first raised the issue and other federal government officials who the Secretary and staff later consulted.  PX-2 (AR).  As a result, they have not disclosed the identities of the "senior Administration

officials." PX-302 at 2-3.  Defendants' explanation for failing to disclosing these identities is not

credible.

297.    The Commerce Department admits that, on or about January 31, 2017, press reported that

the Chair of the White House Domestic Policy Council, Andrew Bremberg, released a draft

Executive Order proposing census questions to determine immigration and citizenship status.

PX-298(R) at RFA 42.

298.    On or before February 2, 2017, David Langdon asked Earl Comstock about his interest in

Congressional notification of Decennial Census topics and Comstock indicated that he was

"very" interested and the Secretary would be as well. PX-30 (AR); Langdon Dep. at 81.

299.    Following that conversation, Mr. Langdon set up briefings regarding those same topics

during and after the transition period. PX-30 (AR); PX-79 (AR); PX-80 (AR); Langdon Dep. at

93-98.

300.    By March 2017, Secretary Ross asked Mr. Comstock whether noncitizens were included

in the census.  PX-55 (AR); Comstock Dep. at 62–64.

301.    On March 10, 2017, Mr. Comstock sent Secretary Ross an email responding to Secretary

Ross' question.  Mr. Comstock told Secretary Ross that the Census Bureau made clear that

"undocumented residents (aliens) in the 50 states" are "included in the apportionment population

counts," and pasted in an article entitled "The Pitfalls of Counting Illegal Immigrants."  PX-55

(AR); PX-298(R) at RFA 55; Comstock Dep. at 65–68.

302.    On March 10, 2017, Mr. Langdon offered to set up a briefing for Mr. Comstock to

understand the congressional notification process for the Decennial Census. PX-79 (AR).

303.    On March 15, 2017, Secretary Ross and Wendy Teramoto had a telephone discussion with

Marc Neuman and Ted Kassinger about the census.  PX-193 at 28.

304.  On or about April 5, 2017 Secretary Ross discussed the addition of a citizenship question

on the 2020 Decennial Census with Mr. Bannon.  PX-58 (AR); PX-19 at 1-2 (AR); PX-302 at 3;

PX-298(R) at RFA 56.

305.  During their conversation on or about April 5, 2017, Mr. Bannon advised Secretary Ross

that he wanted a citizenship question included on the 2020 Decennial Census.  PX-58 (AR); PX-

19 at 1 (AR); PX-302 at 3.

306.  The Commerce Department admits that Secretary Ross knew by spring of 2017 that Mr.

Bannon wanted him to speak with Kris Kobach about including a citizenship question on the

2020 Decennial Census.  PX-298(R) at RFA 51.

307.  When Secretary Ross spoke with Mr. Bannon, Mr. Bannon asked Secretary Ross to speak

with Mr. Kobach about his ideas about adding a citizenship question on the 2020 census.  PX-58

(AR); PX-19 at 1 (AR); PX-302 at 3; PX-298(R) at RFA 56.  Mr. Kobach stated that Mr. Bannon

"direct[ed]" him and Secretary Ross to have this conversation.  PX-19 at 1 (AR).

308.  Following the call with Mr. Bannon, Secretary Ross discussed with Mr. Kobach the

possibility of adding a citizenship question to the Decennial Census. PX-58 (AR); PX-19 at 1

(AR); Comstock Dep. at 205–208; Teramoto Dep. at 38–47; PX-302 at 2-3.

309.  During the course of their discussion, Secretary Ross and Mr. Kobach discussed the

potential effect of adding a citizenship question on how non-citizens are counted for purposes of

apportionment. PX-19 at 2 (AR).

310.  The Commerce Department admits that Secretary Ross' conversation with Kris Kobach

about adding a citizenship question to the 2020 Decennial Census came before any request from

DOJ to add a citizenship question to the Decennial Census.  PX-298(R) at RFA 80.

311.   Shortly after Secretary Ross' call with Steve Bannon, Mr. Comstock contacted Mr.

Neuman.  On April 11, 2017, Mr. Neuman emailed Mr. Comstock a link to the Supreme Court's

decision in *LULAC v. Perry*, which considered citizen voting age population in assessing claims

under section 2 of the VRA.  PX-188 (AR).

312.   On April 13, 2017 Mr. Comstock emailed Mr. Neuman asking when Census would need

to notify Congress regarding census questions. PX-87 (AR); PX-186 (AR).

313.   Mr. Neuman responded to Mr. Comstock on April 14, 2017 that the notification deadline

for topics had already passed, but there would be another opportunity next year, when the

questions are due.  PX-87 (AR).

314.   On April 20, 2017 Secretary Ross' personal assistant Brooke Alexander emailed Mr.

Comstock and Ms. Teramoto on Secretary Ross' behalf noting that then-Census Bureau Director

John Thompson had an upcoming meeting on April 29 with the Census National Advisory

Committee on Racial, Ethnic and Other Populations, and admonishing them that "[w]e must get

our issue resolved before this!" PX-81 (AR); Comstock Dep. at 137–41; Cont. Teramoto Dep.

(Docket No. 509-3) at 195–97.

315.   In the spring of 2017, Secretary Ross discussed adding a citizenship question to the

Decennial Census with Jeff Sessions. PX-302 at 3.

**B.    Secretary Ross' Demand for a Citizenship Question and His Staff's Efforts to Enlist Another Agency to Request the Addition of a Citizenship Question**

316.   Secretary Ross decided he wanted to add a citizenship question to the Census soon after

he was confirmed, very likely in March or April of 2017. Comstock Dep. at 54, 82, 146; PX-83.

317.   As early as May 2, 2017 Secretary Ross emailed Mr. Comstock stating that he was

"mystified why nothing have [sic] been done in response to my months old request that we

include a citizenship question [on the 2020 Decennial Census]."  PX-88 (AR); PX-298(R) at

RFA 62; Comstock Dep. at 145–46; Teramoto Dep. at 28–32. By simple arithmetic, "months old" would place the request at the beginning of March or earlier.

318.    That same day, Mr. Comstock responded to Secretary Ross promising "[o]n the citizenship question we will get that in place."  PX-88 (AR); PX-298(R) at RFA 63; Comstock Dep. at 151–52.

319.    As of May 2017, Commerce had not identified any legitimate need for addition of a citizenship question internal to the Commerce Department that would permit adding the question to the census.  Mr. Comstock believed that he needed another agency to request addition of the question because OMB and the Paperwork Reduction Act required Commerce to "justify" why a citizenship question was "need[ed]," and Mr. Comstock understood that simply saying that "the Secretary wanted it" would not "clear [the] legal thresholds."  Comstock Dep. at 153-54.

320.    Mr. Comstock set out in the spring of 2017 to come up with a "legal rationale" to support the Secretary's request to add a citizenship question.  Comstock Dep. at 265-66.  Mr. Comstock testified that it was his job to "help [the Secretary] find the best rationale" for adding the question, because "[t]hat's what a policy person does."  Comstock Dep. at 267. Mr. Comstock testified that he did not "need to know what [the Secretary's] rationale might be, because it may or may not be one that is … legally-valid."  Comstock Dep. at 267.

321.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ."  PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

322.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ."  PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

323.    Mr. Comstock advised Secretary Ross on May 2, 2017 that he had been advised it would be necessary to "work with Justice to get them to request that citizenship be added back to a census question . . . ." PX-88 (AR); PX-298 (R) at RFA 64; Comstock Dep. at 151–58.

324.    Prior to May 2017 DOJ had not requested that a citizenship question be added to the 2020 Decennial Census. PX-298 (R) at RFA 66; Gore Dep. at 168-69 (objection).

325.    Two days after advising Secretary Ross that "we will get [the citizenship question] in place," on May 4, 2017, Mr. Comstock sent an email to Eric Branstad asking him to identify the "best counterpart at DOJ" to speak with "[r]egarding [the] Census." PX-84 (AR); PX-524 (AR); PX-537 (AR).

326.    Eric Branstad was the Senior White House Advisor at the Department of Commerce. PX-84 (AR).

327.    Mr. Branstad responded with the name "Mary Blanche Hankey," who previously served as legislative counsel to then-Senator Jeff Sessions, and was the White House liaison at the DOJ. PX-84 (AR); PX-524 (AR); PX-537 (AR).

328.    On May 4, 2017, after corresponding with Mr. Branstad, Mr. Comstock sent an email to Ms. Hankey, and asked to set up a meeting. PX-524 (AR); PX-537 (AR); PX-51 (AR); PX-298 (R) at RFA 68.

329.    When Mr. Comstock contacted DOJ on May 4, 2017 for the purpose of adding a citizenship question to the 2020 Decennial Census, Mr. Comstock was not seeking to promote more effective enforcement of the VRA. PX-524 (AR); PX-537 (AR); PX-51 (AR); Comstock Dep. at 167–172.

330.    Mr. Comstock and Ms. Hankey spoke in person in May 2017 and later directed Comstock to speak James McHenry in DOJ. PX-524 (AR); PX-537 (AR).

331.   James McHenry was Director of DOJ's Executive Office for Immigration Review
(EOIR). PX-485.

332.   Mr. McHenry had no responsibility for enforcement of the VRA.  PX-485; PX-298 (R) at
RFA 71; Comstock Dep. at 270–71; Gore Dep. at 65.

333.   After May 2, 2017, Mr. Comstock spoke on multiple occasions with Mr. McHenry at DOJ
for the purpose of adding a citizenship question to the 2020 Decennial Census. PX-524 (AR); PX-
537 (AR); PX-51 (AR); PX-298 (R) at RFA 70; Comstock Dep. at 174–179, 270–73.

334.   Mr. McHenry advised Mr. Comstock that "after considering the matter . . . Justice staff did
not want to raise the question given the difficulties Justice was encountering in the press at the
time (the whole Comey) matter" and Mr. McHenry "directed [Comstock] to Gene Hamilton at the
Department of Homeland Security." PX-48 (AR); PX-524 (AR); PX-537 (AR).

335.   Having failed to obtain DOJ's cooperation, Mr. Comstock then contacted Eugene (Gene)
Hamilton at Department of Homeland Security for the purpose of adding a citizenship question
to the 2020 Decennial Census.  PX-524 (AR); PX-537 (AR).  They spoke several times.  PX-51
(AR); PX-298 (R) at RFA 73; Comstock Dep. at 179–85, 277–83.

336.   The Department of Homeland Security has no responsibility for enforcement of the VRA.
PX-298 (R) at RFA 74; Comstock Dep. at 277.

337.   Eugene (Gene) Hamilton had no responsibility for enforcement of the VRA. PX-298 (R)
at RFA 77; Comstock Dep. at 277.

338.   When Mr. Comstock contacted Mr. Hamilton at the Department of Homeland Security for
the purpose of adding a citizenship question to the 2020 Decennial Census, Mr. Comstock was
not seeking to promote more effective enforcement of the VRA. PX-298 (R) at RFA 75;
Comstock Dep. at 179–85, 277–83.

339. Eventually, Mr. Hamilton told Mr. Comstock that the Department of Homeland Security would not request a citizenship question. PX-524 (AR); PX-537 (AR).

340. Mr. Hamilton told Mr. Comstock that "it was best handled by the Department of Justice." PX-48 (AR); PX-524 (AR); PX-537 (AR).

> C. **Secretary Ross' Staff Investigates Whether the Commerce Department Can Add a Citizenship Question On Its Own While Mr. Kobach and Capitol Hill Allies Press for a Citizenship Question**

341. On May 24, 2017, Secretary Ross met with Mr. Comstock, Mr. Langdon, and others "all afternoon." PX-150 (AR).

342. On or before May 24, 2017, Mr. Langdon, on behalf of Mr. Comstock, requested information from Census Bureau staff including Burton Reist regarding whether and/or how the census counts non-citizens and illegal immigrants for purposes of apportionment. PX-150 (AR); Cont. Langdon Dep. (Docket No. 510-3) at 174-183, 184.

343. During that meeting, Secretary Ross asked questions about the content of the Decennial Census and "seemed . . . puzzled why citizenship is not included in the 2020" census. PX-85 (AR); PX-150 (AR); Cont. Langdon Dep. at 160-163.

344. Following that meeting, Mr. Langdon requested further information from Census Bureau staff including Mr. Reist regarding "the criteria used to pick topics for 2020 versus ACS. Say, citizenship." PX-150 (AR).

345. Also on May 24, 2017, Mr. Langdon sent an email to Mr. Comstock entitled "Counting of illegal immigrants," which states "the counting of illegal immigrants (or of the larger group of non-citizens) has a solid and fairly long legal history . . . [there is] a Bush 41 era DOJ opinion that proposed legislation to exclude illegal aliens from the decennial census was illegal." PX-565 (AR).

346.    Mr. Comstock responded to Mr. Langdon on May 24, 2017, asking for further information on the selection of questions for the census versus the ACS, and passing along the Supreme Court decision that Mr. Neuman had previously provided for the proposition that the government might have a use for citizenship data.  PX-565 (AR).

347.    Later on May 24, 2017, at nearly 11:00 PM, Mr. Langdon made an apparently urgent request to Acting Associate Director of the 2020 Decennial Census Lisa Blumerman to respond to his inquiry related to a citizenship question, asking for a response, "Ideally this evening." PX-150 (AR); Cont. Langdon Dep. at 172-174.

348.    Mr. Langdon made this request specifically in the context of pursing the addition of a citizenship question.  Cont. Langdon Dep. at 167-169.

349.    Mr. Langdon reported back to Mr. Comstock that he made that request.  PX-543 (AR).

350.    Following his failed discussions with Mr. Hamilton, Mr. Comstock asked James Uthmeier to investigate "how Commerce could add the question to the Census itself."  PX-48 (AR); PX-524 (AR); PX-537 (AR).

351.    On July 14, 2017, Mr. Kobach emailed Secretary Ross. PX-19; PX-298 (R) at RFA 81; Comstock Dep. at 205–06; Teramoto Dep. at 40–46.

352.    In his July 14, 2017 email, Mr. Kobach wrote to Secretary Ross to remind Secretary Ross of their prior telephone discussion "a few months ago."  PX-19 (AR); PX-298 (R) at RFA 82; Comstock Dep. at 205–06.

353.    Mr. Kobach wrote that during their earlier discussion, he and Secretary Ross "talked about the fact that the US census does not currently ask respondents about their citizenship," and further advised Secretary Ross that the absence of such a question "leads to the problem that

aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." PX-19 (AR); PX-298 (R) at RFA 82; Teramoto Dep. at 40–46.

354.    Mr. Kobach further wrote that "it was essential that one simple question be added to the upcoming 2020 census" and that a variant of the question that appears on the American Community Survey "needs to be added to the census." PX-19 (AR); Teramoto Dep. at 40–46.

355.    On July 21, 2017, Mr. Kobach called Ms. Teramoto.  He also emailed her, forwarding his July 14 email to Secretary Ross stating that he had spoken to Secretary Ross about the addition of citizenship question to the 2020 Decennial Census "at the direction of Steve Bannon . . . ." PX-19 (AR); PX-298 (R) at RFA 83; Comstock Dep. at 120–21, 205–06; Teramoto Dep. at 40–46.

356.    During her testimony, Ms. Teramoto denied knowledge of her conversation with Mr. Kobach and denied knowing who he was. Teramoto Dep. at 40–41.

357.    Following their conversation on July 21, 2017, Ms. Teramoto arranged for a call between Mr. Kobach and Secretary Ross. PX-19 (AR).

358.    On or around July 25, 2017, Secretary Ross had a further telephone conversation with Mr. Kobach concerning the addition of a citizenship question to the 2020 Decennial Census, in which Ms. Teramoto and Deputy Chief of Staff Israel Hernandez participated. PX-19 (AR); PX-298 (R) at RFA 84; PX-193 at 8, 40; Comstock Dep. at 208–09.

359.    Ms. Teramoto testified she had no recollection of this call and again denied knowing who Mr. Kobach was. Teramoto Dep. at 40–41.

360.    Undersecretary Kelley testified that it is "very plausible" that she knew as early as July 2017 that Secretary Ross was considering adding a citizenship question to the 2020 decennial Census. Kelley Dep. at 45:5-12.

361.   On July 25, 2017, the Commerce Department Director of Intergovernmental Affairs,

Aaron Willard, requested Census Bureau personnel provide a briefing to Undersecretary Kelley

on "how the process works when questions are discussed and approved to be used on the

[American Community Survey] and also those on Census questionnaire.  Likewise, we would

like to know how issues surrounding things like [the proposal to add a question about Sexual

Orientation and Gender Identity] are discussed and reviewed throughout this process as well."

PX-28 (AR); PX-29 (AR); Kelley Dep. at 47–54.

362.   On July 25, Census Bureau personnel gave Undersecretary Kelley and Mr. Willard a

briefing on, among other things, the process how questions are "approved to be used on the . . .

Census questionnaire." PX-28 (AR); PX-29 (AR); Kelley Dep. at 47–54.

363.   During her testimony, Undersecretary Kelley denied this briefing had anything to do with

the potential addition of a citizenship question to the Decennial Census.  Kelley Dep. at 49, 51,

54.

364.   Approximately a week after the call with Mr. Kobach, on August 2, Congressman Mark

Meadows requested a meeting with Secretary Ross.  PX-567.  Congressman Meadows is a

member of the U.S. House of Representatives from North Carolina and is the Chairman of the

House Freedom Caucus.

365.   On August 8, 2017, Secretary Ross discussed adding a citizenship question to the

Decennial Census with Congressman Mark Meadows. PX-193 at 9.  According to Secretary

Ross' calendar, Mr. Comstock, Mr. Hernandez, and Ms. Teramoto attended this call. PX-193 at

41-42.

366.   On August 8, Secretary Ross was advised by an email from Mr. Hernandez that Congressman Steve King introduced a bill to the House of Representatives seeking the addition of a citizenship question to the Decennial Census. PX-18 (AR).

367.   On August 8, 2017, after the call with Congressman Meadows, Secretary Ross emailed Mr. Comstock asking "where is DOJ in their analysis" of whether to request the addition of a citizenship question to the 2020 Decennial Census.  PX-97 (AR); PX-298 (R) at RFA 91; Comstock Dep. at 213.

368.   Secretary Ross' email of August 8, 2017 further advised Mr. Comstock that "[i]f they [the Department of Justice] still have not come to a conclusion please let me know your contact person and I will call the AG." PX-97 (AR); PX-298 (R) at RFA 92; Comstock Dep. at 214.

369.   Mr. Comstock responded to Secretary Ross on August 8, 2017 stating that he would get back to him with the requested information. PX-97 (AR); PX-298 (R) at RFA 93; Comstock Dep. at 213–215.

370.   As of August 8, 2017, DOJ had not agreed to request the addition of a citizenship question to the 2020 Decennial Census.  PX-298 (R) at RFA 94.

371.   On August 9, Mr. Comstock sent a further response to Secretary Ross stating "we are preparing a memo and full briefing for you on a citizenship question.  The memo will be ready by Friday . . . Since this issue will go to the Supreme Court we need to be diligent in preparing the administrative record." PX-95 (AR); PX-523 (AR); Comstock Dep. at 216.

372.   Secretary Ross responded to Mr. Comstock the next day, "I would like to be briefed on Friday by phone . . . we should be very careful about everything, whether or not it is likely to end up in the SC." PX-95 (AR); PX-523 (AR); Comstock Dep. at 217.

373.   On August 11, Mr. Comstock and Mr. Uthmeier exchanged edits on briefing materials on a citizenship question for Secretary Ross.  During this exchange, Mr. Uthmeier wrote that he had "recommendations on execution," stating that he thought "our hook" was "ultimately, we do not make decisions on how the [citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide."  PX-607 (AR).

374.   On August 11, Mr. Comstock emailed Secretary Ross and Ms. Teramoto a memorandum prepared by James Uthmeier concerning the addition of a citizenship question to the Decennial Census. PX-3 at AR 2461 (AR); PX-146 (AR).  The Defendants have withheld this memorandum on grounds of privilege.

375.   On August 16, Ms. Teramoto requested that she and Mr. Comstock meet with Undersecretary Kelley and the new-Commerce General Counsel Peter Davidson on August 21 "to sort this out." PX-50 (AR); PX-94 (AR).

376.   Mr. Comstock agreed to this meeting.  PX-50 (AR).

377.   During their respective depositions, Mr. Comstock, Ms. Teramoto, and Undersecretary Kelley all denied having any recollection of the August 21 meeting. Comstock Dep. at 221; Teramoto Dep. at 54–58; Kelley Dep. at 91–92.

378.   Mr. Gore testified that, at the end of August or beginning of September, Secretary Ross initiated a discussion about the addition of a citizenship question with Attorney General Sessions. Gore Dep. at 83–84; PX-302 at 2-3.

###### D.      Secretary Ross and His Staff Discuss Mr. Kobach's Request and Decide to Redouble Their Efforts to Solicit the Department of Justice to Request Addition of a Citizenship Question (September 2017)

379.   On September 1, Secretary Ross complained to Mr. Comstock and Ms. Teramoto about a number of issues, including that he had "received no update [on] the issue of the census

question" and Mr. Comstock responded, "Understood. Wendy and I are working on it." PX-45 (AR); PX-96 (AR).

380.   On September 6, Secretary Ross and his senior staff (including Messrs. Comstock, Hernandez, Davidson, Uthmeier, and Ms. Teramoto, Undersecretary Kelley, and Ms. Park-Su) had a meeting to discuss the addition of a citizenship question. PX-31 (AR); PX-35 (AR); PX-36 (AR); PX-46 (AR); PX-47 (AR); PX-193 at 11.

381.   Mr. Comstock, Ms. Teramoto, and Undersecretary Kelley have all denied having any recollection of the meeting. Comstock Dep. at 221; Teramoto Dep. at 58–61 (objection); Kelley Dep. at 105–07.

382.   Mr. Uthmeier prepared a briefing book for the September 6 meeting. PX-35 (AR); PX-36 (AR); PX-281 at ¶ 3.

383.   Defendants' counsel represented that none of the participants in the meeting retained the briefing book.

384.   On September 7, Mr. Comstock wrote to Messrs. Uthmeier and Davidson that Secretary Ross "would like an update on progress since the discussion yesterday regarding the citizenship question." PX-37 (AR).

385.   After receiving Mr. Uthmeier's response (which Defendants have withheld on the basis of privilege), Mr. Comstock reiterated "the Secretary is asking for progress on this." PX-44 (AR); PX-49 (AR).

386.   Mr. Uthmeier responded that Mr. Davidson had been in touch with "Kassinger this evening." PX-44 (AR).

387.   In a subsequent exchange, Mr. Davidson wrote to Mr. Comstock, Mr. Uthmeier and Ms. Teramoto that Secretary Ross had discussed Mr. Kobach in the meeting about a citizenship

question the day before, but Mr. Davidson was "concerned about" contacting Mr. Kobach
directly, and recommended contacting a trusted advisor, such as Mr. Neuman, "before we do
anything externally."  PX-614 (AR).

388.    The following day (September 8, 2017), Mr. Uthmeier contacted Mr. Neumann to discuss
"some Census legal questions for the Secretary." PX-38 (AR).

389.    Also on September 8, 2017, Mr. Comstock sent Secretary Ross a memo reporting on his
efforts to identify someone who would request the addition of a citizenship question to the 2020
Decennial Census, and advising that, as of that date, he had not been successful. PX-48 (AR);
PX-133 (AR); PX-298 (R) at RFA 96.

390.    The memo summarized Mr. Comstock's prior discussions with Ms. Hankey, Mr.
McHenry, and Mr. Hamilton of the Departments of Justice and Homeland Security.  PX-133
(AR); PX-524 (AR); PX-537 (AR).

391.    Mr. Comstock later forwarded that memorandum to Ms. Teramoto, PX-58 (AR); PX-133
(AR); PX-524 (AR); PX-537 (AR), presumably to prepare her for an upcoming call she was to
have with DOJ regarding a citizenship question. *See* PFOF III.E.

392.    Ms. Teramoto denied all recollection of reading that memorandum or discussing it with
Mr. Comstock. Teramoto Dep. at 69-70.

393.    Early afternoon on September 13, Mr. Uthmeier followed up with Mr. Neuman and they
talked later that day regarding a citizenship question. PX-145 (AR); PX-592 (AR).

394.     Mr. Comstock testified that the Secretary never told him why he wanted to add a
citizenship question to the census.  Comstock Dep. at 112, 251-54. Mr. Comstock also testified
that he never asked the Secretary why he wanted to add a citizenship question.  Comstock Dep.
at 171-72. According to Mr. Comstock, the reasons why the Secretary wanted a citizenship

question were irrelevant.  Comstock Dep. at 253-54, 260-62.  Ms. Teramoto similarly testified

that she had no knowledge of why the Secretary wanted to add a citizenship question.  Teramoto

Dep. at 32.  Undersecretary Kelley similarly testified that she had no knowledge of why the

Secretary wanted to add a citizenship question.  Kelley Dep. at 39.

395.   There is no writing of any kind either in the Administrative Record or produced in

discovery authored by the Secretary or anyone at the Commerce Department (or anyone else)

that describes the reasons why the Secretary wanted to add a citizenship question as early as the

first quarter of 2017.  PX-1 to PX-14 (AR).

396.   The record does indicate that, at the same time the Secretary was discussing adding a

citizenship question to the census in the spring and summer of 2017, he was asking Mr.

Comstock questions about whether congressional apportionment based on the census included

non-citizens, he was informed that including non-citizens in congressional apportionment was

legally required, but that Mr. Kobach was advising him that it was nonetheless a "problem."  PX-

19 (AR), PX-55 (AR), PX-58 (AR), PX-85 (AR), PX-88 (AR), PX-150 (AR), PX-565 (AR), PX-

607 (AR), PX-614 (AR).

397.   Mr. Comstock did not believe that the Secretary's unstated reasons to add a citizenship

question would "clear [the] legal thresholds" set by OMB and federal law, Comstock Dep. at

153-54, and believed that they might or might not be "legally-valid," Comstock Dep. at 267.

398.   If the Secretary's reasons for wanting a citizenship question were legitimate, it would be

ordinary to find in writing some documentation of why the Secretary wanted the question or why

the Secretary thought this was a good idea.  The Administrative Record is absent of such

documentation.  PX-1 to PX-14 (AR).  It would also be ordinary for the Secretary's aides to

know why he wanted the question added and for them to be able to articulate why this was in the

national interest.  But none of Secretary Ross' senior aides could explain why Secretary Ross

wanted the question added.

399.    The record reflects an extraordinary level of concealment and denial.  The evidence is

overwhelming that the Secretary wanted to add a citizenship question and that this was an

important priority for him.  To the extent that Defendants argue that the June 21 Supplemental

Memorandum says that before the DOJ request, the Secretary was merely considering a

citizenship question, the weight of the evidence demonstrates that this position was not credible.

Rather, the weight of the evidence demonstrates that the Secretary made the decision to add a

citizenship question before knowing whether DOJ had any need or even desire for addition of the

question.  *See, e.g.,* PX-44 (AR), PX-49 (AR), PX-72 (AR), PX-88 (AR), PX-95(AR), PX-

97(AR), PX-523(AR).

400.    Similarly, the aides' testimony that they did not know why the Secretary wanted to add a

citizenship question is not credible and is evidence of a cover-up as to the Secretary's true

motivations.  In the alternative, that the Secretary might not have confided in his aides is still

evidence of a cover-up.  Indeed, the evidence that Mr. Comstock did not ask for the Secretary's

reasons, believed that the Secretary's reasons for adding the question might not have been legally

valid, and believed that it was his job to find a legally supportable rationale for addition of the

question demonstrates that the Secretary was attempting to cover up his true rationale for adding

the question.

**E.    Origins of December 12 Letter from Department of Justice to Census Bureau
(September 2017—December 2017)**

401.    In September 2017, Secretary Ross and his staff "inquired whether the Department of

Justice (DOJ) would support, and if so would request, inclusion of a citizenship question."  PX-2

(AR); PX-59 (AR); PX-60 (AR); PX-63 (AR); PX-66 (AR); PX-67 (AR).

402.   Around Labor Day 2017, but before September 8, 2017, John Gore became involved in the deliberations over whether or not to request the inclusion of a citizenship question for the Decennial Census. Gore Dep. at 73–75.

403.   John Gore was the Acting Assistant Attorney General (AAAG) for Civil Rights in the U.S. DOJ.  Gore Dep. at 18.

404.   Mr. Gore was and is a political appointee, not career Civil Rights Division staff.  Gore Dep. at 14, 18–19.

405.   In his role as AAAG, Mr. Gore was the head of DOJ's Civil Rights Division. Gore Dep. at 18-19.

406.   One of the sections within the DOJ Civil Rights Division is the Voting Section.  Among the duties of the Voting Section is to enforce Section 2 of the VRA of 1965. Gore Dep. at 18-19.

407.   Prior to becoming AAAG, Mr. Gore was previously an attorney in private practice.  Gore Dep. at 14.

408.   As an attorney in private practice, Mr. Gore litigated numerous cases under the VRA. Gore Dep. at 14–15.

409.   In all of the cases he litigated under Section 2 of the VRA prior to coming to DOJ, Mr. Gore represented defendants rather than plaintiffs. Gore Dep. at 16.

410.   The issue of the adequacy of CVAP data never came up in any of the VRA cases litigated by Mr. Gore.  Gore Dep. at 16–17.

411.   In his experience representing jurisdictions defending VRA lawsuits, Mr. Gore never took the position that plaintiffs' block-level CVAP data was insufficient because it was based on sample survey data rather than a "hard count" from the decennial Census. Gore Dep. at 16–17.

412.   Mr. Gore has no experience drawing districts for the purposes of complying with the *Gingles* preconditions for VRA liability or using block-level data about the characteristics of populations. Gore Dep. at 17–18.

413.   Mr. Gore became involved in these deliberations through conversation with Ms. Hankey and Attorney General Sessions. Gore Dep. at 73–75.

414.   On or around Labor Day 2017, Mr. Gore had a conversation with Attorney General Sessions regarding a citizenship question.  Gore Dep. at 83.

415.   Mr. Gore learned from that conversation with Attorney General Sessions that Secretary Ross had initiated an earlier discussion between Secretary Ross and Attorney General Sessions regarding a citizenship question.  Gore Dep. at 83–84.

416.   Mr. Gore was also aware that someone from the Department of Commerce had spoken to Ms. Hankey and Mr. McHenry before September 8, 2017.  Gore Dep. at 61–62, 63–64. The Commerce Department initiated all of the prior DOC-DOJ conversations (with Sessions, Hankey and McHenry); these conversations were not initiated by DOJ, either for the purpose of obtaining better data for VRA enforcement or for any other purpose. *Id.* at 67-68.

417.   Beginning roughly in mid-September, the Commerce Department initiated direct conversation with Mr. Gore. Gore Dep. at 91–92, 94–95.

418.   Between September and October 2017, Gore spoke with three individuals from the Commerce Department about a citizenship question: Peter Davidson, James Uthmeier, and Wendy Teramoto.  Gore Dep. at 92-94, 118.  Mr. Gore participated in various conversations with Mr. Davidson, Mr. Uthmeier, and Ms. Teramoto through the autumn of 2017.  Gore Dep. at 92–94.  None of these conversations were initiated by Gore or anyone in DOJ's Civil Rights Division.  Gore Dep. at 94-95.

419.   Mr. Gore recalls first being contacted by Mr. Davidson in mid-September.  Gore Dep. at 92–93, 97–98.

420.   Mr. Davidson called Mr. Gore to discuss the addition of a citizenship question to the census.  Gore Dep. at 97–98.

421.   During their conversation, Mr. Davidson asked Mr. Gore to reach out to Ms. Teramoto. Gore Dep. at 97, 98.

422.   On September 13, Mr. Gore sent Ms. Teramoto an email "to talk about a DOJ-DOC" issue. PX-59 (AR); PX-60 (AR); Gore Dep. at 95-96.

423.   The "DOJ-DOC" issue referred to the addition of a citizenship question to the 2020 Census.  PX-59 (AR); PX-60 (AR); Gore Dep. at 96-97.

424.   Through Ms. Teramoto's Assistant Macie Leach, Mr. Gore and Ms. Teramoto arranged to speak on the phone on Friday, September 15, 2017. PX-59 (AR); PX-60 (AR).

425.   Ms. Teramoto testified she had no recollection of this conversation.  Teramoto Dep. at 74–77.

426.   Following their conversation on September 15, 2017, Mr. Gore put Ms. Teramoto in touch with Attorney General Sessions' aide Danielle Cutrona on September 16, 2017.  PX-63 (AR); PX-66 (AR); PX-67 (AR); Gore Dep. at 102–103.

427.   Mr. Gore wrote, "Wendy, By this email, I introduce you to Danielle Cutrona from DOJ. Danielle is the person to connect with about the issue we discussed earlier this afternoon."  PX-63 (AR).

428.   Ms. Teramoto requested Ms. Cutrona to "let me know when the AG is available to speak with Secretary Ross." PX-63 (AR); PX-66 (AR); PX-67 (AR).

429.   Ms. Teramoto testified she had no recollection of this exchange. Teramoto Dep. at 75, 78–79.

430.   Ms. Cutrona responded by providing Attorney General Sessions' cell phone number and stating "From what John [Gore] told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist." PX-66 (AR); PX-67 (AR); Gore Dep. at 105–106.

431.   Ms. Teramoto testified she had no recollection of this exchange.  Teramoto Dep. at 77.

432.   Ms. Cutrona has no experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 104.

433.   On September 18, 2017 Secretary Ross again spoke to Attorney General Sessions specifically regarding the addition of a citizenship question.  PX-61 (AR); Gore Dep. at 112.

434.   On or about September 18, 2017, Ms. Teramoto advised Ms. Cutrona that Secretary Ross and Attorney General Sessions "connected." PX-62 (AR).

435.   On the same day, Ms. Teramoto emailed Mr. Gore, writing, "AG and Sec spoke. Please let me know when you have a minute." PX-61 (AR); Gore Dep. at 111.

436.   Secretary Ross contemporaneously emailed Mr. Davidson that Ms. Teramoto participated on that call. PX-57 (AR).

437.   Ms. Teramoto testified she had no recollection of this call.  Teramoto Dep. at 83–85.

438.   During their September 18, 2017 conversation, Secretary Ross inquired whether Attorney General Sessions would support, and if so, request, inclusion of a citizenship question on the 2020 Decennial Census. PX-62 (AR); PX-61 (AR); Gore Dep. at 112; PX-298 (R) at RFA 98.

439.   On September 19, 2017, Secretary Ross sent an email with the subject "Census" advising Peter Davidson that "Wendy and I spoke with the AG yesterday.  Please follow up so we can resolve this issue today." PX-57 (AR).

440.   Ms. Teramoto testified that she has no recollection of this event. Teramoto Dep. at 84.

441.   On September 22, 2017, Mr. Uthmeier reached out to Mr. Gore. Gore Dep. at 117-18 (objection).

442.   Mr. Gore returned Mr. Uthmeier's call, on or about September 22, 2017, and they discussed the addition of a citizenship question to the 2020 Census. Gore Dep. at 118, 119.

443.   Mr. Uthmeier has no experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 117-118.

444.   After their call, Mr. Gore was also provided Mr. Uthmeier's August 11 memorandum discussing addition of a citizenship question. Gore Dep. at 118.

445.   With the August 11 memorandum, Mr. Gore also received a handwritten note from Mr. Uthmeier.  Gore Dep. at 118–119. This handwritten note from Uthmeier to Gore contained information that DOJ considered in drafting the final letter requesting a citizenship question. *Id.* at 123-24.  Defendants have withheld this note on the basis of privilege.

446.   Mr. Gore responded to that note in a discussion with Mr. Uthmeier and Mr. Davidson, purportedly to provide legal advice in anticipation of litigation.  Gore Dep. at 120-124.

447.   DOJ relied, in part, on Mr. Uthmeier's input in reaching its decision to send the December 12, 2017 letter to the Census Bureau.  Gore Dep. at 123-124

448.   On Sunday October 8, Secretary Ross sent an email to Mr. Davidson with the subject line "Letter from DOJ" and asking "what is its status." PX-52 (AR).

449.    Mr. Davidson responded "I'm on the phone with Mark Neuman right now . . . he is giving me a readout of his meeting last week." PX-52 (AR).

450.    The following day, on October 9 (Columbus Day), Secretary Ross issued a press release applauding Trump Administration programs to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse and chain immigration." PX-479.

451.    Also on October 9, Mr. Willard sent Undersecretary Kelley an email about a citizenship question stating "1) must come from DOJ, 2) court cases you can hang your hat on, 3) every census since 1880, except 2000."  PX-148 (R) (AR).

452.    In October of 2017, AAAG Gore, John Zadrozny of the White House Domestic Policy Council, along with Rachael Tucker, Mr. Hamilton, and others from DOJ participating in a conference call to discuss the addition of a citizenship question to the Census without the participation of any Commerce Department or Census Bureau personnel.  Gore Dep. at 409–12.

453.    During the autumn of 2017, Mr. Gore also discussed a citizenship question with Mr. Neuman with the understanding that he was advising the Department of Commerce and Census Bureau on the issue.  Gore Dep. at 438.

454.    On or about November 1, 2017, Mr. Gore wrote the initial draft of the letter from DOJ to Census Bureau requesting the inclusion of a citizenship question on the 2020 Decennial Census. Gore Dep. at 126–127 (objection).

455.    On Wednesday, November 1, 2017, Mr. Gore emailed Chris Herren, Chief of DOJ's Voting Section, and copied Ben Aguiñaga. Gore Dep. at 126 (objection); PX-211.

456.    The subject of the email was: "Confidential & Close Hold: Draft Letter." Gore Dep. at 126 (objection). Gore testified that he intended that Herren could not share the draft letter without Gore's approval.  Gore Dep. at 130.

457.   Mr. Gore attached a draft letter that he had written requesting a citizenship question be added to the 2020 Census questionnaire.  Mr. Gore asked for input from Mr. Herren on the draft. Gore Dep. at 126-27 (objection).

458.   Also on November 1, 2017, Gore's aide Mr. Aguiñaga forwarded a draft of the December 12 Letter to Bethany Pickett. Gore Dep. at 133.

459.   Ben Aguiñaga and Bethany Pickett were political appointees in the front office of the Civil Rights Division who began working there in 2017, having graduated from law school around 2015. Gore Dep. at 133-34.

460.   Before then, neither had any experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. Gore Dep. at 134–35.

461.   Mr. Gore received substantive input from Mr. Herren, Mr. Aguiñaga and Ms. Pickett. Gore Dep. at 136–137.

462.   Mr. Gore did not solicit or receive substantive input at this stage from anyone besides Mr. Arthur Gary, Ms. Pickett, Mr. Aguiñaga, and Mr. Herren.  Gore Dep. at 136–137.

463.   Mr. Gore does not recall either sharing subsequent drafts of the Gary letter with Herren or Herren giving him comments on any subsequent drafts.  *Id.* at 444-45.

464.   Mr. Gore has no recollection of receiving any input or edits from career DOJ Civil Rights Division staff on the letter requesting a citizenship question other than the first round of edits from Herren.  *Id.* at 152-53.

465.   The only other people in DOJ's Civil Rights Division from whom Gore can recall soliciting or receiving input on the draft letter requesting a citizenship question were Ms. Pickett and Mr. Aguiñaga.  *Id.* at 136-37.

466.    Sometime in mid-November ("a few weeks" before November 27) Mr. Gore discussed

adding a citizenship question with Rachael Tucker, then counsel in the front office in the Office

of the Attorney General, and Robert Troester, then Associate Deputy Attorney General.  Gore

Dep. at 141.

467.    Neither Ms. Tucker nor Mr. Troester had experience as counsel in VRA cases, litigating

Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the

reliability of CVAP data used in VRA litigation. Gore Dep. at 140.

468.    On or about November 26, 2017 (Thanksgiving weekend), Secretary Ross conversed with

President Trump.  PX-298(R) at RFA 103.

469.    On the evening November 27, 2017 Secretary Ross sent Mr. Davidson, General Counsel

of the Department of Commerce, an email with the subject "Census Question" stating that

"Census is about to begin translating the questions into multiple languages and has let the

printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the

responsible person at Justice. We must get this resolved." PX-143 (AR); PX-298 (R) at RFA

105.

470.    On or around November 27, 2017, Mr. Davidson and Mr. Gore communicated. PX-53

(AR).

     **F.**    **Final Revisions to and Delivery of the December 12 Letter (November 2017 -
December 2017)**

471.    In late November 2017, Gore solicited and received edits on the draft letter requesting a

citizenship question from Rachael Tucker, Counsel in the front office of the Attorney General;

and Robert Troester, then-Associate Deputy Attorney General.  PX-205; Gore Dep. at 138-42

(objection).

472.   On November 27, 2017, Mr. Gore sent an email to Rachael Tucker, then Counsel in the front Office of the Attorney General, and Robert Troester, then Associate Deputy Attorney General, and attached a "near-final" draft of the December 12 Letter.  Gore Dep. at 138–139.

473.   Both Ms. Tucker and Mr. Troester provided edits to the letter. Gore Dep. at 142.

474.   Mr. Gore did not receive substantive edits from anyone besides Ms. Tucker and Mr. Troester in the last few days before the December 12 Letter was sent.  Gore Dep. at 146.

475.   In early December 2017 Undersecretary Kelley was officially notified about the DOJ letter.  PX-73 (AR); Kelley Dep. at 145:12-148:7.

476.   On December 8, 2017, Mr. Gore emailed Mr. Gary a draft of the letter "with leadership's final changes," and stated "With these changes, we are authorized to send. Sending on Monday is fine." Gore Dep. at 145, 146–147 (objection).

477.   Mr. Gore did not solicit or receive further edits from within DOJ to the final versions of the December 12 Letter.  Gore Dep. at 146.

478.   Attorney General Sessions decided that DOJ would request that the Census Bureau ask a citizenship question on the Census.  Gore Dep. at 442.

479.   Mr. Gore testified that that final authorization to send the letter came from either Ms. Tucker or Mr. Troester on behalf of Attorney General Sessions, probably on Tuesday, December 12, 2017.  Gore Dep. at 158–160.

480.   On Tuesday, December 12, 2017, Arthur Gary sent the final letter, signed by him and addressed to Ron Jarmin, Acting Director of the Census Bureau. PX-32 (AR); PX-101 (AR); PX-1 at AR 663 (AR); Gore Dep. at 155.

481.   The Gary letter formally requests the addition of a citizenship question to the Census. PX-32 (AR); PX-101 (AR); PX-1 at AR 663 (AR); Gore Dep. at 20–21.

482.   The December 12 Gary letter sent to the Census Bureau requesting a citizenship question does not state that a citizenship question is necessary for the purposes of VRA enforcement to collect CVAP data through the census questionnaire.  PX-32 (AR).

483.   Gore testified he does not personally believe that it is necessary for DOJ's VRA enforcement efforts to collect CVAP data through the census questionnaire.  Gore Dep. at 300.

484.   Gore testified further he does not know whether the data the Census Bureau will obtain through the addition of a citizenship question will have larger or smaller margins of error, or be more precise, than the existing data available to DOJ. Gore Dep. at 215-16, 226-27, 232-33.

485.   The only career staffer in the Civil Rights Division that provided input at any stage of drafting was Mr. Herren in early November. Gore Dep. at 151–153.

486.   After Mr. Herren provided initial edits, Mr. Gore continued to re-draft with input from DOJ political leadership and DOC legal counsel. Gore Dep. at 151–153.

487.   Before the letter was sent to the Census Bureau, Mr. Gore was aware that DOJ "staff did not want to raise the citizenship question" in the fall of 2017.  Gore Dep. at 68–69.

488.   Before the December 12 Letter was sent to the Census Bureau, Mr. Gore was aware that that the "Department of Justice did not reach out to the Department of Commerce to initiate those conversations for the purposes of obtaining better data to enforce the Voting Rights Act." Gore Dep. at 67–68.

489.   Prior to the final December 12 letter requesting the addition of a citizenship question on the Decennial Census, DOJ had never communicated to the Census Bureau that ACS CVAP data was not ideal for DOJ's VRA enforcement purposes.  Nov. 13 Trial Tr. at 996.

490.    Before the letter was sent to the Census Bureau, Mr. Gore was aware that the Commerce
Department initiated those conversations and the larger request for DOJ to ask the Census
Bureau to add a citizenship question to the Decennial Census.  Gore Dep. at 67, 150.

491.    Mr. Gore is not aware of any communications between DOJ and the Census Bureau about
whether or not adding a citizenship question to the census would in fact produce data that has
smaller margins of error than the citizenship data currently used by DOJ, due to required
disclosure avoidance techniques.  Gore Dep. at 228, 233–234.

492.    The December 12 Letter requests the addition of a citizenship question on the basis of
VRA enforcement, and provides no other justification. PX-32 (AR); PX-101 (AR); PX-1 at AR
663 (AR); Gore Dep. at 22, 24–25, 164.

493.    Mr. Gore admitted that he did not know whether citizenship data produced from the
census questionnaire would in fact be better for purposes of VRA enforcement than citizenship
data that DOJ already had, undermining the sole justification offered in the December 12 letter.
Although Mr. Gore authored the letter to the Census Bureau stating that the "decennial census
questionnaire is the most appropriate vehicle" for collecting "reliable" data about citizen voting
age population for purposes of enforcing the VRA, PX-32, Mr. Gore does not know whether
citizen voting age population data produced from the census questionnaire would in fact be
"more precise than the CVAP data on which DOJ is currently relying for purposes of VRA
enforcement."  Gore Dep. at 233.

494.    The December 12 Letter represents DOJ's and Attorney General Session's final decision
and statement of position with respect to the issue of a citizenship question on the Census. Gore
Dep. at 162-163 (objection).

**G. The Census Bureau Consistently Recommended Against Adding a Citizenship Question (December 2017 - March 2018)**

495.   As set forth below, the Census Bureau repeatedly advised the Secretary and the

Commerce Department against the addition of a citizenship question.  The Census Bureau

specifically recommended that DOJ's request for block level citizenship data could be best

satisfied by administrative records without asking a question about citizenship.  The Census

Bureau advised, based on scientific analysis, that the addition of a citizenship question would be

very costly and result in a poorer quality census count.  In addition, the Census Bureau advised

that using responses to a citizenship question in conjunction with administrative records, would

result in poorer quality citizenship data than from just relying on administrative records.  At no

point in the process did the Secretary or the Department of Commerce present any contrary

technical or scientific information to the Census Bureau.

496.   Following the December 12 Letter, Undersecretary Kelley directed her assistants to notify

the leadership of the Census Bureau, who were then attending a Federal Economic Statistical

Committee Meeting, that they needed to convene the appropriate personnel to review that

proposal. Kelley Dep. at 145:12-148:7.

497.   Director Jarmin then notified the senior professional staff that it would be necessary for

the Census Bureau to evaluate the merits of adding a citizenship question to the 2020 Decennial

Census. Jarmin Dep. (Docket No. 511-2) at 60:21-62:10.

498.   In particular, Director Jarmin emailed Dr. John Abowd directing him to assemble a team

of census experts to evaluate and formulate a response to DOJ's request. PX-3 at AR 3364 (AR);

Nov. 13 Trial Tr. at 879-80.

499.   Prior to being notified in December, Dr. Abowd and other members of the senior staff of

the Census Bureau had not been advised that Secretary Ross was considering adding a

citizenship question to the 2020 Decennial Census. Nov. 13 Trial Tr. at 879. Acting Director

Jarmin was aware of the impending request "not much more than a couple of weeks" before the

December 12 Letter.  Jarmin Dep. (Docket No. 511-2) at 24:20-25:2.

500.    Dr. Abowd directed senior professional staff at the Census Bureau (nicknamed the

"SWAT Team"), to formulate a response to the suggestion that a citizenship question be added,

which Dr. Abowd managed and reviewed. PX-74 (AR); PX-4 at AR 9339 (AR); PX-147 (AR);

PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR); Nov. 13 Trial Tr. at 879, 880.

501.    In a series of technical reports, responses to questions posed by Secretary Ross, and other

briefing documents, Census Bureau repeatedly and consistently recommended against the

addition of a question. PX-147 (AR); PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR);

PX-297 at RFA 1; Census Bureau 30(b)(6) Dep. Vol. II. (Docket No. 502-4) at 409:16-410:2,

432:21-433:3.

502.    This recommendation has not changed.  PX-297 at RFA 6, 107; Census Bureau 30(b)(6)

Dep. Vol. II. at 409:16-410:2, 432:21-433:3; Kelley Dep. at 179:3-13, 207:19-213:20; Nov. 13

Trial Tr. at 878-79, 967.

503.    The Census Bureau repeatedly and consistently concluded that adding the question would

reduce self-response rates, harm the overall data and integrity of the Decennial Census, and serve

no useful purpose. PX-147; PX-100; PX-22, PX-132; PX-162; Nov. 13 Trial Tr. at 881, 891-92,

922, 952-53.

504.    The assessment has not changed. Kelley Dep. at 212:7-213:20; PX-297 at RFA 6; Nov. 13

Trial Tr. at 881, 891-92, 922, 952-53.

505.    The Census Bureau repeatedly and consistently concluded that the stated goals of DOJ

with respect to enforcement of the VRA could be accomplished, in a less costly and more

effective manner, by linking Census responses to other administrative data sets available to the federal government. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162 (AR); Kelley Dep. at 258:1-12; Census Bureau 30(b)(6) Dep. Vol. II. at 409:16-410:2; Nov. 13 Trial Tr. at 961-62, 990.

506.   This conclusion has not changed. Kelley Dep. at 174:20-177:7; Nov. 13 Trial Tr. at 990.

507.   The Census Bureau does not believe that inclusion of a citizenship question is necessary to provide complete and accurate data in response to DOJ's request. PX-22 (AR); Census Bureau 30(b)(6) Dep. Vol. I. (Docket No. 502-2) at 331:8-17; Nov. 13 Trial Tr. at 1048.

508.   This position has not changed. Nov. 13 Trial Tr. at 1048.

509.   The Census Bureau repeatedly and consistently concluded that adding a citizenship question would involve substantial additional cost over non-action and the use of administrative records. PX-147 (AR); PX-100 (AR); PX-22 (AR), PX-132 (AR); PX-162 (AR); Nov. 13 Trial Tr. at 961-62, 990; Nov. 14 Trial Tr. at 1249-1250.

510.   This position has not changed. Kelley Dep. at 167:16-168:5; PX-297 at RFA 6; Nov. 14 Trial Tr. at 1249-1250.

511.   Dr. Abowd and the Census Bureau maintains that the Census Bureau produced "credible, quantitative evidence" that the addition of a citizenship question to the 2020 Census could be expected to lower the self-response rate in households that may contain non-citizens, which is an identifiable and large subpopulation. PX-22 (AR); Nov. 13 Trial Tr. at 881, 918, 921-22, 923.

512.   Moreover, Dr. Abowd and the Census Bureau maintain that the natural experiment reflected in the various memoranda submitted to Secretary Ross represent a sufficiently reliable basis, and the best available evidence, for the Census Bureau to perform a quantitative estimate of the effects of putting a citizenship question on the census. Nov. 13 Trial Tr. at 926.

513.   Dr. Abowd and the Census Bureau maintain that the balance of evidence available

suggests that adding a citizenship question to the 2020 Decennial Census would lead to a lower

self-response rate in households potentially containing noncitizens. Nov. 13 Trial Tr. at 881.

> **H.    The Census Bureau Repeatedly Communicated Its Recommendation Against Adding a Citizenship Question to Secretary Ross (December 2017 - March 2018)**

514.   The Census Bureau analyses and recommendations regarding inclusion of a citizenship

question in the 2020 Decennial Census are memorialized in memoranda dated December 22,

2017 (PX-102 (AR); PX-147 (AR)), January 3, 2018 (PX-100 (AR)), January 19, 2018 (PX-22

(AR); PX-575 (AR); PX-572 (AR)), March 1, 2018 (PX-25 (AR); PX-132 (AR)), and August 6,

2018 (PX-162)).

515.   These memoranda all presented analysis that the addition of a citizenship question was not

necessary to meet the DOJ request, and that there were alternatives that were less costly and less

burdensome. PX-102 (AR); PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-575 (AR); PX-572

(AR); PX-25 (AR); PX-132 (AR); PX-162.

516.   Census Bureau had a single meeting with Secretary Ross on February 12, 2018, to discuss

the memorandum of January 19, 2018.  PX-3 at AR 9450 (AR); Nov. 13 Trial Tr. at 883-84.

517.   At that meeting, the Census Bureau informed Secretary Ross the Census Bureau observed

a difference in self-response rates on the ACS and the census when comparing citizen and non-

citizen households and thought that this probably related to the citizenship question on the ACS.

Nov. 13 Trial Tr. at 922.

518.   The Census Bureau prepared an undated additional memorandum to expound on the data

quality issues discussed in the memo of March 1, 2018. PX-24 (AR).

519.   These memoranda and communications use a common nomenclature for four possible alternative responses to the December 12 Letter. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

520.   "Alternative A" refers to the Census Bureau making no changes to data collection and continuing to use ACS data to produce census track-level CVAP data. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

521.   "Alternative B" refers to the addition of a citizenship question to the 2020 Decennial Census to manufacture census block-level CVAP data. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

522.   "Alternative C" refers to the use of existing administrative records available to the Census Bureau to obtain census block-level CVAP data and linking those records to enumeration on the 2020 Decennial Census to populate citizenship data without the use of a citizenship question. PX-147 (AR); PX-100 (AR); PX-22 (AR); PX-132 (AR); PX-162; Nov. 13 Trial Tr. at 885.

523.   "Alternative D" refers to the use of administrative records in concert with the addition of a citizenship question to the 2020 Decennial Census to produce census block-level CVAP data. PX-132 (AR); Nov. 13 Trial Tr. at 965.

**1.     The Attorney General Directs the Department of Justice to Rebuff the Census Bureau's Attempts to Discuss the December 12 Letter**

524.   Throughout December 2017 and January 2018, the professional staff at the Census Bureau sought to meet with representatives of DOJ to understand their request and to satisfy the goals of DOJ. PX-71 (AR); PX-4 at AR 8651 (AR); Jarmin Dep. (Docket No. 511-2) at 64:17-18.

525.   After a number of attempts, however, the Census Bureau was advised by DOJ that they did not wish to meet to discuss the proposal. Jarmin Dep. (Docket No. 511-2) at 105:11-15; PX-297 at RFA 200.

526.    Director Jarmin provided an initial response to DOJ on December 22, 2018 advising Mr.

Gary that "the best way to provide PL94 block-level data with citizen voting population by race

and ethnicity would be through utilizing a linked file of administrative and survey data the

Census Bureau already possesses. This would result in higher quality data produced at a lower

cost." PX-71 (AR); PX-200; PX-197; PX-297 at RFA 184; Census Bureau 30(b)(6) Dep. Vol. I.

at 85:1-15; Nov. 13 Trial Tr. at 961-62.

527.    In his December 22, 2017, correspondence, Director Jarmin suggested a "meeting of

Census and DOJ technical experts to discuss the details of this proposal." PX-71 (AR); PX-101

(AR); PX-200; PX-297 at RFA 189.

528.    On January 2, 2018, Director Jarmin sent a follow-up email to Mr. Gary requesting for a

meeting on the following week. PX-101 (AR); PX-4 at AR 5490 (AR); PX-199.

529.    On January 9, 2018, Director Jarmin emailed Mr. Gary and again requested to meet,

stating that they "have a pretty short clock to resolve the request" and that it would be "good to

meet with your team as soon as possible." PX-198.

530.    On January 10, Director Jarmin wrote back, agreeing to meet at Main Justice on Friday,

January 19 at 11 AM. PX-197.

531.    Mr. Gore discussed with Mr. Gary in January of 2018 that the Census Bureau had an

alternative means of producing block-level CVAP data other than the addition of a citizenship

question. Gore Dep. at 263:8-18 (objection (802)). In that conversation, Mr. Gary told Mr. Gore

that the Census Bureau had requested a meeting and Gore told Gary that he would think about it

and discuss it further with others. *Id.* at 264:16-20 (objection (802)). Gore did not ask Gary to

get more information from the Census Bureau about the specifics of their alternative proposal to

produce higher-quality CVAP data at lower cost. *Id.* at 268:12-19. Mr. Gore also discussed this

with several DOJ officials, including with Attorney General Sessions at an in-person meeting. Gore Dep. at 265:12-22, 268:20-269:3.In January 2018, Attorney General Sessions decided that DOJ would not pursue the Census Bureau's alternative proposal for producing block-level CVAP data. *Id.* at 271:10-272:19.

532.   Around January 29, 2018, Gore informed Gary that DOJ technical staff would not meet with Census Bureau staff to discuss the alternative proposal for producing higher-level CVAP data at lower cost.  Gore Dep. at 273:17-274:4.

533.   On February 16, 2018, almost two months after Director Jarmin had first suggested the technical meeting to DOJ, he reported the Census and Commerce staff that Gary "has spoken to DOJ leadership.  They believe the letter requesting citizenship to be added to the 2020 Census fully describes their request.  They do not want to meet." PX-3 at AR 3460; PX-4 at AR 09074; Census Bureau 30(b)(6) Dep. Vol. I. at 98:9-20.

534.   Attorney General Sessions made the decision by DOJ not to meet with the Census Bureau and to hear the Census Bureau's alternative proposal for producing block-level CVAP data was made by Attorney General Sessions.  Gore Dep. at 271:21-272:13.

535.   No meeting between the Census and DOJ technical experts took place before issuance of the Ross Decision Memo on March 26, 2018. Census Bureau 30(b)(6) Dep. Vol. I. at 96:3-9; PX-297 at RFA 170, 195, 196; Gore Dep. at 259:5-11.

536.   It is normal process for the Census Bureau to hold a technical meeting with the agency requesting additional data to discuss the best way to deliver usable data for a particular use case. Nov. 14 Trial Tr. at 1248.

537.   Mr. Gore testified he is unaware of any other circumstance where DOJ asked the Census Bureau to collect data but then refused to have a technical meeting to discuss that data request. Gore Dep. at 282:4-10.

538.   Dr. Abowd testified that he was unaware of another circumstance in which a Cabinet Secretary personally directed agency staff not to meet with the Census Bureau, and that this refusal was "unusual."  Nov. 13 Trial Tr. at 962-65.

539.   Dr. Abowd also testified that Attorney General Sessions' decision to prevent a meeting between DOJ technical staff and Census Bureau staff constituted "political influence" on the decisionmaking process.  Nov. 14 Trial Tr. at 1267-68.

540.   Former Census Bureau Director John Thompson described input from subject matter experts, usually consisting of "staff from both the Census Bureau and the requesting agency," as "essential to the development of a new question," stating that "[t]hese experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome." Thompson Aff. ¶ 60.

541.   Dr. Hermann Habermann similarly described meetings with a requesting agency, such as the meeting Director Jarmin requested with DOJ on December 22, 2017, as "normal Census Bureau procedure. [Such a meeting] allows the technical experts to better understand how the Census Bureau can meet the needs of the proposers. It also allows for a discussion of alternative ways of meeting a request. In this case, the Census Bureau suggested that modeling of the American Community Survey data would meet the DOJ needs at less cost than adding a question to the Decennial Census. Without such a meeting, it would not be possible to know if the modeling approach would in fact meet the DOJ's needs." Habermann Aff. ¶¶ 28-29.

542.    It is unusual for the Census Bureau to receive a data request and then for the agency to

refuse to meet to discuss the technical aspects of that data request. Census Bureau 30(b)(6) Dep.

Vol. I. at 98:21-99:6.  The Census Bureau is not aware of any instance, other than the request to

add a citizenship question to the Decennial Census questionnaire, in which the DOJ has

requested data from the Census Bureau and then declined to meet to discuss that request.  PX-

297 at RFA 201.  Defendants have identified no reason, legitimate or otherwise, for the DOJ not

to take this meeting.  The only reasonable inference is that the DOJ had no interest in

cooperating with the Census Department to find the best solution since that might have resulted

in a determination that it was unnecessary to ask a citizenship question on the census.  This much

is clear from the facts in the Administrative Record.  The fact that the decision not to hold a

technical meeting about how to best satisfy the DOJ's needs was made by the Attorney General

confirms that this was a political decision, not driven by a legitimate need for the data..

### 2.    Census Bureau Analyses Recommended Against the Addition of a Citizenship Question

543.    On or about December 15, 2017, Dr. Abowd directed senior executives and expert

employees of the Census Bureau to evaluate alternative methods of providing estimates of the

Citizen Voting Age Population to support redistricting under Public Law 94 -171 (PL94) and

Section 2 of the VRA. PX-4 at AR 9339; PX-147 (AR); Nov. 13 Trial Tr. at 879-80.

### a.    December 22 Memo (PX-147)

544.    This evaluation is reflected in a memorandum dated December 22, 2017 and provided to

the Commerce Department (the "December 22 Memo"). PX-4 at AR 9339 (AR); PX-4 at AR

11634 (AR); PX-147 (AR); Nov. 13 Trial Tr. at 948-49.

545.    The December 22, 2017 Memorandum, reflected the work of six professional Census

Bureau employees, Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek,

Lawrence Warren, and Moises Yi, who analyzed two potential sources of citizenship data requested by the DOJ in its December 12, 2017 letter to Director Jarmin. PX-147 (AR).

546.    The December 22 Memo identified eight administrative sources of citizenship information either already in use by the Census Bureau or available for acquisition by the Census Bureau. PX-147 at 3 (AR).

547.    The December 22 Memo concludes that Numident, an administrative source already in use by the Census Bureau was "the most complete and reliable administrative record source of citizenship data currently available." PX-147 at 3 (AR).

548.    The December 22 Memo concluded that using these administrative records to assess CVAP was "potentially a more accurate measure of citizenship" and was also "cost efficient." PX-147 at 11 (AR).

549.    The December 22 Memo concluded that including a citizenship question in the 2020 Decennial Census could affect response rates for the 2020 Decennial Census because "[h]ouseholds with noncitizens could be particularly sensitive to the inclusion of citizenship questions." PX-147 at 6 (AR).

550.    The December 22 Memo concluded that "[t]o collect [citizenship] information through self-report by adding questions to the 2020 decennial would require additional unnecessary costs and burden to the Bureau." PX-147 at 11 (AR).

551.    The December 22 Memo concluded that including a citizenship question in the 2020 Decennial Census could lower the rate of voluntary compliance and would require expanded field operations for the implementation of the 2020 Decennial Census. PX-147 at 12 (AR).

552.    Accordingly, the Census Bureau's December 22 Memo recommends that the best way of "supporting redistricting in the manner requested by the Department of Justice is to make a

citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential

data file from which the PL94 tabulations are produced. PX-147 at 11 (AR).

553.    If citizenship were available on that file, the PL94 tabulations could be restructured to

include direct estimates of the citizen voting age population by race and ethnicity at the block

level. PX-147 at 11 (AR).

554.    "These tabulations would have essentially the same accuracy as current PL94 and

Summary File (SF1) data."  PX-147 at 11 (AR).

555.    The December 22 Memo concluded that, if this recommendation were followed, "[t]he

2020 Census questionnaire would not be altered, and the field operations would not have to be

expanded to compensate for the lower rate of voluntary compliance predicted for a census that

asks the citizenship question directly." PX-147 at 12 (AR).

556.    After receiving this memo, Director Jarmin sent the initial response to Mr. Gary described

above advising Mr. Gary that "the best way to provide PL94 block-level data with citizen voting

population by race and ethnicity would be through utilizing a linked file of administrative and

survey data the Census Bureau already possesses.  This would result in higher quality data

produced at a lower cost." PX-71 (AR).

**b.      January 3 Memo (PX-100)**

557.    Following the December 22 Memo and Director Jarmin's email to Mr. Gary, the Census

Bureau further memorialized its research and analysis of potential sources of citizenship data in a

January 3, 2018 memorandum from Dr. Abowd to Director Jarmin (hereinafter the "January 3

Memo"). PX-100 (AR).

558.    The January 3, 2018 Memo analyzed the same three alternative methods of meeting DOJ

request for census block level estimates of the citizen voting age population ("CVAP"). PX-100

(AR).

559.   The January 3 Memo concludes that Alternative A—maintaining the status quo and providing improved statistical modeling techniques—would result in only an incremental cost of approximately \$200,000.  PX-100 (AR).

560.   The January 3 Memo concludes that Alternative B—adding a citizenship question to the 2020 Decennial Census—would increase the cost of the 2020 Decennial Census by at least \$27.5 million. PX-100 (AR).

561.   The January 3 Memo concludes that Alternative B would also increase non-response rates by at least 5.1%. PX-100 (AR).

562.   January 3 Memo did not consider the potential cost of additional communication campaigns required as a result of the addition of a citizenship question to the 2020 Decennial Census under Alternative B. PX-100 (AR).

563.   The January 3 Memo did not recommend Alternative B because adding a citizenship question to the Decennial Census would decrease the coverage quality of the 2020 Decennial Census and could result in at least 154,000 fewer correct enumerations. PX-100 (AR).

564.   The January 3 Memo concludes that Alternative C—using administrative sources to provide CVAP at a census block level—would result in an incremental cost of less than \$1 million. PX-100 (AR).

565.   In the January 3 Memo, the Census Bureau recommends using Alternative C because it was far less costly than adding a citizenship question to the 2020 Decennial Census, and would not harm the quality of the census count. PX-100 (AR).

566.   On January 4, 2018, Dr. Abowd wrote to various census officials, including Director Jarmin, that "Ron reports that he has discussed this with the Under Secretary and she agrees with

the recommendation of alternative C, but Alternative A remains a possibility as well." PX-121

(AR).

### c.      January 19 Memo (PX-22)

567.    On January 19, 2018, Dr. Abowd sent a memorandum to Secretary Ross on the "Technical

Review of the Department of Justice Request to Add Citizenship Question to the 2020 Census"

(hereinafter "January 19 Memo"). PX-22 (AR); PX-297 at RFA 7; Nov. 13 Trial Tr. at 884-85.

568.    The January 19 Memo was prepared by a technical team of census experts under Dr.

Abowd's supervision. Nov. 13 Trial Tr. at 882-83.

569.    The January 19 Memo presents the view of Dr. Abowd and his technical team evaluating

Alternatives A, B and C. PX-22 (AR); Nov. 13 Trial Tr. at 882-83.

570.    The January 19 Memo was reviewed and approved by Director Jarmin. Nov. 13 Trial Tr.

at 883.

571.    In the January 19 Memo, the Census Bureau concluded that adding a citizenship question

to the Decennial Census, "is very costly, harms the quality of the census count, and would use

substantially less accurate citizenship status data than are available from administrative sources."

PX-22 (AR); Nov. 13 Trial Tr. at 885.

572.    The January 19 Memo further concluded that a citizenship question "would make the

2020 Census modestly more burdensome in the direct sense and potentially much more

burdensome in the indirect sense in that it would lead to a larger decline in self-response for

noncitizen households" PX-22 (AR); Nov. 13 Trial Tr. at 882-83; Nov. 13 Trial Tr. at 892.

573.    Further, the Census Bureau concluded that Alternative C "is comparatively far less costly

than Alternative B, does not increase response burden, and does not harm the quality of the

census count." PX-22 (AR); Nov. 13 Trial Tr. at 886.

574.   Instead of adding a citizenship question, the January 19 Memo recommended either Alternative A (making no changes) or Alternative C (using Administrative Records to provide DOJ with block-level CVAP data). PX-22 (AR); Nov. 13 Trial Tr. at 885-86.

575.   In preparing the January 19 memo, the Census Bureau performed three analyses supporting the conclusion that the addition of a citizenship question would have an adverse impact on self-response. PX-22 (AR); PX-297 at RFA 18; Nov. 13 Trial Tr. at 885, 890-91.

576.   In the January 19 Memo, the Census Bureau analyzed unit non-response, item non-response, and break-off rates. PX-22 (AR); Nov. 13 Trial Tr. at 887.

577.   According to Defendants' sole expert, Dr. Abowd, all three analyses (unit self-response, item self-response, and break-off rates) were appropriate to support the Census Bureau's conclusion that using administrative record would be a better option for producing block-level CVAP data for VRA enforcement as compared to the addition of a citizenship question to the census. Nov. 13 Trial Tr. at 890.

578.   All three analyses supported the conclusion that the addition of a citizenship question would have an adverse impact on self-response. PX-22 (AR); Nov. 13 Trial Tr. at 890-91.

579.   For unit self-response, the Census Bureau developed a cautious estimate that 5.1% of households with at least one noncitizen would not self-respond to the 2020 Census questionnaire because of a citizenship question.  PX-22 (AR); PX-297 at RFA 13; Nov. 13 Trial Tr. at 891-92.

580.   The 5.1 % estimate was derived by comparing 2010 ACS data, that was not adjusted or weighted, to 2010 Decennial Census data.  PX-22 (AR); PX-297 at RFA 14; Nov. 13 Trial Tr. at 891-92.

581.   The January 19 Memo find that it  "is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020

census modestly more burdensome in the direct sense and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households." PX-22 (AR); Nov. 13 Trial Tr. at 892.

582.   The 5.1% unit non-response estimate based on 2010 data represented a substantial increase from the 3.3% unit non-response estimate based on 2000 data, which reflects increasing non-response rates overall. PX-22 (AR); Nov. 13 Trial Tr. at 888.

583.   According to the Census Bureau, the 5.1% estimate is "conservative" because "the differences between citizen and noncitizen response rate and data quality will be amplified during the 2020 Census compared to historical levels. Hence the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census." PX-22 (AR).

584.   The Census Bureau has since updated this estimate to 5.8% in the so-called "Brown Memo" of August 6, 2018. PX-162  (AR); PX-297 at RFA 24; PX-22 (AR); Nov. 13 Trial Tr. at 895-96.

585.   The analysis of unit non-response data included in the January 19 Memo applies equally to Alternative B, the subject of the January 19 Memo, and Alternative D, the subject of the March 1 Memo. Nov. 13 Trial Tr. at 953.

586.   In the January 19 Memo, the Census Bureau also analyzed the item non-response rate on the citizenship question on the 2013-2016 ACS, comparing again non-citizen household against citizen households. PX-22 (AR); Nov. 13 Trial Tr. at 905-06, 910-911.

587.   For non-Hispanic whites, item non-response to the mail-in ACS ranged from 6.0% to 6.3% and item non-response to the internet ACS was 6.2%. PX-22 (AR); Nov. 13 Trial Tr. at 906.

588.    Item non-response rate on the citizenship question on for Hispanics ranged from 11.6% to

12.3% on mail-in ACS and 15.5% on the internet ACS. PX-22 (AR); Nov. 13 Trial Tr. at 906-

07.

589.    For non-Hispanic whites, there was little change in item non-response rates over time.

But, for Hispanics, the item non-response rates increased.  Nov. 13 Trial Tr. at 910.

590.    The January 19 memo also reported break-off rate data showing that the ACS citizenship

question was more sensitive for Hispanics than for non-Hispanic whites. Specifically, the

breakoff rate on the citizenship question on the 2016 ACS for Hispanics was 8 times that of non-

Hispanic whites. PX-22 (AR); Nov. 13 Trial Tr. at 914.

591.    Once 2017 ACS data became available, the Census Bureau further found that citizenship

question breakoff rate on the 2017 ACS for Hispanics was more than 12 times what it is for non-

Hispanic whites. PX-9 (AR); Nov. 13 Trial Tr. at 916-17.

592.    In light of the unit non-response, item non-response, and break-off rate evidence, the

Census Bureau concluded that Hispanics will respond to a citizenship question at lower rates

than non-Hispanic whites.  Nov. 13 Trial Tr. at 917-18.

593.    Dr. Abowd testified that insofar as the Hispanic population is correlated to the non-citizen

population, the Hispanic population will respond to a citizenship question as lower rates than the

non-Hispanic population.  Nov. 13 Trial Tr. at 917-920.

594.    Dr. Abowd testified that the Hispanic population is "highly correlated" to the non-citizen

population. Nov. 13 Trial Tr. at 920.

595.    In the January 19 Memo, the Census Bureau also concluded that adding a citizenship

question to the 2020 Decennial Census would lead to major potential quality and cost

disruptions. PX-22 (AR); PX-297 at RFA 8, 16; Nov. 13 Trial Tr. at 950-52.

596.   In the January 19 Memo, the Census Bureau concluded that the addition of a citizenship question on the 2020 Decennial Census would increase the cost of the 2020 Decennial Census by at least $27.5 million. PX-22 (AR); PX-297 at RFA 15; Nov. 13 Trial Tr. at 951.

597.   The January 19 Memo describes the estimate of $27.5 million as "conservative" and a "lower bound estimate." PX-22 (AR); Nov. 13 Trial Tr. at 951.

598.   The January 19 Memo cost estimates are conservative because "the differences between citizen and noncitizen response rate and data quality will be amplified during the 2020 Census compared to historical levels." Nov. 13 Trial Tr. at 952.

599.   Moreover, the January 19 Memo cost estimates do not account for increased communications costs. Nov. 13 Trial Tr. at 952.

600.   At trial, Dr. Abowd testified that the Census Bureau's current best conservative estimate of increased costs associated with the addition of a citizenship question is now $82.5 million. Nov. 14 Trial Tr. at 1249-50.

601.   In contrast to this figure, the January 19 Memo concluded that using administrative records would only cost between $500,000 and $2,000,000. PX-22 (AR).

602.   In the January 19 Memo, the Census Bureau concluded that addition of a citizenship question to the Decennial Census would increase respondent burden. PX-22 (AR); PX-297 at RFA 9; Nov. 13 Trial Tr. at 892.

603.   In the January 19 Memo, the Census Bureau concluded that addition of a citizenship question to the Decennial Census harm the quality of the census count. PX-22 (AR); PX-297 at RFA 10; Nov. 13 Trial Tr. at 952-53.

604.   The reduction in data quality largely comes from the fact that more response will be acquired through NRFU, which produces a lower quality count.  Nov. 13 Trial Tr. at 953.

605.   In the January 19 memo, the Census Bureau also concluded that addition of a citizenship question would result in substantially less accurate citizenship data than are available from administrative sources. PX-22 (AR); PX-297 at RFA 11; Nov. 13 Trial Tr. at 952-3.

606.   Dr. Abowd and the Census Bureau determined that, for people whom the administrative records indicate are noncitizens, there is disagreement between the administrative records and the survey responses between 30 and 37 percent of the time. PX-22 (AR); Nov. 13 Trial Tr. at 956.  Dr. Abowd and the Census Bureau believe that in the case of such disagreements,  the administrative records are more likely to be correct. PX-22 (AR); Nov. 13 Trial Tr. at 956.

607.   The Census Bureau has no empirical basis to believe that noncitizens who respond to a citizenship question on the Census will respond more accurately than they do to the citizenship question on the ACS. Census Bureau 30(b)(6) (Abowd) Vol. I. (8/29/18) at 93:11-17; Nov. 13 Trial Tr. at 956-57.

608.   And, in fact, the Census Bureau believes that there are "definitely indications" that responses by noncitizens to a citizenship question on the 2020 Census will be less even accurate than they have historically been on the ACS. Census Bureau 30(b)(6) (Abowd) Vol. I. (8/29/18) at 93:18 - 94:7; Nov. 13 Trial Tr. at 957.

609.   If the Census Bureau utilized administrative records as recommended in Alternative C, the issue of responses that conflict with records would not be an issue, and the results would be more accurate. Nov. 13 Trial Tr. at 957-58.

610.   Moreover, the January 19 Memo concluded that many noncitizen households would require six or more NRFU visits. PX-22 (AR); PX-297 at RFA 19.

### d.    35 Questions from Commerce and Commerce's Edits to Question 31

611.    Following the January 19 Memo, senior aides to Secretary Ross including Mr. Comstock, Mr. Ulthmeier, and Mr. Langdon developed a set of 35 questions for the Census Bureau to answer about the January 19 analysis. PX-545 (AR); Nov. 13 Trial Tr. at 1004: 19-25.

612.    These questions covered overall inquiries as well as questions directed to each of the three Alternatives addressed in the January 19 Memo. PX-545 (AR).

613.    On January 29, 2018, Secretary Ross sent an email to Ms. Teramoto alone with the subject "Census" and asked, "Please arrange a quick update for me tomorrow." PX-56 (AR).

614.    The set of 35 questions was sent to the Census Bureau on January 30, 2018.  PX-545 (AR).

615.    The Census Bureau responded to these questions through Dr. Abowd and Mr. Reist. Nov. 13 Trial Tr. at 1005.

616.    The Census Bureau provided responses to these questions on a running basis. Nov. 13 Trial Tr. at 1005:8-22.

617.    Dr. Abowd testified that he maintained the "control" or "master" copy of the responses to these questions that represent the final and official position of the Census Bureau, as Dr. Abowd understood them. Nov. 13 Trial Tr. at 1010-11.

618.    Mr. Reist provided an initial set of responses to Earl Comstock on February 2, 2018, noting that some following up was being requested for the Question 30. PX-42 (AR); PX-43 (AR).

619.    Commerce requested clarifications and changes to some of these questions in an iterative process. Nov. 13 Trial Tr. at 1013-14; PX-14 (AR).

620.   Dr. Abowd provided a final set of responses with his memorandum of March 1, 2018. PX-132 (AR).

621.   In response to these questions, the Census Bureau indicated, in response to Question 10, that the increased burden on the NRFU process as a result of adding a citizenship question would be a "significant concern" because "it gives rise to incremental NRFU cost of at least $27 million," that that figure was a "lower bound," and that the increased follow-up costs of households affected by a citizenship question would be greater than average "because these households overwhelmingly contained at least one non-citizen and that it is one of our acknowledged hard-to-count subpopulations." PX-23 (AR); PX-43 (AR); PX-132 (AR).

622.   The Census Bureau staff further stated, in response to Question 13, that they were "confident that Alternative C is viable and that we have already ingested enough high-quality citizenship data from SSA and IRS." PX-23 (AR); PX-43 (AR); PX-132 (AR).

623.   Although some of the Census Bureau answers were then revised in various ways, these two conclusions were never revised. PX-23 (AR); PX-43 (AR); PX-132 (AR); Kelley Dep. at 229:18-233:5, 233:11-235:2.

624.   However, in the case of one question (Question 31), senior aides to Secretary Ross replaced the answer provided by Census Bureau experts and approved by Dr. Abowd. Park-Su Dep. at 142:6-21; Nov. 13 Trial Tr. at 1006-14.

625.   Question 31 asked: "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?" PX-23 (AR); PX-43 (AR); PX-132 (AR); PX-140 (AR).

626.   Victoria Velkoff, Chief of the American Community Survey Office at the U.S. Census Bureau, originally drafted an answer to this question on behalf of the Census Bureau, which

stated, "The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation" and went on to describe the "formal process for making content changes" laid out by the Census Bureau and the Office of Management and Budget. PX-43 (AR); PX-132 (AR); PX-140 (AR); PX-4 at AR 7644 (AR).

    a.    The first step in the formal process is that "federal agencies evaluate their data needs and propose additions or changes to current questions through OMB." PX-140 (AR).

    b.    The next step is that "[i]n order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations." PX-140 (AR).

    c.    The next step is that "[f]inal proposed questions result from extensive cognitive and field testing to ensure they result in proper data, with an integrity that meets the Census Bureau's high standards." PX-140 (AR).

    d.    The next step is that the "process includes several opportunities for public comment." PX-140 (AR).

    e.    The next step is that "the final decision is made in consultation with OMB." PX-140 (AR).

627.    The description of the "well-established" process in the Census Bureau's response to Question 31 is consistent with other Census Bureau documents describing the process to add a

question or change the content of the Decennial Census.  PX-4 at AR 9687, AR 3890, AR 3560 (AR); PX-271.

628.    The Census Bureau's final version of Question 31 was transmitted to the Department of Commerce on March 1, 2018. PX-132 (AR); Nov. 13 Trial Tr. at 1012:13-1014:13.

629.    The Census Bureau's final version of Question 31 contained the steps listed above. PX-132 (AR); Nov. 13 Trial Tr. at 1006:20-1007:6.

630.    Commerce Department personnel revised the language of Question 31. PX-14 (AR); Park-Su Dep. at 142:6-21.

631.    The Commerce Department's revision to Question 31 was drafted by Deputy General Counsel Mike Walsh. PX-14 (AR); Park-Su Dep. at 142:6-21.

632.    On February 23, 2018, Sahra Park-Su, former Senior Policy Advisor at the Department of Commerce, typed up Mr. Walsh's revision. PX-14 (AR); Park-Su Dep. at 142:19-143-1.

633.    The answer to Question 31, as revised by Mr. Walsh and Ms. Park-Su read: "No new questions were added to the 2010 Decennial Census, so there is no recent precedent for considering a request to add questions to a Decennial Census. Consistent with longstanding practice for adding new questions to the ACS survey, the Census Bureau is working with relevant stakeholders to ensure that legal and regulatory requirements are fulfilled and that the question would produce quality, useful information for the nation. As you are aware, that process is ongoing. Upon its conclusion, you will have all of the relevant data at your disposal to make an informed decision about the pending request from the Department of Justice."  PX-14 (AR).

634.    The final version of the response to Question 31 included in the original administrative record was further modified to contains the following language: "Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound

by past precedent when considering the Department of Justices' request. Rather, the Census

Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements

are filled and that questions will produce quality, useful information for the nation. As you are

aware, that process is ongoing at your direction." PX-23 (AR).

635.   Dr. Abowd did not receive, review, or approve either the Park-Su (PX-14 (AR)) or

administrative record (PX-23 (AR)) versions of the response to Question 31, and neither set of

language was incorporated into Dr. Abowd's "control" copy of the responses. Nov. 13 Trial Tr.

at 1010.

### e.      February 12 meeting

636.   Dr. Abowd discussed the January 19 Memo with Secretary Ross and others at a meeting

on February 12, 2018. PX-4 at AR 9450 (AR); Nov. 13 Trial Tr. at 883, 922.

637.   In anticipation of the February 12 Meeting with Secretary Ross, Dr. Abowd had a pre-

meeting with Undersecretary Kelley early the same day. Nov. 13 Trial Tr. at 883.

638.   During that meeting Dr. Abowd discussed the January 19 Memo with Undersecretary

Kelley and others and expressed the views summarized by the January 19 Memo. Nov. 13 Trial

Tr. at 883.

639.   Undersecretary  Kelley expressed no disagreement with Dr. Abowd and the Census

Bureau's evaluation summarized by the January 19 Memo at their February 12 Meeting. Nov. 13

Trial Tr. at 883.

640.   The meeting on February 12, 2018 was the only meeting between Secretary Ross and the

Census Bureau regarding this question. Nov. 13 Trial Tr. at 883-84.

641.   Dr. Abowd expressed the views of the Census Bureau experts, as captured by the January

19 Memo at his meeting with Secretary Ross on February 12, 2018. PX-3 at AR 9450; Nov. 13

Trial Tr. at 883, 922, 959, 1017.

642.    At the February 12, 2018 meeting, Secretary Ross requested a list of stakeholders to meet with, as well as a meeting "with [Young & Rubicam] to discuss how they would handle messaging if citizenship is on the form," as well as a copy of the advertisements used in the 2010 Census.  PX-4 at AR 9450 (AR).

643.    There is no evidence in the Administrative Record that Secretary Ross met with Young & Rubicam to discuss the public campaign.  PX-1 through PX-14 (AR).

644.    Following the February 12 meeting, Census personnel attempted to set up stakeholder meetings with supporters of adding a citizenship question. PX-3 at AR 9450 (AR); PX-70 (AR); PX-286 (AR).

645.    In February of 2017, Under Secretary Kelley worked with Director Jarmin to find individuals that were willing to express their support for adding a citizenship question to the Decennial Census. PX-70 (AR); PX-286 (AR); Kelly Dep. at 236:13-18.

646.    On February 13, 2018, Director Jarmin wrote to an individual at the American Enterprise Institute (AEI) that "We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking for someone thoughtful who can speak to the pros of adding such a question . . . ." PX-70 (AR).

647.    On the same day, Michael Strain of the AEI responded that "None of my colleages at AEI would speak favorably about the proposal." PX-70 (AR).

648.    On the same day, Director Jarmin wrote to Under Secretary Kelley that "Please see the thread below. Appears no one at AEI is willing to speak in favor of putting question on the 2020." PX-70 (AR).

649.   Director Jarmin later reported that Census Bureau personnel were unable to find any supporting organizations other than individuals associated with the Center for Immigration Studies and the Heritage Foundation.  PX-1 at AR 1206, 1261 (AR); PX-3 at AR 4849 (AR); PX-4 at AR 8325 (AR).

650.   At no point at the February 12 meeting or at any other team did the Secretary or the Commerce Department present any technical or scientific evidence contrary to that presented by the Census Bureau.  The evidence is that at no point did the Secretary or the Commerce Department have professional expertise regarding census matters independent from that of the Census Bureau. Comstock Dep. at 324:19–325:1; Park-Su Dep. at 57-58 (objection (vague) at 57:7); Jarmin Dep. (Docket No. 511-2) at 33-37, 59, 108 (objection (602) at 34:10-14).

### f.      March 1 Memo (PX-25, PX-132)

651.   After Dr. Abowd and the Census Bureau communicated the Census Bureau's views during the February 12 meeting, Secretary Ross directed the Census Bureau to consider of a fourth alternative—Alternative D. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 965.

652.   On March 1, 2018, Dr. Abowd sent an additional recommendation memorandum through Mr. Lamas, Director Jarmin, and Undersecretary Kelley to Secretary Ross (hereinafter "March 1 Memo"). PX-25 (AR); PX-132 (AR).

653.   The March 1 Memo analyzed "Alternative D" and the weaknesses in Alternative C on its own, at the request of Secretary Ross. PX-25 (AR); PX-132 (AR).

654.   In the March 1 Memo, the Census Bureau continued to recommend against addition of a citizenship question. PX-25 (AR); PX-132 (AR).

655.   The March 1 Memo also provides a final set of the Census Bureau's responses to the set of 35 questions posed by Secretary Ross and Mr. Comstock with input from Mr. Uthmeier and Mr. Langdon. PX-25 (AR); PX-132 (AR).

656.   In the March 1 Memo, the Census Bureau concludes that, "Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce." PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 967.

657.   Specifically, the Census Bureau professionals stated that "inclusion of a citizenship question on the 2020 Census Questionnaire is very likely to reduce self-response rate, pushing more households into Nonresponse Follow-up (NRFU).  Not only will this likely lead to more incorrect enumerations, but it is expected to increase the number of persons who cannot be linked to the administrative data because NRFU PII is lower quality than self-response data." PX-25 (AR); PX-132 (AR).

658.   The memorandum stated that such an alternative "would result in poor quality citizenship data than Alternative C," which uses administrative records but without any additional citizenship question.  PX-25 (AR); PX-132 (AR).

659.   In part, this is due to the "suspect quality" of any survey data gathered by a citizenship question to the Decennial Census. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 974.

660.   In contrast, the Census Bureau considers the administrative data on citizenship that has already been accumulated to be "high quality." Nov. 13 Trial Tr. at 974.

661.   In part, this is also due to the fact that a greater number of individuals' responses would need to be modeled and imputed, due to a lower overall response rate. PX-25 (AR); PX-132 (AR); Nov. 13 Trial Tr. at 974-75.

662.   The memorandum of the Census Bureau professionals further stated that Alternative D "would still have all the negative cost and quality implications of Alternative B [adding the

question] outlined in the draft January 19, 2018 memo to the Department of Commerce." PX-25 (AR); PX-132 (AR).

663.    Under Secretary Kelley was not aware of any memorandum authored by the Census Bureau concerning the issue of adding a citizenship question after March 1, 2018, but before the issuance of Secretary Ross' decision on March 26, 2018. Kelley Dep. at 258:8-12.

**g.      Alternative C v. Alternative D Key Differences Memo (PX-24)**

664.    Census Bureau professionals expounded upon the differences between Alternative C and Alternative D in a further memorandum titled, "Summary of Analysis of the Key Differences Between Alternative C and Alternative D," with a focus on data quality issues. PX-24 (AR); Nov. 13 Trial Tr. at 278.

665.    This memorandum contains analysis that in comparison to Alternative C, Alternative D will lead to a larger number of people for whom the Census cannot match an administrative record and whose answers must be produced by a model. PX-24 (AR). Nov. 13 Trial Tr. at 981.

666.    Further, the memorandum explains: "Under Alternative C, there will be error in the administrative records, but we believe these to be relatively limited dues to the procedure following by SSA, USCIS and State. In both Alternative, the modeled cases will be subject to prediction error. ... Alternative D has an additional source or error, response error. This is where 2020 respondent give the incorrect status. Statisticians often hope these error are random and cancel out. However, we know from prior research that citizenship status responses are systematically biased for a subset of noncitizens. Response error is only an issue in alternative D." PX-24 (AR).

667.    The Census Bureau maintains that data quality is better under Alternative C and therefore, a higher number of individuals could be linked to more reliable administrative records. PX-24 (AR); Census Bureau 30(b)(6) (Abowd) Vol. II. (10/5/18) at 418:4-11; Nov. 13 Trial Tr. at 981.

668.    The Census Bureau concluded that, under Alternative D, for the group of 22 million

people for which the Census Bureau has both a response and administrative records, but they do

not match, the citizenship data will be less accurate than under Alternative C, due to response

errors. PX-24 (AR); Census Bureau 30(b)(6) (Abowd) Vol. II. (10/5/18) at 419:12-16; Nov. 13

Trial Tr. at 981.

669.    For 90.4% of the population, Alternative D will provide no improvement to the citizenship

data available under Alternative C. PX-24 (AR); Nov. 13 Trial Tr. at 980.

670.    Further, for 6.7% of the population, Alternative D will produce lower quality data than

Alternative C because the Census Bureau would have to use survey responses that are, generally

speaking, less accurate than the imputation methods the Census Bureau would deploy under

Alternative C. PX-24 (AR); Nov. 13 Trial Tr. at 984.

671.    And finally, for 2.9% of the population, Alternative D creates a problem that does not

exist under Alternative C, where survey and administrative data conflict as to citizenship and the

Census Bureau has no current plans to resolve that conflict. PX-24 (AR); Nov. 13 Trial Tr. at

984.

     **I.**      **Department of Commerce and Department of Justice Discussed the Addition
of a Citizenship Question with Outside Stakeholders (January 2018 –
February 2018)**

672.    On January 4, 2018, Arturo Vargas of NALEO Educational Fund sent a letter to

Undersecretary Kelley and Director Jarmin, to which Director Jarmin responded on the same

day. PX-1 at AR 778-779, AR 1213 (AR).

673.    Mr. Vargas asked to speak with the Under Secretary about NALEO's concerns with

DOJ's request.  PX-1 at AR 778-779, AR 1213 (AR).

674.  Director Jarmin responded that the Census Bureau would review the request and explore

options that do not require adding questions to the census, on an expedited basis. PX-1 at AR

778-779, AR 1213 (AR).

675.  On January 5, 2018, Senators Feinstein, Carper, Schatz, Cortez Masto, and Harris wrote to

Secretary Ross.  PX-1 at AR 780 (AR).

676.  After reminding Secretary Ross that the GAO report has put the 2020 Decennial Census

on its list of high risk projects and the fact that the Census Bureau lacks a permanent director,

Senators Feinstein, Carper, Schatz, Cortez Masto, and Harris advised Secretary Ross, "The

DOJ's request to include a question on citizenship in the 2020 Census dramatically increase our

concerns about the already troubled census. Such a question would likely depress participation in

the 2020 Census from immigrants who fear the government could use the information to target

them. It could also decrease response rates from U.S. citizens who live in mixed-status

households, and who might fear putting immigrant family members at risk through providing

information to the government … This chilling effect could lead to broad inaccuracies across the

board, from how congressional districts are drawn to how government funds are distributed.

Rather than preserve civil rights, as the Justice Department claims, a question on citizenship in

the decennial census would very likely hinder a full and accurate accounting of this nation's

population" PX-1 at 780-81 (AR).

677.  Also on January 5, 2018, the American Sociological Association wrote to Secretary Ross

to strongly urge him to reject DOJ's proposal to add a citizenship question.  PX-1 at AR 787

(AR).

678.  The American Sociological Association's letter advised, "Should such a proposal be

favorably received, the integrity of the 2020 Census data will be fundamentally compromised.

Including a citizenship question is likely to keep some people from responding to the questionnaire and others from responding truthfully, thereby undermining the accuracy of the data. In addition, there is no longer time to properly test a new question. As you know, creation of the questionnaire is a complex process that requires years of evaluation. With little time left before the 2020 launch, a new question could not be subject to standard rigorous testing, which would further undermine the quality of the data." PX-1 at AR 787 (AR).

679.    On January 9, 2018, members of the Census Scientific Advisory Committee (CSAC) wrote to Attorney General Sessions, Mr. Gary, Secretary Ross, Director Jarmin, and Mr. Lamas. PX-1 at AR 794-95 (AR).

680.    The CSAC members wrote, "We hold the strong opinion that including citizenship in the 2020 Census would be a serious mistake which would result in a substantial lowering of the response rate." PX-1 at AR 794-95 (AR).

681.    CSAC's letter highlighted the following issue: "The United States Census has not encountered the problems with a high level of Census refusal that have been a problem in many other high income countries, including Germany. One reason is that in 2010 there were about 250,000 community partners who encouraged people in their communities to respond to the Census. It is expected that there will be a similar number of community partners for the 2020 Census. Adding a citizenship question to the main Census questionnaire is almost certain to jeopardize the cooperation of at least some community partners and lead to a lower response rate, hurting the reputation of the Census Bureau." PX-1 at AR 794-95 (AR).

682.    On January 10, 2018, The Leadership Conference on Civil and Human Rights sent a letter to Secretary Ross titled "Protect the Census: Oppose DOJ Request to Add a Citizenship Question to the 2020 Census." PX-1 at AR 798-800 (AR).

683.    The Leadership Conference wrote, "we urge you to reject the Department of Justice's untimely and unnecessary request for a new citizenship question on the 2020 Census, which would threaten a fair and accurate decennial census. Adding a new citizenship question to the 2020 Census would destroy any chance for an accurate count, discard years of careful research, and increase costs significantly." PX-1 at AR 798 (AR).

684.    The Leadership Conference also explained, "Adding a citizenship question to the 2020 Census would disrupt preparations at a pivotal point in the decade, undermining years of research and testing and increasing census costs significantly at a time when Congress has directed a less expensive enumeration. The Justice Department's request would literally would add billions of dollar's to the life-cycle cost of this census, without improving accuracy." PX-1 at AR 798 (AR).

685.    The Leadership Conference further stated, "The question is unnecessarily intrusive and will raise concerns in all households — native- and foreign-born, citizens and non-citizens — about the confidentiality of information provided to the government and how that information might be used. Moreover, there are many mixed status households in the United States, which include members who are both citizens and non-citizens with various legal statuses. Mixed-status and immigrant households will be especially fearful of providing information to the federal government in 2020, given the heightened climate of fear that anti-immigrant rhetoric and policies have created." PX-1 at AR 799 (AR).

686.    The Leadership Conference added, "In short, any effort to determine citizenship through the constitutionally required census would jeopardize the accuracy of the entire count, leaving public, private, and nonprofit decision-makers with bad information for all purposes, for the next 10 years. Further, such an effort is likely to shake public confidence in the narrow (though vital)

statistical objectives of the Census Bureau's work, damaging ongoing data collection efforts well into the future." PX-1 at AR 799 (AR).

687.    The Leadership Conference continued, "Finally, in addition to being untimely, the request is unnecessary. The Justice Department has never needed to add this new question to the decennial census to enforce the VRA before, so there is no reason it would need to do so now. Contrary to the Justice Department's letter, the Census Bureau has not included a citizenship question on the modern census 'short form,' sent to every household." PX-1 at AR 799 (AR).

688.    On January 17, 2018, Secretary Ross received a letter from numerous Members of Congress (hereinafter "January 17 House Letter"). PX-1 at AR 840 (AR).

689.    The January 17 House Letter advised, "The inclusion of citizenship questions in the census will suppress responses from minority communities who will fear reprisal against themselves or loved ones from revealing citizenship details. … In fact, in an amicus curiae brief in Evenwel v. Abbott, four former directors of the U.S. Census Bureau noted that asking about citizenship status 'would likely exacerbate privacy concerns and lead to more inaccurate responses from non-citizens worried about a government record of their immigration status...invariably lead[ing] to a lower response rate to the Census in general…'" PX-1 at AR 840-41 (AR).

690.    The January 17 House Letter continued by explaining that, "The resulting undercount will reverberate across the nation: from ensuring a fair distribution of congressional seats based on the census data to making certain that an accurate allocation of nearly $700 billion taxpayer funds for critical programs is made." PX-1 at AR 840-41 (AR).

691.   The January 17 House Letter also noted, "In addition to the problems described above, the inclusion of such a question so late in the process will not allow for necessary testing to correct wording problems." PX-1 at AR 840-41 (AR).

692.   On January 18, 2018, Secretary Ross received a separate letter from numerous Members of Congress urging Ross to reject the request to add a citizenship question (hereinafter "January 18 House Letter").  PX-1 at AR 908-09 (AR).

693.   The January 18 House Letter highlighted that, "Including a new question this late in the process allows no time for testing or the correction of wording problems, and only serves to increase the risk to a census that has already experienced massive cost increases and heightened levels of public mistrust." PX-1 at AR 908-09 (AR).

694.   The January 18 House Letter also highlighted that the trend of "'unprecedented' level[s] of concern regarding the confidentiality" of census data "suggest that the addition of a citizenship question could exacerbate confidentiality concerns and severely undermine accuracy and initial response levels. This, in turn, would increase the cost of the census by hundreds of millions of dollars in non-response follow-up, the most expensive component of the decennial census operation." PX-1 at AR 909 (AR).

695.   On January 23, 2018, the Population Association of American sent a letter to Secretary Ross opposing the addition of a citizenship question and reminded Secretary Ross that, "As you know, and as noted in the January 10 letter, questionnaire design and testing began nearly eight years ago. With less than two years before Census 2020, there is simply not enough time to responsibly craft and evaluate how a citizenship question would affect census participation. Further, we are concerned that adding a question, particularly one that could influence enhanced nonresponse follow up activity, will significantly increase the costs of the 2020 Census at a time

when Congress is already considering a request from the Administration to spend an estimated

additional $3 billion on the 2020 Census." PX-1 at AR 1053-54 (AR).

696.   On March 19, 2018 Secretary Ross received a letter from the Latino Community

Foundation, which "strongly urge[d Ross] to reject the inclusion of a citizenship question to the

2020 Census." PX-1 at AR 1222 (AR).

697.   The Latino Community Foundation explained, "Including a citizenship question to the

census will add to an extensive list of concerns that can and will suppress Latino participation.

Increased immigration enforcement, anti-immigrant rhetoric in our political discourse, and

privacy concerns have already meshed together to create a climate of fear and aversion of the

federal government. In fact, a recent poll commissioned by LCF showed that over 50% of

California's Latinos believe that their responses to the census might be shared with immigration

authorities." PX-1 at AR 1222 (AR).

698.   On January 26, 2018, Secretary Ross received a letter from six former Directors of the

Census Bureau concerning the possible addition of a citizenship question. PX-116 (AR).

699.   The former Directors stated that they were "troubled to learn that the Department of

Justice has recently asked the Bureau to add a new question on citizenship to the 2020 Census.

We are deeply concerned about the consequence of this possible action and hope that our

objective observations provide a useful perspective before final decision is made on this issue."

PX-116 (AR).

700.   The former Directors were also concerned that the addition of the question had not been

appropriately tested:  "There is a well-proven multi-year process to suggest and test new

questions.  We strongly believe that adding an untested question on citizenship status at this late

point in the decennial planning process would put the accuracy of the enumeration and success

of the Census in all communities at grave risk." PX-116 (AR).

701.   The former Directors further explained that, in their opinion, "it is highly risky to ask

untested questions in the context of the complete 2020 Census design.  There is a great deal of

evidence that even small changes in survey question order, wording, and instructions can have

significant, and often unexpected, consequences for the rate, quality and truthfulness of

response." PX-116 (AR).

702.   The former Directors further stated that in their opinion "the effect of adding a citizenship

question to the 2020 Census on data quality and census accuracy, therefore, is completely

unknown.  Also of import, overcoming unexpected obstacles that arise as 2020 Census

operations unfold would add to the cost, without assurances that such efforts would yield a more

accurate outcome." PX-116 (AR).

703.   On February 9, 2018, Secretary Ross received a letter from Senator Jack Reed arguing

that a citizenship question "could lead to fewer respondents and less precision" and that "a

Census question on citizenship is unnecessary as this information is already gathered through the

American Community Survey." PX-1 at AR 1086 (AR).

704.   Secretary Ross also received a February 14, 2018 letter from MinKwon Center on behalf

of Asian Pacific Americans Voting & Organizing to Increase Civic Engagement (APA VOICE),

PX-1 at AR 1150 (AR).

705.   The MinKwon Center's letter explained that, "[a]dding a citizenship question at this time

will negatively impact response rates and the accuracy among millions of United States

residents, whether they are lawful permanent residents, asylees, refugees, Temporary Protected

Status beneficiaries, visa holders, undocumented, or one of the 16.7 million people who have an

undocumented family member living with them. Census Bureau representatives conducting field tests have already reported unprecedented fear among respondents. Out of fear, distrust, and concern for how the data collected will be used and shared, test respondents have been reported being visibly nervous, providing incomplete or incorrect information about household members. Furthermore, as the 2020 Census topics were already submitted last March, introducing new topics this late in the process would add significant costs to an already constrained budget." PX-1 at AR 1150-51 (AR).

706.    Secretary Ross also received a letter from 10 Jewish Organizations on February 15, 2018. PX-1 at AR 1122 (AR).

707.    These Jewish organizations advised that, "If the Census Bureau were to grant the Department of Justice's request, it raises the likelihood of suppressing response rates from immigrant and other minority communities. From the ban on entry of immigrants from Muslim-majority countries to the termination of DACA, America's immigrant communities feel increasingly vulnerable. A new Census question about citizenship will raise fears about such information now or in the future being used against them or their loved ones. This will potentially lower Census response rates and undermine the Census's accuracy." PX-1 at AR 1122 (AR).

708.    The Jewish organizations' letter also highlighted that, "the federal government continues to conduct the American Community Survey to obtain estimates of the citizen population, the data from which has been deemed suitable for use in Voting Rights Act enforcement cases," while  "all questions that are included on the Census are carefully designed and tested to ensure that the data collected is accurate. Adding a question to the Census at this stage of the planning

process would disrupt preparation and increase costs, in addition to threatening the accuracy of the data." PX-1 at AR 1122 (AR).

709. On March 20, 2018 Secretary Ross received another letter from three Members of Congress: Grace Meng, José E. Serrano and Carolyn B. Maloney. PX-1 at AR 1223 (AR).

710. Members Meng, Serrano, and Maloney explained that they represent New York City, which already has a substantial "hard to count" populations and has estimated substantial local undercounts in the past. PX-1 at AR 1223 (AR).

711. Members Meng, Serrano, and Maloney advised that adding a citizenship question to the Decennial Census "will result in depressed and inaccurate response rates, which could have a real and direct impact on the resources that New York City residents receive from the federal government over the next decade," and urged Secretary Ross to reject the proposed citizenship question. PX-1 at AR 1223 (AR).

712. On March 21, 2018 the Department of Commerce also received a letter from Gary Bass of the Bauman Foundation, on behalf of nearly 120 non-political organizations opposing the addition of a citizenship question to the 2020 Decennial Census. PX-1 at AR 1235 (AR).

713. On March 21, 2018 individuals representing Native American interests wrote to Secretary Ross and explained, "the addition of a citizenship question to the 2020 census form … would jeopardize the responses of hard-to-count communities, including those in Indian Country. We are informed that immigrants and minority groups are currently fearful for the security and safety of their families posed by the possibility of including a question on citizenship, which could have a very negative impact on the accuracy of the 2020 Census count (as highlighted by the Census Bureau at the Fall 2017 meeting of its National Advisory Committee on Racial, Ethnic and Other Population). We believe that a citizenship question would have a similar negative impact in

Indian Country, resulting in an undercount of American Indians and Alaska Natives in 2020 that surpasses their high undercount in 2010. Because of the lengthy and complicated history of discrimination against indigenous peoples in this country, American Indians and Alaska Natives share a strong distrust of non-tribal governments." PX-1 at AR 1239 (AR).

714.   On March 22, 2018, Secretary Ross received a letter from Constitutional Accountability Center, on behalf of several organizations such as Asian Americans Advancing Justice, NAACP Legal Defense and Education Fund.  PX-3 at AR 3605-06 (AR).

715.   The Constitutional Accountability Center's letter advised that, "A new, untested citizenship question would be an end-run around the Constitution's text, history, and values," and "Adding the new citizenship question proposed by the Department of Justice would undermine the Census Bureau's constitutional commitment to count all persons. It would also result in inaccurate data, thereby biasing congressional apportionment, redistricting, and funding decisions, for an entire decade, and producing harmful inequalities which would last even longer. Overwhelming evidence shows that this new question, if it becomes a part of the 2020 Census, will deter participation by immigrants across the country, who do not want an official record of their immigration status and fear that their responses will be used by the government to harm them and their families. The Census Bureau's own data demonstrates "an unprecedented groundswell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants." PX-3 at AR 3605-06 (AR).

716.   The Constitutional Accountability Center's letter further advised, "Adding a citizenship question to the 2020 Census-given the overwhelming evidence that it will chill participation and produce inaccurate responses-would break faith with the Constitution's mandate for a head count of the entire nation." PX-3 at AR 3605-06 (AR).

717.    The Constitutional Accountability Center's letter also advised, "Although the Department of Justice urges the addition of a citizenship question to the 2020 Census, it offers no reason to doubt what the latest Census Bureau data shows: asking all persons to divulge their citizenship status will chill participation by noncitizens and citizens alike and produce inaccurate data. Instead, the DOJ maintains that a new citizenship question will ensure better enforcement of the Voting Rights Act. This is false. Since the passage of the Voting Rights Act in 1965, the Census has never asked all persons to report their citizenship. In other words, a mandatory question on citizenship has never been necessary to ensure robust protection of the right to vote. That is just as true now as it was in 1965 when the Voting Rights Act was passed." PX-3 at AR 3605-06 (AR).

718.    Also on March 22, 2018, Secretary Ross received a letter from Ready Nation, a council of business leaders who wrote "to express our deep concern about the Department of Justice's request that the Census Bureau include an untested question about citizenship in the 2020 Census questionnaire" because "[t]he decennial Census provides critical data that informs decision-making in both the private and public sectors." PX-3 at AR 3608-09 (AR).

719.    The Ready Nation letter advised first that, "Adding a new question this late in the decennial Census process could reduce the accuracy of the 2020 Census. We know from the science of survey design that adding questions to an established questionnaire essentially creates a new questionnaire that needs to be validated. Every question and the order of questions affect how respondents answer the other questions. When a change is made to a standardized questionnaire that has already been tested, the reliability and validity of the questionnaire are potentially affected, requiring the survey to be retested." PX-3 at AR 3608-09 (AR).

720.    The Ready Nation letter also advised that, "Adding a new question would incur additional delays and costs, and waste taxpayer dollars that have already been spent on designing and planning the 2020 Census. The Census Bureau has completed its multi-year, multi-million-dollar research and testing phase for the 2020 Census, and its end-to-end test in Rhode Island is underway. And the schedule is already tight. Instead of spending more money and time on altering the questionnaire, additional taxpayer dollars would be better directed to addressing ongoing challenges around deploying mobile technology that will yield a more accurate Census." PX-3 at 3608-09 (AR).

721.    On March 23, 2018 Secretary Ross received a letter from various members of the scientific community include the Acting President of the Federation of American Scientists, the Director of 2020 Census Counts, and the President of the American Political Science Association.  PX-1 at AR 1269-70 (AR).

722.    The March 23 letter provided the following: "This request is ill-conceived for a number of reasons. We have more accurate methods for measuring and studying non-citizenship, for example through anonymous surveys. Imposing a citizenship question would lead to a lower participation rate and substantial undercount of certain geographic regions and demographic populations, undermining the scientific integrity of the entire project." PX-1 at AR 1269 (AR).

723.    The March 23 letter further reminded Secretary Ross that, "[p]reliminary focus groups and interviews with Census field representatives have already shown that greater fears of deportation, threats of a "Muslim ban," and the termination of the DACA program are exacerbating already high non-response rates among historically undercounted populations. The potential for an increased undercount would have far reaching consequences." PX-1 at AR 1269 (AR).

724.   Secretary Ross also received various letters throughout the process from elected officials

and associations at other levels of government, opposing the proposed addition of a citizenship

question.  *See e.g.*, PX-1 at AR 1073, AR 1082, AR 1090 (AR).

## IV.   THE MARCH 26 DECISION MEMO

725.   On March 26, 2018, Secretary Ross sent a memorandum to Undersecretary Kelley titled

"Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire."

Secretary Ross concluded in the memorandum that the Census Bureau should add a citizenship

question to the 2020 Decennial Census. PX-26 (AR).  As discussed below, the decisionmaking

process departed significantly from normal Census Bureau processes.  And the March 26 memo

is rife with misstatements and material omissions.

### A.   Political Interference in the Decision to Add a Citizenship Question

726.   A federal statistical agency such as the Census Bureau should follow the principle that it is

independent from political or other undue external influences. PX-355 (AR).

727.   Dr. Abowd testified that "a process where an agency makes a request to the Census

Bureau for data to be collected through the census, but then refuses to meet to discuss the

technical aspects of that data request" is very problematic with respect to that principle. Nov. 14

Trial Tr. at 1266.

728.   Dr. Abowd testified that the aspect of the process leading up to the decision to include a

citizenship question where DOJ was directed by the Attorney General not to meet with the

Census Bureau constituted "political influence" on the process. Nov. 14 Trial Tr. at 1267:20-

1268:4.

729.   Mr. Thompson testified that in his experience as the former Director of the Census Bureau

and a career employee of the Census Bureau for almost three decades, it is unprecedented for a

senior Department of Commerce official to dismiss a Census Bureau technical recommendation

based on extensive research without documenting a rationale for such an action. Thompson Aff. (Docket No. 516-1) at ¶ 92.

### B. Deviations from Census Bureau Standard Pre-Testing Processes in the Decision to Add a Citizenship Question

730.    Based on his extensive experience overseeing the Decennial Census and as Director of the Census Bureau, John Thompson testified that it is his opinion that the process for adding a citizenship question to the 2020 Decennial Census constituted a significant deviation from the Census Bureau's standard practices. Thompson Aff. ¶ 92.

731.    Both the Census Bureau and Dr. Abowd have a high opinion of Dr. Thompson and of his qualifications to offer an expert opinion in this case. Nov. 14 Trial Tr. at 1192.

732.    Mr. Thompson described the extensive and well-established testing processes the Census Bureau has developed in order to (a) properly assess proposed changes to the content of a Census Bureau questionnaire and (b) avoid the risk of undercount or introducing inaccuracies into the census data. Thompson Aff. ¶ 56; Nov. 9 Trial Tr. at 566.

733.    The Census Bureau does not have a manual for the precise testing that must be done to prepare for each Decennial Census. Nov. 9 Trial Tr. at 566.

734.    Instead, after each Decennial Census, the Census Bureau begins preparing for the next census by reviewing the previous census and requesting input from stakeholders on improvements that could be made. Following that process, detailed procedures for testing and evaluation for the next upcoming census are then drafted in order to account for issues specific to that census. Nov. 9 Trial Tr. at 578.

735.    In the decade before a Decennial Census, the Census Bureau conducts several large-scale tests, including contacting tens of thousands of addresses, to optimize the data collection procedures.  Nov. 5 Trial Tr. at 149:5-20.

736. Mr. Thompson also described the procedure that should be followed if a new question is proposed for the Decennial Census. First, the Census Bureau should determine whether the proposed question needs to be included on the Decennial Census. Thompson Aff. ¶ 57.

737. To do so, the Census Bureau should work with the Office of Management and Budget and with the Department of Commerce Office of General Counsel to determine whether the information from the proposed question should be collected from the Decennial Census questionnaire. Thompson Aff. ¶¶ 57-58.

738. Before a decision was made to add a citizenship question to the 2020 Decennial Census, the proposed citizenship question should have undergone an evaluation of the need for the data it will produce and a determination of whether that data can only be collected through the Decennial Census. PX-140 at AR 10901; PX- 359 at 10-11; Thompson Aff. ¶¶ 57-58; ; Habermann Aff. (Docket No. 498-11) at ¶ 24, 29, 35, 41; *see also* 13 U.S.C. § 6.

739. There is no evidence in the Administrative Record that the Census Bureau evaluated the need for the data or concluded such data collection was necessary before deciding to add a citizenship question to the 2020 Decennial Census.  PX-1 through PX-14 (AR).

740. Nor is there evidence in the Administrative Record that the Census Bureau met with DOJ to evaluate the need for data that would be produced by the addition of a citizenship question. PX-1 through PX-14 (AR).

741. Indeed, the Administrative Record reflects that DOJ refused to meet with the Census Bureau to discuss the need for a citizenship question to be included on the 2020 Decennial Census. PX-4 at AR 9074 (AR); Thompson Aff. ¶ 61; PX-297 at RFA 170, 171, 201; Habermann Aff. ¶ 41.

742.   Once the need for a new question has been established, a rigorous testing program of the proposed question should begin. Thompson Aff. ¶ 60.

743.   A citizenship question should have been pretested before a decision was made to add it to the 2020 Decennial Census. PX-260; PX-271; PX-364; PX-140 (AR); PX-134 (AR); PX-3 (AR); PX-4 3890, 9867 (AR); Thompson Aff. ¶¶ 43-96; Nov. 5 Trial Tr. at 169:19-23.

744.   There is no evidence in the Administrative Record that there was any pretesting of a citizenship question before a decision was made to add the question to the 2020 Decennial Census. PX-1 through PX-14 (AR); Thompson Aff. ¶ 55.

745.   There has been no pretesting of a citizenship question on the 2020 Decennial Census. Nov. 14 Trial Tr. at 1280:4-8; Thompson Aff. ¶ 77; Census Bureau 30(b)(6) Dep. Vol. I at 142:18-143:4; Habermann Aff. ¶¶ 56-58.

746.   The first step of this testing program is for experts in both subject matter and cognitive design to develop several reasonable alternatives for the proposed question wording. These experts help ensure that the Census Bureau has a clear understanding of the desired uses of the new data so that the new question can be worded to achieve the desired outcome. The subject matter experts usually consist of staff from both the Census Bureau and the requesting agency. Thus a citizenship question should have undergone this cognitive testing before the decision was made to add it to the 2020 Decennial Census. Thompson Aff. ¶ 60, 72; Habermann Aff. ¶¶ 56-58; PX-140 (AR); PX-260; PX-271.

747.   The second step of this testing program is to design the entire questionnaire. Assessment of the potential questionnaire design should take into account the order in which the questions will appear and the length of the questionnaire because any given individual question may take on added significance in a shorter questionnaire. Assessment of the potential questionnaire

should also take into account the interaction between questions on the questionnaire and whether the wording of the question to be added is consistent with the instrument on which it is to be included. Thompson Aff. ¶ 63, 65, 67.

748. If there is not consistency between the wording of a question and the purpose of the instrument in which it is found, respondents may question the instrument's or question's purpose and their response rate can be impacted. Nov. 5 Trial Tr. at 162-163.

749. For example, if the purpose of a citizenship question on the Decennial Census is to determine a person's citizenship status, respondents may question why it is necessary to differentiate, as the proposed citizenship question does, between citizens born in Puerto Rico and those born in other parts of the United States. Nov. 5 Trial Tr. at 152-153; Thompson Aff. ¶ 69.

750. This cognitive testing is also essential in order to ensure that the final question is worded in such a way as to produce the desired data. Thompson Aff. ¶ 60; Habermann Aff. ¶ 57. *See generally* PX-260, PX-364.

751. The next step of this testing is for cognitive survey methodology experts to conduct facilitated focus group studies to examine how potential respondents react to each of the alternative questions. These cognitive testing focus groups are intended to determine whether respondents understand the questions and are providing accurate answers, and whether questions are worded or ordered in such a way that they will lead respondents to not respond either to certain questions or to the entire questionnaire. Thompson Aff. ¶¶ 72, 74; Habermann Aff. ¶¶ 57-58.

752. This focus group testing should test the entire questionnaire and the sequence in which the questions will be asked and be conducted with a representative sample of the population of the United States. Thompson Aff. ¶ 73, 75.

753.   Focus group testing is crucial because it will give an indication if questions are worded or ordered in such a way that they will lead respondents to not respond either to certain questions or to the entire questionnaire, which could in turn result in an undercount. Thompson Aff. ¶ 74.

754.   Focus group testing is particularly important in light of Census Bureau research that indicates growing concerns that respondents have with privacy, confidentiality and government surveys. Thompson Aff. ¶ 78.

755.   There is no evidence in the Administrative Record that there was any cognitive testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census questionnaire. PX-1 through PX-14 (AR); Thompson Aff. ¶ 78.

756.   There was no cognitive testing of a citizenship question prior to the decision to add it to the 2020 Decennial Census. Thompson Aff. ¶¶ 60, 71, 77; Nov. 13 Trial Tr. at 997; Habermann Aff. ¶ 13.

757.   This failure to propose and test reasonable alternative questions is contrary to the Census Bureau's standard practices for considering new questions. Thompson Aff. ¶ 71; Habermann Aff. ¶¶ 42, 59, 63.

758.   After alternative question wording is drafted and tested through focus groups, a comprehensive field testing program should then test the entire proposed Decennial Census questionnaire, including the proposed new question, in order to test the effect of the question in the context of the entire questionnaire. Thompson Aff. ¶ 62.

759.   A citizenship question should have been field tested as a part of the entire Decennial Census questionnaire before the decision was made to add it to the 2020 Decennial Census. PX-271; PX-134 at 9865 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3891, 9867 (AR); Thompson Aff. ¶ 79.

760. This field testing should have been conducted with a sample that simulates to the greatest possible extent a Decennial Census environment, including a sufficient number of observations to assess potential effects on hard to count populations, and in such a way that the alternative questionnaires were administered to the sample households in a manner that replicates, to the greatest extent possible, the way in which the Decennial Census will be conducted. Thompson Aff. ¶ 80-81; Habermann Aff. ¶ 68.

761. There is no evidence in the Administrative Record that there was any field testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

762. The Census Bureau never conducted any field testing analyzing the effect of a citizenship question on the 2020 Decennial Census. Census 30(b)(6) Dep. Vol. I. at 27; Nov. 5 Trial Tr. at 157; Nov. 13 Trial Tr. at 997-98.

763. After the Census Bureau field tests a new question, it should re-interview either all, or at least a subsample of, the respondents who completed the sample questionnaires to determine whether respondents provided accurate answers. Thompson Aff. ¶ 82.

764. These re-interviews are of critical importance to designing and testing a citizenship question for the Decennial Census because between 28 and 34 percent of non-citizens report themselves as citizens when responding to the citizenship question included on the ACS questionnaire. Thompson Aff. ¶ 82; PX-22 at AR 1284.

765. There is no evidence in the Administrative Record that there were any interviews of respondents who participated in field testing of a potential citizenship question before a decision was made to add a citizenship question to the 2020 Decennial Census. PX-1 through PX-14 (AR); Thompson Aff. ¶ 83-84.

766.   A new question added to the 2020 Decennial Census should have been tested in the context of the entire 2020 Decennial Census questionnaire. Thompson Aff. ¶ 62;  Nov. 9 Trial Tr. at 736.

767.   There is no evidence in the Administrative Record that there was any testing of a citizenship question in the context of the full 2020 Decennial Census questionnaire before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

768.   The Census Bureau never conducted any testing of a citizenship question within the context of the entire 2020 Decennial Census questionnaire. Nov. 5 Trial Tr. at 156; Nov. 9 Trial Tr. at 736; Nov. 13 Trial Tr. at 997 -98.

769.   Every cycle of Decennial Census pre-testing culminates with end-to-end census tests (typically there are three); these are a comprehensive field test or "dress rehearsal" of the actual Decennial Census and encompass every stage of the census count. Nov. 5 Trial Tr. at 155.

770.   The peak operations portion of the end-to-end test is intended to include all aspects of the planned Decennial Census, "as a way to make sure that all the operations are in place, all of the —everything is being tested out in the field." Nov. 5 Trial Tr. at 155; Nov. 14 Trial Tr. at 1096.

771.   The 2018 end-to-end test was "planned to test and validate 2020 operations, procedures, systems, and infrastructure together."  PX-406 at 54.

772.   In 2018, there was a single end-to-end test, conducted in Rhode Island. Nov. 5 Trial Tr. at 156.

773.   A new question added to the 2020 Decennial Census questionnaire should have been part of the 2018 end-to-end test in order to be adequately tested prior to the 2020 Decennial Census. Nov. 5 Trial Tr. at 149.

774.   The Census Form for the 2018 end-to-end did not include a citizenship question. Census Bureau 30(b)(6) Dep. Vol. I. Dep. at 225.

775.   A citizenship question was not included in the end-to-end test to prepare for the 2020 Decennial Census. Nov. 13 Trial Tr. at 998; Nov. 5 Trial Tr. at 156; Census Bureau 30(b)(6) Dep. Vol. I. at 225; Nov. 13 Trial Tr. at 998:4-11.

776.   A citizenship question added to the 2020 Decennial Census should have undergone randomized controlled trial (RCT) testing to determine the effect of the addition of a citizenship question to the 2020 Decennial Census. PX-162 at 39; Census Bureau 30(b)(6) Dep. Vol. II. at 430; Nov. 13 Trial Tr. at 923.

777.   There is no evidence in the Administrative Record that there was any RCT testing of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

778.   A citizenship question on the 2020 Decennial Census was never the subject of RCT testing. 30(b)(6) Dep. Vol. II. at 427; Nov. 13 Trial Tr. at 925.

779.   The analysis of the results of any pre-testing of a new question to be added to a Decennial Census should be discussed with the Census Bureau advisory committees, the Office of Management and Budget ("OMB"), and outside researchers with expertise in questionnaire design and in the subject matter area related to the new questionnaire.  These consultations should happen before a final decision is made to add the question to the Decennial Census questionnaire. PX-140 (AR); PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR); Thompson Aff. ¶ 85; Habermann Aff. ¶ 35, 36, 42-46.

780.   Without these discussions there is a significant risk that the resulting data from the proposed new question will not meet the intended need. Thompson Aff. ¶ 87; Habermann Aff. ¶ 35.

781.   Mr. Thompson testified that, following consultation with outside groups and experts, under standard Census Bureau procedures, the Census Bureau would then make a recommendation to the Department of Commerce on whether or not to proceed with the new question on the Decennial Census. Thompson Aff. ¶ 88.

782.   There is no evidence in the Administrative Record that there was any discussion of a citizenship question with Census Bureau advisory committees, the Office of Management and Budget, or outside researchers before Secretary Ross made the decision to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

783.   A new question added to the 2020 Decennial Census should have been noticed for public comment before the decision was made to add it to the Decennial Census. PX-140 (AR); PX-134 (AR); PX-3 at AR 3560 (AR); PX-4 at AR 3890, 9867 (AR).

784.   There is no evidence in the Administrative Record that the Census Bureau noticed a citizenship question for public comment before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14.

785.   There was never any opportunity for public comment on the addition of a citizenship question on the 2020 Decennial Census prior to the Secretary's decision to add the question to the 2020 Decennial Census.

786.   If there are any questions about whether a certain process or methodology is consistent with Census Bureau Quality Standards, one option is to consult Census Quality Program staff for guidance on how to proceed. Nov. 14 Trial Tr. at 1283.

787.    There is no evidence in the Administrative Record that Census Quality Program staff were consulted regarding the addition of a citizenship question before a decision was made to add it to the 2020 Decennial Census. PX-1 through PX-14 (AR).

788.    In fact, Quality Program staff were never consulted with respect to the addition of a citizenship question to the 2020 Decennial Census. Nov. 14 Trial Tr. at 1284.

### C.    The March 26 Memo Was Prepared Without Adequate Consultation of Census Bureau Officials

789.    James Uthmeier and Earl Comstock took the lead on drafting the original version of the March 26 Ross Memorandum.  Comstock Dep. at 242-43.

790.    Senior political appointees at DOJ (including Mr. Shumate, Chad Readler, and Hashim Mooppaan) reviewed and commented on multiple drafts of the March 26 memo prior to its issuance.  PX-3 at AR 2036-37, 3669 (AR), PX-4 at AR 11253, 11294-295, 11325 (AR), COM_DIS 17064-065, COM_DIS 17066-67, 17133. All of these documents were withheld as privileged.

791.    Undersecretary Kelley testified she did not substantially participate in the drafting of the March 26, 2018 memorandum.  Kelley Dep. at 68-69.

792.    Census Bureau professionals were only allowed to review the March 26 decisional memorandum to assure that information about the Census Bureau was technically correct; Census Bureau professionals did not make substantive changes. Jarmin Dep. (Docket No. 511-3) at 169, 173.

793.    Neither Undersecretary Kelley nor Census Bureau professionals made any substantive changes to the March 26 decisional memorandum. Kelley Dep. at 69; Jarmin Dep. (Docket No. 511-3) at 169, 173.

### D. Secretary Ross' Congressional Testimony Just Prior to the Decisional Memo (March 2018)

794.    Secretary Ross testified before the House Appropriations Committee on March 20, 2018. PX-491.

795.    Congressman José E. Serrano asked Secretary Ross, ". . . Has the President or anyone else in the White House directed you to add this or a similar question to the 2020 Census?"  Secretary Ross responded that the Department of Commerce was "responding solely to Department of Justice's request." PX-491.

796.    On the same day, Representative Grace Meng asked Secretary Ross if "the President or anyone in the White House discussed with you or anyone on your team about adding the citizenship question?" PX-493.  Secretary Ross replied "I am not aware of any such." PX-493.

797.    Two days later, on March 22, 2018, Secretary Ross testified before the House Ways and Means Committee. PX-480.

798.    Congresswoman Judy Chu asked if Secretary Ross could tell her "whether the Department of Commerce plans to include the citizenship question in the 2020 Census?"  Secretary Ross responded that the "Department of Justice, as you know, initiated the request for the inclusion of the citizenship question" to the Decennial Census. PX-480.

799.    During each of these exchanges, Secretary Ross did not mention that he requested that DOJ send a letter requesting the addition of a citizenship question on the 2020 Census.  PX-2; PX-491; PX-492; PX-493; PX-494; PX-537.

### E.    The Conclusions in the Decisional Memorandum

#### 1.    Statements Concerning the Genesis of a Citizenship Question

800.    Secretary Ross stated in his March 26, 2018 Decisional Memorandum, that "the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census." PX-26 (AR).

801.    In his March 26 memo, Secretary Ross wrote that "following receipt of the DOJ request, I set out to take a hard look at the request and ensure I considered all facts and data relevant so that I could make an informed decision.  To that end, the Department of Commerce immediately initiated a comprehensive review process led by the Census Bureau." PX-26 (AR).

802.    Contrary to the statements in his March 26 memo:

a.    Secretary Ross had personally sought the addition of a citizenship question months prior to the DOJ request and had directly asked that DOJ request the addition of a citizenship question. PX-2 (AR); PX-88 (AR); PX-55 (AR); PX-537 (AR); PX-58 (AR); PX-298(R) at RFA 62; Teramoto Tr. at 28–32; Comstock Tr. at 145–46.

b.    Prior to Secretary Ross's efforts, DOJ had not requested addition of a citizenship question or block-level citizenship voting age population (CVAP) data to enforce the VRA. PX-298(R) at RFA 66, 100.

c.    Secretary Ross's consideration of a citizenship question did not commence "following receipt of the DOJ request," but rather started almost ten months earlier.  PX-2 (AR); PX-55 (AR); PX-58 (AR); PX-19 (AR).

d.    The Department of Commerce did not "initiate a comprehensive review . . . Following receipt of the DOJ request"; the review of this issue by Ross's senior aides started well in advance of the DOJ request.  *See* PFOF III.C.

e.      The review process was not "led by the Census Bureau," nor did Secretary Ross
meet "with Census Bureau leadership on multiple occasions to discuss their
process for reviewing the DOJ request, their data analysis, my questions about
accuracy and response rates, and their recommendation."  Rather, Secretary Ross
made his decision based on minimal contact with Census Bureau leadership and
experts during the review process (limited to one meeting on February 12), and
dismissed the repeated admonition that adding a citizenship question was "very
costly, harms the quality of the census count, and would use substantially less
accurate citizenship status data than are available from administrative sources."
PX-22 (AR); PX-25 (AR); PX-3 at AR 9450 (AR); Nov. 13 Trial Tr. at 883-884.

2.      Statements Concerning the Secretary's Process

803.   Secretary Ross did not take a "hard look at the [DOJ] request" nor did he "consider all
facts and data relevant," but as detailed below, ignored key facts and data.

a.      The March 26 Memorandum takes the DOJ request entirely at face value.  There
is not a single "hard" question raised about it.  A true hard look would have raised
any number of obvious questions.

b.      The Secretary does not ask anything about why DOJ needed a question on the
Decennial Census to enforce the Voting Rights Act ("VRA").  The Act was
enacted in 1965 and between now and then, DOJ has never had CVAP data
calculated from a question asked of every household.  Any "hard look," would
have asked how DOJ had been able to enforce the Act for the previous fifty plus
years but apparently not now.  Has something changed?  What exactly is the
problem with the existing data and how in concrete terms is it insufficient?  None

of these basic questions were raised in the Secretary's memorandum, or anywhere in the administrative record.

c.   In fact, as detailed in PFOF IX.B.2, the evidence is that DOJ has been able to enforce the VRA in the past and that there is no reason why it required a census question asked of every household.  In any event, the Secretary did not probe DOJ on this point.

d.   A "hard look," would have raised related questions about why a citizenship question needed to be on the 2020 Decennial Census.  What was the rush?  Especially since citizenship was not one of the topics for the census reported to Congress as required under 13 U.S.C. 141(f)(1).  Why could not the matter be tested and analyzed, consistent with the Census's well established procedures, *see* PX-4 at AR 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR) for the 2030 census?  The answer to this might have been apparent had the Secretary asked why the question was needed in the first place.

e.   A "hard look" would have meant inquiring about why the DOJ had refused to have a technical meeting with Census officials to discuss how the Census Bureau might best meet DOJ's needs.  As discussed, *see* PFOF III.I, DOJ's refusal to meet was, at least unusual and inexplicable.

f.   A "hard look" would have raised the question of whether the Census could disclose census block level data consistent with statutory confidentiality provisions.  These provisions, found in Section 6 of Title 13, say the Census cannot disclose identifying information for respondents.  As it stands, it is wholly unclear that consistent with these statutory provisions, the Census Bureau can

produce for DOJ any better quality information than it already does now.  *See*
PFOF IX.B.4.

g.   A "hard look" at DOJ's request would have examined whether asking a question
about citizenship on the Decennial Census was needed to provide DOJ with the
best data.  As discussed at PFOF III.H.2.c, IV.E.1, the Census Bureau
unambiguously advised the Secretary that Alternative B (asking a citizenship
question) "would use substantially less accurate citizenship status data than are
available from administrative resources."  PX-22 (AR); Nov. 13 Trial Tr. at 885.

804.   In sum, the Secretary took no "hard look" of any kind at DOJ's request.  The only
reasonable inference to be drawn here is that the Secretary deliberately did not ask the many
obvious but "hard" questions to be asked about DOJ's request; the answers to those questions
would lead to rejecting DOJ's request or, at the very least, requiring further study before a
citizenship question could be placed in the Decennial Census.  Moreover, it would have been
nonsensical for the Secretary to have asked these sorts of "hard" questions given that it was the
Secretary who had pushed DOJ to ask a citizenship question in the first place.  Not only did the
Secretary not take a "hard look," his failure to do so is best explained by his strong interest in
adding a citizenship question to the census, an interest that was prior to, and was independent of,
the DOJ request.

### 3.   Conclusions Regarding Sufficiency of Testing

805.   Secretary Ross stated in his March 26, 2018 Memorandum that "the citizenship question
has been well tested."  PX-26 (AR).

806.   Two problems with Secretary Ross' assertion are apparent from the face of the March 26
memo.  First, notwithstanding his assertion that the question is "well tested,"  the Secretary's
analysis makes clear over and over again that answers that would have been available had the

question been well tested are not available.  For example, the Secretary states that "there is no information available to determine the number of people who would in fact not respond to a citizenship question being added." PX-26 at 5 (AR).  Elsewhere he says, citing a former Chief Executive Officer of the Census, "no empirical data existed on the impact of a citizenship question on responses."  PX-26 at 3 (AR).  In fact there is empirical evidence, but as Mr. Thompson testified, had "there been a thorough testing and evaluation program, the Secretary would not find himself saying that he had no good information on this subject."  Thompson Aff. ¶ 94.

807.   Second, while the Secretary states that the question is well-tested (presumably for the ACS), he ignores the testing implications stemming from the evidence that the question did not perform well on the ACS, with noncitizens frequently answering that they were citizens.  (Oddly, the Secretary cites this evidence for the proposition that the question does not perform  well on the ACS without drawing the obvious inference that this suggests the question might also not perform well on the Decennial Census. PX-26 at 6 (AR).  These facts indicate not that the citizenship question was "well tested"  but rather that there was cause for caution.

808.   In any event, the question was not well tested as gauged by governing regulatory requirements and standards.  During trial, Defendants' sole witness, Dr. Abowd, testified that the only testing of a citizenship question of which he was aware was for the ACS.  Nov. 14 Trial Tr. at 1271-73.

809.   The citizenship question on the American Community Survey was last tested in 2006. PX-310.

810.   As discussed above, the Census Bureau did not conduct any cognitive testing or field testing, including randomized control testing (RCT), to analyze the effect of a citizenship question on the 2020 Decennial Census.

811.   This lack of testing conflicted with the Census Bureau's well-established process for making changes to the questionnaire, under which "[t]he Census Bureau must test the wording of the new question." PX-4 at AR 3890 (AR); PX-3 at AR 2304 (AR); PX-134 (AR); November 14 Trial Tr. at 1264:20-25.

812.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the Census Bureau Statistical Quality Standards.  PX-260. Under Sub-Requirement A2-3.3 of the Statistical Quality Standards, pretesting is not required for questions that performed adequately in another survey, but Dr. Abowd testified that the citizenship question on the ACS is not adequately performing. Nov. 14 Trial Tr. at 1287-88.

813.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the "Planned Development and Submission of Subjects Planned for the 2020 Census Program and Questions Planned for the 2020 Census Program" Memorandum (the "Blumerman Memorandum").  PX-271.

814.   The testing of the addition of a citizenship question to the 2020 Decennial Census did not comply with the standards set out in the Census Bureau's response to Question 31 in the questions posed by the Commerce Department about Dr. Abowd's January 19 memorandum. PX-132 (AR); PX-140 (AR).

815.   The testing of the addition of the citizenship question did not comply with the standards set out in "Census Bureau Standard: Pretesting Questionnaires and Related Materials for Surveys and Censuses." PX-364 ("Census Bureau Pretesting Standards").  The Census Bureau Pretesting

Standards explicitly state "if there is insufficient evidence about how well a question performs, the question must be subjected to some form of questionnaire pretest."  PX-364.

816.    According to these Census Bureau Pretesting Standards, if the Department of Commerce was not able to determine definitively how a citizenship question would perform on the Decennial Census, it must pretest the question.  PX-364.

817.    The testing of the addition of a citizenship question to the 2020 Decennial Census also did not comply with Principle 4 of the Principles and Practices of a Federal Statistical Agency. PX-355.

818.    The Census Bureau's representative, Dr. Abowd, testified that the Decennial Census was not adequately tested. Census Bureau 30(b)(6) Dep. Vol. I. at 142-43.

819.    Dr. Abowd also testified that a citizenship question has not been well-tested in the context of the short-form Decennial Census. Nov. 15 Trial Tr. at 1330.

820.    A citizenship question on the 2020 Decennial Census short form has never been certified by OMB as being properly tested. Nov. 15 Trial Tr. at 1329.

821.    The Decennial Census with a citizenship question was not adequately tested in the view of Former Census Bureau Director Mr. Thompson. Thompson Aff. ¶ 13.

822.    Mr. Thompson testified that the addition of a citizenship question was a significant deviation from standard practice and that Secretary Ross's statement regarding testing is not supported by the Administrative Record. Thompson Aff. ¶ 92.

823.    Dr. Hillygus and Dr. Barreto also testified that the Decennial Census with a citizenship question was not adequately tested. Nov. 5 Trial Tr. at 157:14-16;  Nov. 9 Trial Tr. at 737:3-6.

a.    Dr. Hillygus and Dr. Barreto testified that a citizenship question is a sensitive question both for individuals who live in households with non-citizens and for Hispanics. Nov. 5 Trial Tr. At 51:12-25.

b.    Dr. Hillygus testified that other experts agree that pre-testing of the citizenship question as part of the Decennial Census questionnaire is required. Nov. 5 Trial Tr. at 169:24-170:5; Nov 9 Trial Tr. at 604:10-13.

824.   Six former Census Bureau directors wrote to the Commerce Department to state their view that the citizenship question had not been adequately tested. PX-116 (AR).

825.   The National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics (CNSTAT) Task Force on the 2020 Decennial Census concluded that the citizenship question had not been properly tested for inclusion on the Decennial Census. PX-539.

826.   As Dr. Hillygus and Mr. Thompson testified, the fact that a question has previously been used on the ACS does not mean that it has been appropriately tested to be used on the Decennial Census due in part to the importance of testing an entire questionnaire before it is used. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

827.   There are several differences between the ACS and Decennial Census questionnaires that affect the relevance of ACS testing in the Decennial Census context. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

828.   Changes to the Decennial Census are more dramatic than changes to the ACS. Nov. 14 Trial Tr. at 1263:12-15; 1284:12-15.

829.   The ACS is a different survey instrument and has a different purpose than the Decennial Census questionnaire.  Thompson Aff. ¶ 32.

830.    First, the ACS is a much longer questionnaire than the Decennial Census questionnaire and includes over 70 questions. Thompson Aff. ¶ 63; PX-255; PX-665.

831.    By contrast, the 2020 Decennial Census will contain 11 questions, if a citizenship question is included. Thompson Aff. ¶ 63; Nov. 5 Trial Tr. at 159:3-15.

832.    A question concerning citizenship may take on added significance to a respondent in the context of the much shorter Decennial Census questionnaire. Thompson Aff. ¶ 63; PX-162 at 39; Nov. 5 Trial Tr. at 159:3-15.

833.    Second, the macro-environment is different between when the ACS was last tested and the current environment. Nov 9 Trial Tr. at 737:3-16; Nov. 14 Trial Tr. at 1258-59.

    a.    The ACS was most recently tested in 2006. Nov. 14 Trial Tr. at 1252, 1258.

    b.    The current political macro-environment is different from that of 2006 and it will be a difficult macro-environment for a citizenship question on the Decennial Census in 2020. Nov. 9 Trial Tr. at 616:12-23, 619:11-620:1, 737:3-16; Nov. 14 Trial Tr. at 1258-59.

834.    Third, survey methodologists have shown that the question order and context—not just the question wording—is relevant to evaluating data quality, unit and item nonresponse. Nov. 5 Trial Tr. at 149; Thompson Aff. ¶ 63.

    a.    The Census Bureau agrees that question sequencing can affect response rates, including in unanticipated ways that could be discovered through testing. Census Bureau 30(b)(6) Dep. Vol. I. at 14-15.

    b.    The citizenship questions on 1950 census and on the Decennial Census long form were preceded by a question on place of birth ("nativity"). Nov. 5 Trial Tr. at 150; Docket No. 516-1 ¶¶ 65, 66; Nov. 14 Trial Tr. at 1274-75.

c.     On the ACS citizenship status is asked as a follow-up to the question: "Where was this person born?" PX-255; Nov. 5 Trial Tr. at 159-60.  Only those who indicate that they were born outside the United States are then asked about citizenship status in the ACS internet self-response. PX-255; Nov. 5 Trial Tr. at 159-60.

d.     In contrast, as indicated by the language submitted to Congress, the 2020 Decennial Census will ask about citizenship without a preceding nativity question regarding place of birth—and it will be asked of all individuals regardless of their method of response.  PX-489; Census Bureau 30(b)(6) Dep. Vol. I. at 22-23; Docket No. 516-1 ¶ 66; Nov. 14 Trial Tr. at 1275.

e.     The nativity question on the ACS may cause respondents to be more comfortable with the citizenship question. Thompson Aff. ¶ 66.

f.     As such, the absence of the nativity question before the citizenship question on the 2020 Decennial Census questionnaire may cause respondents to feel that the citizenship question is intrusive and cause them to be less willing to respond. Thompson Aff. ¶ 66.  This creates a fundamentally different context on the ACS than the context for a citizenship question on the Decennial Census. Nov. 5 Trial Tr. at 160:11-17.

g.     The Census Bureau is not aware of any cognitive testing of citizenship question without a preceding question about nativity. Census Bureau 30(b)(6) Dep. Vol. I. at 24:4-9; Nov. 14 Trial Tr. at 1275:11-18.

h.     The Administrative Record indicates that no testing on the effect of question order was conducted for the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14; Thompson Aff. ¶ 66; Nov. 14 Trial Tr. at 1275.

    i.     On the ACS, there are many other questions that make any particular question potentially less salient. PX-255; Nov. 5 Trial Tr. at 160:19-161:6.  This context difference could affect survey responses. Nov. 5 Trial Tr. at 160:19-161:6.

    j.     Secretary Ross stated in his March 26, 2018 memorandum that placing the question at the end of the survey will "minimize any impact on decennial response rates." PX-26 (AR).  However, Dr. Hillygus testified that this statement by Secretary Ross reflects a fundamental misunderstanding.  Respondents are directed to answer all of the questions on the Decennial Census questionnaire sequentially for each member of their household.  In other words, respondents will see a citizenship question when they answer the census questionnaire for the first member of the household, and before they answer any questions about other members of the household. Nov. 5 Trial Tr. at 151-52.  Additionally, on a paper form, respondents can view all of the questions before completing any of it. PX-489.

835.  Fourth, the form of the question may affect response rates. Docket No. 516-1 at ¶¶ 68-70.

    a.     The ACS citizenship question includes five response categories rather than asking a simple yes/no question. PX-255.

    b.     Members of Congress and other stakeholders have raised concerns about the response category "Yes born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas" because respondents in Puerto Rico may be offended by the perception that their citizenship is different from that of citizens in the mainland United States and thus potentially less likely to respond. Thompson Aff. ¶ 69; Nov. 5 Trial Tr. at 162:9-25.

    c.        However, there is no evidence in the Administrative Record that any alternative question designs, including a simple yes/no question, were considered or tested before Secretary Ross made the decision to add the ACS citizenship question to the 2020 Decennial Census questionnaire. Thompson Aff. ¶ 71.

836.   The Administrative Record indicates that no testing was conducted to determine how the absence of the nativity question or how the use of the specific wording from the ACS citizenship question will influence response rates to a citizenship question if asked on the Decennial Census. PX-1 to 14 (AR); Thompson Aff. ¶ 71.

### 4.     Conclusions Regarding Decline in Response Rate and Expense

837.   Secretary Ross stated in his March 26, 2018 Decisional Memorandum that "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially." PX-26 (AR).

838.   He further stated that "the [Commerce] Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially" and "the Census Bureau's analysis did not provide definitive, empirical support" for the proposition that the addition of a citizenship question to the 2020 Decennial Census would reduce response rates. PX-26 (AR).

839.   Prior to issuance of the memo, the Census Bureau provided an analysis to Secretary Ross finding that adding a citizenship question to the 2020 Decennial Census would lead to a 5.1% decrease in self-response rates for households containing noncitizens. PX-22 (AR); PX-297 at RFA 84.

840.   Dr. Abowd testified that he discussed the decline in self-response rates with Secretary Ross during the February 12 meeting. Nov. 13 Trial Tr. at 921.

841.   Secretary Ross stated in his March 26, 2018 memorandum that while the Census Bureau considered whether non-response follow-up increases resulting from the addition of a citizenship question would lead to increased costs, "this estimate was difficult to assess." PX-26 (AR).

842.   Prior to issuance of the memo, the Census Bureau provided an analysis to Secretary Ross estimating that the decrease in self-response rates caused by adding a citizenship question to the 2020 Decennial Census would lead to an increase in costs of at least $27.5 million and that this was a "conservative" estimate. PX-22 (AR), PX-297 at RFA 86.

843.   The Census Bureau has subsequently found that adding a citizenship question to the 2020 Decennial Census would lead to a 5.8% decrease in self-response rates and an increase in costs of at least $91.2 million. PX-297 at RFA 87; PX-162.

844.   Secretary Ross stated in his March 26, 2018 Decisional Memorandum that the difference in "nonresponses to the [ACS] citizenship question" for non-Hispanic whites and Hispanics were "comparable" to the difference in "nonresponse rates for other questions," such as marriage, educational attainment, monthly gas costs, weeks worked in the past 12 months, wage/salary income, and yearly property insurance. PX-26 (AR); PX-297 at RFA 88.

845.   The difference in nonresponse rates for Hispanics and non-Hispanic whites for the ACS citizenship question is larger than the difference for nonresponse rates for Hispanics and non-Hispanic whites for the questions about marriage, educational attainment, monthly gas cost, weeks worked in the past 12 months, wage/salary income, and yearly property insurance. PX-297 at RFA 89-95; PX-9 (AR).

846.   In analyzing the impact of the addition of a citizenship question, the Census Bureau found empirical evidence that a citizenship question could reduce response rates and provided that evidence to Secretary Ross. PX-297 at RFA 96-97; PX-22 (AR); PX-162 (AR).

847.    In analyzing the impact of the addition of a citizenship question, the Census Bureau did not make or find any analysis which concluded adding a citizenship question would not impact response rates. PX-297 at RFA 98.

848.    The Census Bureau's analysis produced credible, quantitative evidence that the addition of a citizenship question could be expected to lower the self-response rate in households that may contain noncitizens. Nov. 13 Trial Tr. at 923.

849.    Dr. Barreto and Dr. Hillygus testified that decades of social science research, including Census Bureau reports, establish that the addition of a citizenship question will reduce self-response rates on the 2020 Decennial Census, especially among Latino and immigrant communities. Nov. 9 Trial Tr. at 590:13-18, 591:14-592:2; Nov. 5 Trial Tr. at 30, 50-51; *see also* PFOF VII.D.2-3.

850.    Dr. Barreto's survey results also provide credible, quantitative evidence confirming that the addition of a citizenship question to the 2020 Decennial Census will be expected to lower self-response rates both nationally and differentially and will ultimately exacerbate the net differential undercount of Latino and immigrant communities in particular. Nov. 9 Trial Tr. at 590:19-24, 591:9-12, 671:6-671:19, 672:13-672:22, 675:10-675:14; *see also* PFOF VII.D.3.

851.    Dr. Barreto provided empirical evidence that between 28 and 35 million people would not respond due to a citizenship question on the 2020 Decennial Census, of which 10-11 million people would be Hispanic. Thus, although the Hispanic population is only 13% of the national total, they would constitute approximately 35% of those affected by a citizenship question. Nov. 9 Trial Tr. at 683-686; PX-675; PX-676.

852.   Secretary Ross's decision memo repeatedly references information provided by The

Nielsen Company, particularly as a source of "empirical evidence about the impact of sensitive

questions on survey response rates."  PX-26 (AR).

853.   But Christine Pierce, the  Senior Vice President of Data Science for the Nielsen Company

who spoke with Secretary Ross about a citizenship question, testified that the Secretary's

decision memo does not accurately reflect the telephone conversation she had directly with the

Secretary and Michael Walsh, a Commerce Department lawyer, about a citizenship question.

Ms. Pierce, the stakeholder referenced in the Secretary's decision memo as a purported source of

"empirical evidence about the impact of sensitive questions on survey response rates," testified at

trial that Nielsen did not provide any such evidence.  Pierce Aff. (Docket No. 498-18) at ¶¶ 15,

18.

854.   In fact, Pierce testified that Secretary Ross's decision memo materially mischaracterized

her input and omitted key facts (including her "unequivocal[]" concern "that a citizenship

question would negatively impact self-response rates").  *Id.* at ¶¶ 9, 12-18.

855.   Secretary Ross's decision memorandum states that "to the best of [Nielsen's] knowledge,

no empirical data existed on the impact of a citizenship question on responses." PX-26 at AR

1315. But Ms. Pierce testified that she "did not say 'to the best of [my] knowledge no empirical

data existed on the impact of a citizenship question on responses.'" Pierce Aff. ¶ 10.

856.   Secretary Ross stated in his March 26, 2018 memorandum that the "Census [Bureau] was

not able to isolate what percentage of decline was caused by the inclusion of a citizenship

question rather than some other aspect of the long form survey," and "[t]he Department of

Commerce is not able to determine definitively how inclusion of a citizenship question on the

decennial census will impact responsiveness."  PX-26 (AR)

857.   Conducting an RCT would have allowed the Census Bureau to isolate the effect of a

particular question, such as a citizenship question, on response rates.  Nov. 13 Trial Tr. at 923-

26.

858.   Employees at the Census Bureau developed a proposed RCT test for the content of a

citizenship question on the 2020 Decennial Census. PX-164; PX-165.

859.   The proposal would have taken six weeks to collect the data, and would have cost

between $2 million and $4.1 million, which is money that the Census Bureau has.  PX-165; PX-

268; Census Bureau 30(b)(6) (Abowd) Vol. II. (Docket 502-4) at 426-27; Nov. 13 Trial Tr. at

1001-02.

860.   The Census Bureau could have conducted an RCT on the citizenship question prior to

printing the questionnaires for the 2020 Decennial Census.  PX-268; Nov. 13 Trial Tr. at 1002.

861.   A group of decision makers including Under Secretary Kelley made the decision not to

conduct this proposed RCT.  Census Bureau 30(b)(6) (Abowd) Vol. II. (Docket 502-4) at 427: 8-

11; Nov. 13 Trial Tr. at 1002.

862.   The Census Bureau has subsequently updated the analysis in the January 19 Memo in an

August 6, 2018 memorandum titled "Understanding the Quality of Alternative Citizenship Data

Sources for the 2020 Census" (hereinafter "August 6 Memo"; also known as "White Paper" or

"Brown Memo"). PX-162; DX-2; PX-297 at RFA 24; Nov. 13 Trial Tr. at 895-96.

863.   The August 6 Memo is the most recent version of the technical report performed under the

supervision of Dr. Abowd. Nov. 13 Trial Tr. at 895.

864.   The December 22 Memo constitutes an earlier draft of the August 6 Memo. PX-4 at AR

11634 (AR);  Nov. 13 Trial Tr. at 896.

865.    Dr. Abowd testified that the methodology reflected in this memorandum was appropriate and that the memorandum "constitutes the best analysis that the Census Bureau can do of the consequences of adding the citizenship question to the 2020 census … with the available data." Nov. 13 Trial Tr. at 897.

866.    Dr. Abowd agrees with the conclusions of this memorandum. Nov. 13 Trial Tr. at 897.

867.    The August 6 Memo developed a "cautious" and "conservative" estimate that an additional 5.8% of households with at least one noncitizen would not self-respond to the 2020 Decennial Census because of the addition of a citizenship question. PX-162 (AR); PX-297 at RFA 24; Nov. 13 Trial Tr. at 897-98.

868.    This 5.8% is the "best conservative estimate" of the adverse impact of the addition of a citizenship question on response rates to the 2020 Decennial Census. PX-162 (AR); Nov. 13 Trial Tr. at 897.

869.    The August 6 Memo's 5.8% conservative estimate is based on 2016 ACS data compared against 2010 Census data. Nov. 13 Trial Tr. at 898-98.

870.    The 5.8% estimate is conservative, in part, because it is based on: (a) ACS data that does not reflect the prominence of a citizenship question on the Decennial Census compared to the ACS; (b) 2016 data that does not reflect the changing macro-environment in which a citizenship question would be asked on the 2020 Decennial Census; and (c) the comparison of citizen households against non-citizen households and therefore does not include any possible reduction in self-response among all-citizen households. PX-162 (AR); Nov. 13 Trial Tr. at 901-03.

871.    Dr. Abowd testified that the assumption that a citizenship question will not have any effect on all-citizen households is probably wrong. PX-162 (AR); Nov. 13 Trial Tr. at 903-05.

872.    The August 6 Memo is being submitted for peer reviewed publication by the Census Bureau. Nov. 13 Trial Tr. at 1015-16.

### 5.    Conclusions Regarding Respondent Burden

873.    Secretary Ross stated in his March 26, 2018 Decisional Memorandum that "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition." PX-26 (AR).

874.    The Census Bureau has conducted analyses that conclude the addition of a citizenship question imposes a burden on non-citizens. PX-26 (AR); PX-22 (AR); PX-162; PX-297 at RFA 100.

875.    The Census Bureau has conducted analyses that conclude the addition of a citizenship question imposes a burden on Hispanics, including Hispanic citizens. PX-22 (AR); AR-162; PX-297 at RFA 101.

876.     Dr. Hillygus testified that Secretary Ross' statement that a citizenship question is no additional imposition is contradicted by survey research and Census Bureau opinion.  Nov. 5 Trial Tr. at 50:6-8.

877.    Dr. Habermann testified that a citizenship question would impose higher data collection costs than superior alternatives.  Docket No. 498-11 at ¶¶ 48-54.

878.    Secretary Ross supported his decision in the March 26 Memo with the statement that "the former director of the Census Bureau during the last Decennial Census told me that, while he wished there were data to answer the question, none existed to his knowledge." PX-26 (AR).

879.    On January 26, 2018, Secretary Ross received a letter from six former Census Directors regarding the addition of a citizenship question to the Decennial Census. PX-116(AR).

880.    One of the six former Census Directors was Robert Groves.  PX-116 (AR)

881.   The six former Census Directors warned against adding a citizenship question, and stated
that "we believe that adding a citizenship question to the 2020 Census will considerably increase
the risks to the 2020 enumeration." PX-116 (AR).

882.   The Secretary stated in the March 26 Memo that "there is no information available to
determine the number of people who would in fact not respond due to a citizenship question
being added" and that "no empirical data existed on the impact of a citizenship question on
responses." PX-26 (AR).

883.   But as detailed above, the Census Bureau provided multiple analyses detailing the impact
of a citizenship question on responses.

### 6.   Conclusions Regarding Data Quality

884.   Secretary Ross stated in his March 26, 2018 memorandum that "[i]t is my judgment that
Option D will provide DOJ with the most complete and accurate CVAP data in response to its
request. Asking the citizenship question of 100 percent of the population gives each respondent
the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have
to impute an answer for millions of people."  PX-26 (AR).

885.   Secretary Ross further stated in his March 26 memo that the addition of "a citizenship
question on the 2020 decennial census is necessary to provide complete and accurate data in
response to the DOJ request."  PX-26 (AR).

886.   Secretary Ross further stated that "citizenship data provided to DOJ will be more accurate
with the question than without it, which is of greater importance than any adverse effect that may
result from people violating the law."  PX-26 (AR).

887.   These assertions are wholly at odds with the administrative record.  The Census Bureau
repeatedly advised the Secretary based on empirical analysis, not disclosed in the Secretary's
memorandum, that more accurate information could be provided by looking to administrative

records alone rather than by using a citizenship question.  PX-26 (AR); PX-25 (AR); PX-132 (AR); PX-574 (AR); PX-575 (AR).

888.   Dr. Abowd testified that neither he nor the Census Bureau agrees that the addition of a citizenship question to the 2020 Decennial Census is necessary to provide complete and accurate data in response to the DOJ request.  Nov. 13 Trial Tr. at 1048.

889.   In Dr. Abowd's January 19 memo to the Secretary, the Census Bureau unambiguously advised the Secretary that Alternative B (asking a citizenship question) "would use substantially less accurate citizenship status data than are available from administrative resources."  PX-22 (AR); Nov. 13 Trial Tr. at 885.

890.   After the Secretary asked the Census Bureau to consider Alternative D (combining results of asking a citizenship question and using administrative records), the Census Bureau advised him in Dr. Abowd's March 1 memo that "Alternative D would result in poorer quality citizenship data than Alternative C." PX 25 at 5 (AR). The Census Bureau's conclusions were based on a careful analysis of the available data.  *See* PFOF IV.E.4.

891.   By contrast, there is no empirical or other evidence anywhere in the Administrative Record supporting the Secretary's assertion that the "citizenship data provided to DOJ will be more accurate with the question than without it…."  PX-26 at 7 (AR).  Indeed, the Secretary had no professional expertise regarding these matters independent of the Census Bureau.  Comstock Dep. at 324:19-325:1; Park-Su Dep. at 57-58 (objection at 57:7); Jarmin Dep. (Docket No. 511-2) at 33-37, 59, 108 (objection (602) at 34:10-14).  The Secretary's assertion is no more than an assumption which he did not discuss with Dr. Abowd and which was not endorsed by the Census Bureau.  Nov. 13 Trial Tr. at 977.

892.   To the extent that the Secretary's  position is premised on the notion that questioning all households about citizenship would avoid the need for "sophisticated statistical modeling," or for the Census Bureau to "deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data,"  PX 26 (AR), he was operating under a misapprehension.  In analyzing Alternative D, the Census Bureau professionals concluded that "[i]ncluding a citizenship question in the 2020 Census does not solve the problem of incomplete person linkages when producing citizenship statistics after 2020. Both the 2020 decennial record and the record with the person's future location would need to be found in PVS [Person Validation Service] to be used for future statistics."  PX-25 (AR).

893.   Dr. Abowd testified that including a citizenship question on the Decennial Census would not eliminate the need for the Census Bureau to model an answer for millions of people.  Nov. 13 Trial Tr. at 970-72.  Dr. Abowd further testified that because survey responses are not reliable enough to fill the gaps in administrative records regarding citizenship data, the inclusion of citizenship question on the Decennial Census does not eliminate the need to do statistical modeling to determine census block-level citizenship data.  Nov. 13 Trial Tr. at 975.

894.   Elsewhere in his memo, Secretary Ross states that "placing the [citizenship] question on the Decennial Census and directing the Census Bureau to determine the best means to compare the Decennial Census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so." PX-26 (AR).  In contrast the Census Bureau professionals concluded that "survey-collected citizenship data may not be reliable for many of the people falling in the gaps

in administrative data." PX-25 (AR); Nov. 13 Trial Tr. at 973-74.  Indeed, the Census Bureau

professionals found that in the 2016 ACS, individuals whom the administrative records indicate

are noncitizens responded "citizen" 34.7% of the time.  PX-22 (AR).

895.   Secretary Ross relied on technical presumptions in his March 26, 2018 memorandum.

PX-26 (AR); Nov. 13 Trial Tr. at 977.  The technical presumptions that Secretary Ross relied on

in his March 26, 2018 memorandum were not endorsed by the Census Bureau.  Nov. 13 Trial Tr.

at 977.

896.   For reasons discussed in PFOF IX.B.4, the Census Bureau's use of disclosure avoidance

procedures means that the CVAP data produced will necessarily not be "complete and accurate."

897.   There is no evidence in the Administrative Record that supports Secretary Ross' statement

that providing the citizenship data to DOJ "is of greater importance than any adverse effect that

may result from people violating the law."  PX-1 to PX-14 (AR).

a.   There is evidence in the Administrative Record and the Census Bureau believes

that adding a citizenship question will impose burden on Hispanic and non-citizen

respondents resulting in reduced self-response, greater costs, and a less accurate

census.  PX-22 (AR); PX-162; PX-267.

b.   By saying that providing the data to DOJ is of "greater importance" than anything

else, he is necessarily saying that provision of the data to DOJ is more important

than achieving a full enumeration—to "count everyone once, only once, and in

the right place." Nov. 14 Trial Tr. at 1087.

c.   But DOJ was able to enforce the VRA since 1965 without such data.  *See* PFOF

IX.B.2.

    d.      And DOJ witnesses admitted that they do not believe this data is necessary to enforce the VRA.  *See* PFOF III.F, IX.B.5.

    e.      And who is Secretary Ross to say that collection of the data is more important than a community's loss of political representation?  Or a community's loss of funding?  Or the heightened stress that addition of a citizenship question will achieve?

    **7.      Important Aspects of the Problem Not Discussed in Secretary Ross' March 26 Decision Memo**

898.   Secretary Ross's March 26 memo does not note or otherwise discuss the Census Bureau's failure to identify citizenship as a topic on the March 31, 2017 notification to Congress pursuant to 13 U.S.C. § 141(f)(1).  PX-26 (AR).

899.   Secretary Ross' March 26 memo does not note or otherwise discuss his obligation to "find new circumstances exist which necessitate" the addition of citizenship as a subject for the Decennial Census after the March 31, 2017 deadline as required by 13 U.S.C. § 13(f)(2).  PX-26 (AR).

900.   There is no evidence in the Administrative Record or discussed in Secretary Ross' memo that DOJ's asserted need for block-level CVAP data constituted a "new circumstance" arising after the March 31, 2017 subject disclosure deadline.  PX-1 to PX-14 (AR), PX-26 (AR).

901.   Secretary Ross's March 26 memo does not note or otherwise discuss his obligation "to the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to "acquire and use information available from any source [from other federal or other governmental entities] inst    ead of conducting direct inquiries as required by 13 U.S.C. § 6(c). PX-26 (AR).

a.     There is evidence in the Administrative Record that Secretary Ross could have acquired and used information available from other federal government agencies (including the Social Security Administration, the Internal Revenue Service, and the Department of State) to obtain the citizenship data needed to satisfy DOJ Request.  PX-22 (AR), PX-25 (AR).

b.     There is evidence in the Administrative Record that the data that Secretary Ross could have acquired from other federal government agencies was of higher quality and could be collected on a more timely basis at far less expense that adding a citizenship question to the Decennial Census.  PX-22 (AR), PX-25 (AR).

902.   Secretary Ross's March 26 memo does not address the Office of Management and Budget Standards and Guidelines for Statistical Surveys, including Standard 1.3 which requires agencies to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs . . ." PX-359; PX-26 (AR).

903.   There is evidence in the Administrative Record that the option chosen by Secretary Ross would not "achieve the highest practical rates of response" and imposed respondent burden and higher data collection costs than alternatives.  PX-22, PX-25.

904.   Secretary Ross's March 26 memo does not discuss the Census Bureau Statistical Quality Standards, including requirement A2-3 which provides that 'data collection instruments . .. must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden."  PX-360; PX-26 (AR).

a.     There is evidence in the Administrative Record that the option chosen by Secretary Ross did not balance "data quality and respondent burden" and imposed

higher respondent burden than options that would have produced more accurate

data.  PX-22 (AR); PX-25 (AR).

    b.    Dr. Hillygus testified at length about the respondent burden associated with a

citizenship question, including how Secretary Ross' statements about burden were

contradicted by survey methodology literature, Nov. 5 Trial Tr. at 47-50, the

external evidence that the citizenship question was sensitive, *id.* at 52-58, the

Census Bureau research on confidentiality concerns, *id.* at 58-68, and Dr.

Abowd's analysis on impact on response (PX-22), *id.* at 68-89.

905.   Secretary Ross's March 26 memo does not discuss the Census Bureau's Statistical Quality

Standards, including requirement A2-3-3.1 which provides "data collection instruments and

supporting materials must be pretested with respondents to identify problems (e.g., problems

related to content, order/context effects, skip instructions, formatting, navigation, and edits) and

then refined, prior to implementation based on the pretesting results."  PX-260.

    a.    Secretary Ross's memo states that the citizenship question had been "well-tested,"

but there is no exception in the Census Bureau Statistical Quality Standards for

"well-tested questions."  Rather, the exception states that "pretesting is not

required for questions that performed adequately in another survey."  PX-260.

    b.    There is evidence in the Administrative Record (which Secretary Ross did not

address in his decisional memo) that the citizenship question was not performing

adequately on the American Community Survey.  PX-22 (AR); PX-25 (AR); PX-

162.  Specifically, the Census Bureau presented analysis to Secretary Ross that in

the 2016 ACS, individuals whom administrative records indicate are noncitizens

responded "citizen" 34.7% of the time, and a number of citizens responded that

they were non-citizens.  PX-22 (AR).

    c.    Dr. Abowd does not believe the citizenship question on the ACS is performing

adequately.  Nov. 14 Trial Tr. at 1287-88.

906.  Secretary Ross's March 26 memo does not discuss that the Census Bureau is prohibited

from making "Any publication whereby the data furnished by any particular individual under

this title can be identified."  13 U.S.C. § 9(a)(2); PX-26 (AR).

    a.    Because census blocks can contain small numbers of people, the Census Bureau

engages in disclosure avoidance procedures in every census block to prevent third

parties from potentially unmasking information about Census respondents.  Nov.

13 Tr. at 1031-33.

    b.    Secretary Ross's memo does not address that the Census Bureau, in order to

comply with its disclosure mandates, engages in disclosure avoidance procedures

that prevent the disclosure of actual demographic characteristics at the census

block level.  PX-26 (AR).

    c.    Secretary Ross's memo does not address the implications for disclosure avoidance

procedures; Ross does not acknowledge that these procedures will preclude the

Census Bureau from providing actual or accurate CVAP counts at the census

block level.  PX-26 (AR).

    d.    Neither Secretary Ross's memo nor the Administrative Record provides any

support for Secretary Ross's conclusion that asking a citizenship question on the

Decennial Census is "necessary to provide complete and accurate data in response

to the Department of Justice request."  PX-26 (AR).

## V.    LAWSUIT AND POST-LAWSUIT DISCLOSURES

907.    The States of New York, Connecticut, Delaware, Illinois, Iowa, Maryland, Minnesota,

New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, and Washington;

Commonwealths of Massachusetts, Pennsylvania, and Virginia; District of Columbia; cities of

Chicago, New York, Philadelphia, Providence, and Seattle; city and county of San Francisco;

and the United States Conference of Mayors filed a lawsuit to challenge the addition of a

citizenship question on April 3, 2018.  Docket No. 1. The State and City Plaintiffs filed a First

Amended Complaint in April 30, 2018 and a Second Amended Complaint on July 25, 2018

adding Central Falls, Columbus, Pittsburgh, counties of Cameron, El Paso, Hidalgo, Monterey,

and the city of Phoenix as plaintiffs, respectively. Docket No. 85; Docket No. 214.

908.    On June 6, 2018, New York Immigration Coalition, CASA de Maryland, American-Arab

Anti-Discrimination Committee, ADC Research Institute, and Make the Road New York filed a

lawsuit to challenge the addition of a citizenship question. *See* No. 18-cv-05025, Docket No. 1.

909.    On May 9, 2018, this Court ordered the production of the Administrative Record on or

before June 8, 2018. Docket No. 137.

910.    On May 8, 2018, Earl Comstock testified, along with Director Jarmin, before the House

Oversight Committee on the topic of the Census. PX-276.

911.    Congresswoman Eleanor Holmes Norton asked them why a citizenship question, "which

was dropped for 70 years, suddenly appear on the decennial census? What was the point?" PX-

282 at 37.

912.    Mr. Comstock responded that they "received a request from the Justice Department for

this, and their rationale was that the level of the information that they needed to enforce the

Voting Rights Act was not available." PX-282 at 37.

913.   Congresswoman Norton also asked if they had "any evidence that it would not have an impact on the Census, asking such a question, particularly given the testimony of Mr. Levitt that people have increasingly refused to answer this question." PX-282 at 38.

914.   Mr. Comstock responded that Secretary Ross "carefully considered the issue and there was quite extensive discussion of the matter.  And that was exactly the point: we were asked, made a valid request by a government agency to add this to the census; we went through our normal process; and we looked at this carefully." PX-282 at 38-39.

915.   On May 10, 2018, Secretary Ross testified before the Senate Appropriations Committee, and Senator Patrick Leahy asked Secretary Ross, "Now, you have also marketed the citizenship question as necessary to enforce the Voting Rights Act.  The Justice Department hasn't brought any voting rights cases since the President took office, they don't seem to see a problem out there. All the voting rights advocates I've spoken with oppose including the question.  They say it is going to have the opposite effect and will bring about severe under-representation of those who they are trying to protect.  And why the sudden interest in that when the Department that is supposed to enforce violations doesn't see any problems?" PX-494.

916.   Secretary Ross responded that, "Well, the Justice Department is the one who made the request of us." PX-494.

917.   These statements to Congress omitted: (1)  the fact that the Secretary Ross directed his staff and the Census Bureau to consider the addition of a citizenship question long before the December 12, 2017 letter from DOJ, (2) the active lobbying of DOJ by Mr. Comstock on behalf of Secretary Ross, and (3) contacts between Defendants Ross and the White House.  PX-88 (AR); PX-55 (AR); PX-537 (AR); PX-58 (AR); PX-298 (R) at RFA 62; Teramoto Tr. at 28–32; Comstock Tr. at 145–46.

918.    On May 21, 2018, Mr. Gore testified before the House Oversight Committee.  He declined to answer many questions, citing pending litigation.  Among other things, Gore did not mention that the Department of Commerce reached out to DOJ to see if DOJ would request a citizenship question.  PX-509;  Gore Dep. at 63:20–64:10.  Mr. Gore also failed to mention that DOJ was initially reluctant to request the question, or that Attorney General Sessions had directed DOJ not to meet with the Census Bureau to discuss a citizenship question.  Gore Dep. at 63:20–64:10, 68:7–14, 69:4–9, 271:21–272:13.  Gore also did not mention that Acting Director Jarmin—the Acting Director of the Census Bureau—believed that there was a different vehicle that would yield "more accurate" data for the purposes of VRA enforcement.  PX-509.

919.    Defendants produced an Administrative Record along with a certification and index on June 8, 2018 with only 1,320 pages.  PX-1 (AR); Docket No. 173.  These materials allude to but contain little documentation of internal deliberations before December 2017 or communications between the Departments of Commerce and Justice. Docket No. 173. PX-1 (AR).

920.    On June 21, 2018, Secretary Ross filed a supplemental memorandum significantly revising the narrative as to the origin and genesis of how a citizenship question came to be placed on the Decennial Census. Docket No. 189; PX-2 (AR).  The June 21 memorandum provided the first public acknowledgment of internal consideration of a citizenship question prior to DOJ's letter on December 12, 2018, but still provided no details of those deliberations or any communications between the Department of Commerce and DOJ. PX-2 (AR).  The supplemental memorandum states that Secretary Ross and his staff "inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question . . . ." PX-2 (AR).  The supplemental memorandum also introduced the fact that Secretary Ross consulted with "senior administration officials" prior to speaking with DOJ. PX-2 (AR).

921.   Dr. Abowd described himself and everyone he knows at the Census Bureau as surprised when they learned about Secretary Ross's role in soliciting DOJ to request the inclusion of a citizenship question.  Nov. 13 Trial Tr. at 1020-22.

922.   On July 3, 2018, and memorialized in the July 5, 2018 order, this Court ordered the Defendants to produce a complete Administrative Record by July 23, 2018, and authorized limited extra record discovery.  Docket No. 199.  The Court granted additional time to produce a complete Administrative Record on July 26, 2018. Docket No. 211.

923.   Defendants produced supplemental Administrative Record documents on July 23, 2018 (Bates 0001322-0003735) and July 27, 2018 (0003736-0012464). Docket Nos. 212, 216, 217; PX-3 (AR); PX-4 (AR).  The productions of July 23, 2018 and July 27, 2018 contain additional information about Department of Commerce deliberations preceding the December 12, 2017 letter from DOJ, and communications between Commerce and DOJ.

924.   On July 12, 2018, Plaintiffs asked several interrogatories of Defendants Ross and Department of Commerce, most particularly Interrogatory No. 1, PX-511:

> "With regard to the document found in the Administrative Record at 1321, please IDENTIFY:
> a. the "senior Administration officials" who "previously raised" reinstating the citizenship question;
> b. the "various discussions with other government officials about reinstating a citizenship question to the Census";
> c. the consultations Secretary and his staff participated in when they "consulted with Federal governmental components";
> d. the date on which the "senior Administration officials" who "previously raised" reinstating the citizenship question first raised this subject; and
> e. all PERSONS with whom the "senior Administration officials had previously raised" reinstating the citizenship question. PX-280.

925.   On August 13, 2018, Defendants responded to Plaintiffs' first interrogatory by saying, "Defendants have not to date been able to identify individuals responsive to subpart a.

Defendants' investigation is continuing, and Defendants will supplement this response as appropriate," but provided initial responses to the other subparts.  PX-280 at 14-15.

926.   On September 5, 2018, Defendants supplemented their response to Plaintiffs' first interrogatory by saying they "construed subparts a, b, and c, as coextensive," and identified Mary Blanche Hankey, James McHenry, Gene Hamilton, Danielle Cutrona, John Gore and Jefferson Sessions, along with Kris Kobach and Steve Bannon.  PX-511 at 2-3.  With regard to conversations between Secretary Ross and the Attorney General, Defendants in the September 5 Supplemental response to Plaintiffs' first interrogatory stated that "Secretary Ross discussed the possible reinstatement of a citizenship question on the 2020 Decennial Census with Attorney General Sessions in August 2017. In addition, it is possible that the two had an additional discussion concerning the issue, and although the date of that conversation is unknown, Defendants believe it took place earlier in 2017." PX-511 at 3.  In the September 5 Supplemental Response to Plaintiffs' first interrogatory, Defendants further stated that "Defendants cannot confirm that the Secretary spoke to Steve Bannon regarding the Citizenship Question." PX-511 at 3.

927.   On October 11, 2018, Defendants again supplemented their responses to Plaintiffs' first interrogatory and made substantial changes to the September 5 response. PX-302.  For the first time, on October 11, 2018, Defendants stated in response to Plaintiffs' first interrogatory that "Secretary Ross discussed the possible reinstatement of citizenship question on the 2020 Decennial Census with Attorney General Sessions in the Spring of 2017 and at subsequent times." PX-302.  On October 11, 2018, Defendants once again supplemented their response to Plaintiffs' first interrogatory by stating that "Secretary Ross recalls that Steven Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to

then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census." PX-302.

928.   On November 13, 2018, amidst trial, the Department of Commerce issued an official statement reacting to Dr. Abowd's testimony in this case, providing the following: "Under authority granted to the Secretary of Commerce, Ross determined that the addition of the question, combined with administrative records, would provide the best results to fulfill DOJ's request.  While his decision was ultimately different from Dr. Abowd's recommendation, the Secretary reached his decision, in part, due to the Census Bureau's assurances that any drop in self-response rate can and will be remediated by non-response follow operations." PX-684.

929.   On November 13, 2018, Secretary Ross gave an interview to Yahoo! News in which he discussed the matter at issue in this litigation and a citizenship question more broadly.  PX-688. In that interview, Secretary Ross stated, "[W]e ourselves released that there had been a conversation with Steve Bannon, there had been a conversation with Kobach. Those are natural. And there was in the air early in the administration a whole bunch of questions about census, so it was natural that there'd be some limited discussions. But what triggered the investigation, the real study, what triggered the process that lead to the determination to do it was the letter from the Department of Justice." PX-688.

## VI.   THE ADDITION OF A CITIZENSHIP QUESTION IS CLOSELY LINKED WITH THE TRUMP ADMINISTRATION'S WIDER NATIVIST AGENDA.

### A.   Department of Commerce's Admissions Regarding President Trump, Attorney General Sessions, and Other Senior Administration Officials' Statements of Animus Toward Immigrant Communities of Color and Secretary Ross's Support

930.   The Department of Commerce admitted that in December 2016, during an interview with TIME magazine, Donald Trump stated, in reference to an article about a supposed recent crime wave on Long Island: "They come from Central America.  They're tougher than any people

you've ever met.  They're killing and raping everybody out there. They're illegal. And they are

finished."  PX-298 (R) at RFA 15.

931.    The Department of Commerce admitted that on January 27, 2017, Donald Trump signed

an executive order blocking persons from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen

from entering the United States.  PX-298 (R) at RFA 17.

932.    The Department of Commerce admitted that Stephen Bannon called Secretary Ross in the

Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of

State Kris Kobach about Secretary's Kobach's ideas about a possible citizenship question on the

Decennial Census. PX-19(AR); PX-58(AR); PX-298 (R) at RFA 51; Comstock Dep. at 120–123;

Teramoto Dep. at 160. PX-302.

933.    The Department of Commerce admitted that on March 27, 2017, Attorney General

Sessions, referring to Latino immigrants, stated: "the American people are justifiably angry . . .

assaults, burglaries, drug crimes, rapes, crimes against children and murders.  Countless

Americans would be alive today and countless loved ones would not be grieving today . . . The

President has rightly said that this disregard for the law must end. . . ."  PX-298 (R) at RFA 20.

934.    The Department of Commerce admitted that on June 13, 2017, Acting ICE Director

Thomas Homan testified "every immigrant in the country without papers . . . should be

uncomfortable. You should look over your shoulder. And you need to be worried. . . . No

population is off the table. . . ."  PX-298 (R) at RFA 21.

935.    The Department of Commerce admitted that on June 28, 2017, Donald Trump said: "They

are bad people. And we've gotten many of them out already. . . We're actually liberating towns,

if you can believe that we have to do that in the United States of America.  But we're doing it,

and we're doing it fast."  PX-298 (R) at RFA 23.

936.    The Department of Commerce admitted that on July 14, 2017, Kris Kobach wrote to

Secretary Ross stating: "I'm following up on our telephone discussion from a few months ago.

As you may recall, we talked about the fact that the US census does not currently ask

respondents their citizenship.  This lack of information impairs the federal government's ability

to do a number of things accurately.  It also leads to the problem that aliens who do not actually

'reside' in the United States are still counted for congressional apportionment purposes."  PX-

19(AR); PX-298 (R) at RFA 82.

937.    The Department of Commerce admitted that on September 5, 2017, the Department of

Homeland Security announced the rescission of the Deferred Action for Childhood Arrivals

program.  PX-298 (R) at RFA 26.

938.    The Department of Commerce admitted that on October 9, 2017, Secretary Ross said:

"President Trump's tighter border controls have already reduced greatly the influx of illegal

aliens, but he needs legislation to finish the task. I support his request to secure our borders,

swiftly return illegal entrants, stop visa fraud and overstays, sanctuary cities, asylum abuse and

chain immigration, as well as exploitative employment of illegal aliens.  This will take money

for more ICE officers, more federal prosecutors and more physical barriers.  That will be money

well spent!"  PX-298 (R) at RFA 29.

939.    The Department of Commerce admitted that on November 6, 2017, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Nicaragua.  PX-298 (R) at RFA 30.

940.    The Department of Commerce admitted that on November 20, 2017, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Haiti. PX-298 (R) at RFA 31.

941.    The Department of Commerce admitted that on January 8, 2018, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from El Salvador.  PX-298 (R) at RFA 32.

942.    The Census Bureau admitted that in January 2018, the Census Bureau announced that it

would not hire census enumerators who are not U.S. citizens for the 2020 Decennial Census.

PX-297 at RFA 76.

943.    The Department of Commerce admitted that on April 5, 2018, President Trump, speaking

about individuals who enter the country "through chain migration," stated: "This is what the

Democrats are doing to you. And they like it because they think they're going to vote

Democratic . . . . A lot of them aren't going to be voting. A lot of times it doesn't matter, because

in places, like California, the same person votes many times.  You probably heard about that.

They always like to say.  'Oh, that's a conspiracy theory.'  Not a conspiracy theory, folks.

Millions and millions of people."  PX-298 (R) at RFA 35.

944.    The Department of Commerce admitted that on April 6, 2018, Attorney General Sessions

announced a "zero tolerance" policy for immigrants who cross the border unlawfully.  PX-298

(R) at RFA 39.

945.    The Department of Commerce admitted that on April 28, 2018, Donald Trump stated: "If

a person puts their foot over the line, we have to take them into our country. We have to register

them…. And you know, one of the reasons they do it is because the Democrats actually feel and

they are probably right, that all of these people that are pouring across are going to vote for

Democrats, they're not going to vote for Republicans, they're going to vote no matter what we

do, they're going to vote."  PX-298 (R) at RFA 37.

946.   The Department of Commerce admitted that on April 26, 2018, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Nepal.  PX-298 (R) at RFA 36.

947.   The Department of Commerce admitted that on May 4, 2018, the Department of

Homeland Security announced that it would not be renewing the Temporary Protected Status

designation for immigrants from Honduras.  PX-298 (R) at RFA 38.

948.    The Department of Commerce admitted that on May 16, 2018, Donald Trump stated:

"We have people coming into the country, or trying to come in — and we're stopping a lot of

them — but we're taking people out of the country.  You wouldn't believe how bad these people

are.  These aren't people.  These are animals.  And we're taking them out of the country at a

level and at a rate that's never happened before…"  PX-298 (R) at RFA 40.

> **B.**   **These Expressions of Animus Evidently had an Impact on Immigrant Communities of Color and their Willingness to Participate in Government.**

949.   In September 2017, the Census Bureau's Center for Survey Measurement ("CSM")

published a memorandum in which it noted a "recent increase in respondents spontaneously

expressing concerns about confidentiality in some of our pretesting studies conducted in 2017."

PX-158 (AR).

950.   The CSM memorandum stated that "CSM researchers heard respondents express new

concerns about topics like the 'Muslim ban,' discomfort 'registering' other household members

by reporting their demographic characteristics, the dissolution of the 'DACA' . . . repeated

references to Immigration and Customs Enforcement (ICE)," and reported that "respondents'

fears, particularly among immigrant respondents, have increased markedly this year."  PX-158

(AR).

951.   The CSM memorandum also noted that "Spanish-speakers brought up immigration raids, fear of government, and fear of deportation."  PX-158 (AR).

952.   The CSM memorandum further stated that: "A Spanish-speaking respondent answered that he was not a citizen, and then appeared to lie about his country of origin.  When the FR [Field Respondents] started asking about his year of entry into the U.S., he 'shut down' and stopped responding to her questions.  He then walked out and left her alone in the apartment, which had never happened to her during an interview before."  PX-158 (AR).

953.   The CSM memorandum stated that one Field Respondent "added that she had observed Hispanic members of a household move out of a mobile home after she tried to interview them." PX-158 (AR).

954.   The CSM memorandum stated: "Spanish-speaking respondents who participated in paper testing of the CBAMS (Census Barriers, Attitudes, and Motivators Survey) expressed concern about whether their answers might be shared with other government agencies."  PX-158 (AR).

955.   The CSM memorandum stated that, with regard to Respondents, "[d]espite having participated in the past, they seemed visibly nervous and reticent and required extensive explanations regarding how their data would be used and their personal identifying information would be redacted.  This behavior was in contrast to their demeanor during prior CSM pretesting projects."  PX-158 (AR).

956.   The CSM memorandum stated: "Several Chinese-speaking focus group respondents stated that the Chinese community's main fear or concern was immigration status and how the data are used."  PX-158 (AR).

957.   The CSM memorandum stated: "Arabic-speakers reported that they had concerns about their perception of the current environment as unwelcoming to Arabic-speaking immigrants and said that they feared deportation."  PX-158 (AR).

958.   The CSM memorandum stated: "Another FS [Field Supervisor] reported that each time she spoke to a Spanish-speaking respondent, her focus was on convincing the respondent of the confidentiality of their answers 'given the political temperature these days.'"  PX-158 (AR).

959.   The CSM memorandum stated that Field Supervisors "reiterated that the main issue they saw was privacy concerns of Latino respondents, and that FRs [Field Representatives] should do more practice interviews where someone models those concerns and concerns about immigration so that the FRs are more prepared to respond adequately in the field."  PX-158 (AR).

960.   The CSM memorandum stated:  "These findings are particularly troubling given that they impact hard-to-count populations disproportionately, and have implications for data quality and nonresponse."  PX-158 (AR).

961.   The CSM memorandum recommended "systematically collecting data on this phenomenon, and development and pretesting of new messages to avoid increases in nonresponse among hard-to-count populations for the 2020 Census."  PX-158 (AR).

962.   The Latino immigrant community is increasingly afraid of being targeted by the government as a result of the Trump administration's anti-immigrant policies and rhetoric, leading to concern about the addition of a citizenship question on the 2020 Decennial Census and fear about the potential use of data gathered based on this question.  PX-662; Supp. Escobar Aff. ¶ 5; Sarmiento Aff. (Docket No. 488-3) ¶¶6-9; Sarmiento Supp. Aff. (Docket No. 488-4) ¶ 2; Cullinane Aff. (Docket No. 505-1) ¶¶ 3, 5-11; Cullinane Supp. Aff. (Docket No. 505-3) ¶ 4; Vargas Supp. Aff. (Docket No. 498-22) ¶ 9. Nov. 9 Trial Tr. at 678:8-25.

963.   Members of CASA are increasingly afraid of interacting with the government due to the

Trump Administration's anti-immigrant policies and rhetoric.  Escobar Aff. ¶ 15; Sarmiento Aff.

¶ 7; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

964.   Policies such as family separation at the border, the "zero-tolerance" policy for

immigrants entering the United States without documentation, and the elimination of the

Deferred Action for Childhood Arrivals and Temporary Protected Status programs have

increased fears among immigrant communities of being targeted by agencies such as

Immigration and Customs Enforcement (ICE).  Escobar Aff. ¶ 17; Escobar Aff. ¶ 17; Sarmiento

Aff. ¶¶ 6-9; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4; Nov. 9

Trial Tr. at 618:1-22.

965.   CASA members have expressed fear of a knock on the door by a stranger, such as a

census enumerator, given the high number of arbitrary immigration enforcement actions that

have been undertaken by the Trump Administration.  Escobar Aff. ¶ 20.

966.   Many CASA members and other community members have expressed fears that

participating in the Census presents too high a risk to their safety and security, due to concerns

about information being shared with immigration enforcement agencies, to justify participating

in the Census.  Escobar Aff. ¶ 21; Sarmiento Aff. ¶¶ 6-9;Cullinane Aff. ¶¶ 3-11 (3rd sentence in

¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

967.   Many CASA, VACIR, and Make the Road New Jersey members have expressed fears that

responding to a citizenship question on the 2020 Decennial Census could lead to them being

targeted by immigration enforcement authorities and deported.  Escobar Aff. ¶ 23; Sarmiento

Aff. ¶ 7; Cullinane Aff. ¶¶3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶ 4.

968.   Particularly if citizenship status is reported at the block-level, this would exacerbate fears among the immigrant community of being targeted by immigration enforcement authorities if they respond to a citizenship question on the 2020 Decennial Census.  Escobar Aff. ¶ 24.

969.   President Trump's anti-immigrant policies, particularly those aimed at the Arab and Muslim communities, have increased fear in the Arab American community.  Supp. Khalaf Aff. ¶ 4.

970.   The Arab-American community is specifically afraid of responding to a citizenship question on the 2020 Decennial Census because of the context in which this question was added, by an administration that implemented a travel ban on several Arab- and Muslim-majority countries. Khalaf Aff. ¶ 22.

971.   The Arab-American community is afraid that census participation could lead to loss of citizenship, revocation of Legal Permanent Resident status, or the broadening of the President's ban on entry for people from several Arab- and Muslim-majority countries.  Khalaf Aff. ¶ 22.

972.   The Trump Administration's hostile and discriminatory actions and attitudes towards immigrants of color have led to fear among immigrants of color of interacting with government workers.  This fear has been increased by the additional of a citizenship question to the Census. Plum Aff. ¶ 13; Sarmiento Aff. ¶¶ 6-9;Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 is struck); Cullinane Supp. Aff. ¶ 4; Rodriguez Aff. (Docket No. 488-1) ¶ 8.

973.   Immigrants have expressed the fear that they will receive a visit from Immigration and Customs Enforcement if they report that there are noncitizens in their household.  Plum Aff. ¶ 16; Cullinane Aff. ¶¶ 3-11 (3rd sentence in ¶ 4 struck); Cullinane Supp. Aff. ¶4.

## VII.   EFFECT OF CITIZENSHIP QUESTION ON RESPONSE RATES

974.   The Parties agree that the addition of a citizenship question on the 2020 Census will depress self-response rates, particularly among noncitizen and Hispanic households.

975.   Establishing that there will be a decline in self-response is relevant to certain, but not all, of Plaintiffs' bases for standing. *See* PFOF VIII (Intro).

976.   For purposes of the merits of the Administrative Procedure Act claim, the undercount resulting from the addition of a citizenship question bears on the accuracy of the statements in Secretary Ross' March 26 memo assessing whether adding a citizenship question "would negatively impact the response rate for non-citizens," "neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially," and "limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially." PX-26 (AR).

### A.   Census Bureau Analyses of Decline in Response Due to a Citizenship Question

977.   The Census Bureau's primary analysis of the anticipated decline in self-response rates traceable to a citizenship question is found in a series of memoranda drafted by senior technical staff at the Census Bureau and culminating in a detailed white paper.

978.   By memorandum dated January 19, 2018, the Census Bureau prepared a technical review of DOJ request to add a citizenship question to the 2020 Decennial Census ("January 19 Abowd Memo"). PX-22 (AR); Nov. 13 Trial Tr. at 882:23-883:16.

979.   The January 19 Abowd Memo was based on a December 22, 2017 analysis in a draft white paper examining the impact of a citizenship question on response rates. PX-102 (AR); PX-147 (AR); Nov. 13 Trial Tr. at 896:7-12.

980.   The December 22, 2017 draft white paper was compiled by a team of technical experts assembled by Dr. John Abowd, referred to as the Census Bureau SWAT team. Nov. 13 Trial Tr. at 879:23-880:12.

981.   The analysis in this initial draft white paper was later updated and extended, and the most recent version of this analysis is dated August 6, 2018 ("the White Paper").  PX-162 (AR); Nov. 13 Trial Tr. at 896:7-12; 948:13-949:3.  The initial draft is in the Administrative Record.  *See* PX-4 at AR 5500 (AR), 11634.

982.   The White Paper represents the Census Bureau's most comprehensive and up-to-date analysis of the impact of a citizenship question on self-response rates. Nov. 13 Trial Tr. at 896:7–15; Census Bureau 30(b)(6) Dep. Vol. II at 353:2–354:4; PX-162 at 33-41.

983.   The Census Bureau believes that the analysis in the White Paper is methodologically sound. Nov. 13 Trial Tr. at 897:4-8; Census Bureau 30(b)(6) Dep. Vol. II at 355:13-20.

984.   The Census Bureau believes the White Paper constitutes the best analysis that it can do of the quality of citizenship data available from different sources, including surveys and administrative records, and the Bureau agrees with the analysis set forth in that paper. Nov. 13 Trial Tr. at 897:13-15; Census Bureau 30(b)(6) Dep. Vol. II at 357:6 -11.

985.   The January 19 Abowd Memo concludes that it is "a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households." PX-22 (AR); Nov. 13 Trial Tr. at 892:8-17; PX-297 at RFA 9.

986.   The Administrative Record reflects that, prior to the issuance of the March 26 decisional memo, the Census Bureau's best conservative estimate of the decrease in the self-response rates caused by the addition of a citizenship question was 5.1% for households containing one or more noncitizens relative to all-citizen households, and that there would also be a material decrease in the self-response rates of Hispanics.  PX-22 (AR); PX-25 (AR).

987.    The analysis of declines in self-response contained in the drafts of the White Paper and in the January 19 Abowd Memo apply to any alternative in which a citizenship question is asked on the Census short form, including the option of combining a citizenship question with the use of administrative records, which was eventually selected by Secretary Ross ("Alternative D"). Nov. 13 Trial Tr. at 888:22-889:6; PX-297 at RFA 22.

988.    Dr. Abowd discussed the analysis from the initial White Paper contained in the January 19 Abowd Memo (PX-22 (AR)) with Undersecretary Kelley and Secretary Ross at meetings on February 12, 2018, during which Kelley expressed no disagreement with the analysis, and Secretary Ross indicated he had a thorough understanding of the issues presented by the Census Bureau. Nov. 13 Trial Tr. at 883:17-884:10.

### B.    Effect of Question on Noncitizen Response Rates

989.    As Defendants effectively conceded at trial, and as the overwhelming weight of the evidence establishes, a citizenship question will decrease self-response rates in households with at least one noncitizen.

990.    The Census Bureau agrees that adding a citizenship question to the 2020 Census will lead to a lower self-response rate in households containing noncitizens. PX-22 (AR); PX-25 (AR); PX-100 (AR); PX-147 (AR); PX-162; Nov. 13 Trial Tr. at 881:19-882:3 ("balance of evidence" indicates decline in response rates); Census Bureau 30(b)(6) Dep. Vol. II at 358:12-17; Jarmin Dep. (Docket No. 511-4) at 278:2-10; 279:18-22.

991.    Following the decisional memo, the Census Bureau performed supplemental analyses estimating that the decrease in self-response rates among households with a noncitizen or a person of unknown citizenship status caused by the addition of a citizenship question would range between 5.1 and 11.9 percentage points depending on various estimates and assumptions, and that conservatively the most likely decline would be 5.8 percentage points.  Nov. 13 Trial Tr.

at 897:16-20; Census Bureau 30(b)(6) Dep. Vol. II at 372:2-12; PX-162 at 39; Jarmin Dep.

(Docket No. 511-5) at 290:10-14; PX-297 at RFAs 24, 26.

992.    In arriving at their 5.8 percentage points estimate, the Census Bureau conducted a natural

experiment, comparing response rates on the 2016 ACS, which incorporated a citizenship

question, to response rates on the 2010 Decennial Census, which did not incorporate a

citizenship question, and made a comparison of the resulting change in response rates between

households where all members of the household are citizens (as confirmed by administrative

records and their responses to the ACS citizenship question), and all other households (*i.e.*,

households that contain or may contain one or more noncitizens). Nov. 13 Trial Tr. at 898:2-

899:6; Census Bureau 30(b)(6) Dep. Vol. II at 373:9-15, 374:8-16; PX-162 at 39.  By comparing

the difference in drop-off between all-citizen households and other households between the 2016

ACS (which included a citizenship question) and the 2010 Census (which did not), the Census

Bureau adduced quantitative evidence about the impact of a citizenship question on self-response

rates. Nov. 13 Trial Tr. at 920:17-922:17.

993.    The Census Bureau acknowledges a citizenship question is sensitive to noncitizens. PX-

297 at RFA 70.

994.    The Census Bureau also analyzed response rates to the 2010 Census, which did not

incorporate a citizenship question, and the 2010 ACS, which did, and made a comparison of the

resulting change in response rates between households where all members of the household are

citizens (as confirmed by administrative records), and households in which one or more members

were noncitizens (as reflected in the administrative records).  Nov. 13 Trial Tr. at 891-93.  The

difference in the drop-off was 5.1 percentage points, which formed the basis for the Census

Bureau's best conservative estimate of the effect of a citizenship question on response rates prior

to Secretary Ross's Decision Memo, as reflected in the Administrative Record.  PX-22 (AR);

Nov. 13 Trial Tr. at 891-93.

995.   With respect to the 2000 Census, the Census Bureau compared the decline in self-

response during the 2000 Census on the Census long-form, which had a citizenship question, to

the Census short-form, which did not inquire into citizenship, for households that were all

citizens and households with at least one noncitizen.  PX-22 (AR); PX-162 at 40; Nov. 13 Trial

Tr. at 887:16-20.

996.   In its analysis of 2000 Census response rates, the Census Bureau found that households

with at least one noncitizen in them had a decline in self-response between the long-form and

short form that was 3.3 percentage points more than it was for all-citizen households.  PX-22

(AR); PX-162 at 40; Nov. 13 Trial Tr. at 888:2-6.  The differential response rate from the 2000

Census is credible, quantitative evidence that a citizenship question caused a decline in self-

response rates, and that "noncitizens are more sensitive to the inclusion of citizenship questions."

PX-22 (AR 1280); PX- 162 at 40; Nov. 13 Trial Tr. at 888:7-12.

997.   The Census Bureau also conducted similar analyses of response rates in the 2000 Census,

and the 2014 Survey of Income and Program Participation ("SIPP").  PX-162 at 40.

998.   With respect to the Survey of Income Program Participation ("SIPP") survey, a Census

Bureau survey containing a citizenship question, the evidence reflected that in more recent time

periods, noncitizens shrunk as a share of respondents; the Bureau considered this evidence to be

consistent with other evidence that households with a noncitizen or person of unknown

citizenship status are more sensitive to questions about citizenship status. Census Bureau

30(b)(6) Dep. Vol. I at 113:17 - 116:12. PX-162 at 40.

### C.      Effect of Question on Hispanic Response Rates

999.   A citizenship question will likely decrease response rates of Hispanic respondents at a

substantial rate.

1000.  The Census Bureau acknowledges that response rates to the 2020 Decennial Census will

decline more among Hispanics than non-Hispanic whites as a result of a citizenship question.

Nov. 13 Trial Tr. at 919:12–920:10; Census Bureau 30(b)(6) Dep. Vol. II at 365:18–366:16,

364:21 - 365:6.

### 1.      Item Non-Response Rates

1001.  In the January 19 Abowd Memo and the White Paper, the Census Bureau examined the

item nonresponse rates on the ACS for different racial and ethnic groups between 2013 and

2016. PX-22 (AR); PX-162 at 9–10; Nov. 13 Trial Tr. at 905:22-906:11.

1002.  Item nonresponse rates are the rate at which respondents do not answer particular

questions on a survey. Nov. 13 Trial Tr. at 905:22–906:11.

1003.  From 2013 through 2016, the item nonresponse rate for the citizenship question on the

ACS was more than twice as high for Hispanics as it was for non-Hispanic whites for both the

mail-in and internet response versions of the ACS.  PX-22 (AR); PX-162 at 8-10; Nov. 5 Trial

Tr. at 70-72; Nov. 13 Trial Tr. at 906:12-907:20; Census Bureau 30(b)(6) Dep. Vol. II at 359:13–

361:5; PX-298(R) at RFA 122.

1004.  The item nonresponse rate for the citizenship question for Hispanics increased from 2013

to 2016, in contrast to other questions, such as sex. PX-162 at 9.  As a result, the increase in item

nonresponse for the citizenship question could not be attributed to an increase in item

nonresponse to all questions. PX-162 at 9; Nov. 5 Trial Tr. at 72; Nov. 13 Trial Tr. at 912:10-19;

PX-297 at RFAs 90-92, 94; Kelley Dep. at 297:8-22.

1005.  As the item nonresponse rate for the citizenship question for Hispanics is much higher

than for non-Hispanic whites, the Census Bureau concluded that this difference is statistical

evidence that a citizenship question on the Census would result in higher nonresponse rates from

Hispanics as compared to non-Hispanic whites.  Nov. 13 Trial Tr. at 908:2-6, 910:7-13; Nov. 5

Trial Tr. at 72.  The Census Bureau has documented a higher item non-response rate for

Hispanics on the 2000 Census as well. PX-297 at RFA 68.

1006.  As discussed below, once the Census Bureau released the corresponding ACS data for

2017, Dr. Van Hook analyzed that data and found that item nonresponse for Hispanics on

citizenship was significantly higher in 2017 compared to prior periods.  Van Hook Aff. (Docket

No. 489-3) ¶¶ 69-72, Figures S1, S2, Table S3.

### 2.    Breakoff Rates

1007.  The January 19 Abowd Memo and the White Paper also examined breakoff rates from the

2016 ACS; the breakoff rate is the rate at which people responding to the ACS online stop

answering the survey on a particular question.  Nov. 13 Trial Tr. at 913:17-24.

1008.  Breakoff rates for the citizenship question on the 2016 ACS for Hispanics were more than

eight times the rate for non-Hispanic whites, a figure that is reflected in the Administrative

Record. PX-22 (AR); PX-69 (AR); PX-162 at 10; Nov. 5 Trial Tr. at 72-76; Nov. 13 Trial Tr. at

914:5-8; Census Bureau 30(b)(6) Dep. Vol. II at 361:6–363:4.

1009.  Likewise, the differences in the breakoff rates of Hispanics as compared to non-Hispanic

whites were much higher for the year of entry and citizenship questions.  PX-162 at 10; PX-22

(AR); PX-69 (AR); Nov. 5 Trial Tr. at 72-76; Nov. 13 Trial Tr. at 915:9-13.

1010.  The differences in breakoff rates in the 2016 ACS indicate that the citizenship question is

more sensitive for Hispanic than non-Hispanic whites, and that the survey-response quality of

Hispanics is differentially affected.  PX-22 (AR); PX 162 at 10; Nov. 5 Trial Tr. at 72; Nov. 13 Trial Tr. at 914:9-12.

1011.  These differential breakoff rates are becoming even higher.  The Hispanic breakoff rate for the citizenship question on the 2017 ACS was twelve times higher than the rate for non-Hispanic whites. PX-151 (AR); Nov. 5 Trial Tr. at 74-75; Nov. 13 Trial Tr. at 916:4-22; Census Bureau 30(b)(6) Dep. Vol. II at 363:5 - 364:8.

1012.  From 2016 to 2017, the breakoff rate for Hispanics for the citizenship question on the ACS increased, while it did not for non-Hispanic whites, resulting in a larger difference between the two. PX-22 (AR); PX-151 (AR); Nov. 5 Trial Tr. at 74-75; Van Hook Aff. ¶¶ 70, 71, Figures S1, S2; Nov. 13 Trial Tr. at 916:18-917:3; Census Bureau 30(b)(6) Dep. Vol. II at 364:9-20.  The breakoff rate for Hispanics to the citizenship question on the 2016 ACS was 8 times that of non-Hispanic whites, but was 12 times the rate in 2017. Nov. 13 Trial Tr. at 916-17.

1013.  Based on its analysis of item non-response rates and breakoff rates, the Census Bureau believes that Hispanics are more sensitive to citizenship survey questions than they were a few years ago, while non-Hispanic whites are not. Nov. 13 Trial Tr. at 917:8-918:2; Census Bureau 30(b)(6) Dep. Vol. II at 366:17–369:19.

## D.    Expert Testimony on Reduced Self-Response Rates Attributable to a Citizenship Question

1014.  In addition, Plaintiffs' expert witnesses concurred that the addition of a citizenship question will decrease self-response on the 2020 Decennial Census among noncitizens and Hispanics.

### 1.    Dr. Jennifer L. Van Hook

1015.  Dr. Jennifer L. Van Hook, an expert sociologist and demographer, likewise confirmed the negative impact of a citizenship question on self-response rates.  Dr. Van Hook conducted an

analysis of data from the "Current Population Survey ("CPS"), which is a monthly survey of

approximately 60,000 U.S. households administered by the U.S. Census Bureau, and which

contains a question concerning citizenship status, to assess what the nonresponse rates to that

survey suggest about the effect of adding a citizenship question to the 2020 Decennial Census.

Van Hook Aff. ¶ 17.  Dr. Van Hook testified that "the 2020 Decennial Census will be conducted

under the current administration, so current levels of nonresponse on government surveys

featuring a citizenship question (i.e., post-2017), including the CPS, are very relevant for

anticipating the effect of adding a citizenship question to the 2020 Decennial Census." *Id.* ¶ 20.

1016.  Dr. Van Hook's "analyses of the patterns and trends in nonresponse point to three key

findings: 1) Hispanics and immigrants (especially noncitizens or those living in immigrant

households) tend to have relatively high unit nonresponse rates and item nonresponse rates for

questions on place of birth and citizenship. 2) Both unit and item nonresponse have increased

significantly over time among immigrants. Unit nonresponse rates rose in the Trump era among

noncitizens while remaining steady or declining among citizens. Item nonresponse also rose

among those living in immigrant households, particularly for Hispanics. 3) Hispanic immigrants

experienced particularly large increases in nonresponse since the start of 2018."  *Id.* ¶ 12.

1017.  Dr. Van Hook further testified that "the overall patterns of unit and item nonresponse are

consistent with the understanding that survey response changed for the worse among Hispanic

noncitizens [over the period from 2014 through 2018], and the timing of the change suggests that

it is linked to changes in the political and/or policy climate, including the proposal to add a

citizenship question to the 2020 Decennial Census. The unit nonresponse data is consistent with

the understanding that adding a citizenship question to the Census will reduce nonresponse rates

among racial minorities (in particular Hispanics) as compared to non-Hispanic whites, and noncitizens as compared to citizens." *Id.* ¶ 16.

1018.  Dr. Van Hook testified that non-citizens have higher unit non-response rates to the CPS than do citizens. *Id.* ¶¶ 35, 47, Figure 4.  Further, unit nonresponse rates increased among noncitizens in recent years, particularly since 2017, while remaining relatively flat among citizens. *Id.* ¶¶ 41, 48, Figure 8. These diverging trends led the gap in unit nonresponse between noncitizens and citizens to double since the last quarter of 2016, with the unit nonresponse rates for noncitizens that were roughly 30% higher than for citizens by the first quarter of 2018. *Id.*

1019.  Dr. Van Hook testified that unit nonresponse rates are higher for ethnic minorities than non-Hispanic whites: Hispanics are approximately 20% more likely than non-Hispanic whites to drop out of the CPS. *Id.* ¶ 47.  And unit nonresponse among Hispanic noncitizens in particular has increased of recent with unit nonresponse increasing by 43 percent between the last quarter of 2016 and the first quarter of 2018, with a particularly sharp increase in first quarter 2018. *Id.* ¶¶ 43, 48-49, Figure 9.

1020.  Dr. Van Hook concluded that, "[o]verall, the CPS unit nonresponse data is consistent with the understanding that racial and ethnic minorities are less responsive to a survey concerning a citizenship question, and are more likely to not respond to a U.S. Census Bureau survey containing a citizenship question than are non-Hispanic whites. The same is the case for noncitizens as compared to citizens. Finally, the CPS unit nonresponse data is consistent with the understanding that noncitizens, and particularly, Hispanic noncitizens, have become less responsive to a survey containing questions concerning citizenship since the onset of the Trump administration, particularly during the first quarter of 2018." *Id.* ¶ 50.

1021.  Dr. Van Hook's analysis of patterns and trends in item nonresponse on the place of birth and citizenship questions in the CPS shows that item nonresponse is significantly higher among Hispanics and Asians than non-Hispanic whites and blacks, and more than twice as high among those living in immigrant households as for those in U.S.-born households. *Id.* ¶ 62.  Dr. Van Hook further testified that item nonresponse on citizenship has increased in recent years, most dramatically among Hispanics living in immigrant households, reaching its peak in the first quarter of 2018, while there was no corresponding increase in item nonresponse on questions about age. *Id.* ¶ 63.

1022.  Dr. Van Hook testified that the American Community Survey (ACS) is important because it is the most similar to the 2020 Decennial Census with respect to its mode of data collection. *Id.* ¶ 69.  Also, similar to the Decennial Census, response to the ACS is mandatory by law. *Id.*  She testified about the analysis she conducted based on the 2017 ACS data that recently was publicly released.  *Id.*  This analysis showed that item nonresponse on citizenship increased significantly among Hispanics each year from 2013 to 2017.  *Id.* ¶ 70.  In contrast, item nonresponse did not significantly increase after 2014 among Asians, and it did not significantly increase after 2015 among blacks and among non-Hispanic whites. *Id.*  By 2017, item nonresponse on citizenship was significantly higher among Hispanics than Asians, blacks, and non-Hispanic whites. *Id.* ¶ 70, Figure S1, Table S3.  Among all adults, Hispanics have the highest nonresponse rates to the citizenship question in the ACS. *Id.* ¶ 71.Among those in immigrant households, item nonresponse on citizenship in the ACS increased significantly every year from 2013 to 2017 among Hispanics. *Id.* ¶ 71. In contrast, item nonresponse did not significantly increase after 2014 among Asians; it did not significantly increase after 2015 among blacks; and it did not

significantly increase in any year among non-Hispanic whites in immigrant households. *Id.* ¶ 71, Figure S2.

1023.  Dr. Van Hook also examined how item nonresponse on citizenship compares with the other Decennial Census questions that are asked in the ACS:  age, sex, race, Hispanic origin, and housing tenure (rent/own). *Id.* ¶ 72. In the 2017 ACS, for all four racial/ethnic groups, item nonresponse rates on citizenship were significantly higher than item nonresponse on any other Decennial Census item. *Id.* ¶ 72, Figure S3, Table S4.

1024.  Dr. Van Hook also analyzed trends from 2013 to 2017 in item nonresponse for Hispanics on all Decennial Census questions that are also on the ACS to assess whether item nonresponse on citizenship is part of a broader pattern of increasing nonresponse and concluded that was not the case: a citizenship question is different. *Id.* ¶ 73. The percentage point change in item nonresponse among Hispanics on the ACS citizenship question increased significantly from 2013 to 2017 and more than it did for other questions. *Id.* ¶ 73, Figure S4, Table 5.

1025.  Finally, Dr. Van Hook also testified about a difference-in-change analysis of ACS item nonresponse on citizenship. *Id.* ¶ 74, Table S6.  Item nonresponse increased more for Hispanics as a whole as well as for Hispanics in immigrant households between 2015 and 2017 than in the earlier 2013 to 2015 time period. *Id.* ¶ 74.

1026.  Dr. Van Hook concluded that the nonresponse trends identified in her analysis of the ACS data are consistent with the findings of her analysis of the CPS data and with the understanding that response to Census Bureau surveys has changed for the worse in recent years, particularly among Hispanics and those in immigrant households.  *Id.* ¶¶ 75-76.

**2.      Dr. D. Sunshine Hillygus**

1027.  Dr. D. Sunshine Hillygus is an expert "in public opinion, survey methodology, and the United States Census." Nov. 5 Trial Tr. at 29:19-20.  Dr. Hillygus testified there is considerable

evidence "that adding a citizenship question to the decennial census will depress census participation among noncitizens and Hispanics," Nov. 5 Trial Tr. at 30. She based this conclusion on a review of a "wide range of different types of research," all of which pointed to a "negative impact on the participation of noncitizen and Hispanic households." Nov. 5 Trial Tr. at 50:23-51:4. The research she reviewed indicated that "noncitizens and Hispanics are differentially concerned about the confidentiality of a citizenship question, so would be less likely to participate, which will contribute to a give [differential] under count." Nov. 5 Trial Tr. at 51:7-11.

1028. Dr. Hillygus likewise concluded that adding a citizenship question would depress census participation among Hispanics, not limited to noncitizens. Nov. 5. Trial Tr. at 30:7-13. She testified that the social science research demonstrated that Hispanics, like noncitizens, were differentially concerned about the confidentiality of a citizenship question, which would make them less likely to participate in the census if it included such a question. Nov. 5. Trial Tr. at 51.

1029. In support of this opinion, Dr. Hillygus testified about the following evidence:

    a. The Census Bureau analysis, including Dr. Abowd's January 19 memo (PX-22(AR)) and the Brown memo (PX-162). Nov. 5 Trial Tr. at 70-89.

    b. Focus group research conducted in conjunction with the Census Bureau's Barriers, Attitudes, and Motivators Survey (CBAMS) (e.g., PX-152, PX-662, PX-663) found that Spanish-speaking participants "expressed fears of participating in the census, given their or others' immigration status. Even if they personally are citizens or legal residents, they said that filling out the census form can adversely affect their relatives, people in their community who did not have a secure immigration status . . . [they] were highly suspicious of how the data will be used

once collected . . . while their data might be protected now, there is no guarantee

that it will not be used against them in the future . . . there did not seem to be a

single trusted voice that could mitigate the distrust of the government to uphold

the promise of confidentiality." *Id.* at 64:21-65:1, 65:19-23, 66:4-6; PX-152, PX-

662; PX-663.

c.  Research conducted by the Census Bureau Center for Survey Measurement in

September 2017 (e.g., PX-136(AR), PX-160, PX-448, PX-656(AR)) documenting

"respondent confidentiality concerns" among immigrant respondents "in which

spontaneously the respondents were bringing up these issues of confidentiality"

which shows "Hispanics and immigrants are concerned about the confidentiality

of the Census." Nov. 5 Trial Tr. at 57:23-25, 58:7-9, 61:15-16; PX-136 (AR); PX-

160; PX-448; PX-656 (AR).

d.  Various studies show "the impact of these fears on the engagement with the

government . . . health advocacy organizations have reported that legal

immigrants are less likely to use public health services since Trump's election.

There is empirical research that finds that noncitizen parents are failing to sign

their children up for fear of revealing themselves.  There is also empirical

research showing that those who are not even eligible for deportation are . . .

failing to use food stamps or [Affordable Care Act] because of concerns about

deportation."  Nov. 5 Trial Tr. at 53:21–54:5.

1030.  Dr. Hillygus further testified that there is "empirical evidence . . . that Hispanics will also

be affected, including Hispanic citizens" by a citizenship question and that "we are going to

likely see an impact not only among noncitizens but also the spillover effects on Hispanics."

Nov. 5 Trial Tr. at 51:23-25, 57:6-7, 85:14-19, 86:2-5; Nov. 15. Trial Tr. at 1404:6-17 (noting

that her "opinion on the basis of the available empirical analysis is that the impact is likely to be

on Hispanics, including Hispanic citizens.").

### 3.      Dr. Matthew Barreto

1031.  Dr. Matthew Barreto is "an expert in survey methodology, public opinion polling, and

racial and ethnic politics." Nov. 9. Trial Tr. at 589.  He testified that his review of "the social

science research, as well as the self-published reports by the census, established that the

citizenship question will reduce self-response, and this will ultimately harm the accuracy and the

quality of the data in the census." Nov. 9. Trial Tr. at 590.  Dr. Barreto also conducted a survey

experiment that "confirms that the addition of the citizenship question will reduce self-response

and very clearly establishes that it will exacerbate the net differential undercount in particular of

the Latino and immigrant community." *Id.*

1032.  First, Dr. Barreto reviewed social science literature on the topic of survey methodology, as

well as social science research published by the Census Bureau.  This review of pertinent

literature confirmed that the "addition of a sensitive question such as [the citizenship question]

will erode trust and will lead to lower self-response rates." Nov. 9. Trial Tr. at 591-592.

1033.  Dr. Barreto testified as to the factors affecting survey participation, stating that the main

factors that impact participation in a survey are: trust in the survey administrator, both the person

directly administering the survey and the agency or organization overseeing it; the sensitivity of

the questions; and the macro-environment, or the social and political climate in which the survey

is being administered to the public. Nov. 9. Trial Tr. at 596.

1034.  As Dr. Barreto explained, the social science literature makes clear that absent trust,

respondents will not participate in surveys. Nov. 9. Trial Tr. at 597.  He testified that trust

specifically influences census participation, because "the census is an official government

survey. It is done on behalf of the federal government by the Census Bureau, and the public has

to trust that the federal government is carrying out their job faithfully and using the information

for these purposes." Nov. 9. Trial Tr. at 599-600.  Furthermore, trust is particularly important to

a citizenship question, because "questions related to citizenship are ones that many in the Latino

and immigrant community have trust issues with." Nov. 9. Trial Tr. at 601.

1035.  Although there are legal requirements for confidentiality with the census, Dr. Barreto

explained that such legal requirements may do little to assuage concerns of the public,

particularly given the sensitivity associated with a citizenship question and the current political

environment.  Nov. 9. Trial Tr. at 602-604, 606-610; *see also* PX-462; PX-430.

1036.  Likewise, as Dr. Barreto explained, the macro-environment is directly related to whether

respondents perceive a question as sensitive and therefore to the concomitant response rates.

Where the macro-environment is perceived as threatening, it raises the stakes of participation; if

respondents feel that participation will put them at risk, self-response rates will decline.  Nov. 9.

Trial Tr. at 610.

1037.  Accordingly, Dr. Barreto concluded that given current trust issues arising from the macro-

environment, "the addition of a citizenship question was a particularly sensitive question and that

the addition of this question in today's macro environment would result in reduced participation

in Latino and immigrant communities in 2020." Nov. 9. Trial Tr. at 620-621.

1038.  Dr. Barreto also introduced the results of an original public opinion survey; this survey

confirms that adding a citizenship question will reduce self-response rates. Nov 9 Trial Tr. at

590.  This survey, which examined the willingness of respondents to participate in the 2020

Census included a Randomized Controlled Trial (RCT) experiment.  Put simply, Dr. Barreto's

survey inquired, *inter alia*, into the likelihood of a respondent responding to the census, both with and without a citizenship question.  Nov. 9 Trial Tr. at 644–740.

1039.  Dr. Barreto explained that survey research can "reliably represent populations with millions of members" and present "a truly representative and unbiased picture of it." Nov. 9 Trial Tr. at 644; PX-427 at 2.  Survey research is relied on extensively by the federal government, not just in the census, but in many different agencies and across the social sciences to understand public opinion and participation. Nov. 9 Trial Tr. at 645.  Dr. Barreto testified that his survey met all the applicable criteria for ensuring accuracy and reliability that enabled him to extrapolate his results to the national population. Nov. 9 Trial Tr. at 646-647.

1040.  Dr. Barreto conducted his survey on sample of 6,309 respondents from across the United States, with an additional oversample of Latinos, and geographic oversamples in San Jose, California and Cameron County and Hidalgo County, Texas. Nov. 9 Trial Tr. at 651-653; *see* PX 669.

1041.  The results derived from this survey were set forth in a number of tables.  As Dr. Barreto explained, the drop-off rate—reflecting respondents who would not participate in a census with a citizenship question—was 7.14% for all respondents to the survey, but 14.1% for Latinos. Nov. 9 Trial Tr. at 669-73; *see also* PX 670.

1042.  Even after being assured that the Census Bureau would keep their answers confidential, Dr. Barreto's survey found that Latino households stated that they were unwilling to participate in the census—with or without assurances of confidentiality—at substantially higher rates than the national sample taken as a whole.  Specifically, the national drop-off rate for all respondents was 9.69%, and the drop-off rate for Latinos was 16.58%. Nov. 9 Trial Tr. at 674-675; *see* PX 671 (reflecting the drop-off rate after assurances of confidentiality).

### 4. Dr. Christopher Warshaw

1043. Dr. Christopher Warshaw, an expert in public opinion based on surveys and census data, as well as the study of representation, elections, and polarization in American Politics, testified that "the addition of a citizenship question could… depress response rates among noncitizens and immigrant communities" Warshaw Aff. (Docket No. 526-1) ¶¶ 1–7, 23.

1044. Dr. Warshaw analyzed the survey data from Dr. Barreto's RCT (described above), by running a "weighted regression that evaluates the treatment effect of the citizenship question. In other words, it evaluates whether people in the treatment group, that were told the Census would include a citizenship question, are less likely to indicate they would respond to the Census than people in the control group that were told it would not include a citizenship question." Warshaw Aff. ¶¶ 27–31, 33.

1045. Overall, Dr. Warshaw's results, set forth in the table below, showed that "that the citizenship question makes both Latinos and Foreign-born non-Latinos less likely to respond to the Census. The weighted regression model in column (1) indicates that Latinos are about 5.9% less likely to complete the Census if it includes a citizenship question. The results are similar in the other two models shown in columns (2) and (3). For foreign-born, non-Latinos, the weighted regression in column (4) indicates that they are about 11.3% less likely to complete the Census if it includes a citizenship question. The results are substantively similar, though more statistically significant, in the other two models shown in columns (5) and (6)." Warshaw Aff. ¶ 35.

1046. Dr. Warshaw testified that he has a 95% confidence in the predictions from the RCT. Warshaw Aff. Table 4.

Table 4: Experiment Results on Effects of Citizenship Question on Census Response among Latinos and Foreign-born

| | Latinos | | | Foreign-born (not Latino) | | |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Citizenship Question | −0.059** | −0.070** | −0.062*** | −0.113 | −0.164** | −0.096** |
| | (0.029) | (0.028) | (0.016) | (0.072) | (0.066) | (0.039) |
| Survey Weights | X | X | | X | X | |
| Controls | | X | X | | X | X |
| Observations | 2,362 | 2,362 | 2,362 | 488 | 488 | 488 |
| $R^2$ | | | 0.043 | | | 0.117 |
| Adjusted $R^2$ | | | 0.021 | | | 0.022 |
| Log Likelihood | −2,851.497 | −2,763.581 | | −782.779 | −714.807 | |

*Note:* *$p<0.1$; **$p<0.05$; ***$p<0.01$

*Id.* ¶ 35.

### E.  The Census Bureau's Estimates of the Decline in Self-Response Rates are Conservative

1047.  The Census Bureau's estimate of the decrease in self-response resulting from a citizenship question is conservative, and underestimates the likely impact of adding the question.

1048.  The Plaintiffs' and Defendants' experts agree that the 5.8 percent decrease in self-response is "conservative." Nov. 5 Trial Tr. at 78:11-12, 80-89; Nov. 13 Trial Tr. at 866:3-4.

1049.  The Census Bureau concurs that the 5.8 percentage point estimate is conservative, noting that "factors suggest the estimated effect on self-response from the exercise in Table 9 [*i.e.,* the 5.8 percent decrease in self-response] is conservative." PX-162 at 39.

1050.  The 5.8 percentage point estimate is conservative because it is based on an analysis on ACS response rates, but a citizenship question on the Decennial Census questionnaire, which is much shorter, would be more prominent. Nov. 5 Trial Tr. at 87-89; Nov. 13 Trial. Tr. at 901:22–902:4.

1051.  The greater prominence of a citizenship question on the Decennial Census questionnaire means that the question could have a larger impact in terms of decreasing self-response as

compared to the less prominent citizenship question on the ACS. Nov. 5 Trial Tr. at 87-89; Nov. 13 Trial Tr. at 902:5-10; Census Bureau 30(b)(6) Dep. Vol. II at 376:13–377:5.

1052.  The "ACS contains 75 questions, so any one question is unlikely to stand out, whereas an added question will be more visible in the 2020 Census questionnaire, which contains just 10 other questions." PX-162 at 39; Nov. 5 Trial Tr. at 88:1-4; PX-255; PX-665.

1053.  The 5.8 percentage point estimate is also conservative because it considers only the impact on households with at least one noncitizen resident and does not account for nonresponse households composed entirely of citizens. PX-162 at 38-39; Nov. 5 Trial Tr. at 85-86; Nov. 13 Trial Tr. at 903:1-8.  As the Census Bureau concedes, this assumption—that a citizenship question will have no impact on the response rates of citizen households—is likely incorrect. Nov. 13 Trial Tr. at 903:15-905:2.

1054.  In addition, the 5.8 percentage point estimate is conservative because it based on 2016 ACS data and does not account for salient developments that might impact response rates that occurred after 2016.  PX-162 at 39; Nov. 5 Trial Tr. at 81-83; Nov. 13 Trial Tr. at 902:11-23.

1055.  The Census Bureau's natural experiments reflect that nonresponse rates to citizenship questions among noncitizens are increasing. Census Bureau 30(b)(6) Dep. Vol. I at 105:17–106:16; Nov. 13 Trial Tr. at 917:8–918:23.  The 5.8 point estimate is based on 2016 ACS data, and would not account for increased sensitivity of the citizenship question after that date, for example, as reflected in 2017 ACS break-off rates.

1056.  For example, the Census Bureau's analysis of item non-response and break-off rates are consistent with the hypothesis that noncitizens and Hispanics have become more sensitive to a citizenship question, and less likely to respond to a census questionnaire including such a

question, over time. PX-22 (AR); PX-151 (AR); Nov. 13 Trial Tr. at 917:8–918:2; Census Bureau 30(b)(6) Dep. Vol. I at 108:7-16.

1057. The CBAMS survey and focus group analysis conducted by the Census Bureau also suggest that noncitizen and Hispanic sensitivity to a citizenship question has been increasing since 2016. Nov. 13 Trial Tr. at 944:07-14; PX-662. Increased sensitivity to a citizenship question as reflected in the 2018 CBAMS research would not be accounted for in the 5.8 point estimate, which is based on 2016 ACS data. Nov. 13 Trial Tr. at 944-46.

1058. In addition, Plaintiff's expert, Dr. Hillygus, testified at length about the conservative nature of the estimate in the August 6, 2018 version of the Census Bureau White Paper. PX-162. The White Paper reflected that the introduction of a citizenship question on the 2020 Decennial Census could depress self-response rates among noncitizen households by between 5.1% and 11.9%. Nov. 5 Trial Tr. at 77-80.

1059. Dr. Hillygus gave numerous reasons for believing that the research set forth in the White Paper was an underestimate of the effect the introduction of a citizenship question on the 2020 Decennial Census would have on the rates of self-response among noncitizen households, *id.* at 81-88, including:

    a. Discussing PX-365 and other Census Bureau research, Dr. Hillygus testified the Census Bureau analysis is based on 2010 data and the issue of citizenship is more salient and prominent given changes in the macro-environment (in particular increase in political rhetoric about immigration and increased confidentiality concerns) and Census Bureau research on difficulty of convincing individuals with confidentiality concerns to participate. Nov. 5 Trial Tr. at 81:7-15; PX-365.

    b.   The Census Bureau analyses presented in PX-22 (AR) and PX-162 relied on matching ACS and Census Bureau data, and noncitizens are more likely to be missing from one or both sets of data. Nov. 5 Trial Tr. at 84:5-15; PX-22 (AR); PX-162; Nov. 15 Trial Tr. at 1403:10–1404:3.

    c.   Census Bureau analyses in PX-22 and certain analysis in PX-162 assumed that individuals whose citizenship information was missing from the administrative data were assumed to be citizens. Nov. 5 Trial Tr. at 85:5-6.

    d.   The Census Bureau analyses controlled for a number of factors in their modeling assumptions that are aligned with people who may have confidentiality concerns (such as non-English speakers), such that the Census Bureau's exclusion of them from the model would blunt the impact. Nov. 5 Trial Tr. at 86:18-20, 87:6-11; PX-162 at 37-39; Tables A13, A14.

## F.    The Macro-Environment

1060.  The current macro-environment further confirms the likelihood that a citizenship question will likely decrease self-response rates in the 2020 Decennial Census at a substantial rate.

1061.  The Census Bureau admits that the macro-environment, part of which is the political environment within which a Census is taken, can affect response rates. Nov. 13 Trial Tr. at 926:21-23.

1062.  The current political environment around immigration amplifies the effect of a citizenship question on response rates as compared to response rates in 2016. *Id.* at 927:5-10.

### 1.    CBAMS Results

1063.  Research conducted by the Census Bureau confirms that the current macro-environment has intensified fears relating to a citizenship question.  From February through May 2018 the Census Bureau conducted the "Census Barriers, Attitudes, and Motivators Survey" (CBAMS),

which is designed to provide the Census Bureau with information on the macro- environment. PX-161; PX-152; Nov. 13 Trial Tr. at 927:18-24.

1064.  The CBAMS consists of a survey of 50,000 households and a series of 42 focus groups designed to inform the Census Bureau's integrated partnership and communications program. Nov. 13 Trial Tr. at 927:25–928:11; PX-152; PX-662; Census Bureau 30(b)(6) Dep. Vol. II at 437:6–438:16.

1065.  During the CBAMS, Census Bureau researchers asked about a citizenship question in 30 out of 42 focus groups, including all Spanish-language focus groups. PX-163 at 6; PX-152; Nov. 13 Trial Tr. at 930:16-19.

1066.  The PowerPoint containing this focus group finding was presented to Undersecretary Kelley and Secretary Ross in September 2018. PX-163; Nov. 13 Trial Tr. at 928:20–929:16; Census Bureau 30(b)(6) Dep. Vol. II at 445:5-18, 448:5-17.

1067.  The CBAMS reflect how respondents' fear of deportation influenced their response to a census that included a citizenship question. For example, during the Spanish (U.S. Mainland) focus groups, "[m]ost participants said that though they personally are citizens or legal residents and are not afraid to answer the citizenship question, they know many others who will not fill out the question or the form altogether out of fear.  While all participants expressed the desire to be counted, fear of deportation outweighs any benefit." PX-152 at 22; Nov. 13 Trial Tr. at 933:24–934:7; Census Bureau 30(b)(6) Dep. Vol. II at 449:5–13, 449:21–451:9

1068.  The Census Bureau believes that this focus group result is an indication that a citizenship question is viewed as extremely problematic for the Hispanic population.  Nov. 13 Trial Tr. at 934:8–12.

1069.  The CBAMS reflected similar results for other immigrant and non-white communities. Nov. 13 Trial Tr. at 930:09–24, 938:22–939:17, 940:04–941:14

1070.  Participants from the Middle East and North African focus group stated that they understood that census responses are confidential, but "indicated a fear that this could change," and are therefore less likely to self-respond. PX-152 at 13; Census Bureau 30(b)(6) Dep. Vol. II at 457:12–458:13.

1071.  Participants in the Chinese (Mandarin and Cantonese) focus group expressed a reluctance to report on others outside of their immediate families, thus making the use of neighbors as proxies in these communities difficult. PX-152 at 7; Census Bureau 30(b)(6) Dep. Vol. II at 458:15–459:14.

1072.  Participants in the Native Hawaiian and Pacific Islander focus group expressed reluctance to provide a census response for every member of their household out of concern that their landlords might learn how many people are staying there, thus making the use of landlords as proxies in these communities difficult. PX-152 at 16; Census Bureau 30(b)(6) Dep. Vol. II at 461:2–21.

1073.  The Census Bureau acknowledges that with a citizenship question, people who are afraid of deportation will be an extremely difficult group to count.  Nov. 13 Trial Tr. at 934:13–936:13.

1074.  The focus group results also demonstrate that members of the Hispanic community would be more likely to self-respond if there was not a citizenship question on the 2020 Decennial Census. Nov. 13 Trial Tr. at 936:14–937:4.

1075.  Director Jarmin has acknowledged the new challenges that a citizenship question presents to the Census Bureau. Supp. Vargas Aff. (Docket No. 498-22) ¶ 8.

1076.  In an October 31, 2018 presentation about the CBAMS results, the Census Bureau revealed that 10% of respondents to the CBAMS believe that the 2020 Decennial Census will be used to locate people living in the country without documentation, while 37% are unsure whether the Census will be used in that manner. PX-662 at 20; Nov. 13 Trial Tr. at 938:14-21.

1077.  The Census Bureau found that 41% of both Asian respondents and Limited English Proficient respondents expressed concerns about confidentiality in the CBAMS, and 34% of Hispanics expressed these concerns. PX-662 at 30, 58; Nov. 13 Trial Tr. at 940:4-9.

1078.  The Census Bureau found that 37% of Limited English Proficient respondents, and 36% of those responding in Spanish expressed concerns about data sharing of Census responses with other government agencies.  In addition, 32% of foreign-born respondents, and 32% of Hispanic respondents expressed similar concerns. PX-662 at 32.

1079.  The Census Bureau found that 41% of Asian respondents fear that their Census responses will be used against them, as did 39% of foreign-born respondents, 34% of those responding in Spanish, and 33% of Hispanics. PX-662 at 36, 58; Nov. 13 Trial Tr. at 941:2-14.

1080.  The Census Bureau further noted that "the citizenship question may be a major barrier", and that participants in focus group testing expressed concerns that the purpose of the question is "to find undocumented immigrants" and that the "political discourse is targeting their ethnic group." PX-662 at 43; Nov. 13 Trial Tr. at 941:15–942:3; Supp. Vargas Aff. ¶ 9.

1081.  For Hispanic participants in focus groups, the Census Bureau noted that they "expressed intense fear that information will be shared with other government agencies to help them find undocumented immigrants.  Participants worried that their participation in the census could harm them personally or others in their communities/households they care about." PX-662 at 58; Nov. 13 Trial Tr. at 943:14-21.

1082.  The CBAMS research suggests that a citizenship question is particularly sensitive in the current macro-environment.  Nov. 13 Trial Tr. at 944:7-14.

1083.  The sensitivity to a citizenship question that is reflected in the CBAMS research is not captured in the Census Bureau's estimate of a 5.8% decrease in self-response, which is based on 2016 data. Nov. 13 Trial Tr. at 944:25-945:5.

### 2.  Center of Survey Measurement Memoranda

1084.  In addition to the CBAMS, the former Center for Survey Measurement at the Census Bureau also found concerns about confidentiality during focus group testing in 2017 that suggest issues in the macro-environment. PX-136 (AR); PX-448.

1085.  Researchers at the Center for Survey Measurement summarized several issues relating to "Respondent Confidentiality Concerns," in a memorandum for the Associate Directorate for Research and Methodology at the Census Bureau, dated September 20, 2017, and a subsequent presentation, dated November 2, 2017. PX-136 (AR), PX-448.

1086.  The researchers noted that during Census Bureau pretesting in 2017, they found "fears, particularly among immigrant respondents, have increased markedly this year." PX-136 (AR).

1087.  In addition, the researchers noted a "[r]ecent increase in respondents spontaneously expressing concerns to researchers and field staff about confidentiality and data access relating to immigration." PX-448 at 2.

1088.  During focus group testing, the researchers found that respondents expressed "fear of deportation, concern about how the data are used, and which agencies can see it (DHS? ICE?)." PX-448 at 9.

1089.  The researchers also noted that the behavioral changes were recent, quoting one Census Bureau interviewer who reported that "[t]hree years ago was so much easier to get respondents

compared to now because of the government changes . . . and trust factors . . . Three years ago I didn't have problems with the immigration questions." PX-448 at 13.

1090.  The findings from the CBAMS and Center for Survey Measurement research suggest that the sensitivity of a citizenship question is increasing in the current political environment.

### 3.  Plaintiffs' Experts Agree that the Current Macro-Environment Heightens Concerns that a Citizenship Question will Substantially Reduce Response Rates

1091.  As set forth above, Dr. Barreto testified that the existence of a hostile macro-environment on issues relating to immigration enforcement could be expected to drive down self-response rates on the 2020 Decennial Census among Latinos and immigrants. Nov. 9 Trial Tr. at 612-617.

1092.  Dr. Hillygus also testified to the existence of a climate of fear of deportation among Hispanics and noncitizens, noting that a recent Pew Research Center public opinion poll showed that 47% of Hispanics polled say, "regardless of their own immigration or citizenship status, they worry a lot or some that they, a family, or close member could be deported," while 52% of foreign-born citizens and 66% of noncitizens expressed the same belief.  Nov. 5. Trial Tr. at 52:11-21.  Dr. Hillygus also testified about a recent UCLA survey of both Latinos and whites showed that 56% of Latinos surveyed were concerned about deportation, while only 19% of whites were.  Nov. 5 Trial Tr. at 53:17-20.

1093.  In addition to the survey evidence of a hostile macro-environment on immigration issues, Dr. Hillygus also relied on impact evidence, examining behaviors of Latinos and noncitizens relating to their willingness to interact with government programs as evidence of their levels of concern. Nov. 5 Trial Tr. at 54.  For example, she testified:

- that research conducted by health advocacy organizations that "legal immigrants are less likely to use public health services since Trump's election," and that

noncitizen parents are failing to sign their children up for those services for fear of revealing themselves.  Nov. 5 Trial Tr. at 53-54.

- that fear of deportation had a chilling effect on willingness to use WIC in families with mixed citizenship status, and is therefore "preventing U.S. children from receiving aid."  Nov. 5 Trial Tr. at 55:7-25.

- that a National Bureau of Economic Research study shows that, due to fear related to deportations, even Hispanic citizens who are not themselves at risk of deportation are nonetheless less likely to use SNAP or enroll with the ACA. Nov. 5 Trial Tr. at 56:7-25.

1094.  The combination of survey evidence and impact evidence about the climate of fear among Latinos and noncitizens makes it likely that inclusion of a citizenship question on the 2020 Decennial Census would have "an impact not only among noncitizens but also the spillover effects on Hispanics." Nov. 5 Trial Tr. at 57:6-7.

## VIII.   EFFECT OF A CITIZENSHIP QUESTION ON UNDERCOUNT

1095.  Establishing that there will be an undercount is relevant to certain, but not all, of Plaintiffs' claims of standing.

1096.  In particular, establishing that there will be a statewide net differential undercount is relevant to Plaintiffs' injuries about diminishment of federal political power (relative to apportionment of federal representatives and Electoral College electors).  *See* PFOF X.C.1.  And establishing that there will be a statewide net differential undercount is relevant to the State Governmental Plaintiffs' claims about claims about loss of federal funding, and NGO Plaintiffs' claims of loss of federal funding. *See* PFOF X.C.2.a & b.

1097.  Establishing that there will be a net differential undercount within states or local geographies is relevant to Plaintiffs' claims about diminishment of political power at the state or local level. *See* PFOF X.C.1.

1098.  Establishing that there will be a net differential undercount is not necessary to establish Plaintiffs' injuries that flow from the impact of a citizenship question on data quality or data privacy issues.  As discussed in PFOF X.D, the quality of Census data has a direct impact on funding and resource allocation issues.  And as discussed in PFOF.X.E, respondent data privacy is implicated by both the use of the Census to collect citizenship data and the plans to publish PL-94-171 data at the granular block level.

1099.  Establishing that there will be a net differential undercount is not necessary to establish Plaintiffs' injuries related to a citizenship question stemming from the diversion of their resources (in terms of expenditures, staff time, and resources) in their capacity as "trusted voices" to promote participation in the Census. *See infra* PFOF X.A.

1100.  Establishing that there will be a net differential undercount for non-citizens, racial or ethnic minorities is relevant to the NYIC's Plaintiffs' Fifth Amendment claim.

### A. Hard-to-Count Populations and Undercount

1101.  The Census always fails to count some people. Census Bureau 30(b)(6) Dep. Tr. Vol. I  at 253:20-254:4; Nov. 15 Trial Tr. at 1362 (Abowd).

1102.  Some demographic groups have proven more difficult to count in the Decennial Census than others. The Census Bureau refers to these groups as "hard-to-count." Docket No. 480-1 at ¶ 21.

1103.  Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census. Docket No. 480-1 at ¶ 22.

1104.  Individuals identifying as Hispanic were undercounted by almost 5% in the 1990 Decennial Census. Docket No. 480-1 at ¶ 23.

1105.  The 2010 Decennial Census undercounted on net more than 1.5 million Hispanic and African American individuals. Docket No. 480-1 at ¶ 24.

1106.  The Census Bureau describes the undercounting of a particular racial and ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. Docket No. 480-1 at ¶ 25.

1107.  Dr. Abowd acknowledged that either a 5.1 or a 5.8 percent decline in non-citizen self-response would result in millions of additional individuals going into non-response follow up operations. Nov. 13 Trial Tr. at 894:1-895:2.

1108.  Dr. Barreto testified that "due to the citizenship question, there will be heightened concerns and trust issues related to confidentiality and that these concerns will make the NRFU process less successful in 2020." Nov. 9 Trial Tr. at 621:15-615:20.

1109.  Dr. Barreto explained that trust and sensitivity concerns around a citizenship question would have differential impacts: "for some groups, the NRFU process this year might be as successful in previous years. They may feel no change. . . But for other groups who feel that the question is sensitive and is putting them at risk, it is expected to be far less successful. So not only do I think overall NRFU will be more challenging and less successful, but there will be a

differential success rate, and in particular, Latino and immigrant communities are expected to have less NRFU success." Nov. 9 Trial Tr. at 621:21-622:8.

1110.   Dr. Barreto based his opinion, in part, on a review of relevant social science research. Nov. 9 Trial Tr. at 593:6-595:16.

1111.   The social science research relied on by Dr. Barreto in forming his opinion involved more than fifty sources, *see* PX 389, PX-420 to PX-450 and PX-452 to PX-478, and included:

    a.    Census Bureau research work by Manuel de la Puente examining the 1990 and 2000 census undercounts of the Hispanic and immigrant communities. De la Puente recognized that "trust and concerns over immigration status remained barriers to participation in Latino and immigrant communities, and he continued to note an undercount and difficulties in the NRFU process in successfully implementing the census in these communities." Nov. 9 Trial Tr. at 608:2-609:22; PX-430; PX 431.

    b.    A 2018 Census Bureau study by Brown, et al. which "concluded that there would not only be a lower self-response rate due to the citizenship question, but that this would affect NRFU as well. This . . . perceived negative environment would follow through all the way through the NRFU process, leading people to be less likely to participate and interact with field staff." Nov. 9 Trial Tr. at 635:8-637:5; PX-162.

    c.    A 2017 study by Terry, et al. which found a direct link between increased immigration enforcement and lower enumeration and less effective NRFU in the presence of that increased immigration enforcement. "The main take-away is that if people are choosing to not participate in the census, if they are pulling

themselves out due to a threatening context . . . NRFU cannot fix that because that . . . threat is still there. So whatever problems we have in lowering the self-report will stay for those same communities and we will have problems with NRFU."

Nov 9 Trial Tr. at 635:8-637:5; PX-385.

1112.  Dr. Hillygus testified that adding "a citizenship question is going to make conducting the census a heck of a lot more difficult because of concerns about confidentiality among noncitizens and Hispanics." Nov. 5 Trial Tr. at 67:10-12.

1113.  Dr. Hillygus cites social science research supporting her conclusion, noting that Census Bureau's ethnographic research has found that fear of deportation, cultural resistance to government compliance, language barriers, and complex households all contribute to the differential undercounts of racial and ethnic groups. PX-390 at 68-70.

### B.  The Parties' Responses to the Expected Undercount

1114.  The Census Bureau has developed a range of strategies to address the net differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills. Docket No. 480-1 at ¶ 26.

1115.  All parties expect to expend significant resources to mitigate the expected net differential undercount.

1116.  The NGO Plaintiffs' efforts, which will divert resources from other organizational priorities, are described at PFOF X.A.

1117.  The NGO Plaintiffs do not expect their efforts will prevent the material net differential undercount resulting from the addition of a citizenship question. PFOF X.A.

1118.  The Governmental Plaintiffs' efforts, which will divert resources from other funding needs, are described at PFOF X.B.

1119.  The Governmental Plaintiffs do not expect their efforts will prevent a material net differential undercount resulting from the addition of a citizenship question. PFOF X.B.

1120.  Through their expert testimony, Defendants' position is that they expect to be able to mitigate the decline in self-response through the integrated communications campaign and their non-response follow up operations ("NRFU"). Nov. 14 Trial Tr. at 1113:18-111-8.

1121.  Plaintiffs' and Defendants' experts agree that neither the integrated communications campaign nor the Census Bureau's NRFU operations will fully mitigate the decline in non-citizen and Hispanic self-response, nor will they eliminate the net differential undercount. Nov. 15 Trial Tr. at 1357:4-14 (Abowd).  Among other reasons, Dr. Hillygus testified:

a.   The Census Bureau CBAMS focus groups found that Spanish language and immigrant respondents were concerned about confidentiality and that "there does not seem to be a single trusted voice that could mitigate the distrust of the government to uphold the promise of confidentiality." Nov. 5 Trial Tr. at 66:4-6; PX-152, PX-662 & PX-663.

b.   "[C]ommunication scholars recognize that reaching the public is incredibly difficult and more difficult today than it was in 2010. We have a fragmented media environment, so simply even getting the message out is more complicated today than it was in previous censuses." Nov. 5 Trial Tr. at 91:20-24.

c.   The Census Bureau "planned to do considerable research to be able to have a more effective communication campaign [for the 2020 Decennial Census], and that was eliminated, including being eliminated from the 2018 end-to-end test,

and so [the Census Bureau] are going in without . . . a robust set of evidence backing up their communications campaign." Nov. 5 Trial Tr. at 91:25-92:6.

    d.    Census Bureau research (including PX-365) suggests that confidentiality concerns (such as those implicated by a citizenship question) "can be especially difficult to move in terms of any outreach . . . you couldn't kind of message your way out of those concerns." Nov. 5 Trial Tr. at 81:16-18, 81:22-23; PX-365.

1122. Dr. Barreto testified that a "citizenship question, coupled with the political environment that immigrants perceive, will make it very difficult for census enumerators to convince people to participate, and that this will remain a very low participation rate, not only of the self-response, but throughout the entire NRFU process. That will result in an undercount of many in the Latino and immigrant community." Nov. 9 Trial Tr. at 644:1-7.

1123. These concerns are becoming more acute. As Dr. Barreto discussed, a 2017 presentation by the Center for Survey Measurement (CSM) reflected increasing concern regarding confidentiality, particularly around immigration issues, posing serious barriers for NRFU operations. Nov. 9 Trial Tr. at 625:24-626:24, 630:6-630:24; PX-448.

1124. Dr. Abowd conceded that if there were a citizenship question on the census, the trusted partners that the Census Bureau relies on to carry forth the message that it is important to participate in the census would have additional challenges communicating that message. Nov. 13 Trial Tr. at 937:16-23.

1125. And Dr. Abowd testified that "it would either be very or extremely difficult to mitigate the citizenship question consequences in 2020 . . . because of the macro-environment." Nov. 14 Trial Tr. at 1159:4-8.

### C. The Defendants' Planned Integrated Communications and Partnership Campaign

1126. Although Defendants' expert noted the importance of the integrated communications and partnership campaign, Secretary Ross' decisional memo does not cite or otherwise discuss the impact of the integrated communications and partnership campaign. PX-26 (AR).

1127. In particular, Secretary Ross' decisional memo does not claim that the integrated communications campaign will either mitigate the impact of a citizenship question in reducing self-response or in promoting the efficacy of Defendants' non-response follow up efforts. PX-26 (AR).

1128. There is no evidence in the Administrative Record about Defendants' planned integrated communications (planned advertising campaign) or partnership campaign for the 2020 Decennial Census. PX-1 to PX-14 (AR).

1129. There is no evidence in the Administrative Record that Defendants' planned integrated communications and partnership campaign will mitigate the expected reduction in self-response due to the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14 (AR).

1130. There is no evidence in the Administrative Record that Defendants' planned integrated communications campaign will foster cooperation with the Census, the Census' non-response follow up operations, or that such efforts will mitigate or eliminate the undercount due to the addition of a citizenship question to the 2020 Decennial Census. PX-1 to PX-14 (AR).

1131. In the 2000 and 2010 Decennial Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness. Docket No. 480-1 at 27.

1132.  Former Census Bureau Director John Thompson testified about the importance of the integrated communications and partnership campaign in the 2000 and 2010 Censuses, noting that it was a "key component" to reducing undercounts relative to the 1990 Census because it helped "deliver a message to hard-to-count populations that the census is important to their community, that the data collected through the census is completely confidential and that no individual's information is shared with any other organization or law enforcement entity." Thompson Aff. (Docket No. 516-1) ¶ 99.

1133.  For the 2000 and 2010 Decennial Censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations to reach these communities and improve the accuracy of the count. Docket No. 480-1 at ¶ 28.

1134.  Mr. Thompson further testified that the communications and partnership campaign "was responsible for dramatic gains in the accuracy and coverage of the 2000 and 2010 Decennial Census relative to the 1990 Census, which did not include such a program" and his opinion was that "one of the reasons for the success of these efforts is that it worked to help gain people's trust and that by gaining people's trust, the Census Bureau was able to obtain better Decennial Census participation."  Thompson Aff. ¶¶ 100-101.

1135.  Dr. Abowd testified that a key component of the Census Bureau's strategy for enumerating households that are reluctant to interact with enumerators is the integrated partnership and communications program. Nov. 14 Trial Tr. at 1187:25-1188:10.

1136.  There is no information in the Administrative Record that the planned advertising campaign for the 2020 Decennial Census is materially different from the advertising campaigns

in the 2000 or 2010 Censuses that failed to eliminate the differential undercounts in those Censuses between Hispanics and non-Hispanic whites. PX-1 to PX-14 (AR).

1137.  There is no information in the Administrative Record that the planned partnership campaign for the 2020 Decennial Census is materially different from the partnership campaigns in the 2000 or 2010 Censuses that failed to eliminate the differential undercounts in those Censuses between Hispanics and non-Hispanic whites. PX-1 to PX-14 (AR).

1138.  With regard to the partnership campaign, Dr. Abowd testified about the "trusted voices" campaign, where community voices with whom the census partners carry forward a message that census participation is safe and important, and confirmed that the trusted voices campaign is a key part of the Census Bureau's efforts to mitigate the decline in self-response. Nov. 14 Trial Tr. at 1304:5-13; Nov. 15 Trial Tr. at 1382:17-23. In his testimony, Dr. Abowd testified about several "trusted voices"—including the National Association of Latino Elected Officials (NALEO), the National Conference of American Indians (NCAI), and the Leadership Conference on Civil and Human Rights.  Nov. 14 Trial Tr. at 1304:14-1305:9.

1139.  The Administrative Record includes materials reflecting the opposition of NALEO, NCAI, the Leadership Conference, and many other census partners to the addition of a citizenship question. PX-1 at AR 773-775, 778-779, 1239-1240 (AR).

1140.  For example, on January 4, the Leadership Conference on Civil and Human Rights wrote to Secretary Ross that adding a citizenship question would be "unnecessarily intrusive and will raise questions in all households—native and foreign born, citizen and noncitizens—about the confidentiality of information provided to the government and how government authorities might use that information. Asking every household and every person in the country about their

citizenship status in the current political environment . . . will no doubt give many people pause about participating in the census altogether." PX-1 at AR 774 (AR).

1141.  In a follow up letter on January 10 sent on behalf of 167 organizations, the Leadership Conference warned "there are many mixed status households in the United States, which include members who are both citizens and non-citizens with various legal statuses. Mixed-status and immigrant households will be especially fearful of providing information to the federal government in 2020, given the heightened climate of fear that anti-immigrant rhetoric and policies have created." PX-1 at AR 799 (AR).

1142.  In addition to the letter in the Administrative Record, NALEO's Chief Executive Officer Arturo Vargas testified that he advised Secretary Ross on March 13 that (i) the Center for Survey Measurement had recently documented challenges the Census Bureau staff had documented challenges the Census Bureau staff had in securing the participation and trust of immigrants, and (ii) that several NALEO members had expressed that they would not encourage their constituents to complete their census forms if a citizenship question is added for fear that the Trump Administration would use the information against them. Vargas Aff. (Docket No 498-21) at ¶ 21.

1143.  The Administrative Record documentation of Secretary Ross' March 13 communication with Mr. Vargas fails to document their discussion of the Center for Survey Management findings. PX-1 at AR 1213 (AR).

1144.  Mr. Vargas also testified that although NALEO is a "trusted messenger" and will cooperate with the Census Bureau, that NALEO's messaging strategy research "has shown that individuals are scared to answer the citizenship question for fear of disclosure of that information to other government entities." Vargas Aff. ¶ 25. Mr. Vargas further testified that "it is not clear

how we should advise our members in terms of messaging and processes related to non-response follow up, as we have received no direction on this from the Census Bureau." *Id.*

1145.  Other organizations (including the non-governmental plaintiff organizations) that have served in the past and plan to serve as "trusted voices" in the Census have uniformly expressed that the addition of a citizenship question will negatively impact their ability to persuade Hispanics and immigrant communities to participate in the Census. *See* PFOF III.I; PFOF X.A.

1146.  Organizations who are not formally "trusted voices," but who are conducting critical outreach on the Decennial Census have also expressed challenges in overcoming the reluctance in immigrant communities to fill out the citizenship question, as well as an overall confusion on messaging due to a lack of direction from the Census Bureau. Cullinane Aff. (Docket No. 505-2) ¶¶ 3-11, Sarmiento Aff. (Docket Nos. 488-3 & 488-4) ¶¶ 6-10, Rodriguez Aff. (Docket Nos. 488-1 & 488-2) ¶¶ 8-12.

1147.  Former Census Bureau Director Thompson testified that his opinion was that the integrated communications and partnership campaign would "not work as well for the 2020 Census because of this issue of trust. If you cannot gain people's trust, you cannot get out a message that will compel people to respond to the Census." Thompson Aff. ¶ 101.

1148.  Dr. Hillygus testified that it will "be incredibly difficult for this outreach campaign to be effective at overcoming their predicted differential self-response." Nov. 5 Trial Tr. at 91:14-16.

1149.  Dr. Hillygus further testified that the reason that these campaigns would have limited effect is that the barriers to participating in the census caused by the addition of a citizenship question are not like other participatory barriers, but are driven by concerns about confidentiality, making them particularly hard to overcome. Nov. 5 Trial Tr. at 81-82.

1150.  Dr. Barreto also testified that he did not believe Defendants' communication plan will be effective in 2020 "as a direct result of the citizenship question being added to the census." Nov. 9 Trial Tr. at 696:24-697:4. He explained that "many of the important trusted partners that the census has identified are actually quite concerned and skeptical right now of the citizenship question," and that they will "not be as effective in getting the word out in the community." Nov. 9 Trial Tr. at 697:12-697:22; 698:10-699:2.

1151.  In sum, as Dr. Barreto explained, "the communications plan and the work with the trusted partners is very tenuous at this point. The partners are very concerned themselves about this, and it is not at all clear to me that these trusted partners will be effective—even if they do work with the census, they will be able to convince people to participate." Nov. 9 Trial Tr. at 699:3-699:10.

1152.  The Census Bureau's Barriers Attitudes and Motivators Survey (CBAMS) research confirms that the integrated communications and partnership campaign will not be effective in overcoming the decision to not participate in the census due to a citizenship question. PX-15, PX-662.

1153.  For example, Census Bureau research has noted that one messaging strategy that has been critical to prior integrated communications and partnership campaigns aimed at Hispanics is that the Census does not inquire about immigration status, i.e., "None of the questions in this survey will ask about immigration status." PX-160 at 16.  This message would not be accurate or effective if a citizenship question is asked on the Decennial Census.

1154.  Similarly, CBAMS focus groups of Spanish language participants found there was not a single trusted voice that could mitigate their distrust of the government to uphold the promise of confidentially. PX-15 at 22.

1155.  Dr. Abowd agreed that the CBAMS research "suggests a particularly difficult macro environment for a census questionnaire with a citizenship question on it." Nov. 14 Trial Tr. at 1259:3-7.

1156.  The Census Bureau admitted that if there is "a citizenship question on the decennial census, trusted partners will have additional challenges in convincing this [immigrant] community to participate." Census Bureau 30(b)(6) Dep. Vol. II at 451-453, 462 (objection).

### D.  Household and Household Member Omissions - There is Agreement that Not All Individuals Missed in the Census Will Be Covered by NRFU Processes

1157.  Households are included in NRFU only if they are included within the Master Address File ("MAF"). Nov. 6 Trial Tr. at 290:19-21.

1158.  As Dr. Salvo explained, "the address list is the foundation for the decennial census. If you do not have an address that is on the Census Bureau's master address file (MAF), you cannot be enumerated." *Id.*

1159.  Similarly, NRFU efforts do not capture households whose addresses were not in the Census Bureau's Master Address File (MAF), which Dr. Hillygus testified is "likely to miss" hard-to-count populations. Nov. 5 Trial Tr. at 103:21-104:6.

1160.  Likewise, Dr. Salvo testified that "hidden units"—often in small, multi-unit buildings— are not always captured by the MAF.  Nov. 6 Trial Tr. at 296:25-297:09, 338:17-339:08.

1161.  Census Bureau research has concluded that one reason for an undercount of noncitizen and Hispanic households is that they live in unusual or concealed housing units that are not in the MAF and that the MAF is more likely to miss non-citizens and ethnic and racial minorities who are more likely to live in complex housing situations. PX-389; PX-390 at 70.

1162.  Dr. Hillygus testified that the role of the MAF in determining which individuals are included in NRFU was one of the features of NRFU that may exacerbate the differential

undercount because there is "potential for individuals to respond who are not in the master address file . . . to go onto the Internet and/or make a phone call and make sure that you're counted. That requires self-motivation . . . and it seems unlikely that that option will be used by noncitizens or those concerned about the confidentiality . . . it could potentially . . . exacerbate [the undercount]." Nov. 5 Trial Tr.131:9-24.

1163.  Dr. Salvo similarly testified that the MAF is not foolproof; to the contrary, the Census Bureau has historically struggled with the erroneous designation of occupied units as vacant. For example, during the 2010 Census, there were a large number of discrepancies between the determination of occupancy status in NRFU and in the Vacant   Delete Check operation (intended to verify the occupancy status of units classified in NRFU as deletes) in Northwestern Queens and Southern Brooklyn, demonstrating that NRFU operations had significantly overstated the number of vacant addresses in these areas. Nov. 6 Trial Tr. at 308:21-309:15, 350:24-353:12, 451:06-21.

1164.  There is additional evidence of some populations being undercounted because they are left out of both the self-response and the NRFU processes. Census Bureau research has acknowledged a significant problem with the counts of young children. PX-346; PX-378; PX-381; PX-410; Nov. 6 Trial Tr. at 383:07-22. For example, the undercount of children under the age of 5 in the 2010 census was 4.6% even though there was an overcount of adults in the 2010 Census. PX-346 at 4. Among other issues, the Census Bureau found that one reason for this undercount is "Fear of government, political factors, or respondent fatigue may cause a household respondent to intentionally leave a child off the roster." *Id.* at 6.

1165.  Additionally, Dr. Hillygus testified that experimental and ethnographic research has found deliberate concealment of household members based on "concerns about confidentiality,

deportation, and their general trust in government." Nov. 5 Trial Tr. at 125-126; PX-385 at 11; PX-390 at 70.

1166.  In a specific discussion of NRFU field operations among Hispanic respondents, for instance, researchers explained that "some proxy respondents resisted the interview by providing data that seemed inaccurate or incomplete just to comply with the interview." PX-385 at 11.

1167.  This research suggests that noncitizens and Hispanics might systematically underreport household size to enumerators, and increased confidentiality concerns associated with the addition of a citizenship question could exacerbate such underreporting.  Nov. 5 Trial Tr. at 124-125.

1168.  The Census has historically undercounted Hispanics in part because of the failure of Hispanic households to provide a response for every member of their households. Census Bureau 30(b)(6) Dep. Vol. II at 394:7-20;  Nov. 14 Trial Tr. at 1306 (Abowd).

1169.  The Census Bureau's internal research is consistent with the notion that a citizenship question will "cause an incremental increase in the number of households that respond to the census but don't provide a response for every member of the household."  Census Bureau 30(b)(6) Dep. Vol. II at 396:2-11; Nov. 14 Trial Tr. at 1308-09 (Abowd).

1170.  If a household omits one or members in its census response, the Census Bureau will not conduct NRFU efforts to enumerate those individuals. Census Bureau 30(b)(6) Dep. Vol. II.  at 397:19-399:2; Nov. 14 Trial Tr. at 1309-10 (Abowd).

1171.  There is nothing in current Census protocols to address situations where a household provides a response but does not include every member of the household. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 459:21 - 460:15; Nov. 14 Trial Tr. at 1310 (Abowd).

### E.      The Defendants' Planned Non-Response Follow-up (NRFU) Operations

1172.  Nonresponse Follow-up (NRFU) is the process by which the Census Bureau attempts to collect information from households that do not self-respond to the census questionnaire. The parties have stipulated on the basic planned components of NRFU for the 2020 Decennial Census. Docket No. 480-1 at ¶¶ 8-13; PX-655.

1173.  If the Census Bureau does not receive a response to the questionnaire, it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in person interview in order to collect the data. Docket No. 480-1 at ¶ 8.

1174.  If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. Docket No. 480-1 at ¶ 9.

1175.  For those households without high-quality administrative records, an enumerator will attempt to re-contact the household in person. Docket No. 480-1 at ¶ 10.

1176.  If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." Docket No. 480-1 at ¶ 11.

1177.  A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. Docket No. 480-1 at ¶ 12.

1178.  For a proxy-eligible case an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview. Docket No. 480-1 at ¶ 13.

1179.  If the Census Bureau is unable to find a proxy, it will impute the "count" or number of members of the household, as well as the demographic characteristics of the individual residents. PX-655.

### 1.    The Limitations on NRFU to Address Undercount in Prior Decennial Censuses

1180.  Of the NRFU processes, the use of in-person enumeration, proxies, and imputation was used in prior censuses, including the 1990, 2000, and 2010 Censuses. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 400:19-401:21; Nov. 5 Trial Tr. at 94:23-95:3 (Hillygus);  Nov. 6 Trial Tr. at 295:23-296:11, 312:22-313:06, 388:19-23 (Salvo).

1181.   The Census Bureau conducted a post-enumeration study after the 2010 Census to estimate how well the 2010 Census covered the total population of the United States. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 399:3 - 400:18; Nov. 14 Trial Tr. at 1362-63 (Abowd).

1182.  The post-enumeration study examined the percentage of racial and ethnic groups omitted and undercounted in the 2010 census and noted that neither omissions nor the undercount is distributed evenly across racial and ethnic groups. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 401:22 - 402:6, 403:21 - 404:21; Nov. 6 Trial Tr. at 393:12-16, 407:10-13, 416:9-23 (Salvo); Nov. 15 Trial Tr. at 1363 (Abowd).

1183.  Blacks and Hispanics had a higher omission rate than non-Hispanic whites in the 2010 Census, and also had a higher undercount rate. PX-267; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II. at 404:22 - 406:19; Nov. 15 Trial Tr. at 1364-65 (Abowd).

1184.  In the 2010 Census, there were undercounts among particular racial and ethnic groups and also in certain states and localities. PX-267; PX-338; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 406:20 - 407:8; Nov. 6 Trial Tr. at 412:25- 413:2.

1185.  The post-enumeration survey conducted for the 2010 Census determined that, following NRFU and imputation, Hispanics were undercounted by 1.54 percent and non-Hispanic whites

were overcounted by .84 percent, resulting in a net undercount of Hispanics of 2.38 percent. PX-267 at Table 7; Nov. 5 Trial Tr.42:6-13 (Hillygus).

1186.  The post-enumeration survey conducted for the 2000 Census determined that, following NRFU and imputation, Hispanics were undercounted by .71 percent and non-Hispanic whites were overcounted by 1.13 percent, resulting in a net undercount of Hispanics of 1.84 percent. PX-267 at Table 7; Nov. 5 Trial Tr.42:6-17 (Hillygus).

1187.  The post-enumeration survey conducted for the 1990 Census determined that, following NRFU and imputation, Hispanics were undercounted by 4.99 percent and non-Hispanic whites were undercounted by .68 percent, resulting in a net undercount of Hispanics of 4.31 percent. PX-267 at Table 7; Nov. 5 Trial Tr. at 42:6-17 (Hillygus). That survey also found that New York City was undercounted by over three percent. Nov. 6 Trial Tr. at 394:07-11 (Salvo).

1188.  Furthermore, as Dr. Salvo testified, these differential undercounts can manifest at the neighborhood level. Nov. 6 Trial Tr. at 407:10-13, 412:10-413:13, 414:11-20, 416:09-23 452:19-453:07. For example, in the 2010 census, approximately 65,000 individuals were omitted or undercounted in minority neighborhoods of Brooklyn and Queens, both boroughs of New York City. Nov. 6 Trial Tr. at 452:19-453:07. In particular, Dr. Salvo testified that there was an erroneous enumeration of 8.4 percent in non-Hispanic white areas and an omission of over 10 percent in "the black communities of Brooklyn followed by areas with large clusters of Hispanic population." Nov. 6 Trial Tr. at 412:10-413:13, 414:11-20, 452:19-453:07.

1189.  These local inaccuracies at the granular level can be masked at higher levels of geography. For example, in the 2010 census, the net undercount in Brooklyn was effectively zero, but the Census reported that over 10% of the population was omitted and 8.4% was erroneously enumerated. Nov. 6 Trial Tr. at 412:8-15; 414:2-7. The omissions and erroneous enumerations in

Brooklyn likely occurred in different neighborhoods within Brooklyn. Based on the racial and ethnic differential undercount in 2010, it is likely that the 10.4% of omissions in Brooklyn were concentrated "heavily in the black communities of Brooklyn followed by areas with large clusters of Hispanic population." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:11-16. Similarly, the 8.4% of erroneous enumerations were "likely in the non-Hispanic white areas . . . .that tend to show net overcounts." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:17-20.

1190.  Problems resulting from undercounts in particular neighborhoods are not always reflected in borough or city-level net undercount rates. Nov. 6 Trial Tr. at 452:25-453:7. For instances, approximately 65,000 individuals were missed by the Census in 2010 in Brooklyn and Queens as a result of problems with the Census Bureau's vacant-delete check process. Nov. 6 Trial Tr. at 351:22-352:9, 353:18-354:13. This undercount had serious implications on City services dependent on accurate data, including the calculation of vital rates by the New York City Department of Health. Nov. 6 Trial Tr. at 355:14-357:2. However, this undercount was not reflected in the net undercount rates for Brooklyn or Queens in 2010.  PX-338 at 39.

**2.      The Expected Increase in NRFU Caseload for the 2020 Decennial Census**

1191.  In 2010, approximately 219,207,000 out of 300,703,000 persons enumerated, or approximately 73 percent of respondents self-responded to the Census. The remaining cases were sent to NRFU. PX-267 at 32, table 19.

1192.  Any household that does not self-respond is assigned to NRFU. Nov. 5 Trial Tr.; 33:6-9 (Hillygus); Nov. 13 Trial Tr. at 950; Nov. 14 Trial Tr. at 1131:19-24.

1193.  Prior to the addition of a citizenship question, the Census Bureau estimated that self-response rate will decrease to 60.5 percent. PX-1 at 172 (AR); PX-3 at 2401 (AR).

1194.  The expected decrease in self-response will result in a direct increase in NRFU cases. Nov. 5 Trial Tr. at 94:13-15; 134:18-24 (Hillygus).

1195.  At the time of Secretary Ross' determination, the Census Bureau conservatively estimated that the decline in self-response of 5.1 percent of households containing a non-citizens because of a citizenship question would result in an increased NRFU workload of 630,000 households or 1.6 million persons. PX-22 at 6 (AR).

1196.  The Census Bureau conservatively estimates that the addition of a citizenship question this will result in an increase in NRFU workload of 2.09 million households and 6.5 million persons. PX-162 at 42; Nov. 5 Trial Tr. at 94:19-22 (Hillygus).

1197.  Dr. Barreto estimated that between 28 and 35 million people would not respond due to a citizenship question on the 2020 Decennial Census and would go into non-response follow up operations, of which a disproportionately high number (10-11 million people) would be Hispanic.  Nov. 9 Trial Tr. at 683-686; PX-675; PX-676.

### 3.    The Relationship Between Reduced Self-Response and Undercount

1198.  The Census Bureau has acknowledged that "response rates and net undercount rates may be causally linked." PX-343 at 1.

1199.  The Census Bureau Task Force on the Undercount of Young Children similarly concluded that "research suggests that areas with the lowest levels of cooperation have higher levels of coverage and nonresponse error." PX-346 at 5.

1200.  Dr. Hillygus testified that there was "an empirical pattern that we have seen in the past . . . [where] we had a differential self-response in the past and we had a differential undercount . . . There's nothing to suggest that, we wouldn't see that same pattern this time." Nov. 5 Trial Tr. at 97:13-17.

1201.  Dr. Hillygus testified that areas with lower self-response rates have more census omissions, and that there is post enumeration survey evidence to support this fact. Nov. 5 Trial Tr. at 123:9-24; PX 414 at 2.

1202.  Dr. William O'Hare testified that prior censuses demonstrated that there is a "close connection between lower self-response rates and higher net undercount rates" such that "the Census Bureau's expected decrease of at least 5.1 percentage points in the self-response rate for households with at least one noncitizen because of the citizenship question will increase the net undercount and omission rates for people living in those households." O'Hare Aff. (Docket No. 507-1) ¶ 9.

1203.  Dr. O'Hare found a moderate to high correlation between self-response rates and net undercounts for all demographic groups in each of the last three censuses. O'Hare Aff. ¶¶ 47-48.

1204.  Dr. O'Hare testified social scientists typically look for four elements to show causation: (i) that the causal agent occurs prior in time to the thing that it is causing; (ii) that there is an association or correlation between the causal agent and the thing being caused; (iii) that intervening mechanisms between the independent variable and the dependent variable can be specified; and (iv) that other potential explanations have been controlled. O'Hare Aff. ¶ 49.

1205.  Dr. O'Hare testified that three elements of causation are satisfied here: self-response occurs prior in time to net undercounting, it is moderately to highly correlated with net undercounting, and the intervening mechanism is the lower response rate. O'Hare Aff. (Docket No. 507-1) at ¶ 50.

1206.  Dr. Abowd testified that while he does not know the marginal coefficients that he believes are necessary to evaluate the relationship between omissions and undercounts, he acknowledged that it is factually true that in the past increased gross omissions for Hispanics have been offset in

the net undercount calculation by an increase in the erroneous enumerations of whites that get double counted. Nov. 14 Trial Tr. at 1219:13-1220:4.

1207.  It is, therefore, likely that an increase in gross omissions for Hispanics would contribute to an increase in the differential net undercount of Hispanics, consistent with Dr. O'Hare's testimony that there is a correlation between increases in omissions and ultimate differential net undercounts.

1208.  Dr. O'Hare testified that while his analysis does not control for other potential explanations, this could be controlled for through a randomized control trial ("RCT"), which the Census Bureau could have, but has not, performed. O'Hare Aff. ¶ 50.

1209.  Discussing PX-378 and research conducted by Dr. O'Hare, Dr. Hillygus testified that demographic analysis demonstrated that the "census count had systematically underestimated the number of Hispanic young children . . . this is one of those direct links to the differential undercount" and "offers very clear documentation about the undercount of Hispanics and provides links to the undercount as associated with the NRFU operations.  Nov. 5 Trial Tr. at 127:13-128:5.

1210.  Dr. Hillygus further testified that "Again, the Census Bureau agrees that there is going to be a differential self-response of non-citizen households, and this is part of the evidence that leads to my conclusion that they are not going to be able to fully address that differential self-response through NRFU operations." Nov. 5 Trial Tr. at 127:18-24; 129:8-15.

### 4.      Planned NRFU Operations Will Not Totally Eliminate Impact of Reduced Self-Response Resulting in Higher Undercount

1211.  The Census Bureau has not conducted any testing of the efficacy of NRFU operations with a citizenship question, nor has it included evidence of such testing in the Administrative Record. PX-1 to PX-14 (AR); Nov. 14 Trial Tr. at 1303:18-21.

1212.  The Census Bureau has not placed any evidence of the efficacy of NRFU operations in the Administrative Record. PX-1 to PX-14 (AR).

1213.  The Census Bureau has not placed any evidence in the Administrative Record that NRFU operations will be sufficient to address the decline in self-response, the increase in NRFU operations, or the resulting net differential undercount. PX-1 to PX-14 (AR).

1214.  The Census Bureau testified that enumeration errors resulting from a decline in self-response may be unavoidable regardless of how much money the Census Bureau spends on fieldwork. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. Vol. II at 380:16 - 381:13; Nov. 15 Trial Tr. at 1337 (Abowd).

1215.  The Census Bureau testified that the macro-environment, including the political context, can affect NRFU efficacy; and it is possible that a citizenship question will exacerpate those effects. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 314:4 - 315:1.

1216.  The Census Bureau's analysis of a citizenship question acknowledged that NRFU may not eliminate undercount, even with unlimited resources, stating that "errors may not be avoidable simply by spending more money on fieldwork. Once a household decided not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on the door." PX-162 at 43 n. 60.

1217.  Former Census Bureau Director Thompson testified that "there is no research cited in the administrative record—and I know of no research outside of the administrative record—to support [Dr. Abowd's] conclusion that despite a lowered self-response rate, NRFU will ensure that there is no undercount . . . [and] the internal Census Bureau analysis [PX-162]. . . raises serious concerns about the accuracy of NRFU procedures for addressing an increase in non-response resulting from the citizenship question." Thompson Aff. ¶ 110-111.

1218.  Dr. Hillygus testified "there are lots of reasons to think that the NRFU operations will fail to correct what is predicted to be a differential self-response rate among noncitizen households, and there are parts of the operation that potentially could even exacerbate things." Nov. 5 Trial Tr. at 96:4-8.

1219.  Dr. Hillygus testified that among other reasons that NRFU will be less effective in 2020 than it was in 2010 is that a citizenship question will be "in a different macro and political environment" and will "be occurring during a presidential election" and "the potential for this to be politicized and for the salience of this to be even more means that the NRFU challenge is even greater in . . . 2020 than even today with respect to a citizenship question." Nov. 5 Trial Tr. at 100:4-12.

1220.  Dr. Barreto testified that "the citizenship question, coupled with the political environment that immigrants perceive, will make it very difficult for census enumerators to convince people to participate, and that this will remain a very low participation rate, not only of the self-response, but throughout the entire NRFU process. That will result in an undercount of many in the Latino and immigrant community." Nov. 9 Trial Tr. at 643:22-644:7.

1221.  Indeed, he testified that differential responsiveness to NRFU might well widen the differential between non-Hispanic white and Latino and immigrant communities: "the enumeration process during NRFU is unlikely to be effective, and instead, it is likely to widen the gap or exacerbate the differential between white and . . . nonimmigrant communities, which may not be threatened and may participate regularly with NRFU, and Latino and immigrant communities who will feel more threatened and will participate at lower rates. So whatever gap or differential we have just at the beginning in self-response, the NRFU process will seek to widen that because where it will be successful will be in those communities that already had a

higher self-response rate, and Latino immigrant communities are likely to further have problems responding." Nov. 9 Trial Tr. at 637:7-637:19.

1222.  Dr. Barreto's opinions regarding NRFU were based in part upon his survey, which was designed to "understand why people would or would not participate in the census, and also to evaluate whether or not the NRFU in the imputation process might be successful or not." Nov. 9 Trial Tr. at 650:23-651:1.

1223.  Dr. Barreto's survey looked at two components that directly touch on nonresponse follow-up.

1224.  First, Dr. Barreto's survey examined the trust and confidence of various communities in the federal government's ability to keep census responses confidential, which is critical to an accurate nonresponse follow-up. Nov. 9 Trial Tr. at 686:12-687:16; PX-677.

1225.  Second, Dr. Barreto's survey explored respondents' willingness to participate in a census that included a citizenship question with simulated NRFU procedures; respondents received assurances of confidentiality and were asked again if they would participate in order to observe expected NRFU success. Nov. 9 Trial Tr. at 686:12-687:3.

1226.  As detailed in PX-677, assurances of confidentiality were far less effective for Latino and immigrant respondents, suggesting that those households will be more likely refuse to participate during NRFU operations. Nov. 9 Trial Tr. at 688:18-688:25. Dr. Barreto's survey asked respondents in question 2 whether they would respond to a census that included a citizenship question, and then, later in the survey, assured respondents that their census responses would be kept confidential and again asked them whether they would respond to the census.  Nov. 9 Trial Tr. at 686:12-687:20.

    a.      For the sample as a whole, 45.2 percent of respondents who had initially refused to respond to a census with a citizenship question agreed to respond to a census with a citizenship question after assurances of confidentiality. PX 677.

    b.      For white respondents, 49.5 percent of initial non-responders agreed to respond to a census with a citizenship question after assurances. *Id.*

    c.      For Latino respondents, 38.9 percent of non-responders agreed to respond to a census with a citizenship question after assurances. *Id.*

Assurances of confidentiality were therefore significantly less likely to convert Latino respondents from non-responders into responders than they were for white respondents or for the sample as a whole. *Id.*

1227. However, 89.3% of whites and 80.1% of Latinos were willing to participate in the census after receiving assurances of confidentiality when they were advised that the census would not include a citizenship question. Nov. 9 Trial Tr. at 687:4-688:15; PX-677.

1228. Moreover, respondents receiving assurances of confidentiality were much more likely to indicate willingness participate in the census when they were advised that the census would not include a citizenship question, though even then white respondents were significantly more likely to participate than Latinos. In contrast, when advised that the census did include a citizenship question, even assurances of confidentiality did little to assuage concerns of Latino and immigrant households or elicit their participation. Nov. 9 Trial Tr. at 687:4-688:15; PX-677.

1229. Dr. Barreto testified that PX-677 "is very clear evidence that in the presence of a citizenship question, significantly less people are going to participate in the NRFU. Nov. 9 Trial Tr. at 689:3-689:11.

1230.  Other analyses performed by Dr. Barreto suggest that "the longer the census is in the field, the longer people are talking about it, the longer there's more information," more people will convert to become non-responders; as Dr. Barreto explained, this finding is "consistent with the social science literature…reviewed, which found that some people may grow suspicious of these follow-up visits and of this additional information." Nov. 9 Trial Tr. at 693:21-695:20; PX-678; PX-679.

1231.  Moreover, these findings corroborate social science research about the expected inadequacies of NRFU, including the Brown memo (PX-162).  Nov. 9 Trial Tr. at 692:1-692:7.

### 5.      The Components of NRFU Will Not Off-Set the Decline in Self-Response.

1232.  Each of the major components of NRFU—in-person enumeration, use of administrative records, proxies, and imputation—have shortcomings that will prevent the components from off-setting the impact of decline in self-response.

### a.      In-person Enumerators

1233.  The Census Bureau noted in the Administrative Record that "those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well. . . ." PX-25 at 4.

1234.  The Census Bureau's subsequent analysis of the "effects of citizenship question on Nonresponse Follow-up" similarly acknowledged that "Households deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door." PX-162 at 41 (COM_DIS 9873); Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 425:3-21; Nov. 15 Trial Tr. at 1336-37 (Abowd).  The Census Bureau's analysis of the "effects of citizenship question on Nonresponse Follow-up" also acknowledged that "If a household declines to self-respond due to the citizenship question, we suspect it would also refuse to

cooperate with an enumerator coming to their door, resulting in a need to use a proxy." PX-162 at 42 n. 59.  Dr. Abowd also testified that the same considerations at play in causing households not to respond to the Census because of a citizenship question will also be at play with respect to enumerator visits.  Nov. 14 Trial Tr. at 1312 (Abowd).

1235.  There is no evidence in the Administrative Record reflecting credible quantitative evidence that someone who chooses not to respond to the 2020 Decennial Census because of a citizenship question will respond at all in a face-to-face encounter with an in-person enumerator. Nov. 15 Trial Tr. at 1336 (Abowd); *see also* PX-1 to PX-14 (AR).

1236.  The Census Bureau testified that it has "no empirical evidence that someone who chooses not to self-respond to the citizenship question would respond in a face-to-face interaction with a census enumerator." Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 251:15-21.

1237.  In contrast, the Administrative Record does contain an analysis of "computer-assisted personal interview" (CAPI) which is the in-person non-response follow up used for the ACS, that was conducted in conjunction with preparing the January 19 memorandum.  PX-155 (AR). This analysis shows that for the census tracts with the highest percentages of non-citizen households (i) participation in the ACS has been decreasing, and (ii) non-response follow-up is less successful.  Census Bureau Aug. 29 30(b)(6) Dep. Tr. at 124-135; PX-155 (AR).  The Census Bureau's analysis of CAPI response rates is consistent with the notion that citizenship questions have become more sensitive on surveys since 2010. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 131:4-11. Given the Census tracts with higher percentages of noncitizen household have lower response rates to the ACS and lower ACS NRFU success, the Census Bureau believes that people who live in census tracts will be less likely to give proxy responses than people who live in other areas. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:2-15.

1238.  The Census Bureau's cost analysis in the Administrative Record similarly assumed that an average of three enumerator visits to enumerate households that do not self-respond to the Census because of a citizenship question, with the authors stating that they "expect that many more of these noncitizen households would receive six NRFU visits." PX-22 at 6 (AR 1282).

1239.  Dr. Abowd testified that he is not aware of any credible quantitative evidence that three visits will, in fact, be sufficient on average to enumerate households that do not respond to Census because of a citizenship question.  Nov. 15 Trial Tr. at 1336 (Abowd).

1240.  In testifying about PX-162, Dr. Hillygus testified that the Census Bureau's analysis confirms that confidentiality issues "are going to matter for the NRFU operations as well" and "the Census Bureau agrees that the concerns raised will affect NRFU" and "the concerns about confidentiality are going to reduce cooperation not only through self-response but also cooperation with NRFU operations." Nov. 5 Trial Tr.98:1-2; 99:4-6; 99:18-21.

1241.  Dr. Hillygus testified that the same issues that result in decreased self-response will impact respondent's willingness to respond to in-person enumerators. Nov. 5 Trial Tr. at 97-98.

1242.  Likewise, Dr. Barreto testified that in-person enumeration could be counterproductive. He explained that "there is a very good chance that the literature that is left behind will create more anxiety and fear in many immigrant communities because it will resemble government monitoring or surveillance, leaving information that somebody from the government was at your doorstep, they're coming to try to find out your household count, your personal information about your household, and that is a strong finding in the literature." Nov. 9, Trial Tr. at 625:4-625:16; *see also* Nov. 9, Trial Tr. at 629:17-630:4; PX-448 at 12 (describing how one household moved after a field staff member dropped off information concerning the enumeration).

1243.  Dr. Hillygus further testified that "there's an extensive research and survey methodology that emphasizes that there's an interaction between . . . how [somebody] respond[s] and willingness to respond depends on the interviewer . . . so with NRFU, you're no longer having somebody self-respond about their household, they're now going to be talking to an enumerator. And the survey methodology research indicates people are less likely to reveal sensitive information when they have to reveal it to a person as opposed to write it on a form." Nov. 5 Trial Tr.100:15-24.

1244.  The Census Bureau similarly testified that none of the testing that has been used to plan NRFU staffing levels has included a citizenship question. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 198:2-10.

1245.  The Census Bureau testified that none of the testing that has been used to project the number of field offices, adequacy of enumerator training, NRFU protocols, or census questionnaire assistance has accounted for a citizenship question. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 200:9 - 201:10; Nov. 14 Trial Tr. at 1303-04 (Abowd).

1246.  Former Census Bureau Director Thompson testified that the Census Bureau's conclusion "that it is likely that households that refuse to respond to the Decennial Census questionnaire because of the citizenship question are also likely to respond to enumerators" is one fact that "strongly suggests that NRFU efforts may be unsuccessful with respect to households that decline to answer the Decennial Census questionnaire because of the citizenship question." Thompson Aff. ¶¶ 111, 114.

1247.  When Dr. Hillygus was asked about whether "respondent sensitivity impacts cooperation with NRFU" she responded the "confidentiality concerns associated with the citizenship question

that the Census Bureau acknowledges and has shown to have an impact on the self-response, all matter for cooperation with a census enumerator." Nov. 5 Trial Tr.97:18-24.

1248.  Discussing PX-385 (Terry), Dr. Hillygus testified that "fears of deportation are related to people being omitted from the roster" and that "experimental and ethnographic research have found deliberate concealment of household members based on concerns about confidentiality, deportation, and their general trust in government . . . field staff report that they are not able to get a full count of a household, and that will happen whether individual members are being excluded because of fears of disclosure." Nov. 5 Trial Tr. at 126:5-8; 125:14-17; 125:19-23.

1249.  Additionally, the Census Bureau will have challenges with mitigated non-response of individuals who fail to self-respond through in-person enumerators because the decennial enumerators tend to have less experience than the ACS interviews. Nov. 5 Trial Tr. at 101; PX-162 at 30 n. 44. And it is clear that the Census Bureau is going have trouble hiring the number of enumerators that are needed. A GAO report notes that "[i]n early hiring for 2020, Bureau officials reported smaller than expected applicant pools, declined offers, and turnover." PX-367 at 2.

1250.  The Census Bureau testified that the macro-environment is making it difficult to hire enumerators. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 316:11-17.

1251.  As Dr. Hillygus testified the Census Bureau is likely to have trouble hiring enumerators for hard to count neighborhoods that match the language and background of the enumerator to more effectively canvas the neighborhood. Nov. 5 Trial Tr. at 182.

1252.  Dr. Hillygus testified about further challenges the Census Bureau will have in conducting in-person enumeration, including the potential that the Census Bureau will not hire non-citizen enumerators which will make it difficult to hire enumerators from certain neighborhoods, and

concerns raised by the General Accountability Office about the Census Bureau's ability to hire a strong pool of enumerators. Nov. 5 Trial Tr. at 100:25-101:16; 182:18-23; PX-367 at 2; Nov. 14 Trial Tr. at 1176:15-1177:11 (Census is still trying to get permission to hire non-citizen enumerators).

1253.  Additionally, as Dr. Hillygus also testified that a research presentation at the American Association of Public Opinion Research, Census researchers Mikelyn Meyers and Patricia Goerman explained that respondents were "spontaneously expressing concerns" about confidentiality during multilingual pretesting projects conducted in 2017. PX-448 at 2; Nov. 5 Trial Tr. at 57-58.

1254.  Respondents referenced legal residency status, immigration, and certain current events like changes to the DACA program and in fact provided an example of an individual getting up and leaving their own home rather than continue an interview with a census enumerator. PX-448 at 12, Nov. 5 Trial Tr. at 57-21-58:12.

1255.  Dr. Hillygus testified about the results from focus group testing during the Census Barriers, Attitudes, and Motivators Survey (CBAMS), which showed that a citizenship question "may be a major barrier" as respondents interpret its purpose as "find[ing] undocumented immigrants," and "targeting their ethnic group."  Nov. 5 Trial Tr. at 67-68; PX-662.

1256.  Dr. Hillygus further testified  about the results from the CBAMS: "[W]hat's so significant about this is that post the addition of the citizenship question, this offers one of the only kind of attempts by the Census Bureau to evaluate the impact of that citizenship question, and so these focus groups . . . offer some especially direct evidence about what can be expected." Nov. 5 Trial Tr. at 64:20-65:8; *see* PX-152 at 22.

**b.**     **Use of Administrative Records in the NRFU process**

1257.  For the first time in 2020, the Census Bureau plans to use administrative records to

enumerate individuals who do not self-respond. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 387;

Nov. 15 Trial Tr. at 1340: 3-7 (Abowd).

1258.  The Census intends to use administrative data from the Social Security Administration,

the Internal Revenue Service, Medicare, and the U.S. Postal Service to enumerate individuals

who do not self-respond. PX-25 at AR 1309; DX-27 Appendix D.

1259.  These administrative records will be used for two purposes: first, to determine whether an

address should be deleted from the MAF, and second, to enumerate some households who did

not initially self-respond.  Both of uses of administrative records will exacerbate the differential

undercount.

### (a)    Use of administrative records in the vacant/delete check

1260.  Dr. Abowd testified that administrative records will be used by an enumerator after one

NRFU visit to an address to determine whether the address is vacant or should be deleted.  Nov.

14 Trial Tr. at 1116:13-24; 1202:25-1203:14.

1261.  If, on the basis of an administrative record, the Census Bureau determines an address is

vacant or should be deleted, the Census Bureau will remove the address from the NRFU

workload, and will mail a final postcard to the address encouraging self-response.  PX-655 at 7.

Nov. 14 Trial Tr. at 1200:5-13.

1262.  Dr. Salvo testified that when an address is declared vacant or deleted, the address is

determined as containing no people, and as a result, there is no subsequent imputation that occurs

for the address.  Nov. 6 Trial Tr. at 368:8-21.

1263.  But as Dr. Salvo testified, this vacant/delete process is problematic.  This process has been

because it has been error prone in the past, resulting in misidentification of occupied housing as

vacant, and there is strong evidence that the Census Bureau's plans for 2020 will exacerbate the problem.  Nov. 6 Trial Tr. at 308:19-309:15; 313:19-314:10.

1264.  The Census Bureau conducted tests on their planned use of administrative records to identify vacant housing in 2016 in Los Angeles and Harris Counties.  Nov. 6 Trial Tr. at 365:17-21.

1265.  The tests in Los Angeles and Harris County compared the determination of housing status for addresses using administrative records, with determinations made by NRFU fieldwork, i.e. in-person follow-up.  Nov. 6 Trial Tr. at 366:25-367:5.

1266.  The tests revealed that over 20% of addresses determined as vacant by administrative records were found to be occupied by NRFU fieldwork, and another 15% could not be resolved or determined by NRFU fieldwork. PX-564 at 18, Table 5.  Nearly 30% of addresses that administrative records determined should be deleted were found to be occupied by NRFU fieldwork, while another 10% could not be resolved or determined by NRFU fieldwork.

1267.  Dr. Salvo testified that the high rate of misidentification revealed by the 2016 Census Tests suggested that administrative records do not accurately portray vacancy status for addresses, and "calls into question the efficacy" of what the Census Bureau is planning to do with administrative records.  Nov. 6 Trial Tr. at 330:14-20; 357:22-358:2.

1268.  Dr. Abowd acknowledged this high rate of error in the use of administrative records in his testimony, however, he suggested that the Census Bureau planned to address the issue by adding a direct visit by a field enumerator before any address will be designated as vacant or delete. Nov. 14 Trial 1199:19-25; 1200:5-13.

1269.  Dr. Abowd acknowledged, however, that the Census Bureau had performed no analyses or testing to ascertain how effective these modified vacant/delete procedures will be.  Nov. 15 Trial Tr. at 1379:3-9.

1270.  Moreover, the use of field enumerators to confirm the vacancy status of an address is similar to the vacant delete process in place in 2010, where an enumerator was sent to an address identified as vacant to make an independent determination of housing status.  Nov. 6 Trial Tr. at 352:14-24.

1271.  Dr. Salvo testified that the process in 2010 was also error prone, and often led to the misidentification of vacancies, including over 60,000 households misidentified as vacant and undercounted in Northwest Queens and South Brooklyn.  Nov. 6 Trial Tr. at 351:24-352:9; 353:18-354:13; PX-666.

1272.  As a result, the planned vacant delete process for the 2020 Decennial Census, will likely result in the misidentification of some addresses as vacant or should be deleted, when they are, in fact, occupied.

1273.  The inclusion of a citizenship question on the 2020 Decennial Census will exacerbate misidentifications in the vacant delete process, by increasing the NRFU workload, and the number of cases that will be subject to the vacant delete process.  Nov. 6 Trial Tr. at 330:21-331:11.

1274.  Ultimately, Dr. Salvo testified that, the vacant delete process introduces error into the Decennial Census, as does every NRFU operation, and that the way to prevent these errors is through self-response. Nov. 6 Trial Tr. at 302:13-19; 353:9-17.

(b)   <strong>Use of administrative records in the enumeration</strong>

1275.  If the initial NRFU visit does not result in collecting complete data for a household, administrative records may be used to enumerate a limited number of those households for which there is high quality administrative data about the household. Stipulation No. 9.

1276.  The Census Bureau's proposal to use administrative records has not yet been approved by OMB. PX-655, at 7. Dr. Abowd testified that the Census Bureau "hasn't made a decision yet about how it will process responses to the citizenship question alongside the administrative records." Nov. 13, Trial Tr. at 1030:3-6.

1277.  Because the Census Bureau has not used administrative records for enumeration on a wide scale in a prior Census, it does not have evidence from a deployment in a prior Census as to how well enumeration by administrative records will work in practice.  Nov. 15 Trial Tr. at 1340 (Abowd).

1278.  The Census Bureau has noted in the Administrative Record that the "inclusion of a citizenship question on the 2020 Census is very likely . . . to increase the number of persons who cannot be linked to the administrative data because the NRFU PII is lower quality than the self-response data. In the 2010 Decennial Census, the percentage of NRFU persons who could be linked to administrative data rate was 81.6 percent, compared to 96.7 percent for mail responses." PX-25 at AR 1311.

1279.  The Census Bureau analysis of the citizenship question acknowledged that "missing data are higher for administrative records (AR) than the ACS, and both sources' rates are higher for minorities and nonrelatives." PX-162.

1280.  Director Jarmin testified that administrative records could be used to enumerate non-citizens, Hispanics and hard-to-count population households "less of the time." Jarmin Dep. (Docket No. 511-4) at 285-286.

1281. The Census Bureau testified that it cannot link Hispanics to administrative records at a higher rate than non-Hispanic whites. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 389:12 - 390:5; Nov. 15 Trial Tr. at 1340-41 (Abowd).

1282. The Census Bureau testified that undocumented immigrants are less likely to be found in administrative records, and this will be harder to enumerate using such records. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 391:4-19; Nov. 15 Trial Tr. at 1341:3-6 (Abowd).

1283. The Census Bureau testified that it is a reasonable hypothesis that administrative records are more likely to exist for citizens than for noncitizens. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. at 252:16 - 253:6.

1284. The Census Bureau testified that it expects that enumeration using administrative records will be less successful for noncitizens than for citizens. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 391:21-392:4; Nov. 15 Trial Tr. at 1341:16-19 (Abowd).

1285. Dr. Hillygus and Dr. Barreto also testified that the quality of administrative records varies for different groups and "noncitizen households and Hispanics who are less likely to have administrative records or quality administrative records." Nov. 5 Trial Tr. at 104:19-24; Nov. 9 Trial Tr. at 639:22-640:15; PX-399.

1286. Social science research also confirms this testimony. PX-383 at 8 (noting that "characteristics observed with lower validation rates may be associated with language barriers, trust in government, or privacy preferences. These include groups such as Hispanic, some other race, non-U.S. citizen, poor spoken English, and other language than English spoken at home.")

1287. Dr. Hillygus and Dr. Barreto specifically cited differential coverage in administrative records as a factor that could exacerbate the differential undercount of Hispanics relative to

whites because "those records are more available for some portions of the population than others." Nov. 5 Trial Tr.131:4-8; Nov. 9 Trial Tr. at 638:16-639:22.

### c.  Proxy Responses

1288.  If a third attempt to contact a household does not yield a response, a case will become "proxy-eligible." Stipulation No. 11; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:9-17; PX-162 at 41 n. 15.

1289.  A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there. Stipulation No. 12; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:9-17.

1290.  Proxy responses generally are more likely to result in errors and omissions of a member of a household. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 382:18-383:9.

1291.  There is no evidence in the Administrative Record reflecting credible quantitative evidence that households that fail to respond to the Census because of a citizenship question will be enumerated through the use of proxies as successfully as other non-responding households. Nov. 15 Trial Tr. at 1342 (Abowd); *see also* PX-1 to PX-14.

1292.  The Census Bureau did not conduct any testing of the impact of a citizenship question on the willingness of proxies to cooperate with enumerators. Nov. 15 Trial Tr. at 1344 (Abowd).

1293.  There is no evidence in the Administrative Record that proxies will be as cooperative with NRFU operations in the 2020 Decennial Census as they have been in prior Censuses. PX-1 to PX-14 (AR).

1294.  The Census Bureau testified that census tracts with higher percentages of households with a non-citizen would be less likely to give proxy responses to the Census than people who live in other areas. Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:2-15.

1295.  The Census Bureau analysis on a citizenship question similarly concluded that because "reference persons are much less likely to answer the citizenship question for nonrelatives in the household than for themselves . . . they may be even less likely to answer it for neighbors." PX-162 at 43; Census Bureau 30(b)(6) Oct. 5 Dep. Tr. at 386:16 - 387:10.

1296.  The Census Bureau has also raised significant questions about the accuracy of proxy responses. PX-22 (AR); PX-267 at 33, Table 21; PX-162.

1297.  The Census Bureau's analysis in the Administrative Record noted that one of the reasons errors are "so much greater during NRFU is that the data are much more likely to be collected from a proxy rather than a household member . . . [and] that person has less accurate information than self-responders." PX-22 at AR 1282.

1298.  The Census Bureau's analysis in the Administrative Record cited the 2010 post-enumeration study found that proxy responses resulted in a correct enumeration only 70.2 % of the time, as compared to the 97.3 % of the self-responses. PX-22 at AR 1282 (citing PX-267 at 33, Table 21).

1299.  Summarizing the Census Bureau's analyses on proxy accuracy, the Census Bureau analysis on a citizenship question similarly stated that "proxies supply poor quality individual demographic and socioeconomic information about the person on behalf of whom they are responding. PX-162 at 41-42 & Table 12.

1300.  Director Jarmin testified that "accuracy of NRFU response is less than self-response and proxy response is less than NRFU response." Jarmin Dep. (Docket No. 511-5) at 308: 15-17.

1301.  Moreover, the use of proxy respondents, such as landlords, may further exacerbate the problem. As Dr. Salvo testified, proxy respondents may have incentives to minimize the number of occupants in a unit; occupancy regulations, for example, may lead landlords to understate the

number of household members in a unit, since disclosure of high occupancy levels may be seen

as inviting scrutiny by the government. *See* Nov. 6 Trial Tr. at 336:09-337:06, 337:15-338:05.

Dr. Salvo explained that reliance on such proxies risks introducing error in the enumeration and

omissions with respect to household size. *See id*.; 380:04-09.

1302.  Dr. Abowd acknowledged that he believes that proxy responses are more likely to result in

the omission of a household member than self-responses.  Nov. 15 Trial Tr. at 1343 (Abowd).

1303.  Census Bureau research on the undercount of young children has demonstrated that

"proxy responses are potentially problematic, as proxies may not provide complete and accurate

information for the census enumeration." PX-378 at 23.

1304.  Dr. Abowd testified that, based on a census tract-level analysis showing that ACS

responses rates (PX-162 at 12) and ACS NRFU success (PX-137, 3rd Table) are lower in census

tracts with higher percentages of households with a noncitizen, that the Census Bureau will be

less likely to be able to obtain proxy responses in areas with more noncitizens.  Nov. 15 Trial Tr.

at 1344-49.

1305.  Dr. Hillygus testified (discussing PX-162) that the "Census Bureau recognizes that the use

of proxy respondents will result in less accurate census data. That's not a question at all . . . The

evidence . . . indicates . . . that the expected increase in proxy respondents in the NRFU

operations will contribute to a systemic underestimation of the size of non-citizen and Hispanic

households." Nov. 5 Trial Tr.112:14-20. In support of this conclusion, Dr. Hillygus noted the

following:

> a.      Discussing PX-386, Dr. Hillygus testified that "for noncitizen households and
>
> Hispanics . . . proxy respondents are likely underestimating household size . . . for
>
> households that are larger and more complex, proxy respondents do not have

accurate information, and we know from other research that noncitizen households in particular are likely to have more—they might have more people living in the household than known by a landlord." Nov. 5 Trial Tr. at 107:18-108:18 & PX-386.

b.   Discussing PX-387, Dr. Hillygus further testified that empirical research "shows that the households that are more complex . . . are more likely to have proxy respondents omitting members of the household. Again, this is that key link between proxy respondents not just giving less accurate information, but they are underestimating the size of noncitizen and Hispanic households at a higher rate than they would do for other households." Nov. 5 Trial Tr. at 110:15-22 & PX-387.

c.   Dr. Hillygus further testified, discussing recent public opinion research and the CBAMS results (PX-152, PX-662 & PX-663) that "the evidence points to the likelihood that the neighbors are also going to be reluctant to share information, particularly about citizenship status, of their neighbors, [a]nd . . . the potential consequence [is] . . . you'll either have more difficulty finding a proxy respondent or you're going to find proxy respondents who have less information about the household . . . . What I think the evidence is suggest—is that it's systematically going to underestimate household size because of the use of proxy respondents." Nov. 5 Trial Tr.111:2-14.

1306.  In a specific discussion of NRFU field operations among Hispanic respondents, for instance, as Dr. Hillygus noted in her testimony, researchers explained that "some proxy respondents resisted the interview by providing data that seemed inaccurate or incomplete just to

comply with the interview." PX-385 at 11, Nov. 15 Trial Tr. at 1399:21-23. This research

suggests that noncitizens and Hispanics might systematically underreport household size to

enumerators, and increased confidentiality concerns associated with the addition of a citizenship

question could exacerbate such underreporting.

1307.  Dr. Hillygus also testified that analysis suggests "unknowledgeable or unwilling proxy

respondents may be a key factor in the undercount of young children" Nov. 15 Trial Tr. at

1399:2-5, citing PX-339.  Dr. Hillygus testified that PX-385 and PX-339 provide support for her

opinion that "there is sufficient evidence to suggest that an increase in proxy respondents

associated with the citizenship questions will also reduce accuracy because of the direction of

some of those inaccuracies, in other words, there will be bias."  Nov. 15, Trial Tr. at 1400:19-23.

1308.  Additionally, research has shown "that tenuously attached people are likely to be omitted

from the typical survey roster." PX-392 at 2. Proxy respondents are a "source[] of residential

ambiguity" and that "[p]eople whose residence status is ambiguous or uncertain are at risk of

being omitted from or incorrectly included in demographic surveys and the census."  PX-392 at

3, 9. PX-378, PX-386, PX-387.

1309.  Similarly, Dr. Barreto testified that proxies would not mitigate the harm of a citizenship

question. He explained that proxy responses will decline for the same reasons that self-response

will decline, and that the proxy response information will be less accurate either because proxies

do not know the underlying information, or because they will be unwilling to provide

information to the census if they believe that there are people who would be at risk of

immigration enforcement. Nov. 9 Trial Tr. at 640:23-641:9

1310.  Dr. Barreto emphasized that proxies tend to result in understatement of total household size and, accordingly, lead to omissions, resulting in ultimate undercount. Nov. 9 Trial Tr. at 641:10-643:21; PX-162.

1311.  Dr. Abowd testified that the "the fewer imputations you have to make the more accurate you're going to be . . . ."  Nov. 14 Trial Tr. at 1239:7-15; Nov. 14 Trial Tr. at 1235:6-12.

### d.    Imputations

1312.  If the Census Bureau is unable to otherwise enumerate a household through NRFU procedures, it will "impute" the number of persons living in the household and their characteristics. PX-655.

1313.  Count imputation is the process by which the Census Bureau imputes the household size of an address determined to be occupied but where no information could be collected about the occupants, even household size, from proxies or other means. Nov. 14 Trial Tr. at 1193:23—1194:1 (Abowd). Whole-person census imputation, which includes count imputations, is the process by which "all the characteristics were imputed for these census person records." PX 267 at 100-11.

1314.  Imputation involves modeling information for non-responding households based on information from households that have already been enumerated.  Nov. 15 Trial Tr. at 1351 (Abowd).

1315.  The Census Bureau uses an ignorable missing data model for imputation, which "assum[es] that the people that you have observed provide sufficient information to fill in the people that you . . . have [not] observed" Nov. 5 Trial Tr. at 115:18 - 116:5 (Hillygus).

1316.  Non-ignorable missing data means there is a "relationship between those who have not responded and the information that should be in there."  Nov. 5 Trial Tr. at 116:3-5 (Hillygus).

Dr. Abowd explained if there is nonignorable missing data from the whole data set used for

imputation this will result in incorrect imputations. Nov. 14 Trial Tr. at 1236:19-24.

1317.  Dr. Abowd testified that using an ignorable missing data model when the missing data are

not ignorable can bias the imputation data model.  Nov. 15 Trial Tr. at 1351:20-1352:3.

1318.  Self-response to the census is correlated with citizenship status, meaning that imputation

will be based on households that are disproportionately all-citizen households.  Nov. 15 Trial Tr.

at 1351-52 (Abowd); PX-162 at 44.

1319.  Dr. Abowd testified that whole person imputations are not very accurate. Nov. 15 Trial Tr.

at 1351:11-14 (Abowd); Nov. 14 Trial Tr. at 1222:20-23; Census Bureau 30(b)(6) Aug. 29 Dep.

Tr. at 253:7-15.

1320.  The Census Bureau has noted that "[t]he accuracy of this imputation system is unknown at

this time."  PX-162 at 44.  The Census Bureau has not publicly disclosed its imputation

procedures, and has not set its imputation algorithms for the 2020 Decennial Census.  Nov. 15

Trial Tr. at 1351 (Abowd).

1321.  Dr. Abowd testified that qualitative evidence confirms that "count imputation

disadvantages hard-to-count subpopulations" Nov. 15 Trial Tr. at 1384-85 (Abowd).

1322.  In the 2010 Census, there were 5.99 million people imputed, of whom 1.16 million were

count imputations and 4.61 million where imputation was required for the whole household. PX-

267 at 14 & Table 6; PX-478.

1323.  The Census Bureau analysis of the addition of a citizenship question acknowledges that

there are going to be significantly more whole person imputations (1.477 million) in the 2020

Census because of the addition of a citizenship question and its impact of decreasing self-

response. PX-162 at 42.

1324. Dr. Hillygus testified that it is "critical . . . that it is expected that there is going to be more [imputation] in 2020." Nov. 5 Trial Tr.115:10-11.

1325. There is no evidence in the Administrative Record that whole person imputation will be more accurate in 2020 than it was in 2010. PX-1 to PX-14 (AR).

1326. Dr. Abowd testified that "an expert panel within the Census Bureau" can "modify the imputation algorithm, if they can figure out a way to do so successfully, but I will say that no such modification has been proposed to date." Nov. 15 Trial Tr. at 1353:7-13.

1327. The Census Bureau post-enumeration survey for 2010 concluded that the Hispanic population had larger percentage of omissions (7.7 percent) than the Non-Hispanic white population (3.8 percent) and "part of the omissions . . . may be accounted for by the whole-person census imputations" because Hispanic populations have larger percentage of imputations (2.4 percent) than the white population (1.6 percent). PX-267 at 16 & Table 9.

1328. Accordingly, Defendants' claims about the relative accuracy of the imputation procedure for 2020 are entitled to little weight.

1329. While the processes have varied, the Census Bureau's past imputation processes have all involved an algorithm that in part is dependent using data from households that have respond to the census to impute the size of the households that did not respond. PX-478 at 5-7.

1330. Federal government research has concluded that Hispanic and immigrant households are more likely to live in crowded, complex households than citizen or white households. PX-388 at Figures 13 & 14.

1331. Census Bureau research similarly has linked crowded, complex household types to census omissions in previous censuses. PX-389, PX-430, PX-469, PX-390 at 70.

1332.  Dr. Hillygus testified that "imputation is essentially just using a guess to fill in the numbers," and "the imputation is going to contribute to the under count because the imputation procedure is likely to under estimate household size in non-citizen and Hispanic households." Nov. 5 Trial Tr. at 113:5-6; 114:25-115:1-3.

1333.  Dr. Hillygus further testified that although the Census Bureau has not finalized or released the planned imputation procedures for 2020, based on the 2010 process "there is still reason to believe that is going to underestimate the size of non-citizen households." Nov. 5 Trial Tr. at 118:2-8. In support of this conclusion, Dr. Hillygus testified:

    a.    The imputation models the Census Bureau has used treat household size of imputed individuals as "ignorable" meaning that it assumes that there is no relationship between the size of households who self-respond to the Census and those who do not self-respond to the Census and the household size of imputed individuals is "random." Because "households that are not responding to the census, are larger" use of "information about those household that did respond is going to systematically underestimate the size of the imputed households." Nov. 5 Trial Tr.115:23-116:18.

    b.    "There is compelling evidence that because household size is related to census participation, because Hispanics and non-citizens are documented to have larger household sizes on average, that it is not reasonable to assume that the household size of those individuals who failed to respond will be the same as those who do." Nov. 5 Trial Tr. at 119:4-9.

    c.    Discussing PX-400 and PX-397, Dr. Hillygus testified that "there is evidence that household size is related to census participation. That is the key for saying that the

missing data is non-ignorable because the missingness related to the quantum that

we're trying to impute" and "Hispanic origin is not ignorable." Nov. 5 Trial Tr. at

120:6-9; 121:12.

d.     Discussing PX-267 and PX-400, Census Bureau and other Bureau research,

including post-enumeration surveys and demographic analysis, "consistently find

that noncitizens and Hispanics are more likely to be omitted from the census."

Nov. 5 Trial Tr.123:2-4.

e.     Discussing PX-388 and PX-394, Dr. Hillygus testified that external research

shows "Hispanics and immigrants have larger households, more complex

households" and are "harder to enumerate [and] are more likely to be omitted

from the census. . . .these are the same individuals who the Census Bureau

documents and predicts are going to be less likely to respond to citizenship

question and so it follows that we are also going to see it with the differential

undercount." Nov. 5 Trial Tr. at 124:11-20.

f.     Discussing PX-414 and PX-389, Dr. Hillygus testified "we most directly see this

link between self-response and differential undercount . . . [in the] decades of

ethnographic research conducted about different censuses where they go in and

they talk to households and have found out that Hispanic and noncitizens are

being missed by the census count" and "[o]ther research has also found

empirically that the larger the household size, the more likely those households—

that households members are going to be omitted . . . so what that results is a

systemic underestimation of Hispanic and non-citizens because they have larger

household size on average." Nov. 5 Trial Tr.125:2-13.

1334. Dr. Hillygus testified that "the missing-ness on citizenship will not be ignorable . . . so if you apply an ignorable assumption in the imputation methods, then you will end up with bias." Nov. 15 Trial Tr. at 1401:9-19.

1335. Dr. Barreto confirms that whole-person imputation is the end of the census process "because it's sort of the last resort, and it's known to be the least accurate." Nov. 9 Trial Tr. at 701:5-701:17.

1336. Dr. Barreto's survey experiment provides quantitative evidence that the Hispanic and immigrant households that do not respond to the census are larger than those households that do respond; accordingly, imputation (which relies on responding households to impute household size for nonresponding households) will systematically undercount nonresponding households.

    a.    Dr. Barreto's data reflects that "for multiple different demographic indicators, responding units are not statistically the same as non-responding units. They are, in fact, statistically different on many important metrics," which "will create considerable problems for imputation." Nov. 9 Trial Tr. at 711:4-711:8.

    b.    Specifically, Dr. Barreto's experiment shows that households that will respond to a census that includes a citizenship question have smaller household sizes than those that will choose not to respond. PX-680. Accordingly, responders who would serve as the donor group for imputation have smaller household sizes than the non-responders whose household size would need imputing, resulting in omissions and ultimate differential undercount. Nov. 9 Trial Tr. at 711:18-712:16.

    c.    As Dr. Barreto explained: "[w]hat we found when we analyzed this imputation model was that the decision to not respond appears to be correlated with household size, that is, people who are the most anxious and nervous and not

willing to respond have larger household sizes that cannot be accounted for by other demographic differences. This is consistent with the literature that suggested that people would be more fearful if they had other relatives who were noncitizens and others living in the house. So when the imputation model is applied at the very end of the process, there will be more Latino and immigrant households in need of imputation, first of all, because of the lower self-response and because of the lesser success of NRFU. So when we get to the imputation component, this model suggests that there will be a larger miss, disproportionately larger miss of Latino household sizes leading to a net undercount." Nov. 9 Trial Tr. at 733:7-733:24

d.   Moreover, Dr. Barreto's survey shows that non-respondents will be geographically clustered, concentrated in zip codes that have high Latino and immigrant populations, further challenging the ability of an imputation model to adequately or accurately address non-response. Nov. 9 Trial. Tr. at 713:1-714:5; PX-681.

e.   Dr. Barreto's "analysis indicates that, on whole, [imputation] will exacerbate the net differential undercount for Latino and immigrant communities, in that the imputation estimates will be less accurate and they will be too small in Latino and immigrant communities. So while they will come up with a number, it will continue to underestimate[] the true count." Nov. 9. Trial Tr. at 707:21-709:11.d

1337.  Dr. Barreto created an imputation model designed to mimic the model historically used by the Census Bureau and set forth in PX-478, the "DSSD 2010 Decennial Census Memorandum Series #J-12" ("J-12 Memo"). Nov. 9 Trial Tr. at 725:18-726:7.

1338.  This model uses "nearest neighbors" to impute household count for non-responding households; it controls for similar housing type, characteristics, and geographic proximity: "When they get 20 of these so-called nearest neighbors, they then create a distribution of the household sizes from there, and then they assign a household size to the missing unit." Nov. 9 Trial Tr. at 718:20-719:9; Nov. 9 Trial Tr. at 719:12-721:21; Nov. 14 Trial Tr. at 1232:13-1232:14; PX-661 (screenshot of Dr. Barreto's model applied to the dataset, reflecting the difference between the model's imputation or guess as to a particular respondent's household size and the household's actual size).

1339.  Dr. Barreto's imputation analysis reflects that, on a national level, since responding households tend to be larger than those that do not respond, imputation would undercount households by an average of .3179 persons (or approximately 1/3 of a person) per household. As a result, a citizenship question would be responsible for a national net undercount of 2.8 million households. Nov. 9 Trial Tr. at 727:3 - 729:12; PX-682.

1340.  However, the effects of imputation will be amplified in the Latino population. For Latino households, imputation misses approximately .75 of a person per household on average; higher non-response rates will result in higher NRFU rates, higher imputation rates, and ultimately, a higher net differential undercount. Ultimately, Dr. Barreto estimated that the addition of a citizenship question would result in a 1.78 million net undercount of Latinos: "That is 65 percent of the people missed will be in Latino households. So while they only represented 13 percent of all households, and every step along the way they are over represented in being undercounted, the final estimates suggests that they'll be 65 percent of all of the undercount." Nov. 9 Trial Tr. at 729:13-730:25; PX-682.

1341.  Even when accounting for mitigated non-response in light of assurances of confidentiality,

Dr. Barreto's data reflects that Latino's will be disproportionately undercounted by 1.45 million

people. Nov 9 Trial Tr. at 732:1-732:23; PX-683.

1342.  In sum, based on the expected impacts of imputation, Dr. Barreto estimated that the net

differential undercount anticipated to flow from a citizenship question to be in the range of about

1.45 and 1.8 million in the Latino and immigrant community. Nov. 9 Trial Tr. at 734:19-734:25.

1343.  Dr. Barreto's findings are confirmed by social science research concerning imputation in

Latino and immigrant communities. Nov. 9 Trial Tr. at 717:5-718:1; PX-389

### 6.  Recap of Key Points on Self-Response and NRFU

1344.  Overall, the Census Bureau's various enumeration procedures, including NRFU efforts,

are more likely to miss Hispanics, as compared to non-Hispanic whites. PX-267 Table 7; Census

Bureau 30(b)(6) Aug. 29 Dep. Tr. at 259:1-15; Nov. 6 Trial Tr. at 393:09-16, 393:25-394:03;

Nov. 15 Trial Tr. at 1353-54 (Abowd).

1345.  Overall, the Census Bureau's various enumeration procedures, including NRFU efforts,

are more likely to miss people living in bilingual areas compared to the U.S. population as a

whole. Census Bureau 30(b)(6) Aug. 29 Dep. Tr. Vol. I. at 261:11-16; PX-267 at 27.

1346.  The evidence reflects that historically the Census process omits significant numbers of

certain populations, such as young children, when they are left off the household roster in self-

responses submitted from their household or when their residence is not part of the Master

Address File. The evidence described here establishes that more likely than not the addition of a

citizenship question will exacerbate this problem, contributing to an increase in the net

differential undercount of Hispanics and persons who live in non-citizen households. In

particular, the addition of a citizenship question to the Decennial Census will cause many

households, even if they do self-respond, to leave off their responses members of their household who are not US citizens or do not have legal status.

1347. While the Census Bureau concedes that there will be a decline in self-response of 5.8% among non-citizen households, the evidence presented establishes that it is more likely than not that the decrease in self-response of individuals who live in non-citizen households caused by the addition of a citizenship question will be significantly more than 5.8%. Moreover, the evidence presented about the impact of the addition of a citizenship question on the response rates of Hispanics establishes that there will also be a meaningful decline in the self-response rates of Hispanics.

1348. Relying upon all the evidence presented, the decrease in self-response rates before the implementation of NRFU will be significantly more than 5.8% of non-citizen households and Hispanics.

1349. In addition, there is no evidence that the NRFU operations will adequately address the decline in self-response rates caused by the addition of a citizenship question among Hispanics and individuals who live in non-citizen households.

1350. The Census Bureau has provided no evidence that demonstrates that the decline in self-response rates will not result in a differential net undercount.

1351. While Dr. Abowd suggested that it might be possible to conduct an analysis as to determine the exact relationship between such declines in self-response and net differential undercount, Dr. Abowd testified that such a hypothetical analysis would require identifying a statistical way of predicting the relationships between different components such as omissions and erroneous enumerations; even the Census Bureau has not ascertained how to conduct such an analysis. Nov. 14 Trial. Tr. at 1219:6-9. And Dr. Abowd testified that some of the coverage

measurement experts at the Census Bureau do not think this is possible even for the Census Bureau. Nov. 14 Trial. Tr. at 1216:12-18.

1352. The Census Bureau has not yet determined exactly what method is going to be used for imputation in the 2020 Decennial Census, but the process will be similar to that used in 2010. The evidence described here establishes that historically the Census imputation process has resulted in a downward bias of certain subpopulations that on average have larger families and more complicated living arrangements, such as Hispanics and non-citizen households. The historical imputation process has under-estimated the populations of these households. *See* PFOF ¶¶ 1315, 1320, 1326.

1353. The evidence described here establishes that the addition of a citizenship question to the Decennial Census will significantly increase the number of Hispanic persons and non-citizen households that end-up in the imputation process. Once in imputation, the evidence reflects that the addition of a citizenship question will exacerbate this bias in the imputation process, contributing to an increase in the net differential undercount of Hispanics and persons who live in non-citizen households. *See* PFOF ¶¶1312-1343, 1333, 1336.

1354. All the available evidence strongly suggests that the addition of a citizenship question will significantly increase the net differential undercount among these identified subpopulations. Likewise, the addition of a citizenship question will exacerbate the net differential undercount. In particular, the testimony, scientific literature, and census documents all support the finding that the NRFU operations will not prevent the differential net undercount of individuals of non-citizen households and Hispanics caused by the decrease in the self-response resulting from the inclusion of a citizenship question.

1355.  While NRFU operations and imputation will have some success in mitigating the decrease in self-response, given the likely significant decrease in self-response among persons who reside in non-citizens households, it is a reasonable inference that more likely than not there will an undercount of individuals in household with at least one non-citizen of at least 5.8% caused by the addition of a citizenship question even after NRFU and imputation.

1356.  While NRFU operations and imputation will have some success in mitigating the decrease in self-response, given the likely significant decrease in self-response among Hispanics, there will an undercount of Hispanics of at least 5.8% caused by the addition of a citizenship question even after NRFU and imputation.

1357.  The conclusion that there will more likely than not be an undercount of Hispanics and non-citizen households is consistent with Dr. Barreto's survey results.  These results reflect that the national decline in self-response due to a citizenship question is between 7.14% and 9.69% and that for Latinos, that estimate is between 14.1% and 16.58%. Nov. 9 Trial Tr. at 671:6-671:19, 672:13-672:22, 675:10-675:14. It is a reasonable inference that the ultimate undercount for non-citizen households and Hispanics will be at least 5.8% if self-response declines by between 7.14% and 16.58%.

1358.  Even if one were to accept the Census Bureau's more conservative prediction that the only impact on self-response caused by a citizenship question will be among individuals who live in non-citizen households, and that this impact will be only a 5.8% decrease in self-response; and even assuming that the NRFU efforts will result in the accurate enumeration of at least some of these households that do not self-respond, there is no evidence to suggest NRFU efforts could possibly achieve accurate enumeration of every such household that does not self-respond.  The overwhelming weight of the evidence reflects that the addition of a citizenship question will

increase the net differential undercount of individuals who live in non-citizen households. Additionally, there is no doubt that the addition of a citizenship question will increase the net differential undercount of Hispanics.

1359.  Given all the evidence presented of the limitations of the ability of NRFU operations to achieve accurate enumerations of households that do not self-respond, even if NRFU efforts have some limited success, there will still be an increase in the undercount of at least 2% among individuals who live in households with non-citizens.

1360.  This conclusion—that even after NRFU, there will still be an undercount of individuals living in non-citizen households of at least 2%—is consistent with the other evidence presented in this case, and if anything, is conservative. Dr. Warshaw testified that the 2 percent net differential undercount scenario could be viewed as the ultimate result, after NRFU, of a 5.8 decline in self-response rate.  Nov. 13 Trial Tr. at 863:5-9; 863:18-22; 869:4-13.

1361.  This conclusion is also consistent with the results of Dr. Barreto's survey, which suggests that NFRU efforts will have only a 45.2% success rate for the entire population. Nov. 9 Trial Tr. at 686:12-687:20.

1362.  This conclusion is also consistent with the opinion of Dr. Thompson, that the addition of a citizenship question will limit the effectiveness of the Census Bureau's communication marketing campaign aimed at hard to reach populations and outreach through trusted community partners, efforts which have helped the lower the undercount since 1990. Dr. Thompson testified that he believes that the addition of a citizenship question will cause the undercount of Hispanics to be at least as high as it was in the 1990 census before these programs were implemented. Thompson Decl. (Docket No. 516-1) ¶106. The net undercount for Hispanics in 1990 was 4.99 %. PX-267, p. 15. Parties Stipulation ¶ 23.

1363.  Considering the evidence as a whole, it is that more likely than not that there will be an undercount of individuals in households with at least one non-citizen—at a bare minimum, 2%—caused by the addition of a citizenship question; in all likelihood, the resulting undercount will be far higher.

## IX.    ABSENCE OF A LEGITIMATE VRA ENFORCEMENT RATIONALE

1364.  The evidence shows that the only justification that Secretary Ross offered for his decision to add a citizenship question to the Decennial Census—that a citizenship question was necessary for the DOJ  enforcement of the VRA ("VRA")—is a myth.  The VRA enforcement justification that Secretary Ross relied upon in his decisional memo is not supported by DOJ's prior practice of enforcing the VRA over the past five decades.  Indeed, during that time, DOJ has *never* had access to the kind of "hard count" citizenship data that it claimed to need and that Secretary Ross cited in his decisional memo.  On top of that, the citizenship data that the Decennial Census will produce will not enhance DOJ's ability to enforce the VRA relative to its existing capabilities.

1365.  On December 12, 2017, DOJ sent a letter signed by Mr. Gary to Director Jarmin "to formally request" that the Census Bureau include a citizenship question on the 2020 decennial Census questionnaire directed to every household in the United States.  PX-32 (AR).

1366.  Although the letter was signed by Mr. Gary, it was initially drafted by Acting Assistant Attorney General ("AAAG") John Gore.  Gore Dep. at 127.

1367.  The Gary letter asserts that "the decennial census questionnaire is the most appropriate vehicle for collecting" citizen voting-age population ("CVAP") data for purposes of enforcing Section 2 of the VRA.  *Id.*

1368.  Other than the Gary letter, there is no evidence in the Administrative Record to support the assertion that existing CVAP data are in any way deficient for purposes of enforcing the

VRA, or that adding a citizenship question to the Decennial Census questionnaire is the most appropriate vehicle for collecting CVAP data.  PX-1 through PX-14 (AR).

1369.  DOJ has always relied on statistical estimates of CVAP rather than hard count data for purposes of VRA enforcement.  No DOJ case has ever been hampered or unsuccessful because of that fact.  Prior to December 2017, DOJ had never requested the inclusion of a citizenship question on the Decennial Census questionnaire.

1370.  There is nothing in the Administrative Record indicating that CVAP data collected through the Decennial Census will be more accurate or more precise than existing CVAP data used by DOJ.  PX-1 through PX-14.

1371.  On December 22, Director Jarmin advised Mr. Gary that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses.  This would result in higher quality data produced at a lower cost."  PX-71 (AR); PX-200; PX-197; PX-297 at RFA 184; Census Bureau 30(b)(6) Dep. Vol. I. at 85:1-15; Nov. 13 Trial Tr. at 961-62.

1372.  The Administrative Record reflects that the Census Bureau repeatedly requested a meeting with DOJ to discuss its request, but was rebuffed. PX-71 (AR); PX-75(R) (AR); PX-197; PX-198; PX-199; PX-200; PX-4 at AR 8651 (AR); PX-4 at AR 9074 (AR); Jarmin Dep. (Docket 511-2) at 64:17-18, 105:11-15; Census Bureau 30(b)(6) Dep. Vol. I. at 98:9-20; PX-297 at RFA 184, 189, 200.

### A.   Qualifications of Dr. Handley

1373.  Plaintiffs have offered the testimony of Dr. Lisa Handley to address the need for a census citizenship question to enforce Section 2 of the VRA.

1374.  Dr. Handley is a consultant in redistricting and in electoral district design.  She has over thirty years of experience as an expert in redistricting, minority voting rights, and the use of

census data for voting rights enforcement purposes, advising many jurisdictions and other clients

on minority voting rights and redistricting-related issues and serving as an expert in dozens of

voting rights cases.  Nov. 13 Trial Tr. at 787, 790-92.

1375.  Dr. Handley's clients have included state and local jurisdictions, the DOJ, national civil

rights organizations, and such international organizations as the United Nations.  *Id.* at 790-92.

1376.  Dr. Handley holds a Ph.D. in political science from The George Washington University

and she is currently a visiting research academic at Oxford Brookes University in the UK.  *Id.* at

788.

1377.  In the last dozen years, Dr. Handley has served as an expert in four cases that involved

drawing redistricting plans featuring districts in which minorities constitute a majority of the

citizen voting age population, two as an expert on behalf of DOJ.  *Id.* at 793-795.

1378.  Overall, Dr. Handley has served as a voting rights expert in more than 25 voting rights

cases, including in six cases on behalf of DOJ; of the ten Section 2 redistricting cases DOJ has

filed since 2006, it has retained Dr. Handley in five of them.  *Id.* at 794-96.

1379.  Dr. Handley has also co-authored a book, *Minority Representation and the Quest for

Voting Equality*, as well as three other books, and her research on these topics has also appeared

in a number of peer-reviewed journals and law reviews including her North Carolina Law

Review Article entitled "Drawing Effective Minority Districts: A Conceptual Framework and

Some Empirical Evidence."  *Id.* at 789-90.

1380.  Based on her education, experience, and knowledge, Dr. Handley is well-qualified to offer

opinions on Section 2 of the VRA, and the use of census data in Section 2 litigation and

enforcement proceedings, and Dr. Handley's opinions in this case are reliable and credible.

B.     The Department of Justice's Need for Decennial Census CVAP Data

1.     VRA Enforcement and the Use of Census Survey Data

1381.  In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the U.S. Supreme Court determined that

minority plaintiffs had to satisfy three threshold factors to establish a violation of Section 2 of the

VRA: 1) the minority group must be sufficiently large and geographically compact to constitute

a majority in a single-member district; 2) the minority group must be politically cohesive; and 3)

the minority group must be able to demonstrate that the white majority votes sufficiently as a

bloc to enable it to usually defeat the minority's preferred candidate.  Nov. 13 Trial Tr. at 797-

99.

1382.  Dr. Handley testified that in most Section 2 cases, plaintiffs use data collected and

reported by the Census Bureau to determine if there are a sufficient number of geographically

concentrated minorities to satisfy the first *Gingles* precondition.  *Id.* at 798-99.

1383.  Dr. Handley testified that she occasionally uses Census Bureau data to conduct an analysis

of voting patterns by race/ethnicity if registration or turnout data by race/ethnicity is not

available.  *Id.* at 800.

1384.  Dr. Handley also testified that if a court finds that a jurisdiction is violating Section 2,

Census Bureau data may be used in part to draw effective remedial districts, though the electoral

behavior of those within the district—participation rates and cohesiveness by race—plays a far

more important role.  *Id.* at 800-01.  When crafting remedial districts, Dr. Handley explained that

she uses a district-specific, functional approach in which an analysis of voting patterns by race

and ethnicity plays the essential role in the evaluation and citizenship rates are taken into account

only indirectly.  This is the same approach DOJ has adopted.  Nov. 13 Trial Tr. at 823-24; PX-

332.

1385.  In its redistricting-related work, DOJ has always relied on total population data collected through the Decennial Census.  The Census Bureau produces what is referred to as the PL 94-171 data file, which provides data to be used in redistricting at various levels of census geography, including census blocks.  Census Bureau Aug. 29 30(b)(6) Dep. at 38-39; Nov. 13 Trial Tr. at 1024 (Abowd).  The PL 94-171 data file has never had citizenship data in it.  *Id.* at 40; Nov. 13 Trial Tr. at 1025 (Abowd).  P.L. 94-171 data has margins of error associated with it. *Id.* at 48-49; Nov. 13 Trial Tr. at 1027 (Abowd).

1386.  Since the passage of the Voting Rights Act of 1965, the Decennial Census questionnaire directed to every household in the United States has not included a question about citizenship. Parties' Stipulations (Docket No. 480-1) ¶ 30; Nov. 13 Trial Tr. at 802-03 (Handley).  DOJ has never had CVAP data based on hard count total population enumeration data from the Decennial Census. Nov. 13 Trial Tr. at 802 (Handley); Gore Dep. at 203:5-10.

1387.  When it has needed citizenship data, DOJ has always relied on CVAP data based on statistical estimates for purposes of VRA enforcement.  Nov. 13 Trial Tr. at 802 (Handley); Gore Dep. at 173-76 (Objection); 203:5-10.

1388.  From the 1970 through 2000 Censuses, the Census Bureau included a citizenship question on the "long form" questionnaire; in 2000, the long form was sent to about one in every six households during each Decennial Census.  Parties' Stipulations ¶¶ 31, 33, 35.  Because the long form questionnaire was not sent to every household in the U.S., citizenship data based on responses to the long form were statistical estimates that had a margin of error.  Nov. 13 Trial Tr. at 802-03 (Handley), 1026 (Abowd).

1389.  Between the 2000 and 2010 decennial Censuses, the long form was discontinued and its functions were taken over by the ACS, which also includes a citizenship question and is sent to about 2% of households in the U.S. every year.  Parties' Stipulations ¶¶ 39-41.

1390.  The Census Bureau produces different CVAP data, including 1-year statistical estimates based on a single year of ACS survey responses for CVAP ("1-year ACS estimates") and 5-year statistical estimates aggregated from a consecutive 5-year period for CVAP ("5-year ACS estimates").  Parties' Stipulations ¶ 51; Nov. 13 Trial Tr. at 1028 (Abowd).

1391.  The 1-year ACS estimates are intended for areas with a population larger than 65,000, while the 5-year ACS estimates have a larger sample size and a smaller margin of error than 1-year ACS estimates, and are considered by the Census Bureau to be usable for all geographic areas.  Parties' Stipulations ¶¶ 53-54; PX-504; Nov. 13 Trial Tr. at 806-07 (Handley); 1028-29 (Abowd).

1392.  The 5-year ACS estimates represent a sample of about 1-in-8 households, roughly comparable to the long form's sample of about 1-in-6 households.  Parties' Stipulations ¶ 52; Nov. 13 Trial Tr. at 807 (Handley).

1393.  The Census Bureau's tabulation of CVAP data is publicly available.  Census Bureau Aug. 29 30(b)(6) Dep. at 41-42.

1394.  Dr. Handley described how she uses 5-year ACS CVAP estimates for purposes of analyzing the first *Gingles* precondition in VRA cases.  Dr. Handley testified credibly that such data are perfectly adequate for the purposes of VRA enforcement, and that her opinion to a reasonable degree of scientific certainty is that block-level CVAP data derived from the ACS are reliable and accurate.  Nov. 13 Trial Tr. at 808-19.

1395.  Dr. Handley further explained that the district-specific functional analysis that she

employs in VRA analysis, and used by DOJ, does not depend on precise measurement of CVAP

at the individual block level, but rather on an analysis of turnout rates and voting patterns within

a district.  Nov. 13 Trial Tr. at 819-24; PX-332.

## 2.  The Department of Justice Did Not See a Need for Decennial Census Data Prior to Being Contacted By Secretary Ross' Staff

1396.  Prior to this letter, in the 53-year history of the VRA, DOJ had never requested the

inclusion of a citizenship question on the decennial Census questionnaire directed to every

household in the United States.  Gore Dep. at 168-69 (Objection).

1397.  DOJ had also never communicated to the Census Bureau that ACS CVAP data was not

ideal for DOJ's VRA enforcement purposes.  Nov. 13 Trial Tr. at 996.

1398.  DOJ filed five Section 2 cases during the Obama Administration.  PX-515; Gore Dep. at

251.  The Obama Administration also had obligations under Section 5 of the VRA to review

voting changes in all or part of 16 states for more than four years before the decision in *Shelby*

*County v. Holder*, 570 U.S. 529 (2013); the Trump Administration has not had Section 5

obligations to the same extent.  Gore Dep. at 250-51.

1399.  DOJ has not filed any Section 2 VRA cases during the Trump Administration.  PX-515;

Gore Dep. at 249-50.

1400.  On July 1, 2016, Arthur Gary wrote a letter to then-Census Bureau Director John

Thompson in which he indicated that DOJ had no need to amend the current content or to request

new content in the ACS for the 2020 Census.  PX-1 at AR 311 (AR).

1401.  On November 4, 2016, Mr. Gary wrote another letter to Mr. Thompson to "supplement[]"

his July letter.  *Id.*  In the November 4, 2016 letter, Mr. Gary formally requested that the Census

Bureau include a topic on the ACS relating to LGBT populations.  *Id.* The November 4, 2016

letter does not request additional information on either the ACS or the 2020 Decennial Census questionnaire beyond this request about LGBT populations. *Id.* The November 4, 2016 letter does not make any request for the inclusion of a citizenship question on the Decennial Census questionnaire, nor does it make any mention of a need for better citizenship data. *Id.*

1402.  Mr. Gore testified that he was unaware of any changes in law since November 4, 2016 with respect to the data that plaintiffs may rely on to establish the first *Gingles* precondition for Section 2 VRA liability. Gore Dep. at 54-55.

1403.  Mr. Gore testified he is also unaware of any changes to the forms of citizenship data available to plaintiffs bringing VRA claims in order to satisfy the first *Gingles* precondition. *Id.* at 56.

1404.  Mr. Gore testified he knows of no changes in the social scientific community since November 4, 2016 regarding the assessment of the accuracy of citizenship estimates based on ACS data. *Id.* at 57 (Objection).

1405.  Mr. Gore first became involved in deliberations about whether or not to request a citizenship question on the Decennial Census around September 4, 2017. *Id.* at 73, 75.

1406.  At that time—a little more than three months before DOJ officially requested a citizenship question—Gore did not hold an opinion about whether hard-count CVAP data would be better for DOJ's VRA enforcement needs than would ACS statistical estimates. *Id.* at 77-78.

1407.  Mr. Gore testified that he was unaware of whether, by September 8, 2017, he held the opinion that the Decennial Census would be the best vehicle for collecting CVAP data for DOJ's VRA enforcement purposes. *Id.* at 79.

1408.  Mr. Gore testified that as of September 8, 2017 (the date Mr. Comstock wrote his memo stating that "Justice staff did not want to raise the [citizenship] question"), DOJ staff did not

want to raise a citizenship question.  Gore Dep. at 69; PX-133 (AR); PX-524 (AR); PX-537 (AR).

**3.    There is No Evidence in the Administrative or Evidentiary Record to Support the Claims in the Gary Letter About the Purported Problems with Existing ACS CVAP Data**

1409.  Prior to the December 12, 2017 Gary Letter, the Census Bureau had never heard from DOJ that the Census Bureau's tabulation of CVAP data was insufficient for purposes of VRA enforcement.  Nov. 13 Trial Tr. at 996.

1410.  DOJ has not identified any cases it failed to bring, or any VRA cases it brought that were unsuccessful, due to concerns about the accuracy of CVAP data.

1411.  The Gary letter states that ACS data "does not yield the ideal data for the purpose of" Section 2 enforcement, and lists four bullet points in support:

a.    DOJ uses Decennial Census "total population data . . . to determine compliance with the Constitution's one-person, one-vote requirement," but must then use "ACS citizenship estimates," for purposes of "conducting redistricting" or "enforcing Section 2"

b.    ACS citizenship data "do not align in time with the Decennial Census data"

c.    ACS citizenship "estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases"

d.    ACS citizenship data are not published at the smallest unit of census geography, the census block, requiring CVAP estimates for redistricting that "interject[s] further uncertainty."  PX-32 (AR).

1412.  With regard to the first assertion in the Gary Letter regarding the purported difficulty of using a "different data set[]," namely, "ACS citizenship estimates," for purposes "conducting redistricting" or "enforcing Section 2," PX-32 (AR), there is no evidence in the Administrative Record that supports this assertion.  PX-1 to PX-14 (AR).

1413.  DOJ has always relied on a separate data set for citizenship rates for purposes of VRA enforcement, even prior to the ACS.  *See supra*.

1414.  Dr. Handley testified that it is not difficult to combine the two data sets, that her work as an expert has never been impeded by the need to do so, and that she is unaware of a single case that failed because of the need to combine total population and CVAP data from separate data sets.  Nov. 13 Trial Tr. at 827-29.

1415.  Mr. Gore testified he is not aware of any time where DOJ, in enforcing the VRA, has had a single dataset that contained both total population and citizenship data.  Gore Dep. at 188-89. He similarly testified he is unaware of any filed VRA cases where DOJ or any plaintiff was unsuccessful because citizenship data and total population data were in two different data sets. *Id.* at 190-91.

1416.  Dr. Abowd testified is not sure yet whether the Census Bureau will in fact be able to produce a single dataset with block-level CVAP data from the 2020 Decennial Census.  Nov. 13 Trial Tr. at 1029.  The Census Bureau has not yet determined how it will assemble the CVAP tabulation, or whether it will be included in the P.L. 94-171 data file.  Census Bureau 30(b)(6) Vol. I Dep. at 56.

1417.  With regard to the second claim in the Gary letter, that ACS citizenship data "do not align in time with the decennial census data," PX-32 (AR), there is no evidence in the Administrative Record that supports this assertion.  PX-1 to PX-14 (AR).

1418. Dr. Handley testified ACS citizenship data are available that align in time with Decennial Census data by using the 5-year ACS dataset with a midpoint that aligns with the Decennial Census year. Nov. 13 Trial Tr. at 829-30. She testified that her work has never been impeded because ACS 5-year estimates are collected over a longer period of time than Decennial Census data, and the she is unaware of any case in which a claim failed because of the purported misalignment in time between Decennial Census total population data and 5-year ACS CVAP estimates. *Id.*

1419. Mr. Gore testified he is unaware of any case filed by DOJ under the VRA or filed by any plaintiff that was unsuccessful because ACS citizenship data does not align in time with Decennial Census data. Gore Dep. at 194-95.

1420. With regard to the Gary Letter's third assertion, that ACS citizenship "estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases," PX-32 (AR), there is no evidence in the Administrative Record that supports the suggestion that this has impeded VRA enforcement. PX-1 to PX-14 (AR).

1421. As an initial matter, it is not the case that, in contrast to ACS CVAP estimates, the total population data from the Decennial Census lacks margins of error. The P.L. 94-171 data has also has margins of error associated with it. Nov. 13 Trial Tr. at 1027 (Abowd).

1422. DOJ has always relied on CVAP data that are sample-based estimates featuring a margin of error. Even before the ACS, when the Census Bureau included a citizenship question on the "long form" questionnaire, the data produced based on responses to the long form were statistical estimates that had a margin of error. Nov. 13 Trial Tr. at 802-03 (Handley), 1026 (Abowd). Dr. Handley testified that her work as a VRA expert has never been hampered by this fact, and that

she is unaware of any cases in which a claim failed due to reliance on statistical estimates of CVAP.  Nov. 13 Trial Tr. at 830-32.

1423.  Mr. Gore testified that as long as DOJ has been enforcing the VRA, it has always relied upon statistical estimates for citizenship data, and that he is unaware of any cases filed by DOJ where DOJ was unsuccessful because the CVAP data it relied upon had a margin of error that increases as the geographic area decreases; and that he was unaware of any cases where a claim failed because the plaintiffs relied on 5-year ACS estimates.  Gore Dep. at 173-76 (Objection), 203-04.

1424.  With regard to the fourth claim of the Gary letter—that "redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan," PX-32 (AR)—there is no evidence in the Administrative Record that this inhibits VRA enforcement in any way.  PX-1 to PX-14 (AR).

1425.  Dr. Handley testified that in VRA cases involving states and larger jurisdictions, there is often no need to split census blocks either to satisfy the first prong of the *Gingles* test or to draw remedial districts.  Nov. 13 Trial Tr. at 810.

1426.  Dr. Handley further testified that for instances in which splitting census blocks are necessary (such as those involving smaller geographies), VRA plaintiffs have relied on available CVAP at the tract or block group level to estimate CVAP at the census block level using one of several reliable methods to conduct this analysis and generate estimates of the CVAP of particular racial groups at the block level, and that these estimation procedures are sufficiently reliable to a reasonable degree to scientific certainty.  Nov. 13 Trial Tr. at 810-19, 856.

1427.  Dr. Handley testified that, to the extent that block-level CVAP data is necessary in a case, it has always been obtained through the use of an estimation procedure, but that this has never hampered her work as a VRA expert and that she is unaware of any case that failed before of the use of such an estimation procedure.  Nov. 13 Trial Tr. at 831-32 (Handley).

1428.  Mr. Gore testified that he is unaware of any time in which DOJ had access to block-level CVAP that was produced without using an estimation procedure to develop that data from a different level of geographic specificity, and that he is unaware of any case failing because of the need to employ such an estimation procedure.  Gore Dep. at 235-37.

1429.  Overall, none of the cases cited in the Gary Letter involved a claim that failed because of reliance on statistical estimates of CVAP data based on data collected separate and apart from the "full count" Decennial Census; plaintiffs in all of the cases cited in the letter relied on sample-based CVAP estimates without any problems.  Nov. 13 Trial Tr. at 824-25 (Handley).

1430.  AAAG Gore testified that he is aware of only one case in which plaintiffs bringing a VRA were unsuccessful in part because of their reliance on ACS data, *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010); Gore Dep. at 244.

1431.  DOJ did not bring the *Benavidez* case, which expressed no opinion as to the general reliability of ACS number for VRA purposes and explained that the plaintiffs relied on 1-year ACS estimates for CVAP data.  Gore Dep. at 242-46.  The Plaintiffs in *Benadidez* did not rely on 5-year ACS estimates.  As noted, *supra*, 1-year ACS estimates are not considered reliable for areas with a population less than 65,000; while 5-year ACS are considered reliable by the Census Bureau for any geographic area. PX-504;  Nov. 13 Trial Tr. at 806-07 (Handley), 1029 (Abowd).

1432.  For both statewide and local districting purposes, the current data available is perfectly adequate for meeting the *Gingles* requirements and drawing adequate remedial districts to a

reasonable degree of scientific certainty, as Dr. Handley credibly explained and as Defendants

have not rebutted.  *See* Nov. 13 Trial Tr. at 840-42.

> **4.      There is No Evidence in the Administrative or Evidentiary Record Indicating that CVAP Data Collected through the Decennial Census Will Be an Improvement for VRA Enforcement Purposes over Existing ACS CVAP Data**

1433.  There is no evidence in the Administrative Record that if a citizenship question is

included on the decennial form that the data would be more accurate or more precise for VRA

purposes than existing survey data used. PX-1 to PX-14 (AR).

1434.  Rather, the evidentiary record in this case suggests data gathered through the Decennial

Census may, in fact, be less accurate and less precise for such purposes.  Nov. 13 Trial Tr. at

834, 840 (Handley), 956-57 (Abowd).

1435.  With respect to *accuracy*, the trial record indicates that CVAP data collected through the

Decennial Census will not be more accurate than existing ACS CVAP Data.  Dr. Handley

testified that the Decennial Census itself has several types of errors: (1) coverage errors, which

arise when persons are incorrectly excluded, included, or duplicated in the count; (2) geographic

errors, which happen when an address was placed in the wrong census geographic location or a

misunderstanding of the census residence rules; and (3) demographic errors, which occur when a

person's demographic characteristics have been incorrectly reported, recorded, or imputed.  Nov.

13 Trial Tr. at 832-34; *see also* Census Bureau Aug. 29 30(b)(6) Dep. at 49.

1436.  In its post-2010 enumeration survey, the Bureau estimated that "among the 300.7 million

people who live in housing units, about 94.7 percent were counted correctly, 3.3 percent were

counted erroneously, 1.6 percent provided only a census count and had their demographic

characteristics imputed, and .4 percent needed more extensive imputation after all census follow-

up efforts were attempted."  PX-333 at 1.  The Bureau also estimated there were 16.0 million

omissions in the 2010 census (although it indicates that 6 million of these people were likely to have been counted in the census but could not be verified in the post-enumeration survey). *Id.* These omissions disproportionately affect certain segments of the population, including blacks and Hispanics, who are more likely not to be counted than others. *Id.*

1437.  As noted, *supra*, documents in the Administrative Record including Dr. Abowd's memos dated January 19, 2018, and March 1, 2018, indicate that the addition of a citizenship question will exacerbate these errors and harm the overall quality of Census data.  In particular, Dr. Abowd's January 19 Memo in the Administrative Record noted "[m]ajor potential quality and cost disruptions" from the addition of a citizenship question.  PX-22 (AR) at 2.  *See also* Nov. 13 Trial Tr. at 832-34 (Handley).  Dr. Abowd testified that there is considerable evidence indicating that a citizenship question will depress census participation among noncitizens and Hispanics. Nov. 14 Trial Tr. at 1249.  Data collected through the NRFU process will not be as accurate as data collected from self-response; as Dr. Abowd testified, NRFU creates more erroneous enumeration, whole person census imputations, and gross omissions, all of which raise error rates.  PX-25 (AR); Nov. 13 Trial Tr. at 966-70.

1438.  With respect to *precision*, disclosure avoidance techniques employed by the Census Bureau to mask responses to the Census questionnaire will render block-level CVAP data imprecise, which undermines any justification for adding a citizenship question to the 2020 Decennial Census based on any purported need for "hard count" CVAP data.

1439.  Because of confidentiality concerns, citizenship data reported in the Decennial Census will have to go through a disclosure avoidance process to prevent the personal identification of individuals or families in relation to their reported answers.  Census Bureau Aug. 29 30(b)(6) Dep. at 50-51; Nov. 13 Trial Tr. at 1032-33, 1039-46 (Abowd).

1440.  For example, some census blocks only have one person on them.  Nov. 13 Trial Tr. at 837-38 (Handley); 1031-32 (Abowd).  In census blocks where there is only one person, the Census Bureau produces block-level CVAP data in which it will not publish that person's actual citizenship status as reported in their response to a citizenship question.  Census Bureau Aug. 29 30(b)(6) Dep. at 65-68; Nov. 13 Trial Tr. at 1032-33, 1036 (Abowd)

1441.  The Census Bureau has not yet set the parameters for the 2020 disclosure avoidance system, but they have used two primary techniques in the past: household-level swapping and synthetic noise infusion.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-41 (Abowd).

1442.  In previous censuses, the Census Bureau has employed household-level swapping, meaning that the certain variables on the household record are matched to variables on a household record in a different geographic area and across census blocks.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-40.  For households selected for swapping, all the values are swapped except the address ID so it looks as if the data from a different address lived at the address of the original.  Census Bureau Aug. 29 30(b)(6) Dep. at 51; Nov. 13 Trial Tr. at 1039-40 (Abowd).

1443.  In this Census, the Census Bureau will employ synthetic noise infusion, which involves identifying sensitive responses and then using a statistical model to replace the sensitive value with a value that is sampled from the model and its error distribution.  Census Bureau Aug. 29 30(b)(6) Dep. at 53-54; Nov. 13 Trial Tr. at 1039-42 (Abowd).

1444.  By nature, the disclosure avoidance process introduces further errors into CVAP data produced at the block level.  Census Bureau Aug. 29 30(b)(6) Dep. at 53-56, 69-71, 100-01.

1445.  The Census Bureau will undertake disclosure avoidance for every census block, meaning that—except for randomly—there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 Decennial Census questionnaire.  Census Bureau Aug. 29 30(b)(6) Dep. at 67-68; Nov. 13 Trial Tr. at 1033 (Abowd).  The block-level CVAP produced by the Census Bureau will not reflect the actual citizenship status of each individual in each census block as reported from a citizenship question on the census questionnaire.  Census Bureau Aug. 29 30(b)(6) Dep. at 67-68, 70-71.

1446.  Block-level CVAP data based on responses to a citizenship question will be estimates rather than a precise tabulation.  Nov. 13 Trial Tr. at 1043-44 (Abowd).  Thus, even with the inclusion of a citizenship question on the Census, the block-level CVAP data produced by the Census Bureau will still have margins of error associated with it. Census Bureau Aug. 29 30(b)(6) Dep. at 71; Nov. 13 Trial Tr. at 1044 (Abowd).  As with ACS CVAP data currently used by DOJ, the CVAP data based on responses to a citizenship question will be estimates that will be more precise for areas with larger populations, but will be less precise, more uncertain, and will have larger margins of error for geographic units with smaller populations.  Nov. 13 Trial Tr. at 1041-42 (Abowd).

1447.  The Census Bureau has not determined if, after disclosure avoidance, the error margins for the block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census Bureau Aug. 29 30(b)(6) Dep. at 100-101.  The Census Bureau does not know if the CVAP produced based on responses to a citizenship question will have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies. *Id.*; Nov. 13 Trial Tr. at 1044-46.

A citizenship question therefore cannot be justified based on a purported need for more precise CVAP data.

1448.  There are no documents in the Administrative Record indicating that DOJ considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.  *See* PX-1 to PX-14 (AR).  There were no conversations between the Census Bureau and DOJ regarding this issue.  Nov. 13 Trial Tr. at 1046 (Abowd).

1449.  There are no documents in the Administrative Record indicating that Secretary Ross considered the effect of disclosure avoidance on the precision of block-level CVAP data based on responses to a citizenship question on the Census questionnaire.  *See* PX-1 to PX-14 (AR); Nov. 13 Trial Tr. at 1047-48 (Abowd).

1450.  Dr. Abowd testified that he informed Secretary Ross of disclosure avoidance issues, but Secretary Ross nevertheless made the decision to order the inclusion of a citizenship question. Nov. 13 Trial Tr. at 1046-48 (Abowd).

### 5. The Administrative and Evidentiary Record Indicate the Decision to Include a Citizenship Question on the Census Will Produce Less Accurate CVAP Data for VRA Enforcement Purposes than Using Administrative Records

1451.  The Administrative Record indicates that, to the extent DOJ could use better-quality CVAP data than it currently has, a better option would be to use administrative records than a citizenship question on the Census (Alternative C).  In Dr. Abowd's January 19 memo, the Census Bureau concluded that adding a citizenship question to the 2020 Decennial Census "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources."  PX-22 at 1 (AR); Nov. 13 Trial Tr. at 885 (Abowd testimony).  The Census Bureau determined that using administrative

records under Alternative C "best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count." PX-22 at 1; Nov. 13 Trial Tr. at 886 (Abowd testimony).

1452. Using administrative records will produce more accurate block-level CVAP data than adding a citizenship question—either alone or in combination with administrative records—for three reasons. The first reason is that administrative records tend to be more accurate than survey self-responses as to citizenship status, particularly for noncitizens. Nov. 13 Trial Tr. at 955 (Abowd).

1453. There is sometimes disagreement between a person's citizenship status as reflected in administrative records and what is reported for that person in response to the ACS citizenship question. PX-22 at 7-8; Nov. 13 Trial Tr. at 953-54 (Abowd).

1454. The Census Bureau describes citizenship status as reflected in the administrative records as "verified," because the administrative records are a legal document indicating a person's citizenship status. PX-22 at 7 (AR); Nov. 13 Trial Tr. at 954 (Abowd testimony).

1455. By contrast, the Census Bureau describes citizenship status as reported in response to the ACS citizenship question as "unverified" or a "survey response," because it does not constitute a legal document. PX-22 at 7 (AR); Nov. 13 Trial Tr. at 954-55.

1456. Dr. Abowd believes that administrative records tend to report more accurate citizenship status data than do survey records. PX-22 at 7 (AR); PX-162 at 46 ("the survey responses are more often inaccurate when they disagree"); PX-4 at 7913 et seq (AR); Nov. 13 Trial Tr. at 955. The Census Bureau has determined that citizenship data gathered based on survey responses to a citizenship question are of "suspect quality," while administrative record citizenship data are "high quality." PX-25 (AR); Nov. 13 Trial Tr. at 974.

1457.  In the 2016 ACS, individuals whom the administrative records indicate are noncitizens responded that they were citizens 34.7 percent of the time.  PX-22 at 8 (AR).  That number rose even higher on the 2017 ACS.  Census Bureau Aug. 29 30(b)(6) Dep. at 91-92; Nov. 13 Trial Tr. at 915-16 (Abowd testimony).  Dr. Abowd estimates that more than 30 percent of noncitizens provide an inaccurate response to the ACS citizenship question.  PX-22 at 8 (AR); Nov. 13 Trial Tr. at 956.

1458.  The Census Bureau has no empirical basis to believe that noncitizens would give more accurate responses to the citizenship question on the Census than they do on the ACS.  Census Bureau Aug. 29 30(b)(6) Dep. at 93; Nov. 13 Trial Tr. at 956-57.  To the contrary, the Census Bureau believes that there are "definitely indications" that responses by noncitizens to a citizenship question on the 2020 Decennial Census will be even less accurate than they have historically been on the ACS. Nov. 13 Trial Tr. at 957.

1459.  The Census Bureau estimates that there would be 9.5 million people for whom the survey self-response and the administrative record would disagree on citizenship status. PX-24 at 4 (AR); Nov. 13 Trial Tr. at 982.  For this group, the traditional Census Bureau practice would be to rely on the survey response rather than the administrative record—a practice that Dr. Abowd states would be less accurate.  PX-25 at 4 (AR); Census Bureau Oct. 5 30(b)(6) Dep. at 416-17; Nov. 13 Trial Tr. at 982-83 (Abowd).  If instead the Census Bureau were to use administrative records to produce CVAP data and did not include a citizenship question, the Bureau would not have situations in which there were disagreements between survey responses and administrative records, and would, on balance, produce higher quality and more accurate CVAP data. Nov. 13 Trial Tr. at 958.

1460.  The Census Bureau has made no determination about how it will address disagreement between survey responses on a citizenship question on the 2020 Decennial Census and the administrative records regarding citizenship status when producing block-level CVAP data for DOJ. Nov. 13 Trial Tr. at 957.  There have been no conversations with DOJ about how the CVAP tabulation will be assembled from the various forms of citizenship data available to the Census Bureau.  Census Bureau Aug. 29 30(b)(6) Dep. at 62; ; Gore Dep. at 273-74; Nov. 13 Trial Tr. at 962-63 (Abowd).

1461.  A second reason that Alternative C (relying on administrative records) will produce more accurate CVAP data than adding a citizenship question to the 2020 Decennial Census (either alone or in combination with using administrative records) is that adding a citizenship question will result in lower-quality Census data and fewer people who can be linked to administrative records. Nov. 13 Trial Tr. at 969.

1462.  Because a citizenship question would produce lower-quality personal data because fewer people will self-respond to the Census, there would also be a reduction in the number of people whom the Census Bureau can link to administrative records under Alternative D. PX-25 (AR); Nov. 13 Trial Tr. at 969.  The Census Bureau was able to link 93 percent of self-responses to administrative records in the 2010 Census; by contrast, the Census Bureau was only able to link 33.8 percent of proxy responses obtained through the NRFU responses to administrative records in the 2010 Census. *Id.*

1463.  The Census Bureau estimates that, under Alternative D, there would be about 36 million people who cannot be linked to administrative records on citizenship—greater than the number of people who the Census Bureau estimates would not be able to be linked to administrative records under Alternative C.  PX-24 at 4 (AR); Nov. 13 Trial Tr. at 981.  The Census Bureau

believes that there would be a greater number of people who could not be linked to administrative records under Alternative D than under Alternative C because a citizenship question would reduce self-response rates and drive more people into NRFU efforts, which hurts data quality.  PX-24 at 3-4 (AR); Nov. 13 Trial Tr. at 981.  This means that, in comparison to Alternative C, Alternative D would result in more people whose citizenship status cannot be determined by linking them to administrative records.

1464.  ACS item non-response rates and break-off rates indicate that Hispanics as compared to non-Hispanic whites, are more likely not to respond to a citizenship question on the Census. Nov. 13 Trial Tr. at 919-20 (Abowd); Nov. 9 Trial Tr. at 737-38 (Barreto).  Under Alternative D, for individuals who do not respond to a citizenship question and cannot be linked to administrative records, modeling of citizenship status will still be necessary.  Nov. 5 Trial Tr. at 35 (Hillygus); Nov. 13 Trial Tr. at 976 (Abowd).  The Census Bureau estimates that there will be 13.8 million people who do not provide a response to the citizenship question, and who cannot be linked to administrative records.  PX-24 at 4 (AR).

1465.  A third reason that Alternative C (relying on administrative records) will produce more accurate CVAP data than adding a citizenship question to the 2020 Decennial Census (either alone or in combination with using administrative records) is that, for people who cannot be linked to administrative records, modeling citizenship status produces more accurate data in comparison to self-reported survey responses.  Nov. 13 Trial Tr. at 976 (Abowd).

1466.  Secretary Ross' memo claims that a downside to Alternative C—using administrative records without a citizenship question—is that the Census Bureau would have to impute, or model, the citizenship status for respondents who cannot be linked to administrative records. PX-26 at 4 (AR); Nov. 13 Trial Tr. at 970 (Abowd).  Secretary Ross' memo claims that using both a

citizenship question and administrative records might eliminate the need for modeling

citizenship status for respondents who cannot be matched to administrative records, because the

Census Bureau would be able to rely on survey responses. PX-26 at 5 (AR); Nov. 13 Trial Tr. at

971-3 (Abowd).

1467.  The Census Bureau estimated that under Alternative C, the Census Bureau would be able

to link 295 million out of the 330 million people expected to be enumerated in the 2020

Decennial Census to administrative records—meaning that 89.4 percent of the population would

be linked to administrative records and 10.6 percent of the population would fall into an

administrative record gap. PX-24 at 3 (AR); Nov. 13 Trial Tr. at 978-79 (Abowd testimony).

Under Alternative C, then, the Census Bureau has estimated that it would model citizenship

status for about 10.6 percent of the population. PX-24 at 3 (AR); Nov. 13 Trial Tr. at 979.

1468.  A major difference between Alternatives C and D, then, is that for respondents who

cannot be linked to administrative records, the Census Bureau under Alternative C would model

respondents' citizenship status, and under Alternative D would use survey self-responses. Nov.

13 Trial Tr. at 973.

1469.  The Census Bureau estimates that under Alternative D there would be 22.2 million people

who couldn't be linked to administrative records but who would provide a survey response to the

citizenship question—comprising about 6.7 percent of the population. PX-24 at 4 (AR); Nov. 13

Trial Tr. at 981, 984.

1470.  The Census Bureau states that one problem with relying on survey responses to fill gaps in

administrative records is that noncitizens have a strong incentive to provide an incorrect answer

to the citizenship question or not answer at all. PX-25 at 4 (AR); PX-162 at 19; Nov. 13 Trial Tr.

at 973 (Abowd testimony).  Even a large number of legal permanent residents provide incorrect

answers to the ACS citizenship question. PX-25 at 4 (AR); Nov. 13 Trial Tr. at 973 (Abowd testimony).  The Census Bureau has concluded that survey-collected citizenship data may not be reliable for many respondents for whom there are no administrative records. PX-25; Nov. 13 Trial Tr. at 973-74.

1471.  Dr. Abowd and the Census Bureau believe that, for individuals who cannot be linked to administrative records on citizenship, the modeling conducted under Alternative C would be more accurate than survey responses under Alternative D for respondents who cannot be matched to administrative records. Nov. 13 Trial Tr. at 975.  As such, the Census Bureau would prefer modeling to survey responses in determining citizenship status for respondents who cannot be linked to administrative records. Nov. 13 Trial Tr. at 975-76; PX-162 at 46.

1472.  There are an estimated 22.2 million people under Alternative D for whom there would be a survey response to the citizenship question but not an administrative record; for this group, the Census Bureau believes that relying on the survey response would be less accurate than modeling their citizenship status.  Nov. 13 Trial Tr. at 985.

1473.  The Census Bureau estimates that under Alternative D there would be 13.8 million people who have no administrative record on citizenship and would also provide no survey response to a citizenship question.  PX-24 at 4 (AR); Nov. 13 Trial Tr. at 981.  Under Alternative D, modeling of citizenship status for this group would still be necessary.

1474.  The Brown, et al memo contains analyses of various scenarios with respect to Alternatives C and D, which led to the same conclusion: that it will produce worse quality Census data overall and worse quality citizenship data specifically.  PX-162 at 49-53; Nov. 13 Trial Tr. at 986 (Abowd testimony).

1475.  Secretary Ross' decision memo stated that including a citizenship question on the 2020 Decennial Census would enable the Census Bureau to model citizenship status more accurately. PX-26; Nov. 13 Trial Tr. at 977. (Abowd testimony).

1476.  No one at the Commerce Department ever discussed Secretary Ross' contention that a citizenship question would enable the Census Bureau to model citizenship status more accurately with Dr. Abowd. Nov. 13 Trial Tr. at 977.  Secretary Ross' conclusion that including a citizenship question on the 2020 Decennial Census would enable the Census Bureau to model citizenship status more accurately is based on technical presumptions that the Census Bureau does not currently endorse. *Id.*  At the time of Secretary Ross' decision memo, the Census Bureau had not completed any analysis as to whether or not the inclusion of a citizenship question would enable the Census Bureau to more accurately model citizenship status for people who are not listed in administrative records. *Id.* at 978.

1477.  Both Dr. Abowd and the Census Bureau disagree with Secretary Ross' claim that Alternative D is justified over Alternative C because Alternative C requires modeling for people who cannot be linked to administrative records.  PX-25 at 5 (AR); Nov. 13 Trial Tr. at 985-86. When Secretary Ross wrote in his decision memo that Alternative D may eliminate the need for the Census Bureau to model the citizenship status for millions of people, the Census Bureau had already communicated its conclusion to Secretary Ross that Alternative D would not eliminate that modeling need.  PX-25 at 5 (AR); Nov. 13 Trial Tr. at 988.

1478.  In sum, Dr. Abowd and the Census Bureau concluded that, contrary to the assertions in Secretary Ross's decision memo, adding a citizenship question is not necessary to provide a complete and accurate response to DOJ's request.  Nov. 13 Trial Tr. at 1048 (Abowd testimony). Compare PX-22 at 1 (AR) (Abowd Memo) with PX-26 at 8 (AR) (Ross Decision Memo).

1479.  Acting AAG Gore also acknowledged that a citizenship question on the Decennial Census questionnaire is not necessary for DOJ's VRA enforcement efforts.  Gore Dep. at 300.

## X.    INJURY TO ORGANIZATIONS AND GOVERNMENTAL PLAINTIFFS

1480.  The evidence establishes that adding a citizenship question to the Decennial Census will cause several types of harms to the NGO and Governmental Plaintiffs.  Both sets of Plaintiffs will be forced to devote more resources to a Decennial Census that includes a citizenship question than they would have done otherwise.  Adding a citizenship question will also harm the NGO and Governmental Plaintiffs in other ways, including by causing a decline in self-reporting leading to a differential undercount that will cause them to lose political power from malapportioned legislative districts.  Because adding a citizenship question will cause both a differential undercount and undermine the accuracy of the count, it will also harm the NGO and Governmental Plaintiffs by reducing federal funding to their communities and distorting allocation of resources.  And adding a citizenship question to the  Decennial Census injures the NGO Plaintiffs' members by invading their right to privacy.

### A.  Organizational Injuries to NGO Plaintiffs

1481.  Each NGO Plaintiff has suffered harm as a result of being required to divert resources from other organizational priorities and spend more money to address the effects of the fear created by a citizenship question among community members who are less likely to respond to the Decennial Census questionnaire. *See* Plum Aff. (Docket No. 498-19) ¶¶ 12-23; Choi Aff. (Docket No. 489-1) ¶¶ 14-22; Altschuler Aff. (Docket No. 503-1) ¶¶ 7-11; Khalaf Aff. (Docket No. 498-16) ¶¶ 15-29; Escobar Aff. (Docket No. 498-3) ¶¶ 15-29.

1482.  The NGO Plaintiffs have also proved harm to their organizational missions—all of which include promoting engagement in and representation of immigrant communities of color—as a

result of a citizenship question. *See* Plum Aff. ¶¶ 10-13; Choi Aff. ¶¶ 3-9, 14-15; Altschuler Aff. ¶¶ 11-22; Khalaf Aff. ¶¶ 13-16; Escobar Aff. ¶¶ 15, 20-25.

1483.  Moreover, as Dr. Abowd testified, a critical component of the Census Bureau's outreach to hard-to-count communities is through its "trusted partners" program, which involves non-profit organizations such as the NGO Plaintiffs. Census Bureau 30(b)(6) Vol I. Dep. at 453, 462; Nov. 11 Trial Tr. at 1119.

1484.  Dr. Abowd admitted that, as demonstrated by the Census Barriers, Attitudes and Motivators Survey (CBAMS), the macro-environment has created "significant barriers associated with self-response that may plausibly and credibly be related to a citizenship question" which has made outreach more difficult for trusted partners such as the NGO Plaintiffs. Nov. 11 Trial Tr. at 1123; PX-158 (AR); PX-162; PX-448; PX-662.

1485.  As Dr. Abowd testified, many of the trusted partners (including the NGO plaintiffs) will need to spend their own money and resources to address the negative effects of a citizenship question. Census Bureau 30(b)(6) Vol I. Dep. at 453, 462; Nov. 11 Trial Tr. at 1121-22.

### 1.    NYIC

1486.  Plaintiff NYIC, its member organizations, and the communities NYIC serves all have a fundamental interest in ensuring as complete and accurate a Decennial Census as possible, principally because an undercount would diminish crucial governmental funding and political representation to which immigrant communities are entitled. Choi Aff. ¶¶ 6-7.

1487.  NYIC has worked to encourage Decennial Census response rates among noncitizens in prior Decennial Censuses; in the 2010 Decennial Census cycle, NYIC launched an outreach campaign to boost immigrant participation in the Decennial Census, held press briefings with elected officials, and coordinated public service announcements in 24 languages that appeared in 69 newspapers. *Id.* ¶ 9; Plum Aff. ¶ 10.

1488.  NYIC had planned to engage in similar work in the 2020 Decennial Census in mid-2017 before the announcement of a citizenship question. Choi Supp. Aff. (Docket No. 489-2) ¶ 10.

1489.  A citizenship question has substantially increased the amount of resources NYIC felt necessary to devote to the Decennial Census and has already caused NYIC to divert resources from other program areas to accelerate its Census education and outreach work for the 2020 Decennial Census. Choi Aff. ¶¶ 16-21; Plum Aff. ¶ 14.

1490.  NYIC has also shown that fear in its community due to the addition of a citizenship question will make their efforts to encourage participation of noncitizens in the 2020 Decennial Census more difficult. Choi Aff. ¶¶ 12-15; Plum Aff. ¶ 13.

1491.  NYIC and several of its member organizations have also reported community members who have expressed reluctance or unwillingness to respond to the 2020 Decennial Census because of a citizenship question. Plum Aff. ¶¶ 15-21.

1492.  Further, NYIC demonstrated that because of the heightened fear and suspicion created by a citizenship question, it has expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the noncitizen community. Choi Aff. ¶¶ 17-21; Plum Aff. ¶ 14.

1493.  Prior to the decision to add a citizenship question, NYIC did not anticipate having to commence significant Census education and outreach work until the Summer of 2019. Choi Aff. ¶ 18.

1494.  Instead, as a result of the announcement of Secretary Ross's decision, NYIC had to accelerate the start of significant Census work to March 2018. Choi Aff. ¶¶ 10, 18; Plum Aff. ¶ 11.

1495.  The decision to add a citizenship question to the 2020 Decennial Census has required NYIC both to make substantial and additional investments just to achieve Census participation rates comparable to what NYIC would have achieved absent a citizenship question, Choi Aff. ¶ 16; Plum Aff. ¶ 14, and to hire more staff than previously planned, Choi Aff. ¶ 19.

1496.  To alleviate fear and confusion caused by a citizenship question among the immigrant communities that NYIC and its members serve, NYIC has had to begin its Census education and outreach efforts substantially earlier and engage many more staff, members, and partners than planned—i.e., in March 2018, instead of in 2019. Choi Aff. ¶ 18.

1497.  Prior to the addition of a citizenship question, NYIC had planned to spend approximately $625,000 on Census education and outreach over a three-year period ahead of the 2020 Decennial Census. Choi Aff. ¶ 16.

1498.   Instead, over the next three years and due to a citizenship question's addition, NYIC is planning to spend approximately $1 million on community education and outreach efforts to work towards a complete and accurate count within the communities that NYIC and its member organizations serve—representing an increase of approximately 60% over what the organization would have spent in the absence of a citizenship question. Choi Aff. ¶ 16; Plum Aff. ¶ 14.

1499.  So far in 2018, as a result of the decision to add a citizenship question, NYIC has spent at least $93,000 on Census-related activities that it would have not spent otherwise. Choi Aff. ¶ 17; Plum Aff. ¶ 14.

1500.  NYIC anticipates spending an additional amount in excess of $282,000 between now and May 2020 as a result of a citizenship question. Choi Aff. ¶ 17.

1501.  The fear and confusion brought on by the decision to add a citizenship question prompted NYIC to hire a dedicated, full-time senior Census fellow at a cost of approximately $36,000 in

the year to date; absent a citizenship question, NYIC would not have hired such a fellow until 2019. *Id.* ¶ 19.

1502.  NYIC also hired multiple paid Census Interns to engage with NYIC's ongoing communications, training, and education needs as they related to a citizenship question, at a cost of nearly $10,000 in the year to date. *Id.* ¶ 19.

1503.  Without a citizenship question, NYIC would not have hired any Census-focused interns, but now anticipates spending $50,000 on interns through May 2020. *Id.*

1504.  NYIC also expended resources to broaden the reach of the New York Counts 2020 conference to address concerns among NYIC's members and their communities arising out of the decision to add a citizenship question, which cost over $19,000—excluding the cost of the time for organizational staff or the senior Census fellow. *Id.*

1505.  NYIC is also in the process of hiring a full-time manager of democracy policy, an estimated 40% of whose time through May 2020 will be spent on work generated by a citizenship question, costing approximately $41,000. *Id.*

1506.  NYIC has also made or anticipates making considerable and additional expenditures for communications, training, and travel expenses to educate members of the immigrant communities it serves about the Decennial Census and a citizenship question in particular—it anticipates these expenditures will total approximately $100,000. *Id.* ¶ 20.

1507.  Because of these increased expenditures and time commitments, NYIC has shown it will need to divert resources from other mission critical areas including health care, language access, and employment issues. Plum Aff. ¶ 23.

1508.  NYIC diverted and anticipates continuing to have to divert 10% of the staff time from the organization's managers of member engagement for the Long Island, Western New York,

Hudson Valley, and Central New York regions to address concerns related to a citizenship question, costing approximately $19,000. Choi Aff. ¶ 19.

1509. Since March 2018, NYIC has had to divert approximately 20% of staff time from the organization's director of immigration policy to staff work, at a cost of approximately $14,000 to the organization. *Id.*

## 2. Make the Road New York

1510. Plaintiff MRNY has demonstrated an ongoing commitment to promoting engagement in the Decennial Census among its members and constituents. Altschuler Aff. ¶ 7.

1511. MRNY has worked to encourage Census response rates among noncitizens in prior Decennial Censuses, worked on census advisory committees, and planned to engage in similar work in the 2020 Decennial Census before the announcement of a citizenship question. *Id.*

1512. A citizenship question has increased the amount of resources MRNY felt necessary to devote to this area and has already caused MRNY to divert resources from other program areas to accelerate its Census education and outreach work for the 2020 Decennial Census. *Id.* ¶ 19.

1513. MRNY has also shown that the fear in its community due to the addition of a citizenship question will make their efforts to encourage participation of noncitizens in the 2020 Decennial Census more difficult. *Id.* ¶¶ 13, 19.

1514. MRNY has reported at least six members who have expressed reluctance or unwillingness to respond to the 2020 Decennial Census because of a citizenship question. *Id.* ¶¶ 14-17.

1515. Further, MRNY demonstrated that because of the heightened fear and suspicion created by a citizenship question, they have expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the noncitizen community. *Id.* ¶¶ 13, 19.

1516.  Because of the heightened fear and suspicion created by a citizenship question, MRNY has begun its 2020 Decennial Census outreach earlier than initially anticipated and will be forced to expend more resources than initially anticipated to try to reduce the negative effect of this question on the response rate in the immigrant communities of color it serves. *Id.* ¶ 19.

1517.  MRNY anticipates expending at least double the amount on 2020 Decennial Census education and outreach that the organization spent on its efforts to encourage participation in the 2010 Decennial Census. *Id.*

1518.  To date, far more than a year out from the 2020 Decennial Census, MRNY has already created a two-page informational sheet for educational purposes, and its communications team has spent several hours creating and sharing social media content to educate the public and encourage them to submit public comments on a citizenship question. *Id.* ¶ 20.

1519.  MRNY's research team has spent approximately 30 hours researching the impact of an undercount towards the purpose of informing its communications and outreach efforts to its members about the 2020 Decennial Census. *Id.*

1520.  Additionally, MRNY has organized nearly 30 organizations statewide—and subsequently nearly twenty organizations on Long Island—to sign onto letters rejecting the proposed citizenship question and to release a joint media statement once the question was formally recommended. *Id.*

1521.  Because of the need to increase the time and money spent on Census outreach due to the addition of a citizenship question, MRNY has diverted and will continue to divert resources from other areas critical to its mission including civic engagement and providing legal services. *Id.* ¶ 21.

1522.  MRNY's Director for Civic Engagement and Research has spent at least 50 hours on Census-related work that he would have otherwise spent on other civic engagement areas of work, such as voter registration and voter education. *Id.* ¶ 22.

1523.  MRNY has also already diverted resources with regard to its participation in this lawsuit; the legal director spent approximately ten hours drafting declarations, communicating with the litigation team, drafting educational materials, fielding questions from the organization, and communicating with individual MRNY members about the litigation. *Id.*

### 3.   ADC/ADCRI

1524.  Plaintiffs ADC and ADCRI have both shown the importance to their missions of having Arab-Americans accurately counted in the Decennial Census; both worked to improve Arab-American response rates in prior Decennial Censuses and ADC served on Census advisory committees, and both planned to engage in similar work for the 2020 Decennial Census even before the announcement of a citizenship question. Khalaf Aff. ¶¶ 13-15.

1525.  The announcement of a citizenship question changed the amount of resources both organizations felt necessary to devote to Census outreach. *Id.* ¶¶ 15-16.

1526.  ADC and ADCRI have also shown that the fear in their community due to the addition of a citizenship question will make their efforts to encourage participation of Arab-Americans more difficult—fear documented through forums held in different parts of the country and conversations with active members and manifested in an increased reluctance to respond to the 2020 Decennial Census. *Id.* ¶¶ 17-22, 28.

1527.  This increased level of fear and likelihood that more Arab Americans will not respond to the Decennial Census harms the organizational missions of ADC and ADCRI of promoting a stronger voice for Arab Americans. *Id.* ¶¶ 6-12.

1528.  Further, ADC and ADCRI demonstrated that because of the heightened fear and suspicion created by a citizenship question, they have expanded plans for Census-related services, programming, and support to try to reduce the negative effect of this question on the response rate in the Arab-American community. *Id.* ¶¶ 23-28.

1529.  Specifically, they are holding public forums, panels and community symposiums, working in coalition with partner organizations, conducting training for Census enumerators, running advertisements encouraging participation, holding a strategy symposium, and held a panel addressing the Census and citizenship question at the 2018 annual national convention. *Id.* ¶¶ 25-27.

1530.  In total between them, ADC and ADCRI anticipate spending at least $150,000 more on 2020 Decennial Census education and outreach than the organizations spent on its efforts to encourage participation in the 2010 Decennial Census as a result largely as a result of the presence of a citizenship question. *Id.* ¶ 28.

1531.  Because of these increased expenditures and time commitments, ADC and ADCRI have shown they will need to divert resources from other mission critical areas including organizing, issue advocacy efforts and educational initiatives. *Id.* ¶ 29.

1532.  Additionally, ADC will need to divert resources from its legal work to Census related matters, resulting in less money to use towards assisting victims of hate crimes and providing pro bono legal services. *Id.*

### 4.    CASA

1533.  CASA has a long-held commitment to promoting engagement of its members, constituents, and the communities it serves in the Decennial Census as a core part of its mission to increase the political power of low-income immigrant communities; a commitment it has

shown through 30 years of outreach including door-to-door efforts, group education sessions, and media campaigns. Escobar Aff. ¶¶ 7-9.

1534.  The announcement of the addition of a citizenship question to the 2020 Decennial Census has caused CASA to divert its limited resources to try to address the likely negative impact of the question in the communities it serves. *Id.* ¶ 15.

1535.  The likelihood of lower response rates in its community due to a citizenship question also directly harms CASA's organizational mission of increasing the political voice of immigrant communities. *Id.* ¶¶ 7, 15, 25.

1536.  CASA has conducted additional outreach because of the tremendous level of fear and greater unwillingness of its constituents to respond to the Decennial Census due to a citizenship question in the context of other policies from the Trump Administration targeting them. *Id.* ¶¶ 16-24.

1537.  CASA's substantial effort to address the negative effects of a citizenship question and increase community participation in the Decennial Census includes conducting neighborhood meetings, rolling Census education into "Get Out The Vote" activities, and reorganizing its communications team and staff to address the barriers posed by the addition of the question. *Id.* ¶¶ 25-28

1538.  These increased efforts have caused CASA to divert both personnel and monetary resources from other organizational priorities to address the addition of a citizenship question. *Id.* ¶¶ 26, 29.

### B.  Organizational Injuries to Governmental Plaintiffs

1539.  Similarly, as Dr. Abowd testified, local and state governments are a critical component of the Census Bureau's outreach to hard-to-count communities through its "trusted partners"

program. Dr. Abowd specifically cited the City of New York's work at the local level as a "trusted voice to indicate that it's safe to answer the question." Nov. 14 Trial Tr. at 1121:1-7.

1540.  The governmental plaintiffs have demonstrated that they have or will expend additional resources to mitigate the adverse effects of a citizenship question on response rates. For example, the governmental plaintiffs introduced evidence—uncontroverted by Defendants—about the recent mitigation efforts of New York City and Chicago that indicate that governmental plaintiffs generally have or intend to devote substantial resources and personnel to respond to the impacts of a citizenship question. For example, in stark contrast to past Decennial Censuses, New York City has dramatically expanded its efforts to encourage its residents to participate in the 2020 Census. Nov. 6 Trial Tr. at 317-321.

1541.  Dr. Salvo—who serves as the Director of the Population Division at the New York City Department of City Planning—testified that because of reluctance in some communities to complete the Decennial Census questionnaire because of a citizenship question, the City has taken concrete steps to encourage participation. Nov. 6. Trial Tr. at 319, 430. These efforts include the City creating a specially-designated census office for the first time, staffed with at least 15 employees, who will help to encourage participation in the census.  *Id.*

1542.  In addition, the Plaintiffs offered undisputed evidence that New York City is budgeting $5.5 million for the 2020 Decennial Census, whereas it did not have any specialized budget for outreach in 2010 or 2000. *Id.* at 429-431.  The City budgeted $4.3 million of this total after DOJ made its request to add a citizenship question to the 2020 Decennial Census in December 2017; after Defendants announced their plans to add a citizenship question to the 2020 Decennial Census, and in response to that decision, New York City increased its budget for census outreach efforts by approximately $1.2 million dollars. *Id.* at 427-29.

1543.  These unprecedented outreach efforts, and concomitant expenditures of time and resources resulted, in significant part, from New York City's concern about the impact that a citizenship question will have on the quality of the data collected during the 2020 Decennial Census. *Id.* at 359-61, 427-31.

1544.  Likewise, because of the citizenship question, the City of Chicago anticipates the need to allocate additional resources and staff to encourage Chicagoans to participate in the 2020 Decennial Census. Rodriguez Aff. (Docket No. 488-1) ¶¶ 7, 10, 12, 13. A recently-introduced City Council resolution specifically designates funds for specialized outreach to immigrant communities in light of the citizenship question. *See id.* ¶ 12; Garcia Aff. (Docket No. 498-9) ¶¶ 14-15 (discussing efforts to allocate additional resources to countermand the impact of the citizenship question on immigrant communities); PX-243 (Cook County resolution to "Establishing an Emergency Fund to Address the Citizenship Question in the 2020 Census"); PX-246 (Chicago City Council resolution to establish a $500,000 "emergency fund to address a citizenship question in the 2020 census" in order to "conduct specialized outreach to immigrant communities in the City of Chicago").

1545.  In light of the Census Bureau's own recognition that the addition of a citizenship question will depress self-response rates among Hispanic and immigrant communities, *see infra*, both state and local governmental plaintiffs will be called upon to mitigate the anticipated harm stemming from those depressed response rates, and many, as the examples of New York City and Chicago demonstrate, are already devoting considerable resources to that effort.  Such expenditures directly constitute injury to the governmental plaintiffs.

## C.  Injuries Stemming from Undercount

1546.  The evidence shows that the addition of a citizenship question to the Decennial Census will cause a differential undercount of certain persons that will lead to several distinct types of injuries for plaintiffs. First, the citizenship question will cause the malapportionment of federal and state legislative districts, diminishing the political power of the Governmental Plaintiffs and the members of the NGO Plaintiffs that reside in impacted federal, state, and local districts. Second, the citizenship question will cause a loss of federal funds that will harm the NGO and Governmental Plaintiffs alike.

### 1.  Apportionment and Political Power

1547.  Dr. Christopher Warshaw has a Ph.D. in Political Science from Stanford University, where his graduate training included courses in political science and statistics.  Dr. Warsaw also has a J.D. from Stanford Law School.  His academic research focuses on public opinion based on surveys and census data, as well as the study of representation, elections, and polarization in American Politics.  He has also taught courses on statistical analysis.  Dr. Warshaw has published or forthcoming articles in peer-reviewed journals such as: the American Political Science Review, the American Journal of Political Science, the Journal of Politics, Political Analysis, Political Science Research and Methods, the British Journal of Political Science, Political Behavior, the Election Law Journal, Nature Energy, Public Choice, and edited volumes from Cambridge University Press and Oxford University Press.  He is also on the Editorial Board of the Journal of Politics. Warshaw Aff. (Docket No. 526) ¶¶ 2-5.

1548.  Dr. Christopher Warshaw is qualified to be an expert witness in this case to provide expert opinions on population projections, apportionment, redistricting, the impact of redistricting on awards for government funding, and generally statistics and political science. It further finds his methodology reliable and his opinions helpful to the Court's fact-finding role.

1549.  Dr. Warshaw calculated the likely population for each state and for a number of local jurisdictions in 2020 when the Decennial Census is conducted.

    a.  The jurisdictions are: Phoenix, AZ; Los Angeles County, CA; Monterey County, CA; San Francisco, CA; Miami, FL; Chicago, IL; Prince Georges County, MD; New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA. Warshaw Aff. Table 2, p.8, Table 3, p.9.

    b.  Defendants provided no evidence disputing those population projections.

1550.  Dr .Warshaw's testimony about population projections for the 2020 population supports  a conclusion that the population projections reflected in Tables 2 and 3 of his Affidavit are reasonable and reliable. Warshaw Aff. ¶¶ 18-22. Nov. 13 Trial Tr. at 872:5-25, 873:1-4.

1551.  Apportionment of the 435 Congressional House of Representatives seats is done through the Method of Equal Proportions, which was adopted by Congress in 1941. Warshaw Aff. ¶ 43.

1552.  Based on Dr. Warshaw's testimony, it is well established in the political science research that jurisdictions in the area of a state that were underrepresented in state legislatures or Congress due to malapportionment received substantially lower shares of distributive funding. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1553.  Using the apportionment method and his population projections, Dr. Warshaw analyzed the likely population and the Census counts for each state in 2020 if there is an 5.8% undercount of individuals in households with at least one non-citizen and determined that the impact on the Census population counts caused by this undercount would cause the State of California to lose a congressional seat that it will not lose otherwise. Warshaw Aff. Table 6, pg. 23, ¶¶ 42-46.  Dr. Warshaw determined that under this scenario, the State of California would suffer a 1.7%

decrease in its projected census population count, creating a very high probability that the California would lose a congressional seat that it would not lose otherwise. Warshaw Aff. Table 6, pg. 23, ¶¶ 42-45, 46, 62(a).

1554.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 5.8% of individuals in households with at least one non-citizen. *See* PFOF ¶¶ 1344-1363, 1347, 1349, 1352, 1353, 1355, 1356. Therefore, on the basis of the calculations reflected in Table 6 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question will cause California to lose a congressional seat that it would not have otherwise lost. Warshaw Aff. ¶¶ 46, 47, 48, 62(a).

1555.  Plaintiff ADC has active chapters with members residing in California. Khalaf Aff. ¶ 8. Specifically, ADC has 1,296 dues paying members in California. *Id.* ¶ 35.

1556.  All of the members of ADC who reside in California will lose political power as a result of this loss of a Congressional seat. Additionally, Governmental Plaintiffs City and County of San Francisco, and County of Monterey will also lose political power if California loses a Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research that the loss of political power causes injury, this loss of political power due to a loss of a seat in Congress will injure the Governmental Plaintiffs in California and the ADC members who reside in California. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1557.  Using the apportionment method and his population projections, Dr. Warshaw analyzed the likely population and Decennial Census counts for each state in 2020 if there is a 5.8% undercount of individuals living in noncitizen households and Hispanic individuals, and determined that the impact on the Census population counts caused by this undercount of both

these subpopulations would more likely than not cause the State of Texas, in addition to California, to lose a congressional seat that it will not lose otherwise. Warshaw Aff. Table 6 p. 20, ¶¶ 42-45, 46, 47, 48, 62(a).

1558.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 5.8% of individuals in households with at least one non-citizen and Hispanic individuals. *See* PFOF ¶¶ 1344-1363, 1347, 1349, 1352, 1353, 1355, 1356. Therefore, on the basis of the calculations reflected in Table 6 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will cause Texas to lose a congressional seat that it would not have otherwise lost. Warshaw Aff. Table 6 p. 20, ¶¶ 46, 47, 48, 62(a).

1559.  Plaintiff ADC has active chapters with members residing in Texas. Khalaf Aff. ¶ 8. Specifically, ADC has 408 dues paying members who reside in Texas.  All of the members of ADC who reside in Texas will lose political power as a result of the loss of this Congressional seat. Additionally, Governmental Plaintiffs Cameron County, El Paso County, and Hidalgo County, Texas will also lose political power if Texas loses a Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research, this loss of political power due to the loss of a seat in Congress will injure the Governmental Plaintiffs in Texas and the ADC members who reside in Texas. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1560.  Using the apportionment method and his population projections, Dr. Warshaw analyzed the likely population Decennial Census counts for each state in 2020 if there is an undercount of foreign-born and Hispanic individuals equivalent to the non-response observed in Dr. Barreto's survey results, *see, e.g.*, PFOF ¶ 1357, and determined that the impact on the Decennial Census population counts caused by this undercount of these subpopulations would cause the State of

Florida, in addition to California and Texas, to lose a congressional seat that it will not lose otherwise. Warshaw Aff. Table 6 p. 20, ¶¶ 42-45, 46, 47, 48, 62(a).

1561.  Plaintiff ADC has active chapters with members residing in Florida. Khalaf Aff. ¶ 8. Specifically, ADC has 551 dues paying members who reside in Florida. Khalaf Aff. ¶ 35. Under this scenario, all of the members of ADC who reside in Florida will lose political power as a result of the loss of this Congressional seat. Relying on Dr. Warshaw's testimony that it is a well-established fact of political science research, this loss of political power due to the loss of a seat in Congress would injure the ADC members who reside in Florida. Warshaw Aff. ¶ 49 (citing PX-325, PX-326).

1562.  In addition to these interstate impacts, Dr. Warshaw also examined the impact of a citizenship question on intrastate redistricting.  Dr. Warshaw's analysis shows that even a 2% undercount of only individuals who live in non-citizen households would lower the population enumeration of Phoenix, AZ; Los Angeles, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince George's County, MD; New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, thereby lowering each areas' share of its state population.  Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 53, 54, 55, 57, 58, 59.

1563.  As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 2% of individuals in households with at least one non-citizen. *See* PFOF ¶¶ 1359-1362. Therefore, based on the calculations reflected in Table 8 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will lower the population counts for Phoenix, AZ; Los Angeles, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince Georges

County, MD; New York, NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, and this in turn will lower each jurisdiction's share of its state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 50, 53, 54, 55, 57, 58, 59.

1564. Dr. Warshaw's analysis also shows that a 2% undercount of individuals who live in non-citizen households and Hispanics would lower the population enumeration of Phoenix, AZ; Los Angeles, CA; San Francisco, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince George's County, MD; New York, NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, thereby lowering most of these areas' share of their state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 53, 54, 55, 57, 58, 59.

1565. As explained, there is a substantial risk that the addition of a citizenship question will cause an undercount of at least 2% of individuals in households with at least one non-citizen and Hispanics. *See* PFOF ¶¶ 1359-1362. Therefore, based on the calculations reflected in Table 8 presented in Dr. Warshaw's testimony and his related explanation of that data, it is more likely than not that the addition of a citizenship question to the Decennial Census will lower the population counts for Phoenix, AZ; Los Angeles, CA; San Francisco, CA; Monterey County, CA; Miami, FL; Chicago, IL; Prince Georges County, MD; New York NY; Columbus, OH; Philadelphia, PA; Pittsburgh, PA; Central Falls, RI; Providence, RI; Cameron County, TX; El Paso County, TX; Hidalgo County, TX; and Seattle, WA, and this in turn will lower most of these jurisdictions' share of their state population. Warshaw Aff. Table 7, p. 26, Table 8 p. 28, ¶¶ 50, 53, 54, 55, 57, 58, 59.

1566.  Dr. Warshaw notes the reductions in share of their state's population caused by these undercounts are particularly pronounced for Plaintiffs Central Falls and Providence, Rhode Island; Cameron, Hidalgo, and El Paso County, Texas, and Phoenix, Arizona and New York City. Warshaw Aff. ¶¶ 54, 55.

1567.  Based on Dr. Warshaw's testimony that it is a well-established fact of political science research, these lower population enumerations caused by the addition of a citizenship question will lead to the dilution of the voting power of these jurisdictions and the individuals who reside in them because it will result in decreased representation in state legislatures, which is a loss of intrastate voting power. Warshaw Aff. ¶¶ 51, 54, 57 (citing PX 326), Nov. 13 Trial Tr. at 870:1-14.

1568.  When state legislatures use population enumerations reflecting fewer people than a place actually has, this means that the area has lost representation. Warshaw Aff. ¶ 57.

1569.  This loss of political power is highly likely because the reasonable assumption is that state governments will not consciously try to remedy any undercounts when they redistrict absent some specific assertion that they would. Warshaw Aff. ¶ 52.

1570.  This loss of political power will result in less distributive government spending to these locations and the individuals who reside in them, and this will cause injury to these locations. Warshaw Aff. ¶ 57 (citing PX-326).

1571.  It is, therefore, more probable than not that the Plaintiff cities of Phoenix, Chicago, New York, Columbus, Philadelphia, Pittsburgh, Central Fall, Providence and Seattle, and the Plaintiff Counties of Monterey County, CA; Cameron County, El Paso County, and Hidalgo County will be injured by this population undercount of individuals who live in non-citizen households caused by the addition of a citizenship question. Additionally, it is more probable than not that

the Plaintiff City of San Francisco will be injured by this population undercount of individuals who live in non-citizen households and Hispanics caused by the addition of a citizenship question.

1572. Plaintiff ADC has active chapters with members residing in Phoenix, Arizona, Los Angeles, California, Miami, Florida, and New York, New York. Khalaf Aff. ¶ 8. Also Plaintiff ADC has dues paying members who live in Los Angeles County, California; New York, New York; Miami, Florida; Prince George's County, Maryland; Phoenix, Arizona; and Chicago, Illinois. Khalaf Aff. ¶ 5.

1573. Plaintiff MRNY has 23,000 members who reside in New York City, Nassau County, Suffolk County and Westchester County. Altschuler Aff. ¶ 4. Some of these members live in New York City, New York. *Id.* at ¶¶ 25, 26, 27, 28, 29, 30 (describing MRNY members who live in New York City in Queen County, King County, the Bronx and Brooklyn); Altshuler Supp. Aff. (Docket No. 503-3) ¶¶ 15, 16, 17-18, 19, 20 (describing the same).

1574. CASA has 32,000 members who reside in Prince George's County. George Escobar Aff. ¶ 14.

1575. It is more probable than not that Plaintiffs ADC, MRNY and CASA's members who reside in Los Angeles County, California; New York, New York; Miami, Florida; Prince George's County, Maryland; Phoenix, Arizona; and Chicago, Illinois will be injured by the dilution of the voting power caused by these lower population enumerations resulting from the addition of a citizenship question. Warshaw Aff. ¶¶ 51, 54, 57 (citing PX-326).

1576. Nearly all the Local Governmental Plaintiffs will experience vote dilution as a result of even small levels of undercounting caused by the addition of a citizenship question.

1577.  For example, Plaintiff the City of New York is substantially likely to be injured by the undercount in the Decennial Census caused by the addition of a citizenship question. New York State has been required since 1969 by its Constitution to base legislative redistricting on the whole number of persons as reported in the Decennial Census. There is no other source for a count of the whole number of persons at the block level. New York State would not have the resources or expertise to substitute its own efforts for those of the Census Bureau. Breitbart Aff. ¶ 4.

1578.  In New York State, there is a strong tendency for minority-group voting-age citizens to be concentrated in the same congressional districts as non-citizens. The five congressional districts in New York State in which non-citizens constitute the highest percentages of the total population are, in descending order: CD 14 (population 25.11% non-citizen), where 68.40% of the citizens of voting-age are members of minority groups; CD 6 (population 21.20% non-citizen), where 55.73% of the citizens of voting-age are members of minority groups; CD 15 (population 21.08% non-citizen), where 96.58% of the citizens of voting-age are members of minority groups; CD 7 (population 20.04% non-citizen), where 64.80% of the citizens of voting-age are members of minority groups; and CD 13 (population 19.23% non-citizen), where 82.74% of the citizens of voting age are members of minority groups. Breitbart Aff. ¶ 10.  All five of these congressional districts are located entirely in New York City.  An undercount differentially affecting non-citizens would dilute the voting power of those districts, and would be very likely to lead to less distributive spending to those districts. Warshaw Aff. ¶ 57 (citing PX-326).

1579.  In contrast, the five congressional districts in which noncitizens constitute the lowest percentages of the total population are, in ascending order: CD 27 (population 1.34% non-citizen), where 6.49% of the citizens of voting-age are members of minority groups; CD 21

(population 1.59% non-citizen), where 8.23% of the citizens of voting age are members of

minority groups; CD 23 (population 2.22% non-citizen), where 8.51% of the citizens of voting-

age are members of minority groups; CD 22 (population 2.33% non-citizen), where 8.82% of the

citizens of voting-age are members of minority groups; and CD 24 (population 2.70% non-

citizen), where 13.28% of the citizens of voting age are members of minority groups.  No part of

these congressional districts is located in New York City.

1580.  In the total population estimates created by the Census Bureau with the 2012-16 five-year

ACS estimates, New York State has a total population of 19,697,457, and New York City has a

total population of 8,461,961—42.96% of the state total. New York State is estimated to have a

non-citizen population of 2,020,397, and New York City is estimated to have a non-citizen

population of 1,438,215. Thus, non-citizens are estimated to constitute 10.26% of the state

population, 17.00% of the New York City population, and 5.18% of the total population of the

57 counties outside of New York City. New York City, with 42.96% of the total state population,

has 71.18% of the non-citizen population, while the other 57 Counties, with 57.04% of the total

state population, have 28.82% of the non-citizen population. Breitbart Aff. ¶ 12. An undercount

differentially affecting non-citizens would dilute the voting power of New York City, and would

be very likely to lead to less distributive spending to New York City. Warshaw Aff. ¶ 57 (citing

PX-326), Nov. 13 Trial Tr. at 871:9-14.

1581.  As explained, there is a substantial risk that a citizenship question will cause an

undercount of non-citizens.  Given that non-citizens in New York State are heavily concentrated

in New York City, it is likely that the voting power of the City will be adversely impacted by the

addition of a citizenship question.

1582.  Within New York City, moreover, Dr. Salvo testified that there are neighborhoods with large concentrations of immigrants and Hispanics that are vulnerable to the impact of citizenship question on the 2020 Decennial Census. Nov. 6 Trial Tr. at 376:3-11.  These neighborhoods are at risk of undercounting, while other neighborhoods, with predominantly white populations, are likely to be overcounted.  Nov. 6 Trial Tr. at 407:14-408:8. These differential undercounts at the neighborhood level can lead to vote dilution for particular communities compared to others. Nov. 6 Trial Tr. at 417:21-418:20.

1583.  As noted above, Dr. Warshaw found that even under a 2% undercount of non-citizens and Hispanics, several Plaintiff jurisdictions, including the El Paso, Cameron and Hidalgo Counties, are at risk of losing over 1% of their share of their state's population. Warshaw Aff. Table 8, p. 28.  Central Falls and Providence, Rhode Island will experience significant decreases in the share of Rhode Island's population with an undercount of non-citizens, alone. *Id.*

1584.  In addition to the injury caused by the loss of political power that nearly all the Local Governmental Plaintiffs will experience as a result of undercounting caused by the addition of a citizenship question, nearly every State Governmental Plaintiff will struggle to distribute voting power equitably during the next redistricting cycle because of the poor quality of the data collected through the 2020 Decennial Census.  Dr. Warshaw found that a citizenship question would have the most substantial impact in large metropolitan counties with major cities. Warshaw Aff. ¶ 61.  Specifically, he found that the undercount in these areas would result in a reduction of their share of the overall population, while increasing the share of rural areas.  *Id.* This "would reduce the representation of urban counties, and increase the voting power of rural counties." *Id.* As a result, nearly every State Governmental Plaintiff will struggle to distribute

voting power equitably during the next redistricting cycle, as required by the one person one vote rule.

1585.  For example, Plaintiff the Commonwealth of Virginia relies exclusively on tabulations of the population produced by the Census Bureau from the Decennial Census to establish legislative districts, and is required by the Constitution of Virginia to do so. Lucyk Aff. (Docket No. 506-1) ¶ 5.

1586.  As of 2016, the total foreign-born population in Virginia was 1.031 million people, or over 12% of the population. Of this number, only about 45% of the population statewide were naturalized citizens. Thus, the majority of Virginia's foreign-born residents are non-citizens. Lucyk Aff. ¶ 8.

1587.  Foreign-born residents are not evenly distributed throughout Virginia. For instance, based on 2010 Decennial Census data, the Northern Virginia region planning district,  has 561,718 foreign-born persons, or roughly 64% of the entire immigrant population in Virginia. The Richmond region planning district has 77,951 foreign-born residents, or 9% of the state total, while the Tidewater region planning district has 71,130, or 8% of the state total. By contrast, the very rural Southside and Southwest region planning districts have  between one tenth and one half of one percent of the total immigrant population, while the also rural Upper Shenandoah Valley and Roanoke Valley region planning districts are home to 0.7 % to 1.5% of the foreign-born population.  Lucyk Aff. ¶ 9.

1588.  A differential undercount of non-citizens and foreign-born residents of Virginia in the 2020 Decennial Census would—due to the significantly higher numbers of noncitizens residing in the Northern Virginia region, as well as the Richmond and Tidewater regions—mean that these regions will likely lose representation in the Virginia General Assembly, while other, more

rural parts of the Commonwealth with fewer noncitizen residents would have greater representation in the General Assembly.  Lucyk Aff. ¶ 10.

### 2.    Impact of Undercount on Federal Funding

1589.  Dr. Andrew Reamer is an expert in how census data influence federal financial assistance programs.  Reamer Aff. (Docket No. 508-1) ¶ 8.

1590.  A research professor in the George Washington Institute of Public Policy (GWIPP) at George Washington University, Dr. Reamer previously spent six years at the Brookings Institution's Metropolitan Policy Program and 20 years as a consultant in U.S. regional economic development and public policy, helping ensure the commencement and continued existence of the American Community Survey (ACS).  *Id.* ¶¶ 2-3.

1591.  Throughout his career, Dr. Reamer prepared strategic analyses and plans that relied heavily on federal demographic and economic statistics including his current research project "Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds."  *Id.* ¶ 4.

1592.  Prior to the 2010 Decennial Census, Dr. Reamer published a Counting for Dollars study that identified Census-guided federal financial assistance programs and calculated FY2008 funding flows by program to states, metro areas, and counties. *Id.* ¶ 5.

1593.  Dr. Reamer received a Ph.D. in Economic Development and Public Policy and a Master of City Planning from the Massachusetts Institute of Technology and a Bachelor of Science in Economics from the Wharton School, University of Pennsylvania. *Id.* ¶ 6.

1594.  Dr. Reamer is a member of several federal advisory committees—the Bureau of Economic Analysis (BEA) Advisory Committee, which is part of the Commerce Department, as well as the U.S. Bureau of Labor Statistics (BLS) Data Users Advisory Committee (former chair) and

the Workforce Information Advisory Council, both of which are part of the Department of Labor. *Id.* ¶ 7.

1595.  Based on his education, experience, and knowledge, Dr. Reamer possesses the qualifications to offer expert opinions in the area of how census survey results influence federal financial assistance program funds distribution.

1596.  Dr. Reamer's opinions are reliable and helpful to the Court in rendering its decision as it concerns Plaintiffs' standing based on loss of federal funding.

1597.  Plaintiffs have demonstrated the likely undercount of noncitizen households and Hispanics, *see* PFOF VIII, this disparate undercount will harm a number of states and their residents due to that undercount's effect on a number of federal domestic financial assistance programs with census-tied geographic allocation formulas. Reamer Aff. ¶¶ 15-17, 83.

1598.  Because Census data influence a large number of federal financial assistance programs, an undercount in the Decennial Census among non‑citizens, the foreign‑born, and Hispanics will lead to measurable fiscal losses for states with population percentages of these subgroups that are above the nationwide average. *Id.* ¶ 18.

1599.  A significant portion of federal domestic financial assistance is distributed on the basis of statistics derived from the Decennial Census, including at least 320 federal domestic assistance programs that use census‑derived data and distributed about $900 billion in FY2016. *Id.* ¶ 9.

1600.  Specifically, Dr. Reamer identified and analyzed almost two-dozen federal financial assistance programs with funding formulas that allocate federal funds geographically in a manner dependent in part or whole on Decennial Census results. *Id.* ¶ 10; PX-329.

1601.  Eighteen of these programs are "state-share" programs, in that they rely in whole or part on state share of a U.S. population total. Reamer Aff. ¶¶ 16-17.  The relevant state-share

programs are as follows: Federal Transit Formula Grants, Community Block Development

Grants/Entitlement Grants, Crime Victim Assistance, Title I Grants to Local Educational

Authorities (LEAs), Special Education Grants, Head Start, Supplemental Nutrition Program for

Women, Infants, and Children (WIC), Child Care and Development Block Grant, Supporting

Effective Instruction State Grants, WIOA Youth Activities, Rehabilitation Services: Vocational

Rehabilitation Grants to the States, Unemployment Insurance administrative costs, Block Grants

for Prevention and Treatment of Substance Abuse, Social Services Block Grants, Career and

Technical Education—Basic Grants to States, WIOA Disclosed Worker Formula Grants, Special

Programs for the Aging, Title III, Part C, Nutrition Services. PX-329.

1602.  The remaining six programs Dr. Reamer identified use the Federal Medical Assistance

Percentage (FMAP) reimbursement formula. Reamer Aff. ¶¶ 16-17.  The relevant FMAP

programs are: Medical Assistance Program (traditional Medicaid), State Children's Health

Insurance Program (CHIP), Foster and Child Care, Adoption Assistance, and Medicare Part D

Clawback.  PX-329.

1603.  Because the Decennial Census is carried out once a decade and collects data on a small

number of demographic characteristics, Congress authorized a series of more current and

descriptive census   derived datasets for use in funding formulas. Reamer Aff. ¶ 23.

1604.  Of particular note, the Census Bureau constructs annual Population Estimates and

Housing Estimates by augmenting decennial population and housing numbers with more recent

data, primarily from vital statistics and tax records. *Id.* ¶ 26.

1605.  While a number of these programs use the Population Estimates datasets directly, many

also use other datasets derived from Population Estimates, including Per Capita Income (PCI).

*Id.* ¶ 27.

1606.  Additionally, the Census Bureau relies on the Decennial Census in several different ways to design and implement the American Community Survey (ACS), the Current Population Survey, and the Consumer Expenditure Survey.  *Id.* ¶ 28.

1607.  Therefore, programs that use funding formulas reliant on these surveys are also sensitive to undercounts in the Decennial Census.  *Id.* ¶¶ 30-31.

1608.  There is a strong, direct relationship between the accuracy of the Decennial Census and the reliability all of these datasets and surveys such that Decennial Census data is an essential ingredient to their accuracy and reliability.  *Id.* ¶ 11; Nov. 7 Trial Tr. at 514-17.

1609.  Using five of these programs as examples, Dr. Reamer performed calculations using a series of seven potential undercount figures due to the addition of a citizenship question of individuals living in noncitizen households, these individuals and Hispanics, and Hispanics and foreign-born individuals, which he applied to 2020 population projections by state.  Reamer Aff. ¶¶ 13-15, 32-33.

1610.  Dr. Reamer's analysis shows that the magnitude of the impact varies greatly across states depending on the nature of the undercount, but that numerous states and programs will be negatively impacted if the addition of a citizenship question causes any measurable undercount of individuals living in non-citizen households relative to the population as a whole.  *Id.* ¶¶ 15-19.

1611.  Specifically, for the eighteen state-share programs identified—as Dr. Reamer demonstrated with the WIC, Social Services Block Grants, and Title I Grants to LEAs programs—New York, California, Texas, Florida, New Jersey, Nevada, and Hawaii will lose population share and thus funding under these programs if there is an undercount caused by the

addition of a citizenship question of individuals living in non-citizen households of least 2 percent. *Id.* ¶¶ 46-47, 51-52, 61-62.

1612.  In fact, these states would lose funding for these programs based on any measurable undercount of non-citizens, as well as of non-citizens plus Hispanics. *Id.* ¶¶ 19, 83; Nov. 7 Trial Tr. at 518-19.

1613.  Additionally, for the six FMAP programs, Texas, Florida, Nevada, Hawaii, and Arizona would see relatively large decreases in their FMAP due to the population share that each state would lose as a result of any measurable undercount of individuals living in non-citizen households.  Reamer Aff. ¶¶ 70, 71, 81; Nov. 7 Trial Tr. at 518-19.

1614.  This would make calculated reimbursement levels fall for these states due to the lower FMAP, causing these states to lose funding for these programs.  Reamer Aff. ¶ 17.

1615.  Therefore, these states—New York, California, Texas, Florida, New Jersey, Nevada, and Hawaii for state-share programs, and Texas, Florida, Nevada, Arizona, and Hawaii for FMAP programs—and their residents will suffer a loss of federal funding and will be harmed if a citizenship question is added. *Id.* ¶¶ 70-71, 81-82.

1616.  It is possible that New Mexico, Washington, Maryland, Massachusetts, Connecticut, Oregon, Illinois, and Georgia may also lose funding under some or all of these programs as a result of the undercount of non-citizens households, Hispanics and foreign-born residents caused by a citizenship question. *Id.*

### a.  Financial Harm to NGO Plaintiffs

1617.  Plaintiff ADC has demonstrated that it has individual members who live in all fifty states, including the states described above that will be negatively impacted regarding funding, and has identified individual members by name living in California, New York, Florida, Texas, and New Jersey.  Khalaf Aff. ¶¶ 30-31.

1618.   Although their residence in these states is enough to cause them to be harmed due to federal funding losses to their states, ADC has also shown that its some of its members directly rely upon affected programs such as Title I educational funds that a citizenship question will negatively affect in the states where they live.  *Id.* ¶ 36.

1619.   As for Plaintiff MRNY, it has 23,000 members residing in New York City, Nassau County, Suffolk County, and Westchester County, New York, including several specific members living in New York who will be harmed by the loss of funding to the state due to an undercount caused by a citizenship question.  Altschuler Aff. ¶¶ 4, 23-30.

1620.   Several individual MRNY members have also demonstrated reliance on Title I educational funds and Head Start funding due to their children attending schools and programs that receive such funding, and thus will be directly harmed when New York loses funding for this program due to an undercount.  *Id.* ¶¶ 25-28.

1621.   Plaintiff CASA has more than 90,000 members in the Mid-Atlantic including in Maryland (including Prince George's County and the City of Baltimore), Virginia, and Pennsylvania. Escobar Aff. ¶ 4.

1622.   CASA assists many of its members who use census-related funding programs including Supplemental Nutritional Assistance Program (SNAP), which provides food assistance to low-income residents and the Special Supplemental Nutrition Program for Women Infants and Children (WIC); these members in Maryland will be harmed under several of the undercount scenarios discussed by Professor Reamer. *Id.* ¶¶ 10-11.

1623.   Both plaintiff NYIC itself as well as a number of its member organizations directly receive census-influenced funding through programs that will be negatively affected if New

York state residents are undercounted due to a citizenship question, as this will reduce the pool of funding available to them through the State. Plum Aff. ¶¶ 5-9; Choi Aff. ¶ 6.

1624. Specifically, NYIC receives census-guided funding through the Corporation for National & Community Service for 21 positions filled by AmeriCorps VISTA, NYIC member Chhaya Community Development Corporation receives funding through the Community Development Block Grant program, and NYIC member Chinese-American Planning Council receives funding through the Workforce Innovation and Opportunity Act. Plum Aff. ¶¶ 6, 9.

### b. Financial Harm to Governmental Plaintiffs

1625. The governmental plaintiffs have also shown that they will suffer harm due to losses in funding from census-related federal programs due to a disproportionate undercount of their states and localities because of a citizenship question.

1626. Dr. Reamer found that State Governmental Plaintiffs New York State and New Jersey will consistently lose state-share program funds under each of the undercount scenarios he evaluated. Reamer Aff. ¶ 16. New York and New Jersey are home to large non-citizen, Hispanic, and foreign-born populations. As a result, even minimal undercounting resulting from a citizenship question is likely to impact these states relative to others. *Id.* ¶ 13.

1627. Dr. Reamer specifically demonstrated potential losses for New York and New Jersey under the WIC, Social Service Block Grant and Title I LEA Grant Program. *Id.* Table "Change in Allocation of WIC Supplemental Food Grants due to Census Undercount, by State, FY2016," p. 16, Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, ¶¶ 46-47, 51-52, 61-62.

1628.  Dr. Reamer also demonstrated that other State Governmental Plaintiffs will likely lose funding under particular undercount scenarios, depending on the specific groups impacted by undercounting in those scenarios.

1629.  For instance, even a 2% undercounting concentrated in households with at least one non-citizen is likely to result in funding losses under the Title I LEA Grant program and the Social Service Block Grant Program for Illinois, the District of Columbia, Massachusetts, Washington, and Maryland.  *Id.*  Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, ¶¶ 51-52, 61-62.

1630.  Under the non-citizen only undercount scenario, Illinois will also lose Medicaid funds, while Oregon and New Mexico will lose Children's Health Insurance Program ("CHIP") funds, and Washington will lose both Medicaid funds and CHIP funds.  *Id.* Table "Change in Federal Reimbursements for Traditional Medicaid FY 2015," p. 23, Table "Change in Federal Reimbursements for CHIP FY 2015," p.27 ¶¶ 70-71, 81-82.

1631.  Dr. Reamer found that New Mexico will be at risk of losing federal funding at minimal levels of undercounting of non-citizens and Hispanics.  Under a 2% undercount of individuals in households with at least one non-citizen, and Hispanic individuals generally, New Mexico lost funding under the WIC, Social Service Block Grants, and Title I LEA Grant programs, as well as the CHIP program.  *Id.*  Table "Change in Allocation of WIC Supplemental Food Grants due to Census Undercount, by State, FY2016," p. 16, Table "Change in Allocation of Social Services Block Grants due to Census Undercount, by State, FY2016," p. 17, Table "Change in Allocation of Title I LEA Grants due to Census Undercount, by State, FY 2016," p. 18, Table "Change in Federal Reimbursements for CHIP FY 2015," p.27 ¶¶ 46-47, 51-52, 61-62, 81-82.

1632.  Apart from the state-share programs identified by Dr. Reamer, many other federal programs distribute funds to states on the basis of census-derived information, and are likely to be impacted by undercounting resulting from the addition of a citizenship question on the 2020 Decennial Census.  For instance, the Community-Based Child Abuse Prevention (CBCAP) Grants and Older Americans Act (OAA) Grants for State and Community Programs on Aging, Title II Part A and Title IV Part A funding under the Every Student Succeeds Act, Temporary Assistance for Needy Families ("TANF") funding, Low-Income Home Energy Assistance Program ("LIHEAP") funding, and Community Services Block Grant ("CSBG") funding are allocated to states, at least in part, on Decennial Census data.  Haney Aff. (Docket No. 498-12) ¶¶ 5-8; PX-329; Harmon Aff. (Docket No. 498-14) ¶¶ 10-13, 17; Franklin Aff. (Docket No. 498-5) ¶¶ 6-10; Tiema-Massie Aff. (Docket No. 501-1) ¶ 11.

1633.  An undercount resulting from the addition of a citizenship question on the 2020 Decennial Census that reduces a state's relative share of the relevant population covered by these federal funding programs would likely result in losses of funding under these programs.  Haney Aff. ¶¶ 7, 8; Harmon Aff. ¶¶ 9, 13, 17; Franklin Aff. ¶¶ 7-8.

1634.  Differential undercounting concentrated among non-citizens and Hispanics will also injure State Governmental Plaintiffs by preventing the equitable distribution of federal funds to localities.

1635.  Many federal funding programs require states to distribute funds to localities on the basis of Census-derived information, including, under the Every Student Succeeds Act, Title I LEA Grants (improving basic programs), Title II Part A funds (supporting effective instruction), and Title IV Part A funds (student support and academic enrichment grants).  Harmon Aff. (Docket No. 498-14) ¶¶ 3, 5, 6, 10-13, 17; Harmon Supp. Aff. (Docket No. 498-15) ¶ 5.

1636.  Under each of these education-related programs, the State Education Agency is required to distribute funds to LEAs on the basis, at least in part, of the number of children aged 5-17 living in poverty within each LEA's jurisdiction. Harmon Aff. ¶¶ 5-6, 12-13, 16, 17; Harmon Supp. Aff. ¶ 5.

1637.  Undercounts, therefore, not only impact the allocation of education funding to the state, but also have a "negative direct impact" on individual school districts most in need of funding. Harmon Aff. ¶¶ 13, 17; Harmon Supp. Aff. ¶ 5.

1638.  For example, New York State estimates that a decrease of 1.54% in the count of children in poverty aged 5-17 would result in a loss of nearly $300,999 in Title I LEA funding in a single year.  Harmon Aff. ¶ 9.  This loss would not only impact the allocation of funding to New York State, but also the direct amount received by the locality. Harmon Supp. Aff. ¶ 5.  A loss of over $300,000 for a LEA in New York is the equivalent of losing 6 full-time academic support teachers paid at the state's average teachers' salary.  Harmon Aff. ¶ 9.

1639.  Moreover, even a decrease as low as 0.02% in the count of children in poverty aged 5-17 residing in an LEA's jurisdiction can lead to changes in eligibility for federal education grants that could amount to cuts as large as 40% of an LEA's Title I Grant.  Harmon Aff. ¶ 9.

1640.  As explained above, Dr. Warshaw found that undercounting resulting from a citizenship question is likely to reduce population shares of large metropolitan counties relative to other areas, and specifically noted reductions for nearly all Plaintiff Cities and Counties relative to their states, under every undercount scenario.  Warshaw Aff. Table 8, p. 28, ¶¶ 59, 60-61.

1641.  As a result, the addition of a citizenship question on the 2020 Decennial Census will likely require State Governmental Plaintiffs to inequitably distribute education funds to localities, specifically depriving non-citizen and Hispanic students in poverty residing in large metropolitan

areas, including those located in most of the Plaintiff Cities and Counties, of much needed education funding.

1642.  Similarly, several additional programs require states to use census-derived information to distribute funds directly to the City and County Plaintiffs.  Examples include funding under the Victims of Crime Act program, Temporary Assistance for Needy Families ("TANF") program, Low Income Home Energy Assistance ("LIHEAP") Program, the Workforce Innovation and Opportunity Act ("WIOA") program, and the Community Services Block Grant ("CSBG"). Franklin Aff. ¶¶ 6-10; Tiema-Massie Aff. ¶ 11.

1643.  Localities, including Plaintiff Cities and Counties, receive funds under these programs based on their relative share of the relevant population within a state.  For instance, states are required to distribute TANF, LIHEAP, WIOA, and CSBG funds to localities based, at least in part, on the proportion of low-income individuals residing in the jurisdiction.  Franklin Aff. ¶¶ 7-8, 10; Tiema-Massie Aff. ¶ 11.

1644.  As a result, the addition of a citizenship question on the 2020 Decennial Census will likely require State Governmental Plaintiffs to inequitably distribute funding under these and similar program, disadvantaging residents in need of important services.  Franklin Supp. Aff. (Docket No. 498-6) ¶ 5.  Undercounting resulting from the inclusion of a citizenship question on the 2020 Decennial Census thus will also cause Plaintiff Cities and Counties to lose crucial federal funding under these programs as well.

1645.  For example, the City of Phoenix explained that an undercount that results in a 1% cut in funding under these programs would result in significant losses for the City, including $60,209 under the LIHEAP program, meaning utility assistance payments will not be processed for 109

households, and $107,518 in WIOA funds available for employment and support services to adult, youth and displaced workers.  Franklin Aff. ¶¶ 8, 10; Franklin Supp. Aff. ¶ 5.

1646.  Similarly, the City of Chicago receives significant funding under the CSBG program that is used to provide services to 26,000 vulnerable families.  Tiema-Massie Aff. ¶ 11.  Reductions in these funds would disrupt provision of these services.  *Id.* ¶ 15.

1647.  Plaintiff Cities and Counties have also proven that they will lose funding from federal programs due to a citizenship-question-induced undercount of their cities.

1648.  Many federal funding programs provide direct funding to localities based on census-derived information.  These include the Community Development Block Grant ("CDBG") program, the Emergency Solutions Grant ("ESG") program, and the HOME Investment Partnerships Program.  Freedman Aff. (Docket No. 498-7) ¶¶ 7, 10, 12.

1649.  Each of these programs provides funding to cities and counties on the basis, at least in part, of their share of the overall population count relative to other metropolitan areas, and their share of the population in poverty. *Id.*

1650.  As a result, an undercount resulting from the addition of a citizenship question that reduces the share of the overall population, or the population in poverty of Plaintiff Cities or Counties, will impact the Plaintiffs' funding allocations, and impact critical services.

1651.  For example, Plaintiff City of Providence, Rhode Island offered testimony that a 1% decrease in CDBG funds would result in losses of over $50,000 in critical services, and would likely force the city to cut free daycare, and after-school programs for low-income families.  Freedman Aff. ¶ 9.

1652.  A similar decrease in ESG funding would result in losses of $4,000 and cuts to the hours of case workers devoted to finding housing for the homeless residents of Providence.  *Id.* ¶ 11.

1653.  A 1% reduction in HOME Investment funding would result in losses of $170,000, denying approximately 22 low-income families down-payment and closing cost assistance.  *Id.* ¶ 13.

1654.  As explained above, Dr. Warshaw found that several City and County Plaintiffs were at particular risk of undercounting based on the impact of a citizenship question on non-citizens.  Warshaw Aff. ¶ 56.  Specifically, Dr. Warshaw showed that Cameron, Hidalgo, and El Paso Counties in Texas, Monterey County in California, and Providence and Central Falls in Rhode Island, experienced some of the largest decreases in population counts under the scenario of estimating 2% undercounting of household with at least one non-citizen.  Warshaw Aff. Table 7, p. 26.  As a result, it is likely that these Plaintiff Cities and Counties are at high risk of losing population relative to other metropolitan areas.

1655.  Moreover, cities that are home to large populations of non-citizens and Hispanics, including Chicago, New York City, Phoenix and San Francisco, also experience significant losses in population count under Dr. Warshaw's analysis relative to cities with smaller proportions of non-citizen and Hispanic residents.  Warshaw Aff. Table 7, pg. 26.  These Plaintiff Cities are also at substantial risk of losing population share relative to other less diverse metropolitan areas.

1656.  An undercount of 2% of individuals in non-citizen households and Hispanic individuals resulting from the inclusion of a citizenship question on the 2020 Decennial Census would result in losses of funding for several Plaintiff Cities and Counties, by reducing the share of the overall population, and the population in poverty, relative to cities and counties with fewer non-citizens and Hispanics.

1657.  The Plaintiff States, Cities and Counties are likely to experience losses of federal funding,

or, for many states, inequitable intrastate distribution of federal funding, as a result of the

addition of a citizenship question on the 2020 Decennial Census.

### D.  Injuries Independent from Undercount—Data Quality

> #### 1.      Adding a Citizenship Question to the Census Will Cause More Respondents to Be Enumerated through NRFU Processes, Resulting in Worse-Quality Census Data

1658.  In Dr. Abowd's January 19 memo, the Census Bureau concluded that adding a citizenship

question to the 2020 Decennial Census "is very costly, harms the quality of the census count, and

would use substantially less accurate citizenship status data than are available from

administrative sources." PX-22 at 1 (AR); Nov. 13 Trial Tr. at 885 (Abowd testimony).

1659.  Dr. Abowd's March 1 memo confirms that the Census Bureau's conclusion that adding a

citizenship question will harm Census data quality also applies to the option of adding a

citizenship question in conjunction with using administrative records to develop block-level

CVAP data for DOJ ("Alternative D"). PX-25 at 5 (AR); Nov. 13 Trial Tr. at 953, 968.

1660.  Dr. Abowd testified that Alternative D will result in worse data quality and will be worse

for the Census Bureau's goal of conducting an accurate 2020 Decennial Census, as compared to

Alternative C (relying exclusively on administrative records to produce block-level CVAP data).

Nov. 15 Trial Tr. at 1374-75 (Abowd testimony). He testified that, if one's goal is to have an

accurate Census, Alternative C is superior to Alternative D. Nov. 13 Trial Tr. at 968-69.

1661.  Dr. Abowd's memos in the Administrative Record indicate that the Census Bureau

concluded that, because a citizenship question will lead to a decline in self-response rates to the

2020 Decennial Census questionnaire, it will result in the enumeration of more people through

nonresponse follow-up (NRFU) efforts, such as proxy responses. PX-22; PX-25 at 4 (AR). Dr.
Abowd confirmed this point in his trial testimony. Nov. 13 Trial Tr. at 950-52, 968.

1662. The Census Bureau has specifically acknowledged that "nonresponse is highly correlated
with citizenship." PX-162 at 44. In other words, noncitizens, to the extent that they are
enumerated at all, will disproportionately be enumerated through NRFU efforts.

1663. NRFU efforts produce Census questionnaire responses that are not as reliable as answers
from self-responses. Nov. 13 Trial Tr. at 953. The NFRU process involves the use of proxies,
and the Census Bureau acknowledges "that proxies supply poor quality . . . socioeconomic
characteristic information about the person on behalf of whom they are responding." PX-162 at
41.

1664. The Census Bureau thus believes that the increased number of enumerations through the
NRFU process in the event of a citizenship question would produce lower-quality personal data
than would a Census without a citizenship question. Nov. 13 Trial Tr. at 968 (Abowd).

1665. The result will be more incorrect enumerations through the NRFU process than there
would be if there were no citizenship question. PX-25 (AR); Nov. 13 Trial Tr. at 968 (Abowd).

1666. Using administrative records to provide DOJ with block-level CVAP data under
Alternative C would not harm the quality of the census data. PX-22 (AR); Nov. 13 Trial Tr. at
958 (Abowd).

## 2. Secretary Ross's Choice of Alternative D, which Will Produce Worse Data Quality, Violates OMB Standards

1667. The Census Bureau believes that harming the quality of census data is a bad thing that
should be avoided. Nov. 13 Trial Tr. at 953 (Abowd).

1668. Before Secretary Ross issued his March 26, 2018 decision memo, he was aware of the
Census Bureau's findings that Alternative C—obtaining citizenship data from administrative

records—would be less costly and produce more accurate CVAP data than adding a citizenship question to the census questionnaire. Nov. 13 Trial Tr. at 959 (Abowd).

1669.  The Census Bureau is bound by the Office of Management and Budget's Standards and Guidelines. Nov. 13 Trial Tr. at 989 (Abowd).

1670.  OMB Standard 2.3 states that "[a]gencies must design and administer their data collection instruments and methods in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost." PX-359.

1671.  Dr. Abowd has concluded that—within the meaning of OMB Standard 2.3—Alternative D would result in lower data quality, higher cost, and higher respondent burden than the Census Bureau's recommended Alternative C. Nov. 13 Trial Tr. at 989-90.

1672.  OMB Guideline 2.3.1 states: "Design the data collection instrument in a manner that minimizes respondent burden, while maximizing data quality." PX-359.

1673.  Dr. Abowd stated that Alternative C would comport with OMB Guideline 2.3.1. Nov. 13 Trial Tr. at 990-91.

### 3.      Adding a Citizenship Question to the Census Will Damage the Quality of Census Data Relating to Population Characteristics

1674.  Dr. Salvo testified that while the Census Bureau collects the count of residents in a particular neighborhood, it also collects information relating to the attributes or characteristics of those residents, such as race and age. Nov. 6 Trial Tr. at 303:21-304:4.

1675.  The Administrative Record indicates that the Census Bureau determined that a citizenship question will damage the quality of population characteristic data collected through the 2020 Decennial Census. In the January 19 Abowd Memo, the Census Bureau concluded that lower self-response and increased NRFU workload resulting from the inclusion of a citizenship

question, will "degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates." PX-1 at AR 1281 (AR). The Census Bureau similarly concluded that a citizenship question will reduce data quality in the March 1 Memo evaluating Alternative D that was ultimately adopted by Secretary Ross. PX-1 at AR 1311 (AR). And outside of the Administrative Record, the Bureau's August 6, 2018 White Paper reached the same conclusion. PX-162 at 54.

1676.  Dr. Salvo testified that apart from a citizenship question's impact on the net differential undercount, a citizenship question will reduce the data quality of characteristic data and impair local-level information. Nov. 6 Trial Tr. at 302:8-20.

1677.  When the quality of the data relating to characteristics is compromised, sub-groups are no longer accurately defined. Nov. 6 Trial Tr. at 304:5-7. As a result, even when the total population of the jurisdiction is accurate, data about subgroups within the jurisdiction may be inaccurate. Nov. 6 Trial Tr. at 304:5-13.

1678.  Such data quality issues can give rise to substantial local-level differential inaccuracies between neighborhoods in the same jurisdiction. Nov. 6 Trial Tr. at 415:9-17. These inaccuracies impact the delivery of services and funding. Nov. 6 Trial Tr. at 304:5-13.

1679.  Dr. Abowd acknowledges that a citizenship question, by decreasing self-response rates and thus increasing reliance on NRFU efforts, will reduce the quality of characteristic data produced during the 2020 Decennial Census. Nov. 13 Trial Tr. at 882:2-5, 952:23-953:14; Nov. 14 Trial Tr. at 1251:9-13. Dr. Abowd conceded that a citizenship question will reduce the accuracy of the characteristic data collected regardless of whether there is ultimately a net undercount, or differential net undercount. Nov. 14 Trial Tr. at 1221: 22-1222:1.

1680.  Moreover, Dr. Salvo explained that high rates of proxy response and high imputation rates in particular neighborhoods diminish the accuracy of census information about demographic subgroups in those neighborhoods. Nov. 6 Trial Tr. at 395:8-396:14.

### 4.    The Governmental Plaintiffs Require Accurate Characteristics Data to Make Decisions Regarding the Distribution of Resources

1681.  Dr. Abowd testified that the data quality with respect to characteristics information is important for state and local decisions relating to services and funding. Nov. 14 Trial Tr. at 1223:2-1224:23.

1682.  For example, when New York City seeks to design services and infrastructure that takes into account future locations of aging populations in the City; such efforts depend on accurate census data relating to where those populations reside within the City. Nov. 6 Trial Tr. at 356:15-21.

1683.  Likewise, localities depend on accurate characteristic data—including race and age information—in order for health departments to allocate resources or decide where to put health centers. Nov. 6 Trial Tr. at 395:16-396:14, 416:24-417:20.

1684.  For example, since particular ethnic populations are particularly at risk for particular illnesses, the New York City Department of Health requires accurate characteristic data relating to age and race. Nov. 6 Trial Tr. at 307:6-16. Without accurate characteristics data, "the health department can't make good decisions on where to deploy resources." Nov. 6 Trial Tr. at 308:3-18.

1685.  Accurate census information about the number of children in a jurisdiction is also critically important. For instance, Dr. Salvo testified that the New York City Department of Education relies on demographic data from the census to draw school zone boundaries, and that

inaccurate information about groups such as children under the age six or children of school age compromises that process. Nov. 6 Trial Tr. at 305:11-21.

1686.  Similarly, the Department of Education relies on information about neighborhood composition by race to understand and react to changes in neighborhood composition; inaccurate information can compromise that process as well. Nov. 6 Trial Tr. at 305:21-306:10.

1687.  Similarly, New York City depends on accurate characteristic data on a neighborhood-by-neighborhood basis in order to determine where to properly allocate language access services. No. 6 Trial Tr. at 306:23-308:25.

### 5.    Federal Funding Programs Rely on Accurate Census Data Relating to Characteristics

1688.  Dr. Hillygus explained that "there are federal funding decisions made on the basis of the characteristics of the population, not just the count of the population." Nov. 15 Trial Tr. at 1401:24-1402:22.

1689.  Dr. Reamer identified several federal funding programs that depend on accurate counts of children. *See* Reamer Aff. ¶¶ 36, 38, 40, 44, 45, 55, 56, 59. An inaccurate count of children will impact funding streams under these programs.

1690.  For example, under the Head Start program, municipalities and non-profits are required to use Census data about the number of children aged 0-5 to identify families eligible for enrollment in the program, and the location of services and slots within a municipality. Franklin Aff. ¶ 9.

1691.  If a city such as Phoenix, New York City, Chicago or Philadelphia experiences a differential undercount of the population of children aged 0-5 relative to other municipalities, as New York City and Chicago did in 2010, that undercount would lead to erroneous information

that would impact the identification of eligible families within the City and could reduce funding available for necessary services. Franklin Aff. ¶ 9; Harmon Aff. ¶¶ 4-6; PX-346 at 18.

1692.  Similarly, the Supplemental Nutrition Program for Women, Infants, and Children (WIC) funds are apportioned by each state's share of the nationwide number of infants and children ages 1-4 at or below 185 percent of poverty. Reamer Aff. ¶ 44. Where a state, like New York, New Jersey or Illinois experiences a differential undercount of children ages 1-4, as compared to other states, as New York and Illinois did in 2010, it would lose funding under the WIC program, regardless of whether the state experienced a net undercount in total population. PX-346 at 17.

1693.  Under the Community-Based Child Abuse Prevention (CBCAP) Program, funds are distributed to states based on the number of children under the age of 18, a figure drawn from the Decennial Census. Harvell-Haney Aff. (Docket No. 498-12) at ¶ 7. If the population of children under the age of 18 in a particular state, such as Massachusetts, New York or New Jersey, were to appear to decrease relative to other states because of an undercount, that state would receive less in CBCAP funds. *Id.*

1694.  As a result, even if there is little to no net undercounting in the total population nationally or within the state, if the population of children under 18 within a state like New York or New Jersey is disproportionately undercounted as compared to other states, that state's share of CBCAP funding would decrease. *Id.*

### 6.      Omissions and Data Quality

1695.  Reductions in data quality introduced by the decline in self-response rates can have other far-reaching implications even when they do not result in a net undercount.

1696.  Dr. Salvo noted that respondents are often missed by the Census Bureau, but are offset by the double counting of dissimilar individuals in other neighborhoods, thereby ensuring a net undercount close to zero that hides underlying inaccuracies. Nov. 6 Trial Tr. at 411:2-15. The

number of omissions in the Census, i.e. those households that should have been counted in the

Census but were missed, is an important indicator of local Census accuracy. Nov. 6 Trial Tr. at

403:25-404:2. As Dr. O'Hare explained, omissions can be completely offset by erroneous double

counting of other respondents, known as erroneous enumerations, and whole person imputations,

which would result in no net undercounting. O'Hare Aff. (Docket No. 507-1) at ¶ 15.

1697.  However, as Dr. Salvo testified, the households that are omitted are often different

demographically and different in location than the households that are double counted. Nov. 6

Trial Tr. at 412:10-13; 414:11-23.

1698.  For instance, Dr. Salvo testified that misidentification of significant amounts of housing

units as vacant in 2010 resulted in vacancy rates suggestive of urban abandonment in several

dynamic neighborhoods in Northwest Queens and South Brooklyn. Nov. 6 Trial Tr. at 309:8-18.

This error resulted in the undercounting of approximately 65,000 people in Northwest Queens

and South Brooklyn. Nov. 6 Trial Tr. at 351:22-352:9; 354:4-13. While these undercounts were

not reflected in the overall net undercounts for Queens and Brooklyn in 2010, both of which

were effectively zero, they nevertheless impacted New York City agencies and services. PX-338

at 39; Nov. 6 Trial Tr. at 355:14-357:2.

1699.  In the 2010 Decennial Census, the net undercount in Brooklyn was effectively zero, but

the Census reported that over 10% of the population was omitted while 8.4% was erroneously

enumerated. Nov. 6 Trial Tr. at 412:8-15; 414:2-7; PX-338 at 39.

1700.  Dr. Salvo testified that the omissions and erroneous enumerations in Brooklyn likely

occurred in different neighborhoods within Brooklyn. Nov. 6 Trial Tr. at 414:11-23. Specifically,

Dr. Salvo testified that it is likely that the 10.4% of omissions in Brooklyn were concentrated

"heavily in the black communities of Brooklyn followed by areas with large clusters of Hispanic

population". PX-267 at Table 7; Nov. 6 Trial Tr. at 414:11-16. Similarly, the 8.4% of erroneous enumerations were "likely in the non-Hispanic white areas . . . .that tend to show net overcounts." PX-267 at Table 7; Nov. 6 Trial Tr. at 414:17-20, 415:3-9.

1701.  The differential impacts of omissions—even when balanced out in the final calculus—can have significant impacts on planning decisions by local agencies. Nov. 6 Trial Tr. at 416:24-417:11. The Department seeks data from the Census about children in need of services, to determine where to locate health centers. Nov. 6 Trial Tr. at 417:2-6. Where the data the Department is relying on has significant omissions, as where Black children are disproportionately missing from the data, the Department of Health is more likely to shortchange the undercounted community, meaning "they may not pay attention to a particular neighborhood that they need to pay attention to." Nov. 6 Trial Tr. at 417:6-11.

1702.  Dr. Abowd has conceded that a citizenship question is likely to increase gross omissions in the 2020 Decennial Census. Nov. 14 Trial Tr. at 1221:18-19. The differential impact of increased omissions resulting from a citizenship question is likely to negatively impact the planning of local services and the distribution of funding.

## 7.  Children are Particularly Vulnerable to Being Omitted from the Census

1703.  The Census historically has struggled to obtain accurate information about children. During the 2010 Decennial Census, the Census Bureau failed to collect accurate information about children, especially those aged 0-4, even when collecting overall accurate counts for the population. PX-381 at 6; PX-267 at 18, Table 7; PX-337 at 35.

1704.  While the net overcount in 2010 for the total population was near zero, 4.6% of children between the ages of 0-4 were undercounted, and 10.3% of that demographic was omitted, or missed. O'Hare Aff. ¶ 18, Table 1.1.

1705.  Moreover, the Census Bureau found that these undercounts were clustered geographically. Specifically, the undercounts of children in several states, including Arizona, California, Texas, New York, Illinois, and New Mexico were higher than the national average. PX-346 at 17, 30, Appendix A. Moreover, counties with a total population of more than a half million total population in 2010, including Kings, Queens, New York and Bronx boroughs in New York, Cook County in Illinois, and Philadelphia County, Pennsylvania, accounted for more than 90% of the national net undercount of the population age 0-4. PX-346 at 18.

1706.  The Census Bureau, evaluating the 2010 Decennial Census, found that "the likelihood of the census missing a young child is higher than the likelihood of missing a person in any other age or age/sex group" and that "a higher omission rate is a driver for the undercount of young children." PX-410 at 15.

1707.  Moreover, the Census Bureau found that "census duplication, other enumeration errors, and whole-person imputations do not offset the high levels of omissions for young children." PX-410 at 15.

1708.  Within the total population of children aged 0-4, some subgroups were more likely to be missed than young White children, including Black, American Indian and Alaska Natives, and Hispanic children. PX-339 at 18, 20; PX-337 at 35. This was especially problematic in 2010, as Hispanics made up a disproportionate share of children overall, and children aged 0-4. PX-381 at 14, Table 4. In addition, "children who were grandchildren, other relatives (such as a niece, nephew, or cousin), and nonrelatives of the householder," were also more likely to be undercounted in 2010. PX-339 at 18.

1709.  Dr. O'Hare testified that nearly a third of children missed in the 2010 Census were left off of household self-responses, and nearly two thirds were missed in the NRFU operation. PX-339 at 19, Table 9; Nov. 7 Trial Tr. at 548:5-17.

1710.  Significantly, the Census Bureau found that, "NRFU proxy respondents and misclassification of vacant units may contribute to the undercount of young children." PX 339 at 18.

1711.  Specifically, the Census Bureau found that its evidence suggested that "proxies may not provide complete and accurate information for the census enumeration," and that "unknowledgeable or unwilling proxy respondents may be a key factor in the undercount of young children." PX-339 at 19.

1712.  A citizenship question will likely contribute to the undercount of children. Dr. Abowd testified that a citizenship question will likely decrease self-response among noncitizen and Hispanic households, and increase reliance on flawed NRFU operations, such as proxies, to capture the characteristics of these households. Nov. 13 Trial Tr. at 881:19-882:5, 919:12-920:10, 952:23-953:10. As a result, by increasing reliance on proxies, the key factor in the undercount of young children, a citizenship question will likely contribute to the problem. PX-339 at 19.

1713.  Dr. Abowd also testified that a citizenship question will lead to more gross omissions during the 2020 Decennial Census. Nov. 14 Trial Tr. at 1221:18-19.

1714.  The Census Bureau found that young children are more likely to be missed than any other age group, and that higher omissions is a driver of the undercount of young children. PX-410 at 15. Moreover, the Census Bureau found that erroneous enumerations and whole person imputations "do not offset the high level of omissions for young children." PX-410 at 15. As a

result, by causing higher omissions, a citizenship question is likely to contribute to the undercount of children.

1715.  As detailed above, the Plaintiff jurisdictions depend on accurate census data relating to children to ensure appropriate allocations of federal resources that are distributed, in part, based on the number of children within a particular jurisdiction.

### E.  Injury Based on Risk to Privacy

1716.  In his March 26, 2018 decisional memo, Secretary Ross called for the institution of a citizenship question on the 2020 Decennial Census as a means to provide citizenship voting-age population (CVAP) data at the census block level. PX-26 (AR).

1717.  Dr. Abowd testified that census blocks vary significantly in terms of their populations. Nov. 13 Trial Tr. at 1031.

1718.  Both Dr. Abowd and Dr. Handley similarly testified that some census blocks are very small; some census blocks have just one person in them. *Id.*; Nov. 13 Trial Tr. at 837; *see also* Brower Aff. (Docket No. 498-1) ¶ 6.

1719.  For example, according to the 2010 Census Redistricting Data (Public Law 94-171) File, 26,213 blocks in Minnesota contained only one household, while 95,220 blocks in Minnesota contained between one and nine households. Brower Aff. ¶ 6.  In 2010, 63% of the populated census blocks (i.e., those census blocks with a non-zero population) in Minnesota contained fewer than ten households.  *Id.*

1720.  For another example, according to the 2010 Census PL 94-171 data set, 52,976 census blocks in New York State—comprising nearly 22% of all populated census blocks in New York State—had a population of only one to ten persons. Breitbart Aff. ¶ 5.

1721.  The State Demographer for the State of Minnesota testified that if citizenship data is published at the block level, it will be harder to give people assurances that their responses on the census questionnaire will be kept safe and confidential. Brower Aff. ¶ 9.

1722.  Federal law prohibits the Commerce Secretary—or any other Department of Commerce employee, bureau, agency, or local government census liaison—from "mak[ing] any publication whereby the data furnished by any particular establishment or individual . . . can be identified." 13 U.S.C. § 9(a)(2).

1723.  The publication of granular, deeply personal citizenship information could also constitute a violation of a legally protected interest in confidentiality of Census responses.

1724.  As Dr. Hillygus explained, the addition of a citizenship question creates a real increased risk of disclosure.  She testified that "you have policies that can change and you can have mistakes happen where data are accidentally released . . . there is no doubt you have increased harm associated with accidental or deliberate disclosure with a citizenship question."  Nov. 5 Trial Tr. at 136:9-24.

1725.  The risk created by the potential of disclosure is substantially more than it was without citizenship information—if, in 2010, somebody accidentally got your individual census level data they would not have known your citizenship status, but now they would have access to "what the Census Bureau designates as sensitive information, and the risk of harm is substantially increased."  *Id.* at 136:25–137:5.

1726.  Moreover, there is an actual increase in the probability of disclosure because now the Census data will have more information about individual households. Nov. 5 Trial Tr. at 137:9-14.  This makes the potential of disclosure stronger.  Nov. 5 Trial Tr. at 138:5-11.

1727.  This potential threat is understood by the general public.  For example, George Escobar, Chief of Programs and Services at CASA, is concerned that by identifying the citizenship status of individuals living within a very small geographic area, a citizenship question could lead to immigration enforcement targeting these particular areas and communities and harm the privacy of CASA members. Escobar Aff. ¶ 24.

1728.  A large number of people living in immigrant communities of color—citizens and noncitizens alike—have expressed significant apprehension about answering the citizenship for fear that their citizenship status or the citizenship status of their neighbors and loved ones will be made public and potentially used for law enforcement profiling against people on blocks with high levels of noncitizens. Escobar Aff. ¶¶ 20-24; Althschuler Aff. ¶¶ 13-18; Vargas Supp Aff. (Docket No. 498-22) ¶9; PX-662. One U.S. citizen with undocumented parents stated that she feared that filling out a citizenship question would prompt the Census Bureau and potentially other governmental entities to check the status of any non-citizens living in her home, and that the government could use the citizenship question to create a list to separate families and deport undocumented Virginians. Sarmiento Aff. (Docket 488-3) ¶ 6.

1729.  On November 1 and 2, at the National Advisory Committee ("NAC") Meeting, the Census Bureau presented its finding from the Census Barriers, Attitudes, and Motivators Surveys ("CBAMS").  Vargas Supp. Aff. (Docket No. 498-22) ¶ 7.  The Census Bureau reported its finding that focus group participants in the CBAMS expressed concern that the purpose of a citizenship question was to target certain ethnic groups for purposes of fear and immigration enforcement.  Id. ¶ 8; PX-662 at 20-21, 29-38, 43-46, 56-59, 61.

1730.  On June 20, 2018 in Falls Church, Virginia, an undocumented mother with U.S. citizen children expressed concern to the Executive Director of the Virginia Coalition for Immigrant

Rights that the Trump Administration could use citizenship data to create a deportation list and separate families, or potentially round up undocumented individuals and put them in internment camps. Sarmiento Aff. ¶ 7. She stated that she was not planning to fill out the census form, solely because of the citizenship question. *Id.*

1731. On July 12, 2018, a visibly upset undocumented Latino activist stated that he feared disclosing citizenship information to the government and would therefore likely not fill out the census form. *Id.* ¶ 8.

1732. Immigrant communities of color in Virginia have expressed concern that—in light of the Trump Administration separating families at the border—the Administration would use citizenship information derived from the census to separate mixed status families. *Id.* ¶ 9.

1733. Many CASA members have expressed fears that answering a particular census question could lead to their family being harmed or separated, and have stated that participating in the Census presents too high a risk to the safety and security of themselves and their families to justify participating. Escobar Aff. ¶ 21.

1734. One CASA member told a CASA Health Promoter about a family member that he believed was placed in deportation proceedings shortly after applying for a Driver's License—a story this member said made answering a question about immigration status on a federal government form not worth the risk. *Id.* ¶ 23.

1735. Since the beginning of the Trump Administration, members of immigrant communities of color in New Jersey have been increasingly hesitant to share their information with governmental agencies to help their U.S. citizen family members apply for critical governmental benefits or services. Cullinane Aff. (Docket 505-1) ¶ 6.

1736.  Enrollment in Supplemental Nutrition Assistance Program has declined across the state of New Jersey among families where only children apply for the program—typically a marker of an immigrant household. *Id.*

1737.  A school in Elizabeth, New Jersey that provides Head Start services and is attended mainly by immigrant children and children of immigrants has experienced an extreme decline in enrollment. *Id.*

1738.  At Passaic County College, a public community college with a significant number of immigrant students, enrollment also decreased in 2017. *Id.*

1739.  Make the Road New Jersey found that immigrant clients were increasingly afraid to access the justice system, out of fear of ICE enforcement around courthouses, including clients that failed to pursue orders of protection, and clients who had failed to attend court dates altogether.  Cullinane Aff. ¶ 5

1740.  Multiple members of immigrant communities of color in New Jersey have asked whether the government will misuse the information they divulge when filling out the census questionnaire, while others have asked whether they will be deported if they report that they are non-citizens. *Id.* ¶ 8.

1741.  The Chinese-American Planning Council (CPC), a member organization of Plaintiff NYIC, has reported that some of their members have expressed concern that they will receive a visit from Immigration and Customs Enforcement (ICE) if they indicate that there are noncitizens in their household. Plum Aff. ¶ 16.

1742.  Some CPC members have also expressed concern about answering a citizenship question because they are aware that Census data was used to identify Japanese-Americans for internment during World War II. *Id.*

1743. Somia Elrowmeim, Adult Education Program Manager of NYIC member organization Arab-American Association of New York (AAANY), has reported that many of her students are fearful or apprehensive about having their names disclosed because of their legal status. *Id.* ¶ 17.

1744. Members of Chhaya Community Development Corporation ("Chhaya"), another NYIC member organization, have expressed that answering a citizenship question is deeply concerning to them because they do not trust the federal government with such information. *Id.* ¶ 18.

1745. A man who emigrated to the United States from Guyana reported to NYIC member organization Desis Rising Up and Moving that he would not answer a citizenship question because he feared that the information could be used to target his family members who are non-citizens for deportation based on his understanding that Census data was used to target Japanese-American citizens for internment. *Id.* ¶ 19.

1746. A 30-year-old DACA recipient who lives in a mixed status household reported to NYIC member organization Little Sisters of the Assumption Family Health Service that he is afraid to answer a citizenship question because he is concerned that the Trump Administration may use that data to hurt his family and community. *Id.* ¶ 20.

1747. A central concern of NYIC's member organizations and NYIC itself regarding a citizenship question is the loss of privacy that members in the immigrant communities they serve would suffer by publishing citizenship data at the block level. *Id.* ¶ 21.

1748. Members of immigrant communities of color in New York City and New York State are deeply concerned that citizenship information may be viewed and potentially used for law enforcement profiling against people on blocks with high levels of noncitizens by ICE or other parts of the Trump Administration that have been used to intimidate and marginalize immigrants. Choi Aff. ¶ 22; Altschuler Aff. ¶¶ 13, 18.

1749. One member of Make the Road New York (MRNY) who is a DACA recipient and lives in a mixed status household has reported that he is afraid to answer the Census out of fear of subjecting his household or other households on his block to profiling by immigration authorities. Altschuler Aff. ¶ 15.

1750. Another MRNY member—a naturalized U.S. citizen and Long Island resident—reported that she is less likely to respond to the Census if it contains a citizenship question because she is fearful of the consequences of answering the question for non-citizens in her neighborhood. *Id.* ¶ 16.

1751. At least three other individuals have expressed fear to MRNY about answering the Census survey if a citizenship question is on it: a 48-year-old non-citizen MRNY member of Honduran origin who lives in Brooklyn; a 30-year-old woman of Ecuadorian origin with DACA status who resides in Suffolk County and comes from a mixed status family; and a 54-year-old woman of Salvadoran origin who is a United States citizen and resides in Suffolk County with her mixed status family. *Id.* ¶ 17.

*          *          *

Respectfully submitted,

BARBARA D. UNDERWOOD
Attorney General of the State of New York

By: /s/ Matthew Colangelo

Steven C. Wu
   *Deputy Solicitor General*
Judith N. Vale
   *Senior Assistant Solicitor General*

Matthew Colangelo
   *Executive Deputy Attorney General*
Elena Goldstein, *Senior Trial Counsel*
Danielle Fidler, *Assistant Attorney General*
Sania Khan, *Assistant Attorney General*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Laura Wood, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs

ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: /s/ John A. Freedman

Dale Ho
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org

Sarah Brannon*
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, DC 20005-2313
202-675-2337
sbrannon@aclu.org
* *Not admitted in the District of
Columbia; practice limited pursuant to*

Andrew Bauer
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7669
Andrew.Bauer@arnoldporter.com

John A. Freedman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, DC 20001-3743
(202) 942-5000
John.Freedman@arnoldporter.com

*D.C. App. R.*
*49(c)(3).*

Perry M. Grossman
New York Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the NYIC Plaintiffs

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STATE OF NEW YORK, et al., | | |
| Plaintiffs, | | |
| v. | | 18-CV-2921 (JMF) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | | |
| Defendants. | | |

| | | |
|---|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | | |
| Plaintiffs, | | |
| v. | | 18-CV-5025 (JMF) (Consolidated Case) |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | | |
| Defendants. | | |

**PLAINTIFFS' JOINT PROPOSED POST-TRIAL CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. iv

I.      The obligation to conduct a decennial census ..................................................... 1

II.     Plaintiffs have standing to challenge Defendants' decision to demand citizenship
        information through the 2020 decennial census. .................................................. 2

        A.      This Court may consider all of the evidence at trial, including extra-record
                evidence, to evaluate Plaintiffs' standing. .............................................. 3

        B.      The evidence shows that Plaintiffs have suffered and will suffer concrete
                injuries-in-fact. ........................................................................................ 3

                1.      Injuries from the diversion of resources. ..................................... 5

                        a.      Organizational injuries to NGO Plaintiffs. ..................... 5

                        b.      The Governmental Plaintiffs are injured through the expenditure of
                                resources necessary to mitigate the substantial risk of harm. ........ 8

                2.      Loss of privacy ............................................................................ 11

                3.      Injuries from degradation of data quality .................................... 14

                4.      Injuries from diminished political representation. ...................... 17

                        a.      The addition of a citizenship question will result in a differential
                                undercount ....................................................................... 19

                        b.      Plaintiffs will lose political power as a result of the differential
                                undercount ....................................................................... 21

                5.      Reductions in federal funding. .................................................... 23

                        a.      The citizenship question will cause Plaintiffs to directly lose federal
                                funding. ............................................................................ 24

                        b.      The Governmental Plaintiffs will suffer financial harms arising from the
                                addition of a citizenship question. ................................... 25

                        c.      The NGO Plaintiffs will suffer financial harms arising from the addition
                                of a citizenship question .................................................. 27

        C.      Traceability and redressability. .............................................................. 29

III.    Defendants' decision to demand citizenship information through the decennial
        census violates the Administrative Procedure Act ............................................. 31

        A.      The scope of judicial review in this case. .............................................. 32

                1.      Review on the whole Administrative Record is to be probing and thorough. ...... 32

Page

2.   The "whole record" before the agency includes not only the designated
     Administrative Record, but also evidence that reflects information the
     Secretary directly or indirectly considered. ......................................................... 33

3.   The Court may consider extra-record evidence that serves as background
     to explain or clarify scientific or technical subjects requiring specialized
     knowledge. ............................................................................................................ 39

4.   The Court may consider extra-record evidence to evaluate whether the
     agency failed to consider all relevant factors...................................................... 41

5.   The Court may consider extra-record evidence relevant to Plaintiffs' claims
     that the Secretary's decision was based on pretext or prejudgment. .................... 44

B.   Defendants' decision to add a citizenship question to the census was arbitrary
     and capricious in violation of the APA................................................................ 46

1.   The decision to add a citizenship question was counter to the evidence
     before the agency. ............................................................................................... 47

     a.   Adding a citizenship question will materially lower response rates............ 47

     b.   Adding a citizenship question will not provide more accurate, usable,
          or complete citizenship data....................................................................... 51

     c.   The Secretary's decision to choose Option D over Option C is contrary
          to the evidence before the agency............................................................... 53

     d.   Adding a citizenship question to the census is not necessary to enforce
          the Voting Rights Act, and would instead undermine the goal of fair
          representation for all communities............................................................... 56

     e.   Secretary Ross's decision memo is replete with assertions unsupported
          by and often contrary to the evidence. ........................................................ 60

2.   Defendants' decision entirely failed to consider important aspects
     of the problem ..................................................................................................... 63

     a.   The March 26 decision memo failed to address key legal obligations. ....... 63

     b.   The Secretary failed to consider the relevant standard of proof for
          adding new questions to the census. ........................................................... 65

     c.   The Secretary failed to consider the impact of disclosure avoidance
          protocols on his decision............................................................................. 66

     d.   Defendants bypassed the procedures designed to identify the best
          means of satisfying DOJ's request............................................................... 68

     e.   Defendants failed adequately to consider the need for testing both the
          citizenship question and the full census questionnaire. ............................... 70

Page

    f.    Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates .................. 74

  3.  Defendants' stated rationale was pretextual. ....................................... 75

    a.    The Administrative Record alone confirms that the stated rationale is pretext. ............................................................................... 76

    b.    Extra-record evidence confirms that the Secretary's given rationale is pretext. ............................................................................... 82

  4.  The Secretary improperly prejudged the decision to add a citizenship question. ............................................................................................. 84

C.    Defendants' decision to demand citizenship information is not in accordance with law. ............................................................................... 89

  1.  Section 141(f) of the Census Act. .................................................... 90

    a.    The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act. ........................................ 92

    b.    Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3). ........................................ 95

  2.  Section 6 of the Census Act. .......................................................... 95

    a.    The Administrative Record is clear that Defendants did not comply with Section 6(c) of the Census Act. ......................................... 96

    b.    Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c). ................... 98

  3.  OMB standards and Census Bureau guidelines regarding pretesting and burden reduction. ........................................................................ 99

    a.    The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards. ................................. 101

    b.    Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards. .................................... 102

  4.  Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief. ................................. 102

D.    Remedies for Defendants' APA violation. ....................................... 102

  1.  This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census. ........................... 102

  2.  This Court should should decline to remand to the agency and reject any request to remand without vacatur. ................................................. 103

  3.  This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census. ...................... 107

| | | | Page |
|---|---|---|---|
| | 4. | Whether this Court vacates the Secretary's decision or issues an injunction, any relief will properly apply nationwide. | 109 |
| | 5. | This Court should enter the requested declaratory relief. | 111 |
| IV. | | Defendants' decision to add a citizenship question was motivated by discriminatory animus. | 111 |
| | A. | Plaintiffs have proven that the citizenship-question decision was motivated by discriminatory intent through substantial evidence on each of the *Arlington Heights* factors. | 111 |
| | 1. | The addition of a citizenship question will disparately impact Latinos and immigrants of color. | 112 |
| | 2. | Historical background of the decision. | 114 |
| | 3. | Irregular procedural sequence. | 115 |
| | 4. | Substantive departures from past practice. | 119 |
| | 5. | Contemporary statements by decisionmakers and those influencing them. | 120 |
| | B. | The pretextual nature of the decision also supports a finding of discriminatory intent. | 122 |
| | C. | Plaintiffs proved intentional discrimination based on race and national origin, but even if Defendants discriminated against immigrants generally, such discrimination would violate the Fifth Amendment. | 127 |
| | 1. | Defendants' citizenship question decision seeks to diminish political power and harms groups based on race, rthnicity, and national origin. | 128 |
| | 2. | Defendants' arbitrary targeting of a politically unpopular group cannot pass constitutional muster under any level of scrutiny | 131 |
| Conclusion | | | 135 |

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*ACEMLA v. Copyright Royalty Tribunal,*
   763 F.2d 101 (2d Cir. 1985)...................................................................................94

*Action on Smoking & Health v. Civil Aeronautics Bd.,*
   699 F.2d 1209 (D.C. Cir. 1983) ..............................................................................55

*Air India v. Brien,*
   No. 00-cv-1707, 2002 WL 34923740 (E.D.N.Y. Feb. 14, 2002) ..........................103

*Air Transport Ass'n of Am., Inc. v. Nat'l Mediation Bd.,*
   663 F.3d 476 (D.C. Cir. 2011)..........................................................................84, 85

*All. for the Wild Rockies v. U.S. Forest Serv.,*
   2018 WL 5316129 (9th Cir. Oct. 25, 2018)..................................................103, 105

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) .....................................................................105, 106

*Am. Bioscience, Inc. v. Thompson,*
   269 F.3d 1077 (D.C. Cir. 2001) ...................................................................103, 106

*Am. Littoral Soc'y v. U.S. Envtl. Prot. Region,*
   199 F. Supp. 2d 217 (D. N.J. 2002) ........................................................................3

*Am. Petroleum Inst. v. EPA,*
   787 F.2d 965 (5th Cir. 1986) ...............................................................................101

*Am. Wild Horse Pres. Campaign v. Perdue,*
   873 F.3d 914 (D.C. Cir. 2017) ...............................................................................66

*Am. Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) ...............................................................................41

*Animal Defense Council v. Hodel,*
   840 F.2d 1432 (9th Cir. 1988) ...............................................................................39

*Asarco, Inc. v. United States E.P.A.,*
   616 F.2d 1153 (9th Cir. 1980) .................................................................39, 42, 43

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,*
   412 U.S. 800 (1973).................................................................................................41

*Ave. 6E Investments, LLC v. City of Yuma, Ariz.,*
   818 F.3d 493 (9th Cir. 2016) ...............................................................................122

**Cases**                                                                         **Page(s)**

*Bank of Am. Corp. v. City of Miami, Fla.*,
   137 S. Ct. 1296 (2017) ....................................................................................5

*Bar MK Ranches v. Yuetter*,
   994 F.2d 735 (10th Cir. 1993) .....................................................................33

*Barnett v. City of Chicago*,
   141 F.3d 699 (7th Cir. 1998) ........................................................................58

*Batalla Vidal v. Duke*,
   295 F. Supp. 3d 127 (E.D.N.Y. 2017) ........................................................31

*Batalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) .........................................19, 120, 122

*Bauer v. DeVos*,
   325 F. Supp. 3d 74 (D.D.C. 2018) ................................................................2

*Bellevue Hosp. Ctr. v. Leavitt*,
   443 F.3d 163 (2d Cir. 2006) .........................................................................55

*Benavidez v. Irving Indep. Sch. Dist.*,
   690 F. Supp. 2d 451 (N.D. Tex. 2010) ......................................................125

*Benavidez v. Irving Indep. Sch. Dist.*,
   No. 3:13–CV–0087–D, 2014 WL 4055366 (N.D. Tex. 2014) ...................125

*Bennett v. Spear*,
   520 U.S. 154 .............................................................................................3, 29

*Beta Analytics Int'l, Inc. v. United States*,
   61 Fed. Cl. 223 (2004) .................................................................................44

*Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
   448 F.3d 138 (2d Cir. 2006) ...........................................................................2

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
   290 F.R.D. 409 (S.D.N.Y. 2012) .............................................................5, 17

*Buffalo Cent. Terminal v. United States*,
   886 F. Supp. 1031 (W.D.N.Y.1995) ...........................................................39

*Bunyard v. Hodel*,
   702 F. Supp. 820 (D. Nev. 1988) ..............................................................101

*Camp v. Pitts*,
   411 U.S. 138 (1973) ...................................................................................103

**Cases**                                                                                                    **Page(s)**

*Carey v. Klutznick,*
    508 F. Supp. 420 (S.D.N.Y. 1980)...........................................................................40

*Carey v. Klutznick,*
    637 F.2d 834 (2d Cir. 1980)..................................................................... passim

*Carey v. Klutznick,*
    653 F.2d 732 (2d Cir. 1981)...................................................................................12

*Casa de Maryland v. U.S. Dep't of Homeland Sec.,*
    284 F. Supp. 3d 758 (D. Md. 2018) .......................................................................19

*Central United Life, Inc. v. Burwell,*
    128 F. Supp. 3d 321 (D.D.C. 2015) .....................................................................107

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017)..........................................................................2, 5, 30

*Centro Presente v. U.S. Dept. of Homeland Sec.,*
    No. CV 18-10340, 2018 WL 3543535 (D. Mass. July 23, 2018)..........................120

*Chemical Mfrs. Ass'n v. EPA,*
    28 F.3d 1259 (D.C. Cir. 1994) ............................................................................104

*Chevron Corp. v. Donziger,*
    833 F.3d 74 (2d Cir. 2016)....................................................................................29

*Choice Care Health Plan, Inc. v. Azar,*
    315 F. Supp. 3d 440 (D.D.C. 2018) .......................................................................61

*Citizens to Pres. Overton Park v. Volpe,*
    401 U.S. 402 (1971)................................................................................32, 41, 45

*City & County of San Francisco v. Sessions,*
    No. 17-cv-04642-WHO, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018) .................50

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ..............................................................................111

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)............................................................................................133

*City of Detroit v. Franklin,*
    4 F.3d 1367 (6th Cir. 1993) ..................................................................................23

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.,*
    923 F.2d 188 (D.C. Cir. 1991)..............................................................................48

**Cases**                                                              **Page(s)**

*City of Los Angeles v. Sessions,*
  293 F. Supp. 3d 1087 (C.D. Cal. 2018) ...............................................49

*City of New York v. U.S. Dep't of Commerce,*
  713 F. Supp. 48 (E.D.N.Y. 1989) ..................................................18

*City of New York v. U.S. Dep't of Commerce,*
  822 F. Supp. 906 (E.D.N.Y. 1993) ................................................40

*City of Phila. v. Sessions,*
  280 F. Supp. 3d 579 (E.D. Pa. 2018) ............................................50

*City of Philadelphia v. Klutznick,*
  503 F. Supp. 663 (E.D. Pa. 1980) .................................................23

*City of Willacoochee, Ga. v. Baldrige,*
  556 F. Supp. 551 (S.D. Ga. 1983) ................................................23

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...........................................................4, 8, 11

*Clean Air Council v. Pruitt,*
  862 F.3d 1 (D.C. Cir. 2017) ....................................................103

*Connecticut v. Daley,*
  53 F. Supp. 2d 147 (D. Conn. 1999) .............................................35

*Crawford v. Bd. of Educ.,*
  458 U.S. 527 (1982) ...........................................................112

*Crown Cork & Seal Co. v. NLRB,*
  36 F.3d 1130 (D.C Cir. 1994) ..................................................104

*Ctr. for Biological Diversity v. Zinke,*
  900 F.3d 1053 (9th Cir. 2018) ..................................................66

*Ctr. for Food Safety v. Price,*
  No. 17-cv-3833 (VSB), 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ............14, 17

*Cuomo v. Baldrige,*
  674 F. Supp. 1089 (S.D.N.Y. 1987) .............................................40

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002) ...............................................86, 88

*Delaware Dep't of Nat. Res. & Envtl. Control v. EPA,*
  785 F.3d 1 (D.C. Cir. 2015) ...................................................55, 57

**Cases**                                                                                                    **Page(s)**

*Denney v. Deutsche Bank AG,*
   443 F.3d 253 (2d Cir. 2006) ................................................................. 11

*Dep't of Agriculture v. Moreno,*
   413 U.S. 528 (1973) ........................................................... 127, 128, 133

*Dopico v. Goldschmidt,*
   687 F.2d 644 (2d Cir. 1982) ................................................... 33, 35, 37

*EEOC v. Ethan Allen,*
   44 F.3d 116 (2d Cir. 1994) ................................................................. 81

*Engine Mfrs. Ass'n v. EPA,*
   20 F.3d 1177 (D.C. Cir. 1994) .......................................................... 106

*Evenwel v. Abbott,*
   136 S. Ct. 1120 (2016) ........................................................................ 1

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .......................................................................... 32

*FEC v. Akins,*
   524 U.S. 11 (1998) ..................................................................... 14, 17

*Fed'n for Am. Immigration Reform v. Klutznick,*
   486 F. Supp. 564 (D.D.C. 1980) ...................................... 1, 114, 119

*Fertilizer Inst. v. EPA,*
   935 F.2d 1303 (D.C. Cir. 1991) ....................................................... 106

*Florida v. United States,*
   885 F. Supp. 2d 299 (D.D.C. 2012) ................................................. 123

*Friedman v. U.S. Postal Serv.,*
   No. 08-cv-00913, 2011 WL 3267713 (D. Conn. July 28, 2011) ...................................... 11, 14

*Glavin v. Clinton,*
   19 F. Supp. 2d 543 (E.D. Va. 1998) .......................................... 18, 23

*Gorzynski v. JetBlue Airways Corp.,*
   596 F.3d 93 (2d Cir. 2010) .............................................................. 129

*Guglielmi v. Northwestern Mut. Life Ins. Co.,*
   No. 06-cv-3431, 2007 WL 1975480 (S.D.N.Y. July 6, 2007) ................................. 35

*Hampton v. Mow Sun Wong,*
   426 U.S. 88 (1976) ........................................................... 127, 128, 131

**Cases** Page(s)

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) ...................................................................110

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ......................................................................2, 5, 15, 17

*Hooper v. Nat'l Transp. Safety Bd.,*
    841 F.2d 1150 (D.C. Cir. 1988) .....................................................................68

*Humane Soc'y of United States v. Zinke,*
    865 F.3d 585 (D.C. Cir. 2017) .......................................................................66

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ........................................................................................2

*Inforeliance Corp. v. United States,*
    118 Fed. Cl. 744 (2014) .................................................................................86

*Innovative Health Sys., Inc. v. City of White Plains,*
    117 F.3d 37 (2d Cir. 1997) ...........................................................................117

*INS v. Yueh-Shaio Yang,*
    519 U.S. 26 (1996) .........................................................................................40

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) .......................................................................54

*Int'l Resource Recovery, Inc. v. United States,*
    61 Fed. Cl. 38 (2004) .....................................................................................44

*Int'l Snowmobile Mfrs. Ass'n v. Norton,*
    340 F. Supp. 2d 1249 (D. Wyo. 2004) ..........................................................84

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,*
    920 F.2d 960 (D.C. Cir. 1990) .....................................................................101

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    626 F.3d 84 (D.C. Cir. 2010) .........................................................................51

*Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.,*
    482 F.3d 79 (2d Cir. 2006) .....................................................................47, 53

*Karcher v. Daggett,*
    462 U.S. 725 (1983) .......................................................................................17

*Katzenbach v. Morgan,*
    384 U.S. 641 (1966) .......................................................................................58

**Cases**                                                                              **Page(s)**

*Kern v. U.S. Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) ...................................................................53

*Kuang v. U.S. Dep't of Defense*,
  No. 18-cv-3698-JST, 2018 WL 6025611 (N.D. Cal. Nov. 16, 2018).....................56

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
  91 Fed. Cl. 347 (2010) ...........................................................................44

*L-3 Commc'ns Integrated Sys., L.P. v. United States*,
  98 Fed. Cl. 45 (2011) ........................................................................43, 44

*LaFleur v. Whitman*,
  300 F.3d 256 (2d Cir. 2002)......................................................................3

*Lam v. Univ. of Hawaii*,
  40 F.3d 1551 (9th Cir. 1994) ..................................................................126

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) .................................................................38

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*,
  19 F.3d 1342 (11th Cir. 1994) ...........................................................74, 85

*League of United Latin Am. Citizens v. Wheeler*,
  899 F.3d 814 (9th Cir. 2018) ..................................................................99

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)..............................................................94, 105

*Leibovitz v. N.Y. City Transit Auth.*,
  252 F.3d 179 (2d Cir. 2001).....................................................................12

*Los Angeles v. Lyons*,
  461 U.S. 95 (1983)..................................................................................12

*Luciano v. Olsten Corp.*,
  110 F.3d 210 (2d Cir. 1997)....................................................................119

*LULAC v. Perry*,
  548 U.S. 399 (2006)................................................................................56

*Mathews v. Diaz*,
  426 U.S. 67 (1976)................................................................................124

*McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*,
  375 F.3d 1182 (D.C. Cir. 2004) ...............................................................51

## Cases                                                                 Page(s)

*McNabola v. Chicago Transit Auth.*,
  10 F.3d 501 (7th Cir. 1993) ...................................................................120

*Mhany Management, Inc. v. Cty. of Nassau*,
  819 F.3d 581 (2d Cir. 2016)...........................................................109, 119

*Monga v. Nat'l Endowment for the Arts*,
  323 F. Supp. 3d 75 (D. Me. 2018) ...............................................128, 129

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)...................................................................................104

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983).......................................................................... passim

*N. Mariana Islands v. United States*,
  686 F.2d 7 (D.D.C. 2009) .........................................................................72

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
  684 F.3d 286 (2d Cir. 2011).....................................................................30

*N.Y. Pub. Interest Research Grp. v. Whitman*,
  321 F.3d 316 (2d Cir. 2003).......................................................................3

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
  798 F.3d 125 (2d Cir. 2015).....................................................................21

*NAACP v. Trump*,
  315 F. Supp. 3d 457 (D.D.C. 2018) .......................................................107

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*,
  55 F. Supp. 3d 316 (E.D.N.Y. 2014) .....................................................48

*Nat'l Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1997) ...............................................39, 41, 42, 44

*Nat'l Fuel Gas Supply Corp. v. FERC*,
  468 F.3d 831 (D.C. Cir. 2006)...................................................................60

*Nat'l Mining Ass'n v. Jackson*,
  856 F. Supp. 2d 150 (D.D.C. 2012) .......................................................39

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) .................................................................104

*Nat. Res. Def. Council v. EPA*,
  658 F.3d 200 (2d Cir. 2011).....................................................................32

**Cases**                                                                          **Page(s)**

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
 894 F.3d 95 (2d Cir. 2018) ................................................................ passim

*Negron v. City of Miami Beach*,
 113 F.3d 1563 (11th Cir. 1997) ................................................................58

*New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*,
 727 F.2d 1127 (D.C. Cir. 1984) ................................................................57

*New York State Bar Ass'n v. Fed. Trade Comm'n*,
 276 F. Supp. 2d 110 (D.D.C. 2003) ..........................................................73

*New York v. Salazar*,
 701 F. Supp. 2d 224 (N.D.N.Y. 2010) ...........................................79, 80, 85

*New York v. U.S. Dep't of Commerce*,
 315 F. Supp. 3d 766 (S.D.N.Y. 2018) ...............................................91, 101

*New York v. U.S. Dep't of Commerce*,
 No. 18-cv-2921, 2018 WL 4539659 (S.D.N.Y. Sept. 21, 2018) .............75, 76, 109

*Nnebe v. Daus*,
 644 F.3d 147 (2d Cir. 2011) ...................................................................5

*North Carolina v. EPA*,
 550 F.3d 1176 (D.C. Cir. 2008) ..............................................................105

*NRDC v. EPA*,
 489 F.3d 1250 (D.C. Cir. 2007) ........................................................103, 105

*NRDC v. Train*,
 519 F.2d 287 (D.C. Cir. 1975) ................................................................36

*Oceana, Inc. v. Pritzker*,
 126 F. Supp. 3d 110 (D.D.C. 2015) ...........................................................42

*Orange Lake Assocs., Inc. v. Kirkpatrick*,
 21 F.3d 1214 (2d Cir. 1994) .................................................................129

*Padula v. Webster*,
 822 F.2d 97 (D.C. Cir. 1987) ................................................................101

*Patino v. City of Pasadena*,
 230 F. Supp. 3d 667 (S.D. Tex. 2017) .......................................................125

*Pearl River Union Free Sch. Dist. v. King*,
 214 F. Supp. 3d 241 (S.D.N.Y. 2016) ........................................................101

**Cases**                                                                **Page(s)**

*Personnel Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ..............................................................................130

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.,*
    No. 18-cv-5680 (NRB), 2018 WL 4168977 (S.D.N.Y. Aug. 30, 2018) .................107, 109

*Pleune v. Pierce,*
    765 F. Supp. 43 (E.D.N.Y. 1991) .........................................................101

*PLMRS Narrowband Corp. v. F.C.C.,*
    182 F.3d 995 (D.C. Cir. 1999) ................................................................85

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..............................................................................127

*Pollinator Stewardship Council v. EPA,*
    806 F.3d 520 (9th Cir. 2015) ......................................................104, 106

*Porrazzo v. Bumble Bee Foods, LLC,*
    822 F. Supp. 2d 406 (S.D.N.Y. 2011) ....................................................98

*Portland Audubon Soc'y v. Endangered Species Committee,*
    984 F.2d 1534 (9th Cir. 1993) .................................................................33

*Prometheus Radio Project v. FCC,*
    373 F.3d 372 (3d Cir. 2004) ...................................................................68

*Pub. Citizen, Inc. v. Mineta,*
    340 F.3d 39 (2d Cir. 2003) .....................................................................54

*Pub. Citizen v. Heckler,*
    653 F. Supp. 1229 (D.D.C. 1986) ..........................................................80

*Pub. Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989) ..........................................................................14, 17

*Ragin v. Harry Macklowe Real Est. Co.,*
    6 F.3d 898 (2d Cir. 1993) .....................................................................4, 5

*Ramos v. Nielsen,*
    No. 18-cv-1554, 2018 WL 4778285 (N.D. Cal. Oct. 3, 2018) ........49, 120, 122, 130

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ................................................................................81

*Remijas v. Neiman Marcus Group, LLC,*
    794 F.3d 688 (7th Cir. 2015) ..............................................................9, 11

**Cases**                                                                **Page(s)**

*Reyes v. City of Farmers Branch*,
   586 F.3d 1019 (5th Cir. 2009) .................................................................57

*Rioux v. City of Atlanta, Ga.*,
   520 F.3d 1269 (11th Cir. 2008) .............................................................120

*Rodriguez v. Harris Cty.*,
   964 F. Supp. 2d 686 (S.D. Tex. 2013) ....................................................12

*Rodriguez-Silva v. I.N.S.*,
   242 F.3d 243 (5th Cir. 2001) ...........................................128, 129, 130

*Romer v. Evans*,
   517 U.S. 620 (1996)........................................................125, 130, 131

*Romero v. City of Pomona*,
   665 F. Supp. 853 (C.D. Cal. 1987) .........................................................57

*Rosen v. Thornburgh*,
   928 F.2d 528 (2d Cir. 1991).................................................................109

*Ross v. AXA Equitable Life Ins. Co.*,
   115 F. Supp. 3d 424 (S.D.N.Y. 2015)......................................................12

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)......................................................................30

*Sackin v. TransPerfect Glob., Inc.*,
   278 F. Supp. 3d 739 (S.D.N.Y. 2017)..............................................9, 11

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016).....................................................................98

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) .................................................................39

*Secretary of Labor v. Cranesville Aggregate Cos.*,
   878 F.3d 25 (2d Cir. 2017)......................................................................99

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*,
   769 F.3d 1184 (D.C. Cir. 2014)..............................................................70

*Sierra Club v. Costle*,
   657 F.2d 298 (D.C. Cir. 1981)................................................................37

*Sierra Club v. Leavitt*,
   355 F. Supp. 2d 544 (D.D.C. 2005)........................................................98

**Cases**                                                                 **Page(s)**

*Soberal-Perez v. Heckler,*
    717 F.2d 36 (2d Cir. 1983)........................................................................125

*Sokaogon Chippewa Cmty. v. Babbitt,*
    961 F. Supp. 1276 (W.D. Wis. 1997) ..............................................43, 87

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016)..............................................................................2

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard,*
    85 F. Supp. 3d 197 (D.D.C. 2015) .........................................................68

*St. Mary's Honor Ctr. v. Hicks,*
    509 U.S. 502 (1993)...............................................................................119

*State of Connecticut v. U.S. Dep't of Commerce,*
    No. 3:04-cv-1271, 2007 WL 2349894 (D. Conn. Aug. 15, 2007)..........66

*State of Tex. v. Mosbacher,*
    783 F. Supp. 308 (S.D. Tex. 1992) ..................................................18, 24

*Stewart v. Azar,*
    313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................70

*Stratton v. Dep't for the Aging for City of New York,*
    132 F.3d 869 (2d Cir. 1997)...................................................................79

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)..................................................................................2

*Susan B. Anthony List v. Driehaus,*
    134 S. Ct. 2334 (2014)..............................................................................3

*Sztorc v. Prudential Ins. Co. of America,*
    No. 05-cv-0222, 2007 WL 521278 (W.D.N.Y. Feb. 12, 2007)...............34

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...............................................................107

*Thornburg v. Gingles,*
    478 U.S. 30 (1986)..................................................................................55

*Tovar v. U.S. Postal Serv.,*
    3 F.3d 1271 (9th Cir. 1993) .................................................................130

*Tummino v. Torti,*
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ......................................... passim

**Cases**                                                                    **Page(s)**

*Tummino v. von Eschenbach*,
    427 F. Supp. 2d 212 (E.D.N.Y. 2006) ........................................................... passim

*U.S. Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) .................................................................................18, 19, 40

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ................................................................................................2

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ..............................................................................41

*United States v. Duggan*,
    743 F.2d 59 (2d Cir. 1984) ................................................................................129

*United States v. Lue*,
    134 F.3d 79 (2d Cir. 1998) ................................................................................128

*United States v. Windsor*,
    570 U.S. 744 (2013) ...........................................................................................130

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d Cir. 1987) ............................................................................109

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) ...........................................................................35

*Utah v. Evans*,
    536 U.S. 452 (2002) .............................................................................................15

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .............................................................................113

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ....................................................................................109, 111

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984) .............................................................................37

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) .......................................................................47

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .................................................................................................17

*Wisconsin v. City of New York*,
    517 U.S. 1 (1996) ......................................................................................1, 15, 89

**Cases**                                                                    **Page(s)**

*Wong Yang Sung v. McGrath,*
    339 U.S. 33 (1950) ...................................................................................33

*Woods Petroleum Corp. v. U.S. Dep't of Interior,*
    18 F.3d 854 (10th Cir. 1994) ....................................................................74

*XP Vehicles, Inc. v. Dep't of Energy,*
    118 F. Supp. 3d 38 (D.D.C. 2015) ...........................................................74

**Constitutional Provisions**

U.S. Const. Amend. XIV § 2 ...........................................................1, 73, 125

U.S. Const. art. I, § 2, cl. 3.............................................................1, 73, 125

**Federal Statutes and Congressional Authorities**

Pub. L. No. 94-521, 90 Stat. 2459 (1976) ...............................................88, 93

Pub. L. No. 105-119, 111 Stat. 2440 (1997) .................................................1

5 U.S.C.
    § 553..........................................................................................................42
    § 554..........................................................................................................42
    § 706................................................................................................ passim

13 U.S.C.
    § 4..............................................................................................................1
    § 6.......................................................................................................93, 94
    § 9.............................................................................................12, 13, 63
    § 141.......................................................................................16, 87, 88

42 U.S.C. § 7607 .........................................................................................102

44 U.S.C.
    § 3501........................................................................................................96
    § 3504........................................................................................................96

H. Rep. No. 94-944 (1976) ......................................................................88, 93

S. Rep. No. 94-1256 (1976) .....................................................................88, 93

**Rules**

Fed. R. Evid. 201 .........................................................................................14

**Miscellaneous Authorities**                                          **Page(s)**

Administrative Conference of the United States Recommendation 2013-4: The
    Administrative Record in Informal Rulemaking, 78 Fed. Reg. 41,352 .................................34

*Administrative Records Offset Declining Census Survey Responses: Survey*
    *Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at
    https://census.gov/library/stories/2018/11/administrative-records-offset-
    declining-census-survey-response.html .................................................................................95

*ICE Out of Courts*, Immigrant Defense Project ............................................................14

John Burnett, *Border Patrol Arrests Parents While Infant Awaits Serious*
    *Operation*, NPR (Sept. 20, 2017) ...................................................................................14

*Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the*
    *Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil*
    *Serv.*, 94th Cong. 25 (1976) ...........................................................................................88

National Commission on the Voting Rights Act, Protecting Minority Voters: The
    Voting Rights Act at Work, 1982-2005, https://lawyerscommittee.org/wp-
    content/uploads/2015/07/0023.pdf (2006) .....................................................................57

Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—*
    *Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006) ...........................97

Ray Sanchez, *ICE arrests undocumented father taking daughter to California*
    *school*, CNN (Mar. 3, 2017) ........................................................................................14

Richard McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings,*
    *Discovery, and Additional Factfinding During Judicial Review of Informal*
    *Agency Action*, 1982, Duke L. J. 333, 348-50 (1982) ..........................................34, 39

# PROPOSED CONCLUSIONS OF LAW

**I.      The obligation to conduct a decennial census.**

1.      The Constitution requires an "actual Enumeration" of the population every ten years to count "the whole number of persons in each State." U.S. Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.

2.      All residents must be counted, regardless of citizenship status. *See Fed'n for Am. Immigration Reform v. Klutznick* ("*FAIR*"), 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

3.      The "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs." Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

4.      The enumeration affects the apportionment of Representatives to Congress among the States, the allocation of electors to the Electoral College, and the division of congressional, state, and local electoral districts. *See* U.S. Const. art. I, § 2, cl. 3; *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).

5.      Congress has assigned its duty to conduct the enumeration to the Secretary of Commerce and Census Bureau. 13 U.S.C. § 4.

6.      Their obligation is to obtain a total-population count that is "as accurate as possible, consistent with the Constitution" and the law. Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481; *see Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (decisions must bear "a reasonable relationship to the accomplishment of an actual enumeration of the population").

**II.   Plaintiffs have standing to challenge Defendants' decision to demand citizenship information through the 2020 decennial census.**

7.      To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

8.      The standing inquiry is satisfied so long as a single plaintiff establishes standing, including in a consolidated case.  *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 90-91 (D.D.C. 2018) (consolidated case).

9.      Organizations can establish standing in their own right, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), or "associational standing" on behalf of their members. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

10.      An organization has associational standing to sue if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006).  The third prong is a prudential requirement only.  *See United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996).

11.      Where, as here, a plaintiff "seeks civil penalties and injunctive relief only, not money damages, its claims do not require 'individualized proof.'"  *Bldg. & Constr. Trades Council*, 448 F.3d at 150.  Moreover, even the participation "of a limited number of individual

2

members" will not negate standing if the claims and relief do not "make the individual participation of each injured party indispensable to proper resolution of the cause." *N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 130–31 (2d Cir. 2015) (citation and internal quotation marks omitted).

12.     The NGO Plaintiffs and the Governmental Plaintiffs both have standing in this case because they have suffered several different types of injuries-in-fact that are fairly traceable to Defendants' decision to add a citizenship question to the census, and these injuries will redressed if Defendants' decision is vacated or enjoined.

**A.      This Court may consider all of the evidence at trial, including extra-record evidence, to evaluate Plaintiffs' standing.**

13.     Defendants concede that the Court can consider evidence outside the Administrative Record to evaluate standing in this case.  Trial Tr. 1421–22.

14.     Courts adjudicating APA challenges can and do consider extra-record evidence for standing purposes.  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167-68 (because "each element of Article III standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation,'" a plaintiff "must ultimately support any contested facts with evidence adduced at trial") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Am. Littoral Soc'y v. U.S. Envtl. Prot. Agency Region*, 199 F. Supp. 2d 217, 228 & n.3 (D. N.J. 2002) (considering plaintiffs' extra-record evidence in support of standing in an APA case because "they go to the issue of the Court's jurisdiction").

**B.      The evidence shows that Plaintiffs have suffered and will suffer concrete injuries-in-fact.**

15.     Allegations of a "future injury" qualify "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."  *Susan B. Anthony List v.*

*Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

16.     The injury-in-fact required to establish standing "need not be large, an identifiable trifle will suffice." *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (quoting *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 557 (5th Cir. 1996)); *see also N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 326 (2d Cir. 2003); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (holding that *Havens* required only a "perceptible impairment" of an organization's mission to create standing).

17.     The possibility that Defendants may take undefined future steps (some of which are hypothetical, not planned) to try to mitigate harms caused by the addition of a citizenship question, *see* Trial Tr. 1424-25, does not undermine the showing of injury-in-fact described in Parts II.B.1 to II.B.5 below.  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331-32 (1999) (concluding that plaintiffs established injury-in-fact based on expected effects of the use of sampling in the 2000 census because "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issue presented here, because such a pause would result in extreme – possibly irremediable – hardship"); *see also* Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481 ("Congress finds that . . . the decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted.").

18.     The evidence establishes that Plaintiffs will be injured in numerous different and independent ways from the addition of a citizenship question to the census, including through:

(1) diversion of resources; (2) loss of privacy; (3) harms to data accuracy and quality; (4) diminished political representation; and (5) reductions in federal funding.

### 1.   Injuries from the diversion of resources.

#### a.   Organizational injuries to NGO Plaintiffs.

19.    The Supreme Court and the Second Circuit have both recently affirmed that "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Comunidad Hispana*, 868 F.3d at 111 (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017), and *Havens*, 455 U.S. at 379).

20.    To demonstrate such an injury, a plaintiff need only show a "'perceptible impairment' of an organization's activities." *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (quoting *Ragin*, 6 F.3d at 905).  In *Nnebe*, the Second Circuit held that a taxi driver advocacy group had a sufficient injury for organizational standing "[e]ven if only a few suspended drivers are counseled by [the group] in a year" as a result of the challenged policy, because there was "some perceptible opportunity cost expended." *Id*. at 156–57.

21.    A "nonprofit organization establishes an injury-in-fact if . . . it establishes that it 'spent money to combat' activity that harms its organization's core activities." *City of Miami*, 137 S. Ct. at 1303 (citing *Havens*, 455 U.S. at 379).

22.    The NGO Plaintiffs have standing because they have diverted "resources that could be spent on other activities," and the addition of a citizenship question harms their organizational missions.  *Nnebe*, 644 F.3d at 157; *see also Comunidad Hispana*, 868 F.3d at 111 (organizational standing is established when resources are diverted); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012) (Second Circuit requires only "'scant' evidence of 'only a perceptible impairment of an organization's activities'").

23.     Plaintiffs presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, NGO Plaintiffs will expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.  This evidence is uncontroverted by Defendants.

24.     Each NGO Plaintiff – the New York Immigration Coalition ("NYIC"), Make the Road New York ("MRNY"), the American-Arab Anti-Discrimination Committee ("ADC") and the ADC Research Institute ("ADCRI"), and CASA de Maryland ("CASA") – has suffered harm as a result of being required to divert resources from other organizational priorities and spend more money to address the effects of the fear created by a citizenship question among community members who are less likely to respond to the census.  *See* Plum Aff. (Docket No. 498-19) ¶¶ 12-23; Choi Aff. (Docket No. 489-1) ¶¶ 14-22; Altschuler Aff. (Docket No. 503-1) ¶¶ 7-11, 21; Khalaf Aff. (Docket No. 498-16) ¶¶ 15-29; Escobar Aff. (Docket No. 498-3) ¶¶ 15-29.

25.     The NGO Plaintiffs have also established that their organizational missions – all of which include promoting engagement in and representation of immigrant communities of color – will be impaired as a result of a citizenship question.  *See* Plum Aff. ¶¶ 10-13,23; Choi Aff. ¶¶ 3-9, 14-15; Altschuler Aff. ¶¶ 3,11-22; Khalaf Aff. ¶¶ 13-16; Escobar Aff. ¶¶ 15, 20-25.

26.     The trial record establishes that Plaintiff NYIC has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.1.  For example, NYIC demonstrated that because of the heightened fear and suspicion created by the addition of a citizenship question, they have expanded plans for census-related services, programming, and support to try

to reduce the negative effect of this question on the response rate among noncitizens.  Choi Aff.

¶¶ 17-22; Plum Aff. ¶ 14.  Because of these increased expenditures and time commitments,

NYIC has shown it will need to divert resources from other mission-critical areas, including

health care, language access, and employment issues.  Plum Aff. ¶ 23.

27.     The trial record establishes that Plaintiff MRNY has suffered harm and will

continue to suffer harm as a result of being required to divert resources to address the effects of

adding a citizenship question to the census.  PFOF § X.A.2.  For example,

    a.   MRNY demonstrated that because of the heightened fear and suspicion created

         by the citizenship question, they have expanded plans for census-related services,

         programming, and support to try to reduce the negative effect of this question on

         the response rate among noncitizens.  Altschuler Aff. ¶¶ 13, 19.

    b.   At least six MRNY members expressed unwillingness or reluctance to respond to

         the 2020 census because of the citizenship question.  *Id.* ¶¶ 14-17.

    c.   Because of the need to increase the time and money spent on Census outreach due

         to the addition of a citizenship question, MRNY has diverted and will continue to

         divert resources from other areas critical to its mission including civic

         engagement and providing legal services.  *Id.* ¶ 21.

28.     The trial record establishes that Plaintiffs ADC and ADCRI have suffered harm

and will continue to suffer harm as a result of being required to divert resources to address the

effects of adding a citizenship question to the census.  PFOF § X.A.3.  For example,

    a.   ADC and ADCRI demonstrated that because of the heightened fear and suspicion

         created by the citizenship question, they have expanded plans for census-related

         services, programming, and support to try to reduce the negative effect of this

question on the response rate in the Arab-American community.  Khalaf Aff. ¶¶ 23-28.

      b.   Because of these increased expenditures and time commitments, ADC and ADCRI have shown they will need to divert resources from other mission-critical priorities including organizing, issue advocacy efforts, and educational initiatives. *Id.* ¶ 29.

29.     The trial record establishes that Plaintiff CASA has suffered harm and will continue to suffer harm as a result of being required to divert resources to address the effects of adding a citizenship question to the census.  PFOF § X.A.4.  For example, CASA has conducted additional outreach because of the tremendous level of fear and greater unwillingness of its constituents to respond to the census due to the citizenship question in the context of other policies from the Trump Administration targeting them.  Escobar Aff. ¶¶ 16-27.

        **b.**      **The Governmental Plaintiffs are injured through the expenditure of resources necessary to mitigate the substantial risk of harm.**

30.     The Governmental Plaintiffs similarly presented evidence that to counteract the anticipated decline in self-response rates caused by the addition of a citizenship question, they have expended and will continue to expend additional resources, including increasing their census program budgets and devoting additional person-power for census outreach, at the expense of other priorities.

31.     These expenditures constitute a direct injury to the budgets and resources of the Governmental Plaintiffs that is sufficient to establish injury-in-fact for standing purposes.  *See, e.g.*, *Clapper*, 568 U.S. at 414 n.5 (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 746-47 (S.D.N.Y. 2017) (where harm is sufficiently imminent, "a plaintiff's expenses in

taking reasonable measures to prevent the harm's fruition also may be viewed as an injury-in-fact"); *see also Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015).

32.    The Governmental Plaintiffs have demonstrated that they have expended or will expend additional resources to mitigate the adverse effects of the citizenship question on response rates.  This evidence – all of which is uncontroverted by Defendants – establishes that several of the Governmental Plaintiffs have or intend to devote substantial resources and personnel to respond to the impacts of the citizenship question. PFOF § X.B.

33.    For example, in stark contrast to past decennial censuses, New York City has dramatically expanded its efforts to encourage its residents to participate in the 2020 census.  Trial Tr. 317-21.  Dr. Salvo – who serves as the Director of the Population Division at the New York City Department of City Planning – testified that because of reluctance in some communities to fill out the census because of the citizenship question, the City has taken concrete steps to encourage participation.  Trial Tr. 319, 430.  These efforts include the creation of a specially-designated census office, including at least fifteen staff members, who will help to encourage participation in the census.  *Id.*  These outreach efforts, and concomitant expenditures of time and resources, substantially exceed those of past censuses.  *Id.*; *see also id.* at 359-61, 430-31.

34.    Plaintiffs offered undisputed evidence that after Defendants announced their plans to add a citizenship question to the 2020 census, and in response to that decision, New York City increased its budget for census outreach efforts by approximately $1.2 million dollars.  Trial Tr. 427, 429.

35.    Likewise, because of the citizenship question, the City of Chicago anticipates the need to allocate additional resources and staff to encourage Chicagoans to participate in the 2020

census.  Rodriguez Aff. (Docket No. 488-1) ¶¶ 7, 10, 12, 13.  A recently-introduced City Council resolution specifically designates funds for specialized outreach to immigrant communities in light of the citizenship question.  *See id.* ¶ 12; Garcia Aff. (Docket No. 498-9) ¶¶ 14-15 (discussing efforts to allocate additional resources to countermand the impact of the citizenship question on immigrant communities); PX-243 (Cook County resolution to "Establish an Emergency Fund to Address the Citizenship Question in the 2020 Census"); PX-246 (Chicago City Council resolution to establish a $500,000 "emergency fund to address citizenship question in 2020 census" in order to "conduct specialized outreach to immigrant communities in the City of Chicago").

36.     In light of the Census Bureau's own recognition that the addition of a citizenship question will depress self-response rates among Hispanic and immigrant communities, the Governmental Plaintiffs reasonably seek to mitigate the anticipated harm stemming from those depressed response rates.  Such expenditures constitute direct, significant, and concrete injury to the Governmental Plaintiffs.

37.     There is no dispute that, as Dr. Abowd testified, the current macro environment has created "significant barriers associated with self-response that may plausibly and credibly be related to the citizenship question."  Trial Tr. 1123; *see also* PX-158 (AR); PX-160; PX-161; PX-162; PX-448; PX-662.  These barriers make outreach more difficult for both the NGO Plaintiffs and the Governmental Plaintiffs, requiring Plaintiffs to spend their own money and resources to address the negative effects of the citizenship question.  Census Bureau 30(b)(6) Dep. (Docket No. 502-2) at 453, 462; Trial Tr. 1122.

38.     Because Plaintiffs have diverted resources from other priorities and spent their own money to counteract the expected decline in self-response caused by addition of a

citizenship question, they have demonstrated sufficient injury-in-fact to establish standing. *E.g.*, *Remijas*, 794 F.3d at 694; *Sackin*, 278 F. Supp. 3d at 746-47.

## 2. Loss of privacy.

39.     Defendants' sole justification for adding a citizenship question – to provide DOJ with census block data about citizenship of residents – also injures NGO Plaintiffs' members by invading their right to privacy.

40.     "[A]esthetic, emotional or psychological harms . . . suffice for standing purposes." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006); *see also Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 184-85 (2d Cir. 2001).

41.     To satisfy the injury-in-fact requirement for standing purposes, Plaintiffs must establish that the emotional or psychological harm is significant enough to constitute injury, and is more than mere "personal sense of embarrassment." *Friedman v. U.S. Postal Serv.*, No. 08-cv-00913, 2011 WL 3267713, at *5 (D. Conn. July 28, 2011).

42.     The threatened harm must be "sufficiently real and immediate to show an existing controversy," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), though Plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about," *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting Clapper, 568 U.S. at 414 n.5).

43.     Both the likelihood of and widespread concern regarding privacy violations from disclosure of immigration status caused by including a citizenship question on the census are sufficient to show injury-in-fact.

44.     Federal law provides that Defendants must maintain the confidentiality of responses to the Census questionnaire. *See* 13 U.S.C. § 9(a)(2) ("Neither the [Commerce] Secretary, nor any other officer or employee of the Department of Commerce or bureau or

agency thereof," may "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified.").

45.     "Both the history of the Census Act and the broad language of the confidentiality provisions of § 9 make abundantly clear that Congress intended both a rigid immunity from publication or discovery and a liberal construction of that immunity that would assure confidentiality." *Carey v. Klutznick*, 653 F.2d 732, 739 (2d Cir. 1981) (quoting *McNichols v. Klutznick*, 644 F.2d 844, 845 (10th Cir. 1981)).

46.     But the federal government's intention to publish CVAP data on a block-level basis will result in the disclosure of at least some individuals' responses to the citizenship question, and presents a high risk of disclosure for many others.

47.     Census blocks often consist of only a few households, and some contain only a single individual.  Publication of granular CVAP data will necessarily disclose the citizenship status of some individuals, violating the confidentiality of their census responses.  13 U.S.C. § 9(a)(2).

48.     The Census Bureau admits that it has not yet developed any methodology or plan for how such granular data can be published without disclosure, and as such its assertion that it does not intend to publish actual individual responses does not mitigate the risk of violating the confidentiality requirement. *See Carey*, 653 F.2d at 738-39 (holding that it was error to compel discovery of address registers, even though individual names would be redacted, because the § 9(a)(2) requirement is that no identifying information be made public).

49.     Moreover, there is a genuine increased threat of disclosure, which the general public is aware of.  PFOF § X.E ¶¶ 1724-1727.  As Dr. Hillygus explained, the addition of a citizenship question creates a real increased risk of disclosure.  Trial Tr. 136 ("You have policies

that can change and you can have mistakes happen where data are accidentally released. . . . [T]here is no doubt that you have increased . . . the harm associated with accidental or deliberate disclosure with a citizenship question."). There is an actual increase in the probability of disclosure because census data will now have more information about individual households. *Id.* at 137-38.

50. For members of the NGO Plaintiffs, being compelled to answer questions as to the citizenship status of every member of their household – deeply personal information – is extremely invasive when combined with Defendants' goal of providing this information to DOJ at the census block level.

51. In addition, the door-to-door collection of citizenship information will result in increased fear and emotional stress among members of immigrant communities, and raises the specter that the release of such granular data could be used for immigration enforcement.

52. For members of NGO Plaintiffs who are undocumented immigrants and noncitizens with legal status, the publication of CVAP data presents a grave threat that such publicly-available information could be used for immigration enforcement against known noncitizens or targeting areas with high levels of noncitizens.

53. The Census Bureau's own qualitative research records this widespread concern. *E.g.*, PX-662 at 17, 21, 29, 31, 34-36, 43.

54. These fears are warranted because this Administration has used other publicly available information to target noncitizens. For example, using public data, U.S. Immigration and Customs Enforcement (ICE) has targeted noncitizen communities for enforcement action, which has resulted in both a 1,200% increase in ICE arrests and attempted arrests in New York State generally and at courthouses in New York between 2016 and 2017, as well as swaths of

enforcement actions at sensitive public locations such as schools, hospitals, and churches.  *See,*

*e.g.*, *ICE Out of Courts*, Immigrant Defense Project; *see also* Ray Sanchez, *ICE arrests*

*undocumented father taking daughter to California school*, CNN (Mar. 3, 2017); John Burnett,

*Border Patrol Arrests Parents While Infant Awaits Serious Operation*, NPR (Sept. 20, 2017).[1]

55. The fear that immigration enforcement will use all available information to target

noncitizens is real, as documented in the Census Bureau's own research, *see* PX-662; and

demonstrates sufficient injury-in-fact for NGO Plaintiffs to establish standing.  *See, e.g.*,

*Friedman*, 2011 WL 3267713, at *5.

### 3. Injuries from degradation of data quality.

56. Plaintiffs have also proved injury-in-fact because adding a citizenship question

will admittedly harm the quality of the count.   *See* PFOF § X.D.

57. Where a defendant has a duty to provide accurate information, failure to so

provide creates an injury-in-fact sufficient to confer standing.  *See, e.g.*, *Pub. Citizen v. U.S.*

*Dep't of Justice*, 491 U.S. 440, 449-51 (1989) (plaintiff had standing to sue under the Federal

Advisory Committee Act for failure to make publicly available reports and minutes of American

Bar Association meetings relating to prospective judicial nominees); *see also FEC v. Akins*, 524

U.S. 11, 20-21 (1998) (plaintiff voters had standing to sue the Federal Election Commission on

the ground that the statute in question gave plaintiffs a right to the information being withheld by

the FEC); *see also Ctr. for Food Safety v. Price*, No. 17-cv-3833 (VSB), 2018 WL 4356730, at

*5 (S.D.N.Y. Sept. 12, 2018) (informational injury satisfies the injury-in-fact requirement of

standing where a statutory provision has explicitly created a right to information).

---

[1] The Court may take judicial notice of facts "generally known within the trial court's territorial jurisdiction,"
including recent increases in ICE immigration enforcement activities at sensitive locations in New York.  Fed. R.
Evid. 201(b)(1).

58.     An injury sufficient to create standing is created not only by a total deprivation of information to which plaintiffs have a statutory right, but also by the deprivation of accurate or truthful information.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (holding that because the Fair Housing Act created a statutory right to truthful information concerning the availability of housing, "testers" who were misinformed had standing to sue without demonstrating any further injury).

59.     Here, Defendants are constitutionally required to provide accurate information, and Plaintiffs have a statutory right to the provision of those results.  *See Utah v. Evans*, 536 U.S. 452, 478 (2002) (explaining Framers' "strong constitutional interest in accuracy"); *Wisconsin v. City of N.Y.*, 517 U.S. 1, 20 (1996) (the conduct of the census must bear a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, obtaining an accurate count of the population in each state); 13 U.S.C. § 141(c); *see also* Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481 ("Congress finds that . . . [i]t is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States." ).

60.     As Dr. Salvo testified, increased reliance on methods of enumeration other than self-response compromises the quality and accuracy of census data in terms of its ability to describe demographic subgroups by, for example, age or ethnicity; and this loss of accuracy constitutes an injury to Plaintiffs who make use of that data.  Trial Tr. 289, 302-04 (Salvo).

61.     The decision to add a citizenship question, and its concomitant harm to data quality, injures Plaintiffs in concrete ways.  PFOF § X.D.  For example, Dr. Salvo testified that New York City will be injured if the 2020 census is of lessened accuracy overall, regardless of whether the City is subject to a net undercount.   Trial Tr. 289, 302-04.

62.     As Dr. Salvo explained, the New York City Department of Education relies on demographic data from the census to draw school zone boundaries, and inaccurate information about groups such as children under six or children of school age compromises that process.  *Id.* at 305.  Similarly, the Department of Education relies on information about neighborhood composition by race, and inaccurate information can cause problems there as well.  *Id.* at 305-06.

63.     Similarly, the New York City Department of Health recognizes that certain populations are particularly at risk for some diseases; accordingly, the Department of Health requires accurate information about the population of particular demographic groups to calculate vital rates such as disease prevalence within particular groups.  *Id.* at 307-08.  This information is used to make decisions about where to deploy Health Department resources, and inaccurate census information – for example, as a result of inaccuracies in the 2010 census – has caused serious problems for the Health Department in the past.  *Id.* at 308.

64.     Where high imputation rates are concentrated in a particular neighborhood, those differential imputation rates diminish the accuracy of census information about demographic subgroups in that neighborhood, and render the count less useful to city agencies such as the Health Department.  *Id.* at 394-95.  Likewise, the combination of overcounts in some neighborhoods and net undercounts in others can lead to errors in measuring neighborhood populations, which leads to misallocation of resources.  *Id.* at 416-17.

65.     The Governmental Plaintiffs have a strong interest in ensuring that they allocate resources properly throughout their jurisdictions.  The degradation of data quality caused by the citizenship question will impinge on those vital interests.

66.     In addition, Plaintiffs have a strong interest in accurate data for drawing election districts.  The Governmental Plaintiffs are required to rely on decennial census counts as the

population base for periodically redrawing their state and local districts to be "as nearly of equal population as is practicable." *Karcher v. Daggett*, 462 U.S. 725, 782 n.14 (1983); *see also Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).

67.     For example, trial testimony confirms that Virginia requires accurate data from the decennial census for drawing congressional and state legislative election districts.  Lucyk Aff. (Docket No. 506-1), at ¶¶ 5-6.  The trial record includes evidence that New York relies on census data for the same purposes.  Breitbart Aff. (Docket No. 504-1), at ¶ 4.

68.     The addition of a citizenship question will force these states to redistrict using population counts that will be fundamentally inaccurate, harming their sovereign interests in ensuring that their representative governments fairly and accurately reflect the number of people who live in each district.

69.     Defendants' decision to add a citizenship question, and the resulting impairment of data quality, harms Plaintiffs' interests in accurate information and is sufficient to establish injury-in-fact.  *Havens Realty*, 455 U.S. at 373-74; *see also FEC*, 524 U.S. at 20-21; *Pub. Citizen*, 491 U.S. at 449-51; *Ctr. for Food Safety*, 2018 WL 4356730, at *5.

### 4.     Injuries from diminished political representation.

70.     Plaintiffs will likely lose political power as a result of their communities being undercounted, or inaccurately counted, in the 2020 census.  These harms will directly injure the Governmental Plaintiffs and the NGO Plaintiffs' members who reside in those jurisdictions, on whose behalf the NGO Plaintiffs may assert associational standing.  *See Bloomberg*, 290 F.R.D. at 415 (an organization can establish "standing solely as a representative of its members.").

71.     The likely loss of political power as a result of a plaintiff's community being undercounted in the decennial census constitutes a "concrete," "actual or imminent" injury that is

"not 'conjectural' or 'hypothetical.'"  *Dep't of Commerce*, 525 U.S. at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

72.    This is true for both effects on interstate apportionment (the allocation of Congressional seats among the states) and intrastate districting (the drawing of lines for election districts for state and local legislative bodies).  *See id.*; *see also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980); *Glavin v. Clinton*, 19 F. Supp. 2d 543, 549 (E.D. Va. 1998) (three-judge court), *aff'd sub nom. Dep't of Commerce*, 525 U.S. 316 (1999); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313 (S.D. Tex. 1992); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989).

73.    It is well-established that where changes to the decennial census will likely result in a loss of congressional representation, plaintiffs have standing.  In *Department of Commerce*, the Supreme Court evaluated whether individual plaintiffs would be injured if the Census Bureau adopted sampling rather than person-by-person enumeration for the decennial census; the Court concluded, based on expert testimony, that Indiana would likely lose a seat, and the Indiana resident plaintiff was injured because with "one fewer Representative, Indiana residents' votes will be diluted."  *Dep't of Commerce*, 525 U.S. at 330-32; *see also Carey*, 637 F.2d at 838 (holding that individual New York residents "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in loss of representation in Congress").

74.    Changes to the census that will result in intrastate harms, such as dilution of voting power *within* a state, also confer standing.  The *Department of Commerce* Court held that because particular localities used decennial census population numbers for their state legislative redistricting, residents of those localities could "suffer vote dilution in state and local elections as

a result" of the Census Bureau's proposed sampling plan.  *Dep't of Commerce*, 525 U.S. at 332-33.  Accordingly, those residents had grounds to challenge the plan based in intra-state redistricting harms.  *Id*.

75.     Moreover, the NGO plaintiffs have associational standing on behalf of their members to seek redress for these injuries-in-fact for multiple reasons.  First, the NGO plaintiffs have members living in affected areas.  Second, each of the NGO Plaintiffs works to facilitate civic engagement and enhance the political representation of the very communities whose representation will be diluted by an undercount resulting from the inclusion of the citizenship question.  Third, the NGO Plaintiffs easily can pursue this action without much individual participation of members.  *See Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 771 (D. Md. 2018) (finding Plaintiff CASA a "prototypical example[] of possessing associational standing"); *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 282 n.12 (E.D.N.Y. 2018) (holding Plaintiff MRNY had associational standing).

        a.     **The addition of a citizenship question will result in a differential undercount.**

76.     The record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount.  PFOF §§ VII, VIII.  As detailed below, this undercount will cause several states to lose congressional representation and will cause many of the local government plaintiffs to suffer intrastate vote dilution harms.

77.     Plaintiffs' injuries are actual and imminent, not conjectural and speculative. As the Supreme Court held in *Department of Commerce*, because Defendants have set the policy that will harm Plaintiffs, "it is certainly not necessary for this Court to wait until the census has been conducted to consider the issues presented here, because such a pause would result in extreme – possibly irremediable – hardship."  525 U.S. at 332.

78.     Although Defendants contend that the Census Bureau's non-response follow up (NRFU) efforts may mitigate the undercount, NRFU has never prevented an undercount of hard-to-count populations in the past.  PFOF § VIII.E ¶¶ 1101-06.  And the trial record demonstrates that adding a citizenship question to the census will likely cause a net differential undercount in the 2020 census.  PFOF § VII-VIII.

79.     Moreover, the near-unanimous evidence establishes that NRFU will be even less effective in 2020 due to a citizenship question and the current political environment.  PFOF §§ VII.F; VIII.A – VIII.E.

80.     The evidence reflects that the addition of a citizenship question will significantly reduce the self-response rate and increase the NRFU workload for certain subpopulations, and will increase the net differential undercount among those populations.  PFOF §§ VII-VIII.

81.     The overwhelming weight of the evidence, including testimony, scientific literature, and Census Bureau analyses, supports the finding that the NRFU operations will not prevent the differential net undercount of individuals of non-citizen households and Hispanics caused by the decrease in the self-response resulting from the inclusion of a citizenship question.  PFOF § VIII.A-E.

82.     To the contrary, the evidence reflects that the citizenship question will cause an undercount of individuals in households with at least one non-citizen of at least 5.8%, even after NRFU and imputation.  PFOF § VIII.E.6.

83.     As a result, many of the Governmental Plaintiffs and, as in *Dep't of Commerce*, various states and localities in which the NGO Plaintiffs' members reside, will lose political power as a result of the inclusion of a citizenship question on the census.  PFOF § X.C.1.

     **b.**     **Plaintiffs will lose political power as a result of the differential undercount.**

84.     As detailed below, because of the differential undercount stemming from the addition of a citizenship question, Plaintiffs will suffer both inter- and intra-state losses of political power.

     **(1)**     **Interstate apportionment harms.**

85.     Defendants' decision to add a citizenship question on the census will cause several Plaintiffs to lose congressional representation.

86.     *California.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause California to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

87.     Plaintiff ADC has members residing in California, and all of the members of ADC who reside in California will lose political power as a result of this loss of a Congressional seat.  *Id.*

88.     Additionally, Governmental Plaintiffs City and County of San Francisco and County of Monterey and all the residents of these jurisdictions will also lose political power if California loses a Congressional seat.  *Id.*

89.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in California and the ADC members who reside in California.  *Id.*

90.     *Texas.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Texas to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

91.     Plaintiff ADC has members residing in Texas, and all of the members of ADC who reside in Texas will lose political power as a result of this loss of a Congressional seat.  *Id.*

92.     Additionally, Governmental Plaintiffs Cameron County, Texas; El Paso County, Texas; and Hidalgo County, Texas, and all the residents of these jurisdictions will also lose political power if Texas loses a Congressional seat.  *Id.*

93.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Texas and the ADC members who reside in Texas.  *Id.*

94.     *Florida.*  Based on the evidence, including expert testimony, the addition of a citizenship question will cause Florida to lose a congressional seat that it would not have otherwise lost.  PFOF § X.C.1.

95.     Plaintiff ADC has members residing in Florida, and all of the members of ADC who reside in Florida will lose political power as a result of this loss of a Congressional seat.  PFOF § IV.A.

96.     This loss of political power (the loss of a seat in Congress) will injure the Plaintiffs in Florida and the ADC members who reside in Florida.  *Id.*

**(2)     Intra-state dilution of political power.**

97.     Based on the evidence, including expert testimony, the addition of a citizenship question will lower both the population counts and the relative population share within their states for each of the county and city Plaintiffs: the cities of Central Falls, Chicago, Columbus, New York, Philadelphia, Phoenix, Pittsburgh, Providence, and Seattle; and counties of Cameron, El Paso, Hidalgo, and Monterey.  PFOF § X.C.1.

98.     Additionally, based on the evidence, including expert testimony, the addition of a citizenship question to the census will lower the population counts and relative population of Los Angeles, Miami, and Prince George's County, Maryland.  *Id.*

99.     Plaintiff ADC has members residing in Phoenix, Arizona; Miami, Florida; New York City; Prince George's County, Maryland; and Chicago, Illinois.  PFOF § X.C.2.a.  Plaintiff

MRNY has members residing in New York City. *Id.* Plaintiff CASA has members who reside in Prince George's County. *Id.*

100.     The addition of a citizenship question will therefore lead to the dilution of the voting power of these jurisdictions and the individuals who reside in them, and this loss of political power will cause injury to these locations and the individuals who reside in them. PFOF § X.C.1. *See, e.g.*, *Carey*, 637 F.2d at 838.

### 5.     Reductions in federal funding.

101.     Plaintiffs have also established injury-in-fact based on the harmful effect the citizenship question will have on federal funds that they (or the jurisdictions in which their members reside) receive.

102.     In *Carey*, the Second Circuit held that New York State and New York City had standing to challenge the conduct of the 1980 census because they "made a showing . . . that Census Bureau actions in New York State have caused a disproportionate undercount which will result in . . . decreased federal funds flowing to their city and state." *Carey*, 637 F.2d at 838.

103.     Other courts have followed *Carey*. *See, e.g.*, *Glavin*, 19 F. Supp. 2d at 550; *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980) (injury-in-fact existed for standing purposes even if "none of the named plaintiffs personally receives a dollar of state or federal aid, [because] all enjoy the benefits yielded when the City is enabled to improve quality of life through the receipt of this money"); *Mosbacher*, 783 F. Supp. at 313-14 (even though the "Census Bureau and the Department of Commerce are not in charge of distribution of federal funds," their "actions significantly affect the distribution of funds"); *see also City of Detroit v. Franklin*, 4 F.3d 1367, 1375 (6th Cir. 1993) (finding standing where plaintiffs claimed that "the census undercount will result in a loss of federal funds" to their city); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 554 (S.D. Ga. 1983) (same).

104.     Both the NGO Plaintiffs and Governmental Plaintiffs will suffer financial harm

from the addition of a citizenship question.  Even a small citizenship-question-induced disparate

undercount of noncitizen households or Hispanics will cause jurisdictions with a greater-than-

average share of noncitizen or Hispanic residents to lose funding under several dozen federal

financial assistance programs that rely on geographic distribution criteria.  PFOF § X.C.2;

Reamer Aff. (Docket No. 508-1) ¶¶ 16-19.  In addition, this differential undercount will injure

the Governmental Plaintiffs by preventing the equitable distribution of federal funds to localities.

### a.     The citizenship question will cause Plaintiffs to directly lose federal funding.

105.     Because Census data influence a large number of federal financial assistance

programs, a differential census undercount involving noncitizens, the foreign-born, or Hispanics

will lead to measurable fiscal losses for states with population percentages of these subgroups

that are above the nationwide average, harming both the Governmental Plaintiffs and members

of NGO Plaintiffs in those states.  *Id.*

106.     A significant portion of federal domestic financial assistance is distributed on the

basis of statistics derived from the decennial census, including at least 320 federal domestic

assistance programs that use census-derived data and distributed about $900 billion in Fiscal

Year 2016.  PFOF § X.C.2.

107.     There is a strong, direct relationship between the accuracy of the decennial census

and the reliability of these datasets and surveys; decennial census data is an essential ingredient

of accurate and reliable funding allocations.  PFOF § X.C.2 ¶ 1608.

108.     Dr. Reamer identified nearly two dozen financial assistance programs, including

state-share programs and Federal Medical Assistance Percentage (FMAP) programs, with

funding formulas that allocate federal funds geographically in a manner dependent in part or in

whole on decennial census results.  *Id.*  As described in the PFOF, *see* § X.C.2, even a small differential undercount stemming from the citizenship question will cause Plaintiffs (or the jurisdictions in which NGO Plaintiffs' members reside) to lose federal funding.

109.    Using five of these programs as examples, Dr. Reamer performed calculations using a series of seven undercount scenarios that he applied to 2020 population projections. PFOF § X.C.2 ¶ 1609.

110.    Dr. Reamer's analysis reflects that while the magnitude of the impact varies across states depending on the nature of the undercount, numerous states and localities will be negatively impacted if a citizenship question causes even a minimal undercount of non-citizen households relative to the population as a whole.[2]  PFOF § X.C.2 ¶ 1610.

### b.    The Governmental Plaintiffs will suffer financial harms arising from the addition of a citizenship question.

111.    Dr. Reamer's analysis establishes that a differential undercount will cause many of the Governmental Plaintiffs to suffer harm due to the direct loss of funding from census-related federal programs.  PFOF § X.C.2.b.

112.    For example, Plaintiffs New York and New Jersey are home to large non-citizen, Hispanic, and foreign-born populations.  As a result, even minimal undercounting resulting from a citizenship question is likely to impact these states relative to others; as Dr. Reamer's analysis

---

[2] That not every Plaintiff will see a reduction in funding under every federal funding program as a result of the citizenship question does not defeat Plaintiffs' showing of injury-in-fact.  It is well-settled that in the context of multi-plaintiff challenges to government action, injury on the part of a single plaintiff is sufficient to confer standing.  *See, e.g.*, *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) ("For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim."); *Melrose Credit Union v. City of N.Y.*, 247 F. Supp. 3d 356, 365 (S.D.N.Y. 2017).  Nor does the possibility that some individual Governmental Plaintiffs' share of specific funding programs increase under some of the undercount scenarios defeat standing, because "standing is not defeated by other benefits that outweigh the injury that establishes standing, even if the other benefits may defeat damages."  Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.4 (3d ed. & Supp. 2018); *see also, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing.").

reflects, New York State and New Jersey will consistently lose state-share program funds under each of the undercount scenarios. *Id.* Likewise, many of the other State Governmental Plaintiffs will be lose federal funding under many of the scenarios examined by Dr. Reamer. *Id.*

113. In addition to the programs described in Dr. Reamer's analysis, various representatives from the Governmental Plaintiffs' broad coalition of states and localities submitted detailed descriptions of how a differential undercount will impair additional funding streams. *See id.* For example, in New York, even a .02% undercount in the number of children in poverty aged 5 to 17 residing in a Local Education Agency's (LEA) jurisdiction can lead to changes in eligibility for federal education grants that could amount to cuts as large as 40% of an LEA's Title I Grant. *See id.*; Harmon Aff. (Docket No. 498-14) ¶ 9.

114. Other Governmental Plaintiffs described a broad swath of federal programs designed to ensure funding for, *inter alia*, public schools, families living in poverty, energy assistance for the needy, and the elderly, all of which depend on census or census-derived data. PFOF § X.C.2.

115. These harms – the diminution of funds attributed to a citizenship question – also directly impact the City and County Governmental Plaintiffs. As detailed in the PFOF, some federal programs require states to use census-derived information to distribute federal funds directly to the City and County Plaintiffs. Localities receive funds under these programs based on their relative share of the relevant population within the state. Given the concentration of immigrants and Hispanics within the City and County Governmental Plaintiffs as compared to their states, PFOF § X.C.1, nearly all of the City and County Plaintiffs will likewise experience direct funding harms.

116.    For the same reason – that differential undercounting will be concentrated among non-citizens and Hispanics that are likely to live in metropolitan areas – State Governmental Plaintiffs will be required to inequitably distribute funds to localities within their jurisdiction.  As detailed at PFOF § X.C.2.b, states are required to distribute many federal funds to localities based on census or census-derived data.  This is also plainly injury.  For example, the addition of a citizenship question will require State Governmental Plaintiffs to misallocate funds within their states, specifically depriving noncitizen and Hispanic students in poverty residing in large metropolitan areas, including those located in most of the Plaintiff Cities and Counties, of much-needed social services and educational funding.  *See id.*

### c.    The NGO Plaintiffs will suffer financial harms arising from the addition of a citizenship question.

117.    Plaintiff ADC has individual members who live in all fifty states, including the states above that will be negatively impacted regarding funding, and has identified individual members living in California, New York, Florida, Texas, and New Jersey.  PFOF § X.C.2.a ¶ 1617; *see also* PFOF § I.A.4; Khalaf Aff. ¶¶ 30-31.  Each of these states was identified by Dr. Reamer as losing population share and thus funding under the state-share programs he identified if there is even a 2% undercount of individuals living in non-citizen households.

118.    As for Plaintiff MRNY, it has 23,000 members residing in New York City, Nassau County, Suffolk County, and Westchester County, New York, including several specific members living in New York who will be harmed by the loss of funding to the state due to an undercount caused by the citizenship question.  PFOF § X.C.2.a ¶ 1619; *see also* PFOF § I.A.3; Altschuler Aff. ¶¶ 4, 23-30.

119.    Finally, although the Second Circuit has held that it is unnecessary for standing purposes, the NGO Plaintiffs also introduced evidence that a number of their members do

27

directly use, rely on, or interact with some of the programs that would lose money.  *See Carey*, 637 F.2d at 838 (holding that individuals could establish harm by showing "decreased federal funds flowing to their city and state," without showing that they themselves relied on the particular programs at issue).

120.    Although their residence in these states is enough to be harmed due to federal funding losses to their states, ADC has also shown that its some of its members directly rely upon programs such as Title I education funds that the citizenship question will negatively affect in the states where they live.  PFOF § X.C.2.a ¶ 1618.

121.    Several individual MRNY members have also demonstrated reliance on Title I educational funds and Head Start funding due to their children attending schools and programs that receive such funding, and thus even more direct harm when New York loses funding for this program due to an undercount.  PFOF § X.C.2.a ¶ 1620.

122.    CASA assists many of its members who use census-related funding programs including Supplemental Nutritional Assistance Program (SNAP), which provides food assistance to low-income and the Special Supplemental Nutrition Program for Women Infants and Children (WIC); these members in Maryland will be harmed under several of the undercount scenarios discussed by Professor Reamer.  PFOF § X.C.2.a ¶ 1622.

123.    Plaintiff NYIC and a number of its member organizations directly receive census-influenced funding through programs that will be negatively affected if New York state residents are undercounted due to the citizenship question, as this will reduce the pool of funding available to them through the State.  Plum Aff. (Docket No. 498-19) ¶¶ 5-9; Choi Aff. (Docket No. 489-1) ¶ 6.

124.    Specifically, NYIC receives census-guided funding through the Corporation for

National & Community Service for 21 positions filled by AmeriCorps VISTA; NYIC member

Chhaya Community Development Corporation receives funding through the Community

Development Block Grant program; and NYIC member Chinese-American Planning Council

receives funding through the Workforce Innovation and Opportunity Act.  Plum Aff. ¶¶ 6, 9.

125.    The evidence is overwhelming that Plaintiffs have demonstrated sufficient injury-

in-fact caused by losses to their fair share of federal funds.  *E.g., Carey*, 637 F.2d at 838.

### C.    Traceability and redressability.

126.    To establish causation, a plaintiff must show that the injury-in-fact is "fairly

traceable to the challenged action of the defendant."  *N.Y. Civil Liberties Union v. N.Y. City*

*Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011) (quoting *Summers*, 555 U.S. at 493).

127.    This requirement is met if Plaintiffs "demonstrate a causal nexus between the

defendant's conduct and the injury."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir.

2016)

128.    Such a nexus is established if Defendants' conduct "has a determinative or

coercive effect on the action of someone else."  *Bennett*, 520 U.S. at 169.

129.    This standard, however, is "lower than that of proximate cause," and "indirectness

is 'not necessarily fatal.'"  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Simon*

*v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976)).

130.    Defendants' actions need not be "the very last step in the chain of causation," and

independent action by a third party "does not exclude injury produced by determinative or

coercive effect upon the action of someone else."  *Bennett*, 520 U.S. at 168-69 (1997); *see also*

*Chevron Corp.*, 833 F.3d at 121 ("A defendant's conduct that injures a plaintiff but does so only

after intervening conduct by another person, may suffice for Article III standing").

131.    Thus, Plaintiffs will be injured by the question's "coercive effect upon the action" of others.  *Bennett*, 520 U.S. at 168-69; *see also Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104-05 (2d Cir. 2018) ("*NRDC*") (holding that delaying penalty increase for automakers that violate fuel standards would lead automakers to violate those standards more frequently, and thus cause more pollution that would injure the plaintiff organizations' members).

132.    Here, the evidence shows that addition of a citizenship question will cause a significant decline in self-response.  PFOF § VII.  That decline is unlikely to be fully remedied by any of Defendants' NRFU operations.  PFOF §§ VIII.A – VIII.D.  And even if the likelihood of a net differential undercount could somehow be avoided, Defendants concede that adding a citizenship question will distort the quality and accuracy of the resultant census data.  PFOF § X.D.1.  Whether from a net undercount, a net differential undercount, or simply a decline in data quality, adding a citizenship question will directly cause the harms identified in Parts II.B.1 to II.B.4 above.  This showing meets Plaintiffs' traceability burden.  *NRDC*, 894 F.3d at 104-05.

133.    To meet the redressability requirement, Plaintiffs must show only "that a favorable decision would redress [their] injuries."  *Comunidad Hispana*, 868 F.3d at 109.

134.    A favorable decision vacating or enjoining the citizenship question on the census would redress Plaintiffs' injuries from increased mitigation expenses and diversion of resources, by ensuring that not all of these additional resources need be expended or diverted.

135.    A favorable decision would redress NGO Plaintiffs' loss-of-privacy injuries, by reducing the risk that publication of citizenship data regarding NGO Plaintiffs' members at the granular block level would expose them to statutory privacy violations and heightened risk of targeted immigration enforcement.  *See Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 156

(E.D.N.Y. 2017) (plaintiffs had standing to challenge changes to DHS's information-use policy

for DACA recipients because "[i]t is not difficult to infer that this information would facilitate

DHS's ability to remove these individuals from the country," which is "sufficiently concrete,

imminent, and traceable to Defendants' alleged conduct to establish standing").

136.    A favorable decision would also redress harms caused by the expected distortions

to data accuracy that a citizenship question would cause, as well as Plaintiffs' electoral and

funding injuries arising from a differential undercount.  *Carey*, 637 F.2d at 838.

137.    Because Plaintiffs have alleged extensive injuries-in-fact that are fairly traceable

to Defendants' decision to add a citizenship question and would be redressed by an order

vacating or enjoining that decision, the Court should find that Plaintiffs have satisfied their

burden to demonstrate standing.

## III.    Defendants' decision to demand citizenship information through the decennial census violates the Administrative Procedure Act.

138.    The Administrative Procedure Act provides that courts must "hold unlawful and

set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C.

§ 706(2)(A); or that is "not in accordance with law," "contrary to constitutional right," "in excess

of statutory jurisdiction, authority, or limitations," or that is "without observance of procedure

required by law."  5 U.S.C. § 706(2)(A)-(D).

139.    Judicial review of agency action under the APA is based on the rationale the

agency provided in making its decision; a court "may not supply a reasoned basis for the

agency's action that the agency itself has not given."  *Nat. Res. Def. Council v. EPA*, 658 F.3d

200, 215 (2d Cir. 2011) (*quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

A. **The scope of judicial review in this case.**

    1. **Review on the whole Administrative Record is to be probing and thorough.**

140.    The APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706.

141.    The Supreme Court has made clear that this Court's review is to be "thorough, probing, [and] in-depth." *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching and careful" review).

142.    Rigorous judicial review under the APA was intended to maintain the balance of power between the branches of government: "[I]t would be a disservice to our form of government and to the administrative process itself if the courts should fail, so far as the terms of the [APA] warrant, to give effect to its remedial purposes." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring in the judgment) (in enacting the APA, "Congress confined agencies' discretion and subjected their decisions to judicial review").

143.    The parties agree that the Court may consider the designated Administrative Record.  Docket No. 523; Docket No. 524; Docket No. 529; Trial Tr. 1415-16.

144.    The parties agree that the Court may consider extra-record evidence, including expert evidence, that addresses Plaintiffs' standing.  Trial Tr. 1421-22.

2.   The "whole record" before the agency includes not only the
designated Administrative Record, but also evidence that reflects
information the Secretary directly or indirectly considered.

145.    The full administrative record contains not only the designated Administrative

Record, but also other evidence reflecting important information that Secretary Ross directly or

indirectly considered in deciding to add a citizenship question, including oral conversations with

Secretary Ross that are not reflected in the designated Administrative Record.

146.    APA review requires a court to consider the "whole record" before the agency.  5

U.S.C. § 706; *see Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982).

147.    As Defendants have recognized in this proceeding, that record must include *all*

information "'directly or indirectly'" considered by the agency, including "'evidence contrary to

the agency's position.'"  Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018)

(quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)); *see Bar MK*

*Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993).

148.    In this case, the full Administrative Record includes testimony or affidavits

recounting meetings or other oral conversations that provided important information to Secretary

Ross or his direct subordinates regarding the addition of a citizenship question.

149.    Agency decision-makers and their direct subordinates often receive important

data, perspectives, or other information through oral communications with their staff, officials in

other agencies, or outside third parties.  When such communications convey critical information

that a decision-maker directly or indirectly considered in reaching the challenged decision,

evidence about these communications is not "extra-record" material at all, but rather a necessary

component of the entire "informational base" before the agency when it made its decision.

*Dopico*, 687 F.2d at 654; *see Portland Audubon Soc'y*, 984 F.2d at 1548 (whole record includes

"everything that was before the agency pertaining to the merits"); *Sztorc v. Prudential Ins. Co. of*

33

*America,* No. 05-cv-0222, 2007 WL 521278, at *3 n.4 (W.D.N.Y. Feb. 12, 2007) (administrative

record incomplete where it lacked information about telephone calls); *see also* Richard

McMillan, Jr. & Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and*

*Additional Factfinding During Judicial Review of Informal Agency Action*, 1982 Duke L. J. 333,

348-50 (1982).

150.    Indeed, federal guidance about the proper compilation of an administrative record

in informal proceedings confirms that the record should include, *inter alia*, "transcripts or

recordings, if any, of oral presentations made in the course of a rulemaking."  Administrative

Conference of the United States Recommendation 2013-4: The Administrative Record in

Informal Rulemaking, 78 Fed. Reg. 41,352, 41,360 (adopted June 14, 2013).

151.    To be part of the "whole record," such oral communications must be sufficiently

relevant and important that they had (or should have had) "a significant impact on the agency's

decisionmaking process." McMillan & Peterson at 348; *cf. United Steelworkers of Am., AFL-*

*CIO-CLC v. Marshall*, 647 F.2d 1189, 1215 (D.C. Cir. 1980) (noting concern "whenever the

record fails to disclose important communications that may have influenced the agency decision

maker").

152.    In the ordinary case, an agency can be presumed in the regular course of agency

decisionmaking to follow record-keeping processes that will provide the court with a complete

record, including important information discussed in meetings or oral communications.   For this

reason, the ordinary APA case will not require a court to decide whether it is necessary to

consider discovery, testimony, or affidavits of oral conversations not reflected in the designated

administrative record to allow review of the whole record.

153.    For example, a typical administrative record will often include written briefings or summaries of meetings and calls, which, together with memoranda, emails, and other written materials, adequately provide the court with all information directly or indirectly considered by the decision-maker. *See, e.g.*, *Guglielmi v. Northwestern Mut. Life Ins. Co.*, No. 06-cv-3431, 2007 WL 1975480, at *8 (S.D.N.Y. July 6, 2007) (summary of telephone call that involved information on which decision-maker relied); *Connecticut v. Daley*, 53 F. Supp. 2d 147, 158-160 (D. Conn. 1999) (transcripts and summaries of meetings).

154.    Here, by contrast, the initial record produced by Defendants was patently incomplete – including the absence of materials reflecting the agency's consideration of the issue prior to the December 2017 letter from the Department of Justice (notwithstanding the June 21 supplement to the Administrative Record indicating that Secretary Ross began considering whether to add the question soon after his confirmation); the absence of materials or analyses expressly referenced in the Secretary's decision memo; and the failure to include materials considered by key subordinates including Dr. Abowd, July 3 Hearing Tr. 79-82 (Docket No. 205) – leading this Court to issue its July 3 order requiring Defendants to complete the Administrative Record. *Id.* at 76-90; *see also* Docket No. 199. Defendants have affirmatively declined to contest that mandate. *See* Defs.' Reply Br. 17, No. 18-2652, *In re U.S. Dep't of Commerce* (2d Cir. Sept. 21, 2018), Docket No. 56.

155.    Although Defendants have since supplemented the record with thousands of pages of additional documents, this Court is not required to accept Defendants' supplemented record as complete if other evidence produced through discovery "identifie[s] specific materials that appear to be missing from the record." Order at 2, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *see also Dopico*, 687 F.2d at 654 (declining to accept federal

"defendants' assurances that they have submitted the full record"); *NRDC v. Train*, 519 F.2d 287, 292 (D.C. Cir. 1975) (declining to treat even supplemented administrative record as complete).

156.     Here, that additional material includes testimony and affidavits about oral communications that conveyed critical information that the Secretary considered in deciding to add the citizenship question.

157.     Excluding "oral communications of central relevance" to the Secretary's decision from this Court's review would improperly force this Court to ignore "information central to the [Secretary's] justification" simply because it was "communicat[ed] . . . by voice rather than by pen." *Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C. Cir. 1981).

158.     If agencies were permitted to shield oral communications from judicial review – even when, as here, there is clear evidence that their documentary record is incomplete – it would be too easy for them to hide adverse evidence through the simple expedient of providing it to the decision-maker through unrecorded meetings or telephone calls.  But bedrock principles of administrative law provide that an agency may not "withhold evidence unfavorable to its case" and thereby impede the court's ability "to review [the] agency's action fairly." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984).

159.     The evidence that this Court may consider under this category includes the following:

160.     Dr. Abowd testified that he attended a meeting with the Secretary and others on February 12, 2018, to discuss the citizenship question and the Census Bureau's findings about the adverse effects of adding such a question to the decennial enumeration. This meeting was the

only one that the Secretary had with the Census Bureau's Chief Scientist before deciding to add the citizenship question.  Trial Tr. 883-84.

161.    Although it is difficult to imagine that such an important meeting played no role whatsoever in the Secretary's decision-making process, *cf.* Order at 3, *In re Nielsen*, No. 17-3345 (2d Cir. Dec. 27, 2017), Docket No. 193-1; *Dopico*, 687 F.2d at 654, the designated Administrative Record contains only a single email written by a Census Bureau employee summarizing follow up points from this meeting.  PX-127 (AR 9450).

162.    Dr. Abowd also testified that he had separate conversations with Secretary Ross and Acting Deputy Secretary Kelley about, *inter alia*, the Census Bureau's intention to use disclosure avoidance procedures at the block level.  Trial Tr. 1046-47.  These conversations are also not reflected in the designated Administrative Record.

163.    Christine Pierce, Senior Vice President of Data Science for the Nielsen Company, testified that the designated Administrative Record does not accurately reflect a telephone conversation she had directly with the Secretary and Michael Walsh, then the Commerce Department's Deputy General Counsel (and now Chief of Staff), about the citizenship question.  This conversation is expressly cited as support in the Secretary's decision memo.  Ms. Pierce's testimony provides context and details about this telephone conversation that are not reflected in the designated Administrative Record.  *Compare* Pierce Aff. (Docket No. 498-18) ¶¶ 10-13, 17-18, *with* PX-1 at AR 1276, PX-26 at AR 1318.

164.    In addition, in his June 21, 2018 Supplemental Memorandum regarding the Administrative Record, Secretary Ross admitted that he began considering whether to add a citizenship question to the 2020 census soon after his confirmation in February 2017.  PX-2 (AR).  This consideration included "discussions with other governmental officials," all of which

occurred prior to the December 12, 2017, date on which the Department of Justice sent its letter requesting a citizenship question on the 2020 census.  *Id.*

165.    Secretary Ross, and his team at his direction, were later revealed to have had conversations about the citizenship question with a long list of officials outside the Commerce Department prior to December 2017, including with DOJ officials (Mary Blanche Hankey, James McHenry, John Gore, and Attorney General Jefferson Sessions); the Department of Homeland Security (Eugene Hamilton); senior White House advisers; and Members of Congress including Representative Mark Meadows.  PX-193; PX-302; PX-524 (AR); PX-567.

166.    The Secretary and his team made very little record of these conversations.  Key discussions that Secretary Ross had prior to December 12, 2017 are not memorialized in the designated Administrative Record, including discussions with Attorney General Sessions in the spring of 2017 and around Labor Day 2017, with Steve Bannon on April 5, 2017, with Kris Kobach in the spring and summer of 2017, and with Representative Meadows on August 8, 2017.  PX-193; PX-302.  Similarly, key meetings with senior staff, including meetings on August 21, 2017, and September 6, 2017, are not memorialized in the designated Administrative Record.  The only way to know about the content of these discussions and meetings, which were part of the Secretary's decision-making process, is from the testimony of senior aides that attended these meetings, such as Earl Comstock, Wendy Teramoto, Karen Dunn Kelley, David Langdon, and Sahra Park-Su.

3.     **The Court may consider extra-record evidence that serves as background to explain or clarify scientific or technical subjects requiring specialized knowledge.**

167.     As is standard in Administrative Procedure Act cases, this Court may consider extra-record evidence as background to explain or clarify scientific or technical subjects requiring specialized knowledge.[3]

168.     This Court may consider evidence outside of the administrative record where such evidence "is necessary to explain technical terms or complex subject matter involved" in the agency decision at issue.  *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988); *see, e.g., Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1045-46 (W.D.N.Y.1995) ("[T]he court is permitted to go outside of the administrative record to consider background evidence to clarify the information before the agency at the time of its decision.").

169.     This type of extra-record evidence is routinely permitted to ensure that the court can fully understand highly technical or scientific information referenced in the administrative record.  Such evidence may also be necessary to ensure that the court can properly understand the agency's reasoning and decision-making when that reasoning and decision-making involved, for example, scientific tests, complex calculations, or other specialized processes.  *See, e.g.*, *Asarco, Inc. v. United States E.P.A.*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) (testimony of copper plant manager to explain operation of smelter); *see also San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) (extra-record evidence permissible in

---

[3] Defendants' pending application in the Supreme Court does not challenge this aspect of the Court's July 3 Order permitting extra-record discovery.  Defendants challenge only discovery "to probe the mental processes of the agency decisionmaker." *See* Pet. 17, *In re U.S. Dep't of Commerce*, No. 18-557 (Oct. 29, 2018).  That application for relief has no bearing on the Court's independent authorization for expert discovery, which is "commonplace in cases of this sort."  July 3 Hearing Tr. at 87 (Docket No. 205).

APA case to explain "technical terms or complex subject matter"); *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 157 (D.D.C. 2012) (extra record evidence will be considered "if it is needed to assist a court's review").  *See generally* Richard McMillan, Jr. and Todd D. Peterson, *The Permissible Scope of Hearings, Discovery, and Additional Factfinding During Judical Review of Informal Agency Action*, 1982 Duke L. J. 333, 359 (1982) ("As administrative decisionmaking becomes increasingly complex, courts may not be able to understand, much less evaluate, the complexities of the record.").

170.    Absent such explanatory evidence, a court would not be able to "evaluate the challenged action on the basis of the record before it."  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

171.    Such explanatory expert evidence is commonplace in census-related disputes, which often involve technical issues, such as statistical techniques and calculations; survey methodology and design; demography; and the Census Bureau's established testing and other procedures.  *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 331 (1999); *City of New York v. U.S. Dep't of Commerce*, 822 F. Supp. 906, 917 (E.D.N.Y. 1993); *Cuomo v. Baldrige*, 674 F. Supp. 1089, 1093-1103 (S.D.N.Y. 1987); *Carey v. Klutznick*, 508 F. Supp. 420, 422 (S.D.N.Y. 1980).

172.    Here, for example, Plaintiffs and Defendants proffered expert testimony to help the Court understand the Census Bureau's testing procedures and the role of survey methodology in those procedures.  Both parties also proffered expert testimony on the Census Bureau's efforts to enumerate hard-to-count populations, NRFU operations, and imputation procedures, including the general methodology and factors that may bias or skew the imputation model.

40

173.    Both parties also proffered expert testimony relevant to issues of standing, including the impact of the citizenship question on data accuracy, privacy, political representation, eligibility for federal funding resources, and other matters.

### 4.    The Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors.

174.    This Court may consider extra-record evidence to evaluate whether the agency failed to consider all relevant factors, ignored an important aspect of the problem, or deviated from established agency practices.

175.    An agency's decision is arbitrary and capricious under the APA if, among other things, the agency failed to consider all "relevant factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 31, 43-44; or made "an irrational departure from [settled] policy," *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996).

176.    To apply these standards, a court must as a threshold matter understand what is "relevant," "important," or "settled" in the field where the challenged agency decision was made.

177.    In many cases, the administrative record will provide the relevant benchmarks. But evidence outside the "bare record" may be required to determine "the applicable standard" to apply in evaluating the completeness of the agency's reasoning and in determining whether the agency ignored critical factors or information.  *Overton Park*, 401 U.S. at 420 (emphasis added); *see also Hoffman*, 132 F.3d at 15; *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

178.    Such extra-record evidence is essential in cases involving technical, complex, or specialized subjects, where the reviewing court would otherwise lack the expertise to know the factors that a reasonable decision-maker in the field would typically consider or the "settled course of behavior," *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S.

800, 807 (1973) (plurality op.), that such a decision-maker would typically follow. *See Hoffman*, 132 F.3d at 15; *cf. United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) (expert "testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice").

179.    As courts have explained, "[i]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco*, 616 F.2d at 1160; *see also Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 114 (D.D.C. 2015) (permitting expert testimony to "point out gaps in the agency's explanation and analysis").

180.    Indeed, without extra-record evidence to determine the relevant benchmarks, a court would be unable to even identify, let alone redress, the most egregious instances where an agency disregards important or relevant factors, since it will be in the most flagrant violations of reasonable agency decision-making that the administrative record will be most bare. *See Hoffman*, 132 F.3d at 15 ("omission of technical scientific information is often not obvious from the record itself").

181.    The potential need for such extra-record record evidence is particularly acute where, as here, the agency engages in *informal* rather than *formal* decision-making.  Formal notice-and-comment rulemaking and adjudicatory proceedings provide numerous procedural safeguards that ensure that interested parties can present all relevant factors and information to the agency – and thereby to the court.

182.    For example, notice-and-comment procedures provide all interested parties, including experts, the opportunity to submit "written data, views, or arguments" that will be added to the administrative record.  5 U.S.C. § 553.

183.    Adjudicatory proceedings likewise provide the parties to such proceedings an opportunity to submit "facts [and] argument" that the agency should consider.  *Id.* § 554.

184.    Informal decision-making, by contrast, lacks such mechanisms to guard against the creation of an inadequate administrative record.  Accordingly, where informal decision-making is at issue, the reviewing court may not be able to "adequately discharge its duty to engage in a 'substantial inquiry'" into the agency's decision if the court "is required to take the agency's word that it considered all relevant matters" and followed all relevant procedures.  *Asarco*, 616 F.2d at 1160.

185.    Here, for example, and as described in Parts III.B.1 and III.B.2 below, the decision-making process lacked adequate consideration of several relevant factors.  The process did not include an evaluation of the utility or fitness of citizenship data collected from the census for the stated purpose in the request from the Department of Justice, *i.e.* enforcement of Section 2 of the Voting Rights Act.  For instance, Secretary Ross did not consider any information in making his decision about the granularity of data required by the Department of Justice to enforce the Voting Rights Act.  PX-26 (AR).  Similarly, Secretary Ross did not consider any information about the impact of disclosure avoidance requirements on the quality of citizenship data that would be produced by including a citizenship question on the 2020 census, or how those requirements could impact the utility of the data for Voting Rights Act enforcement.  *Id.*  Ignoring these and other considerations relevant to the fitness of the data for its purported use, was a significant omission.

43

5.     **The Court may consider extra-record evidence relevant to Plaintiffs'
       claims that the Secretary's decision was based on pretext or
       prejudgment.**

186.     This Court may also consider extra-record evidence that is relevant to Plaintiffs'

claims that the Secretary's decision to add a citizenship question was based on pretext,

prejudgment, undue political influence, or other types of bad faith.

187.     On July 3, this Court authorized extra-record discovery based on its finding that

"plaintiffs have made a strong preliminary or prima facie showing that they will find material

beyond the Administrative Record indicative of bad faith." July 3 Hearing Tr. at 85 (Docket No.

205). Now that discovery and trial are complete, this Court may consider extra-record evidence

that is relevant to adjudicating the merits of Plaintiffs' claims of pretext, prejudgment, undue

political influence, or other types of bad faith.

188.     The Court's consideration of such evidence is "necessary to meaningful judicial

review" of Plaintiffs' claims. *Tummino v. Torti*, 603 F. Supp. 2d 519, 543 (E.D.N.Y. 2009); *L-3

Commc'ns Integrated Sys., L.P. v. United States*, 98 Fed. Cl. 45, 49 (2011) (considering extra-

evidence of bias and bad faith that was "clearly necessary for the Court to conduct effective

judicial review").

189.     Evidence of bad faith rarely appears in a formal administrative record precisely

because an agency is unlikely to record and make public its own improper conduct – hence the

need for extra-record discovery in the first place. *See, e.g.*, *Beta Analytics Int'l, Inc. v. United

States*, 61 Fed. Cl. 223, 226 (2004) (placing "evidence of bad faith . . . in an administrative

record" would be "both sinister and stupid"); *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp.

1276, 1281 (W.D. Wis. 1997) (agency is not likely "to keep a written record of improper

political contacts").

44

190.    Where, as here, such evidence is uncovered, the agency's actual decision-making "cannot be fully understood" without considering that extra-record evidence.  *Tummino*, 603 F. Supp. 2d at 544.

191.    Here, for example, extra-record evidence of bad faith includes, but is not limited to, the testimony of Acting Assistant Attorney General John Gore that the DOJ components with responsibility for enforcing the Voting Rights Act did not request a citizenship question on the census; that he drafted the letter requesting a citizenship question because of Secretary Ross's request; that he does not believe a citizenship question on the census is in fact necessary to enforce the VRA; and that he does not know if data based on responses to a citizenship question will be any more precise than existing data.  *See infra* Part III.B.3.b.

192.    This Court asked the parties to brief whether some additional, intermediate finding of bad faith is required before the Court may consider this evidence.  Trial Tr. 1426. Courts that have allowed initial extra-record discovery on the basis of a preliminary showing of bad faith have at times conducted an intermediate inquiry, at the close of discovery, into whether to formally supplement the administrative record with specific extra-record evidence before proceeding to summary judgment or trial.  *See, e.g.*, *L-3 Commc'ns*, 98 Fed. Cl. at 49-53; *Int'l Resource Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 41-42 (2004).

193.    In such cases, the intermediate inquiry warrants formally supplementing the record where the evidence produced through discovery confirms either a "strong showing of bad faith or improper behavior" or the continued inadequacy of the designated administrative record to provide a "full picture" of the agency's decision-making.  *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 91 Fed. Cl. 347, 354 (2010) (quoting *Overton Park*, 401 U.S. at 420); *see Hoffman*, 132 F.3d at 16 (affirming district court's decision not to supplement record with

affidavit where "plaintiffs failed to make the required 'strong showing' of bad faith"); *Int'l Resource Recovery*, 61 Fed. Cl. at 42 (supplementing record where allegations of bad faith were "sufficiently well grounded").

194.    In this case, because the Court has already completed the trial, there is no need to conduct the intermediate inquiry that other courts have applied at an earlier stage of proceedings. Rather, this Court should decide the scope of its review of extra-record evidence (just as it is determining the admissibility of evidence) in connection with its final ruling on the merits of Plaintiffs' claims of pretext, prejudgment, and undue political influence.

195.    More specifically, this Court should identify the grounds on which a finding of bad faith would invalidate the Secretary's decision, and consider only the extra-record evidence that is relevant to the grounds it has accepted.  If the Court rejects a particular ground for finding bad faith, or finds that the evidence (including extra-record evidence) fails to support bad faith, then it should decline to consider the extra-record evidence that is associated with such rejected or failed theories of bad faith. Through this analysis, the Court can ensure that the scope of its review is limited to extra-record evidence that is directly relevant to bad-faith findings that would invalidate the Secretary's decision to add a citizenship question.

**B.    Defendants' decision to add a citizenship question to the census was arbitrary and capricious in violation of the APA.**

196.    Under the APA, the Court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

197.    Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43.

198.     Agency action is also arbitrary and capricious if not based on a "reasoned

analysis" that indicates the agency "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"  *Id.* at 42-43.

199.     Defendants' decision is arbitrary and capricious when measured against each and

every one of these considerations.

### 1.     The decision to add a citizenship question was counter to the evidence before the agency.

#### a.     Adding a citizenship question will materially lower response rates.

200.     Defendants' decision is counter to the evidence because adding a citizenship

question to the census will materially lower self-response rates.

201.     Secretary Ross justified his decision on the grounds that "no one provided

evidence that reinstating a citizenship question on the decennial census would materially

decrease response rates."  PX-26 at AR 1317.  This assertion is counter to the uncontroverted

evidence in the Administrative Record (*e.g.*, PX-22 at AR 1277; PX-102 at AR 5500; PX-147

AR 11634), and is further disproven if extra-record evidence is considered.

202.     The Administrative Record contains substantial quantitative evidence detailing

how the addition of a citizenship question to the decennial census would reduce response rates

among immigrant and Hispanic households.  As detailed in PFOF § III.H.2, the Census Bureau

conducted several natural experiments designed to assess the effect a citizenship question would

have on response rates.  The Census Bureau examined differential declines in self-response rates,

and differential sensitivity to citizenship inquiries as shown in item non-response rates and

breakoff rates.  The Census Bureau's initial analyses, as detailed in the Administrative Record,

reflect that adding a citizenship question to the 2020 census would lead to a 5.1% decrease in self-response rates.  PX-22; PX 147 at AR 11634 (draft white paper).

203.    The scientific analyses done by the Census Bureau are the *only* quantitative evidence in the Administrative Record on this point.  The Administrative Record contains no evidence whatsoever that the citizenship question will *not* harm the response rate.  Although the decision memo references studies that purport to show the contrary, such as survey evidence purportedly provided by the Nielsen Company, *see* PX-26 at AR 1315, 1318; no such evidence appears anywhere in the record.

204.    The qualitative evidence in the Administrative Record likewise confirms that adding a citizenship question will cause a material decline in self-response rates, particularly among immigrant and Hispanic households.  PFOF § III.H.2.

205.    Nothing in the Administrative Record supports Secretary Ross's effort to dismiss this quantitative and qualitative evidence of a decline in self-response from the addition of a citizenship question.  Courts "ha[ve] not hesitated" to reverse agency decisions "when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action."  *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (reversing agency decision that "ignore[d] critical context" and "cherry-pick[ed] evidence"); *see also, e.g.*, *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking and cannot survive review under the arbitrary and capricious standard.").

206.    Courts will not defer to agency action where the record evidence "directly contradicts the unsupported reasons of the agency and the agency fails to support its

pronouncements with data or evidence." *See Islander E. Pipeline Co., LLC v. Connecticut Dep't of Envtl. Prot.*, 482 F.3d 79, 103 (2d Cir. 2006); *see also City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1099-1100 (C.D. Cal. 2018) (agency decision is arbitrary and capricious where "there is no evidence of record . . . that Defendants based [their] conclusion on any findings or data").

207.    This is not a case where the Administrative Record shows that "specialists express conflicting views," *see Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 351 (E.D.N.Y. 2014) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); to the contrary, the evidence in the Administrative Record uniformly confirms that adding a citizenship question will reduce self-response rates.

208.    The Secretary's description otherwise is simply an unsupported pronouncement that cannot substitute for record evidence. *See Ramos v. Nielsen*, No. 18-cv-1554, 2018 WL 4778285, at *9-15 (N.D. Cal. Oct. 3, 2018) (finding likelihood of success on merits of APA arbitrary-and-capricious claim regarding termination of Temporary Protected Status for certain countries where DHS Secretary's unsupported pronouncement of changed country conditions is contradicted by extensive record evidence to the contrary).

209.    In addition, evidence that is outside of the designated A.R., but that the court may consider as evidence that essentially completes the Administrative Record, further shows that adding a citizenship question will decrease self-response rates in immigrant and Hispanic households.

210.    Christine Pierce, the Nielsen Company's Vice President of Data Science – the stakeholder referenced in the Secretary's decision memo as a purported source of "empirical

evidence about the impact of sensitive questions on survey response rates" – testified that

Nielsen did not provide any such evidence.  Pierce Aff. (Docket No. 498-18) at ¶¶ 15, 18.

211.    In fact, Pierce testified that Secretary Ross's decision memo materially

mischaracterized her input and omitted key facts (including her "unequivocal[]" concern "that a

citizenship question would negatively impact self-response rates").  *Id.* at ¶¶ 8, 12-18.

212.    This Court specifically noted the omission of any empirical evidence from

Nielsen as one basis for its order directing Defendants to complete the Administrative Record.

*See* July 3 Hearing Tr. at 81 (Docket No. 205) ("[T]he current record expressly references

documents that Secretary Ross claims to have considered but which are not themselves a part of

the Administrative Record.  For example, Secretary Ross claims that 'additional empirical

evidence about the impact of sensitive questions on the survey response rates came from the

Senior Vice-President of Data Science at Nielsen.'  That's page 1318 of the record.  But the

record contains no empirical evidence from Nielsen.").

213.    The reason this empirical evidence nowhere appears in the Administrative Record

is that the Secretary's decision memo falsely claimed it existed, when it does not.  Resting a

decision on claims that are "factually untrue" itself renders agency action arbitrary and

capricious.  *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 623-24 (E.D. Pa. 2018) (vacating the

Justice Department's imposition of immigration-related grant conditions on local law

enforcement funding where the stated basis for the Department's decision rested on claims that

were factually untrue); *see also City & County of San Francisco v. Sessions*, No. 17-cv-04642-

WHO, 2018 WL 4859528, at *25-28 (N.D. Cal. Oct. 5, 2018) (same).

214.    Moreover, extra-record evidence developed and presented at trial – including the

testimony of Plaintiffs' experts and of Defendants' only witness – confirms beyond any doubt

that adding a citizenship question will have devastating effects on the self-response rates of immigrant and Hispanic households. *See, e.g.*, PX-162 (revising "conservative" estimate of decline in self-response to 5.8% percent);  PX-297 at RFA 98, RFA 84 (5.1% decrease in self response), RFA 96-97 (the Census Bureau found empirical evidence that a citizenship question could reduce response rates); PX-662 (updated CBAMS presentation); Trial Tr. 881-82, 897, 919-20 (Abowd); Trial Tr. 30, 50-51, 78-80 (Hillygus); Trial Tr. 881-82, 919-20 (Barreto); PX-670; PX-671; *see generally* PFOF § VII.

> **b.    Adding a citizenship question will not provide more accurate, usable, or complete citizenship data.**

215.    Defendants' decision is counter to the evidence because adding a citizenship question to the census will not provide more accurate citizenship data than are currently available.

216.    Defendants' decision is predicated on the notion that a citizenship question will result in the "most complete and accurate" citizenship data for DOJ.  PX 26 at AR 1317; *see also id.* at AR 1313 ("prioritiz[ing] the goal of obtaining *complete and accurate data*") (emphasis in original); *id.* at AR 1316 ("it was imperative" to choose an option to "provide a greater level of accuracy").  But when viewed in light of this stated goal, Defendants' decision to add a citizenship question to the 2020 census plainly runs counter to the evidence.

217.    The evidence in the Administrative Record establishes that the addition of the citizenship question will result in *less* accurate and *less* complete citizenship data.

218.    Defendants do not dispute, and the Administrative Record establishes, that survey data regarding citizenship is inaccurate; non-citizens respond to inquiries into their citizenship status by responding that they are citizens approximately 30% of the time.  PX-22 at AR 1283; PX-25 at AR 1311.

219.    Every scientific analysis in the record confirms that the addition of the citizenship

question will result in lower quality citizenship data.  *See, e.g.*, PX-25 (AR 1312) ("Alternative D

would result in poorer quality citizenship data than Alternative C."); PX-22 (AR 1277-78)

(explaining that adding the citizenship question would result in "substantially less accurate

citizenship status data than are available from administrative sources").

220.    Moreover, as detailed above, the addition of the citizenship question will reduce

self-response rates, which will further reduce data quality by driving more households into

NRFU procedures that compromise that accuracy of the ultimate data produced.  *See* PFOF

§ III.H.2.

221.    The uncontroverted empirical evidence belies Secretary Ross's contention that

collection of citizenship data through the census will enhance the accuracy of the data collected.

Courts will "not defer to the agency's conclusory or unsupported suppositions."  *McDonnell*

*Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004); *see also*

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C.

Cir. 2010) (explaining that an agency has an "obligation to explain its reasoning for rejecting"

expert evidence contrary to its decision).

222.    Secretary Ross's statement is unsupported by *any* evidence in the record;

asserting that the citizenship question will improve the accuracy of the data collected does not

make it so.  Rather, as the Administrative Record makes clear, the use of the census to collect

citizenship data compromises the accuracy of the data collected by the census.

223.    In addition, Secretary Ross contends that Option D "would maximize the Census

Bureau's ability to match the decennial census responses with administrative records," PX- 26 at

AR 1316, so as to allow for "more complete" citizenship data.  But this assertion is likewise

contrary to the evidence in the Administrative Record.

224.    The Administrative Record reflects that because adding a citizenship question

would drive down the self-response rate and put more households into NRFU operations, Option

D actually reduces the Census Bureau's ability to match survey responses with administrative

records.  PX-25 at AR 1311 (explaining that since "NRFU PII is lower quality than the self-

response data," the citizenship question will increase "the number of persons who cannot be

linked to the administrative data").  There is no evidence in the record to the contrary.

225.    Consideration of extra-record evidence – including trial testimony from

Defendants' sole expert witness, the consistent testimony of Plaintiffs' experts, and subsequent

analyses performed by the experts at the Census Bureau – explained the use of survey-based

inquiries and the statistical methods used to understand whether adding a citizenship question

will yield lower quality citizenship data. This testimony further explained the factors and

benchmarks that a reasonable decision-maker would have looked at to determine whether adding

a citizenship question will yield lower quality citizenship data.  *See* PFOF § IX.B.5.

226.    The Secretary's stated desire for accuracy cannot be squared with a decision that

moves the census in precisely the opposite direction.  *See State Farm*, 463 U.S. at 43 (decision is

arbitrary when it is "so implausible that it could not be ascribed to a difference in view or the

product of agency expertise").

         c.      **The Secretary's decision to choose Option D over Option C is
contrary to the evidence before the agency.**

227.    Defendants' decision is counter to the evidence because the Secretary

unreasonably rejected the Census Bureau's alternative proposal of Option C, which would have

better met DOJ's stated needs at lower cost, lower respondent burden, and higher quality.  PX-22

(AR 1277).

228.    Evidence in the Administrative Record makes clear that Option C "best meets

DoJ's stated uses, is comparatively far less costly [than adding a citizenship question], does not

increase response burden, and does not harm the quality of the census count."  *Id.*

229.    This uncontroverted evidence establishes that Option C – the use of

administrative records alone – is better by every metric that the Secretary purports to value.  *See*

*Islander,* 482 F.3d at 99 (reversing where agency offered "no explanation for dismissing record

evidence that runs counter to its findings").

230.    In contrast, adding a citizenship question "is very costly, harms the quality of the

census count, and would use substantially less accurate citizenship status data than are available

from administrative sources."  PX-22 (AR 1277); *see also*, *e.g.*, PX-24; PX-25; PX-132.

231.    Adopting a "plainly inferior" course of action is arbitrary and capricious.  *Pub.*

*Citizen, Inc. v. Mineta*, 340 F.3d 39, 56 (2d Cir. 2003).

232.    The Administrative Record standing alone also makes clear that selecting Option

D is arbitrary for the independent reason that it depends on achieving undefined future

improvements in Census Bureau methods.  PX-26 at AR 1316 ("Under Option D, the ACS

citizenship question would be asked on the decennial census, and the Census Bureau would use

the two years remaining until the 2020 decennial census to further enhance its administrative

record data sets, protocols, and statistical models to provide more complete and accurate data.").

233.    A decision based on the vague expectation of future improvements "to provide

more complete and accurate data" is almost the definition of arbitrary; this kind of build-the-

plane-as-you're-flying-it approach is no substitute for reasoned decisionmaking, especially

regarding a decision as consequential as the conduct of the census.  *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002) ("An agency may not avoid an obligation to analyze in an [environmental impact statement] environmental consequences that foreseeably arise from [a resource management plan] merely by saying that the consequences are unclear or will be analyzed later . . . ."); *cf. Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 179 (2d Cir. 2006) (agency decision was arbitrary where instead of complying with statutory requirement, "agency simply stated its intent to do better the next time")

234.    Extra-record evidence – including Dr. Abowd's testimony, the testimony of Plaintiffs' experts witnesses, testimony of Census Bureau executives, and subsequent Census Bureau analyses provided background on the complex concepts and calculations that were used to evaluate Options C and D, which are reflected but not entirely explained in the Administrative Record. This extra-record evidence further highlighted the professionally accepted and objective benchmarks and standards that a rational decision-maker would have relied on to evaluate whether Option D is by any standard worse than Option C.  PFOF § IX.B.5.

235.    Secretary Ross's failure to articulate a satisfactory explanation  for rejecting a less expensive, less burdensome, and higher quality alternative renders his decision arbitrary and capricious.  *See, e.g.*, *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015), *as amended* (July 21, 2015) (reversing where, *inter alia*, agency did not fully consider alternatives); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 825-26 (D.C. Cir. 1983) (rescission of ban on work within another's home was arbitrary where the agency failed to consider alternatives to complete elimination of the restriction); *Action on Smoking & Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1216, 1218 (D.C. Cir. 1983) (agency's decision failed to give sufficient consideration to narrower alternatives).

    **d.**    **Adding a citizenship question to the census is not necessary to enforce the Voting Rights Act, and would instead undermine the goal of fair representation for all communities.**

236.    Defendants' decision is counter to the evidence because adding a citizenship question to the census is not necessary to enable DOJ to enforce Section 2 of the Voting Rights Act.

237.    The Secretary's decision memo determines that adding a citizenship question is "necessary" to provide the data DOJ requires to enforce Section 2 of the VRA.  PX-26 at AR 1313, 1320.

238.    The Administrative Record contains no evidence that census-derived block-level CVAP data are necessary to enforce Section 2 of the VRA.

239.    The December 2017 DOJ letter does not state that such data is "necessary" to enforce the VRA; rather it studiously avoids using the word "necessary" to describe the request for the data.  PX-32 (AR).

240.    The DOJ letter does not identify any VRA cases that it failed to bring because of inadequate block-level CVAP data.  *Id.*

241.    The DOJ letter does not identify any VRA cases that it did bring that failed because of inadequate block-level CVAP data.  *Id.*

242.    The Administrative Record contains extensive evidence that the Secretary ignored from voting rights experts and others demonstrating that census-derived block-level CVAP data are not necessary to enforce the VRA.  PFOF § III.I.

243.    The Administrative Record also establishes that citizenship data produced in response to a citizenship question on the census will have serious issues with accuracy and completeness, particularly as to the data for immigrant and Hispanic populations.  PFOF § III.H.2.

244.    Congress could not possibly have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data, because such data have never been available at any point since Section 2 has existed: not in 1965 when the Voting Rights Act was first enacted; not in 1982 when the Act was amended to clarify the vote-dilution standard; and not in 1986 when the Supreme Court articulated the vote-dilution test in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

245.    Agency action should be set aside as arbitrary when "the reason which the [agency] gave for its action . . . makes no sense." *New England Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984).

246.    In addition, the Secretary's decision memo gives no explanation at all for how the DOJ letter justified the ultimate decision, except to state that DOJ requested a citizenship question.  Failure to conduct any analysis at all of how the DOJ letter supports the Secretary's decision also renders that decision invalid under the APA.  *Kuang v. U.S. Dep't of Defense*, No. 18-cv-3698-JST, 2018 WL 6025611, at *31 (N.D. Cal. Nov. 16, 2018) ("DoD has simply provided no explanation for how the 2017 Study's findings support its policy choice, and 'where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious.'") (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).

247.    Nor were Defendants entitled simply to rely uncritically on the DOJ letter to support their decision, without any independent assessment of its merits.  Defendants may not simply hide behind the Department of Justice's stated rationale.  *See Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 16 ("EPA seeks to excuse its inadequate responses by passing the entire issue off onto a different agency.  Administrative law does not permit such a dodge.").  This is especially so where the Administrative Record establishes that Defendants themselves not

only solicited the request from DOJ, but also and provided DOJ with the rationale in the December 2017 letter.  PFOF § III.B – III.E.

248.    In addition, the cases cited in the DOJ letter – which provide the only support in the Administrative Record for the VRA justification – do not themselves support the contention that existing citizenship data were inadequate or caused plaintiffs to lose their Section 2 actions. PX-32 (AR 1525) (citing cases).  *See LULAC v. Perry*, 548 U.S. 399, 423-42 (2006) (plaintiffs *prevailed* on their vote-dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021-25 (5th Cir. 2009) (plaintiffs' expert testimony for estimating HCVAP failed to satisfy the first *Gingles* precondition, but that analysis was *not* based on ACS data, and court of appeals left open whether plaintiffs could have satisfied *Gingles* One had their expert properly used his alternative method); *Barnett v. City of Chicago*, 141 F.3d 699, 702-04 (7th Cir. 1998) (Posner, J.) ("The census counts the total population for the same reason that it counts rather than samples: in order to minimize controversy.  To verify the age and citizenship of the population would enormously complicate the decennial census and open the census-takers to charges of manipulation." (citations omitted)); *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) (plaintiffs did not even attempt to demonstrate that illustrative districts had a majority Latino CVAP population); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (the plaintiffs acknowledged that none of their illustrative districts had majority Hispanic or black population).

249.    The extra-record evidence introduced at trial provided background about and explained the ways that data are used for VRA enforcement.  This evidence further explained the standards and benchmarks that are used to determine whether census-derived block-level data would be necessary for VRA enforcement.

250.     Dr. Lisa Handley explained that existing data products are more than adequate to enforce the VRA.  PFOF § IX.B.3 – IX.B.4.

251.     The substantial number of successful Section 2 cases filed since 1982 belies Defendants' assertion that census-derived CVAP information is somehow necessary to enforce the Voting Rights Act.  *See* National Commission on the Voting Rights Act, Protecting Minority Voters: The Voting Rights Act at Work, 1982-2005, at 88, https://lawyerscommittee.org/wp-content/uploads/2015/07/0023.pdf (2006) (listing 117 "reported Section 2 cases leading to favorable results for minority voters" in the "23-year period following the 1982 reauthorization" of the Act).

252.     And the extra-record evidence confirms that data produced pursuant to the Secretary's Option D will retain margins of error; and that Defendants do not know whether the error margins for block-level CVAP data produced from a citizenship question on the census will be larger or smaller than currently available block-level CVAP data.  PFOF § IX.B.4.

253.     The extra-record evidence further explained that disclosure avoidance concerns will also impact the utility (if any) of adding a citizenship question—an important aspect of the problem that the Secretary entirely ignored.  The Census Bureau's disclosure avoidance protocols will introduce further errors into CVAP data produced at the block level, and will effectively mean that in general, there will not be a single census block where the CVAP data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  PFOF § IX.B.4.

254.     Extra-record evidence further establishes another important factor that the Secretary failed to consider, namely, that not only is a citizenship question unnecessary to

enforce the VRA, but that adding this question to the census will in fact *undermine* the goals the Voting Rights Act was enacted to protect.

255. The purpose of the Voting Rights Act is to accomplish "nondiscriminatory treatment by government – both in the imposition of voting qualifications and the provision or administration of governmental services, such as public schools, public housing and law enforcement." *Katzenbach v. Morgan*, 384 U.S. 641, 652 (1966).

256. Because adding a citizenship question will predictably undercount some communities, those communities will not achieve nondiscriminatory treatment in the application either of voting qualifications or of the administration of governmental services. Warshaw Aff. (Doc. 526-1) at ¶¶ 50-61.

> **e.  Secretary Ross's decision memo is replete with assertions unsupported by and often contrary to the evidence.**

257. Defendants' decision is counter to the evidence because the Secretary's decision memo contains numerous flawed assertions that are either based on no supporting evidence at all or are directly contradicted by the record evidence.

258. For example, the Secretary contends that "no one has identified any mechanism" for identifying respondents who would self-respond to the census but for the addition of a citizenship question. PX-26 at AR 1313, 1317. This claim ignores the Census Bureau's multiple empirical analyses in the Administrative Record that go to precisely this issue. *E.g.*, PX-22 at AR 1277; PX-25 at AR 1308; PX-4 at AR 8614; PX-147 at AR 11634.

259. The Secretary also asserts that placing the citizenship question last on the census will somehow "minimize any impact on decennial census response rates." PX-26 at AR 1320. The Administrative Record includes no evidence supporting this hypothesis.

260.     The Secretary's decision memo states that it was "difficult to assess" whether "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs."  PX-26 at AR 1319.  But the Administrative Record reflects that prior to the Secretary's decision, the Census Bureau prepared an analysis estimating that the expected self-response decline from adding a citizenship question would increase costs by at least $27.5 million.  PX-22 at AR 1282.

261.     The Secretary concluded that nonresponse rates to the ACS citizenship question for Hispanics and non-Hispanic whites were "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve.  PX-26 at AR 1315.  The nonresponse rates listed in the decision memo are, on their face, not comparable.  (*E.g.*, nonresponse rates to the ACS citizenship question for Hispanics are *twice as high* as nonresponse rates for non-Hispanic whites.  *Id.*)

262.     The Secretary stated with no support that "for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition."  PX-26 at AR 1317.  The Administrative Record contains the Census Bureau's clear and evidence-based determination that adding a citizenship question to the census would impose an additional burden on all respondents.  PX-22 at AR 1277, 1281.

263.     It is the definition of arbitrary to base an agency decision on assertions with no foundation in fact.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (agency rule was arbitrary and capricious where agency lacked any evidence to support key factual conclusion); *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive review under the APA, "the facts on which the agency purports to

have relied" must "have some basis in the record") (quoting *Fulbright v. McHugh*, 67 F. Supp.
3d 81, 89 (D.D.C. 2014)).

264.    If considered, the extra-record evidence presented at trial further confirms that
many of the Secretary's assertions ignored important factors that a rational decision-making
process would have considered.

265.    The assertion that there are no mechanisms to identify respondents who would
self-respond but for the inclusion of a citizenship question ignores the possibility of conducting a
randomized control test, which extra-record evidence confirms would have been possible if the
Secretary had actually wanted additional empirical evidence.  *See* PX-162 (White Paper) at 39 n.
53 (noting the possibility of conducting "a randomized control trial (RCT) comparing self-
response rates where some households are randomly chosen to have an 11-question Census
questionnaire with a citizenship question (the treated group), and a randomly chosen set of
control households receive a 10-question Census questionnaire without citizenship"); PX-165
(proposed RCT); *see also* PFOF § IV.B; Trial Tr. 164-65 (Hillygus); Trial Tr. 925-26 (Abowd).

266.    Extra-record evidence also confirms that all questions on the decennial census
impose an incremental burden on respondents.  *See, e.g.*, Habermann Aff. (Docket No. 498-11)
¶¶ 22-25; Pierce Aff. (Docket No. 498-18) ¶ 9; Trial Tr. 43 (Hillygus).

267.    The Census Bureau has produced further analyses estimating the significantly
increased costs from asking the question.  PX-162.

268.    In response to requests for admissions, the Census Bureau admitted that the non-
response rates to the ACS citizenship question for Hispanics and non-Hispanic whites were not
"comparable" to nonresponse rates for other ACS questions, such as educational attainment,
monthly gas costs, and weeks worked in the past twelve.  PX-297 at RFAs 89-95.

269.    Unrebutted extra-record testimony from the former Director of the UN Statistics Division proves that the Secretary relied on UN recommendations for conducting population censuses without considering that the UN recommendations include a number of steps that were totally ignored here, including that Defendants "ensure that the topics are appropriate for meeting the demonstrated requirements of users," include "suitable consultation with existing and potential users at all stages," and conduct "adequate testing of new topics."  Habermann Aff. (Docket No. 498-11) at ¶¶ 78-84.

270.    The same unrebutted testimony identifies further factors that the Secretary ignored in relying on international comparisons, including that Australia and Canada (cited by the Secretary as benchmarks for adding a citizenship question, *see* PX-26 at AR 1319) do not in fact have comparable practices.  Habermann Aff. at ¶ 85.

## 2.    Defendants' decision entirely failed to consider important aspects of the problem.

271.    The APA requires this Court to set aside Defendants' decision as arbitrary if Defendants "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

### a.    The March 26 decision memo failed to address key legal obligations.

272.    As set out in more detail in Part III.C.1 below, Secretary Ross's decision memo does not note or otherwise discuss Defendants' failure, in its March 2017 notification to Congress pursuant to 13 U.S.C. § 141(f)(1), to identify citizenship as a subject that would be included on the decennial census.  PX-26 (AR); *see also* PX-357.

273.    Secretary Ross' decision memo does not note or otherwise discuss his mandatory statutory obligation to "find[] new circumstances exist which necessitate" the addition of any

new subjects to the decennial census after the March 31, 2017 deadline, as required by 13 U.S.C. § 141(f)(3).  PX-26 (AR).

274.    As set out in more detail in Part III.C.2 below, Secretary Ross's decision memo does not note or otherwise discuss his obligation "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to "acquire and use information available from any source [from other federal or other governmental entities] instead of conducting direct inquiries," as required by 13 U.S.C. § 6(c).  PX-26 (AR).

275.    As set out in more detail in Part III.C.3 below, Secretary Ross's decision memo does not address the binding Office of Management and Budget standards, including Statistical Policy Directive No. 2, which requires agencies to "design the survey to achieve the highest practical rates of response, commensurate with the importance of survey uses, respondent burden, and data collection costs."  PX-359 (Standard 1.3); PX-26 (AR).

276.    Secretary Ross's decision memo does not discuss the Census Bureau's binding Statistical Quality Standards, which requires that "data collection instruments . . . must be developed and tested in a manner that balances (within the constraints of budget, resources, and time) data quality and respondent burden."  PX-260 (req. A2-3); PX-26 (AR).

277.    Secretary Ross's decision memo does not discuss the requirement in the Census Bureau's Statistical Quality Standards, including requirement A2-3.3 which provides "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (e.g., problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on the pretesting results." PX-260 (req. A2-3.3).

278.     Secretary Ross's decision memo does not discuss that the Census Bureau is prohibited from making "[a]ny publication whereby the data furnished by any particular . . . individual under this title can be identified."  13 U.S.C. § 9(a)(2); PX-26 (AR).

279.     Defendants' complete failure to address these binding statutory mandates and internal standards renders the decision arbitrary and capricious.  *League of Women Voters v. Newby*, 838 F.3d 1, 10-12 (D.C. Cir. 2016) (disregard for statutory criterion renders agency decision arbitrary under the APA)

> **b.     The Secretary failed to consider the relevant standard of proof for adding new questions to the census.**

280.     Defendants' decision failed to consider important aspects of the problem because the Secretary applied an incorrect (and insurmountable) standard for determining when new questions would unreasonably harm the census count or data quality.

281.     The Secretary's decision inverts the standard of proof for adding new questions to the census.  Defendants bear the burden to demonstrate the need for the question, and to confirm that the change will not cause harm.  Habermann Aff. (Docket No. 498-11), at ¶ 18.

282.     Dr. Habermann testified that "[i]t is the responsibility of the government to ensure that the intrusion and burden are carefully considered and fully justified.  When a question is proposed for any census or survey instrument, including the decennial census, federal statistical agencies proceed from the premise that there is a burden of proof on the requestors of the question to demonstrate the need for the question and to demonstrate that the proposed question will not harm the survey instrument nor damage the credibility of the statistical system with the public."  Habermann Aff. (Docket No. 498-11), at ¶ 18; *see also* PFOF § IV.B.

283.     But the Secretary's decision makes clear that Defendants made no affirmative finding whatsoever that the citizenship demand would *not* harm the decennial census; instead,

the Secretary based his decision on the purported *absence* of evidence of harm.  *See* PX-26 (AR 1313, 1316-17).

284.    As detailed above, the Administrative Record is replete with evidence demonstrating that, *inter alia*, adding the question would "increase response burden" and "harm the quality of the census count."  PX-22 (AR 1277).

285.    But even setting aside such evidence, the Secretary's reliance on the purported absence of evidence inverts the relevant burden of proof and introduces unacceptable – and unlawful – risk to the census.  *See Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1075 (9th Cir. 2018) (agency action was arbitrary and capricious where the agency failed to consider scientific evidence "solely because of 'uncertainty'").

286.    In light of the irreparable impact of adding a citizenship question – dilution of political power, reductions in funding streams for the next decade, impaired demographic data and statistics – Secretary Ross's failure to consider and apply the appropriate standard is arbitrary and capricious.  *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (agencies must "adequately analyze . . . the consequences" of their actions).

      **c.**      **The Secretary failed to consider the impact of disclosure avoidance protocols on his decision.**

287.    Defendants' decision failed to consider important aspects of the problem because the Secretary did not address the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices on the fitness of citizenship data for DOJ's stated purposes.

288.    The words "disclosure avoidance" appear nowhere in the Secretary's decision memo.  *See* PX-26 (AR).  Yet the Census Bureau's disclosure avoidance protocols, which require the Census Bureau to ensure that data released by the Bureau do not compromise

respondent confidentiality, indisputably impact how the Census Bureau will be able to process and release block-level CVAP data.

289. Pursuant to their disclosure avoidance protocols, the Census Bureau will undertake disclosure avoidance for every census block, meaning that even after the addition of a citizenship question – except for randomly – there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 decennial census questionnaire.  Trial Tr. 1033 (Abowd); Census 30(b)(6) Dep. (Docket No. 502-2) at 54-56, 65-86, 70-71, 100-01; PFOF § IX.B.4.

290. The Bureau has not determined if, after disclosure avoidance, the error margins for block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census 30(b)(6) Dep. at 101.  PFOF §§ IX.B.4, IX.B.5.

291. As documents in the Administrative Record make clear, Defendants were well-aware that disclosure avoidance protocols would impact the ultimate CVAP data produced for the DOJ.  *See, e.g.*, PX-1 at AR 1292 (explaining that only data that has been "processed through the Bureau's disclosure avoidance procedures can be released for public use"); PX-3 at AR 2952 (Census Bureau acknowledgment that the Bureau will need to ascertain "how disclosure avoidance will be handled"); PX-3 at AR 6415 (discussing application of disclosure avoidance system to Census Bureau proposal to obtain CVAP information).

292. Because the Administrative Record includes no details as to how this process will impact the DOJ's stated data need for granular citizenship data, and does not even contain any suggestion that the Secretary in any way considered the implications of disclosure avoidance for his ultimate decision, Defendants' failure even to consider this important aspect of the issue is

arbitrary. *See, e.g.*, *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) ("Despite immense losses in the gray wolves' historical range . . . the Service nowhere analyzed the impact of that loss on the survival of the gray wolves as a whole . . . . Such a failure to address 'an important aspect of the problem,' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking.") (quoting *State Farm*, 463 U.S. at 43); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 420-21 (3d Cir. 2004) (vacating agency repeal rule where agency failed to consider or even acknowledge "the effect of its decision on minority television station ownership"); *State of Connecticut v. U.S. Dep't of Commerce*, No. 3:04-cv-1271, 2007 WL 2349894, at *12-13 (D. Conn. Aug. 15, 2007) (vacating agency decision as arbitrary because, *inter alia*, "the Secretary failed to address an important aspect of the problem because he effectively ignored the adverse effects on oysters," where "the destruction of oysters . . . is significant in balancing the adverse effects of the project against the national interest").

> **d.    Defendants bypassed the procedures designed to identify the best means of satisfying DOJ's request.**

293.    Defendants' decision failed to consider important aspects of the problem because Defendants never complied with their standard practice of conferring with the requesting agency to determine how best to meet its data needs.

294.    The absence of any communication between the Census Bureau and the DOJ subject matter experts to discuss the parameters or details of DOJ's stated data need bolsters the conclusion that the Secretary's decision was arbitrary and capricious.

295.    As detailed in the Administrative Record, when an agency requests data, it is standard operating procedure for the Census Bureau to meet with that agency to discuss the data

request, drill down into the details of the data use, and consider how best to meet the need presented.  PX-1 at AR 1168-72; *see also* PX-71 (AR); PX-101 (AR); PX-4 at AR 5490, 8651.

296.    In this case, the Census Bureau advised DOJ that they had a less burdensome proposal for meeting DOJ's purported data need and reached out repeatedly to DOJ to set up a meeting between their respective experts.  PX-71 (AR); PX-4 at AR 8651.  But the Administrative Record makes clear that DOJ refused to meet with the Census Bureau to explain their request for block level CVAP data or discuss how best to satisfy DOJ's stated needs.  PX-75(R) (AR); PX-4 at AR 5489, AR 9074.

297.    This deviation from usual practice supports a finding that the Secretary's decision to add a citizenship question is arbitrary and capricious.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 523 (E.D.N.Y. 2009), *amended sub nom. Tummino v. Hamburg*, No. 05-cv-366, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013) (holding that where the FDA "departed from its normal procedures," agency conduct was arbitrary and capricious); *St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 207 (D.D.C. 2015) (agency's unsupported departure from prior practice was arbitrary and capricious); *see also Hooper v. Nat'l Transp. Safety Bd.*, 841 F.2d 1150, 1150 (D.C. Cir. 1988) (failure to enforce a procedural rule uniformly is arbitrary and capricious).

298.    The purpose of these inter-agency meetings is to allow the Census Bureau to understand the granular use case for the requested data and ensure that the method proposed for satisfying that data need is suited to the use required.

299.    In the absence of such coordination, Defendants cannot demonstrate that the Secretary's decision fits DOJ's data needs.  For example, the Administrative Record confirms that DOJ was not even apprised of the high inaccuracy rate of citizenship survey responses.  *See*

PX 23 (AR 1294-95).  Nor is there any evidence in the Administrative Record that the Census

Bureau discussed their disclosure avoidance protocols, and concomitant implications for block

level CVAP data, with DOJ.  The record is bereft of any indication as to whether these issues –

widespread errors in survey responses and impacts of disclosure avoidance protocols – will make

the resulting data product unfit for DOJ's stated use.

300.    Consideration of extra-record evidence confirms that Defendants deviated from

long-established processes that were designed and are followed precisely to ensure that federal

statistical agencies can perform their jobs effectively.

301.    Plaintiffs' experts confirm that it is standard operating procedure, and best

practice, for the Census Bureau to meet with a requesting agency to discuss that agency's data

needs.  PFOF § IV.B.

302.    The extra-record evidence further confirms that the refusal to meet was politically

motivated and highly unusual.  PFOF § III.H.1, IV.A-B.  Acting AAG John Gore testified that

this refusal was personally directed by Attorney General Sessions himself.  Gore Dep. (Docket

No. 491-2) at 274.  Dr. Abowd testified that this kind of political interference contravenes

foundational principles designed to uphold the effectiveness and truthworthiness of federal

statistical agencies.  Trial Tr. 1265-68; *see also* PX-355 at 3.

303.    Under these circumstances, Defendants cannot show that there is a fit between the

purported data need presented by the Department of Justice – block-level CVAP data – and the

method identified to satisfy that need – the addition of a citizenship question.

> **e.    Defendants failed adequately to consider the need for testing both the citizenship question and the full census questionnaire.**

304.    Defendants' decision failed to consider important aspects of the problem because

Defendants unreasonably overlooked the insufficiency of prior testing of the citizenship

question, and disregarded the need to test the census questionnaire as a whole after having been changed.

305.    The Secretary's decision memo dismisses the need for testing the citizenship question exclusively on the grounds that because the citizenship question had been included on the ACS since 2005, it had already been sufficiently tested.  PX-26 (AR 1314, 1319).

306.    Based on evidence in the Administrative Record alone, this determination failed to properly consider the Census Bureau's established processes and specific considerations that require pretesting of new survey questions.

307.    The Census Bureau's well-established policies and practices reflect that when changing the decennial census, "[t]he Census Bureau must test the wording of the new question." PFOF § II.E.1; PX-4 at AR 3890, 9867; PX-3 at AR 2304; PX-134 (AR).

308.    The Administrative Record likewise reflects that stakeholders, including six former census directors, emphasized to the Secretary the importance of testing the citizenship question.  PFOF § III.I; PX-116; PX-539.

309.    Defendants contend that they were not obligated to test the citizenship question because it had "performed adequately" on the ACS, but the Administrative Record proves that, in fact, the citizenship question had not performed adequately; instead, roughly 30% of all people identified as noncitizens by administrative records self-report as citizens.  PFOF § IV.E.3; PX-22 (AR).

310.    Secretary Ross says in his decision memo that the high disagreement rate is a sign that ACS citizenship data are unreliable.  PX-26 at AR 1316.  The Secretary seems not to have understood that this assertion undermines his reliance on the ACS for his conclusion that the citizenship question as "well tested."  PFOF § IV.E.3; PX-26 at AR 1314.  There is no evidence

of any kind in the Administrative Record that Secretary Ross evaluated whether the ACS citizenship question was performing adequately in concluding it did not need to be tested again.

311.     There is no evidence in the Administrative Record that Secretary Ross considered whether testing was required in light of the changing macro environment.

312.     There is no evidence in the Administrative Record that Secretary Ross considered whether the citizenship question required testing in light of differences between the ACS and the decennial census, including the absence of a preceding nativity question on the ACS or the prominence of the citizenship question in a much shorter survey.

313.     The Secretary's failure to address any of these reasons why prior testing of a citizenship question on the ACS was insufficient is a paradigmatic example of arbitrary decisionmaking.  *See, e.g.*, *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1188 (D.C. Cir. 2014) (vacating agency order where agency failed even to consider potential harms of its changes to an airport advertising program); *Stewart v. Azar*, 313 F. Supp. 3d 237, 263 (D.D.C. 2018) (vacating HHS Secretary's waiver of several requirements of expanded Medicaid because "[f]or starters, the Secretary never once *mentions* the estimated 95,000 people who would lose coverage, which gives the Court little reason to think that he seriously grappled with the bottom-line impact on healthcare.").

314.     The Administrative Record also demonstrates that Defendants failed entirely to consider the need to test the full census questionnaire, as modified to include a new citizenship question.  The Secretary's decision memo does not address the need for full testing of the complete questionnaire, as distinct from testing of the question itself, at all.

315.     OMB statistical directives and the Census Bureau's own Statistical Quality Standards dictate that the full census instrument be pre-tested when changes are made, as even

minor variations in the design of a questionnaire can lead to unanticipated differences in response patterns. *See, e.g.*, PX-260 at § A2-3.3.

316.    The Secretary's decision memo makes no reference to the scientific consensus concerning the need for full-questionnaire testing or the Census Bureau's own Statistical Quality Standards that require testing of the entire census questionnaire.  PX-26 (AR 1313, 1314, 1319) (referencing only testing of the question for the ACS).

317.    Defendants' failure even to consider the need for testing of the entire proposed questionnaire is arbitrary and capricious.  *See, e.g.*, *New York State Bar Ass'n v. Fed. Trade Comm'n*, 276 F. Supp. 2d 110, 145 (D.D.C. 2003) (agency's failure to consider whether statutory scheme warranted a *de minimis* exception was arbitrary and capricious).

318.    If considered, the extra-record evidence further proves that testing of the citizenship question on the ACS does not justify its use on the decennial census.

319.    Expert testimony from Plaintiffs' witnesses confirms that the citizenship question was not properly tested for inclusion on the census, because the question was not performing adequately on the ACS; because changes in the macro environment required up-to-date testing; and because of the many differences between the ACS sample survey and the decennial census. PFOF § IV.E.3.

320.    Extra-record evidence also demonstrates that the Census Bureau typically spends *years* testing survey instruments prior to deciding whether or not to change the decennial census; for this census cycle alone, the Census Bureau conducted many tests of the instrument.  PFOF § IV.E.4; Thompson Aff. (Docket No. 516-1) ¶¶ 48-54; Habermann Aff. (Docket No. 498-11) ¶¶ 44-46; Trial Tr. 167.

321.    The Committee on National Statistics (CNSTAT) of the National Academy of

Sciencies also concluded that the citizenship question had not been properly tested.  PX-529.

322.    Dr. Abowd himself testified at trial that the ACS citizenship question is *not* in fact

performing well.  Trial Tr. 1282.

323.    In addition, both Dr. Abowd and David Langdon testified that one reason to

conclude that prior testing was sufficient here was that there was not enough time following

receipt of the DOJ request to conduct new testing.  Trial Tr. 1291; Langdon Dep. (Docket No.

510-2) at 243 ("There hasn't been any testing to date.  And the time frame wouldn't – the

Secretary's decision wouldn't – you know, wouldn't accommodate that kind of testing.").  But

that is an exigency of Defendants' own making; failure to give themselves enough time to

conduct proper pretesting does not excuse noncompliance with testing standards.  *See N.*

*Mariana Islands v. United States*, 686 F.2d 7, 21 (D.D.C. 2009) ("DHS should not now expect to

excuse its violation of the APA by pointing to the problems created by its own delay.").

>    **f.    Defendants failed adequately to consider the range of injuries that result from including a question that depresses response rates.**

324.    The Secretary's decision memo states that "[t]he citizenship data provided to DOJ

will be more accurate with the question than without it, which is of greater importance than any

adverse effect that may result from people violating their legal duty to respond."  PX-26 at

AR 1319.  The Secretary's assertion that providing information to DOJ "is of greater

importance," than "any adverse effect" is both incorrect and fails to consider the broad range of

harms that stem from depressing responses to the census.

325.    The sole constitutional purpose of the decennial census – the reason it exists, first

and foremost – is the apportionment of Representatives in Congress among the states.  U.S.

Const. art. I, § 2, cl. 3; *id.* amend. XIV, § 2.  This interest is paramount and certainly more important than assisting DOJ.

326.    The Secretary's decision memo nowhere considers the wide variety of harms that can result from getting this enumeration wrong.  PX-26; *see* PFOF § X.  Nor does he make any effort to weigh those harms against the value of assisting DOJ.  PX-26 (AR).

327.    Finally, the Secretary's assertion that assisting DOJ is more important than adverse effects "that may result from people violating their legal duty to respond," again failed adequately to consider the nature and quality of injuries that may result from an inaccurate census.  The fact that some people might refuse to respond because the Secretary has chosen to include a question uniformly understood to discourage people from responding is not a good reason why other residents of that state or community should be denied their just representation, or funding for medical services, educational services, and the like.  In any case, nowhere is there any evidence that the Secretary weighed these issues.  PX-26.

328.    Extra-record evidence confirms that the Secretary's failure to consider the profound detrimental impact of adding a citizenship question on the census is arbitrary.  As Dr. Abowd testified, the decennial census "is the statistical foundation of the Census Bureau's work on households and compromising its quality to produce a citizenship tabulation that could be produced from other sources more accurately is not a risk that I would be willing to take."  Trial Tr. 1332.

### 3.    Defendants' stated rationale was pretextual.

329.    Agency action is invalid under the APA where the agency has "relied on factors which Congress has not intended it to consider."  *State Farm*, 463 U.S. at 43.

330.    Agency action will be arbitrary and capricious if it is based on a pretext – that is, if "the stated rationale for Secretary Ross's decision was not his actual rationale."  *New York v.*

*U.S. Dep't of Commerce*, No. 18-cv-2921, 2018 WL 4539659, at *2 (S.D.N.Y. Sept. 21, 2018);

*see also Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994); *XP*

*Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 79 (D.D.C. 2015) (plaintiff stated pretext

claim based on allegations that, *inter alia*, agency proffered pretextual reason for its decision).

331.    Manufacturing a post hoc explanation—DOJ's purported need for citizenship data

for VRA-enforcement purposes—for a decision that Secretary Ross had already made based on

some other rationale is evidence of pretext.  *See Tummino v. von Eschenbach*, 427 F. Supp. 2d

212, 231-33 (E.D.N.Y. 2006) (officials "needed to find acceptable rationales"); *see also Woods*

*Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994) (setting aside

agency action because "sole reason" for that action was "to provide a pretext" for the agency's

"ulterior motive"), *adhered to on reh'g en banc*, 47 F.3d 1032 (10th Cir. 1995).

### a.    The Administrative Record alone confirms that the stated rationale is pretext.

332.    The Administrative Record demonstrates that the Secretary's reliance on DOJ's

purported need for citizenship data for VRA enforcement was a pretext manufactured by

Commerce to cover the Secretary's actual rationale for adding a citizenship question to the

decennial census questionnaire.

333.    The Secretary's own statements, along with the emails and documents contained

in the Administrative Record, establish that the Secretary was pursuing a citizenship question

long before he reached out to DOJ to obtain DOJ's December 2017 letter, and long before he had

any awareness of any purported VRA-enforcement rationale.  PX-55 (AR); PX-19 (AR); PX-150

(AR); PX-607 (AR).

334.     As the Secretary has admitted, he began considering the citizenship question "[s]oon after [his] appointment as Secretary" in February 2017 – almost a year before DOJ's letter.  PX-2 at AR 1321.

335.     The Secretary's ensuing months-long pursuit of the citizenship question had nothing to do with any purported VRA-enforcement rationale.  For example, early in the Secretary's tenure, at the direction of then-White House Chief Strategist Stephen Bannon, the Secretary spoke with Kris Kobach, the Kansas Secretary of State, who urged the Secretary to add a citizenship question as an "essential" tool to resolve "the problem" of noncitizens' being counted for purposes of congressional apportionment.  PX-19 (AR 763-64).  Kobach's email made no mention of the VRA.  *Id.*

336.     The Secretary then pressed his staff to add a citizenship question to the decennial census when they failed to move quickly.  In March 2017, Comstock responded to the Secretary's "question on the census" by discussing whether the census's total-population count must include noncitizens.  PX-55 (AR).  This email also did not discuss the VRA.  *Id.*

337.     In May 2017, the Secretary asked Comstock by email why "nothing [has] been done in response to my *months old* request that we include the citizenship question."  PX-88 (AR) (emphasis added).  The Secretary's email did not mention the VRA.

338.     Comstock replied that Commerce would "get that in place" and "work with Justice to get them to request that citizenship be added," again without mentioning the VRA.  PX-88 (AR).

339.     The Secretary's demand for progress also set off further activity among the Secretary's staff, including discussions about the legal basis for counting "illegal immigrants" in the census.  PX-150; PX-565.

340.    In August and early September 2017, the Secretary sent multiple emails to his staff demanding updates, briefings, and meetings about adding the citizenship question. Although one of these emails references DOJ and offers to call the Attorney General, PX-97 (AR), none of them mentions the VRA.  PX-45 (AR), PX-95 (AR).

341.    The VRA rationale continued to be absent during Commerce's subsequent, extensive efforts "to find acceptable rationales" for adding the citizenship question.  *See Tummino*, 427 F. Supp. 2d at 231-33.

342.    As the Administrative Record demonstrates, Commerce staff began shopping the question around to different federal agencies.  Staff solicited officials in other agencies to request addition of the question, including officials who work on immigration matters in the Departments of Justice and Homeland Security, but these officials declined Commerce's overtures.  When those efforts failed, the Secretary's staff worked on "how Commerce could add the question to the Census *itself*" – i.e., without any rationale from another agency.  PX-48 (AR). Commerce's efforts to find some other justification for adding the citizenship question, rather than the VRA rationale that the Secretary later relied on, further demonstrate that the VRA justification is pretext.

343.    In December 2017, DOJ eventually requested that Commerce add a citizenship question to the 2020 census questionnaire.  But the origins of that request and the Secretary's shifting characterization of it further underscore the pretextual nature of the VRA rationale.

344.    The Secretary's initial memorandum in March 2018 stated that he began his decision-making process about a citizenship question *after* receiving the Department of Justice's December 2017 request letter.  PX-26 at AR 1313.  The Secretary repeated this account in subsequent Congressional testimony, in which the Secretary claimed that Commerce's

investigation into adding a citizenship question was *solely* in response to DOJ's December 2017 request.  PFOF § IV.D.  What these statements did (and were intended to) convey was that the Secretary was merely deferring to DOJ's independent judgment about the need for citizenship data in an area of DOJ expertise.

345.    But the Administrative Record demonstrates that both aspects of the Secretary's narrative were false: it was the Secretary, not DOJ, who initiated the decision-making process to add a citizenship question, nearly a year before DOJ's December 2017 request; and it was the Secretary who first reached out to DOJ about the citizenship question rather than the other way around.

346.    Indeed, DOJ's request had not arisen organically from that agency's independent judgment; instead, Commerce had repeatedly solicited DOJ and then worked with DOJ to produce the December 2017 letter so that it would appear – falsely – as though DOJ had independently initiated the request for citizenship data.  PX-537 at AR 12756.

347.    Among other efforts, the Secretary personally and repeatedly lobbied the Attorney General to submit the request that the Secretary later claimed was the sole reason he began considering a citizenship question.  PFOF §§ III.D, III.E; PX-97 at AR 4004; PX-48 at AR 2458; PX-67 at AR 2653; PX-61 at AR 2636; PX-52 at AR 12755.  Such post-hoc rationalizations do not constitute rationale or good faith decision-making.  *See, e.g., Tummino v. Torti*, 603 F. Supp. 2d 519, 547-49 (E.D.N.Y. 2009); *Tummino*, 427 F. Supp. 2d at 231-33; *New York v. Salazar*, 701 F. Supp. 2d 224, 242 (N.D.N.Y. 2010), *aff'd*, 2011 WL 1938232 (N.D.N.Y. 2011).

348.    The Administrative Record also belies the genuineness of DOJ's assertion in its December 2017 letter that adding the citizenship question would assist VRA enforcement.

349.    First, as explained, that rationale originated with the Secretary and not with DOJ staff or leadership independently.

350.    Second, DOJ officials refused to meet with the Bureau's experts to discuss their concerns that adding a citizenship question would not produce accurate citizenship data and that there were better, alternative means to obtain higher quality and more accurate CVAP data that better suits DOJ's needs.  *See* PFOF §§ III.H, IX.B.5.

351.    Both facts suggest that DOJ officials with relevant expertise did not in fact believe that, or care whether, the question would provide accurate citizenship data for VRA enforcement.  The questionable nature of DOJ's request further demonstrates that the Secretary adopted the VRA-enforcement rationale as a pretext, particularly given the Secretary's direct role in inducing that letter.

352.    Commerce's efforts to cover up the Secretary's actual decision-making process and rationales also support a finding of pretext.  *See Salazar*, 701 F. Supp. 2d at 242 (agency took steps to conceal that official "prejudged and controlled" decision); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing . . . and do another" is "the essence of arbitrary action.").

353.    As explained, the Secretary's initial explanations of his decision-making were false, as was the Secretary's testimony regarding the lack of White House involvement in his decisionmaking process.  AR 763, AR 2561.  Defendants then also submitted a patently deficient administrative record that lacked nearly any documents from before December 2017, even those these documents disclosed the Secretary's extensive pursuit of the citizenship question before the DOJ letter and before any purported VRA-rationale was in the picture.

354. Moreover, Secretary Ross and his senior staff agreed in August 2017 to whitewash the administrative record.  AR 12476.  These efforts to conceal the pre-December 2017 events strongly suggest that the Secretary's reliance on DOJ's December 2017 letter is pretext.

355. By analogy to employment discrimination caselaw, evidence of Defendants' false or shifting justifications is a strong demonstration of pretext. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 881 (2d Cir. 1997) (evidence of employer's false explanation for employment action supported jury's finding of unlawful pretext); *EEOC v. Ethan Allen*, 44 F.3d 116, 120 (2d Cir. 1994) (evidence of shifting explanations was sufficient for a jury to conclude that employer's explanations were pretextual).

356. Finally, the Administrative Record establishes that the stated reason for the decision – to better enforce Section 2 of the Voting Rights Act ("VRA") – is also implausible and thus a pretext.  *See Torti*, 603 F.Supp.2d at 523 ("implausible justifications for decision-making" showed "lack of good faith and reasoned agency decision-making").  Block-level citizenship data from the decennial census have never been available since the 1965 enactment of the VRA, yet DOJ has been able to enforce the VRA since its passage without such information. PFOF § IX.B.

357. And even if more accurate data could in theory be helpful to DOJ, here, the Administrative Record shows that CVAP data collected through a citizenship question on the

census will be less accurate, because the addition of a citizenship question will damage the overall quality of census data. *See* PFOF IX.B.4.

### b. Extra-record evidence confirms that the Secretary's given rationale is pretext.

358. Extra-record evidence strengthens the conclusion that the VRA-enforcement rationale is a pretext and that the Secretary's decision to add the citizenship question based on that rationale should therefore be set aside as arbitrary and capricious.

359. Specifically, Acting AAG Gore's testimony further undermined the genuineness of DOJ's claim to need more accurate citizenship data to enforce the VRA, and confirmed that DOJ did not independently request such data from Commerce.

360. In his testimony, Gore acknowledged that none of the DOJ components with principal responsibility for enforcing the VRA requested the addition of a citizenship question; instead, he drafted the DOJ letter solely in response to the Secretary's request. Gore Dep. (Docket No. 491-2) at 64-67, 94-95. He also testified that he drafted the DOJ letter despite not even knowing if citizenship data based on responses to a citizenship question on the census will have smaller or larger margins of error, or will be any more precise, than the existing citizenship data on which DOJ currently relies. PFOF § III.F.

361. The extra-record evidence confirms that the VRA-enforcement rationale was not the Secretary's actual reason for adding the citizenship question because the extra-record evidence demonstrates that better block-level citizenship data are not in fact needed to enforce Section 2 of the VRA. PFOF § IX.B.1.

362. And the extra-record evidence adduced at trial establishes that any citizenship data collected through the 2020 census would not be usable at the block level in any event, because of the Census Bureau's statutorily-mandated disclosure avoidance protocols and

confidentiality protections.  In order to make such data usable, the Census Bureau will be

forced to introduce errors into the data, transforming any block-level CVAP data into estimates

with a margin of error rather than a hard count; and the Bureau does not know whether such

CVAP estimates will be any more precise than the existing CVAP data on which DOJ

relies.  *See* PFOF § IX.B.4.

363.     The extra-record evidence also confirms that Commerce failed even to inform the

Census Bureau that the Secretary had long been pursuing a citizenship question or his purported

reason for doing so.  As the extra-record evidence shows, the entire senior executive staff of the

Census Bureau – indeed, "everyone" Dr. Abowd knows at the Census Bureau – was surprised by

the contents of the Administrative Record that predated the December 2017 letter from DOJ.

Trial Tr. 1020 (Abowd).

364.     During all of the work that Dr. Abowd and his senior team did to evaluate the

DOJ request, nobody from the Commerce Department ever told him of the Secretary's many

repeated demands to add a citizenship question, the lengthy efforts to recruit another federal

agency to sponsor the question, or any purported VRA-enforcement rationale for adding the

citizenship question.  PFOF § III.G.

365.     Nor did Commerce officials – during their months-long efforts to solicit an

agency to request a citizenship question – ever consult the Census Bureau to understand the

methodological or programmatic implications of their actions.

366.     Commerce officials' persistent failure to consult with the Census Bureau strongly

suggests pretext by demonstrating that officials were not genuinely interested in obtaining high-

quality and accurate citizenship data for VRA enforcement.

367.    No one at Commerce or DOJ asked the Census Bureau's expert staff whether adding a citizenship question would, in fact, provide citizenship data more accurate than the data that DOJ already uses for VRA enforcement.  Nor did anyone at Commerce or DOJ find out whether there were other, better ways to obtain more accurate citizenship data without adding a citizenship question.

368.    Indeed, the extra-record evidence confirms that when the Census Bureau sought to discuss the best way to obtain accurate citizenship data with DOJ, Attorney General Sessions personally directed DOJ officials not to meet with the Bureau's staff.  *See* PFOF §§ III.H.1; V. Trial testimony conclusively demonstrated that the Census Bureau determined that using administrative records would produce more accurate data for DOJ's needs.  *See* PFOF § IX.B.5. Asserting that a citizenship question will provide more accurate citizenship data without knowing whether that assertion is true and without asking the professional staff whether that assertion is even supportable is strong evidence of pretext.

369.    Finally, extra-record evidence strengthens the conclusion that the Secretary's initial presentation of the genesis of his decision was false and misleading.  On November 13, 2018 – in the middle of the trial of this action – the Secretary gave a press interview regarding his decision to add a citizenship question, and stated that he was aware that discussions of adding a citizenship question were "in the air" from the "early days" of the Trump Administration.  PX-688.  But as Dr. Abowd testified, after viewing the video of Secretary Ross's November 13 press interview, a citizenship question was "not [in] the air I was breathing."  Trial Tr. 1373.

### 4.    The Secretary improperly prejudged the decision to add a citizenship question.

370.    Agency action is arbitrary and capricious under the APA where the decision-maker prejudged important matters underlying the challenged decision.  *See, e..g*, *Air Transport*

*Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 486-88 (D.C. Cir. 2011); *PLMRS*

*Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1002 (D.C. Cir. 1999); *Salazar*, 701 F. Supp. 2d at

242.

371.     An agency decision-maker prejudges important matters when he acts with a

closed mind rather than engaging in "fair and honest consideration" of the matters at hand. *Torti*,

603 F. Supp. 2d at 542; *see Air Transport*, 663 F.3d at 486-88.

372.     The Administrative Record demonstrates that the Secretary prejudged his decision

to add the citizenship question.  As the Administrative Record establishes, the Secretary decided

to add the citizenship question to the 2020 census well before DOJ's December 2017 letter and

well before his March 2018 initial decision memorandum.  Moreover, the Secretary single-

mindedly pursued that goal despite multiple obstacles and objections, without giving fair

consideration to important underlying issues.

373.     The Administrative Record shows that the Secretary decided to add the

citizenship question many months before he even received DOJ's December 2017 letter.  For

example, the Secretary demanded to know in May 2017, "why nothing [has] been done in

response to my *months old* request that we include the citizenship question," to which Comstock

answered that Commerce would "get that in place."

374.     In the months that followed, the Secretary repeatedly demanded to know why his

goal of adding the citizenship question had not been completed, and repeatedly stated that he

would personally reach out to the Attorney General if progress was not made on getting DOJ to

sponsor the addition of a citizenship question.

375.    And in November 2017, before DOJ had sent its request, the Secretary warned

that Commerce was "out of time" to add the citizenship question and that he would thus

personally call "whoever is the responsible person at [DOJ]."  PFOF § III.E.

376.    An open-minded decision-maker would not speak about the decision to add a

citizenship question as a matter decided "months ago" or as an action that must be completed

now because the agency is "out of time."  *See Davis v. Mineta*, 302 F.3d 1104, 1112-13 (10th

Cir. 2002), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7

(2008) (agency comments reflected prejudgment); *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340

F. Supp. 2d 1249, 1260-61 (D. Wyo. 2004) (decision-maker's comments reflected prejudgment).

377.    The Administrative Record also belies the Secretary's contention that he fairly

considered the addition of a citizenship question after receiving DOJ's December 2017 request.

The fact that the Secretary and his staff solicited DOJ's request and worked with DOJ to draft the

December 2017 letter strongly suggests that the Secretary had already made up his mind before

the request arrived, and that DOJ's request letter merely provided cover for a decision already

made.  *Tummino*, 427 F. Supp. 2d at 231-33.

378.    The Administrative Record also establishes that throughout his entire decision-

making process, the Secretary continued to push to add the citizenship question no matter the

hurdles he faced or the strong objections raised by the Census Bureau, legislators, or other third

parties.  For example, the Secretary repeatedly demanded that his staff take action to add the

citizenship question when they were not making sufficient progress. He urged his staff to add the

citizenship question even after he found out that both DOJ and Homeland Security had refused to

sponsor such a question.  He personally and repeatedly lobbied the Attorney General to request

the question even after DOJ had declined to do so.  PFOF § III.B.

379.    The Secretary also disregarded the repeated warnings of the Census Bureau.  As the Administrative Record demonstrates, the Secretary added the question even though the Census Bureau informed him that adding the question would reduce rather than enhance the accuracy of citizenship data, and that using administrative records would provide more accurate citizenship data than adding a citizenship question.  He also ignored the Census Bureau's warning that adding the citizenship question would undermine the Bureau's ability to use administrative records to produce accurate citizenship data.  PFOF §§ III.E.6, III.H.  In fact, no evidence before the Secretary suggested that adding a citizenship question would improve, rather than detract from, the accuracy of citizenship data.

380.    The Administrative Record also demonstrates that the Secretary ignored many other warnings from the Census Bureau, including that adding the citizenship question would harm the accuracy of the census count, result in enormous extra costs, and place significant burdens on the residents responding to the census and NRFU operations. PFOF §§ III.H, III.E.4-6. And the Secretary also ignored the significant concerns about adding the citizenship question that were raised by a numerous and broad group of stakeholders, including Ms. Pierce, whose opinion the Secretary invoked in his decision memorandum. PFOF § III.E.4.

381.    Indeed, the Administrative Record demonstrates that Commerce struggled to find *anyone* who would publicly support adding the citizenship question. PFOF § III.H.2.e.

382.    A decision-maker who was fairly and honestly considering the evidence before him would not have proceeded in the face of one-sided evidence that adding a citizenship question would not only lead to an inaccurate enumeration, but also prevent the collection of accurate citizenship data for the VRA-enforcement purpose that was his ostensible rationale. The Secretary's insistence on adding the question notwithstanding this evidence demonstrates

that the Secretary had prejudged the issue.  *See Latecoere*, 19 F.3d at 1365; *Tummino*, 427 F. Supp. 2d at 231-33.

383.    The Administrative Record also belies the Secretary's contention that he or his staff at Commerce genuinely set out to take a "hard look" at the citizenship question or engage in a "comprehensive review process"  after receiving DOJ's December 2017 letter.

384.    The true timeline of the extraordinary efforts that the Secretary and his staff had already undertaken well before DOJ's letter to add the citizenship question demonstrate that the process that occurred after December 2017 could not plausibly have altered the Secretary's decision and was simply a vehicle to make it falsely appear as if the Commerce staff and the Secretary had initiated the decision-making solely in response to DOJ's request.  *Davis*, 302 F.3d at 1112-13 (agency prejudged decision where it conducted "an evidently *pro forma* public opportunity to comment").

385.    The Administrative Record further shows prejudgment based on the Secretary's dramatic departures from the typical decision-making process for making even minor alterations to the decennial census questionnaire.  The Census Bureau typically takes years to test the census design and validate new questions, but here Defendants decided to add the citizenship demand in less than four months, with no testing or validation, and with no consultation with DOJ to determine how its data needs could be met.  AR 3460.

386.    Bypassing the very procedures that are designed to provide the Secretary with the information he needs to make an informed and open-minded judgment about whether to add the citizenship question demonstrates that he had already made the determination and would not alter his mind. *See Tummino*, 427 F. Supp. 2d at 233-34 ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing

of bad faith . . . has been made."); *Inforeliance Corp. v. United States*, 118 Fed. Cl. 744, 747-48 (2014).

387.    Finally, the evidence in the Administrative Record of political pressure on the Commerce Department from White House staff and Presidential advisers, including Stephen Bannon and Kris Kobach, to add the citizenship question, independently supports setting aside Defendants' decision on arbitrary and capricious grounds.  AR 763-764, AR 2561.  *See Tummino v. Torti*, 603 F. Supp. 2d 519, 544-45 (E.D.N.Y. 2009) (citing *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49 (D.C. Cir. 1971)); *see also Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997).

**C.    Defendants' decision to demand citizenship information is not in accordance with law.**

388.    The Administrative Procedure Act provides that the Court "shall" "hold unlawful and set aside" agency action that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

389.    The Secretary's decision to add a citizenship question is not in accordance with law and should be set aside under the APA because (1) it does not comply with the Congressional reporting requirements of Section 141(f) of the Census Act; (2) it does not comply with the requirements of Section 6 of the Census Act to prioritize use of administrative records over direct inquiries to the maximum extent possible; and (3) it does not comply with the pretesting and burden-reduction requirements contained in the OMB Statistical Policy Directives and in the Census Bureau's Statistical Quality Standards.

1.      **Section 141(f) of the Census Act.**

390.    Section 141(f) of the Census Act sets a strict timeline for changing the content of the decennial census and cabins the Secretary's discretion to add new questions to the instrument.

391.    The Act provides that the Secretary "shall submit" a report to Congress "not later than 3 years before the appropriate census date," identifying the "subjects proposed to be included, and the types of information to be compiled, in such a census."  13 U.S.C. § 141(f)(1).

392.    The Census Act allows the Secretary to amend the subjects on the census after the report is submitted only where "*new* circumstances exist which *necessitate* that the subjects, types of information, or questions contained in reports so submitted be modified."  13 U.S.C. § 141(f)(3) (emphasis added).

393.    The Act additionally requires the Secretary to submit a report to Congress documenting any such "new circumstances."  *Id.*

394.    Congress added the requirements at Section 141(f) of the Census Act through the 1976 amendments to that Act.  Pub. L. No. 94-521, § 7(a), 90 Stat. 2459, 2461-62 (1976).

395.    The legislative history of those amendments establishes that the purpose of these provisions was to enable Congress to exercise greater scrutiny and oversight of decennial census subjects and questions.  The Senate Report on the 1976 amendments notes that the purpose of the provisions codified at Section 141 was to "*require*[] that the Secretary of Commerce submit at various intervals the subjects and questions to be used in the decennial and mid-decade censuses of population to the appropriate committees of Congress for their review and recommendations." S. Rep. No. 94-1256, at 5 (1976) (emphasis added).

396.    Similarly, the House Report on the 1976 amendments notes that "[i]n view of the increasing attention focused on the content of census questionnaires," the requirements at

90

Section 141 were intended to "establish[] a time table for proposed subjects and questions . . . to be submitted to the Congress for its review and recommendations," in order to allow Congress to "assure that the statistical needs will be met and that the citizens will not be unfairly subject to questions invading their privacy."  H. Rep. No. 94-944, at 5-6 (1976).

397.    The Commerce Department advised Congress in 1976, during consideration of these amendments, that "[w]e have no objection to this provision which is to ensure that Congress is kept informed on census planning."  *Mid-Decade Census Legislation: Hearing on S. 3688 and H.R. 11337 Before the Subcomm. on Census and Statistics of the S. Comm. on Post Office and Civil Serv.*, 94th Cong. 25 (1976) (statement of agency views, General Counsel, U.S. Dep't of Commerce).

398.    The reporting requirements in 13 U.S.C. § 141(f) are therefore not merely ministerial, but are necessary for Congress to assure adequate oversight of the Commerce Secretary's exercise of his discretion regarding the decennial census.  This is particularly so because the Constitution "vests *Congress* with wide discretion over . . . the conduct of the census," *Wisconsin*, 517 U.S. at 15 (emphasis added); and Defendants are authorized to act only by subsequent delegation of that authority by Congress to the Secretary of Commerce, *id.* at 19 (citing 13 U.S.C. § 141(a)).

399.    The requirements at Section 141(f) are therefore substantive components of – and restrictions on – the Secretary's exercise of the discretion delegated to him by Congress.  *Cf. New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 795-96 (S.D.N.Y. 2018) (rejecting Defendants' argument that the Secretary's decision is judicially unreviewable as "committed to agency discretion by law," because among other reasons "the Census Act imposes any number of mandatory duties upon the Secretary").

### a.  The Administrative Record is clear that Defendants did not comply with Section 141(f) of the Census Act.

400.    In March 2017, the Secretary submitted the report required under Section 141(f)(1) in March 2017, and did not identify citizenship as a subject to be included on the decennial census.  PX-1 at AR 194 (the "Subjects Planned" report).

401.    The Administrative Record makes clear that commenters on the DOJ request pointed out to the Secretary the importance of complying with the Section 141(f)(1) requirement.  Six former Directors of the Census Bureau wrote the Secretary in January 2018 to stress, among other considerations, the three-year report requirement.  PX-1 at AR 1057 ("There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.").

402.    Plaintiff the U.S. Conference of Mayors wrote the Secretary in January 2018 and stressed "the Justice Department has not set forth new legal or programmatic reasons for the Census Bureau to collect this information from every household in the country since its initial cataloguing of data requirements for the census . . . prior to the Census Bureau's submission of 2020 Census and ACS topics to Congress last spring."  PX-1 at AR 1066, AR 1075.

403.    The Administrative Record is clear that the Census Bureau was well aware of these deadlines and requirements, and organized their original content review process around these mandatory statutory deadlines.  PX-1 at AR 1168 ("This memorandum officially documents the U.S. Census Bureau's plan to develop and transmit to Congress the *Subjects Planned for the 2020 Census Program*," and noting that "Title 13, U.S. Code requires the Census Bureau to send Congress the subjects proposed to be included in the census not later than three years before the Census date.").

404.    The Census Bureau's own description of the process for adding content to the

decennial census questionnaire notes that "[b]y law, the Census Bureau notified the Congress of

the topics to be covered by the 2020 Census on March 31, 2017. . . .  This is an intentional[]

process designed to give Congress the ability to review the topics and questions on the

questionnaire before they are finalized.  If an additional topic is required, it is imperative that

Congress be notified as soon as possible."  PX-134 at AR 9865; *see also* PX-4 at AR 3890-91.

405.    Defendants have never transmitted any report to Congress that identifies new

circumstances "necessitating" a change in the topics to be covered by the decennial census, as

required by Section 141(f)(3).  The report required by Section 141(f)(2), which was submitted to

Congress in March 2018, simply notes that a question on citizenship will be included in the

census.  PX-489 at 11.  It does not identify "new circumstances . . . which necessitate" a need for

a citizenship question.  *Id.*

406.    Nor does anything else in the Administrative Record identify any new

circumstances arising after the March 2017 report suggesting that existing data for VRA

enforcement were suddenly problematic or ineffective.

407.    To the contrary, the evidence in the Administrative Record confirms that as far as

effective enforcement of the Voting Rights Act is concerned, no "new circumstances" arose

between March 2017 and March 2018 "which necessitate[d]" the inclusion of a citizenship

question.  *See, e.g.*, PX-1 at AR 773 (letter from Vanita Gupta, President and CEO of the

Leadership Conference on Civil & Human Rights) ("I know from my prior experience as the

chief government enforcer of the Voting Rights Act [that] the Justice Department has never

needed to add this new question to the decennial census to enforce the Voting Rights Act before,

so there is no reason it would need to do so now."); *id.* at AR 798 (citizenship data from the

decennial census are "unnecessary" to enforce the Voting Rights Act); *id.* at AR 1083 (same from the National League of Cities); *id.* at AR 1096-98 (same from coalition of state Attorneys General); *id.* at AR 1207 (same as recorded in Gupta stakeholder call).

408.     The Court may take judicial notice that Congress did not enact legislation amending the Voting Rights Act between March 2017 and March 2018.

409.     The DOJ request letter does not identify any changed circumstances between March 2017 and March 2018, and does not contend that data from a citizenship question on the decennial census are "necessary" for VRA enforcement.

410.     Accordingly, Defendants' failure to include citizenship on the list of decennial subjects in the March 2017 report to Congress, and the concomitant absence of changed circumstances that necessitate the addition, is plainly contrary to law.  *See NRDC*, 894 F.3d at 108-13 (vacating the agency's decision for failure to comply with unambiguous statutory deadlines); *ACEMLA v. Copyright Royalty Tribunal*, 763 F.2d 101, 109 (2d Cir. 1985) (vacating the agency's order as not in accordance with law for failure to comply with statutory obligation to "state in detail the criteria . . . , the various facts that it found . . . , and the specific reasons for its determination"); *East Bay Sanctuary Covenant v. Trump*, 18-cv-6810-JST, 2018 WL 6053140, at *11-14 (N.D. Cal. Nov. 19, 2018) (finding likelihood of success on the merits sufficient to enter nationwide temporary restraining order to enjoin rule that would bar asylum for immigrants entering between ports of entry, on the ground that "the [r]ule flouts the explicit language of the statute").

94

**b.**     **Extra-record evidence establishes that Defendants are not able to meet the requirements of Section 141(f)(3).**

411.     Dr. Jarmin testified that he agrees the Section 141(f) requirements are intentionally designed "to give Congress the ability to review the topics and questions on the questionnaire before they're finalized."  Jarmin Dep. (Docket No. 511-2) at 50.

412.     Even if Defendants were to attempt today to cure this violation of their statutory obligations, extra-record evidence establishes that the statutory standard to identify new evidence necessitating a change cannot be met.

413.     The Department of Justice itself agrees that adding a citizenship demand to the census is not "necessary" to enforce the VRA.  Gore Dep. (Docket No. 491-2) at 300 ("Q. You agree, right, Mr. Gore, that CVAP data collected through the census questionnaire is not necessary for DOJ's VRA enforcement efforts?  A. I do agree with that.  Yes.").

414.     Dr. Abowd similarly testified that he does not believe adding a citizenship question is "necessary" to provide the Department of Justice with the data they requested.  PFOF § IV.E.6 ¶ 888.

415.     The unrebutted expert testimony of Plaintiffs' voting rights expert Dr. Lisa Handley also confirms that a citizenship question on the census is not "necessary" to enforce the Voting Rights Act.  PFOF § IX.B.2; *see also* Br. of the Leadership Conference on Civil & Human Rights as *Amicus Curiae* at 2 (Docket No. 443) (explaining that there is "no evidence" that census-derived CVAP data "would have assisted the litigation" of VRA cases in the past, nor evidence that such data "would assist this litigation either today or in the future").

**2.**     **Section 6 of the Census Act.**

416.     Section 6(c) of the Census Act requires that "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary

*shall* acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries." 13 U.S.C. § 6(c). Subsections (a) and (b) in turn refer to the administrative records of other federal agencies as well as state and municipal governments and private parties. *Id.* § 6(a), (b).

417.    Congress added the requirement at Section 6(c) of the Census Act through the 1976 amendments to that Act. Pub. L. No. 94-521, § 5, 90 Stat. at 2460.

418.    The legislative history of Section 6(c) of the Census Act is clear that Congress intended to make *mandatory* the use of statistical data from other sources in lieu of direct inquiry whenever possible, in order to reduce burden and cost.

419.    The Senate Report on the 1976 amendments explains that "Section 5 adds a new subsection (c) to section 6 of title 13, U.S.C., which directs the Secretary of Commerce to acquire and use to the greatest extent possible statistical data available from other sources, in lieu of direct inquiries. While current law authorizes the Secretary to purchase or otherwise acquire such information, this amendment serves to emphasize Congress['s] desire that the authority be used whenever possible in the interest of economy and reducing respondent burden." S. Rep. No. 94-1256, at 3 (1976).

420.    The House Report on the 1976 amendments likewise notes that the requirement codified at Section 6(c) "direct[s] the Secretary to the maximum extent possible to acquire and use information already available, instead of conducting direct inquiries." H. Rep. No. 94-944, at 5 (1976).

a.      **The Administrative Record is clear that Defendants did not comply with Section 6(c) of the Census Act.**

421.    The Administrative Record makes clear that the Secretary's decision to select "Alternative D" over "Alternative C" was not in accordance with his mandatory obligation to use

administrative records "[t]o the maximum extent possible," 13 U.S.C. § 6(c), instead of
conducting direct inquiries.

422.    The Census Bureau analyses in the Administrative Record demonstrate that using
administrative records was a superior alternative to the direct inquiry Secretary Ross ultimate
chose.  The Census Bureau's January 2018 memo concluded that Alternative C (obtaining
citizenship status from administrative records) "best meets DoJ's stated uses, is comparatively
far less costly than Alternative B, does not increase response burden, and does not harm the
quality of the census count."  PX-22 at AR 1277; *see also* PX-25 at AR 1312 ("In sum,
Alternative D would result in poorer quality citizenship data than Alternative C.  It would still
have all the negative cost and quality implications of Alternative B . . . ."); PX-23 at AR 1293
(Question 21: "Is using sample data and administrative records sufficient for DOJ's request?  A.
The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request.").

423.    Secretary Ross discarded those conclusions based on a flawed assessment of
Alternative C that Dr. Abowd debunked at trial.  PFOF § IV.E.6.

424.    Because Defendants failed to comply with the mandatory obligation in
Section 6(c) to use administrative records instead of direct inquiries "[t]o the maximum extent
possible," the decision should be set aside under § 706(2)(C) of the APA.  *See NRDC*, 894 F.3d
at 112-13 ("because the text, purpose, and history of the [statutory provision] are all
unambiguous regarding the mandatory nature of the" agency's obligation, the agency's decision
was "issued 'in excess of statutory . . . authority'") (quoting 5 U.S.C. § 706(2)(C)); *cf. League of
Women Voters*, 838 F.3d 9-10 ("Because [the agency's executive director] expressly found that
the criterion set by Congress . . . was 'irrelevent' to his analysis, it is difficult to imagine a more
clear violation of the APA[].").

b.  **Extra-record evidence further confirms that the Secretary's decision is "not in accordance with law" under Section 6(c).**

425.    Extra-record evidence further confirms that the unjustified decision not to use administrative records to respond to the DOJ request was inconsistent with the Secretary's mandatory obligations under Section 6(c) of the Census Act.

426.    Dr. Jarmin testified that on receiving the Justice Department's letter, the Census Bureau decided to "explore the use of administrative records to fulfill the request" because "it's an area that we always explore," because "it's often easier, potentially more accurate to [use] administrative records, but it's also the intention of Congress in Title 13, the census code, that when possible, we use administrative records in lieu of direct collection.  So this is something that we typically – typically do."  Jarmin Dep. (Docket No. 511-2) at 59-60.

427.    Dr. Abowd testified that using administrative records is consistent with the Census Bureau's obligation to control costs and burden on respondents under, among other sources of authority, Section 6 of Title 13.  Trial Tr. 1338 (Abowd).

428.    Just yesterday, the Census Bureau published an article describing its statutory obligation under Section 6 to use administrative records in place of direct inquiries "to the maximum extent possible," and noting the benefits in terms of cost savings, quality improvement, and burden reduction.  U.S. Census Bureau, *Administrative Records Offset Declining Census Survey Responses: Survey Fatigue, Time Crunch May Have Lowered Response*, Nov. 20, 2018, at https://census.gov/library/stories/2018/11/administrative-records-offset-declining-census-survey-response.html.[4]

---

[4] Under Rule 201 of the Federal Rules of Evidence, this Court may take judicial notice at any stage of the proceedings of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," such as statements of federal government policy published on a government website.  *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411-12 (S.D.N.Y. 2011) (taking notice of agency guidance documents, consumer advisory, backgrounder, and letters because they were available on FDA website).

3.      **OMB standards and Census Bureau guidelines regarding pretesting and burden reduction.**

429.    The Census Bureau's conduct of the census is constrained by a number of federal standards that require burden-reduction and pretesting of statistical data collection instruments administered by the federal government, like the decennial census.

430.    By statute, the Office of Management and Budget (OMB) has responsibility for coordinating the federal statistical system, including to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes." 44 U.S.C. § 3504(e)(1); *see also id.* §§ 3501(9), 3504(a)(1)(B)(iii), 3504(e).

431.    OMB is also required to establish government-wide guidelines and policies regarding statistical collection methods. *Id.* § 3504(e)(3).

432.    The purpose of these government-wide guidelines is to ensure that federal statistical agencies minimize the burden of their data collection activities and maximize the utility of the information collected. *Id.* § 3501(1), (2).

433.    Consistent with these statutory obligations, OMB has published a number of Statistical Policy Directives that govern the data collection efforts of federal statistical agencies, including the Census Bureau.  PX-354 (Statistical Policy Directive No. 1); PX-359 (Statistical Policy Directive No. 2); PX-360 (addendum to SPD No. 2).

434.    Statistical Policy Directive No. 1, *Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, requires among other obligations that statistical agencies like the Census Bureau "[c]onduct objective statistical activities" by "produc[ing] data that are impartial, clear, and complete and are readily perceived as such by the public."  PX-354 at 7.

435.     Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys*, was issued because OMB determined it was "essential that, to the extent permitted by law, there be sufficient government-wide uniformity in statistical methods and practices to ensure the maximum usefulness of the statistics produced."  Office of Mgmt. & Budget, *Standards and Guidelines for Statistical Surveys—Notice of Decision*, 71 Fed. Reg. 55,522, 55,522 (Sept. 22, 2006).

436.     Directive No. 2 requires, among other obligations, that agencies "must" design all statistical surveys "to achieve the highest practical rates of response" and "minimize[] respondent burden, while maximizing data quality."  PX-359 at 13, 16 (§§ 1.3, 2.3).

437.     These guidelines also require that agencies conduct a pretest of all components of a survey, including by conducting a field test and full dress rehearsal "for highly influential surveys."  PX-359 at 14 (§ 1.4).

438.     The Census Bureau has further clarified the statistical standards it must utilize to address the agency's unique methodological and operational challenges.  PX-260 (Census Bureau Statistical Quality Standards).

439.     The Statistical Quality Standards provide that "[a]ll Census Bureau employees . . . *must comply* with these standards." *Id.* at 5.

440.     These standards require that all data collection instruments be tested "in a manner that balances data quality and respondent burden," and specifically require pretesting to ensure questions are not "unduly sensitive" and "do not cause undue burden."  *Id.* at 7-8 reqs. A2-3 & A2-3.3.

441.     The Census Bureau Statistical Quality Standards and the OMB Statistical Policy Directives provide "meaningful standards [to] constrain[]" agency discretion.  *Salazar v. King*,

822 F.3d 61, 77-80 (2d Cir. 2016); *see also Pearl River Union Free Sch. Dist. v. King*, 214 F.

Supp. 3d 241, 257 (S.D.N.Y. 2016); *New York*, 315 F. Supp. 3d at 798 n.19; *Sierra Club v.*

*Leavitt*, 355 F. Supp. 2d 544, 550-53 (D.D.C. 2005) (regulation implementing the Clean Air Act

"clearly and unambiguously" establishes a nondiscretionary duty).

### a.   The Administrative Record is clear that Defendants did not comply with OMB and Census Bureau standards.

442.   The Administrative Record standing alone establishes that in deciding to add a

citizenship question to the census, Defendants did not comply with the pretesting and burden-

reduction requirements contained in OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

443.   Because Defendants did not comply with these obligations, the Secretary's

decision should be set aside as not in accordance with law under the APA.  *See Padula v.*

*Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("It is well settled that an agency, even one that

enjoys broad discretion, must adhere to voluntarily adopted, binding policies that limit its

discretion.") (citation omitted); *Am. Petroleum Inst. v. EPA*, 787 F.2d 965, 975 (5th Cir. 1986)

("It is elementary administrative law that an agency must operate within the confines of its own

regulations."); *Pleune v. Pierce*, 765 F. Supp. 43, 45 (E.D.N.Y. 1991) ("Actions taken in

violation of agency regulations are . . . 'not in accordance with law'" under the APA); *Bunyard*

*v. Hodel*, 702 F. Supp. 820, 822 (D. Nev. 1988) ("Numerous Courts of Appeals have held that an

agency's failure to interpret properly and to comply with applicable CFR regulations constitutes

arbitrary and capricious conduct that is not in accordance with law.") (citing cases); *cf. Secretary*

*of Labor v. Cranesville Aggregate Cos.*, 878 F.3d 25, 36 (2d Cir. 2017) (holding that decision of

the Occupational Safety and Health Review Commission was "not in accordance with the law"

under § 706(2)(A) where the Commission's decision did not comply with the Labor Secretary's

interpretation of sub-statutory standards).

     **b.**    **Extra-record evidence confirms that the Secretary's decision did not comply with OMB and Census Bureau standards.**

444.    The extra-record evidence developed at trial further confirms that Defendants have failed to comply with binding OMB and Census Bureau standards.  PFOF §§ IV.B, IV.E.

     **4.**    **Defendants have waived any merits-based argument in defense to Plaintiffs' "not in accordance with law" claim for relief.**

445.    Plaintiffs pled a distinct claim for relief that the Secretary's decision should be set aside under the APA because it is "not in accordance with law" or "in excess of statutory . . . authority."  Docket No. 214 (Second Am. Compl.); No. 18-cv-5025, Docket No. 1 (Compl.)

446.    Plaintiffs briefed this claim for relief in both their pretrial memorandum of law and pretrial reply.  Docket No. 410, at 28-29; Docket No. 455, at 7-8.

447.    Defendants raised no argument regarding this claim for relief in either their pretrial memorandum of law or their pretrial reply.  Docket No. 413; Docket No. 456.

448.    Defendants' failure to raise any defense to Plaintiffs' argument that the Secretary's decision is contrary to law should constitute a waiver.  *See, e.g.*, *League of United Latin Am. Citizens v. Wheeler*, 899 F.3d 814, 829 (9th Cir. 2018) (Rakoff, D.J., sitting by designation) ("The EPA presents no arguments in defense of its decision.  Accordingly, the EPA has forfeited any merits-based argument.")

    **D.**    **Remedies for Defendants' APA violation.**

     **1.**    **This Court should vacate the Secretary's March 2018 determination to add a citizenship question to the decennial census.**

449.    The APA mandates that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

450. "[O]rdinarily, when a regulation is not promulgated in accordance with the APA, the regulation is invalid" and must be vacated. *All. for the Wild Rockies v. U.S. Forest Serv.*, 2018 WL 5316129 (9th Cir. Oct. 25, 2018) (quotation marks omitted); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled to relief under that statute, which normally will be a vacatur of the agency's [decision]").

451. Vacatur properly reflects the sound principle that an agency action that violates the APA "'cannot be afforded the force and effect of law,' and therefore is void." *Air India v. Brien*, No. 00-cv-1707, 2002 WL 34923740, at *14 (E.D.N.Y. Feb. 14, 2002) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979)).

452. Vacatur is an appropriate remedy under the APA both when an agency acts contrary to law, *e.g.*, *NRDC v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule that "conflicts with the plain meaning" of statute), and when an agency action is arbitrary and capricious, *e.g.*, *Camp v. Pitts*, 411 U.S. 138, 143 (1973) ("If [the agency's] finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated . . . .").

### 2. This Court should should decline to remand to the agency and reject any request to remand without vacatur.

453. Although courts will often remand to the agency after invalidating an improper determination, courts have also not hesitated to vacate agency actions without remand when they are taken in violation of statutory or procedural requirements. *See, e.g.*, *NRDC*, 894 F.3d at 115-16; *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017).

454. That disposition reflects the fact that statutory or procedural violations can be so fundamental as to render the agency's basic choice – and not merely its particular articulation of that choice – "substantively fatal." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety*

& *Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand").

455.    Here, as discussed in Part III.C above, Plaintiffs have proven statutory and procedural violations that warrant vacatur without remand.  In particular, because Defendants violated their notification deadlines to Congress under 13 U.S.C. § 141(f), failing to give Congress the time it determined it would need to review Defendants' decisions; and because the circumstances for addressing that statutory violation cannot be met, *see infra* Part III.C.1; Defendants cannot at this point add a citizenship question to the 2020 census and remand of the issue for further administrative proceedings would be pointless.

456.    Remand is also unnecessary if this Court concludes that the Secretary's stated rationale for the citizenship question is arbitrary and capricious, because the Secretary has never suggested an alternative basis for his decision.  *See Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1142-43 (D.C Cir. 1994) (remand unnecessary when NLRB "suggested no alternative bases for upholding" its determination); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) ("No remand for further administrative proceedings is warranted because the EPA did not suggest in the rulemaking under review that there is any alternative basis in the record" for its decision.).

457.    Defendants have in fact disclaimed reliance on any other basis.  July 3 Hearing Tr. 47 (Docket No. 205); Defs.' Mem. Opp. Motions in Limine 2-3 (Docket No. 453).

458.    Even if this Court were to order a remand, it should reject any suggestion by Defendants that remand *without* vacatur would be appropriate.  It is questionable whether such a disposition is even available in this case, when no statute expressly confers such remedial

discretion. *Compare* 5 U.S.C. § 706(2)(A) (providing that court "*shall* . . . hold unlawful and set aside" improper agency action (emphasis added)), *with, e.g.*, 42 U.S.C. § 7607(d)(9) (judicial review provision under Clean Air Act providing that court "*may* reverse" improper action (emphasis added)); *see NRDC v. EPA*, 489 F.3d at 1262 (Randolph, J., concurring) ("In cases governed by the Administrative Procedure Act, I have long believed that the law *requires* us to vacate the unlawful agency rule," in contrast to cases governed by the Clean Air Act, which provides "remedial discretion." (emphasis added)).

459.    In any event, the standards for ordering remand without vacatur have not been met here.  An agency overcomes "the presumption of vacatur" of an improper agency determination, *All. for the Wild Rockies*, 2018 WL 5316129, at *12, only if it can demonstrate that vacatur would be "quite disruptive," and further show a "serious possibility that the [agency] will be able to substantiate its decision on remand."  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

460.    Neither factor is satisfied here. Vacatur would not be disruptive because it would merely preserve the status quo, under which the decennial census has omitted a citizenship question for more than sixty years.  This case is thus not one where vacatur of an improper determination would itself trigger the very harms that the challenge to that determination was intended to prevent.  *Compare North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding insufficiently protective environmental rule without vacatur when vacating that rule "would at least temporarily defeat . . . the enhanced protection of the environmental values" sought by petitioner) (quotation marks omitted).

461.    To the contrary, leaving the citizenship question in place, notwithstanding the invalidity of the Secretary's determination, would be the more disruptive choice here, for reasons

described in Plaintiffs' showing of injury-in-fact at Part II.B above.  *See Pollinator Stewardship Council*, 806 F.3d at 532 (declining remand without vacatur when leaving improper environmental rule in place "risks more potential environmental harm than vacating it").

462.    This case is also not one where the agency's violations may easily be resolved on remand in the limited time that remains before the June 2019 deadline for printing the decennial census questionnaires.  The errors here are not just "of form," *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1184 (D.C. Cir. 1994) – such as providing an unclear or incomplete statement of the agency's decision, *see id.*; *Am. Bioscience*, 269 F.3d at 1086 (remand without vacatur appropriate "where we perceive that a ground poorly articulated might be sufficient to sustain agency action"), or failing to comply with a simple procedural step, *compare Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) ("[A]n unlawfully promulgated regulation can be left in place while the agency provides the proper *procedural* remedy." (emphasis added)).

463.    Rather, Plaintiffs' claims here identify far more serious defects, including that the Secretary's decision is unsupported by the evidence, rests on glaring factual errors and made-up evidence, relies in some cases on propositions with no support whatsoever, failed to consider important aspects of the problem, is based on a false and pretextual explanation for the Secretary's action, and was reached in violation of Defendants' statutory and regulatory obligations.  *See infra* Parts III.B, III.C.

464.    Because there is no "serious possibility" that defendants can expeditiously resolve these many pervasive defects on remand, *Allied-Signal*, 988 F.2d at 151, remand without vacatur would be wholly inappropriate.

### 3. This Court should enjoin Defendants and all those acting on their behalf from adding a citizenship question to the 2020 census.

465. A plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

466. The decision to grant injunctive relief under the APA is "controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted); *see, e.g.*, *Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 18-cv-5680 (NRB), 2018 WL 4168977, at *24 (S.D.N.Y. Aug. 30, 2018) (applying equitable factors for permanent injunction in APA challenge to agency decision). All of these factors counsel in favor of an injunction here.

467. An injunction prohibiting an agency from taking an action is appropriate where the court has found that action to be contrary to law under the APA. *See Planned Parenthood*, 2018 WL 4168977, at *24.

468. Under such circumstances, an injunction properly prohibits "the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and ensures that the agency complies with the law going forward, *see Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

469.    As demonstrated in Part III.C above, Plaintiffs have proven that the Secretary's decision is contrary to law in multiple ways, and that any attempt to institute a citizenship question on the 2020 Census now would also be unlawful.

470.    An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts.

471.    An injunction is particularly advisable here because, as Defendants themselves have repeatedly represented, there is little time remaining to conduct further testing or analysis before Defendants must print the 2020 census questionnaire in June 2019.  *See* Trial Tr. 1023 (Abowd); Docket No. 540 (stating that Census Bureau needs to begin printing the 2020 census questionnaire in June 2019); Docket No. 103, at 4-5 (noting Acting Director Ron Jarmin's Congressional testimony that "the Census Bureau would like to 'have everything settled for the questionnaire this fall'" and "wants to resolve this issue 'very quickly'"); Langdon Dep. (Docket No. 510-2) at 243.

472.    At the same time, any efforts by Defendants to continue pursuing the citizenship question would risk inflicting further irreparable harm on Plaintiffs.  The evidence at trial – including the results of the CBAMS surveys and focus groups, PFOF § VII.F.1; the reactions of the Census Bureau's "Trusted Voices," PFOF § VIII.C ¶¶ 1138-46; the unrebutted and uncontested fact testimony of Plaintiffs' witnesses, PFOF § X.A.1 – X.A.4;  and the testimony of Defendants' own witness, PFOF § X.A ¶¶ 1483-85 – demonstrates beyond doubt that the Secretary's decision to add the citizenship question has inflamed fears among populations who are particularly sensitive to such a question, particularly in the current political climate.

473.    If this Court were to invalidate the Secretary's decision, allowing Defendants to *continue* perpetuating these harms in a futile pursuit to remedy the defects identified by this Court will severely injure Plaintiffs and their residents and members.

474.    And these harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief.  *See Planned Parenthood*, 2018 WL 4168977, at *24.

475.    The balance of the hardships and the public interest also weigh heavily in favor of an injunction.  Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years.  By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

476.    As this Court has explained, the "fair and orderly administration of the census . . . is arguably the Secretary of Commerce's most important duty, and it is critically important that the public have 'confidence in the integrity of the process' underlying 'this mainstay of our democracy.'"  *New York v. U.S. Dep't of Commerce*, __ F. Supp. 3d __, 2018 WL 4539659, at *5 (S.D.N.Y. Sept. 21, 2018) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring in part and concurring in the judgment)).

477.    An injunction prohibiting the addition of a citizenship question on the 2020 census will provide the public with the certainty and confidence that is necessary to protect the integrity of the 2020 census.

### 4.    Whether this Court vacates the Secretary's decision or issues an injunction, any relief will properly apply nationwide.

478.    As an initial matter, nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated – not that their application to the individual petitioners is

proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C. § 706(2)(A).

479.    An order vacating the Secretary's decision under the APA thus inherently has nationwide application, without implicating concerns about the power of courts to issue nationwide injunctive relief.  *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018) (order setting aside agency decision under APA did not implicate any concerns about nationwide injunctions).

480.    In any event, even an injunction preventing defendants from instituting a citizenship question would not implicate the concerns raised by other nationwide injunctions. There is only a single form of the census questionnaire that is sent to every household nationwide.  Defendants have never suggested – let alone presented any evidence to support – that a citizenship question could somehow be included in only some but not other questionnaires.

481.    Nor would a geographically limited injunction make sense in this context because, as Defendants' own expert has made clear, the census questionnaire must be uniform across the country in order to count accurately *all* residents across the nation.

482.    Defendants' uniform, nationwide treatment of the census questionnaire necessarily means that any injunctive relief here must also apply nationwide.  *Cf. Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform immigration rules).

483.    The broad geographic scope of the plaintiffs in this case also minimizes any concern about this Court's power to order nationwide relief.  The Governmental Plaintiffs in 18-CV-2921 are state and municipal governments located in eleven of the twelve federal judicial circuits (all but the 11th Circuit).  Second Am. Compl., Docket No. 210, ¶¶ 12-24.  The NGO

plaintiffs include the American-Arab Anti-Discrimination Committee, which has members in
every state and regional chapters in Miami and Orlando, Florida (in the 11th Circuit).  Khalaf
Aff. (Docket No. 498-16), at ¶ 8.

484.    This case is thus not one where a single plaintiff seeks to leverage an essentially
localized dispute into national relief.  *Compare City of Chicago v. Sessions*, 888 F.3d 272, 296
(7th Cir. 2018) (Manion, J., concurring in part and dissenting in part), *vacated*, No. 17-2991,
2018 WL 4268814 (7th Cir. Aug. 10, 2018).

### 5.    This Court should enter the requested declaratory relief.

485.    The Court should also enter declaratory judgment that Defendants' decision to
add a citizenship question to the census is not in accordance with law, beyond statutory
authority, and is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706.

486.    The Court should further enter declaratory judgment Defendants have not met and
cannot meet their requirements under § 141 and § 6 of the Census Act, and that the decision to
add a citizenship question violates the APA for this reason as well.  5 U.S.C. § 706.

## IV.    Defendants' decision to add a citizenship question was motivated by discriminatory animus.

### A.    Plaintiffs have proven that the citizenship-question decision was motivated by discriminatory intent through substantial evidence on each of the *Arlington Heights* factors.

487.    Secretary Ross's decision to add a citizenship question to the Decennial Census
was motivated at least in part by a desire to harm Latinos and immigrants of color by
diminishing their political power, and thus violates the Fifth Amendment's prohibitions on
intentional discrimination on the basis of race and national origin.

488.    To succeed on an intentional discrimination claim, Plaintiffs need not show that
intentional discrimination was the sole reason for Secretary's Ross's decision, but only that it

was one of several motivating factors.  *See United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181,

1216–17 (2d Cir. 1987).

489.     Because "discriminatory intent is rarely susceptible to direct proof," *Mhany

Management, Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016), the Court must conduct

"a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,"

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also

Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("A victim of discrimination is . . .

seldom able to prove his or her claim by direct evidence. . . .").

490.     Under the Supreme Court's decision in *Arlington Heights*, 429 U.S. at 266–68,

the relevant factors for this "sensitive inquiry" include: (1) disparate impact; (2) the "historical

background of the decision . . . particularly if it reveals a series of official actions taken for

invidious purposes"; (3) "[d]epartures from the normal procedural sequence"; (4) "[s]ubstantive

departures" from past practice; and (5) "contemporary statements" by those deciding the issue.

### 1.     The addition of a citizenship question will disparately impact Latinos and immigrants of color.

491.     The "racially disproportionate effect of official action provides an important

starting point" in the intentional discrimination inquiry.  *Crawford v. Bd. of Educ.*, 458 U.S. 527,

544 (1982) (internal quotation marks & citation omitted).

492.     The evidence presented at trial shows that a citizenship question will have a

disparate effect on Decennial Census response rates among the overlapping categories of non-

citizens, immigrants, and Hispanics and that these reduced response rates will ultimately lead to

an undercount of these groups and a drop in overall data quality.  *See generally* PFOF §§ VII,

VIII, X.D.

493.    The Census Bureau estimates that adding a citizenship question will decrease self-response rates by 5.8 percent among households with a noncitizen or person of unknown citizenship status relative to all-citizen households—itself a conservative estimate.  PFOF § VII.B; PX-22 (AR); Trial Tr. 894-95.

494.    Testimony from Plaintiffs' experts demonstrates that a citizenship question would likely increase the non-response rate for non-citizen households by more than 5.8 percent, and possibly by as much as 11.9 percent.  *See, e.g.*, PFOF § VII.B; Trial Tr. 80.

495.    Additionally, the Census Bureau expects that a citizenship question will cause Hispanic response rates to the Decennial Census to decline more than those of non-Hispanic whites.  PFOF § VII.C; Trial Tr. 918.

496.    In addition to the statistical evidence from the Census Bureau and Plaintiffs' experts, qualitative evidence at trial demonstrated that the inclusion of a citizenship question would bear more heavily on those who are foreign-born, and Hispanics in particular.  PFOF § VII.D, F.

497.    That qualitative testimony included focus groups research conducted by the Census Bureau as part of the Census Barriers, Attitudes, and Motivators Survey (CBAMS)—evidence that showed that Hispanic citizens and foreign-born individuals are extremely concerned about answering a citizenship question for fear of negative repercussions for themselves and their neighbors and loved ones.  PFOF § VII.F; PX-152; PX-163; PX-662.

498.    Plaintiffs have also introduced considerable testimony regarding fear among immigrant and Hispanic communities about responding to the Census due to the addition of a citizenship question, which has raised concerns about targeting for immigration-enforcement actions and harassment. *See, e.g.*, Cullinane Aff. (Docket 505-1) ¶¶ 5-9; Escobar Aff. (Docket

498-3) ¶¶ 20-24; Sarmiento Aff. (Docket 488-3) ¶¶ 6-9; Plum Aff. (Docket 498-19) ¶¶ 16-23;

Altschuler Aff. (Docket 503-1) ¶¶ 11, 13-18.

499.    Notwithstanding the Census Bureau's non-response follow-up (NRFU) efforts,

the decline in response rates will translate into an undercount, with a concomitant loss of

resources and political representation for communities with larger percentages of immigrants and

Hispanics—i.e., a disparate impact on those groups.  *See, e.g.*, PFOF § VIII; Trial Tr. 30.

### 2.    Historical background of the decision.

500.    Plaintiffs presented evidence regarding the historical background of a citizenship

question "reveals a series of official actions taken for invidious purposes," *Arlington Heights*,

429 U.S. at 266, that creates an inference of discriminatory intent.

501.    First, other individuals who recently have tried to add a citizenship question to the

Decennial Census have done so for anti-immigrant purposes rather than a VRA-related motive.

*See, e.g.*, *FAIR*, 486 F. Supp. at 568; PX-296.

502.    By contrast, Defendants presented no evidence that DOJ or any other party has

ever tried to add a citizenship question for purposes of VRA enforcement; instead, Defendants

admitted that as of early September 2017, DOJ staff did not want to request a citizenship

question and had previously made no complaints about data usability or quality for VRA

purposes.  PFOF § IX.B.2.

503.    Indeed, the Census Bureau has a longstanding objection to adding a citizenship

question to the Decennial Census, manifested as recently as 2015, when four former Census

Bureau Directors submitted a brief arguing that adding a citizenship question to the Decennial

Census would "likely exacerbate privacy concerns and lead to inaccurate responses from non-

citizens worried about a government record of their immigration status."  PFOF § II.D; PX-1 at

AR 840-41.

504.    Second, the evidence showed that the decision to add a citizenship question stemmed from discriminatory, rather than VRA-related, motives.

505.    Immediately after assuming office, Secretary Ross began considering adding a citizenship question, and his request to do so was already "months old" by May 2017.  PFOF § III.A-B; PX-88 (AR).

506.    During this same period of early 2017 and months before the VRA rationale first emerged in the Administrative Record in the December 12 DOJ letter, Secretary Ross had conversations with several individuals who sought to target immigrants of color.  PFOF § III.A.

507.    As the evidence reveals, the individuals who first encouraged Secretary Ross to add a citizenship question—unnamed senior administration officials (including Steve Bannon) and Kris Kobach—were motivated by a desire to stem the political power of immigrant communities of color.  PFOF § III.A, C; PX-1 at AR 763-64 (AR).

508.    Despite his public testimony that his decision-making process was spurred by a request from DOJ in December 2017, Secretary Ross had made his decision independently, and then had lobbied several agencies to request the question and concocted a reason to do so.  PFOF §§ III.A-E.

509.    Given the origin of attempts to add a citizenship question for the 2020 Decennial Census, the historical-background evidence points strongly to discriminatory intent.

### 3.    Irregular procedural sequence.

510.    The trial record also revealed several aspects of the citizenship-question decision that evidence major departures from the usual and recommended sequence of adding or changing a question on a Census survey.

511.    As described above, the evidence shows that Secretary Ross made a series of

misleading and contradictory assertions about the genesis of the request, and that he solicited

other agencies to provide a post hoc reason for his decision.  PFOF §§ III.B-D, IV.D, V.

512.    The evidence also demonstrates that Defendants did not follow their own standard

procedures and methodology in adding the question, instead attempting to rush the question onto

the form.  PFOF §§ II.E, III.G-I, IV.A-C.

513.    First, the Administrative Record demonstrates that Secretary Ross offered shifting

rationales for when and why he decided to add a citizenship question.  *See, e.g.*, *Veasey v.

Abbott*, 830 F.3d 216, 240–41 (5th Cir. 2016) (noting that shifting rationales for a voter

identification law were probative of discriminatory intent).

514.    Secretary Ross testified in congressional hearings that his process of considering

whether to add a citizenship question was "initiated" by DOJ's request to include a citizenship

question on the 2020 Decennial Census, and that he undertook his consideration "solely" in

response to the DOJ letter, which stated that the question was needed to obtain better citizenship

data for VRA enforcement.  PFOF §§ IV.D, V; *see also* PX-491; PX-492; PX-493.

515.    However, only after this litigation was filed and the Administrative Record was

lodged, DOJ drafted and urged Secretary Ross to sign and file a supplemental memorandum as

part of the Administrative Record, stating that, in fact, he "'began considering' whether to add

the citizenship question '[s]oon after' his appointment as Secretary in February 2017 — almost

ten months before the 'request'" from DOJ — and that, '[a]s part of that deliberative process,' he

and his staff asked the Department of Justice if it 'would support, and if so would request,

inclusion of a citizenship question.'"  PX-2 (AR).

516.     At Secretary Ross's direction, Department of Commerce officials then pushed

DOJ and then the Department of Homeland Security (DHS) to request a citizenship question,

contacting individuals responsible for immigration and not voting rights issues.  PFOF § III.B, D.

517.     The evidence showed that DOJ initially rebuffed these overtures, and instead

referred Commerce officials to DHS, which also declined to request the question.  PFOF § III.B.

518.     Only after both DHS and DOJ declined, Secretary Ross exerted political pressure

to get DOJ to make the request, ultimately securing the request in part by speaking to Attorney

General Sessions personally, and having his staff coordinate with Acting Assistant Attorney

General John Gore, to ensure that DOJ did so.  PFOF §§ III.D-E.

519.     Secretary Ross and top Commerce officials did not consult with Census Bureau

officials during this period, and kept them in the dark about the fact that it was not DOJ, but

rather Secretary Ross, who had originated the attempt to add a citizenship question after his

conversations with Messrs. Bannon and Kobach.  PFOF §§ IV.C, V; *see also* Trial Tr. 1015-22.

520.     The evidence at trial also showed that the process for adding a citizenship

question departed from normal procedures.  PFOF §§ II.E, IV.A-C.

521.     Plaintiffs' expert witnesses, including the former Director of the Census Bureau,

explained the extensive testing processes the Census Bureau has developed in order to properly

assess proposed changes to a census questionnaire, none of which were followed here.  PFOF

§ II.E, F.

522.     This is in stark contrast to the extensive process that was used previously for

considering changes to questions concerning race and ethnicity on the Decennial Census.  PFOF

§ II.F.

523.    The evidence at trial showed that, here, the Census Bureau conducted no pretesting of the 2020 Decennial Census questionnaire with the inclusion of a citizenship question, including no testing of the survey design or any cognitive of field testing.  PFOF § IV.B.

524.    Defendants asserted that no pre-testing was required because a citizenship question has been adequately tested through its inclusion on the Census Bureau's American Community Survey ("ACS").  PFOF § IV.E.3.

525.    But the evidence shows that there are significant differences between the citizenship question on the 2020 Decennial Census and the citizenship question currently used on the ACS; differences that significantly limit the relevance and validity of prior testing of the citizenship question on the ACS.  PFOF § IV.E.3.

526.    Although Defendants contend that the ACS citizenship question was "adequately tested," their own expert Dr. Abowd admitted that the ACS citizenship question was tested in a different political environment. PFOF §§ IV.E.3, F.

527.    Dr. Abowd also admitted that the reliance on the testing of the ACS citizenship question which was done about fifteen years ago was only adequate in the sense that it was the best they could do under the rushed timeline of several months that was of Secretary Ross's own making.  PFOF § IV.E.3; Trial Tr. 1270-74.

528.    Most notably, Dr. Abowd also stated that the Census Bureau's own internal analysis indicates that the ACS citizenship question is not performing "adequately" and therefore cannot be deemed to have been adequately tested in accordance with accepted survey standards. PFOF § IV.E.3; Trial Tr. 1287-88.

118

529. The evidence further establishes that impartial experts—including six former Census Directors, the National Academics of Sciences, Engineering, and Medicine's Committee on National Statistics Task Force on the 2020 Census, and the Census Bureau's own Scientific Advisory Committee—have uniformly expressed the view that the rushed process to add a citizenship question was inconsistent with accepted standards for survey methodology, and thereby threatens the accuracy of the count.  PFOF § IV.E.3.

### 4. Substantive departures from past practice.

530. The evidence also shows that the decision to add a citizenship question departs from past practice, as the Census Bureau has repeatedly rejected prior attempts to add a citizenship question to the Decennial Census.  PFOF § II.D.

531. Prior to both the 1980 and 1990 Decennial Censuses, the Census Bureau opposed adding a citizenship question, stating in the former case that "any effort to ascertain citizenship will inevitably jeopardize" the accuracy of the count because such questions "are particularly sensitive in minority communities and would inevitably trigger hostility, resentment and refusal to cooperate." *FAIR*, 486 F. Supp. at 568; *see also* PX-306, PX-307.

532. In 1988, Census Bureau Director John Keane testified before Congress that the Census Bureau believed that the addition of a citizenship question would cause immigrants and legal residents to "misunderstand or mistrust the census and fail or refuse to respond." PX-307.

533. Similarly, in 2015, four former Census Bureau Directors appointed by presidents of both political parties filed a Supreme Court amicus brief in which they explained that a person-by-person citizenship inquiry would reduce the Decennial Census response rate.  PX-309.

534. And of course, the Census Bureau continues to this day to oppose adding a citizenship question, citing reduced response rates for non-citizen households and Latinos and reduced data quality—views ignored by Secretary Ross.  PFOF §§ III.G, H.2.

119

### 5.    Contemporary statements by decision-makers and those influencing them.

535.    Plaintiffs also introduced contemporary statements by Secretary Ross and those who influenced him to add a citizenship question that further support a discriminatory motive.

536.    As the Second Circuit has explained, when multiple officials influence a final decision, the relevant inquiry is whether the decision was "tainted with discriminatory intent even if the decisionmakers personally have no strong views on the matter." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997).

537.    In fact, several courts have recently applied these very principles to situations in which President Trump or his advisors influenced other government officials in making decisions such as revoking protections from Deferred Action for Childhood Arrivals (DACA) recipients and temporary protected status from residents of certain Central American, Caribbean, and African nations.  *See Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (holding in DACA-rescission case that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos v. Nielsen*, No. 18-CV-01554-EMC, -- F. Supp. 3d --, 2018 WL 4778285, at *16 (N.D. Cal. Oct. 3, 2018) (granting preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process.") (citation omitted); *see also Centro Presente v. U.S. Dept. of Homeland Sec.*, No. CV 18-10340, 2018 WL 3543535, at *14 n.3 (D. Mass. July 23, 2018) (explaining that although the "cat's paw" principle originates in the employment discrimination context, "nothing in the reasoning of those opinions makes them inapplicable in a constitutional context").

538.    Here, Plaintiffs presented evidence that Secretary Ross and those who influenced him were motivated at least in part by a desire to dilute the political power of immigrant communities of color.  *See generally* PFOF §§ III.A, VI.

539.    In October 9, 2017, Secretary Ross made clear his support for a wide array of President Trump's  immigration policies, including the President's efforts to restrict what he called "chain migration," or the process of one family member with legal status sponsoring other family members for immigration—a program that primarily benefits immigrants of color.  PX-479.

540.    And in connection with the consideration of a citizenship question, in March 2017, Secretary Ross asked another Commerce official whether noncitizens were included in the census, and received in response an article entitled "The Pitfalls of Counting Illegal Immigrants."  PX-55 (AR).

541.    Additionally, the evidence shows that the individuals who played a major role in convincing Secretary Ross to add a citizenship question did so with discriminatory motives.  PFOF §§ III.A, VI.

542.    Secretary Ross has admitted that in early 2017, he discussed adding a citizenship question with Kris Kobach, Steve Bannon, and Attorney General Sessions.  PX-2 (AR).

543.    The White House, through senior aide Steve Bannon, requested the Secretary speak with Mr. Kobach about adding a citizenship question.  Secretary Ross knew Mr. Kobach was advocating for a citizenship question in part to make it easier for states to exclude immigrants from apportionment considerations.  PFOF § III.C; *see also* PX-19 (AR); PX-298 (R) at RFA 82.  In fact, other than the discredited VRA justification, the only other reason for adding a citizenship question to the Decennial Census that is identified anywhere in the

administrative record is Kris Kobach's explanation to Secretary Ross that Commerce should add

the citizenship question to respond to the "problem" of non-citizen immigrants being counted for

apportionment purposes.  *Id.*

544.    Moreover, the trial record is rife with statements by President Trump—whose

campaign claims he ordered Secretary Ross to add a citizenship question—demeaning immigrant

communities of color.  PFOF § VI.

545.    Attorney General Sessions expressed some of these sentiments as well.  PFOF

§ VI.

546.    The Court need not "bury its head in the sand when faced with overt expressions

of prejudice." *Batalla Vidal*, 291 F. Supp. 3d at 278.

547.    Nor need it ignore statements that employ "code words" rather than overt

statements of bias against a group.  *See Mhany Mgmt.*, 819 F.3d at 609 (affirming a finding of

racial discrimination in a housing case and holding that given the context, certain comments

"were code words for racial animus" and proper evidence of discrimination); *Ave. 6E Invs., LLC

v. City of Yuma, Ariz.*, 818 F.3d 493, 505 (9th Cir.), *cert. denied*, 137 S. Ct. 295 (2016) (holding

that "the use of 'code words' may demonstrate discriminatory intent").

548.    The evidence that President Trump and others from his Administration that

pushed Secretary Ross to add a citizenship question "harbor[ ] an animus against non-white, non-

European aliens which influenced" the decision provides strong evidence of discriminatory

intent.  *Ramos*, 2018 WL 4778285, at *17.

**B.    The pretextual nature of the decision also supports a finding of
discriminatory intent.**

549.    As the Supreme Court has held in the Title VII context, "rejection of the

defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional

discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis removed); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 216 (2d Cir. 1997) (holding that a "showing of pretext was probative of intentional discrimination").

550.    Other courts have extended this proposition to constitutional intentional discrimination claims, explaining that even though pretext "was not a factor expressly mentioned in *Arlington Heights*," in "some circumstances it is reasonable to infer discriminatory intent based on evidence of pretext." *Florida v. United States*, 885 F. Supp. 2d 299, 355 (D.D.C. 2012); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1282–83 (11th Cir. 2008) (holding that if "the trier of fact believed [the plaintiff's] showing of pretext, and disbelieved [defendant's] proffered legitimate reason, then a violation of the Equal Protection Clause would be shown" where additional evidence permitted the inference); *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513–14 (7th Cir. 1993) (adopting principle of inference from pretext for equal protection claim).

551.    The evidence at trial showed that the decision to add a citizenship question was motivated by discriminatory purposes rather than for VRA enforcement; and furthermore, that even taking the DOJ letter at face value, there is no actual need for citizenship data from the Decennial Census to properly enforce Section 2 of the VRA.

552.    First, the idea for a citizenship question originated in early 2017 with Secretary Ross, as influenced by still unidentified senior Administration officials (including Steve Bannon) and Kris Kobach, not from DOJ, the agency responsible for enforcing the VRA.  PFOF § III.A.

553.    When Commerce officials did reach out to DOJ in May 2017, they spoke with James McHenry, the then-acting head of DOJ's immigration arm and an individual with no VRA-related responsibilities.  PFOF § III.B.

554.    After he rebuffed Commerce's appeal to request a citizenship question, Commerce then turned to DHS, an agency with no voting rights responsibility, which also rejected the request. PFOF § III.B.

555.    When DOJ finally did agree to make the request in late 2017, it was not due to any unmet VRA-related needs or a request from DOJ's VRA enforcement attorneys, but rather from political pressure applied by Secretary Ross and a direct appeal to Attorney General Sessions.  PFOF § III.E, F.

556.    The request for a citizenship question was ultimately drafted by a political appointee, John Gore, and edited by other political appointees with no voting rights experience, with only minimal input from career Civil Rights Division staff—on only one occasion to the first draft of the letter.  PFOF § III.E; *see also* Gore Dep. at 126-27.

557.    None of this process was made public through either the December 2017 DOJ letter or subsequent DOJ statements until the origin of the question was revealed through this litigation. *See, generally*, PFOF § V.

558.    Second, the evidence at trial has shown that DOJ does not and has never needed citizenship data collected through the "full count" Decennial Census questionnaire to properly enforce Section 2 of the VRA.  PFOF § IX.B.2, 3.

559.    DOJ has never had "hard count" citizenship data during the lifespan of the VRA, but that this has not hampered enforcement efforts.  PFOF § IX.B.2, 3; Trial Tr. 802; Gore Dep. at 203:5-10.

560.    For decades, survey sample data collected through the Decennial Census "long form" questionnaire was used to produce citizenship estimates used for VRA enforcement, and

more recently, similar estimates are based on survey sample data collected through the ACS.
PFOF § IX.B.2, 3.

561.    In fact, Defendants have been unable to identify any DOJ Section 2 case that has
ever failed because of a lack of citizenship data collected through the Decennial Census.  PFOF
§ IX.B.2, 3.

562.    The one case Defendants identified in which a court rejected reliance on ACS
data, *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010), was a
district court case brought by private plaintiffs and not the DOJ where plaintiffs relied on
estimates based on only a single year of ACS responses ("one-year ACS estimates"), which had
too small of a sample size to generate statistically reliable estimates for the geographic area in
question.  PFOF § IX.B.3.

563.    This contrasts with the estimates based on a pool of five years of ACS responses
("five-year ACS estimates") that courts have repeatedly found sufficient.  *See, e.g.*, *Rodriguez v.
Harris Cty.*, 964 F. Supp. 2d 686, 727–28 (S.D. Tex. 2013); *Patino v. City of Pasadena*, 230 F.
Supp. 3d 667, 687-89 (S.D. Tex. 2017); *Benavidez v. Irving Indep. Sch. Dist.*, No. 3:13–CV–
0087–D, 2014 WL 4055366, at *17 (N.D. Tex. 2014).

564.    At trial, Plaintiffs presented evidence from Dr. Lisa Handley, a frequent expert
witness for DOJ in VRA cases, who credibly testified that she has never been hampered by a
lack of Decennial Census citizenship data in proving a Section 2 violation, and that the current
data is perfectly adequate for this process.  PFOF § IX.A, B.1, 2.

565.    For example, as to the lack of block-level citizenship data from the ACS, Dr.
Handley demonstrated that in some VRA cases involving states and larger jurisdictions, there is
often little or no need to split census blocks.  PFOF § IX.B.3; Trial Tr. 810.

566.    And for instances in which splitting census blocks are necessary, DOJ has always relied on citizenship data not published at the block level and performed further calculations to estimate CVAP at the census block level using one of several reliable methods.  PFOF § IX.B.3; Trial Tr. 810-19.

567.    The evidence at trial also showed that citizenship data based on responses to a question on the Decennial Census questionnaire will likely be no better and perhaps even worse than currently available citizenship data.  PFOF § IX.B.4.

568.    The data from the Decennial Census already contains several types of errors; errors that will be found in citizenship data collected through the Decennial Census, and could even be magnified by the inclusion of a citizenship question on the Decennial Census questionnaire.  There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more accurate than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.4.

569.    Additionally, the evidence shows that the Census Bureau uses disclosure-avoidance techniques to protect the confidentiality of responses to the Decennial Census questionnaire, which will entail purposefully introducing errors into any block-level CVAP data made available to DOJ and the public.  The Census Bureau does not even know whether the error margins for block-level CVAP data based on responses to a citizenship question will be smaller or more precise than those associated with the ACS estimates on which DOJ currently relies. There is thus no evidence that citizenship data based on responses to a question on the Decennial Census questionnaire will be more precise than existing ACS-based citizenship data on which DOJ relies.  PFOF § IX.B.5.

570.    The Census Bureau approached DOJ after receiving the December 12 letter to discuss the technical dimensions of DOJ's request, and to instead propose using administrative data to generate CVAP data at the block level, which the Census Bureau determined would better meet their VRA-related needs than adding a citizenship question.  PFOF § III.H.1.

571.    But DOJ refused to meet with the Census Bureau to discuss these issues, belying the notion that DOJ was interested in obtaining the best possible data for VRA enforcement purposes.  PFOF § III.H.1.

572.    Indeed, the evidence at trial showed a complete lack of interest by the Trump Administration in enforcing the VRA; the Administration, for example, has not filed any such cases during its almost two years in power.  PFOF § IX.B.2; *see also* PX-515; Gore Dep. (Docket 491-2) at 249-50.

573.    In sum, the evidence at trial rebuts Defendants' asserted motive for adding a citizenship question and provide affirmative evidence on all *Arlington Heights* factors, allowing the Court to infer intentional discrimination based on national origin and race.

574.    This evidence clearly shows that the decision was motivated by a "bare [ ] desire to harm a politically unpopular group," and thus violates the Fifth Amendment.  *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

**C.    Plaintiffs proved intentional discrimination based on race and national origin, but even if Defendants discriminated against immigrants generally, such discrimination would violate the Fifth Amendment.**

575.    The Fifth Amendment prohibits invidious discrimination—even against people "whose presence in this country is unlawful."  *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976).

576.    Regardless of whether Defendants' decision to add a citizenship question was intended to target individuals because of race and/or national origin or because they are

immigrants generally, the Fifth Amendment applies—this distinction only raises the issue of what level of scrutiny applies.

577.     Plaintiffs have provided substantial evidence that Defendants intended to target Latinos and immigrant communities of color, meriting strict scrutiny.

578.     Even under a lower level of scrutiny, however, the Fifth Amendment does not permit  arbitrary exclusions of non-citizens in a way that does not promote a legitimate federal interest, *see Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 (1976).  And "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *Romer v. Evans*, 517 U.S. 620, 634 (1996) (citing *Moreno*, 413 U.S. at 534) (emphasis removed).

579.     The need for meaningful review of the government's proffered justifications and actual intent applies here where—rather than using its plenary power regarding immigration and naturalization issues—Defendants attempt to weaken immigrants' political power through the Decennial Census despite the Constitution requiring counting of and apportionment based on *all* individuals residing in the United States.  *See* U.S. Const. art. I, § 2, cl. 3; U.S. Const. Amend. XIV, § 2.

### 1.     Defendants' citizenship question decision seeks to diminish political power and harms groups based on race, ethnicity, and national origin.

580.     As discussed in more depth *supra*, Defendants' decision to add a citizenship question targets not only immigrants generally, but also all Latinos and immigrants of color specifically: individuals whose presence the Trump Administration has repeatedly targeted.

581.     Because "Hispanics as an ethnic group do constitute a suspect class for the purpose of equal protection analysis," *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983),

128

Defendants' targeting of individuals in this group merits strict scrutiny.  *See also Orange Lake*

*Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1226 (2d Cir. 1994) (noting broadly that actions that

intentionally discriminate based on race and national origin merit strict scrutiny).

582.    For immigrants of color, that Defendants discriminate in part because of those

individuals' non-citizen status does not lower the level of scrutiny required because Defendants

also seek to target these individuals due to their race and national origin.

583.    Strict scrutiny still applies because attempting to "bisect a person's identity at the

intersection of race and [another characteristic] often distorts or ignores the particular nature of

their experiences." *Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1562 (9th Cir. 1994), *as*

*amended* (Nov. 21, 1994 & Dec. 14, 1994).

584.    A "plaintiff's discrimination claims may not be defeated . . . based merely on the

fact that certain members of a protected class are not subject to discrimination, while another

subset is discriminated against based on a protected characteristic shared by both subsets."

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010).

585.    The evidence provides two primary bases for finding that Defendants

discriminated against Latinos and immigrants of color and not just immigrants as an entire class.

586.    First, Secretary Ross was aware that adding a citizenship question would

discourage participation among Latinos.

587.    Dr. Abowd and his team informed Secretary Ross personally and through written

analysis on several occasions that adding a citizenship question would disproportionately

negatively impact not only non-citizen households, but also Hispanic individuals.  PFOF § III.H.

588.    Dr. Abowd's team also explained that there would be no countervailing benefit to

adding a citizenship question, that DOJ's request was better served by using administrative

records to determine citizenship, and that a citizenship question on the Decennial Census would merely add cost and harm data quality.  PFOF § III.H.

589.   Yet Secretary Ross forged ahead with his decision to add a citizenship question despite all the evidence showing that it was unnecessary and would only create negative outcomes and while knowing that those negative outcomes would primarily affect non-citizens and Latinos.

590.   As a result, there can be little doubt that he chose this path "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

591.   Second, as explained above, the Administrative Record shows that the White House and other Trump administration officials pushed Secretary Ross to add a citizenship question, and these individuals were motivated by animus toward immigrants of color and Latinos in particular and not just all immigrants.

592.   As another court recently recognized in granting a preliminary injunction against President Trump's attempt to revoke temporary protected status from individuals from Haiti, Sudan, El Salvador, and Nicaragua, the plaintiffs were likely to succeed on their equal protection claim because the White House influenced this decision and "there is evidence that President Trump harbors an animus against non-white, non-European aliens which influenced" the decision. *Ramos*, 2018 WL 4778285, at *17.

593.   Likewise, the record from trial shows that Secretary Ross and those who influenced him sought to target immigrants of color specifically and not merely immigrants as a whole.  PFOF § VI.A.

## 2. Defendants' arbitrary targeting of a politically unpopular group cannot pass constitutional muster under any level of scrutiny.

594. Even if the Court determines that Defendants' animus targets immigrants generally (rather than subgroups based on race, ethnicity, and/or national origin) and thus that less-than-strict scrutiny should apply, the Court's review must still have teeth—particularly when there is no legitimate federal interest relating to immigration and naturalization for the action in question and where the evidence reflects a desire to harm immigrants. *See United States v. Lue*, 134 F.3d 79, 86 (2d Cir. 1998) (explaining that "deference to the federal government" in its treatment of non-citizens is "tied to Congress's express Constitutional authority to regulate the conduct of noncitizens within our borders").

595. First, the Supreme Court has recognized that "federal power over" non-citizens is not "so plenary that any agent of the National Government may arbitrarily" treat non-citizens differently than citizens. *Hampton*, 426 U.S. at 101.

596. As one Court recently explained in citing *Hampton*, "a more searching judicial analysis than mere rational basis and a less searching judicial analysis thank strict scrutiny" may be appropriate the "further the challenged law, regulation, or policy from the core federal interests in immigration and foreign affairs." *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 91–92 (D. Me. 2018); *see also Rodriguez-Silva v. I.N.S.*, 242 F.3d 243, 247 (5th Cir. 2001) ("the broad power to control immigration does not imbue Congress with plenary power over aliens themselves.").

597. Therefore, when "the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest." *Hampton*, 426 U.S. at 103.

598.     In *Hampton*, the Supreme Court struck down a regulation from the Civil Service

Commission prohibiting the employment of non-citizens in most positions of federal

employment, holding that even if "national interests" could support such a decision, those

interests did not rationally explain the determination by the Civil Service Commission.  *Id.* at

116.

599.     *Hampton* thus established the principle that federal decisions or regulations that

target non-citizens or treat them differently still require a rational link to a legitimate interest of

the decision-maker.

600.     Here, the evidence shows that the VRA enforcement rationale advanced by

Defendants represents a pretext.

601.     Moreover, the fact that the Constitution requires that the Census count all persons

and that Congress use such figures for apportionment, the attempt to enact a policy that would

hinder that ability has no nexus to "core federal interests in immigration and foreign affairs."

*Monga*, 323 F. Supp. 3d at 91–92; *see also Rodriguez-Silva*, 242 F.3d at 247.

602.     And although the Second Circuit "has adopted a stance of minimal scrutiny

respecting federal regulations that contain alienage-based classifications," *United States v.

Duggan*, 743 F.2d 59, 76 (2d Cir. 1984), this standard does not prohibit judicial review and

regardless, should not apply here where the issues presents not an actual classification but

instead reflects invidious intent.

603.     Applying less-than-strict scrutiny but conducting an actual review of Defendants'

justifications, even assuming that there was a legitimate need for better citizenship data to

enforce Section 2 of the VRA, Secretary Ross's decision bears no rational relationship to that

interest.

132

604.    Because the Census Bureau explained that it could better achieve that interest by using administrative records and that adding such a question would harm response rates of non-citizen households as well as the quality of the data itself (and Defendants have presented no arguments to the contrary), the citizenship-question decision lacks a rational basis.

605.    Second, the Supreme Court has paved a now-well-trodden path for striking down governmental action even without heightened scrutiny when that action is "inexplicable by anything but animus." *Romer*, 517 U.S. at 632; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (striking down decision under rational basis review that "rest[s] on an irrational prejudice"); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (citing *Moreno* regarding the Constitution's "guarantee of equality").

606.    Because the decision to add a citizenship question was motivated by a "bare [ ] desire to harm a politically unpopular group," *Moreno*, 413 U.S. at 534, it violates the Fifth Amendment regardless of the level of scrutiny applied.  This line of cases has not depended on the targeting of a group based on a recognized characteristic like race or national origin that requires strict scrutiny—instead, the Supreme Court has struck down laws that target individuals without a legitimate basis based on sexual orientation (*Romer* and *Windsor*), disability (*Cleburne*), and even groups of non-married individuals living together in the same household (*Moreno*).

607.    Indeed, the federal government "cannot subject all aliens or any group of aliens to invidious discrimination."  *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1288 (9th Cir. 1993); *Rodriguez-Silva*, 242 F.3d at 247 ("aliens are 'persons' entitled to protection against invidious State action under the Fourteenth Amendment.").

608.     Sweeping away the only rationale offered by Defendants as pretext, the record
makes it clear that Secretary Ross knew that his decision would negatively affect the ability of
the Decennial Census to accurately count noncitizen households.  PFOF § III.H.

609.     In addition to his knowledge that adding a citizenship question would harm
noncitizens, Secretary Ross has previously expressed animus toward immigrants, using the
derogatory term "chain migration" to praise Trump Administration immigrant policies and
oppose the process of granting status to family members of current immigrants with legal status.
PFOF § VI.A; PX-479.

610.     Defendants also admit that Secretary Ross discussed adding a citizenship question
with the Trump White House and Steve Bannon in particular, and the record makes clear that
this helped motivate him to request the question.  PFOF § III.A.

611.     Yet Secretary Ross was well-aware that President Trump and Steve Bannon had
long made statements and enacted policies designed to ostracize immigrants, reduce their
numbers, and single them out for disfavored treatment, and that Mr. Kobach shared these same
goals.  PFOF §§ III.C, VI.A.

612.     Taken together, the proffered explanation for adding a citizenship question—
VRA enforcement—lacks any credibility, and thus adding it had no rational purpose at all other
than the one communicated or implied by the individuals influencing Secretary Ross: a desire to
harm a politically unpopular group in violation of the Fifth Amendment.  *See Romer*, 517 U.S. at
632 (holding that the decision at issue was "so discontinuous with the reasons offered for it that
the amendment seems inexplicable by anything but animus toward the class it affects" and thus
"lacks a rational relationship to legitimate state interests").

613.    This intentional discrimination violates the equal protection guarantee embedded in the Due Process Clause of the Fifth Amendment.

## CONCLUSION

614.    The evidence demonstrates that Defendants' decision to add a citizenship question to the census substituted impermissible considerations for reasoned, scientific processes; disregarded mandatory statutory obligations and federal agency requirements; and was motivated by discriminatory animus in violation of the Fifth Amendment.

615.    Plaintiffs respectfully request that this Court vacate and set aside Defendants' decision, enjoin Defendants from adding a citizenship question to the 2020 census, and declare that the decision is arbitrary, capricious, not in accordance with law, and unconstitutional under the Fifth Amendment.

Respectfully submitted,

BARBARA D. UNDERWOOD
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

|  |  |
|---|---|
| Steven C. Wu | Matthew Colangelo |
| *Deputy Solicitor General* | *Executive Deputy Attorney General* |
| Judith N. Vale | Elena Goldstein, *Senior Trial Counsel* |
| *Senior Assistant Solicitor General* | Danielle Fidler, *Assistant Attorney General* |

Sania Khan, *Assistant Attorney General*
Elizabeth Morgan, *Assistant Attorney General*
Ajay Saini, *Assistant Attorney General*
Laura Wood, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
matthew.colangelo@ag.ny.gov

Attorneys for the *State of New York* Plaintiffs


ARNOLD & PORTER KAYE SCHOLER LLP
AMERICAN CIVIL LIBERTIES UNION

By: */s/ John A. Freedman*

|  |  |
|---|---|
| Dale Ho | Andrew Bauer |
| American Civil Liberties Union Foundation | Arnold & Porter Kaye Scholer LLP |
| 125 Broad St. | 250 West 55th Street |
| New York, NY 10004 | New York, NY 10019-9710 |
| (212) 549-2693 | (212) 836-7669 |
| dho@aclu.org | Andrew.Bauer@arnoldporter.com |
|  |  |
| Sarah Brannon* | John A. Freedman |
| American Civil Liberties Union Foundation | Arnold & Porter Kaye Scholer LLP |
| 915 15th Street, NW | 601 Massachusetts Avenue, N.W. |
| Washington, DC 20005-2313 | Washington, DC 20001-3743 |
| 202-675-2337 | (202) 942-5000 |
| sbrannon@aclu.org | John.Freedman@arnoldporter.com |
| *\* Not admitted in the District of Columbia;* |  |
| *practice limited pursuant to D.C. App. R.* |  |
| *49(c)(3).* |  |

136

Perry M. Grossman
New York Civil Liberties Union Foundation
125 Broad St.
New York, NY 10004
(212) 607-3300 601
pgrossman@nyclu.org

Attorneys for the *NYIC* Plaintiffs

# EXHIBIT 3



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

November 4, 2016

John H. Thompson
Director
Economics and Statistics Administration
U.S. Census Bureau
Unites States Department of Commerce
Washington, D.C. 20233-0001

Re: Legal Authority for American Community Survey Questions

Dear Mr. Thompson:

This letter supplements my letter of July 1, 2016, in which I advised that, at that time, the Department of Justice had no needs to amend the current content and uses or to request new content in the American Community Survey (ACS) for the 2020 Census. In 2014, the Department affirmed its continuing needs and legal justification for existing subjects and questions in the ACS. I understand your office recently has been in communication with Department officials regarding new uses sought by the Department relating to LGBT populations. Consistent with those communications, this letter formally requests that the Census Bureau consider a new topic in the ACS relating to LGBT populations. The attached spreadsheet accurately reflects the legal authority supporting the necessity for the collection of this information.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel

Attachment

Cc: Civil Rights Division
    Office of the Deputy Attorney General

# DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
## REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

The following statutes enforced by the Department bar discrimination on the basis of sexual orientation, gender identity, or both.

| Statutory Requirement: | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Violence Against Women Reauthorization Act of 2013 | 42 USC 13925(b)(13) | R | Would be used to enforce prohibitions against discrimination in programs or activities receiving financial assistance administered by the Office on Violence Against Women. | Place | Annual |
| Violence Against Women Act of 1994, as amended, Victims of Trafficking and Violence Protection Act of 2000, Violence Against Women and Department of Justice Reauthorization Act of 2005, Violence Against Women Reauthorization Act of 2013 | 42 USC 3796gg(b)(5), 3796gg(b)(19), 3796gg-7(d), 10420(c)(1)(B), 13925(a)(39), 13971(b), 13971(d)(4), 13975(a), 13975(g)(3)(C)(ii), 14041(b)(1), 14041(b)(4), 14045(a)(1), 14045(c)-(d), 14045(b)(10). | P | Would be used to help administer grants, and plan education about and enforcement of prohibitions against discrimination in programs or activities receiving financial assistance administered by OVW. | Census block group | Annual |
| Title VII of the Civil Rights Act of 1964 | 42 USC 2000e et seq.; 42 USC 2000e-2(k); Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) | R | Would be used to enforce the prohibition against unlawful employment discrimination. | Place | Annual |
| Title VII of the Civil Rights Act of 1964 | 42 USC 2000e et seq. | P | Would be used to help plan education and enforcement efforts concerning the prohibition against unlawful employment discrimination. | Census block group | Annual |
| Title IX of the Education Amendments of 1972 | 20 USC 1701 et seq.; 34 CFR 106.21(b)(2), 106.23(b), 106.37(b)(1), 106.51(a)(3)-(4), 106.52, 106.53 | R | Would be used to enforce the prohibition against unlawful discrimination in education programs and activities receiving federal financial assistance. | Place | Annual |

DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Statutory Requirement | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Title IX of the Education Amendments of 1972 | 20 USC 1701 et seq. | P | Would be used to help plan education and enforcement efforts concerning the prohibition against unlawful discrimination in education programs and activities receiving federal financial assistance. | Census block group | Annual |
| Fair Housing Act of 1968 | 42 USC 3601 et seq.; 24 CFR 100.500; Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015). | R | Would be used to enforce the prohibition against unlawful discrimination in housing. | Place | Annual |
| Fair Housing Act of 1968 | 42 USC 3601 et seq.; 24 CFR 100.500. | P | Would be used to help plan education, testing and enforcement efforts to eliminate unlawful discrimination in housing. | Census block group | Annual |
| Equal Credit Opportunity Act | 15 USC 1691 et seq.; 12 CFR 202.6 n.2 | R | Would be used to enforce the prohibition against unlawful discrimination in lending. | Place | Annual |
| Equal Credit Opportunity Act | 15 USC 1691 et seq. | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in lending. | Census block group | Annual |
| Omnibus Crime Control and Safe Streets Act of 1968 | 42 USC 3789d(c); 28 CFR 42.203(c), (e) | R | Would be used to enforce the prohibition against unlawful discrimination in criminal justice programs receiving federal financial assistance. | Place | Annual |

000313

DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Statutory Requirement | | | | | |
|---|---|---|---|---|---|
| Title | Citations | Classification | Uses | Lowest geography | Frequency |
| Omnibus Crime Control and Safe Streets Act of 1968 | 42 USC 3789d(c) | P. | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in criminal justice programs receiving federal financial assistance. | Census block group | Annual |
| Juvenile Justice and Delinquency Prevention Act of 1974 | 42 USC 5672(b) | R. | Would be used to enforce the prohibition against unlawful discrimination in juvenile justice programs receiving federal financial assistance. | Place | Annual |
| Juvenile Justice and Delinquency Prevention Act of 1974 | 42 USC 5672(b) | P. | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in juvenile justice programs receiving federal financial assistance. | Census block group | Annual |
| Civil Rights of Institutionalized Persons Act | 42 USC 1997 et seq. | R | Would be used to enforce the prohibition against egregious or flagrant violations of law for persons residing in or confined to covered institutions. | Census block group | Annual |
| Civil Rights of Institutionalized Persons Act | 42 USC 1997 et seq. | P. | Would be used to help plan education and enforcement efforts to eliminate egregious or flagrant violations of law for persons residing in or confined to covered institutions. | Census block group | Annual |

000314

## DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
## REQUIREMENTS FOR AMERICAN COMMUNITY SURVEY DATA

| Title | Statutory Requirement | | Classification | Uses | Lowest geography | Frequency |
|---|---|---|---|---|---|---|
| | Citations | | | | | |
| Violent Crime Control and Law Enforcement Act of 1994 | 42 USC 14141 | | R | Would be used to enforce the prohibition against patterns or practices of unlawful conduct by law enforcement or by officials in the juvenile justice system. | Place | Annual |
| Violent Crime Control and Law Enforcement Act of 1994 | 42 USC 14141 | | P | Would be used to help plan education and enforcement efforts to eliminate patterns or practices of unlawful conduct by law enforcement or by officials in the juvenile justice system. | Census block group | Annual |
| Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act of 2009 | 18 USC 249 | | P | Would be used to help plan education and enforcement efforts to prosecute and deter covered hate crimes against LGBT individuals. | Census block group | Annual |
| Victims of Crime Act of 1984 | 42 USC 10604(e) | | P | Would be used to help plan education and enforcement efforts to eliminate unlawful discrimination in crime victim compensation programs receiving federal financial assistance. | Census block group | Annual |

000315

# EXHIBIT 4

| | |
|---|---|
| **To:** | Wilbur Ross |
| **Cc:** | Branstad, Eric (Federal) \EBranstad@doc.gov\ |
| **From:** | Comstock, Earl (Federal) |
| **Sent:** | Fri 3/10/2017 8:31:29 PM |
| **Importance:** | Normal |
| **Subject:** | Your Question on the Census |
| **Received:** | Fri 3/10/2017 8:31:30 PM |

I was not able to catch anyone at their desk when I called the numbers I have for the Census Bureau from their briefing.  However, the

Census Bureau web page on apportionment is explicit and can be found at
https://www.census.gov/population/apportionment/about/faq.html#Q16  It says:

### Are undocumented residents (aliens) in the 50 states included in the apportionment population counts?

Yes, all people (citizens and noncitizens) with a usual residence in the 50 states are to be included in the census and thus in the apportionment counts.

Further, this WSJ blog post from 2010 confirms that neither the 2000 nor the 2010 Census asked about citizenship.
http://blogs.wsj.com/numbers/the-pitfalls-of-counting-illegal-immigrants-937/

THE NUMBERS

The Pitfalls of Counting Illegal Immigrants



By CARL BIALIK

May 7, 2010 7:05 pm ET

The debate over Arizona's immigration law has included several estimates of the state's illegal-immigrant population, at "almost half a million," "half a million" or "more than half a million." Arguing against the law, Homeland Security chief Janet Napolitano — who is the former governor of Arizona — pointed to decreasing illegal immigration in the state.

These estimates and claims rest on several annual efforts to count illegal immigrants in the U.S. The nonpartisan Pew Hispanic Center estimated that in 2008 the nationwide population was 11.9 million, and half a million in Arizona. The federal Department of Homeland Security and the Center for Immigration Studies, a Washington, D.C., research group that opposes increased immigration, agree on a figure of 10.8 million for 2009, with DHS putting the Arizona population at 460,000, down from 560,000 a year earlier.

But as my print column notes this week, these estimates are limited by several factors that make it difficult for researchers to count this population. No major government survey, including the decennial census now under way, asks Americans about their citizenship status. Thus estimates of the number of illegal immigrants in the country are indirect and possibly far off from the correct count.

These studies rely on census surveys, and assume that about 10% of illegal immigrants aren't counted in these surveys. But that figure largely is based on a 2001 survey of Mexican-born people living in Los Angeles. "I do not advise use of my estimated undercounts for the 2000 census outside of L.A. county, nor for migrants from other nations," said study co-author Enrico Marcelli, assistant professor of sociology at San Diego State University. "However, demographers do not have any other empirical evidence at the moment with which to proceed."

One concern is that the nearly two in five households who didn't respond to the 2001 survey may have included a

0002521

disproportionately large number who also didn't respond to census interviewers. Marcelli said further study would be needed to test that possibility, but cautioned that the effort must be able to put illegal immigrants at ease in order to elicit honest answers.

"As far as I know, there has not been a new, serious attempt to estimate the undercount of illegal immigrants in the census," said Steven Camarota, director of research for the Center for Immigration Studies.

In 2005, Robert Justich, then a portfolio manager for Bear Stearns, co-authored a report suggesting the population of illegal immigrants "may be as high as 20 million people." Jeffrey Passel, senior demographer for the Pew Hispanic Center, disputed that finding. For one thing, other data sources, such as U.S. birth rates and Mexico's own census, don't corroborate such a large number. If there were really so many more immigrants, than there would be more women of child-bearing age, and more births. And if instead the missing millions are mostly Mexican men working in the U.S. and sending money home, the flip side of that influx would be reflected as a gap in the Mexican census numbers.

"Definitely the number is not as high as 20 million," said Manuel Orozco, senior associate of the Inter-American Dialogue, a Washington, D.C., policy-analysis group.

Justich, who now owns a music and film production firm, countered that immigrants from countries other than Mexico may make up the rest. However, he added that the number is no longer as high as 20 million.

Larger estimates also sometimes are based on border-patrol counts of apprehensions, which are far from reliable proxies. No one is sure of how many people are missed for each one who is caught trying to cross into the U.S. illegally. Many of those who do get through may return quickly, or cross back and forth. Also, some people are caught more than once, inflating the count. "It seems like we're not missing that many bodies in the United States," said Camarota, referring to the gap between the 20 million figure and his own.

The immigrant counters generally have seen a decline in the illegal-immigration population. "Economic drivers are very, very powerful" in lowering the illegal-immigrant population, said Hans Johnson, associate director of the Public Policy Institute of California. Others point to stepped-up enforcement efforts.

However, because of all the assumptions baked into these numbers, such drops come with so much statistical uncertainty that they may not be statistically significant. "The methodology for doing these estimates is not really designed to measure year-to-year change," Passel said.

One key difference between his count and the federal agency's: Homeland Security uses the Census Bureau's American Community Survey, which has a much larger sample size than the Current Population Survey, which Passel used. "I developed all of my methodology and all of the things that go with it when there wasn't an ACS," Passel said, "and I haven't gotten around to shifting to the new survey."

The ACS was introduced after the 2000 census, and may help overcome a problem with census numbers exposed in the last decennial census. Many more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau. Census officials think these estimates have improved since 2000 thanks to the annual ACS surveys of three million households. "That's the source we're using to estimate the movement" of the foreign-born population, said Howard Hogan, the Census Bureau's associate director for demographic programs. "It's a huge improvement over anything we had available in the '90s."

Still, the Census Bureau doesn't ask people about their immigration status, in part because such questions may drive down overall response rates. Robert M. Groves, director of the Census Bureau, said he'd like to test that hypothesis. "We're sort of data geeks here," Groves said. "What we'd like to do to answer that question is an experiment."

That doesn't mean that census interviewers don't try to find and enumerate illegal immigrants. Groves compares counting that group to efforts to track another population that is hard to count, though not necessarily because of willful avoidance: people who are homeless. Census interviewers spend three days visiting soup kitchens, shelters and outdoor gathering spots such as under certain highway overpasses in Los Angeles. "You don't have to look at that operation very long to realize that though it's a heroic effort, there are all sorts of holes in it," Groves said. As a result, the Census Bureau includes anyone counted in that effort in the overall population, but doesn't break out a separate estimate of homeless people.

"We would like to do estimates that have the smallest number of assumptions we can't test," Groves said. When it comes to counting illegal immigrants, if we don't know whether we're overcounting or undercounting in that situation, then we're uncomfortable giving a Census Bureau estimate that is subject to all of those debates."

 Further reading: Passel outlined methods for counting the illegal-immigrant population, while this paper analyzed some difficulties with the estimates. Earlier the Christian Science Monitor and I have examined these numbers. Immigration statistics have become a subject of debate in the U.K., as well.

# EXHIBIT 5

# Subjects Planned for the 2020 Census and American Community Survey

*Federal Legislative and Program Uses*

Issued March 2017
Revised





**United States™**
**Census**
**Bureau**

**U.S. Department of Commerce**
Economics and Statistics Administration
U.S. CENSUS BUREAU
*census.gov*

000194

The original version of the appendix has been revised.

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Protecting the Information Collected by These Subjects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Operational Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Subjects Planned for the 2020 Census and the American Community Survey . . . . . . . . . . . . . . . . . . . . . 5

    Age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Race/Ethnicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Tenure (Owner/Renter) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Subjects Planned for the American Community Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Acreage and Agricultural Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Ancestry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Commuting (Journey to Work) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    Computer and Internet Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    Fertility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    Grandparent Caregivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    Health Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

    Home Heating Fuel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    Home Value and Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    Industry, Occupation, and Class of Worker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    Labor Force Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    Language Spoken at Home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    Marital Status and Marital History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    Migration (Previous Residence)/Residence 1 Year Ago . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    Place of Birth, Citizenship, and Year of Entry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    Plumbing Facilities, Kitchen Facilities, and Telephone Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    School Enrollment, Educational Attainment, and Undergraduate Field of Degree . . . . . . . . . . . . . . 55

    Selected Monthly Owner Costs (Cost of Utilities, Condominium and Mobile Home Fees, Taxes,
       Insurance, and Mortgages) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    Supplemental Nutrition Assistance Program (SNAP)/Food Stamps . . . . . . . . . . . . . . . . . . . . . . . . . 59

    Units in Structure, Rooms, and Bedrooms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    Vehicles Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    Veteran Status, Period of Service, and Department of Veterans Affairs (VA)
       Service-Connected Disability Rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    Work Status Last Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

    Year Built and Year Moved In . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Appendix: Year Current Subjects Planned First Asked in Decennial Census Program . . . . . . . . . . . . . . A-1

000197

# Introduction

## BACKGROUND

Since 1790, a national census of the U.S. population has been conducted every 10 years, as required by the U.S. Constitution. Additional information beyond the population count has been collected with each census in response to the challenges facing the nation and a national desire to understand ourselves.

In the 20th century, most addresses received a "short" form, while a portion of addresses received a more detailed "long" form. The Census 2000 short form was designed to collect basic demographic and housing information (i.e., age, race, gender, relationship, and tenure) to be used for apportionment and redistricting. The long form sent to approximately 1 in 6 households collected social, housing, and economic information (i.e., citizenship, educational attainment, disability status, employment status, income, and housing costs) that was used to plan and determine funding for a wide array of federal, state, local, and tribal programs.

Since 2005, in order to provide communities, businesses, and the public with the detailed long-form information more frequently, these data have been collected monthly (and released annually) through the American Community Survey (ACS).[1] This innovation enabled the 2010 Census to be a "short-form-only" census. Decoupling the collection of short- and long-form data allowed the U.S. Census Bureau to focus decennial census efforts on the constitutional requirements to produce a count of the resident population, while employing technology in both collections to improve efficiencies, improve accuracy, and reduce costs. The result has been the dissemination of more current and detailed information than has ever been available.

The 2020 Decennial Census Program, comprised of the 2020 Census and the ACS, will provide an official count through a "short-form-only" census, as well as a portrait of communities counted across the nation through data collected by the ACS. This program is the only data-gathering effort that collects information from enough people to produce comparable data for every geographic area recognized by the Census Bureau.

## SUBMISSION OF SUBJECTS PLANNED FOR THE 2020 DECENNIAL CENSUS PROGRAM

Section 141(f) of the Census Act requires that the subjects to be included in the next census be submitted to Congress no later than 3 years before the census date. The contents of this handbook describe the subjects that will be asked on the 2020 Census and the ACS.

The Census Act also requires that the questions to be included in the next census be submitted to Congress no later than 2 years before the census date. A document that meets that requirement for the 2020 Census and the ACS will be submitted to Congress by March 31, 2018.

## ABOUT THE SUBJECTS PLANNED FOR THE 2020 DECENNIAL CENSUS PROGRAM

Throughout each decade, regular content reviews are conducted to ensure that the information collected through the decennial census program is required by federal programs. Beginning after the 1990 Census, the U.S. Office of Management and Budget (OMB) in conjunction with the Census Bureau, asked federal agencies to provide information describing their data needs. This information, updated each decade by subsequent changes to federal legislative requirements, is used to evaluate content considered for the decennial census program.

To prepare for the 2020 Census, OMB and the Census Bureau embarked on a comprehensive review including chartering the Interagency Council on Statistical Policy (ICSP) Subcommittee on the ACS and conducting the 2014 ACS Content Review. This effort was designed to examine and confirm the value of each question on the ACS, and to confirm and update the statutory and regulatory authority for the questions with federal agencies. In 2016, the Census Bureau asked federal agencies to provide any updates to this documentation.

The resulting information about federal uses is presented throughout the descriptions of the subjects on the following pages. These descriptions are designed to give the reader a clear understanding of 1) the relationship between questions asked of respondents and the summarized data that are released in published tables, 2) how federal agencies use the resulting data, and 3) the benefits of the data at the community level.

---

[1] The ACS also collects short-form data on its questionnaire. However, ACS asks for basic demographic and housing information from a sample of households, while the decennial census asks for basic demographic and housing information from all households.

# Protecting the Information Collected by These Subjects

The Census Bureau has an obligation to produce accurate, relevant statistics about the nation's economy and people, but we recognize that the information collected in these subjects is often private. We depend on cooperation and trust, and promise to protect the confidentiality of this information.

Federal law protects this information; Title 13 of the U.S. Code protects the confidentiality of all collected information. Violating this law is a crime with severe penalties. Please visit <www.census.gov/about/policies/privacy/data_protection/federal_law.html>.

## OUR PRIVACY PRINCIPLES

We recognize the value of respondent trust, and we believe that when a person answers the 2020 Census or the ACS we must serve as caretakers of the information. The Census Bureau's Privacy Principles remind us of this promise and help ensure the protection of respondent information throughout all of our activities.

The Privacy Principles are our guidelines. They help us as we determine content to consider respondents' rights and concerns. Every principle embodies a promise to the respondent.

### Necessity: Do we need to collect information on this subject?

Every time we prepare to ask a question, we determine whether the information is truly necessary. All of the information we collect is used for federal programs.

- We promise to collect only information necessary for each survey and census.

- We promise that we will use the information only to produce timely, relevant statistics about the population and the economy of the United States.

### Openness: Do respondents know why we are collecting this information?

We collect information only for statistical purposes, and it is never used to identify individuals. Before participating, respondents have the right to know why we are conducting the survey or census, why we are asking specific questions, and the purposes for which the information will be used.

- We promise to inform respondents about the purpose and uses for every survey or census we conduct before respondents provide answers.

### Respectful treatment of respondents: Are our efforts reasonable and do we treat people with respect?

- We promise to minimize the effort and time it takes for respondents to participate in the data collection by efficient designs.

- We promise to use only legal, ethical, and professionally accepted practices in collecting data.

- We promise to ensure any collection of sensitive information from children and other sensitive populations does not violate federal protections for research participants and is done only when it benefits the public good.

### Confidentiality: How do we protect this information?

In addition to removing personally identifiable information (i.e., names, telephone numbers, and addresses) from our data files, we use various approaches to protect personal information—including computer technologies, statistical methodologies, and security procedures.

Our security measures ensure that only a restricted number of authorized people have access to private information and that access is only granted to conduct our work and for no other purposes. Every person who works with census confidential information collected by the Census Bureau is sworn for life to uphold the law.

Violating the confidentiality of a respondent is a federal crime with serious penalties, including a federal prison sentence of up to 5 years, a fine of up to $250,000, or both.

- We promise that every person with access to respondent information is sworn for life to protect respondent confidentiality.

- We promise that we will use every technology, statistical methodology, and physical security procedure at our disposal to protect respondent information.

# Operational Questions

Some operational questions will appear on the 2020 Census and American Community Survey that will not result in published counts or estimates. These questions are asked to better administer the data collection process and to ensure greater accuracy of the data collected through the other subjects.

**A person's contact information, including name and phone number, are requested in case someone must be reminded to complete their response or to verify information in a follow-up operation.**

Contact information is not part of published estimates and is carefully protected, as mandated by federal law, to respect the personal information of respondents.

**An address is verified or requested to ensure that the data collected from the people in each household are included in the correct place.**

The U.S. Census Bureau is required to provide state legislatures with the small-area census population tabulations necessary for legislative redistricting. For example, a county count will be a summary of the data collected from all of the addresses in that county. To ensure that a household's data are included with the correct town, county, and state counts, we need to ensure that we know where the information was collected. Addresses are not part of published tabulations and are carefully protected, as mandated by federal law, to respect the personal information of respondents.

**The 2020 Census questions about the number of people in the home, whether anyone was included who does not usually live or stay there, or whether anyone who does usually live or stay there was forgotten, are used to ensure that everyone is counted once, only once, and in the right place.**

The first U.S. decennial census in 1790 established the concept of "usual residence" as the main principle in determining where people were to be counted. The Census Bureau uses residence criteria to determine whom to count and where, especially because the place where a person lives and sleeps most of the time is not necessarily the same as the person's voting residence or legal residence. Asking these additional questions helps ensure that no one is missed, people are not counted in multiple locations, and that people are included in the right place.

**The 2020 Census questions about maritime vessels, military living quarters, and other group quarters facilities, such as college or university student housing, nursing/ skilled nursing facilities, group homes, emergency and transitional shelters for people experiencing homelessness, and other such locations, are used to better administer the data collection process in group living situations.**

Asking these additional questions helps ensure accurate classification of group quarters which is a part of the Census Bureau's mission to ensure that everyone is counted once, only once, and in the right place.

## Selected Statutory Uses of Operational Questions Data

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | The Census Act, 13 USC § 141(c) |
| U.S. Department of Commerce, Bureau of the Census | The Census Act, 13 USC § 181 |

# Subjects Planned for the 2020 Census and the American Community Survey

000203

# Age

Age asked since 1790.

**AGE AND DATE OF BIRTH QUESTIONS ARE USED TO UNDERSTAND THE SIZE AND CHARACTERISTICS OF DIFFERENT AGE GROUPS AND TO PRESENT OTHER DATA BY AGE.**

Age data are used in planning and funding government programs that provide funds or services for specific age groups, such as children, working-age adults, women of childbearing age, or the older population. These statistics are also used to enforce laws, regulations, and policies against age discrimination in government programs and in society.

## AGE DATA HELP COMMUNITIES:

### Provide Assistance to Older Americans

Knowing how many people in a community are aged 60 and older helps local officials provide programs and services that enable older adults to remain living safely in their homes and communities (Older Americans Act). Age data are also used in programs that provide services and assistance to seniors, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Provide Assistance to Children and Families

Knowing the numbers and ages of children in families in combination with other information, such as household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, age data are used in targeted efforts to enroll eligible people in Medicaid and the Children's Health Insurance Program.

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. Age in combination with other information, such as disability status, language spoken at home, and poverty status, assists schools in understanding the needs of their students and qualifying for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

### Ensure Equal Opportunity

Knowing the ages of people in the community in combination with information about housing, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination based on age. For example, age information is used to analyze the employment status of workers by age (Age Discrimination in Employment Act).

## Selected Statutory Uses of Age Data

| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, and 1490a 7 CFR 3550.10 |
|---|---|
| U.S. Department of Education | 20 USC §§ 6333, 6334(a)(1), 6335(a), and 6337(b)(1)(A) |
| U.S. Department of Education | 220 USC §§ 6821, 6824, 7011(5), and 7801(20) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111–148, § 10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii(b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | 12 USC § 1701q; 24 CFR part 891 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, Public Law 89-110, as amended, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2 |
| U.S. Department of Labor | Older Americans Act Amendments of 2000, Public Law 109-365, 42 USC § 3056e; 20 CFR 641.140, 641.360, and 641.365 |
| U.S. Department of Labor | 29 USC §§ 49f(a)(3)(D), 49g(d), and 49l-2(a)15 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202, 29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74-271, as amended, 42 USC § 401(c) |

# Gender

Gender asked since 1790.

**A QUESTION ABOUT THE GENDER OF EACH PERSON IS USED TO CREATE STATISTICS ABOUT MALES AND FEMALES AND TO PRESENT OTHER DATA, SUCH AS OCCUPATION, BY GENDER.**

Gender data are used in planning and funding government programs and in evaluating other government programs and policies to ensure they fairly and equitably serve the needs of males and females. These statistics are also used to enforce laws, regulations, and policies against discrimination in government programs and in society.

## GENDER DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the gender of people in the community in combination with information about housing, voting, language, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination on the basis of gender. For example, gender data are used to enforce laws against discrimination based on gender in education programs and activities receiving federal financial assistance (Title IX of the Education Amendments of 1972).

### Understand Changes

Knowing whether people of different genders have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, the National Science Foundation uses gender data to provide information on women in the science and engineering workforce, and several agencies use gender data to investigate whether women, including women who are military veterans, have similar employment opportunities as men.

## Selected Statutory Uses of Gender Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4), § 8629(a)(1)–(3), and (6), § 8629(b) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3),(6),(8), 299b-2(a)(1), and 299(c)(1)(B) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Health Resources and Services Administration, Bureau of Clinician Recruitment and Service | 42 USC § 254e; 42 CFR 5.2 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | Fair Housing Act, Public Law 90–284, 42 USC 3600–3620, 42 USC 3608(e) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e(2)(k); Wards Cove Packing Co. v. Atonio; 490 U.S. 642 (1989) |
| U.S. Department of Justice, Civil Rights Division | Title IX of the Education Amendments of 1972, 20 USC § 1701 et seq. |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352;42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74-271, as amended, 42 USC § 401(c) |

# Race/Ethnicity

Race asked since 1790, ethnicity asked since 1970.

> **QUESTIONS ABOUT A PERSON'S RACE OR ETHNICITY ARE USED TO CREATE DATA ABOUT RACE AND ETHNIC GROUPS.**

These data are required for federal and state programs and are critical factors in the basic research behind numerous policies, particularly for civil rights. Race and ethnicity data are used in planning and funding government programs that provide funds or services for specific groups. These data are also used to evaluate government programs and policies to ensure they fairly and equitably serve the needs of all racial and ethnic groups and to monitor compliance with antidiscrimination laws, regulations, and policies. States also use these data to meet legislative redistricting requirements.

The U.S. Census Bureau collects race and ethnicity data in accordance with the 1997 Office of Management and Budget standards on race and ethnicity. The categories on race and ethnicity are based on self-identification and generally reflect a social definition of race and ethnicity. The categories are not an attempt to define race and ethnicity biologically, anthropologically, or genetically.

## RACE AND ETHNICITY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the races and ethnicities of community members in combination with information about housing, voting, language, employment, and education, helps government and communities enforce antidiscrimination laws, regulations, and policies. For example, race and ethnicity data are used in the following ways:

- Establish and evaluate the guidelines for federal affirmative action plans under the Federal Equal Opportunity Recruitment Program.

- Monitor compliance with the Voting Rights Act and enforce bilingual requirements.

- Monitor and enforce equal employment opportunities under the Civil Rights Act of 1964.

- Identify segments of the population who may not be getting needed medical services under the Public Health Service Act.

- Allocate funds to school districts for bilingual services under the Bilingual Education Act.

## Understand Changes

Knowing if people of different races and ethnicities have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. The National Science Foundation uses data on race and ethnicity to provide information on people of different racial and ethnic backgrounds in the science and engineering workforce. Several federal agencies use race and ethnicity data to investigate whether housing or transportation improvements have unintended consequences for specific race and ethnic groups. Data on race and ethnicity are used with age and language data to address language and cultural diversity needs in health care plans for the older population.

## Administer Programs for Specific Groups

Knowing how many people are eligible to participate in certain programs helps communities, including tribal governments, ensure that programs are operating as intended. For example, the Indian Housing Block Grant program, Indian Community Development Block Grant program, and Indian Health Service all depend on accurate estimates of American Indians and Alaska Natives. Data for the American Indian and Alaska Native population come from the questions about a person's race or ethnicity.

**Selected Statutory Uses of Race/Ethnicity Data**

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 13 USC § 141(c) |
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902(2), 9903, and 9908(b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965, Public Law 89-73, 42 USC § 3018 |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC § 300kk |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43; 25 USC § 1602 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, 42 USC 5306(a)(1); 24 CFR §1003.101 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203, 52 USC § 10503; 28 CFR Part 55 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |

# Relationship

Relationship asked since 1880.

**A QUESTION ABOUT THE RELATIONSHIP OF EACH PERSON IN A HOUSEHOLD TO ONE CENTRAL PERSON IS USED TO CREATE ESTIMATES ABOUT FAMILIES, HOUSEHOLDS, AND OTHER GROUPS, AND TO PRESENT OTHER DATA AT A HOUSEHOLD LEVEL.**

Relationship data are used in planning and funding government programs that provide funds or services for families, people living or raising children alone, grandparents living with grandchildren, or other households that qualify for additional assistance.

## RELATIONSHIP DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing about the different types of households in a community (single people, couples, families, roommates, etc.) helps communities understand whether available housing meets the needs of residents. Information about the relationships among people in a household, in combination with housing costs and the combined income of all people in a household, helps communities understand whether housing is affordable for residents.

When housing is not sufficient or not affordable, relationship data can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Assistance to Families

Knowing more about families, such as the ages of children, household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them, such as Head Start and the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. Relationship data are also used to ensure that programs like Temporary Assistance for Needy Families are making a difference for families.

### Understand Changing Households

Information about living arrangements and how they are changing, including whether older residents are staying in their homes as they age, whether young people are living with parents or moving in with roommates, and which kinds of households include young children, can help communities plan future programs and services for residents. For example, the Social Security Administration estimates future program needs based on the current relationships of working people.

**Selected Statutory Uses of Relationship Data**

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Energy | Energy Conservation and Production Act, Public Law 94-385, as amended, 42 USC § 6861, 6864; 10 CFR 440.10 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Education | 20 USC §§ 6333, 6334(a)(1), 6335(a), 6337(b)(1)(A) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8629 (a) (1)–(3) and (5)–(6), 8629 (b), and 8622 (11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, § 124(c)(5); 42 USC 15024 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, as amended, Public Law 93-383, 42 USC 5301, 5302, and 5305; 24 CFR 91.205(a)–(c ), 91.305(a)–(c), 570.208(a)(1), 570.483(b)(1), 570.704(a)–(c), 570.707(a)–(c), and 570.901 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Social Security Administration | The Social Security Act, Public Law 74–271, as amended, 42 USC § 401(c) |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, § 334, 38 USC § 3122 |

# Tenure (Owner/Renter)

Tenure asked since 1890.

**A QUESTION ABOUT WHETHER A HOME IS OWNED OR RENTED IS USED TO CREATE DATA ABOUT TENURE, RENTERS, AND HOME OWNERSHIP.**

Tenure is the most basic characteristic to asses housing inventory. Tenure data are used in government programs that analyze whether adequate housing is affordable for residents. Tenure data are also used to provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies against discrimination in private-market housing, government programs, and in society.

## TENURE DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of households in a community (single people, couples, families, roommates, etc.) and rates of home rental and ownership helps communities understand whether available housing meets the needs of residents. Data about owners and renters, in combination with housing costs and the combined income of all people in a household, help communities understand whether housing is affordable for residents.

When housing is not sufficient or affordable, data about owners and renters can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of rented homes, mortgaged homes, and homes owned free and clear changes over time can help communities understand changes in local housing markets; identify opportunities to improve tax, assistance, and zoning policies; and to reduce tax revenue losses from vacant or abandoned properties. Tenure is also used in formulas that communities use to determine housing assistance funding (Fair Market Rents).

### Ensure Equal Opportunity

Knowing the characteristics of people who rent and people who own homes in the community, such as age, gender, race, Hispanic origin, disability, helps government and communities enforce laws, such as the 1968 Fair Housing Act, designed to eliminate discrimination in housing.

### Understand Changing Households

Knowing whether older residents are staying in homes as they age or moving into rented homes; and whether young people are staying with parents, renting with roommates, or buying homes, can help governments and communities distribute funds appropriately between home ownership and rental housing programs and services for residents.

## Selected Statutory Uses of Tenure Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.563–564, 1940.575, 3560.11, and 3560.152(a)(2) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC § 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Rehabilitation Act of 1973, § 504, Public Law 93-112, 29 USC 794; 24 CFR § 8.22(b); 24 CFR § 8.23(a) |
| U.S. Department of Housing and Urban Development | 12 USC § 4568 |
| U.S. Department of Housing and Urban Development | 12 USC § 1701q; 24 CFR part 891 |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(l), (iii)(l), (iv), and(g); 15 U.S.C § 631 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965; 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg V. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6302(c), 6304(a), 6309(a) |

# Subjects Planned for the American Community Survey

000215

# Acreage and Agricultural Sales

Acreage asked since 1960, agricultural sales asked since 1960.

**QUESTIONS ABOUT THE ACREAGE ASSOCIATED WITH HOUSES, MOBILE HOMES, AND AGRICULTURAL SALES ARE USED TO CREATE DATA ABOUT AGRICULTURAL PROPERTIES AND TO BETTER UNDERSTAND HOME VALUE STATISTICS.**

These data are used in planning government programs designed to benefit the farm population and identifying or excluding agricultural areas for many other programs.

## ACREAGE AND AGRICULTURAL SALES DATA HELP COMMUNITIES:

### Provide Equitable Housing Assistance

Knowing which homes might qualify for farm subsidies, and which homes qualify for housing subsidies, is important to ensure that funds are fairly allocated. For example, the historical definition of Fair Market Rents, used to allocate housing assistance, has always excluded units on acreage of more than 10 acres to eliminate those units that might benefit from farm subsidies and therefore have lower-than-market rents. Understanding which kinds of properties are eligible for certain programs helps communities inform eligible residents and determine whether the community is eligible for funds based on its farm population.

### Support Agricultural Programs

Knowing which areas of a community are agricultural helps communities ensure eligible institutions receive funding for cooperative agricultural extension work and agricultural research. This funding is distributed to eligible institutions based on a legislatively determined formula that uses these data.

### Plan Community Development

Knowing the size and agricultural nature of areas of each community can help communities understand changes in local housing markets; identify opportunities to improve tax, assistance, and zoning policies; and reduce tax revenue losses from vacant or abandoned properties.

## Selected Statutory Uses of Acreage and Agricultural Sales Data

| | |
|---|---|
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(iii)(I); 15 USC § 631 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113, 24 CFR 982.401 |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Federal Reserve Board | Public Law 95-128,12 USC § 2901 et seq.; 12 CFR 228.12 |
| U.S. Federal Reserve Board | Public Law 94-200, 12 USC § 2809(a);12 CFR 203 |

# Ancestry

Ancestry asked since 1980.

**A QUESTION ABOUT A PERSON'S ANCESTRY OR ETHNIC ORIGIN IS USED TO CREATE STATISTICS ABOUT ANCESTRY GROUPS IN AMERICA.**

Ancestry data are used in planning and evaluating government programs and policies to ensure they fairly and equitably serve the needs of all groups. These statistics are also used to enforce laws, regulations, and policies against discrimination in society.

## ANCESTRY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing the ethnic groups in a community in combination with information about housing, voting, language, employment, and education, helps government and communities enforce laws, regulations, and policies against discrimination based on national origin. For example, ancestry data are used to enforce nondiscrimination in education (including monitoring desegregation); to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations; and to enforce laws, regulations, and policies against discrimination in federal financial assistance (Civil Rights Act of 1964).

### Understand Changes

Knowing whether people from different backgrounds have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, ancestry data are used with age and language data to address language and cultural diversity needs in health care plans for the older population.

**Selected Statutory Uses of Ancestry Data**

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Justice, Civil Rights Division | Title VI of Civil Rights Act of 1964, 42 USC § 2000d–2000d-7; 28 CFR 42.101–42.112; 28 CFR 42.401–42.415; 28 CFR 50.3; 67 Fed. Reg. 41,555 (June 18, 2002); Lau v. Nichols, 414 U.S. 563 (1974) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F.2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, 42 USC § 2000c et seq. |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299, 307–308 (1977) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, § 673 (2), 674, and 681A, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115; 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); 42 C.F.R. § 136.12(a) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Title VI of the Civil Rights Act of 1964, 42 USC § 2000d; Patient Protection and Affordable Care Act § 1557, 42 USC § 18116 |

# Commuting (Journey to Work)

Journey to work asked since 1960.

**QUESTIONS ABOUT WHERE PEOPLE WORK, HOW THEY GET THERE, WHEN THEY LEAVE, AND HOW LONG IT TAKES ARE USED TO CREATE DATA ABOUT COMMUTING OR A PERSON'S JOURNEY TO WORK.**

Journey to work data are used in planning and funding for improvements to road and highway infrastructure, developing transportation plans and services, and understanding where people are traveling in the course of a normal day. These data are also used to evaluate transportation plans to ensure they fairly and equitably serve the needs of all groups.

## COMMUTING DATA HELP COMMUNITIES:

### Improve Transportation Planning

Knowing where people commute to and from, and what time of day they are commuting, helps transportation planners create mass transportation and metropolitan transportation plans that are compliant with various transportation, environmental, and antidiscrimination regulations.

Local agencies and organizations use these statistics to plan transportation programs and services that meet the diverse needs of local populations, including the disabled population, bicycle commuters, carpool and ride-shares, and many other groups. Commuting data are also used to forecast future use of new or updated transportation systems.

### Ensure Equal Opportunity

Knowing where people could reasonably commute from in order to work in a certain area is used by communities and businesses for employment planning, and by communities and governments to enforce laws, regulations, and policies against employment discrimination.

### Understand Changes in Commutes

As commuting patterns change, information about where people could reasonably commute from in order to work in a certain area is used to understand commercial markets and labor force participation, and to plan local emergency response programs.

## Selected Statutory Uses of Commuting (Journey to Work) Data

| | |
|---|---|
| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | 2003 Medicare Modernization Act, 42 USC § 1395ww(d)(13) |
| U.S. Department of Health and Human Services, Health Resources and Services Administration, National Center for Healthcare Workforce Analysis | Public Health Service Act, §§ 761(b)(2)(A), 792(a), 792(b)(2), and 806(f)(1), 42 USC §§ 294n, 295k, and 296e |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, 42 USC § 2000e(2)(k); Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of the Interior | Public Law 102-477, 25 USC §§ 3401 and 3416; Senate Report 102-188 |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), 6309 (a) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC §§ 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112; 29 USC § 791(b); 29 CFR 1614.602 |

# Computer and Internet Use

Computer and Internet use asked since 2013.

**QUESTIONS ABOUT THE COMPUTERS AND DEVICES THAT PEOPLE USE, WHETHER PEOPLE ACCESS THE INTERNET, AND HOW PEOPLE ACCESS THE INTERNET ARE USED TO CREATE DATA ABOUT COMPUTER AND INTERNET USE.**

These statistics were first released to the public in September 2014. The questions were added as a requirement of the Broadband Data Improvement Act of 2008. They help federal agencies measure the nationwide development of broadband access and decrease barriers to broadband access.

## COMPUTER AND INTERNET USE DATA HELP COMMUNITIES:

### Ensure Residents Can Communicate

State and local agencies can use these statistics to evaluate access to broadband in their communities. They can measure access to information on the Internet, including access for schools, libraries, rural health care providers, and other public services. Communities ensure their residents are connected to assistance programs, emergency services, and important information. These statistics may also be useful to understand whether to use Internet or more expensive outreach methods for distributing important public health or safety information.

Federal agencies use these data to evaluate the extent of access to, and adoption of broadband, with a focus on underserved areas. State and local agencies might choose to use these statistics to evaluate access to broadband in their communities.

## Selected Statutory Uses of Computer and Internet Use Data

| | |
|---|---|
| U.S. Federal Communications Commission | Broadband Data Improvement Act of 2008, Public Law 110-385, 47 USC § 1303(d) |
| U.S. Department of Commerce, National Telecommunications and Information Administration | Broadband Data Improvement Act of 2008, Public Law 110-385, 47 USC § 1303(d) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |

# Disability

Disability asked since 1830.

**QUESTIONS ABOUT A PERSON'S DIFFICULTY WITH SPECIFIC DAILY TASKS ARE USED TO CREATE STATISTICS ABOUT DISABILITY.**

Disability data are used in planning and funding government programs that provide funds or services for populations with disabilities. In addition, these data are used in evaluating other government programs and policies to ensure that they fairly and equitably serve the needs of all groups. These statistics are also used to enforce laws, regulations, and policies against discrimination.

## DISABILITY DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of disabled households in a community helps communities understand whether available housing meets the needs of residents. When housing is not sufficient or not affordable, disability data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Health Care to Children and Families

Knowing the disability status of people in families in combination with other information, such as household income, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, disability data are used to target efforts to enroll eligible people in Marketplace, Medicaid, and the Children's Health Insurance Program (CHIP). Disability data are also used to ensure that Marketplace, Medicare, Medicaid, and CHIP programs are adequately serving these families.

### Ensure Equal Opportunity

Knowing the disability status of people in the community in combination with information about housing, voting, employment, and education, helps governments and communities enforce laws, regulations, and policies against discrimination based on disability status. For example, disability data are used to evaluate whether there are health care or public health program disparities based on disability status (Developmental Disabilities Assistance and Bill of Rights Act of 2000).

### Provide Assistance to People With Disabilities

Knowing how many people in a community over a certain age have a disability helps local officials provide programs and services to older adults that enable them to remain living safely in their homes and communities (Older Americans Act). Disability status data are also used in programs that provide services and assistance to people with a disability, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Understand Changes

Knowing whether people with disabilities have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. Communities also need to understand changes in the needs and geographic concentrations of people with disabilities to ensure that they can meet the community's needs during weather events, disasters, and public health emergencies.

## Selected Statutory Uses of Disability Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention | Public Health Service Act, § 301, 42 USC 241; Public Health Service Act, § 3101, 42 USC 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, § 124(c)(5); 42 USC 15024 |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965; Public Law 89-73; 42 USC § 3013, 3024, 3030s-1, 3032 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Health Resources and Services Administration | Public Health Service Act § 792(b)(2), 42 USC § 295(k)(b)(2) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115; 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |
| U.S. Department of Health and Human Services, Office for Civil Rights | Rehabilitation Act of 1973, § 504 , Public Law 93-112; Americans With Disabilities Act Titles II and III, as amended by the ADA Amendments Act of 2008, Public Law 110-325, 42 USC 126 |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Rehabilitation Act of 1973, § 504, Public Law 93-112, 29 USC 794; 24 CFR §8.22(b); 24 CFR §8.23(a) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |

# Fertility

Fertility asked since 1890.

**A QUESTION ABOUT WHETHER A WOMAN HAD A BABY IN THE LAST YEAR IS USED TO CREATE STATISTICS ABOUT FERTILITY.**

Fertility data are used in planning government programs and adjusting other important data, such as the size of the population eligible for different services, as new people are born. These statistics can also be used to project the future size of the population and to understand more about growing families.

## FERTILITY DATA HELP COMMUNITIES:

### Provide Health Care to Children and Families

Knowing the numbers of women with a recent birth in combination with other information, such as marital status, labor force status, household income, health insurance status, and poverty status, can help communities understand changes in the demand for health care. For example, knowing how many American Indian babies are born can help communities, tribes, and the federal government estimate the demand for health care through the Indian Health Service.

## Understand Changing Households

Knowing the characteristics of women who are giving birth, including where in the country they live, is important to understand the relationships among different development patterns, including housing and travel information and public health and pollution.

Though local vital statistics offices typically have a count of births per year, fertility data are able to provide federal program planners, policymakers, and researchers with additional statistics about the age, education, and employment of parents in households welcoming children, and other important information about the homes (age, size, etc.) and households (income, language spoken, etc.) for a more complete picture of families.

State and local agencies can use these statistics in combination with other information about new mothers, such as education and income, to understand future needs for the local education system and health services.

## Selected Statutory Uses of Fertility Data

| | |
|---|---|
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); Indian Healthcare Improvement Act, Public Law 94-43, 25 USC § 1602 |

# Grandparent Caregivers

Grandparent caregivers asked since 2000.

**QUESTIONS ABOUT WHETHER A PERSON IS THE PRIMARY CAREGIVER FOR HIS/HER GRANDCHILDREN AND HOW LONG HE/SHE HAS CARED FOR HIS/HER GRANDCHILDREN, ARE USED TO CREATE STATISTICS ABOUT GRANDPARENT CAREGIVERS.**

Grandparent caregiver data help federal agencies understand the special provisions needed for federal programs designed to assist families, as older Americans are often in different financial, housing, and health circumstances than those of other ages. These data are also used to measure the effects of policies and programs that focus on the well-being of families, including tax policies and financial assistance programs.

## GRANDPARENT CAREGIVER DATA HELP COMMUNITIES:

### Provide Assistance to Families

Knowing more about families, particularly those where grandparents care for grandchildren, along with data about the ages of children, household income, disability, and poverty status can help communities enroll eligible families in programs designed to assist them, such as the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. These data are also used to evaluate programs like Temporary Assistance for Needy Families.

### Provide Assistance to Older Americans

Knowing how many people in a community are over a certain age, including whether older Americans are caring for grandchildren, helps local officials fund programs and services targeted to reach older adults with the greatest economic and social needs (Older Americans Act).

### Understand Changing Households

Knowing more about how often grandparents are responsible for the basic care for grandchildren and how long they have been responsible in combination with information about age, presence of children, income, etc., can help communities understand if available housing and services are meeting residents' needs.

**Selected Statutory Uses of Grandparent Caregivers Data**

| | |
|---|---|
| U.S. Department of Commerce,<br>Bureau of the Census | 13 USC § 141 note |
| U.S. Department of Health and Human Services,<br>Administration for Children and Families | 13 USC § 141 note |

# Health Insurance

Health insurance asked since 2008.

**QUESTIONS ABOUT THE SOURCES OF A PERSON'S HEALTH INSURANCE ARE USED TO CREATE STATISTICS ABOUT THE PERCENTAGE OF PEOPLE COVERED BY HEALTH INSURANCE AND THE SOURCES OF HEALTH INSURANCE.**

Health insurance data are used in planning government programs, determining eligibility criteria, and encouraging eligible people to participate in health insurance programs.

## HEALTH INSURANCE DATA HELP COMMUNITIES:

### Provide Assistance to Children and Families

Knowing the health insurance coverage status in combination with other information, such as number and age of children in families, household income, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, health insurance coverage status and age data are used to target efforts to enroll eligible people in Marketplace, Medicaid, and the Children's Health Insurance Program (CHIP). Health Insurance data are also used to ensure that Marketplace, Medicare, Medicaid, and CHIP programs are improving health outcomes for families.

### Provide Health Care for Veterans

Knowing the number and characteristics of veterans eligible to use Department of Veterans Affairs health care, compared to those currently using services, can help communities and the federal government estimate the future demand for health care services and facilities for veterans.

### Provide Health Care for American Indians

Knowing the health insurance coverage of American Indians can help communities, tribes, and the federal government estimate the demand for health care through the Indian Health Service.

### Understand Changes

Knowing the health insurance coverage status of people in a community helps planners identify gaps in community services, plan programs that address those gaps, and qualify for funding for those programs.

Knowing more about changes in health insurance coverage rates and the characteristics of people who have or do not have health insurance is also of interest to researchers, advocacy groups, and policymakers. For example, State Councils on Developmental Disabilities use health insurance coverage data in their comprehensive reviews and analyses of the unmet needs of people with developmental disabilities.

**Selected Statutory Uses of Health Insurance Data**

| | |
|---|---|
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3), (6), (8), 299b-2(a)(1), and 299(c)(1)(B) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Indian Health Service | Snyder Act, Nov. 2, 1921, c. 115, 25 USC § 13; Transfer Act, Aug. 5, 1954, c. 658, § 2, 42 USC § 2001(a); 42 CFR § 136.12(a) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Rehabilitation Act of 1973, § 504; Public Law 93-112; Americans With Disabilities Act, Titles II and III, as amended by the ADA Amendments Act of 2008, Public Law 110-325, 42 USC, Chapter 126 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Veterans Affairs | Public Law 106-117, 38 USC §§ 8134(a)(2) |

# Home Heating Fuel

Home heating fuel asked since 1940.

**QUESTIONS ABOUT HOME HEATING FUEL ARE USED TO CREATE DATA ABOUT HOME ENERGY USE.**

These data are used in government programs that analyze community air quality and energy needs. Federal agencies use these statistics to forecast future energy demand, analyze the fuels available to community residents, and plan and fund programs that help low-income residents afford to heat their homes.

## HOME HEATING FUEL DATA HELP COMMUNITIES:

### Provide Assistance With Utilities

Knowing which fuel is used to heat homes in combination with the cost of those fuels and the characteristics of the low-income households that need assistance with their utilities, helps communities enroll eligible households in assistance programs like the Low Income Home Energy Assistance Program and qualify for grants to fund assistance. These data are also used to evaluate whether these programs benefit eligible households.

### Estimate Future Energy Demand

Knowing the current users of certain heating systems and the kinds of systems used in new homes helps communities predict future demand for fuels and the future costs of systems in use in a community. For example, the Department of Energy uses these data to project demand over the next 30 years, assessing the energy needs of the U.S. economy in a domestic and international context.

### Measure Environmental Impacts

Communities with older heating systems may have lower air quality at times when they are in high use. Home heating fuel data are used to develop an inventory of the national aggregate emissions of each greenhouse gas and to research and report on the relationships among different development patterns (including housing and travel information) and public health and pollution (Clean Air Act, Clean Water Act).

**Selected Statutory Uses of Home Heating Fuel Data**

| | |
|---|---|
| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4), § 8629(a)(1)–(3) and (6), § 8629(b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8623(a)(2) and (4) and § 8622(11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a)(1)–(3) and (6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(2), (b)(1), and (b)(6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254 (a)(2), (b)(6), and (s) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Home Value and Rent

Home value asked since 1940, rent asked since 1940.

> **QUESTIONS ABOUT THE MONTHLY RENT AMOUNT OR HOW MUCH THE HOME AND PROPERTY ARE WORTH ARE USED TO PRODUCE STATISTICS ABOUT RENT AND HOME VALUE.**

These data are used in government programs that analyze whether adequate housing is affordable for residents and provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies designed to eliminate discrimination in private-market housing, government programs, and in society.

## HOME VALUE AND RENT DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of households in a community (single people, couples, families, roommates, etc.) helps communities understand whether available housing meets the needs of residents. Housing costs in combination with relationship and combined income of all people in a household helps communities understand whether housing is affordable.

When rental housing is not affordable, rent data are used to identify rental distribution of housing units (the standard cost of different types of housing in different areas of the country) and to determine Fair Market Rents, which the Department of Housing and Urban Development uses to determine the amount of tenant subsidies in housing assistance programs.

When housing is not sufficient or not affordable, housing cost data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of rented homes, mortgaged homes, and owned homes changes over time can help communities understand changes in local housing markets and identify opportunities to improve tax, assistance, and zoning policies.

### Ensure Equal Opportunity

Knowing more about people who rent and people who own homes in the community in combination with age, gender, race, Hispanic origin, disability, and other data, helps government and communities enforce laws, such as the 1968 Fair Housing Act designed to eliminate discrimination in housing.

**Selected Statutory Uses of Home Value and Rent Data**

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC 1485, 1486, 1490a, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 3560.11, 3560.152(a)(2), 3560.254(c) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 9902 (2), 9908(b)(1)(A), and 9914 (a) and (c ) |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3),(6),(8), 299b-2(a)(1), and 299c(1)(B) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Social Security Act, Public Law 74-271, § 1848e(1)(A), 42 USC § 1395w-4(e)(1)(A) |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended; 42 USC § 1437f(c)(1); 24 CFR 888.113, 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Housing and Economic Recovery Act of 2008, Public Law 110-289, Federal Housing Enterprises Financial Safety and Soundness Act of 1992, § 1338, 12 USC § 4568 |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), and 6309 (a) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)-(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Income

Income asked since 1940.

> **QUESTIONS ABOUT THE FUNDS A PERSON RECEIVES FROM VARIOUS SOURCES ARE USED TO CREATE STATISTICS ABOUT INCOME, ASSISTANCE, EARNINGS, AND POVERTY STATUS.**

Income data are used in planning and funding government programs that provide economic assistance for populations in need and measure the economic well-being of the nation. Income and poverty estimates are often part of allocation formulas that determine how food, health care, job training, housing, and other assistance are distributed.

## INCOME DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the combined income of all people in a household in combination with housing costs helps communities understand whether housing is affordable for residents. When housing is not sufficient or not affordable, income data can help communities enroll eligible households in programs designed to assist them and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Provide Assistance to Older Americans

Knowing how many older people in a community are living in poverty in combination with other information, such as age and disability status of other family members, can help communities ensure these residents receive appropriate assistance, such as financial assistance with utilities (Low Income Home Energy Assistance Program).

### Provide Assistance to Children and Families

Knowing household income in combination with other information, such as the number and age of children in families, health insurance status, and poverty status, can help communities enroll eligible families in programs designed to assist them. For example, income data are used to identify eligibility and provide funding in programs like Medicaid, the Child and Adult Care Food Program, and Head Start.

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. Household income and family composition determine poverty status, which is used along with school enrollment, information on disability status, and language spoken at home, to help schools understand the needs of their students and qualify for grants that help fund programs for students with needs for additional services or assistance, including free/reduced price school lunches (Elementary and Secondary Education Act of 1965).

### Plan Community Development

Knowing more about the financial situation of residents, including income, employment, and housing costs, can help communities qualify for loan and grant programs designed to stimulate economic recovery, improve housing, run job-training programs, and define areas as empowerment or enterprise zones.

## Selected Statutory Uses of Income Data

| | |
|---|---|
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV; Act of May 8, 1914, ch. 79, 7 USC § 3175; 7 USC § 343(d) |
| U.S. Department of Agriculture | Richard B. Russell National School Lunch Act, 42 USC § 1759a(g) |
| U.S. Department of Agriculture | 7 USC § 2020(e)(1); 7 CFR 272.4(b)(6) |
| U.S. Department of Agriculture | 42 USC § 1766(f)(3)(A)(ii)(I)(aa) and 1766(f)(3)(E)(i); 7 CFR 226.15(f) |
| U.S. Department of Education | 20 USC § 6333, 6334(a)(1), 6335(a), 6337(b)(1)(A) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC 300kk |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, §10334; 42 USC 300kk |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention | Public Health Service Act, § 301, 42 USC 241; Public Health Service Act, § 3101, 42 USC 300kk |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC 11371–11376; 24 CFR Part 91 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, 42 USC 5306(a)(1); 24 CFR §1003.101 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974 as amended; Public Law 93-383, as amended, 42 USC 5301, 5302, and 5305; 24 CFR 91.205(a)–(c ), 91.305(a)–(c), 570.208(a)(1), 570.483(b)(1), 570.704(a)–(c), 570.707(a)–(c),  570.901 |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and(g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |

# Industry, Occupation, and Class of Worker

Industry asked since 1820,[1] occupation asked since 1850, class of worker asked since 1910.

**QUESTIONS ABOUT A PERSON'S EMPLOYER, THE KIND OF BUSINESS OR INDUSTRY OF THAT EMPLOYER, THE KIND OF WORK A PERSON DOES, AND THAT PERSON'S MOST IMPORTANT ACTIVITIES ARE USED TO PRODUCE INDUSTRY, OCCUPATION, AND CLASS OF WORKER STATISTICS.**

These data are used to provide information about the labor force in government programs, to evaluate government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## INDUSTRY, OCCUPATION, AND CLASS OF WORKER DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973). Industry, occupation, and class of worker data provide additional detail about the jobs and careers pursued by people participating in these programs.

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs including job fairs and training programs, and promote business opportunities.

### Ensure Equal Employment Opportunity

Knowing more about people who are employed or looking for work in combination with educational attainment, age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce civil rights laws against employment discrimination. For example, these data are used to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of growing or declining industries and occupations is an important part of estimating changes in the economy. Labor force estimates are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

Class of worker data, in particular, are used by the National Institute of Food and Agriculture to understand changes in farm workers and agriculture.

---

[1] Industry asked in 1820, 1840, and 1910 until present.

## Selected Statutory Uses of Industry, Occupation, and Class of Worker Data

| | |
|---|---|
| U.S. Department of Agriculture | Smith- Lever Act of 1914, 7 USC § 343(c) |
| U.S. Department of Agriculture | 7 USC 3222b, NIFA Funding Opportunity Announcement (RFA) |
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV, 7 USC § 3222 |
| U.S. Department of Agriculture | National Agricultural Research, Extension, and Teaching Policy Act, Public Law 95-113, Title XIV, 7 USC § 3221 |
| U.S. Department of Agriculture | Act of Mar. 2, 1887, ch. 314, 7 USC § 361c |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | 49 USC §§6303(c ) and 6304(a); |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, § 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112; 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202, 29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352; 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Labor Force Status

Labor force status asked since 1890.

> **QUESTIONS ABOUT WHETHER A PERSON WORKED LAST WEEK AND, IF THE ANSWER IS NO, WHY HE/SHE WAS NOT WORKING, WHETHER HE/SHE PLANS TO RETURN TO WORK, AND HOW MUCH THEY WORKED IN THE PAST YEAR ARE USED TO PRODUCE STATISTICS ABOUT THE LABOR FORCE, INCLUDING UNEMPLOYMENT STATISTICS.**

Labor force data are used in planning and funding government programs that provide unemployment assistance and services. These data are also used to evaluate other government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## LABOR FORCE DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973).

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs, including job fairs and training programs, and to promote business opportunities.

### Ensure Equal Opportunity

Knowing more about people who are employed or looking for work in combination with age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce laws, regulations, and policies against discrimination in employment. For example, labor force data are used to enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of people who are working or looking for work is an important part of estimating changes in the economy. Labor force estimates are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

**Selected Statutory Uses of Labor Force Status Data**

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(3); 42 USC §15024 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Labor | 29 USC §§ 49f(a)(3)(D), 49g(d), and 49l-2(a) |
| U.S. Department of Labor | Workforce Investment Act of 1998, Public Law 105-220; 20 CFR 668.296(b) and 668.440 |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Moving Ahead for Progress in the 21st Century Act, Public Law 112-141 (2012), 49 USC § 5304 (a); 49 CFR Part 613, Subpart B |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Age Discrimination in Employment Act of 1967, Public Law 90-202, 29 USC § 623(a)–(d) and 633a; 29 CFR 1625.7(d); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Language Spoken at Home

Language spoken at home asked since 1890.[1]

QUESTIONS ABOUT WHETHER A PERSON SPEAKS A LANGUAGE OTHER THAN ENGLISH AT HOME, WHAT LANGUAGE HE/SHE SPEAKS, AND HOW WELL HE/SHE SPEAKS ENGLISH ARE USED TO CREATE STATISTICS ABOUT LANGUAGE AND ABOUT ABILITY TO SPEAK ENGLISH.

Language data are used in planning government programs for adults and children who do not speak English well. These data are also used to ensure that information about public health, law, regulations, voting, and safety is communicated in languages that community members understand.

## LANGUAGE SPOKEN AT HOME DATA HELP COMMUNITIES:

### Educate Children

Knowing how many children and youth with limited English-speaking abilities depend on services through schools helps school districts make long-term staffing and funding decisions. Language spoken at home in combination with other information, such as disability status, school enrollment, and poverty status, helps schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

### Ensure Equal Opportunity

Knowing the languages spoken by people in the community in combination with information about housing, voting, employment, and education, helps the government and communities enforce laws, regulations, and policies against discrimination based on national origin. For example, language data are used to support the enforcement responsibilities under the Voting Rights Act to investigate differences in voter participation rates and to enforce laws and policies related to bilingual requirements.

Knowing languages spoken in a community also helps federal agencies identify needs for services for people with limited English proficiency under Executive Order 13166.

### Understand Changes

Knowing whether people who speak languages other than English have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. For example, language data are used with age and ancestry data to address language and cultural diversity needs in health care plans for the older population.

---

[1] Language spoken at home was not asked in 1950.

## Selected Statutory Uses of Language Spoken at Home Data

| U.S. Department of Agriculture | 7 USC § 2020(e)(1); 7 CFR 272.4(b)(6) |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Education | 20 USC §§ 6821 and 6824, 7011(6), and 7801(25) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Community Living | 42 USC § 300kk |
| U.S. Department of Health and Human Services, Administration for Community Living | Older Americans Act of 1965, Public Law 89-73, as amended, 42 USC §§ 3013, 3024. 3030s-1, 3032 |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Patient Protection and Affordable Care Act, Public Law 111-148, § 10334; 42 USC § 300kk |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act 42 USC § 11371–11376; 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC § 12705(b)(1)–(3); 24 CFR Part 91, 24 CFR 91.205(a)–(c) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203, 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | The Civil Rights Act of 1964, Title VI, 42 USC § 2000d–2000d-7; 28 CFR 42.101–42.112; 28 CFR 42.401–42.415; 28 CFR 50.3; Lau v. Nichols, 414 U.S. 563 (1974) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F. 2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965,52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |

# Marital Status and Marital History

Marital status asked since 1880, marital history asked since 1850.

**QUESTIONS ABOUT WHETHER A PERSON IS CURRENTLY MARRIED, WIDOWED, DIVORCED, SEPARATED, OR NEVER MARRIED; WHETHER HIS/HER MARITAL STATUS CHANGED IN THE PAST 12 MONTHS; AND LIFETIME MARRIAGES ARE USED TO CREATE STATISTICS ABOUT CURRENT MARITAL STATUS AND MARITAL HISTORY.**

Marital status and marital history data help federal agencies understand marriage trends, forecast future needs of programs that have spousal benefits, and measure the effects of policies and programs that focus on the well-being of families, including tax policies and financial assistance programs.

## MARITAL STATUS AND MARITAL HISTORY DATA HELP COMMUNITIES:

### Provide Benefits to Spouses and Survivors

Knowing more about how many spouses and ex-spouses may qualify for programs with spousal benefits, including veteran and social security programs, can help federal agencies ensure adequate funding and facilities for these programs and can help communities determine where gaps in benefits and services might exist.

### Provide Assistance to Families

Knowing more about families, particularly blended and single-parent families, along with data about the presence of children, labor force status, and poverty status, can help communities enroll eligible families in programs designed to assist them, such as the Children's Health Insurance Program, and can help communities qualify for grants to fund these programs. These data are also used to evaluate programs like Temporary Assistance for Needy Families.

### Understand Changing Households

Knowing more about community marriage trends (whether people are marrying later in life, not getting married, or marrying again) in combination with information about age, presence of children, income, etc., can help communities understand if the available housing, job training, rental assistance, and administrative services and programs are meeting residents' needs during their major life changes. These data also help the federal government plan for the future. For example, the Social Security Administration estimates future program needs based on the current relationships of working people.

**Selected Statutory Uses of Marital Status and Marital History Data**

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC §§ 299a(a)(3), (6), (8), 299b-2(a)(1), and 299(c )(1)(A) |
| U.S. Department of Health and Human Services, Center for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs 38 USC § 3122 |
| U.S. Social Security Administration | Social Security Act, Public Law 74–271 as amended, 42 USC § 401(c) |

# Migration (Previous Residence)/Residence 1 Year Ago

Residence 1 year ago asked since 1930.

**QUESTIONS ABOUT WHETHER A PERSON MOVED IN THE LAST YEAR AND WHERE HE OR SHE LIVED 1 YEAR AGO ARE USED TO CREATE STATISTICS ABOUT WHERE PEOPLE ARE MOVING (TO/FROM FOREIGN COUNTRIES AND WITHIN THE UNITED STATES).**

Migration (residence 1 year ago) data are used in planning government programs and adjusting other important geographic data as people move. The characteristics of people who have moved are also an important part of estimating population changes. These population estimates are used in funding decisions, to ensure surveys are accurate, to understand change in other data, and to produce official international migration estimates.

## MIGRATION/RESIDENCE 1 YEAR AGO DATA HELP COMMUNITIES:

### Understand Changes

Knowing the characteristics of people who have moved and the patterns of migration (where people move to and from) is an important part of estimating population changes. Population estimates are used in funding decisions, to ensure surveys are accurate, to understand change in other data, and to produce international migration estimates. These data also help agencies assess residential stability and the effects of migration on urban and rural areas.

Knowing where certain populations move to and from helps federal agencies assess the needs of counties with large refugee populations and the effects of immigration on local areas.

Knowing the characteristics of people who live or have lived in certain areas is important to understand the relationships among different development patterns, including housing and travel information, public health, and pollution. These data may also assist state and local agencies in developing programs that attract new residents or employers.

**Selected Statutory Uses of Migration/Residence 1 Year Ago Data**

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 13 USC § 181 |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1) (A)(i), |
| U.S. Department of Health and Human Services, Indian Health Service | Indian Citizenship Act of 1924, 25 USC § 13; 42 USC § 2001(a); 42 CFR 136.12(a) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Place of Birth, Citizenship, and Year of Entry

Place of birth asked since 1850, citizenship asked since 1820,[1] year of entry asked since 1890.[2]

> **QUESTIONS ABOUT A PERSON'S PLACE OF BIRTH, CITIZENSHIP, AND YEAR OF ENTRY INTO THE UNITED STATES ARE USED TO CREATE DATA ABOUT CITIZENS, NONCITIZENS, AND THE FOREIGN-BORN POPULATION.**

These statistics are essential for agencies and policymakers setting and evaluating immigration policies and laws, seeking to understand the experience of different immigrant groups, and enforcing laws, policies, and regulations against discrimination based on national origin. These statistics are also used to tailor services to accommodate cultural differences.

## PLACE OF BIRTH, CITIZENSHIP, AND YEAR OF ENTRY DATA HELP COMMUNITIES:

### Ensure Equal Opportunity

Knowing how many people in the community are born in other countries in combination with information about housing, voting, language, employment, and education, helps the government and communities to enforce laws, regulations, and policies against discrimination based on national origin. For example, these data are used to support the enforcement responsibilities under the Voting Rights Act to investigate differences in voter participation rates and to enforce other laws and policies regarding bilingual requirements.

### Educate Children

Knowing how many foreign-born children depend on services through schools helps school districts make staffing and funding decisions. Place of birth, citizenship, and year of entry statistics in combination with other information, such as language spoken at home, help schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

### Understand Changes

Knowing whether people of different races or countries of birth have the same opportunities in education, employment, voting, home ownership, and many other areas is of interest to researchers, advocacy groups, and policymakers. These data may also help communities with large refugee populations that qualify for financial assistance (Immigration Nationality Act).

---

[1] Citizenship asked 1820–1830, 1870, and 1890 to present.
[2] Year of entry asked 1890–1930, and 1970 to present.

## Selected Statutory Uses of Place of Birth, Citizenship, and Year of Entry Data

| | |
|---|---|
| U.S. Department of Commerce, Bureau of the Census | 52 USC § 10503 |
| U.S. Department of Commerce, Bureau of the Census | 13 USC § 141(c) |
| U.S. Department of Education | 20 USC §§ 6821, 6824, 7011(5), and 7801(20) |
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC §§ 9902 (2), 9903, and 9908(b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office for Civil Rights | Civil Rights Act of 1964, Title VI; Patient Protection and Affordable Care Act, Section 1557 |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)(C) |
| U.S. Department of Housing and Urban Development | Fair Housing Act, Public Law 90–284, 42 USC 3600–3620; 42 USC 3608(e) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, Title VII, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964, Title VII, Public Law 88-352, 42 USC § 2000e-2 ; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791 (b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352,42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |
| U.S. Social Security Administration | Social Security Act, Public Law 74–271, as amended, 42 USC § 401(c) |

# Plumbing Facilities, Kitchen Facilities, and Telephone Service

Plumbing facilities asked since 1940, kitchen facilities asked since 1940, telephone service asked since 1960.

**QUESTIONS ABOUT THE PRESENCE OF HOT AND COLD RUNNING WATER, A BATHTUB OR SHOWER, A SINK WITH A FAUCET, A STOVE OR RANGE, A REFRIGERATOR, AND TELEPHONE SERVICE ARE USED TO CREATE DATA ABOUT INDICATORS OF HOUSING QUALITY.**

These data are used in planning and funding government programs that identify areas eligible for housing assistance, rehabilitation loans, and other programs that help people access and afford decent, safe, and sanitary housing. Public health officials may also use this information to locate areas in danger of ground-water contamination and waterborne diseases.

## PLUMBING FACILITIES, KITCHEN FACILITIES, AND TELEPHONE SERVICE DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing more about the quality of housing in a community helps communities understand whether available housing meets the needs of residents. When housing is not sufficient or not affordable, data on household facilities can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnership Program, Emergency Solutions Grant, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the quality of different types of homes in combination with whether they are occupied or vacant, can help communities identify opportunities to improve tax, assistance, and zoning policies and to reduce tax revenue losses from vacant or abandoned properties. These data may also be useful in identifying types of homes in disaster-prone areas during emergency planning and preparation.

### Ensure Residents Can Communicate

Measuring the extent of telephone service, including access for schools, libraries, health care providers, and low-income residents, helps communities ensure their residents have universal access to assistance programs, emergency services, and important information.

### Measure Environmental Impacts

Substandard plumbing systems may impact the local water supply. Understanding where these systems are concentrated helps communities research their wastewater infrastructure needs and work to improve their systems.

# Selected Statutory Uses of Plumbing Facilities, Kitchen Facilities, and Telephone Service Data

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490c, 1490d, 1490e, and 1490l,; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 1980.312, 3560.11; 7 CFR 3550.53(a), 3550.67(b), 3550.68(c); 7 CFR 1980.301(d); 7 CFR 3560.152(a)(2), 3560.254(c) RD Instruction 1980-D, Exhibit C |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also Appendices A and B) |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and (g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Federal Housing Enterprises Financial Safety and Soundness Act of 1992, § 1338, 12 USC § 4568 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, 42 USC § 12747(b)(1)(A) and (B); 24 CFR 92.50(a), (b), and (c) |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94; 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Federal Communications Commission | Telecommunications Act of 1996, Public Law 104-104, 47 USC §151 and 254; 47 CFR 54.702(i) |

# School Enrollment, Educational Attainment, and Undergraduate Field of Degree

School enrollment asked since 1850, educational attainment asked since 1940, undergraduate field of degree asked since 2009.

QUESTIONS ABOUT WHETHER A PERSON IS ATTENDING SCHOOL OR COLLEGE, THE HIGHEST LEVEL OF EDUCATION HE/SHE HAS COMPLETED, AND THE FIELD OF ANY COMPLETED UNDERGRADUATE COLLEGE DEGREES ARE USED TO CREATE DATA ABOUT EDUCATION.

These statistics are used to analyze the characteristics and needs of school-aged children and to understand the continuing education needs of adults.

## SCHOOL ENROLLMENT, EDUCATIONAL ATTAINMENT, AND UNDERGRADUATE FIELD OF DEGREE DATA HELP COMMUNITIES:

### Educate Children and Adults

Knowing how many children and adults depend on services through schools helps school districts make long-term building, staffing, and funding decisions. School enrollment in combination with other information, such as disability status, language spoken at home, and poverty status, helps schools understand the needs of their students and qualify for grants that help fund programs for those students (Elementary and Secondary Education Act of 1965).

Knowing how many adults do not have a high school diploma or equivalent helps schools understand the needs of adult students and qualify for grants that help fund programs for these students (Workforce Investment Act).

Knowing the major fields of study of adults with bachelor's degrees enables efforts to develop the nation's science, technology, engineering, and mathematics labor force (America COMPETES Reauthorization Act of 2010).

### Ensure Equal Opportunity

Understanding more about the characteristics of people enrolled or not enrolled in school helps government and communities enforce laws, regulations, and policies against discrimination in education (Civil Rights Act).

Knowing the educational attainment of workers compared to those seeking employment in combination with age, gender, race, Hispanic origin, disability, and other data, helps enforce nondiscrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964). This information is also used in targeting voting rights enforcement (Voting Rights Act).

## Selected Statutory Uses of School Enrollment, Educational Attainment, and Undergraduate Field of Degree Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(5); 42 USC § 15024 |
| U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality | 42 USC § 299a(a)(3),(6),(8); 42 USC § 299b-2(a)(1); 42 USC § 299(c )(1)(A) |
| U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics | 42 USC § 242k(b), (h), and (l) |
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Equal Educational Opportunities Act of 1974, 20 USC § 1701 et seq.; Castaneda v. Pickard, 648 F.2d 989 (1981) |
| U.S. Department of Justice, Civil Rights Division | Civil Rights Act of 1964 (Rights to Public Education and Equal Educational Entitlement), 42 USC § 2000c et seq. |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, § 203; 52 USC § 10503; 28 CFR Part 55 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 52 USC § 10301; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III–Labor and Education Matters, Subtitle C–Vocational Rehabilitation Matters, Section 334–Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b) (2) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |
| U.S. Equal Employment Opportunity Commission, Office of General Counsel | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A) |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood School Dist. v. United States, 433 U.S. 299 (1977) |

# Selected Monthly Owner Costs (Cost of Utilities, Condominium and Mobile Home Fees, Taxes, Insurance, and Mortgages)

Cost of utilities asked since 1940, condominium and mobile homes fees asked since 1990, taxes asked since 1940,[1] insurance cost asked since 1980, mortgages cost asked since 1940.

**QUESTIONS ABOUT THE USE AND COST OF COMMON UTILITIES, ANY APPLICABLE CONDOMINIUM AND MOBILE HOME FEES, TAXES, UTILITIES, MORTGAGES, AND HOME LOANS ARE USED TO PRODUCE STATISTICS ABOUT SELECTED MONTHLY OWNER COSTS.**

These data are used in government programs that analyze whether adequate housing is affordable for residents and to provide and fund housing assistance programs. These statistics are also used to enforce laws, regulations, and policies against discrimination in government programs and in society.

## SELECTED MONTHLY OWNER COSTS DATA HELP COMMUNITIES:

### Provide Adequate Housing

Comparing housing costs to household income (the combined income of everyone in the household) helps communities understand whether housing is affordable for residents.

When housing is not sufficient or not affordable, housing cost data can help communities enroll eligible households in programs designed to assist them, and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how housing costs change over time can help communities understand changes in local housing markets and to identify opportunities to improve tax, assistance, and zoning policies.

### Ensure Equal Opportunity

Knowing more about the housing costs of people who own homes in the community in combination with age, gender, race, Hispanic origin, disability, and other data about the household residents, helps government and communities enforce laws, such as the 1968 Fair Housing Act designed to eliminate discrimination in housing.

---

[1] Cost of utilities asked since 1940, condominium and mobile homes fees asked since 1990, taxes asked in 1940 and since 1980, insurance cost asked since 1980, mortgages cost asked since 1940.

**Selected Statutory Uses of Selected Monthly Owner Costs Data**

| | |
|---|---|
| U.S. Department of Commerce, Bureau of Economic Analysis | 15 USC § 1516; Department Organization Order 35-1A |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act, 42 USC § 11371–11376, 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; 24 CFR Part 574 |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended, 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also appendices A and B) |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC § 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Supplemental Nutrition Assistance Program (SNAP)/Food Stamps

SNAP/food stamps asked since 2005.

> **QUESTIONS ABOUT A HOUSEHOLD'S RECEIPT OF FOOD STAMPS/SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP)[1] ARE USED TO CREATE STATISTICS ABOUT PARTICIPATION IN FOOD ASSISTANCE PROGRAMS.**

SNAP data are used in planning and funding government programs that provide food assistance and in evaluating other government programs.

## SNAP DATA HELP COMMUNITIES:

### Provide Food Assistance to School Children

Knowing more about food assistance program participation in combination with school enrollment, income, and poverty status, can help communities streamline administration of the National School Lunch Program and School Breakfast Program by replacing administrative paperwork with American Community Survey estimates of students eligible for free and reduced-price meals.

### Evaluate SNAP

Knowing more about food-assistance program participation is used to evaluate the SNAP program and award bonuses to communities that administer SNAP funds well.

### Understand Changes

State and local agencies use these statistics to assess state food assistance needs and participation rates for eligible families and individuals and to determine gaps in services and programs. Faith-based and other nonprofit organizations use information about food assistance needs to determine where food banks, food kitchens, and other programs could be beneficial and how the needs of their communities can be met with additional resources and services.

---

[1] In 2008, the food stamp program was renamed SNAP, but the question uses both program names to minimize confusion.

**Selected Statutory Uses of SNAP Data**

| U.S. Department of Agriculture | Richard B. Russell National School Lunch Act, 42 USC § 1759a(g) |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1)(A)(i) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 9835(g) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8629 (a)(1)–(3) and (5)–(6), 8629 (b), and 8622 (11) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 13 USC § 141 note |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 603(a)(4) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Units in Structure, Rooms, and Bedrooms

Units in structure asked since 1940, rooms asked since 1940, bedrooms asked since 1960.

**QUESTIONS ABOUT THE TYPE OF BUILDING, UNITS IN THE STRUCTURE, NUMBER OF ROOMS, AND NUMBER OF BEDROOMS ARE USED TO CREATE DATA ABOUT HOUSING TYPES AND HOUSING DENSITY.**

These data are used in government programs that analyze whether adequate housing is available and affordable for residents and provide and fund housing assistance programs. The number of rooms in combination with the number of people living in a unit provides a ratio of people to rooms, which can be used to measure the extent of overcrowding among our nation's households. These statistics are also used to enforce laws, policies, and regulations against discrimination in government programs and in society.

## UNITS IN STRUCTURE, ROOMS, AND BEDROOMS DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the different types of housing, and how many people occupy that housing, helps communities understand whether available housing meets the needs of residents. For example, these data are used to measure overcrowding in communities and are used as integral components to set Fair Market Rents for all areas of the country.

When housing is not sufficient, data can help communities enroll eligible households in programs designed to assist them (such as the Low Income Home Energy Assistance Program), and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

These data provide benchmark statistics that measure progress toward the Congressional declaration of goals for a national housing policy—a decent home and suitable living environment for every American family.

### Plan Community Development

These data are used to identify adequate housing and may be useful in identifying types of structures in disaster-prone areas during emergency planning and preparation.

**Selected Statutory Uses of Units in Structure, Rooms, and Bedrooms Data**

| | |
|---|---|
| U.S. Department of Agriculture | 42 USC §§ 1472, 1474, 1485, 1486, 1490, 1490a, 1490c, 1490d, 1490e, 1490l, 1490m, 1490p-2, 1490r; 7 CFR 1940.560–1940.567, 1940.575; 7 CFR 3550.10, 1980.312, 3560.11; 7 CFR 3550.53(a), 3550.67(b), 3550.68(c); 7 CFR 1980.301(d); 7 CFR 3560.152(a)(2), 3560.254(c) RD Instruction 1980-D, Exhibit C |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629 (a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8623 (a) (2) and (4), 8629 (a) (1)–(3) and (6), 8629 (b) |
| U.S. Department of Health and Human Services, Center for Medicare and Medicaid Services | Social Security Act, Section 1848e(1)(A) |
| U.S. Department of Housing and Urban Development | Native American Housing Assistance and Self-Determination Act of 1996, Public Law 104-330, as amended; 25 USC § 4152(b); 24 CFR 1000.324–1000.330 (Also appendices A and B) |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974; 42 USC § 5306(a)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | 12 U.S.C § 1701q; 24 CFR Part 891 |
| U.S. Department of Housing and Urban Development | McKinney-Vento Homeless Assistance Act; 42 USC §11371–11376; 42 USC § 12901; 24 CFR Part 91; 24 CFR Part 576; 24 CFR Part 574 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383 as amended, 42 USC §§ 5302(a)(6)(D)(iv), (a)(9), (10), (11), (12), (13), (14), (15), (20), and (b) and 5306(a), (b)(1), (2), and (3) and (d)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625' 42 USC § 12705(b)(1)-(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Federal Housing Enterprises Financial Safety and Soundness Act of 1992, section 1338, 12 USC § 4568 |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Vehicles Available

Vehicles available asked since 1960.

**A QUESTION ABOUT THE VEHICLES AVAILABLE TO EACH HOUSEHOLD IS USED TO CREATE DATA ABOUT VEHICLE ACCESS.**

Vehicle data are used in planning and funding for improvements to road and highway infrastructure, developing transportation plans and services, and understanding how people are traveling in the course of a normal day. These data are also used to evaluate pollution and access to transportation in emergencies.

## VEHICLE AVAILABILITY DATA HELP COMMUNITIES:

### Improve Transportation

Knowing how many households have access to vehicles, in combination with where people commute to and from, and whether they commute with a personal vehicle helps transportation planners create mass transportation and metropolitan plans that are compliant with various regulations.

Local agencies and organizations use these data to plan programs and services for the disabled population, bicycle commuters, carpool and ride-sharers, and many other groups; and to predict future use of new or updated transportation systems based on their understanding of the current users of various transportation options.

### Understand Changes in Vehicle Use

Understanding vehicle availability and use helps communities understand exposure to air pollution and plan programs to help people without vehicles move about the community. Knowing whether people could evacuate using their personal vehicles in an emergency also helps communities plan emergency response.

## Selected Statutory Uses of Vehicles Available Data

| | |
|---|---|
| U.S. Department of Energy | Energy Policy Act of 1992, Public Law 102-486, 42 USC § 13385 |
| U.S. Department of Justice, Civil Rights Division | Voting Rights Act of 1965, 42 USC § 1973 et seq.; 28 CFR Part 51; LULAC v. Perry, 548 U.S. 399 (2006); Johnson v. DeGrandy, 512 U.S. 997 (1994); Thornburg v. Gingles, 478 U.S. 30 (1986) |
| U.S. Department of Transportation | 49 USC § 5303; 49 CFR Part 613 |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94, 49 USC § 5304; 49 CFR Part 613, Subpart B |
| U.S. Department of Transportation | Fixing America's Surface Transportation Act, Public Law 114-94, 49 USC § 5303(c), (e), (h), (i), (j),(k), and (n) |
| U.S. Department of Transportation | 49 USC §§ 6302(b)(3)(B), 6303(c ), 6304(a), and 6309(a) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(2), (b)(1), and (b)(6) |
| U.S. Environmental Protection Agency | Air Pollution Control Act (Clean Air Act), Public Law 84-159, 42 USC § 7403(a)(1), (b)(6), (b)(7), (e), and (g) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500' 33 USC § 1254 (a)(2), (b)(6), and (s) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Veteran Status, Period of Service, and Department of Veterans Affairs (VA) Service-Connected Disability Rating

Veteran status asked since 1890, period of military service asked since 1890,[1] VA service-connected disability rating asked since 2008.

**QUESTIONS ABOUT A PERSON'S MILITARY SERVICE AND SERVICE-CONNECTED DISABILITY RATING ARE USED TO CREATE ESTIMATES OF VETERANS AND THEIR NEEDS AT THE COMMUNITY LEVEL.**

Data about veterans are used in planning and funding government programs that provide funds or services for veterans and in evaluating other government programs and policies to ensure they fairly and equitably serve the needs of veterans. These statistics are also used to enforce laws, policies, and regulations against discrimination in society. Though the VA maintains veterans' records, these statistics do not provide federal program planners, policymakers, and researchers with additional statistics about all veterans, regardless of whether they use VA services.

## VETERAN STATUS, PERIOD OF SERVICE, AND VA SERVICE-CONNECTED DISABILITY RATING DATA HELP COMMUNITIES:

### Administer Programs for Veterans

Knowing the numbers and characteristics of veterans eligible for federal programs benefiting veterans, such as the VA Home Loan Guarantee program, the Post-9/11 GI Bill, and job training and hiring preference programs can help communities and the federal government estimate the future demand for these programs and services. These data are also used to evaluate these programs to determine whether they are benefiting veterans as intended.

### Provide Health Care for Veterans

Knowing the number of veterans eligible to use VA health care in combination with age, disability, and service-connected disability ratings, can help communities and the federal government estimate the future demand for health care services and facilities. Communities in need of major VA medical facilities throughout the country make a case for new construction projects using these data to estimate the expected usage of new facilities.

### Plan End-of-Life Options for Veterans

Knowing where veterans are living toward the end of their lives is important, as the VA estimates the number of nursing home and domiciliary beds needed based on the concentrations of eligible veterans over age 65. These data are also important for the VA National Cemetery Administration, whose goal is to have a VA burial option within 75 miles of a veteran's residence. These data are used to plan construction of new cemeteries near the communities where veterans choose to live.

### Ensure Equal Opportunity

Knowing the veteran and service-connected disability rating status of people in the community in combination with information about housing, voting, employment, and education, helps government and communities enforce against discrimination based on veteran or disability status.

### Understand New Challenges for Veterans

Knowing more about the characteristics of veterans returning to civilian life is also important to combat specific problems they may face. For example, these data are used in research to understand why veteran status is a predictor of homelessness. Such data have been combined with administrative data produced by shelters in an attempt to understand and document which interventions reduce homelessness among veterans.

---

[1] Veteran status and period of service were not asked in 1920.

### Selected Statutory Uses of Veteran Status, Period of Service, and VA Service-Connected Disability Rating Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation | 42 USC § 1397ii (b)(2)(A)–(C) |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2 |
| U.S. Department of Justice, Civil Rights Division | Title VII of the Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2.; Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) |
| U.S. Department of Veterans Affairs | Veterans Millennium Health Care Benefits Act, Public Law 106-117, Section 101; 38 USC § 1710, 8131(1), and 8134(a)(2) |
| U.S. Department of Veterans Affairs | 38 USC § 308(b) |
| U.S. Department of Veterans Affairs | 38 USC § 8104(b)(2) |
| U.S. Department of Veterans Affairs | 38 USC § 546 |
| U.S. Department of Veterans Affairs | Veterans Benefits Improvement Act of 2008, Public Law 110-389, Title III—Labor and Education Matters, Subtitle C—Vocational Rehabilitation Matters, Section 334—Longitudinal study of Department of Veterans Affairs vocational rehabilitation programs, 38 USC § 3122 |
| U.S. Department of Veterans Affairs | Veterans Millennium Health Care and Benefits Act, Public Law 106-117, Section 613(b)(2) |

# Work Status Last Year

Work status last year asked since 1880.

**QUESTIONS ABOUT HOW MANY WEEKS A PERSON WORKED IN THE LAST YEAR, AND HOW MANY HOURS HE OR SHE WORKED EACH WEEK ARE USED TO PRODUCE STATISTICS ABOUT FULL-TIME AND PART-TIME WORKERS, AS WELL AS YEAR-ROUND AND SEASONAL WORKERS.**

Data on work status last year are used in planning and funding government programs that provide unemployment assistance and services, and to understand trends and difference in wages, benefits, work hours, and seasonal work. These data are also used to evaluate other government programs and policies to ensure they fairly and equitably serve the needs of all groups, and to enforce laws, regulations, and policies against discrimination in society.

## WORK STATUS LAST YEAR DATA HELP COMMUNITIES:

### Provide Employment Opportunities

Knowing whether programs designed to employ specific groups, such as people with disabilities or veterans, are succeeding is important to employers, federal agencies, and federal government contractors (Vietnam Era Veterans' Readjustment Assistance Act, Rehabilitation Act of 1973).

State and local agencies use these statistics to identify labor surplus areas (areas with people available for hiring and training), plan workforce development programs including job fairs and training programs, and promote business opportunities.

### Ensure Equal Opportunity

Knowing more about people who are employed or looking for work, in combination with age, gender, race, Hispanic origin, disability status, veteran status, and other data, helps governments and communities enforce laws, policies, and regulations against discrimination in employment. For example, data on work status last year are used to enforce laws against discrimination in employment by federal agencies, private employers, employment agencies, and labor organizations (Civil Rights Act of 1964).

### Understand Changes

Knowing the characteristics of people who are working or looking for work is an important part of estimating changes in the economy. Estimates of work status last year are used in funding decisions; to ensure surveys are accurate, including surveys that provide official labor market estimates; and to understand change in other data (Wagner-Peyser Act and Workforce Investment Act).

**Selected Statutory Uses of Work Status Last Year Data**

| U.S. Department of Health and Human Services, Administration for Community Living | Developmental Disabilities Assistance and Bill of Rights Act of 2000, Public Law 106-402, Section 124(c)(5), 42 USC § 15024 |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | Community Services Block Grant Act, Public Law 105-285, 42 USC § 9902 (2), 9903, and 9908 (b)(1)(A), (b)(11), and (c)(1) (A)(i) |
| U.S. Department of Labor | Workforce Investment Act of 1998, Public Law 105-220; 20 CFR 668.296(b) and 668.440 |
| U.S. Equal Employment Opportunity Commission, Office of Federal Operations | The Rehabilitation Act of 1973, Public Law 93-112, 29 USC § 791(b); 29 CFR 1614.602 |
| U.S. Equal Employment Opportunity Commission, Office of Research, Information, and Planning | Civil Rights Act of 1964, Public Law 88-352, 42 USC § 2000e-2(k)(1)(A); Hazelwood v. United States, 433 U.S. 299 (1977) |

# Year Built and Year Moved In

Year built asked since 1940, year moved in asked since 1960.

**QUESTIONS ABOUT WHEN A BUILDING WAS BUILT AND WHEN A PERSON MOVED INTO THAT HOME ARE USED TO CREATE DATA ABOUT HOUSING AGE AND AVAILABILITY.**

These data are used in government programs that analyze whether adequate housing is available and affordable for residents, provide and fund housing assistance programs, and measure neighborhood stability.

## YEAR BUILT AND YEAR MOVED IN DATA HELP COMMUNITIES:

### Provide Adequate Housing

Knowing the ages of housing in a community helps communities understand whether available housing meets the needs of residents.

When housing is not sufficient or older than a certain age, housing data can help communities enroll eligible households in programs designed to assist them (such as the Low Income Home Energy Assistance Program), and can help communities qualify for grants from the Community Development Block Grant, HOME Investment Partnerships Program, Emergency Solutions Grants, Housing Opportunities for Persons With AIDS, and other programs.

### Plan Community Development

Knowing how the balance of different ages of homes in combination with whether they are occupied or vacant, can help communities identify opportunities to improve tax, assistance, and zoning policies and to reduce tax revenue losses from vacant or abandoned properties. These data may also be useful in identifying older structures in disaster-prone areas during emergency planning and preparation.

Knowing more about the age of the housing stock in combination with the financial situation of residents, including income, employment, and housing costs, can help communities qualify for loan and grant programs designed to stimulate economic recovery, improve housing, run job-training programs, and define areas as empowerment or enterprise zones.

## Selected Statutory Uses of Year Built and Year Moved In Data

| | |
|---|---|
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC § 8629(a) and (b) |
| U.S. Department of Health and Human Services, Administration for Children and Families | 42 USC §§ 8623(a)(2) and (4), 8629 (a)(1)–(3) and (6); 42 USC 8629(b) |
| U.S. Department of Housing and Urban Development | United States Housing Act of 1937, Public Law 93-383, as amended, 42 USC § 1437f(c)(1); 24 CFR 888.113; 24 CFR 982.401 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93–383, as amended, 42 USC § 1439 (d)(1)(A)(i); 24 CFR 791.402 |
| U.S. Department of Housing and Urban Development | Housing and Community Development Act of 1974, Public Law 93-383 as amended, 42 USC § 5302(a)(6)(D)(iv), (a) (9), (10), (11), (12), (13), (14), (15), (20), and (b); 42 USC§ 5306(a), (b)(1), (2), and (3) and (d)(1); 24 CFR 1003.101 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101–625, 42 USC 12705(b)(1)–(3); 24 CFR Part 91; 24 CFR 91.205(a)–(c) |
| U.S. Department of Housing and Urban Development | Tax Reform Act of 1986, Public Law 99-514, 26 USC § 42(d)(5)(B)(ii)(I), (iii)(I), (iv), and (g); 15 U.S.C § 631 |
| U.S. Department of Housing and Urban Development | Cranston-Gonzalez National Affordable Housing Act, Public Law 101-625, 42 USC § 12747(b)(1)(A) and (B); 24 CFR 92.50(a),(b), and (c) |
| U.S. Environmental Protection Agency | Federal Water Pollution Control Act (Clean Water Act), Public Law 92-500, 33 USC § 1254(a)(1)–(2), (b)(2), (b)(6), (b)(7), (n)(1), and (o)(1) |

# Appendix:
# Year Current Subjects Planned First Asked in Decennial Census Program

## Year Current Subjects Planned First Asked in Decennial Census Program

| Subjects Planned for 2020 Census and/or ACS | Year Subject First Asked in Decennial Census or ACS | Years Not Asked |
|---|---|---|
| Acreage | 1960 | |
| Age | 1790 | |
| Agricultural Sales | 1960 | |
| Ancestry | 1980 | |
| Bedrooms | 1960 | |
| Citizenship | 1820 | 1840–1860, 1880 |
| Class of Worker | 1910 | |
| Commuting (Journey to Work) | 1960 | |
| Computer and Internet Use | 2013 | |
| Condominium and Mobile Home Fees | 1990 | |
| Cost of Utilities | 1940 | |
| Disability | 1830 | |
| Educational Attainment | 1940 | |
| Ethnicity | 1970 | |
| Fertility | 1890 | |
| Gender | 1790 | |
| Grandparent Caregivers | 2000 | |
| Health Insurance | 2008 | |
| Home Heating Fuel | 1940 | |
| Home Value | 1940 | |
| Income | 1940 | |
| Industry | 1820 | 1830, 1850–1900 |
| Insurance | 1980 | |
| Kitchen Facilities | 1940 | |
| Labor Force Status | 1890 | |
| Language Spoken at Home | 1890 | 1950 |
| Marital History | 1850 | |
| Marital Status | 1880 | |
| Migration (Previous Residence)/Residence 1 Year Ago | 1930 | |
| Mortgages | 1940 | |
| Occupation | 1850 | |
| Period of Military Service | 1890 | 1920 |
| Place of Birth | 1850 | |
| Plumbing Facilities | 1940 | |
| Race | 1790 | |
| Relationship | 1880 | |
| Rent | 1940 | |
| Rooms | 1940 | |
| School Enrollment | 1850 | |

**Year Current Subjects Planned First Asked in Decennial Census Program**—Con.

| Subjects Planned for 2020 Census and/or ACS | Year Subject First Asked in Decennial Census or ACS | Years Not Asked |
|---|---|---|
| Supplemental Nutrition Assistance Program (SNAP)/ Food Stamps | 2005 | |
| Taxes | 1940 | 1950–70 |
| Telephone Service | 1960 | |
| Tenure (Owner/Renter) | 1890 | |
| Undergraduate Field of Degree | 2009 | |
| Units in Structure | 1940 | |
| VA Service-Connected Disability Rating | 2008 | |
| Veteran Status | 1890 | 1920 |
| Work Status Last Year | 1880 | |
| Year Built | 1940 | |
| Year Moved In | 1960 | |
| Year of Entry | 1890 | 1940–1960 |

# EXHIBIT 6

**To:**      hilary geary 
**From:**    Alexander, Brooke (Federal)
**Sent:**    Wed 4/5/2017 4:24:19 PM
**Importance:**    Normal
**Subject:**   tonight
**Received:**     Wed 4/5/2017 4:24:00 PM

Mrs. Ross,

Do you have plans following the Newseum?  I'm asking because Steve Bannon has asked that the Secretary talk to someone about the Census and around 7-7:30 pm is the available time.  He could do it from the car on the way to a dinner …

 Brooke V Alexander

Executive Assistant to the Secretary

The U.S. Department of Commerce

Washington, D.C.  20230

balexander@doc.gov

202-482-████ office

████████  cell

# EXHIBIT 7

| | |
|---|---|
| **From**: | Comstock, Earl (Federal) █████████████ |
| **Sent**: | 5/2/2017 2:19:11 PM |
| **To**: | Wilbur Ross ████████████ |
| **CC**: | Herbst, Ellen (Federal) ████████████ |
| **Subject**: | Re: Census |

I agree Mr Secretary.

On the citizenship question we will get that in place. The broad topics were what were sent to Congress earlier this year as required. It is next March -- in 2018 -- when the final 2020 decennial Census questions are submitted to Congress. We need to work with Justice to get them to request that citizenship be added back as a census question, and we have the court cases to illustrate that DoJ has a legitimate need for the question to be included.  I will arrange a meeting with DoJ staff this week to discuss.

Earl


Sent from my iPhone

> On May 2, 2017, at 10:04 AM, Wilbur Ross ████████████ wrote:
>
> ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████  Worst of all they emphasize
that they have settled with congress on the questions to be asked.  I am mystified why nothing have been
done in response to my months old request that we include the citizenship question. Why not? ████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

> Sent from my iPhone

# EXHIBIT 8

**From:** Kris Kobach [mailto ███████████]
**Sent:** Monday, July 24, 2017 2:43 PM
**To:** Teramoto, Wendy (Federal) <███████████>
**Cc:** Alexander, Brooke (Federal) <███████████>; Hernandez, Israel (Federal) <███████████>
**Subject:** Re: Follow up on our phone call

Yes.

Sent from my iPhone

On Jul 24, 2017, at 1:39 PM, Teramoto, Wendy (Federal) <███████████> wrote:

> Kris- can you do a call with the Secretary and Izzy tomorrow at 11 am?  Thanks. Wendy
>
> **From:** Kris Kobach [mailto:███████████]
> **Sent:** Monday, July 24, 2017 12:02 PM
> **To:** Teramoto, Wendy (Federal) <███████████>
> **Subject:** Re: Follow up on our phone call

That works for me.  What number should I call?  Or would you like to call me?

On Mon, Jul 24, 2017 at 9:12 AM, Teramoto, Wendy (Federal) <███████████> wrote:

We can speak today at 230. Please let me know if that works. W

Sent from my iPhone

On Jul 21, 2017, at 4:34 PM, Kris Kobach <███████████> wrote:

Wendy,

Nice meeting you on the phone this afternoon.  Below is the email that I sent to Secretary Ross. He and I had spoken briefly on the phone about this issue, at the direction of Steve Bannon, a few months earlier.

Let me know what time would work for you on Monday, if you would like to schedule a short call.  The issue is pretty straightforward, and the text of the question to be added is in the email below.

000763

Thanks.


Kris Kobach

██████████


---------- Forwarded message ----------
From: **Kris Kobach** <███████████████>
Date: Fri, Jul 14, 2017 at 9:12 AM
Subject: Follow up on our phone call
To: ███████████


Secretary Ross,

 Kansas Secretary of State Kris Kobach here.  I'm following up on our telephone discussion from a few months ago.  As you may recall, we talked about the fact that the US census does not currently ask respondents their citizenship.  This lack of information impairs the federal government's ability to do a number of things accurately.  It also leads to the problem that aliens who do not actually "reside" in the United States are still counted for congressional apportionment purposes.

 It is essential that one simple question be added to the upcoming 2020 census.  That question already appears on the American Community Survey that is conducted by the Census Burear (question #8).  A slight variation of that question needs to be added to the census.  It should read as follows:

**Is this person a citizen of the United States?**

▢**Yes, born in the United States**

▢**Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas**

▢**Yes, born abroad of U.S. citizen parent or parents**

▢**Yes, U.S. citizen by naturalization – Print year of naturalization _____**

▢**No, not a U.S. citizen – this person is a lawful permanent resident (green card holder)**

▢**No, not a U.S. citizen – this person citizen of another country who is not a green card holder (for example holds a temporary visa or falls into another category of non-citizens)**

 Please let me know if there is any assistance that I can provide to accomplish the addition of this question.  You may reach me at this email address or on my cell phone at ██████████

 Yours,

Kris Kobach

# EXHIBIT 9

| From: | Wilbur Ross ██████████ |
|---|---|
| Sent: | 8/10/2017 7:38:25 PM |
| To: | Comstock, Earl (Federal) ██████████ |
| Subject: | Re: Census Matter |

I would like to be briefed on Friday by phone. I probably will need an hour or so to study the memo
first.████████████████████████████████████████████████████████████████WLR

Sent from my iPad

> On Aug 9, 2017, at 10:24 AM, Comstock, Earl (Federal) <████████████> wrote:
>
> PREDECISIONAL AND ATTORNEY-CLIENT PRIVILEGED
>
> Mr. Secretary - we are preparing a memo and full briefing for you on the citizenship question.  The
memo will be ready by Friday, and we can do the briefing whenever you are back in the office. ██████
>
> Earl
>
> On 8/8/17, 1:20 PM, "Wilbur Ross" ██████████ wrote:
>
                        Were you on the call this morning about Census?
                                                    where is the DoJ in their analysis ? If
they still have not come to a conclusion please let me know your contact person and I will call the AG.
Wilbur Ross
>
>    Sent from my iPhone
>
>> On Aug 8, 2017, at 10:52 AM, Comstock, Earl (Federal) ██████████ wrote:
>>
>> ████
>
>

# EXHIBIT 10

**To:**        Wilbur Ross[███████████]
**From:**    Comstock, Earl (Federal)
**Sent:**     Tue 8/8/2017 7:44:29 PM
**Importance:**        Normal
**Subject:**   Re: [████████████████]
**Received:**        Tue 8/8/2017 7:44:29 PM

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

Will be back shortly with an update on the census question.  I have two attorneys in the DoC General Counsel's office working on it.

Earl

On 8/8/17, 1:20 PM, "Wilbur Ross" [███████████] wrote:

████████████████████████████████████████
                          Were you on the call this morning about Census?
████████████████████████████████████████ where is the DoJ in their analysis ? If they still have not come to a conclusion please let me know your contact person and I will call the AG.  Wilbur Ross

Sent from my iPhone

> On Aug 8, 2017, at 10:52 AM, Comstock, Earl (Federal) [████████████████] wrote:
>
> ████

0004004

# EXHIBIT 11

September 8, 2017

To:     Secretary Wilbur Ross

Fr:     Earl Comstock

Re:     <u>Census Discussions with DoJ</u>


In early May Eric Branstad put me in touch with Mary Blanche Hankey as the White House liaison in the Department of Justice.  Mary Blanche worked for AG Sessions in his Senate office, and came with him to the Department of Justice.  We met in person to discuss the citizenship question.  She said she would locate someone at the Department who could address the issue. A few days later she directed me to James McHenry in the Department of Justice.

I spoke several times with James McHenry by phone, and after considering the matter further James said that Justice staff did not want to raise the question given the difficulties Justice was encountering in the press at the time (the whole Comey matter).  James directed me to Gene Hamilton at the Department of Homeland Security.

Gene and I had several phone calls to discuss the matter, and then Gene relayed that after discussion DHS really felt that it was best handled by the Department of Justice.

At that point the conversation ceased and I asked James Uthmeier, who had by then joined the Department of Commerce Office of General Counsel, to look into the legal issues and how Commerce could add the question to the Census itself.

# EXHIBIT 12

**From:** Cutrona, Danielle (OAG)
**Sent:** 9/18/2017 1:05:14 AM
**To:** Teramoto, Wendy (Federal)
**Subject:** Re: Call

Excellent. Thanks.

Sent from my iPhone

On Sep 17, 2017, at 8:25 PM, Teramoto, Wendy (Federal) ▌▌▌▌▌▌ wrote:
They connected. Thanks for the help. Wendy

Sent from my iPhone

On Sep 17, 2017, at 12:10 PM, Cutrona, Danielle (OAG) < ▌▌▌▌▌▌ > wrote:
Wendy,
The Attorney General is available on his cell. His number is ▌▌▌▌▌▌ He is in Seattle so he is 3 hours behind us. From what John told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist. Please let me know if you need anything else. You can reach me at ▌▌▌
▌▌▌▌
Thanks,
Danielle
Sent from my iPhone

On Sep 17, 2017, at 10:08 AM, Cutrona, Danielle (OAG) ▌▌▌▌▌▌ wrote:
Checking now. Will let you know as soon as I hear from him.

Sent from my iPhone

On Sep 16, 2017, at 6:29 PM, Teramoto, Wendy (Federal) < ▌▌▌▌▌▌ wrote:
Thanks. Danielle-pls let me know when the AG is available to speak to Secretary Ross. Thanks. Anytime on the weekend is fine too. W

Sent from my iPhone

On Sep 16, 2017, at 3:55 PM, Gore, John (CRT) < ▌▌▌▌▌▌ > wrote:
Wendy:

By this email, I introduce you to Danielle Cutrona from DOJ. Danielle is the person to connect with about the issue we discussed earlier this afternoon.

Danielle:

Wendy's cell phone number is ▌▌▌▌▌

Thanks.

Sent from my iPhone

On Sep 13, 2017, at 4:57 PM, Teramoto, Wendy (Federal) ███████████ > wrote:
Yes. CC'ing macie to set up. Look forward to connecting. W

Sent from my iPhone

On Sep 13, 2017, at 4:44 PM, Gore, John (CRT) ◄ ███████████ > wrote:
Wendy:

My name is John Gore, and I am an acting assistant attorney general in the Department of Justice.  I would like to talk to you about a DOJ-DOC issue.  Do you have any time on your schedule tomorrow (Thursday) or Friday for a call?

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
██████████
███████████████

# EXHIBIT 13

**To:**        Wilbur Ross
**From:**      Davidson, Peter (Federal)
**Sent:**      Tue 11/28/2017 12:53:51 AM
**Importance:**        Normal
**Subject:**   Re: Census. Questions
**Received:**      Tue 11/28/2017 12:53:52 AM

I can brief you tomorrow...no need for you to call. I should have mentioned it this afternoon when we spoke.

Sent from my iPhone

On Nov 27, 2017, at 7:23 PM, Wilbur Ross <                > wrote:

> Census is about to begin translating the questions into multiple languages and has let the printing contact.
> We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice.
> We must have this resolved.  WLR
>
>
> Sent from my iPhone

# EXHIBIT 14

DEC-14-2017  17:51                                                               P. 02/04



**U.S. Department of Justice**

Justice Management Division

*Office of General Counsel*

*Washington, D.C. 20530*

**DEC 1 2 2017**

<u>**VIA CERTIFIED RETURN RECEIPT**</u>
*7014 2120 0000 8064 4964*

Dr. Ron Jarmin
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
United States Department of Commerce
Washington, D.C. 20233-0001

Re: Request To Reinstate Citizenship Question On 2020 Census Questionnaire

Dear Dr. Jarmin:

The Department of Justice is committed to robust and evenhanded enforcement of the Nation's
civil rights laws and to free and fair elections for all Americans. In furtherance of that
commitment, I write on behalf of the Department to formally request that the Census Bureau
reinstate on the 2020 Census questionnaire a question regarding citizenship, formerly included in
the so-called "long form" census. This data is critical to the Department's enforcement of
Section 2 of the Voting Rights Act and its important protections against racial discrimination in
voting. To fully enforce those requirements, the Department needs a reliable calculation of the
citizen voting-age population in localities where voting rights violations are alleged or suspected.
As demonstrated below, the decennial census questionnaire is the most appropriate vehicle for
collecting that data, and reinstating a question on citizenship will best enable the Department to
protect all American citizens' voting rights under Section 2.

The Supreme Court has held that Section 2 of the Voting Rights Act prohibits "vote dilution" by
state and local jurisdictions engaged in redistricting, which can occur when a racial group is
improperly deprived of a single-member district in which it could form a majority. See
*Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Multiple federal courts of appeals have held that,
where citizenship rates are at issue in a vote-dilution case, citizen voting-age population is the
proper metric for determining whether a racial group could constitute a majority in a single-
member district. See, e.g., *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1023–24 (5th Cir.
2009); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998); *Negrn v. City of Miami
Beach*, 113 F.3d 1563, 1567-69 (11th Cir. 1997); *Romero v. City of Pomona*, 883 F.2d 1418,
1426 (9th Cir. 1989), *overruled in part on other grounds by Townsend v. Holman Consulting
Corp.*, 914 F.2d 1136, 1141 (9th Cir. 1990); see also *LULAC v. Perry*, 548 U.S. 399, 423–442
(2006) (analyzing vote-dilution claim by reference to citizen voting-age population).

The purpose of Section 2's vote-dilution prohibition "is to facilitate participation ... in our political process" by preventing unlawful dilution of the vote on the basis of race. *Campos v. City of Houston*, 113 F.3d 544, 548 (5th Cir. 1997). Importantly, "[t]he plain language of section 2 of the Voting Rights Act makes clear that its protections apply to United States citizens." *Id.* Indeed, courts have reasoned that "[t]he right to vote is one of the badges of citizenship" and that "[t]he dignity and very concept of citizenship are diluted if noncitizens are allowed to vote." *Barnett*, 141 F.3d at 704. Thus, it would be the wrong result for a legislature or a court to draw a single-member district in which a numerical racial minority group in a jurisdiction was a majority of the total voting-age population in that district but "continued to be defeated at the polls" because it was not a majority of the citizen voting-age population. *Campos*, 113 F.3d at 548.

These cases make clear that, in order to assess and enforce compliance with Section 2's protection against discrimination in voting, the Department needs to be able to obtain citizen voting-age population data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected. From 1970 to 2000, the Census Bureau included a citizenship question on the so-called "long form" questionnaire that it sent to approximately one in every six households during each decennial census. See, e.g., U.S. Census Bureau, *Summary File 3: 2000 Census of Population & Housing*—Appendix B at B-7 (July 2007), *available at* https://www.census.gov/prod/cen2000/doc/sf3.pdf (last visited Nov. 22, 2017); U.S. Census Bureau, Index of Questions, *available at* https://www.census.gov/history/www/through_the_decades/index_of_questions/ (last visited Nov. 22, 2017). For years, the Department used the data collected in response to that question in assessing compliance with Section 2 and in litigation to enforce Section 2's protections against racial discrimination in voting.

In the 2010 Census, however, no census questionnaire included a question regarding citizenship. Rather, following the 2000 Census, the Census Bureau discontinued the "long form" questionnaire and replaced it with the American Community Survey (ACS). The ACS is a sampling survey that is sent to only around one in every thirty-eight households each year and asks a variety of questions regarding demographic information, including citizenship. See U.S. Census Bureau, *American Community Survey Information Guide* at 6, *available at* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS Information Guide.pdf (last visited Nov. 22, 2017). The ACS is currently the Census Bureau's only survey that collects information regarding citizenship and estimates citizen voting-age population.

The 2010 redistricting cycle was the first cycle in which the ACS estimates provided the Census Bureau's only citizen voting-age population data. The Department and state and local jurisdictions therefore have used those ACS estimates for this redistricting cycle. The ACS, however, does not yield the ideal data for such purposes for several reasons:

•       Jurisdictions conducting redistricting, and the Department in enforcing Section 2, already use the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement, see *Evenwel v. Abbott*, 136 S. Ct. 1120 (Apr. 4, 2016). As a result, using the ACS citizenship estimates means relying on two different data sets, the scope and level of detail of which vary quite significantly.

2

- Because the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data. Citizenship data from the decennial census, by contrast, would align in time with the total and voting-age population data from the census that jurisdictions already use in redistricting.

- The ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases. See U.S. Census Bureau, *Glossary: Confidence interval (American Community Survey), available at* https://www.census.gov/glossary/#term_ConfidenceintervalAmericanCommunity Survey (last visited November 22, 2017). By contrast, decennial census data is a full count of the population.

- Census data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group. See *American Community Survey Data* 3, 5, 10. Accordingly, redistricting jurisdictions and the Department are required to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block, which is the fundamental building block of a redistricting plan. Having all of the relevant population and citizenship data available in one data set at the census block level would greatly assist the redistricting process.

For all of these reasons, the Department believes that decennial census questionnaire data regarding citizenship, if available, would be more appropriate for use in redistricting and in Section 2 litigation than the ACS citizenship estimates.

Accordingly, the Department formally requests that the Census Bureau reinstate into the 2020 Census a question regarding citizenship. We also request that the Census Bureau release this new data regarding citizenship at the same time as it releases the other redistricting data, by April 1 following the 2020 Census. At the same time, the Department requests that the Bureau also maintain the citizenship question on the ACS, since such question is necessary, *inter alia*, to yield information for the periodic determinations made by the Bureau under Section 203 of the Voting Rights Act, 52 U.S.C. § 10503.

Please let me know if you have any questions about this letter or wish to discuss this request. I can be reached at (202) 514-3452, or at Arthur.Gary@usdoj.gov.

Sincerely yours,

Arthur E. Gary
General Counsel
Justice Management Division

3

# EXHIBIT 15

| From: | Ron.S.Jarmin@census.gov [Ron.S.Jarmin@census.gov] |
|---|---|
| Sent: | 12/22/2017 8:36:41 PM |
| To: | Karen Kelley [⌐ PII ⌐] |
| Subject: | Fwd: Request to Reinstate Citizenship Question On 2020 Census Questionnaire |

FYI. Will let you know what I hear.

Sent from my iPhone

Begin forwarded message:

**From:** "Ron S Jarmin (CENSUS/ADEP FED)" <Ron.S.Jarmin@census.gov>

**Date:** December 22, 2017 at 3:32:12 PM EST

**To:** "⌐ PII ⌐⌐"

**Cc:** "Enrique Lamas (CENSUS/ADDP FED)" <Enrique.Lamas@census.gov>

**Subject: Request to Reinstate Citizenship Question On 2020 Census Questionnaire**

Arthur,

Thank you for your letter dated 12/12/2017 regarding improving the quality of citizenship information for DOJ enforcement of the Voting Rights Act. Let me start by saying the Bureau is fully supportive of providing DOJ with the highest quality statistical information possible. To that end, I directed staff to review all possible ways to address the needs expressed in the letter. They have now briefed me and their findings suggest that the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses. This would result in higher quality data produced at lower cost.

I suggest we schedule a meeting of Census and DOJ technical experts to discuss the details of this proposal. We look forward to working with you on this important statistical matter.

Happy Holidays

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov   Connect with us on Social Media

# EXHIBIT 16

| From: | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov] |
|---|---|
| Sent: | 12/22/2017 6:02:07 PM |
| To: | John Maron Abowd (CENSUS/ADRM FED) [john.maron.abowd@census.gov] |
| CC: | Enrique Lamas (CENSUS/ADDP FED) [Enrique.Lamas@census.gov]; John L Eltinge (CENSUS/ADRM FED) |
| | [john.l.eltinge@census.gov] |
| Subject: | Re: Memorandum and White Paper on Improving PL94 with Citizenship Data |

This is sufficient for me to reach out to DOJ. I'm in meetings until 3 and will send them a note then. Will ask for follow up meeting with more technical folks after the New Year.

Thanks and Happy Holidays

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov
census.gov   Connect with us on Social Media

---

**From:** John Maron Abowd (CENSUS/ADRM FED)
**Sent:** Friday, December 22, 2017 10:06:19 AM
**To:** Ron S Jarmin (CENSUS/ADEP FED)
**Cc:** Enrique Lamas (CENSUS/ADDP FED); John L Eltinge (CENSUS/ADRM FED)
**Subject:** Memorandum and White Paper on Improving PL94 with Citizenship Data

See attached. I am available at 3.5880 until you send an "all clear" or call me.

Thanks,
John

**John M. Abowd, PhD**
Associate Director and Chief Scientist
Research and Methodology
U.S. Census Bureau

Office 301.763.5880 (simulring on cell) Room 8H120
john.maron.abowd@census.gov

census.gov
Connect with us on Social Media

# EXHIBIT 17



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001

December 22, 2017

MEMORANDUM FOR        Ron S. Jarmin
                      Performing the Non-exclusive Functions and Duties of the Director

From:                 John M. Abowd
                      Chief Scientist and Associate Director for Research and Methodology

Subject:              Feasibility of Enhancing the PL94-171 Redistricting Data

[This memorandum and the accompanying white paper contain no confidential data. The tables in the white paper and the estimates in this memo were cleared for release to the public under CBDRB-2017-CDAR-001.]

**Summary**

Based on balanced consideration of multiple factors of quality, cost and feasibility, we recommend that the citizenship data for Department of Justice Voting Rights Act enforcement be obtained through the use of administrative records and not through the addition of a question to the decennial census instrument.

Citizenship, race, and ethnicity data for the voting-age population are essential to designing legislative districts that meet the criteria for nondiscrimination according to Section 2 of the Voting Rights Act. The Census Bureau currently supports this requirement with two distinct publications: the PL94-171 redistricting data (PL94), which must be released by April 1st of the year following a decennial census, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) data, which are published annually in February using the most current 5-year American Community Survey (ACS) data. The Department of Justice and redistricting experts, partisan and bi-partisan, combine these data to produce estimates of the citizen voting age population by race and ethnicity at the lowest feasible level of geography, usually a census block. Neither the PL94 nor the CVAP tabulations contain estimates of the citizen voting age population by race and ethnicity at the block level. For PL94, this is because there is no citizen variable on the census questionnaire. For CVAP, this is because the 5-year ACS estimates do not go below the block-group level, and even there often have margins of error that make them difficult to use for creating block-level estimates in combination with PL94 via statistical methods.

The direct solution to this problem is to make a citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential data file from which the PL94 tabulations are produced. If citizenship were available on that file, the PL94 tabulations could be restructured to include direct estimates of the citizen voting age population by race and ethnicity at the block level. These tabulations would have essentially the same accuracy as current PL94 and Summary File 1 (SF1) data. There are two alternative methods for accomplishing the addition of citizenship to the CEF. The first method is to ask the question

on the 2020 Census, just as we currently do on the ACS and used to do on the decennial census long form. The second method is to load the citizenship variable onto CEF by record linkage using administrative data. There are advantages and disadvantages to both methods.

The advantages of directly asking the question are (1) the provenance of the data is transparent and (2) the data are contemporaneous with the census by construction. The disadvantages are (1) potential negative impact on voluntary cooperation with the census, and (2) poorer quality citizenship data than would be available through administrative records. The advantages of using administrative records are (1) better quality data than result from directly asking citizenship, and (2) cost savings to the census from avoiding the need to redesign questionnaires and increase nonresponse follow-up due to lower voluntary compliance. The disadvantages of using administrative data are (1) some risk of differential incomplete coverage due to incompleteness of these data for some foreign-born subpopulations, and (2) additional processing complexity during the critical period between the closeout of the Decennial Response File (DRF), the end of data acquisition from the census operations, and the delivery of the Census Edited File.

**Analysis**

We were not able to find any randomized controlled trials of the census or ACS questionnaires with and without the citizenship question. We conducted a limited analysis of the incremental field burden using the following natural experiment. Compare the first mailing response rates in the 2010 Census and the 2010 ACS for the same housing units. Response rates for citizens and noncitizen households are both lower in the ACS than in the 2010 Census, however the response rate for the noncitizen households falls by 5.1 percentage points more than the decline for citizens. Assuming that the number of households with at least one noncitizen is about 7,435,000 (+/- 47,000),[1] this implies an incremental burden of 380,000 households in non-response follow-up. 380,000 is approximately 0.3% of the 2016 Population estimate of 117,700,000 households in the U.S. At $100,000,000 incremental NRFU cost per 1% decline in first mailing response rates, this translates to approximately $32,000,000 cost due to the decline in response rates from including the citizenship question.

The cost of implementing our recommended solution has not been fully vetted. Accounting for ten cycles of processing between January 1, 2018 and April 1, 2020 and two senior staff FTEs to do the required modeling, the cost is less than $1,000,000. These estimates include the burden on the 2020 Census processing of the Census Unedited File.

We investigated the availability of directly reported citizenship data on all household surveys. The white paper concludes that there is insufficient data collected between 2000 and 2015 to use this source alone. It also concludes that the administrative record data are superior to the direct reports in several important dimensions. First, using historical direct reports creates problems with the timeliness of the citizenship status for naturalized citizens who acquired that status between the time that they

---

[1] 2011 estimate from https://www.census.gov/prod/2013pubs/acsbr11-15.pdf. The 7,435,000 estimate is for households with a noncitizen head. The estimate for households with at least one noncitizen is necessarily greater.

responded and the reference date for the 2020 Census. Second, we document that there is good evidence that citizenship is accurately reported by citizens, but less accurately self-reported by household responders. This accuracy deficit in the self-responses may be due to the inherent difficulty of securing such information from the householder or proxies when they pertain to someone other than the respondent. The accuracy deficit may also be due to the sensitivity of the citizenship question itself. The white paper documents with preliminary evidence that acquiring citizenship status from administrative records is very likely to produce more accurate and timely data overall than asking the question directly, and then handling the item nonresponse in the edit and imputation phase of the 2020 Census. Nevertheless, we note that if the question is asked, the administrative data sources discussed in the white paper could be a valuable supplement to that phase.

**Recommendation**

The accompanying white paper proposes the creation of PL94 block-level data with citizen voting age population by race and ethnicity, in addition to the total population by race and ethnicity, using citizenship data that have been linked from (i) a collection of high quality national administrative data that the Census Bureau has already integrated into 2020 Census systems and (ii) data from the United States Citizen and Immigration Services (USCIS) that would be acquired by executing a Memorandum of Understanding with USCIS. We would develop our own edit and imputation system for the citizenship variable. The tabulation variable would be added to CEF and available to the 2020 Disclosure Avoidance Subsystem (DAS) for inclusion in a modified version of the proposed P2 table "Race/Ethnicity for the Population Age 18 and Over" where "Population Age 18 and Over" would be replaced by "Citizen Population Age 18 and Over." This revision would allow the use of the same disclosure avoidance methodology, state-of-the-art differential privacy, currently available for the 2018 End-to-End Test and the enhanced methods, integrated PL94 and SF1 protection, planned for the 2020 Census itself. This version of P2 would be the first PL94 data produced at the block-level with estimates of the citizen voting age population by race and ethnicity and with accuracy comparable to the accuracy of P1 "Total population." The P1 and P2 tables would tabulate race and ethnicity in the same manner as currently proposed. Tables P42 "Group Quarters Population by Group Quarters Type" and H1 "Occupancy Status" would not be modified. The 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly.

0011649

# EXHIBIT 18

# Alternative Sources of Citizenship Data for the 2020 Census

| | |
|---|---|
| Prepared for: | John M. Abowd |
| Through: | John L. Eltinge |
| Prepared by: | Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi |
| Disclosure review: | Amy Lauger (CBDRB-2017-CDAR-001) The statistics in this report may be released to the public. |
| Date: | December 22, 2017 |

## Introduction

The Census Bureau has provided estimates of the Citizen Voting Age Population by Race and Ethnicity (CVAP)[1] and data to support redistricting under Public Law 94-171 (PL94) and Section 2 of the Voting Rights Act.[2] This paper examines alternative sources for the citizenship data, specifically the addition of a question on the 2020 decennial instrument or the integration of administrative records on citizenship into the 2020 Census Edited File (CEF). In 2011, when they were released, the PL94 data from the 2010 Census had a reference date of April 1, 2010. The CVAP data released in February 2011 were based on the 5-year American Community Survey (ACS) data from 2005-2009. In addition, the 2011 CVAP data were based on Census 2000 block group geography while the PL94 data were based on 2010 Census block geography. The difficulty in integrating these two data tools for redistricting and enforcement of the Voting Rights Act was directly cited by the Department of Justice in its December 12, 2017 letter to Dr. Ron Jarmin, who was performing the non-exclusive functions and duties of the Director on that date.

## Data from Household Questionnaires and Administrative Sources

The Census Bureau currently has four surveys containing citizenship questions. Citizenship is collected on the American Community Survey (ACS), the Current Population Survey (CPS), the American Housing Survey (AHS), and the Survey of Income and Program Participation (SIPP), and all persons in the household are in universe. The ACS, CPS, and AHS distinguish between citizens born in the United States, in U.S. territories, abroad to U.S. parents, and of foreign nativity but naturalized. SIPP collapses citizenship into a binary indicator of whether or not one is a citizen.[3] Table 1 shows how much of the 2010 Census these sources cover. By linking citizenship data collected from the household surveys listed below to the 2010 Census, we can identify directly reported citizenship for approximately 14.4% of the total population.

The integration of these surveys with the 2010 Census is based on the Protected Identification Key (PIK) added to all files using the Person Identification Validation System (PVS). From 2000 to

---

[1] https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html
[2] https://www.census.gov/rdo/data/2010_census.html
[3] This information is from the Master Demographic Pilot Report.

2015, a small number of the PIKs in these surveys do not match records in the 2010 Census. The nonmatch rate is less than 0.2% for all years, with a minimum of less than 0.1% in 2010.

**Table 1. Citizenship in Household Surveys Linked to the 2010 Decennial by Demographics**

| | Household Surveys Linked to 2010 Decennial | | | | | | | 2010 Decennial | |
| | Noncitizen | | Citizen | | Missing | | Total | | |
| | N | (%) | N | (%) | N | (%) | (%) | N | (%) |
|---|---|---|---|---|---|---|---|---|---|
| Total Population | 1,523,000 | | 43,090,000 | | 1,192,000 | | 100.0 | 308,745,538 | 100.0 |
| | | | | | | | | *Coverage* | *14.4* |
| Sex | | | | | | | | | |
| Female | 785,000 | 1.7 | 22,380,000 | 48.9 | 613,000 | 1.3 | 51.9 | 157,000,000 | 50.8 |
| Male | 738,090 | 1.6 | 20,710,000 | 45.2 | 579,000 | 1.3 | 48.1 | 151,800,000 | 49.2 |
| Race | | | | | | | | | |
| White | 729,000 | 1.6 | 35,320,000 | 77.1 | 837,000 | 1.8 | 80.5 | 227,200,000 | 73.6 |
| Black | 127,000 | 0.3 | 4,157,000 | 9.1 | 172,500 | 0.4 | 9.7 | 40,400,000 | 13.1 |
| American Indian, Aleut Eskimo | 14,800 | 0.0 | 562,000 | 1.2 | 15,780 | 0.0 | 1.3 | 4,007,000 | 1.3 |
| Asian or Pacific Islander | 364,000 | 0.8 | 1,688,000 | 3.7 | 93,000 | 0.2 | 4.7 | 16,770,000 | 5.4 |
| Other | 286,800 | 0.6 | 1,358,000 | 3.0 | 74,650 | 0.2 | 3.8 | 20,400,000 | 6.6 |
| Ethnicity | | | | | | | | | |
| Hispanic/Spanish | 675,000 | 1.5 | 4,046,000 | 8.8 | 198,100 | 0.4 | 10.7 | 50,480,000 | 16.4 |
| Non-Hispanic/Spanish | 848,000 | 1.9 | 39,040,000 | 85.2 | 994,300 | 2.2 | 89.3 | 258,300,000 | 83.7 |

Source: 2010 Decennial Census and Master Demographics, U.S. Census Bureau.
Note: Household survey data unweighted. The reported population total is the official count from the 2010 Census. All other counts have been rounded.

The Census Bureau has acquired multiple national administrative record sources that include citizenship data, as shown in Table 2.

**Table 2. National Administrative Record Sources with Citizenship Fields**

| Currently In Census Inventory | Universe |
| --- | --- |
| Social Security Administration Numident | Quarterly Transactions |
| Temporary Assistance to Needy Families | Program Applicants |
| Bureau of Prisons | Federal Prison Inmates |
| **Potential New Acquisitions** | **Universe** |
| USCIS Citizen Data | Population |
| Real ID Act Data | Driver's License Applicants |
| FHA Loan Applications | Loan Applicants |
| State Department Expatriates | Students studying aboard and embassies registrations |
| Medicare/Medicaid Loan Applications | Program Applicants |

Whether or not citizenship data are collected on the 2020 Census questionnaire, it would be consistent treatment to use administrative records to edit and/or impute the citizenship variable, when necessary.

From the sources in Table 2, the Census Numident is the most complete and reliable administrative record source of citizenship data currently available. The Numident file is a record of applications for Social Security cards. Unique, life-long SSNs are assigned to individuals based on these applications. A full record of all changes to the information (such as change of name) is also maintained. To obtain a Social Security Number, the applicant must provide documented identifying information to the Social Security Administration (SSA). Through the "enumeration at birth" program, children can be issued a Social Security Number (SSN) when they are born. Examples of data elements on a Numident record include name, date and place of birth, parents' names, and date of death.

As shown in Table 3, 90 percent of persons in the 2010 Census can be matched to the Protected Identification Key (PIK).[4] Once a PIK is assigned, virtually every record is matched to the Census Numident (>99%). Nearly all the PIKs not in the Numident are Individual Taxpayer Identification Numbers (ITIN), which are held by noncitizens for IRS tax filing reasons. Among persons with non-blank citizenship in the Numident, 91 percent are U.S. citizens. Around 21 percent of the Numident records have a blank for citizenship. The Social Security Administration did not require evidence of citizenship until 1972.[5] Many older persons thus did not report citizenship when applying for an SSN. We investigate this issue further below.

---

[4] See NORC (2011) and Layne, Wagner and Rothhaas (2014) for details about the process used to assign and the quality of the PIKs used in data linkage at the Census Bureau.
[5] A detailed history of the SSN is available at https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (Exhibit 1).

**Table 3. PIK Coverage of the 2010 Decennial Census and Numident Citizenship Distribution**

|  | Count | Percent of Decennial Population | Percent of Matched Sample |
|---|---|---|---|
| No PIK, not sent to PVS | 10,367,975 | 3.4 |  |
| No PIK, failed in PVS | 19,198,234 | 6.2 |  |
| PIK, but not in Numident, not ITIN | 8,871 | 0.0 |  |
| PIK, but not in Numident, is ITIN | 1,566,645 | 0.5 |  |
| Blank Citizenship | 57,914,337 | 18.8 | 20.9 |
| U.S. Citizen | 200,422,211 | 64.9 | 72.2 |
| Legal Alien, authorized to work | 18,198,545 | 5.9 | 6.6 |
| Legal Alien, not authorized to work | 444,727 | 0.1 | 0.2 |
| Other | 259,674 | <0.1 | <0.1 |
| Alien Student, restricted work authorized | 184,673 | <0.1 | <0.1 |
| Conditionally Legalized Alien | 179,646 | <0.1 | <0.1 |
| Total | 308,745,538 | 100.00 | 100.00 |

PVS is the Person Identification Validation System.

One of the reasons why some person records fail to receive a PIK is insufficient personally identifiable information, which is the case for the 3.4 percent of records not sent to the Person Identification Validation System (PVS), as shown in Table 3. It is thus likely that many of the same records for which it is not possible to link in citizenship information due to a lack of a PIK also have imputed values for other demographic variables. Tables 4A-4C show that imputation rates are much higher for 2010 Decennial Census person records lacking a PIK, especially for date of birth (a characteristic which may be hard for proxy respondents to report on behalf of their neighbors, for example).

**Table 4A. 2010 Decennial Census Gender Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| As reported | 98.7 | 75.4 |
| From first name | 1.3 | 1.4 |
| Value edited for household consistency | <0.1 | 0.4 |
| Allocated from hot deck | 0.0 | 2.1 |
| Allocated from consistency check | <0.1 | <0.1 |
| Substituted | <0.1 | 20.7 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

**Table 4B. 2010 Decennial Census Date of Birth Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| Fully reported date of birth | 96.0 | 35.7 |
| Only day of month allocated | 0.2 | 0.5 |
| Month and day both allocated | 0.3 | 1.7 |
| Year of birth created from two-digit year | 0.7 | 0.5 |
| DOB allocated consistent with reported age | 1.6 | 16.4 |
| DOB allocated consistent with allocated age | 1.3 | 24.7 |
| Substituted | 0.0 | 20.7 |
| Year of birth of householder or spouse adjusted to be consistent with number of children | <0.1 | <0.1 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

**Table 4C. 2010 Decennial Census Race Source, PIK vs. non-PIK Records**

|  | With PIK | No PIK |
|---|---|---|
| As reported | 96.6 | 68.6 |
| Code changed through consistency edit | <0.1 | <0.1 |
| Assigned race from response in Hispanic question | <0.1 | <0.1 |
| Allocated from within household | 1.5 | 4.1 |
| Allocated from hot deck | 0.7 | 5.9 |
| Substituted | 0.0 | 20.7 |
| Assigned race from previous census response | 1.2 | 0.7 |
| Percent of Sample | 90.9 | 9.1 |

The number of observations is 304,450,000. Group Quarters are excluded.

**The Estimated Effects of Including a Citizenship Question on the 2020 Census**

We also study how including the citizenship question might affect response rates by comparing first mailing response rates in the 2010 Decennial and the 2010 ACS for the same housing units. An important difference between the two questionnaires is that the ACS questionnaire contains citizenship questions, and the Decennial Census does not. Households with noncitizens could be particularly sensitive to the inclusion of citizenship questions. Here we focus on housing units that received a mailing (housing units in the initial mailing and that did not have mail returned as Undeliverable as Addressed (UAA)) and which were not classified as a vacant or delete. The housing units are divided into two groups, those where at least one person is a noncitizen in the Census Numident and has been assigned to this housing unit in the 2010 Census Match Study's administrative records person-place (PIK-MAFID) crosswalk, and those where all of the persons are citizens in the Census Numident.

Table 5 shows the 2010 Census and ACS response rates for these two groups. The self-response rate is higher for 2010 Census than for the ACS for both citizenship categories, presumably reflecting the higher burden of the ACS. The citizens[6] response rate is greater than the noncitizen rate in each survey, suggesting that noncitizens have a lower participation rate in general. Most important for this study is understanding how the difference in self-response rate across groups varies between the 2010 Census and ACS. While the self-response rate for citizen households is 13.8 percentage points lower in the ACS than in the 2010 Census, the self-response rate for households with at least one noncitizen is 18.9 percentage points lower for the ACS than the self-response rate to the 2010 Census, which is a 5.1 percentage point difference between the two

---

[6] Citizens include those born in the U.S., those born abroad to U.S. parents, and naturalized.

categories. Though there could be other reasons why households with noncitizens are particularly unwilling to respond to the ACS, this evidence is consistent with citizenship questions being more sensitive for households with noncitizens.

**Table 5. Comparison of 2010 ACS and 2010 Decennial Census Response Rates, by 2010 Numident Citizenship Status**

|                    | Response rate (%) | | Difference | Row Percent |
| ------------------ | ------ | ----- | ---------- | ----------- |
| (Numident Status)  | Census | ACS   |            |             |
| Citizen            | 79.9   | 66.1  | 13.8       | 94.1        |
| Not Citizen        | 71.5   | 52.6  | 18.9       | 5.9         |

The sample size is 929,000 households.

Other proxy measures for understanding response sensitivity to questions of citizenship can be examined with longitudinal data. Using the 2014 SIPP longitudinal panel waves 1 and 2, Table 6 shows household response rates for citizens and noncitizens. Noncitizens made up around 6% of the 2014 SIPP survey. Of persons living in households where at least one individual did not respond to the survey questionnaire, noncitizens made up around 8%.

**Table 6. Noncitizens and Non-Response in the 2014 Survey of Income and Program Participation**

|                                                              | Wave 1 | | Wave 2 | |
| ------------------------------------------------------------ | ----- | ------- | ----- | ------- |
|                                                              | (%)   | (se)    | (%)   | (se)    |
| Noncitizens                                                  | 6.1   | (0.144) | 5.7   | (0.096) |
| At least one member in the noncitizen household did not respond | 7.9   | (0.473) | 8.5   | (0.351) |

Source: 2014 SIPP, Waves 1 and 2
Note: Citizenship status refers to status in Wave 1.

To get a sense of the quality of the survey and administrative citizenship data, we compared ACS and Census Numident responses for the same PIKs. Table 7A shows that over 99 percent of the blanks are U.S. citizens in the ACS, so it is highly likely that persons with blanks for citizenship in the Numident are U.S. citizens. Among those who are legal resident noncitizens in the Numident, roughly 40 percent say they are U.S. citizens, nearly all via naturalization. This suggests that either the Numident citizenship data are out of date, or that there is a tendency for noncitizen ACS respondents to report being U.S. citizens. To provide context for these discrepancies, note that the share of the stock of legal permanent residents who became naturalized citizens was 8.3 percent, 6.0 percent, and 4.9 percent in 2008, 2009, and 2010, respectively, suggesting that the Numident data would need to be several years out of date to explain the observed discrepancies, if

the ACS data are accurate.[7] If the Census Bureau obtains the U.S. Citizen and Immigration Services (USCIS) citizenship file, we would be able to measure how up to date the Numident citizenship information is.

One way discrepancies can occur between the ACS and Numident citizenship information is incorrect PIK linkages. In Table 7B we include only PIKs that have median or above PVS scores in the linking attempt matching on the most information (geosearch pass 1). The discrepancies are smaller for the cases where the PIK is a citizen in the Numident, but they are larger where the PIK is a noncitizen in the Numident. This suggests that the significant discrepancies with the ACS when the PIK is a noncitizen in the Numident are not due to linkage errors with the PIKs.

---

[7] The data on naturalizations come from https://www.dhs.gov/sites/default/files/publications/Naturalizations_2010.pdf, and estimates for the stock of legal permanent residents come from https://www.dhs.gov/immigration-statistics/population-estimates/LPR.

0011641

Case 8:18-cv-01041-GJH    Document 70    Filed 11/27/18    Page 621 of 971

**Table 7A. Comparison of 2010 ACS and 2010 Numident Citizenship, All PIKs**

| ACS\Numident | Blank | A=U.S. Citizen | B=Legal Alien, authorized to work | C=Legal Alien, not authorized to work | D=other | E=Alien Student, restricted work authorized | F=Conditionally legalized alien | Row Percent |
|---|---|---|---|---|---|---|---|---|
| Yes, Born Citizen | 95.1 | 96.6 | 3.8 | 3.6 | 11.6 | 2.0 | 5.6 | 91.0 |
| Yes, Naturalized | 4.1 | 3.2 | 36.9 | 37.3 | 11.0 | 47.2 | 42.4 | 5.3 |
| Not a Citizen | 0.8 | 0.3 | 59.3 | 59.1 | 77.3 | 50.7 | 51.9 | 3.7 |
| Column Percent | 24.8 | 69.5 | 5.3 | 0.1 | <0.1 | <0.1 | <0.1 | |

The number of observations is 4,022,000.

**Table 7B. Comparison of 2010 ACS and 2010 Numident Citizenship, Higher Quality PIKs**

| ACS\Numident | Blank | A=U.S. Citizen | B=Legal Alien, authorized to work | C=Legal Alien, not authorized to work | D=other | E=Alien Student, restricted work authorized | F=Conditionally legalized alien | Row Percent |
|---|---|---|---|---|---|---|---|---|
| Yes, Born Citizen | 97.2 | 97.9 | 2.7 | 2.8 | 26.4 | 2.4 | 8.6 | 95.4 |
| Yes, Naturalized | 2.4 | 2.0 | 44.0 | 40.9 | 17.4 | 45.8 | 47.1 | 3.1 |
| Not a Citizen | 0.4 | <0.1 | 53.3 | 56.4 | 56.2 | 51.9 | 44.3 | 1.5 |
| Column Percent | 28.1 | 69.5 | 2.3 | <0.1 | <0.1 | <0.1 | <0.1 | |

The number of observations is 2,168,000. Only PIKs with a median or above score in the Person Identification Validation System (PVS) geosearch module pass 1 are included here.

0011642

Table 8 shows the ACS citizenship response distribution for ITINs. About 7 percent report being citizens, though only noncitizens should have ITINs.

**Table 8. 2010 ACS Citizenship Responses for ITINs**

|                  | ITIN |
|------------------|------|
| Yes, Born Citizen | 4.9  |
| Yes, naturalized  | 2.4  |
| Not a citizen     | 92.7 |

The number of observations is 42,000.

We next examine how the discrepancies between the ACS and Numident citizenship responses vary by whether the household responds to the first mailing vs. different kinds of follow-up. We restrict the ACS sample to the population of individuals in households that received a mail-in form. A self-response in our sample refers to an individual being part of a household that successfully responded to a first ACS mailing. An individual is classified as a "Mail Follow-up" (Mail FU) if that person responded to a follow-up mailing. Lastly, an individual is classified as CATI/CAPI if that person did not respond to the initial mailing and ended up receiving a telephone or in-person follow-up interview. To assess the reported citizenship in the ACS, we consider individuals in our ACS sample who also match to the Numident, giving us an additional source of citizenship information. In the Numident, we classify all citizen categories as well as missing citizenship as citizens, for the reasons given above.

Table 9 shows the distribution of ACS outcomes for individuals who are also classified as citizen or noncitizen in the Numident. Regardless of the response mode, individuals classified as citizens in the Numident also reply that they are citizens in the ACS, while nearly half of those classified as noncitizens in the Numident report being citizens. Thus, the patterns shown in Table 7 vary little by response mode.

**Table 9. Comparison of 2010 ACS and 2010 Numident Citizenship by Response Type**

| ACS\Numident              | Citizen | Not Citizen | Row Percent |
|---------------------------|---------|-------------|-------------|
| Citizen, (Resp.)          | 63.9    | 22.7        | 61.6        |
| Not Citizen, (Resp.)      | 0.2     | 29.2        | 1.8         |
| Citizen, (Mail FU)        | 21.1    | 9.9         | 20.5        |
| Not Citizen, (Mail FU)    | 0.1     | 13.9        | 0.9         |
| Citizen, (CATI/CAPI)      | 14.6    | 8.5         | 14.2        |
| Not Citizen, (CATI/CAPI)  | 0.1     | 15.8        | 1.0         |
| Column Percent            | 94.4%   | 5.6%        |             |

The number of observations is 3,752,000 individuals. Mail FU is Mail Follow-up, CATI is Computer-Assisted Telephone Interview, and CAPI is Computer-Assisted In-Person Interview.

**Other Potential Administrative Record Sources of Citizenship Data**

There are several additional administrative sources of citizenship information that the Census Bureau could consider trying to obtain. Most important are the USCIS citizenship and noncitizen

0011643

legal resident files. The citizenship file could be used to evaluate the quality of the Numident citizenship data, and in particular, how quickly it is updated. The legal nonresident file could serve as an additional reference file, so that more noncitizens can be given Census PIKs.

Another likely useful source of citizenship is state drivers' license data. The REAL ID Act of 2005 requires evidence of citizenship to obtain a driver's license. This has been fully implemented in 28 states, and the others have waivers. The Department of Homeland Security is overseeing implementation of the law. Starting January 22, 2018, passengers with a driver's license issued by a state that is still not compliant with the REAL ID Act (and has not been granted an extension) will need to show an alternative form of acceptable identification for domestic air travel to board their flight. Each state must agree to share its motor vehicle database with all other states. This database must include, at a minimum, all the data printed on the state driver's licenses and ID cards, plus drivers' histories.[8] These databases could become an important source of citizenship data.

Other potential sources include FHA loan applications and Medicare and Medicaid applications.

It would also be useful to obtain data on U.S. expatriates from the U.S. State Department. The State Department may have data on students studying abroad and expatriates registering with embassies. These data would prevent these PIKs from being mistakenly included in the administrative record person-place crosswalk.

It is worth noting that others who are interested in noncitizens have used administrative records to estimate stay rates and other relevant characteristics. Finn (2014) developed stay rates for students in science education by linking social security numbers of students enrolled in science programs with the Internal Revenue Service (IRS) tax records.

Not only is using administrative records potentially a more accurate measure of citizenship, but it is also cost efficient. The Bureau already acquires SSA Numident information on a quarterly basis. To collect that information through self-report by adding questions to the 2020 decennial would require additional unnecessary costs and burden to the Bureau.

**Implementation for the 2020 Census**

The direct solution to supporting redistricting in the manner requested by the Department of Justice is to make a citizenship variable available on the 2020 Census Edited File (CEF), the internal, confidential data file from which the PL94 tabulations are produced. If citizenship were available on that file, the PL94 tabulations could be restructured to include direct estimates of the citizen voting age population by race and ethnicity at the block level. These tabulations would have essentially the same accuracy as current PL94 and Summary File 1 (SF1) data. We recommend provisioning the citizenship variable onto the CEF by record linkage using the national administrative data discussed above.

---

[8] There is some debate about whether a national database is being created from these data. DHS says this isn't the case, but see https://papersplease.org/wp/2016/02/11/how-the-real-id-act-is-creating-a-national-id-database/.

Once the citizen tabulation variable is added to the CEF, it would be available to the 2020 Disclosure Avoidance Subsystem (DAS) for inclusion in a modified version of the proposed P2 table "Race/Ethnicity for the Population Age 18 and Over" where "Population Age 18 and Over" would be replaced by "Citizen Population Age 18 and Over." This revision would allow the use of the same disclosure avoidance methodology, state-of-the-art differential privacy, currently available for the 2018 End-to-End Test and the enhanced methods, integrated PL94 and SF1 protection, planned for the 2020 Census itself. This version of P2 would be the first PL94 data produced at the block-level with estimates of the citizen voting age population by race and ethnicity and with accuracy comparable to the accuracy of the P1 "Total population" table. The P1 and P2 tables would tabulate race and ethnicity in the same manner as currently proposed. Tables P42 "Group Quarters Population by Group Quarters Type" and H1 "Occupancy Status" would not be modified. The 2020 Census questionnaire would not be altered, and the field operations would not have to be expanded to compensate for the lower rate of voluntary compliance predicted for a census that asks the citizenship question directly.

**References**

Finn, Michael G., 2014, "Stay Rates of Foreign Doctorate Recipients from U.S. Universities, 2011," Oak Ridge Institute for Science and Education. https://pdfs.semanticscholar.org/7a4c/49e7878730b587201548338aa6052e2401b7.pdf.

Layne, Mary, Deborah Wagner, and Cynthia Rothhaas, 2014, "Estimating Record Linkage False Match Rate for the Person Identification Validation System," CARRA Working Paper #2014-02.

NORC, 2011, "Final Report: Assessment of the U.S. Census Bureau's Person Identification Validation System," University of Chicago: Bethesda, MD.

# EXHIBIT 19



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001

January 19, 2018

| | |
|---|---|
| MEMORANDUM FOR: | Wilbur L. Ross, Jr.<br>Secretary of Commerce |
| Through: | Karen Dunn Kelley<br>Performing the Non-Exclusive Functions and Duties of the Deputy<br>Secretary |
| | Ron S. Jarmin<br>Performing the Non-Exclusive Functions and Duties of the Director |
| | Enrique Lamas<br>Performing the Non-Exclusive Functions and Duties of the Deputy<br>Director |
| From: | John M. Abowd<br>Chief Scientist and Associate Director for Research and Methodology |
| Subject: | Technical Review of the Department of Justice Request to Add<br>Citizenship Question to the 2020 Census |

The Department of Justice has requested block-level citizen voting-age population estimates by OMB-approved race and ethnicity categories from the 2020 Census of Population and Housing. These estimates are currently provided in two related data products: the PL94-171 redistricting data, produced by April 1st of the year following a decennial census under the authority of 13 U.S.C. Section 141, and the Citizen Voting Age Population by Race and Ethnicity (CVAP) tables produced every February from the most recent five-year American Community Survey data. The PL94-171 data are released at the census block level. The CVAP data are released at the census block group level.

We consider three alternatives in response to the request: (A) no change in data collection, (B) adding a citizenship question to the 2020 Census, and (C) obtaining citizenship status from administrative records for the whole 2020 Census population.

We recommend either Alternative A or C. Alternative C best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count. Alternative A is not very costly and also does not harm the quality of the census count. Alternative B better addresses DoJ's stated uses than Alternative A. However, Alternative B is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources.



**United States**
**Census**
**Bureau**

| Summary of Alternatives | | | |
|---|---|---|---|
| | *Alternative A* | *Alternative B* | *Alternative C* |
| *Description* | No change in data collection | Add citizenship question to the 2020 Census (i.e., the DoJ request), all 2020 Census microdata remain within the Census Bureau | Leave 2020 Census questionnaire as designed and add citizenship from administrative records, all 2020 Census microdata and any linked citizenship data remain within the Census Bureau |
| *Impact on 2020 Census* | None | Major potential quality and cost disruptions | None |
| *Quality of Citizen Voting-Age Population Data* | Status quo | Block-level data improved, but with serious quality issues remaining | Best option for block-level citizenship data, quality much improved |
| *Other Advantages* | Lowest cost alternative | Direct measure of self-reported citizenship for the whole population | Administrative citizenship records more accurate than self-reports, incremental cost is very likely to be less than $2M, USCIS data would permit record linkage for many more legal resident noncitizens |
| *Shortcomings* | Citizen voting-age population data remain the same or are improved by using small-area modeling methods | Citizenship status is misreported at a very high rate for noncitizens, citizenship status is missing at a high rate for citizens and noncitizens due to reduced self-response and increased item nonresponse, nonresponse followup costs increase by at least $27.5M, erroneous enumerations increase, whole-person census imputations increase | Citizenship variable integrated into 2020 Census microdata outside the production system, Memorandum of Understanding with United States Citizen and Immigration Services required to acquire most up-to-date naturalization data |

Approved: _____   Date: _____

John M. Abowd, Chief Scientist
and Associate Director for Research and Methodology

## Detailed Analysis of Alternatives

The statistics in this memorandum have been released by the Census Bureau Disclosure Review Board with approval number CBDRB-2018-CDAR-014.

### Alternative A: Make no changes

Under this alternative, we would not change the current 2020 Census questionnaire nor the planned publications from the 2020 Census and the American Community Survey (ACS). Under this alternative, the PL94-171 redistricting data and the citizen voting-age population (CVAP) data would be released on the current schedule and with the current specifications. The redistricting and CVAP data are used by the Department of Justice to enforce the Voting Rights Act. They are also used by state redistricting offices to draw congressional and legislative districts that conform to constitutional equal-population and Voting Rights Act nondiscrimination requirements. Because the block-group-level CVAP tables have associated margins of error, their use in combination with the much more precise block-level census counts in the redistricting data requires sophisticated modeling. For these purposes, most analysts and the DoJ use statistical modeling methods to produce the block-level eligible voter data that become one of the inputs to their processes.

If the DoJ requests the assistance of Census Bureau statistical experts in developing model-based statistical methods to better facilitate the DoJ's uses of these data in performing its Voting Rights Act duties, a small team of Census Bureau experts similar in size and capabilities to the teams used to provide the Voting Rights Act Section 203 language determinations would be deployed.

We estimate that this alternative would have no impact on the quality of the 2020 Census because there would be no change to any of the parameters underling the Secretary's revised life-cycle cost estimates. The estimated cost is about $350,000 because that is approximately the cost of resources that would be used to do the modeling for the DoJ.

### Alternative B: Add the question on citizenship to the 2020 Census questionnaire

Under this alternative, we would add the ACS question on citizenship to the 2020 Census questionnaire and ISR instrument. We would then produce the block-level citizen voting-age population by race and ethnicity tables during the 2020 Census publication phase.

Since the question is already asked on the American Community Survey, we would accept the cognitive research and questionnaire testing from the ACS instead of independently retesting the citizenship question. This means that the cost of preparing the new question would be minimal. We did not prepare an estimate of the impact of adding the citizenship question on the cost of reprogramming the Internet Self-Response (ISR) instrument, revising the Census Questionnaire Assistance (CQA), or redesigning the printed questionnaire because those components will not be finalized until after the March 2018 submission of the final questions. Adding the citizenship question is similar in scope and cost to recasting the race and ethnicity questions again, should that become necessary, and would be done at the same time. After the 2020 Census ISR, CQA and printed questionnaire are in final form, adding the citizenship question would be much more expensive and would depend on exactly when the implementation decision was made during the production cycle.

For these reasons, we analyzed Alternative B in terms of its adverse impact on the rate of voluntary cooperation via self-response, the resulting increase in nonresponse followup (NRFU), and the consequent effects on the quality of the self-reported citizenship data. Three distinct analyses support the conclusion of an adverse impact on self-response and, as a result, on the accuracy and quality of the 2020 Census. We assess the costs of increased NRFU in light of the results of these analyses.

B.1.    *Quality of citizenship responses*

We considered the quality of the citizenship responses on the ACS. In this analysis we estimated item nonresponse rates for the citizenship question on the ACS from 2013 through 2016. When item nonresponse occurs, the ACS edit and imputation modules are used to allocate an answer to replace the missing data item. This results in lower quality data because of the statistical errors in these allocation models. The analysis of the self-responses responses is done using ACS data from 2013-2016 because of operational changes in 2013, including the introduction of the ISR option and changes in the followup operations for mail-in questionnaires.

In the period from 2013 to 2016, item nonresponse rates for the citizenship question on the mail-in questionnaires for non-Hispanic whites (NHW) ranged from 6.0% to 6.3%, non-Hispanic blacks (NHB) ranged from 12.0% to 12.6%, and Hispanics ranged from 11.6 to 12.3%. In that same period, the ISR item nonresponse rates for citizenship were greater than those for mail-in questionnaires. In 2013, the item nonresponse rates for the citizenship variable on the ISR instrument were NHW: 6.2%, NHB: 12.3% and Hispanic: 13.0%. By 2016 the rates increased for NHB and especially Hispanics. They were NHW: 6.2%, NHB: 13.1%, and Hispanic: 15.5% (a 2.5 percentage point increase). Whether the response is by mail-in questionnaire or ISR instrument, item nonresponse rates for the citizenship question are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity (data not shown).

B.2.    *Self-response rate analyses*

We directly compared the self-response rate in the 2000 Census for the short and long forms, separately for citizen and noncitizen households. In all cases, citizenship status of the individuals in the household was determined from administrative record sources, not from the response on the long form. A noncitizen household contains at least one noncitizen. Both citizen and noncitizen households have lower self-response rates on the long form compared to the short form; however, the decline in self-response for noncitizen households was 3.3 percentage points greater than the decline for citizen households. This analysis compared short and long form respondents, categories which were randomly assigned in the design of the 2000 Census.

We compared the self-response rates for the same household address on the 2010 Census and the 2010 American Community Survey, separately for citizen and noncitizen households. Again, all citizenship data were taken from administrative records, not the ACS, and noncitizen households contain at least one noncitizen resident. In this case, the randomization is over the selection of household addresses to receive the 2010 ACS. Because the ACS is an ongoing survey sampling fresh households each month, many of the residents of sampled households completed the 2010 ACS with the same reference address as they used for the 2010 Census. Once again, the self-response rates were lower in the ACS than in the 2010 Census for both citizen and noncitizen households. In this 2010 comparison, moreover, the decline in self-response was 5.1 percentage points greater for noncitizen households than for citizen households.

In both the 2000 and 2010 analyses, only the long-form or ACS questionnaire contained a citizenship question. Both the long form and the ACS questionnaires are more burdensome than the shortform. Survey methodologists consider burden to include both the direct time costs of responding and the indirect costs arising from nonresponse due to perceived sensitivity of the topic. There are, consequently, many explanations for the lower self-response rates among all household types on these longer questionnaires. However, the only difference between citizen and noncitizen households in our studies was the presence of at least one noncitizen in noncitizen households. It is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households.

### B.3.    *Breakoff rate analysis*

We examined the response breakoff paradata for the 2016 ACS. We looked at all breakoff screens on the ISR instrument, and specifically at the breakoffs that occurred on the screens with the citizenship and related questions like place of birth and year of entry to the U.S. Breakoff paradata isolate the point in answering the questionnaire where a respondent discontinues entering data—breaks off—rather than finishing. A breakoff is different from failure to self-respond. The respondent started the survey and was prepared to provide the data on the Internet Self-Response instrument, but changed his or her mind during the interview.

Hispanics and non-Hispanic non-whites (NHNW) have greater breakoff rates than non-Hispanic whites (NHW). In the 2016 ACS data, breakoffs were NHW: 9.5% of cases while NHNW: 14.1% and Hispanics: 17.6%. The paradata show the question on which the breakoff occurred. Only 0.04% of NHW broke off on the citizenship question, whereas NHNW broke off 0.27% and Hispanics broke off 0.36%. There are three related questions on immigrant status on the ACS: citizenship, place of birth, and year of entry to the United States. Considering all three questions Hispanics broke off on 1.6% of all ISR cases, NHNW: 1.2% and NHW: 0.5%. A breakoff on the ISR instrument can result in follow-up costs, imputation of missing data, or both. Because Hispanics and non-Hispanic non-whites breakoff much more often than non-Hispanic whites, especially on the citizenship-related questions, their survey response quality is differentially affected.

### B.4.    *Cost analysis*

Lower self-response rates would raise the cost of conducting the 2020 Census. We discuss those increased costs below. They also reduce the quality of the resulting data. Lower self-response rates degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates. An erroneous enumeration means a census person enumeration that should not have been counted for any of several reasons, such as, that the person (1) is a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation (https://www.census.gov/coverage_measurement/definitions/). A whole-person census imputation is a census microdata record for a person for which all characteristics are imputed.

Our analysis of the 2010 Census coverage errors (Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States, Memo G-01) contains the relevant data. That study found that when the 2010 Census obtained a valid self-response (219 million persons),

the correct enumeration rate was 97.3%, erroneous enumerations were 2.5%, and whole-person census imputations were 0.3%. All erroneous enumeration and whole-person imputation rates are much greater for responses collected in NRFU. The vast majority of NRFU responses to the 2010 Census (59 million persons) were collected in May. During that month, the rate of correct enumerations was only 90.2%, the rate of incorrect enumeration was 4.8%, and the rate of whole-person census imputations was 5.0%. June NRFU accounted for 15 million persons, of whom only 84.6% were correctly enumerated, with erroneous enumerations of 5.7%, and whole-person census imputations of 9.6%. (See Table 19 of 2010 Census Memorandum G-01. That table does not provide statistics for all NRFU cases in aggregate.)

One reason that the erroneous enumeration and whole-person imputation rates are so much greater during NRFU is that the data are much more likely to be collected from a proxy rather than a household member, and, when they do come from a household member, that person has less accurate information than self-responders. The correct enumeration rate for NRFU household member interviews is 93.4% (see Table 21 of 2010 Census Memorandum G-01), compared to 97.3% for non-NRFU households (see Table 19). The information for 21.0% of the persons whose data were collected during NRFU is based on proxy responses. For these 16 million persons, the correct enumeration rate is only 70.1%. Among proxy responses, erroneous enumerations are 6.7% and whole-person census imputations are 23.1% (see Table 21).

Using these data, we can develop a cautious estimate of the data quality consequences of adding the citizenship question. We assume that citizens are unaffected by the change and that an additional 5.1% of households with at least one noncitizen go into NRFU because they do not self-respond. We expect about 126 million occupied households in the 2020 Census. From the 2016 ACS, we estimate that 9.8% of all households contain at least one noncitizen. Combining these assumptions implies an additional 630,000 households in NRFU. If the NRFU data for those households have the same quality as the average NRFU data in the 2010 Census, then the result would be 139,000 fewer correct enumerations, of which 46,000 are additional erroneous enumerations and 93,000 are additional whole-person census imputations. This analysis assumes that, during the NRFU operations, a cooperative member of the household supplies data 79.0% of the time and 21.0% receive proxy responses. If all of these new NRFU cases go to proxy responses instead, the result would be 432,000 fewer correct enumerations, of which 67,000 are erroneous enumerations and 365,000 are whole-person census imputations.

For Alternative B, our estimate of the incremental cost proceeds as follows. Using the analysis in the paragraph above, the estimated NRFU workload will increase by approximately 630,000 households, or approximately 0.5 percentage points. We currently estimate that for each percentage point increase in NRFU, the cost of the 2020 Census increases by approximately $55 million. Accordingly, the addition of a question on citizenship could increase the cost of the 2020 Census by at least $27.5 million.  It is worth stressing that this cost estimate is a lower bound.  Our estimate of $55 million for each percentage point increase in NRFU is based on an average of three visits per household.  We expect that many more of these noncitizen households would receive six NRFU visits.

We believe that $27.5 million is a conservative estimate because the other evidence cited in this report suggests that the differences between citizen and noncitizen response rates and data quality will be amplified during the 2020 Census compared to historical levels. Hence, the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census.

***Alternative C: Use administrative data on citizenship instead of add the question to the 2020 Census***

Under this alternative, we would add the capability to link an accurate, edited citizenship variable from administrative records to the final 2020 Census microdata files. We would then produce block-level tables of citizen voting age population by race and ethnicity during the publication phase of the 2020 Census using the enhanced 2020 Census microdata.

The Census Bureau has conducted tests of its ability to link administrative data to supplement the decennial census and the ACS since the 1990s. Administrative record studies were performed for the 1990, 2000 and 2010 Censuses. We discuss some of the implications of the 2010 study below. We have used administrative data extensively in the production of the economic censuses for decades. Administrative business data from multiple sources are a key component of the production Business Register, which provides the frames for the economic censuses, annual, quarterly, and monthly business surveys. Administrative business data are also directly tabulated in many of our products.

In support of the 2020 Census, we moved the administrative data linking facility for households and individuals from research to production. This means that the ability to integrate administrative data at the record level is already part of the 2020 Census production environment. In addition, we began regularly ingesting and loading administrative data from the Social Security Administration, Internal Revenue Service and other federal and state sources into the 2020 Census data systems. In assessing the expected quality and cost of Alternative C, we assume the availability of these record linkage systems and the associated administrative data during the 2020 Census production cycle.

C.1.    *Quality of administrate record versus self-report citizenship status*

We performed a detailed study of the responses to the citizenship question compared to the administrative record citizenship variable for the 2000 Census, 2010 ACS and 2016 ACS. These analyses confirm that the vast majority of citizens, as determined by reliable federal administrative records that require proof of citizenship, correctly report their status when asked a survey question. These analyses also demonstrate that when the administrative record source indicates an individual is not a citizen, the self-report is "citizen" for no less than 23.8% of the cases, and often more than 30%.

For all of these analyses, we linked the Census Bureau's enhanced version of the SSA Numident data using the production individual record linkage system to append an administrative citizenship variable to the relevant census and ACS microdata. The Numident data contain information on every person who has ever been issued a Social Security Number or an Individual Taxpayer Identification Number. Since 1972, SSA has required proof of citizenship or legal resident alien status from applicants. We use this verified citizenship status as our administrative citizenship variable. Because noncitizens must interact with SSA if they become naturalized citizens, these data reflect current citizenship status albeit with a lag for some noncitizens.

For our analysis of the 2000 Census long-form data, we linked the 2002 version of the Census Numident data, which is the version closest to the April 1, 2000 Census date. For 92.3% of the 2000 Census long-form respondents, we successfully linked the administrative citizenship variable. The 7.7% of persons for whom the administrative data are missing is comparable to the item non-response for self-responders in the mail-in pre-ISR-option ACS. When the administrative data indicated that the 2000 Census respondent was a citizen, the self-response was citizen: 98.8%. For this same group, the long-form response was

noncitizen: 0.9% and missing: 0.3%. By contrast, when the administrative data indicated that the respondent was not a citizen, the self-report was citizen: 29.9%, noncitizen: 66.4%, and missing: 3.7%.

In the same analysis of 2000 Census data, we consider three categories of individuals: the reference person (the individual who completed the census form for the household), relatives of the reference person, and individuals unrelated to the reference person. When the administrative data show that the individual is a citizen, the reference person, relatives of the reference person, and nonrelatives of the reference person have self-reported citizenship status of 98.7%, 98.9% and 97.2%, respectively. On the other hand, when the administrative data report that the individual was a noncitizen, the long-form response was citizen for 32.9% of the reference persons; that is, reference persons who are not citizens according to the administrative data self-report that they are not citizens in only 63.3% of the long-form responses. When they are reporting for a relative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 28.6% of the long-form responses. When they are reporting for a nonrelative who is not a citizen according to the administrative data, reference persons list that individual as a citizen in 20.4% of the long-form responses.

We analyzed the 2010 and 2016 ACS citizenship responses using the same methodology. The 2010 ACS respondents were linked to the 2010 version of the Census Numident. The 2016 ACS respondents were linked to the 2016 Census Numident. In 2010, 8.5% of the respondents could not be linked, or had missing citizenship status on the administrative data. In 2016, 10.9% could not be linked or had missing administrative data. We reached the same conclusions using 2010 and 2016 ACS data with the following exceptions. When the administrative data report that the individual is a citizen, the self-response is citizen on 96.9% of the 2010 ACS questionnaires and 93.8% of the 2016 questionnaires. These lower self-reported citizenship rates are due to missing responses on the ACS, not misclassification. As we noted above, the item nonresponse rate for the citizenship question has been increasing. These item nonresponse data show that some citizens are not reporting their status on the ACS at all. In 2010 and 2016, individuals for whom the administrative data indicate noncitizen respond citizen in 32.7% and 34.7% of the ACS questionnaires, respectively. The rates of missing ACS citizenship response are also greater for individuals who are noncitizens in the administrative data (2010: 4.1%, 2016: 7.7%). The analysis of reference persons, relatives, and nonrelatives is qualitatively identical to the 2000 Census analysis.

In all three analyses, the results for racial and ethnic groups and for voting age individuals are similar to the results for the whole population with one important exception. If the administrative data indicate that the person is a citizen, the self-report is citizen at a very high rate with the remainder being predominately missing self-reports for all groups. If the administrative data indicate noncitizen, the self-report is citizen at a very high rate (never less than 23.8% for any racial, ethnic or voting age group in any year we studied). The exception is the missing data rate for Hispanics, who are missing administrative data about twice as often as non-Hispanic blacks and three times as often as non-Hispanic whites.

C.2.     *Analysis of coverage differences between administrative and survey citizenship data*

Our analysis suggests that the ACS and 2000 long form survey data have more complete coverage of citizenship than administrative record data, but the relative advantage of the survey data is diminishing. Citizenship status is missing for 10.9 percent of persons in the 2016 administrative records, and it is missing for 6.3 percent of persons in the 2016 ACS. This 4.6 percentage point gap between administrative and survey missing data rates is smaller than the gap in 2000 (6.9 percentage points) and 2010 (5.6

percentage points). Incomplete (through November) pre-production ACS data indicate that citizenship item nonresponse has again increased in 2017.

There is an important caveat to the conclusion that survey-based citizenship data are more complete than administrative records, albeit less so now than in 2000. The methods used to adjust the ACS weights for survey nonresponse and to allocate citizenship status for item nonresponse assume that the predicted answers of the sampled non-respondents are statistically the same as those of respondents. Our analysis casts serious doubt on this assumption, suggesting that those who do not respond to either the entire ACS or the citizenship question on the ACS are not statistically similar to those who do; in particular, their responses to the citizenship question would not be well-predicted by the answers of those who did respond.

The consequences of missing citizenship data in the administrative records are asymmetric. In the Census Numident, citizenship data may be missing for older citizens who obtained SSNs before the 1972 requirement to verify citizenship, naturalized citizens who have not confirmed their naturalization to SSA, and noncitizens who do not have an SSN or ITIN. All three of these shortcomings are addressed by adding data from the United States Citizen and Immigration Services (USCIS). Those data would complement the Census Numident data for older citizens and update those data for naturalized citizens. A less obvious, but equally important benefit, is that they would permit record linkage for legal resident aliens by allowing the construction of a supplementary record linkage master list for such people, who are only in scope for the Numident if they apply for and receive an SSN or ITIN. Consequently, the administrative records citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method. Finally, having two sources of administrative citizenship data permits a detailed verification of the accuracy of those sources as well.

*C.3.    Cost of administrative record data production*

For Alternative C, we estimate that the incremental cost, except for new MOUs, is $450,000. This cost estimate includes the time to develop an MOU with USCIS, estimated ingestion and curation costs for USCIS data, incremental costs of other administrative data already in use in the 2020 Census but for which continued acquisition is now a requirement, and staff time to do the required statistical work for integration of the administrative-data citizenship status onto the 2020 Census microdata. This cost estimate is necessarily incomplete because we have not had adequate time to develop a draft MOU with USCIS, which is a requirement for getting a firm delivery cost estimate from the agency. Acquisition costs for other administrative data acquired or proposed for the 2020 Census varied from zero to $1.5M. Thus the realistic range of cost estimates, including the cost of USCIS data, is between $500,000 and $2.0M

# EXHIBIT 20

January 26, 2018

The Honorable Wilbur L. Ross
Secretary of Commerce
U.S. Department of Commerce
14th St. and Constitution Avenue, NW
Washington, DC 20230

Dear Secretary Ross:

As former directors of the U.S. Census Bureau, serving under both Republican and Democratic administrations, we want to thank you for the care for the future of the Census Bureau you have displayed. We were, however, troubled to learn that the Department of Justice has recently asked the Bureau to add a new question on citizenship to the 2020 census. We are deeply concerned about the consequences of this possible action and hope that our objective observations provide a useful perspective before a final decision is made on this issue.

We were encouraged by your testimony before the Census Bureau's House and Senate authorizing committees last October. Your frank assessment of the status of 2020 Census preparations and your acknowledgment that the Bureau will need more resources to conduct an acceptably accurate enumeration were correct. Undoubtedly, your substantial private sector experience has informed your approach to the Bureau's mission. Similarly, your experience as a census enumerator many years ago may have helped to shape your appreciation for the importance of the fair and accurate census our Constitution envisions, free from partisan influence and guided by sound, well documented, scientifically driven decisions.[1]

There is a well-proven multi-year process to suggest and test new questions. We strongly believe that adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk. Your observation at the House Oversight and Government Reform Committee hearing on October 12, 2017 — that adding untested questions could reduce response rates — suggests that you have carefully considered respondent burden and other factors that contribute to public acceptance of censuses and surveys, as the window of opportunity to lock down census methods, operations, content, and infrastructure closes quickly.

As you fully appreciate, planning a decennial census is an enormous challenge. Preparations for a census are complex, with each component related to and built upon previous research and tests. The critical

---

[1] We think you will enjoy recalling that Kenneth Prewitt, a signer of this letter, was your crew leader in 1960. You were in the Harvard Business School, and he in the Harvard Divinity School; like you, he wanted to make some extra money over spring break. Ken was appointed a crew leader and recruited enumerators *only* from the HBS, knowing that they would carry out their duties efficiently. Indeed, they (you) did — your crew finished first in Boston, with the highest accuracy score in the city.

1

'dress rehearsal' for the 2020 Census (the 2018 End-to-End Census Test) is starting in Providence County, RI. Adding a citizenship question without a testing opportunity in a contemporary, census-like environment will invalidate the results and lessons learned from the End-to-End test. Key assumptions underlying estimates of self-response, staffing needs, local office sites, and communication strategies will no longer be sound, calling into question cost projections that we know you have worked hard to validate and update. In addition, the Census Bureau would need to modify data capture and processing systems, language assistance and enumerator training materials, and web-based instructions for completing the census in the time remaining before the 2020 Census starts – all without the benefit of field testing.

There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.  It is highly risky to ask untested questions in the context of the complete 2020 Census design. There is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality, and truthfulness of response. The effect of adding a citizenship question to the 2020 Census on data quality and census accuracy, therefore, is completely unknown. Also of import, overcoming unexpected obstacles that arise as 2020 Census operations unfold would add to the cost, without assurances that such efforts would yield a more accurate outcome.

In summary, we believe that adding a citizenship question to the 2020 Census will considerably increase the risks to the 2020 enumeration. Because we share your goal of a "full, fair, and accurate census," as the Constitution requires, we urge you to consider a prudent course of action in response to the Justice Department's untimely and potentially disruptive request.

Please let us know if we can answer any questions or be of further assistance.

Sincerely,

Vincent P. Barabba (1973-1976; 1979–1981)

Martha Farnsworth Riche (1994-1998)

Kenneth Prewitt (1998–2001)

Steven H. Murdock (2008-2009)

Robert M. Groves (2009–2012)

John Thompson (2013–2017)

0002621

# EXHIBIT 21

| From: | Comstock, Earl (Federal) [ PII ] |
|---|---|
| Sent: | 1/30/2018 11:50:49 PM |
| To: | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov]; Enrique Lamas (CENSUS/ADDP FED) [Enrique.Lamas@census.gov] |
| CC: | Kelley, Karen (Federal) [ PII ]; Willard, Aaron (Federal) [ PII ]; Uthmeier, James (Federal) [ PII ]; Davidson, Peter (Federal) [ PII ] |
| Subject: | Questions on the January 19 Alternatives Memo |
| Attachments: | Questions on the 19 Jan Draft Census Memo 01302017.docx |
| Importance: | High |

Hi Ron and Enrique –

Thank you for a good start on the draft memo for the Secretary on the citizenship question. As you know, with Karen's absence [ PII ], I have been working with Aaron, James and David to review the draft. Attached are questions that are raised by the memo. The answers will provide additional information to inform the Secretary that should be included in a revised memo.

Please answer as many of the questions as possible by 10:30 am tomorrow. In particular, if you could provide a response to questions 24, 25, and 26 by 10:30 am tomorrow (Wednesday, Jan. 31) that would be greatly appreciated.

If you have questions you can reach me at [ PII ] or contact Karen.

Thanks again!

Earl

# EXHIBIT 22

| **From**: | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov] |
|---|---|
| **Sent**: | 2/6/2018 8:42:03 PM |
| **To**: | Kelley, Karen (Federal) |
| **CC**: | Lamas, Enrique [enrique.lamas@census.gov] |
| **Subject**: | DOJ |

Karen,

I spoke with Art Gary.  He has spoken with DOJ leadership. They believe the letter requesting citizenship be added to the 2020 Census fully describes their request. They do not want to meet.

Thanks

Ron

Sent from my iPhone

0003460

# EXHIBIT 23

| From: | Ron.S.Jarmin@census.gov [Ron.S.Jarmin@census.gov] |
|---|---|
| Sent: | 2/15/2018 4:37:28 PM |
| To: | BRobinson@doc.gov; Melissa L Creech (CENSUS/PCO FED) [Melissa.L.Creech@census.gov]; Enrique Lamas (CENSUS/ADDP FED) [Enrique.Lamas@census.gov] |
| Subject: | Fwd: DOJ |

FYI

Sent from my iPhone

Begin forwarded message:

**From:** Ron.S.Jarmin@census.gov

**Date:** February 6, 2018 at 3:42:02 PM EST

**To:** Karen Kelley

**Cc:** Enrique Lamas <enrique.lamas@census.gov>

**Subject: DOJ**

Karen,

I spoke with Art Gary. He has spoken with DOJ leadership. They believe the letter requesting citizenship be added to the 2020 Census fully describes their request. They do not want to meet.

Thanks

Ron

Sent from my iPhone

# EXHIBIT 24

| From: | Enrique Lamas (CENSUS/ADDP FED) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2C2E07BF883B4488800E4FF3AE7188AB-LAMAS, ENRI] |
| Sent: | 2/14/2018 12:52:09 AM |
| To: | Ron S Jarmin (CENSUS/ADEP FED) [Ron.S.Jarmin@census.gov] |
| Subject: | Re: Question |

Ok. I'll be in by then.

Enrique Lamas
Associate Director for Demographic Programs,
Performing the Non-Exclusive Functions and Duties of the Deputy Director
US Census Bureau
301 763 2160

On Feb 13, 2018, at 7:35 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:

Sent from my iPhone

Begin forwarded message:

**From:** "Kelley, Karen (Federal)" < PII >
**Date:** February 13, 2018 at 7:11:49 PM EST
**To:** "Jarmin, Ron S" <ron.s.jarmin@census.gov>
**Subject: Re: Question**
Around 8:30 ish.
Sent from my iPhone

On Feb 13, 2018, at 5:45 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:
Sure. What time?
Sent from my iPhone

On Feb 13, 2018, at 4:54 PM, Kelley, Karen (Federal) < PII > wrote:
Thanks. Can we talk early tomorrow morning???

Sent from my iPhone

On Feb 13, 2018, at 3:48 PM, Ron S Jarmin (CENSUS/ADEP FED) <Ron.S.Jarmin@census.gov> wrote:
Please see the thread below. Appears no one at AEI willing to speak in favor of putting question on the 2020.

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov   Connect with us on Social Media

**From:** Ron S Jarmin (CENSUS/ADEP FED)
**Sent:** Tuesday, February 13, 2018 3:46 PM
**To:** Michael R. Strain
**Subject:** Re: Question

Thanks Michael.  We are trying to find someone who can give a professional expression of support for the proposal in contrast to the many folks we can find to give professional statements against the proposal.  Interesting, but perhaps not so surprising, that no one at AEI is willing to do that.

Thanks for your help.

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov

census.gov   Connect with us on Social Media

---

**From:** Michael R. Strain <[ PII ]>
**Sent:** Tuesday, February 13, 2018 3:31:38 PM
**To:** Ron S Jarmin (CENSUS/ADEP FED)
**Subject:** RE: Question

Hi Ron,

Great to hear from you. I hope you are well.

None of my colleagues at AEI would speak favorably about the proposal. Is it important that the person actually be in favor of the proposal?

All the best,

Michael

---

**From:** Ron S Jarmin (CENSUS/ADEP FED) [mailto:Ron.S.Jarmin@census.gov]
**Sent:** Tuesday, February 13, 2018 1:48 PM
**To:** Michael R. Strain <[ PII ]>
**Subject:** Question

Hi Michael,

Hope all is well.  We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders.  Most stakeholders will speak against the proposal.  We're looking to find someone thoughtful who can speak to the pros of adding such a question or perhaps addressing the fundamental data need some other way (e.g., admin records).

Do you know of anyone at AEI, or elsewhere, that could do this sometime over the next couple weeks?

Thanks

**Ron Jarmin, PhD.**
Associate Director for Economic Programs, and
Performing the Non-Exclusive Functions and Duties of the Director
U.S. Census Bureau
Office 301.763.1858, Ron.S.Jarmin@census.gov
census.gov  Connect with us on Social Media

# EXHIBIT 25



UNITED STATES DEPARTMENT OF COMMERCE
Economics and Statistics Administration
U.S. Census Bureau
Washington, DC 20233-0001

March 1, 2018

| | |
|---|---|
| MEMORANDUM FOR: | Wilbur L. Ross, Jr.<br>Secretary of Commerce |
| Through: | Karen Dunn Kelley<br>Performing the Non-Exclusive Functions and Duties of the Deputy Secretary |
| | Ron S. Jarmin<br>Performing the Non-Exclusive Functions and Duties of the Director |
| | Enrique Lamas<br>Performing the Non-Exclusive Functions and Duties of the Deputy Director |
| From: | John M. Abowd<br>Chief Scientist and Associate Director for Research and Methodology |
| Subject: | Preliminary analysis of Alternative D (Combined Alternatives B and C) |

See attached.

Approved: _____ Date: _____

John M. Abowd, Chief Scientist
and Associate Director for Research and Methodology



### Preliminary Analysis of Alternative D

At the Secretary's request we performed a preliminary analysis of combining Alternative B (asking the citizenship question of every household on the 2020 Census) and Alternative C (do not ask the question, link reliable administrative data on citizenship status instead) in the January 19, 2018 draft memo to the Department of Commerce into a new Alternative D. Here we discuss Alternative D, the weaknesses in Alternative C on its own, whether and how survey data could address these weaknesses, implications of including a citizenship question for using administrative data, and methodological challenges.

*Description of Alternative D:* Administrative data from the Social Security Administration (SSA), Internal Revenue Service (IRS), U.S. Citizenship and Immigration Services (USCIS), and the State Department would be used to create a comprehensive statistical reference list of current U.S. citizens. Nevertheless, there will be some persons for whom no administrative data are available. To obtain citizenship information for this sub-population, a citizenship question would be added to the 2020 Census questionnaire. The combined administrative record and 2020 Census data would be used to produce baseline citizenship statistics by 2021. Any U.S. citizens appearing in administrative data after the version created for the 2020 Census would be added to the comprehensive statistical reference list. There would be no plan to include a citizenship question on future Decennial Censuses or American Community Surveys. The comprehensive statistical reference list, built from administrative records and augmented by the 2020 Census answers would be used instead. The comprehensive statistical reference list would be kept current, gradually replacing almost all respondent-provided data with verified citizenship status data.

*What are the weaknesses in Alternative C?*

In the 2017 Numident (the latest available), 6.6 million persons born outside the U.S. have blank citizenship among those born in 1920 or later with no year of death. The evidence suggests that citizenship is not missing at random. Of those with missing citizenship in the Numident, a much higher share appears to be U.S. citizens than compared to those for whom citizenship data are not missing. Nevertheless, some of the blanks may be noncitizens, and it would thus be useful to have other sources for them.

A second question about the Numident citizenship variable is how complete and timely its updates are for naturalizations. Naturalized citizens are instructed to immediately apply for a new SSN card. Those who wish to work have an incentive to do so quickly, since having an SSN card with U.S. citizenship will make it easier to pass the E-Verify process when applying for a job, and it will make them eligible for government programs. But we do not know what fraction of naturalized citizens actually notify the SSA, and how soon after being naturalized they do so.

A third potential weakness of Numident citizenship is that some people are not required to have a Social Security Number (SSN), whether they are a U.S. citizen or not. It would also be useful to have a data source on citizenship that did not depend on the SSN application and tracking process inside SSA. This is why we proposed the MOU with the USCIS for naturalizations, and why we have now begun pursuing an MOU with the State Department for data on all citizens with passports.

0009813

IRS Individual Taxpayer Identification Numbers (ITIN) partially fill the gap in Numident coverage of noncitizen U.S. residents. However, not all noncitizen residents without SSNs apply for ITINs. Only those making IRS tax filings apply for ITINs. Once again, it would be useful to have a data source that did not depend on the ITIN process. The USCIS and State Department MOUs would provide an alternative source in this context as well.

U.S. Citizenship and Immigration Services (USCIS) data on naturalizations, lawful permanent residents, and I-539 non-immigrant visa extensions can partially address the weaknesses of the Numident. The USCIS data provide up-to-date information since 2001 (and possibly back to 1988, but with incomplete records prior to 2001). This will fill gaps for naturalized citizens, lawful permanent residents, and persons with extended visa applications without SSNs, as well as naturalized citizens who did not inform SSA about their naturalization. The data do not cover naturalizations occurring before 1988, as well as not covering and some between 1988-2000. USCIS data do not always cover children under 18 at the time a parent became a naturalized U.S. citizen. Such children automatically become U.S. citizens under the Child Citizenship Act of 2000. The USCIS receives notification of some, but not all, of these child naturalizations. Others inform the U.S. government of their U.S. citizenship status by applying for U.S. passports, which are less expensive than the application to notify the USCIS. USCIS visa applications list people's children, but those data may not be in electronic form.

U.S. passport data, available from the State Department, can help plug the gaps for child naturalizations, blanks on the Numident, and out-of-date citizenship information on the Numident for persons naturalized prior to 2001. Since U.S. citizens are not required to have a passport, however, these data will also have gaps in coverage.

Remaining citizenship data gaps in Alternative C include the following categories:

1.      U.S. citizens from birth with no SSN or U.S. passport. They will not be processed by the production record linkage system used for the 2020 Census because their personally identifiable information won't find a matching Protected Identification Key (PIK) in the Person Validation System (PVS).

2.      U.S. citizens from birth born outside the U.S., who do not have a U.S. passport, and either applied for an SSN prior to 1974 and were 18 or older, or applied before the age of 18 prior to 1978. These people will be found in PVS, but none of the administrative sources discussed above will reliably generate a U.S. citizenship variable.

3.      U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization because they originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974). These people already had an SSN when they were naturalized and they didn't inform SSA about the naturalization, or they didn't apply for an SSN. The former group have inaccurate data on the Numident. The latter group will not be found in PVS.

4.      U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and did not inform USCIS or receive a U.S. passport. Note that such persons would not be able to get an SSN with U.S. citizenship on the card without either a U.S. passport or a certificate from USCIS. These people will also not be found in the PVS.

5.      Lawful permanent residents (LPR) who received that status prior to 2001 and either do not have an SSN or applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974). The former group will not be found in PVS. The latter group has inaccurate data in Numident.

6.      Noncitizen, non-LPR, residents who do not have an SSN or ITIN and who did not apply for a visa extension. These persons will not be found in PVS.

7.      Persons with citizenship information in administrative data, but the administrative and decennial census data cannot be linked due to missing or discrepant PII.

*Can survey data address the gaps in Alternative C?*

One might think that survey data could help fill the above gaps, either when their person record is not linked in the PVS, and thus they have no PIK, or when they have a PIK but the administrative data lack up-to-date citizenship information. Persons in Category 6, however, have a strong incentive to provide an incorrect answer, if they answer at all. A significant, but unknown, fraction of persons without PIKs are in Category 6. Distinguishing these people from the other categories of persons without PIKs is an inexact science because there is no feasible method of independently verifying their non-citizen status. Our comparison of ACS and Numident citizenship data suggests that a large fraction of LPRs provide incorrect survey responses. This suggests that survey-collected citizenship data may not be reliable for many of the people falling in the gaps in administrative data. This calls into question their ability to improve upon Alternative C.

With Alternative C, and no direct survey response, the Census Bureau's edit and imputation procedures would make an allocation based primarily on the high-quality administrative data. In the presence of a survey response, but without any linked administrative data for that person, the edit would only be triggered by blank citizenship. A survey response of "citizen" would be accepted as valid. There is no scientifically defensible method for rejecting a survey response in the absence of alternative data for that respondent.

How might inclusion of a citizenship question on the questionnaire affect the measurement of citizenship with administrative data? Absent an in-house administrative data census, measuring citizenship with administrative data requires that persons in the Decennial Census be linked to the administrative data at the person level. The PVS system engineered into the 2020 Census does this using a very reliable technology. However, inclusion of a citizenship question on the 2020 Census questionnaire is very likely to reduce the self-response rate, pushing more households into Nonresponse Followup (NRFU). Not only will this likely lead to more incorrect enumerations, but it is also expected to increase the number of persons who cannot be linked to the administrative data because the NRFU PII is lower quality than the self-response data. In the 2010 Decennial Census, the percentage of NRFU persons who could be linked to administrative data rate was 81.6 percent, compared to 96.7 percent for mail responses. Those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well, resulting in a proxy response. The NRFU linkage rates were far lower for proxy responses than self-responses (33.8 percent vs. 93.0 percent, respectively).

Although persons in Category 6 will not be linked regardless of response mode, it is common for households to include persons with a variety of citizenship statuses. If the whole household does not self-

respond to protect the members in Category 6, the record linkage problem will be further aggravated. Thus, not only are citizenship survey data of suspect quality for persons in the gaps for Alternative C, collecting these survey data would reduce the quality of the administrative records when used in Alternative D by lowering the record linkage rate for persons with administrative citizenship data.

*What methodological challenges are involved when combining these sources?*

Using the 2020 Census data only to fill in gaps for persons without administrative data on citizenship would raise questions about why 100 percent of respondents are being burdened by a citizenship question to obtain information for the two percent of respondents where it is missing.

Including a citizenship question in the 2020 Census does not solve the problem of incomplete person linkages when producing citizenship statistics after 2020. Both the 2020 decennial record and the record with the person's future location would need to be found in PVS to be used for future statistics.

In sum, Alternative D would result in poorer quality citizenship data than Alternative C. It would still have all the negative cost and quality implications of Alternative B outlined in the draft January 19, 2018 memo to the Department of Commerce.

0009817

**Summary Analysis of the Key Differences Between Alternative C and Alternative D**

This short note describes the Census Bureau's current assumptions about two alternatives to address the need for block level data on citizen voting age populations. The goal is to measure the citizenship status of all people enumerated in the 2020 Decennial Census. Both alternatives utilize administrative data on the citizenship status of individuals, however one option, Alternative D, proposes to also include the current American Community Survey (ACS) question on citizenship status on the 2020 Decennial Census short form.

In both alternatives described here, the methodology requires linking 2020 census response data and administrative records. However, as illustrated both alternatives would also need to assign/impute citizenship for a portion of the population. The Census Bureau will have to assign citizenship in cases of questionnaire non-response and item non-response. Additionally, it is important to note, that even when a self-response is available it is not always possible to link response data with administrative records data. Poor data quality (e.g., name and age) and nonresponse or incomplete 2020 Census responses mean that we will not have a direct measure of citizenship status for all residents enumerated in 2020. The Census Bureau will to need employ an imputation model for these cases.

One of the key differences between to the two alternatives described below is the number of cases requiring imputation. The other key difference is the impact of errors in the citizenship status reported on the 2020 Census.

In the most recent version of the 2020 Decennial Life Cycle Cost Estimate, the Census Bureau projects counting 330 million residents in 2020. Figure 1 summarizes how citizenship status will be measured under Alternative C that does not employ a citizenship question on the 2020 Census. Figure 2 summarizes how this will be done using both administrative records and a 2020 citizenship question under Alternative D.

Alternative C is a simplified process for assigning citizenship through direct linkage and modelling, without including the question on the 2020 Census. The Census Bureau will link the responses for the 330 million census records to administrative records that contain information on the citizenship status of individuals. The Census Bureau expects to successfully link and observe this status for approximately 295 million people. The Census Bureau would need to impute this status for approximately 35 million people under Alternative C whose 2020 responses cannot be linked to administrative data. Although the Census Bureau has fully developed and tested the imputation model, it has high confidence that an accurate model can be developed and deployed for this purpose. Further, we will most likely never possess a fully adequate truth deck to benchmark it to.

Measuring citizenship status is slightly more complex under Alternative D where all U.S. households will be given the opportunity to provide the citizenship status of each household member. Based on response data for the ACS citizenship and other response data research, we know that not all households that respond to the 2020 Census will answer this question, leaving the question blank or with otherwise invalid responses. Additionally, Alternative D, must also account for those households that do not respond at all or will have proxy responses. Due to these reasons, we estimate that we will get 2020 citizenship status responses for approximately 294.6 million people, a slightly higher estimate

0009818

than Alternative C. For the 35.4 million people without a 2020 citizenship response, the Census Bureau will employ the same methodology as in Alternative C, linking the 2020 Census responses to the administrative records. The Census Bureau estimates that it will be able to link these cases to administrative records where we observe citizenship status for approximately 21.5 million people. For the remaining 13.8 million will be imputed through a model as described above. Thus, there will be a need for imputing many cases across either alternative.

The Census Bureau will link the 294.6 million records from the 2020 Census with the administrative records. This will be done both for potential quality assurance purposes and to improve the quality of future modeling uses. Based on the current research from the ACS, the Census Bureau expects to successfully link approximately 272.5 million of these cases. Of these, 263 million will have citizenship statuses that agree across the 2020 response and administrative record. The Census Bureau estimates there will be 9.5 million cases where there is disagreement across the two sources. Historic Census Bureau practice is to use self-reported data in these situations. However, the Census Bureau now knows from linking ACS responses on citizenship to administrative data that nearly one third of noncitizens in the administrative data respond to the questionnaire indicating they are citizens, indicating that this practice should be revisited in the case of measuring citizenship. Finally, for those 22.2 million cases that do not link to administrative records (non-linkage occurs for the same data quality reasons discussed above), the Census Bureau will use the observed 2020 responses. Again, Census Bureau expect some quality issues with these responses. Namely, the Census Bureau estimates that just under 500 thousand noncitizens will respond as citizens.

The relative quality of Alternative C versus Alternative D will depend on the relative importance of the errors in administrative data, response data, and imputations. To be slightly more but not fully precise consider the following description of errors under both alternatives. First note that all possible measurement methods will have errors. Under Alternative C, there will be error in the administrative records, but we believe these to be relatively limited dues to the procedure following by SSA, USCIS and State. In both Alternative, the modeled cases will be subject to prediction error. Prediction error occur when the model returns the incorrect status of a case. As there are more models cases in Alternative C, prediction error will be a bigger issue there. Alternative D has an additional source or error, response error. This is where 2020 respondent give the incorrect status. Statisticians often hope these error are random and cancel out. However, we know from prior research that citizenship status responses are systematically biased for a subset of noncitizens. Response error is only an issue in alternative D. Unfortunately, the Census Bureau cannot quantify the relative magnitude of the errors across the alternatives at this time.

Figure 1





Figure 2



## Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Question Reinstatement Request

1. **With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?**

   Since the collection of this data, whether from administrative records or from an enumerated question, occurs prior to the creation of the Microdata Detail File (MDF) from which all tabulations will be performed, there is no difference in the timing of when the data collected under either alternative B or C could be made available to the public. The exact date for completion of the MDF is still being determined as the 2020 Census schedule is matured.  However, the 2020 Census is working towards publishing the first post-apportionment tabulation data products as early as the first week of February 2021.

2. **What is the "2020 Census publication phase" (page 1 of the Detailed Analysis for Alternative B) versus Alternative C?  Would there be any difference?**

   The 2020 Census publication phase is a broad window stretching from the release of the apportionment counts by December 31, 2020 through the last data product or report published in FY 2023, the final year of decennial funding for the 2020 Census.  However, as stated in the answer to question 1, these data could be made available to the public on the same schedule as any other post-apportionment tabulated data product regardless of whether alternative B or C is used in its collection.

3. **What is the non-response rate for: (A) each question on the 2000 and 2010 Decennial Census short form and (B) each question on the 2010 ACS and most recent ACS?**

   The table below shows the item non-response (INR) rate for each question on the 2000 and 2010 Decennial Census short form.  This is the percentage of respondents who did not provide an answer to an item.

Item Nonresponse Rates for 2000 and 2010 Short Form Person Questions

|      | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
|------|--------------|-----|-----|-----------------|------|--------|
| 2010 | 1.5          | 1.5 | 3.5 | 3.9             | 3.3  | 4.5    |
| 2000 | 1.3          | 1.1 | 3.7 | 3.1             | 2.9  | 4.1    |

Source: Rothhaas, Lestina and Hill (2012) Tables

Notes and Soucre:
Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report"  2010 Census Program for Evaluations and Experiments, January 24, 2012.

1

From report:

The INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e., the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e., incompatible with other responses) are considered non-missing responses.

Online link to 2010 report that has 2000 information as well.
https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf

See attached spreadsheet for the item allocation rates by questions for the ACS for 2010, 2013, and 2016.

4. What was the total survey response rate (i.e., percentage of complete questionnaires) for the 2000 long form and the 2000 short form? Of the incomplete long forms, what percentage left the citizenship question blank? Of the completed long forms, what percentage (if known) contained incorrect responses to the citizenship question?

We do not have measures of total survey response rates from the 2000 long form and 2000 short form available at this time. The mail response rate in 2000 was 66.4 percent for short forms and 53.9 percent for long forms. No analysis that we were aware of was conducted on the incomplete long forms that left the citizenship question blank. The Census 2000 Content Reinterview Survey showed low inconsistency of the responses to the citizenship question. Only 1.8 percent of the respondents changed answers in the reinterview.

Source for 2000 mail response rates:
https://www.census.gov/pred/www/rpts/A.7.a.pdf

Source for 2000 Content Reinterview Survey. Page 32 source.
https://www.census.gov/pred/www/rpts/B.5FR_RI.PDF

5. For the 2000 long and short forms, what was the percentage unanswered (left blank) for each question (i.e., what percentage of the responses for each question (sex, race, ethnicity, income, citizenship, etc.) were left blank)?

For the 2000 shortform, the table in question 3a provides the percentage unanswered for each question.

For the 2000 longform, Griffin, Love and Obenski (2003) summarized the Census 2000 longform responses. Allocation rates for individual items in Census 2000 were computed, but because of the magnitude of these data, summary allocation measures were derived.

2

0009823

These rates summarize completeness across all data items for occupied units (households) and are the ratio of all population and housing items that had values allocated to the total number of population and housing items required to have a response. These composite measures provide a summary picture of the completeness of all data. Fifty-four population items and 29 housing items are included in these summary measures. The analysis showed that 9.9 percent of the population question items and 12.5 percent of the housing unit question items required allocation. Allocation involves using statistical procedures, such as within-household or nearest neighbor matrices, to impute missing values.

https://ww2.amstat.org/sections/srms/Proceedings/y2003/Files/JSM2003-000596.pdf

6. **What was the incorrect response rate for the citizenship question that was asked on the Long Form during the 2000 Decennial Census? Does the response rate on the 2000 Long Form differ from the incorrect response rate on the citizenship question for the ACS?**

In the 2000 long form, 2.3 percent of persons have inconsistent answers, 89.4 percent have consistent answers, and 8.2 percent have missing citizenship data in the SSA Numident and/or the 2000 long form. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2000 long form, 2.6 percent have inconsistent answers and 97.4 percent have consistent answers.

In the 2010 ACS, 3.1 percent of persons have inconsistent answers, 86.0 percent have consistent answers, and 10.8 percent have missing citizenship data in the SSA Numident and/or the 2010 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2010 ACS, 3.6 percent have inconsistent answers and 96.4 percent have consistent answers.

In the 2016 ACS, 2.9 percent of persons have inconsistent answers, 81.2 percent have consistent answers, and 15.9 percent have missing citizenship data in the SSA Numident and/or the 2016 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2016 ACS, 3.5 percent have inconsistent answers and 96.5 percent have consistent answers.

These ACS and 2000 Census long form rates are based on weighted data.

This shows that inconsistent response rates are higher in the 2010 and 2016 ACS than in the 2000 long form.

7. **What is the incorrect response rate on other Decennial or ACS questions for which Census has administrative records available (for example, age, sex or income)?**

Table 7a shows the agreement rates between the 2010 Census response and the SSA Numident for persons who could be linked and had nonmissing values, and Table 7b shows

3

the agreement rates between the 2010 ACS and the SSA Numident. Gender has low disagreement (0.4-0.5 percent), and white alone (0.9 percent), black alone (1.7-2 percent), and age (2.1 percent) also have low disagreement rates. Disagreement rates are greater for other races (e.g., 46.4-48.6 percent for American Indian or Alaska Native alone). Hispanic origin is not well measured in the Numident, because it contains a single race response, one of which is Hispanic.

Table 7a. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 Census Response | Percent Agreement with SSA Numident |
| --- | --- |
| Hispanic | 54.2 |
| Not Hispanic | 99.7 |
| White Alone | 99.1 |
| Black Alone | 98.3 |
| American Indian or Alaska Native Alone | 51.4 |
| Asian Alone | 84.3 |
| Native Hawaiian or Other Pacific Islander Alone | 74.4 |
| Some Other Race Alone | 17.7 |
| Age | 97.9 |
| Gender | 99.4 |

Source: Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Table 7b. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 ACS Response | Percent Agreement with SSA Numident |
| --- | --- |
| White Alone | 99.1 |
| Black Alone | 98.0 |
| American Indian or Alaska Native Alone | 53.6 |
| Asian Alone | 82.9 |
| Native Hawaiian or Other Pacific Islander Alone | 72.9 |
| Some Other Race Alone | 17.2 |
| Age 0-2 Date of Birth | 95.2 |
| Age 3-17 Date of Birth | 95.6 |
| Age 18-24 Date of Birth | 95.2 |
| Age 25-44 Date of Birth | 95.8 |
| Age 45-64 Date of Birth | 95.9 |
| Age 65-74 Date of Birth | 96.5 |
| Age 75 and older Date of Birth | 92.7 |
| Male | 99.5 |
| Female | 99.5 |

4

0009825

Source: Bhaskar, Renuka, Adela Luque, Sonya Rastogi, and James Noon, 2014, "Coverage and Agreement of Administrative Records and 2010 American Community Survey Demographic Data," CARRA Working Paper #2014-14.

Abowd and Stinson (2013) find correlations of 0.75-0.89 between Survey of Income and Program Participation (SIPP) and SSA Detailed Earnings Record annual earnings between 1990-1999.[1]

8. **How does the Census presently handle responses on the (A) Decennial Census and (B) the ACS when administrative records available to the Census confirm that the response on the Decennial Census or ACS is incorrect? Is the present Census approach to incorrect responses based on practice/policy or law (statute or regulation)?**

We have always based the short form Decennial Census and the ACS on self-response, and while we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaire. This is a long established practice at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census. Title 13 of the U.S. Code allows the Census Bureau to use alternative data sources, like administrative records, for a variety of purposes, and we are using data in new ways in the 2020 Census. While this includes the use of administrative records data to fill in areas where a respondent does not provide an answer, we have not explored the possibility of checking or changing responses that a responding household has provided in response to the questionnaire.

9. **Please explain the differences between the self-response rate analysis and the breakoff rate analysis. The range of breakoff rates between groups was far smaller than the range of self-response rates between groups.**

Self-response means that a household responded to the survey by mailing back a questionnaire or by internet, and a sufficient number of core questions were answered so that an additional field interview was not required.

A breakoff occurs when an internet respondent stops answering questions prior to the end of the questionnaire. In most cases the respondent answers the core questions before breaking off, and additional fieldwork is not required. The breakoff rates are calculated separately by which question screen was the last one reached before the respondent stopped answering altogether.

The share of Hispanic respondents who broke off at some point before the end of the questionnaire (17.6 percent) is much higher than for non-Hispanic whites (9.5 percent).

---

[1] Abowd, John M., and Martha H. Stinson, 2013, "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data," Review of Economics and Statistics, Vol. 95(55). pp. 1451-1467.

0009826

Spreading the overall breakoff rates over 134 screens in the questionnaire works out to quite small rates per screen. It works out to an average breakoff rate of 0.131 percent per screen for Hispanics and 0.066 percent for non-Hispanic whites.

10. **The NRFU numbers are comparatively small – approximately one additional household for NRFU per Census enumerator. Is this really a significant source of concern?**

Yes, this is a significant concern. First, it gives rise to incremental NRFU cost of at least $27.5 million. This is a lower bound becaues it assumes the households that do not self-respond because we added a question on citizenship have the same follow-up costs as an average U.S. household. They won't because these households overwhelmingly contain at least one noncitzen, and that is one of our acknowledged hard-to-count subpopulations.

11. **Given that the breakoff rate difference was approximately 1 percent, why did Census choose to use the 5.1 percent number for assessing the cost of Alternative B?**

If a household breaks off an internet response at the citizenship, place of birth, or year of entry screens, this means it would have already responded to the core questions. This would not trigger follow-up fieldwork and thus would not involve additional fieldwork costs. In contrast, if a household does not mail back a questionnaire or give an internet response, fieldwork will be necessary and additional costs will be incurred. Thus, the 5.1 percent number for differential self-response is more appropriate for estimating the additional fieldwork cost of adding a citizenship question.

12. **Alternative C states that Census would use administrative data from the Social Security Administration, Internal Revenue Service, and "other federal and state sources." What are the other sources?**

In addition to continuing the acquisition of the Social Security Administration and Internal Revenue Service data, the Census Bureau is in discussion with the U.S. Citizen and Immigration Services (USCIS) staff to acquire additional citizenship data.

13. **Is Census confident that administrative data will be able to be used to determine citizenship for all persons (e.g., not all citizens have social security numbers)?**

We are confident that Alternative C is viable and that we have already ingested enough high-quality citizenship administrative data from SSA and IRS. The USCIS data are not required. They would, however, make the citizenship voting age tabulations better, but the administrative data we've got are very good and better than the data from the 2000 Census and current ACS. The type of activities required for Alternative C already occur daily and routinely at the Census Bureau. We have been doing this for business data products,

6

0009827

including the Economic Censuses, for decades.  We designed the 2020 Census to use this technology too.

14. For Alternative C, the memo says, "we assume the availability of these record linkage systems and associated administrative data" – does Census already have in place access to this data or would this need to be negotiated?  If negotiated, for which data sets specifically?

The Census Bureau has longstanding contractual relationships with the Social Security Administration and the Internal Revenue Service that authorize the use of data for this project.  For new data acquired for this project (i.e., USCIS) we would estimate a six-month development period to put a data acquisition agreement in place.   That agreement would also include terms specifying the authorized use of data for this project.

15. Are there any privacy issues / sensitive information prohibitions that might prevent other agencies from providing such data?

There are no new privacy or sensitivity issues associated with other agencies providing citizenship data. We have received such information in the past from USCIS. We are currently authorized to receive and use the data from SSA and IRS that are discussed in Alternative C.

16. How long would Census expect any negotiation for access to data take?  How likely is it that negotiations would be successful?  Are MOA's needed/required?

Current data available to the Census Bureau provide the quality and authority to use that are required to support this project.  Additional information potentially available from USCIS would serve to supplement/validate those existing data.   We are in early discussions with USCIS to develop a data acquisition agreement and at this time have no indications that this acquisition would not be successful.

17. What limitations would exist in working with other agencies like IRS, Homeland Security, etc. to share data?

The context for sharing of data for this project is for a one-way sharing of data from these agencies to the Census Bureau.  Secure file transfer protocols are in-place to ingest these data into our Title 13 protected systems.  For those data already in-place at the Census Bureau to support this project, provisions for sharing included in the interagency agreement restrict the Census Bureau from sharing person-level microdata outside the Census Bureau's Title 13 protections.  Aggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use.

0009828

18. If Alternative C is selected, what is Census's backup plan if the administrative data cannot be completely collected and utilized as proposed?

The backup plan is to use all of the administrative data that we currently have, which is the same set that the analyses of Alternative C used. We have verified that this use is consistent with the existing MOUs. We would then use estimation and modeling techniques similar to those used for the Small Area Income and Poverty Estimates (SAIPE) to impute missing citizenship status for those persons for whom we do not have administrative records. These models would also include estimates of naturalizations that occurred since the administrative data were ingested.

19. Does Census have any reason to believe that access to existing data sets would be curtailed if Alternative C is pursued?

No we do not believe that any access to existing data sets would be curtailed if we pursue Alternative C.

20. Has the proposed Alternative C approach ever been tried before on other data collection projects, or is this an experimental approach? If this has been done before, what was the result and what were lessons learned?

The approach in Alternative C has been routinely used in processing the economic censuses for several decades. The Bureau's Business Register was specifically redesigned for the 2002 Economic Census in order to enhance the ingestion and use of administrative records from the IRS and other sources. The data in these administrative records are used to substitute for direct responses in the economic censuses for the unsampled entities. They are also used as part of the review, edit, and imputation systems for economic censuses and surveys. On the household side, the approach in Alternative C was used extensively to build the residential characteristics for OnTheMap and OnTheMap for Emergency Management.

21. Is using sample data and administrative records sufficient for DOJ's request?

The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C.

22. Under Alternative C, if Census is able to secure interagency agreements to provide needed data sets, do we know how long it would take to receive the data transmission from other agencies and the length of time to integrate all that data, or is that unknown?

With the exception of the USCIS data, the data used for this project are already integrated into the 2020 Census production schema. In mid-to late 2018, we plan to acquire the USCIS data and with those data and our existing data begin to develop models and business rules to select citizenship status from the composite of sources and attach that characteristic to

8

0009829

each U.S. person. We expect the development and refinement of this process to continue into 2019 and to be completed by third quarter calendar year 2019.

23. **Cross referencing Census decennial responses with numerous governmental data sets stored in various databases with differing formats and storage qualities sounds like it could be complicated. Does Census have an algorithm in place to efficiently combine and cross reference such large quantities of data coming from many different sources? What cost is associated with Alternative C, and what technology/plan does Census have in place to execute?**

Yes, the 2018 Census End-to-End test will be implementing processing steps to be able to match Census responses to administrative record information from numerous governmental data sets. The Census Bureau has in place the Person Identification Validation System to assign Protected Identification Keys to 2020 Census responses. The required technology for linking in the administrative records is therefore part of the 2020 Census technology. This incremental cost factored into the estimate for Alternative C is for integrating the citizenship variable specifically, since that variable is not currently part of the 2020 Census design. No changes are required to the production Person Identification Validation system to integrate the administrative citizenship data.

24. **For section C-1 of the memo, when did Census do the analyses of the incorrect response rates for non-citizen answers to the long form and ACS citizenship question? Were any of the analyses published?**

The comparisons of ACS, 2000 Decennial Census longform and SSA Numident citizenship were conducted in January 2018. This analysis has not been published.

25. **Has Census corrected the incorrect responses it found when examining non-citizen responses? If not, why not?**

In the American Community Survey (ACS), and the short form Decennial Census, we do not change self-reported answers. The Decennial Census and the ACS are based on self-response and we accept the responses provided by households as they are given. While we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaires. This is a long established process at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.

26. **Has the Department of Justice ever been made aware of inaccurate reporting of ACS data on citizenship, so that they may take this into consideration when using the data?**

9

0009830

Not exactly.  The Census Bureau is in close, regular contact with the Department of Justice (DOJ) regarding their data requirements.  Our counterparts at DOJ have a solid understanding of survey methodology and the quality of survey data, and they are aware of the public documentation on sampling and accuracy surrounding the ACS.  However, the specific rate of accuracy regarding responses to the ACS question on citizenship has never been discussed.

**27. Why has the number of persons who cannot be linked increased from 2010 to 2016?**

The linkage between the ACS and administrative data from the SSA Numident and IRS ITIN tax filings depends on two factors: (a) the quality of the personally identifiable information (PII) on the ACS response and (b) whether the ACS respondent is in the SSN/ITIN universe.

With respect to the quality of the PII on the ACS, there may be insufficient information on the ACS due to item nonresponse or proxy response for the person to allow a successful match using the production record linkage system. There may also be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. Finally, there may be a discrepancy between the PII provided to the ACS and the PII in the administrative records.

Alternatively, the person may not be in the Numident or ITIN IRS tax filing databases because they are out of the universe for those administrative systems. This happens when the person is a citizen without an SSN, or when the person is a noncitizen who has not obtained an SSN or ITIN.

Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely. This means that most of the nonmatches are because the ACS respondent is not in the administrative record universe.

The incidence of ACS persons with sufficient PII but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 39 percent as large as in 2010, suggesting that either fewer of the noncitizens in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

**28. Independent of this memo, what action does Census plan to take in response to the analyses showing that non-citizens have been incorrectly responding to the citizenship question?**

The Census Bureau does not have plans to make any changes to procedures in the ACS. However, we will continue to conduct thorough evaluations and review of census and survey data. The ACS is focusing our research on the potential use of administrative records

10

in the survey. For instance, we are exploring whether we can use IRS data on income to reduce the burden of asking questions on income on the ACS. We are concentrating initially on questions that are high burden, e.g., questions that are difficult to answer or questions that are seen as intrusive.

**29. Did Census make recommendations the last time a question was added?**

Since the short form Decennial Census was established in 2010, the only requests for new questions we have received have been for the ACS. And, in fact, requests for questions prior to 2010 were usually related to the Decennial Census Long Form. We always work collaboratively with Federal agencies that request a new question or a change to a question. The first step is to review the data needs and the legal justification for the new question or requested changes. If, through this process, we determine that the request is justified, we work with the other agencies to test the question (cognitive testing and field testing). We also work collaboratively on the analysis of the results from the test which inform the final recommendation about whether or not to make changes or add the question.

**30. Does not answering truthfully have a separate data standard than not participating at all?**

We're not sure what you're asking here. Please clarify the question.

**31. What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?**

The Census Bureau follows a well-established process when adding or changing content on the census or ACS to ensure the data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation.

The Census Bureau and the Office of Management and Budget (OMB) have laid out a formal process for making content changes.

- First, federal agencies evaluate their data needs and propose additions or changes to current questions through OMB.
- In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.
- Final proposed questions result from extensive cognitive and field testing to ensure they result in the proper data, with an integrity that meets the Census Bureau's high standards.
- This process includes several opportunities for public comment.
- The final decision is made in consultation with OMB.

0009832

- If approved, the Census Bureau implements the change.

32. **Has another agency ever requested that a question be asked of the entire population in order to get block or individual level data?**

Not to our knowledge. However, it is worth pointing out that prior to 1980 the short form of the Decennial Census included more than just the 10 questions that have been on the short form since 1990.

33. **Would Census linking of its internal data sets, with other data sets from places like IRS and Homeland Security, have an impact on participation as well (i.e., privacy concerns)?**

The potential that concerns about the use of administrative records could have an impact on participation has always been a concern of ours, and it's a risk that we're managing on our risk register. We've worked closely with the privacy community throughout the decade, and we established a working group on our National Advisory Committee to explore this issue. We've also regularly briefed the Congress about our plans. At this stage in the decade there does not appear to be extensive concerns among the general public about our approach to using administrative records in the Nonresponse Operation or otherwise. We will continue to monitor this issue.

34. **Would Alternative C require any legislation? If so, what is the estimated time frame for approval of such legislation?**

No.

35. **Census publications and old decennial surveys available on the Census website show that citizenship questions were frequently asked of the entire population in the past. Citizenship is also a question on the ACS. What was the justification provided for citizenship questions on the (A) short form, (B) long form, and (C) ACS?**

In 1940, the Census Bureau introduced the use of a short form to collect basic characteristics from all respondents, and a long form to collect more detailed questions from only a sample of respondents. Prior to 1940, census questions were asked of everyone, though in some cases only for those with certain characteristics. For example, in 1870, a citizenship question was asked, but only for respondents who were male and over the age of 21.

Beginning in 2005, all the long-form questions – including a question on citizenship -- were moved to the ACS. 2010 was the first time we conducted a short-form only census. The citizenship question is included in the ACS to fulfill the data requirements of the Department of Justice, as well as many other agencies including the Equal Employment Opportunities Commission, the Department of Health and Human Services, and the Social Security Administration.

12

0009833

# EXHIBIT 26

## Questions on the Jan 19 Draft Census Memo on the DoJ Citizenship Question Reinstatement Request

1. **With respect to Alternatives B and C, what is the difference, if any, between the time when the data collected under each alternative would be available to the public?**

   Since the collection of this data, whether from administrative records or from an enumerated question, occurs prior to the creation of the Microdata Detail File (MDF) from which all tabulations will be performed, there is no difference in the timing of when the data collected under either alternative B or C could be made available to the public. The exact date for completion of the MDF is still being determined as the 2020 Census schedule is matured.  However, the 2020 Census is working towards publishing the first post-apportionment tabulation data products as early as the first week of February 2021.

2. **What is the "2020 Census publication phase" (page 1 of the Detailed Analysis for Alternative B) versus Alternative C?  Would there be any difference?**

   The 2020 Census publication phase is a broad window stretching from the release of the apportionment counts by December 31, 2020 through the last data product or report published in FY 2023, the final year of decennial funding for the 2020 Census.  However, as stated in the answer to question 1, these data could be made available to the public on the same schedule as any other post-apportionment tabulated data product regardless of whether alternative B or C is used in its collection.

3. **What is the non-response rate for: (A) each question on the 2000 and 2010 Decennial Census short form and (B) each question on the 2010 ACS and most recent ACS?**

   The table below shows the item non-response (INR) rate for each question on the 2000 and 2010 Decennial Census short form.  This is the percentage of respondents who did not provide an answer to an item.

   Item Nonresponse Rates for 2000 and 2010 Short Form Person Questions

   |       | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
   |-------|--------------|-----|-----|-----------------|------|--------|
   | 2010  | 1.5          | 1.5 | 3.5 | 3.9             | 3.3  | 4.5    |
   | 2000  | 1.3          | 1.1 | 3.7 | 3.1             | 2.9  | 4.1    |

   Source:  Rothhaas, Lestina and Hill (2012) Tables

   Notes and Soucre:
   Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report"   2010 Census Program for Evaluations and Experiments, January 24, 2012.

1

From report:

The INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e., the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e., incompatible with other responses) are considered non-missing responses.

Online link to 2010 report that has 2000 information as well.
https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf

See attached spreadsheet for the item allocation rates by questions for the ACS for 2010, 2013, and 2016.

4. **What was the total survey response rate (i.e., percentage of complete questionnaires) for the 2000 long form and the 2000 short form?   Of the incomplete long forms, what percentage left the citizenship question blank?  Of the completed long forms, what percentage (if known) contained incorrect responses to the citizenship question?**

We do not have measures of total survey response rates from the 2000 long form and 2000 short form available at this time.  The mail response rate in 2000 was 66.4 percent for short forms and 53.9 percent for long forms.  No analysis that we were aware of was conducted on the incomplete long forms that left the citizenship question blank.  The Census 2000 Content Reinterview Survey showed low inconsistency of the responses to the citizenship question.  Only 1.8 percent of the respondents changed answers in the reinterview.

Source for 2000 mail response rates:
https://www.census.gov/pred/www/rpts/A.7.a.pdf

Source for 2000 Content Reinterview Survey.  Page 32 source.
https://www.census.gov/pred/www/rpts/B.5FR_RI.PDF

5. **For the 2000 long and short forms, what was the percentage unanswered (left blank) for each question (i.e., what percentage of the responses for each question (sex, race, ethnicity, income, citizenship, etc.) were left blank)?**

For the 2000 shortform, the table in question 3a provides the percentage unanswered for each question.

For the 2000 longform, Griffin, Love and Obenski (2003) summarized the Census 2000 longform responses.  Allocation rates for individual items in Census 2000 were computed, but because of the magnitude of these data, summary allocation measures were derived.

2

These rates summarize completeness across all data items for occupied units (households) and are the ratio of all population and housing items that had values allocated to the total number of population and housing items required to have a response. These composite measures provide a summary picture of the completeness of all data. Fifty-four population items and 29 housing items are included in these summary measures. The analysis showed that 9.9 percent of the population question items and 12.5 percent of the housing unit question items required allocation. Allocation involves using statistical procedures, such as within-household or nearest neighbor matrices, to impute missing values.

https://ww2.amstat.org/sections/srms/Proceedings/y2003/Files/JSM2003-000596.pdf

6. **What was the incorrect response rate for the citizenship question that was asked on the Long Form during the 2000 Decennial Census? Does the response rate on the 2000 Long Form differ from the incorrect response rate on the citizenship question for the ACS?**

In the 2000 long form, 2.3 percent of persons have inconsistent answers, 89.4 percent have consistent answers, and 8.2 percent have missing citizenship data in the SSA Numident and/or the 2000 long form. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2000 long form, 2.6 percent have inconsistent answers and 97.4 percent have consistent answers.

In the 2010 ACS, 3.1 percent of persons have inconsistent answers, 86.0 percent have consistent answers, and 10.8 percent have missing citizenship data in the SSA Numident and/or the 2010 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2010 ACS, 3.6 percent have inconsistent answers and 96.4 percent have consistent answers.

In the 2016 ACS, 2.9 percent of persons have inconsistent answers, 81.2 percent have consistent answers, and 15.9 percent have missing citizenship data in the SSA Numident and/or the 2016 ACS. Among persons with nonmissing citizenship data in the SSA Numident and/or the 2016 ACS, 3.5 percent have inconsistent answers and 96.5 percent have consistent answers.

These ACS and 2000 Census long form rates are based on weighted data.

This shows that inconsistent response rates are higher in the 2010 and 2016 ACS than in the 2000 long form.

7. **What is the incorrect response rate on other Decennial or ACS questions for which Census has administrative records available (for example, age, sex or income)?**

Table 7a shows the agreement rates between the 2010 Census response and the SSA Numident for persons who could be linked and had nonmissing values, and Table 7b shows

3

the agreement rates between the 2010 ACS and the SSA Numident. Gender has low disagreement (0.4-0.5 percent), and white alone (0.9 percent), black alone (1.7-2 percent), and age (2.1 percent) also have low disagreement rates. Disagreement rates are greater for other races (e.g., 46.4-48.6 percent for American Indian or Alaska Native alone). Hispanic origin is not well measured in the Numident, because it contains a single race response, one of which is Hispanic.

Table 7a. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 Census Response | Percent Agreement with SSA Numident |
|---|---|
| Hispanic | 54.2 |
| Not Hispanic | 99.7 |
| White Alone | 99.1 |
| Black Alone | 98.3 |
| American Indian or Alaska Native Alone | 51.4 |
| Asian Alone | 84.3 |
| Native Hawaiian or Other Pacific Islander Alone | 74.4 |
| Some Other Race Alone | 17.7 |
| Age | 97.9 |
| Gender | 99.4 |

Source: Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Table 7b. Demographic Variable Agreement Rates Between the 2010 Census and the SSA Numident

| 2010 ACS Response | Percent Agreement with SSA Numident |
|---|---|
| White Alone | 99.1 |
| Black Alone | 98.0 |
| American Indian or Alaska Native Alone | 53.6 |
| Asian Alone | 82.9 |
| Native Hawaiian or Other Pacific Islander Alone | 72.9 |
| Some Other Race Alone | 17.2 |
| Age 0-2 Date of Birth | 95.2 |
| Age 3-17 Date of Birth | 95.6 |
| Age 18-24 Date of Birth | 95.2 |
| Age 25-44 Date of Birth | 95.8 |
| Age 45-64 Date of Birth | 95.9 |
| Age 65-74 Date of Birth | 96.5 |
| Age 75 and older Date of Birth | 92.7 |
| Male | 99.5 |
| Female | 99.5 |

001289

Source: Bhaskar, Renuka, Adela Luque, Sonya Rastogi, and James Noon, 2014, "Coverage and Agreement of Administrative Records and 2010 American Community Survey Demographic Data," CARRA Working Paper #2014-14.

Abowd and Stinson (2013) find correlations of 0.75-0.89 between Survey of Income and Program Participation (SIPP) and SSA Detailed Earnings Record annual earnings between 1990-1999.[1]

8. **How does the Census presently handle responses on the (A) Decennial Census and (B) the ACS when administrative records available to the Census confirm that the response on the Decennial Census or ACS is incorrect?  Is the present Census approach to incorrect responses based on practice/policy or law (statute or regulation)?**

We have always based the short form Decennial Census and the ACS on self-response, and while we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaire.  This is a long established practice at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.  Title 13 of the U.S. Code allows the Census Bureau to use alternative data sources, like administrative records, for a variety of purposes, and we are using data in new ways in the 2020 Census.  While this includes the use of administrative records data to fill in areas where a respondent does not provide an answer, we have not explored the possibility of checking or changing responses that a responding household has provided in response to the questionnaire.

9. **Please explain the differences between the self-response rate analysis and the breakoff rate analysis.  The range of breakoff rates between groups was far smaller than the range of self-response rates between groups.**

Self-response means that a household responded to the survey by mailing back a questionnaire or by internet, and a sufficient number of core questions were answered so that an additional field interview was not required.

A breakoff occurs when an internet respondent stops answering questions prior to the end of the questionnaire. In most cases the respondent answers the core questions before breaking off, and additional fieldwork is not required. The breakoff rates are calculated separately by which question screen was the last one reached before the respondent stopped answering altogether.

The share of Hispanic respondents who broke off at some point before the end of the questionnaire (17.6 percent) is much higher than for non-Hispanic whites (9.5 percent).

---

[1] Abowd, John M., and Martha H. Stinson, 2013, "Estimating Measurement Error in Annual Job Earnings: A Comparison of Survey and Administrative Data," Review of Economics and Statistics, Vol. 95(55), pp. 1451-1467.

001290

Spreading the overall breakoff rates over 134 screens in the questionnaire works out to quite small rates per screen. It works out to an average breakoff rate of 0.131 percent per screen for Hispanics and 0.066 percent for non-Hispanic whites.

10. **The NRFU numbers are comparatively small – approximately one additional household for NRFU per Census enumerator.  Is this really a significant source of concern?**

Yes, this is a significant concern.  First, it gives rise to incremental NRFU cost of at least $27.5 million.  This is a lower bound becaues it assumes the households that do not self-respond because we added a question on citizenship have the same follow-up costs as an average U.S. household.  They won't because these households overwhelmingly contain at least one noncitzen, and that is one of our acknowledged hard-to-count subpopulations.

11. **Given that the breakoff rate difference was approximately 1 percent, why did Census choose to use the 5.1 percent number for assessing the cost of Alternative B?**

If a household breaks off an internet response at the citizenship, place of birth, or year of entry screens, this means it would have already responded to the core questions. This would not trigger follow-up fieldwork and thus would not involve additional fieldwork costs. In contrast, if a household does not mail back a questionnaire or give an internet response, fieldwork will be necessary and additional costs will be incurred. Thus, the 5.1 percent number for differential self-response is more appropriate for estimating the additional fieldwork cost of adding a citizenship question.

12. **Alternative C states that Census would use administrative data from the Social Security Administration, Internal Revenue Service, and "other federal and state sources."  What are the other sources?**

In addition to continuing the acquisition of the Social Security Administration and Internal Revenue Service data, the Census Bureau is in discussion with the U.S. Citizen and Immigration Services (USCIS) staff to acquire additional citizenship data.

13. **Is Census confident that administrative data will be able to be used to determine citizenship for all persons (e.g., not all citizens have social security numbers)?**

We are confident that Alternative C is viable and that we have already ingested enough high-quality citizenship administrative data from SSA and IRS.  The USCIS data are not required.  They would, however, make the citizenship voting age tabulations better, but the administrative data we've got are very good and better than the data from the 2000 Census and current ACS.  The type of activities required for Alternative C already occur daily and routinely at the Census Bureau.  We have been doing this for business data products,

001291

including the Economic Censuses, for decades.  We designed the 2020 Census to use this technology too.

14. **For Alternative C, the memo says, "we assume the availability of these record linkage systems and associated administrative data" – does Census already have in place access to this data or would this need to be negotiated?  If negotiated, for which data sets specifically?**

The Census Bureau has longstanding contractual relationships with the Social Security Administration and the Internal Revenue Service that authorize the use of data for this project.  For new data acquired for this project (i.e., USCIS) we would estimate a six-month development period to put a data acquisition agreement in place.   That agreement would also include terms specifying the authorized use of data for this project.

15. **Are there any privacy issues / sensitive information prohibitions that might prevent other agencies from providing such data?**

There are no new privacy or sensitivity issues associated with other agencies providing citizenship data. We have received such information in the past from USCIS. We are currently authorized to receive and use the data from SSA and IRS that are discussed in Alternative C.

16. **How long would Census expect any negotiation for access to data take?  How likely is it that negotiations would be successful?  Are MOA's needed/required?**

Current data available to the Census Bureau provide the quality and authority to use that are required to support this project.   Additional information potentially available from USCIS would serve to supplement/validate those existing data.   We are in early discussions with USCIS to develop a data acquisition agreement and at this time have no indications that this acquisition would not be successful.

17. **What limitations would exist in working with other agencies like IRS, Homeland Security, etc. to share data?**

The context for sharing of data for this project is for a one-way sharing of data from these agencies to the Census Bureau.  Secure file transfer protocols are in-place to ingest these data into our Title 13 protected systems.  For those data already in-place at the Census Bureau to support this project, provisions for sharing included in the interagency agreement restrict the Census Bureau from sharing person-level microdata outside the Census Bureau's Title 13 protections.  Aggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use.

001292

18. **If Alternative C is selected, what is Census's backup plan if the administrative data cannot be completely collected and utilized as proposed?**

The backup plan is to use all of the administrative data that we currently have, which is the same set that the analyses of Alternative C used. We have verified that this use is consistent with the existing MOUs. We would then use estimation and modeling techniques similar to those used for the Small Area Income and Poverty Estimates (SAIPE) to impute missing citizenship status for those persons for whom we do not have administrative records. These models would also include estimates of naturalizations that occurred since the administrative data were ingested.

19. **Does Census have any reason to believe that access to existing data sets would be curtailed if Alternative C is pursued?**

No we do not believe that any access to existing data sets would be curtailed if we pursue Alternative C.

20. **Has the proposed Alternative C approach ever been tried before on other data collection projects, or is this an experimental approach? If this has been done before, what was the result and what were lessons learned?**

The approach in Alternative C has been routinely used in processing the economic censuses for several decades. The Bureau's Business Register was specifically redesigned for the 2002 Economic Census in order to enhance the ingestion and use of administrative records from the IRS and other sources. The data in these administrative records are used to substitute for direct responses in the economic censuses for the unsampled entities. They are also used as part of the review, edit, and imputation systems for economic censuses and surveys. On the household side, the approach in Alternative C was used extensively to build the residential characteristics for OnTheMap and OnTheMap for Emergency Management.

21. **Is using sample data and administrative records sufficient for DOJ's request?**

The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C.

22. **Under Alternative C, If Census is able to secure interagency agreements to provide needed data sets, do we know how long it would take to receive the data transmission from other agencies and the length of time to integrate all that data, or is that unknown?**

With the exception of the USCIS data, the data used for this project are already integrated into the 2020 Census production schema. In mid-to late 2018, we plan to acquire the USCIS data and with those data and our existing data begin to develop models and business rules to select citizenship status from the composite of sources and attach that characteristic to

8

each U.S. person.  We expect the development and refinement of this process to continue into 2019 and to be completed by third quarter calendar year 2019.

23. **Cross referencing Census decennial responses with numerous governmental data sets stored in various databases with differing formats and storage qualities sounds like it could be complicated.  Does Census have an algorithm in place to efficiently combine and cross reference such large quantities of data coming from many different sources?  What cost is associated with Alternative C, and what technology/plan does Census have in place to execute?**

Yes, the 2018 Census End-to-End test will be implementing processing steps to be able to match Census responses to administrative record information from numerous governmental data sets.  The Census Bureau has in place the Person Identification Validation System to assign Protected Identification Keys to 2020 Census responses. The required technology for linking in the administrative records is therefore part of the 2020 Census technology.  This incremental cost factored into the estimate for Alternative C is for integrating the citizenship variable specifically, since that variable is not currently part of the 2020 Census design. No changes are required to the production Person Identification Validation system to integrate the administrative citizenship data.

24. **For section C-1 of the memo, when did Census do the analyses of the incorrect response rates for non-citizen answers to the long form and ACS citizenship question?  Were any of the analyses published?**

The comparisons of ACS, 2000 Decennial Census longform and SSA Numident citizenship were conducted in January 2018. This analysis has not been published.

25. **Has Census corrected the incorrect responses it found when examining non-citizen responses?  If not, why not?**

In the American Community Survey (ACS), and the short form Decennial Census, we do not change self-reported answers.  The Decennial Census and the ACS are based on self-response and we accept the responses provided by households as they are given.  While we have procedures in place to address duplicate or fraudulent responses, we do not check the accuracy of the answers provided to the specific questions on the Census questionnaires. This is a long established process at the Census Bureau that has been thoroughly tested and in place since 1970, when the Census Bureau moved to a mail-out/respond approach to the Decennial Census.

26. **Has the Department of Justice ever been made aware of inaccurate reporting of ACS data on citizenship, so that they may take this into consideration when using the data?**

001294

Not exactly.  The Census Bureau is in close, regular contact with the Department of Justice (DOJ) regarding their data requirements.  Our counterparts at DOJ have a solid understanding of survey methodology and the quality of survey data, and they are aware of the public documentation on sampling and accuracy surrounding the ACS.   However, the specific rate of accuracy regarding responses to the ACS question on citizenship has never been discussed.

27. **Why has the number of persons who cannot be linked increased from 2010 to 2016?**

The linkage between the ACS and administrative data from the SSA Numident and IRS ITIN tax filings depends on two factors: (a) the quality of the personally identifiable information (PII) on the ACS response and (b) whether the ACS respondent is in the SSN/ITIN universe.

With respect to the quality of the PII on the ACS, there may be insufficient information on the ACS due to item nonresponse or proxy response for the person to allow a successful match using the production record linkage system. There may also be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. Finally, there may be a discrepancy between the PII provided to the ACS and the PII in the administrative records.

Alternatively, the person may not be in the Numident or ITIN IRS tax filing databases because they are out of the universe for those administrative systems. This happens when the person is a citizen without an SSN, or when the person is a noncitizen who has not obtained an SSN or ITIN.

Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely. This means that most of the nonmatches are because the ACS respondent is not in the administrative record universe.

The incidence of ACS persons with sufficient PII but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 39 percent as large as in 2010, suggesting that either fewer of the noncitizens in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

28. **Independent of this memo, what action does Census plan to take in response to the analyses showing that non-citizens have been incorrectly responding to the citizenship question?**

The Census Bureau does not have plans to make any changes to procedures in the ACS. However, we will continue to conduct thorough evaluations and review of census and survey data. The ACS is focusing our research on the potential use of administrative records

10

in the survey. For instance, we are exploring whether we can use IRS data on income to reduce the burden of asking questions on income on the ACS. We are concentrating initially on questions that are high burden, e.g., questions that are difficult to answer or questions that are seen as intrusive.

29. **Did Census make recommendations the last time a question was added?**

Since the short form Decennial Census was established in 2010, the only requests for new questions we have received have been for the ACS. And, in fact, requests for questions prior to 2010 were usually related to the Decennial Census Long Form. We always work collaboratively with Federal agencies that request a new question or a change to a question. The first step is to review the data needs and the legal justification for the new question or requested changes. If, through this process, we determine that the request is justified, we work with the other agencies to test the question (cognitive testing and field testing). We also work collaboratively on the analysis of the results from the test which inform the final recommendation about whether or not to make changes or add the question.

30. **Does not answering truthfully have a separate data standard than not participating at all?**

We're not sure what you're asking here. Please clarify the question.

31. **What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?**

Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed bound by past precedent when considering the Department of Justices' request. Rather, the Census Bureau is working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation. As you are aware, that process is ongoing at your direction.

32. **Has another agency ever requested that a question be asked of the entire population in order to get block or individual level data?**

Not to our knowledge. However, it is worth pointing out that prior to 1980 the short form of the Decennial Census included more than just the 10 questions that have been on the short form since 1990.

33. **Would Census linking of its internal data sets, with other data sets from places like IRS and Homeland Security, have an impact on participation as well (i.e., privacy concerns)?**

001296

The potential that concerns about the use of administrative records could have an impact on participation has always been a concern of ours, and it's a risk that we're managing on our risk register. We've worked closely with the privacy community throughout the decade, and we established a working group on our National Advisory Committee to explore this issue. We've also regularly briefed the Congress about our plans. At this stage in the decade there does not appear to be extensive concerns among the general public about our approach to using administrative records in the Nonresponse Operation or otherwise. We will continue to monitor this issue.

34. **Would Alternative C require any legislation? If so, what is the estimated time frame for approval of such legislation?**

   No.

35. **Census publications and old decennial surveys available on the Census website show that citizenship questions were frequently asked of the entire population in the past. Citizenship is also a question on the ACS. What was the justification provided for citizenship questions on the (A) short form, (B) long form, and (C) ACS?**

In 1940, the Census Bureau introduced the use of a short form to collect basic characteristics from all respondents, and a long form to collect more detailed questions from only a sample of respondents. Prior to 1940, census questions were asked of everyone, though in some cases only for those with certain characteristics. For example, in 1870, a citizenship question was asked, but only for respondents who were male and over the age of 21.

Beginning in 2005, all the long-form questions – including a question on citizenship -- were moved to the ACS. 2010 was the first time we conducted a short-form only census. The citizenship question is included in the ACS to fulfill the data requirements of the Department of Justice, as well as many other agencies including the Equal Employment Opportunities Commission, the Department of Health and Human Services, and the Social Security Administration.

001297

# EXHIBIT 27

**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

To:     Karen Dunn Kelley, Under Secretary for Economic Affairs

From:  Secretary Wilbur Ross

Date:  March 26, 2018

Re:     Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire

Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the Census Bureau reinstate a citizenship question on the decennial census to provide census block level citizenship voting age population ("CVAP") data that are not currently available from government survey data ("DOJ request"). DOJ and the courts use CVAP data for determining violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census block level will permit more effective enforcement of the Act. Section 2 protects minority population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that I considered all facts and data relevant to the question so that I could make an informed decision on how to respond. To that end, the Department of Commerce ("Department") immediately initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request – as with all significant Census assessments – prioritized the goal of obtaining *complete and accurate data*. The decennial census is mandated in the Constitution and its data are relied on for a myriad of important government decisions, including apportionment of Congressional seats among states, enforcement of voting rights laws, and allocation of federal funds. These are foundational elements of our democracy, and it is therefore incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a thorough assessment that included legal, program, and policy considerations. As part of the process, I also met with Census Bureau leadership on multiple occasions to discuss their process for reviewing the DOJ request, their data analysis, my questions about accuracy and response rates, and their recommendations. At present, the Census Bureau leadership are all career civil servants. In addition, my staff and I reviewed over 50 incoming letters from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

2

completeness. Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods. Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations. However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially. In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates. Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge. Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses. However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys. For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census. The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census. Further, the decennial census has differed significantly in nature from the sample surveys. For example, the 2000 decennial census survey contained only eight questions. Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete. ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent. However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS. Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

3

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C**, the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D**, which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

001316

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**  I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

001317

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

001318

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request. To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018. I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.


CC:    Ron Jarmin, performing the nonexclusive functions and duties of the Director of the Census Bureau

       Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau

001320

# EXHIBIT 28

**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

**Supplemental Memorandum by Secretary of Commerce Wilbur Ross**
**Regarding the Administrative Record in Census Litigation**

This memorandum is intended to provide further background and context regarding my March 26, 2018, memorandum concerning the reinstatement of a citizenship question to the decennial census. Soon after my appointment as Secretary of Commerce, I began considering various fundamental issues regarding the upcoming 2020 Census, including funding and content. Part of these considerations included whether to reinstate a citizenship question, which other senior Administration officials had previously raised. My staff and I thought reinstating a citizenship question could be warranted, and we had various discussions with other governmental officials about reinstating a citizenship question to the Census. As part of that deliberative process, my staff and I consulted with Federal governmental components and inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of the Voting Rights Act.

Ultimately, on December 12, 2017, DOJ sent a letter formally requesting that the Census Bureau reinstate on the 2020 Census questionnaire a question regarding citizenship. My March 26, 2018, memorandum described the thorough assessment process that the Department of Commerce conducted following receipt of the DOJ letter, the evidence and arguments I considered, and the factors I weighed in making my decision to include the citizenship question on the 2020 Census.

Wilbur Ross
June 21, 2018

# EXHIBIT 29

Internet Response Rate

| cithhgrp | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| 1 | 30.28 | 30.35 | 32.40 | 34.32 |
| 2 | 34.39 | 34.96 | 36.92 | 38.64 |
| 3 | 36.64 | 37.04 | 39.14 | 41.13 |
| 4 | 38.06 | 38.37 | 40.77 | 42.81 |
| 5 | 39.09 | 39.86 | 41.98 | 44.18 |
| 6 | 39.55 | 40.04 | 42.31 | 44.38 |
| 7 | 39.02 | 40.00 | 41.94 | 44.07 |
| 8 | 37.24 | 38.37 | 40.53 | 42.46 |
| 9 | 32.99 | 33.78 | 35.96 | 38.06 |
| 10 | 23.03 | 23.53 | 25.47 | 27.43 |

Self Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 64.92 | 64.43 | 64.10 | 64.07 | 63.69 | 64.44 | 64.84 |
| 2 | 66.65 | 66.16 | 65.96 | 66.51 | 66.56 | 67.16 | 67.60 |
| 3 | 66.25 | 65.51 | 65.37 | 66.51 | 66.68 | 67.16 | 67.95 |
| 4 | 65.19 | 64.95 | 64.85 | 66.33 | 65.92 | 67.21 | 67.94 |
| 5 | 64.03 | 64.07 | 64.05 | 65.73 | 65.65 | 66.79 | 67.67 |
| 6 | 63.20 | 62.46 | 62.84 | 64.81 | 64.37 | 65.76 | 66.26 |
| 7 | 61.29 | 60.62 | 60.68 | 62.65 | 63.08 | 63.83 | 64.51 |
| 8 | 57.91 | 58.06 | 57.90 | 59.77 | 60.03 | 60.76 | 61.46 |
| 9 | 52.39 | 52.52 | 52.16 | 53.73 | 53.89 | 54.53 | 55.44 |
| 10 | 40.41 | 40.63 | 40.19 | 40.76 | 40.11 | 40.96 | 41.92 |

CAPI Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 96.20 | 96.57 | 95.84 | 95.62 | 94.72 | 93.32 | 91.67 |
| 2 | 95.75 | 96.09 | 95.47 | 94.95 | 94.14 | 92.74 | 90.77 |
| 3 | 95.07 | 95.39 | 94.63 | 94.40 | 93.26 | 92.10 | 89.85 |
| 4 | 94.60 | 95.20 | 94.14 | 93.92 | 92.65 | 91.41 | 89.21 |
| 5 | 94.33 | 94.99 | 93.85 | 93.45 | 92.54 | 91.07 | 88.18 |
| 6 | 94.08 | 94.57 | 93.42 | 93.07 | 91.84 | 90.25 | 87.19 |
| 7 | 93.83 | 94.33 | 93.29 | 92.50 | 91.64 | 89.88 | 86.71 |
| 8 | 93.89 | 94.07 | 92.77 | 92.21 | 90.92 | 89.41 | 85.98 |
| 9 | 93.79 | 94.11 | 92.90 | 92.12 | 91.36 | 89.54 | 85.87 |
| 10 | 94.96 | 95.24 | 94.23 | 93.46 | 92.64 | 91.11 | 87.40 |

Total Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 98.26 | 98.43 | 98.09 | 97.98 | 97.51 | 96.78 | 95.89 |
| 2 | 98.21 | 98.33 | 98.08 | 97.85 | 97.47 | 96.79 | 95.88 |
| 3 | 97.97 | 98.07 | 97.78 | 97.73 | 97.21 | 96.64 | 95.69 |
| 4 | 97.79 | 98.04 | 97.66 | 97.62 | 97.05 | 96.48 | 95.60 |
| 5 | 97.69 | 97.96 | 97.51 | 97.48 | 97.07 | 96.37 | 95.27 |
| 6 | 97.59 | 97.76 | 97.32 | 97.29 | 96.77 | 96.02 | 94.82 |

| 7  | 97.37 | 97.56 | 97.17 | 96.97 | 96.67 | 95.72 | 94.51 |
| 8  | 97.23 | 97.35 | 96.84 | 96.70 | 96.16 | 95.33 | 93.85 |
| 9  | 96.88 | 97.07 | 96.54 | 96.28 | 95.89 | 94.82 | 93.06 |
| 10 | 97.00 | 97.19 | 96.66 | 96.19 | 95.66 | 94.61 | 92.41 |

Internet Response Rate

| cithhgrp | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| 1 | 88,000 | 95,900 | 101,500 | 103,400 |
| 2 | 96,000 | 105,100 | 110,600 | 112,800 |
| 3 | 89,900 | 98,100 | 103,500 | 106,400 |
| 4 | 85,100 | 92,600 | 97,600 | 101,100 |
| 5 | 84,400 | 92,800 | 97,200 | 100,600 |
| 6 | 82,900 | 91,100 | 95,400 | 99,000 |
| 7 | 81,600 | 90,000 | 93,700 | 97,600 |
| 8 | 76,500 | 85,000 | 89,300 | 92,400 |
| 9 | 69,400 | 76,600 | 81,000 | 84,800 |
| 10 | 53,100 | 58,800 | 63,400 | 67,500 |

Self Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 163,800 | 201,700 | 211,000 | 193,400 | 207,900 | 209,500 | 201,700 |
| 2 | 167,300 | 198,000 | 209,200 | 195,200 | 210,100 | 212,000 | 206,000 |
| 3 | 146,000 | 167,700 | 181,800 | 169,800 | 183,400 | 184,700 | 182,000 |
| 4 | 131,800 | 147,800 | 163,100 | 153,100 | 164,200 | 166,400 | 165,000 |
| 5 | 123,800 | 137,100 | 154,300 | 145,800 | 157,400 | 159,000 | 157,800 |
| 6 | 120,100 | 129,900 | 146,700 | 139,000 | 150,000 | 152,000 | 150,800 |
| 7 | 113,100 | 122,600 | 140,900 | 134,000 | 145,000 | 146,000 | 145,800 |
| 8 | 108,200 | 116,000 | 132,700 | 126,100 | 136,400 | 137,300 | 136,700 |
| 9 | 98,700 | 107,600 | 122,800 | 116,500 | 125,600 | 126,500 | 126,600 |
| 10 | 78,100 | 91,300 | 104,100 | 97,200 | 103,400 | 104,900 | 105,800 |

CAPI Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 66,000 | 85,600 | 90,500 | 84,700 | 91,900 | 89,900 | 89,300 |
| 2 | 58,100 | 73,800 | 80,400 | 74,100 | 80,900 | 78,700 | 78,000 |
| 3 | 45,800 | 58,000 | 63,300 | 58,700 | 63,700 | 62,000 | 60,300 |
| 4 | 38,600 | 46,800 | 51,500 | 47,500 | 52,000 | 49,800 | 48,300 |
| 5 | 35,300 | 41,100 | 46,300 | 42,600 | 45,800 | 44,000 | 42,500 |
| 6 | 33,400 | 38,800 | 43,900 | 40,000 | 43,300 | 41,000 | 39,000 |
| 7 | 33,100 | 38,200 | 43,800 | 39,300 | 42,300 | 40,800 | 38,500 |
| 8 | 36,100 | 40,100 | 44,600 | 40,400 | 43,500 | 41,700 | 39,500 |
| 9 | 40,400 | 46,100 | 51,700 | 46,600 | 50,500 | 48,600 | 45,600 |
| 10 | 54,700 | 65,900 | 74,100 | 68,000 | 74,300 | 71,900 | 67,400 |

Total Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 259,100 | 324,700 | 337,200 | 303,800 | 323,600 | 319,200 | 306,500 |
| 2 | 252,900 | 305,400 | 321,800 | 292,300 | 312,100 | 308,200 | 297,600 |
| 3 | 214,500 | 252,900 | 271,800 | 247,100 | 263,900 | 260,700 | 253,500 |
| 4 | 189,500 | 216,500 | 236,600 | 215,800 | 230,200 | 227,700 | 222,600 |
| 5 | 176,000 | 197,100 | 219,800 | 201,900 | 215,300 | 212,900 | 208,300 |
| 6 | 168,800 | 185,700 | 207,400 | 190,400 | 203,500 | 201,700 | 197,100 |

0010410

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 160,000 | 175,600 | 200,400 | 184,000 | 196,800 | 194,500 | 190,900 |
| 8 | 157,600 | 170,300 | 191,700 | 176,500 | 188,500 | 186,200 | 182,400 |
| 9 | 151,900 | 167,000 | 188,700 | 172,800 | 184,700 | 182,000 | 178,100 |
| 10 | 147,700 | 172,800 | 194,700 | 176,800 | 187,600 | 185,000 | 179,800 |

Internet Response Rate

| cithhgrp | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| 1 | 240,200 | 257,200 | 254,900 | 244,900 |
| 2 | 237,900 | 254,200 | 252,900 | 245,300 |
| 3 | 207,400 | 222,500 | 221,000 | 216,800 |
| 4 | 187,500 | 200,600 | 199,600 | 196,800 |
| 5 | 179,200 | 191,800 | 190,800 | 188,500 |
| 6 | 171,300 | 184,000 | 183,500 | 181,500 |
| 7 | 167,600 | 179,800 | 178,600 | 177,600 |
| 8 | 161,900 | 173,500 | 172,600 | 171,000 |
| 9 | 159,500 | 171,000 | 169,800 | 168,700 |
| 10 | 163,200 | 174,300 | 173,500 | 172,000 |

Self Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 206,200 | 257,100 | 268,400 | 243,700 | 261,100 | 259,900 | 248,100 |
| 2 | 207,800 | 248,600 | 262,200 | 241,200 | 257,900 | 257,600 | 248,200 |
| 3 | 182,200 | 212,300 | 229,200 | 210,000 | 225,500 | 224,700 | 219,200 |
| 4 | 166,200 | 188,100 | 206,800 | 189,700 | 203,000 | 202,700 | 199,000 |
| 5 | 157,300 | 175,400 | 196,200 | 181,200 | 194,200 | 193,600 | 190,400 |
| 6 | 153,200 | 167,600 | 187,700 | 173,200 | 186,200 | 186,100 | 183,300 |
| 7 | 146,500 | 160,000 | 183,400 | 169,400 | 181,900 | 181,200 | 179,300 |
| 8 | 144,400 | 155,800 | 176,900 | 163,700 | 175,600 | 175,000 | 172,700 |
| 9 | 140,100 | 153,800 | 174,800 | 161,200 | 172,800 | 172,000 | 170,300 |
| 10 | 134,800 | 158,300 | 179,900 | 164,800 | 176,000 | 175,400 | 173,400 |

CAPI Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 68,200 | 88,200 | 93,800 | 88,000 | 96,300 | 95,400 | 96,200 |
| 2 | 60,100 | 76,300 | 83,400 | 77,500 | 85,200 | 83,800 | 84,600 |
| 3 | 47,900 | 60,300 | 66,300 | 61,800 | 67,700 | 66,700 | 66,300 |
| 4 | 40,600 | 48,900 | 54,400 | 50,300 | 55,700 | 53,900 | 53,500 |
| 5 | 37,200 | 43,000 | 49,000 | 45,300 | 49,200 | 48,000 | 47,700 |
| 6 | 35,400 | 40,900 | 46,700 | 42,700 | 46,800 | 45,200 | 44,300 |
| 7 | 35,200 | 40,400 | 46,800 | 42,300 | 45,900 | 45,100 | 44,100 |
| 8 | 38,400 | 42,600 | 48,000 | 43,700 | 47,600 | 46,500 | 45,600 |
| 9 | 43,100 | 48,900 | 55,600 | 50,600 | 55,300 | 54,200 | 53,100 |
| 10 | 57,600 | 69,200 | 78,600 | 72,700 | 80,000 | 78,800 | 77,000 |

Total Response Rate

| cithhgrp | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| 1 | 261,500 | 327,600 | 340,700 | 307,300 | 328,200 | 324,900 | 313,800 |
| 2 | 255,300 | 308,200 | 325,000 | 295,900 | 316,600 | 313,600 | 304,500 |
| 3 | 216,800 | 255,500 | 275,000 | 250,200 | 268,100 | 265,600 | 259,600 |
| 4 | 191,700 | 218,800 | 239,500 | 218,600 | 233,900 | 232,000 | 228,000 |
| 5 | 178,100 | 199,200 | 222,600 | 204,600 | 218,700 | 217,000 | 213,700 |
| 6 | 170,900 | 187,900 | 210,300 | 193,100 | 207,000 | 205,900 | 202,400 |

| 7 | 162,200 | 177,900 | 203,500 | 186,900 | 200,300 | 198,900 | 196,500 |
| 8 | 160,000 | 172,800 | 195,100 | 179,700 | 192,500 | 191,000 | 188,600 |
| 9 | 154,700 | 169,900 | 192,600 | 176,700 | 189,200 | 187,600 | 185,600 |
| 10 | 150,600 | 176,100 | 199,000 | 181,400 | 193,100 | 191,800 | 189,200 |

0010413

# EXHIBIT 30

2020 CBAMS Focus Groups – Audience Summary Report
*AIAN*



| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Jennifer Miller-Gonzalez, Jenna Levy, Sarah Evans, Michael Gray, Gerald Gray | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: American Indian/Alaskan Native (AIAN)

Location 1: [D, NM] – [March, 2018]: 2 groups
Location 2: [D, AK] – [March, 2018]: 2 groups
Location 3: [D, SD] – [March, 2018]: 2 groups

### DEMOGRAPHIC SUMMARY OF SEATED GROUPS

| | | [D, NM] | [D, AK] | [D, SD] |
|---|---|---|---|---|
| | **TOTAL SEATED** | **16** | **12** | **13** |
| AGE | 18-24 | 4 | 0 | 2 |
| | 25-34 | 3 | 0 | 5 |
| | 35-54 | 9 | 12 | 6 |
| GENDER | Male | 8 | 6 | 6 |
| | Female | 8 | 6 | 7 |
| EDUCATION | HS or Less | 3 | 5 | 8 |
| | Some College | 6 | 4 | 4 |
| | College + | 7 | 3 | 1 |
| INCOME | <$15K | 4 | 2 | 6 |
| | $15-$29K | 0 | 3 | 4 |
| | $30K + | 12 | 7 | 3 |
| CHILDREN | No Children | 9 | 10 | 3 |
| | With Children (<5 years of age) | 1 | 1 | 7 |
| | With Children (6+ years of age) | 6 | 1 | 3 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 8 | 9 | 9 |
| | >2 Adults in Household | 8 | 3 | 4 |
| TRIBES PRESENT | [D: TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE, TRIBE] | | | |

*Note: All demographics are self-reported.


EXHIBIT
Aboud 24
10-5-18DMB

1

TeamY&R

## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**VARIED KNOWLEDGE OF THE CENSUS:** AIAN audiences across all three regions – New Mexico, Alaska, and South Dakota – express some interest completing the census, but vary in their understanding of its use and applications. While the older generations are knowledgeable of the census and its uses based on previous experiences, their younger counterparts are less so.

**DESIRE TO KNOW MORE ABOUT THE CENSUS:** Across all groups, there is a desire to learn more about the Census and its process, applications, and impact on them. Moreover, some would like to know what the Census Bureau is and what it does with census information. Participants posit more people would participate if there were an education campaign that clearly provides such information.

**LOW MOTIVIATION TO SELF-RESPOND:** There is a low level of motivation to participate in the census. While most participants claim they would fill out the form, there is a noticeable lack of interest in doing so. Yet at least one person in each group understands that Census numbers are used when applying for grants, which makes the Census important and whips up some enthusiasm for participation. The prospect of job creation due to the census also piques people's interest, as some respondents remember previous efforts to hire enumerators locally.

**COMMUNITY DEFINITION IS NOT CONSISTENT:** AIAN respondents vary in their definition of community. For example, when discussing their personal definitions of community, participants of different generations and more urban groups diverge in the extent to which their ethnicity and connection to their tribe define their community. Despite this variation, all would like to see messages targeted to them.

**ENUMERATORS AS ADVOCATES:** Participants prefer to know and relate to their enumerators, especially on reservations.  Many knew an enumerator or were enumerators themselves, and those individuals appeared more knowledgeable about the census. Some say they participated because they knew the person at the door.  In these cases, some report calling their neighbors to encourage them to participate.

**SAFETY AND SECURITY CONCERNS:** As seen in other audiences, safety and security are a concern for AIAN peoples. Respondents cite fear when talking about "strangers" approaching their door, noting they would prefer that person to be from the neighborhood. Some outsiders, especially those from the government, are met with suspicion and fear. Trusted voices that could further reduce concerns. However, these figures or not tribal leaders or elected officials but rather those in their "communities", either their home or where they live. Despite concerns about security, many are interested in mobile and online methods of participating, as they view these as more accessible. That interest, however, depends on knowing what the Census is and the processes involved.

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

*Simson L. Garfinkel*

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26



| Title: Audience Summary Report | Date: [May, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Sarah Evans, Valeria Ojeda-Avitia | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Black/African-American

Location 1: Detroit, MI – [April, 2018]: 2 groups

Location 2: [D, AL] – [April, 2018]: 2 groups

### DEMOGRAPHIC SUMMARY

| | TOTAL SEATED | Detroit, MI 14 | [D, AL] 15 |
|---|---|---|---|
| AGE | 18-24 | 4 | 4 |
| | 25-34 | 3 | 5 |
| | 35-54 | 4 | 3 |
| | 55+ | 3 | 3 |
| GENDER | Male | 5 | 7 |
| | Female | 9 | 8 |
| EDUCATION | HS or Less | 7 | 9 |
| | Some College | 7 | 6 |
| INCOME | <$15K | 2 | 8 |
| | $15-$29K | 9 | 6 |
| | $30K + | 3 | 1 |
| CHILDREN | No Children | 9 | 10 |
| | With Children (<5 years of age) | 1 | 2 |
| | With Children (6+ years of age) | 4 | 3 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 7 | 11 |
| | >2 Adults in Household | 7 | 4 |
| RACE | Black/African-American | 14 | 15 |
| | White, not Hispanic (NH) | 0 | 0 |

*Note: All demographics are self-reported.

1

0013027



## Emerging Themes

*Note to reader: This summary report is based on notes taken by observers in the course of focus group research. These observations are provisional, and in some cases are reliant on the interpretation of a foreign-language translator. Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis, and formal findings will follow. Reviewers should avoid drawing conclusions about any audience group until delivery of the formal analysis.*

**DISTRUST OF GOVERNMENT IS WIDESPREAD:** Among respondents, there appears to be a deep-seated distrust of the motivations of government to gather personal and household information. The U.S. Census Bureau is being lumped into a problematic 'government' frame of reference - along with actors like the IRS and the police, who are perceived as threats. A clear "Us" vs. "Them" mentality about the relationship between the black community and the government was extended towards the Bureau as well.

**UNCERTAINTY & SKEPTICISM OF CENSUS PURPOSE:** While respondents generally understood that the basic function of the US Census Bureau is in keeping an accurate count of the national population, doubts remained about the exact purpose and use of personal data. This led participants to claim feelings of suspicion and anxiety. Multiple respondents discussed the Census' role as one of an "investigatory" nature – aimed at surveying and controlling community behavior.

**LACK OF TANGIBLE RESULTS FROM CENSUS NOTED:** When defining key motivators to fill out the census form, multiple respondents were unclear on how the census had ever made a meaningful difference in their life – even after being informed of its uses. Respondents were unwilling to believe individuals simply telling them that it was a fact. They were adamant in seeing for themselves how it had made a difference with clear outcomes – such as funding increases, resource development, and quality of life improvements.

**RESPONDENTS SEEK IMPROVEMENT FOR THEIR COMMUNITIES:** While skepticism was significant in all the groups we surveyed, there was still an optimistic focus from respondents to try and improve their communities. Typically self-defined by geographic and racial signifiers, respondents stated strong connection to their local communities, and were interested in hearing how the Census could have a positive ample effect on them.

**TRUST BUILT THROUGH SHARED EXPERIENCE AND UNDERSTANDING:** Multiple respondents expressed an idea that trust is most easily built with individuals who share the same background as themselves. As we observed, the U.S. Census Bureau was seen by many as an alien institution – lacking the ability to relate, care, or advance the interest of the black community. There was interest in knowing more about who the Bureau is and in turn showing the connective tissue and empathy present within the Bureau itself.

0013028

**2020 CBAMS Focus Groups – Audience Summary Report**
Black/African-American



## Census Observations

*Note to reader: This is a place for Census to include notes on themes and areas of interest prior to formal analysis by Team Y&R.*

**APPROVAL INFORMATION**

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
Chinese (Mandarin and Cantonese)



| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Jennifer Miller-Gonzalez, Jenna Levy, Sarah Evans, | Team Y&R Approver: Ketzirah Lesser |
| **Background:** This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Chinese (Mandarin and Cantonese)

**Location 1:** New York, NY – [March, 2018]: 2 groups

**Location 2:** Los Angeles, CA – [April, 2018]: 2 groups

## DEMOGRAPHIC SUMMARY

| | | New York, NY | Los Angeles, CA |
|---|---|---|---|
| | **TOTAL SEATED** | **16** | **15** |
| AGE | 18-24 | 4 | 3 |
| | 25-34 | 2 | 3 |
| | 35-54 | 5 | 5 |
| | 55+ | 4 | 4 |
| GENDER | Male | 6 | 6 |
| | Female | 9 | 9 |
| EDUCATION | HS or Less | 9 | 9 |
| | Some College | 4 | 5 |
| | College + | 2 | 1 |
| INCOME | <$15K | 5 | 5 |
| | $15-$29K | 6 | 5 |
| | $30K + | 4 | 5 |
| CHILDREN | No Children | 8 | 8 |
| | With Children (<5 years of age) | 1 | 2 |
| | With Children (6+ years of age) | 6 | 5 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 3 | 4 |
| | >2 Adults in Household | 12 | 11 |
| GENERATION | First (1st) Generation | 9 | 13 |
| | 1.5 Generation | 7 | 2 |

*Note: All demographics are self-reported.

1

APPROVED BY DRB 2018.09.26

**2020 CBAMS Focus Groups – Audience Summary Report**
Chinese (Mandarin and Cantonese)


TeamY&R

## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**CONCERN WITH FRAUD AND SCAMS**: Many Chinese respondents were weary of potential fraud and scams associated with providing personal information. Thus, they wanted to be certain about the veracity of census forms, written communications and potential official visitors. There appears to be an acute skepticism about electronic communications, which makes them more susceptible to dismiss it out of hand, compared with mailed forms (also tied to greater trust of the US Postal Service). This sense is more prevalent with older respondents.

**CITIZENSHIP STATUS TO AFFECT RESPONSE RATES**: Many participants considered that their personal intent to fill out the form would not change with the addition of a question asking legal status, but said individuals who are undocumented – who they may or may not know – would be hesitant to submit their status. However, unprompted awareness of the addition of the question was relatively low among this group as compared to others in the study.

**DISCOMFORT REPORTING ON OTHERS:** This audience expressed discomfort in sharing private information of those who are not their immediate family, such as extended family members, friends, and co-habitants on the census form. This was consistent across the four focus groups.

**COMMUNITY BENEFITS SERVE AS PRIMARY MOTIVATOR TO SELF-RESPOND:** Participants were most motivated to self-respond to the census due to the census' direct connection to funding to improve their communities. Within their communities, it is beneficial improvements for the very young (e.g. school-aged) and old (i.e., seniors) that elicit the most motivation among respondents.  Participants across both locations were aware of the opportunity to gain greater benefits for their community, such as improved infrastructure and housing, through responding to the Census. Less practical notions – such as ethnic pride, political representation, and having voice heard – are not as compelling motivators since they do not drive tangible outcomes for these communities.  In addition, since many participants had varying grasps about Census outcomes, the more they understood how the Census drove resources and services to any given community, the greater they felt compelled to participate.

**MOTIVATED BY RESPONSIBILITY FOR ACCURATE COUNT:** Many participants cited completing the census form as an important sense of duty and responsibility as residents as the U.S. to contribute to an accurate count. Similar to casting a vote or doing your taxes, respondents were motivated to complete their census form as a way to be a law-abiding citizen. The idea of having an accurate count in the Census as a critical instrument for the U.S. government to make policy and prioritize spending made a great deal of practical sense to many Chinese participants.  There were ample reference points cited for similar census taking activities in their native country.

0013031

2020 CBAMS Focus Groups – Audience Summary Report
Chinese (Mandarin and Cantonese)

*Team***Y&R**

**CHINESE LANGUAGE ON FORMS IS IMPORTANT TO PARTICIPATION:** Chinese participants stated that easy and open access to Chinese language materials is an important factor to promote completion of the census form in their community. Without the opportunity to review such materials, respondents claimed that they would face both confusion and skepticism when trying to complete the census effectively. Not only does it serve a practical purpose by making it easier to read, but also the presence of Chinese-language communications in an official government notice elevates the emotional importance of that form and makes them feel their inclusion becomes very important.

## Census Observations

*Note to reader: This is a place for Census to include notes on themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

0013032

APPROVED BY DRB 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
*Low Internet Proficiency*



| Title: Audience Summary Report: Low Internet Proficiency | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Jenna Levy, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |

**Background:** This document provides a summary of audience-specific focus group findings and key themes that will be used to inform the 2020 Census communications campaign.

# Audience Summary Report: Low Internet Proficiency

**Location 1**: [D, NM] – [March, 2018]: 2 groups

**Location 2**: Memphis, TN – [March, 2018]: 2 groups

|  |  | [D, NM] | MEMPHIS, TN |
|---|---|---|---|
|  | **TOTAL SEATED** | 16 | 15 |
| AGE | 35-54 | 4 | 9 |
|  | 55+ | 12 | 6 |
| GENDER | Male | 7 | 7 |
|  | Female | 9 | 8 |
| EDUCATION | HS or Less | 3 | 8 |
|  | Some College | 9 | 7 |
|  | College + | 4 | 0 |
| INTERNET USAGE | Once a week | 8 | 2 |
|  | Less than once a week | 8 | 8 |
|  | Less than once a month | 0 | 5 |
| RACE | White | 11 | 7 |
|  | African American/Black | 0 | 0 |
|  | Hispanic | 5 | 0 |
|  | Other | 0 | 8 |
| INCOME | <$15K | 1 | 5 |
|  | $15-$29K | 4 | 6 |
|  | $30K + | 11 | 4 |
| CHILDREN | No Children | 7 | 13 |
|  | With Children (<5 years of age) | 0 | 0 |
|  | With Children (6+ years of age) | 1 | 2 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in HH | 13 | 13 |
|  | >2 Adults in HH | 3 | 2 |

*Note: All demographics are self-reported.

0013033

TeamY&R

## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**APATHY TOWARD CENSUS:** Low internet proficient audiences in both Memphis and [D, NM] have a general sentiment of apathy when it comes to the census, driven by a lack of understanding of how the census affects their lives and a perceived lack of transparency to both the structure and future applications of the form. This lack of understanding leads participants to guess what types of information to provide, such as whether or not one has to provide their Social Security Number or net worth, or if pets are included.

**SKEPTISIM TOWARDS THE BENEFITS OF CENSUS:** Participants in both markets feel the census could benefit communities, but have not seen tangible results in their own communities or families. Respondents expressed a preference for simple, clear, and evidence-based reasons to fill out the form.

**ABILITY TO COMPLETE ONLINE IS A POTENTIAL BARRIER:** The ability to complete the census online is a potential barrier to this audience specifically due to lack of access, understanding, and interest. Some in both locations say they are interested, but would require help from internet-savvy children or the public library. Others say they would prefer to complete it on paper, or even over the phone by calling into a 1-800 number when offered that option.

**SAFETY CONCERNS ONLINE:** Safety and security online is a heightened concern. Although these audiences display anticipated skepticism around submitting their Census forms online, they are willing to work with trusted members of their community and family to still submit their forms digitally. Community centers and libraries are also seen as viable venues to provide support for those who need help filling out the form. While some participants do not use the internet at all, others use it sometimes and even feel that by 2020, they could be using it more often.

**SELF-RESPONSE TO PREVENT ENUMERATION:** Participants have concerns with strangers knocking on their doors, and many say they would self-respond by filling out a paper copy of the form (or online with assistance) if it meant keeping enumerators off their property. Multiple respondents say they did not knowing if the person knocking at their door was legitimate, while others are worried about potentially fraudulent enumerators. Participants are unsure how to identify a legitimate enumerator, leading to general concerns about legitimacy.

**PROVIDE CLEAR INSTRUCTIONS FOCUSED ON USABILITY:** While their level of internet proficiency is low, respondents note certain ways to increase both usability and ease of completion. Participants in [D, NM] say an online option could only work for them if it was easy-to-use, with large font and navigable components.

0013034

APPROVED BY DRB 2018-09-26

**2020 CBAMS Focus Groups – Audience Summary Report**
*Low Internet Proficiency*

Team **Y&R**

## Census Response

*Note to reader: This is a place for Census to include notes on themes and areas of interest prior to formal analysis by Team Y&R.*

**APPROVAL INFORMATION**

Approved by DRB

Decision #: **CBDRB-FY18-511**

Simson L. Garfinkel

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

0013035

2020 CBAMS Focus Groups – Audience Summary Report
*MENA*



| Title: MENA Audience Summary Report | Date: [May, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: Valeria Ojeda-Avitia, William Fernandez, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Middle East North African

**Location 1:** Los Angeles, CA – [April, 2018]: 2 groups

**Location 2:** Detroit, MI – [April, 2018]: 2 groups

| | | Los Angeles, CA | Detroit, MI |
|---|---|---|---|
| | **TOTAL SEATED** | **16** | **15** |
| AGE | 18-24 | 3 | 1 |
| | 25-34 | 5 | 6 |
| | 35-54 | 5 | 6 |
| | 55+ | 3 | 2 |
| GENDER | Male | 8 | 7 |
| | Female | 8 | 8 |
| EDUCATION | HS or Less | 3 | 3 |
| | Some College | 4 | 6 |
| | College + | 9 | 6 |
| INCOME | Less than $30K | 1 | 6 |
| | $30-$35K | 4 | 5 |
| | $35-$75K+ | 11 | 4 |
| CHILDREN IN HH | No Children | 15 | 12 |
| | With Children (<5 years of age) | 1 | 2 |
| | With Children (6+ years of age) | 0 | 1 |
| # OF ADULTS IN HH | 1-2 Adults in Household | 11 | 9 |
| | >2 Adults in Household | 5 | 6 |
| ETHNICITY | Middle Eastern | 16 | 15 |
| ANCESTRY | Iraqi, Yemeni, Lebanese | 4 | 13 |
| | Iranian | 6 | 2 |
| | Egyptian | 6 | 0 |

*Note: All demographics are self-reported.*

0013036



## Emerging Themes

*Note to reader: This summary report is based on notes taken by observers in the course of focus group research. These observations are provisional, and in some cases are reliant on the interpretation of a foreign-language translator. Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis, and formal findings will follow. Reviewers should avoid drawing conclusions about any audience group until delivery of the formal analysis.*

**OVERARCHING SENSE OF FEAR AND UNCERTAINTY DUE TO THEIR ETHNICITY:** Participants described feeling an increase in general fear and sadness due to their ethnicity. Many participants expressed that the rhetoric and policies directed against those of Middle Eastern and North African descent in the national political sphere had trickled down to their everyday lives, with some reporting instances of discrimination and prejudice. In their discussions of the citizenship question, participants viewed its inclusion as an indicator that things were not going well for people "like them." While the female-only discussions centered largely on feeling fear and distrust of the government and the census, these themes were not as prevalent in the male groups.

**GENERAL DISTRUST OF GOVERNMENT:** Several of the male participants seemed angry at what they perceive is happening in the country and government, unrelated to the census. When the moderators defined the census' promise of confidentiality, both groups stated they did not believe it. Across all the groups, they were concerned that while their data is confidential now, there is no guarantee that it will not be used against them in the future. In Los Angeles, participants said they worry group level demographic data could be used to keep funding sources away from their communities. Older participants across both female and male groups in Los Angeles felt the census is inaccurate because they know of people in their communities who do not participate. Another manifestation of distrust and fear was participants' tendency to want to avoid anyone who would come to their homes whom they did not know previously.

**ASPIRATIONS FOR ETHNIC REPRESENTATION AND RECOGNITION:** Both groups in Los Angeles made a connection to ethnicity when defining their community. A major motivator for this audience was representation. While they distrust their government, they are still willing to respond to the census. Across all groups, some participants cited the need to protect their community, which they consider more vulnerable in the current political environment, as a driver of their participation.

**SENSE OF ADVANCEMENT AND DESIRE FOR MORE PROGRESS**: Throughout the discussions for all the groups, there was a desire to make things better for the future, even if their personal community did not have a purely positive outlook. In Detroit, participants who were naturalized as adults expressed a feeling of civic duty to participate. Other motivators that resonated with the groups included resources for education and funding for their communities. In both female groups, some participants mentioned they were very proud of how far women had come in their communities, and some women in Detroit discussed their community involvement, specifically with formal ethnic organizations.

0013037

APPROVED BY DRB 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
*MENA*

*Team*Y&R

## Census Observations

*Note to reader: This is a place for Census to include notes on observed themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

*Simson L. Garfinkel*

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
*Native Hawaiian and Pacific Islander (NHPI)*



| Title: Native Hawaiian and Pacific Islander (NHPI) Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: Valeria Ojeda-Avitia, Jennifer Miller-Gonzalez, Jenna Levy, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. ||

## Audience Summary Report: Native Hawaiian and Pacific Islander

**Location 1:** Los Angeles, CA – [April, 2018]: 2 groups

**Location 2:** Honolulu, HI – [April, 2018]: 2 groups

|  |  | Los Angeles, CA | Honolulu, HI |
|---|---|---|---|
|  | **TOTAL SEATED** | **14** | **14** |
| AGE | 18-24 | 2 | 2 |
|  | 25-34 | 3 | 2 |
|  | 35-54 | 7 | 3 |
|  | 55+ | 2 | 7 |
| GENDER | Male | 8 | 5 |
|  | Female | 6 | 9 |
| EDUCATION | HS or Less | 4 | 7 |
|  | Some College | 5 | 5 |
|  | College + | 5 | 2 |
| INCOME | Less than $30K | 3 | 7 |
|  | $30-$35K | 4 | 4 |
|  | $35-$75K+ | 7 | 3 |
| CHILDREN IN HH | No Children | 10 | 8 |
|  | With Children (<5 years of age) | 3 | 4 |
|  | With Children (6+ years of age) | 1 | 2 |
| # OF ADULTS IN HH | 1-2 Adults in Household | 5 | 9 |
|  | >2 Adults in Household | 9 | 5 |
| ETHNICITY | Native Hawaiian | 5 | 6 |
|  | Micronesian Island | 3 | 4 |
|  | Polynesian/Melanesian Island | 6 | 4 |

*Note: All demographics are self-reported.

1

0013039

2020 CBAMS Focus Groups – Audience Summary Report
*Native Hawaiian and Pacific Islander (NHPI)*



## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**WIDE VARIETY OF PERSPECTIVES:** Participants in these focus groups illustrated the diversity of the Native Hawaiian and Pacific Islander perspectives. While all participants represented a mix of Native Hawaiian, Polynesian, and Micronesian ethnicities, the first Los Angeles group seemed to be more in engaged with their cultural heritage, while the second Los Angeles group was more Americanized and less connected to their cultural backgrounds. In [D, HI], participants did not discuss their cultural heritages as much, likely due to living in the islands. The first Los Angeles group expressed the importance of non-profit organizations who serve the NHPI population and how some non-profits are considered trusted voices in this community. The diversity of participants offers an important reminder of the breadth of the NHPI audience.

**LACK OF KNOWLEDGE ABOUT LOCAL BENEFITS ARE A BARRIER:** Many were unaware of the benefits of the census, though younger participants in [D, HI] seemed to be more aware of the financial benefits that may come from the census, such as scholarships. Participants noted this lack of understanding was a reason why they and others may not participate. After discussing the various ways their communities could benefit from the census in particular, many of those who originally said they would not fill out the census shifted to they would if it were held today. Participants in [D, HI] generally feel their communities have been suffering from higher crime rates and rising costs of living, and tend to believe that filling out the census could bring assistance.

**MULTI-GENERATIONAL HOUSING IS A POTENTIAL BARRIER:** Participants in [D, HI] expressed concerns about sharing information about the number of people who live in their households. It is a common practice on the islands to live with extended family, or to have more people living in their house than are listed on the lease or official documents. These concerns present a potential barrier for the NHPI audience, as some participants were worried about landlords finding out the number of people living in the residence.

**SKEPTICISM AROUND CITIZENSHIP QUESTION:** Participants were skeptical of the citizenship question, and tended to recognize it as a barrier for others, such as Hispanics or Pacific Islanders with less clear immigration status. They also noted that this question could influence all minorities, not just those who are undocumented.

**ETHNIC PRIDE IS AN IMPORTANT MOTIVATOR FOR SOME:** Ethnic pride seemed to be a motivator for filling out the form. In the first Los Angeles group, participants associated community strongly with ethnic identity and cultural values and traditions. Participants in this group said they wanted to be counted so they can represent their community and pave the way for future generations. In the [D, HI] groups, participants regarded ethnic pride as a motivator because it would give voice to their culture; however, it was not the leading factor for those groups.

0013040

APPROVED BY DRB 2018-09-26

**2020 CBAMS Focus Groups – Audience Summary Report**
*Native Hawaiian and Pacific Islander (NHPI)*



## Census Observations

*Note to reader: This is a place for Census to include notes on observed themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26



Team Y&R

| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Jenna Levy, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

# Audience Summary Report: Rural

**Audience:** Rural
**Definition:** Lives in a Zip Code Tabulation Area (ZCTA) identified as 90%+ rural in the 2010 Census.
**Location:** [D, VA] – [March, 2018]: 2 Groups

| | | [D, VA] |
|---|---|---|
| | **TOTAL SEATED** | 15 |
| AGE | 18-24 | 1 |
| | 25-34 | 3 |
| | 35-54 | 11 |
| GENDER | Male | 4 |
| | Female | 11 |
| EDUCATION | HS or Less | 6 |
| | Some College | 5 |
| | College + | 4 |
| RACE/ETHNICITY | White, not Hispanic (NH) | 15 |
| INCOME | <$15K | 7 |
| | $15-$29K | 3 |
| | $30K + | 5 |
| CHILDREN IN HOUSEHOLD | No Children | 11 |
| | With Children (<5 years of age) | 3 |
| | With Children (6+ years of age) | 1 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 10 |
| | >2 Adults in Household | 5 |

*Note: All demographics are self-reported.*

0013042

APPROVED BY DBB 2018-09-26

**2020 CBAMS Focus Groups – Audience Summary Report**
*Rural*

 *Team*Y&R

## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**DISTRUST & DISCONNECTION FROM INSTITUTIONS:** Rural participants say they feel disconnected from major government institutions, citing that the quality of life in the region has diminished with no real support from government services. While there are some pockets of their communities that harbor strong collective ties (such as churches, community centers, small businesses), the majority of respondents say they feel their community has declined over the past decade. All participants express their communities have been left behind.

**TRUST IN RELIGIOUS ENTITIES AND LOCAL GOVERNMENT:** Participants in these groups voiced a suspicion of federal government overreach, but are not as suspicious of local government programs. Multiple participants state that the most trusted voice in their community is their mayor or locally elected officials. Rural participants also mention that churches and local government are where they can find trusted information and help to provide a sense of community rooted in shared beliefs.

**RECOGINITION OF THE ROLE OF CENSUS:** While not universal, rural respondents generally understand the importance of the census and its role in supporting their communities. They recognize that ensuring a full, fair and accurate census count ensures that their community has fair representation and that they can gain public resources that are made available for economically disadvantaged areas.

**SENSE OF DUTY VS. DATA SECURITY:** All participants say that they would fill out the census, primarily out of a sense of duty to their country. However, their patriotism is also paired with general skepticism about the motivations and applications of the data collection effort. Multiple respondents also cite mishandling of data by the government as a leading deterrent to filling out the form. Furthermore, they say they have heard multiple "scams" about fake U.S. Census Bureau staff trying to collect their information – thus making it harder for the Bureau to develop long-term trust with rural communities.

**MOTIVATED BY FUNDING AND COMMUNITY RESOURCES:** Access to funding for community improvements is nearly universal in its popularity as a motivator to fill out the form. As participants connected the dots between census data and potential benefits it has for infrastructure, health, and education, they felt hopeful for how the census could help their communities.

**AVOID OVERPROMISING BENEFITS:** When evaluating motivators for filling out the form, however, Rural participants are concerned the census may end up overpromising on the effects it has on their communities. Benefits that can be backed up by clear case studies in their communities that were possible thanks to census data are preferred.

## Census Observations

0013043

2020 CBAMS Focus Groups – Audience Summary Report
*Rural*

TeamY&R

*Note to reader: This is a place for Census to include notes on observed themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
*Spanish, U.S. Mainland*



| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: Valeria Ojeda-Avitia, Jenna Levy, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Spanish, U.S. Mainland

**Location 1:** New York, NY – [March, 2018]: 1 group

**Location 2:** Los Angeles, CA – [April, 2018]: 1 group

**Location 3:** Houston, TX – [April, 2018]: 2 groups

### DEMOGRAPHIC SUMMARY

| | | New York, NY | Los Angeles, CA | Houston, TX |
|---|---|---|---|---|
| | **TOTAL SEATED** | **8** | **8** | **16** |
| AGE | 18-24 | 2 | 1 | 2 |
| | 25-34 | 0 | 2 | 3 |
| | 35-54 | 4 | 4 | 8 |
| | 55+ | 2 | 1 | 3 |
| GENDER | Male | 5 | 3 | 8 |
| | Female | 3 | 5 | 8 |
| EDUCATION | HS or Less | 2 | 4 | 12 |
| | Some College | 4 | 3 | 4 |
| | College + | 2 | 1 | 0 |
| INCOME | $15-$30K | 3 | 2 | 5 |
| | $30-$35K | 2 | 4 | 10 |
| | $35-$75K+ | 3 | 2 | 1 |
| CHILDREN | No Children | 4 | 2 | 4 |
| | With Children (<5 years of age) | 3 | 6 | 9 |
| | With Children (6+ years of age) | 2 | 4 | 8 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 7 | 5 | 5 |
| | >2 Adults in Household | 1 | 3 | 11 |
| GENERATION | 1st (First) Generation | N/A | N/A | N/A |
| | 1.5 Generation | N/A | N/A | N/A |
| ANCESTRY PRESENT | Mexican | 0 | 5 | 11 |
| | South American | 3 | 1 | 0 |
| | Central American | 0 | 2 | 5 |
| | Dominican | 2 | 0 | 0 |
| | Puerto Rican | 3 | 0 | 0 |

*Note: All demographics are self-reported.

0013045



## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**RECENT ARRIVALS ARE MORE FEARFUL TOWARD THE CENSUS THAN THOSE WHO ARE MORE ACCULTURATED:** Participants who had more recently arrived in the U.S. seemed to have the greatest concerns about filling out the census form. These participants honestly expressed fears of participating in the census given their or others immigration status. Even if they personally are citizens or legal residents, they said that filling out the census form can adversely affect their relatives or people in their community who do not have a secure immigration status. Participants who more recently arrived in the U.S. (and those participants who know recent arrivals) are also strongly against enumerators coming to the door because of fear of deportation, and said it would not increase their motivation to participate. Conversely, those who have lived in the United States for a longer period actually preferred to be addressed by enumerators.

**FEAR OF MISUSE OF DATA BY THE GOVERNMENT:** Participants were highly suspicious of how the data will be used once collected, particularly as related to immigration. They said while their data may be protected now, there is no guarantee that it will not be used against them in the future. Most participants stated the government will use and share individual level data, rather than aggregate level data. Additionally, while there were suggestions of trusted voices, there does not seem to be a single trusted voice that could mitigate their distrust of the government to uphold the promise of confidentiality. Participants said it will take more than one person to provide them information about the census and how the government will use the data. Participants were surprised to hear and expressed an interest in learning more about the legal and financial penalties associated with a government employee misusing data.

**THE CITIZENSHIP QUESTION IS A DETERMINING FACTOR FOR PARTICIPATION:** All four Spanish, U.S. Mainland focus groups took place after the March 27, 2018 announcement that the 2020 Census will include a question on citizenship. Participants in all locations mentioned the citizenship question before the moderator asked about, except for Houston Group 1 participants. Most participants said that though they personally are citizens or legal residents and are not afraid to answer the citizenship question, they know many others who will not fill out the question or the form altogether out of fear. While all participants expressed the desire to be counted, fear of deportation outweighs any benefit.

**EDUCATION IS AN IMPORTANT MOTIVATOR:** Most participants knew what the census is and generally how it benefits communities from their countries of origin, aside from participants in Houston Group 1 who did not know anything about the census. Even with their baseline knowledge, participants wanted to learn more about the census, specifically about how it directly affects their community. Participants said they must understand the benefits in order to participate. With all the barriers to participation discussed, participants urged the U.S. Census Bureau to proactively provide an education and awareness effort.

## Census Observations

*Note to reader: This is a place for Census to include notes on observed themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

APPROVED BY DBB 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
Spanish – Puerto Rico


*Team*Y&R

| Title: Spanish, Puerto Rico Audience Summary Report | Date: [May, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: Valeria Ojeda-Avitia, Sarah Evans | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Spanish, Puerto Rico

Location 1: [D, PUERTO RICO] – [April, 2018]: 2 groups

Location 2: [D, PUERTO RICO] – [April, 2018]: 2 groups

| | | [D, PUERTO RICO] | [D, PUERTO RICO] |
|---|---|---|---|
| | TOTAL SEATED | 16 | 16 |
| AGE | 18-24 | 4 | 3 |
| | 25-34 | 4 | 4 |
| | 35-54 | 6 | 6 |
| | 55+ | 2 | 3 |
| GENDER | Male | 5 | 9 |
| | Female | 11 | 7 |
| EDUCATION | HS or Less | 8 | 5 |
| | Some College | 6 | 6 |
| | College + | 2 | 5 |
| INCOME | Less than $30K | 15 | 14 |
| | $30-$35K | 1 | 2 |
| | $35-$75K+ | 0 | 0 |
| CHILDREN IN HH | No Children | 13 | 11 |
| | With Children (<5 years of age) | 2 | 1 |
| | With Children (6+ years of age) | 1 | 4 |
| # OF ADULTS IN HH | 1-2 Adults in Household | 14 | 10 |
| | >2 Adults in Household | 2 | 6 |
| ETHNICITY | Hispanic | 16 | 16 |

*Note: All demographics are self-reported.*

0013047



## Emerging Themes

*Note to reader: This summary report is based on notes taken by observers in the course of focus group research. These observations are provisional, and in some cases are reliant on the interpretation of a foreign-language translator. Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis, and formal findings will follow. Reviewers should avoid drawing conclusions about any audience group until delivery of the formal analysis.*

**POST-MARIA, PUERTO RICO HAS CHANGED FUNDAMENTALLY:** Discussions across all groups were driven by a "pre-Maria" and "post-Maria" narrative. In particular, the concept of community has evolved to be more inclusive - all participants mentioned that they found their community stronger and closer knit than before.

**INFRASTRUCTURE LIMITATIONS AND CONFUSION IS A SIGNIFICANT BARRIER:** When discussing their definition of household, the participants mentioned they need clarification on who fills out the form, as there could be multiple families at one address due to displacement post-Maria. In [D, PUERTO RICO], participants referenced the countryside part of Puerto Rico and mentioned Highway Contract (HC) boxes as a potential source of confusion. Multiple families receive mail to one address, and there may need to be clarification on who is to fill out the form.

**PREFERED METHOD OF CONTACT IS NOT UNIVERSAL:** Feelings are mixed about the preferred method of contact. Some participants were not against an enumerator coming to their door and even mentioned that it would help ensure accuracy of the census. These same respondents mentioned, however, that they preferred to be notified that someone would be coming in advance. Some participants mentioned that having an enumerator come to their house is not necessarily safe given the rising amount of fraud throughout the island. If an enumerator were to come to their door, they would need to be clearly identified as a Census worker. Other participants mentioned the possibility of completing the census at key locations, such as shopping malls (similar to the income tax returns centers Treasury Department establishes during tax season). *\*Note: Puerto Rico is an enumerate only location.*

**LIMITED REACTION TOWARD CITIZENSHIP QUESTION:** The participants had neutral reactions in [D, PUERTO RICO] regarding the possible inclusion of a citizenship question. A handful of participants in [D, PUERTO RICO] had associated the question with the Trump administration. The participants know that they are citizens so they do not feel targeted by the question; however, all participants said that those who may be worried about deportation could lie in their response.

**PUERTO RICANS WANT TO BE COUNTED:** This audience had minimal to no personal frustrations with the reason for the census; rather, they spoke about the importance of filling it out in order to ensure that the federal government provides resources to the island. Participants said that there is no reason *not* to fill out the form: it would help Puerto Ricans receive aid, and it is their duty. All participants said they were willing to fill out the form.

**DIGITAL IS A PREFERRED MODE OF EDUCATION AND OUTREACH:** Many referenced that a social media campaign would be the best way to educate the Puerto Rican population about the census. Many participants referenced previous digital campaigns, such as a "How to Vote" campaign, as effective and trustworthy sources of useful information. Practically all of the older participants indicated their preference to receive information through traditional media, namely tv, print, and radio. None of the participants mentioned post-Maria electricity issues as a barrier to learning more about the census.

0013048

APPROVED BY DRB 2018-09-26

**2020 CBAMS Focus Groups – Audience Summary Report**
Spanish – Puerto Rico



## Census Observations

*Note to reader: This is a place for Census to include notes on observed themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
Vietnamese



*Team*Y&R

| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Jennifer Miller-Gonzalez, Jenna Levy, Sarah Evans, | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Vietnamese

Location 1: New York, NY – [March, 2018]: 2 groups

Location 2: Houston, TX – [April, 2018]: 2 groups

## DEMOGRAPHIC SUMMARY

| | CITY | New York, NY | Houston, TX |
|---|---|---|---|
| | TOTAL SEATED | 14 | 15 |
| AGE | 18-24 | 4 | 2 |
| | 25-34 | 7 | 5 |
| | 35-54 | 2 | 4 |
| | 55+ | 1 | 4 |
| GENDER | Male | 8 | 8 |
| | Female | 6 | 7 |
| EDUCATION | HS or Less | 9 | 8 |
| | Some College | 1 | 6 |
| | College + | 4 | 1 |
| INCOME | <$15K | 2 | 1 |
| | $15-$29K | 4 | 3 |
| | $30K + | 2 | 11 |
| CHILDREN | No Children | 5 | 7 |
| | With Children (<5 years of age) | 0 | 0 |
| | With Children (6+ years of age) | 9 | 8 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 4 | 7 |
| | >2 Adults in Household | 10 | 8 |
| GENERATION | 1st (First) Generation | 11 | 6 |
| | 1.5 Generation | 3 | 9 |

*Note: All demographics are self-reported.

1

0013050

APPROVED BY DBB 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
Vietnamese



## Emerging Themes

*Note to reader: Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis.*

**FEAR OF SCAMS ARE TOP-OF-MIND:** Many Vietnamese respondents were particularly guarded about potential scams surrounding the census. Their concerns are heightened further if this involves direct interactions or visits to their homes by strangers. Respondents claimed that anything done to convey the credibility of any official census communications or personnel will be important to diffuse those concerns. Such forms of credibility could include forms written in Vietnamese, official badges for census enumerators, and government seals and signifiers on all census forms. Additionally, fear of fraud led respondents to alter their desired mode of participation in the census – driven by an aversion of sharing information with another person.

**CITIZENSHIP QUESTION RESPONSE IS MIXED:** While many recognize the practical benefits of completing information related to demographic background, the issue of citizenship made participants wonder about the tenuous legal status that many in their community have and gives them pause in considering the Census. Many focus group participants had not heard the recent news about the possible inclusion of this citizenship question, so there was limited contextual awareness about how the question could be used.

**STRONG SENSE OF DUTY AND DESIRE TO BE COUNTED:** While skepticism around government data collection has been noted among other audiences, many in the Vietnamese audience stated the Census serves as an important tool for documenting and measuring their population growth — that can only serve the community well. Participants expressed that the Census is a tool for helping the community make inroads into the U.S. mainstream.

**WILLING TO GIVE BENEFIT OF THE DOUBT TO GOVERNMENT ON INFORMATION SECURITY:** Many first-generation Vietnamese immigrants are strongly pro-American and predisposed to believing the U.S. government as a benevolent force. Therefore, while many express discomfort about providing certain kinds of private information (income, etc.), they stated the federal government is credible and are willing to give it the benefit of the doubt.

**BUILDING TRUST AND CREDIBILITY THROUGH LANGUAGE:** Many Vietnamese participants see having the ability to read the Census form in their native language as a necessary benefit and chief motivator to participate. They also stated that having the form in Vietnamese is an indicator that the government is serious when it comes to accurately survey the entire Vietnamese community. It alleviated concerns among many participants that the communications would be legitimate.

**CIVIL RIGHTS AS A MOTIVATOR:** While many of the same pragmatic issues, such as community funding, tended to motivate Vietnamese respondents to complete the Census, many were also motivated by civil rights as key issue. They wanted to make sure they are incorporated as part of the same cover of protection that other groups enjoy.

2

2020 CBAMS Focus Groups – Audience Summary Report
Vietnamese

*Team*Y&R

## Census Response

*Note to reader: This is a place for Census to include notes on themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

APPROVED BY DBB 2018-09-26

2020 CBAMS Focus Groups – Audience Summary Report
Young & Mobile



| Title: Audience Summary Report | Date: [April, 2018] |
|---|---|
| Version: 1.0 | Order: 7 |
| Team Y&R Author: William Fernandez, Sarah Evans, Valeria Ojeda-Avitia | Team Y&R Approver: Ketzirah Lesser |
| Background: This document, developed from notes and discussions with observers, provides a summary of audience-specific focus group observations and key themes that will be used to inform the 2020 Census communications campaign. This document is meant to represent preliminary observations, and has not been informed by formal analysis of transcripts. | |

## Audience Summary Report: Young & Mobile

Location 1: Chicago, IL – [April, 2018]: 2 groups

## DEMOGRAPHIC SUMMARY

| | | Chicago, IL |
|---|---|---|
| | TOTAL SEATED | 10 |
| AGE | 18-24 | 10 |
| | 25+ | 0 |
| GENDER | Male | 4 |
| | Female | 6 |
| EDUCATION | HS or Less | 1 |
| | Some College | 6 |
| | College Graduate + | 3 |
| INCOME | <$15K | 1 |
| | $15-$29K | 3 |
| | $30K + | 6 |
| CHILDREN | No Children | 9 |
| | With Children | 1 |
| ADULTS IN HOUSEHOLD | 1-2 Adults in Household | 8 |
| | >2 Adults in Household | 2 |
| RACE | White, not Hispanic (NH) | 6 |
| | Other race groups | 4 |

*Note: All demographics are self-reported.

0013053

*Team*Y&R 

## Emerging Themes

*Note to reader: This summary report is based on notes taken by observers in the course of focus group research. These observations are provisional, and in some cases are reliant on the interpretation of a foreign-language translator. Themes in this summary focus on high-level areas of interest for further analysis upon transcript receipt. Additional areas of interest may emerge during analysis, and formal findings will follow. Reviewers should avoid drawing conclusions about any audience group until delivery of the formal analysis.*

**ISSUES OF RESIDENCY WERE TOP OF MIND:** Respondents throughout the Young and Mobile groups were confused and divided on what qualifies as a "household," based upon part-time, temporary, and informal housing situations. Additional clarity from the U.S. Census Bureau was desired by respondents to help clarify what and whom constituted a "household."

**MEDIA CONSUMPTION PATTERNS WERE DIGITAL-FIRST:** This cohort discussed having distinct media consumption patterns that were very different from previous groups'. None of the participants cited watching network T.V., while they instead preferred streaming and digital alternatives. Media patterns included popular social media and over-the-top (OTT) content providers such as YouTube, Facebook, Instagram, Spotify, and Hulu.

**BORED AND ANNOYED BY TRADITIONAL MESSAGING:** Participants in this audience were highly critical of traditional advertising, feeling as if ads were impersonal, patronizing, and annoying. Instead, they preferred a messaging that was more direct, organic, and personal. Additionally, the medium of the ad or messaging must be relevant to this population and their desire to feel heard.

**A MAJOR EDUCATION CAMPAIGN WILL BE NEEDED:** Experience with the census among this audience is limited - primarily due to their age. While some respondents were aware of the Census, many expressed the need for more information to be communicated to participants about the nature, method, and purpose of the form. With the addition of an online submission option, this need for clear and consistent information was highlighted as an even greater priority.

**ONLINE SUBMISSION IDENTIFIED AS MAJOR BENEFIT:** When informed of the fact that citizens would be able to submit their census forms online for the first time, many respondents were pleased and excited about the option. Citing the ease and convenience of the option, this audience was quite receptive to the feature. Additionally, they were less concerned than other audiences in regards to data privacy and government data collection.

**CIVIC DUTY IDENTIFIED AS A RELEVANT MOTIVATOR:** This audience also demonstrated a clear interest in and connection to a shared sense of civic duty and interest in making an impact in their community. Seen as synonymous with voting, respondents cited the census as an opportunity to support their community and country.

2

0013054

**2020 CBAMS Focus Groups – Audience Summary Report**
Young & Mobile

*Team*Y&R

## Census Observations

*Note to reader: This is a place for Census to include notes on themes and areas of interest prior to formal analysis by Team Y&R.*

APPROVAL INFORMATION

Approved by DRB

Decision #: **CBDRB-FY18-511**

Approved by: Simson L. Garfinkel, Chair, DRB
Approval Date: 2018-09-26

0013055

# EXHIBIT 31

**Understanding the Quality of Alternative Citizenship Data Sources for the 2020 Census[1]**

J. David Brown[2]

Misty L. Heggeness[3]

Suzanne M. Dorinski[4]

Lawrence Warren[5]

Moises Yi[6]

August 6, 2018

[1] We thank career staff and statistical experts within the Bureau who graciously gave their time and effort to review, comment, edit, and make improvements to this document. The analysis, thoughts, opinions, and any errors presented here are solely those of the authors and do not necessarily reflect any official position of the U.S. Census Bureau. All results have been reviewed to ensure that no confidential information is disclosed. The Disclosure Review Board release numbers are DRB-B0093-CDAR-20180621, DRB-B0103-CDAR-20180712, and DRB-B0113-CDAR-20180806. Republication in whole or part must be cleared with the authors.

[2] J. David Brown is a Senior Economist in the Center for Economic Studies at the U.S. Census Bureau and the corresponding author on this paper, 4600 Silver Hill Road, Washington, DC 20233, j.david.brown@census.gov.

[3] Misty L. Heggeness is Senior Advisor for Evaluations and Experiments in the Research and Methodology Directorate at the U.S. Census Bureau.

[4] Suzanne M. Dorinski is a Mathematical Statistician currently on detail with the Social, Economic, and Housing Statistics Division at the U.S. Census Bureau.

[5] Lawrence Warren is an Economist in the Center for Economic Studies at the U.S. Census Bureau.

[6] Moises Yi is an Economist in the Center for Economic Studies at the U.S. Census Bureau.

1

COM_DIS00009833

Abstract

This paper examines the quality of citizenship data in self-reported survey responses compared to administrative records and evaluates options for constructing an accurate count of resident U.S. citizens. Person-level discrepancies between survey-collected citizenship data and administrative records are more pervasive than previously reported in studies comparing survey and administrative data aggregates. Our results imply that survey-sourced citizenship data produce significantly lower estimates of the noncitizen share of the population than would be produced from currently available administrative records; both the survey-sourced and administrative data have shortcomings that could contribute to this difference. Our evidence is consistent with noncitizen respondents misreporting their own citizenship status and failing to report that of other household members. At the same time, currently available administrative records may miss some naturalizations and capture others with a delay. The evidence in this paper also suggests that adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in higher fieldwork costs and a lower-quality population count.

2

COM_DIS00009834

## 1. Introduction

National statistical agencies are charged with collecting and reporting accurate information about society, including individuals, households, and businesses. This information is used to produce official statistics about the demographic composition of persons living in the nation – including information about migration, citizenship, and mobility. For decades, the United States has relied on household survey questionnaires to collect data on migration and immigration status (Census Bureau 2002). Generally, the focus is on whether an individual has lived in that current location for more than one (or five) years, a date for their last move, citizenship status, and year of naturalization. To date, the collection of this information via survey vehicles has been sufficient for general statistical reporting on immigrants living in the U.S.; however, very few studies have examined the extent to which individuals answer these sensitive questions accurately, how inclusion of these questions affects overall response rates, or how item nonresponse on these questions compares to other questions.

In this paper, we study the quality of self-reported citizenship questions by comparing responses in the American Community Survey (ACS), the Census, the Survey of Income and Program Participation (SIPP), and administrative records on citizenship from the Social Security Administration. There are now multiple survey and administrative sources of data to study immigration and citizenship status. We examine the strengths and weaknesses of these sources for the development of future statistics on citizenship status. We focus on both the accuracy and completeness in all options. The alternatives we consider for constructing a count of resident citizens are the following: (A) no change in current data collection, combined with small area estimation using the ACS and administrative citizenship data sources, (B) add a citizenship question to the 2020 Census, (C) obtain citizenship status from administrative records for the entire 2020 Census population, and (D) combine alternatives (B) and (C). Factors to consider when evaluating these alternatives include the quality of the data sources, comprehensiveness and biases in data coverage, cost, and the effects on the quality of the 2020 full population count. We analyze each of these aspects.

We find that discrepancies between survey-collected citizenship data and administrative records are more extensive than discrepancy estimates from previous research. The degree to which persons who are noncitizens in administrative records self-report being citizens in surveys is greater for non-Hispanics than Hispanics. Most of the people with these discrepancies report being citizens from birth or naturalized long ago, regardless of ethnicity. The discrepancy patterns imply that the ACS estimate of the noncitizen share of the population is lower than comparable estimates based on currently available administrative records.

The remainder of the paper is structured as follows. Section 2 provides general background and history of the current issue. Section 3 documents the coverage of survey and administrative record citizenship data. The quality of the data from survey and administrative record sources is analyzed in Section 4. Section 5 contains regression analyses of item response and data quality. Section 6 estimates the effects of inclusion of a citizenship question on survey response rates. Estimates of the citizenship question's effects on the cost and quality of the 2020 Census in general are provided in Section 7. Forecasts of the number of people for whom citizenship is sourced by the 2020 Census

3

COM_DIS00009835

citizenship question, administrative records, and model imputation when using each of the alternatives are given in Section 8. Section 9 concludes.

## 2. Background

### 2.1 History of Citizenship Data Collection through Household Surveys and Censuses

The Census Bureau has collected and preserved citizenship data since 1820 via historical full count censuses, household surveys, and administrative records (AR), but the practice of asking citizenship and migration-related questions on censuses has varied over time. The 1820 and 1830 Censuses asked for a tally of the total number of non-naturalized foreigners in the household. The 1870 Census asked citizenship status of all male persons aged 21 and older (Census Bureau 2002). The federal government did not ask citizenship status during the 1880 Census, but reintroduced it in the 1890 Census, and the question stayed on full-count Census questionnaires through 1950. The 1950 Census was the last full-count Census to ask the citizenship status of every resident in the U.S. if he or she reported a foreign birthplace (Census Bureau 2002).

While the 1960 Census did not ask about citizenship throughout the country, it was reintroduced on the long form (which sampled approximately one-in-six households across the country) in the 1970 Census and remained on the long form until 2000 (Census Bureau 2002). The question never reappeared on the short form after 1950. After the 2000 Census, citizenship data collection moved to the American Community Survey (ACS), which replaced the Census long form. The ACS collects responses from approximately 1.6 percent of households annually (American Community Survey 2016a, American Community Survey 2016b).[7]

Since the advent of the long form and continuing with the ACS, the Census Bureau has focused Census enumeration on obtaining only the data necessary for a concise and condensed full-population count (Weinberg 2011). It also prioritizes the collection of data mandated by Public Law 94-171 (PL94), which instructs the Census Bureau to cooperate with state redistricting offices in support of their efforts to redraw legislative districts in compliance with the Constitution, Supreme Court, and the 1965 Voting Rights Act. The questionnaire asks only the core demographic, race, ethnicity, and housing questions, not including citizenship.

### 2.2 The Citizen Voting Age Population by Race and Ethnicity (CVAP) Table

On December 12, 2017, the Census Bureau received a request from the Department of Justice to include a citizenship question on the 2020 Census of Population and Housing (Department of Justice 2017). The request prompted the Census Bureau to conduct a study of the feasibility and best options for meeting this request. This paper summarizes the technical analysis conducted for alternative options for obtaining citizenship data for the entire population to produce the Citizen Voting Age Population by Race and Ethnicity (CVAP) table at the census block level. CVAP is

---

[7] We calculate this number using American Fact Finder (AFF) Tables B98001 and B25001.

4

COM_DIS00009836

currently produced at the census block-group level using estimates from the five-year American Community Survey (ACS) data.

Since 1975, the Census Bureau has provided population estimates by detailed geography to support redistricting under Public Law 94-171 (PL94). For the 2000 Census, the Citizen Voting Age Population (CVAP) estimates, tabulated at the block-group level, were produced from the long form citizenship question. Since 2011, the CVAP estimates have been tabulated annually at the block-group level from the most recent 5-year ACS data. The 2011 publication was based on the 2005-2009 ACS surveys. These data were released in the same time frame as the 2010 PL94 redistricting estimates.[8] The redistricting data must be released before April 1st of the year following a census under the authority of 13 U.S.C. Section 141.

The difficulty in integrating these two tables for redistricting and enforcement of the Voting Rights Act was cited by the Department of Justice in its December 12, 2017 letter. The Department of Justice requested block-level citizen voting-age population estimates by the U.S. Office of Management and Budget (OMB)-approved race and ethnicity categories[9] directly from the 2020 Census of Population and Housing, which would require the addition of a citizenship question directly onto the full count 2020 Census enumeration form.

### 2.3 Prior Research on Citizenship Data Quality

We build on past research on Census citizenship data quality. Prior studies have suggested that citizenship is inaccurately estimated in Census Bureau surveys. Passel and Clark (1997) document that the 1990 Census and 1996 Current Population Survey (CPS) estimates of the number of naturalized persons are much higher than the numbers from Immigration and Naturalization Services (INS) administrative data.[10] The study suggests that about 75 percent of those who report having lived in the U.S. fewer than five years and being naturalized citizens probably are not citizens, at least at the time of the survey. Furthermore, one-third of longer-resident Central American and Mexican origin individuals who self-reported naturalization were probably not citizens at the time of the survey. These discrepancies were attributed to incorrect reporting, possibly because respondents were confused about their status or had an incentive to misreport it to enumerators and interviewers.

Camarota and Capizzano (2004) conducted focus groups with over 50 field representatives (FRs) for the Census 2000 Supplemental Survey (a pilot for the ACS). FRs reported that foreign-born respondents living in the country illegally or from countries where there is distrust in government were less likely to participate. Some foreign-born respondents failed to list all household members. FRs suspected that some foreign-born respondents misreported citizenship status, and they

---

[8] For more information, see: https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html and https://www.census.gov/rdo/data/2010_census.html .
[9] See Office of Management and Budget (1997).
[10] This comes from Van Hook and Bachmeier's (2013) summary of Passel and Clark (1997).

5

believed this was due to "recall bias, a fear of the implications of certain responses or a desire to answer questions in a socially desirable way."

More recently, Van Hook and Bachmeier (2013) compared 2010 ACS and Office of Immigration Statistics (OIS) naturalizations data, finding that the ACS produced higher naturalization estimates than OIS for those residing in the U.S. less than five years, as well as for longer-resident Mexican-origin persons. Several papers have studied the effects of state immigration laws on the number and locational choices of immigrants (see, for example, Amuendo-Dorantes and Lozano 2014 and 2015, Bohn et al. 2014, Ellis et al. 2014, Good 2013, and Orrenius and Zavodny 2016). They have generally found reductions in the immigrant population after the introduction of these laws.[11] Deterioration in survey data quality during periods of stronger immigration enforcement could help explain the measured reductions. We contribute to the literature on Census citizenship data quality by directly linking Census and household survey data to administrative records. We not only examine the quality of survey-collected citizenship data, but also the effect of including a citizenship question on the quality of other data via their consequences for response rates and nonresponse follow-up.

### 3.1 Survey Coverage

In addition to the full count Census of Population and Housing that collects a limited amount of information on the entire population once every ten years, the Census Bureau also collects information on individuals and households in both legally-mandated and sponsored (reimbursable) surveys. These surveys collect more detailed demographic, social, and economic characteristics of people living in the United States, including information on citizenship status and migration variables.

The Census Bureau currently conducts four surveys that ask citizenship questions. The American Community Survey (ACS), the Current Population Survey (CPS), the American Housing Survey (AHS), and the Survey of Income and Program Participation (SIPP) all collect data on citizenship status. The universe for citizenship questions on these surveys is all persons living in the household. The ACS, CPS, SIPP, and AHS distinguish between citizens born in the United States, those born in U.S. territories, those born abroad to U.S. citizen parents, and those of foreign nativity but naturalized. Additionally, the SIPP asks about more nuanced naturalizations, including becoming a citizen through one's own or a spouse's military service or via adoption by U.S. citizen parents.[12]

To assess the citizenship coverage of existing Census Bureau survey data, we link all of the household surveys measuring citizenship status to the 2010 Census. The person-level linkage to

---

[11] For more information, see https://www.troutman.com/files/FileControl/89dad504-6be0-4335-aa1a-35a433102d63/7483b893-e478-44a4-8fed-f49aa917d8cf/Presentation/File/Survey%20of%20state%20and%20federal%20laws%20requiring%20E-Verify.pdf and table 1 in Orrenius and Zavodny (2016) for the list of states with mandatory E-Verify laws.

[12] This information is from the Master Demographic Pilot Feasibility Study.

6

the 2010 Census is based on the Protected Identification Key or PIK (the Census Bureau's internal unique person identifier) appended to person records using the Person Identification Validation System (PVS). To implement the record linkage, we first compiled an unduplicated list of individuals surveyed by the Census Bureau in Title 13 mandated surveys (ACS and SIPP) and reimbursable surveys (CPS[13] and AHS[14]). We link this unduplicated list of individuals to the 2010 Census (see Appendix Table A1).

Household surveys linked to the 2010 Census contain self-reported citizenship status for 44.6 million people, or 14.4 percent of the 2010 Census population. Of these, 43.1 million report being citizens (see Appendix Table A2). We conclude that the population coverage from existing survey data is a relatively small share of the total population, consistent with the sampling rates of these surveys.

Figure 1 Panel A shows item nonresponse in the 2016 ACS for sex, age, and citizenship.[15] We show nonresponse rates for the full sample, as well as for select subgroups by race/ethnicity and relationship to the householder.[16,17] Sex has the lowest nonresponse rates across the entire sample, as well as within subgroups with all recording less than 1 percent nonresponse, except for nonrelatives. Nonresponse rates for age are higher, and for some subgroups it has the highest level of nonresponse among the three items shown here. This is true for non-Hispanic white, non-Hispanic black, reference person, and relative of the reference person.[18] Hispanics and non-Hispanic other race[19] have higher rates of nonresponse for citizenship than for sex or age, providing some preliminary evidence that these groups could be disproportionately impacted by the addition of citizenship on the 2020 Census questionnaire.

---

[13] The CPS is sponsored by the Department of Labor's Bureau of Labor Statistics.

[14] The AHS is sponsored by the Department of Housing and Urban Development.

[15] Appendix Table A3 shows item nonresponse rates for questions on the 2000 Census short form and the 2010 Census. We choose sex and age as benchmarks, since they are on the Census questionnaire. As shown in Appendix Table A3, item allocation rates (including both nonresponses and responses that are edited) are higher for many ACS questions than for sex, age, or citizenship, but they are not being considered for inclusion on the Census questionnaire and are thus less relevant.

[16] Throughout the paper, we show results not only by citizenship, but also by race and ethnicity for two main reasons. The CVAP data provide counts not just by citizenship, but also race and ethnicity, so differential effects on race/ethnic groups from adding a citizenship question are relevant. In addition, our administrative record noncitizen measure has incomplete coverage (it does not cover noncitizens without SSNs), while a significant percentage of noncitizens without SSNs are Hispanic (Bond et al., 2014). Thus, to some extent the Hispanic category captures noncitizens excluded from the measured noncitizen category.

[17] The householder, also referred to as the reference person or person 1, is the first person listed on the household roster. The reference person typically is the primary or sole respondent to the survey. The relative and nonrelative categories are based on the person's relationship to the householder. The relative category includes husband or wife, biological son or daughter, adopted son or daughter, stepson or stepdaughter, brother or sister, father or mother, grandchild, parent-in-law, son-in-law or daughter-in-law, other relative, unmarried partner, and foster child. The nonrelative category includes roomer or boarder, housemate or roommate, and other nonrelative.

[18] We treat all persons in group quarters as reference persons. The results are qualitatively similar if group quarters are excluded.

[19] Non-Hispanic other race includes non-Hispanic Asian, non-Hispanic American Indian and Alaskan Native, non-Hispanic Native Hawaiian and Other Pacific Islander, and non-Hispanic two or more races.

7

COM_DIS00009839

**Figure 1. American Community Survey (ACS) Nonresponse, 2016**



Panel A. Item Nonresponse



Panel B. Item Nonresponse for Census Numident-Identified Noncitizens

Source: American Community Survey (ACS) and Census Numident, 2016.

Given item nonresponse to the citizenship question as shown in Figure 1 Panel A, we are particularly interested in understanding the potential sensitivity of response specifically for noncitizens. Figure 1 Panel B shows the same information as Panel A, restricted to those

8

COM_DIS00009840

individuals who are identified as noncitizens in the Census Numident,[20] meaning that administrative records show their status as noncitizen. Panel B illustrates the heightened sensitivity associated with collecting citizenship data for noncitizens through surveys. Item nonresponse to the citizenship question is particularly high for nonrelative household members, where one-in-ten do not have a citizenship response in the ACS.

Next, we study whether nonresponse rates have been changing over time. Figure 2 has the same layout as Figure 1. It displays the difference in item nonresponse rates between the 2013 and 2016 ACS for the indicated variable.[21] A positive value indicates an increase in the item nonresponse rate, while a negative value indicates a decrease in the same rate. Figure 2, Panel A reports the difference in rates for the entire survey population as well as subgroups (see also Appendix Table A3 for the rates in the 2000 and 2010 Census short forms). Notice that item nonresponse rates for sex have gone down over time. However, item nonresponse for age and citizenship have increased, and, in particular, the increase in citizenship item nonresponse is largest for Hispanics and nonrelatives.

**Figure 2. Difference in American Community Survey (ACS) Item Nonresponse between 2013 and 2016**



Panel A. Difference in Item Nonresponse

---

[20] The Census Numident, which contains all Social Security card applications, is currently the Census Bureau's most complete and reliable administrative record source of citizenship data. For more details, see Section 3.2.

[21] Appendix Table A5 shows citizenship item nonresponse rates in 2013 and 2016 separately for mail-in and internet responses.

9

COM_DIS00009841



Panel B. Difference in Census Numident-Identified Noncitizen Item Nonresponse

Source: American Community Survey (ACS) and Census Numident, 2013 and 2016.

Note: Administrative record noncitizens make up 6.7 percent of the overall 2016 ACS sample.

Figure 2 Panel B shows the same differenced rates, but for those who are identified as noncitizens in the Census Numident. The trends over time are relatively similar for sex and age, with minimal changes. However, item nonresponse to the ACS citizenship question increased for all noncitizen groups, rising by 1.5 percentage points for nonrelatives and 1.8 percentage points for Hispanics. Hispanics, nonrelatives, and noncitizens are particularly sensitive to answering the citizenship question in the ACS, and that sensitivity has increased in recent years.

Table 1 shows break-off rates for the 2016 ACS internet self-responses (ISR) separately by question screen. Using this table, we examine which questions are subject to higher break-off rates. Higher break-off rates indicate potentially sensitive items. They are used as an indicator to inform when the respondent might stop answering the rest of the questions on a survey (Census Bureau 2013). A break-off is the moment in time during which a respondent decides not to continue with the survey and leaves the on-line survey. Break-off rates are highest for Hispanics and lowest for non-Hispanic whites in all question screens. Citizenship-related questions have the most heterogeneous rates across race/ethnicity groups: the ratio of break-off rates for Hispanics versus non-Hispanic whites is much higher for year of entry and citizenship than any of the other question screens in the ACS, except for English proficiency (included in Table 1 for reference purposes). In contrast, financial and work-related questions are sensitive for all groups. This again suggests that citizenship-related questions are more sensitive for Hispanics.

10

**Table 1. 2016 ACS Internet Self-Response Break-off Rates (%) by Screen**

|  | Non-Hispanic White | | Non-Hispanic Other | | Hispanic | |
|---|---|---|---|---|---|---|
|  | (%) | S.E. | (%) | S.E. | (%) | S.E. |
| Work Location | 0.642 | 0.011 | 1.045 | 0.032 | 1.246 | 0.038 |
| Place of Birth | 0.448 | 0.009 | 0.766 | 0.026 | 0.961 | 0.039 |
| Wage Amount | 0.589 | 0.006 | 0.691 | 0.029 | 0.751 | 0.032 |
| Work Last Week | 0.257 | 0.006 | 0.407 | 0.010 | 0.597 | 0.024 |
| Work for Wages | 0.365 | 0.009 | 0.459 | 0.019 | 0.590 | 0.028 |
| Type of Employee | 0.221 | 0.007 | 0.367 | 0.011 | 0.399 | 0.026 |
| Verify Income | 0.198 | 0.007 | 0.263 | 0.016 | 0.368 | 0.021 |
| Citizenship | 0.035 | 0.002 | 0.268 | 0.016 | 0.363 | 0.026 |
| Health Insurance | 0.188 | 0.006 | 0.331 | 0.015 | 0.336 | 0.019 |
| Highest Level of Education | 0.167 | 0.005 | 0.257 | 0.015 | 0.298 | 0.019 |
| Work Duties | 0.143 | 0.005 | 0.223 | 0.015 | 0.266 | 0.020 |
| Year of Entry into U.S. | 0.022 | 0.002 | 0.119 | 0.009 | 0.260 | 0.021 |
| Taxes | 0.164 | 0.005 | 0.182 | 0.014 | 0.259 | 0.019 |
| Interest, Dividends Income | 0.209 | 0.006 | 0.179 | 0.013 | 0.242 | 0.020 |
| Residence Last Year | 0.104 | 0.004 | 0.182 | 0.014 | 0.232 | 0.016 |
| English Proficiency | 0.003 | 0.001 | 0.020 | 0.005 | 0.036 | 0.007 |
| Total Non-Breakoff | 90.52 | 0.040 | 85.93 | 0.109 | 82.41 | 0.145 |

Source: 2016 ACS.

Notes: These are the top fifteen screens, sorted by Hispanic break-off rate. English proficiency and total non-breakoff are also included for reference. The rates are unweighted. The standard errors are calculated using Fay's balanced repeated replication variance estimation method, with 80 replicate weights, adjusting the original weights by a coefficient of 0.5.

Another alternative for measuring sensitivity of response is to examine the extent to which unit nonresponse changes. Unit nonresponse refers to a situation where no one in the household (or unit) responds to the survey. Figure 3 shows ACS unit nonresponse rates from 2010 to 2016 for housing units in the decile of tracts with the highest percent of noncitizens (25.5 percent noncitizens or more), and those in the decile of tracts that have the lowest percent of noncitizens (0.6 percent or less).[22] Tracts with noncitizen shares in the top decile have lower levels of unit response. In tracts with the highest concentrations of noncitizens, unit response rates have decreased over time and show a sharper drop between 2015 and 2016 than for units in tracts with the lowest concentrations of noncitizens.

---

[22] An internet response option was introduced to the ACS in 2013. Baumgardner, Griffin, and Raglin (2014) show that this was associated with an increase in self-response rates for economically advantaged groups and a decrease for economically disadvantaged groups, which could help explain the widening of the gap between these two tract groups in 2013. It cannot explain the further widening of the gap in 2016, however.

11

COM_DIS00009843

**Figure 3. ACS Unit Response Rate by Tract-Level Share of Noncitizens**



Source: American Community Survey (ACS), 2010-2016. The deciles of the distribution for noncitizen share of the tract population are 2011-2015 5-year ACS estimates.

Notes: The noncitizen share is 0.0 to 0.6 percent in the bottom decile and 25.5 to 100 percent in the top decile. The confidence intervals (CI) are at the 90 percent level, calculated via the successive differences replicate methodology, using 80 ACS replicate weights (see American Community Survey (2014)).

The data shown in this section provide preliminary evidence that unit nonresponse and citizenship item nonresponse rates are low in the population as a whole. The very low unit and item nonresponse rates among citizens and non-Hispanics mask increasingly higher noncitizen and Hispanic nonresponse rates, however.

### 3.2 Administrative Record Coverage

An alternative way to obtain citizenship information is to use data collected in the administration of government programs or by commercial data resellers. Respondent sensitivity to answering the question should be less of an issue with administrative sources, since proof of citizenship status is required to determine eligibility for a passport, a job, or government benefits. However, administrative data have incomplete coverage for other reasons, as discussed in this subsection.

Among the sources in Table 2, the Census Numident is the most complete and reliable administrative record source of citizenship data currently available to the Census Bureau. The Numident file is a record of individual applications for Social Security cards and certain subsequent transactions for those individuals. Unique, life-long Social Security Numbers (SSNs) are assigned to individuals based on these applications. In addition, a full record of all changes to the account information (such as change of name) is also maintained. To obtain an SSN, the

12

COM_DIS00009844

applicant must provide documented identifying information to the Social Security Administration (SSA). Through the "enumeration at birth" program, children can be issued an SSN when they are born.[23] Examples of data elements on a Numident record include name, date and place of birth, parents' names, and date of death. The SSA began requiring evidence of citizenship in 1972. Hence, citizenship data for more recently issued SSNs should be reliable as of the time of application.[24] SSA is not automatically notified when previously noncitizen SSN holders become naturalized citizens, however, so some naturalizations may be captured with a delay or not at all. To change citizenship status on an individual's SSN card, naturalized citizens must apply for a new card, showing proof of the naturalization (U.S. passport or certificate of naturalization).[25] Naturalized citizens wishing to work have an incentive to apply for a new card showing their U.S. citizenship, because noncitizen work permits expire, and the Numident is used in combination with U.S. Citizenship and Immigration Services (USCIS) data in the E-Verify program that confirms that job applicants are eligible to work.

Whether or not citizenship data are collected on the 2020 Census questionnaire, administrative records may be useful for editing and imputing the citizenship variable, when necessary.[26]

---

[23] A parent can apply for the infant's SSN at the hospital where the infant is born. Otherwise, applications for U.S.-born persons require an original or certified copy of a birth record (birth certificate, U.S. hospital record, or religious record before the age of five including the date of birth), which SSA verifies with the issuing agency, or a U.S. passport. Foreign-born U.S. citizen applications require certification of report of birth, consular report of birth abroad, a U.S. passport, a certificate of citizenship, or a certificate of naturalization. Noncitizen applications require a lawful permanent resident card, machine readable immigrant visa, arrival/departure record or admission stamp in an unexpired foreign passport, or an employment authorization document. See https://www.ssa.gov/ssnumber/ss5doc.htm. The enumeration at birth was rolled out starting in 1987, and 45 states, Puerto Rico, the District of Columbia, and New York City had signed agreements to offer it by 1991. Today over 90 percent of parents use this process in all 50 states plus Puerto Rico and the District of Columbia. See https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html.

[24] A detailed history of the SSN is available at https://www.ssa.gov/policy/docs/ssb/v69n2/v69n2p55.html (Exhibit 1). For some categories of persons, the citizenship verification requirements started a few years later, but all were in place by 1978.

[25] For more information, see https://www.ssa.gov/ssnumber/ss5doc.htm.

[26] Data edits refer to updating data when there is a clear error either in data entry or in response. Imputations occur when the individual or household did not answer a survey or questions on a survey. They involve modeling a most likely response for that individual or household using other available data.

13

COM_DIS00009845

**Table 2. Administrative Record (AR) Sources Currently Held and/or Under Negotiation for Acquisition**

| Administrative Records Data with Citizenship Info. Currently Held | Universe |
|---|---|
| Census Numident | National-level file of SSA transactions |
| HHS TANF | National Level (not full content for all states) |
| Alaska Permanent Fund | Alaska residents |
| Colorado Leap | Colorado low income energy assistance program |
| Some State SNAP/TANF | State-level program participants |
| Army | Active duty and retired soldiers and family members |
| Bureau of Prisons | Federal prison inmates |
| Commercial Files | Purchased data from data resellers |
| Administrative Records Data with Citizenship Info Under Negotiation for Acquisition | Universe |
| Department of Homeland Security United States Citizenship and Immigration Services | National-level file of Lawful Permanent Residents, Naturalizations |
| Department of Homeland Security United States Customs and Border Protection | National-level file of Customs and Border transaction data |
| Department of State Passport Services | National-level passport transaction data |

Table 3 shows the coverage of the 2010 Census population by the 2010 Numident and ITINs.[27] Ninety-one percent of persons in the 2010 Census can be assigned a Protected Identification Key (PIK) by the Person Identification Validation System (PVS).[28]  Once a PIK is assigned, the vast majority of records are matched to the 2010 Numident (98.2 percent in Table 3). Most of the PIKs associated with persons not in the 2010 Numident are derived from linkage to Individual Taxpayer Identification Numbers (ITIN), issued by the Internal Revenue Service to persons who do not have

---

[27] Rastogi and O'Hara (2012) used an earlier version of the crosswalk between the Numident and ITINs and the 2010 Census, and we show results using that version in Table A6. The enhanced crosswalk in Table 3 uses additional household and geospatial information to increase person linkage, and it has much greater coverage of ITINs. See Bond et al. (2014) for details.
[28] See NORC (2011) and Layne, Wagner and Rothhaas (2014) for details about the process used to assign and the quality of the PIKs used in data linkage at the Census Bureau.

14

COM_DIS00009846

and are not eligible to obtain SSNs, but are required to file a federal individual income tax return (4.3 million person links derived from ITINs vs. 804,000 person links that are not derived from ITINs). Among persons with nonmissing citizenship in the 2010 Numident, 91.3 percent are U.S. citizens.

Approximately 20.9 percent, or 57.6 million of the 2010 Numident records have missing citizenship status. Many older persons did not report citizenship when applying for an SSN, which was not required prior to 1972. Of these older persons with missing citizenship, 7.0 million have either passed away by 2017 or are likely to do so by 2020 (since they would be over 100 years old). Of the remaining 50.7 million persons with missing citizenship in the 2010 Numident, it becomes nonmissing for 5.8 million of them by 2017, nearly all switching to U.S. citizens. About 42.5 million of those still missing citizenship in 2017 were born in the U.S. We treat U.S.-born persons missing citizenship as administrative record citizens in our analysis.[29] This leaves just 2.5 million foreign-born persons with missing citizenship, some of whom could be noncitizens. In the analysis, we treat foreign-born persons with missing citizenship as having missing administrative record citizenship.

Appendix Table A7 shows that among persons who are missing citizenship, alive in 2017, and born after 1919, those who are foreign-born have a much lower propensity to be linked to the 2010 Census (36.3 percent vs. 74.5 percent for U.S.-born persons). Many of the foreign-born people missing citizenship in the Numident are presumably residing outside the U.S. and thus will not be counted in the 2020 Census.[30]

---

[29] Analysis in later sections of this paper labeled "initial assumptions" instead treats all persons with missing Numident citizenship values as AR citizens, whether they are U.S.- or foreign-born. This includes Table 6, Figures 10B, 11A, 12A, and 12C and Appendix Tables A8 and A9.

[30] An example is persons who received temporary work visas prior to when evidence of citizenship was required to receive an SSN and who have since returned to their home countries.

COM_DIS00009847

**Table 3. Administrative Record (AR) Coverage of the 2010 Census**

|  | Count | Percent of 2010 Census Population | Percent of Matched Sample |
|---|---|---|---|
| No PIK, not sent to PVS | 10,260,000 | 3.3 |  |
| No PIK, failed in PVS | 17,490,000 | 5.7 |  |
| PIK, but not in 2010 Numident, not an ITIN | 804,000 | 0.3 |  |
| PIK, but not in 2010 Numident, is an ITIN | 4,326,000 | 1.4 | 1.5 |
| 2010 Numident U.S. Citizen | 199,300,000 | 64.6 | 71.1 |
| 2010 Numident Noncitizen | 18,970,000 | 6.1 | 6.8 |
| 2010 Numident Missing Citizenship | 57,620,000 | 18.7 | 20.6 |
| Of which: |  |  |  |
| Alive in 2017, born after 1919 | 50,670,000 | 16.4 | 18.1 |
| Of which: |  |  |  |
| 2017 Numident U.S. Citizen | 5,678,000 | 1.8 | 2.0 |
| 2017 Numident Noncitizen | 70,500 | 0.0 | 0.0 |
| 2017 Numident Missing Citizenship | 44,920,000 | 14.5 | 16.0 |
| Of which: |  |  |  |
| U.S.-born | 42,460,000 | 13.8 | 15.2 |
| Foreign-born | 2,464,000 | 0.8 | 0.9 |
| Total | 308,745,538 | 100.00 | 100.00 |

Source: 2010 Census Unedited File (CUF) and 2017 Census Numident Files.
Notes: The 2010 Census Numident File is used for all calculations with "Numident" in the label. The 2017 Census Numident File is used to calculate the number alive in 2017 and born after 1919 and the foreign-born share of them. PVS is the Person Identification Validation System used to assign PIKs. PIK is Protected Identification Key, which is a unique person identifier.

Figure 4 shows the share of persons in the 2016 ACS for whom administrative record citizenship status is not available, as well as the ACS citizenship allocation rate (including both item nonresponse and edits to original responses; i.e., the share of persons for whom the value tabulated is not the respondent's answer). The missing data rates are higher for administrative records (AR) than the ACS, and both sources' rates are higher for minorities and nonrelatives. The variability in coverage is higher for AR than the ACS.

16

**Figure 4. Percent without Administrative Record or ACS Citizenship in 2016**



Source: American Community Survey (ACS) and Census Numident, 2016.

Note: For the ACS this is the citizenship item allocation rate, which includes both item nonresponses and edited values.

As shown in Appendix Table A8, the percent of persons in the ACS who cannot be linked to citizenship in AR increases from 8.5 to 10.9 percent between 2010 and 2016. Note that the linkage between the ACS and administrative data from the SSA Numident and IRS ITIN tax filings depends on two factors: (a) the quality of the personally identifiable information (PII) on the ACS response and (b) whether the ACS respondent is in the SSN/ITIN universe.

With respect to the quality of the PII on the ACS, there may be insufficient information on the ACS due to item nonresponse to allow a successful match using the production record linkage system. There may also be more than one record in the Numident or ITIN IRS tax filings that matches the person's PII. Finally, there may be a discrepancy between the PII provided to the ACS and the PII in the administrative records.

Alternatively, the person may not be in the Numident or ITIN IRS tax filing databases, because they are out of the universe for those administrative systems. This happens when the person is a citizen without an SSN, or when the person is a noncitizen who has not obtained an SSN or ITIN.

Very few of the unlinked cases are due to insufficient PII in the ACS or multiple matches with administrative records. The vast majority of unlinked ACS persons have sufficient PII, but fail to match any administrative records sufficiently closely. This means that most of the nonmatches are because the ACS respondent is not in the administrative record universe.

The incidence of ACS persons with sufficient PII but no match with administrative records increased between 2010 and 2016. One contributing factor is that the number of persons linked to ITIN IRS tax filings in 2016 was only 35 percent as large as in 2010,[31] suggesting that either fewer

---

[31] This percentage uses survey weights. Unweighted, it is 39 percent.

17

of the noncitizens in the 2016 ACS had ITINs, or more of them provided PII in the ACS that was inconsistent with their PII in IRS records.

There is an important caveat to the conclusion that survey-based citizenship data are more complete than currently held administrative records. The methods used to adjust the ACS weights for survey nonresponse and to allocate citizenship status for item nonresponse assume that the citizenship status distribution of the sampled non-respondents is statistically the same as that of respondents with similar related characteristics. They might not actually be similar, however, even when selecting the allocation of citizenship status using basic characteristics. For example, Hispanics who respond to the survey might be different from Hispanics who do not respond in various characteristics (including immigration status). Additionally, our unit and item nonresponse analysis in Section 3.1 above casts serious doubt on this assumption, suggesting that those who do not respond to either the entire ACS or the citizenship question on the ACS are not statistically similar to those who do. In particular, their responses to the citizenship question would not be well predicted by the answers of those who did respond.

To reduce the AR coverage gaps, the Census Bureau is considering the possibility of acquiring access to several other national citizenship-related files listed in Table 2. United States Customs and Immigration Services (USCIS) administrative records on naturalizations and lawful permanent residents (LPR), and Customs and Border Protection transaction records on border entries can partially address the weaknesses of the Numident. Through preliminary project development discussions with USCIS, we were informed that USCIS records provide up-to-date information since 2001 (and possibly back to 1988, but with incomplete records prior to 2001). These will fill some gaps for naturalized citizens, lawful permanent residents, and persons with extended visa applications without SSNs, as well as naturalized citizens who did not inform SSA about their naturalization. These data do not cover naturalizations occurring before 1988, and they miss some between 1988 and 2000. USCIS records do not always cover children under 18 at the time a parent became a naturalized U.S. citizen. These children automatically become U.S. citizens under the Child Citizenship Act of 2000. The USCIS receives notification of some, but not all, of these child naturalizations. Others inform the U.S. government of their U.S. citizenship status by applying for U.S. passports, which are less expensive than the application to notify the USCIS. USCIS visa applications list people's children but the information may not be in electronic form.

U.S. passport administrative records available from the State Department can help plug the gaps for child naturalizations, missing status on the Numident, and out-of-date citizenship information on the Numident. Since U.S. citizens are not required to have a passport, however, these records will also have coverage gaps.

The acquisition of these sources would also improve record linkage for noncitizens by allowing the construction of a supplementary record linkage master list for such people, who are currently only in scope for receiving a PIK if they apply for and receive either an SSN or ITIN. Improved record linkage would not only facilitate greater use of administrative record citizenship data, but it could also permit other uses of these administrative records in 2020 Census operations to lower costs and raise quality. Noncitizens are a hard-to-count population (as evidenced by the lower ACS

18

COM_DIS00009850

unit response rates in tracts with more noncitizens in Figure 3), making having reliable administrative records on them particularly valuable.

If the Census Bureau were to obtain each of these files, the remaining AR citizenship data gaps would include the following categories:

1.      U.S. citizens from birth with no SSN or U.S. passport. They will not be processed by the production record linkage system used for the 2020 Census, because their PII won't be found in the PVS reference files.

2.      U.S. citizens from birth born outside the U.S., who do not have a U.S. passport, and either applied for an SSN prior to 1974 and were 18 or older, or applied before the age of 18 prior to 1978. These people will be assigned PIKs, but none of the administrative sources discussed above will reliably generate a U.S. citizenship variable.

3.      U.S. citizens who were naturalized prior to 2001 and did not inform SSA of their naturalization, because they originally applied for an SSN after they were naturalized, and it was prior to when citizenship verification was required for those born outside the U.S. (1974). These people either already had an SSN when they were naturalized, and they didn't inform SSA about the naturalization, or they never applied for an SSN. The former group has inaccurate data in the Numident.  The latter group will not be assigned a PIK.

4.      U.S. citizens who were automatically naturalized if they were under the age of 18 when their parents became naturalized in 2000 or later, and they did not inform USCIS or receive a U.S. passport. Note that such persons would not be able to get an SSN with U.S. citizenship on the card without either a U.S. passport or a certificate from USCIS. These people will also not be assigned a PIK.

5.      Lawful permanent residents (LPR) who received that status prior to 2001 and either do not have an SSN, or they applied for an SSN prior to when citizenship verification was required for those born outside the U.S. (1974). The former group will not be found in the PVS reference files. The latter group has inaccurate data in the Numident.

6.      Noncitizen, non-LPR, residents who do not have an SSN or ITIN and who did not apply for a visa extension. These persons will not be found in PVS.

7.      Persons with citizenship information in administrative data, but the administrative and Census data cannot be linked due to missing or discrepant PII.

It is uncertain whether Census Bureau household survey data could reliably fill the above gaps when their person record cannot be assigned a PIK or when they have a PIK but the administrative record lacks up-to-date citizenship information. Persons in Category 6 have a strong incentive to provide an incorrect survey answer, if they answer at all, due to concerns about the data being used for enforcement.[32] Presumably a significant, but unknown, fraction of persons without PIKs are in

---

[32] Title 13, U.S.C. prohibits the use of Census data for enforcement purposes, but respondents may still have this concern.

COM_DIS00009851

Category 6. Distinguishing these people from the other categories of persons without PIKs is inherently inexact, because there is no feasible method of independently verifying their citizenship status.

## 4. Data Reliability

To assess the reliability of citizenship data, we compare the responses to the 2000 Census long form and 2010 and 2016 ACS citizenship questions with the administrative record (AR) citizenship variable (from the 2002, 2010, and 2016 Numidents and ITINs for the latter two years).[33] Since previous studies suggest that Census survey-AR discrepancies are greater for Hispanics, and the CVAP tables show citizen counts by race/ethnicity and voting age, we show discrepancies separately by race/ethnicity and the voting-age population (age 18 and over). Appendix Tables A8 and A9 show a full set of results for all three years, while the discussion in this section focuses on the 2016 comparison.

Discrepancies between AR and ACS citizenship could be due to several causes: (1) Linkage errors result in the administrative records not matching to the right people in the ACS. The relative discrepancy rates would vary depending on whether AR citizens or noncitizens have more linkage errors. One might expect unrelated persons in the household to have more linkage errors than relatives of reference persons, since PII quality is likely to improve with familiarity. (2) AR incorrectly report that the person is a citizen. This would appear as AR citizen-ACS noncitizen discrepancies. (3) AR are out of date, missing some naturalizations captured by the ACS. This would show up as AR noncitizen-ACS citizen discrepancies.[34] (4) The respondent does not know the person's citizenship status and guesses wrong. This is most plausible for unrelated persons and least so for the reference person. (5) The respondent misunderstands the question and answers incorrectly, despite actually knowing the citizenship status. It is not clear whether this would lead to more AR citizen-ACS noncitizen or AR noncitizen-ACS citizen discrepancies, but it should not vary across reference person, related persons, and unrelated persons. (6) The respondent knows the person's citizenship status and misreports it. Here the reference person may have a harder time justifying item nonresponse (implying (s)he does not know her/his own citizenship), so the way to keep from attracting attention is to say (s)he is a U.S. citizen. When asked about others, the respondent can more easily say (s)he does not know. This factor is likely to be more relevant when people have heightened concerns that the data will be used for immigration enforcement.

Of the candidate reasons (1) through (3) relevant for administrative records, linkage errors (reason 1) would be the most difficult to overcome. If linked to the wrong people, even perfect administrative records will produce inaccurate statistics. Though improvements can be made to record linkage methods, the linkage quality also depends on the quality of PII supplied by the sources being linked. In contrast, the acquisition of more timely administrative record sources

---

[33] The 2002 Numident is the closest available Numident to the 2000 Census.
[34] Note that as the Census Bureau receives more administrative record sources of citizenship data, the probability that the administrative records are incorrect should fall.

COM_DIS00009852

should reduce missing naturalizations problems (reason 3). The use of additional administrative record sources can also help illuminate instances where currently held administrative records are more likely to be incorrect (reason 2).[35]

Guessing wrong (reason 4) and misunderstanding the question (reason 5) would reduce precision (i.e., increase statistical variability), but it is not clear that either would result in biased estimates. In contrast, intentional misreporting (reason 6) is likely to result in reduced accuracy (more bias), since citizens and noncitizens may have different incentives to misreport status. Of these three reasons, the extent of intentional misreporting is most likely to vary across geographical areas and over time, depending on the degree of concern about personal security.

Figure 5 Panel A shows that a remarkably high 99.6 percent of U.S. citizens (according to administrative records) report being U.S. citizens in the 2016 ACS.[36] This suggests that when AR report the person is a citizen, (s)he is actually a citizen, and reason (2) is not an important factor. The discrepancy rate is higher for Hispanics (2.0 percent) and other minorities (1.3 percent) than for non-Hispanic white individuals. The discrepancy rate is higher for nonrelatives than relatives of the respondent, and for relatives than reference persons, consistent with the reference person knowing other people's status less well than his/her own.

Discrepancy rates are higher for those individuals identified as U.S. noncitizens in administrative records: 37.6 percent report being U.S. citizens in the ACS, as shown in Figure 5 Panel B. This implies that ACS estimates of the U.S. citizen population are higher than they would be if one were to use currently available administrative records.[37] The ordering of rates across groups is reversed compared to the AR citizen-ACS noncitizen rates. Here non-Hispanic white individuals have the highest discrepancy rate and Hispanic individuals the lowest. This means that the difference between ACS citizen and AR citizen population estimates is greatest for non-Hispanic white individuals and lowest for Hispanic individuals. This contrasts with Van Hook and Bachmeier's (2013) conclusion based on aggregates that self-reported naturalizations by persons of Mexican origin are most likely to be incorrect.[38,39]

The AR noncitizen-ACS citizen discrepancy rate is highest for the reference person, followed by relatives and then nonrelatives. This pattern is not a clear outcome of out of date administrative

---

[35] For example, if a person is a foreign-born citizen in one administrative record source, but other administrative records and the survey response each say the person is a noncitizen, one might have more confidence in selecting noncitizen than when having only the first administrative record source and the survey response.

[36] This is even higher than the agreement rate for sex in the 2010 Census vs. the Numident, which is 99.4 percent. See Rastogi and O'Hara (2012).

[37] Note that since we are unable to compare records that are missing in one or both sources, the estimates provided in this section may understate the difference between the ACS estimate of the U.S. citizen population and the true value, especially since most unauthorized persons (other than the small fraction with ITINs) are missing AR citizenship data here.

[38] Hispanics make up the largest number of AR noncitizen-ACS citizen persons (2.6 million), compared to 2.5 million non-Hispanic other minorities, 1.7 million non-Hispanic whites, and 800,000 non-Hispanic blacks, which may be why previous studies' analysis of aggregated data find the largest administrative record-survey differences to be among Hispanics. But the discrepancy rate is more relevant for evaluating quality than the absolute number of discrepancies.

[39] According to 2016 1-year ACS data in American Factfinder Table S0201 (American Community Survey 2016c), 63.2 percent of Hispanics are of Mexican origin.

21

COM_DIS00009853

records (reason 3), lack of knowledge about others' status (reason 4), or misunderstanding the question (reason 5). Recall that citizenship item nonresponse is highest for nonrelatives and lowest for reference persons (see Figure 1). This suggests respondents behave differently when asked about their own status versus that of others. It may be easier for respondents to say they do not know the status of someone else (particularly a nonrelative) than their own status. They thus misreport their own status (reason 6), while they say they do not know the status of others.

22

COM_DIS00009854

**Figure 5. Administrative Records-ACS Survey Response Citizenship Agreement**



Panel A. Percent of Administrative Record Citizens who respond as 2016 ACS Noncitizens

Notes: Administrative record citizens make up 81.1 percent of the overall 2016 ACS sample, 90.1 percent for non-Hispanic white, 81.5 percent of non-Hispanic black, 60.2 percent of Hispanic, 62.5 percent of non-Hispanic other race, 81.1 percent of reference persons, 82.1 percent of relatives, and 64.8 percent of nonrelatives. See Appendix Table A10.



Panel B. Percentage of Administrative Record Noncitizens who respond as 2016 ACS Citizens

Notes: Administrative record noncitizens make up 6.7 percent of the overall 2016 ACS sample, 1.9 percent for non-Hispanic white, 5.1 percent of non-Hispanic black, 16.2 percent of Hispanic, 22.0 percent of non-Hispanic other race, 6.9 percent of reference persons, 6.5 percent of relatives, and 7.1 percent of nonrelatives. See Appendix Table A10.

Source: American Community Survey (ACS) 1-year file and Census Numident, 2016.

23

COM_DIS00009855

We show the AR citizen-ACS noncitizen and AR noncitizen-ACS citizen discrepancies separately for higher- and lower-quality linkages and by reference person vs. relative vs. nonrelative categories in Figure 6. For AR citizen-ACS noncitizen discrepancies, the rates are lowest for the reference person and highest for nonrelatives, likely due to people being able to report their own PII more accurately than that of others. Records with high-quality links have lower discrepancy rates, consistent with linkage errors being a contributing factor to these discrepancies. The patterns reverse for AR noncitizen-ACS citizens. Higher-quality linked records actually have higher discrepancy rates, so linkage errors (reason 1) do not appear to explain the AR noncitizen-ACS citizen discrepancies. This pattern holds regardless of the type of person the reference person is responding about (oneself, a relative, or a nonrelative).

24

**Figure 6. Quality of the Citizenship Question Responses by Relation to Reference Person and Higher- vs. Lower-Quality Linkage**



Panel A. AR Identifies as a Citizen and 2016 ACS Identifies as a Noncitizen



Panel B. AR Identifies as a Noncitizen and 2016 ACS Identifies as a Citizen

Source: American Community Survey (ACS) and Census Numident, 2016.

Notes: High-quality linkage is defined as having an above-median linkage confidence score on the first linking attempt (pass), and lower-quality is all others. The weighted sample shares of the ACS are 18.1 percent for reference person high-quality linkage, 23.9 percent for relative high-quality linkage, 0.6 percent for nonrelative high-quality linkage, 20.3 percent for reference person low-quality linkage, 33.8 percent for relative low-quality linkage, and 3.2 percent for nonrelative low-quality linkage. See Appendix Table A11.

To evaluate further the hypothesis that AR are out of date (reason 3), we make comparisons to USCIS statistics. In the AR-ACS citizenship status comparison above, we estimate 7,605,000 persons are AR noncitizens-ACS citizens. This is equivalent to the Numident missing all the

25

naturalizations reported by USCIS back to 2007, plus some of 2006. Figure 7 shows the annual number of persons who first entered the Numident as noncitizens and switch to U.S. citizenship in each particular year, as well as the number of naturalizations according to USCIS statistics.[40] USCIS reports significantly more naturalizations prior to 2010, but there is little difference subsequently. This suggests that if the main reason for the discrepancies were out-of-date Numident citizenship, the Numident would have to be missing many naturalizations that occurred long ago.

**Figure 7. Estimated Annual Naturalizations in Census Numident Data versus USCIS Statistics**



Source: USCIS Immigration Yearbooks and 2017 Census Numident.

We compare the ACS naturalization year and the year when citizenship switched to U.S. citizen in the Numident among persons with naturalized citizen status in both sources in Figure 8.[41] For 67.4 percent of these persons, the ACS naturalization year is earlier than the Numident citizenship change year, and 33.1 percent have an ACS naturalization year that is more than five years prior. Just 11.3 percent have a later ACS naturalization year. This is consistent with tardy notification to SSA about naturalizations.

---

[40] The Numident switches do not include persons who did not have an SSN prior to being naturalized. According to USCIS officials, the percentage of persons naturalized in 2014 who did not previously have an SSN is 0.33 percent, and it is 0.40 percent in 2015, suggesting that this type of Numident omission is negligible, at least recently.

[41] The Numident citizenship change year is the year when citizenship changed from noncitizen to citizen in the data.

26

**Figure 8. Difference between ACS Naturalization and Numident Citizenship Change Years**



ACS Naturalization Year - Numident Citizenship Change Year

Source: American Community Survey (ACS) and Census Numident, 2016. The sample is persons who are naturalized citizens in both sources, and the ACS citizenship value is as reported by the respondent.

Figure 9 shows the distribution of AR noncitizen-ACS citizens by naturalization year. Approximately 15.9 percent report being citizens from birth, which, if true, would mean that the Numident is not out of date for these people, but incorrect from the first SSN application. This possibility seems unlikely, given that proof of citizenship status must be presented to SSA when applying for an SSN, whereas the ACS citizenship response is not checked. A third of the ACS-reported naturalizations (2.1 million) occurred between 2010 and 2016, while the total gap between USCIS naturalizations and Numident switches from noncitizen to citizen between 2010 and 2016 is several times less than that, at 288,000.

Figure 9 shows that the AR noncitizen-ACS citizen naturalization distributions are very similar for Hispanics and non-Hispanics. The results are contrary to Van Hook and Bachmeier's (2013) finding that citizenship misreporting by persons saying they were naturalized more than five years ago primarily occurs among persons of Mexican origin, and Passel and Clark's (1997) finding that it is among those of Mexican or Central American origin.

We also explore whether the AR noncitizen-ACS citizen naturalization distributions vary with linkage quality. One might expect that if linkage quality is driving the discrepancies, then persons with higher quality links would be recently naturalized, reflecting out-of-date Numident data. In contrast, more of the persons with low quality links would be ACS citizens from birth or naturalizations long ago, since the Numident and ACS records could be for different people, and the Numident should be less likely to be out of date for citizens from birth and earlier naturalizations. Figure 9 does show a higher share of ACS citizens from birth among those with

27

lower quality links, but also for more recent naturalizations. This is further evidence that linkage errors are probably not an important explanation for these discrepancies.

**Figure 9. Distribution of ACS Citizenship Receipt Timing for Administrative Record Noncitizen-ACS Citizens by Linkage Quality and Ethnicity**



Source: American Community Survey (ACS) and Census Numident, 2016.

As a final data quality check, we calculate the 2016 ACS citizenship distribution for persons with ITINs. Though only noncitizens may have ITINs, 6.6 percent say they were born citizens, and 11.1 percent report being citizens in the ACS (see Appendix Table A12).

### 5. Item Response and Data Quality Regression Analysis

We estimate multivariate regressions predicting item response in Table 4 and AR-ACS discrepancies in Table 5. The item response and citizenship status disagreement regressions test whether the associations shown above are statistically significant and robust to inclusion of controls. These analyses also provide an opportunity to study other potentially relevant factors. The item response regressions are estimated separately for AR citizens, AR noncitizens, and those missing AR citizenship. The item response variables are equal to one if there is a response for the item (whether it was later edited or not), and zero otherwise. The ACS noncitizen-AR citizen dependent variable is equal to one if the person is an as-reported noncitizen in the ACS and an AR citizen, and it is zero if both sources say the person is a citizen. Analogously, the ACS citizen-AR noncitizen dependent variable is equal to one if the person is an as-reported citizen in the ACS and an AR noncitizen, and it is zero if both sources say the person is a noncitizen. The last specification in Table 5 investigates determinants of the difference between the ACS naturalization year and the year in which the status changed to citizen in the Numident among persons who were noncitizens in their first SSN application.

28

COM_DIS00009860

Besides relationship to the reference person, we include several other factors that theoretically could drive differences observed in both survey response and data quality. These include demographic characteristics such as sex, race/ethnicity, log one plus age, and its square. We also include socioeconomic characteristics such as educational attainment, working in the last week, and searching for a job in the last four weeks. Educational attainment is classified as less than high school diploma (base category), at least high school but less than a bachelor's degree, bachelor's degree, and graduate degree. Time since entry to the U.S. and reference person English language variables are included, since these variables may influence item response and discrepancies in citizenship status reporting. For our analysis, those variables are log of one plus the number of years since entering the U.S. (or since birth if born in the U.S.) and its square[42] and English language ability for those speaking another language at home (speaking only English at home is the base category). We include an indicator for better or worse quality person linkage, since it may also drive differences in survey response and data quality. An indicator for whether the response is via mail or internet (i.e., without participation by an interviewer) vs. a personal or telephone interview. According to Camarota and Capizzano (2004), item nonresponse rates are lower in in-person interviews, and foreign-born persons are more likely to take the survey via personal interview, so controlling for mode could be particularly important when comparing the behavior of citizens and noncitizens.

The associations highlighted in Figures 1-6 above are robust to inclusion of other variables and are highly statistically significant.[43] Item nonresponse and ACS noncitizen-AR citizen discrepancy rates are higher for nonrelatives, but the ACS citizen-AR noncitizen propensity is much lower, again consistent with reference persons misreporting their own citizenship, but not reporting that of others at all, especially nonrelatives. Like nonrelatives, Hispanics have a lower propensity to provide citizenship, a higher propensity to have ACS noncitizen-AR citizen discrepancies, and a lower propensity to have ACS citizen-AR noncitizen discrepancies. Better linkage is strongly associated with ACS citizen-AR noncitizen discrepancies, inconsistent with the hypothesis that these discrepancies are driven by linkage errors.

Now turning to factors not investigated in previous sections, labor market activity is positively associated with having a citizenship answer; especially for AR noncitizens (see Table 4). However, as Table 5 shows, working is also associated with both types of citizenship status disagreements, particularly ACS citizen-AR noncitizen. Reference persons who speak another language at home have a higher propensity to respond about sex, especially when their English language ability is less strong. This is also true for AR citizens for the citizenship question, but when asked to report about AR noncitizens, those speaking another language at home have much lower citizenship item response rates. Those speaking English less well also have a higher propensity to report ACS noncitizen when the person they are responding about is an AR citizen, perhaps reflecting misunderstanding of the question. However, the reference person's English language ability is positively associated with ACS citizen-AR noncitizen discrepancies, again suggesting that

---

[42] In cases where the person came to live in the U.S. more than once, respondents are instructed to give the latest year.

[43] In results not shown here, we also estimate item response regressions with the full sample, regardless of AR citizenship status. The patterns are similar to those described in this paragraph, except that Hispanics have higher propensity to have item response for age in the full sample.

29

COM_DIS00009861

misunderstanding the question is an important factor behind ACS noncitizen-AR citizen, but not ACS citizen-AR noncitizen discrepancies. Responding without the participation of an interviewer results in lower item response (except for age for AR noncitizens), consistent with Camarota and Capizzano (2004), and this effect is particularly strong for citizenship item response among AR noncitizens. ACS noncitizen-AR citizen discrepancies are more prevalent with interviewer participation, but ACS citizen-AR noncitizen discrepancies are much less prevalent. Interviewers may develop a rapport that encourages noncitizens to truthfully respond to what is a sensitive question for them.[44] It could also be more difficult psychologically for a respondent to misreport to another person than when they fill out a questionnaire on their own.

As shown in Table 4, the associations with citizenship item response tend to be several times stronger for AR noncitizens than for citizens, with those missing AR citizenship falling in between the other two categories. Such differences are much more muted for sex and age. This again highlights the nonrandom nature of citizenship item nonresponse.

---

[44] This effect may be weaker in the Census than in the ACS, however, since ACS interviewers have much more experience than most Census enumerators.

COM_DIS00009862

31

**Table 4. Item Response Regressions**

| | Sex Item Response | | | Age Item Response | | | Citizenship Item Response | | |
|---|---|---|---|---|---|---|---|---|---|
| | AR Citizen | AR Noncitizen | AR Missing | AR Citizen | AR Noncitizen | AR Missing | AR Citizen | AR Noncitizen | AR Missing |
| Relative | -0.159 (0.007) | -0.079 (0.016) | -0.759 (0.039) | -0.234 (0.013) | -0.224 (0.060) | -4.446 (0.123) | -0.057 (0.010) | -0.480 (0.082) | -0.106 (0.066) |
| Nonrelative | -0.455 (0.035) | -0.309 (0.072) | -1.146 (0.084) | -2.353 (0.034) | -3.509 (0.307) | -9.533 (0.300) | -1.141 (0.047) | -7.395 (0.171) | -4.808 (0.200) |
| Non-Hispanic African Amer. | -0.136 (0.014) | -0.160 (0.050) | -0.003 (0.082) | -0.142 (0.029) | -0.227 (0.143) | -0.225 (0.247) | -0.122 (0.012) | -3.092 (0.185) | -0.979 (0.078) |
| Hispanic | 0.128 (0.013) | 0.002 (0.030) | 0.147 (0.069) | 0.033 (0.032) | 0.075 (0.103) | 2.068 (0.210) | -0.391 (0.024) | -4.432 (0.140) | -1.692 (0.119) |
| Other Non-Hispanic | 0.050 (0.017) | 0.038 (0.028) | 0.230 (0.072) | -0.100 (0.034) | -0.108 (0.092) | 1.229 (0.230) | -0.177 (0.031) | -2.320 (0.129) | -1.885 (0.152) |
| Worked in Last Week | 0.174 (0.008) | 0.073 (0.024) | 0.694 (0.037) | 0.334 (0.017) | 0.149 (0.081) | 1.872 (0.132) | 0.915 (0.013) | 8.687 (0.141) | 3.773 (0.088) |
| Searched for Job | 0.045 (0.020) | 0.017 (0.046) | 0.668 (0.063) | 0.457 (0.033) | 0.466 (0.126) | 3.834 (0.252) | 0.769 (0.016) | 7.414 (0.185) | 3.494 (0.114) |
| English Very Well | 0.116 (0.014) | 0.101 (0.029) | 0.690 (0.064) | 0.084 (0.035) | 0.068 (0.088) | 1.823 (0.224) | 0.087 (0.028) | -1.036 (0.133) | -0.580 (0.129) |
| English Well | 0.141 (0.023) | 0.050 (0.034) | 0.703 (0.073) | 0.306 (0.052) | 0.074 (0.102) | 3.044 (0.247) | 0.390 (0.056) | -1.688 (0.159) | -0.892 (0.191) |
| English Not Well | 0.125 (0.024) | -0.006 (0.041) | 0.523 (0.082) | 0.056 (0.073) | -0.148 (0.128) | 1.728 (0.270) | 0.475 (0.070) | -2.115 (0.191) | -0.441 (0.190) |
| English Not At All | 0.117 (0.035) | 0.070 (0.036) | 0.599 (0.072) | -0.179 (0.143) | -0.155 (0.189) | 3.178 (0.272) | 0.571 (0.122) | -1.241 (0.236) | 0.846 (0.178) |
| Better | 1.022 (0.010) | 0.338 (0.019) | 2.502 (0.061) | 1.384 (0.015) | 1.193 (0.040) | 9.002 (0.122) | 0.127 (0.008) | 1.766 (0.115) | 2.078 (0.125) |
| Linkage | | | | | | | | | |
| Mail or Internet Response | -0.967 (0.010) | -0.449 (0.024) | -2.703 (0.068) | -0.083 (0.019) | 0.708 (0.073) | -3.527 (0.156) | -0.397 (0.011) | -5.923 (0.122) | -2.329 (0.092) |
| Weighted Obs. | 264,700,000 | 21,910,000 | 39,950,000 | 264,700,000 | 21,910,000 | 39,950,000 | 264,700,000 | 21,910,000 | 39,950,000 |
| Unweighted Obs. | 4,418,000 | 280,000 | 558,000 | 4,418,000 | 280,000 | 558,000 | 4,418,000 | 280,000 | 558,000 |

Source: American Community Survey (ACS) and Census Numident, 2016. Notes: These regressions are estimated by linear probability models (LPM), weighted by ACS person weights. Standard errors are clustered by household. The base categories are reference person for relationship, non-Hispanic white for race/ethnicity, non-Hispanic white for relationship, and in-person or phone interview for response mode. We also include educational attainment (less than high school, high school but less than bachelor's degree, bachelor's degree, and graduate degree), log of one plus age and its square, and log of one plus the number of years in the U.S. and its square, but do not report them here.

**Table 5. Citizenship Status and Naturalization Year Disagreement Regressions**

|  | ACS Noncitizen-AR Citizen | ACS Citizen-AR Noncitizen | ACS – Numident Natural. Year |
|---|---|---|---|
| Relative | 0.028 | -0.753 | -0.343 |
|  | (0.011) | (0.215) | (0.068) |
| Nonrelative | 0.571 | -5.461 | -0.852 |
|  | (0.045) | (0.613) | (0.282) |
| Non-Hispanic African Amer. | -0.137 | 2.744 | 0.683 |
|  | (0.013) | (0.546) | (0.128) |
| Hispanic | 0.621 | -16.00 | 1.129 |
|  | (0.030) | (0.417) | (0.104) |
| Other Non-Hispanic | -0.327 | 0.755 | 0.144 |
|  | (0.034) | (0.376) | (0.093) |
| Worked in Last Week | 0.398 | 1.992 | 0.631 |
|  | (0.015) | (0.260) | (0.095) |
| Searched for Job | 0.302 | -0.620 | 0.136 |
|  | (0.029) | (0.542) | (0.157) |
| English Very Well | -0.452 | 1.983 | 0.517 |
|  | (0.031) | (0.373) | (0.096) |
| English Well | 0.114 | 1.063 | 0.712 |
|  | (0.081) | (0.426) | (0.107) |
| English Not Well | 1.461 | -4.927 | 0.997 |
|  | (0.113) | (0.480) | (0.129) |
| English Not At All | 3.391 | -8.282 | 1.656 |
|  | (0.260) | (0.592) | (0.210) |
| Better Linkage | 0.060 | 4.586 | 0.006 |
|  | (0.009) | (0.308) | (0.067) |
| Mail or Internet Response | -0.262 | 3.810 | 0.365 |
|  | (0.012) | (0.285) | (0.077) |
| Weighted Obs. | 250,300,000 | 20,220,000 | 6,407,000 |
| Unweighted Obs. | 4,165,000 | 254,000 | 89,000 |

Source: American Community Survey (ACS) and Census Numident, 2016.
Notes: These regressions are estimated by linear probability models (LPM), weighted by ACS person weights. Standard errors are clustered by household. The base categories are reference person for relationship, non-Hispanic white for race/ethnicity, speaks only English at home for English ability, and in-person or phone interview for response mode. We also include educational attainment (less than high school, high school but less than bachelor's degree, bachelor's degree, and graduate degree), log of one plus age and its square, and log of one plus the number of years in the U.S. and its square, but do not report them here.

The last specification of Table 5 shows that the ACS naturalization-Numident citizenship change gap is larger when reporting for a relative or especially a nonrelative, which could indicate lack of respondent knowledge about others' naturalization years.[45] Lack of English language ability is associated with a smaller gap between the ACS and Numident years, suggesting that misunderstanding the question is not an important explanatory factor. Employed people have smaller gaps, reflecting the incentive to promptly tell SSA about the naturalization to facilitate their employment eligibility verification.

---

[45] Since very few observations have Numident citizenship change years before the ACS naturalization year, a positive coefficient generally means a smaller gap.

COM_DIS00009864

**6. Effect of Citizenship Question on Unit Self-Response Rates**

To forecast the effect of adding a citizenship question to the 2020 Census, we compare mail response rates in the 2010 Census and the 2010 American Community Survey (ACS) for the same housing units. By comparing the self-response behavior of the same housing unit across two surveys, we control for the household's propensity to self-respond to mandatory Census Bureau household surveys in general.

The Census Bureau randomly selected a sample of households to receive the ACS questionnaire in 2010. The questionnaire included 75 questions and asked individuals to report their citizenship status. These households also received the full-count Census questionnaire in the same year, a list of 10 questions that did not include citizenship. We focus on Census housing units that received both questionnaires by mail. In the 2010 Census, these are the housing units from the initial mailing that did not have the questionnaire returned as Undeliverable as Addressed (UAA) and which were not classified as a vacant or delete (meaning uninhabitable or cannot be found). We define a 2010 Census self-response as a returned questionnaire from the first mailing that is not blank. For the 2010 ACS, a self-response is a mail response, also from the first contact mailing.

The presence of a citizenship question is not the only potential reason why a household may be less inclined to self-respond to the ACS than the Census. Census self-response is bolstered by a media campaign and intensive community advocacy group support, and the ACS questionnaire involves much greater respondent burden (OMB 2008, OMB 2009). To distinguish the citizenship question effect, we compare the actual ACS-Census difference in response rates for households that are likely to be more sensitive to the citizenship question to the ACS-Census difference for households less likely to be sensitive to the question. We assume that any reduction in self-response to the ACS vs. the Census for households unsensitive to the citizenship question is due to factors other than the presence of a citizenship question. We use two ways to divide the sample into sensitive and non-sensitive groups. The first is to define the sensitive group as households where at least one person is an AR noncitizen and has been assigned to this housing unit in Rastogi and O'Hara's (2012) administrative records person-address crosswalk (AR noncitizen households), and the less sensitive group is households where all of the persons assigned to the address are AR citizens (AR all-citizen households).[46] AR citizenship status is established using the 2010 Numident and ITINs, as described in Section 3.2.[47] The choice of noncitizens as the sensitive group is motivated by the results in Section 3.1 that AR noncitizens have much higher item nonresponse rates for the citizenship question, both relative to their nonresponse rates for other demographic questions and compared to other people for citizenship. The use of an independent source for where noncitizens are located avoids the potential problem that households with noncitizens may be less likely to provide PII on household members, preventing linkage to

---

[46] Here we impose a restriction that all household members have nonmissing AR citizenship for the less sensitive group, but we do not impose that restriction on the sensitive group.
[47] The initial definition of citizenship (treating all persons in the Numident but with missing citizenship as citizens) is used for this first set of groups. In the second set of groups, U.S.-born persons with missing citizenship in the Numident are treated as citizens, while foreign-born persons with missing citizenship in the Numident are treated as missing AR citizenship.

33

their AR citizenship data. The remaining noncitizen households where AR linkage is done may be relatively more cooperative, potentially biasing the results.

We examine a second set of groups for several reasons. We would like to project the citizenship self-response effect forward in time, since population characteristics associated with this effect may be changing. No administrative records person-place crosswalk is available after 2010, however, so we instead use the ACS household roster to define which people are living in the household.[48] AR noncitizens are probably not the people most sensitive to a citizenship question, since most of them are legal residents. Those lacking an SSN should presumably be even more sensitive to a citizenship question, so the AR noncitizen definition may exclude much of the sensitive population.[49] In our second dichotomy the less sensitive group is "AR & ACS all-citizen households", those households where all persons reported in the ACS to be living in the household at the time of the survey are AR citizens, and all are self-reported as being citizens in the ACS as well. The more sensitive group is "all other households", including those households where some residents are both AR citizens and self-reported citizens but at least one is not; there is a mismatch between the survey report and administrative record response; or citizenship status is not reported in one or both sources. We assume AR & ACS all-citizen households are less sensitive to a citizenship question than all other households, since they have demonstrated a willingness to provide citizenship status answers for all household members, those answers are consistent with administrative records and thus likely truthful responses,[50] and citizens presumably have less to fear about revealing their status than noncitizens. In comparison to others, more of this group's reluctance to self-respond to the ACS should be due to reasons other than the citizenship question, such as unwillingness to answer a longer questionnaire. Note that if some of the reluctance by AR & ACS all-citizens households to self-respond is due to the citizenship question in the ACS, then our analysis will underestimate the citizenship question unit self-response effect.

The sample size for the second set of groups is significantly larger than that for the first set of groups, because the first set excludes households where no persons are AR noncitizens at the address, but at least one person assigned to that address by administrative records cannot be linked to the Numident.

Table 6 displays unweighted 2010 Census and ACS response rates for the AR all-citizen households and AR noncitizen household groups. The self-response rate is higher for the 2010 Census than for the ACS for both citizenship categories, presumably reflecting the higher burden of the ACS. The all-citizen response rate is greater than the noncitizen rate in each survey, suggesting that noncitizen households have a lower participation rate in general. Most important for this study is understanding how the difference in self-response rate across groups varies

---

[48] Another reason to use the survey household roster rather than the AR crosswalk is that the AR crosswalk often places people in different locations. Rastogi and O'Hara (2012) report that among the 279.2 million persons in the 2010 Census who could be assigned a PIK, 27.2 percent are assigned to an address in the AR crosswalk that differs from their Census address.

[49] This is consistent with Camarota and Capizzano (2004), who say field representatives reported that illegal immigrants were less likely to respond than other foreign-born persons. Illegal immigrants are ineligible for SSNs.

[50] As shown in Section 4 above, when an administrative record shows that someone is a citizen, the ACS response is nearly always citizen as well, giving us a high degree of confidence that the person truly is a citizen.

34

COM_DIS00009866

between the 2010 Census and ACS. While the self-response rate for citizen households is 13.8 percentage points lower in the ACS than in the 2010 Census, the self-response rate for households with at least one noncitizen is 18.9 percentage points lower for the ACS than the self-response rate to the 2010 Census, which is a 5.1 percentage point difference between the two categories.

**Table 6. Comparison of 2010 ACS to 2010 Census Response Rates with Initial Assumptions**

|  | Self-Response Rate (%) | | Difference |
|---|---|---|---|
|  | 2010 ACS | 2010 Census |  |
| Households with at least | 52.6 | 71.5 | -18.9 |
| one AR noncitizen | (0.21) | (0.19) | (0.26) |
| AR all-citizen households | 66.1 | 79.9 | -13.8 |
|  | (0.05) | (0.04) | (0.06) |
| Difference-in-differences |  |  | -5.1 |
|  |  |  | (0.26) |

Source: 2010 ACS 1-year file, 2010 Census Unedited File (CUF), and 2010 Numident.
Notes: 2010 CUF self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. All persons in the 2010 Numident that are missing citizenship are treated as citizens here. Robust standard errors are in parentheses, calculated from regressions. The estimates are unweighted. Around 5.9 percent of the households have at least one noncitizen. The sample size is 929,000. DRB clearance number CBDRB-2017-CDAR-001.

Using survey weights can facilitate comparisons of results across years, since sampling can change, and we would like to be able to project results forward in time. We thus display weighted response rates in Table 7, now both for the first and second sets of groups. As expected, the restriction to being a citizen in both the AR and ACS results in higher self-response rates in the AR & ACS all-citizen household group compared to the AR all-citizen household group. The response rates for the two noncitizen groups differ little from each other. The difference-in-differences estimate for the first set of groups increases to 8.9 percentage points compared to the unweighted gap in Table 6. It is three percentage points higher (11.9) across the second set of groups.

35

COM_DIS00009867

**Table 7. Comparison of 2010 ACS to 2010 Census Response Rates (Weighted)**

| | Self-Response Rate (%) | | Difference |
|---|---|---|---|
| | 2010 ACS | 2010 Census | |
| Households with at least | 42.4 | 62.1 | -19.7 |
| one AR noncitizen | (0.32) | (0.18) | (0.26) |
| AR all-citizen households | 62.0 | 72.8 | -10.8 |
| | (0.34) | (0.11) | (0.24) |
| Difference-in-differences | | | -8.9 |
| | | | (0.35) |
| All other households | 42.0 | 62.7 | -20.7 |
| | (0.32) | (0.14) | (0.25) |
| AR & ACS all-citizen | 65.6 | 74.4 | -8.9 |
| households | (0.33) | (0.11) | (0.24) |
| Difference-in-differences | | | -11.9 |
| | | | (0.34) |

Source: 2010 ACS 1-year file, 2010 Census Unedited File (CUF), and 2010 Numident.
Notes: 2010 CUF self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. The standard errors are in parentheses. The standard errors for the self-response rates and differences are calculated using Fay's balanced repeated replication variance estimation method, with 80 replicate weights, adjusting the original weights by a coefficient of 0.5. The difference-in-differences ($DiD$) standard errors ($SE$) are calculated as $DiD\ SE = \sqrt{SE(Est_1)^2 + SE(Est_2)^2}$, where the two estimates ($Est$) are the 2010 Census – 2010 ACS differences for the two groups. The estimates use ACS housing unit weights. 88.2 percent of households are in the AR all-citizen household group vs. 11.8 percent in the households with at least one AR noncitizen group. 74.9 percent are in the AR & ACS all-citizen household group vs. 25.1 percent in the all other households group. The number of observations is 1,418,000.

The larger decline in self-response rates for the AR noncitizen household and all other households groups may not actually be due to greater sensitivity. Other characteristics besides citizenship status could be associated with lower ACS self-response, and the AR noncitizen household and all other households groups could have a higher propensity to have such characteristics. To explore this possibility, we perform Blinder-Oaxaca decompositions (Blinder 1973 and Oaxaca 1973).[51]

Households may belong to one of two groups $G \in (S, U)$, where the $S$ group is thought to be potentially sensitive to a citizenship question, while the $U$ group is not. We set the self-responses $R_{G_i ACS_t}$ and $R_{G_i Census_t}$ equal to 100 if household $i$ in group $G$ self-responds in year $t$ to the ACS and Census, respectively, and zero otherwise.[52] The difference between the survey responses is

$$\Delta R_{G_i t} = R_{G_i ACS_t} - R_{G_i Census_t} \qquad (1)$$

The vector of predictors $X$ includes household size and reference person characteristics (sex, race/ethnicity, age, educational attainment, household income, working in the last week, job search

---

[51] This method was initially developed to study the extent to which the gender wage gap is due to different distributions of characteristics associated with wages by gender (explained variation) vs. differing behavior across gender for a given set of characteristics (unexplained variation). The unexplained variation is usually attributed to discrimination, but it also captures any effects of differences in unobserved variables.
[52] We use 100 for response so that the results are expressed in percentages.

36

COM_DIS00009868

in the last four weeks, and English language ability among those speaking a language other than English at home). β contains the slope parameters and intercept, and ε is an error term with mean zero.

We estimate OLS models for each household group

$$\Delta R_{S_{it}} = X'_{S_{it}} \beta_{S_t} + \varepsilon_{S_{it}} \tag{2}$$

$$\Delta R_{U_{it}} = X'_{U_{it}} \beta_{U_t} + \varepsilon_{U_{it}} \tag{3}$$

The difference-in-differences in expected self-response rates across the two surveys for the two groups $S$ and $U$ in year $t$ is

$$\Delta\Delta R_{SU_t} = E(\Delta R_{S_t}) - E(\Delta R_{U_t}) \tag{4}$$

We decompose this as follows:

$$\Delta\Delta R_{SU_t} = \left[E(X_{S_t}) - E(X_{U_t})\right]' \beta_{U_t} + \left[E(X_{S_t})'(\beta_{S_t} - \beta_{U_t})\right] \tag{5}$$

The first term (explained variation) applies the coefficients for the unsensitive group to the difference between the expected value of the sensitive group's predictors and those of the unsensitive group. The second (unexplained variation) is the difference between the expected value of the sensitive group's predictors applied to the sensitive group's coefficients and the same predictors applied to the unsensitive group's coefficients. The interpretation that the unexplained variation represents the citizenship question effect is dependent on the assumption that there are no unobserved variables relevant to the difference-in-differences in self-response across the two surveys.

Table 8 shows the results of the Blinder-Oaxaca decomposition for the two sets of groups. In the AR all-citizen vs. AR noncitizen comparison, virtually all the difference-in-differences is explained by differences in predictors across the two groups. Thus, it appears that the larger fall in self-response to the ACS vs. the Census for AR noncitizen households is not due to sensitivity to the citizenship question, but rather that AR noncitizen households have a greater propensity to have other characteristics that are associated with lower ACS self-response. In contrast, about half (6.1 percentage points) of the difference-in-differences for the AR & ACS all-citizen vs. all other household comparison is unexplained, suggesting that the larger drop-off in ACS self-response for all other households is partly due to sensitivity to the citizenship question. Appendix Table A13 shows the regression coefficients for equations (2) and (3), and the explained variation and unexplained variation coefficients for each predictor are shown in Appendix Table A14.

37

**Table 8. Blinder-Oaxaca Decomposition of Comparison of Predicted 2010 ACS to 2010 Census to Response Rates by Households Citizenship Type**

|  | 2010 ACS − 2010 Census |
| --- | --- |
| Households with at least | -19.7 |
| one AR noncitizen | (0.13) |
| AR all-citizen households | -10.8 |
|  | (0.12) |
| Difference-in-differences | -8.9 |
|  | (0.09) |
| Explained | -8.7 |
|  | (0.11) |
| Unexplained | -0.2 |
|  | (0.13) |
| All other households | -20.7 |
|  | (0.12) |
| AR & ACS all-citizen households | -8.9 |
|  | (0.12) |
| Difference-in-differences | -11.9 |
|  | (0.07) |
| Explained | -5.8 |
|  | (0.14) |
| Unexplained | -6.1 |
|  | (0.16) |

Source: 2010 ACS 1-year file, 2010 Census Unedited File (CUF), and 2010 Numident.

Notes: 2010 CUF self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. The standard errors are in parentheses. The standard errors are bootstrapped using 80 ACS replicate weights. The number of observations is 1,418,000.

To see how changes in predictors over time affect the magnitude of the unexplained variation ($UV$) in the decomposition, we apply the coefficients from the 2010 models to the predictors in the 2016 ACS

$$UV_{2016} = E\left(X_{S_{2016}}\right)' \beta_{S_{2010}} - E\left(X_{S_{2016}}\right)' \beta_{U_{2010}} \qquad (6)$$

Table 9 shows that the unexplained variation is still insignificant for the AR all-citizen vs. AR noncitizen comparison. It is of a similar magnitude in 2016 as in 2010 (5.8 percentage points vs. 6.1) for the AR & ACS all-citizen vs. all other household comparison. Note that this does not capture changes over time in the degree of sensitivity to a citizenship question for a housing unit with a fixed set of characteristics. That would require estimating models on fresher data of surveys with and without a citizenship question for the same households.

38

COM_DIS00009870

**Table 9. Comparison of Predicted 2016 ACS to 2010 Census Response Rates for AR Noncitizen and All Other Households with Their Own vs. All-Citizen Models**

|  | 2016 ACS – 2010 Census |
|---|---|
| Model\Sample | AR noncitizen household sample |
| AR noncitizen household model | -19.7 |
|  | (0.47) |
| AR all-citizen household model | -20.5 |
|  | (0.34) |
| Difference-in-differences | 0.8 |
|  | (0.58) |
| Model\Sample | All other household sample |
| All other household model | -21.7 |
|  | (0.33) |
| AR & ACS all-citizen household model | -15.9 |
|  | (0.39) |
| Difference-in-differences | -5.8 |
|  | (0.51) |

Source: 2016 ACS 1-year file and 2016 Numident.
Notes: 2010 Census self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. The standard errors are in parentheses. The standard errors for the 2010 Census – 2016 ACS response differences are calculated using Fay's balanced repeated replication variance estimation method, with 80 replicate weights, adjusting the original weights by a coefficient of 0.5. The difference-in-differences ($DiD$) standard errors ($SE$) are calculated as $DiD\ SE = \sqrt{SE(Est_1)^2 + SE(Est_2)^2}$, where the two estimates ($Est$) are the 2010 Census – 2016 ACS differences for the two groups. The estimates use ACS housing unit weights. 28.6 percent are in the all other households group in 2016. The standard errors are in parentheses. They are the standard errors of the model predictions, based on the bootstrapped regressions in Appendix Table A12 that use 80 ACS replicate weights. The number of observations is 163,000 for the AR noncitizen household sample and 477,000 for the all other household sample.

Though suggestive, these exercises and the ones performed below are not perfect laboratories for studying the self-response effect of inclusion of a citizenship question on the 2020 Census. The ACS contains 75 questions, so any one question is unlikely to stand out, whereas an added question will be more visible in the 2020 Census questionnaire, which contains just 10 other questions.[53] Thus, we would ideally want to compare response rates on a short questionnaire without a citizenship question to one adding just the citizenship question. Second, the level of concern about using citizenship data for enforcement purposes may be very different in 2020 than it was in 2000 or 2010, so a more recent test would be preferable. These factors suggest the estimated effect on self-response from the exercise in Table 9 is conservative.

---

[53] A preferable test would be a randomized control trial (RCT) comparing self-response rates where some households are randomly chosen to have an 11-question Census questionnaire with a citizenship question (the treated group), and a randomly chosen set of control households receive a 10-question Census questionnaire without citizenship.

39

COM_DIS00009871

As robustness checks we do similar exercises below with the 2000 Census and the 2014 Survey of Income and Program Participation (SIPP), a longitudinal survey that follows the same individuals over time. Unlike the decennial census and the ACS, individuals respond for themselves in the SIPP. The 2000 Census long form (sent to one of every six housing units, selected randomly) contained a citizenship question among many other additional questions, while the short form (sent to the remaining housing units) did not. As in the first set of groups above, we divide housing units into those with all citizens and those with at least one noncitizen, based on citizenship data from the 2002 Numident for persons enumerated at those housing units in the 2000 Census.[54] As with the 2010 ACS and Census exercises, Table 10 shows that self-response rates are higher in the short form than the long form, and they are higher in households with all citizens. The short- vs. long-form difference in response rates is greater for households with at least one noncitizen by 3.3 percentage points, again consistent with the possibility that households with noncitizens are more sensitive to the inclusion of citizenship questions.

**Table 10. 2000 Census Long Form and Short Form Analysis**

| Households by Citizen | Self-response rate (%) | | Difference |
|---|---|---|---|
| | Long Form | Short Form | |
| At Least One Noncitizen | 62.5 | 71.0 | -8.5 |
| | (0.017) | (0.016) | (0.023) |
| All Citizens | 76.1 | 81.3 | -5.2 |
| | (0.005) | (0.004) | (0.006) |
| Difference | 13.6 | 10.3 | -3.3 |
| | (0.017) | (0.016) | (0.024) |

Source: 2000 Census short and long forms.
Notes: These are weighted using housing unit weights. The number of short forms is 105.5 million, and the number of long forms is 16.4 million. The definition of self-response is mail response here. Robust standard errors are in parentheses, generated from weighted regressions of response on an interaction of the household citizenship status with short form. The standard errors for the differences are calculated as $SE(Est_1 - Est_2) = \sqrt{SE(Est_1)^2 + SE(Est_2)^2}$.

Longitudinal data provide another means for understanding response sensitivity to questions of citizenship. Using the 2014 Survey of Income and Program Participation (SIPP) longitudinal panel waves 1 and 2, we show how nonresponse changes from Wave 1 to Wave 2 for noncitizen respondents, as well as for households with at least one noncitizen. The first row in Table 11 shows nonresponse rates for noncitizens from the 2014 Survey of Income and Program Participation (SIPP) Waves 1 and 2. Noncitizens made up around 6 percent of the 2014 SIPP survey in Wave 1. The proportion of noncitizens in Wave 2 decreased slightly, implying that noncitizens were more

---

[54] To be classified as a housing unit with all citizens in this exercise, all persons must be linked to the Numident. A housing unit can be classified as having at least one noncitizen if there is at least one person linked to the Numident who is a Numident noncitizen, whether or not all the other persons in the housing unit could be linked to the Numident or not.

40

COM_DIS00009872

likely to leave the survey due to attrition or other factors than citizens. In addition, the rate of nonresponse among those households with at least one noncitizen increased from Wave 1 to Wave 2, from 7.9 percent to 8.5 percent. While noncitizens were more likely to drop out of the survey, those who stayed were more likely to live in households where at least one member did not respond. These data provide additional hints of the potential future impact to nonresponse for noncitizens in surveys that ask about citizenship status.

**Table 11. Noncitizens and Nonresponse in the 2014 Survey of Income and Program Participation**

|  | Wave 1 | | Wave 2 | |
|  | (%) | (se) | (%) | (se) |
| Noncitizens | 6.1 | (0.144) | 5.7 | (0.174) |
| At least one member in the noncitizen household did not respond | 7.9 | (0.473) | 8.5 | (0.537) |

Source: 2014 SIPP, Waves 1 and 2
Notes: Citizenship status refers to status in Wave 1. The standard errors are clustered in Wave 2. These estimates are run on the internal run 16 version of the 2014 SIPP.

**7. Effects of Citizenship Question on Nonresponse Follow-up Costs and Enumeration Quality**

A drop in the self-response rate from adding a citizenship question in Alternatives B (obtaining citizenship from the 2020 Census only) and D (obtaining citizenship from the 2020 Census and administrative records) results in increased costs in the Nonresponse Follow-up (NRFU) operation and affects the quality of the population count. Households deciding not to self-respond because of the citizenship question are likely to refuse to cooperate with enumerators coming to their door in NRFU, resulting in the use of neighbors as proxy respondents on their behalf. [55] As shown in Table 12, Mule (2012) reports that the correct enumeration rate is 27.1 percentage points lower for proxies than mail in self-responses based on data from the 2010 Census Coverage Measurement (CCM) survey. The person linkage rate is 62.9 percentage points lower for proxies than for mail in self-responses in the 2010 Census, according to Rastogi and O'Hara (2012). Both these studies provide suggestive evidence that proxies supply poor quality individual demographic and socioeconomic characteristic information about the person on behalf of whom they are responding.

---

[55] A proxy response is a response about the household by someone outside the household, such as a neighbor or property manager. The enumerator will seek a proxy response for households that don't mail back their Census questionnaire or give an in-person interview after several attempts.

41

COM_DIS00009873

**Table 12. Enumeration Quality in Mailout/Mailback and Nonresponse Follow-up (NRFU) Proxy Responses**

|  | Mailout/Mailback Response | NRFU Proxy |
|---|---|---|
| Correct Enumerations | 97.3 | 70.2 |
| Erroneous Enumerations | 2.5 | 6.7 |
| Whole-Person Census Imputations | 0.3 | 23.1 |
| Person Linkage Rate | 96.7 | 33.8 |

Source: Mule (2012) for correct enumerations, erroneous enumerations, and whole-person Census imputations, and Rastogi and O'Hara (2012) for the person linkage rate.

We provide two sets of estimates, the first based on our initial assumptions (in parentheses), and a second based on revised assumptions. The main changes in the revised assumptions are an expansion of the group of housing units considered potentially sensitive to a citizenship question and the estimated percentage of them who will not respond to a questionnaire due to the presence of a citizenship question (5.8 percent in Table 9 vs. 5.1 percent in Table 6).

Using these estimates as well as the data in Table 12, we can develop cautious estimates of the data quality and cost consequences of adding the citizenship question to the enumeration form. We assume that all-citizen households are unaffected by the change and that an additional 5.8 percent (5.1 percent) of households that possibly have noncitizens go into NRFU because they do not self-respond.[56] We expect 320 million persons in 126 million occupied households in the 2020 Census.[57] Based on a combination of administrative records from the 2016 Numident and ITINs and the 2016 ACS, we estimate that 28.6 percent (9.8 percent) of all households could potentially contain at least one noncitizen. Combining these assumptions implies an additional 2,090,000 households (630,000 households) and 6.5 million persons (1.6 million persons) in NRFU.[58] If the NRFU data for those households have the same quality as the average NRFU data in the 2010 Census, then the result would be 561,000 (139,000) fewer correct enumerations, of which 185,000 (46,000) are additional erroneous enumerations and 376,000 (93,000) are additional whole-person census imputations. This analysis assumes that during the NRFU operations a cooperative member of the household supplies data 79.0 percent of the time, and 21.0 percent receive proxy responses. If all of these new NRFU cases go to proxy responses instead,[59] the result would be 1,750,000

---

[56] Recall that the initial estimate is based on households with at least one AR noncitizen, which is only a fraction of the housing units in the all other households category, which also includes persons with missing citizenship in AR or the ACS or citizenship values that conflict between AR and the ACS.

[57] We assume 10 million residents of group quarters. Group quarters are not included in either mailout/mailback or NRFU operations, and here we assume no effect of a citizenship question on their enumeration.

[58] The initial assumption here is that average household size for households with at least one noncitizen is the same as the forecast for all households in the 2020 Census (2.54 persons). The revised assumption is that average household size for all other households is the same as its average in the 2016 ACS, 3.1 persons.

[59] If a household declines to self-respond due to the citizenship question, we suspect it would also refuse to cooperate with an enumerator coming to their door, resulting in a need to use a proxy.

42

COM_DIS00009874

(432,000) fewer correct enumerations, of which 272,000 (67,000) are erroneous enumerations, and 1,477,000 (365,000) are whole-person census imputations.[60] The number of persons who are linkable to administrative records would fall by 4.1 million (1 million).

Our estimate of the incremental cost proceeds as follows. Using the analysis in the paragraph above, the estimated NRFU workload will increase by approximately 2,090,000 households (630,000 households), or approximately 1.66 percentage points (0.5 percentage points). We currently estimate that for each percentage point increase in NRFU, the cost of the 2020 Census increases by approximately $55 million. Accordingly, the addition of a question on citizenship could increase the cost of the 2020 Census by at least $91.2 million ($27.5 million). It is worth stressing that this cost estimate is a lower bound. Our estimate of $55 million for each percentage point increase in NRFU is based on an average of three visits per household. We expect that many more of these noncitizen households would receive six NRFU visits.

## 8. Distribution of 2020 Citizenship Data Sources by Collection Method

Figures 10-12 provide forecasts of how many U.S. residents in the 2020 Census acquire their citizenship data from survey responses, administrative records, and model-based imputation methods in Alternatives B, C, and D. Once again we provide forecasts based on initial and revised assumptions, with initial forecasts in parentheses.[61] A reduction in self-response rates and increase in proxy responses from adding the citizenship question in Alternatives B and D is likely to affect the number of persons with survey responses for citizenship. As shown above, reference persons are much less likely to answer the citizenship question for nonrelatives in the household than for themselves, so they may be even less likely to answer it for neighbors. In order to obtain a range of estimates based on best and worst case scenarios, Figure 10 Panel A and Figure 12 Panels A and B assume that proxies report citizenship at the same rate as they do in the 2010 ACS relative to all persons in the 2010 ACS,[62] while Figure 10 Panels B and C and Figure 12 Panels C and D assume none of the proxies report citizenship.

We begin with the estimated 2020 Population of 330 million, the total number of persons we expect to count in the 2020 Census. Under Alternative B with complete citizenship data from proxy

---

[60] These enumeration errors may not be avoidable simply by spending more money on fieldwork. Once a household decides not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on their door.

[61] In addition to the differences between the initial and revised assumptions mentioned in Section 7, two others are relevant here. One is that the initial assumptions classify foreign-born persons with missing citizenship in the Numident and without an ITIN as AR citizens, while the revised assumptions classify them as having missing AR citizenship. A second is that instead of showing the difference in the AR linkage rate with and without a citizenship question in the 2020 Census as an increase in the AR linkage rate in Alternative C, the revised assumptions show it as a decrease in the AR linkage rate in Alternative D.

[62] Within 2010 ACS households that have NRFU proxy responses in the 2010 Census, the nonmissing citizenship rate is 96.7 percent, vs. 97.1 percent for all ACS households. We apply this proxy to total sample ratio to the 93.7 percent nonmissing citizenship rate in the 2016 ACS to get an estimated 92.9 percent nonmissing citizenship rate for proxies in 2020.

COM_DIS00009875

responses, 309.1 million citizenship responses are obtained from the Census. Applying the missing citizenship rate of 6.3 percent in the 2016 ACS, we expect 20.9 million to have missing data for the citizenship question, either because the respondent skipped the question, or because a proxy response in nonresponse follow-up (NRFU) did not deliver information on that question. Citizenship is imputed using models for these 20.9 million persons.[63] With no citizenship data from proxy responses, the number of citizenship responses drops to 290 million (294.6 million), with 40 million (35.4 million) modeled.[64] The accuracy of this imputation system is unknown at this time. As discussed above, the imputation will be challenging due to the fact that nonresponse is highly correlated with citizenship.

Under Alternative C, we expect to link 289.6 million (295.0 million) to administrative records containing citizenship data, applying the linkage rate for the 2016 ACS to currently available administrative records.[65] The remaining 40.4 million (35.0 million) will have citizenship imputed using models based on the variables common to the linked and non-linked portions of the data. At this time, the accuracy of that imputation system is not known, but it would be based on the administrative record citizenship variable, so it would not be subject to the biases caused by survey citizenship reporting issues.

Of the 309.1 million who provide valid responses to the Census citizenship question in Alternative D, we expect to link 269.6 million (272.5 million) records to the administrative data.[66] Of these, the vast majority, 260.9 million (263.0 million), will have administrative record and Census responses that agree (applying the 2016 ACS-AR agreement rate of 96.8 percent), and since the agreement is with the same administrative record system as in Alternative C, these people will have the same citizenship status under either alternative. Of the 269.6 million (277.4 million) linked Census responses with a valid answer to the 2020 Census question, we expect the administrative record and the Census response to disagree for 8.7 million (9.7 million). These are the persons for whom we have two choices: (1) accept the Census questionnaire answer or (2)

---

[63] General imputation models develop a response for those who did not respond using all available relevant data.

[64] Based on the analysis in Table 9, under our revised assumptions we project 6.5 million additional proxy responses due to the citizenship question, of which an estimated 840,000 already have missing citizenship (applying the allocation rate of 13.0 percent from the 2016 ACS among persons who do not both report being citizens and are AR citizens). This is in addition to an estimated 14.5 million proxy responses in 2020 without a citizenship question, of which an estimated 1,030,000 already have missing citizenship (applying the 2016 ACS citizenship item allocation rate of 6.3 percent among all ACS-AR citizenship groups, adjusted by the ratio of the 2010 ACS citizenship allocation rate for 2010 Census proxy respondents (3.3 percent) to the 2010 ACS citizenship allocation rate for the whole 2010 ACS sample (2.9 percent)). Note that the proxy responses that are anticipated to occur in 2020 regardless of presence of a citizenship question may happen in households containing people in any ACS-AR citizenship group, whereas the additional proxies due to the citizenship question are assumed to come from housing units where people are not in the group with both ACS and AR citizen responses.

[65] As discussed in Section 7, our initial estimate of the effect of a citizenship question on the number of linkable persons is 1 million, and the revised estimate is 4.1 million. Our initial estimate adds 1 million to the number of linked persons when no citizenship question is included in the questionnaire. We incorporate the change in the number of linkable persons as a reduction in AR linkage in Alternative D for our revised estimate, as discussed below.

[66] When applying the 2016 ACS linkage to administrative record citizenship rate, the estimate is 273.4 million persons with linked citizenship. Of the 4.1 million anticipated reduction in linkage due to the citizenship question in our revised estimate, about 3.9 million are applied to the group with observed 2020 citizenship, as 93.7 percent of persons are anticipated to have observed 2020 citizenship (applying the missing citizenship rate in the 2016 ACS).

44

COM_DIS00009876

replace the questionnaire answer with the administrative answer. If we do the former, all of these cases will differ from the Alternative C answer. The estimated direct response is U.S. citizen for 7.6 million (7.7 million) of these persons, compared to 1.1 million (2.0 million) in the administrative records. Use of direct responses for those with disagreement would result in a projected 6.5 million (5.7 million) more U.S. citizens than when using administrative records.[67]

Continuing with Alternative D, we would process the 20.9 million responses where we did not get a valid answer to the Census citizenship question as in Alternative C. This would result in 16.0 million (16.6 million) persons for whom we expect to find an answer in the administrative records, and 4.9 million (4.3 million) for whom we would use a modeled answer.[68] The models would be developed using the same methods as in Alternative C, but not the same input data, because of the change in response behavior associated with asking the citizenship question.

When 2020 citizenship is observed in Alternative D, but the record cannot be linked to administrative data, we would accept the survey response for an expected 39.5 million (31.7 million) people. The number of persons whose records can be linked to administrative data is lower by 4.1 million (10.7 million) in Alternative D than in Alternative C due to poorer linkage quality from proxy responses, which would have been self-responses without a citizenship question (see Table 10). This captures the negative effect of inclusion of the citizenship question on the ability to use administrative data for citizenship.

When we assume that none of the proxy responses report citizenship, the number where 2020 citizenship is observed falls to 289.5 million (294.6 million) in Alternative D, just as in Alternative B. 263.4 million (272.5 million) of these are linked to administrative record citizenship, 255.6 million (263.0 million) of those answers agree between sources, and 7.8 million (9.5 million) disagree. The direct response for the latter group is U.S. citizen for 6.8 million (7.5 million) vs. 1.0 million (2.0 million) U.S. citizens in administrative records, leading to a 5.8 million (5.6 million) higher count of U.S. citizens if direct responses are used.

Of the 26.6 million (22.2 million) persons for whom 2020 citizenship is observed, but the record cannot be linked to administrative data, we estimate that about 560,000 (500,000) noncitizens will respond as citizens, based on the AR noncitizens reporting as ACS citizens share of the 2016 ACS (2.3 percent in the initial estimates and 2.1 percent in the revised estimates).

These results show that there is a tendency for persons missing citizenship in one source to also be missing it in the other. Among persons with observed 2020 Census citizenship in Figure 12 Panel D, 90.8 percent have AR citizenship, while only 55.5 percent of those without 2020 Census citizenship have AR citizenship. Of those with AR citizenship, 92.2 percent have 2020 Census citizenship, but just 59.9 percent of those without AR citizenship have 2020 Census citizenship. The correlated missingness reduces the coverage gain from using multiple sources. Only 22.2 million persons' citizenship values can be covered by AR among those without 2020 Census

---

[67] To put this in context, the 2016 ACS estimates that 22.5 million U.S. residents are noncitizens, or 7.0 percent of the population.
[68] Here we apply the remainder of the anticipated 4.1 million reduction in linkage to administrative record citizenship due to increased proxy response to the group for which 2020 citizenship is not observed.

COM_DIS00009877

citizenship, whereas AR coverage would be 34.6 million if the missingness correlation were zero. Analogously, just 26.6 million persons missing AR citizenship have 2020 Census citizenship, vs. 39.0 million if the correlation were zero.

Across the three alternatives, the data for at least 255.6 million (263.0 million) persons would be identical, and it would be identical for at least 276.9 million (284.3 million) between alternatives C and D. If the administrative record response is used when the cases disagree, then the data for alternatives C and D would agree for 285.6 million (294.0 million) linked cases.

Alternative C results in more persons with modeled citizenship responses, while Alternative D has fewer imputations. If no proxy respondents report citizenship, then Alternative B has about the same number of imputations as Alternative C, but otherwise its level is in between that of Alternatives C and D.

As mentioned above, the estimated reduction in self-response due to the inclusion of a citizenship question is based on a comparison of a long 2010 ACS questionnaire to a short 2010 Census questionnaire. The visibility of the citizenship question may be more prominent when added to a short questionnaire, resulting in a larger reduction in self-response than what we have estimated here. If the assumption that all proxy responses result in citizenship item nonresponse is accurate, every additional person without Census citizenship will have to have modeled citizenship in Alternative B. With Alternative D, fewer of the additional nonresponses will be modeled, as some can be linked to administrative record citizenship data. The option to use administrative records in Alternative D thus partially mitigates the citizenship question self-response effect.

These estimates are based on currently available administrative record citizenship data and linkage capability. The Census Bureau may obtain several additional sources by 2020 and develop better linkage, in which case administrative record coverage may be higher than that shown here. This would lead to fewer imputations in Alternative D and especially Alternative C. The number of imputations in Alternative C is not much higher than in Alternative B, so even a small improvement in administrative record citizenship data coverage would lead to a lower imputation rate in Alternative C than B. Alternative D's advantage in coverage over Alternative C would shrink, though it is unlikely to vanish completely.

A key question when comparing Alternatives C and D is whether the data quality is higher for the 2020 Census or for imputed values for the persons with imputations in Alternative C and observed 2020 Census data in Alternative D. Survey citizenship data exhibit a markedly higher U.S. citizen share compared to administrative records for persons with both sources, but it is unknown whether that tendency also applies to persons without links to administrative records.

A second question is what data source(s) to use when administrative records and the survey response disagree in Alternative D. Citizenship status is verified via documentation from the issuing government agencies in the administrative records data, but not in the survey, and the analysis in Section 4 above exhibits patterns suggesting that the survey responses are more often inaccurate when they disagree. On the other hand, using administrative records when the sources disagree would mean that the survey response contribution to the citizenship statistics would be minor – it would only be necessary for persons without linked administrative record citizenship

46

data. The 2020 Census citizenship data is the sole source for 8.1 percent (6.7 percent) of persons in Figure 12 Panel D (Panel C), and this share could be smaller if administrative record coverage improves or survey coverage is lower than estimated. It could be difficult to justify burdening respondents with this question if needed for only a small fraction of the population.

**Figure 10. Alternative B**



Panel A. Alternative B, Proxies Report Citizenship



Panel B. Alternative B, Proxies Don't Report Citizenship, Initial Assumptions

47

COM_DIS00009879



Panel C. Alternative B, Proxies Don't Report Citizenship, Revised Assumptions

COM_DIS00009880

**Figure 11. Alternative C**



Panel A. Initial Assumptions



Panel B. Revised Assumptions

49

**Figure 12. Alternative D**



Panel A. Alternative D, Proxies Report Citizenship, Initial Assumptions

COM_DIS00009882

51



Panel B. Alternative D, Proxies Report Citizenship, Revised Assumptions

COM_DIS00009883



Panel C. Alternative D, Proxies Don't Report Citizenship, Initial Assumptions

COM_DIS00009884



Panel D. Alternative D, Proxies Don't Report Citizenship, Revised Assumptions

COM_DIS00009885

## 9. Conclusion

This paper analyzes general issues of data quality in self-reported citizenship data and examines the coverage and quality of survey-collected and administrative records data available to produce block-level estimates of the Citizen Voting Age Population (CVAP). Our descriptive and regression analyses suggest that many noncitizens misreport their own citizenship on the American Community Survey (ACS), and, in many cases, they do not provide it at all for other noncitizens in the household. The evidence also suggests some naturalized persons either do not notify the Social Security Administration (SSA) about their change in citizenship status or they do so with delay. This potential weakness in SSA data illustrates the desirability of obtaining more timely and complete citizenship data from the U.S. Customs and Immigration Services (USCIS), Customs and Border Protection (CBP), and the State Department. Addressing survey misreporting would be more difficult, however. In the absence of 100 percent complete, accurate, and up to date administrative records, one cannot rule out the possibility that the self-reported citizenship status is correct. Conceptually, it would be challenging to decide which answer to use when sources conflict. Asking respondents to provide proof of citizenship status could reduce misreporting, but this would significantly increase respondent burden and the cost of administering the survey, and it could result in additional unit nonresponse.

This paper's examination of several Census Bureau surveys with and without citizenship questions suggests that households that may contain noncitizens are more sensitive to the inclusion of citizenship in the questionnaire than all-citizen households. The implication is that adding a citizenship question to the 2020 Census would lead to lower self-response rates in households potentially containing noncitizens, resulting in more nonresponse follow-up (NRFU) fieldwork, more proxy responses, and a lower-quality population count.

54

COM_DIS00009886

# References

American Community Survey, 2014, "Variance Estimation," in *American Community Survey Design Methodology (January 2014)* version 2.0, Chapter 12, https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/acs_design_methodology_ch12_2014.pdf, accessed on June 27, 2018.

American Community Survey, 2016a, "Unweighted Housing Unit Sample," Table B98001 – American Community Survey 1-Year Estimates. U.S. Census Bureau, Washington DC, accessed on June 27, 2018, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

American Community Survey, 2016b, "Housing Units," Table B25001 – American Community Survey 1-Year Estimates. U.S. Census Bureau, Washington DC, accessed on June 27, 2018, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk.

American Community Survey, 2016c, "Selected Population Profile in the United States," Table S0201 – American Community Survey 1-Year Estimates. U.S. Census Bureau, Washington DC, accessed on July 31, 2018, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_16_1YR_S0201&prodType=table.

American Community Survey, 2018a, "Item Allocation Rates," accessed July 9, 2018, https://www.census.gov/acs/www/methodology/sample-size-and-data-quality/item-allocation-rates/.

American Community Survey, 2018b, "Item Allocation Rates Definitions," accessed July 9, 2018, https://www.census.gov/programs-surveys/acs/methodology/sample-size-and-data-quality/item-allocation-rates-definitions.html.

Amuedo-Dorantes, C., and F. Lozano, 2014, "Piecemeal Immigration Enforcement and the New Destinations of Interstate Undocumented Migrants: Evidence from Arizona," mimeo, Pomona College and San Diego State University.

Amuedo-Dorantes, C., and F. Lozano, 2015, "On the Effectiveness of SB1070 in Arizona," *Economic Inquiry*, 53, pp. 335-51. https://doi.org/10.1111/ecin.12138

Baumgardner, Stephanie K., Deborah H. Griffin, and David A. Raglin, 2014, "The Effects of Adding an Internet Response Option to the American Community Survey," 2014 American Community Survey Research and Evaluation Report Memorandum Series ACS14-RER-21.

Blinder, Alan S., 1973, "Wage Discrimination: Reduced Form and Structural Estimates," The Journal of Human Resources, 8, pp. 436-455. https://doi.org/10.2307/144855.

Bohn, Sarah, Magnus Lofstrom, and Steven Raphael, 2014, "Did the 2007 Legal Arizona Workers Act Reduce the State's Unauthorized Immigrant Population?" *Review of Economics and Statistics*, 96(2), pp. 258-269. https://doi.org/10.1162/rest_a_00429

55

Bond, Brittany, J. David Brown, Adela Luque, and Amy O'Hara, 2014, "The Nature of the Bias When Studying Only Linkable Person Records: Evidence from the American Community Survey," Proceedings of the 2013 Federal Committee on Statistical Methodology (FCSM) Research Conference, https://www.census.gov/library/working-papers/2014/adrm/carra-wp-2014-08.html (cited on July 3, 2018)

Camarota, Steven, and Jeffrey Capizzano, 2004, "Assessing the Quality of Data Collected on the Foreign-Born: An Evaluation of the American Community Survey," accessed July 31, 2018, http://www.copafs.org/seminars/evaluation_of_american_community_survey.aspx.

Census Bureau, 2002, "Measuring America: The Decennial Censuses from 1790 to 2000," Washington DC, accessed June 27, 2018, https://www.census.gov/history/pdf/measuringamerica.pdf.

Census Bureau, 2013, "Use of Paradata to Assess the Quality and Functionality of the American Community Survey Internet Instrument," 2012 American Community Survey Research and Evaluation Report Memorandum Series #ACS12-RER-26-R1/DSSD 2010 American Community Survey Memorandum Series #ACS12-MP-04-R1, Washington DC, accessed July 5, 2018, https://www.census.gov/content/dam/Census/library/working-papers/2013/acs/2013_Horwitz_01.pdf.

Department of Justice, 2017, "Request to Reinstate Citizenship Question on 2020 Census Questionnaire," letter accessed on June 27, 2018, https://www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html.

Ellis, M., R. Wright, M. Townley, and K. Copeland, 2014, "The Migration Response to the Legal Arizona Workers Act," *Political Geography*, 42, 46-56. https://doi.org/10.1016/j.polgeo.2014.06.001

Good, M., 2013, "Do Immigrant Outflows Lead to Native Inflows? An Empirical Analysis of the Migratory Responses to US State Immigration Legislation," *Applied Economics*, 45, pp. 4275-97. https://doi.org/10.1080/00036846.2013.786802

Layne, Mary, Deborah Wagner, and Cynthia Rothhaas, 2014, "Estimating Record Linkage False Match Rate for the Person Identification Validation System," CARRA Working Paper #2014-02.

Mule, Thomas, 2012, "2010 Census Coverage Measurement Estimation Report: Summary of Estimates of Coverage for Persons in the United States," DSSD 2010 Census Coverage Measurement Memorandum Series #2010-G-01, Washington, DC, accessed on July 6, 2018, https://www2.census.gov/programs-surveys/decennial/2010/technical-documentation/methodology/g-series/g01.pdf.

NORC, 2011, "Final Report: Assessment of the U.S. Census Bureau's Person Identification Validation System," University of Chicago: Bethesda, MD.

Oaxaca, Ronald, 1973, "Male-Female Wage Differentials in Urban Labor Markets," International Economic Review, 14, pp. 693-709. https://doi.org/10.2307/2525981.

56

COM_DIS00009888

Office of Management and Budget, 1997, "Revisions to the Standards for the Classification of Federal Data on Race and Ethnicity," *Federal Register*, 62 FR 58782, Washington DC, accessed on June 28, 2018, https://www.federalregister.gov/documents/1997/10/30/97-28653/revisions-to-the-standards-for-the-classification-of-federal-data-on-race-and-ethnicity.

Office of Management and Budget, 2009, "The American Community Survey," OMB Control No. 0607-0810/ICR Reference No. 200910-0607-005, Washington DC, accessed on July 5, 2018, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=200910-0607-005#.

Office of Management and Budget, 2008, "2010 Census," OMB Control No. 0607-0919/ICR Reference No. 200808-0607-003, Washington DC, accessed on July 5, 2018, https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=200808-0607-003#.

Orrenius, Pia, and Madeline Zavodny, 2016, "Do State Work Eligibility Verification Laws Reduce Unauthorized Immigration?" *IZA Journal of Migration*, 5(5). https://doi.org/10.1186/s40176-016-0053-3

Passel, Jeffrey S., and R.L. Clark, 1997, "How Many Naturalized Citizens Are There: An Assessment of Data Quality in the Decennial Census and the Current Population Survey," Paper presented at the 1997 Annual Meeting of the Population Association of America.

Rastogi, Sonya, and Amy O'Hara, 2012, "2010 Census Match Study," 2010 Census Planning Memoranda Series No. 247.

Rothhaas, C., Lestina, F. and Hill, J. (2012) "2010 Decennial Census Item Nonresponse and Imputation Assessment Report" 2010 Census Program for Evaluations and Experiments, Census Bureau: Washington DC, accessed July 6, 2018, https://www.census.gov/2010census/pdf/2010_Census_INR_Imputation_Assessment.pdf.

Van Hook, Jennifer, and James D. Bachmeier, 2013, "How Well Does the American Community Survey Count Naturalized Citizens?" *Demographic Research*, 29(1), pp. 1-32. https://doi.org/10.4054/DemRes.2013.29.1

Weinberg, Daniel H., 2011, "Management Challenges of the 2010 U.S. Census," Census Bureau Working Paper: Washington, DC, accessed on June 27, 2018, https://www.census.gov/history/pdf/weinberg-managing2010.pdf.

COM_DIS00009889

Appendix I: Tables & Figures

Table A1. Linkage Rates to the 2010 Census by Household Survey and Year, 2000 to 2015

| | ACS | | | SIPP | | | CPS | | | AHS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sample (N) | Linked (N) | (%) | Sample (N) | Linked (N) | (%) | Sample (N) | Linked (N) | (%) | Sample (N) | Linked (N) | (%) |
| 2000 | | | | | | | 33,500 | 27,500 | 0.8114 | | | |
| 2001 | 1,301,000 | 1,097,000 | 0.8432 | 46,500 | 38,500 | 0.8328 | 44,500 | 37,500 | 0.8381 | | | |
| 2002 | 1,110,000 | 948,000 | 0.8539 | | | | 71,000 | 61,000 | 0.8564 | | | |
| 2003 | 1,225,000 | 1,060,000 | 0.8652 | | | | 68,500 | 59,000 | 0.8635 | | | |
| 2004 | 1,222,000 | 1,072,000 | 0.8770 | 86,000 | 76,000 | 0.8847 | 62,000 | 54,000 | 0.8716 | 6,700 | 5,700 | 0.8397 |
| 2005 | 4,068,000 | 3,609,000 | 0.8870 | | | | 61,000 | 53,500 | 0.8783 | | | |
| 2006 | 4,259,000 | 3,792,000 | 0.8904 | | | | 78,000 | 69,000 | 0.8853 | | | |
| 2007 | 4,159,000 | 3,754,000 | 0.9026 | | | | 77,500 | 69,000 | 0.8909 | | | |
| 2008 | 4,123,000 | 3,774,000 | 0.9155 | 94,500 | 84,500 | 0.8927 | 75,500 | 68,000 | 0.9021 | | | |
| 2009 | 4,068,000 | 3,759,000 | 0.9241 | | | | 77,500 | 70,500 | 0.9059 | | | |
| 2010 | 4,206,000 | 3,868,000 | 0.9195 | | | | 77,000 | 70,500 | 0.9115 | | | |
| 2011 | 4,571,000 | 4,205,000 | 0.9200 | | | | 77,000 | 70,000 | 0.9068 | 298,000 | 270,000 | 0.9047 |
| 2012 | 5,096,000 | 4,615,000 | 0.9055 | | | | 75,500 | 67,000 | 0.8869 | | | |
| 2013 | 4,801,000 | 4,275,000 | 0.8903 | 66,000 | 57,500 | 0.8717 | 75,000 | 65,500 | 0.8747 | 133,500 | 115,500 | 0.8683 |
| 2014 | 5,014,000 | 4,385,000 | 0.8745 | | | | | | | | | |
| 2015 | 4,966,000 | 4,273,000 | 0.8605 | | | | | | | 173,500 | 146,500 | 0.8455 |

Source: 2010 Census and Master Demographics, U.S. Census Bureau.
Notes: Household survey data unweighted. All counts have been rounded.

58

COM_DIS00009890

59

**Table A2. Citizenship in Household Surveys Linked to the 2010 Census by Demographics**

| | Household Surveys Linked to 2010 Census | | | | | | | 2010 Census | |
| | Noncitizen | | Citizen | | Missing | | Total | | | |
| | N | (%) | N | (%) | N | (%) | (%) | N | (%) |
|---|---|---|---|---|---|---|---|---|---|
| Total Population | 1,523,000 | | 43,090,000 | | 1,192,000 | | 100.0 | 308,745,538 | 100.0 |
| | | | | | | | | *Coverage* | *14.4* |
| **Sex** | | | | | | | | | |
| Female | 785,000 | 1.7 | 22,380,000 | 48.9 | 613,000 | 1.3 | 51.9 | 157,000,000 | 50.8 |
| Male | 738,000 | 1.6 | 20,710,000 | 45.2 | 579,000 | 1.3 | 48.1 | 151,800,000 | 49.2 |
| **Race** | | | | | | | | | |
| White | 729,000 | 1.6 | 35,320,000 | 77.1 | 837,000 | 1.8 | 80.5 | 227,200,000 | 73.6 |
| Black | 127,000 | 0.3 | 4,157,000 | 9.1 | 173,000 | 0.4 | 9.7 | 40,400,000 | 13.1 |
| American Indian, Aleut Eskimo | 15,000 | 0.0 | 562,000 | 1.2 | 16,000 | 0.0 | 1.3 | 4,007,000 | 1.3 |
| Asian or Pacific Islander | 364,000 | 0.8 | 1,688,000 | 3.7 | 93,000 | 0.2 | 4.7 | 16,770,000 | 5.4 |
| Other | 287,000 | 0.6 | 1,358,000 | 3.0 | 74,500 | 0.2 | 3.8 | 20,400,000 | 6.6 |
| **Ethnicity** | | | | | | | | | |
| Hispanic/Spanish | 675,000 | 1.5 | 4,046,000 | 8.8 | 198,000 | 0.4 | 10.7 | 50,480,000 | 16.4 |
| Non-Hispanic/Spanish | 848,000 | 1.9 | 39,040,000 | 85.2 | 994,000 | 2.2 | 89.3 | 258,300,000 | 83.7 |

Source: 2010 Census and Master Demographics, U.S. Census Bureau.

Notes: The household survey data are unweighted. The reported population total is the official count from the 2010 Census. All other counts have been rounded. CBDRB-2017-CDAR-001.

COM_DIS00009891

**Table A3. Item Nonresponse Rates for 2000 and 2010 Short Form Person Questionnaires**

|      | Relationship | Sex | Age | Hispanic Origin | Race | Tenure |
|------|------|------|------|------|------|------|
| 2000 | 1.3 | 1.1 | 3.7 | 3.1 | 2.9 | 4.1 |
| 2010 | 1.5 | 1.5 | 3.5 | 3.9 | 3.3 | 4.5 |

Source: Rothhaas, Lestina, and Hill (2012) Tables.

Notes: Rothhaas, Lestina, and Hill (2012) state "the INR rate is essentially the proportion of missing responses before pre-editing or imputation procedures for a given item (i.e. the respondent did not provide an answer to the item). For INR, missing values are included in the rates, but inconsistent responses (i.e. incompatible with other responses) are considered non-missing responses."

60

COM_DIS00009892

**Table A4. ACS Item Allocation Rates**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Overall housing allocation rate occupied and vacant housing units | 5.2 | 5.6 | 4.9 |
| Overall person allocation rate total population | 5.8 | 8.4 | 9.5 |
| Vacancy status vacant housing units | 2.9 | 3.5 | 3.9 |
| Tenure occupied housing units | 1.2 | 1.3 | 1.2 |
| Units in structure occupied and vacant housing units | 1.5 | 1.5 | 1.5 |
| Year moved in occupied housing units | 3.4 | 3 | 3 |
| Month moved in occupied housing units into which households move in the last two years | 0.7 | 0.7 | 0.7 |
| Year built occupied and vacant housing units | 16.2 | 17.1 | 18.2 |
| Lot size occupied and vacant single family and mobile homes | 4.2 | 3.9 | 3.9 |
| Agricultural sales occupied and vacant single family and mobile homes with lot size greater than or equal to 1 acre | 4.4 | 4.2 | 4 |
| Business on property occupied and vacant single family and mobile homes | 3 | 2.4 | ** |
| Number of rooms occupied and vacant housing units | 5.2 | 5.5 | 5 |
| Number of bedrooms occupied and vacant housing units | 4.3 | 4.6 | 5.5 |
| Running water occupied and vacant housing units | 2 | 2.1 | 2.4 |
| Flush toilet occupied and vacant housing units | 2 | 2.2 | ** |
| Bathtub or shower occupied and vacant housing units | 2 | 2.2 | 2.6 |
| Sink with a faucet occupied and vacant housing units | 2 | 2.2 | 2.6 |
| Stove or range occupied and vacant housing units | 2.5 | 2.8 | 3.1 |
| Refrigerator occupied and vacant housing units | 2.7 | 2.9 | 3.2 |
| Telephone occupied housing units | 1.1 | 1.2 | 1.5 |

61

COM_DIS00009893

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Number of vehicles | 1.3 | 1.4 | 1.2 |
|   occupied housing units | | | |
| Heating fuel, occupied housing units | 3.3 | 3.4 | 3.4 |
| Monthly electricity cost | 7.3 | 8.2 | 8.1 |
|   occupied housing units | | | |
| Monthly gas cost | 9.8 | 9.9 | 9.6 |
|   occupied housing units | | | |
| Yearly water and sewer cost | 8.1 | 8.8 | 8.5 |
|   occupied housing units | | | |
| Yearly other fuel cost | 10.6 | 8.3 | 7.3 |
|   occupied housing units | | | |
| Yearly food stamp recipiency | 1.3 | 1.7 | 1.7 |
|   household occupied housing units | | | |
| Yearly real estate taxes | 16.3 | 18.5 | 16.7 |
|   owner-occupied housing units | | | |
| Yearly property insurance | 23.2 | 25.6 | 23.9 |
|   owner-occupied housing units | | | |
| Mortgage status | 2.1 | 2.5 | 2.2 |
|   owner-occupied housing units | | | |
| Monthly mortgage payment | 10.7 | 12.4 | 10.5 |
|   owner-occupied housing units with a mortgage payment | | | |
| Mortgage payment incl. real estate taxes | (X) | 6.9 | 6.2 |
|   owner-occupied housing units with a mortgage | | | |
| Mortgage payment incl. insurance | (X) | 7.4 | 6.8 |
|   owner-occupied housing units with a mortgage | | | |
| Second mortgage | 3.4 | 3.7 | 3.2 |
|   owner-occupied housing units | | | |
| Home equity loan | 4.2 | 4.3 | 3.7 |
|   owner-occupied housing units | | | |
| Other monthly mortgage payment(s) | 17.9 | 21.7 | 23.3 |
|   owner-occupied housing units with second mortgage or home equity loan | | | |
| Property value | 12.3 | 12.9 | 11.6 |
|   owner-occupied housing units and vacant housing units for sale | | | |
| Yearly mobile home costs | 19.9 | 21.5 | 21.7 |
|   Occupied mobile homes and other units | | | |
| Monthly condominium fee | 0.7 | 0.8 | 0.8 |
|   owner-occupied housing units | | | |
| Monthly rent | 9.3 | 9.8 | 10.5 |
|   occupied housing units rented for cash rent and vacant housing units for rent | | | |

62

COM_DIS00009894

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Meals included in rent<br>    occupied housing units rented for cash rent and<br>    vacant housing units for rent | 2 | 2.1 | 2.1 |
| Desktop/laptop/notebook computer<br>    occupied housing units | ** | 3.2 | 1.3 |
| Handheld computer/smart mobile phone<br>    occupied housing units | ** | 3.3 | ** |
| Tablet or other portable wireless computer<br>    occupied housing units | ** | ** | 1.6 |
| Smartphone<br>    occupied housing units | ** | ** | 1.6 |
| Other computer<br>    occupied housing units | ** | 3.7 | 1.7 |
| Household has internet access<br>    occupied housing units | ** | 4.4 | 3.3 |
| Dial-up internet service<br>    occupied housing units with internet access | ** | 5.7 | 3.8 |
| DSL internet service<br>    occupied housing units with internet access | ** | 5.7 | ** |
| Cable modem internet service<br>    occupied housing units with internet access | ** | 5.7 | ** |
| Fiber-optic internet service<br>    occupied housing units with internet access | ** | 5.7 | ** |
| Cellular data plan (formerly mobile broadband)<br>    occupied housing units with internet access | ** | 26.7 | 7.6 |
| Satellite internet service<br>    occupied housing units with internet access | ** | 5.7 | 3.8 |
| High speed internet service<br>    occupied housing units with internet access | ** | ** | 3.8 |
| Some other internet service<br>    occupied housing units with internet access | ** | 5.7 | 3.8 |
| Race<br>    total population | 1.5 | 1.6 | 1.5 |
| Hispanic origin<br>    total population | 1.8 | 2.1 | 1.8 |
| Sex<br>total population | 0.1 | 0.1 | 0.1 |
| Age<br>    total population | 1.3 | 1.6 | 1.7 |
| Relationship<br>    total household population | 1.2 | 1.1 | 1.2 |
| Marital status<br>    total population 15 years and over | 3 | 4.8 | 5.3 |

63

COM_DIS00009895

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Married past 12 months | 4.7 | 6.6 | 6.9 |
| total population 15 years and over, except those never married | | | |
| Widowed past 12 months | 4.5 | 7 | 7.4 |
| total population 15 years and over, except those never married | | | |
| Divorced past 12 months | 4.5 | 7 | 7.4 |
| total population 15 years and over, except those never married | | | |
| Times married | 5.1 | 7.8 | 8.1 |
| Total population 15 years and over, except those never married | | | |
| Year last married | 11.4 | 13.3 | 13.5 |
| total population 15 years and over, except those never married | | | |
| Place of birth | 6.5 | 8.6 | 9.1 |
| total population | | | |
| Citizenship | 2.7 | 5.2 | 6 |
| total population | | | |
| Year of naturalization | 16.6 | 22.5 | 22.5 |
| total population naturalized citizens | | | |
| Year of entry | 10.3 | 13.2 | 14.8 |
| total population not born in U.S. | | | |
| Speaks another language at home | 3.4 | 5.9 | 6.8 |
| total population 5 years and over | | | |
| Language spoken | 5.7 | 7 | 8.3 |
| total population 5 years and over who speak another language at home | | | |
| English ability | 4 | 5.9 | 7.1 |
| total population 5 years and over who speak another language at home | | | |
| School enrollment | 3.7 | 6 | 6.7 |
| total population 3 years and over | | | |
| Grade level attended | 6 | 8.9 | 10.2 |
| total population 3 years and over enrolled | | | |
| Educational attainment | 5.6 | 8 | 8.5 |
| total population 3 years and over | | | |
| Field of degree | 9.8 | 12.4 | 13.5 |
| total population 25 years and over with a bachelor's degree or higher | | | |
| Mobility status | 4 | 6.5 | 7.2 |
| total population 1 year and over | | | |

COM_DIS00009896

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Migration state/foreign county | 7.1 | 11.3 | 13.2 |
|   total population 1 year and over movers | | | |
| Migration county | 8.3 | 12.5 | 14.6 |
|   total population 1 year and over movers within U.S. | | | |
| Migration minor civil division | 8.4 | 12.1 | 14.2 |
|   total population 1 year and over movers within U.S. | | | |
| Migration place | 8.8 | 12.9 | 15 |
|   total population 1 years and over movers within U.S. | | | |
| Health insurance through employer/union | 6.2 | 9 | 10.7 |
|   total population | | | |
| Health insurance purchased directly | 6.9 | 9.7 | 11.3 |
|   total population | | | |
| Health insurance through Medicare | 5.2 | 8.1 | 9.5 |
|   total population | | | |
| Health insurance through Medicaid | 7.9 | 10.5 | 12.2 |
|   total population | | | |
| Health insurance through TRICARE | 8.1 | 10.8 | 12.5 |
|   total population | | | |
| Health insurance through VA | 8.1 | 10.7 | 12.3 |
|   total population | | | |
| Health ins. Through Indian Health Service | 8.5 | 11.1 | 12.8 |
|   total population | | | |
| Visual difficulty | 3.4 | 6.1 | 7.1 |
|   total population | | | |
| Hearing difficulty | 3.2 | 5.9 | 6.8 |
|   total population | | | |
| Physical difficulty | 3.5 | 6.7 | 7.5 |
|   total population 5 years and over | | | |
| Difficulty remembering | 3.5 | 6.7 | 7.5 |
|   total population 5 years and over | | | |
| Difficulty dressing | 3.5 | 6.7 | 7.5 |
|   total population 5 years and over | | | |
| Difficulty going out | 3.4 | 6.5 | 7.3 |
|   total population 16 years and over | | | |
| Grandchildren living in home | 0.9 | 1 | 1.1 |
|   noninstitutionalized population 30 years and over | | | |
| Responsibility for grandchildren | 12 | 15.7 | 17.7 |
|   noninstitutionalized population 30 years and over who are grandparents with grandchildren in the home | | | |

65

COM_DIS00009897

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|------|------|------|------|
| Months responsible for grandchildren | 14.9 | 16.1 | 17.2 |
|   noninstitutionalized population 30 years and over who are grandparents with grandchildren in the home that have responsibility | | | |
| Fertility status | 3.7 | 6.7 | 7.8 |
|   female total population 15-50 | | | |
| Veteran status | 3.8 | 6.8 | 7.3 |
|   total population 17 years and over | | | |
| Periods of military service | 6.3 | 9.3 | 9.7 |
|   total population 17 years and over on active duty now or previously | | | |
| Service-connected disability rating | 3.9 | 6.6 | 6.8 |
|   total population 17 years and over, except those who never served in the Armed Forces | | | |
| Employment status recode | 0.7 | 0.2 | 0.2 |
|   noninstitutionalized population 16 years and over | | | |
| When last worked | 5.1 | 8.1 | 8.7 |
|   noninstitutionalized population 16 years and over | | | |
| Weeks worked in the past 12 months | 6.9 | 9.7 | 10.6 |
|   noninstitutionalized population 16 years and over who worked in the past 12 months | | | |
| Hours worked per week | 7.7 | 10.8 | 11.9 |
|   noninstitutionalized population 16 years and over who worked in the past 12 months | | | |
| Place of work state/foreign county | 6.3 | 10.4 | 11.8 |
|   noninstitutionalized population 16 years and over at work last week | | | |
| Place of work county | 7 | 11 | 12.5 |
|   noninstitutionalized population 16 years and over at work last week | | | |
| Place of work minor civil division | 2.1 | 3.3 | 3.6 |
|   noninstitutionalized population 16 years and over at work last week | | | |
| Place of work place | 7.6 | 11.6 | 13.1 |
|   noninstitutionalized population 16 years and over at work last week | | | |
| Transportation to work | 5.7 | 8.8 | 9.6 |
|   noninstitutionalized population 16 years and over at work last week | | | |
| Carpool size | 6.8 | 9.9 | 10.9 |
|   noninstitutionalized population 16 years and over at work last week who drive to work | | | |

COM_DIS00009898

**Table A4. ACS Item Allocation Rates Continued**

| Item | 2010 | 2013 | 2016 |
|---|---|---|---|
| Time of departure<br>  noninstitutionalized population 16 years and over at<br>  work last week who don't work at home | 12.8 | 18.5 | 20.2 |
| Commuting time<br>  noninstitutionalized population 16 years and over at<br>  work last week who don't work at home | 9.7 | 13.3 | 14.5 |
| Class of worker<br>  total population 16 years and over who worked in<br>  the last 5 years | 7.2 | 10.7 | 11.7 |
| Industry<br>  total population 16 years and over who worked in<br>  the last 5 years | 7.8 | 11.4 | 12.7 |
| Occupation<br>  total population 16 years and over who worked in<br>  the last 5 years | 8.1 | 11.8 | 13.4 |
| Wages/salary income<br>  total population 15 years and over | 16 | 19 | 19.1 |
| Self-employment income<br>  total population 15 years and over | 5.9 | 9.3 | 10.5 |
| Interest, dividends, etc. income<br>  total population 15 years and over | 8.8 | 12.6 | 15.2 |
| Social security or railroad retirement<br>  total population 15 years and over | 8.9 | 12.3 | 14.5 |
| Supplemental security income<br>  total population 15 years and over | 6.7 | 10.3 | 12.7 |
| Public assistance<br>  total population 15 years and over | 6.8 | 10.5 | 13.2 |
| Retirement income<br>  total population 15 years and over | 7.5 | 11.1 | 13.6 |
| Other income<br>  total population 15 years and over | 7.4 | 10.8 | 13.2 |
| Some or all income allocated<br>  total population 15 years and over | 22.4 | 25.3 | 28.4 |

Source: American Community Survey (ACS) 1-year files in 2010, 2013, and 2016.

Notes: Item allocation includes nonresponses and responses that were edited. See ACS (2018a and 2018b) for more information about ACS item allocation rates. ** Item was not asked in this year. [X] Some instances where no response to this question was required were incorrectly tallied as allocations, overstating the true level of item allocation required. The incorrect rates have been removed.

COM_DIS00009899

**Table A5. Citizenship Item Allocation Rate by Response Mode, 2013-2016**

| | Mail-in Response | | | | Internet Self-Response | | | |
| | 2013 | | 2016 | | 2013 | | 2016 | |
| | (%) | s.e. | (%) | s.e. | (%) | s.e. | (%) | s.e. |
|---|---|---|---|---|---|---|---|---|
| NH White | 6.1 | (0.023) | 6.3 | (0.024) | 6.2 | (0.019) | 6.2 | (0.018) |
| NH Black | 12.3 | (0.090) | 12.6 | (0.100) | 12.3 | (0.100) | 13.1 | (0.091) |
| NH Asian/NHPI | 10.3 | (0.126) | 12.7 | (0.151) | 9.4 | (0.083) | 9.6 | (0.075) |
| NH Other | 8.4 | (0.143) | 8.4 | (0.154) | 10.0 | (0.128) | 10.2 | (0.114) |
| Hispanic/Latino | 11.8 | (0.080) | 12.3 | (0.088) | 13.0 | (0.078) | 15.5 | (0.071) |

Source: 2013 & 2016 ACS 1-year files.

Note: Item allocation includes nonresponses and responses that were edited.

**Table A6. Administrative Record (AR) Coverage of the 2010 Census, Using Initial AR-Census Crosswalk**

| | Count | Percent of Decennial Population | Percent of Matched Sample |
|---|---|---|---|
| No PIK, not sent to PVS | 10,370,000 | 3.4 | |
| No PIK, failed in PVS | 19,200,000 | 6.2 | |
| PIK, but not in Numident, not ITIN | 8,900 | 0.0 | |
| PIK, but not in Numident, is ITIN | 1,567,000 | 0.5 | |
| Blank Citizenship | 57,910,000 | 18.8 | 20.9 |
| U.S. Citizen | 200,400,000 | 64.9 | 72.2 |
| Noncitizen | 19,270,000 | 6.2 | 6.9 |
| Total | 308,745,538 | 100.00 | 100.00 |

Source: 2010 Numident and initial administrative record-2010 Census crosswalk.

Note: This is the crosswalk used by Rastogi and O'Hara (2012).

**Table A7. Percent Linked to 2010 Census among 2017 Numident Records with Missing Citizenship**

| | Foreign-Born | U.S.-Born |
|---|---|---|
| Percent Linked to 2010 Census | 36.3 | 74.5 |
| Total | 6.8 million | 57.0 million |

Source: 2010 Census and 2017 Numident

Notes: These are persons in the 2017 Numident with missing citizenship, born after 1919, and with no date of death. Our preliminary analysis reported 6.6 million foreign-born persons, which excluded some relevant records.

68

COM_DIS00009900

**Table A8 Panel A: Citizenship Agreement between 2000 Census Long Form and Administrative Records**

| | AR Citizen | AR Noncitizen | AR Missing | Percent by ACS Category |
|---|---|---|---|---|
| All (N=42,580,000) | | | | |
| Census Citizen | 98.8 | 29.9 | 71.6 | 93.0 |
| Census Noncitizen | 0.9 | 66.4 | 23.8 | 6.2 |
| Census Missing | 0.3 | 3.7 | 4.6 | 0.8 |
| Percent by AR Cat. | 86.9 | 5.4 | 7.7 | 100.0 |
| Non-Hispanic White (N=31,690,000) | | | | |
| Census Citizen | 99.4 | 31.8 | 92.4 | 97.9 |
| Census Noncitizen | 0.4 | 65.8 | 5.9 | 1.8 |
| Census Missing | 0.2 | 2.4 | 1.7 | 0.3 |
| Percent by AR Cat. | 93.4 | 1.8 | 4.8 | 100.0 |
| Non-Hispanic Black (N=4,543,000) | | | | |
| Census Citizen | 99.3 | 36.3 | 92.5 | 96.1 |
| Census Noncitizen | 0.4 | 59.2 | 5.4 | 3.3 |
| Census Missing | 0.2 | 4.5 | 2.1 | 0.6 |
| Percent by AR Cat. | 85.3 | 4.0 | 10.8 | 100.0 |
| Hispanic (N=4,534,000) | | | | |
| Census Citizen | 94.3 | 25.6 | 35.9 | 69.3 |
| Census Noncitizen | 4.7 | 69.7 | 55.2 | 27.3 |
| Census Missing | 1.0 | 4.7 | 4.7 | 3.3 |
| Percent by AR Cat. | 60.6 | 19.1 | 20.3 | 100.0 |
| Non-Hispanic Other Race (N=1,821,000) | | | | |
| Census Citizen | 93.4 | 33.3 | 53.1 | 71.2 |
| Census Noncitizen | 5.1 | 63.7 | 37.0 | 26.0 |
| Census Missing | 1.4 | 3.0 | 9.9 | 2.9 |
| Percent by AR Cat. | 59.2 | 29.3 | 11.6 | 100.0 |
| Reference Person (N=16,450,000) | | | | |
| Census Citizen | 98.7 | 32.9 | 76.9 | 94.0 |
| Census Noncitizen | 0.9 | 63.3 | 19.3 | 5.3 |
| Census Missing | 0.4 | 3.9 | 3.8 | 0.8 |
| Percent by AR Cat. | 89.4 | 5.5 | 5.1 | 100.0 |
| Relative (N=24,980,000) | | | | |
| Census Citizen | 98.9 | 28.6 | 71.7 | 92.9 |
| Census Noncitizen | 0.8 | 68.0 | 24.3 | 6.4 |
| Census Missing | 0.2 | 3.4 | 4.1 | 0.7 |
| Percent by AR Cat. | 86.4 | 5.3 | 8.3 | 100.0 |
| Nonrelative (N=1,153,000) | | | | |
| Census Citizen | 97.2 | 20.4 | 58.6 | 80.4 |
| Census Noncitizen | 1.9 | 72.0 | 31.3 | 15.6 |
| Census Missing | 0.9 | 7.6 | 10.1 | 4.1 |
| Percent by AR Cat. | 63.7 | 7.4 | 28.9 | 100.0 |
| Age 18+ (N=31,260,000) | | | | |
| Census Citizen | 98.5 | 30.3 | 67.1 | 91.8 |
| Census Noncitizen | 1.1 | 65.5 | 26.8 | 7.2 |
| Census Missing | 0.4 | 4.1 | 6.1 | 1.1 |
| Percent by AR Cat. | 86.2 | 6.5 | 7.2 | 100.0 |

Source: 2000 Census Long Form and 2002 Census Numident.

Notes: These are weighted percentages. The first three rows of each panel contain percentages by survey group within the AR category, and the last row contains percentages by AR category of the sample as a whole. Here AR citizen includes Numident records with missing citizenship, regardless of their country of birth.

COM_DIS00009901

Table A8 Panel B: Citizenship Agreement between 2010 ACS and Administrative Records

| | AR Citizen | AR Noncitizen | AR Missing | Percent by ACS Category |
|---|---|---|---|---|
| All (N=4,520,000) | | | | |
| ACS Citizen | 96.9 | 32.7 | 74.8 | 90.2 |
| ACS Noncitizen | 0.8 | 63.2 | 17.5 | 6.9 |
| ACS Missing | 2.4 | 4.1 | 7.7 | 2.9 |
| Percent by AR Cat. | 83.9 | 7.5 | 8.5 | 100.0 |
| Non-Hispanic White (N=3,152,000) | | | | |
| ACS Citizen | 97.8 | 42.4 | 87.4 | 96.1 |
| ACS Noncitizen | 0.2 | 53.9 | 4.0 | 1.5 |
| ACS Missing | 2.0 | 3.7 | 8.6 | 2.4 |
| Percent by AR Cat. | 92.4 | 2.0 | 5.7 | 100.0 |
| Non-Hispanic Black (N=434,000) | | | | |
| ACS Citizen | 96.3 | 40.1 | 85.0 | 92.4 |
| ACS Noncitizen | 0.5 | 54.5 | 6.5 | 3.8 |
| ACS Missing | 3.2 | 5.4 | 8.6 | 3.8 |
| Percent by AR Cat. | 86.2 | 5.2 | 8.6 | 100.0 |
| Hispanic (N=609,000) | | | | |
| ACS Citizen | 93.9 | 23.8 | 61.1 | 72.7 |
| ACS Noncitizen | 2.9 | 72.4 | 32.9 | 23.4 |
| ACS Missing | 3.2 | 3.9 | 6.0 | 3.9 |
| Percent by AR Cat. | 59.8 | 21.5 | 18.8 | 100.0 |
| Non-Hispanic Other Race (N=326,000) | | | | |
| ACS Citizen | 93.7 | 41.3 | 59.0 | 77.3 |
| ACS Noncitizen | 2.8 | 54.3 | 31.8 | 18.5 |
| ACS Missing | 3.5 | 4.4 | 9.1 | 4.2 |
| Percent by AR Cat. | 65.7 | 25.4 | 8.8 | 100.0 |
| Reference Person (N=1,770,000) | | | | |
| ACS Citizen | 97.7 | 37.2 | 80.8 | 91.9 |
| ACS Noncitizen | 0.7 | 59.9 | 14.1 | 6.2 |
| ACS Missing | 1.6 | 2.9 | 5.1 | 1.9 |
| Percent by AR Cat. | 85.4 | 7.7 | 6.9 | 100.0 |
| Relative (N=2,504,000) | | | | |
| ACS Citizen | 96.5 | 30.6 | 75.3 | 89.7 |
| ACS Noncitizen | 0.7 | 64.7 | 16.4 | 6.9 |
| ACS Missing | 2.8 | 4.6 | 8.2 | 3.4 |
| Percent by AR Cat. | 84.0 | 7.5 | 8.5 | 100.0 |
| Nonrelative (N=102,000) | | | | |
| ACS Citizen | 94.1 | 20.0 | 53.0 | 77.0 |
| ACS Noncitizen | 1.9 | 72.2 | 34.8 | 16.6 |
| ACS Missing | 4.0 | 7.8 | 12.2 | 6.4 |
| Percent by AR Cat. | 66.0 | 9.4 | 24.6 | 100.0 |
| Age 18+ (N=3,505,000) | | | | |
| ACS Citizen | 97.0 | 33.1 | 71.7 | 89.1 |
| ACS Noncitizen | 0.9 | 62.9 | 20.9 | 8.2 |
| ACS Missing | 2.1 | 4.0 | 7.3 | 2.7 |
| Percent by AR Cat. | 82.6 | 9.0 | 8.4 | 100.0 |

Source: 2010 American Community Survey (ACS) and 2010 Census Numident.

Notes: These are weighted percentages. The first three rows of each panel contain percentages by survey group within the AR category, and the last row contains percentages by AR category of the sample as a whole. Here AR citizen includes Numident records with missing citizenship, regardless of their country of birth.

70

COM_DIS00009902

**Table A8 Panel C: Citizenship Agreement between 2016 ACS and Administrative Records**

| | AR Citizen | AR Noncitizen | AR Missing | Percent by ACS Category |
|---|---|---|---|---|
| All (N=5,255,000) | | | | |
| ACS Citizen | 93.8 | 34.7 | 70.4 | 87.3 |
| ACS Noncitizen | 0.7 | 57.6 | 17.7 | 6.4 |
| ACS Missing | 5.5 | 7.7 | 11.9 | 6.3 |
| Percent by AR Cat. | 82.4 | 6.7 | 10.9 | 100.0 |
| Non-Hispanic White (N=3,579,000) | | | | |
| ACS Citizen | 95.0 | 44.7 | 81.8 | 93.1 |
| ACS Noncitizen | 0.2 | 48.8 | 4.4 | 1.4 |
| ACS Missing | 4.8 | 6.6 | 13.7 | 5.5 |
| Percent by AR Cat. | 91.1 | 1.9 | 7.0 | 100.0 |
| Non-Hispanic Black (N=495,000) | | | | |
| ACS Citizen | 93.2 | 42.0 | 82.5 | 89.3 |
| ACS Noncitizen | 0.4 | 49.7 | 5.8 | 3.6 |
| ACS Missing | 6.4 | 8.4 | 11.7 | 7.2 |
| Percent by AR Cat. | 82.3 | 5.1 | 12.6 | 100.0 |
| Hispanic (N=732,000) | | | | |
| ACS Citizen | 90.5 | 26.6 | 58.0 | 73.1 |
| ACS Noncitizen | 2.7 | 65.2 | 32.3 | 19.3 |
| ACS Missing | 6.8 | 8.2 | 9.7 | 7.7 |
| Percent by AR Cat. | 62.0 | 16.2 | 21.8 | 100.0 |
| Non-Hispanic Other Race (N=449,000) | | | | |
| ACS Citizen | 90.3 | 39.1 | 54.2 | 74.6 |
| ACS Noncitizen | 2.4 | 53.5 | 32.2 | 17.3 |
| ACS Missing | 7.3 | 7.4 | 13.6 | 8.1 |
| Percent by AR Cat. | 65.8 | 22.0 | 12.2 | 100.0 |
| Reference Person (N=2,037,000) | | | | |
| ACS Citizen | 96.7 | 39.1 | 71.6 | 90.6 |
| ACS Noncitizen | 0.7 | 56.4 | 20.1 | 6.1 |
| ACS Missing | 2.7 | 4.5 | 8.3 | 3.2 |
| Percent by AR Cat. | 85.5 | 7.3 | 7.2 | 100.0 |
| Relative (N=2,789,000) | | | | |
| ACS Citizen | 92.3 | 32.5 | 68.4 | 86.0 |
| ACS Noncitizen | 0.7 | 58.2 | 18.6 | 6.3 |
| ACS Missing | 6.9 | 9.3 | 13.0 | 7.7 |
| Percent by AR Cat. | 83.5 | 6.5 | 10.0 | 100.0 |
| Nonrelative (N=135,000) | | | | |
| ACS Citizen | 85.3 | 21.5 | 52.4 | 71.8 |
| ACS Noncitizen | 1.5 | 61.5 | 23.6 | 11.8 |
| ACS Missing | 13.2 | 17.0 | 23.9 | 16.4 |
| Percent by AR Cat. | 65.6 | 7.1 | 27.3 | 100.0 |
| Age 18+ (N=4,178,000) | | | | |
| ACS Citizen | 94.3 | 34.8 | 68.0 | 86.6 |
| ACS Noncitizen | 0.9 | 57.7 | 20.3 | 7.6 |
| ACS Missing | 4.8 | 7.6 | 11.7 | 5.8 |
| Percent by AR Cat. | 81.0 | 8.2 | 10.7 | 100.0 |

Source: 2016 American Community Survey (ACS) and 2016 Census Numident.

Notes: These are weighted percentages. The first three rows of each panel contain percentages by survey group within the AR category, and the last row contains percentages by AR category of the sample as a whole. Here AR citizen includes Numident records with missing citizenship, regardless of their country of birth.

71

COM_DIS00009903

**Table A9. Citizenship Agreement Rates (%) Between Census Surveys and Administrative Records**

|  | Consistent | Inconsistent | Missing in One or Both Sources | Consistent, Conditional on Nonmissing | Inconsistent, Conditional on Nonmissing |
|---|---|---|---|---|---|
| 2000 Census | 89.4 | 2.4 | 8.2 | 97.4 | 2.6 |
| 2010 ACS | 86.1 | 3.1 | 10.8 | 96.5 | 3.5 |
| 2016 ACS | 81.1 | 2.9 | 15.9 | 96.5 | 3.5 |

Source: 2000 Census long form, 2002 Census Numident, 2010 American Community Survey (ACS), 2010 Census Numident, 2016 ACS, and 2016 Census Numident.

Notes: These are weighted percentages. Here AR citizen includes Numident records with missing citizenship, regardless of their country of birth. The original estimate for inconsistent in the 2000 Census was 2.3 percent, for consistent in the 2010 ACS was 86.0 percent, consistent conditional on nonmissing in the 2010 ACS was 96.4 percent, inconsistent conditional on nonmissing in the 2010 ACS was 3.6 percent, and consistent in the 2016 ACS was 81.2 percent.

**Table A10. AR Citizen and Noncitizen Percentages of the 2016 ACS by Race/Ethnicity and Relationship to Reference Person**

|  | AR Citizens | AR Noncitizens |
|---|---|---|
| All | 81.1 | 6.7 |
| Non-Hispanic White | 90.1 | 1.9 |
| Non-Hispanic Black | 81.5 | 5.1 |
| Hispanic | 60.2 | 16.2 |
| Non-Hispanic Other Race | 62.5 | 22.0 |
| Reference Person | 81.1 | 6.9 |
| Relative | 82.1 | 6.5 |
| Non-Relative | 64.8 | 7.1 |

Source: 2010 ACS 1-year file

Notes: These are weighted percentages. The omitted category is persons missing AR citizenship.

**Table A11. Percentages of the 2016 ACS Sample by Relationship to Reference Person and Record Linkage Quality**

|  | High-Quality Linkage | Low-Quality Linkage |
|---|---|---|
| Reference Person | 18.1 | 20.3 |
| Relative | 23.9 | 33.8 |
| Non-Relative | 0.6 | 3.2 |

Source: 2016 ACS 1-year file

Notes: These results are weighted. This excludes persons missing AR citizenship.

72

COM_DIS00009904

**Table A12. 2016 ACS Citizenship Distribution for ITINs**

|  | Percent of All ITINs |
|---|---|
| U.S. Citizens | 11.1 |
| Born Citizens | 6.6 |

Source: 2016 ACS 1-year file

Note: These results are weighted.

COM_DIS00009905

**Table A13. Comparison of 2010 ACS and 2010 Census Response Rates: Regressions by Household Citizenship Type**

| | AR all-citizen households | AR noncitizen households | AR & ACS all-citizen households | All other households |
|---|---|---|---|---|
| Log Household Size | -3.184 | -8.237 | -0.4762 | -7.185 |
| | (0.1476) | (0.5100) | (0.1737) | (0.3067) |
| Log Household Size Squared | -0.0998 | 1.565 | -1.929 | 2.944 |
| | (0.0899) | (0.2304) | (0.1159) | (0.1423) |
| Female | -6.665 | -6.687 | -6.263 | -8.167 |
| | (0.0557) | (0.1809) | (0.0578) | (0.1289) |
| Non-Hispanic African Amer. | -10.53 | -8.422 | -11.48 | -3.573 |
| | (0.1143) | (0.3952) | (0.1275) | (0.2064) |
| Hispanic | -7.532 | -20.55 | -7.145 | -14.07 |
| | (0.1585) | (0.2962) | (0.1640) | (0.2123) |
| Other Non-Hispanic | 0.8338 | -0.1256 | 0.4897 | 4.129 |
| | (0.1809) | (0.2904) | (0.2162) | (0.2158) |
| Age 25-34 | -4.052 | -3.101 | -4.658 | -1.380 |
| | (0.2078) | (0.5207) | (0.2602) | (0.3202) |
| Age 35-44 | -9.122 | -4.746 | -9.582 | -3.653 |
| | (0.2117) | (0.5048) | (0.2704) | (0.3181) |
| Age 45-54 | -11.83 | -6.676 | -12.26 | -5.095 |
| | (0.2418) | (0.5313) | (0.3082) | (0.3113) |
| Age 55-64 | -12.78 | -5.792 | -13.20 | -5.395 |
| | (0.2715) | (0.5466) | (0.3530) | (0.3315) |
| Age 65+ | -13.06 | -4.225 | -13.76 | -3.617 |
| | (0.3121) | (0.6672) | (0.4051) | (0.3857) |
| High School | 0.7658 | -1.195 | 1.641 | -1.866 |
| | (0.1055) | (0.2641) | (0.1097) | (0.1828) |
| Bachelor's Degree | 3.864 | 2.383 | 5.116 | 0.1112 |
| | (0.1197) | (0.3549) | (0.1262) | (0.2316) |
| Graduate Degree | 7.685 | 7.098 | 8.448 | 6.310 |
| | (0.1330) | (0.3923) | (0.1387) | (0.2661) |
| HH Income $1-$25,000 | -1.854 | -1.525 | -2.249 | -1.537 |
| | (0.3130) | (0.9868) | (0.3665) | (0.5480) |
| HH Income $25,001 -$50,000 | -2.759 | -1.995 | -3.002 | -3.304 |
| | (0.3158) | (0.9549) | (0.3604) | (0.5348) |
| HH Income $50,001 -$75,000 | -3.093 | -0.6062 | -3.454 | -2.555 |
| | (0.3164) | (0.9907) | (0.3563) | (0.5494) |
| HH Income $75,001 -$100,000 | -3.037 | -0.4054 | -3.300 | -2.435 |
| | (0.3091) | (1.004) | (0.3590) | (0.5505) |
| HH Income $100,001+ | -2.272 | 1.035 | -2.499 | -0.9051 |
| | (0.3183) | (1.016) | (0.3672) | (0.5719) |

74

**Table A13. Continued**

| | AR all-citizen households | AR noncitizen households | AR & ACS all-citizen households | All other households |
|---|---|---|---|---|
| Worked in | 2.741 | 1.204 | 3.027 | -1.012 |
| Last Week | (0.0644) | (0.2549) | (0.0742) | (0.1613) |
| Searched for | 8.495 | 8.559 | 8.565 | 6.753 |
| Job | (0.1282) | (0.3652) | (0.1357) | (0.2629) |
| Log Number of | | | | |
| Years in | -11.17 | -10.34 | -14.09 | -1.286 |
| U.S. | (0.5538) | (0.5499) | (1.434) | (0.4572) |
| Log Number of | | | | |
| Years in | 2.845 | 1.997 | 3.315 | -0.1304 |
| U.S. Squared | (0.0904) | (0.1044) | (0.2063) | (0.0823) |
| English Very | 0.9990 | 0.7404 | 0.7193 | 5.302 |
| Well | (0.1669) | (0.2508) | (0.1760) | (0.1927) |
| English Well | 3.823 | 0.4760 | 6.686 | 3.160 |
| | (0.3037) | (0.3007) | (0.3449) | (0.2369) |
| English Not | -4.707 | -7.014 | -0.5008 | -6.007 |
| Well | (0.3595) | (0.3431) | (0.4334) | (0.3088) |
| English Not | -13.87 | -14.00 | -15.19 | -13.50 |
| At All | (0.6209) | (0.5355) | (1.070) | (0.4750) |
| Weighted Obs. | 85,100,000 | 11,400,000 | 72,300,000 | 24,200,000 |
| Unweighted Obs. | 1,280,000 | 139,000 | 1,112,000 | 306,000 |

Source: 2010 ACS 1-year file, 2010 Census Unedited File (CUF), and 2010 Numident.
Notes: The 2010 Census self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. These regressions are estimated by linear probability models (LPM), weighted by ACS person weights. The standard errors are in parentheses. The standard errors are bootstrapped using 80 ACS replicate weights. The base categories are non-Hispanic white for race/ethnicity, less than high school for educational attainment, no income for household income, and speaks only English at home for English ability.

75

COM_DIS00009907

**Table A14. Blinder-Oaxaca Decomposition Coefficients for Comparison of ACS 2010 and Census 2010 Self-Response Rates by Household Citizenship**

| | AR all-citizen vs. AR noncitizen households | | AR & ACS all-citizen vs. all other households | |
|---|---|---|---|---|
| | Explained | Unexplained | Explained | Unexplained |
| Log Household Size | 1.347 | 5.799 | 0.1479 | 6.758 |
| | (0.0624) | (0.5861) | (0.0539) | (0.3311) |
| Log Household Size Squared | 0.0778 | -2.687 | 1.108 | -6.613 |
| | (0.0700) | (0.3702) | (0.0664) | (0.2305) |
| Female | -0.4591 | 0.0090 | -0.2351 | 0.8355 |
| | (0.0076) | (0.0761) | (0.0048) | (0.0619) |
| Non-Hispanic White | 2.261 | -0.6934 | 1.612 | 0.4970 |
| | (0.0419) | (0.0480) | (0.0311) | (0.0566) |
| Non-Hispanic African Amer. | -0.2343 | -0.4469 | -0.0307 | -0.7966 |
| | (0.0042) | (0.0230) | (0.0030) | (0.0217) |
| Hispanic | 1.196 | 4.487 | 0.6141 | 2.391 |
| | (0.0420) | (0.0904) | (0.0280) | (0.0515) |
| Other Non-Hispanic | -0.9869 | -0.4652 | -0.6266 | -0.3870 |
| | (0.0258) | (0.0396) | (0.0202) | (0.0298) |
| Age Below 25 | 0.0184 | 0.1686 | -0.0735 | 0.2663 |
| | (0.0029) | (0.0160) | (0.0031) | (0.0156) |
| Age 25-34 | -0.3132 | 0.7466 | -0.1863 | 0.4588 |
| | (0.0091) | (0.0536) | (0.0065) | (0.0402) |
| Age 35-44 | 0.0819 | 0.0026 | 0.0487 | -0.0507 |
| | (0.0107) | (0.0539) | (0.0068) | (0.0396) |
| Age 45-54 | 0.1199 | -0.1936 | 0.0323 | -0.3278 |
| | (0.0036) | (0.0537) | (0.0017) | (0.0315) |
| Age 55-64 | -0.2849 | -0.3316 | -0.1938 | -0.3167 |
| | (0.0069) | (0.0331) | (0.0059) | (0.0295) |
| Age 65+ | -0.7552 | -0.2910 | -0.4319 | -0.6361 |
| | (0.0229) | (0.0218) | (0.0165) | (0.0354) |
| Below High School | 0.4911 | -0.2640 | 0.4301 | -0.5491 |
| | (0.0130) | (0.0609) | (0.0094) | (0.0338) |
| High School | -0.3682 | 0.4025 | -0.1901 | 0.4193 |
| | (0.0084) | (0.0735) | (0.0048) | (0.0557) |
| Bachelor's Degree | 0.0169 | 0.0827 | 0.0341 | 0.4077 |
| | (0.0013) | (0.0356) | (0.0018) | (0.0255) |
| Graduate Degree | -0.0978 | -0.0594 | -0.0036 | -0.0646 |
| | (0.0030) | (0.0320) | (0.0018) | (0.0217) |
| HH Income = $0 | 0.0017 | 0.0190 | -0.0191 | 0.0117 |
| | (0.0005) | (0.0099) | (0.0024) | (0.0096) |
| HH Income $1 -$25,000 | 0.0072 | 0.2648 | 0.0003 | -0.0193 |
| | (0.0021) | (0.0567) | (0.0002) | (0.0453) |
| HH Income $25,001 -$50,000 | 0.0122 | 0.2196 | 0.0042 | 0.2364 |
| | (0.0017) | (0.0619) | (0.0007) | (0.0424) |

76

COM_DIS00009908

**Table A14. Continued**

| | AR all-citizen vs. AR noncitizen households | | AR & ACS all-citizen vs. all other households | |
|---|---|---|---|---|
| | Explained | Unexplained | Explained | Unexplained |
| HH Income | 0.0030 | -0.1651 | -0.0063 | -0.0477 |
| $50,000-$75,000 | (0.0006) | (0.0470) | (0.0007) | (0.0288) |
| HH Income | -0.0032 | -0.1245 | -0.0060 | -0.0278 |
| $75,001-$100,000 | (0.0005) | (0.0339) | (0.0007) | (0.0221) |
| HH Income | 0.0003 | -0.3579 | -0.0001 | -0.1981 |
| $100,001+ | (0.0003) | (0.0581) | (0.0007) | (0.0408) |
| Worked in | -0.3684 | 1.134 | -0.0440 | 2.545 |
| Last Week | (0.0089) | (0.1959) | (0.0024) | (0.1203) |
| Searched for | -0.1195 | -0.0050 | -0.0399 | 0.1230 |
| Job | (0.0041) | (0.0286) | (0.0025) | (0.0198) |
| Log Number of. | -10.19 | -2.434 | -8.077 | -42.62 |
| Years in U.S | (0.5032) | (2.068) | (0.8219) | (4.835) |
| Log Years in | 16.68 | 7.861 | 12.22 | 40.24 |
| U.S. Squared | (0.5292) | (1.126) | (0.7610) | (2.490) |
| Only English | 1.876 | -0.2650 | 0.7321 | -0.2700 |
| | (0.1384) | (0.0675) | (0.1293) | (0.1763) |
| English Very | -0.9976 | -0.3151 | -0.4244 | -1.183 |
| Well | (0.0486) | (0.0873) | (0.0481) | (0.0699) |
| English Well | -1.270 | 0.4510 | -1.010 | 0.3912 |
| | (0.0491) | (0.0669) | (0.0360) | (0.0468) |
| English Not | 0.3237 | 0.1948 | -0.1211 | 0.5456 |
| Well | (0.0444) | (0.0541) | (0.0393) | (0.0414) |
| English Not | 0.6369 | -0.0655 | 0.5055 | -0.0864 |
| At All | (0.0272) | (0.0377) | (0.0308) | (0.0358) |

Source: 2010 ACS 1-year file, 2010 Census Unedited File (CUF), and 2010 Numident.
Notes: The 2010 Census self-response is non-blank response to the first mailing, and only NRFU-eligible housing units are included. ACS self-response is mail response. These regressions are estimated by linear probability models (LPM), weighted by ACS person weights. The standard errors are in parentheses. The standard errors are bootstrapped using 80 ACS replicate weights. The base categories are non-Hispanic white for race/ethnicity, less than high school for educational attainment, no income for household income, and speaks only English at home for English ability. The number of observations is 1,418,000 (unweighted) and 96,540,000 (weighted).

77

COM_DIS00009909

# EXHIBIT 32

**From:** Gore, John (CRT)
**Sent:** Friday, November 3, 2017 5:11 PM
**To:** Gary, Arthur (JMD)
**Subject:** Close Hold: Draft Letter
**Attachments:** Letter (rev).docx

Art:

The draft letter that we discussed earlier this week is attached.  Let's touch base early next week once you've had a chance to review it.

Thanks, and have a great weekend.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

1

DOJ00002738

| From: | Aguiñaga, Ben (CRT) |
|---|---|
| Sent: | Friday, November 3, 2017 2:04 PM |
| To: | Pickett, Bethany (CRT) |
| Subject: | FW: Confidential & Close Hold: Draft Letter |
| Attachments: | Letter.docx |

**J. Benjamin Aguiñaga (AH-gheen-YAH-gah)**
Chief of Staff and Counsel
Office of the Assistant Attorney General
Civil Rights Division
United States Department of Justice



**From:** Gore, John (CRT)
**Sent:** Wednesday, November 1, 2017 6:32 PM
**To:** Herren, Chris (CRT) PII
**Cc:** Aguiñaga, Ben (CRT) PII
**Subject:** Confidential & Close Hold: Draft Letter

Chris:

Attached is the draft letter we discussed yesterday.  I would appreciate your comments and edits no later than Friday.  As we discussed, this is confidential and close hold.

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

PII

1

| | |
|---|---|
| **From:** | Troester, Robert J. (ODAG) |
| **Sent:** | Thursday, November 30, 2017 9:22 AM |
| **To:** | Gore, John (CRT); Tucker, Rachael (OAG) |
| **Subject:** | RE: Census Letter |
| **Attachments:** | Request for Citizenship Information.Nov26 REDLINE RCT edits (RJT edits).docx |

**Deliberative** I have proposed a minor edits on page 3 in the attached.

I am available this afternoon from 1:00 – 3:30 and after 4:30.

**From:** Gore, John (CRT)
**Sent:** Thursday, November 30, 2017 7:31 AM
**To:** Tucker, Rachael (OAG) PII
**Cc:** Troester, Robert J. (ODAG) PII
**Subject:** Re: Census Letter

I'm flying back this morning and can talk this afternoon. Is there a particular time when you're free?

Sent from my iPhone

On Nov 29, 2017, at 8:47 PM, Tucker, Rachael (OAG) PII wrote:

> This is a little nit. **Deliberative** Thanks! Can we talk tomorrow about where we are on this? Curious if you've heard from Commerce recently.
>
> **From:** Gore, John (CRT)
> **Sent:** Monday, November 27, 2017 12:43 PM
> **To:** Tucker, Rachael (OAG) PII Troester, Robert J. (ODAG) PII
> **Subject:** Census Letter
>
> Rachael and Bob:
>
> Attached please find the near-final draft of the letter to Census on the citizenship issue we discussed a couple of weeks ago. JMD would like to send it out this week, and I agree. **Deliberative** **Deliberative**
>
> Will you let me know **no later than Wednesday** whether we need to discuss this with anyone in your offices?
>
> Thanks.
>
> John M. Gore
> Acting Assistant Attorney General
> Civil Rights Division
> U.S. Department of Justice
> PII

1

PII

<Request for Citizenship Information.Nov26 REDLINE RCT edits.docx>

DOJ00014799

| | |
|---|---|
| **From:** | Gore, John (CRT) |
| **Sent:** | Friday, December 8, 2017 4:43 PM |
| **To:** | Gary, Arthur (JMD) |
| **Subject:** | RE: Close Hold: Draft Letter |
| **Attachments:** | Request for Citizenship Information.Dec 8 REDLINE edits (002).docx |

Art:

Apologies for the serial emails (on a Friday afternoon, no less).

Attached is a redline of the letter with leadership's final changes.  With these changes, we are authorized to send.  Sending on Monday is fine.

Let's touch base on Monday regarding how best to proceed.

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice



PII

---

**From:** Gore, John (CRT)
**Sent:** Friday, December 8, 2017 3:57 PM
**To:** Gary, Arthur (JMD) <    PII    >
**Subject:** RE: Close Hold: Draft Letter

Art:

# Deliberative

Feel free to call if you'd like to discuss.

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice



PII

1

**From:** Gary, Arthur (JMD)
**Sent:** Monday, December 4, 2017 2:06 PM
**To:** Gore, John (CRT) < [ PII ] >
**Subject:** FW: Close Hold: Draft Letter

OK. Standing/sitting by…

**From:** Gore, John (CRT)
**Sent:** Monday, December 04, 2017 2:03 PM
**To:** Gary, Arthur (JMD) { [ PII ] }
**Subject:** Re: Close Hold: Draft Letter

Art:

Thanks.  I'm sill waiting to hear back from
leadership on this.  I'm traveling the next couple of days but will be back in touch once I know more.

Thanks.

Sent from my iPhone

On Nov 30, 2017, at 6:07 PM, Gary, Arthur (JMD) [ PII ] wrote:

> That works for me.  I can't quite tell what changed, but it looks like it is based on the last redline so
> there appear to be edits we already made.  Happy to wait till Monday to lock it down.

> **From:** Gore, John (CRT)
> **Sent:** Thursday, November 30, 2017 4:21 PM
> **To:** Gary, Arthur (JMD) [ PII ]
> **Subject:** RE: Close Hold: Draft Letter

> Art:

> I have received some nits back from the leadership offices, which are reflected in the attached redline
> and clean versions.

> The leadership offices have requested additional time to review these through the weekend.  I told
> them that would be fine.  So let's plan to be ready to send this out on Monday.

> Thanks,
> John

> John M. Gore
> Acting Assistant Attorney General
> Civil Rights Division
> U.S. Department of Justice
> [ PII ]

> **From:** Gary, Arthur (JMD)
> **Sent:** Monday, November 27, 2017 12:19 PM

DOJ00014822

**To:** Gore, John (CRT) <John.Gore@crt.usdoj.gov>
**Subject:** RE: Close Hold: Draft Letter

John – I'm free after about 4:30 – usually here till 7 or so.   Kind of crazy till then.  Will that work?

---

**From:** Gore, John (CRT)
**Sent:** Monday, November 27, 2017 12:06 PM
**To:** Gary, Arthur (JMD)  PII
**Subject:** RE: Close Hold: Draft Letter

Art:

Do you have a few minutes to discuss this today?  Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

PII

---

**From:** Gore, John (CRT)
**Sent:** Saturday, November 25, 2017 4:33 PM
**To:** Gary, Arthur (JMD) <agary@jmd.usdoj.gov>
**Subject:** RE: Close Hold: Draft Letter

Art:

Thanks again for this.  I found a few nits, which I corrected in the attached redline.  Let's touch base early this week.  Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

PII

---

**From:** Gary, Arthur (JMD)
**Sent:** Wednesday, November 22, 2017 5:31 PM
**To:** Gore, John (CRT)  PII
**Subject:** RE: Close Hold: Draft Letter

John – I'm finally able to spring my revised draft.  So sorry for the delay.  **Deliberative**

# Deliberative

Attaching both clean and redline versions.  I'm out on Friday but in all next week.

DOJ00014823

Best to you and your family for Thanksgiving.

Art

Arthur E. Gary
General Counsel
Justice Management Division
U.S. Department of Justice
Two Constitution Square, Suite 8E.500
145 N. Street, NE
Washington, DC 20530

> PII

NOTICE: This email (including any attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited. If you received this email in error, please notify the sender immediately and destroy all copies.

---

**From:** Gore, John (CRT)
**Sent:** Tuesday, November 14, 2017 1:34 PM
**To:** Gary, Arthur (JMD) < PII
**Subject:** Re: Close Hold: Draft Letter

What is the best number to reach you around 4? Thanks.

Sent from my iPhone

On Nov 14, 2017, at 10:04 AM, Gary, Arthur (JMD) < PII > wrote:

> Hi John – sure—after 4 is best for me. I had an email drafted last night to give you a
> quick update but somehow I never found the 'send' key. FYI, I'm hoping to be ready to
> send the letter by the end of the week – or before Thanksgiving for sure. [ Deliberative ]
> [ Deliberative ]
>
> Art
>
> **From:** Gore, John (CRT)
> **Sent:** Tuesday, November 14, 2017 9:28 AM
> **To:** Gary, Arthur (JMD) < PII >
> **Subject:** Re: Close Hold: Draft Letter
>
> Art:
>
> Do you have time to catch up on this today?
>
> Thanks.
>
> Sent from my iPhone

4

On Nov 3, 2017, at 5:17 PM, Gary, Arthur (JMD) [PII] wrote:

Will do, John.  Have a good weekend your own self too.

Art

Arthur E. Gary
General Counsel
Justice Management Division
U.S. Department of Justice
Two Constitution Square, Suite 8E.500
145 N. Street, NE
Washington, DC  20530
**PII**

NOTICE:  This email (including any attachments) is intended for the use of the individual or entity to which it is addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received this email in error, please notify the sender immediately and destroy all copies.

**From:** Gore, John (CRT)
**Sent:** Friday, November 03, 2017 5:11 PM
**To:** Gary, Arthur (JMD) [PII]
**Subject:** Close Hold: Draft Letter

Art:

The draft letter that we discussed earlier this week is attached.  Let's touch base early next week once you've had a chance to review it.

Thanks, and have a great weekend.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
**PII**

DOJ00014825

| | |
|---|---|
| **From:** | Gore, John (CRT) |
| **Sent:** | Thursday, November 30, 2017 4:21 PM |
| **To:** | Gary, Arthur (JMD) |
| **Subject:** | RE: Close Hold: Draft Letter |
| **Attachments:** | Request for Citizenship Information.Nov30 REDLINE.docx; Request for Citizenship Information.Nov30 CLEAN.docx |

Art:

I have received some nits back from the leadership offices, which are reflected in the attached redline and clean versions.

The leadership offices have requested additional time to review these through the weekend. I told them that would be fine. So let's plan to be ready to send this out on Monday.

Thanks,
John

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

---

**From:** Gary, Arthur (JMD)
**Sent:** Monday, November 27, 2017 12:19 PM
**To:** Gore, John (CRT) < **PII** >
**Subject:** RE: Close Hold: Draft Letter

John – I'm free after about 4:30 – usually here till 7 or so. Kind of crazy till then. Will that work?

---

**From:** Gore, John (CRT)
**Sent:** Monday, November 27, 2017 12:06 PM
**To:** Gary, Arthur (JMD)  **PII**
**Subject:** RE: Close Hold: Draft Letter

Art:

Do you have a few minutes to discuss this today? Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

1

DOJ00014834

**From:** Gore, John (CRT)
**Sent:** Saturday, November 25, 2017 4:33 PM
**To:** Gary, Arthur (JMD) PII
**Subject:** RE: Close Hold: Draft Letter

Art:

Thanks again for this.  I found a few nits, which I corrected in the attached redline.  Let's touch base early this week.  Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

PII

**From:** Gary, Arthur (JMD)
**Sent:** Wednesday, November 22, 2017 5:31 PM
**To:** Gore, John (CRT) PII
**Subject:** RE: Close Hold: Draft Letter

John – I'm finally able to spring my revised draft.  So sorry for the delay. Deliberative

# Deliberative

Attaching both clean and redline versions.  I'm out on Friday but in all next week.

Best to you and your family for Thanksgiving.

Art

Arthur E. Gary
General Counsel
Justice Management Division
U.S. Department of Justice
Two Constitution Square, Suite 8E.500
145 N. Street, NE
Washington, DC. 20530
PII

NOTICE: This email (including any attachments) is intended for the use of the individual or entity to which it is addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received this email in error, please notify the sender immediately and destroy all copies.

DOJ00014835

**From:** Gore, John (CRT)
**Sent:** Tuesday, November 14, 2017 1:34 PM
**To:** Gary, Arthur (JMD) [PII]
**Subject:** Re: Close Hold: Draft Letter

What is the best number to reach you around 4?  Thanks.

Sent from my iPhone

On Nov 14, 2017, at 10:04 AM, Gary, Arthur (JMD) [PII] wrote:

> Hi John – sure—after 4 is best for me.  I had an email drafted last night to give you a quick update but somehow I never found the 'send' key.  FYI, I'm hoping to be ready to send the letter by the end of the week – or before Thanksgiving for sure. [Deliberative]
> [Deliberative]
>
> Art
>
> **From:** Gore, John (CRT)
> **Sent:** Tuesday, November 14, 2017 9:28 AM
> **To:** Gary, Arthur (JMD) [PII]
> **Subject:** Re: Close Hold: Draft Letter
>
> Art:
>
> Do you have time to catch up on this today?
>
> Thanks.
>
> Sent from my iPhone
>
> On Nov 3, 2017, at 5:17 PM, Gary, Arthur (JMD) [PII] wrote:
>
>> Will do, John.  Have a good weekend your own self too.
>>
>> Art
>>
>> Arthur E. Gary
>> General Counsel
>> Justice Management Division
>> U.S. Department of Justice
>> Two Constitution Square, Suite 8E.500
>> 145 N. Street, NE
>> Washington, DC  20530
>> [PII]
>>
>> NOTICE:  This email (including any attachments) is intended for the use of the individual or entity to which it is addressed.  It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient (or the recipient's agent), you are hereby notified that any dissemination, distribution, copying, or use of this email or its contents is strictly prohibited.  If you received this email in error, please notify the sender immediately and destroy all copies.

3

**From:** Gore, John (CRT)
**Sent:** Friday, November 03, 2017 5:11 PM
**To:** Gary, Arthur (JMD)    
**Subject:** Close Hold: Draft Letter

Art:

The draft letter that we discussed earlier this week is attached.  Let's touch base early next week once you've had a chance to review it.

Thanks, and have a great weekend.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

DOJ00014837

| | |
|---|---|
| **From:** | Gore, John (CRT) |
| **Sent:** | Thursday, November 30, 2017 4:17 PM |
| **To:** | Troester, Robert J. (ODAG); Tucker, Rachael (OAG) |
| **Subject:** | RE: Census Letter |
| **Attachments:** | Request for Citizenship Information.Nov30 CLEAN.docx |

Thanks to you both.  The attached clean version incorporates your changes **Deliberative** Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

**From:** Troester, Robert J. (ODAG)
**Sent:** Thursday, November 30, 2017 10:19 AM
**To:** Tucker, Rachael (OAG) **PII** Gore, John (CRT) **PII**
**Subject:** RE: Census Letter

No problem.

**From:** Tucker, Rachael (OAG)
**Sent:** Thursday, November 30, 2017 10:17 AM
**To:** Gore, John (CRT) **PII**
**Cc:** Troester, Robert J. (ODAG) **PII**
**Subject:** RE: Census Letter

I just spoke to John so no need for the 5:15. Bob- I'm going to get this reviewed over the weekend.

**From:** Gore, John (CRT)
**Sent:** Thursday, November 30, 2017 10:09 AM
**To:** Tucker, Rachael (OAG) **PII**
**Cc:** Troester, Robert J. (ODAG) **PII**
**Subject:** Re: Census Letter

5:15 works for me.  I'm also sitting in the airport now for the next 20 minutes or so if anyone wants to talk - **PII**
**PII**

Sent from my iPhone

On Nov 30, 2017, at 9:38 AM, Tucker, Rachael (OAG) **PII** wrote:

I can do 4 and 5:15...sorry.

**From:** Troester, Robert J. (ODAG)
**Sent:** Thursday, November 30, 2017 9:22 AM

1

DOJ00014840

**To:** Gore, John (CRT) [ PII ] Tucker, Rachael (OAG) [ **PII** ]
**Subject:** RE: Census Letter

[ **Deliberative** ]  I have proposed a minor edits on page 3 in the attached.

I am available this afternoon from 1:00 – 3:30 and after 4:30.

---

**From:** Gore, John (CRT)
**Sent:** Thursday, November 30, 2017 7:31 AM
**To:** Tucker, Rachael (OAG) <ratucker@jmd.usdoj.gov>
**Cc:** Troester, Robert J. (ODAG) <rtroester@jmd.usdoj.gov>
**Subject:** Re: Census Letter

I'm flying back this morning and can talk this afternoon.  Is there a particular time when you're free?

Sent from my iPhone

On Nov 29, 2017, at 8:47 PM, Tucker, Rachael (OAG) [ **PII** ] wrote:

> This is a little nit. [ Deliberative ] Thanks! Can we talk tomorrow about where we are on
> this? Curious if you've heard from Commerce recently.
>
> **From:** Gore, John (CRT)
> **Sent:** Monday, November 27, 2017 12:43 PM
> **To:** Tucker, Rachael (OAG) [ **PII** ] Troester, Robert J. (ODAG)
> [ **PII** ]
> **Subject:** Census Letter
>
> Rachael and Bob:
>
> Attached please find the near-final draft of the letter to Census on the citizenship issue
> we discussed a couple of weeks ago.  JMD would like to send it out this week, and I
> agree. [ **Deliberative** ]
>
> Will you let me know **no later than Wednesday** whether we need to discuss this with
> anyone in your offices?
>
> Thanks.
>
> John M. Gore
> Acting Assistant Attorney General
> Civil Rights Division
> U.S. Department of Justice
> [ **PII** ]
>
> <Request for Citizenship Information.Nov26 REDLINE RCT edits.docx>

2

**From:**     Gore, John (CRT)
**Sent:**     Wednesday, May 2, 2018 6:15 PM
**To:**       Herren, Chris (CRT)
**Subject:**  RE: Census Citizenship Question Litigation


Very helpful.  Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

**PII**

**From:** Herren, Chris (CRT)
**Sent:** Wednesday, May 2, 2018 5:56 PM
**To:** Gore, John (CRT)   **PII**
**Subject:** RE: Census Citizenship Question Litigation

John,

Thanks very much for the chance to offer thoughts on this.

I have attached a clean version and a version redlined against your draft (the redline is not all that helpful).

Please let us know what else we can do to assist.

Thanks, Chris


**From:** Gore, John (CRT)
**Sent:** Wednesday, April 25, 2018 4:19 PM
**To:** Herren, Chris (CRT)   **PII**
**Subject:** FW: Census Citizenship Question Litigation

Chris:

Below in bold are my proposed responses to CIV's questions.  Will you take a look and let me know whether you propose any changes?

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice
**PII**

1

PII

**From:** Wells, Carlotta (CIV)
**Sent:** Tuesday, April 24, 2018 11:27 AM
**To:** Gore, John (CRT) [PII]
**Cc:** Readler, Chad A. (CIV) < [PII] >; Shumate, Brett A. (CIV) < [PII] >; Griffiths, John (CIV) < [PII] >; Womack, Eric (CIV) <erwomack@CIV.USDOJ.GOV>; Federighi, Carol (CIV) <CFederig@CIV.USDOJ.GOV>; Bailey, Kate (CIV) <katbaile@CIV.USDOJ.GOV>; Ehrlich, Stephen (CIV) <sehrlich@CIV.USDOJ.GOV>; Tarczynska, Dominika (USANYS) <Dominika.Tarczynska@usdoj.gov>
**Subject:** Census Citizenship Question Litigation

Hi John –

# AWP/Deliberative

DOJ00028355

# AWP/Deliberative

DOJ00028356

# AWP/Deliberative

PII

Regards,

Carlie

Carlotta P. Wells
Assistant Branch Director
Federal Programs Branch
Civil Division

PII

*The information in this transmittal (including attachments, if any) is intended only for the recipient(s) listed above and may contain information that is privileged and confidential. Any review, use, disclosure, distribution, or copying of this transmittal is prohibited except by or on behalf of the intended recipient. If you have received this transmittal in error, please notify me immediately and destroy all copies of the transmittal. Your cooperation is appreciated*

4

| | |
|---|---|
| **From:** | Herren, Chris (CRT) |
| **To:** | Gore, John (CRT) |
| **Subject:** | RE: Confidential & Close Hold: Draft Letter |
| **Date:** | Friday, November 3, 2017 3:30:00 PM |

Thanks John

**From:** Gore, John (CRT)
**Sent:** Friday, November 3, 2017 3:14 PM
**To:** Herren, Chris (CRT)
**Cc:** Aguiñaga, Ben (CRT)

PII

**Subject:** RE: Confidential & Close Hold: Draft Letter

Chris:

This is great.  Thanks for the quick turnaround.

Have a nice weekend.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

PII

**From:** Herren, Chris (CRT)
**Sent:** Friday, November 3, 2017 2:10 PM
**To:** Gore, John (CRT) <
**Cc:** Aguiñaga, Ben (CRT)

PII

**Subject:** RE: Confidential & Close Hold: Draft Letter

John –

Thanks very much for sharing the draft.  Some comments from me are included on the attached.
Please let me know what else we can do to assist.

Thanks, Chris

**From:** Gore, John (CRT)
**Sent:** Wednesday, November 1, 2017 6:32 PM
**To:** Herren, Chris (CRT) <
**Cc:** Aguiñaga, Ben (CRT)

PII

**Subject:** Confidential & Close Hold: Draft Letter

Chris:

Attached is the draft letter we discussed yesterday.  I would appreciate your comments and edits no later than Friday.  As we discussed, this is confidential and close hold.

Thanks.

John M. Gore
Acting Assistant Attorney General
Civil Rights Division
U.S. Department of Justice



# EXHIBIT 33

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3    ---------------------------------------
      NEW YORK IMMIGRATION COALITION, ET AL.,
 4
                     Plaintiffs,
 5         vs.       Case No.  1:18-CF-05025-JMF
 6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,
 7                   Defendants.
      ---------------------------------------
 8
 9                   Washington, D.C.
10                   Wednesday, August 29, 2018
11    Deposition of:
12                   DR. JOHN ABOWD
13    called for oral examination by counsel for
14    Plaintiffs, pursuant to notice, at the office of
15    Arnold & Porter, 601 Massachusetts Avenue NW,
16    Washington, D.C., before KAREN LYNN JORGENSON,
17    RPR, CSR, CCR of Capital Reporting Company,
18    beginning at 9:06 a.m., when were present on
19    behalf of the respective parties:
20              Veritext Legal Solutions
                 Mid-Atlantic Region
                1250 Eye Street NW - Suite 350
21              Washington, D.C.  20005
22
```

Page 2

```
1           CONTENT
                          PAGE
2
     DR JOHN ABOWD                9
3        Examination by Mr Ho       9
         Examination by Ms Shah     144
4        Examination by Mr Talik    187
         Examination by Mr Adams    264
5        Examination by Mr Ehrlich  333
         Examination by Ms Goldstein 334
6
         ABOWD DEPOSITION EXHIBITS
7    EXHIBIT                        PAGE
         NUMBER
8    Plaintiffs' Exhibit 1  Questionnaire  16
         for the
9            American
             Community
10           Survey
     Plaintiffs' Exhibit 2  Census 2000  19
11           questionnaire
     Plaintiffs' Exhibit 3  1950 census  21
12           questionnaire
     Plaintiffs' Exhibit 4  Federal     56
13           Register notice
     Plaintiffs' Exhibit 5  Map         64
14   Plaintiffs' Exhibit 6  Email thread  71
     Plaintiffs' Exhibit 7  January 19,  74
15           2018 memo
     Plaintiffs' Exhibit 8  Email       79
16   Plaintiffs' Exhibit 9  Email       82
     Plaintiffs' Exhibit 10 Email       96
17   Plaintiffs' Exhibit 11 Analysis   111
     Plaintiffs' Exhibit 12 Tables     127
18   Plaintiffs' Exhibit 13 PowerPoint 144
     Plaintiffs' Exhibit 14 Census Bureau 157
19           statistical
             quality
20           standards
     Plaintiffs' Exhibit 15 Census 2000  182
21           brief
     Plaintiffs' Exhibit 16 2005        185
22           National
             Content Test
```

Page 3

```
1    Plaintiffs' Exhibit 17  G series    254
             documents
2    Plaintiffs' Exhibit 18  2020 CBAMS  267
             survey
3    Plaintiffs' Exhibit 19  2020 CBAMS  278
             brief update
4    Plaintiffs' Exhibit 20  Question 28  290
     Plaintiffs' Exhibit 21  2020 census  304
5            integrated
             communication
6            plan
     Plaintiffs' Exhibit 22  OMB standards  320
7            and guidelines
             for statistical
8            surveys
     Plaintiffs' Exhibit 23  Secretary Ross  325
9            decision memo
10
     (Exhibits attached to transcript.)
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

```
1         A P P E A R A N C E S
     On behalf of New York Immigration
2    Coalition, CASA De Maryland, American-Arab
     Anti-Discrimination Committee, ADC Research
3    Institute and Make the Road New York:
             John Freedman, Esquire
4        Caroline Kelley, Esquire
         ARNOLD & PORTER
5        601 Massachusettes Avenue, NW
         Washington, D C  20001
6        (202) 942-5316
         jon freedman@arnoldporter com
7        caroline kelly@arnoldporter com
8    On behalf of New York Immigration Coalition:
         Dale Ho, Esquire
9        Sarah Brannon, Esquire
         AMERICAN CIVIL LIBERTIES UNION
10       915 15th Street, NW
         Washington, D C  20005
11       (202) 675-2337
         sbrannon@aclu org
12       dho@aclu org
13   On behalf of Kravitz Plaintiffs:
         Karun Tilak, Esquire
14       COVINGTON & BURLINGTON
         850 Tenth Street, NW
15       Washington, D C  20001
         (202) 662-5458
16       ktilak@cov com
17   On behalf of Los Angeles Unified School District:
         Keith Yeomans, Esquire (Telephonically)
18       DANIELS WOLIVER KELLEY
         115 Pine Avenue
19       Suite 500
         Long Beach, California 90802
20       (562) 366-8500
         kyeomans@dwkesq com
21
22
```

Page 5

```
1    On behalf of LUPE Plaintiffs:
         Denise Hulett, Esquire (Telephonically)
2        MALDEF
         1016 16th Street NW
3        Suite 100
         Washington, D C  20036
4        (202) 293-2828
         dhuelett@maldef org
5
         Niyati Shah, Esquire
6        ASIAN AMERICANS ADVANCING JUSTICE
         1620 L Street, NW
7        Suite 1050
         Washington, D C  20036
8        (202) 296-2300
         nshah@advancingjustice-aajc org
9
     On behalf of City of San Jose & Black Alliance for
10   Just Immigration:
         Rory Adams, Esquire
11       MANATT, PHELPS & PHILLIPS
         7 Times Square
12       New York, New York 10036
         (212) 790-4501
13       radams@manatt com
14       Ezra Rosenberg, Esquire
         Dorian Spence, Esquire
15       LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
         1401 New York Avenue, NW
16       Suite 400
         Washington, D C  20005
17       (202) 662-8345
         erosenberg@lawyerscommittee org
18       dspence@lawyerscommittee org
19
20
21
22
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1    A  If you're going to ask me about one of
2  the analyses that's in this early draft, I need to
3  know which one.
4    Q  Sure.
5    A  If you're going to ask me about something
6  else, I need to have my memory refreshed as to
7  what you're asking me about.
8    Q  I understand.  I don't think it made its
9  way into that version of the white paper.
10    A  Okay.
11    Q  But my understanding is that at some
12  point, the SWAT team looked at CAPI response rates
13  and they compared census tracts to a stratified
14  analysis, deciles -- percentage -- a household --
15  census tracts with the lowest percentage of
16  households with a noncitizen and -- you know, from
17  1 to 10, those with the greatest percentage of
18  households with a noncitizen, and compared the
19  CAPI response rates.  Does that help refresh your
20  memory?
21    A  You've refreshed my memory to the point
22  that I acknowledge that an analysis was done in

1  which tracts were stratified by decile.  But I
2  would like to review what it is you're asking me
3  about, because I don't remember specifically what
4  the stratifier was and what the response was.
5  I've had to look at a lot of documents over the
6  last several weeks.  I simply am not sure what the
7  exact analysis is you're asking me about.
8        (Plaintiffs' Exhibit 12, Tables, was
9    marked.)
10    Q  Okay.  Let me show you a document.  It's
11  been marked as Exhibit 12.  It's a series of
12  tables.  The first page on the document is
13  AR10408.
14        And I'm looking at the third table, the
15  CAPI response rate.  Now, this table shows an
16  analysis of census tracts broken into deciles from
17  least to most percentage of households with a
18  noncitizen comparing CAPI response rates; is that
19  right, Dr. Abowd?
20    A  Yes.  I don't recall exactly how the
21  tract deciles were determined, but they are from
22  least to most noncitizen.  That's right.

1    Q  So one is the decile of census tracts
2  with the lowest percentage of households with a
3  noncitizen.  Ten is the decile of census tracts
4  with the largest percentage with households with a
5  noncitizen, correct?
6    A  That's correct.
7    Q  And, basically, what that means is, as
8  you go from 1 to 10, the percentage of households
9  in a census tract increases, correct?
10    A  Percentage of households with a
11  noncitizen.
12    Q  Noncitizen, sorry.
13        And when we look at -- just to take one
14  number from the table -- for the 10th decile, year
15  2016, the CAPI response rate is 87.4, bottom right
16  corner of the table.  What does that mean for the
17  CAPI response rate to be 87.4 for that decile
18  census tract?
19    A  I'm going to check with the author of
20  this table on the next break to make certain that
21  the CAPI here means only the nonresponse follow-up
22  that was followed up by computer-assisted personal

1  interview.  We sometimes lump Internet
2  self-response in, but I don't think that was done
3  here, because Internet self-response is by itself
4  separately, and it didn't start until 2013.
5    Q  Uh-huh.
6    A  And up until 2016, you could also be
7  followed up with CATI, computer-assisted telephone
8  interview.  So I think I've told you correctly,
9  that this is nonresponse follow-up
10  computer-assisted personal interview.
11        In that case, it means that the subsample
12  of nonrespondents that was selected for
13  nonresponse follow-up in the ACS were successfully
14  followed up with the percentages indicated in the
15  table.
16    Q  So just to be clear, the subset of
17  non- -- of households chosen for nonresponse
18  follow-up on the ACS for the tenth decile in 2016,
19  nonresponse follow-up on the ACS was successful
20  87.4 percentage of the time?
21    A  That's correct.
22    Q  Now, if we look at this table, correct,

33 (Pages 126 - 129)

1 that the Bureau found that nonresponse follow-up

2 for the ACS has declined each year for each

3 decile; is that correct?

4    A   That -- that seems to be correct.

5    Q   Okay.  And is that consistent with the

6 notion that citizenship has become a more

7 sensitive question on surveys since the year 2010?

8    A   One of the reasons that this particular

9 analysis doesn't appear in some of the technical

10 papers that were relied upon by the larger group

11 of senior executives at the Census Bureau in

12 drawing their conclusions, is that the internal

13 peer review of this particular analysis suggested

14 that there were enough qualifications to that

15 conclusion that many of them were unwilling to

16 make it.

17       You correctly characterized the trend

18 lines, that there were changes to the design of

19 the survey that occurred here and there were also

20 potential other differences that -- that many of

21 the people who looked at this found qualifications

22 that -- so that's the right conclusion.  But it

1 isn't a conclusion that the Census Bureau,

2 speaking collectively for the people who peer

3 reviewed this analysis, would have jointly made.

4    Q   I understand there are caveats, but

5 notwithstanding those caveats, is the decline in

6 successful nonresponse follow-up for the ACS since

7 2010 suggestive of the notion that citizenship

8 questions on surveys have become more sensitive

9 since 2010?

10    A   It's consistent with that interpretation,

11 yes.

12    Q   It also appears that in each year, as a

13 census tract has greater percentage of households

14 with a noncitizen, that nonresponse follow-up,

15 generally, is less successful.  Would you agree

16 with that?

17    A   Yes.  It's consistent with that

18 interpretation, as well.

19    Q   Okay.  So is it consistent -- is that

20 data consistent with the notion that noncitizen

21 households are less likely to cooperate with

22 nonresponse follow-up to the ACS?

1    A   So we didn't -- well, if we did a

2 difference-and-difference analysis of this table,

3 I don't remember it.  And I flipped and it doesn't

4 seem to be in here.  So without a

5 difference-and-difference analysis, I'm not able

6 to draw a conclusion like the one you just

7 suggested.

8    Q   But as a census tract gets a greater

9 percentage of households with a noncitizen,

10 generally speaking, nonresponse follow-up in that

11 census tract is less successful, correct,

12 Dr. Abowd?

13    A   Is less successful than?

14    Q   Than it is for a census tract with a

15 lower percentage of households with a noncitizen?

16    A   You're asking me do the numbers go down

17 when the deciles go up, and that's correct, yes.

18    Q   Now, I believe when you testified at your

19 last deposition, when you were talking about the

20 CAPI analysis, you described something like a

21 spreadsheet that had all the tables that you

22 looked at which had been cleared for release by

1 the disclosure review board.  Does that ring a

2 bell?

3    A   My testimony rings a bell, yes.

4    Q   Do you believe this was the table you

5 were referring to during your deposition -- or

6 these set of tables?

7    A   I believe so.  As it turns out, it wasn't

8 in the same collection of spreadsheets I thought

9 it was, but I believe this was the table I was

10 referring to, yes.

11    Q   Has the Census Bureau looked at the 2017

12 CAPI data?

13    A   Someone in the Census Bureau may have.

14 This team has not yet analyzed the 2017 data.

15    Q   Do you know if the 2017 CAPI data shows a

16 continuing trend of less successful nonresponse

17 follow-up to the ACS?

18    A   I don't know.  The production data from

19 the 2017 ACS won't be ready until September, and

20 so it's not until after those data have been

21 generated that you can generate a column that's

22 comparable to these columns from 2017.

34 (Pages 130 - 133)

Page 138

1  on public attitudes with respect to answering a
2  citizenship question?
3      A   The Census Bureau has awarded the
4  integrated communication contract for the 2020
5  census.  Under task orders associated with that
6  contract, the CBAMS -- I expanded the acronym
7  earlier -- the CBAMS surveys and the CBAMS focus
8  groups were conducted.  They were conducted by the
9  contractor, who I believe satisfies the definition
10  of an external expert on collecting survey
11  opinion.
12      And after the Secretary instructed us to
13  put the citizenship question on the 2020 census,
14  the focus group protocol was modified to begin
15  collecting information on it, but it was not time
16  to modify the survey protocol.
17      Q   Who is that external contractor?
18      A   So the lead contractor is
19  Young & Rubicon.
20      Q   Has the Census Bureau contracted with a
21  company named Reingold to conduct research on
22  public attitudes with respect to answering a

Page 139

1  citizenship question?
2      Reingold spelled R-E-I-N-G-O-L-D.
3      A   I do not know whether Reingold is a
4  subcontractor in the integrated communication
5  contract.  If they are, then the answer could be
6  yes.  I'm not aware of another contract, but I
7  will check during a break.
8      Q   Okay.  Does the Census Bureau think that
9  adding a citizenship question to the 2020
10  enumeration questionnaire is a good idea?
11      A   No.
12      MR. HO:  Can we go off the record for a
13  second?
14      VIDEOGRAPHER:  We're going off the
15  record.  The time on the video is 12:07 p.m.
16      (Off the record.)
17      VIDEOGRAPHER:  This begins Media Unit
18  Number 3.  The time on the video is 1:03 p.m.  We
19  are on the record.
20  BY MR. HO:
21      Q   Dr. Abowd, I don't have any other
22  questions for you at this time, but I know you

Page 140

1  said you were going to check on a few things at
2  lunch, and I just wondered if there was anything
3  in particular that you wanted to offer any detail
4  about that you were unable to -- for which you
5  were unable to do earlier?
6      A   Yes.  First of all, let's go to the
7  easiest one.  Reingold is a contractor for the
8  Census Bureau.
9      Q   Okay.  What are they a contractor for?
10      A   They're in -- they have one of the
11  decennial communications contracts.  I have
12  requested a summary of the task orders.  I haven't
13  received it yet.
14      Q   Do you know what work they've performed
15  for the Census Bureau?
16      A   That's why I asked for a summary of the
17  task orders.  I do not.
18      Q   Do you know if there are any documents
19  reflecting the work that Reingold has done for the
20  Census Bureau?
21      A   I didn't ask that.  I will at the next
22  break.

Page 141

1      Q   Any other issues you'd like to clarify?
2      A   In the ACT -- I'm sorry -- ACS RCT, the
3  design was to last for six weeks of data
4  collection, so the one that would -- had it
5  started in November, those data would have been
6  collected by mid-January.  There were two designs.
7  They both involved a control group, which in these
8  experiments just means the ACS says it is being
9  run, so we don't have a separate control group.
10      A questionnaire that just had the
11  American Community Survey citizenship question,
12  just the citizenship question, and a group -- a
13  treatment group that just had the CPS version, yes
14  or no.  It wasn't the exact CPS version but a
15  two-choice version.  And then --
16      (Thereupon, the court reporter
17  clarified.)
18      THE WITNESS:  A treatment group that had
19  no citizenship question.
20      To achieve the high level of accuracy
21  would have been $4 million.  To achieve the lower
22  level of accuracy would have been 2 million, same

36 (Pages 138 - 141)

Page 142

1 field period.
2 BY MR. HO:
3     Q   Thank you.  And this would have been the
4 only testing of the 2020 decennial questionnaire
5 with a citizenship question in it, correct?
6     A   This is the only field testing with and
7 without citizenship question, directly analyzing
8 the citizenship question that we have considered
9 at the Census Bureau.
10     I also verified that the 2010 census
11 questionnaire had full cognitive and field
12 testing.  That the 2020 questionnaire without the
13 citizenship question had -- so I asked him the
14 same way you asked me, was adequately, cognitively
15 tested; yes.
16     Q   I'm sorry.  Who did you ask whether or
17 not?
18     A   I asked my staff -- the same group that I
19 had been asking generally about the testing, I
20 specifically asked about the cognitive testing for
21 the 2020 questionnaire, with and without the
22 citizenship question, and their answer was that it

Page 143

1 was adequately tested with the citizen- -- without
2 the citizenship question, but not adequately
3 tested with the citizenship question, cognitive
4 testing.
5     Q   Thank you.
6     A   Okay.
7     And, thirdly, in this table, Exhibit 12,
8 the third panel, the CAPI response rate, I
9 confirmed, so I can now say the way the tract was
10 put into deciles was based on the five-year
11 American Community Survey for the middle five
12 years of the table, so 2011 through 2015.  That
13 the CAPI response rate is just the CAPI response
14 rate in the nonresponse follow-up system, okay.
15     I think those were all the things we had
16 unresolved.  If you think there were others -- we
17 went over our notes, but I think I've answered the
18 questions that that were unresolved.
19     MR. HO:  I don't have any others right
20 now, so I'm going to pass you along to one of the
21 other lawyers for one of the other plaintiff
22 groups, subject, of course, to the issue that I've

Page 144

1 raised earlier about wanting to potentially ask
2 you questions about the documents produced last
3 night.  But thank you very much.
4     THE WITNESS:  You're welcome.
5     VIDEOGRAPHER:  We're going off the
6 record.  The time on the video is 1:08 p.m.
7     (Off the record.)
8     VIDEOGRAPHER:  We're back on the record.
9 The time on the video is 1:09 p.m.
10     EXAMINATION BY MS. SHAH:
11     Q   Good morning -- afternoon, Dr. Abowd.  My
12 name is Niyati Shah, and I represent the
13 plaintiffs in Lupe v. Ross in the District of
14 Maryland, Case Number 8:1801570.
15     I'd like to just kind of start today by
16 giving you a document, first, and we can mark it
17 as Exhibit 13.  It is Bates-stamped 4802.
18     (Plaintiffs' Exhibit 13, PowerPoint, was
19 marked.)
20 BY MS. SHAH:
21     Q   And this is a draft PowerPoint from
22 February 2018 titled submission of the 2020 census

Page 145

1 and American Community Survey questions to
2 Congress.  If you could turn to Page 4804, and it
3 has a slide and some presentation notes below the
4 slide, and notes towards the bottom say that,
5 "Requests undergo legal review of the
6 justification by DOC; technical review by the
7 Census Bureau; and policy review by DOC and OMB."
8     I'd like to put aside technical review
9 for a moment, and can you tell me what a legal
10 review is?
11     A   A legal review means whether there is any
12 statutory basis -- first of all, let me preface
13 with I'm not a lawyer -- my understanding as a
14 senior executive at the Census Bureau who makes
15 use of the legal review is that they are
16 examinations of statutory basis for the request
17 and the potential for any statutory bars from the
18 request.
19     Q   And who conducts this review?
20     A   So the Census Bureau uses the legal staff
21 of the Office of the General Counsel and
22 Department of Commerce.  A number of their

37 (Pages 142 - 145)

Page 154

1 enumeration, but it is part of census. And so the
2 process that we had in place for evaluating which
3 questions would be on the long form dates from the
4 creation of the long form. And it was inherited
5 by the American Community Survey and modernized
6 for the American Community Survey, and the way in
7 which these bullets on this page -- page AR4804
8 describe the process as adaptation of the process
9 that is in place and is used for questions on the
10 American Community Survey.
11    Q  But to go back to my question,
12 this -- this process that we've just talked about,
13 the three reviews that are on this page, 4804, if
14 any one of those reviews advises against the
15 addition of a question, does the question get
16 added?
17    A  So it would be more iterative than that.
18 If a technical review revealed that it was going
19 to be difficult to ask the question for some
20 reason -- let's speak hypothetically -- then we
21 would probably not prepare a clearance package
22 supported by a technical analysis that says this

Page 155

1 is not likely to work very well. The
2 Census Bureau would re-examine the use case for
3 the particular request. If it's a -- if it's a
4 specific agency of the executive branch, one of
5 our principal statistical clients, we would work
6 with that agency to refine the request. What we
7 were attempting to determine is the least
8 burdensome way of delivering statistics that are
9 suitable for the purpose that we're being asked to
10 produce them.
11    So in that iterative process, would
12 attempt to identify a technically better way of
13 addressing the data need. And, generally
14 speaking, that -- in that iterative process, both
15 the Census Bureau and the principal client -- all
16 these data are going to be released for public
17 use, so the principal client is acting as the
18 agent of the general public in design of a
19 product. If there was an agreement that this
20 particular technical solution will work and it
21 will meet the needs, then we would -- and then it
22 would involve a modification or a question -- a

Page 156

1 new question on the survey, then we would move
2 forward with the questionnaire design and the
3 testing that we would normally do, and we would
4 eventually get to the point where a clearance
5 package would be sent forward.
6    There might be some other regulatory
7 barriers. There are lots of -- I shouldn't say
8 lots of. There are several very specific
9 categories of data that statistical agencies and
10 other agencies of the federal government collect
11 that are governed by regulations of OMB. And so
12 if the request involved something that inherently
13 meant you had to modify or update one of those
14 standards, then that would also come into play.
15 And those standards are regularly modified and
16 updated, and there, the Office of the Chief
17 Statistician takes charge of creating the relevant
18 working group, preparing the modification, doing
19 the Federal Register notices on the modifications.
20 So if you have to modify the standards before you
21 can produce a survey instrument, then that process
22 would happen.

Page 157

1    This would all basically go on
2 simultaneously, but no OMB clearance package would
3 be sent to the Office of the Statistician prior to
4 doing the ground work that the chief statistician
5 is known to require before she, in this case,
6 would approve the clearance request.
7    Q  So did I understand you correctly that
8 the clearance package has not yet been submitted
9 to OMB with regard to the citizenship question?
10    A  The clearance package for the specific
11 forms for the 2020 census has not yet been
12 submitted to OMB.
13 BY MS. SHAH:
14    Q  I'm going to hand you what's Exhibit 14,
15 and I only have two copies, because they're very
16 large. I'm going to have this marked as
17 Exhibit 14, which is statistical quality standards
18 from the Census Bureau.
19    (Plaintiffs' Exhibit 14, Census Bureau
20 statistical quality standards, was marked.)
21 BY MS. SHAH:
22    Q  Are you familiar with this document?

40 (Pages 154 - 157)

1    A   Yes.

2    Q   Do you follow it?

3    A   The Census Bureau conducts its production

4    of statistical and other information products

5    according to these standards, yes.

6    Q   And who has to follow it?

7    A   All -- so it defines the types of

8    products that are covered by the -- by the

9    standards.  And essentially, all outward-facing

10   products, which would be official statistical

11   products, special tabulations, research papers,

12   the reports of activity -- information summaries

13   that accompany the releases of principal monthly

14   indicators and the 2017 ACS when it's released in

15   September, so both the information products that

16   are used for the general public and the detailed

17   information product that you're releasing are

18   subject to the standards.

19   Q   And -- but what I meant was -- I'm sorry

20   if I was unclear -- was, do all census employees

21   have to follow the guidelines set forth in this

22   document?

1    A   So the guidelines are Census Bureau

2    guidelines, and the employee, in the conduct of

3    his or her job, when preparing an information

4    product covered by the standards, that's what I

5    just explained, would be expected to abide by

6    standards, yes.

7    Q   And what about the Secretary?

8    A   The Secretary is not bound by the

9    standards.

10   Q   And we talked about some of the products

11   that this applies to.  Does it apply to the

12   decennial census questionnaire?

13   A   Yes.

14   Q   And, more specifically, the citizenship

15   question, as well?

16   A   Yes.

17   Q   So is it fair to say that the

18   Census Bureau has to follow these standards when

19   they develop and design survey questionnaires?

20   A   It is fair to say that every information

21   product and statistical program within the

22   Census Bureau is expected to follow these

1    standards?  Yes.

2    Q   And if you can turn to Page 5 of this

3    document -- and it's a large one, so, you

4    know -- when we're talking about Requirement A16,

5    which says that, "Quality control checks must be

6    performed to ensure the accuracy and completeness

7    of the program plans including, among other

8    things, survey designs."

9        Does this requirement apply to the

10   decennial census questionnaire?

11   A   Yes.

12   Q   And what does it mean, survey design?

13   A   In this -- on Page 5, it has a very broad

14   interpretation.  We might sometimes call it the

15   lifecycle design, all of the components that go

16   into executing a -- an information product,

17   including, to be frank, a case where there's no

18   actual survey --

19   Q   Uh-huh.

20   A   -- but it's the design of an information

21   product.

22   Q   And has this quality check been done for

1    the citizenship question?

2    A   It is the view of the senior executive

3    staff at the Census Bureau that the citizenship

4    question has been adequately tested.  It is clear

5    from the timeline of that -- of the Secretary's

6    decision that it couldn't have been subjected to

7    all the testing that the rest of the questionnaire

8    has been subjected to.  The question itself has

9    been through cognitive testing.  The question

10   itself has been used extensively in the

11   American Community Survey.  We made the decision

12   when the request from the Department of Justice

13   came that the only way we could respond to that

14   request would be to use the pre-existing

15   American Community Survey question.  There simply

16   wasn't time to engineer the -- a decades' worth of

17   tests.  We thought it would be inappropriate to

18   tell the Secretary that we cannot put the question

19   on the census because we have not had a decade to

20   test it.

21       So our standards permit us, in the

22   situation where because of either time or

41 (Pages 158 - 161)

1    A   We often lump them together, but yes.

2    Q   And did -- was 2017 a year where testing

3  was conducted?

4    A   Yes.

5    Q   So, basically, every year since 2012?

6    A   Yes. -- wrong -- not 2019.  There's no

7  operational plan test.  There will be testing.

8  There's -- testing is continuous.  We're talking,

9  really, about these formal designed tests that

10 usually have an RCT component to them, but not

11 always.

12   Q   And why does the Census Bureau run this

13 series of tests to prepare for 2020?

14   A   In a modern business, when you develop a

15 tool that you're going to use for your flagship

16 product, you're usually going to use it

17 continuously.  So in a modern business, there's a

18 continual improvement and implement phase.

19      For the census of population, that tool

20 is going to be used exactly once.  So you can't

21 guess how you're going to do it.  You have to take

22 the accumulated knowledge from the last times you

1  did it, multiple decades ago, and predict what the

2  environment's going to be like when you're

3  starting about a decade forward, and try to

4  balance the likely budget that you will get.

5  You'll only know the early part of it.  You won't

6  know the -- with the goals -- the goal has

7  consistently been the -- an accurate actual

8  enumeration, but the goals have been expanded.  So

9  the current census also has the goal to collect

10 the race and ethnicity data that are used to

11 enforce civil rights laws.  So the social goals

12 have to be incorporated, and they change.

13      So it's -- it -- the Census Bureau

14 doesn't have the option of using the continuous

15 improvement model.  So it has to simulate that by

16 having something that is a first roughed out one

17 and then doing continuous improvement on that and

18 then scaling it at -- we used to call the test

19 that we just completed a dress rehearsal.  We

20 don't call it an end-to-end test.  You scale it

21 right after that.

22   Q   So these tests help you simulate what the

1  decennial census environment might be like,

2  correct?

3    A   They help you predict the quality of the

4  instrument and the cost of the operations to

5  implement it and collect and process the data.

6    Q   And would you agree trying to count more

7  than 300 million people across the country is a

8  fairly complex undertaking?

9    A   Yes.

10   Q   So the Census goes through these multiple

11 years of tests in order to make sure it get things

12 right for the 2020 census, correct?

13   A   Actually, we hold ourselves to a higher

14 standard.  We like to do them better than we did

15 them last time.

16   Q   Because the decennial census is a

17 once-in-a-decade event?

18   A   It is authorized in the Constitution.

19   Q   And we discussed testing, at length,

20 earlier.  Is one of the purposes that testing is

21 used for to develop predictions about field

22 operations?

1    A   Yes.

2    Q   And particularly options for --

3  operations for nonresponse follow-up?

4    A   Among other operations, yes.

5    Q   And is it okay if I refer to nonresponse

6  follow-up as NRFU going forward?

7    A   I'll recognize it if you call it NRFU.

8    Q   Okay.  Are the tests used to help

9  project, for example, staffing levels for NRFU

10 operations?

11   A   They're used to help refine the

12 projections.  They're usually our early on

13 projections that are based on the most recent

14 census and then they're refined.

15   Q   How are they refined?

16   A   So the relevant history is the post-war

17 history of the census, and that is the era in

18 which we moved from the primary operational mode

19 is you send an enumerator into a space that is

20 defined by a physical area, and you ask that

21 enumerator to find every domicile or other place

22 where people can live, and then after finding

49 (Pages 190 - 193)

Page 194

1 those domiciles, to count the number of people
2 that are there and to collect other information
3 about them.
4     We moved from that mode to asking the
5 residents of the United States to supply that
6 information for themselves in a manner that would
7 allow us to control whether we had received
8 information about a particular physical address.
9 So the field operators are different in those two.
10 There really -- it wasn't really NRFU before there
11 was NR to follow up.
12     Q   So just talking about the 2020 census,
13 have these tests been used to project the number
14 of NRFU enumerators that the Census Bureau may
15 need to hire?
16     A   Yes.  They have been used along with
17 other data to do that projection.
18     Q   What is the other data that's been used?
19     A   Historical practice, feedback from the
20 field office and tests for the various forms of
21 the operational control systems.
22     Q   And when were those tests for the

Page 195

1 operations control systems performed?
2     A   So every time we do a test, there's an
3 operational control system.  So it's a component
4 of the data that we gather in order to revise our
5 estimates of how much effort is going to be needed
6 at each phase of the census.
7     Q   And have these tests over the last
8 several years also been used to project the number
9 of census offices that the Census Bureau will need
10 to open up for the 2020 census?
11     A   They have been used to revise the area
12 census office plan, yes.
13     Q   Have these tests been used to test the
14 adequacy or the amount of training that
15 enumerators will receive?
16     A   Yes.
17     Q   And have these tests been used to test
18 NRFU -- methods of NRFU contact with households?
19     A   If I rephrase your question, have they
20 been used to test a variety of NRFU protocols and
21 modes, yes.
22     Q   Have these tests been used to -- in

Page 196

1 relation to the census questionnaire assistance
2 telephone service?
3     A   Yes.  Not all of them, but some of them.
4     Q   Which tests have been used for that
5 purpose?
6     A   So I will have to review which of the
7 tests included a CQA.  That's what we call it,
8 census questionnaire -- census questionnaire
9 assistance, which is the telephone component.  The
10 end-to-end test did.  The 2015 National Content
11 Test did.  I can't remember whether the 2017 test
12 did or not.
13     In the next break -- I have notes on
14 this.  I'll just -- fleshed short-term memory, so
15 I'm not sure.  Some of them did and some of them
16 didn't.
17     Q   And is it accurate that the census
18 questionnaire assistance service is there for
19 people to ask questions that they might have about
20 the 2020 census questionnaire?
21     A   So the goal of the CQA is to get to the
22 point where during what we call peak operations,

Page 197

1 once we mail out the invitation to take the
2 census, that we would be able to take a call load
3 that would support a large proportion of the
4 population making inquiry, expect to actually
5 enumerate a nontrivial fraction of the household
6 directly on the CQA.
7     Q   By enumerate, you mean get people to
8 respond to the census over the phone?
9     A   The training for the CQA operators is to
10 ask early on in the contact, would you like us to
11 just do it right now, and then begin the
12 telephone-administered instrument.
13     Q   And has the testing program for the 2020
14 census been used to project the call load that
15 might be expected for that peak operations period?
16     A   It has.  And so has the question -- the
17 equivalent operation for the economic census,
18 which is a field mode.
19     Q   Has the testing program since -- the
20 testing program for the 2020 census been used to
21 test the role of administrative records in
22 reducing the NRFU workload?

50 (Pages 194 - 197)

1    A   Yes.

2    Q   Now, for -- have any of the tests to date

3  in the 2020 census testing program, have any of

4  them included a citizenship question?

5    A   No.

6    Q   And so none of these tests, to the extent

7  that they were used to project staffing levels or

8  to refine the projections, would have accounted

9  for the citizenship question?

10    A   Directly, no.

11    Q   Would they have done so indirectly?

12    A   Well, we used -- we didn't use evidence

13  from a test, but we used evidence similar to the

14  evidence generated in the test to make indirect

15  inferences.  But directly, no.

16    Q   What was -- what were the sources you

17  used for the indirect inferences?

18    A   These are the experiments that I

19  described -- the natural experiments that I

20  described in my fact witness testimony.

21        Do you want to go through them again?

22    Q   Are those the ones discussed in your

1  January 19th memo?

2    A   The ones that existed at that point in

3  time are discussed in the memo, yes.

4    Q   And since then, are there any other ones

5  that have been done?

6    A   There are more extensive ones that have

7  been done in the full version of the technical

8  paper that was developed after the memo was

9  written.

10    Q   Is that the document that was just

11  produced to us yesterday?

12    A   Yes.

13    Q   And besides those two sources, are there

14  any other -- let me rephrase.

15        Besides the sources discussed in those

16  two documents, are there any other sources that

17  you used to develop indirect inferences?

18    A   They haven't been used yet, but we intend

19  to examine the field operation data from the

20  end-to-end test, because it occurred as the

21  information about the citizenship question was

22  becoming public.  It's not clear how useful it

1  would be, but that would be another form of

2  indirect inference.  There was no citizenship

3  question, but there were environmental factors

4  that intervene.

5    Q   Besides that, are there any other

6  sources?

7    A   None that I'm aware of.

8        Sorry.  From our test operations.

9    Q   And so to the extent that any tests

10  conducted to date have been used to project the

11  number of offices that the Census Bureau will open

12  in 2020, those projections would not have

13  accounted from the citizenship question, correct?

14    A   In general, that's correct, yes.

15    Q   And to the extent the tests were used to

16  test the adequacy or amount of enumerator

17  training, they would not have accounted for the

18  citizenship question, correct?

19    A   That's correct.

20    Q   And the same question with respect to the

21  testing of NRFU protocols.  To the extent that

22  testing has been used to test the adequacy of

1  those protocols, they would not have accounted for

2  the citizenship question, correct?

3    A   That's correct.

4    Q   And the same question with respect to the

5  census questionnaire assistance.  To the extent

6  the testing was used to develop a projection about

7  call loads for peak operations, those projections

8  would not account for the citizenship question,

9  correct?

10    A   That's correct.

11    Q   In light of the Secretary's decision to

12  add the citizenship question, will the

13  Census Bureau conduct any testing on the impact of

14  that question on staffing levels?

15        MR. EHRLICH:  Objection.  Form.

16        THE WITNESS:  It's hard to imagine what

17  kind of testing we might do, other than on a

18  relatively small scale.  However, we are working

19  closely with the integrated communication

20  campaign, which the Secretary has recommended

21  increasing the budget to 500 million.  They are

22  developing messaging and other tools that we fully

51 (Pages 198 - 201)

Page 222

1    A  It's a part -- it's a part of the field
2  operation to determine whether an address exists,
3  and if it exists whether anybody -- whether
4  anybody could live there.  So it should be
5  classified as a housing unit, not something else.
6  And then whether anybody does live there.  And the
7  nonresponse follow-up will include an enumerator
8  determination or sometimes an
9  enumerate- -- administrative record determination
10  of vacant or occupied.  If that's all we know,
11  then there are whole person imputations.
12       In addition, if all we know is the count,
13  then there are whole person imputations for the
14  characteristics of those people.  But we only
15  impute the count when the only piece of hard
16  information we have is occupancy status.
17    Q  And so you would impute if you know that
18  a unit is occupied but you don't know how many
19  people live there or any other characteristics of
20  those people?
21    A  That's correct.  Yes.
22    Q  And that would only occur if those people

Page 223

1  had not self-responded or you could not enumerate
2  them through a household visit or through proxies,
3  correct?
4    A  So that occurs after the sixth, in the
5  current protocol, nonresponse follow-up.  The
6  enumerator is charged with getting any credible
7  information about whether somebody lives there or
8  not.
9    Q  Now, besides those methods that we just
10  discussed, household visits, proxies,
11  administrative record, and imputations, are there
12  any other methods that the Census Bureau uses to
13  enumerate a household that has not self-responded?
14       THE WITNESS:  Could you read it back to
15  me, please?
16       (Thereupon, the reporter read the record
17  as requested.)
18       THE WITNESS:  No.
19  BY MR. TILAK:
20    Q  And you mentioned that the maximum number
21  of household visits was six; is that right?
22    A  In the current protocol.

Page 224

1    Q  And is that the same maximum number of
2  visits across the country?
3    A  So the training protocol is the same, but
4  in the actual operations of a census, the area
5  supervisors have discretion.  And that discretion
6  extends to sending an enumerator out for an
7  additional visit but it also extends to sending
8  multiple enumerators to the same place.  So at
9  that point, you don't actually know which contact
10  visit that is until the enumeration of the field
11  data comes back in.
12    Q  Has the Census Bureau made any decisions
13  as to where additional visits might be warranted?
14    A  No decisions have been made.
15    Q  And that's in the discretion of the
16  supervisors in the field; is that right?
17    A  Well, the first thing we're going to do
18  is take the data from the end-to-end test and
19  evaluate the efficiency of the field operational
20  control system and the field performance.  Those
21  data may suggest modifications.  Other analysis
22  possibly engendered by the presence of the

Page 225

1  citizenship question may make modifications.
2       Those modifications will have to be made
3  relatively soon.  The field operations actually
4  start with address canvass and address canvases
5  start next summer.  So we don't have a lot of
6  time.  But the final forms of the training
7  materials and the final onboarding of those
8  activities hasn't happened.  So we do have the
9  scope to make modifications, and we are intending
10  to analyze the data from the end-to-end test and
11  other data as they became available to us in order
12  to optimize that.
13    Q  And the end-to-end didn't test
14  citizenship, right?
15    A  There was no citizenship question on the
16  form.
17    Q  And these additional data you mentioned
18  with respect to citizenship, those are possible
19  small scale tests that the Census might do, right?
20    A  What I said was that the focus groups
21  from CBAMS were small scale tests and the in place
22  testing of instruments would necessarily be small

57 (Pages 222 - 225)

1  current protocol -- federal source for every item
2  on it, and we replace all the tax items with that
3  source. If it wasn't a tax item, we compare the
4  two sources and choose one according to protocol.
5      What we now have is an administrative
6  record enumeration of that household that does not
7  depend on tax data. We copy that into the ad rec
8  area of the 2020 census, and that is a household
9  candidate enumeration -- candidate record for
10 ad rec enumeration.
11     If in the operations of the census that
12 address, MAFID, doesn't have a response, then it's
13 triggered for nonresponse follow-up, and under the
14 current protocol, a field enumerator goes to that
15 address and attempts to get an interview. If that
16 first nonresponse visit comes back unsuccessful,
17 then the ad rec becomes the enumeration and the
18 NRFU for that MAFID is turned off.
19 Q  Is there a minimum quality requirement
20 for that administrative record -- let me rephrase.
21     Is there a minimum quality requirement
22 that the administrative record must meet before it

1  can be used to enumerate a household after just
2  one household visit?
3  A  Yes. There are multiple cutoff criteria
4  that have been honed over the course of the decade
5  and will probably be honed again from the
6  end-to-end test.
7  Q  And none of those tests have been used to
8  hone these quality requirements, including the
9  citizenship question, correct?
10 A  That's correct.
11 Q  What proportion of the NRFU population do
12 you expect can be enumerated through
13 administrative records?
14     MR. EHRLICH: Objection. Form.
15     THE WITNESS: In the current lifecycle
16 cost estimate -- I'm going to check this on the
17 break, because I actually know this is true for
18 Version 2 but I'm not sure it's true for Version 3
19 -- that was 6 million households we expected to be
20 able to enumerate with ad recs.
21 BY MR. TILAK:
22 Q  Has any research been done on the

1  differential availability or quality of these
2  records for households with noncitizens compared
3  to the U.S. population generally?
4  A  The research that has been done is
5  germane to that question, not necessarily because
6  it's specifically looking at a citizenship
7  variable, but one of the things that matter is
8  quality of the personal identifying information in
9  the ad recs. And people who file income tax
10 returns on time, in particular, are much more
11 likely to have useable PII. And that PII is the
12 language we were talking about in the early part
13 of this deposition verified -- it's audited by the
14 Internal Revenue Service. So we know the
15 characteristics of that subpopulation are much
16 more likely to be citizens, but that's not
17 specifically using the citizenship variable. It's
18 just announcing that a characteristic of the way
19 we created the administrative record eligible
20 enumerations is going to favor citizens.
21 Q  So these indicative --
22 A  I didn't mean favor. I'm very

1  sensitive -- is going to more likely select
2  citizens.
3  Q  So is that indicative that administrative
4  records meeting the Census Bureau's quality
5  requirements are more likely to exist for citizens
6  than for noncitizen households?
7  A  They are more likely to exist for persons
8  who file -- persons and households that file an
9  income tax return, and that is more likely to be
10 the case for higher income people who are more
11 likely to be citizens.
12 Q  How about for racial and ethnic
13 minorities, for example, Hispanics?
14 A  So this is the reason why we use Medicare
15 records, because that -- that is nearly exhaustive
16 for the population over age 65. But, again, it's
17 only if you have a Social Security number that
18 you're going to be eligible. So you have to be
19 eligible for social benefits in the United States,
20 and some noncitizens are and they're going to be
21 in those records. They're also often eligible for
22 State programs. And we did a plan to assemble

Page 234

1  State records, but that's what's been evaluated
2  before we finalize which kinds of records we're
3  going to use.
4        We're making a push to require SNAP
5  records, Supplemental Nutrition Assistance Program
6  records, and we don't have them for every state,
7  and we need to make a decision about whether --
8  sufficiently complete that we will go forward.
9  That decision hasn't been made.
10    Q   Returning, briefly, to proxy enumeration.
11 Will the default of three visits before proxy
12 eligibility apply across the country?
13    A   It -- well, the answer is in the current
14 design, yes.  But then I will say, again, that
15 field staff have the authority from the very first
16 visit to pile on, so they -- they can redeploy
17 enumerators if they -- for example, if they
18 deployed one early on in the process and our
19 quality evaluation of that enumerator's work is
20 going to cause that enumerator not to get any more
21 work, the field staff can redo some of that.
22        And we do continuous quality control on a

Page 235

1  sample, so that's going to involve additional
2  visits, as well.
3        The six visits is the operational
4  guideline and the training and the expectation,
5  but the discretion of the field staff and the
6  discretion of the operational staff back at the
7  census headquarters can modify that, even if the
8  protocol was not officially modified.
9     Q   And to date, are there any guidelines for
10 varying the number of visits before proxy
11 eligibility?
12    A   I believe that there are not, but I
13 believe that will be part of the end-to-end test
14 evaluation, whether we should modify that.
15    Q   And, again, end-to-end did not include
16 the citizenship question, correct?
17    A   That's correct.
18    Q   Dr. Abowd, in the memos that you wrote --
19 is that correct?
20    A   That I supervised the preparation of.
21    Q   That you supervised the preparation of,
22 is it accurate that you found evidence of a lower

Page 236

1  self-response rate in households with at least one
2  noncitizen as a result of the citizenship
3  question?
4        MR. EHRLICH:  Objection.  Form.
5        THE WITNESS:  With respect to your
6  question up to the phrase as a result of the
7  citizenship question, yes.
8        As I explained in my previous deposition,
9  this was a natural experiment and not a randomized
10 controlled experiment, and so what you can test is
11 what you have.  So in our work that you're talking
12 about, the two groups were everyone in the
13 household is a citizen, according to
14 administrative record, versus at least one person
15 in the household is not a citizen, according to
16 administrative records.  There's a third ground
17 that wasn't analyzed.  That's everybody else.
18 That's the group where there's a 5.1 percentage
19 point difference between their self-response for a
20 form that includes the citizenship question versus
21 a form that does not.  But that form that included
22 the citizenship question also included other

Page 237

1  questions.
2  BY MR. TILAK:
3     Q   Is natural experiment an accepted method
4  of research in social science?
5     A   Yes.
6     Q   Do you believe a decline in self-response
7  rates in households with at least one noncitizen
8  will result in a higher undercount for noncitizen
9  households?
10    A   We don't have any evidence to suggest
11 that hypothesis is true.
12    Q   Do you have any evidence to suggest the
13 hypothesis is false?
14    A   No.
15    Q   So you just don't know, one way or the
16 other?
17    A   No.  We think we know.  We believe that
18 the net undercount -- I put the net before your
19 undercount, but I'm putting it there
20 exclusively -- that the net undercount depends
21 primarily on the energy and efficacy of the
22 nonresponse follow-up efforts.  That is a lesson

60 (Pages 234 - 237)

Page 250

1  hard-to-count communities as compared to the U.S.
2  population?
3     A  The research that was done with the 2010
4  Census Coverage Measurement studies included
5  analyses of the components of the year-end census
6  by characteristics like the ones you just recited.
7     Q  And that's the G1 --
8     A  That's the G series.
9     Q  The G series may help us, okay.
10       Has the Census Bureau decided what
11  geographical unit will be used for whole person
12  substitutions?
13     A  I'm not sure I know what the question
14  means.
15     Q  In general, when imputation is done -- or
16  substitution is done, does that rely on records
17  from surrounding communities?
18     A  The hot-deck imputation algorithms that
19  were in place for the 2000 and 2010 census did use
20  nearby records.  Statistical imputation systems do
21  not have to.
22     Q  Is that still the plan for 2020?

Page 251

1     A  There is no plan for 2020.  That is among
2  the candidate algorithms.
3     Q  So no final decision has been made?
4     A  That's right.
5        MR. TALIK:  If we could go off the record
6  and take a short break.
7        VIDEOGRAPHER:  This is the end of
8  Media Unit Number 4.  The time on 3:40 p.m. and we
9  are off the record.
10       (Off the record.)
11       VIDEOGRAPHER:  This begins Media Unit
12  Number 5.  The time on the video is 4:04 p m.  We
13  are on the record.
14  BY MR. TILAK:
15     Q  Dr. Abowd, is there any empirical
16  evidence that someone who chooses not to respond
17  to this 2020 census because of the citizenship
18  question would respond in a face-to-face
19  interaction with a census enumerator?
20       MR. EHRLICH:  Objection.  Form.
21       THE WITNESS:  Not that I'm aware of.
22  BY MR. TILAK:

Page 252

1     Q  And if that household doesn't respond,
2  census enumerator would then try to find a proxy,
3  correct?
4     A  That's correct.
5     Q  And is there any empirical evidence on
6  the accuracy of proxy enumerations for areas with
7  large noncitizen populations compared to the rest
8  of the United States?
9     A  Only indirect.
10     Q  And what is that indirect evidence?
11     A  That evidence that's in the technical
12  reports that you've seen.
13       THE WITNESS:  The evidence that's in the
14  technical reports that you have seen.
15  BY MR. TILAK:
16     Q  And if a proxy is not found, the census
17  could then also use administrative records to
18  enumerate the household, correct?
19     A  The census may use administrative records
20  whether or not a proxy respondent is found.
21     Q  But based on your earlier testimony, the
22  characteristics of the administrative records are

Page 253

1  such that there are more likely to be
2  administrative records for citizens compared to
3  noncitizens?
4     A  I think that's a reasonable hypothesis.
5  I don't actually have any empirical data to
6  support it.
7     Q  And this, finally, this whole person
8  imputation, is there any empirical evidence on the
9  accuracy of a whole person imputation for
10  noncitizen households versus the U.S. population?
11     A  So whole person substitutions and whole
12  person imputations are not very accurate.  We've
13  documented that for multiple censuses, but we
14  documented it most carefully for the 2010 census
15  where we explicitly looked at it.  We know that.
16     Q  And so you would agree that --
17     A  We don't count them as correct
18  enumerations, because we require that the
19  characteristics be correct, not just the count.
20     Q  So you wound agree with all the censuses
21  procedures to try to enumerate a household, some
22  people are always missed in the decennial census?

64 (Pages 250 - 253)

Page 258

1 don't know its order of magnitude.
2    Q   Would you agree that the undercount is
3 differential between different subpopulations in
4 the United States?
5    A   We have documented that the net
6 undercount is differential.
7    Q   And are hard-to-count populations
8 specifically likely to be undercounted
9 differentially compared to the rest of U.S.
10 population?
11    A   That's almost tautological.  When we
12 label a subpopulation hard-to-count, one of the
13 indicators we use is its net undercount.
14    Q   Let's next turn to Page 9, and the
15 last -- the paragraph, it says, "The black alone
16 or in combination and the Hispanic populations had
17 a larger percent omissions than the non-white
18 Hispanics" --
19    A   Sorry.  Sorry.  You got there too fast.
20 Point.
21    Q   It's the second paragraph.
22    A   Got it.  Okay.

Page 259

1    Q   "The black alone or in combination and
2 Hispanic populations have larger percent
3 omissions, 9.3 percent and 7.7 percent,
4 respectively, than the nonwhite -- non-Hispanics
5 white-alone population."
6        Is it accurate that the census's
7 enumeration procedures are more likely to the
8 Hispanics -- members of the Hispanic population
9 compared to the non-Hispanic white population?
10    A   I think the answer to that question is
11 yes, but I would not use the information in this
12 table to answer that question.  I would use the
13 information in the net undercount table, which
14 is -- it might not be in this report, but there's
15 a summary in G01.
16    Q   Got it.
17        And then turning to Page 17, this refers
18 to -- refers to bilingual mailing areas.  Are
19 bilingual mailing areas where the population is
20 likely to have limited English proficiency?
21    A   So bilingual mailing areas for the 2010
22 census would have been predicted from the 2005 to

Page 260

1 2009 language questions in the American Community
2 Survey.  So they're indicators of households that
3 speak more than one language.
4    Q   And, again, the omission percentage for
5 bilingual mailing areas in Table 9 is 7.3 percent
6 compared to 5.3 percent for the U.S. total.  Is it
7 accurate that the census's enumeration procedures
8 are more likely to miss people living in bilingual
9 mailing areas compared to the U.S. population,
10 generally?
11    A   I'll correct your question.  If you mean
12 gross omissions, that's what the table describes.
13 If you meant net undercount, you can't get that
14 from this table.
15    Q   What table would you refer to for that?
16    A   If we have a net undercount estimate, it
17 would be in one that is labeled net undercount
18 as -- or percentage net undercount, one of those
19 two.  I don't know -- I don't know the contents of
20 all of those G series reports.  They're summarized
21 in G01.
22    Q   If I can refer you to the column just to

Page 261

1 the left of omissions percentage undercount, is
2 that the net undercount?
3    A   Thank you.  Thank you.
4    Q   And is the Number .80 for bilingual
5 mailing areas?
6    A   Yes.
7    Q   And the asterisk indicates that it's
8 statistically significant, correct?
9    A   At the 90 percent level, yes.  That's
10 correct.
11    Q   And so given that information, is it more
12 likely that the census's enumeration procedures
13 would miss people living in bilingual areas
14 compared to the U.S. population?
15    A   Yes.  That's what a positive differential
16 net undercount is.
17    Q   And then going back to Page 9 on Table 2,
18 which we were at earlier.
19    A   Was there one there, too, and I missed
20 it?  Yes, there was.  Okay.
21    Q   If we look at the bottom of Table 2, the
22 net -- the percent undercount is 1.54 percent?

66 (Pages 258 - 261)

Page 262

1    A   Yes.
2    Q   And that's statistically-significant --
3    A   Yes.
4    Q   -- compared to the U.S. population?
5        So with that information, is it more
6  likely that the census's enumeration procedures
7  will miss members of the Hispanic population
8  compared to population --
9    A   There's a differential net undercount for
10 Hispanics, yes.
11   Q   Now, this is all for the 2020 census.
12 Does the Census Bureau expect not to have a
13 differential undercount of Hispanics for the 2020
14 census?
15       MR. EHRLICH:  Objection.  Form.
16       THE WITNESS:  The Census Bureau expects
17 to improve its net undercount performance every
18 census and targets the populations that had
19 previous net undercounts for special attention.
20 Sometimes with tests that have been demonstrated
21 to be more effective and sometimes with
22 advertising campaigns that have looser empirical

Page 263

1  connection.  Although we used targeted advertising
2  in 2010 to try to address net undercount issues,
3  and it was successful in its evaluation.  That's
4  why we were trying to do more targeted
5  advertising, why we included a specific component
6  in the integrated communication contract for
7  targeted marketing.  And one of the indicators
8  being used for the targeted marketing is our low
9  response rate indicator, which is not the same
10 thing as a net undercount.  These numbers are not
11 available at levels of geographic detail that
12 would be useful, but they have correlates, like,
13 lower response.
14 BY MR. TILAK:
15   Q   You said to improve.  Do you also expect
16 to eliminate the differential undercount for
17 hard-to-count populations?
18   A   We design the census, and we optimize the
19 efforts in order to control the net undercount.
20 We are trying to achieve a zero net undercount,
21 but the census is a human operation, and we
22 evaluate it for the coverage years.  We will learn

Page 264

1  when we evaluate it whether we were successful.
2    Q   Do you agree that adding the citizenship
3  question will make it more difficult to achieve
4  that goal of reducing undercount for hard-to-count
5  populations?
6        MR. EHRLICH:  Objection.  Form.
7        THE WITNESS:  It will make it more
8  difficult to correct -- to collect accurate data
9  on the enumeration, which will complicate the
10 assessment of net undercount, because the
11 indicators, the right-hand side variables, won't
12 be as accurate as they are if you get more
13 self-responses.
14       MR. TALIK:  We can go off record.
15       VIDEOGRAPHER:  We're going off the
16 record.  The time on the video is 4:19 p.m.
17       (Off the record.)
18       VIDEOGRAPHER:  We're back on the record.
19 The time on the video is 4:20 p.m.
20       EXAMINATION BY MR. ADAMS:
21   Q   Good afternoon, Dr. Abowd.  My name is
22 Rory Adams.  I represent the City of San Jose and

Page 265

1  the Black Alliance for Just Immigration in the
2  action pending in Northern District of California.
3        What is the purpose of the 2020 CBAMS?
4    A   Census Barriers, Attitudes, Motivators
5  Survey?
6    Q   Yes.
7    A   Sorry, study.
8        There's both a survey and focus group
9  component.  Its primary objective was to gather
10 information on indicators that we call barriers,
11 indicators that we call attitudes and things that
12 we think of as motivators.  So a barrier is a
13 reason why someone might not complete the census.
14 So the questions asks, for example, are you
15 planning to fill out the census, and if not, well,
16 we try to get some reasons.
17       An attitude might be, do you think
18 that -- do you trust the government, do you think
19 that your 2020 census information will be kept
20 confidential?
21       And motivators are things like do you
22 think it's important to equitably allocate the

67 (Pages 262 - 265)

Page 310

1  that process a little bit more difficult --
2      A  Yes.
3      Q  -- fair to say?
4      A  Yes.
5      Q  Okay.  So let's go to Page 37, and if you
6  go one, two, three, four, bullet points down,
7  "With young children having a highest net census
8  undercount rate than any other age group, Hispanic
9  children account for more than 36 percent of the
10  total net undercount for all children younger than
11  five."
12      Did I read that correctly?
13      A  Yes.
14      Q  So there is a -- prior to any addition of
15  the citizenship question, the Census Bureau has
16  recognized that there is a net undercount for
17  Hispanic children, correct?
18      A  Yes.
19      Q  Is it fair to say that the NRFU -- NRFU
20  efforts that the Census Bureau puts in place are
21  less effective with respect to this population?
22      MR. EHRLICH:  Objection.  Form.

Page 311

1      THE WITNESS:  So these are estimates
2  based on the 2010 census coverage measurement
3  program.
4  BY MS. GOLDSTEIN:
5      Q  Sure.
6      A  So they were in an environment -- a
7  different political environment and a
8  questionnaire without a citizenship question on
9  it.  And this identification of children, age zero
10  to four, this is the first time that that had
11  popped out as such a large net undercount.
12      There's a couple of possible reasons for
13  that.  Our demographic data -- so one of the
14  things we would measure against better now are for
15  that age group because of accuracy of birth
16  records.  So we have, consistently, throughout
17  this decade, focused on ways in which we can
18  improve our undercount.  The -- the end-to-end
19  test does have a coverage evaluation component,
20  but it wasn't structured to provide statistical
21  information.  So we have only the direct analysis
22  of the test to see if we have improved it.

Page 312

1      I don't want to say it's a crap shoot.  I
2  think that there is solid evidence that design
3  changes that have been made, particularly queues
4  and reminders, and these are actually easier to do
5  on the Internet self-response instrument than on a
6  paper instrument, because you can blow by the
7  reminders and the queues on the paper one, but
8  it's harder to blow by the ones on the Internet
9  instrument, too, but it's harder to because of the
10  way it's structured.  So we put some considerable
11  effort --
12  BY MS. GOLDSTEIN:
13      Q  Sure.
14      A  -- into trying to alert people who have
15  answered someplace else on the form, correlates to
16  there might be a young -- an uncounted person here
17  on this, but we don't have the statistical
18  evidence to back up a claim that that will reduce
19  the net undercount.  We have the statistical
20  correlates to suggest it might.
21      Q  Is it possible that the presence of the
22  citizenship question on the decennial census will

Page 313

1  exacerbate this kind of net undercount of Hispanic
2  children?
3      A  Yes.  That is what we mean when we say
4  the quality of the census count will be harmed.
5      Q  Let's go to Page 53.  And I just want
6  to -- you got -- direct you to the very last
7  paragraph in bold.  Leading up to the 2020 count,
8  all communication elements, including advertising,
9  earned media, collateral and other items designed
10  for public dissemination will be pretested and
11  refined.
12      Has that process happened yet?
13      A  I'm sure that some parts of that process
14  have happened already.  But a systemic part of it
15  would have been part of the 2018 end-to-end test
16  and so -- yeah, at the point at which this plan
17  was written, I believe -- I get my budget years
18  and my calendar years -- I believe -- we were
19  still in fiscal 2017.  The full design for the
20  end-to-end test was still on the table.  That was
21  the three site and it included a media campaign.
22  So those comment components were not done.

79 (Pages 310 - 313)

Page 314

1    The other components that are part of the
2 integrated communication contract and the ongoing
3 activities of the decennial census were done.
4    Q  Earlier you testified that the political
5 environment can affect response rates, correct?
6    A  I know I just said political. I've been
7 trying very hard to say macroenvironment. If
8 you'll give me leave to say macroenvironment,
9 that's what I meant.
10    Q  And one of the things that goes into
11 macroenvironment is the political context, fair to
12 say?
13    A  That's fair to say. But another thing
14 that goes into it is the state of the economy.
15    Q  Absolutely.
16    So let's say -- so would you -- you've
17 also testified that the macroenvironment can
18 affect the efficacy of NRFU, correct?
19    A  Correct.
20    Q  Is there -- is it possible that the
21 presence of a citizenship question will exacerbate
22 those effects?

Page 315

1    A  It's certainly possible, yes.
2    Q  Does the Census Bureau believe that that
3 is likely?
4    A  So what we believe is likely is that
5 we're going to need more intensive nonresponse
6 follow-up than the baseline lifecycle cost
7 estimate. One of our big concerns -- macro
8 concerns is when you ramp up the NRFU, you have to
9 hire the planned number of enumerators so that
10 they're available to deploy. If you discover one
11 week into NRFU that you're short of enumerators,
12 the six- to seven-week onboarding process defeats
13 you.
14    So let me just say there are many
15 professionals at the Census Bureau painfully aware
16 of the consequences of not being able to onboard
17 enough enumerators. As I understand it, we had to
18 ask for a budget supplement in 1990 because of
19 difficulties onboarding.
20    We had the best possible macroenvironment
21 for conducting a census in this regard in 2010,
22 for all the wrong reasons, but, nevertheless, it

Page 316

1 was extraordinarily easy to onboard very good,
2 quality enumerators.
3    So in terms of macroenvironment,
4 we're -- the red lights are flashing around can
5 you hire enough enumerators? And the cost
6 estimate is designed -- assuming that we can, if
7 we can, then where the extra cost from the
8 nonresponse follow-up might be caused by the
9 citizenship question will come from having to
10 deploy them more intensively than we had planned.
11    Q  And it's fair to say that there are
12 aspects of the macroenvironment currently that are
13 making it difficult to hire as many enumerators as
14 the Census Bureau needs?
15    A  So I don't have to hypothesis, we had
16 difficulty hiring enumerators in Rhode Island for
17 the test.
18    Q  And you expect that problem to be the
19 case for the -- as you attempt to onboard more
20 enumerators, correct?
21    A  I would say we used that experience
22 to -- as an opportunity to revisit some components

Page 317

1 of that recruitment plan.
2    Q  But it's fair to say that the low levels
3 of unemployment right now will make it more
4 difficult to hire enumerators?
5    MR. EHRLICH: Objection. Form.
6    THE WITNESS: It's fair to say it will
7 make it more expensive to hire enumerators. And
8 if that's not acknowledged, then it will make it
9 more difficult to hire enumerators.
10 BY MS. GOLDSTEIN:
11    Q  So, previously, you testified about the
12 work that Young & Rubicon was retained to do,
13 correct?
14    A  So I testified about the work of the
15 integrated communication contract for which Y&R is
16 the lead contractor.
17    Q  Have they done attitudinal studies on the
18 citizenship question as part of that contract?
19    A  I do not know whether they have done
20 them. I do know that they are being actively
21 discussed.
22    Q  And has Reingold performed attitudinal

80 (Pages 314 - 317)

Page 340

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - x

4    STATE OF NEW YORK, et al.,     :

5                 Plaintiffs,       :

6        vs.                        : Civil Action No.

7    UNITED STATES DEPARTMENT OF    : 1:18-cv-2921-JMF

8    COMMERCE, et al.,              :

9                 Defendants.       : Volume II

10   - - - - - - - - - - - - - - - x

11      CONTINUED VIDEOTAPED 30(b)(6)DEPOSITION OF:

12    UNITED STATES CENSUS BUREAU GIVEN BY JOHN M. ABOWD

13   DATE:        Friday, October 5, 2018

14   TIME:        9:05 a.m.

15   LOCATION:    Arnold & Porter Kaye Scholer

16                601 Massachusetts Avenue, N.W.

17                Washington, D.C.

18   REPORTED BY: Denise M. Brunet, RPR

19                Reporter/Notary

20                Veritext Legal Solutions

21            1250 Eye Street, N.W., Suite 350

22                 Washington, D.C.  20005

<table>
<tr><td>

Page 341

1     A P P E A R A N C E S

2

3  On behalf of the New York Immigration Coalition:

4     DALE HO, ESQUIRE

5     American Civil Liberties Union

6     Foundation

7     125 Broad Street

8     18th Floor

9     New York, New York  10004

10    (212) 549-2693

11    dale.ho@aclu.org

12

13    SARAH BRANNON, ESQUIRE

14    American Civil Liberties Union

15     Foundation

16    915 15th Street, Northwest

17    Washington, D.C.  20005

18    (202) 675-2337

19    sbrannon@aclu.org

20

21

22  (Appearances continued on the next page.)

</td><td>

Page 343

1  APPEARANCES (continued):

2

3  On behalf of the Kravitz Plaintiffs:

4     KARUN TILAK, ESQUIRE

5     Covington & Burling

6     850 10th Street, Northwest

7     Washington, D.C.  20001

8     (202) 662-6000

9     ktilak@cov.com

10

11  On behalf of the Lupe Plaintiffs:

12    NIYATI SHAH, ESQUIRE

13    ERI ANDRIOLA, ESQUIRE

14    Asian Americans Advancing Justice

15    1620 L Street, Northwest

16    Suite 1050

17    Washington, D.C.  20036

18    (202) 296-2300

19    nshah@advancingjustice-aajc.org

20

21

22  (Appearances continued on the next page.)

</td></tr>
<tr><td>

Page 342

1  APPEARANCES (continued):

2

3  On behalf of the New York Immigration Coalition

4  (continued):

5     JOHN A. FREEDMAN, ESQUIRE

6     DAVID GERSCH, ESQUIRE

7     Arnold & Porter Kaye Scholer, LLP

8     601 Massachusetts Avenue, N.W.

9     Washington, D.C.  20001

10    (202) 942-5316

11    john.freedman@arnoldporter.com

12

13  On behalf of the State of New York:

14    DANIELLE FIDLER, ESQUIRE

15    Assistant Attorney General

16    Environmental Protection Bureau

17    28 Liberty Street

18    New York, New York  10005

19    (212) 416-8441

20    danielle.fidler@ag ny.gov

21

22  (Appearances continued on the next page.)

</td><td>

Page 344

1  APPEARANCES (continued):

2

3  On behalf of the City of San Jose & Black Alliance

4  for Just Immigration:

5     DORIAN L. SPENCE, ESQUIRE

6     Lawyers Committee for Civil Rights

7     Under Law

8     1500 K Street, Northwest

9     Suite 900

10    Washington, D.C.  20005

11    (202) 662-8324

12    dspence@lawyerscommittee.org

13

14  On behalf of the State of California:

15    ANNA FERRARI, ESQUIRE

16    Department of Justice

17    Office of the Attorney General

18    Government Law Section

19    455 Golden Gate Avenue, Suite 11000

20    San Francisco, California  94102

21    (415) 510-3779

22  (Appearances continued on the next page.)

</td></tr>
</table>

2 (Pages 341 - 344)

Page 345

1  APPEARANCES (continued):

2

3  On behalf of the State of California (continued):

4        R. MATTHEW WISE, ESQUIRE

5         (via telephone)

6        Department of Justice

7        Office of the Attorney General

8        1300 I Street

9        P.O. Box 944255

10       Sacramento, California  94244

11       (916) 210-6053

12       matthew.wise@doj.ca.gov

13

14  On behalf of Los Angeles Unified School District:

15       KEITH YEOMANS, ESQUIRE

16        (via telephone)

17       Dannis Woliver Kelley

18       115 Pine Avenue, Suite 500

19       Long Beach, California  90802

20       (562) 366-8500

21       keyomans@dwk.com

22  (Appearances continued on the next page.)

Page 346

1  APPEARANCES (continued):

2

3  On behalf of the County of Los Angeles:

4        DAVID I. HOLTZMAN, ESQUIRE

5         (via telephone)

6        Holland & Knight

7        50 California Street

8        Suite 2800

9        San Francisco, California  94111

10       (415) 743-6909

11       david.holtzman@hklaw.com

12

13  On behalf of Defendants:

14       STEPHEN EHRLICH, ESQUIRE

15       U.S. Department Of Justice

16       Civil Division

17       20 Massachusetts Avenue, Northwest

18       Washington, D.C.  20530

19       (202) 305-9802

20       stephen.ehrlich@usdoj.gov

21

22  (Appearances continued on the next page.)

Page 347

1  APPEARANCES (continued):

2

3  On behalf of Defendants (continued):

4        MILES RYAN, ESQUIRE

5        Office of the Chief Counsel for

6         Economic Affairs

7        Office of the General Counsel

8        U.S. Department of Commerce

9        U.S. Census Bureau

10       4600 Silver Hill Road

11       Suitland, Maryland  20746

12       (301) 763-9844

13       miles.f.ryan.iii@census.gov

14

15  ALSO PRESENT:  Nhat Pham, Videographer

16

17

18

19

20

21

22

Page 348

1          C O N T E N T S

2  EXAMINATION BY:              PAGE:

3  Mr. Ho                    349

4  Ms. Fidler                436

5

6  ABOWD DEPOSITION EXHIBITS:        PAGE:

7  24 - Bates COM_DIS00009833 - 9909      349

8  25 - Bates COM_DIS0012757 - 762       349

9  26 - DSSD 2010 Census Coverage Measurement

10      Memorandum Series #2010-G-01      399

11  27 - Proposed Content Test on Citizenship

12      Question             425

13  28 - Bates COM_DIS00010669 - 684      436

14  29 - Bates COM_DIS0013025 - 55       436

15

16     (*Exhibits attached to the transcript.)

17

18

19

20

21

22

Page 377

1  the citizenship question could have more
2  prominence and a greater effect in terms of
3  reducing self-response rates; is that right,
4  Dr. Abowd?
5     A   Yes.
6     Q   Now -- okay.  The Census Bureau's view,
7  Dr. Abowd, which you articulated earlier, is that
8  the Census Bureau is going to enumerate most of
9  the people who failed to respond to the census
10  questionnaire because of the citizenship question;
11  is that right?
12     MR. EHRLICH:  Objection.  Form.
13     THE WITNESS:  The vast majority, yes.
14  BY MR. HO:
15     Q   Now, one of the ways that you have of
16  enumerating people when their household does not
17  self-respond to the census questionnaire is by
18  sending census enumerators in person to that
19  household, correct?
20     A   That's correct.
21     Q   And we would call that -- we could call
22  that part of the non-response follow-up, or

Page 378

1  N-R-F-U.  I'm going to call it NRFU during the
2  deposition.  Is that okay?
3     A   That's fine.  I say NRFU, but it's a
4  matter of style.
5     Q   Let's look at page 42 of the white paper,
6  Bates number COM_DIS9874.  And I'm looking at the
7  last paragraph, last complete sentence, starting
8  with, "This analysis."  It reads, "This analysis
9  assumes that, during the NRFU operations, a
10  cooperative member of the household supplies data
11  79.0 percent of the time, and 21.0 percent receive
12  proxy responses."
13     In that sentence, the phrase "this
14  analysis" refers to the Census Bureau's cost
15  analysis of the effect of adding the citizenship
16  question to the 2020 census, correct?
17     A   The particular cost analysis in the
18  paragraph that you're reading, yes.
19     Q   Okay.  Now, in generating this cost
20  analysis about the effect of adding the
21  citizenship question to the 2020 census, the
22  Census Bureau assumed that of the households that

Page 379

1  do not respond to the census questionnaire because
2  of the citizenship question, 79 percent will
3  respond to an in-person enumerator, correct?
4     A   Yes.
5     MR. EHRLICH:  Objection.  Form.
6     THE WITNESS:  Yes.
7  BY MR. HO:
8     Q   Let's turn back to the previous page,
9  page 41, Bates number COM_DIS9873.  The last
10  paragraph on this page, the second sentence, four
11  lines down, reads, "Households deciding not to
12  self-respond because of the citizenship question
13  are likely to refuse to cooperate with enumerators
14  coming to their door in NRFU, resulting in the use
15  of neighbors as proxy respondents on their
16  behalf."
17     Does the Census Bureau agree with that
18  sentence?
19     A   That's one of the places where the
20  authors are stating their own opinion.
21     Q   Okay.  Does the Census Bureau agree with
22  that sentence, Dr. Abowd?

Page 380

1     A   Not completely.
2     Q   Is there an empirical basis for the
3  Census Bureau's incomplete agreement with that
4  sentence?
5     A   The sentence represents a summary of
6  qualitative evidence with which the Census Bureau
7  agrees that hard-to-count subpopulations are less
8  cooperative in NRFU and, to that extent, the
9  Census Bureau agrees with that sentence.
10     Q   Okay.  And that sentence was written by
11  the authors of this white paper whom you selected
12  as the best people at the Census Bureau to conduct
13  the analysis reflected in the white paper,
14  correct, Dr. Abowd?
15     A   Yes.
16     Q   Let's turn forward two pages to page 43,
17  Bates number COM_DIS09875.  And let's look at
18  footnote 60, which reads, "These enumeration
19  errors may not be avoidable simply by spending
20  more money on field work.  Once a household
21  decides not to cooperate, it may not be possible
22  to obtain an accurate enumeration no matter how

11 (Pages 377 - 380)

Page 381

1 many times an enumerator knocks on their door."

2     In this footnote, the term "these

3 enumeration errors" refers to enumeration errors

4 that arise as a result of increased non-response

5 to the census questionnaire due to the addition of

6 a citizenship question, correct?

7    A   Yes.

8    Q   And the view of the Census Bureau is that

9 enumeration errors arising from the decline in

10 self-response caused by the citizenship question

11 may not be avoidable simply by spending more money

12 on field work, correct?

13    A   Yes.

14    Q   And it is the view of the Census Bureau

15 that once a household decides not to cooperate

16 with the census because of the citizenship

17 question, it may not be possible to obtain an

18 accurate enumeration of that household no matter

19 how many times an enumerator knocks on their door,

20 correct?

21    A   Accurate in this sentence means erroneous

22 enumerations and whole-person census imputations.

Page 382

1 It does not mean net undercount.

2     THE REPORTER: Could you please repeat

3 your answer.

4     THE WITNESS: Accurate enumeration in

5 this sentence means enumeration errors and

6 whole-person census imputations. It does not mean

7 net undercount.

8 BY MR. HO:

9    Q   Now, if you send an in-person enumerator

10 to a household that doesn't self-respond and that

11 doesn't result in a response, one way that you

12 could -- another way you could have of enumerating

13 that household is through a proxy response, which

14 means trying to obtain a response from someone who

15 is not a member of that household about that

16 household, correct?

17    A   Yes.

18    Q   And the Census Bureau agrees that proxy

19 enumeration generally results in lower quality

20 enumeration data than self-responses, correct?

21    A   Yes.

22    Q   And the Census Bureau agrees that a proxy

Page 383

1 response is more likely to result in the omission

2 of a household member than a self-response,

3 correct?

4    A   I haven't looked at the table recently,

5 but I believe that's correct, yes.

6    Q   Let's go to the white paper again. And I

7 want to look at page 12, Bates number

8 COM_DIS09844, figure 3.

9    A   Figure 3, did you say?

10    Q   I believe so. On page 12?

11    A   Okay. I thought I heard 4.

12    Q   Okay. Figure 3 depicts unit non-response

13 to the ACS from 2010 through 2016 comparing census

14 tracts with the lowest decile of housing units

15 containing a non-citizen to the census tracts in

16 the highest decile of housing units containing a

17 non-citizen, correct?

18    A   Correct.

19    Q   And for each year of ACS depicted here,

20 census tracts in the highest decile of housing

21 units containing a non-citizen have a lower

22 response rate to the ACS than do census tracts in

Page 384

1 the lowest decile of housing units with a

2 non-citizen, correct?

3    A   Yes.

4    Q   And for both groups, unit non-response to

5 the ACS declined between 2010 and 2016, correct?

6    A   No. It increased between 2010 and 2011

7 and then declined from 2011 forward.

8    Q   But if we just compare 2016 to 2010 --

9    A   Yes.

10    Q   -- the unit non-response rate for both

11 groups in 2016 was lower than it was in 2010,

12 correct?

13    A   That's correct, yes.

14    Q   Okay. And the decline amongst -- I'm

15 sorry, let me start that again.

16     The decline in census tracts in the

17 highest decile of housing units including a

18 non-citizen -- the decline in unit self-response

19 rates for that group was sharper than the decline

20 in unit self-response rates by households in

21 census tracts with the -- in the lowest decile of

22 housing units with a non-citizen, correct?

12 (Pages 381 - 384)

Page 389

1 primarily why the Census Bureau would be unable to
2 link an ACS respondent to an administrative record
3 indicating citizenship status: One, because the
4 personally identifiable information on the survey
5 response might not be high quality enough to link
6 that person to administrative records; and, two,
7 because the survey respondent is not in the
8 administrative records at all; is that correct?
9     MR. EHRLICH: Objection. Form.
10     THE WITNESS: Yes.
11 BY MR. HO:
12   Q   And if we look back at the graph,
13 figure 4, among 2016 ACS respondents, Hispanics
14 could not be linked to an administrative record at
15 a higher rate than non-Hispanic whites, correct?
16   A   Correct.
17   Q   Now, based on this data, would you agree
18 that the available evidence indicates that the
19 Census Bureau, generally speaking, cannot link
20 Hispanic survey respondents to administrative
21 records at as high a rate as it can for
22 non-Hispanic whites?

Page 390

1   A   Yes.
2   Q   The administrative records referenced
3 here are the SSA and tax records, correct?
4   A   The individual tax identification number
5 records.
6   Q   You corrected me earlier when we talked
7 about enumeration via administrative records.
8 Could you just clarify what administrative records
9 the Census Bureau relies on when it tries to
10 enumerate people using administrative records?
11   A   There's two parts to the process for
12 using administrative records for enumeration. One
13 part is performing the record linkage to identify
14 all of the administrative records that might apply
15 to a particular household. And the other part is
16 constructing a candidate administrative record
17 enumeration to be used during the NRFU process if
18 the first NRFU follow-up visit doesn't produce a
19 successful interview.
20     In the former part of the process,
21 there's extensive use of tax records. In the
22 latter part of the process, by agreement with the

Page 391

1 IRS, none of the tax data survive to the record
2 that will be used for a candidate enumeration.
3 That was the distinction I was trying to...
4   Q   Would you agree that undocumented
5 individuals are less likely to be found in the
6 administrative records -- and when I say
7 undocumented individuals, I mean undocumented
8 immigrants -- are less likely to be found in the
9 administrative records that the Census Bureau uses
10 to enumerate people than persons who have legal
11 status in this country?
12   A   Yes.
13   Q   And would you agree that the Census
14 Bureau would have a more difficult time
15 enumerating undocumented immigrants through the
16 use of administrative records than it will for
17 persons with legal status?
18     MR. EHRLICH: Objection. Form.
19     THE WITNESS: Yes.
20 BY MR. HO:
21   Q   Overall, would you agree that the Census
22 Bureau does not expect enumeration by

Page 392

1 administrative records to be as successful for
2 non-citizens as it is for citizens?
3     MR. EHRLICH: Objection. Form.
4     THE WITNESS: Yes.
5 BY MR. HO:
6   Q   Let's go to page 5 of the white paper,
7 Bates number COM_DIS09837. And I'm looking at the
8 last paragraph on the page that starts with,
9 "Camarota."
10     "Camarota and Capizzano, 2004, conducted
11 focus groups with over 50 field representatives
12 (FRs) for the 2000 supplemental survey, a pilot
13 for the ACS. FRs reported that foreign-born
14 respondents living in the country illegally or
15 from countries where there is distrust in
16 government were less likely to cooperate. Some
17 foreign-born respondents failed to list all
18 household members. FRs suspected that some
19 foreign-born respondents misreported citizenship
20 status, and they" -- continuing to the next
21 page -- "believed this was due to recall bias, a
22 fear of the implications of certain responses or a

14 (Pages 389 - 392)

Page 393

1 desire to answer questions in a socially desirable
2 way."
3     Did I read that right?
4    A   Yes.
5    Q   Okay.  Now essentially what the white
6 paper authors are stating here is that in a study
7 of a survey that was a precursor to the ACS which
8 contained a citizenship question, the researchers
9 conducting that study found that foreign-born
10 people responding to the survey sometimes did not
11 list all the members of their households, correct?
12    A   The focus group evidence was that, yes.
13     THE REPORTER:  The focus group...
14     THE WITNESS:  The focus group evidence
15 was as described.
16 BY MR. HO:
17    Q   And essentially -- sorry, let me start
18 again.
19     Separate and apart from this study, the
20 Census Bureau has determined that one of the
21 reasons in past censuses for the undercounting of
22 Hispanics is because of the failure of Hispanic

Page 394

1 households to include a response for every member
2 of their household, such as children, correct?
3     MR. EHRLICH:  Objection.  Form.
4     THE WITNESS:  Are you referring to a
5 specific study that you want me to comment on?
6 BY MR. HO:
7    Q   I'm not.  I'm just -- my understanding
8 is -- and I just want you to correct me if my
9 understanding is mistaken -- that the Census
10 Bureau has looked at the historical undercount of
11 Hispanics in previous censuses.  That's correct,
12 right?
13    A   Yes.
14    Q   Okay.  And one of the reasons that the
15 Census Bureau has attributed the undercount of
16 Hispanics to in previous censuses has been the
17 failure of Hispanic households to provide a
18 response for every member of their household,
19 correct?
20    A   Yes.
21    Q   Okay.  Now, the Census Bureau agrees that
22 if the citizenship question is included in the

Page 395

1 census, that would likely cause some households,
2 such as those including a non-citizen or those
3 including an undocumented immigrant, to fail to
4 provide a response for every member of the
5 household when they respond to the census,
6 correct?
7     THE WITNESS:  Could you read the question
8 back?
9     (The reporter read the record as
10 requested.)
11     THE WITNESS:  The Census Bureau believes
12 that the households in your question might be
13 unlikely to provide a full enumeration whether or
14 not there's a citizenship question on the census
15 and does not have evidence of an incremental
16 effect from the citizenship question.
17 BY MR. HO:
18    Q   Well, does the Census Bureau believe that
19 the citizenship question could have an incremental
20 effect in certain households failing to enumerate
21 every member of their household when they respond
22 to the census?

Page 396

1    A   I think I just answered that question.
2    Q   Is the evidence that we've seen and
3 discussed about item non-response, unit
4 non-response, breakoff rates with a citizenship
5 question, is that evidence consistent with the
6 notion that adding a citizenship question to the
7 census would cause an incremental increase in the
8 number of households that respond to the census
9 but don't provide a response for every member of
10 their household?
11    A   Yes.
12    Q   Now, NRFU efforts are only initiated if a
13 household fails to provide a response for that
14 household altogether, correct?
15    A   With a few minor exceptions outlined in
16 my expert report, correct.
17    Q   So if a household responds to the census,
18 but omits some of the members of that household,
19 the Census Bureau doesn't send in-person
20 enumerators to that person's door because you'd
21 have no way of knowing if they omitted some
22 members of their household, correct?

15 (Pages 393 - 396)

Page 397

1    A    If the household's response passes the
2  sufficiency condition for being considered an
3  essentially complete response, then, yes.
4    Q    What's a sufficiency condition for being
5  considered a complete response?
6    A    It's a set of conditions that are checked
7  before the NRFU workload is generated to see
8  whether the response that came in from the
9  household is complete enough to essentially fill
10  in the rest with imputations or not.  It varies by
11  type of enumeration area, but -- and the actual
12  conditions haven't been set for 2020 yet.
13        It is my way of saying there are some
14  cases that go to NRFU where there was an
15  incomplete response.  And I don't have
16  quantitative evidence on how many of those there
17  are, but, generally, you're right.  Generally, if
18  you submit a self-response, it doesn't go to NRFU.
19    Q    Generally speaking, if you answer the
20  questions on the census questionnaire, the 10
21  questions, or 11, but you don't list every member
22  of the household, the Census Bureau is not going

Page 398

1  to send an in-person enumerator to your door,
2  correct?
3    A    Correct.
4    Q    Okay.  And if you fill out the census
5  response, answer the 10 or 11 questions, but don't
6  list every member of your household, the Census
7  Bureau is not going to try to get a proxy response
8  for your household, right?
9    A    Correct.
10    Q    And if you answer the census
11  questionnaire, but you don't list every member of
12  your household, the Census Bureau is not going to
13  start imputing -- sorry -- the Census Bureau is
14  not going to start using administrative records to
15  enumerate additional members of your household,
16  correct?
17    A    That actually hasn't been determined, but
18  it's probably correct.
19    Q    Okay.  And if you answer the census
20  questionnaire, but you don't list every member of
21  your household, the Census Bureau isn't going to
22  start imputing additional members of your

Page 399

1  household, correct?
2    A    Correct.
3    Q    I want to show a document that's been
4  marked as Exhibit 26.
5        (Abowd Deposition Exhibit Number 26 was
6  marked for identification.)
7  BY MR. HO:
8    Q    This is an official memo published by the
9  Census Bureau, correct?
10    A    It's part of the public memorandum series
11  following the 2010 census that documents the
12  coverage measurement studies, yes.
13    Q    And this memo, Exhibit 26, it was
14  produced by the Census Bureau in the ordinary
15  course of its business, not for the purposes of
16  litigation, correct?
17    A    Correct.
18    Q    Okay.  And the subject line of this
19  Census Bureau memo is, "2010 census coverage
20  measurement estimation report, summary of
21  estimates of coverage for persons in the United
22  States," correct?

Page 400

1    A    Correct.
2    Q    The lead author or the person that's
3  prepared by is Thomas Mule, correct?
4    A    Mule.
5    Q    Mule.  Thank you.  He is in the decennial
6  statistical studies division where he's an
7  economist in the Census Bureau, correct?
8    A    He's a mathematical statistician,
9  otherwise correct.
10    Q    Okay.  And this memo is cited in the
11  white paper, Exhibit 24, correct?
12    A    Yes.
13    Q    Okay.  Now, it's fair to say that
14  Exhibit 26, the Mule memo, that a purpose of it is
15  to estimate how well the 2010 census covered the
16  total population of the United States?
17    A    Its purpose is to summarize a series of
18  studies that had that goal, among others.
19    Q    And the 2010 census, that included NRFU
20  efforts for households that did not self-respond
21  to the census questionnaire, correct?
22    A    Yes.

16 (Pages 397 - 400)

1 population. Sound right?

2    A   I didn't do the calculation, but I'll

3 accept that.

4    Q   Thanks. And the Census Bureau expects

5 under this scenario that, under alternative C, you

6 would not be able to link about 40.4 million

7 people to administrative records on citizenship,

8 correct?

9    A   Correct.

10    Q   So under this scenario, if you use

11 alternative C, the Census Bureau would have to

12 model or impute the citizenship status of about

13 12 percent of the population to produce the CVAP

14 data that DOJ has requested, correct?

15    A   Correct.

16    Q   Now, let's talk about alternative D,

17 which is to both include a citizenship question on

18 the census and to rely on administrative records.

19 Now, the Census Bureau did not recommend

20 alternative D, correct?

21    A   Correct.

22    Q   And the Census Bureau still does not

1 recommend alternative D, correct?

2    A   Correct.

3    Q   Let's look at page 51, figure 12,

4 panel B, alternative D. Now, this has -- this

5 figure has estimates for, if you use

6 alternative D, how many people you would determine

7 the citizenship status of using various methods,

8 correct? At a high level, that's a correct

9 description, right?

10    A   Yes.

11    Q   And this uses the same revised

12 assumptions that we -- that were employed

13 regarding alternative C that you and I discussed a

14 moment ago in panel B of figure 11, correct?

15    A   That's correct.

16    Q   In addition to those revised assumptions,

17 it also includes an assumption that, when you get

18 proxy respondents for people who don't respond to

19 the census, that, generally speaking, those proxy

20 responses are going to report citizenship status,

21 correct?

22    A   I actually don't recall. Did you --

1    Q   Well, under -- it says --

2    A   Oh, yeah, sorry.

3    Q   -- here, panel B, alternative --

4    A   Yes. Okay.

5    Q   -- D.

6    A   Yes, that's right. Thank you. Next

7 time, I'll read the panel titles before I answer.

8    Q   My fault. It's probably an unrealistic

9 rosy assumption, Dr. Abowd, wouldn't you agree,

10 that proxies in the 2020 census are, as a general

11 matter, going to report the citizenship status of

12 their neighbors or for whomever else they're

13 giving a proxy response?

14        MR. EHRLICH: Objection. Form.

15        THE WITNESS: Yes, it's optimistic.

16 BY MR. HO:

17    Q   Okay. So let's take this optimistic

18 scenario for alternative D. On the right side of

19 the chart, under alternative D, in this scenario,

20 there are 20.9 million people for whom you

21 estimate there will be no census response as to

22 that person -- those people's citizenship status,

1 correct?

2    A   Correct.

3    Q   And if we look at the far left side of

4 the chart, under alternative D, this optimistic

5 scenario, there are 260.9 million people who can

6 be linked to an administrative record and whom you

7 estimate their response to the citizenship

8 question is going to be consistent with the

9 administrative record on citizenship, correct?

10    A   Yes.

11    Q   And for both these groups that we just

12 discussed, the 20.9 million people that don't give

13 a census response as to citizenship, and the 260.9

14 million people for whom the census response is the

15 same as the administrative record, adding the

16 citizenship question doesn't in any way improve

17 our ability to get citizenship data about these

18 two groups of people, correct?

19    A   Yes.

20    Q   So that's a total of 281.8 million

21 people, out of the 330 million the Census Bureau

22 expects to enumerate, for whom the addition of the

19 (Pages 409 - 412)

Page 413

1 citizenship question does not improve our ability
2 to get citizenship data on, correct?
3    A    Correct.
4    Q    And that's about 85.4 percent of the
5 population for whom the addition of the
6 citizenship question makes no improvement in terms
7 of the availability of citizenship data, correct?
8    A    Again, I didn't calculate the proportion,
9 but that sounds right, yes.
10    Q    Okay.  Now, the Census Bureau under
11 alternative D expects that the effect on a
12 reduction of self-response rates would be the same
13 as under alternative B, which is just adding the
14 citizenship question without using administrative
15 records, correct?
16    A    Correct.
17    Q    And that means that the Census Bureau
18 expects that, under alternative D, there are more
19 people who would end up getting enumerated by
20 proxy than if you used alternative C, which is
21 administrative records only, no citizenship
22 question, correct?

Page 414

1    A    Correct.
2    Q    And so that means that, under
3 alternative D, as compared to alternative C, the
4 Census Bureau believes that it's going to be able
5 to link fewer people to administrative records
6 because there will be more people enumerated by
7 proxy and proxies generally have lower quality
8 data than self-responses, correct?
9    A    Yes.
10    Q    Now, let's go back to this chart.  In
11 this scenario, there are 39.5 million people under
12 alternative D who would provide a census response
13 to citizenship, but who could not be linked to an
14 administrative record, right?
15    A    Yes.
16    Q    And you also have a total of 4.9 million
17 people who have no census response on citizenship
18 and have no administrative record on citizenship,
19 correct?
20    A    Correct.
21    Q    So that means, under the scenario in
22 alternative B -- D, I'm sorry, if you add those

Page 415

1 two numbers together, it's a total of 44.4 million
2 people who can't be linked to administrative
3 records, correct?
4    A    Correct.
5    Q    So that means, if you'll accept my math,
6 that under alternative D, about 13.5 percent of
7 the population you won't be able to link to
8 administrative records, right?
9    A    Correct.
10    Q    And that's more people that you would not
11 be able to link to administrative records than if
12 you used alternative C, just using the
13 administrative records with no citizenship
14 question, correct?
15    A    Correct.
16    Q    Back to the chart, if we look at the left
17 branch of the chart, but the middle sub-branch,
18 under alternative D in this optimistic scenario,
19 you expect that there are about 8.7 million people
20 for whom the survey response about citizenship and
21 the administrative data on citizenship will not
22 agree, correct?

Page 416

1    A    Yes.
2    Q    That means that currently under
3 alternative D, under this scenario, the Census
4 Bureau at present estimates that there are
5 8.7 million people for whom it doesn't know how
6 it's going to determine their citizenship status
7 for purposes of assembling DOJ's CVAP data,
8 correct?
9    A    At the moment, that's correct.
10    Q    Okay.  That problem of not knowing how to
11 assign citizenship status for millions of people,
12 that problem does not exist under alternative C,
13 correct?
14    A    Correct.
15    Q    Now, the traditional Census Bureau
16 practice, in general, is that if you have a survey
17 response that conflicts with an administrative
18 record, you generally rely on the survey response,
19 correct?
20    A    Correct.
21    Q    But here, you would agree that, under
22 alternative D, if you use the survey response for

20 (Pages 413 - 416)

Page 417

1 these 8.7 million people for whom you estimate the
2 survey response and the administrative record
3 conflict, that that would be more inaccurate on
4 average than just relying on the administrative
5 record, correct?
6    A   We have said there's a disagreement and
7 that is probably an inaccuracy, correct.
8    Q   Conversely, you would expect, under
9 alternative D, when you have this conflict between
10 the survey response and the administrative record
11 for this 8.7 million people, if you were to rely
12 by default on the administrative record rather
13 than the survey response, then for that population
14 of 8.7 million people, there was no reason to ask
15 them the citizenship question, correct?
16    A   Correct.
17    Q   Let me ask about a different issue.
18 Under alternative D, with some of the people for
19 whom you lack citizenship data through
20 administrative records, you at least now have a
21 survey self-response about citizenship, right?
22    A   Are you talking about the one that comes

Page 418

1 down to 39.5 million?
2    Q   Yeah.
3    A   Okay.  Yes.
4    Q   So you would expect that, under
5 alternative C, some of these 39.5 million people
6 you actually would have been able to have linked
7 to administrative records because your survey
8 responses to the census, if you did include the
9 citizenship question, would be higher quality,
10 correct?
11    A   Yes.
12    Q   Now, some of these 39.5 million people,
13 you're not going to be able to link to
14 administrative records under alternative C or
15 alternative D, correct?
16    A   Correct.
17    Q   Under alternative C, for the people that
18 you can't link to administrative records, the plan
19 is you're going to model or impute the citizenship
20 status --
21    A   Which alternative, I'm sorry?
22    Q   Alternative C.  Under alternative C, for

Page 419

1 that subset of people who are not matchable to
2 administrative records, the Census Bureau's plan
3 would be to model or impute the citizenship status
4 of those people, correct?
5    A   Correct.
6    Q   Under alternative D, however, if you
7 can't match someone to the administrative record,
8 but you have a survey response, there's no
9 scientifically defensible method for rejecting
10 that survey response, correct?
11    A   Correct.
12    Q   So under alternative D, just so we're
13 clear, you get a survey response on citizenship
14 and no administrative record; you're stuck using
15 the survey response, correct?
16    A   We would use the survey response.
17    Q   So key difference between C and D for
18 these people who are not matchable to
19 administrative records and don't give you a survey
20 response under D, under C, you impute their
21 citizenship status; under D, you use the survey
22 response, correct?

Page 420

1    A   Yes.
2    Q   There is no reason to think, Dr. Abowd,
3 that for this group of unmatchable people, that on
4 average the survey response about citizenship is
5 going to be more accurate than the imputation
6 method that you would use under alternative C,
7 correct?
8    A   Correct.
9    Q   Dr. Abowd, if someone argued that
10 alternative D was justified because alternative C
11 requires the imputation of citizenship status of
12 people who lack administrative records, would the
13 Census Bureau agree with or disagree with that
14 argument?
15       MR. EHRLICH:  Objection.  Form.
16       THE WITNESS:  Disagree.
17 BY MR. HO:
18    Q   Has the Census Bureau communicated to the
19 Commerce Department that it disagrees with the
20 notion that alternative D is justified because
21 alternative C requires the imputation of
22 citizenship status for some people?

21 (Pages 417 - 420)

Page 421

1    A    Is the question have we communicated
2  consistently our preference for C as opposed to D?
3    Q    It's a more specific question than
4  that --
5    A    Okay.
6    Q    -- Dr. Abowd.  Has the Census Bureau
7  specifically communicated its rejection of the
8  argument that alternative D is better than
9  alternative C because alternative C requires
10  imputation of citizenship status of people for
11  whom there is no linked administrative record?
12    A    So I'm not sure how to answer that
13  question because I don't know that the advice ever
14  took that specific form.  We have consistently
15  communicated that the modeled response was better
16  than the survey responses in the unlinked data.
17    Q    Okay.  So the modeled responses under
18  alternative C for the group of people who can't be
19  matched to citizenship records, in the Census
20  Bureau's view, that's more accurate than the
21  self-responses about citizenship that you would
22  get from adding the citizenship question to the

Page 422

1  survey?
2    A    Yes.
3    Q    Okay.  Have you heard Commerce Department
4  officials opine that alternative D is better than
5  alternative C because alternative C requires the
6  imputation of citizenship status of people who
7  can't be linked to administrative records?
8    A    Yes.
9    Q    Have you heard Earl Comstock offer that
10  opinion?
11    A    Yes.
12    Q    Do you disagree with that opinion?  Does
13  the Census Bureau disagree with that opinion?
14    A    Yes.
15    Q    Has the Census Bureau communicated its
16  disagreement of that opinion to Mr. Comstock?
17    A    Yes.
18    Q    If Mr. Comstock said that the Census
19  Bureau never communicated its disagreement with
20  that opinion, would Mr. Comstock be wrong?
21    MR. EHRLICH:  Objection.  Form.
22    THE WITNESS:  As far as I know, yes.

Page 423

1    MR. HO:  Can we go off the record?
2    THE VIDEOGRAPHER:  Going off the record
3  at 10:26.
4    (Whereupon, a short recess was taken.)
5    THE VIDEOGRAPHER:  Back on the record at
6  10:44.
7  BY MR. HO:
8    Q    Dr. Abowd, you testified that you
9  communicated the Census Bureau's disagreement with
10  the notion that alternative D is justified because
11  alternative C requires imputation of citizenship
12  status -- that you communicated that disagreement
13  to Earl Comstock.  When did you communicate that
14  disagreement to Mr. Comstock?
15    MR. EHRLICH:  Objection.  Form.
16    THE WITNESS:  I testified that the Census
17  Bureau communicated that disagreement.  And that
18  occurred between the time that we briefed the
19  Secretary -- and, I'm sorry, I don't remember the
20  date in February, but I'm sure it's in the
21  record -- and the time he made his final
22  determinations.  Most of that briefing occurred

Page 424

1  because Acting Director Jarmin and Acting Deputy
2  Director Lamas and Special Assistant to the
3  Director Christa Jones were in daily contact with
4  the Under Secretary and with the Secretary's
5  staff.
6    And we were in the process of developing
7  the numbers that you've asked me about that appear
8  in the technical paper in support of the
9  discussion about the difference between
10  alternative C and alternative D.  I didn't
11  personally communicate.
12  BY MR. HO:
13    Q    But to be clear, the Census Bureau
14  communicated its disagreement with alternative D
15  before the Secretary issued his decision
16  memorandum to include the citizenship question in
17  late March 2018, correct?
18    A    Yes.
19    Q    I want to ask you one question --
20  follow-up question about a line in the white
21  paper, page 41, last paragraph, the sentence about
22  a third of the way down that begins with,

22 (Pages 421 - 424)

1  "Households deciding."

2  A   Page?

3  Q   41, last paragraph.

4  A   Yes.

5  Q   "Households deciding not to self-respond

6  because of the citizenship question are likely to

7  refuse to cooperate with enumerators coming to

8  their door in NRFU, resulting in the use of

9  neighbors as proxy respondents on their behalf."

10     I believe you testified that the Census

11  Bureau agrees with part of that statement.  What's

12  the part that the Census Bureau disagrees with?

13  A   So the Census Bureau would say that

14  qualitative evidence suggests that this sentence

15  is correct, and the problem is that the

16  qualitative evidence is difficult to generalize,

17  but we wouldn't ignore it.  And so we would say

18  the best evidence we have suggests that this

19  sentence is correct, but it's not as strong as the

20  evidence that we have when we're able to do both

21  qualitative and quantitative analyses.

22     (Abowd Deposition Exhibit Number 27 was

1  marked for identification.)

2  BY MR. HO:

3  Q   I want to ask you about a document,

4  Exhibit -- that has been marked as Exhibit 27, the

5  title of which is, Proposed content test on

6  citizenship question.  This document sets forth a

7  proposal for two different RCTs for the

8  citizenship question on the census, correct?

9  A   It's one RCT with two different

10  precisions of estimation.

11  Q   And the RCT, as proposed here, would have

12  taken six weeks to collect the data, correct?

13  A   Correct.

14  Q   And the proposal was to initiate the RCT

15  in either November of 2018 or February of 2019,

16  correct?

17  A   Correct.

18  Q   In either case, the RCT could have been

19  completed before census forms are due to be

20  printed, correct?

21  A   Correct.

22  Q   The cost of this proposal, there are two

1  variations on it, but it ranges from 2 million for

2  one option to 4.1 million for the other option,

3  correct?

4  A   Correct.

5  Q   Does the Census Bureau have the money to

6  conduct either option?

7  A   Yes.

8  Q   This proposal was rejected by a group of

9  decision-makers, including Dr. Lamas, Dr. Jarmin

10  and Under Secretary Karen Dunn Kelley, correct?

11  A   That is what I testified, yes.

12  Q   Is it your understanding that the

13  proposal was rejected by a different

14  decision-maker than those three people?

15  A   I wasn't in the conversation.  I'm

16  reporting it based on a summary given to me by

17  Dr. Jarmin and Lamas.

18  Q   Is it the Census Bureau's understanding

19  that these three individuals jointly made the

20  decision to reject the RCT proposal?

21  A   Yes.

22  Q   What is the Census Bureau's understanding

1  of why this RCT proposal was rejected?

2  A   I have, subsequent to my first 30(b)(6)

3  testimony, learned that the motivation for this

4  RCT was a congressional question asking us why, in

5  the proposed census question, we used the form

6  where, yes, born in the United States and, yes,

7  born in Puerto Rico, Guam, the U.S. Virgin Islands

8  or Northern Marianas were separate choices.

9     And primarily Enrique Lamas said that

10  that's the form that's on the ACS, that's the form

11  that's been tested, that's the only tested form we

12  have, and at that point asked if we could do a

13  content test to establish that some other tested

14  form might also be usable.

15     And then -- I actually am not certain

16  exactly how the decision not to make it was done.

17  I think it's one of those decisions where time

18  passed and no instruction was given to do it, and

19  so it was not done.

20     But there was consultation.  I wasn't in

21  the consulting room so I don't want to

22  characterize conversations that I never heard.  We

23 (Pages 425 - 428)

Page 429

1  actively decided not to do this, but I'm not
2  exactly sure that someone said, don't do it, that
3  explicitly.
4      Q    Does the Census Bureau not know why the
5  decision was made to reject the RCT proposal?
6      A    The reason the decision was rejected was
7  because the senior leadership, Jarmin and Lamas,
8  decided that we wouldn't learn enough from this
9  RCT to justify a content change in the specific
10  citizenship question.
11      Q    Why, in the Census Bureau's view, would
12  you not learn enough from the RCT to shed light on
13  the question of whether the citizenship question
14  should be included or what form it should take?
15      A    So the right way to think about that is
16  against what opportunity cost.  And the
17  $4.4 million is not the opportunity cost that
18  mattered.  The opportunity cost that mattered is
19  what the staff in decennial and the American
20  Community Survey would have otherwise been doing
21  while they were diverted to conducting this RCT.
22  Our cost estimates do not include measures of

Page 430

1  headquarters staff time devoted to the experiment.
2          So an active resource allocation decision
3  was made that that staff time would be better
4  spent doing the activities that it would be able
5  to do if we didn't do this experiment.
6      Q    If you had conducted the RCT, you would
7  have had quantitative data on how the citizenship
8  question would perform in the context of the
9  decennial enumeration questionnaire in terms of
10  response rates, correct?
11      MR. EHRLICH:  Objection.  Form.
12      THE WITNESS:  Yes.
13  BY MR. HO:
14      Q    And if the RCT like this had been
15  performed, you would have had quantitative data on
16  how well NRFU efforts could have addressed a
17  decline in self-response resulting from the
18  addition of the citizenship question in the census
19  enumeration questionnaire, correct?
20      MR. EHRLICH:  Objection.  Form.
21      THE WITNESS:  No.
22  BY MR. HO:

Page 431

1      Q    You mentioned differences between NRFU
2  efforts in 2020 versus NRFU efforts in 2010.
3  Could you elaborate on what those differences are
4  anticipated to be?
5      A    The major differences in the NRFU from
6  2020 as compared to 2010 are the extensive use of
7  administrative records at both the determination
8  of occupied, vacant, delete, and potentially for
9  enumeration after the first non-response
10  follow-up.
11      Q    Any other differences in the NRFU efforts
12  planned for 2020 versus 2010 other than the use of
13  administrative records for enumeration purposes?
14      A    The field operations are controlled by a
15  field operational control system that contains a
16  very extensive route optimizer that we tested all
17  decade.
18      (Discussion held off the record.)
19  BY MR. HO:
20      Q    Backing up for a moment, Dr. Abowd, does
21  the Census Bureau believe that it is reasonable to
22  be spending the increased amounts of money that it

Page 432

1  will be forced to spend, and staff time, due to
2  the citizenship question being included on the
3  decennial questionnaire given the utility of the
4  data that will be on it?
5      A    The Census Bureau has been instructed to
6  include a citizenship question on the 2020 census
7  and has attempted to quantify the consequences of
8  that for the operations of the 2020 census.  That
9  quantification suggests increases in the
10  non-response follow-up costs and a deterioration
11  in the quality of the response data.  And we are
12  prepared to conduct the census with those extra
13  resources in NRFU and taking account of the change
14  in the quality of the data.
15      Q    Dr. Abowd, you testified that one of the
16  reasons why the Census Bureau rejected the RCT
17  proposal is that it didn't make sense from a
18  cost-benefit perspective, correct, in the view of
19  the Census Bureau?
20      A    Correct.
21      Q    In the view of the Census Bureau, does it
22  make sense from a cost-benefit perspective to add

24 (Pages 429 - 432)

Page 457

1  are undercounts, funding for things like schools
2  and Medicare that rely on census population
3  numbers can be decreased, correct?
4        MR. EHRLICH: Objection. Form.
5        THE WITNESS: The relation between
6  population measures for local communities and
7  funding is sometimes direct and sometimes
8  indirect. In most cases, having a larger
9  population implies a larger share of the total
10 resource being allocated.
11 BY MS. FIDLER:
12    Q   Many respondents throughout the study
13 indicated an understanding that information is
14 required to be kept confidential, but also
15 indicated a fear that this could change and be
16 used against them in the future. Are you familiar
17 with that?
18    A   Yes.
19    Q   Is that a concern of the Census Bureau?
20    A   The Census Bureau is not concerned about
21 the current confidentiality protections embodied
22 in title 13. Like any law, a law can be modified,

Page 458

1  amended. Statistical agencies in general, and the
2  Census Bureau among them, would be extremely
3  concerned if the respondent confidentiality
4  clauses were removed from title 13.
5        Q   For those who have this fear about the
6  potential for change, aren't those who have this
7  belief less likely to self-respond to the census
8  or to respond to an enumerator?
9        MR. EHRLICH: Objection. Form.
10       THE WITNESS: I'm willing to summarize
11 both the quantitative and the qualitative evidence
12 suggesting that the groups that you have isolated
13 in your question are less likely to self-respond.
14 BY MS. FIDLER:
15    Q   On page 13040 in this summary, one of the
16 emerging themes identified -- and this is a native
17 Hawaiian and Pacific Islander, but it comes up
18 elsewhere as well -- is multigenerational housing
19 as a potential barrier. "Participants expressed
20 concerns about sharing information about the
21 number of people who live in their households. It
22 is a common practice on the islands to live with

Page 459

1  extended family or to have more people living in
2  their house than are listed on the lease or
3  official documents. These concerns present a
4  potential barrier for the NHPI audience, as some
5  participants were worried about landlords finding
6  out the number of people living in their
7  residence."
8        This is another area where you could
9  potentially have either a complete non-response,
10 non-self-response or, as was described earlier,
11 you could have a census response that did not
12 include all of the members of the household,
13 correct?
14    A   Yes.
15    Q   And when this occurs, the members that
16 are not identified are the ones least likely to be
17 found via imputation or other methods, correct?
18 They're the most likely to be omitted as part of a
19 gross omission.
20    A   Could you unpack that question, please?
21    Q   Sure. For the -- for the households that
22 have multigenerational housing, as described here,

Page 460

1  who do not want to disclose all of the members of
2  their household, to the extent that they do not do
3  so, that is where you are likely to have
4  omissions, correct?
5        A   That is where nothing in the current
6  census protocol would correct that particular
7  omission.
8        Q   And these types of omissions can lead to
9  localized or -- undercounts, correct?
10       MR. EHRLICH: Objection. Form.
11       THE WITNESS: So net undercount is the
12 difference between omissions and erroneous
13 enumerations and whole-person census imputations.
14 And these kinds of errors can affect both sides of
15 that equation.
16 BY MS. FIDLER:
17    Q   For those who have these
18 multigenerational households, they're the -- it's
19 unlikely that their landlord would be able to
20 provide information about them, correct, because
21 they wouldn't know?
22       MR. EHRLICH: Objection. Form.

31 (Pages 457 - 460)

Page 461

BY MS. FIDLER:

1 Q Let me back up. This is a focus group
2 that's describing that they do not want to provide
3 information because it is their understanding that
4 their landlords do not know that these numbers are
5 living in their household, correct?
6 A Understood, yes.
7 Q And in those cases when the census is
8 relying on proxy information, in part -- one of
9 the sources for proxy information are landlords,
10 correct, and landlord records, correct?
11 A Yes.
12 Q But in those cases where the landlords do
13 not know about the multigenerational housing, that
14 information would not be there, correct?
15 A That's a reasonable presumption, yes.
16 Q And so for subpopulations where
17 multigenerational housing is common, this could
18 present a problem for an accurate count of that
19 subpopulation, correct?
20 A Yes.
21     MR. EHRLICH: Objection. Form.

Page 461

1 BY MS. FIDLER:
2 Q Let me back up. This is a focus group
3 that's describing that they do not want to provide
4 information because it is their understanding that
5 their landlords do not know that these numbers are
6 living in their household, correct?
7 A Understood, yes.
8 Q And in those cases when the census is
9 relying on proxy information, in part -- one of
10 the sources for proxy information are landlords,
11 correct, and landlord records, correct?
12 A Yes.
13 Q But in those cases where the landlords do
14 not know about the multigenerational housing, that
15 information would not be there, correct?
16 A That's a reasonable presumption, yes.
17 Q And so for subpopulations where
18 multigenerational housing is common, this could
19 present a problem for an accurate count of that
20 subpopulation, correct?
21 A Yes.
22     MR. EHRLICH: Objection. Form.

Page 462

1     THE WITNESS: Yes.
2 BY MS. FIDLER:
3 Q This is also an area where reliance on
4 trusted partners is actually quite helpful for the
5 Census Bureau, correct?
6 A I'm sorry. I was asking Mr. Ehrlich a
7 question.
8 Q The -- the types of housing where there's
9 multigenerational housing or people living in
10 basements is an area where trusted partners are
11 actually critical to helping the census get
12 accurate information, correct?
13 A They're very important, yes.
14 Q And as we've discussed, trusted partners
15 may have a difficult time convincing these
16 communities to provide that information if there's
17 a citizenship question on the census, correct?
18     MR. EHRLICH: Objection. Form.
19     THE WITNESS: Yes.
20 BY MS. FIDLER:
21 Q How do omissions affect both sides --
22     MR. EHRLICH: Counsel, can I just

Page 463

1 interrupt for one second? I think we've reached
2 our time. Are you nearing an end of the
3 questioning?
4     MS. FIDLER: Yeah. I've got, like, one
5 question, possibly two.
6     MR. EHRLICH: Okay. Because I think
7 Dr. Abowd also needs a break anyway. So it works
8 out.
9     MS. FIDLER: Thank you.
10 BY MS. FIDLER:
11 Q How do omissions affect both sides of net
12 undercount calculations?
13 A No, what I said is that net undercount is
14 the difference between omissions and erroneous
15 enumerations, plus whole census [sic] imputations.
16 And the enumeration difficulties that you were
17 asking me about can both affect gross omissions
18 and erroneous enumerations and whole-person
19 imputations; since there's a difference, they can
20 cancel.
21     MS. FIDLER: That's actually my last
22 question. Thank you so much for your patience.

Page 464

1 And I'm done with questioning for today.
2     THE VIDEOGRAPHER: Going off the record
3 at 11:55.
4     (Whereupon, at 11:55 a.m., the deposition
5 of JOHN M. ABOWD was concluded.)

32 (Pages 461 - 464)

# EXHIBIT 34

Page 1

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3     ---------------------------------------
      NEW YORK IMMIGRATION COALITION, ET AL.,
4
                         Plaintiffs,
5           vs.        Case No.  1:18-CF-05025-JMF
6     UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,
7                         Defendants.
      ---------------------------------------
8
9                       Washington, D.C.
10                      Monday, August 20, 2018
11    Deposition of:
12                      DR. RON JARMIN
13    called for oral examination by counsel for
14    Plaintiffs, pursuant to notice, at the office of
15    Arnold & Porter, 601 Massachusetts Avenue NW,
16    Washington, D.C., before KAREN LYNN JORGENSON,
17    RPR, CSR, CCR of Capital Reporting Company,
18    beginning at 9:03 a.m., when were present on
19    behalf of the respective parties:
20                      Veritext Legal Solutions
                        Mid-Atlantic Region
                        1250 Eye Street NW - Suite 350
21                      Washington, D.C.  20005
22

Page 2

1            CONTENT
                        PAGE
2
   DR  RON JARMIN,           11
3  Examination by Ms  Goldstein      11
   Examination by Mr  Tilak         258
4  Examination by Ms  Shah          309
   Examination by Ms  Brannon       343
5  Examination by Mr  Case          376
   Examination by Ms  Bailey        415
6  Further Examination by Mr  Case   417
7
8       JARMIN DEPOSITION EXHIBITS
9  EXHIBIT                   PAGE
   NUMBER
10 Plaintiffs' Exhibit 1  Gary letter    17
   Plaintiffs' Exhibit 2  Email      27
11 Plaintiffs' Exhibit 3  Email      29
   Plaintiffs' Exhibit 4  Email      31
12 Plaintiffs' Exhibit 5  Email      40
   Plaintiffs' Exhibit 6  2020 Census:   44
13          Adding Content
            to the
14          Questionnaire
   Plaintiffs' Exhibit 7  Email      63
15 Plaintiffs' Exhibit 8  Email      76
   Plaintiffs' Exhibit 9  Email      79
16 Plaintiffs' Exhibit 10  Email     89
   Plaintiffs' Exhibit 11  Email     94
17 Plaintiffs' Exhibit 12  Email     98
   Plaintiffs' Exhibit 13  Email    102
18 Plaintiffs' Exhibit 14  Email    108
   Plaintiffs' Exhibit 15  Email    129
19 Plaintiffs' Exhibit 16  Email    133
   Plaintiffs' Exhibit 17  Email    152
20 Plaintiffs' Exhibit 18  Email    155
   Plaintiffs' Exhibit 19  Email    203
21 Plaintiffs' Exhibit 20  Questions on   204
22 the Jan 19 draft Census Memo on the DOJ

Page 3

1            Citizenship
             Question
2            Reinstatement
             Request
3            attachment
   Plaintiffs' Exhibit 21  Memo        226
4  Plaintiffs' Exhibit 22  U S Department 244
             of Commerce
5            Census Bureau
             National
6            Advisory
             Committee on
7            Racial, Ethnic
             and Other
8            Populations
             Charter
9  Plaintiffs' Exhibit 23  Emails      249
   Plaintiffs' Exhibit 24  U S Department 253
10           of Commerce
             Bureau of the
11           Census
             Scientific
12           Advisory
             Committee
13           Charter
   Plaintiffs' Exhibit 25  Memorandum   324
14 Plaintiffs' Exhibit 26  Prepared     331
             statement to
15           the House
   Plaintiffs' Exhibit 27  Letter       333
16 Plaintiffs' Exhibit 28  Template     344
   Plaintiffs' Exhibit 29  Email        347
17 Plaintiffs' Exhibit 30  Letter       351
   Plaintiffs' Exhibit 31  Email        354
18 Plaintiffs' Exhibit 32  Email        362
   Plaintiffs' Exhibit 33  Planned      365
19           questions
             overview
20 Plaintiffs' Exhibit 34  Email        377
   Plaintiffs' Exhibit 35  Email        381
21 Plaintiffs' Exhibit 36  Email        385
   Plaintiffs' Exhibit 37  Email        389
22 Plaintiffs' Exhibit 38  Email        401

Page 4

1  (Exhibits retained by reporter for other
   depositions in this matter.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

1       A P P E A R A N C E S
   On behalf of New York Immigration
2  Coalition, CASA De Maryland, American-Arab
   Anti-Discrimination Committee, ADC Research
3  Institute and Make the Road New York:
       David Gersch, Esquire
4      Peter Grossi, Esquire
       Caroline Kelly, Esquire
5  ARNOLD & PORTER
       601 Massachusettes Avenue, NW
6      Washington, D C  20001
       (202) 942-5316
7      david gersch@arnoldporter com
       caroline kelly@arnoldporter com
8      peter grossi@arnoldporter com
9  On behalf of New York Immigration Coalition:
       Sarah Brannon, Esquire
10 AMERICAN CIVIL LIBERTIES UNION
       915 15th Street, NW
11     Washington, D C  20005
       (202) 675-2337
12     sbrannon@aclu org
13 On behalf of Kravitz Plaintiffs:
       Karun Tilak, Esquire
14 COVINGTON & BURLINGTON
       850 Tenth Street, NW
15     Washington, D C  20001
       (202) 662-5458
16     ktilak@cov com
17 On behalf of Los Angeles Unified School District:
       Keith Yeomans, Esquire (Telephonically)
18 DANIELS WOLIVER KELLEY
       115 Pine Avenue
19     Suite 500
       Long Beach, California 90802
20     (562) 366-8500
       kyeomans@dwkesq com
21
22

2 (Pages 2 - 5)

Page 6

1  On behalf of County of Los Angeles:
   David I Holtzman, Esquire
2  HOLLAND & KNIGHT
   50 California Street
3  Suite 2800
   San Francisco, California 94111
4  (415) 743-6909
   david holtzman@hklaw com
5
   On behalf of Lupe Plaintiffs:
6  Denise Hulett, Esquire (Telephonically)
   Andrea Senteno, Esquire
7  MALDEF
   1016 16th Street, NW
8  Suite 100
   Washington, D C  20036
9  (202) 293-2828
   dhuelett@maldef org
10 asenteno@maldef org
11 Niyati Shah, Esquire
   Terry Minnis, Esquire
12 ASIAN AMERICANS ADVANCING JUSTICE
   1620 L Street, NW
13 Suite 1050
   Washington, D C  20036
14 (202) 296-2300
   nshah@advancingjustice-aajc org
15 tmannis@advaningjustice-aajc org
16 On behalf of City of San Jose & Black Alliance for
   Just Immigration:
17 Andrew Case, Esquire
   MANATT, PHELPS & PHILLIPS
18 7 Times Square
   New York, New York 10036
19 (212) 790-4501
   acase@manatt com
20
21
22

Page 7

1  On behalf of City of San Jose & Black Alliance for
   Just Immigration continued:
2  John Libby, Esquire (Telephonically)
   MANATT, PHELPS & PHILLIPS
3  11355 West Olympic Boulevard
   Los Angeles, California 90064
4  (310) 312-4294
   jlibby@manatt com
5
   Ezra Rosenberg, Esquire
6  David Brody, Esquire
   Dorian Spence, Esquire
7  LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
   1401 New York Avenue, NW
8  Suite 400
   Washington, D C  20005
9  (202) 662-8345
   erosenberg@lawyerscommittee org
10 dbrody@lawyerscommittee org
   dspence@lawyerscommittee org
11
   On behalf of State of California:
12 Gabrielle Boutin, Esquire (Telephonically)
   R  Matthew Wise, Esquire
13 DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
   GENERAL
14 1300 I Street
   P O  Box 944255
15 Sacramento, California 94244
   (916) 210-6053
16 gabrielle boutin@doj ca gov
   matthew wise@doj ca gov
17
18
19
20
21
22

Page 8

1  On behalf of State of New York:
   Danielle Fidler, Esquire
2  Elena Goldstein, Esquire
   Ajay Saini, Esquire (Telephonically)
3  ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
   PROTECTION BUREAU
4  28 Liberty Street
   New York, New York 10005
5  (212) 416-8441
   danielle fidler@ag ny gov
6  elena goldstein@ag ny gov
   ajay saini@ag ny gov
7
   On behalf of Defendants:
8  Kate Bailey, Esquire
   Carlotta Wells, Esquire
9  U S  DEPARTMENT OF JUSTICE
   20 Massachusetts Avenue
10 Washington, D C  20530
   (202) 305-9802
11 kate bailey@usdoj gov
   carlotte wells@usdoj gov
12
   Michael Cannon, Esquire
13 David M S  Dewhirst,Esquire
   U S  DEPARTMENT OF COMMERCE, OFFICE OF THE
14 ASSISTANT GENERAL COUNSEL FOR FINANCE &
   LITIGATION
15 1401 Constitution Avenue, NW
   Room 5890
16 Washington, D C  20230
   (202) 482-5395
17 mcannon@doc gov
   ddewhirst@doc gov
18
   Miles Ryan, Esquire
19 U S  DEPARTMENT OF COMMERCE, OFFICE OF THE
   CHIEF COUNSEL FOR ECONOMIC AFFAIRS
20 4600 Silver Hill Road
   Washington, D C  20233
21 (301) 763-9844
   miles f ryan iii@census gov
22

Page 9

1  ALSO PRESENT:  Herman Habermann
              Katherine Wallman

2
   VIDEOGRAPHER:  Solomon Francis

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

3 (Pages 6 - 9)

Page 30

1 BY MS. GOLDSTEIN:

2    Q  I'm showing you what's been marked as

3 Plaintiffs' Exhibit 3 that's Bates numbered 1634.

4       Do you recognize this document?

5    A  Yes.

6    Q  What is this?

7    A  I believe this is the email that -- where

8 I first saw a faxed version of the letter.

9    Q  Of the Gary letter?

10   A  Yes.

11   Q  And it looks from this email dated

12 12/15/2007 [sic], that there is an attachment

13 called DOJ letter December 12, 2017, correct?

14   A  Uh-huh.  Yes.

15   Q  And is it your recollection --

16   A  My --

17   Q  -- that that is the Gary letter?

18   A  My recollection is that is the Gary

19 letter, yes.

20   Q  And so did you first see the Gary letter

21 on 12/15/2017?

22   A  So, yeah.  I think so.  I mean, I don't

Page 31

1 remember exactly, but, yes, this is probably when

2 I first saw it.

3    Q  Did you see the Gary letter before you

4 got this email?

5    A  I don't know if I did or not, so.  It

6 would have been right around this time, within a

7 couple days, so.

8    Q  Is there anything that would refresh your

9 recollection as to whether or not you saw the Gary

10 letter before or after this email?

11   A  You know, I think this is when I first

12 saw it, so --

13   Q  Okay.

14   A  I just -- yeah.

15   Q  I can take that back.

16   A  You want them both back?

17   Q  Yes.

18      (Plaintiffs' Exhibit 4, Email, was

19 marked.)

20 BY MS. GOLDSTEIN:

21   Q  I'm sorry.  Can you -- I'm going

22 to -- I'm showing you what's been marked as

Page 32

1 Plaintiffs' Exhibit 4.  It's Bates stamp 1357.

2       Do you recognize this document?

3    A  Yes.

4    Q  What is it?

5    A  An email.

6    Q  Are these emails that you received or

7 sent?

8    A  Looks like one of each.

9    Q  So if you go to the bottom on

10 Monday, December 18th, you email

11 Karen Dunn Kelley, "any news"; is that correct?

12   A  Yes.

13   Q  What are you referring to?

14   A  So I don't recall this exactly, but I

15 think we were -- Barry Robinson, who was at OGC at

16 the time, was reaching out to Art Gary at DOJ to

17 see if we could set up a time to discuss the

18 letter.

19   Q  What is OGC?

20   A  Office of General Counsel.

21   Q  And is that -- which department is that?

22   A  Commerce.

Page 33

1    Q  And why was Barry reaching out to Gary to

2 set up a time to discuss the letter?

3    A  So I believe that Barry knew Gary,

4 and, you know, we wanted -- we wanted to meet with

5 them to discuss their request.

6    Q  Why is that?

7    A  Because we typically meet with folks who

8 have a data request.

9    Q  And what's the purpose of that meeting?

10   A  To understand their -- their needs.

11   Q  Can you tell me a little bit more?

12   A  So to have them describe what they need

13 from a technical perspective so that we can best

14 understand how we would go about seeing if we

15 could fulfill it.

16   Q  Who typically attends those meetings?

17   A  Usually, methodologists and technical

18 people.

19   Q  From?

20   A  From Census, along with the subject

21 matter experts from the requesting organization.

22   Q  Who are the subject matter experts that

9 (Pages 30 - 33)

Page 34

1 would attend -- that would typically attend from
2 the Department of Justice?
3    A   So in this case, I guess it would be the
4 folks that were involved in Voting Rights Act
5 enforcement.
6    Q   Do you know who those people are?
7    A   I don't have firsthand knowledge, no.
8    Q   Do you know what job titles they have?
9    A   I can't tell you.
10    Q   Are there statisticians or methodologists
11 at the Department of Justice who are involved in
12 voting rights enforcement?
13       MS. BAILEY:  Objection.
14       THE WITNESS:  I don't know.
15 BY MS. GOLDSTEIN:
16    Q   Why is it important to have a meeting to
17 understand their technical needs?
18    A   So it's important so that when you go
19 through the expense and effort of a data
20 collection, that it actually solves the
21 measurement objective that the subject matter
22 experts have in mind.

Page 35

1    Q   How long do those meetings typically
2 take?
3    A   You know, they vary.  Some requesting
4 agencies have very well-defined requests and we
5 understand it clearly and it could happen
6 efficiently, and some requesting organizations are
7 less organized.  So, you know, it's context
8 specific.
9    Q   Can you give me a range?
10    A   I mean, anywhere from, you know, one or
11 two meetings to many months of negotiations.
12    Q   Prior to the citizenship question, had
13 you received requests for data from the
14 Department of Justice specifically?
15    A   Well, we do -- so I don't know if we
16 received requests or not.  I mean, we do produce
17 Citizen Voting Age Population data from the ACS,
18 and I know there had been conversations between
19 Census and Justice regarding those data.  So I
20 would assume so, but I was not involved in any of
21 those conversations or how that was initiated.
22    Q   And those were prior to your becoming --

Page 36

1    A   Yes.
2    Q   -- acting director?
3    A   Yes.
4    Q   Is it fair to say that part of the
5 purpose for these technical meetings is to
6 determine the fit between the data that the agency
7 is requesting and the way in which the
8 Census Bureau obtains that data?
9       MS. BAILEY:  Objection.  Vague.
10       THE WITNESS:  So I'll answer what I think
11 your question is
12 BY MS. GOLDSTEIN:
13    Q   All right.
14    A   The reason is there's a subject matter
15 need for information, and the Census Bureau will
16 try to understand what that need is and best
17 design a data collection and processing
18 methodology to meet the subject matter experts'
19 requirement.
20 BY MS. GOLDSTEIN:
21    Q   Has DOJ ever asked for a question to be
22 added to the short form of the census prior and

Page 37

1 persistent to the citizenship question?
2       MS. BAILEY:  Objection.
3       THE WITNESS:  Not that I know of.
4 BY MS. GOLDSTEIN:
5    Q   Are you aware of any agency asking for a
6 question to be added to the short form?
7    A   Not to my knowledge, no.
8    Q   Do agencies -- agencies typically request
9 data, not questions, correct?
10    A   No.  That -- agencies often will request
11 a question when they're really requesting data,
12 because they don't know the difference.
13    Q   And that's why you have those meetings,
14 correct?
15    A   Yes.
16    Q   So turning back to Exhibit 4, did you get
17 any more information from Barry about his efforts
18 to reach out to Gary?
19    A   I -- I don't think that we did.  I mean,
20 it was -- you know, this was coming up on the
21 holidays.  I'm getting -- communicating with folks
22 was a little hit or miss.  And so we certainly

10 (Pages 34 - 37)

Page 42

1 exactly what Ben was really referring to. My
2 conjecture is that, like us, that he was concerned
3 that we were asked to fulfill a subject matter
4 experts' requirement with this specific
5 methodology and that there might be other ways of
6 solving this problem.
7 BY MS. GOLDSTEIN:
8   Q   And the phrase, "engage with DOJ," does
9 that refer to that technical meeting that you
10 referred to before?
11   A   That would -- probably, yes.
12   Q   Because that technical meeting with --
13   A   So --
14   Q   -- DOJ would be the typical process,
15 right?
16   A   So Ben would know that we would normally
17 meet with the requesting agency to do this.
18   Q   Who is Nancy Poet -- Nancy?
19   A   Nancy Potok, she is the chief
20 statistician at OMB.
21   Q   What is her role?
22   A   She oversees the entire federal

Page 43

1 statistics system, that includes the Census Bureau
2 and other federal stat agencies.
3   Q   And how did you engage with DOJ?
4   A   So, you know -- not to use the rhyme
5 again -- but Barry reached out to Gary, and I
6 reached out to Gary to try to set up a meeting.
7   Q   And did that meeting ever happen?
8   A   It did not.
9   Q   Who is John Zadrozny?
10   A   John Zad- -- I do not know who that
11 person is.
12   Q   Have you ever spoken to him before?
13   A   No.
14   Q   If you go to the middle of 11195 --
15   A   Uh-huh.
16   Q   -- there's an email from Cindy Simms that
17 says, "John Zadrozny from your DPC team is going
18 to reach out to you." You is not referring to
19 you, Dr. Jarmin.
20       But do you know what "our DPC team" is?
21   A   I actually don't.
22   Q   Did you have any communications with

Page 44

1 folks from the White House about the citizenship
2 question?
3   A   No.
4   Q   Prior to receiving the Gary letter, did
5 you have communications with anyone associated
6 with the White House about the citizenship
7 question?
8   A   No.
9   Q   And after receiving the Gary letter, did
10 you have communications with anyone affiliated
11 with the White House about the citizenship
12 question?
13   A   No.
14   Q   I'll take that.
15       MS. GOLDSTEIN:  I apologize I do not have
16 a lot of those exhibits.
17       (Plaintiffs' Exhibit 6, 2020 Census:
18 Adding Content to the Questionnaire, was marked.)
19 BY MS. GOLDSTEIN:
20   Q   I'm showing you what's been Bates stamped
21 Plaintiffs' Exhibit 6.  It is a two-page document
22 marked 9865 and 9867 entitled 2020 Census:  Adding

Page 45

1 Content to the Questionnaire.
2       Do you recognize this document?  Let's
3 look at the first page first.
4   A   You know, I recognize -- I mean, I'm not
5 sure where this came from, but I think this looks
6 like the process, yes.
7   Q   When you say this looks like the process,
8 what does that mean?
9   A   The process for adding questions to
10 the -- the ACS and decennial.
11   Q   And the process for adding to the ACS and
12 decennial is the same, correct?
13   A   Yes.  We call it the ACS, used to be the
14 long form of the census.
15   Q   And when we refer to the decennial or the
16 census, we're referring to the short form?
17   A   The short form.
18   Q   So if you look at the very top, it says,
19 "The Census Bureau follows a well-established
20 process when adding questions to the decennial
21 census."
22   A   Uh-huh.

12 (Pages 42 - 45)

1    Q  Do you agree with that statement?

2    A  Uh-huh.  Yes.

3    Q  And it says that -- and is it part of

4  that well-established process having those

5  technical meetings that you just referred to?

6    A  Yes.  I mean, it's not laid out in here,

7  but that is generally part of the process.

8    Q  So looking at Step 1 --

9    A  Uh-huh.

10    Q  -- do you agree that typ- -- the

11  typical -- well -- or I'm sorry.  Withdrawn.

12       Do you agree the well-established process

13  first provides that upon receiving requests,

14  lawyers at the Department of Commerce work closely

15  with OMB to determine whether data fulfill legal,

16  regulatory or constitutional requirements?

17    A  Yes.

18    Q  And Step 2, do you agree that upon

19  determining that a new question is warranted, that

20  the Census Bureau must notify Congress of its

21  intent to answer the question?

22    A  Uh-huh.

1    Q  I'm sorry.  I need --

2    A  Yes.  Yes.

3    Q  Thank you.

4       And how does the Census Bureau determine

5  that a new question is warranted?

6    A  So, again, that's -- you know,

7  there's -- whether there's a legal or statutory,

8  regulatory reason, and then whether it's feasible

9  to ask that question.

10    Q  What does that mean?

11    A  That we can actually get valid responses

12  from respondents.

13    Q  How do you -- how does the Census Bureau

14  determine that?

15    A  Often through testing or what have you.

16  So we do cognitive testing to see if people

17  understand questions.

18    Q  What other kinds of testing do you do?

19    A  That's really the primary type of

20  testing.  You know, look at the quality of the

21  data we get back from that, determine how best to

22  word the question.

1    Q  Other than testing wording, are there

2  other things the Census Bureau looks at to

3  determine whether or not a question is feasible?

4    A  So not -- so they -- the -- you know, on

5  the business side, we look to see whether the

6  companies keep records of the thing that we're

7  requesting.  On the household side, that's usually

8  less formal.  So it's whether they understand the

9  question and can answer it, so.

10    Q  Are there other issues that go into

11  whether or not a question will lead to a valid

12  response from respondents?

13    A  So, you know, there's testing.  There's

14  comparing it to other sources of information,

15  trying to understand whether we're getting

16  high-quality responses.  That's not always

17  possible.

18    Q  What do you mean?

19    A  Sometimes there's not another source of

20  data.

21    Q  Is there another source of data for the

22  citizenship information?

1    A  In this case, yes, there is another

2  source of data.

3    Q  And what was that source of data?

4    A  Administrative records from, primarily

5  from the Social Security Administration, but also

6  from USCIS and the State Department.

7    Q  Are there any other aspects of this

8  process of determining whether or not a new

9  question is warranted?

10       MS. BAILEY:  Objection.  Vague.

11       THE WITNESS:  So the warranted is a

12  different term.  Census Bureau is usually looking

13  for feasible.  So the subject matter expert

14  requesting the information is assumed to know

15  whether the information is needed or not, and we

16  look for a way to see if we can provide the

17  information that they need.

18  BY MS. GOLDSTEIN:

19    Q  And that, again, goes back to those

20  technical meetings --

21    A  Yes.

22    Q  -- between the subject matter experts at

13 (Pages 46 - 49)

Page 50

1 Census and the subject matter experts at the
2 agency --
3    A   Correct.
4    Q   -- correct?
5    A   Correct.
6    Q   So continuing on Step 2, this says,
7 skipping down a line, "This is an intentionally
8 [sic] process designed to give Congress the
9 ability to review the topics and questions on the
10 questionnaire before they're finalized?"
11   A   Uh-huh.
12   Q   Do you agree with that statement?
13   A   Uh-huh.  Yes.  Sorry.
14   Q   "If an additional topic is required, it
15 is imperative that Congress be notified as soon as
16 possible."
17        Do you agree?
18        MR. ROSENBERG:  Excuse me.  I think
19 people that are dialed in can no longer hear the
20 deposition.
21        MS. GOLDSTEIN:  Can we go off the
22 deposition for a minute?

Page 51

1        VIDEOGRAPHER:  The time is 9:46 a.m.
2 We're going off the record.
3        (Off the record.)
4        VIDEOGRAPHER:  The time is 9:48 a.m.  We
5 are back on the record.
6        Please proceed, Counsel.
7 BY MS. GOLDSTEIN:
8    Q   So we're still on 9865.  And if we look
9 to Step 3, "The Census Bureau must notify the
10 public and invite comments regarding the change in
11 the questionnaire with the Federal Register
12 notice."
13        Is that correct?
14   A   Yes.
15   Q   And do you agree that that is also part
16 of the well-established process?
17   A   Yes.
18   Q   And has this step of the process been
19 followed for the citizenship question?
20   A   It has not.  This is in process.  This
21 part is to have the Paperwork Reduction Act
22 package that goes to the Office of Management and

Page 52

1 Budget, to Nancy Potok's office.  I'm not sure
2 where in the process, but the whole package for
3 the census will be sent out.  The citizenship
4 question will be part of that package.
5    Q   And Step 4, "The Census Bureau must test
6 the wording of the new question."
7    A   Right.
8    Q   Do you agree that that is also part of
9 the well-established process of adding content to
10 the census questionnaire?
11   A   Yes.
12   Q   And the citizenship question has not been
13 tested, correct?
14   A   That's -- that's not correct.
15   Q   Okay.  The citizenship question has not
16 been tested in the context of the decennial
17 census, correct?
18   A   That's correct.
19   Q   The next sentence says, "It is too late
20 to add a question to the 2018 end-to-end test, so
21 additional testing on a smaller scale would need
22 to be developed and implemented as soon as

Page 53

1 possible."
2        Do you agree that this is part of the
3 well-established process of adding content to the
4 questionnaire?
5    A   No.  No.  This is in addition.
6    Q   Can you explain?
7    A   I'm just saying it's too late to add
8 something to 2018 end-to-end test, and if there
9 was a new question, we would have to find another
10 way to test it.
11   Q   Do you know when 9865, Exhibit 6, was
12 created?
13   A   I'm not sure.
14   Q   Do you know who created it?
15   A   Census staff, I believe.
16   Q   Do you know who on census staff?
17   A   I'm not sure.
18   Q   What is the 2018 end-to-end test?
19   A   It's a test in three different sites
20 that's just wrapping up right now in
21 Providence, Rhode Island, where we did a full
22 end-to-end test to make sure all the systems and

14 (Pages 50 - 53)

Page 54

1  everything work so we are ready to go into the
2  field in 2020.
3      Q   And when you say a full end-to-end test,
4  can you just tell me a little bit what that means?
5      A   So it wasn't all of the operations, but
6  most of the major operations that are involved in
7  the 2020, from address canvassing, all the way
8  through nonresponse follow-up and publishing the
9  data will be our test.
10     Q   And what's the purposes of the end-to-end
11 testing?
12     A   To work out any bugs or kinks, things
13 that -- that we didn't foresee in sort of the
14 smaller scale system specific testing that we do
15 all the time.
16     Q   And why is that important?
17     A   So that we're prepared.
18     Q   Was the citizenship question tested on
19 the -- on any of the end-to-end testing --
20     A   No.
21     Q   -- for the 2020 census?
22     A   It was not.

Page 55

1      Q   And did additional testing on a smaller
2  scale get developed for the 20- -- for the
3  citizenship question --
4      A   No.
5      Q   -- for the 2020 census?
6      A   No.
7      Q   And was additional testing on a smaller
8  scale implemented for the citizenship question on
9  the 2020 census?
10     A   No.
11     Q   Why not?
12     A   The citizenship question that we'll be
13 using on the 2020 census is the same question
14 that's on the American Community Survey and has
15 been answered by between 40 and 50 million
16 households over many years.  The question performs
17 quite well, so we're confident that -- that it's
18 fully tested.
19     Q   Step 4 was not followed with respect to
20 the citizenship question, correct?
21     A   The Step 4 was obviated by the fact that
22 the -- it has been on the ACS for many years.  We

Page 56

1  did not think that this step was necessary.
2      Q   So Step 4 was not followed, correct?
3      A   No.
4      Q   I'm sorry?
5      A   It was not.
6      Q   Okay.  Step 5 is, "The Census Bureau must
7  make additional operational adjustments beyond
8  testing to include new content.  This includes
9  redesigning the paper questionnaire and adjusting
10 the paper data capture system."
11         Has that occurred for the citizenship
12 question?
13     A   I believe this is ongoing.
14     Q   So it's in progress for the citizenship
15 question?
16     A   Yes.
17     Q   "For Internet self-response, the
18 additional question will require system
19 redevelopment, once for English and then again for
20 Spanish."
21         Has that occurred for the citizenship
22 question?

Page 57

1      A   Ongoing.
2      Q   "The census questionnaire assistance
3  operation will require development, as well."
4          Has that occurred for the citizenship
5  question?
6      A   Ongoing.
7      Q   "Finally, the nonresponse follow-up data
8  collection instruments will need to be redesigned
9  and the training modules for enumerators will need
10 further development."
11         Have the nonresponse follow-up data
12 collection instruments been redesigned for the
13 citizenship question?
14     A   It's ongoing.
15     Q   And have training modules for the
16 enumerators been further developed?
17     A   Ongoing.
18     Q   If you turn to 9867, it is another
19 document that is entitled 2020 census adding
20 content to the questionnaire.
21         Do you recognize this document?
22     A   It's another stab at the same process.

15 (Pages 54 - 57)

Page 58

1    Q   Is it fair to say it's another -- another
2  version of the process that's listed on 9865?
3    A   Yes.
4    Q   And do you agree that this is another
5  version of the well-established process when
6  adding questions to the decennial census?
7    A   Sure.  Yes.
8    Q   Anything you disagree with in 9867?
9       MS. BAILEY:  Objection.  Vague.
10      THE WITNESS:  No.
11 BY MS. GOLDSTEIN:
12   Q   I'll take that back.
13      After you learned of the citizenship
14 question, were you given any instructions
15 about -- withdrawn.
16      After you learned about this citizenship
17 question, a couple of weeks before receiving the
18 Gary letter, were you given any instructions?
19   A   No.
20   Q   After receiving the Gary letter, were you
21 given any instructions about next steps?
22   A   I don't think we were given explicit

Page 59

1  instructions.  I think it was taken for granted
2  that we were going to start this process.
3    Q   The well-established process for adding a
4  question to the census?
5    A   Yes.
6    Q   The first step of which is the technical
7  meetings.
8    A   Technical meetings.
9    Q   Did you have any conversations about
10 getting this process started after you received
11 the letter?
12   A   Well, I recall meeting with my staff and
13 discussing, you know, how we were going to
14 proceed, and we were trying to take as broad a
15 view as possible.  So I believe, you know, it was
16 agreed that we would -- we would explore the use
17 of administrative records to fulfill the request,
18 as well.
19   Q   And why was that an area that you were
20 exploring?
21      MS. BAILEY:  Objection.  Vague.
22      THE WITNESS:  Well, it's an area that we

Page 60

1  always explore.  So for -- you know, it's often
2  easier, potentially more accurate to
3  administrative records, but it's also the
4  intention of Congress in Title 13, the census
5  code, that when possible, we use administrative
6  records in lieu of direct collection.  So this is
7  something that we typically -- typically do.
8  BY MS. GOLDSTEIN:
9    Q   Did you receive any direction from
10 Secretary Ross at this point?
11   A   No.
12   Q   Did you receive any directions from
13 Karen Dunn Kelley at this point?
14   A   No.  Other than, you know, proceed
15 with, you know, our analysis.
16   Q   Any other instructions from Ms. Kelley?
17   A   No.
18   Q   Any directions from anyone else at
19 Commerce at this time?
20   A   No.
21   Q   So let's talk a little bit more about
22 what you did after you first received the Gary

Page 61

1  letter.  What exactly did you ask your staff to
2  do?
3    A   So we -- you know, we knew that the
4  question was already on the ACS, so the testing
5  thing was not a priority.  You know, I think we
6  all agreed that the question on the ACS performed
7  as well as it could.  The focus was primarily on
8  seeing whether the administrative records assets
9  that we have at the Census Bureau were useful in
10 this regard to do a comparison of administrative
11 records and -- and survey responses on the ACS and
12 to come up with a -- with an analysis and
13 suggestions as to what's the best way to proceed.
14   Q   Did you have a timeline that you were
15 working on?
16   A   So we were on a tight timeline because,
17 obviously, we needed to provide the questions to
18 Congress by the end of March.  So the Secretary
19 needed to make a decision prior to that, so we
20 were trying to work as quickly as we could.
21   Q   And had anyone from Commerce given you
22 any interim timelines before the point at which

16 (Pages 58 - 61)

Page 242

1  you know, some time to sort through. But
2  certainly before the next meeting.
3      Q   Does the NAC play any role in changing or
4  adding questions to the census?
5      A   When we've contemplated changes, they've
6  weighed in on that, but they don't play a role
7  in -- I mean, they can suggest, like anybody else
8  can, but they don't have a -- they don't have any
9  more formal role than anybody else does in that
10  regard.
11      Q   Did the NAC weigh in on the proposed
12  changes to the race and ethnicity question?
13      A   I believe they did. I was not an active
14  NAC meeting attendee at that time, but it's my
15  understanding that they -- that they weighed in on
16  that.
17      Q   Do you know how they weighed in?
18      A   You know, I think the NAC is a diverse
19  group of people. Race and ethnicity questions are
20  something that never make everybody happy, so I
21  think there was lots of discussion amongst
22  different viewpoints of the NAC about what was the

Page 243

1  best approach to make.
2      Q   Did the NAC ultimately make a
3  recommendation?
4      A   I'd have to go back to see what their
5  recommendation was.
6      Q   You don't recall?
7      A   I don't recall.
8      Q   What about the MENA changes?
9      A   Yes. That would be one of the
10  controversial issues that was discussed amongst
11  the NAC, so.
12      Q   For the record, can you just explain what
13  the proposed MENA changes were?
14      A   It was to add MENA as a separate category
15  on a combined race and ethnicity question.
16      Q   So when we talk about changes to the race
17  and ethnicity question, are the MENA changes part
18  of that conversation?
19      A   Yes.
20      MS. GOLDSTEIN:  Can we stamp this,
21  please?
22      I'm going to apologize. These are not

Page 244

1  stamped.
2      (Plaintiffs' Exhibit 22, U.S. Department
3  of Commerce Census Bureau National Advisory
4  Committee on Racial, Ethnic and Other Populations
5  Charter, was marked.)
6  BY MS. GOLDSTEIN:
7      Q   I'm showing what's been marked as
8  Plaintiffs' Exhibit 22. It's titled U.S.
9  Department of Commerce Census Bureau National
10  Advisory Community on Race and Ethnicity and Other
11  Populations Charter. It is a four-page document.
12      Do you recognize this document?
13      A   I'm not sure I've seen this or not. It
14  looks like pretty standard -- standard boilerplate
15  for advisory committee charter.
16      Q   So you've seen charters like this before?
17      A   Yes.
18      Q   Okay. And if we go to Section 3,
19  objectives and scope of activities, it states that
20  "The committee will advise the director of the
21  Census Bureau."
22      That's you, correct?

Page 245

1      A   Yep.
2      Q   "On the full range of economic housing,
3  demographic socioeconomic, linguistic,
4  technological, methodological, geographic,
5  behavioral and operational variables affecting the
6  cost accuracy and implementation of Census Bureau
7  programs and surveys, including the decennial
8  census."
9      Correct?
10      A   Uh-huh. Yes.
11      Q   And so this charter -- does the
12  citizenship question fall within this scope of
13  activities?
14      MS. BAILEY:  Objection. Form.
15      THE WITNESS:  Yes, it would.
16  BY MS. GOLDSTEIN:
17      Q   If you go further down, it explains that
18  "The committee will address census policies,
19  research and methodology tests, operations,
20  communications/messaging and other activities to
21  ascertain the need -- ascertain needs and best
22  practices to improve Census's surveys, operations

62 (Pages 242 - 245)

1  Advisory Committee Charter, was marked.)
2  BY MS. GOLDSTEIN:
3     Q   I'm showing what has been marked as
4  Plaintiff's Exhibit 24.  It is the U.S. Census
5  Scientific Advisory Committee Charter.  Is this
6  the CSAC charter?
7     A   Yes.
8     Q   And this charter also provides that it
9  will provide formal review and feedback on
10 internal and external working papers, reports and
11 other documents related to the design and
12 implementation of census programs and surveys?
13    A   Yep.
14    Q   Did the CSAC provide any formal review of
15 the memos relating to the citizenship question?
16    A   No.
17    Q   Did the CSAC provide any feedback on any
18 of the memos relating to the citizenship question?
19    A   No.
20    Q   Why not?
21    A   Again, it was not part of an organized
22 agenda in the meeting where they were -- where

1  those -- this was something that happened in the
2  compressed time frame, and we didn't have the
3  normal period through which we could have these
4  sorts of engagements.
5     Q   Is it fair to say in the normal course,
6  when a change is proposed to the decennial census,
7  it's on a longer time frame?
8        MS. BAILEY:  Objection.  Speculation.
9        THE WITNESS:  I mean --
10 BY MS. GOLDSTEIN:
11    Q   For example, the --
12    A   No.
13    Q   -- race and ethnicity proposed changes?
14    A   Yes.  It was on a longer time schedule
15 that allowed more feedback from the advisory
16 committees.
17    Q   And typically, in the ordinary course,
18 when there is a proposed change to a question,
19 that proposed change is raised to the advisory
20 committees, correct?
21    A   If it's significant.
22    Q   So, typically, in the ordinary course,

1  where there is a proposed significant change to
2  the census questionnaire, that proposed change is
3  raised to the advisory committees, correct?
4     A   Yes.
5     Q   Including the NAC?
6     A   Yes.
7     Q   And including the CSAC?
8     A   Correct.
9     Q   But that did not happen with the
10 citizenship question, correct?
11    A   It did not.
12    Q   Because there wasn't time?
13    A   Because there wasn't time.
14    Q   Were there any other reasons why the
15 citizenship question was not raised to the
16 advisory committee?
17       MS. BAILEY:  Objection, speculation.
18       THE WITNESS:  No.
19       That timing was the primary issue, yeah.
20 BY MS. GOLDSTEIN:
21    Q   Were there any --
22    A   No.

1     Q   -- other issues?
2     A   Not that I know of.
3     Q   Okay.  Did CSAC, which is the
4  Census Scientific Advisory Committee, right?
5     A   Yes.
6     Q   Provide any feedback on the citizenship
7  question?
8     A   Yes, they did.
9     Q   What was their feedback on the
10 citizenship question?
11    A   So they had a short presentation about it
12 at the spring CSAC meeting where they argued
13 against it.
14    Q   For what reasons?
15    A   For many of the normal reasons, the short
16 time frame.  They were concerned about it not
17 being tested.
18    Q   Has the Census Bureau responded to CSAC's
19 recommendation yet?
20    A   I think we have, but I'm not sure.  I'd
21 have to see if that's gone out or not.
22    Q   Who would know?

65 (Pages 254 - 257)

Page 258

1    A    Tara Dunlop Jackson.

2    Q    Do you know what the response to the CSAC

3    says or will say?

4    A    I'm sure it says something to the effect

5    that, you know, thank you.  You know, this

6    decision was made by the Secretary taking into

7    account all sorts of input.

8    Q    I'll take that back.

9         MS. GOLDSTEIN:  Can we take 5.56, 7.62

10   and five minutes?  I think I might be done with my

11   portion.

12        VIDEOGRAPHER:  The time is 2:42 p.m.

13   We're going off the record.

14        (Off the record.)

15        VIDEOGRAPHER:  The time is 2:50 p.m.

16   We're back on the record.

17        Please proceed, Counsel.

18        EXAMINATION BY MR. TILAK:

19   Q    Good afternoon, Dr. Jarmin.  My name is

20   Karun Tilak.  I'm counsel for the plaintiffs in

21   Kravitz, et al. v. U.S. Department of Commerce,

22   et al.

Page 259

1         I'd like to follow up on something you

2    said earlier.  I believe your testimony was that

3    it's difficult to simulate the decennial census

4    because it's unique.  Is that a fair

5    characterization?

6    A    Correct.

7    Q    Okay.  But, in fact, that the

8    Census Bureau does the multiyear testing program

9    to prepare for the census; is that correct?

10   A    That's correct.

11   Q    Do you know when that testing process

12   started?

13   A    2013.

14   Q    So seven years in advance of the

15   decennial census, correct?

16   A    Correct.

17   Q    And from that testing, the Census Bureau

18   determines -- obtains various pieces of

19   information that are useful for development of the

20   2020 census?

21   A    Correct.

22   Q    For example, self-response rates?

Page 260

1    A    That's one thing that --

2    Q    Okay.

3    A    So a testing self-response rate is not

4    that indicative of a census self-response rate

5    because of the lack of advertising and --

6    Q    But, in fact, you do do tests to

7    determine self-response rates in preparation for

8    the decennial census?

9    A    I don't think we did any tests whose

10   purpose it was to determine what the self-response

11   rate was.

12   Q    Do you also use these tests to determine

13   or to obtain information about nonresponse

14   follow-up procedures?

15   A    About procedures, yes.

16   Q    And about the use of administrative

17   records?

18   A    And about -- yes.

19   Q    And about the use of data capture systems

20   or the functionality of the those systems?

21   A    Correct.

22   Q    How about for language support

Page 261

1    systems --

2         (Conference call interruption.)

3         THE WITNESS:  Okay.  All right.  Please

4    say the question again.

5    BY MR. TILAK:

6    Q    And how about language support systems or

7    translations services?

8         MS. BAILEY:  Objection.  Vague.

9         THE WITNESS:  So there was some stuff

10   done with language, yes.

11   BY MR. TILAK:

12   Q    So in short, this multiyear testing

13   program does provide meaningful information that

14   the Census Bureau uses to prepare for the 2020

15   census?

16   A    Yes.

17   Q    Did you do any tests where the sole

18   purpose was not self-response rates but one of the

19   items that was looked at was self-response rates?

20        MS. BAILEY:  Objection.  Form.

21        THE WITNESS:  So we always look at the

22   self-response rate as a matter of course.

66 (Pages 258 - 261)

Page 262

1 BY MR. TILAK:

2　Q　And would it be fair to say this

3 multiyear testing program imposes a cost upon the

4 Bureau?

5　A　Absolutely.

6　Q　And would it also be fair to say that

7 none of these tests over the last seven --

8 five years have included -- or included a

9 citizenship question?

10　A　Over the last --

11　Q　Five years, since 2013 to 2018.

12　A　No.  None of the census tests included a

13 citizenship question.

14　Q　We have just touched on self-response.

15 Briefly, self-response, could you provide a short

16 definition for that?

17　A　Self-response is when a survey is -- when

18 we ask someone to do a survey, they, you know,

19 fill it out either online, on paper, over the

20 phone, and provide us their answers by themselves.

21　Q　And where a households fail to

22 self-respond to the census, there are other ways

Page 263

1 the Census Bureau can use to attempt to enumerate

2 that household; is that correct?

3　A　Correct.

4　Q　Is one of those ways having an enumerator

5 visit the household that hasn't self-responded?

6　A　That is a primary means, yes.

7　Q　Is that called nonresponse follow-up?

8　A　Yes.

9　Q　And that's where someone comes to your

10 house and asks you to respond to a census

11 questionnaire?

12　A　Correct.

13　Q　Who are the enumerators that go out and

14 visit these people's houses who haven't

15 self-responded?

16　MS. BAILEY:  Objection.  Form.

17　THE WITNESS:  So we hire the pool of

18 enumerators.  They're temporary employees who we

19 hire for -- either for tests or for the decennial

20 census from local communities.

21 BY MR. TILAK:

22　Q　And do these enumerators differ from

Page 264

1 enumerators that are used, for example, on the

2 ACS?

3　A　Yes.

4　Q　How do they differ?

5　A　The ACS and other survey enumerators are

6 our regular staff.  I wouldn't call them full

7 time, but they -- they work with us over

8 many -- an indefinite period.

9　Q　So they conduct repeated surveys?

10　A　Yes.

11　Q　Are they better trained than the

12 enumerators who are used for the decennial census?

13　A　Yes.

14　MS. BAILEY:  Objection.

15　THE WITNESS:  I mean, have just the

16 repeated experience.

17 BY MR. TILAK:

18　Q　Where as decennial census enumerators

19 don't have that repeated experience, correct?

20　A　Some are -- some have done this before.

21 So I -- the enumerator I went in the field with in

22 Providence during the test worked in 2010, but

Page 265

1 that's not necessarily the rule.

2　Q　It's not a prerequisite to be hired as a

3 decennial census enumerator?

4　A　Not if you're going to try to hire

5 hundreds of thousands of people, it's not.

6　Q　Earlier today you mentioned the concept

7 of a hard-to-count population.  What is a

8 hard-to-count population?

9　A　So there are certain subpopulations that

10 are lower self-response rates.  You know, recent

11 immigrants, you know, people in poverty, you know,

12 folks on tribal lands.

13　Q　How about noncitizen?

14　MS. BAILEY:  Objection.  Vague.

15　THE WITNESS:  Noncitizen, their recent

16 immigrants would be included in that.

17 BY MR. TILAK:

18　Q　How about households with limited English

19 proficiency, are they considered --

20　A　Yes.

21　Q　-- considered a hard-to-count population?

22　A　Yes.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 270

1 by four or five, we start looking for a proxy
2 then.
3    Q   Is there a point in which you stop
4 looking for a proxy?
5    A   So, you know, the design is to stop at
6 six.
7    Q   And it's possible that after six visits,
8 you haven't gotten the response in nonresponse
9 follow-up and you also haven't gotten the response
10 in proxy; is that right?
11    A   That is true, yes.
12    Q   And is that the situation -- where you
13 haven't gotten the response in nonresponse
14 follow-up or proxy, is that a situation where you
15 would apply imputation?
16    A   Yes.
17    Q   And I think you mentioned this earlier,
18 but compared to the U.S. population generally, are
19 proxy rates for hard-to-count populations higher?
20    A   Yes.
21    Q   Are administrative records another way
22 that the Census Bureau can use to enumerate a

Page 271

1 household that has not self-responded?
2    A   Yes.
3    Q   And to determine the number of people who
4 live in a household, what administrative records
5 does the Census Bureau look at?
6    A   So a variety of administrative records.
7 So, importantly, you know, income tax returns,
8 other government administrative records from
9 Social Security or -- or various, you know,
10 assistance programs, SNAP or -- but also using
11 other information like, you know, whether the mail
12 is being delivered to the house at the current
13 time and that sort of stuff.
14        It's actually a pretty small share of
15 the -- you know, it's only like 4 percent of the
16 households can be enumerated that way, where we
17 have high -- high-quality records that are very
18 stable over a period of time.
19    Q   So the ability to use administrative
20 records applies to a fairly small portion of the
21 population; is that correct?
22    A   Of the NRFU population, yes.

Page 272

1    Q   Of the NRFU population.
2        Compared to the U.S. population at large,
3 is the -- can administrative records be used to
4 enumerate hard-to-count populations at a smaller
5 rate than the U.S. population at large?
6        MS. BAILEY:  Objection.  Form.
7        THE WITNESS:  That is the case.
8 BY MR. TILAK:
9    Q   Is whole person imputation a mechanism
10 that the Census Bureau uses to enumerate
11 households that have failed to self-respond?
12    A   And failed -- non- -- didn't respond in
13 nonresponse follow-up.
14    Q   Does the Census Bureau try to obtain a
15 proxy response before resorting to --
16    A   Yes.
17    Q   -- whole person imputation?
18    A   Yes.
19    Q   And briefly, what is whole person
20 imputation?
21    A   It's when the count in the house is
22 imputed and their characteristics are imputed.

Page 273

1    Q   How is that done?
2    A   Using neighborhood characteristics
3 and -- so --
4    Q   Where does the Census -- sorry.  Finish
5 your answer.
6    A   From the other people that have
7 responded.
8    Q   From what sources does the Census Bureau
9 determine the neighborhood characteristics that it
10 then uses to impute to the households?
11    A   So from the ACS, from administrative
12 records, but also, really important here, from the
13 other responses to the Census.
14    Q   Now, besides NRFU and proxy responses and
15 administrative records and whole person
16 imputations, are there any other methods that the
17 Census Bureau can use to enumerate a household
18 that fails to self-respond?
19    A   That's pretty much it.
20    Q   That's the whole list.
21        If there is a decline in the
22 self-response for a subpopulation within the U.S.

69 (Pages 270 - 273)

Page 282

1 U.S. population?
2    A  So, again, you know, the answer there is
3 the same.  We do try to have in-language people as
4 enumerators.  So there's often an after-event
5 analysis of how well that seems to work, so.
6    Q  But you're not aware of any specific test
7 that targeted that question?
8    A  No, not -- not specifically.
9    Q  How about -- did the Bureau evaluate the
10 efficacy of nonresponse follow-up procedures based
11 on census tract or based on state?
12    A  On census or state?
13    Q  Yes.
14    A  I mean, obviously, we look at -- we look
15 at things by the characteristics of different
16 units of geography, but, you know, I'm not sure
17 what you mean by -- what -- what specifically are
18 you trying to get at here?
19    Q  Are there any tests that look at whether
20 certain census tracts are harder to enumerate
21 through nonresponse follow-up procedures than
22 other citizen tracts?

Page 283

1    A  So, I mean, we already -- we already know
2 that, to some degree, because we know that those
3 tracts are made up of higher proportions of
4 hard-to-count populations, so that's -- I don't
5 know what the test is that you're looking for
6 here.  So --
7    Q  And then you mentioned for these
8 noncitizen households that are likely to not
9 self-respond and then will refuse to answer in
10 NRFU, that a proxy response would be required.  In
11 evaluating the citizenship question, did the
12 Bureau consider whether -- consider the
13 availability of proxies -- let me rephrase.
14       In evaluating the citizenship question,
15 did anyone at the Bureau consider whether the
16 availability of proxy was the same for noncitizen
17 households as for other parts of the U.S.
18 population?
19    A  Not that I know of.
20    Q  How about for Hispanic households or
21 households with limited English proficiencies?
22    A  Yeah.  I don't think we've broken

Page 284

1 that -- I mean, neighbors are neighbors, so.
2    Q  And has the Bureau done any analysis of
3 the availability of proxies that's broken down by
4 census tract or by state?
5    A  No.
6    Q  Has any analysis been done by the Bureau
7 on the willingness of proxies to respond for
8 noncitizen households versus the U.S. population
9 at large?
10    A  Not that I know of.
11    Q  The same question with respect to proxies
12 for Hispanic households or households with limited
13 English proficiency.
14    A  No.
15    Q  If proxies were less available for
16 noncitizen households, then fewer of these
17 noncitizen households that did not respond to NRFU
18 would be enumerated through proxies, correct?
19       MS. BAILEY:  Objection.  Calls for
20 speculation.
21       THE WITNESS:  Presumably.
22 BY MR. TILAK:

Page 285

1    Q  We already briefly discussed
2 administrative records.  In evaluating the
3 citizenship question, did anyone at the Bureau
4 consider the differential quality or availability
5 of administrative records for noncitizen
6 households as compared to the U.S. population?
7       MS. BAILEY:  Objection.  Form.
8       THE WITNESS:  Yeah.  That was analyzed in
9 2010.
10 BY MR. TILAK:
11    Q  What test was that analyzed in?
12    A  I believe it was called the census 2010
13 match study.
14    Q  What was the impetus for that test?
15    A  It was one of the regular tests we ran as
16 part of the 2010 program.
17    Q  Briefly, what were the findings of that
18 study?
19    A  So the study basically documented how
20 well we could match census responses, including
21 NRFU and proxy responses, to administrative
22 records.

72 (Pages 282 - 285)

1    Q   And did that study also look at the
2   availability of administrative records for
3   Hispanic households --
4    A   That --
5    Q   -- and households of --
6    A   That --
7    Q   -- limited English --
8    A   That would --
9    Q   -- proficiency?
10    A   -- so it was able to demonstrate that
11   hard-to-count populations had lower-quality
12   administrative records.
13        (Thereupon, reporter requested to speak
14   one at a time.)
15   BY MR. TILAK:
16    Q   And when you say lower-quality
17   administrative records, that means that the
18   administrative records could be used to enumerate
19   those households less of the time?
20    A   Correct.
21    Q   Now, with respect to whole person
22   imputation, in evaluating the citizenship

1   question, did anyone evaluate whether whole person
2   imputation was less accurate for households with
3   noncitizen as opposed to the population at large?
4    A   I'm not sure that that -- that's been
5   done.  I imagine it probably would be, but I don't
6   know what study that is.
7    Q   You haven't seen any study that looks at
8   this question?
9    A   I don't recall seeing it, no.
10    Q   Has anyone evaluated the accuracy of
11   whole person imputation for Hispanic or households
12   with limited English proficiency compared to the
13   population at --
14    A   Same.
15    Q   -- large?
16    A   Same.
17        My guess is there's a study out there,
18   I'm just not familiar with it.
19    Q   Was any such study, to your knowledge,
20   part of the review of the citizen question in
21   preparation for the decennial --
22    A   No.

1    Q   -- census?
2        Did anyone evaluate the accuracy of whole
3   person imputation based on census tract or state?
4    A   I -- I don't know, but that would have
5   been done, probably, in a post-enumeration survey
6   type thing.  Would not have been able to evaluate
7   it by state, so.
8    Q   And by post-enumeration survey, what do
9   you mean by that?
10    A   So that's something we do afterwards to
11   assess the quality of the census.
12    Q   So the last time that that would have
13   been done would have been after the 2010 census?
14    A   2010, yes.
15    Q   Do you know if any such survey was used
16   in preparations for this 2020 census?
17    A   So you can only do a post-enumeration
18   survey after you do a census.  So we did use those
19   results to inform our plans and procedures for
20   2020.
21    Q   Are you aware of any specific calculation
22   of the additional costs that would be incurred to

1   make up for a decline in self-response or failure
2   to not -- failure to answer a NRFU as a result of
3   this citizenship question?
4        MS. BAILEY:  Objection.  Compound.
5        THE WITNESS:  So I believe in the -- in
6   the -- not this memo -- well, it probably is in
7   this memo, too -- but there was a computation of
8   what the expected increase in nonresponse
9   follow-up costs would be.
10   BY MR. TILAK:
11    Q   Do you remember what the calculation was?
12    A   Offhand, I think it was in the, you know,
13   20 to $40 million range, something like that.
14    Q   Was that a conservative estimate?
15    A   A conservative -- yeah.  I think they
16   thought it -- that that was potentially a lower
17   bound.
18    Q   Are you aware of any calculation at the
19   upper bound of what the cost might be?
20    A   Not of an upper bound, no.
21    Q   Earlier today we discussed sensitive
22   questions.  Is it accurate that if a question is

1 the 2018 end-to-end test, we would have included
2 it because it was part of the census. We ran what
3 we thought was the census. Again, we weren't
4 testing the questions in the 2018 end-to-end test.
5 We were testing the systems and procedures.
6 BY MR. TILAK:
7    Q   And what systems and procedures,
8 specifically?
9    A   All of the data collection procedures,
10 all of the data processing procedures, the review
11 and publication of the date products.
12   Q   Did that include nonresponse follow-up
13 procedures?
14   A   It did.
15   Q   And did it include proxy response
16 procedures?
17   A   It did.
18   Q   And whole person imputation procedures?
19   A   It will.
20   Q   And based on Dr. Abowd's analysis, is it
21 accurate that the inclusion of a citizenship
22 question will increase the NRFU workload?

1    A   That's -- we believe that to be the case,
2 yes.
3    Q   And is it also an accurate statement
4 because people who chose to -- who refuse to
5 respond -- self-respond because of a citizenship
6 question will also not respond to NRFU and the
7 proxy workload will also be increased --
8       MS. BAILEY: Objection.
9 BY MR. TILAK:
10   Q   -- in the 2020 census?
11   A   So we do believe it will lead to an
12 increase in the proxy rate. Less confident about
13 that rate, though, because it's a smaller rate.
14   Q   What do you mean by that?
15   A   Well, the number of proxy responses at
16 the end is relatively small compared to the NRFU
17 workload.
18   Q   And of that proportion that's left over
19 for proxy are hard-to-count populations a
20 disproportionate part of the proxy response
21 population as it --
22   A   Yeah. That's part of what it means to be

1 hard to count, I believe.
2    Q   Turning to 1317 on this memo, the last
3 sentence -- well, let's start with the sentence
4 above that. "No one provided evidence that there
5 are residents who would respond accurately to a
6 decennial census that did not contain a citizen,
7 but would not respond if it did, although many
8 believe that such residents had to exist."
9       Does the Census Bureau have any evidence
10 responsive to this question here?
11   A   So I think the Census Bureau's analysis
12 suggested that there would be some folks who would
13 have answered the question through
14 self-response -- or responded via self-response
15 that would now have to go to NRFU. Accuracy of
16 NRFU responses is less than self-response and
17 proxy response is less than NRFU responses.
18   Q   So this is -- it's your testimony that
19 this is not an accurate statement, that the
20 Census Bureau did, in fact, provide evidence?
21   A   So this is the Secretary's assessment of
22 the evidence that was provided to him total, so.

1    Q   But your testimony is the Census Bureau
2 did provide evidence; is that correct?
3    A   Yes.
4       MR. TILAK: We can go off the record for
5 five minutes.
6       MS. BAILEY: Oh. Taking a break?
7       MR. TILAK: Yeah.
8       VIDEOGRAPHER: The time is 3:44 p.m.
9 This completes Media Unit Number 3. We are now
10 off the record.
11      (Off the record.)
12      VIDEOGRAPHER: The time is 3:56 p.m.
13 This begins Media Unit Number 4. We're now on the
14 record.
15      Please proceed, Counsel.
16      EXAMINATION BY MS. SHAH:
17   Q   Good afternoon. My name is Niyati Shah,
18 and I represent the plaintiffs in Lupe v. Ross in
19 the District or Maryland, Case Number 8:1801570.
20      Dr. Jarmin -- of course.
21      I'd like to actually just go back to the
22 discussion we had earlier today about the race and

78 (Pages 306 - 309)

# EXHIBIT 35

Page 1

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3      ---------------------------------------

       NEW YORK IMMIGRATION COALITION, ET AL.,

4

                         Plaintiffs,

5          vs.         Case No.  1:18-CF-05025-JMF

6      UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                      Defendants.

       ---------------------------------------

8

9                      Washington, D.C.

10                     Wednesday, August 15, 2018

11     Deposition of:

12                     DR. JOHN ABOWD

13     called for oral examination by counsel for

14     Plaintiffs, pursuant to notice, at the office of

15     Arnold & Porter, 601 Massachusetts Avenue NW,

16     Washington, D.C., before KAREN LYNN JORGENSON,

17     RPR, CSR, CCR of Capital Reporting Company,

18     beginning at 9:08 a.m., when were present on

19     behalf of the respective parties:

20

21

22

Page 2

1          CONTENT
                        PAGE
2
3   DR  JOHN ABOWD            9
3   Examination by Mr  Freedman      9
    Examination by Mr  Cho        187
4   Examination by Mr  Case       240
    Examination by Mr  Fidler      281
5   Examination by Ms  Boutin      310
    Examination by Ms  Hulett      316
6
7          ABOWD DEPOSITION EXHIBITS
8   EXHIBIT                 PAGE
    NUMBER
9   Plaintiffs' Exhibit 1   Email         12
    Plaintiffs' Exhibit 2   Email         18
10  Plaintiffs' Exhibit 3   Memo        20
    Plaintiffs' Exhibit 4   Summary      20
11  Plaintiffs' Exhibit 5   Memo        44
    Plaintiffs' Exhibit 6   Memo        61
12  Plaintiffs' Exhibit 7   Draft of the     92
            January 19th memo
13  Plaintiffs' Exhibit 8   2016 break-off rates  104
    Plaintiffs' Exhibit 9   Redacted version of a 109
14          break-off analysis of
            2017
15  Plaintiffs' Exhibit 10  Draft of January 19th 111
            memo
16  Plaintiffs' Exhibit 11  Version 1 0 draft   138
            memo
17  Plaintiffs' Exhibit 12  Letter        155
    Plaintiffs' Exhibit 13  Presentation to    174
18          Census Scientific
            Advisory Committee
19  Plaintiffs' Exhibit 14  Email         181
    Plaintiffs' Exhibit 15  Email         184
20  Plaintiffs' Exhibit 16  Questions on the   214
            January 19th Memo
21          Draft Census Memo on
            the DOJ Citizenship
22          Question
            Reinstatement Request

Page 3

1   Plaintiffs' Exhibit 17  Memorandum from the  242
            President
2   Plaintiffs' Exhibit 18  Email         249
    Plaintiffs' Exhibit 19  Email         255
3   Plaintiffs' Exhibit 20  Email         257
    Plaintiffs' Exhibit 21  2020 census program  259
4           memorandum series:
            2016 05
5   Plaintiffs' Exhibit 22  Talking points    263
    Plaintiffs' Exhibit 23  Spreadsheet      269
6   Plaintiffs' Exhibit 24  Draft answers to    270
            questions
7   Plaintiffs' Exhibit 25  March 1, 2018     272
            Memorandum
8   Plaintiffs' Exhibit 26  Questions on the   274
            January 19th draft
9           census memo
    Plaintiffs' Exhibit 27  2020 Census: Adding  284
10          content to the
            questionnaire
11  Plaintiffs' Exhibit 28  September 20, 2017  292
            Memorandum
12  Plaintiffs' Exhibit 29  Email         293
    Plaintiffs' Exhibit 30  Summary analysis of  330
13          the key differences
            between Alternative C
14          and Alternative D
15
16      (Exhibits retained by reporter for next
            deposition )
17
18          Veritext Legal Solutions
            Mid-Atlantic Region
            1250 Eye Street NW - Suite 350
19          Washington, D C  20005
20
21
22

Page 4

1          A P P E A R A N C E S
    On behalf of New York Immigration
2   Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
3   Institute and Make the Road New York:
        John Freedman, Esquire
4       David Gersch, Esquire
        Caroline Kelley, Esquire
5       Chase Raines, Esquire
        ARNOLD & PORTER
6       601 Massachusettes Avenue, NW
        Washington, D C  20001
7       (202) 942-5316
        jon freedman@arnoldporter com
8       david gersch@arnoldporter com
        caroline kelly@arnoldporter com
9       chase raines@apks com
10  On behalf of New York Immigration Coalition:
        Sarah Brannon, Esquire
11      AMERICAN CIVIL LIBERTIES UNION
        915 15th Street, NW
12      Washington, D C  20005
        (202) 675-2337
13      sbrannon@aclu org
14  On behalf of Kravitz Plaintiffs:
        Dustin Cho, Esquire
15      Karun Tilak, Esquire (Telephonically)
        COVINGTON & BURLINGTON
16      850 Tenth Street, NW
        Washington, D C  20001
17      (202) 662-5458
        dcho@cov com
18      ktilak@cov com
19  On behalf of Los Angeles Unified School District:
        Keith Yeomans, Esquire (Telephonically)
20      DANNIS WOLIVER KELLEY
        115 Pine Avenue
21      Suite 500
        Long Beach, California 90802
22      (562) 366-8500
        kyeomans@dwkesq com

Page 5

1
    On behalf of Lupe Plaintiffs:
2       Denise Hulett, Esquire
        Andrea Senteno, Esquire
3       MALDEF
        1016 16th Street NW
4       Suite 100
        Washington, D C  20036
5       (202) 293-2828
        dhuelett@maldef org
6       asenteno@maldef org
7       Niyati Shah, Esquire
        Terry Minnis, Esquire
8       ASIAN AMERICANS ADVANCING JUSTICE
        1620 L Street, NW
9       Suite 1050
        Washington, D C  20036
10      (202) 296-2300
        nshah@advancingjustice-aajc org
11      tmannis@advaningjustice-aajc org
12  On behalf of City of San Jose & Black Alliance for
    Just Immigration:
13      Andrew Case, Esquire
        MANATT, PHELPS & PHILLIPS
14      7 Times Square
        New York, New York 10036
15      (212) 790-4501
        acase@manatt com
16
        Emil Petrosian, Esquire (Telephonically)
17      MANATT, PHELPS & PHILLIPS
        11355 West Olympic Boulevard
18      Los Angeles, California 90064
        (310) 312-4294
19      epetrossian@manatt com
20
21
22

2 (Pages 2 - 5)

Page 6

1  On behalf of City of San Jose & Black Alliance for
   Just Immigration continued:
2     Ezra Rosenberg, Esquire
      LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
3     1401 New York Avenue, NW
      Suite 400
4     Washington, D C  20005
      (202) 662-8345
5     erosenberg@lawyerscommittee org
6  On behalf of State of California:
      Gabrielle Boutin, Esquire
7     R  Matthew Wise
      DEPARTMENT OF JUSTICE OFFICE OF THE ATTORNEY
8     GENERAL
      1300 I Street
9     P O  Box 944255
      Sacramento, California 94244
10    (916) 210-6053
      gabrielle boutin@doj ca gov
11    matthew wise@doj ca gov
12 On behalf of State of New York:
      Danielle Fidler, Esquire
13    Elena Goldstein, Esquire
      Ajay Saini, Esquire
14    ASSISTANT ATTORNEY GENERAL, ENVIRONMENTAL
      PROTECTION BUREAU
15    28 Liberty Street
      New York, New York 10005
16    (212) 416-8441
      danielle fidler@ag ny gov
17    elena goldstein@ag ny gov
      ajay saini@ag ny gov
18
   On behalf of Defendants:
19    Joshua E  Gardner, Esquire
      Stephen Ehrlich, Esquire
20    U S  DEPARTMENT OF JUSTICE
      20 Massachusetts Avenue
21    Washington, D C  20530
      (202) 305-9802
22    joshua e gardner@usdoj gov
      stephen ehrlich@usdoj gov

Page 7

1  On behalf of Defendants continued:
2     Michael Cannon, Esquire
      David M.S. Dewhirst, Esquire
3     U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
      ASSISTANT GENERAL COUNSEL FOR FINANCE &
4     LITIGATION
      1401 Constitution Avenue, NW
5     Room 5890
      Washington, D.C. 20230
6     (202) 482-5395
      mcannon@doc.gov
7     ddewhirst@doc.gov
8     Miles Ryan, Esquire
      U.S. DEPARTMENT OF COMMERCE, OFFICE OF THE
9     CHIEF COUNSEL FOR ECONOMIC AFFAIRS
      (301) 763-9844
10    miles.f.ryan.iii@census.gov
11
   ALSO PRESENT: Herman Habermann
12
   VIDEOGRAPHER: Solomon Francis
13
14
15
16
17
18
19
20
21
22

Page 8

1        P R O C E E D I N G S
2  WHEREUPON,
3       VIDEOGRAPHER:  Good morning, ladies and
4  gentlemen.  We're going on the record at 9:07 a m.
5  August 15, 2018.  This begins Media Unit 1 of the
6  video-recorded deposition of Dr. John Abowd taken
7  in the matter of the State of New York, et al.,
8  Plaintiff, versus United States Department of
9  Commerce, Defendant, Case Number 18-CV-2921 (JMF),
10 and New York Immigration Coalition, et al.,
11 plaintiff, versus U.S. Department of Commerce,
12 et al. defendants case Number 18-CV-5025 (JMF)
13 filed in the U.S. District Court for the
14 Southern District of New York.
15      This deposition is being held at the law
16 offices of Arnold & Porter located at
17 601 Massachusetts Avenue, Northwest,
18 Washington D.C.
19      My name is Solomon Francis from the firm
20 of Veritext Legal Solutions, and I'm the
21 videographer.  The court reporter is
22 Karen Jorgenson with Veritext Legal Solutions.

Page 9

1       Counsel, your appearances will be noted
2  on the stenographic record.
3       At this time, will the court please swear
4  in the witness and we can proceed.
5       DR. JOHN ABOWD,
6  called as a witness, and having been first duly
7  sworn, was examined and testified as follows:
8     THE WITNESS:  I do.
9       EXAMINATION BY MR. FREEDMAN:
10 Q  Dr. John Abowd, good morning.  I'm John
11 Freedman from the law firm of Arnold & Porter.  I
12 represent the plaintiffs in the New York
13 Immigration Coalition case.
14      Could you state your name for the record?
15 A  My name is John Abowd.
16 Q  And what is your professional address?
17 A  United States Census Bureau Headquarters,
18 4600 Silver Lake Road, Room 8H-120,
19 Washington, D.C. 20223.
20 Q  Dr. Abowd, have you been deposed before?
21 A  Yes.
22 Q  If you don't understand my question,

3 (Pages 6 - 9)

Page 206

1  the potential impact of adding the citizenship
2  question on certain subpopulations such as
3  hard-to-count groups?
4      A  I don't know where to begin.  There are
5  many research groups inside the Census Bureau who
6  have, over the course of many decades, worked on
7  problems like that.  I can't begin to recount all
8  of their research.  There are some specific
9  experts in the research and methodology
10  directorate that I go to for advice on such
11  questions, as well as experts in the population
12  division.  There have been a variety of public
13  reports about our efforts to address the
14  identified hard-to-count populations with special
15  efforts in the 2020 census.
16     Q  Can you name some individuals who are
17  involved in assessing the specific impact of the
18  citizenship question on subpopulations?
19     A  So there may be other groups, but the
20  group working with the integrated communication
21  contract has used the information gathered in the
22  focus group component of the CBAMS, Census

Page 207

1  Barriers, Attitudes, and Motivators Study.  They
2  have delivered an interim report.  It landed on my
3  desk one day after I got back from holiday, and I
4  have not had a chance to process what's in it.
5  It's not public.
6      Q  What day was that?
7      A  August 3rd.
8      Q  So are there individuals within the
9  research and methodology directorate who are
10  looking at that study and other studies
11  specifically to assess the impact of the
12  citizenship question?
13     A  So their charge is to glean as much
14  information as they can from both the survey
15  component and the focus group component of those
16  studies at the moment, specifically to inform the
17  early design and purchase considerations for the
18  advertising campaign for the 2020 census.  They
19  are certainly charged with identifying factors
20  that they believe that communication campaign
21  needs to address, and then I believe it's called
22  the creative phase takes over and develops content

Page 208

1  for that.
2      Q  And is one of those factors the
3  citizenship question?
4      A  Yes, it is.
5      Q  Is Nancy Bates involved in any of that?
6      A  She is the senior methodologist of that
7  group from R&M.  Her counterpart in the decennial
8  census is Gina Walejko.
9      Q  I'm sorry?
10     A  Her counterpart from the decennial census
11  is Gina Walejko.
12        She's going to ask me to spell that, and
13  I always have to look it up.  So I'll get it for
14  you.
15        And then there's a team of specialists
16  from the contractor for the integrated
17  communications contract, which is led by
18  Young & Rubicam.
19        (Thereupon, the court reporter
20  clarified.)
21        THE WITNESS:  Young & Rubicam, Y&R.
22  BY MR. CHO:

Page 209

1      Q  And what exactly are Nancy Bates and
2  Gina Walejko working on with respect to the
3  citizenship question?
4      A  So I don't have specific knowledge of
5  what they're working on with respect to the
6  citizenship question.  Because the survey form for
7  CBAMS was finalized before the question was added
8  to the 2020 census, there's no direct question
9  about that question on CBAMS, but they have found
10  variables in that survey that they believe are
11  salient to attitudes about the citizenship
12  question.  Because the focus groups were conducted
13  after the decision to add the questions, questions
14  were specifically inserted into the focus group
15  protocol about the citizenship question.
16     Q  What are the questions that they found
17  salient to the -- to addressing the citizenship
18  question in CBAMS?
19     A  I would prefer to decline to answer that
20  question, because I haven't had the time to read
21  their interim report properly.  So I don't think
22  it's -- I don't think it's right for me to give

53 (Pages 206 - 209)

Page 210

1 you an incomplete answer.

2    Q   Do you recall any at the moment or --

3    A   I don't -- don't specifically recall any.

4        I have a very unusual relationship to
5 this group.  When we did the 2010 census, all of
6 that analysis was done internally, and so
7 confidentiality-protection issues associated with
8 the statistics they were going to use were
9 not -- it wasn't a disclosure-avoidance question.
10 Because we have an explicit external partner and
11 we have to share summaries across the firewall,
12 all of their statistical work has to be cleared
13 for disclosure avoidance and they're subject to
14 the 2020 census's all products not explicitly
15 named have to use a differentially-private
16 publication system, and we didn't have one.  So I
17 spent a lot of time helping them with that, and I
18 didn't focus on the summary tables themselves.  I
19 was focused on the methodology.  There are other
20 people that -- so --

21    Q   So you don't recall at this time?

22    A   I don't recall.  But I hate that answer

Page 211

1 because I did have a lot of contact with them, but
2 it was on a different -- in a different context.

3    Q   Do you know of any other interviews,
4 surveys or fieldwork that has been undertaken or
5 will be undertaken to assess the impact of the
6 citizenship question?

7    A   No, I don't.

8    Q   Would Nancy Bates know more about that?

9        MR. GARDNER:  Objection.  Calls for
10 speculation.

11        THE WITNESS:  She might.

12 BY MR. CHO:

13    Q   Is Peter Miller involved in any of this?

14        MR. GARDNER:  Objection.  Vague.

15 BY MR. CHO:

16    Q   Do you understand the question?

17    A   Peter Miller is another senior survey
18 methodologists on who I have relied extensively
19 since I arrived at the Census Bureau.  I have not
20 asked him about methodological comments on the
21 citizenship question.

22    Q   Is the Center for Survey Measurement more

Page 212

1 generally involved in assessing the impact of the
2 citizenship question?

3    A   The Center for Survey Measurement was a
4 partner of the team that developed the focus
5 groups for the integrated communication contract,
6 so they were very involved.

7    Q   Turning back to Page 1282 of
8 Exhibit Number 6, your January 19th memo, when you
9 estimated the impact of adding the citizenship
10 question on data quality, you assumed that these
11 households would have the same quality as the
12 average NRFU data in the 2010 census; is that
13 right?

14    A   I'm reading the sentence.

15        Yes.

16    Q   Is that a realistic assumption?

17    A   Probably not.

18    Q   Why not?

19    A   That assumption was made because we had
20 agreed to present the Secretary with cost
21 estimates that were based on the most recent
22 audited agreed upon lifecycle cost model for the

Page 213

1 2020 census.  In that model, that's the
2 assumption.  And so we used that assumption to
3 generate the cost estimate, and then we said we
4 used the assumption built in to the Secretary's
5 lifecycle cost estimate.

6    Q   Who asked you to use the lifecycle cost
7 estimate?

8    A   So this was not a case of a serving
9 suggestion.  We had a team, and that team felt
10 most comfortable not departing from the lifecycle
11 cost estimate.  It had taken quite a while to put
12 in place, and it was being relied on throughout
13 the planning of the 2020 census, and we did not
14 want to have to discuss why we deviated from the
15 assumptions in the current lifecycle cost estimate
16 in developing our incremental cost estimate.  It
17 didn't seem like an argument that we needed to
18 have.

19    Q   Do you know whether other members of the
20 team would agree with you, that that was not
21 really a realistic assumption?

22    A   So I think that everyone agrees that

54 (Pages 210 - 213)

1 We use a set in the '18 end-to-end test that
2 appear to have worked pretty well in that test.
3 But there was no citizenship question on that
4 test, so that the administrative records
5 component -- citizenship question that would be in
6 that administration record enumeration, wasn't
7 built for the end-to-end test.
8    Q   So the sources of the administrative
9 records that are used to impute the whole persons
10 are the same records that, you know, would be used
11 to impute citizenship data or other information
12 for item nonresponse?
13    A   Some of the same sources, yes.
14    Q   What are the sources?
15    A   So there's two components to the way it
16 works.  In one part of the system, we use tax
17 returns to build an image of the
18 households -- primarily tax returns and then
19 there's another half a dozen federal
20 administrative records that support that.  By
21 agreement with the IRS, we won't use any of the
22 tax data in an administrative record enumeration.

1    So we then go through and ask, do we have
2 a quality source of each variable in each field of
3 that administrative record enumeration?  And if
4 the answer is yes, then we overwrite any tax data
5 with the internal source.  If we're able to build
6 a -- an administrative record image of an entire
7 household in that system that has no tax data left
8 in it and what is left in it meets the standards
9 for a minimally-complete census form, then that
10 household goes into the administrative
11 record -- the database of potential administrative
12 record enumerations.
13    Q   Are you aware of any information
14 regarding the differential quality of
15 administrative records that would be used for
16 imputations with respect to various subpopulations
17 such as noncitizen?
18    A   Well, I think we documented some of it in
19 the stuff that we've already talked about here.
20 I'm aware of a lot of other work that we've done.
21 Although, most that has to do with our ability to
22 do representative linking of those poor quality

1 subpopulations.  I'm not as aware of the work, but
2 once the linking has been done, what the quality
3 of specific variables, other than things that
4 don't occur on the census.
5    Q   Now I want to ask you a little bit about
6 the sensitivity of the citizenship question.
7    Other than what you discussed in your
8 January 19th memorandum, did the Census Bureau
9 consider any other data or analyses relating to
10 the sensitivity of the citizenship question?
11    A   So there were analyses in the technical
12 paper that we've discussed this morning of other
13 sources.
14    Q   You mean the December 22nd memorandum?
15    A   And subsequent to that and before
16 January 19th.
17    Q   But nothing other than what is contained
18 in those memos that we already discussed today?
19    A   I don't specifically recall all of the
20 things that were in the January -- the December
21 22nd version.  I specifically recall more recent
22 versions, but they're post March 26th, and the

1 date at which I became aware of different
2 subcomponents is the date on which it was prepared
3 in some cases.
4    Myself and others [sic] senior executive
5 staff were monitoring the work of the SWAT team
6 and paying attention to analyses as they were
7 completed and deciding whether that was evidence
8 that we could credibly use in advising the
9 Secretary.
10    Q   Can qualitative research be relevant to
11 identifying potential sensitive questions?
12    A   Yes.
13    Q   What about theoretical work?
14    A   I'm not sure I know what that means.
15    Q   Work that isn't necessarily specifically
16 empirical, but it's, you know, related to theories
17 of about how people work or how people react to
18 things?
19    A   In my world, that means math.  I don't
20 think that's the question you're asking me.
21    Q   No.  I mean social science theory.
22    A   I included that in qualitative research.

1    Q  I see.

2        Is it possible that a question that was

3    somewhat sensitive at one time can become more

4    sensitive at a later time due to changes in the

5    social or political climate?

6        MR. GARDNER:  Objection.  Calls for

7    speculation.

8  BY MR. CHO:

9    Q  You may answer.

10    A  Yes.

11    Q  What's the most recent data you

12    considered in preparing your January 19th memo

13    regarding the sensitivity of the citizenship

14    question?

15    A  We were aware of the qualitative work

16    that was done in the Center for Survey Methods and

17    presented to National Advisory Committee on

18    racial, ethnic and other populations.  We decided

19    not to include that in the memo because that sort

20    of evidence was already being presented from other

21    sources.

22    Q  What do you mean by that?

1    A  The technical response was how to produce

2    a Citizen Voting Age Population by Race and

3    Ethnicity Table from available or

4    potentially-available data assets, and what was

5    the best way to do that.  We did not feel like we

6    had to enumerate all of the considerations that go

7    into the design and conduct of the 2020 census.

8    We needed to highlight the quantifiable components

9    that would be specific to -- to citizenship.  We

10    did not have a good quantification of how that

11    might affect the attitudes or general

12    macroenvironment, as I've been characterizing it.

13    Many of our caveats are related to, we think is

14    become more sensitive.  It appears to have become

15    more sensitive between 2000 and 2010 and 2010 and

16    2016.  Now that's the best quantitative

17    information, but that quantitative information is

18    too weak to draw a trend line with confidence.  We

19    thought that was the best way to summarize the

20    technical information.

21    Q  But none of the data you ended up using

22    in the memorandum post dated 2016; is that right?

1    A  That's right.  We didn't use the --

2    anything from --

3    Q  So if something happened after 2016 that

4    might have made the citizenship more sensitive,

5    that wouldn't be reflected in any of the estimates

6    in your memo?

7    A  Oh.  Yeah.  That's safe to say.

8        MR. FREEDMAN:  Pass the witness.

9        MR. GARDNER:  Can we take a break?

10        MR. CHO:  Yeah.  Let's go off the record.

11        VIDEOGRAPHER:  We are off the record at

12    4:03 p.m.

13        (Off the record.)

14        VIDEOGRAPHER:  The time is 4:26 p.m.

15    This begins Media Unit Number 5.  We're now on the

16    record.

17        Please proceed, Counsel.

18        EXAMINATION BY MR. CASE:

19    Q  Dr. Abowd, my name is Andrew Case.  I'm

20    from the firm of Manatt, Phelps & Phillips.  And

21    we represent the City of San Jose, and the Black

22    Alliance For Just Immigration in one of the

1    California cases.

2        At the end of your examination with

3    Mr. Freedman, you said that you were one of the

4    people who was surprised.  I just want to clarify.

5    What were you surprised by in that question, in

6    reference to that question?

7    A  A few of the -- of the emails that were

8    in the administrative record of the subsequent

9    discovery.

10    Q  And when did you first see those emails?

11    A  The ones in the administrative record the

12    day it was released.

13    Q  You read the administrative record the

14    day it was released?  I don't mean exact date.

15    A  I read parts of the administrative record

16    the day it was released, yes.

17    Q  And had you had any discussions with

18    anyone at Census prior to December 2017 about the

19    White House requesting a citizenship question on

20    the census, the 2020 census?

21    A  No.

22    Q  And had you had any discussions with

Page 278

1 after you sent it to Commerce?

2    A   None that I recall.

3    Q   You mentioned that you had three

4 conversations with Mr. Comstock in the past year

5 and a half.  Is that --

6    A   Three meetings --

7    Q   Three --

8    A   -- in which I can recall that he was

9 present and I was present.

10    Q   And when was the last of those?

11    A   Within the last two months.

12    Q   After this litigation just started?

13    A   Yes.

14    Q   After --

15    A   Only the meeting at which the Secretary

16 was also present where we were discussing the

17 citizenship question.  We were discussing other

18 things and --

19    Q   I understand.

20       But the meeting -- the most recent

21 meeting you had with Comstock was after you

22 received the administrative record in this matter?

Page 279

1    A   To be honest, I can't recall.

2    Q   Was it after you learned that Comstock

3 had written to DOJ to ask them to request a

4 citizenship question?

5    A   I can't recall.

6    Q   Did you bring that up with him when you

7 spoke to him?

8    A   I wasn't speaking to him.  We were in a

9 meeting together, and, mostly, he was asking me

10 questions.

11    Q   Has -- did Mr. Comstock ever mention to

12 you in any of those three meetings that he had

13 reached out to DOJ to ask for the citizenship

14 question to be added?

15    A   He did not.

16    Q   Did Ross, in the meeting you had on

17 February 12th, say that he had requested the

18 citizenship question be added prior to

19 December 2015?

20    A   He did not.

21    Q   Has anyone -- have you spoken to anyone

22 at Commerce or DOJ about the fact that this

Page 280

1 request came from Commerce originally?

2    A   I have not.

3    Q   Had you asked anyone at Census -- have

4 you spoken to anyone at Census that these requests

5 came from Commerce essentially?

6    A   Ron, Enrique and I briefly

7 discussed -- mentioned, whatever you want to call

8 it, the existence of those emails in the

9 administrative record --

10    Q   And what was --

11    A   -- in subsequent discovery.

12    Q   And what did you say?

13    A   All of us were surprised.

14       MR. CASE:  Okay.  I'm going to hand this

15 off.  Thank you.

16       Go off the record.

17       VIDEOGRAPHER:  The time is 5:12 p.m.

18 We're going off the record.

19       (Off the record.)

20       VIDEOGRAPHER:  The time is 5:26 p.m.

21 We're back on the record.

22       Please proceed, Counsel.

Page 281

1       EXAMINATION BY MS. FIDLER:

2    Q   Good afternoon, Dr. Abowd.  My name is

3 Danielle Fidler, and I'm an assistant attorney

4 general with the State of New York here with the

5 State of New York versus the United States

6 Department of Commerce, Docket

7 Number 1:18-CV-2921.

8       I wanted to follow up on the questions

9 about Question 31 that we were just discussing.

10 So we were discussing Question 31 and the

11 differences between your memo, which contained a

12 copy of the questions that, as you understood it,

13 Census had put together and a standalone version

14 that was part of the administrative record that

15 describes not needing to do any testing.

16       Do you know who wrote the revision -- the

17 standalone revision, which as we understand it, is

18 the later in time -- do you know who wrote that

19 version of Question 31 saying testing wasn't

20 necessary?

21    A   I do not.

22    Q   And does that version comport with your

71 (Pages 278 - 281)

Page 282

1  view and Census's view of 31 as you attached it to
2  your March 1st memo?
3      A  So I'm operating on the assumption that
4  the one with Bates number 9822 came from the
5  archival files that I supplied in cooperation with
6  the discovery requests.  In which case, this would
7  have been the last one that I was responsible for
8  collecting content on.
9          Until today, I was unaware of any
10  discrepancy between the one at 1286 and this one.
11  So it's hard for me to address the providence of
12  changes without returning to my own files to see
13  if those changes originated in the Census Bureau.
14  As I said, as far as I know, the one with the
15  Bates number I cited first is the last version I
16  worked on.
17      Q  Sitting here today, is it your view that
18  the version you're just seeing today, would you
19  agree with that or do you think that it reflects
20  the Census Bureau's position today?
21          MR. GARDNER:  Objection.  Calls for
22  speculation.

Page 283

1          THE WITNESS:  I think a correct
2  characterization of the Census Bureau's position
3  today is that the Secretary had the authority to
4  dictate content on the 2020 census, and that the
5  Census Bureau should do its best as a statistical
6  agency to conduct the 2020 census subject to
7  instructions given to us by the Secretary.  It's
8  clear that we did not have the better part of this
9  decade to test that question in the context of
10  2020 census.  That's a matter of fact.
11  BY MS. FIDLER:
12      Q  As of March 1, however, when you
13  submitted the memo, the -- Census Bureau's
14  position on Question 31 is as you described it in
15  the attachment on Exhibit 16/25, correct?
16      A  To the best of my knowledge, that's
17  correct.
18      Q  So at the time the Secretary was making
19  his decision, the Census Bureau's position was as
20  presented in your final memo, correct?
21      A  That's correct.
22      Q  Not to further muddy the waters, but I'd

Page 284

1  like to enter Exhibit 27, which is Bates
2  number 8291.
3          (Plaintiffs' Exhibit 27, 2020 Census:
4  Adding content to the questionnaire, was marked.)
5          MS. FIDLER:  And I apologize, I only have
6  one copy.
7  BY MS. FIDLER:
8      Q  It is yet another sort of version of
9  steps taken on adding content to the
10  questionnaire.
11          Have you seen this document before?
12      A  I don't think I have, no.
13      Q  Is the content at all familiar to you?
14      A  The content looks similar to other
15  content that I have seen about the process that we
16  use for the American Community Survey.
17      Q  Do you have any idea who wrote the
18  document?
19      A  I do not.
20      Q  Or when it was drafted?
21      A  I do not.
22      Q  Okay.  It does state at the top that the

Page 285

1  Census Bureau follows a well-established process
2  when adding questions to the census.
3          Do you recognize the steps -- I mean,
4  they're very similar to what were -- was put into
5  the Question 31, correct, that we've been talking
6  about?
7          MR. GARDNER:  Objection.  Compound.
8          THE WITNESS:  I recognize the steps now.
9  I think they were summarized in our answer to
10  Question 31.
11  BY MS. FIDLER:
12      Q  And so you believe -- do you agree that
13  these steps are a well-established process of the
14  Census Bureau for adding content to the
15  questionnaire?
16          MR. GARDNER:  Objection.  Lack of
17  foundation.  Calls for speculation.
18          THE WITNESS:  To the extent that there
19  exists a well-established process for adding, as
20  opposed to modifying the content on the census
21  questionnaire, this is as good a description of it
22  as we have, and it was summarized in our answers

72 (Pages 282 - 285)

# EXHIBIT 36

Page 1

1             UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF NEW YORK

2

- - - - - - - - - - - - - - -x

3    NEW YORK IMMIGRATION          :

     COALITION, et al.,            :

4                                  :

         Plaintiffs,               :

5                                  :  Case No.

       v.                          :

6                                  :  1:18-CF-05025-JMF

     UNITED STATES DEPARTMENT      :

7    OF COMMERCE, et al.,          :

                                   :

8        Defendants.               :

- - - - - - - - - - - - - - -x

9                                Friday, October 12,2018

                                      Washington, D.C.

10

11

12   Videotaped Deposition of:

13                   JOHN  M. ABOWD, Ph.D.,

14   called for oral examination by counsel for the

15   Plaintiffs, pursuant to notice, at the law offices of

16   Arnold & Porter Kaye Scholer, LLP, 601 Massachusetts

17   Avenue, Northwest, Washington, D.C. 20001-3743,

18   before Christina S. Hotsko, RPR, CRR, of Veritext

19   Legal Solutions, a Notary Public in and for the

20   District of Columbia, beginning at 9:06 a.m., when

21   were present on behalf of the respective parties:

22

Page 2

```
1        A P P E A R A N C E S
2  On behalf of New York Immigration Coalition, CASA de
   Maryland, American-Arab Anti-Discrimination
3  Committee, ADC Research Institute and Make the Road
   New York:
4     JOHN A  FREEDMAN, ESQUIRE
      DAVID GERSCH, ESQUIRE
5     Arnold & Porter Kaye Scholer, LLP
      601 Massachusetts Avenue, Northwest
6     Washington, D C  20001-3743
      (202) 942-5000
7     john freedman@arnoldporter com
8     SARAH BRANNON, ESQUIRE
9     American Civil Liberties Union Foundation
      915 15th Street, Northwest
10    Washington, D C  20005
      (202) 675-2337
11    sbrannon@aclu org
12
   On behalf of the State of New York:
13    ELENA GOLDSTEIN, ESQUIRE
      DANIELLE FIDLER, ESQUIRE
14    State of New York
      Office of the Attorney General
15    Civil Rights Bureau
      28 Liberty Street
16    New York, New York 10005
      (212) 416-6201
17    elena goldstein@ag ny gov
18
   On behalf of the State of California:
19    R  MATTHEW WISE, ESQUIRE
      California Department of Justice
20    Office of the Attorney General
      1300 I Street
21    P O Box 944255
      Sacramento California 94244-2550
22    (916) 210-6046
      matthew wise@doj ca gov
```

Page 4

```
1     A P P E A R A N C E S  C O N T I N U E D
2  On behalf of Defendants:
      CARLOTTA P. WELLS, ESQUIRE
3     U.S. Department of Justice, Civil Division
      20 Massachusetts Avenue, Northwest
4     Washington, D.C. 20530
      (202) 514-4522
5     carlotta.wells@usdoj.gov
6     MILES RYAN, ESQUIRE
      U.S. Department of Commerce
7     U.S. Census Bureau
      Office of the Chief Counsel for Economic
8     Affairs
      Office of the General Counsel
9     4600 Silver Hill Road
      Suitland, Maryland 20746
10    (301) 763-9844
      miles f ryan.iii@census.gov
11
12  Also Present:
      Dan Reidy, Video Technician
13    Kelly Hernandez, Paralegal
14
15
16
17
18
19
20
21
22
```

Page 3

```
1     A P P E A R A N C E S  C O N T I N U E D
2  On behalf of Lupe Plaintiffs:
      NIYATI SHAH, ESQUIRE
3     ERI ANDRIOLA, ESQUIRE
      Asian Americans Advancing Justice
4     1620 L Street, Northwest, Suite 1050
      Washington, D C  20036
5     (202) 296-2300
      nshah@advancingjustice-aajc org
6
7  On behalf of City of San Jose and Black Alliance for
   Just Immigration:
8     DORIAN L  SPENCE, ESQUIRE
      EZRA ROSENBERG, ESQUIRE (Via Telephone)
9     Lawyers Committee for Civil Rights Under Law
      1401 New York Avenue, Northwest, Suite 400
10    Washington, D C  20005
      (202) 662-8324
11    dspence@lawyerscommittee org
      erosenberg@lawyerscommittee org
12
13  On behalf of Kravitz Plaintiffs:
      KARUN A  TILAK, ESQUIRE
14    Covington & Burling, LLP
      One City Center
15    850 Tenth Street, Northwest
      Washington, D C  20001-4956
16    (202) 662-5083
      ktilak@cov com
17
18  On behalf of Los Angeles Unified School District:
      BRYAN J  PARK, ESQUIRE (Via Telephone)
19    Dannis Woliver Kelley
      115 Pine Avenue, Suite 500
20    Long Beach, California 90802
      (562) 366-8500
21    bpark@dwkesq com
22
```

Page 5

```
1        C O N T E N T S
2  EXAMINATION BY:              PAGE
   Counsel for Plaintiffs
3     Mr. Freedman           09
      Mr. Wise               230
4     Mr. Freedman           244
      Ms. Goldstein          306
5
6
7  ABOWD DEPOSITION EXHIBITS:  *      PAGE
8  Exhibit 1   Abowd Expert Disclosure
9              21 Sept 2018
   Exhibit 2   Abowd Expert Disclosure        27
10             3 Oct 2018
11  Exhibit 3   Thompson Expert Report     35
12  Exhibit 4   Habermann Expert Report    44
13  Exhibit 5   Barreto Expert Report      56
14  Exhibit 6   Barreto Rebuttal Report    57
15  Exhibit 7   O'Muircheartaigh Expert Report   104
              and Designation
16
   Exhibit 8   Salvo Expert Rebuttal Report    116
17
   Exhibit 9   O'Hare Expert Report       126
18
   Exhibit 10  July 2013 Statistical Quality    166
19             Standards
20  Exhibit 11  "Understanding the Quality of    204
              Alternative Citizenship Data
21             Sources for the 2020 Census"
              6 Aug 2018
22
```

2 (Pages 2 - 5)

Page 6

1  ABOWD DEPOSITION EXHIBITS:  *            PAGE
2  Exhibit 12  "Quality and the 2010 Census"      222
3
   Exhibit 13  DSSD 2010 Census Coverage      223
4              Measurement Memorandum Series
               2010-G-01 - "Mule Memo"
5
   Exhibit 14  Document Prepared by John Abowd   230
6              and David Brown - 28 Sep 2018
7  Exhibit 15  DSSD 2010 Census Coverage      237
               Measurement Memorandum Series
8              2010-G-04 - 22 May 2012
9  Exhibit 16  DSSD 2010 Decennial Census      267
               Memorandum Series Number J-12
10             7 June 2011
11 Exhibit 17  Coverage of the Hispanic      311
               Population of the United States
12             in the 1970 Census -
               A Methodological Analysis
13
   Exhibit 18  Defendants' Reply Memorandum and  312
14             Opposition to Plaintiffs' Motion
               for Summary Judgment -
15             Federation for American
               Immigration Reform (FAIR) vs.
16             Philip M. Klutznick
17
18
19
20
21      * (Exhibits attached to transcript.)
22

Page 7

1          P R O C E E D I N G S
2      VIDEO TECHNICIAN:  Good morning.  We are
3  going on the record at 9:06 a.m. on Friday,
4  October 12th, 2018.
5      Please note that the microphones are
6  sensitive and may pick up whispering, private
7  conversations, and cellular interference.  Please
8  turn off all cell phones or place them away from
9  the microphones, as they can interfere with the
10 deposition audio.
11     Audio and video recording will continue
12 to take place unless all parties agree to go off
13 the record.
14     This is media unit 1 of the
15 video-recorded deposition of Dr. John Abowd, taken
16 by counsel for the plaintiff, in the matter of the
17 New York Immigration Coalition, et al., versus the
18 United States Department of Commerce, et al.
19     This case is filed in the U.S. District
20 Court for the Southern District of New York.
21     This deposition is being held at the law
22 offices of Arnold & Porter, located at

Page 8

1  601 Massachusetts Avenue, Northwest, Washington,
2  D.C. 20001.
3      My name is Dan Reidy from the firm
4  Veritext Legal Solutions, and I am the
5  videographer.  The court reporter is Christina
6  Hotsko, from the firm Veritext Legal Solutions.
7      I am not authorized to administer an
8  oath, I am not related to any party in this
9  action, nor am I financially interested in the
10 outcome.
11     Counsel and all present in the room and
12 everyone attending remotely will now state their
13 appearances and affiliations for the record.  If
14 there are any objections to proceeding, please
15 state them at the time of your appearance,
16 beginning with the noticing attorney.
17     MR. FREEDMAN:  I believe we've actually
18 already gotten everybody's appearances in, so
19 unless there's any reason to it...
20     VIDEO TECHNICIAN:  Will the court
21 reporter please swear in the witness.
22

Page 9

1  Whereupon,
2      JOHN M. ABOWD, Ph.D.,
3  being first duly sworn or affirmed to testify to
4  the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR
7  THE NEW YORK IMMIGRATION COALITION, ET AL.
8  BY MR. FREEDMAN:
9  Q.  Good morning, Dr. Abowd.
10 A.  Good morning.
11 Q.  We've met before.  I'm John Freedman from
12 Arnold & Porter.  If we could give you frequent
13 testifying miles, I think you would have earned
14 them by now.
15     You understand you're under oath?
16 A.  Yes.
17 Q.  And you've obviously been deposed a
18 couple of times.  Two basic ground rules.  If you
19 don't understand my question, will you tell me and
20 I will try to rephrase?
21 A.  Yes.
22 Q.  And is there any reason you can't testify

3 (Pages 6 - 9)

Page 62

1  with the beliefs of the person who responded in
2  the first place, i.e., who responded to the
3  telephone survey that we're talking about.
4      I disagree with paragraph 22. I will
5  claim expertise in missing data estimation that
6  goes all the way back to the beginning of my
7  career. And Dr. Barreto's characterization of
8  it -- if you want, we can get to the specific
9  paragraphs, but his summary of it in 22 is enough.
10     He doesn't understand the difference
11 between ignorable missing data and missing
12 completely at random, and gives examples of
13 missing completely at random, but that's not the
14 process used to impute missing data in the census.
15     Q. If you could mark that as 8.
16     A. Sorry?
17     Q. Just --
18     A. I marked it as 8, yes.
19     Q. Thanks.
20     A. I disagree with paragraph 44. I think
21 I'm at 9.
22     Q. Yes, you are.

Page 63

1      A. First, it leaves out proxy responses as a
2  possibility. Second, it makes conjectures about
3  the direction of the effect from the imputation
4  that aren't backed up by any statistical evidence.
5      I disagree with paragraph 45. I'm
6  marking it number 10. One of the most important
7  uses of administrative records in the non-response
8  follow-up is the way that they're used to track
9  addresses in the master address file and determine
10 vacant/delete status without a field visit.
11 There's no evidence that that operation has --
12 systematically underrepresents any of the
13 communities discussed in paragraph 45.
14     I acknowledge that administrative records
15 that come from your active interaction with the
16 government clearly have the concerns that he
17 raised. But using them -- using them to keep
18 track of the addresses allows us to focus more of
19 the non-response follow-up effort on the addresses
20 that Postal Service has not been able to
21 successfully deliver mail to but tells us that
22 normally they can deliver mail to that address.

Page 64

1      So that -- that's a particularly
2  important use of administrative records in the
3  non-response follow-up, and it refers to the
4  physical addresses in city style living; it
5  doesn't refer to the characteristics of the
6  households.
7      I disagree with paragraph 47. I'm at 11.
8  I will note that the description of non-ignorable
9  non-response in that paragraph is correct, but the
10 conclusion based on his flawed analysis of
11 household size differences in the survey that he
12 ran. So the conclusion isn't supported by the
13 evidence in the report.
14     Q. And just so the record is clear, you
15 marked that as number 11?
16     A. Yes. I thought I said so. I'm sorry,
17 yes. Yes, I marked as that as number 11.
18     I disagree with paragraph 48. I'm
19 marking it as number 12. It doesn't provide a
20 correct description of the way whole-case census
21 imputation is done. Specifically, it is not done
22 by post-stratification or response rate weighting

Page 65

1  adjustments.
2      I'm going to mark that I disagree with
3  paragraph 49 --
4      Q. Number 12.
5      A. -- as number 13.
6      Q. Oh, number 13, I'm sorry.
7      A. The hot deck method that is used -- that
8  was used for the 2010 census, the hot deck method
9  that will probably be used for the 2020 census --
10 but the actual one hasn't been fully
11 implemented -- do not assume that the data are
12 missing completely at random, but they do make
13 certain ignorability assumptions. And those
14 ignorability assumptions have not been properly
15 characterized in paragraph 49.
16     There's an analysis that starts in
17 paragraph 50 and continues in paragraph 51. It
18 continues basically to flow through the
19 paragraphs, and so they're all -- they're all
20 dependent on the analysis that starts in
21 paragraph 50. So I'll mark my objection to it at
22 paragraph 50. That's number 14.

17 (Pages 62 - 65)

1     There's a very important difference
2 between count imputation and characteristic
3 imputation.  We could argue about the particulars
4 of characteristic imputation, but the basic idea
5 that you have only a few characteristics on which
6 to match and then you're going to inherit the
7 other characteristics after you do the match is
8 correct.  So I'm not taking issue with that.
9     The issue is whether that has a
10 predictable bias on the count imputation.  I don't
11 believe that Dr. Barreto or I have provided any
12 evidence that that imputation method has a
13 predictable bias on the count.
14     I accept the conclusions about the
15 difficulty in getting characteristic imputation
16 right, and I bet -- I'm guessing we're going to
17 get to that later, too.
18     Q.  Probably later in the afternoon.
19     A.  Yes.  Possibly after dinner.
20     MS. WELLS:  I doubt we'll be here that
21 long.
22     THE WITNESS:  So as a consequence, I

1 disagree with the table 1, differences in
2 characteristics of responding and non-responding
3 units.
4 BY MR. FREEDMAN:
5     Q.  That's paragraph 57?
6     A.  That's paragraph 57.  I'm going to mark
7 it with --
8     Q.  We're up to 15.
9     A.  I think I'm at 15.  Yes.  15.
10     As I understand it, table 1 is based on
11 the survey analysis of the survey that he
12 conducted.  And therefore, it is a comparison in
13 that survey of self-responders and
14 non-self-responders, which is not the same thing
15 as a comparison in the census of having a response
16 after both self-response and NRFU have occurred.
17     Secondly, the procedure for weighting and
18 adjusting for representativeness of population
19 estimates in this survey is incompletely
20 documented; and from the documentation that's in
21 the report, it's difficult to determine whether it
22 was done properly.  With a response rate of

1 28 percent, that matters.
2     Q.  Do you know whether Dr. Barreto provided
3 the backup to that calculation?
4     A.  If he did, it wasn't provided to me.
5     Q.  Okay.  Thank you.
6     A.  So paragraph 60 says that this was a
7 national survey of 6,309 respondents.  And
8 paragraph 67 shows the composition of the phone
9 design.  And paragraph 75 reports response rate of
10 28 percent.
11     So I think that the survey was
12 administered to 63,000 -- 6,309 sample units, of
13 whom 28 percent responded.  If it was administered
14 to 6,309 respondents, then the sample plan in
15 paragraph 67 is not a sample plan.
16     I'm marking paragraph 60 as number 16 and
17 the table in paragraph 67 as number 17.
18     At this point, I'd just like to say I
19 don't know enough about the survey design to
20 continue.  It doesn't seem to make sense to
21 speculate.  But it's hard -- it's hard to go from
22 that description of the survey to having

1 confidence in the analysis of it.
2     I had other general analysis criticisms.
3 Some of the numbers reported in the report are not
4 accompanied with margins of error.  Whether those
5 margins of error are properly calculated or not
6 depends upon exactly how the survey design handled
7 non-response.  It had non-response if it had only
8 28 percent respondents.  And I accept that a
9 28 percent response rate is within the range of
10 acceptability for this kind of poll.
11     So I'm not saying that you can't learn
12 anything from a poll this size.  But I am saying
13 that you have to document the methods that you
14 used to generalize to the populations that he
15 tried to generalize to, and the sample plan
16 documentation is inadequate.
17     Q.  Okay.  And I should ask you, were you
18 given any of Dr. Barreto's backup to his survey,
19 either in the plan or backup to these tables?
20     A.  The only things that I have seen are his
21 reports.
22     Q.  Okay.

Page 170

1 maybe we should ask some more hypotheticals just
2 to sort of make sure I understand how you
3 understand it performs adequately.
4        So I want you to assume that you have a
5 question on a survey, and on the paper version of
6 the survey twice as many people from a particular
7 demographic subgroup, let's say Hispanics, skip
8 the question as individuals from another
9 demographic subgroup, non-Hispanic whites, and
10 that finding was statistically significant.
11        Would that be consistent with a
12 conclusion that a question is performing
13 adequately on that survey?
14        MS. WELLS:  Object to form.
15        THE WITNESS:  Yes.
16 BY MR. FREEDMAN:
17    Q.  It's consistent with -- you've got a --
18 twice as many Hispanics skip the question as
19 whites.  Is that consistent with performing
20 adequately?
21    A.  Yes.
22    Q.  Okay.  I want you to assume that you ask

Page 171

1 a question on an internet survey, and the
2 para-data shows that nine times as many people
3 from a particular demographic subgoup,
4 Hispanics --
5    A.  How many times?
6    Q.  Nine times.
7    A.  Okay.
8    Q.  -- stopped doing the survey, broke off,
9 as whites, and that finding was statistically
10 significant.
11        Would that be consistent with a
12 conclusion that a question is performing
13 adequately in that survey?
14    A.  Yes.
15    Q.  Okay.  I want you to assume you ask a
16 question on a survey and the analysis found -- you
17 had an analysis that showed that 5.8 percent of
18 people from a particular demographic subgroup,
19 non-citizens, refused to participate in the survey
20 altogether, compared to another demographic
21 subgroup, citizens.
22        Would that be consistent with a

Page 172

1 conclusion that the question is performing
2 adequately on that survey?
3    A.  It could be.  My answers are based on the
4 general standard for questions, which is that they
5 perform well in the overall population.  So many
6 questions are known to have difficulties in
7 certain subpopulations.  And, as an agency, we're
8 required to address them to the best of our
9 ability.
10        It was not known, until we started doing
11 this research, the degree to which the citizenship
12 question did not perform well for identifiable but
13 not majority subpopulations in the ACS.
14        In my view, that obligates us to begin to
15 investigate corrective action for the American
16 Community Survey, and that happened just as soon
17 as this research was produced.
18        Similar research has been ongoing for
19 more than a decade because we have better sources
20 of income for large swaths of the population, but
21 we can't figure out an alternative to certain
22 components of the income question other than to

Page 173

1 use survey, even though we know the survey numbers
2 don't match up well with aggregate statistics.
3        So the survey can be deemed to be
4 functioning adequately as long as, in general,
5 meaning for the overall population, it delivers
6 reliable estimates and you don't have an
7 alternative to addressing problems.  But when you
8 have a variable like income or a variable like
9 citizenship that you have identified as having
10 specific problems and you develop an alternative,
11 then you're obligated to figure out a way to
12 engineer those into the information product so as
13 to improve it.
14        Publishing the research is our way of
15 disclosing that we are aware that there are
16 problems with that question.  Engineering a
17 solution can take a while.
18    Q.  You mentioned that following the analysis
19 I've been alluding to in my hypotheticals there
20 was -- the Census Bureau undertook to investigate
21 a corrective action.
22        Could you describe those efforts?

44 (Pages 170 - 173)

Page 174

1 Corrective action to the ACS.
2     A. So Dr. Velkoff, Victoria Velkoff, Tori
3 Velkoff, was sitting there, I was sitting here,
4 and she was going over and said, we didn't know
5 this. This is problematic. We're going to need
6 to figure out how to address this.
7         And now, the in-place content adjustment
8 process for the American Community Survey can be
9 invoked. As you might imagine, we are busier on
10 the 2020 census right now, so the content -- the
11 next content evaluation for the American Community
12 Survey isn't scheduled to start until after the
13 2020 census starts. But this is already on the
14 list of things to analyze to decide how to address
15 the issue of mismatch between the responses on the
16 survey and the administrative record.
17     Q. So the Census Bureau has on its agenda
18 for the next round of corrections -- corrections
19 is the wrong word -- for the next round of --
20     A. Content review.
21     Q. -- content --
22     A. Content is what we call it.

Page 175

1     Q. -- content review for the ACS the
2 citizenship question, to see whether the question
3 should be used in its current form or whether
4 adjustments should be made?
5     A. Yes.
6     Q. What preparatory steps have been taken
7 towards conducting that examination?
8     A. So I've testified about this before, too.
9 Acting Director Jarmin and Deputy Director Lamas
10 have convened an internal expert panel that I
11 chair that is specifically charged, for the
12 2020 census, with developing protocols for the
13 processing of the citizenship question, the
14 combining of the citizenship question with
15 administrative records, and the publication
16 standards for those things that do that, the first
17 of them being a CVAP table by block.
18         It is also charged with developing draft
19 standards for the way in which administrative
20 record data will be documented and incorporated in
21 information products that are used -- blended with
22 surveys.

Page 176

1     Q. My question was specifically around what
2 the process is -- or what steps have been taken
3 about examining the -- the ACS citizenship
4 question.
5     A. So Tori Velkoff is on that internal
6 expert panel, along with demographers who are
7 extremely familiar with the American Community
8 Survey, who developed the coding protocols for the
9 citizenship variable on the American Community
10 Survey, and who can inform the discussion of how
11 the survey responses and the administrative record
12 responses can be used and whether one or the other
13 should be relied on exclusively in the future.
14         This is the way we develop alternatives.
15 Part of that content review process would have
16 been, and will be, to have the users of the
17 various products continue to document their -- the
18 basis for their use. A primary client of the
19 citizenship data is the Department of Justice. So
20 they're already supplying input to us. They're
21 supplying input to us because we requested it in
22 the development of the PL94171 data. But they

Page 177

1 also understand that that input informs the way
2 that the citizenship data will be used to prepare
3 a new CVAP.
4         So the -- the process of acquiring the
5 information from the client agency is already
6 underway as well.
7         MR. FREEDMAN: We've been going a little
8 bit -- maybe a little bit more than an hour. Why
9 don't we take a break.
10         THE WITNESS: Sure.
11         VIDEO TECHNICIAN: This concludes media
12 unit number 3. The time on the video is 2:30 p.m.
13 We are off the record.
14         (A recess was taken.)
15         VIDEO TECHNICIAN: This begins media unit
16 number 4. The time on the video is 2:49 p.m. We
17 are on the record.
18 BY MR. FREEDMAN:
19     Q. Dr. Abowd, I want to -- just a few
20 follow-ups from what we were discussing before the
21 break.
22         When is the Census Bureau planning on

45 (Pages 174 - 177)

1 submitting the package to OMB?

2     A.  So the last time we discussed it, there

3 would be an October submission.  And that was the

4 first time I learned that it was only going to be

5 for the address canvassing.  So I don't know the

6 answer to the planning for the questionnaire

7 itself.

8     Q.  Okay.  Is it safe to say it will be after

9 October?

10     A.  Yes.

11     Q.  Okay.  And I just want to make sure I

12 understand the sequence of events that we were

13 discussing before the break.

14        So is it fair to say that in conjunction

15 with the work that the Census Bureau was doing to

16 evaluate the Justice Department's request, you did

17 analysis -- the SWOT team did analysis that, among

18 other things, showed that non-citizens were

19 providing an inaccurate response to the

20 citizenship question on the ACS 30 --

21 approximately 30 percent of the time?

22     A.  There was a disagreement between the

1 survey response and the administrative record

2 between 30 and 37 percent of the time.  Yes.

3     Q.  And that was something the Census Bureau

4 had not been aware of prior to doing that -- that

5 examination, correct?

6     A.  That's correct.

7     Q.  And as a result of that, when the next

8 ACS content review takes place, there will be a

9 review of the citizenship question and how it's

10 performing on the ACS survey, correct?

11     A.  I believe that's correct.  What I was

12 trying to explain is that there is a process

13 change going on now inside the Census Bureau.  It

14 would certainly be a part of that content review.

15 But we are attempting to develop internal

16 standards for deciding how to tabulate -- and the

17 citizenship question is going to come up first --

18 variables that we have reliable administrative

19 data on that we have historically asked on

20 surveys.

21        So that's -- that's not just about the

22 American Community Survey.  That's about the

1 information products that we produce that are

2 related to --

3     Q.  So there's generally a process going on

4 to look at situations where there's a disagreement

5 between administrative data and survey responses;

6 is that what you just --

7     A.  There's an ongoing large-scale effort at

8 the Census Bureau and, in particular, inside the

9 American Community Survey, to begin integrating

10 administrative data into the products that come

11 out of the American Community Survey on a much

12 larger-scale basis.  Most of the research over the

13 last decade has focused on the income questions

14 for, I think, a variety of very good reasons.

15        Because we have already produced this

16 research for the citizenship question, it's now

17 farther along in the process than it would have

18 been otherwise.  And it turns out to be a more

19 straightforward analysis for a single question

20 than it is for a battery of questions like the way

21 we measure income.

22     Q.  Is it fair to say, as part of this

1 content review, the Census Bureau may adjust,

2 change, the wording of the citizenship question on

3 the ACS instrument?

4     A.  It's fair to say that the content review

5 will entertain lots of possibilities for the

6 citizenship question, including changing of

7 wording.

8     Q.  Is it fair to say that the -- as -- one

9 possible result of this process is that the

10 citizenship question could be removed from the

11 ACS?

12     A.  Yes.

13     Q.  And what is the timing for when that

14 review is supposed to be conducted?

15     A.  So the formal review process, as

16 described in the many documents that we've

17 discussed in litigation, was scheduled to start in

18 2021.  But that's -- on the American Community

19 Survey's timetable, that means it's sitting on a

20 plan for 2021.  It doesn't mean that there's an

21 appropriation that's already been -- that is when

22 we are planning to start the next round of content

46 (Pages 178 - 181)

Page 182

1 review.

2    Q. So one year after the 2020 census is
3 conducted, the plan is to conduct the content
4 review for the ACS, including the citizenship
5 question?

6    A. To begin the content review. In fiscal
7 '21.

8    Q. Okay. And I may have asked this earlier,
9 in which case I apologize: Does the content
10 review look at every question, or is it looking --

11    A. Yes.

12    Q. It's going to look at every question?

13    A. We've done two, and they did look at
14 every question.

15    Q. Okay. Is there -- does the Census Bureau
16 have a -- have a view as to whether the
17 citizenship question is adequately performing on
18 the ACS?

19       MS. WELLS: Object to the form.

20       THE WITNESS: I don't know how to answer
21 that question.

22       (Conference call interruption.)

Page 183

1       THE WITNESS: Testifying as the 30(b)(6)
2 witness, the correct answer would be the Census
3 Bureau now acknowledges that there's a problem
4 with the citizenship question on the American
5 Community Survey but does not have a consensus
6 view of what to do with it.

7 BY MR. FREEDMAN:

8    Q. Thank --

9    A. Do about it.

10    Q. Thank you. Let's -- if you could turn to
11 Exhibit 1, page 3. I want to talk about some of
12 your other key conclusions.

13       So your first key conclusion starts, "The
14 Census Bureau produced credible quantitative
15 evidence that the addition of a citizenship
16 question to the 2020 census could be expected to
17 lower the self-response rate in an identifiable
18 and large subpopulation -- households that may
19 contain non-citizens."

20       Is that your opinion?

21    A. Yes.

22    Q. What are the facts or data that you

Page 184

1 considered in reaching that opinion? And if
2 they're summarized somewhere in the report, you
3 can point me to where they are in the report.

4    A. They are summarized in the following
5 section, and they largely appear in the technical
6 paper by Ron, et al., that was put in the
7 administrative -- in the discovery record.

8    Q. So if you look at section II of your
9 report, the same page, a little bit further down,
10 the third full paragraph, you cite three documents
11 that we spent a lot of time discussing with you in
12 other sessions, the two administrative record
13 references and the Bates number which I'll
14 represent is the Brown paper.

15    A. It is.

16    Q. Are those the sources that you
17 considered -- primary sources that you considered
18 in reaching this opinion?

19    A. They are the primary sources. Yes.

20    Q. Okay. If I could ask you to turn to
21 page 17 of your report. I want to ask you about
22 the 19 -- the RCT that's discussed in the bottom

Page 185

1 paragraph.

2    A. Yes. Okay.

3    Q. Could you just describe what -- well,
4 first, so our record is clear, what does RCT stand
5 for?

6    A. Randomized controlled trial. I see that
7 I didn't abbreviate it after the first time.

8    Q. What -- what did this -- the RCT you're
9 discussing in this paragraph, what did it study?

10    A. Following the 1990 census, there was a
11 concern that the mail-back rate had declined
12 considerably from the 1980 census. And so a
13 content test was designed to see if various
14 alternative ways of getting the core census
15 information, the short-form information, might
16 work better.

17       I don't recall all of the panels of that
18 content test from memory, but I'm pretty sure I
19 put the memo that described it into the record.

20       Two of the panels in that test were a
21 greatly abbreviated short form, didn't even
22 contain questions about date of birth, versus the

47 (Pages 182 - 185)

Page 286

1  get invited into the home to do a detailed
2  interview and establish a trusted relationship
3  with a member of the household, you can get a much
4  more complete description of the household.
5      And most of the ones that I remember
6  reading about described households that were
7  hiding individuals from the census taker and
8  possibly didn't understand the difference between
9  a census taker and an immigration enforcement
10  until there was a long discussion with this
11  trusted person.
12      I recall, but I -- this is -- I'm really
13  drawing on deep memory here.  I believe that we've
14  tried to use both ethnographers who regularly work
15  for us and ones outside.  Because they're
16  interviewing census cases, they have to be sworn
17  employees.  But we generally allow them to publish
18  the monograph of that ethnography without --
19  essentially without identifying specifically
20  enough where the household was -- or the
21  households were they visited.
22      So that's -- that's the kind of

Page 287

1  qualitative information that we have done after
2  many censuses, I know after all the recent ones,
3  to try to get a better idea in the hard-to-count
4  populations of what the issues were.
5      Q.  So the one acronym you used that I'm not
6  familiar with R&M.
7      A.  Oh, research and methodology.  That's the
8  directorate that I'm in charge of.  Sorry.
9      Q.  And who's the individual you were
10  referring to who just retired?
11      A.  Patricia Suerte.  I'm not sure I can
12  spell the last name, but I could correct it when
13  the transcript comes through.
14      Q.  Okay.  Shifting gears, if you want to go
15  back to your report, Exhibit -- I'm sorry, page 3,
16  Exhibit 1.  I want to ask just one more series of
17  questions about conclusion 2.
18      So with regard to the first sentence of
19  conclusion 2, why hasn't the Census Bureau
20  conducted a study to see if there's credible
21  quantitative evidence that the addition of a
22  citizenship question in the 2020 census would

Page 288

1  increase the net undercount or increase
2  differential net undercounts for identifiable
3  subpopulations?
4      MS. WELLS:  Object to the form.
5      THE WITNESS:  Because we believe the
6  qualitative analysis that we've already produced
7  is sufficient to justify our recommendation not to
8  ask the question.
9  BY MR. FREEDMAN:
10      Q.  Has anybody within the Census Bureau
11  proposed doing that additional analysis to produce
12  credible qualitative evidence that the addition of
13  a citizenship question in the 2020 census will
14  increase the net undercount or increase the
15  differential net undercounts for identifiable
16  subpopulations?
17      A.  Yes.
18      Q.  Who?
19      A.  Me.
20      Q.  And what happened?
21      A.  Well, I had to do a feasibility study by
22  discussing it with the experts and determining

Page 289

1  whether they had artifacts that might be useful
2  for that or, if not, whether the methods that we
3  are experienced in implementing for dual system
4  estimation could be used for that.
5      I consulted internal experts, including
6  the person I consider to be the world's biggest
7  expert on this, and they didn't think that we
8  could do it.
9      Q.  Is that still an open question, whether
10  you can do it?
11      A.  It's not an open question as to whether I
12  should devote staff research time to doing it.
13  I'd say it's an open question as to whether the
14  coverage measurement program could be used for
15  that purpose.  Yes.
16      Q.  So whose decision was it not to undertake
17  any analysis to see if the --
18      A.  So we don't make decisions like that,
19  like chain of command on things like that.  It was
20  within my scope of authority to assemble the team
21  to do that.  I would have had to pull most of them
22  off their current 2020 operations and divert them

73 (Pages 286 - 289)

Page 290

1 from other research projects that are directly
2 related to other interests.
3       And as I've said, we didn't believe that
4 credible quantitative information about net
5 undercounts was necessary for our recommendation
6 to the Secretary or to defend our current
7 mitigation.
8       All of the components are going to be
9 affected. And they could drive the net
10 undercounts way up or they could drive them way
11 down. And I wish that I had a better assessment
12 of that, but it is my expert opinion that the
13 resources required to do that are better deployed
14 in making the 2020 census work.
15    Q. In terms of the OMB clearance package,
16 who is responsible for approving the package to
17 send to OMB at the Census Bureau?
18    A. So the responsibility for preparing it
19 lies with the program area that wants to do the
20 activity. So the responsibility for preparing it
21 lies with the associate director for decennial
22 census.

Page 291

1       The responsibility --
2    Q. Is that Mr. Fontenot?
3    A. Yes, it is. Sorry. Al Fontenot.
4       The responsibility for then ensuring that
5 it is in the proper OMB format and delivering it
6 to OMB and then officially interacting with OMB,
7 awaiting the return -- well, in fact, OM -- the
8 Office of Chief Statistician doesn't hesitate to
9 make direct calls to the people involved. So the
10 communication channels would go directly to the
11 people who prepared it. But it's actually sent by
12 the policy coordination office.
13    Q. Okay. Does Department of Commerce
14 approve -- have to approve the package before it
15 actually goes to OMB?
16    A. I don't think so. I don't -- I don't
17 think so. I don't actually know. Only a few have
18 originated inside R&M since I became the chief
19 scientist, so I know the approval form gets to me.
20 I noticed that the deputy director and the
21 director were on it before it was routed over to
22 policy, but I don't actually know whether -- I

Page 292

1 don't remember whether -- the next one on it would
2 have been the Under Secretary. I don't think so,
3 but I don't know.
4    Q. Okay. Back on page 3. The last sentence
5 of paragraph 1, "Therefore, the Census Bureau can
6 and will make appropriate adjustments to various
7 components of the 2020 census, including NRFU and
8 the Integrated Partnership and Communications
9 Program to mitigate these effects."
10       You used the phrase "appropriate
11 adjustments." What do you mean by "appropriate"?
12    A. So our understanding of our instructions
13 from the Secretary are to put the question on the
14 census -- and we have done that -- and to operate
15 within the design of the 2020 census to ensure
16 that we get as accurate a count as that design
17 will permit.
18       So since we have identified reduced
19 self-response rates as the primary driver of the
20 quality differences that the inclusion of the
21 question is likely to cause, the question is, is
22 there a mechanism within NRFU to ensure that

Page 293

1 households that don't self-respond will get
2 counted?
3       I describe the NRFU process so that you
4 could understand why it is we think that the
5 census was designed to capture them.
6       The main reason why I think that is that
7 increased non-self -- reduced self-response --
8 I'll keep all the negatives out -- has been an
9 increasing problem that our non-response follow-up
10 systems have had to address and improve
11 continuously. And our analysis of the 2010 census
12 has helped us -- if you look at one of the
13 documents that I referenced, the -- the
14 operational plan for NRFU, there's a comparison of
15 the NRFU operations from 2010 to the NRFU
16 operations from 2020.
17       The NRFU operations -- I'll characterize
18 them for you. The NRFU operations from 2010 were
19 a relatively hastily reconstructed version of the
20 NRFU operations from 2000, because there were
21 difficulties in the non-response follow-up of the
22 dress rehearsal that were directly related to

74 (Pages 290 - 293)

# EXHIBIT 37

Page 1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
2
3    ROBYN KRAVITZ, et al.,   ) Civil Action No.
                              ) 8:18-cv-01041-GJH
4            Plaintiffs,      )
                              ) Hon. George J. Hazel
5    vs.                      )
                              )
6    U.S DEPARTMENT OF        )
     COMMERCE, et al.,        )
7                             )
             Defendants.      )
8    _____)
                              )
9    LA UNION DEL PUEBLO      ) Civil Action No.
     ENTERO; et al.,          ) 8:18-cv-01570-GJH
10                            )
             Plaintiffs,      ) Hon. George J. Hazel
11                            )
     vs.                      )
12                            )
     WILBUR L. ROSS, sued in  )
13   his official capacity as )
     U.S. Secretary of        )
14   Commerce, et al.,        )
                              )
15           Defendants.      )
16
17          VIDEOTAPED DEPOSITION OF A. MARK NEUMAN
18               Taken on behalf of Plaintiffs
19                    October 28, 2018
20       (Starting time of the deposition:  12:22 p.m.)
21
22                  Veritext Legal Solutions
                     Mid-Atlantic Region
                   1250 Eye Street NW - Suite 350
23                 Washington, D.C.  20005
24
25

Page 2

1              I N D E X   O F   E X A M I N A T I O N
2
3                                                        Page
4    Questions by Mr. Duraiswamy ....................   8
5
6    INDEX  OF  EXHIBITS
7    EXHIBIT       DESCRIPTION                          PAGE
8    For the Defendant:
9    Exhibit 1   Washington Post Article                86
     Exhibit 2   Excerpts of Draft of Executive Order   86
10   Exhibit 3   Document Excerpt                        86
     Exhibit 4   Ross Calendar Excerpts                 174
11   Exhibit 5   E-Mail                                 186
     Exhibit 6   LULAC Link                             197
12   Exhibit 7   E-Mail                                 107
     Exhibit 8   E-Mail Exchange                        200
13   Exhibit 9   Summary of Supreme Court Cases         208
     Exhibit 10  E-Mail Exchange                        211
14   Exhibit 11  E-Mail Exchange                        221
     Exhibit 12  E-Mail Exchange                        231
15   Exhibit 13  E-Mail                                 237
     Exhibit 14  E-Mail                                 241
16   Exhibit 15  Compilation of Documents               260
     Exhibit 16  E-Mail Exchange                        267
17   Exhibit 17  E-Mail Exchange                        272
     Exhibit 18  Draft of Letter                        278
18   Exhibit 19  Document Subpoena                      285
     Exhibit 20  E-Mail Exchange                        309
19   Exhibit 21  Call Agenda                            309
     Exhibit 22  E-Mail                                 309
20   Exhibit 23  July 28, 2017 Presentation             337
     Exhibit 24  Memo                                   338
21
            (The original exhibits were retained by the
22   court reporter, to be attached to Mr. Duraiswamy's
     transcript.)
23
24
25

Page 3

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
2
3   ROBYN KRAVITZ, et al.,  ) Civil Action No.
                            ) 8:18-cv-01041-GJH
4          Plaintiffs,      )
                            ) Hon. George J. Hazel
5   vs.                     )
                            )
6   U.S DEPARTMENT OF       )
    COMMERCE, et al.,       )
7                           )
           Defendants.      )
8   _____)
                            )
9   LA UNION DEL PUEBLO     ) Civil Action No.
    ENTERO; et al.,         ) 8:18-cv-01570-GJH
10                          )
           Plaintiffs,      ) Hon. George J. Hazel
11                          )
    vs.                     )
12                          )
    WILBUR L. ROSS, sued in )
13  his official capacity as)
    U.S. Secretary of       )
14  Commerce, et al.,       )
                            )
15         Defendants.      )
16
17          DEPOSITION OF WITNESS, A. MARK NEUMAN,
18  produced, sworn, and examined on the 28th day of
19  October, 2018, between the hours of nine o'clock in
20  the forenoon and six o'clock in the evening of that
21  day, at the offices of Feldman, Wasser, Draper & Cox,
22  1307 South Seventh Street, Springfield, Illinois
23  62705, before BRENDA ORSBORN, a Certified Shorthand
24  Reporter within and for the State of Illinois, in a
25  certain cause now pending before United States

Page 4

1    District Court for the District of Maryland, wherein

2    Robyn Kravitz, et al. are the Plaintiffs and U. S.

3    Department of Commerce, et al. are the Defendants, and

4    La Union Del Pueblo Entero, et al. are the Plaintiffs

5    and Wilbur L. Ross, in his official capacity as U.S.

6    Secretary of Commerce, et al. are the Defendants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 A P P E A R A N C E S
 2           For the Plaintiffs:
 3           Mr. Shankar Duraiswamy
             Covington & Burling LLP
 4           850 Tenth Street, NW
             Washington, D.C
 5           (202) 622-5273
             sduraiswamy@cov.com
 6
 7
 8           For Los Angeles Unified School District:
 9           Mr. Keith A. Yeomans (via phone)
             Dannis Woliver Kelley
10           115 Pine Street, Suite 500
             Long Beach, California 90802
11           (562) 366-8500
             kyeomans@DWKesq.com
12
13           For the County of Los Angeles:
14           Mr. David I. Holtzman (via phone)
             Holland & Knight LLP
15           50 California Street, Suite 2800
             San Francisco, California 94111
16           (415) 743-6909
             david.holtzman@hklaw.com
17
18
             For La Union del Pueblo Entero:
19
             Ms. Julia A. Gomez (via phone)
20           MALDEF
             634 South Spring Street, 11th Floor
21           Los Angeles, CA 90014
             (213) 629-2512, Ext. 109
22           jgomez@maldef.org
23
24
25
```

Page 6

```
 1          APPEARANCES CONTINUED:
 2          For the State of California:
 3          Ms. Gabrielle D. Boutin
            Office of the Attorney General
 4          of the State of California
            1300 I Street, Suite 125
 5          Sacramento, California 94244
            gabrielle.boutin@doj.ca.gov
 6
 7          For the State of New York:
 8          Mr. Alex Finkelstein
            Volunteer Assistant Attorney General
 9          Civil Rights Bureau
            Office of the NYS Attorney General
10          28 Liberty Street, 20th Floor
            New York, New York 10005
11          (212) 416-6129
            alex.finkelstein@ag.ny.gov
12
13          For the New York Immigration Coalition:
14          Ms. Sarah E. Brannon
            ACLU Foundation 915
15          15th Street NW
            Washington, D.C. 20005
16          (212) 549-2500
            sbrannon@aclu.org
17
18          For the Defendant United States:
19          Mr. Brad P. Rosenberg
            U.S. Department of Justice
20          Civil Division, Federal Program Branch
            1100 L Street, N.W.
21          Washington, D.C. 20005
            (202) 514-3374
22          brad.rosenberg@usdoj.gov
23
24
25
```

1           MR. FELDMAN:  And by "this," he's

2      referencing Exhibit 2.

3           A.   Exhibit 2, yeah.  May I point out something

4      about --

5           MR. FELDMAN:  No.

6           THE WITNESS:  Okay.

7           Q.   (By Mr. Duraiswamy) Is there something that

8      you would like to point out about the memo?

9           MR. FELDMAN:  Now you can point it out.

10          A.   On Page 7 you say -- it says, "The director

11     of the U.S. Census Bureau shall include questions to

12     determine U.S. citizenship and immigration status on

13     the long-form questionnaire in the decennial census."

14     This is clearly written by someone who isn't talking

15     to anyone who knows something about the census,

16     because there is no long form.  It was eliminated in

17     2000.

18          Q.   (By Mr. Duraiswamy) You testified earlier

19     that Mr. Hoffler had indicated to you that after the

20     ACS census CEDCaP data was no longer available at the

21     block level; is that right?

22          A.   Correct.

23          Q.   Did he suggest to you that prior to the ACS,

24     while the long-form questionnaire was in effect, that

25     citizenship data was available at the block level?

1      A.    That was the whole point of a one in six

2  household sample, is one in six gives you block level

3  data confidence that one in forty-three does not give

4  you.

5      Q.    Are you confident of that, that during the

6  period in which --

7      A.    That's my understanding.

8      Q.    Okay.

9            MR. ROSENBERG:  Objection, form.

10     Q.    (By Mr. Duraiswamy) Just to clean that up.

11 It's your understanding that while the long-form

12 questionnaire was in place, citizenship data was

13 available at the census block level and not just at

14 the census block group level?

15     A.    That's my understanding.

16     Q.    And is that based -- that understanding

17 based on your conversations with Mr. Hoffler or

18 anything else?

19     A.    No, it's based on my experience with the

20 census as chairman of the monitoring board, as member

21 of the executive staff and as a chairman of the 2010

22 Advisory Committee.

23     Q.    Okay.  So we've talked about the transition.

24 I want to now talk about the post-transition period.

25 Can you identify everyone at the Department of Justice

1   with whom you have communicated about the possible

2   addition of a citizenship or immigration question to

3   the 2020 census?

4        A.   That would be one person, John Gore.

5        Q.   Have you spoken to anyone at the Department

6   of Justice about the inclusion of noncitizens or

7   undocumented immigrants in the population count for

8   reapportionment?

9        A.   No.

10        Q.   Have you spoken to anyone at the Department

11   of Justice about the inclusion of non-citizens or

12   undocumented immigrants in the population count for

13   state level redistricting?

14        A.   No.  See, we're talking about people --

15             MR. FELDMAN:  Just answer his questions.

16        A.   I'm -- I'm assuming you're asking me about

17   people other than John Gore when you say "talked to

18   people at the Department of Justice."  Because John

19   Gore in the only person at the Justice Department I've

20   ever talked to.

21        Q.   (By Mr. Duraiswamy) No, I appreciate that

22   clarification, and I encourage you to let him clarify

23   his testimony, because I --

24             MR. FELDMAN:  That's -- well, I -- why don't

25   you ask -- you had said, and I think he recognized --

1    he realized, you had said "anybody," but he had said

2    "John Gore."  If you want to ask both questions with

3    regard to John Gore.

4         Q.    (By Mr. Duraiswamy) Okay.  So have you

5    discussed with John Gore the inclusion of non-citizens

6    or undocumented immigrants in the population counts

7    for reapportionment?

8         A.    I believe that I went over the thing that I

9    go over with everyone, the Constitution requires us to

10   count everyone regardless of citizenship.

11        Q.    But I -- you said that before.  I'm trying

12   to understand.  There -- there are two ideas.  Right?

13   One is whether you count everyone as part of the

14   census, and another is of the people that you have

15   counted, who do you include in the population count

16   for each state when determining the apportionment of

17   Congressional seats to each state.  Does that

18   distinction make sense to you as I've articulated it?

19        A.    Well, to me there's only one set of counts.

20   That's the population count.  I've never had any

21   discussions about trying to split that up.

22        Q.    But, conceptually, you understand the

23   difference that I'm drawing, right?

24        A.    I understand other people may have a

25   different view.  My view is you count all the

1   didn't discuss the census with anyone at DOJ.

2        Q.   Okay.  But you did discuss residency rules

3   with John Gore?

4        A.   I'm not sure that I did, but I could have.

5        Q.   Did you discuss the issue of whether states

6   can exclude citizen -- strike that.

7             Did you discuss the issue of whether states

8   can exclude non-citizens from their population counts

9   when attempting to draw districts of equal population

10  with anyone at the Department of Justice --

11       A.   No.

12       Q.   -- since the transition?

13       A.   No.

14       Q.   Have you discussed that issue with anyone,

15  period, since the transition?

16       A.   I'm sure theoretically with reporters --

17       Q.   Have you --

18       A.   -- who would have asked me about it.

19       Q.   Have you discussed it with anyone in the

20  government or associated in any way with the

21  administration?

22       A.   Only in the context of saying that this

23  is -- that other people are, you know, read an article

24  like this.  Other people talk about this.  So, again,

25  I know what I talk about, which is that you have to

Page 110

1    count everyone, and you can't subtract anyone from the

2    count.

3        Q.   Do you have an understanding of whether

4    there are -- well, strike that.

5             When was your conversation with John Gore

6    about a citizenship question?

7        A.   It would have been after the summer, but

8    well before the winter.

9             MR. FELDMAN:  The summer of what year?  '17?

10       A.   2017.

11       Q.   (By Mr. Duraiswamy) How many conversations

12   about that issue did you have with him?

13       A.   We -- we met one time.

14       Q.   Where did you meet?

15       A.   At a -- not at the -- not at a government

16   building.  We met for coffee near -- near -- probably

17   we met like in the cafe around the -- around his

18   office.

19       Q.   Could it have been in October of 2017?

20       A.   Yeah, it could have been.

21       Q.   Was anyone else present?

22       A.   No one else was present.

23       Q.   How did that meeting come about?

24             MR. ROSENBERG:  I'm going to object.  I just

25   want to caution the witness that there's potential

```
 1              MR. ROSENBERG:  It may not --

 2              MR. DURAISWAMY:  No, no.  That -- that's an

 3    improper objection.

 4              MR. ROSENBERG:  No.

 5              MR. DURAISWAMY:  What's misleading about the

 6    question?

 7              MR. ROSENBERG:  It's -- so we don't know

 8    necessarily from these date -- time stamps whether

 9    there might be different time zones involved in this

10    e-mail.

11              MR. DURAISWAMY:  Do you -- what was my

12    question?

13              MR. ROSENBERG:  I made my objection.

14         Q.   (By Mr. Duraiswamy) Have you ever been on

15    the phone with Mr. Davidson for four hours?

16         A.   I don't recall.

17         Q.   How long were -- were your typical phone

18    calls with him about census issues?

19         A.   I don't recall how long they would go.

20         Q.   You don't recall anything about how long

21    your phone calls were with him?

22         A.   No.

23         Q.   Do you recall if they were -- it's possible

24    that they were 14 hours in length?

25         A.   I'm sure that I never talked him for 14
```

Page 278

1    hours.

2        Q.    Okay.  Do you remember that when we started

3    this deposition, we talked about the fact that if you

4    say that you don't recall something, when, in fact,

5    you do recall it, that that's false testimony?  Do you

6    remember that we talked about that --

7        A.    Yes.

8        Q.    -- at the outset?  Okay.  What do you recall

9    about the length of the phone calls or conversations

10   that you had with Mr. Davidson about the census over

11   the last couple of years?

12       A.    I recall that I had some.

13       Q.    And you have no recollection about how long

14   those calls were or those interactions were?

15       A.    Well, you said -- you asked me if I was --

16   talked to him for four hours.  I don't recall talking

17   to anyone for hour hours in one phone call.

18       Q.    No.  I'm asking you now approximately how

19   long were the interactions that you had with him

20   regarding the census.  Can you give me a range?

21       A.    I -- I don't know.  I don't recall how long

22   they were.

23              [Marked Exhibit No. 18.]

24       Q.    Handing you what we've marked as Exhibit 18.

25   We've got one copy for you guys.  Take a minute to

1   review this document and let me know if you've seen it

2   before.

3          A.   I have seen it before.

4          Q.   When did you see it?

5          A.   I've seen versions of this before.

6          Q.   When you say versions of this, what do you

7   mean?

8          A.   Well, something that starts out with John

9   Thompson and then says reinstatement of the

10  questionnaire.  I -- I've -- this is -- I recall

11  seeing something like this in different versions --

12         Q.   This is --

13         A.   -- at different times.

14         Q.   Okay.  And just so the record is clear, this

15  is a -- a draft of a letter from the Department of

16  Justice to the Commerce Department requesting the

17  reinstatement of a question on the 2020 census

18  questionnaire related to citizenship, correct?

19         A.   Do we know that it's from DOJ?  Oh, because

20  it says --

21         Q.   Do you see the last line?

22         A.   -- for doj.gov.

23         Q.   Yes.

24         A.   So what was the question again?

25         Q.   So this is a draft of a letter from DOJ to

1    the Commerce Department requesting a reinstatement of

2    a citizenship question on the 2020 --

3         A.    Right.

4         Q.    -- census, right?

5              MR. ROSENBERG:  Objection, form, assumes

6    facts not in evidence.

7         A.    I -- I -- I -- it seems to be that.

8         Q.    (By Mr. Duraiswamy) Okay.  And when did

9    you -- or who -- who provided you with versions of

10   this draft letter?

11        A.    I'm not sure which version this is.  Again,

12   I'm familiar with the letter.  I'm not sure who the

13   original author is.  I'm sure that I looked at it.  I

14   might have commented on it, but I'm not sure who

15   writes a first -- a first template, as it were.

16   What's interesting is when I look at this, it seems

17   like --

18              MR. FELDMAN:  And this being?

19        A.    This being the version that you're looking

20   at right now.

21              MR. FELDMAN:  Exhibit 18.

22        A.    And I look at the letter that I first saw in

23   ProPublica.  This letter is very different than the

24   letter that ultimately went from DOJ.

25        Q.    (By Mr. Duraiswamy) Okay.  In order to help

1    us all get out of here on time, I'm going to ask you

2    try to --

3        A.    Oh, we're all going to get here on -- out of

4    here on time.

5        Q.    Well, I want you -- in order to avoid the

6    risk of our having to come back and do more

7    questioning, I want to you to try to focus on just

8    answering the question --

9        A.    Right.

10       Q.    -- that I've asked.  So my question, you

11   stated that you had previously seen a version of this

12   draft, correct?

13       A.    Correct.

14       Q.    Okay.  And I believe you said --

15       A.    And, again, there are people within the

16   Secretary's office who could have had a version, could

17   have had -- marked up their own version, could have --

18   again, trying to figure out who an original author is

19   when this looks a little --

20           MR. FELDMAN:  The question --

21       Q.    (By Mr. Duraiswamy) Yeah.

22           MR. FELDMAN:  Just --

23       Q.    (By Mr. Duraiswamy) I don't -- I don't

24   want -- I don't -- I'm not asking you to tell me about

25   who the original author was or anything.  I want to

1    try to ask about your experience with this --

2         A.    Right.

3         Q.    -- with versions of this draft letter.

4    Okay?  Do you recall who provided you with a -- a

5    version of this draft letter?

6         A.    No.

7         Q.    Presumably, you -- well, strike that.

8              You said you might have commented on it.  Do

9    you recall what comments you may have made on the

10   draft letter?

11        A.    I don't recall.

12        Q.    Do you recall why you were reviewing it?

13        A.    I was comparing this to that ACS letter.  So

14   again, how does DOJ interact with Census on data

15   needs.

16        Q.    Why were you comparing it to the ACS letter?

17        A.    Process.  I'm a process person.

18        Q.    But I'm -- I'm --

19        A.    If you want --

20        Q.    -- trying to understand why specifically you

21   were asked to or took the initiative to compare a

22   draft version of this letter to the ACS letter that we

23   talked about before.

24        A.    Again, I want to make sure that if the

25   department has an interest in evaluating a change in

1    the questionnaire, that they're following procedures.

2    This clearly doesn't look like the -- the letter that

3    actually went out, but it looks like almost a

4    placeholder, a template.

5         Q.    When you say you want to make sure that if

6    the department has an interest in evaluating a change

7    in the questionnaire, you're referring to the -- the

8    Department of Commerce --

9         A.    Correct.

10        Q.    -- correct?

11        A.    Correct.

12        Q.    Okay.  And you recall that others at the

13   Department of Commerce were reviewing and offering

14   thoughts on draft versions of this letter?

15        A.    I seem to recall that, yes.

16        Q.    Who do you recall was involved in that

17   effort?

18        A.    It might have been the general counsel's

19   office, and it might have been the policy office.  And

20   again, blurring a lot of those people, interactions

21   together, new people coming on board, Peter Davidson

22   coming on board, Earl being involved in policy

23   matters, people that work for Earl.  There are a lot

24   of cooks in the kitchen.

25        Q.    Other than Mr. Davidson and Mr. Comstock,

Page 284

1    who you just mentioned, are there other specific

2    people that you recall being involved in that process?

3        A.    Maybe --

4            MR. ROSENBERG:  Objection, mischaracterizes

5    testimony.

6            MR. FELDMAN:  Go ahead.

7        A.    Maybe Izzy Hernandez, maybe Sahra Park-Su.

8    You know, when I think of the policy people, they're

9    all sort of blended together, the general counsel's

10    people and so forth.

11        Q.    (By Mr. Duraiswamy) Do you recall any

12    specific comments or edits that you suggested to the

13    draft version of this letter?

14        A.    I don't recall, but I'm sure that I made

15    comments.

16        Q.    You just don't remember specifically what

17    the comments were?

18        A.    Right, right.

19        Q.    Do you remember who you made the comments to

20    or who you provided the comments to?

21        A.    They would have been within that group of

22    people, and I would -- I would -- you know, when I say

23    general counsel, I -- I include James in that too.

24        Q.    Okay.

25        A.    And in this --

1           MR. ROSENBERG:  There's no question pending.

2           MR. FELDMAN:  There's no question.

3           [Marked Exhibit No. 19.]

4      Q.   (By Mr. Duraiswamy) Mr. Neuman, I'm handing

5  you Exhibit 19.  This is a copy of the document

6  subpoena that was issued to you through Mr. Feldman in

7  the Kravitz case in Maryland.

8           MR. FELDMAN:  Is this the one that we just

9  got yesterday?  Because he has not seen the one we got

10  yesterday.

11          MR. DURAISWAMY:  I don't know what you got

12  yesterday.  I -- I'm pretty sure I sent that two days

13  ago.

14          MR. FELDMAN:  Or two days ago.  The only one

15  he has seen was the original one that was given by

16  you.

17      Q.   (By Mr. Duraiswamy) So I'll represent to you

18  that this one was issued a few days ago, but the

19  substance of the document requests are identical to

20  the substance of the document requests in the New York

21  subpoena.

22          MR. FELDMAN:  And that is what was

23  represented to me, and he has not seen this.

24          MR. DURAISWAMY:  That's fair.  I just want

25  to ask -- use this as a launching off point to ask

# EXHIBIT 38

John H. Thompson
Director,
Bureau of the Census
US Department of Commerce
Washington, DC 20233


Dear Mr Thompson:

We are writing to formally request the reinstatement of a question on the 2020
Census questionnaire relating to citizenship.  The Department seeks to reinstate
the question because of recent Court decisions _____ where courts
required enumerated (block level) data related to voting age population. This data
can only be provided based on enumerated (Census), rather than sample (ACS)
data.

We are aware that the 2010 Census was the first decennial census since the 1880
Census without a question about citizenship.  We also note that the American
Community Survey, which replaced the "long form" version of the questionnaire in
the decennial 2000 Census, asks a question about citizenship.  We are not aware
that of any serious concerns relating to the presence of a citizenship question on
the ACS.

We understand that the Bureau personnel may believe that ACS data on
citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be
aware that two recent Court cases have underscored that ACS data is not viable
and/or sufficient for purposes of redistricting.  Two important citations from these
cases are as follows:

_____

We note that in these two cases, one in 2006 and one in 2009, courts reviewing
compliance with requirements of the Voting Rights Act and its application in
legislative redistricting, have required Latino voting districts to contain 50% + 1 of
"Citizen Voting Age Population (or CVAP).  It is clear that full compliance with
these Federal Court decisions will require block level data than can only be
secured by a mandatory question in the 2020 enumeration.  Our understanding is
that data on citizenship is specifically required to ensure that the Latino
community achieves full representation in redistricting.

We accordingly request that the Bureau prepare, without delay, the appropriate
question on citizenship for the 2020 Census, and submit this addition for 2020



EXHIBIT
18

Census for OMB Review and other appropriate notifications.

Please let me know if you have any questions about his letter or wish to discuss this subject. I can be reached at (202) ------- or _____@doj.gov.

Sincerely yours,


Attachment.


Cc:

# EXHIBIT 39

Page 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------

     NEW YORK IMMIGRATION COALITION, ET AL.,

4

                        Plaintiffs,

5         vs.         Case No.  1:18-CF-05025-JMF

6    UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,

7                   Defendants.

     ---------------------------------------

8

9                   Washington, D.C.

10                  Thursday, August 30, 2018

11   Deposition of:

12                  EARL COMSTOCK

13   called for oral examination by counsel for

14   Plaintiffs, pursuant to notice, at the office of

15   Arnold & Porter, 601 Massachusetts Avenue NW,

16   Washington, D.C., before KAREN LYNN JORGENSON,

17   RPR, CSR, CCR of Capital Reporting Company,

18   beginning at 9:08 a.m., when were present on

19   behalf of the respective parties:

20

21

22

Page 2

```
 1          CONTENT
                        PAGE
 2
    EARL COMSTOCK          9
 3  Examination by Mr Colangelo    9
    Examination by Mr  Gersch     241
 4  Examination by Mr Rosenberg    336
    Examination by Ms Senteno     381
 5  Examination by Ms Boutin     419
 6
 7  COMSTOCK DEPOSITION EXHIBITS
 8  EXHIBIT              PAGE
       NUMBER
 9  Plaintiffs' Exhibit 1  Email      56
    Plaintiffs' Exhibit 2  Email      62
10  Plaintiffs' Exhibit 3  Email      82
    Plaintiffs' Exhibit 4  Email      87
11  Plaintiffs' Exhibit 5  Memo      93
    Plaintiffs' Exhibit 6  Email     114
12  Plaintiffs' Exhibit 7  Email     120
    Plaintiffs' Exhibit 8  Email     123
13  Plaintiffs' Exhibit 9  Email     137
    Plaintiffs' Exhibit 10  Email    145
14  Plaintiffs' Exhibit 11  Email    147
    Plaintiffs' Exhibit 12  Email    158
15  Plaintiffs' Exhibit 13  Email    164
    Plaintiffs' Exhibit 14  Email    167
16  Plaintiffs' Exhibit 15  Memo    182
    Plaintiffs' Exhibit 16  Memo    189
17  Plaintiffs' Exhibit 17  Meeting  194
          notification
18  Plaintiffs' Exhibit 18  Email    199
    Plaintiffs' Exhibit 19  Email    212
19  Plaintiffs' Exhibit 20  Email    215
    Plaintiffs' Exhibit 21  Email    218
20  Plaintiffs' Exhibit 22  Email    219
    Plaintiffs' Exhibit 23  Email    221
21  Plaintiffs' Exhibit 24  Email    224
    Plaintiffs' Exhibit 25  Email    226
22  Plaintiffs' Exhibit 26  Email    234
    Plaintiffs' Exhibit 27  Testimony from  293
```

Page 3

```
 1          Committee on
          Oversight and
 2          Government
          Reform
 3  Plaintiffs' Exhibit 28  Memo      309
    Plaintiffs' Exhibit 29  Memo      317
 4  Plaintiffs' Exhibit 30  Decisional   326
          memorandum
 5  Plaintiffs' Exhibit 31  Questions on  372
          draft Census
 6          memo
    Plaintiffs' Exhibit 32  Memo      374
 7  Plaintiffs' Exhibit 33  Questions on   376
          draft Census
 8          memo
    Plaintiffs' Exhibit 34  Email      378
 9  Plaintiffs' Exhibit 35  Trump campaign  383
          email
10
11      (Exhibits attached to transcript.)
12
13
14
15
16
17
18      Veritext Legal Solutions
          Mid-Atlantic Region
          1250 Eye Street NW - Suite 350
19      Washington, D.C.  20005
20
21
22
```

Page 4

```
 1      A P P E A R A N C E S
    On behalf of New York Immigration
 2  Coalition, CASA De Maryland, American-Arab
    Anti-Discrimination Committee, ADC Research
 3  Institute and Make the Road New York:
       David Gersch, Esquire
 4      ARNOLD & PORTER
       601 Massachusetts Avenue, NW
 5      Washington, D C  20001
       (202) 942-5316
 6      david gersch@arnoldporter com
 7      Perry Grossman, Esquire
       New York Civil Liberties Union
 8      125 Broad Street
       New York, New York 1004
 9      (212) 607-3300
       pgrossman@nyclu org
10
    On behalf of Kravitz Plaintiffs:
11      Daniel Grant, Esquire
       COVINGTON & BURLINGTON
12      850 Tenth Street, NW
       Washington, D C  20001
13      (202) 662-5458
       dgrant@cov com
14
    On behalf of Los Angeles Unified School District:
15      Brian Park, Esquire (Telephonically)
       DANIELS WOLIVER KELLEY
16      115 Pine Avenue
       Suite 500
17      Long Beach, California 90802
       (562) 366-8500
18      bpark@dwkesq com
19  On behalf of County of Los Angeles:
       David I  Holtzman, Esquire
20      HOLLAND & KNIGHT
       50 California Street, Suite 2800
21      San Francisco, California 94111
       (415) 743-6909
22      david holtzman@hklaw com
```

Page 5

```
 1  On behalf of LUPE Plaintiffs:
       Andrea Senteno, Esquire
 2      MALDEF
       1016 16th Street, NW
 3      Suite 100
       Washington, D C  20036
 4      (202) 293-2828
       asenteno@maldef org
 5
       Niyati Shah, Esquire
 6      John C  Yang, Esquire
       ASIAN AMERICANS ADVANCING Justice
 7      1620 L Street, NW
       Suite 1050
 8      Washington, D C  20036
       (202) 296-2300
 9      nshah@advancingjustice-aajc org
       jyang@advancingjustice-aajc org
10
       Ezra Rosenberg, Esquire
11      Dorian Spence, Esquire
       LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
12      1401 New York Avenue, NW
       Suite 400
13      Washington, D C  20005
       (202) 662-8345
14      erosenberg@lawyerscommittee org
       dspence@lawyerscommittee org
15
    On behalf of State of California:
16      Gabrielle Boutin, Esquire
       R  Matthew Wise, Esquire (Telephonically)
17      DEPARTMENT OF JUSTICE
       OFFICE OF THE ATTORNEY GENERAL
18      1300 I Street
       P O  Box 944255
19      Sacramento, California 94244
       (916) 210-6053
20      gabrielle boutin@doj ca gov
       matthew wise@doj ca gov
21
22
```

Page 6

```
1  On behalf of State of New York:
      Danielle Fidler, Esquire
2     Elena Goldstein, Esquire
      Matthew Colangelo, Esquire
3     Alex Finkelstein, Esquire
      ASSISTANT ATTORNEY GENERAL
4     ENVIRONMENTAL PROTECTION BUREAU
      28 Liberty Street
5     New York, New York 10005
      (212) 416-8441
6     danielle fidler@ag ny gov
      elena goldstein@ag ny gov
7     matthew colangelo@ag ny gov
      alexfinkelstein@ag ny gov
8
   On behalf of Defendants:
9     Kate Bailey, Esquire
      Joshua Gardner, Esquire
10    U S  DEPARTMENT OF JUSTICE
      20 Massachusetts Avenue
11    Washington, D C  20530
      (202) 305-9802
12    kate bailey@usdoj gov
      joshua gardner@usdoj gov
13
      Michael Cannon, Esquire
14    David M S  Dewhirst,Esquire
      U S  DEPARTMENT OF COMMERCE, OFFICE OF THE
15    ASSISTANT GENERAL COUNSEL FOR FINANCE &
      LITIGATION
16    1401 Constitution Avenue, NW
      Room 5890
17    Washington, D C  20230
      (202) 482-5395
18    mcannon@doc gov
      ddewhirst@doc gov
19
      Michael Walsh, Jr , Esquire
20    DEPUTY GENERAL COUNSEL
      1401 Constitution Avenue, NW
21    Washington, D C  20230
      (202) 482-4772
22    mwalsh@doc gov
```

Page 7

1  VIDEOGRAPHER:  Dan Reidy
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 8

1         P R O C E E D I N G S
2  WHEREUPON,
3         VIDEOGRAPHER:  Good morning.  We are
4  going on the record at 9:01 a.m. on Thursday,
5  August 30, 2018.  Please note that the microphones
6  are sensitive and may pick up whispering, private
7  conversations and cellular interference.  Please
8  turn off all cell phones or place them away from
9  the microphones, as that can interfere with the
10  deposition audio.  Audio and video recording will
11  continue to take place unless all parties agree to
12  going off the record.
13         This is Media Unit 1 of the video
14  recorded deposition of Earl Comstock to be taken
15  by counsel for the plaintiff in the matter of the
16  New York Immigration Coalition, et al., v. The
17  United States Department of Commerce, et al.  This
18  case is filed in the United States District Court
19  for the Southern District of New York.  This
20  deposition is being held at the law office of
21  Arnold & Porter located a 601 Massachusetts Avenue
22  Northwest, Washington, D.C. 20001.

Page 9

1         My name is Dan Reidy from the firm
2  Veritext Legal Solutions, and I am the
3  videographer.  The court reporter is Karen
4  Jorgenson from Veritext Legal Solutions.
5         I am not authorized to administer an
6  oath.  I am not related to any party in this
7  action, nor am I financially interested in the
8  outcome.
9         Also, counsel appearances will be noted
10  on the stenographic report rather than orally at
11  this time.
12         Will the court reporter please swear in
13  the witness?
14             EARL COMSTOCK,
15  called as a witness, and having been first duly
16  sworn, was examined and testified as follows:
17  THE WITNESS:  I do.
18         EXAMINATION BY MR. COLANGELO:
19  Q   Please state your name and work address.
20  A   Earl Comstock, U.S. Department of
21  Commerce.
22  Q   And we met a minute ago, but for the

3 (Pages 6 - 9)

Page 178

1    A   I think three or four times.
2    Q   And what was the next time you spoke to
3  him after the initial phone call?
4    A   Maybe a week later.
5    Q   Okay.  And what did he say when he -- did
6  he call you or did you call him?
7    A   I don't recall.
8    Q   And what did you discuss on that
9  conversation?
10    A   That he was still exploring the question.
11    Q   How long was that conversation?
12    A   Five minutes.
13    Q   Okay.  So he didn't have anything new to
14  report?
15    A   Right.
16    Q   Okay.  And you said you spoke to him at
17  least a couple more times; is that right?
18    A   Again, I don't recall the exact number of
19  times, but somewhere in the vicinity of three or
20  four times.
21    Q   So after the second call where he said he
22  was still exploring it, tell me about the next

Page 179

1  conversation?
2    A   Memory serves, I think the next
3  conversation was a similar one.  He was still
4  looking into the matter and then -- and then the
5  last conversation he and I had, he directed me to
6  somebody at the Department of Homeland Security.
7    Q   Okay.  And over what period of time were
8  you talking to Mr. McHenry on the phone?
9    A   Probably over the course of a month.
10    Q   So this was primarily in May of 2017?
11    A   I honestly don't recall, but sometime in
12  May, early June.
13    Q   And who did he direct you to at the
14  Department of Homeland Security?
15    A   I don't remember the person's name.
16    Q   Was it Gene Hamilton?
17    A   Again, I know I prepared a memo for the
18  Secretary that had the name.  So if that's the
19  name that was on the memo, then, yes, that would
20  be the person I spoke with.
21    Q   How many times did you speak to your
22  point of contact at the Department of

Page 180

1  Homeland Security?
2    A   Again, I think it was -- I think this was
3  like two or three times.
4    Q   And what did you say when you first spoke
5  to Mr. Hamilton?
6    A   Same -- same basic message, we're looking
7  into the -- exploring the possibility of putting a
8  census question on -- a citizenship question on
9  the decennial census, would this be information
10  that the Department of Homeland Security would
11  need or use, and could he answer that, and his
12  response was, let me look into it.
13    Q   Now, the Department of Homeland Security
14  wasn't the original requester for the ACS
15  citizenship question, to your understanding,
16  correct?
17    A   Correct.
18    Q   Was it your view that the Department of
19  Homeland Security would also be a legitimate
20  requester of this information?
21    A   Legitimate is not the right word, but
22  the -- I think my view was, let me see if

Page 181

1  there's -- what their explanation would be, but
2  they were obviously not our first choice.
3    Q   So you were looking for an agency to make
4  this ask?
5    A   Again, my understanding of the process,
6  based on the research I've been able to do, and
7  consequently was advising the Secretary was an
8  agency needed to make the request; therefore, you
9  have to find an agency that would have a reason to
10  be using this information.  And Justice,
11  obviously, was the primary recipient of the CVAP
12  data from the ACS, so they were the logical place
13  to start.  Justice then says go to
14  Homeland Security, and I say, okay, maybe there's
15  something about Homeland Security that I don't
16  know about that might justify this data.  So you
17  follow up on a call, get more information, informs
18  your decision, you might change it.
19    Q   And so my question was:  So you were
20  looking for an agency to make this ask and --
21    A   Correct.  In order to implement the
22  process that had been outlined to us, you needed

46 (Pages 178 - 181)

Page 182

1 an agency. So that was my task at the time.
2    Q   Thank you.
3       MR. COLANGELO: Let's mark this
4 Exhibit --
5       MR. GARDNER: 15.
6       MR. COLANGELO: -- 15.
7       (Plaintiffs' Exhibit 15, Memo, was
8 marked.)
9       THE WITNESS: The very memo I was
10 speaking of.
11 BY MR. COLANGELO:
12    Q   Exhibit 15 is document stamped 9834.
13       Mr. Comstock, do you have Exhibit 15 if
14 front of you?
15    A   I do.
16    Q   Is this the very memo you were just
17 speaking about?
18    A   It's the very memo I was just speaking
19 about.
20    Q   And what's the date on this memo?
21    A   September 8th.
22    Q   And you see in the second paragraph of

Page 183

1 this memo, the sentence that says, "James directed
2 me to Gene Hamilton at the Department of
3 Homeland Security."
4    A   Correct.
5    Q   So the person you were speaking to at DHS
6 was Gene Hamilton, right?
7    A   Apparently so, yes.
8    Q   The -- in that paragraph -- strike that.
9       This is a memo from you to the Secretary
10 dated September 8th of 2017, correct?
11    A   Correct.
12    Q   Why did you prepare this memo?
13    A   Because the Secretary was asking about
14 the lack of progress and said he was prepared to
15 call the Attorney General, and so he needed the
16 timeline of who I had spoken to.
17    Q   Okay. What do you mean by lack of
18 progress?
19    A   Well, obviously, we're now September 8th,
20 and he inquired on May -- May whatever the date
21 was, 2nd, 5th, whatever it was, saying how come we
22 haven't made more progress? Three months later we

Page 184

1 don't have any response from the
2 Justice Department, so --
3    Q   In his May 2nd email it said, why has
4 nothing been done in response to my months' old
5 request?
6    A   That is what it says, yes.
7    Q   So the Secretary had been asking about
8 this since the early spring of 2017?
9    A   Yes.
10    Q   And you testified and this memo says you
11 met in person with Mary Blanche and she said what?
12    A   Well, as I said, she directed me to
13 James McHenry.
14    Q   And then after speaking with Mr. McHenry,
15 he told you what?
16    A   He directed me to Gene Hamilton.
17    Q   Okay. And then after several phone calls
18 with Gene Hamilton, according to this memo, he
19 relayed that, "After discussion, DHS really felt
20 it was best handled by the Justice Department."
21       Do you see that?
22    A   I see that.

Page 185

1    Q   Why did Mr. Hamilton feel this was best
2 handled by the Justice Department?
3    A   As relayed to me, DHS felt the agency
4 that would most utilize this data was
5 Department of Justice, which was our
6 original conclusion.
7    Q   So DHS said they were not going to make
8 this request, right?
9    A   Well, Gene never made a commitment, one
10 way or the other, for the department. He simply
11 directed me back to the other department. It's
12 not an uncommon experience in the federal
13 government.
14    Q   Tell me what's not uncommon in the
15 federal government.
16    A   Being directed to somebody.
17    Q   Your memo then says at that point the
18 conversation ceased.
19    A   Correct.
20    Q   What do you mean by that?
21    A   Means that I did not talk to
22 Mary Blanche, James McHenry or Gene Hamilton after

47 (Pages 182 - 185)

# EXHIBIT 40

1              UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF NEW YORK

2

- - - - - - - - - - - - - - -x

3      NEW YORK IMMIGRATION              :

       COALITION, et al.,                :

4                                        :

           Plaintiffs,                   :

5                                        :  Case No.

         v.                              :

6                                        :  1:18-CF-05025-JMF

       UNITED STATES DEPARTMENT          :

7      OF COMMERCE, et al.,              :

                                         :

8          Defendants.                   :

- - - - - - - - - - - - - - -x

9                                   Friday, October 16, 2018

                                         Washington, D.C.

10

11

12     Videotaped Deposition of:

13                        JOHN GORE,

14     called for oral examination by counsel for the

15     Plaintiffs, pursuant to notice, at the law offices of

16     Covington & Burling, LLP, One City Center, 850 Tenth

17     Street, Northwest, Washington, D.C. 20001-4956,

18     before Christina S. Hotsko, RPR, CRR, of Veritext

19     Legal Solutions, a Notary Public in and for the

20     District of Columbia, beginning at 9:05 a.m., when

21     were present on behalf of the respective parties:

22

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of New York Immigration Coalition:
      DALE HO, ESQUIRE
 3    JONATHAN TOPAZ, ESQUIRE
      American Civil Liberties Union Foundation
 4    915 15th Street, Northwest
      Washington, D C  20005
 5    (202) 675-2337
      dale ho@aclu org
 6
 7  On behalf of Lupe Plaintiffs:
      DENISE HULETT, ESQUIRE
 8    MALDEF
      1512 14th Street
 9    Sacramento, California 95814
      (916) 642-6352
10    dhulett@maldef org
11    ERI ANDRIOLA, ESQUIRE
      Asian Americans Advancing Justice
12    1620 L Street, Northwest, Suite 1050
      Washington, D C  20036
13    (202) 296-2300
14
      On behalf of City of San Jose and Black Alliance for
15  Just Immigration:
      JON M  GREENBAUM, ESQUIRE
16    DORIAN L  SPENCE, ESQUIRE
      Lawyers Committee for Civil Rights Under Law
17    1401 New York Avenue, Northwest, Suite 400
      Washington, D C  20005
18    (202) 662-8324
      jgreenbaum@lawyerscommittee org
19    dspence@lawyerscommittee org
20
21
22
```

Page 3

```
 1        A P P E A R A N C E S   C O N T I N U E D
 2
      On behalf of Kravitz Plaintiffs:
 3    TINA M  THOMAS, ESQUIRE
      Covington & Burling, LLP
 4    One City Center
      850 Tenth Street, Northwest
 5    Washington, D C  20001-4956
      (202) 662-5083
 6    tthomas@cov com
 7
      On behalf of the State of California:
 8    GABRIELLE D  BOUTIN, ESQUIRE (Via Telephone)
      California Department of Justice
 9    Office of the Attorney General
      1300 I Street
10    P O  Box 944255
      Sacramento California 94244-2550
11    (916) 210-6053
      gabrielle boutin@doj ca gov
12
13  On behalf of Defendants:
      JOSH GARDNER, ESQUIRE
14    REBECCA KOPPLIN, ESQUIRE
      ALICE LACOUR, ESQUIRE
15    BRETT SHUMATE, ESQUIRE
      U S  Department of Justice, Civil Division
16    20 Massachusetts Avenue, Northwest
      Washington, D C  20530
17    (202) 514-4522
18    VALERIE M  NANNERY, ESQUIRE
      ANDREW SAINDOM, ESQUIRE
19    Office of the Attorney General for D C
      One Judiciary Square
20    441 Fourth Street, Northwest, Suite 600 South
      Washington, D C  20001
21    (202) 442-9596
      valerie nannery@dc gov
22
```

Page 4

```
 1    A P P E A R A N C E S   C O N T I N U E D
 2  On behalf of Defendants:
      DAVID DOREY, ESQUIRE
 3    DAVID DEWHIRST, ESQUIRE
      U.S. Department of Commerce
 4    1401 Constitution Avenue Northwest
      Washington, D.C. 20230
 5    (202) 482-2000
 6
    Also Present:
 7    Dan Reidy, Video Technician
 8
 9
10
11
12
13
14
15
16
17
18          Veritext Legal Solutions
              Mid-Atlantic Region
            1250 Eye Street NW - Suite 350
19          Washington, D.C.  20005
20
21
22
```

Page 5

```
 1            C O N T E N T S
 2  EXAMINATION BY:                    PAGE
 3    Counsel for Plaintiffs
        Mr. Ho                11
 4      Ms. Hulett            335
        Mr. Greenbaum         414
 5
 6
    GORE DEPOSITION EXHIBITS:  *        PAGE
 7
    Exhibit 1    E-mail Chain          22
 8
    Exhibit 2    Bloomberg Transcript of Gore    26
 9      Testimony - 21 May 2018
10  Exhibit 3    Letter - 4 Nov 2016         47
11  Exhibit 4    Memo - 8 Sept 2017          58
12  Exhibit 5    E-mail Chain       79
13  Exhibit 6    E-mail Chain       95
14  Exhibit 7    E-mail Chain       101
15  Exhibit 8    E-mail Chain       105
16  Exhibit 9    E-mail Chain       110
17  Exhibit 10   E-mail Chain       115
18  Exhibit 11   E-mail Chain       125
19  Exhibit 12   E-mail Chain       132
20  Exhibit 13   E-mail Chain       135
21  Exhibit 14   E-mail Chain       138
22  Exhibit 15   E-mail Chain       142
```

2 (Pages 2 - 5)

Page 6

1  GORE DEPOSITION EXHIBITS:  *          PAGE
2  Exhibit 16  E-mail Chain          145
3
   Exhibit 17  Letter - 12 Dec 2017          155
4
   Exhibit 18  Screenshot from Census Bureau      178
5              Website
6  Exhibit 19  Map derived from Census Data on    204
               Census Bureau Website
7
   Exhibit 20  Printout from DOJ Website       240
8
   Exhibit 21  E-mail Chain          254
9
   Exhibit 22  E-mail Chain          282
10
   Exhibit 23  Fourth Privilege Log from DOJ in   292
11             Response to Plaintiffs' Document
               Subpoenas
12
   Exhibit 24  E-mail Chain          296
13
   Exhibit 25  Exhibit 24 Attached Draft Letter   297
14
   Exhibit 26  E-mail Chain          300
15
   Exhibit 27  2020 Census Hearing Gore QFRs CRT  300
16             Draft
17 Exhibit 28  DOJ Office of Legal Counsel       303
               Opinion - 4 Jan 2010
18
   Exhibit 29  E-mail Chain          311
19
   Exhibit 30  Article          312
20
   Exhibit 31  E-mail Chain          315
21
   Exhibit 32  Memo - 19 Jan 2018          319
22
   Exhibit 33  E-mail Chain          330

Page 7

1  GORE DEPOSITION EXHIBITS:  *          PAGE
2  Exhibit 34  Census Citizenship Question    330
3  Exhibit 35  District Court Opinion in Reyes  349
               versus City of Farmers Branch
4
   Exhibit 36  Fabela versus City of Farmers  350
5              Branch
6  Exhibit 37  Negron versus City of Miami Beach  358
7  Exhibit 38  Campos versus City of Houston    362
8  Exhibit 39  E-mail Chain          365
9  Exhibit 40  E-mail Chain          369
10 Exhibit 41  E-mail Chain          371
11 Exhibit 42  E-mail Chain          398
12 Exhibit 43  E-mail Chain          403
13 Exhibit 44  Karlan Report          416
14 Exhibit 45  E-mail Chain          443
15 Exhibit 46  E-mail Chain          445
16 Exhibit 47  Gore Written Testimony       446
               18 May 2018
17
18
19
20
21     *  (Exhibits attached to transcript.)
22

Page 8

1         P R O C E E D I N G S

2        VIDEO TECHNICIAN:  Good morning.  We are

3   going on the record at 9:05 a.m. on Friday,

4   October 26th, 2018.

5        Please note that the microphones are

6   sensitive and may pick up whispering, private

7   conversations, and cellular interference.  Please

8   turn off all cell phones or place them away from

9   the microphones, as they can interfere with the

10  deposition audio.

11       Audio and video recording will continue

12  to take place unless all parties agree to go off

13  the record.

14       This is media unit 1 of the

15  video-recorded deposition of John Gore, taken by

16  counsel for the plaintiff in the matter of the

17  New York Immigration Coalition, et al. versus the

18  United States Department of Commerce, et al.

19       This case is filed in the United States

20  District Court for the Southern District of New

21  York.

22       This deposition is being held at the law

Page 9

1   offices of Covington & Burling, LLP, located at

2   850 Tenth Street, Northwest, Washington, D.C.

3   20001.

4        My name is Dan Reidy from the firm

5   Veritext Legal Solutions, and I'm the

6   videographer.  The court reporter is Christina

7   Hotsko from the firm Veritext Legal Solutions.

8        I am not authorized to administer an

9   oath, I am not related to any party in this

10  action, nor am I financially interested in the

11  outcome.

12       Counsel and all present in the room will

13  now state their appearances and affiliations for

14  the record.  If there are any objections to

15  proceeding, please state them at the time of your

16  appearance, beginning with the noticing attorney.

17       MR. HO:  Detail Ho for the New York

18  Immigration Coalition plaintiffs.

19       MR. TOPAZ:  Jonathan Topaz for NYC

20  plaintiffs.

21       MS. HULETT:  Denise Hulett for Lupe

22  plaintiffs.

3 (Pages 6 - 9)

Page 62

1 prior to the date when the Department of Justice's
2 letter went to the Census Bureau to request a
3 citizenship question in December of 2017, correct?
4    A. Yes.
5    Q. Okay. What were you aware of before that
6 letter went out?
7       MR. GARDNER: Same objection.
8       To the extent you can answer the question
9 without divulging information subject to the
10 deliberative process privilege, you may answer.
11 To the extent you can't, I'd instruct the witness
12 not to answer.
13       MR. HO: Josh, let me finish the question
14 before your objection --
15       MR. GARDNER: I thought you were done.
16       MR. HO: -- if that's okay.
17       MR. GARDNER: I apologize. I didn't mean
18 to interrupt you.
19 BY MR. HO:
20    Q. When you say that you were aware of
21 pre-September 8th conversations between Commerce
22 and Justice about the citizenship question before

Page 63

1 your letter from Justice to the Census Bureau went
2 out requesting a citizenship question, what were
3 you aware of with respect to the nature of those
4 pre-September 8th conversations?
5       MR. GARDNER: Same objection. Same
6 instruction.
7       THE WITNESS: I can tell you that I was
8 aware of the fact that conversations had occurred.
9 And beyond that, I don't believe I can give an
10 answer in light of the instruction I've just
11 received.
12 BY MR. HO:
13    Q. When you say that you were aware of the
14 fact that conversations occurred, what do you mean
15 by conversations?
16    A. I mean -- a conversation is a
17 communication between two or more people, and I
18 was aware that two or more people had talked to
19 each other.
20    Q. When you say that you were aware that two
21 or more people had talked to each other, which
22 people were you aware had talked to each other?

Page 64

1    A. It was my understanding that somebody
2 from Commerce had spoken to Mary Blanche Hankey,
3 that someone had spoken to James McHenry, and that
4 Secretary Ross had spoken to the attorney general.
5    Q. And that all of those conversations were
6 about the inclusion of a citizenship question on
7 the census?
8    A. I wasn't a party to those conversations,
9 but my understanding is that they would have
10 touched on that issue.
11    Q. James McHenry is the director of the
12 Executive Office for Immigration Review within
13 DOJ, correct?
14    A. He is now, although at that time he
15 wasn't. At that time, he was on detail to the
16 Office of the Associate Attorney General. And he
17 had come from somewhere else. I can't remember.
18 I think it was OCAHO, which is -- since we're in
19 D.C. and talking about government things, it's an
20 acronym that -- I don't know what it stands for.
21 But Mr. McHenry has been involved -- has been an
22 employee of the department for some time, but in

Page 65

1 early 2017, was on detail to the Office of the
2 Associate Attorney General.
3    Q. During this period, Mr. McHenry was not
4 staff in the civil rights division, correct?
5    A. That's correct.
6    Q. And Mr. McHenry did not have any formal
7 duties with respect to enforcement of the Voting
8 Rights Act during this period, correct?
9    A. He had no formal duties. As I recall, he
10 was for some period of time our point of contact
11 in the Office of the Associate Attorney General,
12 which is why I remember he was there. But he did
13 not have formal duties with respect to
14 enforcement.
15    Q. Do you know of any reasons why
16 Mr. McHenry could address the issue of including a
17 citizenship question on the census?
18       MR. GARDNER: Objection. Calls for
19 speculation.
20       THE WITNESS: Yeah, I'd be speculating.
21 I don't know.
22

17 (Pages 62 - 65)

Page 66

1 BY MR. HO:

2    Q. So you don't know of any reasons why

3 Mr. McHenry could address the issue of including a

4 citizenship question on the census?

5        MR. GARDNER: Same objection.

6        THE WITNESS: I -- I don't know one way

7 or the other.

8 BY MR. HO:

9    Q. When you say you're aware that

10 conversations took place between Commerce

11 officials and Mary Blanche Hankey and James

12 McHenry, what were you aware of with respect to

13 the content of those conversations prior to --

14 those conversations that took place prior to

15 September 8th, 2017?

16       MR. GARDNER: Objection.

17       To the extent that you can answer that

18 question without divulging information subject to

19 deliberative process privilege, you may do so.

20 Otherwise, I instruct you not to answer.

21       THE WITNESS: As I testified before, I

22 understood that those conversations related to the

Page 67

1 issue of reinstating a citizenship question on the

2 census questionnaire. Beyond that, I can't

3 answer.

4 BY MR. HO:

5    Q. What was your understanding of who

6 initiated those conversations?

7    A. My understanding was that those

8 conversations were initiated by the Department of

9 Commerce.

10   Q. Those initial conversations that are

11 referred to in this memo, your testimony is that,

12 to the best of your knowledge, those conversations

13 were not initiated by the Department of Justice,

14 correct?

15   A. Again, I wasn't a party to those

16 conversations, but that's been my working

17 understanding.

18   Q. And your working understanding is that

19 the Department of Justice did not reach out to the

20 Department of Commerce to initiate those

21 conversations for the purposes of obtaining better

22 data to enforce the Voting Rights Act, correct?

Page 68

1        MR. GARDNER: Objection. Lack of

2 foundation.

3        THE WITNESS: Again, I wasn't a party to

4 those conversations, but that's been my working

5 understanding.

6 BY MR. HO:

7    Q. The second paragraph in this memo reads,

8 "I spoke several times with James McHenry by phone

9 and, after considering the matter further, James

10 said that Justice staff did not want to raise the

11 question, given the difficulties Justice was

12 encountering in the press at the time, the whole

13 Comey matter. James directed me to Gene Hamilton

14 at the Department of Homeland Security."

15       So were you aware, before I read that,

16 that as of September 8th, 2017, Justice staff did

17 not want to raise the citizenship question?

18       MR. GARDNER: Objection. Lack of

19 foundation.

20       THE WITNESS: Before you read that, yes,

21 I was aware of that.

22

Page 69

1 BY MR. HO:

2    Q. Okay. When did you become aware -- so --

3 I'm sorry. Let me start that question.

4        So your understanding is that, as of

5 September 8th, 2017, Justice staff did not want to

6 raise the citizenship question, correct?

7    A. Yes, that's my understanding, although it

8 wasn't my understanding on September 8th; it was

9 an understanding that I acquired later.

10   Q. When did you acquire the understanding

11 that, as of September 8th, Justice staff did not

12 want to raise the issue of a citizenship question?

13   A. Again, I think it was along the same

14 timeline that I learned that these conversations

15 had taken place, the conversations referenced in

16 the first paragraph and the second paragraph

17 involving Mr. McHenry. And I believe I became

18 aware of those sometime after September 8th and

19 before the letter was sent from the Department of

20 Justice.

21   Q. How did you become aware of the fact

22 that, as of September 8th, 2017, the Department of

18 (Pages 66 - 69)

1 citizenship question with Secretary Ross?

2     A. No.

3     Q. Prior to May 2017 -- so I'm changing the

4 time period here a little bit --

5     A. Sure.

6     Q. -- had you ever raised the issue of a

7 citizenship question on the decennial census

8 questionnaire?

9     A. No.

10    Q. Were you consulted by Secretary Ross

11 regarding whether the Department of Justice would

12 support or request the inclusion of a citizenship

13 question on the decennial census?

14       MR. GARDNER: Objection. Vague.

15       THE WITNESS: No.

16 BY MR. HO:

17    Q. Were you consulted by Secretary Ross'

18 staff regarding whether the Department of Justice

19 would support or request inclusion of a

20 citizenship question on the census?

21       MR. GARDNER: Same objection.

22       THE WITNESS: Who do you mean by staff?

1 BY MR. HO:

2     Q. Anyone who works in the front office of

3 the Department of Commerce. Were you ever

4 consulted by front office Department of Commerce

5 employees -- that's what I mean by Secretary Ross'

6 staff --

7     A. Okay.

8     Q. -- regarding whether the Department of

9 Justice would support or request the inclusion of

10 a citizenship question on the census?

11       MR. GARDNER: Same objection.

12       THE WITNESS: I guess I'm still not clear

13 on what you mean by the front office of the

14 Department of Commerce. I can recall speaking to,

15 I believe, three individuals at the Department of

16 Commerce about this issue.

17 BY MR. HO:

18    Q. Who are the three individuals at the

19 Department of Commerce --

20    A. Sure.

21    Q. -- that you spoke to about the

22 citizenship question on the census?

1     A. I didn't mean to cut you off, and I

2 apologize, again, to the court reporter for being

3 a fast talker.

4       I recall speaking to Peter Davidson,

5 James Uthmeier, U-T-H-M-E-I-E-R -- and Wendy

6 Teramoto.

7     Q. When was the first occasion on which you

8 consulted with one of those three individuals

9 about the inclusion of a citizenship question on

10 the census?

11    A. I'm not sure I would describe it as a

12 consultation as much as I would describe it as a

13 conversation about various issues related to the

14 reinstatement of a citizenship question on the

15 census questionnaire. I can recall having

16 conversations starting sometime around this

17 September 2017 time frame.

18    Q. Who was the first of those three

19 individuals that you had a conversation with about

20 the inclusion of a citizenship question on the

21 2020 census?

22    A. Peter Davidson.

1     Q. And roughly when was your first

2 conversation with Peter Davidson about including a

3 citizenship question on the 2020 census?

4     A. I don't recall exactly, but I would say

5 it was probably around mid-September of 2017 or

6 somewhere in that time frame.

7     Q. After you spoke to Mr. Davidson in

8 mid-September, what was the next conversation that

9 you had among those three individuals from

10 Commerce about the citizenship question?

11    A. I don't recall exactly when it was. I

12 had several conversations with Peter Davidson

13 beginning in September and continuing through

14 December. I had a couple of conversations as well

15 with Mr. Uthmeier, including at least one between

16 just Mr. Uthmeier and me and one, and maybe two,

17 where Mr. Uthmeier and Peter Davidson were both

18 involved. Then I had a conversation at one point

19 with Wendy Teramoto about a scheduling issue that

20 I think took place in October of 2017, but I don't

21 recall exactly. Somewhere in that time frame.

22    Q. Roughly when was your first conversation

Page 94

1  with Mr. Uthmeier about the citizenship question?
2      A.  I think it would have been either late
3  September or sometime in October of 2017.
4          MR. HO:  We've been going for a little
5  over an hour, about an hour-ten.  Would now be an
6  okay time for a first break?
7          MR. GARDNER:  That's fine with me, yeah.
8          MR. HO:  Great.
9          VIDEO TECHNICIAN:  This concludes media
10  unit number 1.  The time on the video is
11  10:19 a.m.  And we are off the record.
12          (A recess was taken.)
13          VIDEO TECHNICIAN:  This begins media unit
14  number 2.  The time on the video is 10:37 a.m.  We
15  are on the record.
16  BY MR. HO:
17      Q.  Mr. Gore, I just want to follow up
18  on something from before the break.  The
19  communications between the Department of Justice
20  and the Department of Commerce about the
21  citizenship question, those communications were
22  not initiated by the voting section, correct?

Page 95

1      A.  That's correct.  That's my understanding.
2      Q.  And those communications were not
3  initiated by anyone else in the civil rights
4  division, correct?
5      A.  Correct.
6      Q.  And you did not initiate the
7  communications between Commerce and Justice about
8  the citizenship question, correct?
9      A.  That's correct.
10          (Gore Deposition Exhibit 6 marked for
11          identification and attached to the
12          transcript.)
13  BY MR. HO:
14      Q.  In front of you is a document that's been
15  marked as Exhibit 7.  It's an e-mail thread
16  between, among other people, you, Macie Leach, and
17  Wendy Teramoto.  The first page of the document is
18  Bates marked 0002628.  It's from the
19  administrative record.
20          MR. GARDNER:  I think you may have said
21  Exhibit 7.  It's Exhibit 6.
22          MR. HO:  Oh, I'm so sorry.  Exhibit 6.

Page 96

1  Thank you for clarifying, Josh.
2          MR. GARDNER:  Sure.
3  BY MR. HO:
4      Q.  The first e-mail on this thread is on the
5  second page -- first in time, I mean.  It's from
6  you to Wendy Teramoto on Wednesday,
7  September 13th, 2017, correct?
8      A.  It appears to be.  Yes.
9      Q.  And that's two days after your exchange
10  with Mr. Gary regarding 2020 census questions,
11  correct?
12      A.  Correct.
13      Q.  And at the time that you sent this
14  e-mail, you knew that Ms. Teramoto was the chief
15  of staff to Commerce Secretary Ross, correct?
16      A.  Correct.
17      Q.  In the second sentence of your e-mail to
18  Ms. Teramoto, you write, "I would like to talk to
19  you about a DOJ-DOC issue," correct?
20      A.  Correct.
21      Q.  The DOJ-DOC issue that you're referring
22  to in this e-mail is the citizenship question,

Page 97

1  correct?
2      A.  Correct.
3      Q.  What prompted you to reach out to
4  Ms. Teramoto to talk to her about the citizenship
5  question?
6          MR. GARDNER:  Objection.
7          To the extent that that answer calls for
8  the divulsion of information subject to
9  deliberative process privilege, I instruct you not
10  to answer.  To the extent you can answer that
11  question without divulging such information, you
12  may do so.
13          THE WITNESS:  It was a conversation I had
14  with Peter Davidson.
15  BY MR. HO:
16      Q.  When was that conversation with
17  Mr. Davidson?
18      A.  I don't recall exactly.
19      Q.  And what is Mr. Davidson's role at
20  Commerce?
21      A.  I don't know what his current role is.
22  At the time, I understood him to be the general

25 (Pages 94 - 97)

1 This is a separate deliberation --

2     MR. GARDNER:  Of course.

3     MR. HO:  -- about what, Josh?

4     MR. GARDNER:  About the alternatives that

5 you just discussed with Mr. Gore that Mr. Gary

6 raised.

7     MR. HO:  Well, what about the

8 alternatives?  What's the decision --

9     MR. GARDNER:  I'm not here to testify for

10 you.  I am telling you -- you just asked him

11 questions about a proposal made by the Census

12 Bureau that Art Gary communicated to John Gore,

13 John Gore then discussed with the attorney

14 general, and you are now asking about these

15 substantive deliberative conversations about that

16 proposal.

17     MR. HO:  I guess -- the proposal is a

18 topic.

19     MR. GARDNER:  Yeah.  And I --

20     MR. HO:  What's the --

21     MR. GARDNER:  And I allowed him to --

22     MR. HO:  What's the decision, I guess,

1 that --

2     MR. GARDNER:  Decision as to whether to

3 pursue that proposal.

4     MR. HO:  Okay.  That's what I just wanted

5 to clarify because --

6     MR. GARDNER:  Yeah.  Okay.

7     MR. HO:  -- it wasn't clear to me.

8     MR. GARDNER:  Sorry.  I thought that was

9 clear.  I apologize.  Yeah, that's the decision.

10 BY MR. HO:

11     Q.  Okay.  So the conversation with the

12 attorney general included a discussion about

13 whether or not to pursue the Census Bureau's

14 proposal to produce block-level CVAP data for DOJ

15 for VRA enforcement purposes without including a

16 citizenship question, correct?

17     A.  That is correct.  And just to clarify, I

18 wasn't familiar with all the particulars of their

19 proposal.

20     Q.  That's fine.

21     The decision was made not to pursue the

22 Census Bureau's alternative proposal for producing

1 block-level CVAP data for purposes of VRA

2 enforcement through a means other than including a

3 citizenship question on the census, correct?

4     A.  That is correct.

5     Q.  Who made that decision?

6     A.  The attorney general.

7     Q.  When was that decision made?

8     A.  Around this time.  I don't know exactly

9 when it was made.  I can't remember the specific

10 date.

11     Q.  When you say "around this time," you mean

12 around January of 2018, correct?

13     A.  That is correct.

14     Q.  Are the reasons for that decision

15 memorialized anywhere?

16     A.  Not to my knowledge.

17     Q.  Were those reasons ever communicated to

18 you?

19     A.  Yes.

20     Q.  What were those reasons?

21     MR. GARDNER:  Objection.  Calls for

22 information subject to deliberative process

1 privilege.  I instruct the witness not to answer.

2     THE WITNESS:  Consistent with that

3 instruction, I can't answer.  But I do admire your

4 tenacity.

5 BY MR. HO:

6     Q.  On the first page, the second e-mail

7 listed here is from Ron Jarmin to Art Gary on

8 January 26th, 2018 and reads, "Art, any chance of

9 meeting late next week?  Thanks.  Ron."

10     As of this date, it had not yet been

11 communicated to the Census Bureau that the --

12 whether or not the Department of Justice would

13 meet to discuss the Census Bureau's other proposal

14 for producing block-level CVAP data, correct?

15     A.  I'm not sure I know the answer to that

16 question.

17     Q.  Who informed Art Gary of the decision not

18 to meet with the Census Bureau to discuss their

19 alternative proposal for producing block-level

20 CVAP data?

21     A.  I did.

22     Q.  When did you inform Mr. Gary of that

69 (Pages 270 - 273)

Page 286

1  record.
2      MR. GARDNER:  Whatever you wish.
3      VIDEO TECHNICIAN:  This concludes media
4  unit number 4.  The time on the video is 2:55 p.m.
5  We are off the record.
6      (A recess was taken.)
7      VIDEO TECHNICIAN:  This begins media unit
8  number 5.  The time on the video is 3:16 p.m.  We
9  are on the record.
10 BY MR. HO:
11     Q.  Mr. Gore, as the head of the civil rights
12 division, you want the civil rights division to
13 have access to the most accurate CVAP data for
14 purposes of VRA enforcement, right?
15     A.  Right.
16     Q.  You would like it if technical staff from
17 the civil rights division could meet with the
18 Census Bureau to discuss what the Census Bureau
19 believes is the most accurate CVAP data for
20 purposes of VRA enforcement, right?
21     MR. GARDNER:  Objection.  Form.
22     THE WITNESS:  Again, I think you're

Page 287

1  asking me a hypothetical question.  And as I
2  understand the Census Bureau's position, including
3  from Secretary Ross' memo and Dr. Jarmin's own
4  testimony to Congress on May 8th, they believe
5  that the data that Secretary Ross has decided to
6  provide and described in his memo of decision is
7  the most appropriate data for responding to the
8  DOJ request.
9  BY MR. HO:
10     Q.  Wasn't my question.
11     My question was, you would like it --
12 given your desire for the Department of Justice to
13 have the most accurate CVAP data available, you
14 would like it if Department of Justice technical
15 staff could meet with the Census Bureau to learn
16 about the Census Bureau's views about the most
17 accurate CVAP data available, correct?
18     MR. GARDNER:  Objection.  Form.
19     THE WITNESS:  Yeah, I think that's a
20 hypothetical question, and the Census Bureau has
21 made its view known to us through Secretary Ross'
22 memo of decision and the testimony it provided to

Page 288

1  Congress on May 8th.
2  BY MR. HO:
3      Q.  Well, before Secretary Ross' decision
4  memo -- that decision memo was in March of 2018,
5  correct?
6      A.  Sounds right.
7      Q.  Okay.  So before Secretary Ross' memo,
8  you didn't know what the Census Bureau's views
9  were about the most accurate form of CVAP data,
10 correct?
11     A.  That's probably correct.  Yeah.
12     Q.  Okay.  So before March of 2018, as
13 someone who wants the Department of Justice to
14 have the most accurate CVAP data for VRA
15 enforcement, you wanted to be able to have a
16 meeting of DOJ technical staff with the Census
17 Bureau to learn about the Census Bureau's views
18 about the most accurate CVAP data, correct?
19     MR. GARDNER:  Objection.  Hypothetical.
20     THE WITNESS:  That's a hypothetical.
21     MR. HO:  It's not a hypothetical.
22

Page 289

1  BY MR. HO:
2      Q.  There was a request from the Census
3  Bureau to meet with the Department of Justice
4  technical staff.  And you wanted that meeting to
5  happen, right, Mr. Gore?
6      A.  I think you're asking me about my
7  deliberative process with respect to whether the
8  Department of Justice would consider alternatives
9  suggested by the Census Bureau or somebody else.
10     Q.  I'm not asking you about your process.
11 I'm just asking that, as the head of the civil
12 rights division and someone who wants the civil
13 rights division to have the most accurate CVAP
14 data possible, when the Census Bureau reached out
15 and said, let's have a meeting to talk about the
16 most accurate CVAP data, you wanted to have that
17 meeting, right?
18     MR. GARDNER:  Yeah -- objection.  That
19 does call for information subject to deliberative
20 process privilege.
21     To the extent you can answer that without
22 divulging privileged information, you may do so.

73 (Pages 286 - 289)

Page 290

1  Otherwise, I instruct you not to answer.
2      THE WITNESS:  Consistent with that
3  instruction, I can't answer.
4  BY MR. HO:
5      Q.  When was the decision made not to have a
6  meeting with Census Bureau technical staff about
7  their proposal to provide CVAP data at the block
8  level without a citizenship question?
9      A.  I believe it was made the day that
10  Mr. Gary communicated that decision back to the
11  Census Bureau.
12      Q.  Well, you testified earlier that the
13  decision not to hold that meeting was made by
14  Attorney General Sessions, right?
15      A.  That's correct.
16      Q.  When did Attorney General Sessions make
17  the decision not to have that meeting?
18      A.  I don't know when he made that decision.
19      Q.  Did he make that decision during your
20  meeting with him?
21      A.  I don't know when he made that decision.
22      Q.  Was that meeting made before -- sorry.

Page 291

1      Was that decision made before your
2  meeting with him to talk about the proposed
3  meeting with the Census Bureau?
4      A.  I don't know.
5      Q.  When was it communicated to you not to
6  have a meeting with the Census Bureau to discuss
7  their proposal?
8      A.  I don't remember the precise date.
9      Q.  During your meeting with the attorney
10  general, was it communicated to you not to have
11  the meeting with the Census Bureau?
12      MR. GARDNER:  Objection.  Calls for
13  information subject to deliberative process
14  privilege.
15      To the extent you can answer without
16  divulging privileged information, you may do so.
17  Otherwise, I instruct you not to answer.
18      THE WITNESS:  Consistent with that
19  instruction, I can't answer.
20  BY MR. HO:
21      Q.  So just to be clear, your testimony is
22  that the meeting that you had with the attorney

Page 292

1  general, that was pre-decisional, that the
2  decision not to meet with the Census Bureau hadn't
3  been made yet at that point, correct?
4      A.  That is correct.
5      Q.  And the decision wasn't made at some
6  point during the meeting so that some portion of
7  the meeting became post-decisional, correct?
8      A.  That is correct.
9      Q.  All right.  I want to show you a
10  document.
11      (Gore Deposition Exhibit 23 marked for
12      identification and attached to the
13      transcript.)
14  BY MR. HO:
15      Q.  This was produced to us by the Department
16  of Justice.  It's the fourth privilege log from
17  the Department of Justice in response to our
18  document subpoenas in this case.  It's dated
19  October 3rd, 2018.  And I want to ask you a
20  question about an entry on page 49 of the
21  document.
22      The second-to-last entry on this page is

Page 293

1  entry number 694.  It refers to a document with
2  the Bates number DOJ 30395.
3      Do you see that?
4      A.  I do.
5      Q.  The description of this document is that
6  it is an e-mail from Brett Shumate to you dated
7  March 25th, 2018, correct?
8      A.  Yes.
9      Q.  And the description of this document
10  reads, "E-mail among DOJ attorneys discussed and
11  providing legal advice on a draft of Commerce's
12  decision memo concerning the reinstatement of a
13  citizenship question on the census.  The e-mail
14  includes attorneys' thoughts and mental
15  impressions concerning anticipated litigation and
16  would reveal deliberative material that pre-dates
17  Commerce's final decision memo."
18      Did I read that right?
19      A.  Yes.
20      Q.  Okay.  So it's correct that you received
21  a draft of Commerce's decision memo before the
22  final memo became public, correct?

74 (Pages 290 - 293)

1 the second sentence.

2        Before the red-line, that sentence

3 appears to read, "As you noted, the department

4 sent a letter to the Census Bureau asking that the

5 Census Bureau reinstate a question regarding

6 citizenship on the 2020 census questionnaire in an

7 effort to obtain accurate data needed to protect

8 against racial discrimination in voting."

9        Does that appear correct to you?

10    A. That appears to be correct, yes.

11    Q. It was revised to read, "As you noted,

12 the department sent a letter to the Census Bureau

13 asking the Census Bureau -- asking that the Census

14 Bureau reinstate a question regarding citizenship

15 on the 2020 census questionnaire in an effort to

16 obtain the most accurate data to protect against

17 racial discrimination in voting" with the

18 word "needed" struck out, correct?

19    A. That appears to be correct.

20    Q. Okay. The comment bubble reads, "This

21 edit is designed conform to the original JMD

22 letter, which did not say the data was necessary,

1 but did indicate it would assist our enforcement

2 efforts. John's note to CIV specifically noted

3 that the letter did not say the data

4 was 'necessary,' and I think we should avoid that

5 term."

6        Did I read that right?

7    A. Yes, you did.

8    Q. Okay. So it correct, as this comment

9 notes, that the December 12 letter requesting a

10 citizenship question be added to the census did

11 not say that it was necessary to collect CVAP data

12 through the census questionnaire for VRA

13 enforcement?

14    A. That is correct.

15    Q. And as the comment bubble indicates, you,

16 Mr. Gore, have at some point specifically noted

17 that the letter did not use the word "necessary"

18 with respect to collecting CVAP data through the

19 census questionnaire, correct?

20    A. That is what the comment says. Correct.

21    Q. And you -- my question was, you,

22 yourself, have specifically noted that the

1 December 12 letter, the Gary letter, did not use

2 the word "necessary" with respect to the inclusion

3 of a citizenship question on the 2020 census,

4 correct?

5    A. Yes, I have just noted that in my

6 testimony. I will say I don't know -- I have no

7 recollection of what this comment is referring to.

8    Q. You agree, right, Mr. Gore, that CVAP

9 data collected through the census questionnaire is

10 not necessary for DOJ's VRA enforcement efforts?

11    A. I do agree with that. Yes.

12    Q. I'm going to show you another document.

13 We'll mark this as 26 and 27.

14        (Gore Deposition Exhibits 26 and 27

15        marked for identification and attached to

16        the transcript.)

17 BY MR. HO:

18    Q. 26 is an e-mail from Mr. Aguinaga to you

19 dated June 12th, 2018, correct?

20    A. Yes, it is.

21    Q. And the subject is, QFR responses,

22 correct?

1    A. That is correct.

2    Q. And there's an attachment of 2020 census

3 hearing Gore QFRs CRT draft, correct?

4    A. Correct.

5    Q. Exhibit 27 has draft responses from you

6 to questions posed by Congressman Jimmy Gomez,

7 correct?

8    A. Yes, that's correct.

9    Q. The second answer on Exhibit 27 -- or the

10 second question and answer on Exhibit 27 read, "To

11 Mr. Gore: Is the DOJ and Attorney

12 General Sessions still in agreement with that

13 opinion? Is there any provision of any law that

14 may compel census to disclose confidential census

15 data for law enforcement or national security

16 purposes?"

17        And the response, as drafted, reads, "No

18 one should have to fear responding to the census

19 questionnaire or to a citizenship question if, in

20 fact, it is included. To that end, the department

21 is committed to abiding by all laws protecting the

22 confidentiality and non-disclosure of such

# EXHIBIT 41

Page 1

1             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                   SAN FRANCISCO DIVISION

3

4       _____
                                    :
5       CITY OF SAN JOSE, et al.,:
                                    :
6            Plaintiffs,     :
                                    : Case No.
7       vs.                  : 3:18-cv-2279-RS
                                    :
8       WILBUR ROSS, JR., et al.,:
                                    :
9            Defendants.      :
        _____:

10

11

12             Thursday, October 25, 2018

13

14         Videotape Deposition of SAHRA PARK-SU,
15      taken at the Law Offices of Manatt, Phelps &
16      Phillips, LLP, 1050 Connecticut Avenue NW,
17      Washington, D.C., beginning at 9:40 a.m.,
18      before Ryan K. Black, a Registered Professional
19      Reporter, Certified Livenote Reporter and Notary
20      Public in and for the District of Columbia.

21

22             Veritext Legal Solutions
                Mid-Atlantic Region
             1250 Eye Street NW - Suite 350
23           Washington, D.C.  20005

24

25

Page 2

1    A P P E A R A N C E S:
2
3    MANATT, PHELPS & PHILLIPS LLP
4    BY: RORY E. ADAMS, ESQUIRE
5    1050 Connecticut Avenue
6    Washington, DC  20036
7    202.585.6614
8    radams@manatt.com
9    Representing - City of San Jose
10
11    ASIAN AMERICANS ADVANCING JUSTICE
12    BY: NIYATI SHAH, ESQUIRE
13    1620 L Street NW
14    Suite 1050
15    Washington, DC  20036
16    202.296.2300
17    nshah@advancingjustice-aajc.org
18    Representing - Lupe, et al.
19
20
21
22
23
24
25

Page 4

1    A P P E A R A N C E S (Cont'd):
2
3    UNITED STATES DEPARTMENT OF COMMERCE
4    OFFICE OF THE GENERAL COUNSEL
5    BY: MEGAN HELLER, ESQUIRE
6    Herbert C. Hoover Building
7    Room 5890
8    1401 Constitution Avenue, NW
9    Washington, DC  20230
10    202.482.4837
11    mheller@doc.gov
12    Representing - Department of Commerce
13
14    UNITED STATES DEPARTMENT OF JUSTICE
15    BY: KATE BAILEY, ESQUIRE
16    Federal Programs Branch
17    20 Massachusetts Avenue, NW
18    Washington, DC  20530
19    202.514.9239
20    kate.bailey@usdoj.com
21    Representing - Department of Commerce
22
23
24
25

Page 3

1    A P P E A R A N C E S (Cont'd):
2
3    ARNOLD & PORTER LLP
4    BY: CHASE RAINES, ESQUIRE
5    610 Massachusetts Avenue, NW
6    Washington, DC  20001
7    202.942.5917
8    chase.raines@arnoldporter.com
9    Representing - NYIC Plaintiffs
10
11    COVINGTON & BURLING LLP
12    BY: DANIEL GRANT, ESQUIRE
13    One CityCenter
14    850 Tenth Street, NW
15    Washington, DC  20001
16    202.662.6000
17    dgrant@cov.com
18    Representing - Kravitz Plaintiffs
19
20
21
22
23
24
25

Page 5

1    A P P E A R A N C E S (Cont'd):
2
3    CALIFORNIA OFFICE OF THE ATTORNEY GENERAL
4    BY: GABRIELLE D. BOUTIN, ESQUIRE
5       (Via Teleconference)
6    P.O. Box 944255
7    Sacramento, California  94244
8    916.323.5313
9    gabrielle.boutin@doj.ca.gov
10    Representing - State of California
11
12    HOLLAND & KNIGHT LLP
13    BY: DAVID I. HOLTZMAN, ESQUIRE
14       (Via Teleconference)
15    50 California Street
16    Suite 2800
17    San Francisco, California  94111
18    415.743.6900
19    david.holtzman@hklaw.com
20    Representing - County of Los Angeles
21
22
23
24
25

2 (Pages 2 - 5)

Page 6

1    A P P E A R A N C E S (Cont'd):
2
3    DANNIS WOLIVER KELLEY
4    BY:  KEITH A. YEOMANS, ESQUIRE
5        (Via Teleconference)
6    115 Pine Avenue
7    Suite 500
8    Long Beach, California  90802
9    562.366.8500
10   kyeomans@dwkesq.com
11   Representing - Los Angeles Unified School
            District
12
13
14
15
16
17
18
19
20
21
22
23
24   ALSO PRESENT
25   Gene Aranov - Legal Videographer

Page 7

1            I N D E X
2    TESTIMONY OF:  SAHRA PARK-SU        PAGE
3    By Mr. Adams...........................14, 207
4    By Ms. Bailey.........................32, 199
5        E X H I B I T S
6    EXHIBIT        DESCRIPTION        PAGE
7    Exhibit 1    a printout of Ms. Park-Su's
8        former LinkedIn page............57
9    Exhibit 2    a document Bates Numbered 2630..71
10   Exhibit 3    an e-mail from Secretary Ross
11       to Earl Comstock on August 10th,
12       2017............................80
13   Exhibit 4    an e-mail from Ms. Park-Su to
14       Earl Comstock copying others sent
15       on August 29th, 2017............82
16   Exhibit 5    an e-mail......................87
17   Exhibit 6    a document Bates Numbered
18       1378............................89
19   Exhibit 7    a document Bates Numbered
20       COM_DIS14166....................92
21   Exhibit 8    a document Bates Numbered
22       2446...........................100
23   Exhibit 9    a document Bates Numbered
24       3691...........................105
25

Page 8

1            I N D E X (Cont'd)
2    EXHIBIT        DESCRIPTION        PAGE
3    Exhibit 10    a document Bates Numbered
4        663...........................107
5    Exhibit 11    a June 22nd, 2018, e-mail from
6        David Langdon to Ms. Park-Su...110
7    Exhibit 12    a document Bates Numbered
8        3549...........................118
9    Exhibit 13    a document Bates Numbered
10       1984...........................127
11   Exhibit 14    a document Bates Numbered
12       3503...........................129
13   Exhibit 15    a document Bates Numbered
14       1277...........................134
15   Exhibit 16    a document Bates Numbered
16       3706...........................138
17   Exhibit 17    Defendant's Objections and
18       Responses to Plaintiff's Third Set
19       of Interrogatories in the New York
20       Action, Case No. 18-2025.......139
21   Exhibit 18    a document Bates Numbered
22       1286...........................140
23   Exhibit 19    a document Bates Numbered
24       1616...........................145
25

Page 9

1            I N D E X (Cont'd)
2    EXHIBIT        DESCRIPTION        PAGE
3    Exhibit 20    a document Bates Numbered
4        1964...........................150
5    Exhibit 21    a document Bates Numbered
6        13023..........................151
7    Exhibit 22    a document Bates Numbered
8        9812...........................160
9    Exhibit 23    a document Bates Numbered
10       3403...........................160
11   Exhibit 24    a document Bates Numbered
12       2935...........................164
13   Exhibit 25    the schedule of Secretary
14       Wilbur Ross for Wednesday
15       March 7th, 2018................174
16   Exhibit 26    a document Bates Numbered
17       0003566........................177
18   Exhibit 27    an Outlook calendar invite.....179
19   Exhibit 28    a document Bates Numbered
20       001313.........................181
21   Exhibit 29    a certification by Ms.
22       Park-Su........................185
23   Exhibit 30    a document Bates Numbered
24       001321.........................192
25

3 (Pages 6 - 9)

1       I N D E X (Cont'd)

2    EXHIBIT        DESCRIPTION        PAGE

3    Exhibit 31   a document Bares Numbered

4          COM_DIS14052...................196

5    Exhibit 32   a letter to Catherine Lhamon

6          from Secretary Ross dated

7          July 5, 2018...................199

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  Good morning.

2          We are going on the record at 9:40

3    a.m. on October 25th, 2018.  Please note that

4    the microphones are sensitive and may pick up

5    whispering, private conversations and cellular

6    interference.  Please turn off all cell phones,

7    or place them away from the microphones, as they

8    can interfere with the deposition audio.  Audio

9    and video recording will continue to take place

10   unless all parties agree to go off the record.

11         This is Media Unit 1 of the

12   video-recorded deposition of Sahra Park-Su taken

13   by counsel for plaintiff in the matter of the

14   City of San Jose, et al., versus Wilbur M.

15   Ross, Jr., et al., filed in the United States

16   District Court for the Northern District of

17   California, San Francisco Division, Case Number

18   3:18-cv-2279-RS.

19         This deposition is being held at

20   Manatt Phelps & Phillips, located at 1050

21   Connecticut Avenue Northwest, Suite 600,

22   Washington, D.C.

23         My name is Gene Aranov, from the

24   firm Veritext Legal Solutions, and I'm the

25   videographer.  The court reporter is Ryan Black,

1    from the firm of Veritext Legal Solutions.

2          I'm not authorized to administer

3    an oath, I'm not related to any party in this

4    action, nor am I financially interested in the

5    outcome.

6          Counsel and all present in the room,

7    and everyone attending remotely, will now state

8    their appearances and affiliations for the

9    record.  If there are any objections to

10   proceeding, please state them at the time of

11   your appearance, beginning with the noticing

12   attorney.

13         MR. ADAMS:  Good morning.  This is

14   Rory Adams.  I represent Plaintiffs City of

15   San Jose and the Black Alliance for Just

16   Immigration.

17         MS. SHAH:  Hi.  My name is Niyati

18   Shah.  I represent the plaintiffs in Lupe,

19   et al., versus Ross, et al., Case Number

20   8:18-01570, in the District of Maryland.

21         MR. RAINES:  Hi.  My name is Chase

22   Raines.  I represent the NYIC plaintiffs in

23   2:18-cv-5025, which is now consolidated with

24   2921 in the Southern District of New York.

25         MR. GRANT:  My name is Dan Grant,

1    from Covington & Burling.  I represent the

2    plaintiffs in Kravitz v. Department of

3    Commerce, et al., in the District of Maryland.

4          MS. HELLER:  My name is Megan Heller.

5    I'm agency counsel for the Department of

6    Commerce.

7          MS. BAILEY:  My name is Kate Bailey.

8    I'm with the Department of Justice, representing

9    defendants in this matter.

10         THE VIDEOGRAPHER:  Anybody on the

11   phone?

12         MS. BOUTIN:  Yes.  This is Gabrielle

13   Boutin --

14         MR. HOLTZMAN:  David Holtzman --

15         MS. BOUTIN:  -- rep --

16         MR. HOLTZMAN:  Go ahead, please.

17         MS. BOUTIN:  Thank you.

18         This is Gabrielle Boutin, representing

19   the State of California in the State of

20   California v. Roth.

21         MR. HOLTZMAN:  This is David Holtzman

22   of Holland & Knight, representing the County of

23   Los Angeles.

24         MR. YEOMANS:  Keith Yeomans,

25   representing Los Angeles Unified School District

4 (Pages 10 - 13)

1          (Deposition Exhibit No. 16, a document
2    Bates Numbered 3706, was marked.)
3          THE WITNESS:  Mm-hmm.  Okay.
4    BY MR. ADAMS:
5          Q.   Does this refresh your recollection
6    as to whether Secretary Kelly may have had
7    questions?
8          A.   I do not know.
9               Just to clarify, I don't know if
10   they're Karen's questions or if they're a
11   compilation of questions, but it sounds like
12   I had a copy of some questions -- her copy at my
13   desk.
14         Q.   At some point were the que -- were the
15   questions transmitted to the Census Bureau?
16         A.   I don't know.  I'd imagine they were,
17   because Census provided responses.
18         Q.   But you did not transmit them?
19         A.   I did not transmit those questions.
20         Q.   Did you receive responses to the
21   questions --
22         A.   I think --
23         Q.   -- from Census?
24         A.   -- I may have seen a copy of them.
25   I don't know if I was on an e-mail.  I can't

1    recall.
2          Q.   The administrative record reflects
3    multiple versions of these questions.  What do
4    you recall about the process of preparing a
5    final set of responses?
6          MS. BAILEY:  Objection; foundation.
7          THE WITNESS:  All I know was a final
8    copy was given to me to keep for record's sake,
9    and that's all I know.
10         MR. ADAMS:  I'd like to show you
11   what's been marked as Exhibit 17.
12         (Deposition Exhibit No. 17,
13   Defendant's Objections and Responses to
14   Plaintiff's Third Set of Interrogatories in the
15   New York Action, Case No. 18-2025, was marked.)
16   BY MR. ADAMS:
17         Q.   Exhibit 17 is Defendant's Objections
18   and Responses to Plaintiff's Third Set of
19   Interrogatories in the New York -- in the
20   related New York action, Case Number 18-5025.
21   I'd like to direct your attention to Page 2 of
22   the document.
23         A.   Mm-hmm.
24         Q.   And at the bottom of the page
25   is Interrogatory Number 5.  With regard to

1    draft and final response to Question 31 in the
2    questions on the January 19th draft census memo
3    on the DOJ Citizenship Reinstatement Request,
4    found at Administrative Record 2303 to 2304 and
5    Administrative Record 196, please identify, A,
6    all persons who worked on any draft of the
7    response.
8          A.   Mm-hmm.
9          Q.   And in response the Department of
10   Commerce responded with a list of names, among
11   others, yours, correct?
12         A.   Mm-hmm.  Yes.
13         Q.   In what ways did you work on a
14   draft of the response to Question 31, and I
15   can -- would it help to show you Question 31?
16         A.   Sure.  That would be helpful.  I think
17   it's in reference to what we spoke about
18   earlier, --
19         Q.   It is.
20         A.   -- but I'd love to see a copy.
21         MR. ADAMS:  Sure.  So what I'm marking
22   as Exhibit Number 18 is Bates Number 1286 from
23   the administrative record.
24         (Deposition Exhibit No. 18, a document
25   Bates Numbered 1286, was marked.)

1    BY MR. ADAMS:
2          Q.   And Question 31 appears on Page 11.
3          A.   Mm-hmm.
4          Q.   What is the process that was used
5    in the past to get questions added to the
6    Decennial Census, or do we have something
7    similar where a precedent was established?
8          A.   Mm-hmm.
9          Q.   And as we saw in Exhibit 17, the
10   Department of Commerce responded with your name
11   when asked for all people who worked on any
12   draft of the response.
13         A.   Yep.
14         Q.   And what work did you do on a draft of
15   re -- of the response to this question?
16         A.   Yes.  It goes back to what I mentioned
17   earlier.  Census, based off of our understanding
18   of our meetings with them, had indicated that
19   there was a distinction between the process
20   that's used at questions to the American
21   Community Survey, which they had shared with
22   us, and that the Decennial Census did not
23   necessarily have a similar process, to their
24   knowledge, that they could point to.
25   And, therefore, it would not be an accurate

36 (Pages 138 - 141)

1  characterization to say that it was the same.
2      And so based off of that, Census was
3  to go about -- my understanding from the meeting
4  was that Census was going to go back and work on
5  the draft response to Question 31.
6      Now, as I mentioned, these were
7  extremely busy times. And I think a few days,
8  if not a week or so had gone by, and this was
9  not updated. And I was in a meeting with Mike
10 Walsh, we had a call with Census in lieu of an
11 in-person meeting that we typically have, and
12 had a hard copy of this and had asked Mike
13 Walsh, our Deputy General Counsel, based off
14 of his recollection of our meeting with Census,
15 could he draft together a draft response so that
16 I can send it to Census for clearance, comments
17 or edits so I could get the ball rolling so we
18 can finalize these answers.
19     Mike Walsh then handwrote the draft
20 response for me on my paper, which then I then
21 went back and typed it up and sent it to Census.
22 I sent it to -- by e-mail to Ron Jarmin, I
23 believe Enrique Lamas, Christa, which those are,
24 typically, the people that I'll e-mail asking
25 for their comments, suggestions or clearance on

1  this.
2      And that was my involvement regarding
3  this question and answer.
4      Q.  When was -- so Census sent a draft
5  response to Question 31 to Commerce?
6      A.  Mm-hmm.
7      Q.  And you asked at some point for a
8  revision to that response?
9      A.  I don't recall myself asking. I
10 remember at the meeting the understanding was
11 Census was going to go back, because I don't
12 believe this was the only one where they were
13 going to revisit. This was one of some that
14 Census was supposed to come back with their
15 revision.
16     Q.  Do you recall when Census was first
17 asked to revisit their initial response to
18 Question 31?
19     A.  I don't. I would imagine it
20 probably wasn't too long after they provided
21 this response, and it was probably during the
22 course of one of our subsequent meetings with
23 them, either weekly or biweekly, or even a phone
24 conversation -- no, it was an in-person meeting.
25 Excuse me.

1      Q.  Did the Census Bureau provide
2  revisions to other responses to questions?
3      A.  That I don't remember.
4      Q.  Was there urgency in getting answers
5  to these questions, from the perspective of the
6  Department of Commerce?
7      A.  I think there's always an urgency to
8  try to get information for the Secretary to
9  review.
10     Q.  I noticed you were nodding when I
11 asked the question. Was there any particular
12 urgency in -- in this situation to getting
13 responses to these questions?
14     A.  Probably because our understanding
15 from census was that there was a very, very
16 short period of time for the Secretary to
17 consider Department of Justice's request, review
18 Census's recommendations and make a deliberation
19 whether to move forward or not to move forward,
20 for them to move forward. And I think it was,
21 maybe, three months, or maybe even less than,
22 that, from my understanding.
23     Q.  Which -- which makes sense timing-wise
24 with the March decision.
25     A.  With them having -- with Census having

1  to prepare the questions to send up to Congress.
2      Q.  Did Mike Walsh draft revised responses
3  to any questions, other than Question 31?
4      A.  Not that I'm aware of.
5      Q.  In terms of timing, would you agree
6  that Census provided initial responses to most
7  of the 35 questions by the beginning of February
8  2018?
9      A.  Likely. Census tries to turn around
10 information as quickly as they can.
11     But as you can see from Question 30,
12 there's a lot of back and forth where Census
13 would come back and ask, we're not sure what
14 you're asking for, please clarify the question.
15     MR. ADAMS:  I'd like to show you
16 what's been marked as Exhibit Number 19.
17     (Deposition Exhibit No. 19, a document
18 Bates Numbered 1616, was marked.)
19 BY MR. ADAMS:
20     Q.  This is Bates Number 1616, and I'd
21 like to turn to Question Number 31.
22     A.  Mm-hmm.
23     Q.  And if you could review the response
24 to Question 31 and let me know when you've had a
25 chance to look at it.

37 (Pages 142 - 145)

1    aware, that process is ongoing.  I think "as
2    upon its conclusion" probably should have been
3    a separate paragraph and it should have been
4    clarified that "upon its conclusion of looking
5    at the Department of Justice request with
6    regards to Decennial Census", that it's still
7    ongoing and that the information would be
8    provided to the Secretary for consideration.
9    But, again, I wrote this based upon what was
10   given to me --
11       Q.  Typing --
12       A.  -- without any corrections.  Right.
13       Q.  Typing up verbatim what you received
14   from Mr. Walsh?
15       A.  Correct.
16       Q.  Christa Jones responded to you and
17   said, Sahra, I'm fine with this.  This is not
18   to say that there weren't some improvements and
19   presentation changes for the topics between
20   1990, 2000, 2010 and planned for 2020.  I just
21   want us all to be clear that the questionnaires
22   were not -- was not identical from 1990 to now.
23       A.  Mm-hmm.
24       Q.  Aside from this response from
25   Ms. Jones, did you receive any other responses

1    or feedback from Mr. Jarmin, Mr. Lamas or
2    Ms. Jones about this proposed response?
3        A.  No.  And the reason why Christa is
4    always copied on any e-mail to Ron and Enrique
5    is so that she can also ping them and check with
6    them in the event that they missed an e-mail
7    from us.
8            And so Christa was my liaison
9    over there to ensure that we could get a timely
10   response from Census, and, if she responded,
11   then that was good as -- as what census was
12   going forward with, so that was my
13   understanding.
14       Q.  So your understanding -- was it
15   your understanding that Census had reviewed and
16   approved of the language that Mr. Walsh wrote on
17   your hard copy and you retyped here?
18       A.  That's what I took it as.
19       Q.  Following -- following this exchange,
20   did Commerce send to you any other revisions to
21   a response to Question 31?
22       A.  No, not that I can recall.
23       Q.  Can you recall -- do you know whether
24   they -- whether Census sent anyone within the
25   Department of Commerce a further revision of the

1    response to Question 31?
2        A.  I do not know.  As far as I was
3    concerned, this was done and over and we can
4    move on.
5        Q.  From your perspective, you said it's
6    done and over and we can move on, so you view
7    this language as having been approved final
8    language for the response to Question 31?
9        A.  With regards to Census's review, that
10   was my understanding.
11       Q.  Was there further review of the
12   response within the Department of Commerce?
13       A.  I do not know.  At this point there
14   are a lot of e-mails going back and forth,
15   so ...
16           MR. ADAMS:  I'd like to show you
17   what's been marked as Exhibit Number 22, and
18   this is Bates Number 9812.
19           (Deposition Exhibit No. 22, a document
20   Bates Numbered 9812, was marked.)
21           MR. ADAMS:  Before we go to this
22   exhibit, I want to go back to what we were just
23   discussing and show you Exhibit 23.
24           (Deposition Exhibit No. 23, a document
25   Bates Numbered 3403, was marked.)

1            MR. ADAMS:  It's Bates Numbered 3403.
2    BY MR. ADAMS:
3        Q.  And if you compare this document,
4    Exhibit Number 23, with Exhibit Number 21,
5    which was the e-mail we were just looking at, --
6        A.  Right.
7        Q.  -- would you agree that the February
8    23rd, 6:50 p.m. e-mail that has redactions in
9    Exhibit 23 is the same as the unredacted version
10   we see in 21?
11           MS. BAILEY:  Objection; foundation.
12           THE WITNESS:  Maybe.  I don't -- I
13   mean, I see the date and I see the time.  Other
14   than the redacted portion, which I don't know
15   what it is, I -- maybe.  Everything else seems
16   the same.
17   BY MR. ADAMS:
18       Q.  At the top of Exhibit 23 --
19       A.  Mm-hmm.
20       Q.  -- the body of the e-mail says,
21   thanks, everyone.  KDK.
22       A.  Mm-hmm.
23       Q.  The from address is redacted, but
24   would it be fair to say that this appears to be
25   an e-mail from Secretary Kelly?

Page 166

1    A.   The one that was cleared by Census.
2         MR. ADAMS:   Could we go off the record
3    for two minutes?
4         THE VIDEOGRAPHER:   We're going off the
5    record.   The time is 1:53 p.m.
6         (Brief recess.)
7         THE VIDEOGRAPHER:   We're back on the
8    record.   The time is 1:55 p.m.
9    BY MR. ADAMS:
10       Q.   I'd like to compare the different
11   versions of the response to Question 31 that we
12   have.
13       A.   Okay.
14       Q.   So there is the version in Exhibit 22,
15   which is the March 1st, 2018, memo from
16   Dr. Abowd.
17       A.   Okay.
18       Q.   There's the version in Exhibit 19.
19            I think this might be it.
20       A.   No, that's 18.   You said 19, right?
21   So Exhibit 19, --
22       Q.   Exhibit 19.
23       A.   -- and then what was the one before
24   that that you asked?   Oh, and then this one, --
25       Q.   And Exhibit --

Page 167

1    A.   -- Exhibit 22?
2    Q.   So 18, 19, --
3    A.   Nineteen.
4    Q.   -- 21 and 22.   So we have four -- four
5    documents.
6    A.   Okay.   Okay.
7    Q.   Starting with 19 and 22, --
8    A.   19 and 22.   Okay.
9    Q.   Okay.
10        -- would you agree that these versions
11   of the response to Question 31 are the same?
12   A.   I'm sorry.   That the response to --
13   Q.   Question 31.
14   A.   -- 31 for Exhibit 18 --
15   Q.   19 and 22.
16   A.   -- 19 -- I'm sorry.
17   Q.   I'm sorry.
18   A.   I'm sorry.   One more time.   For 19 and
19   22, are they the same?
20   Q.   Yes.
21   A.   Okay.   Yes, they read the same.
22   Q.   Turning to the version in Exhibit 21,
23   this is the e-mail version with the typed-up
24   version of Mr. Walsh's response?
25   A.   Mm-hmm.   Twenty-one.   Okay.   Sorry.

Page 168

1    There's -- okay.
2    Q.   This had been communicated to Census
3    prior to March 1st, 2018, correct?
4    A.   Correct.
5    Q.   Are you aware of any reason why
6    Dr. Abowd would not be using this version of the
7    response to Question 31?
8         MS. BAILEY:   Objection.   Objection.
9    Calls for speculation.   Objection; foundation.
10        THE WITNESS:   I don't know.
11   BY MR. ADAMS:
12       Q.   Did -- did Dr. Abowd, to your
13   knowledge, express to anyone at the Department
14   of Commerce disagreement with the version of the
15   response in Exhibit 21?
16       A.   You mean the one that the Commerce
17   Department provided --
18       Q.   Yes.
19       A.   -- to 21?
20            I don't know.   I believe Dr. Abowd
21   is not in that e-mail that I had sent to Census.
22   I only had sent it, it seems, to Ron Jarmin,
23   Enrique Lamas, Christa Jones, Karen Dunn Kelly,
24   Mike Walsh and Brian Lenihan.
25       Q.   Before we compare the version of the

Page 169

1    response in Exhibit 21 to the version that's in
2    Exhibit 18, --
3    A.   Okay.
4    Q.   -- I just want to go back to 21
5    and make sure I understand what, if anything,
6    happened to this version of the response after
7    February 23rd, 2018.   Did you make any further
8    revisions to the response to Question 31?
9    A.   No.
10   Q.   To your knowledge, did Mr. Walsh
11   make any further revisions to the response?
12   A.   No.
13   Q.   To your knowledge, did Secretary Kelly
14   make any revisions to this version?
15   A.   No.
16   Q.   Are you aware of anyone who made
17   revisions to this version of Question 31 after
18   February 23rd?
19        MS. BAILEY:   Objection.   Asked and
20   answered.
21        THE WITNESS:   No.
22   BY MR. ADAMS:
23       Q.   If we could compare Exhibit 21 with
24   Exhibit 18, --
25       A.   Okay.

43 (Pages 166 - 169)

Page 170

1    Q.   Okay.
2         -- you would agree that these are not
3    identical, correct?
4    A.   Correct.
5    Q.   And the sentence, consistent with
6    longstanding practice for adding new questions
7    to the ACS survey, the Census Bureau is working
8    with relevant stakeholders.
9         MS. BAILEY:  Sorry.  Can we clarify
10   which exhibit?  I'm sorry.
11        MR. ADAMS:  Yes.  Exhibit 21.
12   BY MR. ADAMS:
13   Q.   There is a sentence in 21, consistent
14   with longstanding practice for adding new
15   question -- for adding new questions to the
16   ACS survey, the Census Bureau is working with
17   relevant stakeholders to ensure that legal and
18   regulatory requirements are fulfilled and that
19   the question would produce quality and useful
20   information for the nation.
21   A.   Mm-hmm.
22   Q.   That initial phrase, consistent with
23   longstanding practice for adding a new question
24   to the ACS survey, does not appear in the
25   version of the answer in Exhibit 18, --

Page 171

1    A.   Mm-hmm.
2    Q.   -- correct?
3    A.   Correct.
4    Q.   Do you know why?
5    A.   I do not know why.  It seems like
6    it's a truncated version of Exhibit 21.  It's
7    the same answer, just shortened.
8    Q.   You testified, and correct me if I'm
9    wrong, that you're not aware of anyone having
10   made further revisions to Question 31 as
11   reflected in Exhibit 21.
12   A.   Correct.
13   Q.   In terms of control of the -- the
14   document that had the responses to all of these
15   questions, I'd imagine it changed hands a number
16   of times; is that correct?
17   A.   Yes.  I would imagine.
18   Q.   And after February 23rd, people in
19   addition to you made revisions; is that correct?
20        MS. BAILEY:  Objection.  Calls for
21   speculation.
22        THE WITNESS:  I don't know.  I don't
23   know.
24   BY MR. ADAMS:
25   Q.   How many -- strike that.

Page 172

1         Do you know when responses to these
2    questions were presented to Secretary Ross?
3    A.   I do not know.
4    Q.   Does -- does Secretary Ross typically
5    review draft documents?
6         MS. BAILEY:  Objection; foundation.
7         THE WITNESS:  I don't know.
8    BY MR. ADAMS:
9    Q.   Do you know whether Secretary Ross
10   revises documents --
11        MS. BAILEY:  Object --
12   BY MR. ADAMS:
13   Q.   -- substantively?
14        MS. BAILEY:  Sorry.
15        Objection; foundation.
16        THE WITNESS:  For?
17   BY MR. ADAMS:
18   Q.   For example, do you know -- do you
19   know whether Secretary Ross reviewed and revised
20   the document containing responses to these
21   questions?
22   A.   I don't know.  For -- for Census, I
23   don't know, for this one.
24   Q.   Do you know whether others within
25   Commerce reviewed or revised these -- the

Page 173

1    responses to these questions after February
2    23rd?
3         MS. BAILEY:  Objection.
4         THE WITNESS:  The Secretary?
5         MS. BAILEY:  Objection.  Asked and
6    answered several times.
7         THE WITNESS:  No.
8    BY MR. ADAMS:
9    Q.   I've been asking about revisions by
10   people at the Department of Commerce.  Are you
11   aware of whether anyone within the Census Bureau
12   revised answers -- the answer to Question 31
13   after February 23rd, 2018?
14        MS. BAILEY:  Objection; foundation.
15        THE WITNESS:  No.  I don't know.
16   BY MR. ADAMS:
17   Q.   Who changed the response to Question
18   31 from the version reflected in Exhibit 21 to
19   the version reflected in Exhibit 18?
20        MS. BAILEY:  Objection.  Calls for
21   speculation, foundation, asked and answered.
22        THE WITNESS:  I don't know.
23   BY MR. ADAMS:
24   Q.   Okay.  With respect to -- with respect
25   to the process of considering DOJ's request,

44 (Pages 170 - 173)

# EXHIBIT 42

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF COMMERCE, et al., | CIVIL ACTION NO. 1:18-cv-2921 (JMF) |
| Defendants. | **AFFIDAVIT OF CHRISTINE PIERCE** |

Pursuant to 28 U.S.C. § 1746(2), I, Christine Pierce, hereby declare as follows:

1.      I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2.      I am the Senior Vice President of Data Science for The Nielsen Company (US) LLC ("Nielsen"). I am a social scientist by training and worked as a demographer for Nielsen prior to my current role leading a team of scientists who support Nielsen's audience measurement products. I earned a Master of Public Policy from the University of Minnesota and a graduate certificate in Applied Statistics from Pennsylvania State University. I frequently represent Nielsen at research conferences and have authored papers and presentations for the American Association of Public Opinion Research, the Advertising Research Foundation, and the Population Association of America. In the fall of 2018, the New York State Office of the Attorney General requested that I submit a voluntary affidavit in this case describing my communications with the Department of Commerce in lieu of potentially receiving a trial subpoena.

3.      I am submitting this affidavit in order to ensure that the record accurately reflects my communications with the Department of Commerce.

4.      In the spring of 2018, Nielsen received a request from an assistant to Secretary Ross asking to set up a meeting with someone at Nielsen who is familiar with Nielsen's use of Census data.  At the time, I was under the impression that the phone call would be to discuss the importance of the Census generally, the need for Nielsen and its commercial clients to have as complete and accurate a count as possible, and to advocate for full funding for Census operations.  Nielsen's SVP Community Engagement (Don Lowery) received this request.  When Don Lowery sent the email connecting me to the Secretary's office he included a statement that said "Christine looks forward to speaking to the Secretary regarding the importance of the 2020 Census to Nielsen."  *See* PX-532 (a true and accurate copy of email communications with Department of Commerce).

5.      Prior to the phone call, Brian Lenihan from Secretary Ross's staff asked me via email for a "copy of my biography (paragraph) along with a description of Data Science/Nielsen and how Census data comes into play."  I indicated that "For Nielsen, these public data sources such as the Decennial Census and ACS serve a crucial role in planning samples and consumer panels. Accurate population estimates enhances the sample design and ensures the most accurate coverage of households and persons with various demographic characteristics. Additionally, these public data sources are used to adjust the unweighted input to reflect the entire population." *See id.*

6.      I exchanged several emails with the staff regarding the date/time for the call.  The staff did not mention the citizenship question in any of these emails.  Other than the aforementioned biography and description, Secretary Ross's staff did not ask me to provide any

other documents or data nor did I provide any other data or documents to the Department of
Commerce in Spring 2018.

7.     On the evening of March 23, 2018, I had a telephone call with Secretary Ross and
Michael Walsh, a lawyer from the Commerce Department.  This telephone call lasted
approximately 10-20 minutes.  This was the only time that I spoke with Secretary Ross.  I
understand that three days after our conversation, Secretary Ross wrote a memo in which he
discussed our conversation (the "Ross Memo").

8.     Prior to speaking to the Secretary, I was not aware that the citizenship question
was going to be a topic of conversation.   However, it immediately became apparent that the
citizenship question was the only topic of conversation.  Secretary Ross and Mr. Walsh told me
that they needed to make a recommendation about whether to include a citizenship question on
the Decennial Census and were reaching out to experts and stakeholders to gather information.

9.     During this conversation, I told Secretary Ross unequivocally that I was
concerned that a citizenship question would negatively impact self-response rates.  I explained
that people are less likely to respond to a survey that contains sensitive questions.  I also added
that increasing the length of a survey can reduce response rates.   I discussed the impact that
lower response rates have on survey costs.  I emphasized that Census non-response follow up
operations are expensive because they require a full count and non-response follow up operations
for the Decennial Census include in-person data collection.

10.     The Ross Memo states that I "confirmed that, to the best of [my] knowledge, no
empirical data existed on the impact of a citizenship question on responses." (Ross Memo at 3).
I did not say "to the best of [my] knowledge no empirical data existed on the impact of a
citizenship question on responses."  I did discuss the importance of testing questions to

understand any impacts to response and I explained that a lack of testing could lead to poor survey results.  I confirmed that I was not aware of any such test of a citizenship question by the Census Bureau.   I cannot and did not attempt to quantify the extent of the reduction in self response.

11.     During our conversation, Secretary Ross and Mr. Walsh asked me if Nielsen asked any sensitive questions.  I told them that Nielsen does not ask about citizenship status on its surveys but that we do have surveys that occasionally include sensitive questions.

12.     The Ross Memo explains that Nielsen "stated that it had added questions from the ACS on sensitive topics" including "immigration status to certain short survey forms without any appreciable decrease in response rates." (Ross Memo at 3).  I did not state that Nielsen had added "questions concerning immigration status to short survey forms without any appreciable decrease in response rates."

13.     I did explain to Secretary Ross and Mr. Walsh that Nielsen does ask certain questions from the ACS in our surveys and of our panelists, including place of birth and year of entry to the United States. I stressed the importance of specifically testing changes to questionnaires and that Nielsen had done such testing specifically because we anticipated these sensitive questions could have a negative impact on response rates.   I did confirm that these place of birth and year of entry questions had not caused a significant decline in response rates on Nielsen surveys or in our panels.  But I did not suggest that Secretary Ross could draw parallels between the surveys conducted by Nielsen and the Decennial Census.

14.     Nielsen's survey and panel operations are entirely different from the Decennial Census operations. Nielsen surveys are not conducted by a government agency and are not required by law.  Nielsen studies are intended to understand consumer purchases and media

usage.   Response rates to the Nielsen surveys and panels in my purview generally range from 5% to 40%.   If individuals do not answer a Nielsen survey or decline to participate in a panel, Nielsen will select and recruit different respondents to ensure we have the desired reporting sample size.   While we strive for an accurate representation of the population, we are not required to count all people.   And unlike the Census, Nielsen provides incentives – usually cash – for filling out our surveys.

15.     To my knowledge, the Department of Commerce has not asked for any documents related to Nielsen's survey work or questionnaire testing.   To my knowledge, no one else at Nielsen has been asked for, or provided, any additional data, documents, or surveys to the Department of Commerce in response to the discussions around the citizenship question.

16.     I have reviewed a copy of the Commerce Department's notes of my March 23, 2018 conversation, marked as page 1276 in the Administrative Record ("AR 1276") for this case.

17.     AR 1276 states that "Ms. Pierce stated that including a question on citizenship could make people less likely to respond, but that there is no data to predict how much lower the response rate might be."   I do not recall making this statement as worded here.   Any statement like this would have been in the context of stressing the importance of conducting specific tests for the purpose of predicting the response rates.   Adding a citizenship question to the Decennial Census introduces risk specifically because the impacts have not been tested.

18.     AR 1276 states that I "noted that in the only specific situation she was aware of that sensitive questions were tested on a short questionnaire, there was no impact on response rates."   I did not state that "in the only specific situation that I was aware of that sensitive questions were tested on a short questionnaire, that there was no impact on response rates." However, I did discuss Nielsen's use of certain ACS questions and how Nielsen has tested those

questions specifically to understand any impact to response. I did not provide any written reports with testing results nor did I provide Nielsen data in an attempt to estimate the impact of adding a citizenship question to the Decennial Census.

Executed on October 25, 2018.

*Christine Pierce*

Christine Pierce