**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

| | | |
|---|---|---|
| ROBYN KRAVITZ, *et al.*, | * | |
| Plaintiffs, | * | Case No.: GJH-18-1041 |
| v. | * | |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | | |
| Plaintiffs, | * | Case No.: GJH-18-1570 |
| v. | * | |
| WILBUR ROSS, *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

Plaintiffs in two related cases, *Kravitz et al. v. United States Dep't of Commerce et al.*, 18-1041 and *LUPE et al. v. Ross et al.*, 18-1570, challenge the U.S. Census Bureau's decision to include a citizenship question on the 2020 Census. Plaintiffs contend that the addition of a

1

citizenship question violates the Administrative Procedures Act (APA) and the Constitution.[1] The *LUPE* Plaintiffs also allege that the question was added as part of a conspiracy to violate their civil rights in violation of 42 U.S.C. § 1985. The Defendants moved for summary judgment with respect to all claims asserted against them by both the *Kravitz* and *LUPE* Plaintiffs. ECF Nos. 67 (18-1041) and 82 (18-1570).[2] After a hearing, ECF No. 79 (18-1041), the Court entered an order on December 19, 2018, denying Defendants' Motions for Summary Judgment and permitting the parties to present evidence outside the administrative record at trial, ECF No. 80 (18-1041). This Memorandum Opinion explains that December 19, 2018 order and addresses the *Kravitz* Plaintiffs' Motion for Leave to File Third Amended Complaint, ECF No. 71 (18-1041), which is currently pending before the Court.

---

[1] The *Kravitiz* Individual named Plaintiffs are: Diana Alexander (Houston, Texas); Lauren Rachel Berman (Dallas, Texas); Sarah Bryan (Edinburg, Texas); Alejandro Chavez (Phoenix Arizona); Virginia Garcia (Laredo, Texas); Michael Kagan (Las Vegas, Nevada); Robyn Kravitz (District Heights, Maryland); Michael Kravitz (District Heights, Maryland); Yamile Labori (West Palm Beach, Florida); Lazara Yoelvis Magadan (Miami, Florida); Richard McCune (Nogales, Arizona); Jose Moreno (Somerton, Arizona); Catherine Nwosu (Langley Park, Maryland); Nnabugwu Nwosu (Langley Park, Maryland); Linda Rivas (El Paso, Texas); T. Carter Ross (Hyattsville, Maryland); Martha Sanchez (McAllen, Texas); Sonia Casarez Shafer (Pharr, Texas); and Joanne Wilson (Bowie, Maryland). The *LUPE* Individual named Plaintiffs are: Juanita Valdez-Cox (Texas), Gene Wu (Texas), Mia Gregerson (Washington), Cindy Ryu (Washington), Sharon Tomiko Santos (Washington), Raj Mukherji (New Jersey), OJ Semans (South Dakota). The *LUPE* Organizational named Plaintiffs are: La Unión del Pueblo Entero (LUPE), Texas Senate Hispanic Caucus, Texas House of Representatives Mexican American Legislative Caucus, Southwest Voter Registration Education Project, California Latino Legislative Caucus, Coalition for Humane Immigrant Rights, Dolores Huerta Foundation, Mi Familia Vota Education Fund, Somos Un Pueblo Unido, Georgia Association of Latino Elected Officials, Labor Council for Latin American Advancement, Promise Arizona, El Pueblo, Inc., Maryland Legislative Latino Caucus, Asian Americans Advancing Justice-Chicago, Asia Services in Action, Inc., Minkwon Center for Community Action Inc., Chelsea Collaborative, Chicanos por La Causa, Latino Community Fund of Washington, Arizona Legislative Caucus, California Asian Pacific Islander, Legislative Caucus, California Legislative Black Caucus, Oca-Greater Houston, Friendly House, Four Directions, Inc.

[2] The named Defendants in the *Kravitz* case are the United States Department of Commerce, United States Census Bureau, and the following officials sued in their official capacity: Wilbur L. Ross, Jr., Secretary of Commerce (the "Secretary"), Karen Dunn Kelley, Under Secretary for Economic Affairs, Ron Jarmin, Director of the Census Bureau, and Enrique Lamas, Deputy Director of the Census Bureau. The named Defendants in the *LUPE* case are Wilbur L. Ross in his official capacity as Secretary of Commerce, Ron Jarmin in his official capacity as Director of the Census Bureau, the United States Department of Commerce, and the United States Census Bureau.

## I. BACKGROUND

The factual background, as alleged in Plaintiffs' Complaints, is set forth in the Memorandum Opinions issued supporting the Court's Orders Denying Defendants' Motions to Dismiss. ECF No. 48 (18-1041); ECF No. 80 (18-1570). For efficiency sake, the Court in this Opinion will only highlight facts supported by record evidence that bare on the question of whether there are genuine disputes of material fact precluding summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment is often an appropriate mechanism for deciding claims arising under the APA. *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007). However, summary judgment will be inappropriate where resolution of a claim requires the fact-finder to make credibility determinations or inferences in favor of the moving party. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (courts must review summary judgment motions "without weighing the evidence or assessing the witnesses' credibility"); *see also Buffalo Cent. Terminal v. United States*, 886 F. Supp. 1031, 1047–48 (W.D.N.Y. 1995) (denying summary judgment on an APA claim because of credibility issues related to bad faith and pretext).

## III. DISCUSSION

In its Motions for Summary Judgment, Defendants argued that Plaintiffs lack standing, that the Court should not review evidence outside the administrative record to evaluate Plaintiffs' APA claims, and that, even considering extra-record evidence, no genuine disputes of material fact exist on the merits of Plaintiffs' claims and Defendants are entitled to judgment as a matter of law. Defendants also oppose the *Kravitz* Plaintiffs' Motion for Leave to File a Third Amended Complaint because they allege Plaintiffs acted with dilatory motive. Each of these arguments are addressed below.

### A. Standing

The Article III standing doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements at trial: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *see also Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016). At the summary judgment stage, Plaintiffs must "set forth by affidavit or other evidence specific facts" that support a finding of standing, which the Court will view in the light most favorable to the non-movant, but which may be challenged at trial. 504 U.S. at 561.

This Court previously concluded that Plaintiffs' Complaints included sufficient factual allegations for the Individual and Organizational Plaintiffs to meet the requirements of standing. ECF No. 48 (18-1041) at 10–17; ECF No. 80 (18-1570) at 9–13. Now, the Individual Plaintiffs have supported their factual allegations—that a citizenship question is substantially likely to lead to a disproportionate undercount, harming Plaintiffs' communities by reducing their political

power and federal funding—with evidence. Similarly, the Organizational Plaintiffs have introduced sufficient evidence, viewed in the light most favorable to them as the non-movant, to support their standing allegations.

### 1. Concrete injury-in-fact

To establish standing's injury-in-fact element, a plaintiff must show it "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged action. *Spokeo*, 136 S. Ct. at 1552 (quotation omitted). A plaintiff's injury or threat of injury must be "concrete and particularized," not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. If standing is based upon an alleged future injury, the plaintiff must demonstrate a substantial risk the harm will occur. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

#### a. Injury to the Individual Plaintiffs

The *Kravitiz* Individual Plaintiffs point to evidence that a citizenship question will cause a disproportional undercount, harming their communities because they live in areas with a higher percentage of those likely to be undercounted. By a conservative estimate the citizenship question will reduce response rates to the 2020 Census among households with a noncitizen by 5.1 percentage points, relative to households with only U.S. citizens. ECF No. 70 (18-1041) at 774. Further, there is evidence that a citizenship question will cause a decline in responses by Hispanic households. *Id.* at 629, 630, 724–25, 745; *see also* ECF No. 70-6 (18-1041) at 36, 75–76; ECF No. 70-1 (18-1041) at 8, 43. Additionally, Plaintiffs' expert Dr. Nancy Mathiowetz explains that a citizenship question is likely to lead to so-called roster omissions where, fearing the consequences of providing sensitive information about noncitizen household members, households respond to the Census questionnaire but conceal individual members. ECF No. 70-6 (18-1041) at 34, 73. Specifically, Dr. Mathiowetz writes: "[i]n light of the empirical evidence

concerning rostering errors, it is reasonable to estimate that rostering errors motivated by the addition of the citizenship question will be on the order of five percent and these rostering errors will impact both households with noncitizens as well as households with Hispanic members." *Id.* at 73.[3]

Defendants' argument that corrective measures will undisputedly remedy an undercount, ECF No. 67-1 (18-1041) at 16–18, is unconvincing at this stage. These corrective measures include non-response follow up (NRFU) with households that do not initially respond to the Census, attempts to contact a nearby proxy (i.e. neighbor or building manager), and use of administrative records to supplement data where households are nonresponsive. ECF No. 67-1 (18-1041) at 15–18. However, at the very least, it is disputed whether NRFU efforts will be successful because "[t]hose refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well," ECF No. 70 (18-1041) at 652, and NRFU cannot remedy expected roster omissions, *id.* at 862. Individuals choosing not to respond to the Census out of fear are not likely to be reassured by someone intrusively showing up at their homes. *See id.* at 652.

Defendants next argument, that the undisputed facts show an alleged undercount would not dilute Plaintiffs' votes or affect their communities' federal funding, is also flawed. To the contrary, evidence exists that the *Kravitz* Individual Plaintiffs will be harmed by a differential

---

[3] The Defendants' argument that the Court should disregard this estimate as unreliable is unconvincing. ECF No. 79 (18-1041) at 25. Dr. Mathiowetz's conclusion is consistent with deposition testimony by Defendants' expert Dr. Abowd that a citizenship question will cause at least an incremental increase in the number of households that respond to the census but do not provide a response for every member of the household. ECF No. 70 (18-1041) at 861. That consistency suggests that Dr. Mathiowetz's estimate should not be dismissed as plainly unreliable. Further, even if Dr. Mathiowetz's five percent estimate were excluded as evidence, the data she considered to arrive at this conclusion would not be. Thus, at the summary judgment stage, where evidence is viewed in the light most favorable to the non-movant, Defendants cannot defeat the showing that roster omissions are likely to occur at a potentially significant rate. To be sure, a dispute may exist about the magnitude of the problem, but that dispute can only be resolved through the weighing of evidence—a step that the Court is precluded from taking at the summary judgment stage.

undercount through vote dilution and loss of federal funding. *E.g.,* ECF No. 70-2 (18-1041) at 12; ECF No. 70-3 (18-1041) at 11. Specifically, Plaintiffs point to an expert opinion that a differential undercount of noncitizens and Hispanics will lead to vote dilution from malapportionment of congressional seats in California, Texas, and Arizona. ECF No. 70-2 (18-1041) at 11. Plaintiffs' expert found that a disproportionate undercount will result in vote dilution from intra-state redistricting because states use Census data to draw districts of equal population. *Id.* at 13. Further, Plaintiffs' experts opine that a disproportionate undercount will result in a loss of Medicaid, transportation, and Title I funding to Plaintiffs' communities. *See* ECF No. 70-5 (18-1041) at 6, 12, 14–15; ECF No. 70-7 (18-1041) at 5–6, 11–14.

Because evidence exists to support the *Kravitz* Plaintiffs' claim that a citizenship question will lead to a disproportionate undercount, vote dilution, and loss of funding, Defendants in that case are not entitled to summary judgment on standing's injury-in-fact element. Further, the *LUPE* Individual Plaintiffs point to essentially the same evidence discussed above to establish a substantial risk of a disproportionate undercount, differential vote dilution, and funding losses. *See* ECF No. 85 at 11–17. Thus, the *LUPE* Individual Plaintiffs have also demonstrated that genuine disputes of material fact remain as to standing's injury requirement.

### b. Injury to the Organizational Plaintiffs

Although "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47, 52 n. 2 (2006), the *LUPE* Organizational Plaintiffs have also introduced evidence that they or their members will sustain a direct injury because of a citizenship question, *see e.g.*, ECF No. 82-2 (18-1570) ¶¶ 61–62 & n. 52; ECF No. 85-9 (18-1570) ¶¶ 4, 10 & 12–15. An organizational plaintiff may establish standing's injury-in-fact element under the representational

7

standing doctrine by showing that its members have sustained an injury. *Am. Humanist Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 874 F.3d 195, 203–04 (4th Cir. 2017). Alternatively, organizations may establish associational standing injuries by showing "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

The Census Bureau relies on "Trusted Voices"—organizations that help the Bureau to reach communities that are typically reluctant to respond to the Census. ECF No. 82-2 (18-1570) ¶¶ 61–62 & n. 62. Defendants' expert Dr. Abowd confirmed that the Census Bureau will rely more heavily on these Trusted Voices, including some of the *LUPE* Organizational Plaintiffs, because a citizenship question will make traditionally hard-to-count populations even more reluctant to respond to the Census. *Id.* Plaintiffs also present evidence that several Organizational Plaintiffs have already begun or will imminently be forced to divert resources to help the communities they serve understand that being included in the final census count is critical. *See, e.g.*, ECF No. 85-9 (18-1570) ¶¶ 4, 10 & 12–15; ECF No. 85-10 (18-1570) ¶¶ 3–4, 6–11; ECF No. 85-11 (18-1570) ¶¶ 3, 11–16; ECF No. 85-12 (18-1570) ¶¶ 3–4, 8, 10–11 & 13–14; ECF No. 85-13 18 (18-1570) ¶¶ 3, 11–13; ECF No. 85-14 (18-1570) ¶¶ 3–4, 6–7, 9–12.

For example, according to the Executive Director of LUPE, the organization began its Census outreach and advocacy at least a year early. ECF No. 85-9 ¶ 12. The organization's "mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement," and it carries out this mission through "know-your-rights discussions and membership meetings," "issue-focused advocacy," connecting "its members to social services," "Census outreach," and "voter registration, education, and non-

8

partisan get-out-the-vote campaigns." *Id. ¶ 5.* According to the Executive Director, many LUPE members will be harmed by a citizenship question because an undercount of immigrant communities in Texas will diminish their members' political power relative to others in the state and country. *Id. ¶ 6.* Ultimately a disproportionate undercount would harm LUPE's mission by diluting the political power of the communities that LUPE seeks to organize and civically engage. *Id.* Thus, in response to this threat, LUPE is diverting financial and staffing resources from helping low-income families access social, economic, and legal services to enhancing its Census outreach efforts. *Id. ¶¶ 12–15.*

This evidence—typical of the support provided by the Organizational Plaintiffs—is sufficient, at this stage, to establish the injuries required under either the representational or associational theories of standing. Accordingly, the Defendants are not entitled to summary judgment of the Organizational Plaintiffs' claims based on a failure to establish an injury-in-fact.

### 2. Causation and Redressability

Defendants argue that while any depressed response rates may be traceable to the current political climate, they could not specifically be traced to the addition of a citizenship question. ECF No. 67-1 (18-1041). But record evidence creates a dispute of fact as to this claim. ECF No. 70 (18-1041) at 862. Despite Defendants' contention that any respondent who is reluctant to answer a citizenship question will also be reluctant to respond to the Census if a citizenship question is not included, the Census Bureau's study shows that a citizenship question is likely to further depress response rates among non-citizens and their relatives. ECF No. 70 (18-1041) at 738, 774.

Defendants have also argued that Plaintiffs' alleged injuries are not traceable to a citizenship question because for the injuries to occur, state governments, localities, and schools

must "make their own independent decisions about funding" that leave Plaintiffs' communities with less than they would otherwise enjoy. ECF No. 79 (18-1041) at 35. This argument that third-party decisions might prevent some of Plaintiffs' injuries is unavailing. First, it is purely speculative. The Defendants do not point to any record evidence that suggests third parties will remedy the anticipated harms. Further, even if third parties could resolve Plaintiffs' loss-of-funding concerns, they cannot address the malapportionment of congressional seats that will occur.

In sum, Plaintiffs have set forth sufficient evidence to support a finding of standing and therefore defeat Defendants' motion for summary judgment on this issue.

### B. Enumeration Clause Claims[4]

Moving to Defendants' request for summary judgment on Plaintiffs' claims that the addition of a citizenship question violates the Enumeration Clause challenges, the Court considers whether evidence supports Plaintiffs' position that a citizenship question would unreasonably compromise the distributive accuracy of the census. *Kravitz v. United States Dep't of Commerce*, No. GJH-18-1041, 2018 WL 4005229, *13 (D. Md. August 22, 2018) (citing *Wisconsin v. City of New York*, 517 U.S. 1, 19–20 (1996)). For the same reasons that issues of material fact remain regarding Plaintiffs' Article III standing, Plaintiffs' Enumeration Clause claims will survive summary judgment. As previously discussed, evidence exists to support the conclusion that a citizenship question will lead to a disproportionate undercount, compromising the distributive accuracy of the census. *E.g.*, ECF No. 70 (18-1041) at 629, 630, 724, 745; *see also* ECF No. 70-6 (18-1041) at 36, 75–76; ECF No. 70-1 (18-1041) ¶ 18, 85.

---

[4] Because there is substantial overlap between the arguments and evidence presented by the *Kravitz* and *LUPE* Plaintiffs in support of their Enumeration Clause and APA claims, the Court treats Plaintiffs arguments jointly in Section B and C and cites to the *Kravitz* Plaintiffs' docket entries.

Defendants argue that even to the extent a differential undercount will result, this inaccurate enumeration will not unreasonably compromise the Census's distributive accuracy. However, this argument is unconvincing because Plaintiffs have introduced evidence that the citizenship question does not bear "a reasonable relationship to the accomplishment of an actual enumeration of the population." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996). Evidence supports a finding that there is no genuine need for the data the DOJ purportedly seeks, ECF No. 70-4 (18-1041) at 5–6, and that the Census Bureau believes a citizenship question will not only have a "negative impact on voluntary cooperation with the census" but also will result in "poorer quality" data for DOJ's purposes "than would be available through administrative records," ECF No. 70 (18-1041) at 609.

In light of Plaintiffs' evidence that a citizenship question will impact the distributive accuracy of the final enumeration for no reasonable purpose, there is a material dispute of fact regarding whether the decision to add a citizenship question violates the Enumeration Clause, and Defendants are not entitled to summary judgment on these claims.

### C. APA Claims[5]

As a preliminary matter, Defendants argue that the Court may not consider evidence outside the administrative record when reviewing Plaintiffs' APA claims even though the Court previously ruled that Plaintiffs were entitled to limited extra-record discovery. ECF No. 48 (18-1041) at 33; ECF No. 80 (18-1570) at 24. Ultimately, it is not necessary for the Court to decide whether extra-record evidence is admissible in order to determine if summary judgment is appropriate because the Administrative Record alone creates genuine disputes of material fact as to whether the decision to include the citizenship question was arbitrary and capricious.

---

[5] The CM/ECF citations in this section are to docket entries in the *Kravitz* (18-1041) case and are all references to the Administrative Record.

Nonetheless, as the Court ordered on December 19, 2018, the parties will be permitted to present evidence outside of the administrative record at trial, and the Defendants will be permitted to argue at the close of trial that such evidence should not be considered in the Court's final decision. ECF No. 80 (18-1041).

Turning to the merits of Plaintiffs' APA claims, Plaintiffs argue that the Defendants' decision was arbitrary and capricious or otherwise not lawful in violation of § 706(2)(A) and made "without observance of procedure required by law" in violation of § 706(2)(D). Under 5 U.S.C § 706(2)(A) of the APA, final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" must be held unlawful and set aside. 5 U.S.C. § 706(a). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association v. State Farm*, 463 U.S. 29, 43 (1983).

The Administrative Record suggests that Secretary Ross's stated reasoning and factual assumptions ran counter to all the Census Bureau's unvarnished analysis and expert advice and was based instead on manufactured support created to mask an impermissible, predetermined political motivation. Compare, for example, the Secretary's inaccurate conclusion that "no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did," ECF No. 70 (18-1041) at 689, with the Census Bureau's unwavering position that a citizenship question would lead to a decline in self-response among noncitizen households, *id.* at 629–30. The contradictions

between the evidence before the Secretary and his proffered explanation do not end there. *Compare id.* at 689 (Secretary concluding that "Alternative D"—a proposal he designed to combine a citizenship question addition with administrative records—would maximize accuracy and "the Census Bureau's ability to match the decennial census responses with administrative records") *with id.* at 652–53 (Census Bureau's analysis that Alternative D would reduce Bureau's ability to match data with administrative records and would cause further inaccuracies); *Compare id.* at 686 (Secretary's assertion that the citizenship question had been "well tested" based on its inclusion in the American Community Survey (ACS)) *with id.* at 630–31 (the Census Bureau's conclusion that a significant percent of ACS respondents may be providing inaccurate answers to the ACS citizenship question). Taken together, this Administrative Record evidence suggests the Secretary's decision was not "the product of agency expertise." *State Farm*, 463 U.S. at 43.

Administrative Record evidence also supports a finding that the agency "relied on factors which Congress has not intended it to consider." *Id.* Specifically, the Record suggests that the Secretary relied on improper political influence as opposed to views on how best to obtain an accurate enumeration. Months before the Secretary solicited DOJ to request citizenship data and the DOJ ultimately submitted that request, administration officials appear to have been in communication about adding a citizenship question for politically-motivated reasons different from those reflected in the Secretary's official memoranda. ECF No. 70 (18-1041) at 500–02, 582, 586–87. On March 10, 2017, Director of Policy and Strategic Planning Earl Comstock sent Secretary Ross an email with the subject line "Your Question on the Census" that alerted Ross that "all people (citizens and noncitizens)" are counted in the Census and included a 2010 opinion article titled "the Pitfalls of Counting Illegal Immigrants." *Id.* at 500–01. Comstock

highlighted for Ross that "[n]o major government survey, including the decennial census . . . asks Americans about their citizenship status" and that "[m]any more foreign-born residents were counted in 2000 than was expected based on annual estimates produced by the bureau." *Id.* This email, along with other evidence, at least raises a genuine dispute regarding whether the Secretary was interested in a citizenship question to depress response rates by non-citizens rather than to obtain an accurate enumeration of the population or even to support a DOJ request to assist in enforcement of the Voting Rights Act. Secretary Ross's communications with Kris Kobach about adding a citizenship question further indicates that the Secretary's true motive may have been unrelated to the DOJ's request. *Id.* at 582, 586–87. Specifically, Mr. Kobach advised the Secretary to address the "problem" that "aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." *Id.* at 587.[6] Viewing this evidence in the light most favorable to the Plaintiff, Mr. Kobach was suggesting that a citizenship question be added to reduce the political power of individuals who are intended to be counted in an accurate enumeration. The Secretary launched his campaign to add a citizenship question and to find a permissible reason for such action around the same time that he communicated with Mr. Kobach about the Census. ECF No. 70 (18-1041) at 586–87, 694

Defendants point to the DOJ's request, which Secretary Ross solicited, as Administrative Record evidence that purportedly favors the Secretary's decision. ECF No. 67-1 (18-1041) at 25–26. However, there is, at the very least, a dispute as to whether any evidence supports the notion that a citizenship question would be an effective method for collecting the data that DOJ requested. Further, even if the Court ultimately considers the DOJ request to be support for the Secretary's decision, at this stage, it only shows that Plaintiffs and Defendants have warring

---

[6] Notably, the subject line of Mr. Kobach's email to the Secretary reads "Follow up on our phone call," suggesting prior communication on this topic. ECF No. 70 (18-1041) at 587.

14

evidence that support different conclusions about whether the Secretary's decision and reasoning was permissible.

To support a finding that Defendants' decision violated §706(2)(A) as "otherwise not in accordance with law," Plaintiffs also point to evidence that the citizenship question was added despite no new circumstance necessitating the Secretary's decision contrary to 13 U.S.C. § 141(f)'s congressional reporting instructions. Per § 141(f)(2), the Secretary of Commerce must submit to Congress "not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census." § 141(f)(2). If, after submission of this report, the Secretary "finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports" be modified, he or she must submit a new report describing these modifications. § 141(f)(3). Although congressional reporting requirements such as § 141(f) are typically not judicially reviewable, *see e.g.*, *Guerrero v. Clinton*, 157 F.3d 1190, 1196 (9th Cir. 1998), the Court may consider the lack of new circumstances necessitating a modification as evidence that the agency's decision was arbitrary and capricious. While a failure to comply with § 141(f) may not on its own trigger legal consequences, it may serve as circumstantial evidence that the Secretary's decision was not legitimate.[7]

---

[7] Plaintiffs also argue that Defendants' decision to add a citizenship question was made "without observation of procedure required by the law" in violation of § 706(2)(D) because the Secretary did not adhere to Office of Management and Budget guidelines and the Census Bureau's testing and statistical standards. ECF No. 69 at 45–51. Just as noncompliance with congressional reporting requirements does not alone trigger an APA violation, violations of OMB statistical guidelines are not enough to demonstrate a §706(2)(D) violation. However, as with evidence of the Secretary's failure to comply with congressional reporting instructions, evidence that the Secretary did not meet OMB or Census Bureau standards provides further support for Plaintiffs broader claim that the Secretary's final action was arbitrary and capricious.

Ultimately, resolution of Plaintiffs' APA claims, requires a factfinder to weigh opposing evidence in the Administrative Record, meaning summary judgment is not proper. Given the foregoing, Plaintiffs' APA claims will proceed to trial.

### D. *LUPE* Plaintiffs' Equal Protection Claim[8]

For the *LUPE* Plaintiffs to establish their Equal Protection claim, they must prove that Defendants' decision was motivated by discriminatory animus and its application has an adverse effect on a protected group. *Arlington Heights*, 429 U.S. 252, 264–65 (1977). The Fourth Circuit instructs that we look to the following non-exclusive list of probative factors to determine whether discriminatory intent motivated defendants:

> (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Central Radio Company v. City of Norfolk*, 811 F.3d 625, 635 (4th Cir. 2016) (quoting *Sylvia Development v. Calvert County,* 48 F.3d 810, 819 (4th Cir.1995)). As the Court noted when denying Defendants' Motion to Dismiss this claim, the Administrative Record supports Plaintiffs' allegations that the decisionmaking body engaged in "significant departures from normal procedures." The Court will not repeat that discussion here, but points the parties to that previous ruling, *LUPE v. Ross*, No. GJH-18-1570, 2018 WL 5885528, at *8 (D. Md. Nov. 9, 2018). Similarly, that opinion discusses the "contemporary statements by decisionmakers" that support a finding of discriminatory animus. *Id.*[9]

---

[8] The CM/ECF citations in this section refer to docket entries in the *LUPE*, 18-1570 case.
[9] Although Defendants dispute the relevance of statements made by President Trump and other administration officials, they do not dispute the content of those statements. *See* ECF No. 89 (18-1570) at 12–13.

Although Defendants seek to narrow the Court's attention to only those statements made by the Secretary as the so-called "sole-decisionmaker," that approach ignores the evidence showing that Secretary Ross did not act alone. In fact, Defendants themselves emphasize that Secretary Ross received advice, requests, and recommendations from various administration officials and from Mr. Kobach, labeling this the "normal give-and-take of the agency process." ECF No. 82-1 (18-1570) at 24. It is also non-sensical to assume as a matter of law that public statements alleged to have been made by the President regarding immigration had no bearing on the Secretary's decision.

Defendants also argue unsuccessfully that "Plaintiffs fail to identify a protected class against which the Secretary allegedly discriminated." *LUPE*, ECF No. 89 (18-1570) at 11 n. 3. This argument fails because Plaintiffs point to evidence that inclusion of a citizenship question in the decennial Census is motivated by racial animus towards Hispanics and non-white immigrants. Specifically, as previously described in Section III.A.1, the evidence before the Secretary demonstrated that a citizenship question would depress response rates by Hispanic households, and as detailed in the Court's earlier opinion, 2018 WL 5885528 at *9, contemporary statements by those advising the Secretary support a finding of animus towards non-white immigrants.

Ultimately, evidence supporting the *LUPE* Plaintiffs' Equal Protection claim creates a genuine dispute of material fact, and Defendants are not entitled to summary judgment on this count.

### E. *LUPE* Plaintiffs' Conspiracy to Violate Civil Rights Claim

An actionable conspiracy under 42 U.S.C. § 1985(3) requires "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Simmons v.*

*Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). This Court previously found that the *LUPE* Plaintiffs had sufficiently pled a § 1985(3) claim, 2018 WL 5885528 at *11, based on factual allegations in the Complaint. These same factual allegations have now been supported with evidence.

As previously discussed, Mr. Kobach's interest in a citizenship question stemmed from his view that states like California have had "congressional seats inflated by counting illegal aliens." ECF No. 85-5 (18-1570) at 45; *see also* Administrative Record (AR) 763–64.[10] Drawing all reasonable inferences in Plaintiffs' favor, Mr. Kobach was motivated to reduce immigrant response rates to achieve the unconstitutional goal of reducing their political power. Mr. Kobach pitched the citizenship question idea to administration officials beginning around January 2017. *Id.*

In light of the evidence that the DOJ's voting-rights-act rationale was pretextual, the clearest indications about the Secretary's actual purpose come from the exchanges between Mr. Kobach and administration officials, Mr. Comstock's email response to the Secretary's question about the Census, and the contemporary statements by decisionmakers discussed at the Motion to Dismiss stage. Taken together, this evidence suggests that the Secretary's true purpose for adding a citizenship question was to depress noncitizen response rates. During the same period that Mr. Kobach pushed for a citizenship question, Earl Comstock responded to the Secretary's question about the Census with his email highlighting that undocumented residents are counted for Congressional apportionment and pointing the Secretary to a blog about the "pitfalls of counting illegal immigrants." ECF No. 85-7 (18-1570) at 13–15.

Plaintiffs' demonstration of consistency between the Secretary's actual purpose and Mr. Kobach's articulated intent is not a mere showing of parallel conduct. Instead, the record allows

---

[10] The Administrative Record was filed in the *Kravitz* case (18-1041), ECF Nos. 25 & 26, and incorporated into the *LUPE* Plaintiffs' Opposition, ECF No. 85 (18-1570) at 11 n. 6.

for an inference that Mr. Kobach and administration officials achieved a "meeting of the minds" because it demonstrates coordination between Mr. Kobach, those advising the Secretary, and the Secretary. Over a period of months, Mr. Kobach spoke with Steve Bannon, President Trump, Secretary Ross, and Attorney General Sessions to persuade them to add a citizenship question for the express purpose of reducing the number of immigrant respondents. ECF No. 85-5 (18-1570) at 45, 52–53; *see also* AR 763–64. Secretary Ross and Mr. Kobach spoke at the direction of Mr. Bannon before the Secretary generated the DOJ voting-rights-act rationale. ECF No. 85-5 (18-1570) at 53. After the Secretary communicated with Mr. Kobach about adding a citizenship question, he pursued creating the DOJ voting-rights-act rationale and worked to find someone at DOJ willing to make the request for a citizenship question. *Id.* at 53, 58, 61, 79, 154–157; ECF No. 85-7 at 12, 18, 19; *see also* AR 11646–49, 11634–45, 11193, 12476, 1277–85 1525–27, 2651–52.

In sum, genuine disputes of material fact remain as to whether the requisite meeting of minds existed between Mr. Kobach and administration officials, and the *LUPE* Plaintiffs § 1985 claim may proceed to trial.

### F. *Kravitz* Plaintiffs' Motion for Leave to File Third Amended Complaint

The *Kravitz* Plaintiffs wish to amend their Complaint to add an Equal Protection claim, which is substantively identical to the Equal Protection claim alleged by the *LUPE* Plaintiffs. ECF No. 71 (18-1041). Federal Rule of Civil Procedure 15(a) governs amendments to pleadings before trial. At this stage of the litigation, the parties may amend their pleadings "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Courts are to "freely give leave when justice so requires." *Id.* Under this directive, a court should grant leave to amend unless a reason exists to deny leave, such as "undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Defendants do not argue (nor could they) that Plaintiffs' proposed amendment would cause undue prejudice or that the amendment would be futile—the *Kravitz* and *LUPE* cases have now been consolidated, a trial date is already set at which Defendants will defend against an identical Equal Protection claim, and the Court has already denied a Motion to Dismiss based on substantively identical allegations. However, Defendants oppose Plaintiffs' Motion for Leave because they claim that Plaintiffs acted with a dilatory motive when they waited until the Court had ruled on the Defendants' Motion to Dismiss the *LUPE* Plaintiffs' Equal Protection claim before requesting to amend their Complaint. ECF No. 77 (18-1041). But rather than achieving a goal of delay, the *Kravitz* Plaintiffs' decision to wait on the Court's earlier ruling in the *LUPE* case, avoided consuming the parties' and the Court's resources with duplicative motions. Both parties seek efficient resolution of the Plaintiffs' claims, and the addition of an Equal Protection claim to the *Kravitz* case will not cause any delay. As a result, Plaintiffs' Motion for Leave to File Third Amended Complaint, ECF No. 71, will be granted.

## IV. CONCLUSION

For the foregoing reasons, the Court denied Defendants' Motions for Summary Judgment in a separate order issued on December 19, 2018. A separate order will issue granting the *Kravitz* Plaintiffs' Motion for Leave to Amend.

Dated: December 28, 2018 /s/
GEORGE J. HAZEL
United States District Judge