# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, *et al.* | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| U.S. DEPARTMENT OF COMMERCE, *et al.* | |
| *Defendants*. | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants*. | |

**Plaintiffs' Proposed Conclusions of Law**

## TABLE OF CONTENTS

I. **Plaintiffs Have Standing to Bring Their Claims.** ............................................................. 1

    A.    **Standing Requires an Injury in Fact that Is Fairly Traceable to the Challenged Conduct and Will Be Redressed by a Favorable Decision.** ..................................... 1

    B.    **The Individual Plaintiffs and Individual Members of Organizational Plaintiffs Have Standing.** ................................................................................................................. 4

        1.    **The Individual Plaintiffs and Individual Members of Organizational Plaintiffs Will Suffer an Injury in Fact.** ................................................................. 4

        2.    **The Individual Plaintiffs' Injuries Are Fairly Traceable to the Challenged Conduct and Redressable.** ........................................................................... 12

    C.    **The Organizational Plaintiffs Have Standing.** .......................................................... 14

        1.    **The Organizational Plaintiffs Have Representational Standing Based on Injuries to Their Members.** ............................................................................... 14

        2.    **The Organizational Plaintiffs Have Direct Organizational Standing.** ................... 16

II. **The Defendants' Actions Violate the Administrative Procedure Act.** ........................................ 18

    A.    **Legal Framework of the Census and the Census Bureau** ............................................ 18

    B.    **Scope of Review Under the Administrative Procedure Act** ........................................ 25

        1.    **Judicial Review Under APA § 706(2) Is "Thorough, Probing, and In-Depth."** ................................................................................................................ 25

        2.    **Agency Action Must Be Transparent, Factually Supported, and Grounded in the Agency's Particular Expertise.** ........................................................ 27

        3.    **The Court May Look Beyond the Administrative Record in Appropriate Circumstances.** ............................................................................................... 30

    C.    **The Decision to Add the Citizenship Question Was Arbitrary and Capricious and Must Be Set Aside Under APA § 706(2)(A)-(D).** .......................................... 36

        1.    **The Secretary Failed to Acknowledge Applicable Legal Requirements and Constraints on His Discretion.** ................................................................ 36

        2.    **The Explanations Set Forth in the Ross Memo Ran Counter to the Evidence Before the Agency.** ............................................................................ 38

        3.    **Secretary Ross Failed to Consider Several Important Aspects of the Problem Presented by the DOJ Request.** ................................................... 49

        4.    **Secretary Ross Did Not Make the Findings Required by 13 U.S.C. § 141(f), and There Was No Rational Basis to Support Such Findings.** ......................... 59

        5.   **The Decision to Add the Citizenship Question Violated 13 U.S.C. § 6.** ................ 62

        6.   **Secretary Ross's Stated Rationale Was Pretextual and Failed to Disclose the Improper Political Influence Brought to Bear on the Decision.** ...................... 64

III.   **The Defendants' Actions Violate the Enumeration Clause.** .................................................. 71

IV.   **Defendants' Actions Violate the Due Process Clause** ......................................................... 74

    A.   *Arlington Heights* **Compels a Sensitive Inquiry Into Whether the Totality of the Facts Demonstrate That Defendants Added the Citizenship Question for a Discriminatory Purpose.** .............................................................................................. 74

    B.   **Substantial Evidence Supports the Conclusion Under** *Arlington Heights* **that Discriminatory Intent Motivated Defendants' Plan to Add a Citizenship Question to the 2020 Census.** ....................................................................... 75

        1.   *Arlington Heights* **Factor 1: Plaintiffs' Evidence Demonstrates That They Will Be Disparately Impacted by the Addition of a Citizenship Question to the 2020 Census.** ............................................................................ 76

        2.   *Arlington Heights* **Factor 2: The Historical Background Leading to the Addition of the Citizenship Question Is Replete with Ulterior Motives, Connivance, Falsehood, and Secrecy.** ......................................................... 78

        3.   *Arlington Heights* **Factor 3: Defendants Departed, Procedurally and Substantively, From Past Practice, Including the Concoction of a Rationale That Does Not Bear Scrutiny.** ....................................................... 83

        4.   *Arlington Heights* **Factor 4: The Record Contains Contemporary Statements by Those Involved in Ensuring That the Secretary Carried out the Administration's Intent to Discriminate Against Immigrant Communities of Color.** ..................................................................... 87

    C.   **The Non-Racial Motivations Claimed by Defendants Cannot Alone Explain the Decision To Add a Citizenship Question to the 2020 Census.** ............................... 93

V.   **Defendants' Actions Violate Section 1985.** ................................................................ 97

    A.   **Sovereign Immunity Does Not Bar a Finding of a § 1985(3) Violation.** .................. 101

    B.   **The Intracorporate Conspiracy Doctrine Does Not Preclude Plaintiffs' § 1985(3) Claim.** ....................................................................................................... 102

VI.   **Remedies** ........................................................................................................ 103

    A.   **Enumeration Clause** ............................................................................... 103

    B.   **APA Claim** ......................................................................................... 105

        1.   **Plaintiffs are entitled to vacatur of the decision without remand.** ................ 105

**2.      Plaintiffs are entitled to a permanent injunction.**.....................................................107

**3.      Plaintiffs are entitled to a declaratory judgment.**...................................................109

**C.   Due Process Clause**...........................................................................................................109

**D.   Section 1985 Claim** ...........................................................................................................110

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACEMLA v. Copyright Royalty Trib.*,
763 F.2d 101 (2d Cir. 1985) ............................................................................ 81

*ACLU of Ohio Found., Inc. v. DeWeese*,
633 F.3d 424 (6th Cir. 2011) ........................................................................... 22

*Action v. Gannon*,
450 F.2d 1227 (8th Cir. 1971) (en banc) ........................................................ 130

*Air All. Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018) ........................................................... 19, 67, 91

*Air India v. Brien*,
No. 00-cv-1707, 2002 WL 34923740 (E.D.N.Y. Feb. 14, 2002) ..................... 125

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016) .......................................................... 32

*All. for the Wild Rockies v. U.S. Forest Serv.*,
2018 WL 5316129 (9th Cir. Oct. 25, 2018) ................................................... 125

*Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*,
522 U.S. 359 (1998) ......................................................................................... 45

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ..................................................................... 125

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) ......................................................................................... 45

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ....................................................................................... 120

*American Humanist Ass'n v. Maryland-National Capital Park & Planning Commission*,
874 F.3d 195 (4th Cir. 2017) ........................................................................... 21

*Asarco, Inc. v. EPA*,
616 F.2d 1153 (9th Cir. 1980) ............................................................... 50, 51, 52

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984) (Scalia, J.) ....................................................... 48

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ......................................................................... 20

*Baldrige v. Shapiro,*
    455 U.S. 345 (1982) ............................................................................................ 37, 38

*Bar MK Ranches v. Yuetter,*
    994 F.2d 735 (10th Cir. 1993) ................................................................... 49, 50, 130

*Barnett v. City of Chi.,*
    141 F.3d 699 (7th Cir. 1998) (Posner, J.) ...................................................................... 69

*Batalla Vidal v. Nielsen,*
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) ........................................................ 107, 110

*Bennett v. Spear,*
    520 U.S. 154 (1997) ...................................................................................................... 20

*Beta Analytics Int'l, Inc. v. United States,*
    61 Fed. Cl. 223 (2004) .................................................................................................. 52

*Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.,*
    448 F.3d 138 (2d Cir. 2006) ...................................................................................... 34

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986) (Scalia, J.) ............................................................ 20

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ............................................................................................ 46, 84

*Buschi v. Kirven,*
    775 F.2d 1240 (4th Cir. 1985) ................................................................................ 122

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................................................. 130

*Camp v. Pitts,*
    411 U.S. 138 (1973) (per curiam) ..................................................................... 49, 54, 125

*Carey v. Klutznick,*
    637 F.2d 834 (2d Cir. 1980) .............................................................................. *passim*

*Carey v. Population Servs. Int'l,*
    431 U.S. 678 (1977) ............................................................................................ 19, 27

*Caring Hearts Pers. Home Servs., Inc. v. Burwell,*
    824 F.3d 968 (10th Cir. 2016) (Gorsuch, J.) ............................................................ 56

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) ...................................................................................... 27

*Cent. Elec. Power Co-op, Inc. v. Southeastern Power Admin.,*
    338 F.3d 333 (4th Cir. 2003) ................................................................................ 49

*Central United Life, Inc. v. Burwell*,
128 F. Supp. 3d 321 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ........................................ 127

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
No. 18-10340, 2018 WL 3543535 (Jul. 23, 2018) .......................................... 110

*Chem. Mfrs. Ass'n v. EPA*,
28 F.3d 1259 (D.C. Cir. 1994) ........................................................................ 126

*Choice Care Health Plan, Inc. v. Azar*,
315 F. Supp. 3d 440 (D.D.C. 2018) ................................................. 66, 109, 128

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......................................................... 44, 49, 50, 51

*City & Cty. of San Francisco v. Sessions*,
No. 17-cv-04642-WHO, 2018 WL 4859528 (N.D. Cal. Oct. 5, 2018) ............................................. 48

*City of Camden v. Plotkin*,
466 F. Supp. 44 (D.N.J. 1978) ........................................................................ 27

*City of Detroit v. Franklin*,
4 F.3d 1367 (6th Cir. 1993) ..................................................................... 26, 27

*City of Kansas City, Mo. v. Dep't of Housing and Urban Dev.*,
923 F.2d 188 (D.C. Cir. 1991) ........................................................................ 47

*City of Memphis v. Greene*,
451 U.S. 100 (1981) ........................................................................................ 97

*City of Philadelphia v. Klutznick*,
503 F. Supp. 663 (E.D. Pa. 1980) ......................................................... 26, 27, 61

*City of Philadelphia v. Sessions*,
280 F. Supp. 3d 579, 623-24 (E.D. Pa. 2018) ................................................ 47

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ................................................................................. 19, 26

*Clark County, Nevada. v. Federal Aviation Administration*,
522 F.3d 437 (D.C. Cir. 2008) ........................................................................ 47

*Clark Cty. v. FAA*,
522 F.2d 437 (D.C. Cir. 2008) (Kavanaugh, J.) .............................................. 66

*Clean Air Council v. Pruitt*,
862 F.3d 1 (D.C. Cir. 2017) .......................................................................... 125

*Clinton v. Glavin*,
U.S. No. 98–564, 1998 WL 34082182 ............................................................ 23

*Crown Cork & Seal Co. v. Nat. Labor Relations Bd.*,
    36 F.3d 1130 (D.C Cir. 1994) ................................................................................ 126

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ............................................................................................ 27

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) .............................................................................................. 31

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ................................................................................ 31

*In re Dep't of Commerce*,
    139 S. Ct. 16 (2018) (Gorsuch, J.) ...................................................................... 115

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ....................................................................................... *passim*

*Dow AgroSciences v. Nat'l Marine Fisheries Serv.*,
    707 F.3d 462 (4th Cir. 2013) ................................................................................ 48

*Dugan v. Rank*,
    372 U.S. 609 (1963) ..................................................................................... 120, 121

*E. Bay Sanctuary Covenant v. Trump*,
    18-cv-6810-JST, 2018 WL 6053140 (N.D. Cal. Nov. 19, 2018) ...................... 81

*F.T.C. v. Dean Foods Co.*,
    384 U.S. 597 (1966) ............................................................................................ 130

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) (Kennedy, J., concurring in the judgment) ...................... 45

*FCC v. NextWave Personal Commc'ns Inc.*,
    537 U.S. 293 (2003) .............................................................................................. 49

*FEC v. Akins*,
    524 U.S. 11 (1998) ................................................................................................ 36

*Fed'n for Am. Immigration Reform v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) .......................................................................... 91

*Fed. Power Comm'n v. Texaco Inc.*,
    417 U.S. 380 (1974) .............................................................................................. 46

*Fort Sumter Tours, Inc. v. Babbitt*,
    66 F.3d 1324 (4th Cir. 1995) ................................................................................ 49

*Franklin v. Massachussetts*,
    505 U.S. 788 (1922) .............................................................................................. 44

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) .......................................................................................................... 21

*Friends of Richards-Gebaur Airport v. FAA*,
    251 F.3d 1178 (8th Cir. 2001) ......................................................................................... 56

*Gilder v. PGA Tour, Inc.*,
    936 F.2d 417 (9th Cir. 1991) .......................................................................................... 124

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ..................................................................................................... 19

*Glavin v. Clinton*,
    19 F. Supp. 2d 543 (E.D. Va. 1998) ........................................................................... 26, 27

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989) ....................................................................................... 128

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ..................................................................................................... 22, 35

*Hodgin v. Jefferson*,
    446 F. Supp. 804 (D. Md. 1978) .................................................................................... 122

*Home Box Office, Inc. v. F.C.C.*,
    567 F.2d 9 (D.C. Cir. 1977) ................................................................................... 46, 47, 89

*Humane Soc'y of U.S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ......................................................................................... 75

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) .......................................................................................................... 94

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ............................................................................................... 22, 33, 34

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ....................................................................................... 112, 116, 129

*Immigration Naturalization Serv. v. Yueh-Shaio Yang*,
    519 U.S. 26 (1996) ............................................................................................................ 51

*Innovative Health Sys., Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997) ............................................................................................ 110

*Int'l Fed''n of Prof'l & Tech. Eng'rs v. United States*,
    934 F. Supp. 2d 816 (D. Md. 2013) ............................................................................... 121

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ......................................................................................... 128

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990)......................................................................................... 125, 126

*Jagers v. Fed. Crop Ins. Corp.*,
  758 F.3d 1179 (10th Cir. 2014) ................................................................................................. 90

*James Madison Ltd. v. Ludwig*,
  82 F.3d 1085 (D.C. Cir. 1996).............................................................................................. 49, 53

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty., Md.*,
  No. 18-1450, 2019 WL 469715 (4th Cir. Feb. 7, 2019)..................................... 85, 111, 112

*Kravitz v. U.S. Dep't of Commerce*,
  2018 WL 6830226 (D. Md. Dec. 28, 2018) .................................................................*passim*

*Kravitz v. U.S. Dep't of Commerce*,
  336 F. Supp. 3d 545, 556 (D. Md. 2018).......................................................................... 19

*La Unión Del Pueblo Entero v. Ross*,
  No. GJH-18-1570, 2018 WL 5885528 (D. Md. Nov. 9, 2018) ....................................*passim*

*Laccetti v. SEC*,
  885 F.3d 724 (D.C. Cir. 2018) (Kavanaugh, J.) ............................................................... 47

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005)................................................................................................. 50

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*,
  713 F.3d 187 (4th Cir. 2013)................................................................................................. 21

*Larson v. Valente*,
  456 U.S. 228 (1982) ................................................................................................................. 37

*Latecoere Int'l Inc. v. U.S. Dept. of Navy*,
  19 F.3d 1342 (11th Cir. 1994)................................................................................... 48, 53, 54, 89

*League of Women Voters of U.S. v. Newby*,
  838 F.3d. 1 (D.C. Cir. 2016)............................................................................................ 124, 127

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................................................. 20

*Lucero v. Operation Rescue of Birmingham*,
  954 F.2d 624 (11th Cir. 1992).............................................................................................. 130

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .........................................................................................................*passim*

*LULAC v. Perry*,
  548 U.S. 399 (2006) ................................................................................................................. 69

*Marks v. City of Chesapeake,*
   883 F.2d 308 (4th Cir. 1989) ............................................................................. 112

*Mendia v. Garcia,*
   768 F.3d 1009 (9th Cir. 2014) ............................................................................ 31

*Mfrs. Ry. Co. v. Surface Transp. Bd.,*
   676 F.3d 1094 (D.C. Cir. 2012) (Kavanaugh, J.) .............................................. 47

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
   819 F.3d 581 (2d Cir. 2016) ............................................................................... 113

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015) ....................................................................................... 45

*Miss. U. for Women v. Hogan,*
   458 U.S. 718 (1982) ........................................................................................... 115

*Mississippi Commission on Environmental Quality v. EPA,*
   790 F.3d 138 (D.C. Cir. 2015) ...................................................................... 90, 91

*Mizell v. N. Broward Hosp. Dist.,*
   427 F.2d 468 (5th Cir. 1970) ............................................................................. 130

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) ..................................................................................... 19, 123

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.,*
   463 U.S. 29 (1983) ....................................................................................... *passim*

*Mullen v. Princess Anne Volunteer Fire Co., Inc.,*
   853 F.2d 1130 (4th Cir. 1988) ........................................................................... 107

*N.C. State Conference of NAACP v. McCrory,*
   831 F.3d 204 (4th Cir. 2016) ....................................................................... *passim*

*Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.,*
   55 F. Supp. 3d 316, 351 (E.D.N.Y. 2014) ......................................................... 59

*Nat'l Audubon Soc'y v. Dep't of Navy,*
   422 F.3d 174 (4th Cir. 2005) ............................................................................. 49

*Nat'l Audubon Soc'y v. Hoffman,*
   132 F.3d 7 (2d Cir. 1997) ................................................................................... 52

*Nat'l Fuel Gas Supply Corp. v. FERC,*
   468 F.3d 831 (D.C. Cir. 2006) ........................................................................... 66

*Nat'l Mining Ass'n v. Jackson,*
   856 F. Supp. 2d 150 (D.D.C. 2012) ................................................................... 50

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................................................ 126

*Nat. Res. Def. Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ............................................................................ 125

*NCAA v. Governor of N.J.*,
    730 F.3d 208 (3d Cir. 2013) .................................................................................... 32

*Negron v. City of Miami Beach*,
    113 F.3d 1563 (11th Cir. 1997) ............................................................................... 70

*New York v. U.S. Dep't of Commerce*,
    No. 18-CV-2921 (JMF) (S.D.N.Y. Jan. 15, 2019), 2019 WL 190285 ...................... 98, 108, 109, 111

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................. 123

*NRDC v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) .............................................................................. 81, 125

*NRDC v. U.S. EPA*,
    658 F.3d 200 (2d Cir. 2011) ................................................................................... 83

*Occidental Petroleum Corp. v. S.E.C.*,
    873 F.2d 325 (D.C. Cir. 1989) ............................................................................... 50

*Oceana, Inc. v. Pritzker*,
    126 F. Supp. 3d 110 (D.D.C. 2015) ....................................................................... 52

*Ohio v. U.S. Dep't of the Interior*,
    880 F.2d 432 (D.C. Cir. 1989) ............................................................................... 83

*Ohio Valley Envt'l Coal., Inc. v. United States Army Corps of Engineers*,
    828 F.3d 316 (4th Cir. 2016) .................................................................................. 44

*Parcel 49C Ltd. P'ship v. United States*,
    31 F.3d 1147 (Fed. Cir. 1994) ............................................................................... 53

*Penley v. McDowell Cty. Bd. of Educ.*,
    876 F.3d 646 (4th Cir. 2017) ............................................................................... 117

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................................... 98

*Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*,
    337 F. Supp. 3d 308 (S.D.N.Y 2018) ........................................................... 126, 127

*Plata v. Schwarzenegger*,
    603 F.3d 1088 (9th Cir. 2010) ............................................................................. 130

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) ............................................................................. 125, 126

*Portsmouth Redev. & Hous. Auth. v. Pierce*,
706 F.2d 471 (4th Cir.1983) ....................................................................................... 120

*Porzecanski v. Azar*,
316 F. Supp. 3d 11 (D.D.C. 2018) ............................................................................... 56

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ......................................................................................... 75

*Pub. Citizen v. Heckler*,
653 F. Supp. 1229 (D.D.C. 1986) ................................................................................. 86

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ...................................................................................................... 36

*Pursuing Am. Greatness v. Fed. Election Cmm'n*,
831 F.3d 500 (D.C. Cir. 2016) .................................................................................... 123

*Ramos v. Nielsen*,
No. 18-CV-01554-EMC, 2018 WL 4778285 (N.D. Cal. Oct. 3, 2018) ................... 107, 110

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000) ...................................................................................................... 99

*Reyes v. City of Farmers Branch*,
586 F.3d 1019 (5th Cir. 2009) ...................................................................................... 69

*Romero v. City of Pomona*,
665 F. Supp. 853 (C.D. Cal. 1987) ............................................................................... 70

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ........................................................................................... 20

*Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*,
547 U.S. 47 (2006) ........................................................................................................ 19

*Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*,
2019 WL 286676 (4th Cir. Jan. 23, 2019) ................................................................... 51

*Sea-Land Serv., Inc. v. Alaska R.R.*,
659 F.2d 243 (D.C. Cir. 1981) .................................................................................... 121

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) ........................................................................................................ 45

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ...................................................................................................... 45

*Sierra Club v. Glickman*,
    156 F.3d 606 (5th Cir. 1998) ................................................................................ 21

*Simmons v. Poe*,
    47 F.3d 1370 (4th Cir. 1995) ...................................................................... 116, 117

*Simon v. E. Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) ............................................................................................... 31

*Smith v. Pac. Props. & Dev. Corp.*,
    358 F.3d 1097 (9th Cir. 2004) ......................................................................... 22, 35

*Smith v. Town of Clarkton, N.C.*,
    682 F.2d 1055 (4th Cir. 1982) ............................................................................ 111

*Sokaogon Chippewa Cmty. v. Babbitt*,
    961 F. Supp. 1276 (W.D. Wis. 1997) .................................................................. 52

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ......................................................................................... 19

*State of Tex. v. Mosbacher*,
    783 F. Supp. 308 (S.D. Tex. 1992) ...................................................................... 26

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................................... 21

*Sterk v. Redbox Auto. Retail, LLC*,
    672 F.3d 535 (7th Cir. 2012) ............................................................................. 129

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ....................................................................... 32, 128

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ......................................................................................... 70, 72

*Tummino v. Hamburg*,
    936 F. Supp. 2d 162 (E.D.N.Y. 2013) ................................................................. 53

*Tummino v. Torti*,
    603 F. Supp. 2d 519 (E.D.N.Y. 2009) ........................................................... 48, 89

*In re U.S. Dep't of Commerce, et al.*,
    Case No. 18-557 (U.S. Oct. 29, 2018) ................................................................. 90

*U.S. Lines, Inc. v. Fed. Mar. Comm'n*,
    584 F.2d 519 (D.C. Cir. 1978) ............................................................................. 46

*United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ............................................................................................. 34

*United States v. F/V Alice Amanda*,
    987 F.2d 1078 (4th Cir. 1993) ............................................................................... 47, 48

*United States v. Shaffer Equip. Co.*,
    11 F.3d 450 (4th Cir. 1993) ........................................................................................ 52

*United States v. Testan*,
    424 U.S. 392 (1976) ................................................................................................. 120

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
    865 F.2d 1539 (9th Cir. 1989) ................................................................................. 120

*Utah v. Evans*,
    536 U.S. 452 (2002) ............................................................................................. 25, 92

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977) ............................................................................................. *passim*

*Voyageurs Nat'l Park Ass'n v. Norton*,
    381 F.3d 759 (8th Cir. 2004) ..................................................................................... 53

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................................................... 94

*Water Quality Ins. Syndicate v. United States*,
    225 F. Supp. 3d 41 (D.D.C. 2016) ............................................................................. 48

*White Tail Park, Inc. v. Stroube*,
    413 F.3d 451 (4th Cir. 2005) ................................................................................. 22, 35

*Whitfield v. S. Maryland Hosp. Inc.*,
    No. DKC 12-2749, 2014 WL 923255 (D. Md. Mar. 7, 2014) ................................... 20

*Wisconsin v. City of N.Y.*,
    517 U.S. 1 (1996) ................................................................................................. *passim*

*Wong Yang Sung v. McGrath*,
    339 U.S. 33 (1950) ..................................................................................................... 45

*Woods Petroleum Corp. v. U.S. Dep't of Interior*,
    18 F.3d 854 (10th Cir. 1994) ......................................................................... 53, 54, 89

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ................................................................................... 20

*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ..................................................................................... 121, 122

**Statutes**

5 U.S.C. § 702 ................................................................................................................ 44, 121

5 U.S.C. § 706 .................................................................................................... 48, 49, 129

5 U.S.C. § 706(2)(A) ....................................................................................................... *passim*

5 U.S.C. §§ 706(2)(A) – (D) ............................................................................................. 44

13 U.S.C .......................................................................................................................... 40

13 U.S.C. § 5 ............................................................................................................... 38, 72

13 U.S.C. § 6 ......................................................................................................... 39, 40, 81

13 U.S.C. § 6(a) .............................................................................................................. 81

13 U.S.C. § 6(c) and (9) .............................................................................................. 41, 55

13 U.S.C. § 9(a) ............................................................................................................... 40

13 U.S.C § 141 ................................................................................................................ 55

13 U.S.C. § 141(f)(3) ............................................................................................. 39, 79, 80

28 U.S.C. §§ 2201 and 2202 ........................................................................................... 123

42 U.S.C. § 1985(3) ..................................................................................................... *passim*

44 U.S.C. § 3501(1)-(11) ................................................................................................. 41

44 U.S.C. § 3502(2) ........................................................................................................ 64

44 U.S.C. § 3504(e) ........................................................................................................ 42

44 U.S.C. § 3506(c)(3)(A) .......................................................................................... 42, 68

Census Act ................................................................................................................... *passim*

Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 515(a), 114 Stat. 2763
    (2000) ....................................................................................................................... 41

Fair Housing Act ........................................................................................................... 113

Federal Advisory Committee Act .................................................................................... 36

Federal Information Quality Act ....................................................................................... 41

Fla. Stat. § 11.031(1) ...................................................................................................... 24

Freedom of Information Act ............................................................................................ 36

IQA § 515(a) ................................................................................................................... 42

Md. Code Ann., Elec. Law § 8-701 ................................................................................. 24

PRA ................................................................................................................................ *passim*

Pub. L. No. 97-205, 96 Stat. 131 ................................................................................... 70

Pub. L. No. 105-119, § 209(a)(8), 111 Stat. .................................................................. 92

Voting Rights Act .......................................................................................................... *passim*

**Other Authorities**

5 C.F.R. § 1320.18(c) ............................................................................................... 41, 56

71 Fed. Reg. 55,522 (Sept. 22, 2006) ...................................................................... 43, 76

79 Fed. Reg. 71,610, at 71,610 ..................................................................................... 41

Ariz. Const. art. 4, Pt. 2, § 1 (3) ................................................................................... 24

Cal. Const. art. 21, §1 .................................................................................................... 24

Nev. Const. art. 15, § 13 ................................................................................................ 24

Tex. Const. art. 3, § 26 .................................................................................................. 24

U.S. Const., Art. I, § 2, cl. 3 ..................................................................................... 37, 91

U.S. Constitution Fifth Amendment Due Process Clause ........................................... 112

U.S. Constitution Article I, Section 2, Clause 3 ......................................................... 123

**I.      Plaintiffs Have Standing to Bring Their Claims.**

> **A.      Standing Requires an Injury in Fact that Is Fairly Traceable to the Challenged Conduct and Will Be Redressed by a Favorable Decision.**

1.      The "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006); *see Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977).

2.      Standing requires a plaintiff to show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Kravitz v. U.S. Dep't of Commerce*, 2018 WL 6830226, at 2 (D. Md. Dec. 28, 2018); *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 556 (D. Md. 2018).

3.      For purposes of the injury-in-fact requirement, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Kravitz*, 336 F. Supp. 3d at 557 (citations omitted) (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014)) (emphasis added); *see Kravitz*, 2018 WL 6830226 at 3 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see also Clapper*, 568 U.S. at 414 n.5 (recognizing that standing does not require plaintiffs to "demonstrate that it is literally certain that the harms they identify will come about").

4.      For standing purposes, a plaintiff may rely on qualitative evidence to establish that a threatened injury is certainly impending or that there is a substantial risk of future injury. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 n.3 (2010) (holding that plaintiffs had standing based on their declarations' unquantified assertions of risk of potential future harm); *Air All. Houston v. EPA*, 906 F.3d 1049, 1058–59 (D.C. Cir. 2018) (holding that

plaintiffs had standing based on their declarations' statements that they had previously been put

at risk by chemical disasters and that the same risks that caused the previous disasters still

existed); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027–28 (9th Cir. 2018); *Attias v. Carefirst,*

*Inc.*, 865 F.3d 620, 628–29 (D.C. Cir. 2017); *cf. Whitfield v. S. Maryland Hosp. Inc.*, No. DKC

12-2749, 2014 WL 923255, at 7 (D. Md. Mar. 7, 2014) ("A literature review can be an

appropriate part of a method of determining causation.").

5.      In determining whether Plaintiffs challenging a proposed Census procedure have

standing based on future injuries, this Court cannot wait until after the Census has been taken to

find that Plaintiffs have suffered injuries to their right to fair political representation "because

such a pause would result in extreme—possibly irremediable—hardship." *Dep't of Commerce v.*

*U.S. House of Representatives*, 525 U.S. 316, 332 (1999) (quoting *Whitmore v. Arkansas*, 495

U.S. 149, 155 (1990)).

6.      For a plaintiff's injury to be "fairly traceable" to the defendant's conduct, there

must "be a causal connection between the injury and the conduct complained of." *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560 (1992) (alterations and internal citation omitted). However,

"[p]roximate causation is *not* a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (emphasis added); *see also Rothstein v.*

*UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("[T]he 'fairly traceable' standard is lower than that of

proximate cause."). The Article III standard "requires no more than *de facto* causality." *Block v.*

*Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.).

7.      Furthermore, for an injury to be "fairly traceable," the defendant's actions need

not be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168–69

(1997). While a plaintiff may not have standing where the injury is solely "th[e] result [of] the

independent action of some third party not before the court," *Lujan*, 504 U.S. at 560 (internal citation omitted), "the causation element of standing is satisfied . . . where the plaintiff suffers an injury that is 'produced by [the] determinative or coercive effect' of the defendants' conduct 'upon the action of someone else,'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (quoting *Bennett*, 520 U.S. at 169), or where defendants' conduct "affect[s] the . . . decisions of those third part[ies] . . . to such an extent that the plaintiff's injury could be relieved," *Sierra Club v. Glickman*, 156 F.3d 606, 614 (5th Cir. 1998). In other words, even where standing "depends on the unfettered choices made by independent actors not before the courts," the traceability requirement is nonetheless satisfied if the plaintiff "adduce[s] facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562.

8.      Finally, a plaintiff's injury must be "redressable" by the relief sought — that is, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560−61 (internal citation omitted). If there is "a likelihood that the requested relief will redress the [plaintiff's] injury," the requirement is satisfied. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185−86 (2000) ("[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

9.      An organizational plaintiff's standing can be based on two different theories: (1) representational standing, where the injury is to the organization's members, *American Humanist Ass'n v. Maryland-National Capital Park & Planning Commission*, 874 F.3d 195,

203–04 (4th Cir. 2017) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 429 (6th Cir. 2011); and (2) direct organizational standing, where the injury is to the organization itself, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

10.     A plaintiff organization has representational standing and can sue on behalf of its members if it shows that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

11.     Organizations may establish direct organizational standing injuries by showing "(1) frustration of its organizational mission; and (2) diversion of its resources" to mitigate the effects of the challenged action. *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *see White Tail Park,* 413 F.3d at 458 (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

**B.      The Individual Plaintiffs and Individual Members of Organizational Plaintiffs Have Standing.**

**1.      The Individual Plaintiffs and Individual Members of Organizational Plaintiffs Will Suffer an Injury in Fact.**

12.     There is a virtual certainty or, at a minimum, a substantial risk that the addition of a citizenship question to the 2020 Census will lead to a differential undercount of Hispanics and/or noncitizens that will cause individual Plaintiffs and certain members of organizational Plaintiffs to suffer three kinds of injury: (1) vote dilution from intra-state redistricting; (2) vote dilution from malapportionment of congressional seats; and (3) loss of federal funding to their states and localities.

### a)  Vote Dilution from Intra-State Redistricting

13.     Plaintiffs challenging a proposed Census procedure can establish standing "on the basis of the expected effects" of the challenged procedure "on intrastate redistricting"—in particular, based on a factual finding that individuals residing in certain jurisdictions are "substantially likely . . . [to] suffer vote dilution in state and local elections." *Dep't of Commerce*, 525 U.S. at 332–33; *see also Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980).

14.     In *Department of Commerce v. U.S. House of Representatives*, the Supreme Court held that residents of counties that "were substantially likely to lose population" under the Census Bureau's proposed Census procedure had satisfied Article III's injury-in-fact requirement. 525 U.S. 316, 334 (1999). The Court required only proof that (1) certain states relied on federal decennial census data for intrastate redistricting, (2) voters in certain counties in those states were "substantially likely . . . to suffer vote dilution as a result of the [Census Bureau's] plan," and (3) plaintiffs were among the voters who lived in those counties in those states. *Id.* at 332–34 (internal citation omitted). The Court upheld the district court's determination that voters were substantially likely to suffer vote dilution based on expert testimony that the challenged Census procedure would result in a negative shift in the statewide share of the population for the counties in which individual plaintiffs resided. *Id.* at 333–34; *see also* Joint Appendix, *Clinton v. Glavin*, U.S. No. 98–564, 1998 WL 34082182, at 68–71 (Affidavit of Dr. Ronald F. Weber, hereinafter "Weber Affidavit").

15.     It is virtually certain that the citizenship question will cause a differential undercount of Hispanics and noncitizens of some magnitude. *See* Plaintiffs' Proposed Findings of Fact ("PFOF") ¶¶ 479–713 (filed herewith). It is also virtually certain that a differential undercount of Hispanics and/or noncitizens of any magnitude will result in a negative shift in the statewide share of the population for the counties and PUMAs in which the following individual

Plaintiffs reside: Alejandro Chavez, Jose Moreno, Elizabeth Buchanan, Jacob Cunningham,

Maegan Ortiz, Lazara Yoelvis Magadan, Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross,

Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez,

Sonia Casarez Shafer, and Virginia Garcia. *See* PFOF ¶¶ 726–728.

16.     Each of the states in which the Plaintiffs in paragraph 15 reside uses decennial

census population counts to draw Congressional and state legislative districts of equal population

*See* PFOF ¶ 721; *see also* Ariz. Const. art. 4, Pt. 2, § 1 (3); Cal. Const. art. 21, §1; Nev. Const.

art. 15, § 13; Fla. Stat. § 11.031(1);  Md. Code Ann., Elec. Law § 8-701; N.J. Const. art. 4, § 2 ¶¶

1, 3; Tex. Const. art. 3, § 26. It is therefore virtually certain that these individuals will suffer

intrastate vote dilution due to the addition of a citizenship question because the legislative

districts in which they reside and in which they will vote after 2020 will have a greater true

population than other legislative districts in the state.

17.     Thus, as long as there is a differential undercount of Hispanics and/or noncitizens

of some magnitude, it is virtually certain that the addition of a citizenship question will result in

certain Plaintiffs' suffering vote dilution, thereby satisfying the injury-in-fact requirement for

standing.

### b)     Vote Dilution from Malapportionment of Congressional Seats

18.     Where a plaintiff challenges a proposed Census procedure that would lead to an

"expected loss of a Representative to the United States Congress," this "undoubtedly satisfies the

injury-in-fact requirement of Article III standing." *Dep't of Commerce*, 525 U.S. at 331–32. The

loss of a Representative means that Plaintiffs' "votes will be diluted," and faced with the loss of

a Representative, the harm of vote dilution "is 'concrete' and 'actual or imminent, not

'conjectural' or 'hypothetical.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990))

(quotation missing in original); *accord Carey v. Klutznick*, 637 F.2d 834, 836—38 (2d Cir. 1980); *cf. Utah v. Evans*, 536 U.S. 452, 458 (2002).

19.     Because it is highly likely that the citizenship question will lead to a differential undercount of Hispanics and noncitizens of at least 2% (*see* PFOF ¶¶ 708—719), and because a differential undercount of Hispanics and noncitizens as low as 1.56% will cause California to lose a congressional seat (*see* PFOF ¶ 737), it is highly likely that eligible voters residing in California—including Plaintiffs Elizabeth Buchanan, Jacob Cunningham, and Maegan Ortiz, as well as members of organizational Plaintiffs who reside in California, *see*, *e.g.*, Salas Decl. at ¶¶ 4—5—will suffer vote dilution as a result of the addition of the citizenship question to the 2020 Census. The loss of political representation and vote dilution that these Plaintiffs will suffer due to the loss of a Congressional seat is certainly impending because of the addition of a citizenship question. At a minimum, these Plaintiffs face a substantial risk of such an injury because of the addition of a citizenship question.

20.     There is a substantial risk that the citizenship question will lead to a differential undercount of Hispanics and noncitizens that is greater than 2%, which would cause Texas and Arizona to lose a Congressional seat. *See* PFOF ¶ 738. Thus, there is a substantial risk that eligible voters residing in Arizona and Texas—including Plaintiffs Diana Alexander, Lauren Berman, Sarah Bryan, Alejandro Chavez, Juanita Valdez-Cox, Virginia Garcia, Richard McCune, Jose Moreno, Martha Sanchez, Sonia Casarez Shafer, as well as members of Plaintiff LUPE (who reside in Texas)—will suffer vote dilution as a result of the addition of the citizenship question to the 2020 Census.

21.     The loss of a Congressional seat for a state constitutes a "threat of vote dilution"

that "is 'concrete' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Dep't of*

*Commerce*, 525 U.S. at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

22.     Having shown that the political representation that they will lose because of the

citizenship question is an injury that is "certainly impending," or at a minimum, that they face a

"substantial risk" of such injury, the above-mentioned Plaintiffs—Elizabeth Buchanan, Jacob

Cunningham, Maegan Ortiz,  Diana Alexander, Lauren Berman, Sarah Bryan, Alejandro Chavez,

Juanita Valdez-Cox, Virginia Garcia, Richard McCune, Jose Moreno, Martha Sanchez, Sonia

Casarez Shafer, and members of CHIRLA and LUPE—have satisfied the injury-in-fact

requirement. *See Clapper*, 568 U.S. at 414 n.5; *see also Kravitz*, 2018 WL 6830226 at 4.

### c)     Loss of Federal Funding

23.     Where plaintiffs challenge a proposed Census procedure, a decline in federal

funding to the state or locality in which a plaintiff resides as a result of the challenged procedure

is sufficient to establish injury-in-fact. *See Kravitz*, 2018 WL 6830226 at 4; *see also Carey*, 637

F.2d at 838 (holding that "citizens who challenge a census undercount on the basis . . . that

improper enumeration will result in loss of funds to their city have established . . . an injury" for

purposes of standing); *accord City of Detroit v. Franklin*, 4 F.3d 1367, 1374—75 (6th Cir. 1993);

*Glavin v. Clinton*, 19 F. Supp. 2d 543, 550 (E.D. Va. 1998) (three-judge panel) ("As a matter of

law, allegations of decreased federal and state funding is fairly traceable to population counts

reported in the decennial census."), *aff'd sub nom. Dep't of Commerce v. U.S. House of*

*Representatives*, 525 U.S. 316 (1999); *State of Tex. v. Mosbacher*, 783 F. Supp. 308, 313—314

(S.D. Tex. 1992) ("While the Census Bureau and the Department of Commerce are not in charge

of distribution of federal funds, the Bureau's actions significantly affect the distribution of funds

and therefore satisfies the requirements for injury in fact"); *City of Philadelphia v. Klutznick*, 503

F. Supp. 663, 671 (E.D. Pa. 1980); *City of Camden v. Plotkin*, 466 F. Supp. 44, 47─51 (D.N.J. 1978).

24.     There is no materiality barrier to establishing an injury-in-fact based on a loss of funding. "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017); *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). Thus, no court has required a showing of materiality in finding standing to challenge a proposed Census procedure based on a loss of federal funding. *See, e.g.*, *City of Detroit*, 4 F.3d at 1374─75; *Carey*, 637 F.2d at 838─39; *Glavin*, 19 F. Supp. 2d at 550; *City of Philadelphia*, 503 F. Supp. at 671─72.

25.     It is virtually certain that a differential undercount of Hispanics and/or noncitizens of any magnitude will cause the following urbanized areas to lose STBG suballocation funding and TA set-aside suballocation funding following the 2020 Census: Los Angeles-Long Beach-Anaheim, California; Miami, Florida; Atlanta, Georgia; the Maryland portion of Washington, DC-VA-MD; Las Vegas-Henderson, Nevada; the New Jersey portion of New York-Newark, NY-NJ-CT; Houston, Texas; Laredo, Texas; and McAllen, Texas. *See* PFOF ¶¶ 742-748. Because it is also virtually certain that the citizenship question will cause a differential undercount of Hispanics and noncitizens of some magnitude (*see* PFOF ¶¶ 479-713), the following Plaintiffs who reside in these urbanized areas, as well as members of organizational Plaintiffs who reside in those areas, will suffer an injury-in-fact due to the addition of a citizenship question to the 2020 Census:  Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, Michael Kagan, Michael Kravitz, Robyn Kravitz, Raj Mukherji, Diana Alexander, Sarah Bryan, Martha

Sanchez, Sonia Casarez Shafer, Virginia Garcia, Juanita Valdez-Cox, Joanne Wilson, and members of Plaintiff GALEO.  *See* PFOF ¶¶ 1-20; Gonzalez Decl. at ¶¶ 4-6.

26.     In addition, there is a substantial risk that a loss in funding to these urbanized areas caused by a differential undercount of at least 2 percent will negatively affect one or more of the roads, highways, bridges, sidewalks, trails, or other structures in that urbanized area. Such a reduction is almost certain to delay, eliminate, or change the scope of a transportation or transportation-alternative project of the type covered by the STBG Program in that urbanized area. *See* PFOF ¶¶ 749-751.

27.     Furthermore, Plaintiffs Diana Alexander, Sarah Bryan, Elizabeth Buchanan, Jacob Cunningham, Virginia Garcia, Michael Kagan, Michael Kravitz, Robyn Kravitz, Lazara Magadan, Raj Mukherji, Catherine Nwosu, Nnabugwu Nwosu, Maegan Ortiz, T. Carter Ross, Martha Sanchez, Sonia Casarez Shafer, Juanita Valdez-Cox, Joanne Wilson, and members of CHIRLA, GALEO, and LUPE reside in the urbanized areas identified in the preceding paragraph . These Plaintiffs regularly drive on highways and roads in and around their respective urbanized areas. Thus, there is a substantial risk that reduced funding for the STBG projects in their urbanized areas will cause these Plaintiffs to suffer an injury from the delay, elimination, or change of the projects covered by the STBG funding.

28.     A differential undercount of Hispanics and noncitizens of at least 2 percent will cause the following states to lose federal Medicaid funding following the 2020 Census: Arizona, Florida, Nevada, New Mexico, and Texas. *See* PFOF ¶¶ 752–759. There is a substantial risk or strong likelihood that a reduction in federal Medicaid funds will negatively affect Medicaid beneficiaries' health care benefits and/or medical costs, such as reduction of benefits, services, or access to care, as well as increased costs, for those beneficiaries. *Id.* ¶ 760.

29.     Because it is highly likely that the citizenship question will cause a differential undercount of Hispanics and noncitizens of at least 2 percent (PFOF ¶¶ 708—719), Plaintiffs Sonia Casarez Shafer and Sarah Bryan, who reside in Texas and have children who receive health insurance under the Texas Medicaid program, will suffer an injury-in-fact due to the addition of a citizenship question to the 2020 Census. *See* PFOF ¶¶ 3, 19, 758—760. In addition, members of LUPE and PAZ who reside in Arizona and Texas and receive health insurance under the Arizona and Texas Medicaid programs will suffer an injury-in-fact due to the addition of a citizenship question to the 2020 Census. *See* PFOF ¶¶ 46, 759.

30.     It is highly likely that a differential undercount of Hispanics and noncitizens of at least 2 percent will cause a loss in Title I education funding for numerous school districts in which individual Plaintiffs reside and/or in which their children attend school, including the following: Alhambra Elementary District, Balsz Elementary District, Isaac Elementary District, Roosevelt Elementary District, Somerton Elementary District, and Union Elementary District in Arizona; Clark County School District in Nevada; Edinburg Consolidated Independent School District, Hidalgo Independent School District, Lyford Consolidated Independent School District, Pharr-San Juan-Alamo Independent School District, and Rio Grande City Consolidated Independent School District in Texas. *See* PFOF ¶ 765. This is sufficient to establish an injury-in-fact for these Plaintiffs. *See* PFOF ¶¶ 3, 8, 13, 19, 27, 48, 765.

31.     Furthermore, there is a substantial risk that a loss in Title I education funding to a school district will reduce educational services available to students in the school district, including the children of individual Plaintiffs.

32.     For other programs with allocation formulas based on a state's population or per capita income relative to the United States, there is a substantial risk that a differential

undercount of noncitizens would lead to measurable fiscal loss for states with percentages of noncitizens above the nationwide average. *See* PFOF ¶¶ 769-777.

33.     Plaintiff Juanita Valdez Cox and members of Plaintiffs LUPE and PAZ reside in states with percentages of Hispanics and noncitizens above the national average and benefit from or rely on federally funded programs that use Census data, such as Medicaid, the State Children's Health Insurance Program (CHIP), Supplemental Nutrition Program for Women, Infants, and Children (WIC), and Social Services Block Grants (SSBG), *see* PFOF ¶¶ 21, 24-31, 44-48, and thus will suffer injury from a differential undercount of noncitizens.

### 2.     The Individual Plaintiffs' Injuries Are Fairly Traceable to the Challenged Conduct and Redressable.

34.     Plaintiffs have proven a "causal connection" between their injuries and the conduct they challenge in this lawsuit. *Lujan*, 504 U.S. at 560. As explained above, the evidence has established that the addition of a citizenship question will cause a differential undercount of Hispanics and noncitizens that will, in turn, lead to the individual injuries set forth above, these injuries are fairly traceable to the challenged conduct. Plaintiffs have therefore proven each factual step in the causal chain between their injury and defendants' conduct. *See, e.g.*, *Mendia v. Garcia*, 768 F.3d 1009, 1012─13 (9th Cir. 2014) ("[W]hat matters is not the length of the chain of causation, but rather the plausibility of the links that comprise the chain."). This is not a case in which "[s]peculative inferences are necessary to connect [Plaintiffs'] injury to the challenged actions of [Defendants]." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 45 (1976).

35.     Any argument that plaintiffs' injuries are not "fairly traceable" because third-party decisions might prevent some of Plaintiffs' injuries from materializing is "unavailing," just as it was at the summary judgment stage. *Kravitz*, 2018 WL 6830226 at 5. First, nothing in the record evidence suggests that the long-standing statutory methodologies for the apportionment of

Congressional seats, states' use of Census data to draw legislative districts of equal population, and the funding of various federal programs will suddenly change by 2020. Nor is there any evidence suggesting that individual states or any other third party will make up any loss in funding; indeed, the evidence is to the contrary. PFOF ¶¶ 746, 757. Second, as a matter of law, the hypothetical possibility that the law will change or that a third-party will swoop in to mitigate a plaintiff's injury cannot defeat a showing that a plaintiff's injury is fairly traceable to a defendant's conduct. The Supreme Court has made clear that Article III is concerned with the risk of future injury, rather than its ultimate realization, and that the risk of future injury may satisfy Article III's injury and causation requirements even if several steps on the causal chain still stand between a defendant's conduct and the plaintiff's injury when the case is filed. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). And the possibility that an injury caused by defendant's conduct may ultimately be offset by a third-party decision does not refute the showing of causation. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("[T]he fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing."); *see also Texas v. United States*, 809 F.3d 134, 155-56 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (mem.); *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013) ("A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing analysis is not an accounting exercise . . . ."), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016).

36.     Plaintiffs' injuries are not only "likely" to "be redressed by a favorable decision," *Lujan*, 504 U.S. at 561 (internal quotation marks omitted), they will be fully resolved by a

favorable decision. If Defendants are enjoined from placing a citizenship question on the 2020

census, there will be no differential undercount attributable to the citizenship question or any risk

of future injury resulting from such an undercount.

**C.     The Organizational Plaintiffs Have Standing.**

**1.     The Organizational Plaintiffs Have Representational Standing Based on Injuries to Their Members.**

37.     Organizational Plaintiffs with members[1] ("Membership Plaintiffs") satisfy the

*Hunt v. Washington State Apple Advertising Commission* requirements for representational

standing because (1) at least one of their respective members would otherwise have standing to

sue in their own right; (2) the interests Membership Plaintiffs seek to protect are germane to their

purpose; and (3) neither the claim asserted nor the relief requested requires the participation of

the individual members in this lawsuit. 432 U.S. at 343.

38.     With respect to the first prong of the *Hunt* test, at least one member of each

Membership Plaintiff would have standing to sue because an undercount of Hispanic and

noncitizen communities in their community would harm that member for the reasons set forth in

---

[1] Plaintiffs assert representational organizational standing on behalf of the following eight Organizational Plaintiffs with members and seven legislative caucuses:  La Unión Del Pueblo Entero ("LUPE"), FAC ¶¶ 3─8, 328─31; Coalition For Humane Immigrant Rights ("CHIRLA"), *id*. ¶¶ 22─25, 282─84,  294─95; Georgia Association of Latino Elected Officials ("GALEO"), *id*. ¶¶ 26─30, 296─99; Labor Council For Latin American Advancement ("LCFLAA"), *id*. ¶¶ 31─35, 343─49; Somos Un Pueblo Unido ("Somos"), *id*. ¶¶ 36─40, 314─17; Promise Arizona ("PAZ"), *id*. ¶¶ 64─68, 274─77, 281; Chelsea Collaborative ("Chelsea"), *id*. ¶¶ 106─10, 308─13; OCA-Greater Houston ("OCA-GH"), *id*. ¶¶ 111─14, 328─29, 332, 336─37; Texas Senate Hispanic Caucus ("SHC"), *id*. ¶¶ 41─44, 328─29, 334─37; Texas House of Representatives Mexican American Legislative Caucus ("MALC"), *id*. ¶¶ 45─50, 328─29, 333, 335─37; Maryland Legislative Latino Caucus ("MLLC"), *id*. ¶¶ 83─86, 303─07; Arizona Latino Legislative Caucus ("ALLC"), *id*. ¶¶ 74─77, 274─77, 79; California Latino Legislative Caucus ("CLLC"), *id*. ¶¶ 51─54, 287, 289─90, 294─95; California Asian Pacific Islander Legislative Caucus ("API Caucus"), *id*. ¶¶ 59─63, 285─86, 289─90, 294─95; and California Legislative Black Caucus ("CLBC"), *id*. ¶¶ 55─58, 285, 288─90, 294─95.

Section I.B above. *See, e.g.*, Gonzalez Decl. Ex. 2, ¶¶ 5-6 & 14; Salas Decl. Ex. 3, ¶¶ 4-5 & 16;

Navarrete Decl. Ex. 4, ¶¶ 4-6.

39.     Additionally, at least one LUPE member would have standing to sue based on a

loss of federal funding because an undercount of Hispanic and non-citizen communities in Texas

will reduce federal funds to services that the majority of LUPE members or their children rely

on, including, but not limited to: Texas's Medicaid program; Supplemental Nutrition Assistance

Program Benefits; supplemental nutrition for Women, Infants, and Children benefits; Section 8

housing vouchers; and Title I schools. *See* PFOF ¶¶ 24-31.

40.     Plaintiff Juanita Valdez-Cox, the Executive Director of LUPE, herself drives on

public rounds in Hidalgo County, so she would be harmed from the reduction in STGB funding.

*See* PFOF ¶¶ 21, 748-749.

41.     As for the second prong of the *Hunt* test, which the Defendants do not contest, an

interest is "germane" to an organization's purpose if the lawsuit would "reasonably tend to

further the general interests that individual members sought to vindicate in joining the

association and . . . bears a reasonable connection to the association's knowledge and

experience." *Bldg. & Constr. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,

448 F.3d 138, 149 (2d Cir. 2006). Here, the Membership Plaintiffs' missions involve, *inter alia*,

obtaining government benefits for their communities, including ensuring a fair and accurate

census count of those communities. *See, e.g.*, Trial Tr. (Jan. 22) at 150 & 195; Garcia Decl. Ex. 1

at ¶ 4; Gonzalez Decl. at ¶ 4; Salas Decl. at ¶ 4; Navarrete Decl. at ¶ 4; Tso Decl. Ex. 5 at ¶ 4.

42.     Defendants do not contest the third prong of the *Hunt* test. In any case, concerns

of "administrative convenience and efficiency" favor associational standing, as neither the claims

asserted nor the relief requested in this litigation calls for significant participation by individual

members; at most, the claims call for proof of their residence, but that can be established without

direct participation. *United Food and Commercial Workers Union Local 751 v. Brown Grp.,

Inc.*, 517 U.S. 544, 556─57 (1996).

**2.      The Organizational Plaintiffs Have Direct Organizational Standing.**

43.      Organizational Plaintiffs also have direct organizational standing because the

addition of the citizenship question will cause them to suffer an injury-in-fact that is fairly

traceable to the addition of a citizenship question.

44.      The addition of a citizenship question will cause the organizational Plaintiffs to

suffer an injury-in-fact because it will result in the "(1) frustration of [their] organizational

mission[s]; and (2) diversion of [their] resources" to mitigate the effects of the challenged action.

*Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *see Havens Realty

Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *White Tail Park,* 413 F.3d at 458 (citing *Warth v.

Seldin*, 422 U.S. 490, 511 (1975)); *Kravitz*, 2018 WL 6830226 at 4 (adopting this test).

45.      Several Organizational Plaintiffs have already begun or will imminently be forced

to divert resources to help mitigate the impact of the citizenship question and encourage the

communities that they serve to understand that being included in the final census count is critical,

thereby frustrating their organizational missions. *See*, *e.g.*, Garcia Decl. at ¶¶ 3 & 6-11; Gonzalez

Decl. at ¶¶ 3 & 8-13; Salas Decl. at ¶¶ 3 & 9-15; Navarrete Decl. at ¶¶ 3 & 7-11; Tso Decl. at ¶¶

3 & 7-12; Trial Tr. (Jan. 22) at 150-152, 168, 173-179; 220-221; *see also Kravitz*, 2018 WL

6830226 at 4.

46.      For example, Ms. Valdez-Cox testified that due to the addition of the citizenship

question to the 2020 census, LUPE has begun its census outreach and advocacy work earlier than

it would otherwise and has already diverted resources from its other core programs. PFOF ¶¶

791-795. Likewise, the Executive Director of MinKwon, John Park, also testified that the

addition of the citizenship question has already resulted in a diversion of resources. *Id*. at ¶¶ 815-817.

47.     Moreover, the Census Bureau will rely more heavily on these Trusted Voices, including some of the Organizational Plaintiffs, because a citizenship question will make traditionally hard-to-count populations even more reluctant to respond to the Census. Jan. 30 Trial Tr. at 5─192:12-18; 170:1─13; *see Kravitz v. U.S. Department of Commerce*, --- F.Supp.3d ----, 2018 WL 6830226, at \*4 (D. Md. Dec. 28, 2018).

48.     Further, several Organizational Plaintiffs have proven that they will suffer injury in fact from the degradation of data quality that would occur if the citizenship question appears on the 2020 Census. As discussed above, regardless of how successful NRFU operations are in remedying a differential undercount due to a differential decline in self-response rates, the addition of the citizenship question will result in harm to the quality of census data. Several Organizational Plaintiffs—including LCF, GALEO, ASIA, and MinKwon— rely on decennial census data for the purposes of strategic planning and communication, resource allocation, and advocacy. The degradation in quality of the data would harm these Organizational Plaintiffs' ability to effectively and efficiently allocate their resources and conduct their operations. *See* PFOF ¶¶ 778-789.

49.     Courts have recognized that the inability to obtain information is a cognizable Article III injury. *See FEC v. Akins*, 524 U.S. 11, 21 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) ("[R]efusal to permit appellants to scrutinize the ABA Committee's activities to the extent [the Federal Advisory Committee Act] allows constitutes a sufficiently distinct injury to provide standing to sue."); *id*. ("Our decisions interpreting the

Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records.").

50.     These harms to the organizational Plaintiffs are fairly traceable to the addition of a citizenship question -- regardless of whether the citizenship question leads to any undercount. First, the undisputed sensitivity of the citizenship question and impact it will have on the willingness of noncitizens and Hispanics to participate in the survey will force several organizational Plaintiffs to divert resources to efforts to persuade their members and constituents to participate in the Census. *See* PFOF ¶¶ 791-817. Indeed, the Census Bureau expressly intends to rely on such efforts by community organizations as a strategy for ameliorating the reduced willingness to participate in the Census that the citizenship question will cause. *See id*. ¶¶ 647-685. Thus, the Census Bureau's ability to prevent a differential undercount depends on organizational Plaintiffs' diverting their resources for outreach and communication efforts. Second, even if the Census Bureau's NRFU operations are able to prevent any differential undercount, it is undisputed that the data would be of poorer quality and less accurate overall.

51.     These organizational Plaintiff injuries are "likely" to "be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). A favorable decision here would reduce the funds that Plaintiffs would need expend on Census outreach and avoid the data quality problems that would undermine Plaintiffs' reliance on Census data. To satisfy Article III's redressability requirement, a plaintiff must show that the requested relief will remedy "*an* injury" to the plaintiff, not "*every* injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Plaintiffs' injuries specifically caused by the citizenship question will be mitigated, if not wholly remedied, by its removal.

## II.     The Defendants' Actions Violate the Administrative Procedure Act.

### A.     Legal Framework of the Census and the Census Bureau

52.     The United States Constitution mandates that the Congress conduct an "actual

Enumeration" of "the whole number of persons in each state" every ten years. U.S. Const., Art. I,

§ 2, cl. 3 and Am. XIV § 2 (hereinafter, the "Enumeration Clause"). Although the "initial

constitutional purpose" of the census was to "provide a basis for apportioning representatives

among the states in the Congress," it has long "fulfill[ed] many important and valuable functions

for the benefit of the country." *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982). In particular, it

"now serves as a linchpin of the federal statistical system by collecting data on the characteristics

of individuals, households, and housing units throughout the country." *Department of*

*Commerce*, 525 U.S. at 341 (internal quotation marks omitted). Among other things, the data are

used "for such varied purposes as computing federal grant-in-aid benefits, drafting of legislation,

urban and regional planning, business planning, and academic and social studies." *Baldrige*, 455

U.S. at 353 n.9.

53.     "[T]he Constitution vests Congress with wide discretion over . . . the conduct of

the census." *Wisconsin v. City of N.Y.*, 517 U.S. 1, 15 (1996). Pursuant to this authority,

Congress has delegated the duty of conducting the census to the Secretary of Commerce, subject

to the provisions of the Census Act of 1976, 13 U.S.C. § 141 *et seq.* (the "Census Act"), and

other applicable federal statutes [and regulations promulgated thereunder].

54.     Section 141(a) of the Census Act provides:

> The Secretary shall, in the year 1980 and every 10 years thereafter,
> take a decennial census of population as of the first day of April of
> such year, which date shall be known as the "decennial census
> date," in such form and content as he may determine, including the
> use of sampling procedures and special surveys. In connection with
> any such census, the Secretary is authorized to obtain such other
> census information as necessary.

13 U.S.C. § 141(a); *see also* 13 U.S.C. § 5 (authorizing the Secretary to "prepare

questionnaires," including but not only for the decennial census, and to "determine the inquiries,

19

and the number, form, and subdivisions thereof"). The "tabulation of total population by State" must be completed within nine months of the Census Date. *Id.* § 141(b).

55.     Section 141(f) of the Census Act requires the Secretary to report his "determination[s]" as to the content of the next census within certain deadlines in advance of the Census Date. *See* Census Act § 7(a), 90 Stat. 2462; 13 U.S.C. § 141(f). Section 141(f) provides, in relevant part:

> With respect to each decennial . . . census conducted under subsection (a) . . . of this section, the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census —
>
> (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;
>
> (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and
>
> (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C. § 141(f).

56.     Thus, under § 141(a) of the Census Act, the Secretary is authorized to collect information "other" than total population only "as necessary."  Further, under the express terms of § 141(f)(1) and (3), the Secretary may not modify the "subjects" for the decennial census reported to Congress under § 141(f)(1), without finding that "new circumstances exist which necessitate" such a modification and reporting that finding to Congress. *Id.* § 141(f)(3).

57.     Other provisions of the Census Act address the sources and methods that the

Secretary is authorized to use in collecting data other than the enumeration of total population for

apportionment purposes. In particular, § 6 of the Act provides:

> (a) The Secretary, whenever he considers it advisable, may call
> upon any other department, agency, or establishment of the Federal
> Government, or of the government of the District of Columbia, for
> information pertinent to the work provided for in this title.
>
> (b) The Secretary may acquire, by purchase or otherwise, from
> States, counties, cities, or other units of government, or their
> instrumentalities, or from private persons and agencies, such
> copies of records, reports, and other material as may be required
> for the efficient and economical conduct of the censuses and
> surveys provided for in this title.
>
> (c) To the maximum extent possible and consistent with the kind,
> timeliness, quality and scope of the statistics required, the
> Secretary shall acquire and use information available from any
> source referred to in subsection (a) or (b) of this section instead of
> conducting direct inquiries.

13 U.S.C. § 6. Adopted by Congress in 1976, § 6(c) narrowed the preexisting restriction

on the Secretary's authority set forth in 13 U.S.C,.§ 195, which directs that the Secretary "shall,

if he considers it feasible, authorize the use of the statistical method known as 'sampling'" for all

data collections "[e]xcept for the determination of population for purposes of [Congressional]

apportionment." 13 U.S.C,.§ 195; *see also Department of Commerce*, 525 U.S. at 338 (noting

that § 195 "inform[s]" the "broad grant of authority given in § 141(a)").

58.     The Census Act also constrains the Secretary's authority to use or disseminate

data and other information collected pursuant to the Act's provisions. With certain limited

exceptions, Section 9 of Title 13 provides:

> Neither the Secretary, nor any other officer or employee of the
> Department of Commerce or bureau or agency thereof, . . . may . . .
>
> (1) use the information furnished under the provisions of [Title 13]
> for any purpose other than the statistical purposes for which it is

supplied; or

(2) make any publication whereby the data furnished by any particular establishment or individual under [Title 13] can be identified; or

(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports.

13 U.S.C. § 9(a). In addition, the confidentiality protections of the Census Act specifically limit the Secretary's authority to share data with other federal agencies. Tabulations and other statistical materials provided to such agencies are specifically "[s]ubject to the limitations contained in sections 6(c) and 9." *Id.* § 8(b). Moreover, "copies of tabulations and other statistical materials" provided to other federal agencies may "not disclose the information reported by, or on behalf of, any particular respondent." *Id.*

59.   Housed within the Department of Commerce, the Census Bureau is one of 13 "principal statistical agencies" within the "Federal statistical system." *See* 79 Fed. Reg. 71,610, at 71,610. As a statistical agency, the Census Bureau is subject to the standards and directives of the Office of Management and Budget ("OMB") under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501-21, and the federal Information Quality Act ("IQA"), *see* Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 515(a), 114 Stat. 2763 (2000) (amending PRA). Congress has established this statutory and regulatory framework to ensure that the Census Bureau provides impartial, unbiased, and objective data consistent with the highest standards of statistical accuracy and reliability.

60.   The overall purpose of the PRA is to minimize the burden of federal data collections on the public while also improving data quality and maximizing the practical utility of the information collected. *See* 44 U.S.C. § 3501(1)-(11). The PRA specifically directs OMB to ensure "the integrity, objectivity, impartiality, utility, and confidentiality of information collected

for statistical purposes" by federal statistical agencies, *id.* § 3504(e)(1)(B), including by issuing "Governmentwide policies, principles, standards, and guidelines" governing "statistical collection procedures and methods," *id.* §§ 3504(e)(3), 3504(e)(3)(A).

61.     Under the PRA, the Census Bureau must adhere to OMB's "statistical policy and coordination" standards, including with respect to data collection and analysis. *Id.* § 3506(e); *see also* 5 C.F.R. § 1320.18(c) (OMB regulation requiring agency compliance with "the information policies, principles, standards, and guidelines prescribed by OMB" under the PRA). The IQA also instructs OMB and other federal agencies to issue guidance for "ensuring and maximizing the quality, objectivity, utility, and integrity of information they disseminate." IQA § 515(a).

62.     The PRA sets forth standards that must be met by federal agencies before a proposed data collection from the public can be approved by OMB. Prior to implementation, an agency must, *inter alia*, certify that the data collection "is necessary for the proper performance of the functions of the agency, including that the information has practical utility." 44 U.S.C. § 3506(c)(3)(A).

63.     Pursuant to its authority over the Federal statistical system under 44 U.S.C. § 3504(e), OMB has issued directives defining the statistical standards that agencies, including the Census Bureau, must follow. In particular, OMB's Statistical Policy Directive No. 1, entitled "Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units," requires the Census Bureau to "apply sound statistical methods to ensure statistical products are accurate," and to "produce data that are impartial, clear, and complete and are readily perceived as such by the public." Office of Mgmt. and Budget, Statistical Policy Directive No. 1., *Fundamental Responsibilities of Federal Statistical Agencies and Recognized Statistical Units*, 79 Fed. Reg. 71,610, 71,615 (Dec. 2, 2014); PX-354 at 7. To guarantee such impartiality,

statistical agencies including the Census Bureau "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments" and "must be able to conduct statistical activities autonomously when determining what information to collect and process." *Id.*; *see also id.* (citing PX-[355], National Research Council of the National Academy of Sciences, *Principles and Practices for a Federal Statistical Agency*, Principle 4 at 72 ("A Federal statistical agency must be independent from political and other undue external influence in developing, producing, and disseminating statistics.")).

64.     Further, OMB's Statistical Policy Directive No. 2, entitled "Standards and Guidelines for Statistical Surveys," requires the Census Bureau, *inter alia*, to (i) design its surveys "to achieve the highest practical rates of response, commensurate with the importance of survey uses"; (ii) pretest the survey components, if they have not been successfully used before, to "ensure that all components of a survey function as intended when implemented *in the full-scale survey*" and that "measurement error is controlled"; and (iii) administer the survey in a way that "maximiz[es] data quality" while "minimizing respondent burden and cost." Office of Mgmt. and Budget, Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys* at §§ 1.3, 1.4, 2.3 (2006), https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/statpolicy/standards_stat_surveys.pdf; *see also* 71 Fed. Reg. 55,522 (Sept. 22, 2006); PX-359.

65.     Consistent with OMB directives, the Census Bureau has issued its own Statistical Quality Standards that "address[] the Census Bureau's unique methodological and operational issues" and "apply to all information products released by the Census Bureau and the activities that generate those products." U.S. Census Bureau, Statistical Quality Standards at ii (Reissued

July 2013), https://www.census.gov/content/dam/Census/about/about-the-

bureau/policies_and_notices/quality/statistical-quality-standards/Quality_Standards.pdf. The

Census Bureau has also issued stringent Information Quality Guidelines that require the Bureau

to "provide information that is accurate, reliable and unbiased."  U.S. Census Bureau,

Information Quality: Objectivity, https://www.census.gov/about/policies/quality/guidelines.html

(last modified Apr. 17, 2015).

> **B.**     **Scope of Review Under the Administrative Procedure Act**

> **1.**     **Judicial Review Under APA § 706(2) Is "Thorough, Probing, and In-Depth."**

66.     The APA "sets forth the procedures by which federal agencies are accountable to

the public and their actions subject to review by the courts." *Franklin v. Massachussetts*, 505

U.S. 788, 796 (1922). The APA thus provides that "[a] person suffering legal wrong because of

agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702.

67.     Section 706(2) of the APA provides that, in a suit challenging agency action,

"[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and

conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law; contrary to constitutional right, power, privilege, or

immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

[or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A) ─ (D); *see*

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413─14 (1971) (("In all cases

agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or

constitutional requirements."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99

(1977)).

68.     The Supreme Court has made clear that this Court's review under § 706(2) is to

be "thorough, probing, [and] in-depth." *Overton Park*, 401 U.S. at 415; *see id.* at 416 ("searching

and careful" review); *Ohio Valley Envt'l Coal., Inc. v. United States Army Corps of Engineers*,

828 F.3d 316, 321 (4th Cir. 2016) (stating careful review necessary to ensure that there is a

"rational connection between the facts found and the choice made" (citation omitted)).

69.     Rigorous judicial review under the APA was intended to maintain the balance of

power between the branches of government: "[I]t would be a disservice to our form of

government and to the administrative process itself if the courts should fail, so far as the terms of

the [APA] warrant, to give effect to its remedial purposes." *Wong Yang Sung v. McGrath*, 339

U.S. 33, 41 (1950); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009)

(Kennedy, J., concurring in the judgment) (in enacting the APA, "Congress confined agencies'

discretion and subjected their decisions to judicial review").

70.     Moreover, the APA "establishes a scheme of 'reasoned decisionmaking.'"

*Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998)

(quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 52

(1983) ("*State Farm*")). "Not only must an agency's decreed result be within the scope of its

lawful authority, but the process by which it reaches that result must be logical and rational." *Id.*

71.     It is a "foundational principle of administrative law that a court may uphold

agency action only on the grounds that the agency invoked when it took the action." *Michigan v.

EPA*, 135 S. Ct. 2699, 2710 (2015); *see SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)

(describing the "simple but fundamental rule of administrative law," announced in *SEC v.

Chenery Corp.*, 318 U.S. 80 (1943) ("*Chenery I*"), "that a reviewing court . . . must judge the

propriety of [agency] action solely by the grounds invoked by the agency"). Accordingly, "an

agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50. "[T]he *post hoc* rationalizations of the agency or the parties to . . . litigation cannot serve as a sufficient predicate for agency action." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981).

72.      Moreover, the APA requires an agency decision-maker to "disclose the basis of its" decision to "give clear indication that it has exercised the discretion with which Congress has empowered it." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (internal citation omitted); *accord Fed. Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 396 (1974). Absent compliance with this basic requirement, a reviewing court would be unable to measure agency action against the relevant governing standard. *Cf., e.g.*, *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 533 (D.C. Cir. 1978) (observing that the court could not "determine whether the final agency decision reflect[ed] the rational outcome of the agency's consideration of all relevant factors," as required by the APA, because it "ha[d] no idea what factors . . . were in fact considered by the agency").

73.      Where the agency decision-maker fails to disclose the substance of relevant information that has been presented to it, the court "must treat the agency's justifications as a fictional account of the actual decisionmaking process and must perforce find its actions arbitrary." *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54-55 (D.C. Cir. 1977); *see also U.S. Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 534-535 (D.C. Cir. 1978) (showing basis of agency's decision must be disclosed at the very latest in the final decision to permit meaningful judicial review).

   **2.**  **Agency Action Must Be Transparent, Factually Supported, and Grounded in the Agency's Particular Expertise**.

74.     Under APA § 706(2)(A), courts must "hold unlawful and set aside" agency action that is "arbitrary" and "capricious."  5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43; *accord* Mem. Op. at 12, ECF No. 84 (citing *State Farm*).

75.     Consequently, agency action can also fail arbitrary and capricious review if the agency fails to provide a "coherent explanation" of its decision, *Clark County, Nevada. v. Federal Aviation Administration*, 522 F.3d 437, 443 (D.C. Cir. 2008), or fails to justify departures from past practice (by, for example, failing to persuasively distinguish contrary precedent). *Mfrs. Ry. Co. v. Surface Transp. Bd.*, 676 F.3d 1094, 1096 (D.C. Cir. 2012) (Kavanaugh, J.). Arbitrary-and-capricious review thus implements the APA's requirement "that an agency's exercise of its statutory authority be reasonable *and* reasonably explained." *Id.* (emphasis added); *accord Laccetti v. SEC*, 885 F.3d 724, 725 (D.C. Cir. 2018) (Kavanaugh, J.).

76.     Indeed, "[a]lthough [a court] should not venture into the area of agency expertise, [it] need not 'accept without question administrative pronouncements clearly at variance with established facts.'" *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1085 (4th Cir. 1993) (quoting *Nat'l Labor Relations Bd. v. Morganton Full Fashioned Hosiery Co.*, 241 F.2d 913, 915-16 (4th Cir. 1957)). "Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard." *City of Kansas City, Mo. v. Dep't of*

*Housing and Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991); *see also Home Box Office, Inc.*, 567 F.2d at 37.

77.     In short, resting a decision on claims that are "factually untrue" renders agency action arbitrary and capricious. *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 623-24 (E.D. Pa. 2018) (vacating DOJ's imposition of immigration-related grant conditions on local law enforcement funding where the stated basis for the decision rested on claims that were factually untrue); *see also City & Cty. of San Francisco v. Sessions*, No. 17-cv-04642-WHO, 2018 WL 4859528, at *25—28 (N.D. Cal. Oct. 5, 2018) (same).

78.     Courts also "ha[ve] not hesitated to reject agency determinations under [the APA] when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (internal citations omitted); *see, e.g.*, *Dow AgroSciences v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 471-72 (4th Cir. 2013); *F/V Alice Amanda*, 987 F.2d at 1087.

79.     Furthermore, courts also invalidate agency action as arbitrary and capricious under § 706(2)(A) when an agency predetermines an outcome and then articulates a pretextual justification for its decision in the AR. *See, e.g.*, *Latecoere Int'l Inc. v. U.S. Dept. of Navy*, 19 F.3d 1342, 1364-65 (11th Cir. 1994); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544—47 (E.D.N.Y. 2009).

80.     "The 'scope of review' provisions of the APA are cumulative. Thus, an agency action" that survives review in one regard under Section 706 "may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ass'n of*

*Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683

(D.C. Cir. 1984) (Scalia, J.) (internal citation omitted).

81.     Whether interpreted as simply establishing that the action was arbitrary and

capricious or considered a distinct separate basis, the APA requires courts to set aside agency

action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or is carried out without

following procedures prescribed by statute, *see id.* § 706(2)(D). Indeed, the APA requires courts

to set aside agency action if it violates the Constitution or some *other* law — even if that law is

not directed at the agency or within the agency's specific bailiwick. *See FCC v. NextWave*

*Personal Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires

federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. §

706(2)(A) — which means, of course, *any* law, and not merely those laws that the agency itself

is charged with administering.") (internal citation omitted).

### 3.     The Court May Look Beyond the Administrative Record in Appropriate Circumstances.

82.     In evaluating agency action for compliance with the APA, "the focal point for

judicial review should be the AR already in existence, not some new record made initially in the

reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam). Ordinarily, therefore,

courts reviewing agency action for compliance with Section 706(2)(A) "confine their review to

the 'AR.'" *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal citation

omitted); *accord Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995). The

APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based

on the full AR that was before the Secretary at the time he made his decision." *Overton Park*,

401 U.S. at 420; *see also* 5 U.S.C. § 706.

83.     Courts have held that the agency's designation of an AR, "like any established administrative procedure, is entitled to a presumption of administrative regularity." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993); *see also Cent. Elec. Power Co-op, Inc. v. Southeastern Power Admin.*, 338 F.3d 333, 337 (4th Cir. 2003).

84.     However, that presumption is *only* a presumption. "While review of an agency decision is usually confined to [the administrative] record, 'there may be circumstances to justify expanding the record or permitting discovery.'" *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 188 n.4 (4th Cir. 2005) (quoting *Fort Sumter Tours, Inc.*, 66 F.3d at 1336). "An agency may not unilaterally determine what constitutes the AR." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) (internal citation omitted); *see also Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 340 (D.C. Cir. 1989) (showing question of what constitutes the whole AR is one of fact to be determined by the district court). Ultimately, that question is one for the Court. *See, e.g.*, *Overton Park*, 401 U.S. at 420.

85.     In light of the above, courts have recognized several limited exceptions to the "record rule" which permit the reviewing court to consider material outside the AR compiled and submitted by the agency itself. The Court concludes that each of these exceptions applies to its review in this case.

86.     *First*, the Court may consider evidence outside the AR where such evidence "is necessary to explain technical terms or complex subject matter [involved]" in the decision at issue. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005); *see also Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 157 (D.D.C. 2012) (stating extra record evidence will be considered "if it is needed to assist a court's review").

87.     This type of extra-record evidence is routinely permitted to ensure that the court

can fully understand highly technical or scientific information referenced in the AR. Such

evidence may also be necessary to ensure that the court can properly understand the agency's

reasoning and decision-making when that reasoning and decision-making involved, for example,

scientific tests, complex calculations, or other specialized processes. *See, e.g., Asarco, Inc. v.*

*EPA*, 616 F.2d 1153, 1160-61 (9th Cir. 1980) (showing testimony of copper plant manager to

explain operation of smelter).

88.     Such explanatory expert evidence is commonplace in census-related disputes,

which often involve technical issues, such as statistical techniques and calculations; survey

methodology and design; demography; and the Census Bureau's established testing and other

procedures. *See, e.g., Dep't of Commerce*, 525 U.S. at 331.

89.     *Second,* this Court may consider extra-record evidence to evaluate whether the

Secretary in this case failed to consider all relevant factors, ignored an important aspect of the

problem, or deviated from established agency practices. As noted above, an decision is arbitrary

and capricious under the APA if, among other things, the agency failed to consider all "relevant

factors," *Overton Park*, 401 U.S. at 416; ignored "an important aspect of the problem," *State*

*Farm*, 463 U.S. at 31, 43─44; or made "an irrational departure from [settled] policy,"

*Immigration Naturalization Serv. v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996). To apply these

standards, a court must as a threshold matter understand what is "relevant," "important," or

"settled" in the field where the challenged agency decision was made. *See, e.g., Asarco*, 616 F.2d

at 1160 ("It will often be impossible, especially when highly technical matters are involved, for

the court to determine whether the agency took into consideration all relevant factors unless it

looks outside the record to determine what matters the agency should have considered but did not.").

90.     In many cases, the AR will provide the relevant benchmarks. But evidence outside the "bare record" may be required to assist the court in identifying all factors relevant to a complex determination, evaluating the completeness of the agency's reasoning, and determining whether the agency ignored critical factors or information. *Overton Park*, 401 U.S. at 420; *see also Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 2019 WL 286676, at 8 (4th Cir. Jan. 23, 2019). As courts have explained, "[i]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco*, 616 F.2d at 1160; *see also Oceana, Inc. v. Pritzker*, 126 F. Supp. 3d 110, 114 (D.D.C. 2015) (permitting expert testimony to "point out gaps in the agency's explanation and analysis").

91.     *Third*, and most significantly here, it is well established that courts reviewing the substantive validity of agency action may consider extra-record evidence going to the reasons for the agency's action, where there has been a "strong showing" that the agency has acted in "bad faith." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) ("[A]n extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers . . . ." (citing *Overton Park*, 401 U.S. at 420)); *see also United States v. Shaffer Equip. Co.*, 11 F.3d 450, 460-61 (4th Cir. 1993) ("Given the great possibility that [his] deception affected administrative decisions in this case and disguised a weakness in his capabilities . . . the significance of impeaching the principal EPA witness, who was largely responsible for

developing the record, renders impeachment information material. We thus reject the government's position that the court is essentially stuck with an unimpeachable AR.").

92.     Evidence of bad faith rarely appears in a formal AR precisely because an agency is unlikely to record and make public its own improper conduct. *See, e.g., Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004) (placing "evidence of bad faith . . . in an AR" would be "both sinister and stupid"); *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1281 (W.D. Wis. 1997) (agency is not likely "to keep a written record of improper political contacts"). Although courts have set a high bar for such additional evidence going to an agency decisionmaker's reasons for acting, that bar is not insurmountable. *See, e.g., Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004); *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1357 (11th Cir. 1994); *Tummino v. Hamburg*, 936 F. Supp. 2d 162, 195─96 (E.D.N.Y. 2013).

93.     Moreover, if a plaintiff's strong preliminary showing of bad faith or pretext later matures into a factual finding of bad faith or pretext, that "'fact' would be material to determining whether the [agency] acted arbitrarily" in violation of the APA. *James Madison Ltd.*, 82 F.3d at 1096; *see also, e.g.*, *Woods Petroleum Corp. v. U.S. Dep't of Interior*, 18 F.3d 854, 859-60 (10th Cir. 1994), *adhered to on reh'g*, 47 F.3d 1032 (10th Cir. 1995); *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1150─51 (Fed. Cir. 1994).

94.     This Court previously concluded that Plaintiffs in this case had made a strong preliminary showing of bad faith or pretext sufficient to warrant discovery beyond the AR initially produced—and thereafter materially expanded at the direction of the court in the New York Cases—by Defendants. Mem. Op. at 33, ECF No. 48. The Court now concludes that both the AR evidence alone and the additional extra-record evidence presented at trial confirm the

Court's previous threshold finding and that the extra-record evidence should be considered by the Court in determining whether the Secretary's stated reasons for adding the citizenship question in the March 26 Memorandum were pretextual and not the actual reasons for that decision. The Court therefore will not be limited to the AR in conducting its review of whether the decision was made in bad faith or was pretextual—including whether that determination also rendered the decision arbitrary and capricious under the APA. *See Latecoere*, 19 F.3d at 1356; *Woods Petroleum Corp.*, 18 F.3d at 859-60.

95.     With respect to other aspects of the Court's review, the Court does not consider or rely upon material outside the AR except where, as noted herein, consideration of such evidence is warranted to evaluate whether the decision "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 34, or such material would further illuminate or enable the Court to comprehend the complex issues before it, *Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. at 157.

96.     "[T]he focal point" of the Court's review remains "the AR already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. Indeed, this case presents the unusual instance in which the AR—at least as the meager record that Defendants initially produced has since been voluminously supplemented, under the pressure of motion practice and court orders in the New York Cases—alone provides more than sufficient evidence to demonstrate not only the invalidity of the Secretary's announced decision on the conventional grounds set forth in APA § 706(2) but also  the pretextual nature of the Secretary's stated reasons in his March 26 Memorandum announcing the decision. As set forth more fully below, the Court's conclusion that the stated reasons for the decision were pretextual is based

upon the AR and relies upon extra-record evidence only as additional, confirmatory support for its legal conclusion.

**C.      The Decision to Add the Citizenship Question Was Arbitrary and Capricious and Must Be Set Aside Under APA § 706(2)(A)-(D).**

97.      Applying the legal standards set forth above, the AR standing alone demonstrates that the decision to add the citizenship question announced by the Secretary in the March 26 Memorandum. PX-26 (AR 1313) (hereinafter "Ross Memo") was arbitrary and capricious in multiple respects. While the AR by itself amply establishes that the decision violates the APA and must be set aside, the extra-record evidence presented at trial also powerfully reinforces and provides additional bases for that conclusion.

**1.      The Secretary Failed to Acknowledge Applicable Legal Requirements and Constraints on His Discretion.**

98.      At the outset, the Secretary's statement of his own legal authority in the Ross Memo betrays an almost complete ignorance of the statutory and other legal framework constraining his discretion.

99.      The Secretary asserted in the Ross Memo: "Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the Voting Rights Act ("VRA"). By law, the list of decennial census questions is to be submitted two years prior to the decennial census—in this case, no later than March 31, 2018." PX-26 at 2 (AR1314). This simplistic assertion of unlimited discretion subject only to a two-year deadline for reporting "decennial census questions" to Congress lacks foundation in the law. *Id.*

100.    The Ross Memo nowhere referred to or acknowledged the statutory constraints on his discretion contained in 13 U.S.C § 141, much less the fact that the decision would add an

entirely new subject—citizenship—to the 2020 Census questionnaire long after the three-year

deadline for determining and reporting those subjects to Congress under § 141(f)(1). Nor did the

Secretary evince any awareness—either in the Ross Memo or anywhere else in the AR—of the

other Census Act provisions, including 13 U.S.C. § 6(c) and (9), by which Congress directly

limited the scope of the Secretary's discretion with respect to the Census. The Ross Memo makes

no reference to any statistical standards or procedures of the Census Bureau as a federal

statistical agency at all. *See* PFOF § III.A.

101.    Agency action taken in ignorance of applicable law is arbitrary and capricious,

and must be vacated. *See, e.g.*, *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968,

970-71 (10th Cir. 2016) (Gorsuch, J.); *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d

1178, 1195 (8th Cir. 2001) ("[A]n agency implementing a statute may not ignore . . . a standard

articulated in the statute."); *cf. Porzecanski v. Azar*, 316 F. Supp. 3d 11, 19-20 (D.D.C. 2018)

(holding that agency action that "relies on the wrong law" must be vacated).

102.    While the Ross Memo was not required to identify every statutory provision or

standard relevant to the Secretary's authority, the Secretary was required to comply with the

significant legal constraints that Congress has imposed in delegating some of *its* constitutional

authority over the Census.

103.    The Ross Memo does not acknowledge that the Secretary's discretion is limited

by the Paperwork Reduction Act's requirement that the Census Bureau adhere to OMB's

"statistical policy and coordination" standards, including with respect to data collection and

analysis. *See* 44 U.S.C. §§ 3501-21; 5 C.F.R. § 1320.18(c); *see also* PFOF § II.D.

104.    Nor did the Secretary comply with the restraints on his discretion created by

OMB Directives and the Census Bureau's Statistical Quality Standards. The Ross Memo does

not reference or acknowledge the requirement to pre-test the citizenship question, and there is no

evidence that the citizenship question underwent any testing required by the Census Bureau's

Statistical Quality Standards. *See* PX-260; PFOF § II.E.1.

> **2.      The Explanations Set Forth in the Ross Memo Ran Counter to the Evidence Before the Agency.**

105.     An agency decision is arbitrary and capricious under APA § 706(2) when the

evidence in the AR "runs counter to the evidence before the agency . . . ." *State Farm*, 463 U.S.

at 43. Here, critical factual assertions in the Ross Memo directly contradicted or ignored the

evidence in the AR, including the Census Bureau's expert memoranda prepared specifically for

the Secretary's review.

> **a)      The evidence before the agency showed that adding a citizenship question will materially lower response rates.**

106.     The Ross Memo attempted to justify the decision on the grounds that "no one

provided evidence that reinstating a citizenship question on the decennial census would

materially decrease response rates." PX-26 at 5 (AR1317). This assertion is counter to the

uncontroverted evidence in the AR. *See, e.g.*, PX-22 at 1, 2 (AR 1277, 1278); PX-102 at 6–7

(AR 5505–06); PX-136 (AR 10386); PX-147 (AR 11634).

107.     In fact, the AR contains substantial quantitative evidence detailing how the

addition of a citizenship question to the decennial census would reduce response rates among

noncitizen and Hispanic households. The Census Bureau conducted several natural experiments

designed to assess the effect a citizenship question would have on response rates. *See* PX-22 at 4

(AR1280); PX-1194 at 887:16-20 (Abowd). The Census Bureau examined differential declines

in self-response rates, and differential sensitivity to citizenship inquiries as shown in item non-

response rates and breakoff rates. *See* PX-22 at 4 (AR1280); PX-1194 at 888:7-12 (Abowd); PX-

102 at 6–7 (AR 5505–06). On this basis, the Census Bureau calculated that adding a citizenship

question to the 2020 census would lead to a 5.1% decrease in self-response rates. PX-22 at 4–5 (AR 1280–81); PX-100 at 2 (AR5473); PX-147 (AR 11634).

108.    The scientific analyses done by the Census Bureau are the only quantitative evidence in the AR on this point. The AR contains only evidence that the citizenship question will harm and no evidence whatsoever that the citizenship question will *not* harm the response rate. Although the memo claims to refer to studies that purport to show the contrary, such as survey evidence supposedly provided by the Nielsen Company, *see* PX-26 at 3, 6 (AR1315, 1318), no such evidence appears anywhere in the AR. *See* PX-1 to PX-14 (AR).

109.    The qualitative evidence in the AR also reinforces the Census Bureau experts' well-researched finding that adding a citizenship question to the 2020 Census will cause a material decline in self-response rates, particularly among noncitizen and Hispanic households. PX-147 (AR 11634); PX-100 (AR5473); PX-22 at 4, 5 (AR 1280, 1281); PFOF § II.B.

110.    If anything, the Census Bureau's analysis predicting a 5.1% decline in self-response as the result of a citizenship question represented a *conservative* estimate. PX-1194 at 893:3–4. With the benefit of additional research and analysis, Census Bureau researchers have concluded that the expected decline in self-response due to the citizenship question is *higher*—at least 5.8%. PX-162 at 38-39. The Brown *et al.* paper containing that prediction has been subjected to rigorous internal review by the Census Bureau and has been submitted to a peer-reviewed journal for publication. *See* Jan. 30 Trial Tr. 64:7-15, 68:12-16, 129:12-14 (Abowd).

111.    As of March 26, 2018, the Secretary simply had no competent evidence before him on which to ignore or reject his own experts' unanimous finding. The Ross Memo fails to cite any such evidence.[2] The Secretary referred to an alleged statement by "a former Census

_____

[2] The assertion in the Ross Memo no mechanisms were identified to measure the number of respondents

Bureau Director" that, "even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion." PX-26 at 6 (AR 1318). But "limited" evidence is not *no* evidence, and this external stakeholder could not have had access to the Census Bureau's internal January 19 Memo providing expert empirical analysis and findings on exactly that point. *Id.*

112. The only other "evidence" cited by the Secretary cannot provide a reasonable basis to ignore the expert analysis and findings of the Census Bureau "SWAT team" mobilized in response to the DOJ Letter. PX-32 (AR1525), PX-712 (AR 663) ( "DOJ Letter"). First, the Ross Memo claimed that an unnamed "SVP of Data Science at Nielsen"—a private-sector media rating company—had advised that, "[w]hen Nielsen added questions on place of birth and time or arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different." PX-26 at 6 (AR1318). There is no documentary support in the AR for this reported survey result—one that, even if true, would have no more than anecdotal interest as it lacks any colorable empirical application to the Census. This is equally true with respect to the Secretary's similarly vague description of a "citizenship-like" situation, in which the Department of Homeland Security obtained "aggregate data on the number of Arab Americans by zip code in certain areas of the country." There is no indication in the record that the Secretary even asked Census Bureau experts to comment on the dubious value of such "evidence"—much less what they might have said.

---

who would self-respond but for the inclusion of a citizenship question ignores the possibility of conducting a randomized control test, which extra-record evidence confirms would have been possible if the Secretary had actually wanted additional empirical evidence. *See* PX-162 at 39 n.53 (noting the possibility of conducting "a randomized control trial (RCT) comparing self-response rates where some households are randomly chosen to have an 11-question Census questionnaire with a citizenship question (the treated group), and a randomly chosen set of control households receive a 10-question Census questionnaire without citizenship"); PX-165 (proposed RCT); *see also* Trial Tr. (Jan. 30) 5-72:21-73:23 (Abowd); PX-1194 at 925:5-926:7.

113.     Thus, this is *not* a case where the AR shows that "specialists express conflicting views," and the agency decision-maker made a rational choice between those views. *See Nat'l Audubon Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, 55 F. Supp. 3d 316, 351 (E.D.N.Y. 2014) (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)). To the contrary, the only evidence in the AR uniformly confirms that adding a citizenship question will reduce self-response rates. Furthermore, even more serious doubt is cast upon the Secretary's assertions by extra-record evidence, in the form of the written affidavit testimony of Christine Pierce, the Nielsen Company Vice President of Data Science referred to in the Ross Memo. Ross Memo at 3; Pierce Aff. at ¶¶ 15, 18, ECF No. 498-18 (hereinafter "Pierce Aff."). Ms. Pierce's testimony is admissible as sworn prior testimony under oath of an unavailable witness, to the extent set forth in the Court's Letter Order dated January 25, 2019, ECF No. 128.

114.     Pierce testified*, inter alia*, that that the Ross Memo materially mischaracterizes her unrecorded telephone conversation with the Secretary, including by falsely attributing to her statements that she did not make. In particular, Pierce affirmed that she did not cite evidence that a citizenship question would not cause a decline in self-response rates, but rather expressed her "unequivocal[]" contrary concern "that a citizenship question would negatively impact self-response rates." *Id.* at ¶¶ 9, 12-18.

115.     Even aside from the consideration of this extra-record evidence, purported statements by Pierce concerning unspecified, privately-conducted sample surveys could not provide a logical or sufficient basis for ignoring or contradicting the Census Bureau's expert findings concerning the impact of a citizenship question on decennial Census self-response rates. Further, given the Ross Memo's reliance upon undocumented (or inadequately documented, *see* PX-1 at AR1276) hearsay attributed to Pierce, it is also appropriate to consider the Pierce

affidavit insofar as it completes the AR and enables the Court to conduct the thorough and probing review mandated by the APA.

116.    Pierce credibly testified through her affidavit—which was admitted in the New York Case after Defendants declined to have her appear for in–person cross-examination, NY Tr. 473—that the Ross Memo does not accurately report her statements to the Secretary. Resting a decision on claims that are "factually untrue" itself renders agency action arbitrary and capricious. *See City of Philadelphia*, 280 F. Supp. 3d at 623-24. The Ross Memo's failure to acknowledge the expert evidence on self-response rates provided by the Census Bureau is compounded by its unfounded reliance upon misreported statements of a private citizen that were not memorialized in the AR. Additional extra-record evidence presented at trial—including the testimony of Plaintiffs' experts and of Defendants' witness, Dr. Abowd—also demonstrates that adding a citizenship question will have material adverse effects on self-response rates, particularly those of immigrant and Hispanic households. *See, e.g.*, PX-162 at 39 (revising "conservative" estimate of decline in self-response to 5.8% percent); PX-297 at RFA 96-97 (the Census Bureau found empirical evidence that a citizenship question could reduce response rates); PX-662 (updated CBAMS presentation); PX-1194 at 881-82, 897, 919-20 (Abowd); Trial Tr. (Jan. 23) 126:13-127:10 (Mathiowetz); PX-696 at 621:21-622:8; 615:20-621:15; 644:1-7. (Barreto); PX-670; PX-671; *see generally* PFOF § VI. Although this additional evidence is not needed to establish that the evidence in the AR on self-response rates ran directly counter to the Secretary's claims in the Ross Memo, it serves to confirm the material significance of the Secretary's failure in negating any reasonable basis for the decision.

        **b)       The record contradicts the Ross Memo's claim that a citizenship question will result in more accurate and complete citizenship data.**

117.    As stated in in the Ross Memo, the rationale for the decision was predicated on the Secretary's conclusion that the addition of a citizenship question to the 2020 Census would result in the "most complete and accurate" citizenship data for DOJ. PX-26 at 5 (AR1318); *see also id.* at 1 (AR1313) ("prioritiz[ing] the goal of obtaining complete and accurate data") (emphasis in original); *id.* at 4 (AR1317)  ("it was imperative" to choose an option to "provide a greater level of accuracy"); *id.* at 1 ("[I]t is . . . incumbent upon the Department and the Census Bureau to make every effort to provide a complete and accurate decennial census."). Even assuming the validity of the Secretary's stated priorities, however, the evidence in the AR squarely negates any reasonable conclusion that the decision to add citizenship as a subject for the 2020 Census is consistent with or likely to achieve that result. In this respect as well, the asserted basis for the decision runs counter to the evidence before the Secretary.

118.    Every scientific analysis in the AR confirms that the addition of the citizenship question will result in *less* accurate and *less* complete citizenship data. *See, e.g.*, PX-25 at 5 (AR 1312) ("Alternative D would result in poorer quality citizenship data than Alternative C."); PX-22 at 1 (AR 1277) (explaining that adding the citizenship question would result in "substantially less accurate citizenship status data than are available from administrative sources"); *id.* at 9 (AR 1285) ("[T]he ARs citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method."); PX-23 at 8 (AR 1293) ("Q: Is suing sample data and ARs sufficient for DOJ's request? A: The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C."); PX-24 (AR 1304); PX-25 at 5 (AR 1312) ("Alternative D would result in poorer quality citizenship data than Alternative C."); PX-132 (AR 9812); PX-100 at 3 (AR 5475) ("Alternative C delivers higher quality data than Alternative

B for DoJ's stated uses."). In this regard, there is simply no "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 42-43 (internal citation and quotation marks omitted).

119.    The Ross Memo contends that Alternative D "would maximize the Census Bureau's ability to match the decennial census responses with ARs," PX-26 at 4 (AR1316), so as to allow for "more complete" citizenship data. To the contrary, the AR reflects that because adding a citizenship question would drive down the self-response rate and put more households into NRFU operations, Alternative D actually reduces the Census Bureau's ability to match survey responses with ARs. PX-25 at 4 (AR 1311) (explaining that since "NRFU PII is lower quality than the self-response data," the citizenship question will increase "the number of persons who cannot be linked to the administrative data"). As the Census Bureau itself made clear, adding a citizenship question will drive down the self-response rate and push more households into NRFU operations, which, in turn, produces "lower quality" personal identifying information. *See id*. That, in turn, will actually increase "the number of persons who cannot be linked to . . . administrative data." *Id.* There is no evidence in the record to the contrary.

120.    Further, the Ross Memo itself acknowledges that survey data regarding citizenship are inaccurate; noncitizens respond to inquiries into their citizenship status by responding that they are citizens approximately 30% of the time. PX-26 at 4 (AR1316); PX-22 at 7 (AR 1283); PX-25 at 1 (AR 1311). While the Ross Memo correctly asserts that Alternative C—using ARs "alone"—would require the Census Bureau to "impute" the citizenship of a portion of the population, *see* PX-26 at 4 (AR1316), Alternative D would rely on imputation as well, *see* PX-24 at 2, 4 (AR 1305, 1307). The difference is that in Alternative C, the missing

citizenship data would be imputed from a more accurate source (ARs) than in Alternative D

(proxy responses). *Id.*

121.    The Secretary gave no clear explanation in the Ross Memo of what he meant by

"more complete" citizenship data. The suggestion that "[a]sking the citizenship question of 100

percent of the population gives each respondent the opportunity to provide an answer" bears no

inherent relation to the goal of completeness, since plainly what matters is not whether people

have that opportunity, but whether they take it. Moreover, any superficial gain in "completeness"

derived from potentially "eliminat[ing] the need for the Census Bureau to have to impute an

answer for millions of people," PX-26 at 5 (AR1317), would come *at the expense* of accuracy,

for the reasons highlighted above. And, since the law (including § 6(c) of the Census Act)

mandates a preference for the use of ARs over direct inquiries to the public, the imposition of an

additional question on 100 percent of the U.S. population cannot be spun as an "opportunity"

rather than a burden.

122.    Indeed, the Ross Memo's claim that the citizenship question will be "no

additional imposition" for U.S. citizens and "for the approximately 70 percent of noncitizens

who already answer this question accurately on the ACS," *id.*, runs directly contrary to the

established definition and understanding of "respondent burden" reflected throughout the AR.

*See* PX-22 at 5 (AR 1281) ("Survey methodologists consider burden to include . . . the direct

time costs of responding . . . ."); *see also* 44 U.S.C. § 3502(2) (PRA definition of burden to mean

"time, effort, or financial resources expended by persons" in providing information to a federal

agency). The Secretary's plainly erroneous conception of the citizenship question as an

"opportunity" involving "no imposition" on over 90 percent of the U.S. population introduced a

fundamental imbalance in the Ross Memo's analysis and does not provide a "satisfactory explanation for [the Secretary's] action." *State Farm*, 463 U.S. at 43.

> c)    **The Ross Memo relies on other assertions that are unsupported by and often contrary to the evidence.**

123.    The Ross Memo contains other flawed assertions that are either based on no supporting evidence at all or are directly contradicted by the record evidence.

124.    For example, the Secretary contends that "no one has identified any mechanism" for identifying respondents who would self-respond to the census but for the addition of a citizenship question. PX-26 at 1, 5 (AR1313, 1316). This claim ignores the Census Bureau's multiple empirical analyses in the AR that go to precisely this issue. *See, e.g.*, PX-22 (AR 1277); PX-25 at 4 (AR 1311); PX-4 at 4879 (AR 8614); PX-147 (AR 11634).

125.    The Ross Memo asserted that it is "difficult to assess" whether "non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs." PX-26 at 7 (1319). But the AR reflects that, prior to the March 2018 memo, the Census Bureau prepared an analysis estimating that the expected self-response decline from adding a citizenship question would increase costs by at least $27.5 million. PX-22 at 6 (AR 1282).

126.    The Secretary further asserted that nonresponse rates to the ACS citizenship question for Hispanics and non-Hispanic whites were "comparable" to nonresponse rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve. PX-26 at 3 (AR1315). But the nonresponse rates listed in the memo are, on their face, not comparable. For example, the cited nonresponse rates to the ACS citizenship question for Hispanics are twice as high as nonresponse rates for non-Hispanic whites. *Id.*[3]

---

[3] In response to requests for admissions, the Census Bureau admitted that the nonresponse rates to the ACS citizenship question for Hispanics and non-Hispanic whites were not "comparable" to nonresponse

127.     The Ross Memo also asserts that placing the citizenship question "last" on the census will somehow "minimize any impact on decennial census response rates." PX-26 at 8 (AR1320). Neither the Ross Memo nor the AR provides any evidence to support, much less substantiate, this hypothesis. In fact, that record indicates that the Secretary gave no consideration whatsoever to the specific wording of the proposed citizenship question or the impact of overall questionnaire design, including the placement of the citizenship question within the Census questionnaire. Indeed, since the Census questionnaire requires the respondent to provide information sequentially concerning more than one member of a household, it is not clear what placing the question "last" means, or how the Secretary may have understood this unexplained instruction. In any event, the supposition that this directive would minimize adverse impact is based on rank speculation unsupported by any testing or other expert analysis.

128.     It is the definition of arbitrary to base an agency decision on assertions with no foundation in fact. *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 841 (D.C. Cir. 2006) (agency rule was arbitrary and capricious where agency lacked any evidence to support key factual conclusion); *Choice Care Health Plan, Inc. v. Azar*, 315 F. Supp. 3d 440, 443 (D.D.C. 2018) (to survive review under the APA, "the facts on which the agency purports to have relied" must "have some basis in the record" (quoting *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014)). Compounding that failure, the Secretary failed to explain why he reached conclusions directly contradicted by the AR. *See Clark Cty. v. FAA*, 522 F.2d 437, 441-42 (D.C. Cir. 2008) (Kavanaugh, J.) (conclusory statements that do not address the contrary evidence do not satisfy the APA's reasoned decision-making requirement).

---

rates for other ACS questions, such as educational attainment, monthly gas costs, and weeks worked in the past twelve. PX-297 at RFAs 89-95.

129.    Defendants have repeatedly cited the U.S. Supreme Court's decision in *Wisconsin v. City of New York*, 517 U.S. 1, (1996), contending that it affirmed the authority of the Secretary of Commerce to overrule his experts on Census matters. *See* Mem. of Law in Support of Defs. Mot. for Summary Judgment, ECF 67-1, at 26. But this case bears no resemblance to *Wisconsin*. In that case, the Director of the Census Bureau stated in her report to the Secretary that the question for decision concerned "an issue about which reasonable men and women and the best statisticians and demographers can disagree." *Id.* at 23-24. In contrast, the proposed addition of citizenship to the subjects for the 2020 Census was opposed unanimously by *all* of the Census Bureau personnel who participated in the process—all of whom unwaveringly supported the unequivocal conclusion that the addition of the citizenship question would objectively harm data quality, while increasing both cost and respondent burden. *See* PX-147 (AR11634); PX-100 (AR5473); PX-22 (AR1277); PX-132 (AR9812); PFOF § II.C. The uncontroverted evidence before the Secretary demonstrated that the use of ARs alone without a decennial Census citizenship question—Alternative C—was superior to Alternative D by every relevant metric, including those that the Secretary purported in the Ross Memo to value. *See* PX-26 at 1, 4–5 (AR1313, 1316-17). Consequently, the grounds for the adding the citizenship question set forth in the Ross Memo were both internally illogical and irrational in light of the evidence before the Secretary at the time. The decision was therefore not a proper exercise of judgment or discretion under *Wisconsin*, but arbitrary and capricious action in clear violation of fundamental requirements under the APA.

130.    Extra-record evidence, including Dr. Abowd's testimony, the testimony of Plaintiffs' experts witnesses, testimony of Census Bureau executives, and subsequent Census Bureau analyses, provided background on the complex concepts and calculations that were used

to evaluate Alternatives C and D, which are reflected but not entirely explained in the AR. This extra-record evidence further highlighted the professionally accepted and objective benchmarks and standards that a rational decision-maker would have relied on to evaluate whether Alternative D was by any standard worse than Alternative C. PX-1194 (Abowd NY Testimony) at 881:4–10, 882:2–5; *see also* Jan. 30 Trial Tr. 123:11–16.

> **3.       Secretary Ross Failed to Consider Several Important Aspects of the Problem Presented by the DOJ Request.**

131.    Adding the citizenship question was also arbitrary and capricious because Secretary Ross "failed to consider" several "important aspect[s] of the problem" raised by the DOJ request for block-level citizenship data. *State Farm*, 463 U.S. at 43.

> **a)       The Secretary Failed to Consider Whether a Valid Justification Existed for the DOJ Request.**

132.    First, Secretary Ross failed to consider whether an adequate legal justification for the DOJ request existed sufficient to warrant an expanded data collection by the Census Bureau from the public. Although the Ross Memo asserted that the Secretary gave a "hard look" at the DOJ request, the memo itself takes the validity of the DOJ Letter as a given. PX-26 at 1 (AR1313). And the AR as a whole confirms that the Secretary—who had been instrumental in soliciting and securing the DOJ Letter including through direct high-level communications with the Attorney General—took no steps whatsoever to evaluate the legal justification or practical need for data DOJ requested.

133.    Defendants were not entitled to rely uncritically on the DOJ Letter to support their decision, without any independent assessment of its merits. Although the Census Act delegates the authority to obtain "other census information" to the Secretary of Commerce, it authorizes the collection of such information (subject to limits found elsewhere in the statute, including Section 6(c)) only "as necessary." 13 U.S.C § 141(a). Under the PRA, prior to implementation of

any proposed data collection from the public, certification is required that the collection is "necessary for the proper performance of the functions of the agency" involved. 44 U.S.C. § 3506(c)(3)(A).

134.    The evidence at trial established that it is long-standing standard procedure for the Census Bureau to review and evaluate the legal justification for another federal agency's data request, and to work closely with OMB in ensuring that the legal prerequisites for any public data collection will be met. Trial Tr. (Jan. 22) at 56-61 (Thompson). Even without this evidence, however, the DOJ Letter on its face raised serious questions about the legal justification and practical need for the data requested. *See* PFOF § II.B

135.    Most notably, the DOJ Letter did not state that block-level citizenship data are "necessary" to enforce the VRA. Rather, it conspicuously avoided using the word "necessary" to describe the request for the data. *See* PX-712 at 2-3 (AR664-65) (asserting only that the ACS does not "yield the ideal data" and would "assist" in enforcing VRA). In contrast, the DOJ Letter stated—correctly—that the citizenship question on the *ACS* was "necessary" to provide information required by statute, and it requested that the Census Bureau retain the ACS citizenship question as well.

136.    The AR contains no evidence that block-level CVAP data are necessary to enforce Section 2 of the VRA. In fact, the DOJ Letter did not identify any VRA cases that DOJ had failed to bring because of inadequate block-level CVAP data. *Id.* Nor did it identify any VRA cases brought by DOJ that failed because of inadequate block-level CVAP data. *Id.*

137.    Moreover, the cases cited in the DOJ Letter do not themselves support the contention that existing citizenship data were inadequate or caused Plaintiffs to lose their Section 2 actions. PX-712 at 1–2 (AR664-65) (citing cases). *See LULAC v. Perry*, 548 U.S. 399, 423-42

(2006) (plaintiffs prevailed on their vote-dilution claim); *Reyes v. City of Farmers Branch*, 586 F.3d 1019, 1021–25 (5th Cir. 2009) (plaintiffs' expert testimony for estimating HCVAP failed to satisfy the first Gingles precondition, but that analysis was not based on ACS data, and court of appeals left open whether plaintiffs could have satisfied Gingles One had their expert properly used his alternative method); *Barnett v. City of Chi.*, 141 F.3d 699, 704 (7th Cir. 1998) (Posner, J.) ("The census counts the total population for the same reason that it counts rather than samples: in order to minimize controversy. To verify the age and citizenship of the population would enormously complicate the decennial census and open the census-takers to charges of manipulation." (citations omitted)); *Negron v. City of Miami Beach*, 113 F.3d 1563 (11th Cir. 1997) (plaintiffs did not even attempt to demonstrate that illustrative districts had a majority Latino CVAP population); *Romero v. City of Pomona*, 665 F. Supp. 853, 857 n.2 (C.D. Cal. 1987) (the plaintiffs acknowledged that none of their illustrative districts had majority Hispanic or black population).

138.     Block-level citizenship data have never been available at any point since the VRA was enacted in 1965. Ely Decl. ¶ 22. The unavailability of such data was not addressed by Congress in 1982 when the Act was amended to clarify the vote-dilution standard, see Pub. L. No. 97-205, 96 Stat. 131; nor did the Supreme Court remark upon it when it articulated the still-current vote-dilution test in *Thornburg v. Gingles*, 478 U.S. 30 (1986). Given this history, Congress could not possibly have intended for effective Section 2 enforcement to depend on the availability of person-by-person citizenship data; and courts have acted accordingly. While this point should have been obvious to Secretary Ross from the historical record alone, voting rights experts and other stakeholders made it explicitly clear through multiple submissions that appear in the AR. *See, e.g.*, PX-1116 (AR) (letter from the Leadership Conference on Civil and Human

Rights); PX-1123 (AR) (letter from various Jewish organizations); PX-1128 (AR) (letter from

the Constitutional Accountability Center on behalf of Asian Americans Advancing Justice,

NAACP Legal Defense and Education Fund.

139.   The DOJ Letter also did not suggest that any new circumstances had arisen to

alter the VRA § 2 enforcement landscape. Nor is there any indication in the AR that any

identification of new circumstances justifying DOJ's request was sought or even considered. To

the contrary, it was not DOJ staff but the Secretary's deputy, Comstock, and counsel, Uthmeier,

who assembled "cases" as part of their interagency lobbying effort to convince DOJ that it had a

"legitimate need" to make the request. That effort initially failed, and DOJ only relented and

provided the request after the Secretary's direct intervention with the Attorney General. *See* Gore

Dep. at 83-84. Even then, DOJ failed to include any representation in the DOJ Letter that block-

level citizenship data from the decennial Census are "necessary" for VRA enforcement purposes.

140.   There is no evidence in the AR that would support a finding that more granular

block-level CVAP data are in fact "necessary" for enforcement of the VRA. There is also no

suggestion anywhere in the AR that the Secretary ever considered whether that standard had

been satisfied. To the contrary, that record reflects that Comstock advised the Secretary that not

only DOJ but also DHS had *declined* to make a request for such data. Undeterred, the Secretary

continued to press for satisfaction of his "months-old request that the citizenship question be

added" to the 2020 Census. Nothing in the AR suggests that the Secretary so much as entertained

the possibility that DOJ's supposed need for block-level citizenship data—and therefore the

putative basis for the citizenship question—might be lacking.

141.   The evidence presented at trial provided substantial reinforcement for the lack of

any genuine need by DOJ for this data. This is a complex subject matter involving the

requirements and techniques used to develop statistical proof in VRA § 2 enforcement cases and redistricting. Particularly given the dearth of discussion in the AR on these matters, it is appropriate to consider this evidence in understanding the whether census-derived block-level data would be necessary for VRA enforcement.

142.    Plaintiffs' expert David Ely, a demographer with decades of experience preparing expert statistical proof in VRA cases and investigations, credibly testified that the alleged problems with currently available citizenship data described in the DOJ Letter do not impede the preparation of the statistical proof needed to satisfy the requirements of the so-called *Gingles* factors in VRA enforcement cases. *See* Ely Decl. ¶ 22. PFOF § IV.E.

143.    The material issue is the margin of error at the district level. Ely Decl. ¶¶ 55, 59. Courts do not require any level of certainly about the CVAP estimates at the block level. *Id.* Block-level citizenship data are needed only when an illustrative district cannot be constructed by aggregating census block groups. *Id.* ¶ 60. In the rare event that block-level citizenship data is required, courts have accepted proposed districts using a "raking factor." *Id.* ¶ 61. The margins of error associated with the raking factor procedure results are well-controlled and have been recognized by courts as reliable in the Section 2 context. *Id.* ¶ 64.

144.     Extra-record evidence further establishes that, not only is a citizenship question unnecessary to enforce the VRA, but that adding this question to the census will actually undermine the goals the VRA was enacted to protect.

145.    Because adding a citizenship question will predictably undercount some communities, those communities will not achieve nondiscriminatory treatment in the application either of voting qualifications or of the administration of governmental services. *See* PFOF § VIII.

146.     At the conclusion of the Ross Memo, the Secretary announced that "I have determined that reinstatement of a citizenship question on the 2020 decennial census is *necessary to provide complete and accurate data in response to the DOJ request*."  PX-26 at 8 (AR 1320) (emphasis added). But the Secretary failed to consider, and failed to make any finding, that the data requested was "necessary" *to DOJ*, or that the Census Bureau had an adequate basis to alter the Census questionnaire based on the DOJ's request. In failing to consider or determine that the data collection was necessary at all, the decision was not only arbitrary and capricious but also "otherwise contrary to law" under APA § 706(2)(A).

> **b)**     **The Secretary failed to consider the impact of the Census Bureau's confidentiality obligations on the data DOJ requested.**

147.     While the Ross Memo accepts at face value the DOJ's assertion that ACS data are "insufficient" and asserts that adding a citizenship question will produce the "most complete and accurate CVAP data," PX-26 at 4-5 (AR1316-17), the Secretary entirely failed to consider the impact of the Census Bureau's legal obligation not to disclose identifiable individual data on the accuracy of block-level citizenship data. In fact, the Census Bureau's use of disclosure avoidance protocols means that, even if a citizenship question is added to the Census, block-level data produced using responses to that question will not necessarily reflect the citizenship status of block residents, and will contain margins of error. The Census Bureau does not know if the CVAP produced based on responses to a citizenship question will have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies.

148.     The Census Bureau is legally prohibited from producing data, including for the DOJ, that would allow any individual to be identified. As a result, the Census Bureau uses various disclosure avoidance protocols to swap census responses for households and introduce uncertainty into the data.

149.    The Census Bureau will undertake disclosure avoidance for every census block, meaning that—except for randomly—there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 Decennial Census questionnaire. Census Bureau 30(b)(6) Dep. Vol. I at 67-68; PX-1194 at 1033 (Abowd).

150.    The use of these disclosure avoidance protocols also means that there will be a margin of error associated with block-level CVAP data produced using responses to the citizenship question. These margins of error increase at smaller levels of geography. As Plaintiffs' expert Thompson testified the "uncertainty introduced would have to be the largest" at the block level. Jan. 22 Trial Tr. 77:7-8 (Thompson). Yet the Census Bureau does not currently know—and nothing in the AR suggests that the Secretary or DOJ has assessed—whether the margins of error for block-level CVAP data produced using responses to the citizenship question will be smaller than the margins of error for CVAP data produced with currently available ACS data. *See* PFOF at § IV.F.

151.    Thus, as Plaintiffs' expert Thompson testified, contrary to the Secretary's assertions, "it's not clear that the decennial data, with the uncertainty introduced from disclosure avoidance, would, in fact, be more accurate than the data available from then American Community Survey." Jan. 22 Trial Tr. 76:25-77:3 (Thompson). Plaintiffs' expert Dr. Ely agreed, noting that "adding a citizenship question to the decennial census will not actually provide the DOJ with citizenship." Ely Decl. ¶ 65. Indeed, the Census Bureau admits that, after introducing uncertainty, it is not clear whether CVAP data produced using census responses will "still allow redistricting offices and the Department of Justice to use the data effectively." Census Bureau 30(b)(6) Dep. Tr. Vol. I at 100-101.

The Secretary's failure to consider this critical issue easily qualifies as arbitrary and capricious, especially because it casts grave doubt on the central premise of Secretary Ross's explanation for the decision: that adding a citizenship question to the census "will provide DOJ with the most complete and accurate CVAP data in response to its request."  PX-26 at 5 (AR1317) This easily qualifies as arbitrary and capricious. *See, e.g.*, *Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) ("Despite immense losses in the gray wolves' historical range . . . the Service nowhere analyzed the impact of that loss on the survival of the gray wolves as a whole . . . . Such a failure to address 'an important aspect of the problem' that is factually substantiated in the record is unreasoned, arbitrary, and capricious decisionmaking." (quoting *State Farm*, 463 U.S. at 43)); *see also Prometheus Radio Project v. FCC*, 373 F.3d 372, 420-21 (3d Cir. 2004) (vacating an agency's repeal of a rule where the agency failed to consider or even acknowledge "the effect of its decision on minority television station ownership").

        c)        **The Secretary Failed to Consider the Paramount Importance of Pre-Testing the Addition of a New, Sensitive Subject for the 2020 Census.**

152.    The Ross Memo dispensed with the subject of pre-testing the citizenship question for use on the 2020 Census in a single paragraph, asserting that the citizenship question has been "well tested." The sole basis suggested in the Ross Memo for this assertion is the fact that a citizenship question has been previously asked on the ACS and, before that, on the census long-form questionnaire.

153.    This back-of-the-hand treatment of the Census Bureau's obligations as a statistical agency to pre-test survey materials ignored those obligations and failed to identify any plausible rationale for deviating from the Bureau's rigorous pre-testing standards and procedures by grafting the ACS citizenship question onto the 2020 Census questionnaire with no prior testing

of that question for use in the decennial Census. On this ground as well, the Secretary's action

was arbitrary and capricious.

154.    OMB's Statistical Policy Directive No. 2 ("Standards and Guidelines for

Statistical Surveys") requires the Census Bureau, *inter alia*, to pretest the survey components, if

they have not been successfully used before, to "ensure that all components of a survey function

as intended when implemented *in the full-scale survey*" and that "measurement error is

controlled." PX-359; *see also* 71 Fed. Reg. 55,522 (Sept. 22, 2006). The Census Bureau's own

Statistical Quality Standards similarly require that "[d]ata collection instruments and supporting

materials must be pretested with respondents to identify problems (*e.g.*, problems related to

content, order/context effects, skip instructions, formatting, navigation, and edits) and then

refined, prior to implementation, based on pretesting results." PX-260 at 8. The Census Bureau

must pre-test questions and questionnaires prior to administering them unless the Census Bureau

obtains a waiver or uses a question that has "performed adequately in another survey." PX-260,

at vii, 8.

155.    While the Ross Memo states that the citizenship question has been "well tested,"

PX-26 at 2 (AR 1314), there is no evidence in the AR that the citizenship question underwent

any testing required by the Census Bureau's Statistical Quality Standards. There is also no

evidence analyzing the type of testing the citizenship question may have undergone before it was

added to the ACS. There is also no evidence that Defendants obtained a waiver of the applicable

Census Bureau Statistical Quality Standards for adding a question.

156.    The AR shows that in fact the citizenship question does *not* perform adequately

on the ACS. As the Census Bureau reported to Secretary Ross, and as the Ross Memo itself

acknowledges, approximately one third of respondents identified as noncitizens by ARs reported

themselves as citizens on the 2016 ACS. PX-22 at 8 (AR 1284); PX-26 at 6 (AR 1318). In light

of this finding, the Census Bureau concluded that data on citizenship obtained from the

citizenship question was of "suspect quality" and "may not be reliable," particularly for

noncitizens. PX-25 at 4-5 (AR 1311-12).

157.    In August of 2018, the Census Bureau reported that between 30% and

37% of all people identified as noncitizens by ARs reported themselves as citizens on the ACS.

PX-162. These statistics confirm that the citizenship question has not performed adequately on

the ACS—a conclusion with which both the Census Bureau's Chief Scientist, Dr. Abowd, and

former Census Bureau Director Thompson agreed "without qualification" at trial. *See* Trial Tr.

(Jan. 30) at 166:10-25 (Abowd); Trial Tr. (Jan. 22) at 99:15-21 (Thompson); *see also* Trial Tr.

(Jan. 23) at 90:8-13, 126:20-25 (Mathiowetz). And there is no basis to expect that the citizenship

question would perform better on the decennial census. Trial Tr. (Jan. 22) at 99:22-100:1

(Thompson); Trial Tr. (Jan. 30) at 163:15-20 (Abowd).

158.    The Census Bureau has never conducted any testing of a citizenship question

within the context of the entire 2020 Census questionnaire. New York Tr. 997-98 (Abowd); Trial

Tr. (Jan. 30) 150:10-151:15 (Abowd); Jarmin Dep. 262:6-13; Langdon Dep. 243:7-16. The

Bureau's Statistical Standards recognize that context effects and question wording and design

must be tested within the context of the whole survey instrument in order for a question to be

adequately. There has been no cognitive or field testing of the question in the context of the

decennial Census; the questionnaire used for the 2018 End-to-End Test, which was the final

"dress rehearsal" for the 2020 Census, did not include a citizenship question. Trial Tr. (Jan. 22)

47:5-8 (Thompson); Census Bureau 30(b)(6) Dep. Vol. I 225; Jarmin Dep. 54:18-55:10.

159.    The Secretary's action in ordering the Census Bureau to add citizenship as a subject for the 2020 represented a drastic deviation from the well-established testing practices and standards of the Census Bureau,. Neither technical exception to the Statistical Standards' requirement of rigorous pre-testing applies in this case. *See* PFOF § IV.A.

160.    The lack of adequate testing of the citizenship question is an important as aspect of the problem that the Secretary failed to consider. On this ground, the decision to include the question on the 2020 Census questionnaire is arbitrary and capricious.

**4.      Secretary Ross Did Not Make the Findings Required by 13 U.S.C. § 141(f), and There Was No Rational Basis to Support Such Findings.**

161.    The decision to add a citizenship question is also arbitrary and capricious because the Secretary failed to find "new circumstances" as required by Section 141(f), and in fact he could not have made such a finding, as it lacked any rational basis.

162.    In March 2017, the Secretary submitted the report required under Section 141(f)(1) in March 2017, and did not identify citizenship as a subject to be included on the decennial census. PX-1 at AR 194 (the "Subjects Planned" report).

163.    The AR makes clear that commenters on the DOJ request pointed out to the Secretary the importance of complying with the Section 141(f)(1) requirement. Six former Directors of the Census Bureau wrote the Secretary in January 2018 to stress, among other considerations, the three-year report requirement. PX-1 at AR 1057 ("There are sound reasons that the Census Act requires the Bureau to submit to Congress the topics and actual questions it will include, three and two years, respectively, before Census Day.").

164.    The AR is clear that the Census Bureau was well aware of these deadlines and requirements, and organized their original content review process around these mandatory statutory deadlines. PX-1 at AR 1168 ("This memorandum officially documents the U.S. Census

Bureau's plan to develop and transmit to Congress the Subjects Planned for the 2020 Census

Program," and noting that "Title 13, U.S. Code requires the Census Bureau to send Congress the

subjects proposed to be included in the census not later than three years before the Census date").

165.    The Census Bureau's own description of the process for adding content to the

decennial census questionnaire notes that "[b]y law, the Census Bureau notified the Congress of

the topics to be covered by the 2020 Census on March 31, 2017. . . . This is an intentional[]

process designed to give Congress the ability to review the topics and questions on the

questionnaire before they are finalized. If an additional topic is required, it is imperative that

Congress be notified as soon as possible." PX-134 at 5 (AR 9865); see also PX-4 at 155 (AR

3890).

166.    Defendants have never transmitted any report to Congress that identifies any

"new circumstances" that "necessitate" a change in the topics to be covered by the decennial

census, as required by Section 141(f)(3). The report required by Section 141(f)(2), which was

submitted to Congress in March 2018, simply notes that a question on citizenship will be

included in the census. PX-489 at 11. It does not identify "new circumstances . . . which

necessitate" the addition of a new subject—citizenship—to the Census questionnaire. *See* 13

U.S.C. § 141(f)(3).

167.    Nor does anything else in the AR identify any new circumstances arising after the

March 2017 report suggesting that existing data for VRA enforcement were suddenly

problematic or ineffective. To the contrary, the evidence in the AR confirms that as far as

effective enforcement of the VRA is concerned, no "new circumstances" arose between March

2017 and March 2018 "which necessitate[d]" the inclusion of a citizenship question. *See, e.g.*,

PX-1 at AR 773-74 (letter from Vanita Gupta, President and CEO of the Leadership Conference

on Civil & Human Rights) ("I know from my prior experience as the chief government enforcer of the Voting Rights Act [that] the Justice Department has never needed to add this new question to the decennial census to enforce the Voting Rights Act before, so there is no reason it would need to do so now."); *id.* at AR 798 (citizenship data from the decennial census are "unnecessary" to enforce the VRA); *id.* at AR 1083 (same from the National League of Cities); *id.* at AR 1096-98 (same from coalition of state Attorneys General); *id.* at AR 1207 (same as recorded in Gupta stakeholder call).

168.    The DOJ request letter does not identify any changed circumstances between March 2017 and March 2018, and does not contend that data from a citizenship question on the decennial census are "necessary" for VRA enforcement. In addition, the Court may take judicial notice that Congress did not enact legislation amending the VRA between March 2017 and March 2018.

169.    Defendants have suggested that the DOJ Letter itself was a "new circumstance" that supports the required finding under § 141(f)(3). *See* ECF No. 67-1 at 31. But the three-year deadline for determining the subjects for the Census is a deadline imposed *on the Secretary*. Section 141(f)(1) would be stripped of any meaningful effect if the Secretary, through his own initiative, could generate "new" circumstances through his own initiative, to serve his own interests unrelated to the circumstances (in this case, the needs of VRA enforcement) supposedly "necessitat[ing]" the change. The AR leaves no doubt that, but for the efforts of the Secretary, his senior staff at Commerce, and outside political operatives such as Neuman, the DOJ Letter would never have been sent. It was a manufactured circumstances, not a genuinely "new" one.

170.    Accordingly, Defendants' failure to include citizenship on the list of decennial subjects in the March 2017 report to Congress, and the concomitant absence of changed

circumstances that necessitate the addition, is arbitrary and capricious as well as plainly contrary

to law. *See NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 108-13 (2d Cir. 2018)

(vacating the agency's decision for failure to comply with unambiguous statutory deadlines);

*ACEMLA v. Copyright Royalty Trib.*, 763 F.2d 101, 109 (2d Cir. 1985) (vacating the agency's

order as not in accordance with law for failure to comply with statutory obligation to "state in

detail the criteria . . . , the various facts that it found . . . , and the specific reasons for its

determination" (citation omitted)); *E. Bay Sanctuary Covenant v. Trump*, 18-cv-6810-JST, 2018

WL 6053140, at *11-14 (N.D. Cal. Nov. 19, 2018) (finding likelihood of success on the merits

sufficient to enter nationwide temporary restraining order to enjoin rule that would bar asylum

for immigrants entering between ports of entry, on the grounds that "the [r]ule flout the explicit

language of the statute").

### 5. The Decision to Add the Citizenship Question Violated 13 U.S.C. § 6.

171.    Section 6 of the Census Act authorizes the Secretary, "whenever he considers it

advisable, [to] call upon any other department, agency, or establishment of the Federal

Government . . . for information pertinent to the work provided for in [Title 13]." 13 U.S.C.

§ 6(a). In doing so, however, "[t]o the maximum extent possible and consistent with the kind,

timeliness, quality and scope of the statistics required, the Secretary shall acquire and use

information available from any source referred to in [§ 6(a)] *instead of conducting direct

inquiries*." 13 U.S.C. § 6(c).

172.    The AR here demonstrates that, consistent with Section 6(c), it was "possible" to

"acquire and use" ARs from other government agencies that would produce data "consistent with

the kind, timeliness, quality and scope of the statistics required." 13 U.S.C. § 6(c).

173.    Putting aside for the moment that the data was not actually "required," the "kind"

of data here would be the same regardless of whether it is gathered by ARs or a census

question—in both cases, the relevant data is simply block-level data on citizens versus noncitizens.

174.    There is no indication that the alternative method of collection of block level data proposed by the Census Bureau (ARs from federal agencies) would not have timely met DOJ's request. The Census Bureau advised Secretary Ross in the Ross Memo that regardless of whether administrative data or a citizenship question were used, there was no difference in timing on when the citizenship data would be available. PX-133 at 11 (AR 9834). There is no evidence in the AR indicating that it would take longer to provide citizenship data using ARs than a citizenship question.

175.    As discussed in detail above, the Census Bureau repeatedly advised Secretary Ross that the quality of the citizenship data would be higher from ARs than a citizenship question, due to noncitizens' propensity to report as citizens. *See also* PFOF § II.C.

176.    The scope of the data would be the same, regardless of source, because data would be obtained for residents of the entire country (with a minority requiring imputation, regardless of the data source). *See id*.

177.    As discussed in detail above, in light of the unanimous and uncontradicted expert analysis provided by the Census Bureau in response to the DOJ Letter, there was no reasonable basis in the record before the Secretary to conclude that reliance on ARs (Alternative C) would produce less accurate or otherwise inferior citizenship data than the significant additional "direct inquiry" entailed by the addition of a citizenship question to the decennial Census (Alternative D). To the contrary, the only reasonable conclusion to be drawn from the AR is that Alternative C would yield *more* accurate citizenship data than Alternative D, with no compromise of timeliness, scope, or other criteria of quality relevant to DOJ's stated use. Under every criterion

set forth in section 6(c), with no evidence in the record to the contrary, using ARs alone was superior to adding a citizenship question to the decennial Census.

178.     The compulsory requirement imposed on the Secretary by § 6(c) is unequivocal: To the maximum extent possible and given the kind, timeliness, quality and scope of the data required, Secretary Ross *must* gather data through the acquisition and use of ARs, not by adding direct inquiries to the census or other surveys. The Ross Memo and the AR leave no doubt that the Secretary was either unaware of or completely ignored that requirement altogether:  he treated the choice between Alternatives C and D as a entirely within his discretion and acted "as though the choice between them were a matter of complete indifference from the statutory point of view . . . ." *Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 444 (D.C. Cir. 1989). But the congressional preference for use of ARs in lieu of "direct inquiries" set forth in Section 6(c) "precludes" a decision "which totally ignores that preference."  *Id.* at 444. In failing even to consider this aspect of the problem before him, the Secretary's action was arbitrary and capricious. *See NRDC v. U.S. EPA*, 658 F.3d 200, 217 (2d Cir. 2011) (determining that "[t]he lack of . . . an explanation" as to how an agency action complies with applicable statutory standards "is arbitrary and capricious"). And, because the decision to add citizenship to the subjects for the 2020 Census is not rationally consistent with the standard set forth under § 6(c), it is "not in accordance with law"  under § 706(2)(A) as well.

**6.      Secretary Ross's Stated Rationale Was Pretextual and Failed to Disclose the Improper Political Influence Brought to Bear on the Decision.**

179.     The evidence establishes that the sole rationale that the Secretary articulated for the citizenship question in the Ross Memo—that a citizenship question is needed to enhance DOJ's VRA enforcement efforts—was pretextual. Because Secretary Ross's stated rationale was

not his actual rationale,[4] he did not comply with the APA's requirement that he "disclose the basis of" the decision. *Burlington Truck Lines, Inc.*, 371 U.S at 167-68 (internal quotations omitted). While the AR alone is enough to establish this conclusion by a clear preponderance of the evidence, the extra-record evidence makes it clear and convincing, if not overwhelming.

**a)      The AR Alone Shows that the Secretary's Stated Rationale Was Pretextual.**

180.    The Secretary's own statements, along with the emails and documents contained in the AR, establish that the Secretary was pursuing a citizenship question long before he reached out to DOJ to obtain their December 2017 letter, and long before he had any awareness of any purported VRA-enforcement rationale. PX-55 (AR 2521); PX-19 (AR 763); PX-150 (AR 12541); PX-607 (AR). As the Secretary admitted in his belated memorandum supplementing the AR *post hoc*, he began considering the citizenship question "[s]oon after [his] appointment as Secretary" in February 2017—almost a year before the DOJ Letter. PX-2 (AR 1321).

181.    Documents detailing the Secretary's ensuing months-long pursuit of an agency to justify the addition of the question by providing him with a non-discriminatory reason to carry out the administration's plan contain not one reference to any VRA-enforcement rationale. For example, early in the Secretary's tenure, at the direction of then-White House Chief Strategist Stephen Bannon, the Secretary spoke with Kris Kobach, the Kansas Secretary of State, who urged the Secretary to add a citizenship question as an "essential" tool to resolve "the problem" of noncitizens' being counted for purposes of congressional apportionment. PX-19 (AR 763). Kobach's email made no mention of the VRA. *Id.*

---

[4] It is assumed here for APA purposes that the decision was in fact the Secretary's, not one that was made and imposed from above or the product of a conspiratorial agreement. That distinction does not affect the ordinary APA analysis; but, as discussed below, the record demonstrates that the impropriety in the process leading to the decision here went much deeper. *See* [PART X BELOW]

65

182.    The citizenship question was the predetermined *answer* to a question that had not

been *asked* by any other agency in the federal government. To create an ostensibly legitimate

basis to add the citizenship question to the 2020 Census, the Secretary personally and repeatedly

lobbied the Attorney General and the Department of Homeland Security to submit the request

that the Secretary later claimed was the sole reason he began considering a citizenship question.

PFOF § IV.A; PX-97 (AR 4004); PX-48 (AR 2458); PX-67 (AR 2653); PX-61 (AR 2636); PX-

52 (AR 2482).

183.    The AR is shot through with evidence that the Secretary was intent upon

obtaining a formal request that would serve as the fig-leaf for a decision already made. That

*modus operandi* is strongly implied both in the Secretary's May 2, 2017 reference to his "months

old request *that we include the citizenship question*" on the 2020 Census, PX-88 (AR 3710)

(emphasis added), and Comstock's immediate reassurance that "[o]n the citizenship question *we*

*will get that in place*." *Id.* (emphasis added). It is unmistakable in the Secretary's lack of any

surprise—much less any corrective response—to Comstock's prophetic caveat that a well-

prepared AR was needed to support the decision "[s]ince this issue *will go to the Supreme*

*Court*."  PX-523 (AR12476). If there was any doubt about the ultimate answer to the sought-

after request from DOJ, it was not reflected in the Secretary's terse reply. *Id.* ("we should be

careful about everything, whether or not it is likely to end up in the SC").

184.    Combined with Secretary Ross's misleading public statements concealing his

personal efforts to elicit a data request from another agency, the AR also establishes that the

stated reason for the decision—to better enforce Section 2 of the VRA—is also implausible and

thus a pretext. On March 20, 2018, Secretary Ross testified before Congress that the Department

of Commerce analysis of the citizenship question was "solely" in response "to [the] Department

of Justice's request."  PX-491; *see also* PFOF ¶ 404. The Secretary's lack of candor in his

congressional testimony is evidence of the bad faith lurking behind the decision. *See Salazar*,

701 F. Supp. 2d at 242 (agency took steps to conceal that official "prejudged and controlled"

decision); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to

say one thing . . . and do another" is "the essence of arbitrary action").

185.    In this regard, the Secretary's actions reflected in the AR also speak louder than

his words. For example, the AR contains no indication that anyone at the Census Bureau—acting

Director Jarmin, Dr. Abowd, the members of the "SWAT" team, or anyone else—was informed

that the Secretary and his deputies at Commerce were instrumental in eliciting the request from

DOJ and participated heavily in drafting the DOJ Letter itself. (The trial record confirms this

concealment. *See* PX-1194 at 1020:1-24 (entire senior executive staff of the Census Bureau and

"everyone" else Dr. Abowd knows at the Census Bureau was surprised by the contents of the AR

predating DOJ Letter). To the contrary, the AR reveals the persistent *good-faith* efforts of Census

Bureau personnel in attempting to arrange a meeting with DOJ staff to explain, *inter alia,* that a

decennial Census citizenship question was not needed in light of Alternative C. *See* PX-25 at 11-

22 (AR1319-1330); PFOF § II.C.6. This meeting never occurred (as we now know, it was

canceled by DOJ at the direct instance of the Attorney General, *see* PX-124 (AR9193); PX-101

(AR5489)).

186.    The evidence in the AR establishing that the decision to add the question was

made in early 2017, that the reason for the decision was completely unrelated to VRA

enforcement, that the Secretary reached out in search of a post-hoc rationale, and that the

Secretary sought to conceal this sequence of events is sufficient to find that the rationale was

pretextual.

> **b)** **Extra-Record Evidence Confirms the Pretextual Nature of the Secretary's Rationale Shown by the AR.**

187.    The extra-record evidence reinforces the conclusion that the VRA-enforcement rationale was a pretext and that the decision to add the citizenship question based on that rationale should therefore be set aside as arbitrary and capricious.

188.    Acting Assistant Attorney General Gore's testimony undermines the genuineness of DOJ's claim to need more accurate citizenship data to enforce the VRA, and confirmed that DOJ did not independently request such data from Commerce. Gore acknowledged that none of the DOJ components with principal responsibility for enforcing the VRA requested the addition of a citizenship question; instead, he drafted the DOJ Letter solely in response to the Secretary's request. Gore Dep. (No. 491-2) at 64:1-10, 65:3-14, 66:2-7, 67:5-22, 94:17-95:9, 95:14-22. He drafted the DOJ Letter despite not even knowing if citizenship data based on responses to a citizenship question on the census will have smaller or larger margins of error, or will be any more precise, than the existing citizenship data on which DOJ currently relies. PFOF § III.B.

189.    The extra-record evidence adduced at trial also establishes that any citizenship data collected through the 2020 census would not be usable at the block level in any event, because of the Census Bureau's statutorily-mandated disclosure avoidance protocols and confidentiality protections. In order to make such data usable, the Census Bureau will be forced to introduce errors into the data, transforming any block-level CVAP data into estimates with a margin of error rather than a hard count; and the Bureau does not know whether such CVAP estimates will be any more precise than the existing CVAP data on which DOJ relies. *See* PFOF § IV.F.

190.    During their months-long efforts to solicit an agency to request a citizenship question, neither the Secreno one at Commerce –ever consult the Census Bureau to understand

the methodological or programmatic implications of their actions. Commerce officials' persistent failure to consult with the Census Bureau strongly suggests pretext by demonstrating that officials were not genuinely interested in obtaining high quality and accurate citizenship data for VRA enforcement.

191.    The extra-record evidence confirms that when the Census Bureau sought to discuss the best way to obtain accurate citizenship data with DOJ, Attorney General Sessions personally directed DOJ officials not to meet with the Bureau's staff. *See* PFOF § II.C.6. Trial testimony conclusively demonstrated that the Census Bureau determined that using ARs would produce more accurate data for DOJ's needs. *See* PFOF § IV.D. Proceeding to announce a decision without allowing Census Bureau personnel to meet with DOJ staff to even discuss that finding is strong evidence that the stated rationale was a pretext that the Secretary preferred to insulate from challenge, regardless of DOJ's actual needs.

### c)    The Secretary's Pretextual Rationale Concealed His Improper Consideration of Political Factors.

192.    The conclusion that the decision to add a citizenship question was pretextual— i.e., that it was made well before the Secretary received the DOJ Letter, and for reasons unrelated to the VRA—provides another independent basis for vacating and setting aside that decision. Indeed, courts have not hesitated to find that an agency's reliance on a pretextual justification violates the APA. *See, e.g.*, *Woods Petroleum Corp.*, 18 F.3d at 859 (setting aside agency action because the "sole reason" for the action was "to provide a pretext" for the agency's "ulterior motive"); *Home Box Office*, 567 F.2d at 54-55 ("[W]here . . . an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly, but must treat the agency's justifications as a fictional account of the

actual decisionmaking process and must perforce find its actions arbitrary." (internal citations

omitted)); *Tummino v. Torti*, 603 F. Supp. 2d 519, 544-46 (E.D.N.Y. 2009) (finding agency

action to be arbitrary and capricious when its articulated basis was "fanciful and wholly

unsubstantiated" and other, impermissible considerations were evident from the record).

193.    This is particularly so when the pretext adopted conceals the agency's

consideration of factors in the decision that Congress did not include among the relevant

statutory factors, and therefore did not intend the decision-maker to consider. *See, e.g.*,

*Latecoere*, 19 F.3d at 1364-65. The legal framework delineating the scope of the Secretary's

discretion with respect to the Census and the conduct of the Census Bureau as a federal statistical

agency could not be more clear in prohibiting the influence of political considerations in

decision-making about the content of the Census. *See*, *e.g.*, OMB Statistical Policy Directive

Number 1 ("OMB SPD 1") (requiring that statistical agencies must be "independent from

political and other undue external influence in developing, producing, and disseminating

statistics" and "must function in an environment that is clearly separate and autonomous from

other administrative, regulatory, law enforcement, or policy making activities." PX-354 at 4; *see

also* Trial Tr. (Jan. 22) at 39:18-40:8 (Thompson). It is undisputed that the Bureau's

responsibility to function in a separate and autonomous environment encompasses the obligation

to remain free from political influence. Trial Tr. (Jan. 31) 28:15-17 (Abowd).

194.    There is no merit to Defendants' argument that, as long as the Secretary "actually

believed" the stated rationale for the decision, it does not matter if he had undisclosed "additional

reasons" for the decision. *See* Mem. of Law in Support of Defs. Mot. for Summary Judgment,

ECF 67-1, at 26. Defendants' reliance upon *Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186

(10th Cir. 2014), is unavailing. In *Jagers,* plaintiffs had "provide[d] neither evidence nor

argument to call the validity of the [agency's] scientific evidence into question," nor any

concrete evidence of bad faith or improper deviation from normal procedure in developing such

that evidence. *See Jagers*, 758 F.3d at 1185. The court rejected the plaintiffs' reliance on the

mere allegation that agency personnel had a "subjective desire" or motivation to reach the

agency's result somehow invalidated it. *Id.* at 1185-86.

195.    Nor does *Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d

138 (D.C. Cir. 2015), support Defendants' contention that the Secretary's action must be upheld

unless he had "an unalterably closed mind" or was "unwilling or unable to rationally consider

arguments." *See* Pet. for Mandamus at 26, *In re U.S. Dep't of Commerce, et al.*, Case No. 18-

557 (U.S. Oct. 29, 2018). Putting aside whether the facts of this case might actually meet that

standard, *Mississippi Commission* arose in a wholly different context, and addressed the legal

standard for disqualifying an agency decision-maker from participation in an agency rulemaking.

*See* 790 F.3d at 183. There is no basis to shoehorn the standard for disqualification from an

administrative proceeding *before* any decision has been made into the review of an agency final

action under the APA.

196.    In the context of APA review, the Court need not address whether the Secretary's

subject intent was discriminatory in order to determine that the pretextual justification was a

mask for consideration of reasons that, at a minimum, were nakedly political in nature. On that

basis, there is no doubt that the Secretary considered a prohibited factor under the statutes that

bound his discretion, and the decision therefore must be set aside as arbitrary and capricious.

## III.    The Defendants' Actions Violate the Enumeration Clause.

197.    The U.S. Constitution provides for an "actual Enumeration" of the population

once every decade to count "the whole number of persons" in each state. U.S. Const. art. I, § 2,

cl. 3, and amen. XIV, § 2.

198.    The U.S. Constitution recognizes no exception based on citizenship status; it is

long settled that *all* persons residing in the United States—citizens and noncitizens alike—must

be counted to fulfill the U.S. Constitution's "actual Enumeration" mandate. *Id.*; *Fed'n for Am.*

*Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980).

199.    The Enumeration Clause requires the Secretary's conduct of the census to bear "a

reasonable relationship to the accomplishment of an actual enumeration of the population,

keeping in mind the constitutional purposes of the census," *i.e.*, the "constitutional goal of equal

representation." *Wisconsin v. City of N.Y.*, 517 U.S. 1, 19–20 (1996) (quoting *Franklin v.*

*Massachusetts*, 505 U.S. 788, 804 (1992)). Although this does not require Defendants to achieve

a perfect count, it requires Defendants to conduct the census in a manner that does not

"unreasonably compromise[] the distributive accuracy of the census." *Kravitz*, 336 F. Supp. 3d at

565; *Kravitz*, 2018 WL 6830226, at *5.

200.    A proposal to conduct the Census in a manner that does not comply with the

Constitution may be set aside by a court prior to the start of the Census because "Congress finds

that . . . the decennial enumeration of the population is a complex and vast undertaking, and if

such enumeration is conducted in a manner that does not comply with the requirements of the

Constitution or laws of the United States, it would be impracticable for the States to obtain, and

the courts of the United States to provide, meaningful relief after such enumeration has been

conducted . . . ." Pub. L. No. 105-119, § 209(a)(8), 111 Stat. at 2481.

201.    Plaintiffs have established that the citizenship question does not bear "a

reasonable relationship to the accomplishment of an actual enumeration of the population."

*Wisconsin*, 517 U.S. at 19. Plaintiffs have marshaled substantial evidence, based on the Census

Bureau's own data and analyses—including information that was available to the Defendants at

the time of the Ross Memo—showing that the citizenship question will lead to a differential

undercount that will dilute Plaintiffs' votes. *See* PFOF § VI. Given that the core constitutional

purpose of the Census is to ensure equal representation, this by itself is sufficient to show that

Defendants' addition of a citizenship question unreasonably compromises the distributive

accuracy of the Census and therefore violates the Enumeration Clause. *See Wisconsin*, 517 U.S.

at 19–20; *see also Utah*, 536 U.S. at 478.

202.    As set forth below, the unreasonableness of Defendants' addition of a citizenship

question to the Census is underscored by the lack of any genuine need for the citizenship

question, the woefully deficient process that led to it, and the improper political considerations

that were the true impetus for the decision rather than the post hoc rationalization that was

publicly offered. While none of these considerations is necessary to find that addition of a

citizenship question unreasonably compromised the distributive accuracy of the Census, each

provides further support for that conclusion.

203.    First, by March 2018, there was compelling evidence presented to Secretary Ross

and available to the Defendants showing that the citizenship question would produce a

differential undercount that would undermine the constitutional purpose of the Census. PFOF §

II.C. At the same time, the Bureau's analyses made clear to the Defendants that there was no

genuine need for the citizenship data that could justify or outweigh the constitutional harm of

undermining the distributive accuracy of the Census count. Defendants had determined that

DOJ's request for block-level citizenship data would have been better satisfied through the use of

ARs.  *See* PFOF § II.C.

204.    Second, in an unjustified departure from the law and typical Bureau practices, the

decision to add a citizenship question was announced after the deadline for identifying subjects

to be included on the 2020 Census and without even a single test that would support disregarding concerns regarding the impact that the question would have on the accuracy of the Census count. *See* PFOF §§ II.E.1, IV.A.

205.    Finally, the evidence clearly establishes that the decision to add a citizenship question was influenced by improper political considerations and that the purported rationale of supporting Voting Rights Act enforcement was a mere pretext to rationalize a decision that had already been made for other reasons. *See* PFOF §§ II.E.V, IV.C.

## IV.    Defendants' Actions Violate the Due Process Clause

### A.    *Arlington Heights* Compels a Sensitive Inquiry Into Whether the Totality of the Facts Demonstrate That Defendants Added the Citizenship Question for a Discriminatory Purpose.

211.    The Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–66 (1977), provided a framework for examining the totality of the circumstances surrounding a governmental decision in order to determine whether racial discrimination motivated the action.

212.    Further, governmental actions that are not racially discriminatory on their face can nonetheless violate constitutionally guaranteed protections. *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (citing *Arlington Heights,* 429 U.S. at 264–66; *Washington v. Davis*, 426 U.S. 229, 241 (1976)).

213.    An inquiry into discriminatory intent requires a "sensitive inquiry into such circumstances and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Discriminatory purpose "may often be inferred from the totality of the relevant facts, including the fact" that the effect of the addition of the citizenship question "bears more heavily on one race than another." *Davis*, 426 U.S. at 242; *N.C. State Conference of NAACP*, 831 F.3d at 220.

214.    Plaintiffs need not prove that a racially discriminatory purpose was the sole

motivation for the decision to add the citizenship question. Rather, it is sufficient to prove that

racial discrimination was "a motivating factor."  *Arlington Heights*, 429 U.S. at 265–66.

215.    The Supreme Court further recognizes that when the Court considers the "broader

context" surrounding the addition of a citizenship question to the 2020 Census, it does so in

recognition that "[o]utright admissions of impermissible racial motivation are infrequent and

plaintiffs often must rely upon other evidence."  *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999);

*N.C. State Conference of NAACP*, 831 F.3d at 221.

**B.      Substantial Evidence Supports the Conclusion Under *Arlington Heights* that Discriminatory Intent Motivated Defendants' Plan to Add a Citizenship Question to the 2020 Census.**

216.    The Supreme Court in *Arlington Heights* identified a non-exhaustive list of

factors that may constitute part of the "mosaic" of evidence that can give rise to an inference of

discrimination: (1) disparate impact, i.e., whether the action "bears more heavily on one race

than another;" (2) the "historical background of the decision . . . particularly if it reveals a series

of official actions taken for invidious purposes;" (3) "[d]epartures from the normal procedural

sequence" and "[s]ubstantive departures[,]" "particularly if the factors usually considered

important . . . favor a decision contrary to the one reached," and (4) "contemporary statements"

by those deciding the issue. *Arlington Heights*, 429 U.S. at 266–68 (internal quotations and

citations omitted).

217.    A recent application of the *Arlington Heights* factors led the Fourth Circuit to

enjoin the challenged provisions of a North Carolina's election law as racially discriminatory. In

*North Carolina State Conference of NAACP*, the Fourth Circuit examined South Carolina's

history of racial discrimination in voting, the specific sequence of events leading up to the

passage of the law, the legislative history of the law, and the disproportionate impact of the law

on African-American voters, finding that all of those factors weighed in favor of finding that the law was motivated by discriminatory intent. 429 U.S. at 220-221.

218.     Similarly, the evidence here supports the conclusion under *Arlington Heights* that discriminatory intent motivated Defendants' plan to add a citizenship question to the 2020 Census.

> **1.     *Arlington Heights* Factor 1: Plaintiffs' Evidence Demonstrates That They Will Be Disparately Impacted by the Addition of a Citizenship Question to the 2020 Census.**

219.     First, from the alleged facts, "a clear pattern" emerges "from the effect of the state action" even though it "appears neutral on its face." *Arlington Heights*, 429 U.S. at 266(citations omitted). The Court previously held that the "pattern" in this factor "is the disparate impact itself, not a showing of multiple bad acts by Defendants."  *La Unión Del Pueblo Entero v. Ross*, No. GJH-18-1570, 2018 WL 5885528, at 8 (D. Md. Nov. 9, 2018) ("*LUPE*").

220.     Demonstration of the disproportionate impact of the addition of a citizenship question is sufficient to establish one of the circumstances supporting a finding of discriminatory intent, and the impact of the question need not be overwhelming. *N.C. State Conference of NAACP*, 831 F.3d at 231. In a voting rights context, requiring a "more onerous impact showing would eliminate the distinction between discriminatory results claims under § 2 of the Voting Rights Act [where Plaintiffs need prove only impact] and discriminatory intent claims under § 2 and the Constitution."  *Id.* at 231 n.8.

221.     Applying that standard, the Fourth Circuit in *North Carolina State Conference of NAACP* expressly disapproved of the district court's conclusion that although African-Americans disproportionately used the excised voting procedures, the disproportionate impact of the removal of those procedures would depend on what options were remaining to African-American

voters in the post-legislation elections. Finding clear error, the Fourth Circuit held that

"*Arlington Heights* require[d] nothing of the kind." *Id*. at 230.

222.    Here, Defendants insist that a determination of disproportionate impact requires

an examination of its preparedness to complete NRFU to ensure an accurate enumeration.

However, the Court's inquiry does not depend on predictions of future mitigation in order to

assess disproportionate impact. Rather, the Court is required only to determine whether the

impact of the addition of the citizenship question "bears[s] more heavily on racial minorities."

*Id.* at 230 (noting that *Arlington Heights* plaintiffs were not required to demonstrate no other

housing options or that Chicago would not be able to provide other housing options) (citing

*Arlington Heights*, 429 U.S. at 269); *see also City of Memphis v. Greene,* 451 U.S. 100, 110

(1981) (finding a that a street closure had a disproportionate impact, even though "the extent of

the inconvenience [was] not great").

223.    The Supreme Court has held that "it is certainly not necessary . . . to wait until the

census has been conducted to consider the issues presented here, because such a pause would

result in extreme— possible irremediable—hardship." *U.S. Dep't of Commerce*, 525 U.S. at

332.

224.    Evidence presented at trial confirms that adding a citizenship question will

disproportionately impact noncitizen and Hispanic households. *See generally* PFOF § VI.

Plaintiffs have submitted quantitative and qualitative evidence that disproportionate non-

response rates will result in an undercount of these communities. *See id*

225.    Further, a differential undercount as small as 1.56% will cause California to lose a

congressional seat, and that incrementally higher undercounts of Hispanics and noncitizens

would cause congressional seat losses in Arizona and Texas as well. *See* PFOF ¶¶ 737-738.

226.     An undercount as small as 2% would also result in intrastate vote dilution because the legislative districts in which Plaintiffs reside and in which they will vote after 2020, which contain higher percentages of Hispanics and noncitizens than other areas in the state, will have a greater true population than other legislative districts in the state. *See* PFOF ¶¶ 731-732.

227.     An undercount of Hispanics and noncitizens will also disproportionately impact federal funding in states and urban areas with higher percentages of those groups, and these areas and the Plaintiffs will suffer losses in Medicaid, CHIP, WIC, SSBG, Title I, and transportation and infrastructure funding. *See* PFOF § VIII.C.

228.     Secretary Ross forged ahead with the plan to add a citizenship question despite all the evidence that showed it was unnecessary and would only create negative outcomes, all the while knowing that those negative outcomes would primarily affect noncitizens and Latinos. *See* PFOF §§ II.D, IV.D. As a result, there can be little doubt that he chose this path "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

**2.     *Arlington Heights* Factor 2: The Historical Background Leading to the Addition of the Citizenship Question Is Replete with Ulterior Motives, Connivance, Falsehood, and Secrecy.**

229.     The history leading to the addition of the citizenship question to the 2020 Census "may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268. At the same time, *Arlington Heights* recognizes that testimony as to motive will "frequently will be barred by privilege." *Id.*

230.     Here, although there is a great deal of evidence in the record from which this Court could infer that the addition of the citizenship question was of great concern to Secretary Ross, there is very little direct evidence as to why it was of such concern. *See, e.g. New York v.*

*U.S. Dep't of Commerce,* No. 18-CV-2921 (JMF) (S.D.N.Y. Jan. 15, 2019), 2019 WL 190285, at

*118. It is not surprising that this is the case, since Plaintiffs were barred from deposing

Secretary Ross, Mr. Bannon, and Mr. Kobach. However, this is precisely why *Arlington Heights*

counsels for an intense examination of the history of this issue—the time frame, the persons

involved and their relationship to Secretary Ross, and his efforts to conceal the steps he took to

provide himself with a legitimate motive for the addition of the question.

231.    The Fourth Circuit further counsels for a broad inquiry into historical

discrimination, particularly when matters of political representation are at issue:  "The record

makes clear that the historical origin of the challenged provisions in this statute is not the

innocuous back-and-forth of routine partisan struggle that the State suggests and that the district

court accepted. Rather, the General Assembly enacted them in the immediate aftermath of

unprecedented African American voter participation in a state with a troubled racial history and

racially polarized voting. The district court clearly erred in ignoring or dismissing this historical

background evidence, all of which supports a finding of discriminatory intent." *N.C. State*

*Conference of NAACP*, 831 F.3d at 226–27.

232.    There is a great deal of evidence in the record, much of it undisputed, that the

historical background of the decision was not what Secretary Ross has represented, and that the

rationale for the decision was concocted to cover its true purpose. *See* PFOF § II.D.1. "Proof that

the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence

that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v.*

*Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).

233.    Moreover, Secretary Ross is most certainly not the only actor subject to the

Court's scrutiny, because there is strong evidence that he did not act alone, that his motives were

not closely-held, and that he and other high level officials acted in concert with unlawful discriminatory motives. *See* PFOF § IV.C. The history of this action and the parties involved are relevant under the totality of the circumstances envisioned by *Arlington Heights*. 429 U.S. at 268.

234.     In March 2017, Earl Comstock, Director of Policy and Strategic Planning for the Department of Commerce, emailed Secretary Ross regarding "Your Question on the Census," which appears to have been whether undocumented residents are counted for Congressional apportionment. PX-55 (AR 2521). Mr. Comstock responded in the affirmative, and included a blog entitled "The Pitfalls of Counting Illegal Immigrants." *Id*.

235.     During the same time period, high level officials were in conversations with Secretary Ross about the citizenship question, including Stephen Bannon. PX-302. Secretary Ross also discussed the citizenship question with Mr. Kobach, *id*., *see also* PX-19 (AR 763), and he had the first of a number of conversations with Attorney General Sessions in the Spring of 2017. PX-302; PX-19 (AR 763); PX-58 (AR 2561).

236.     By the beginning of May 2017, Secretary Ross was complaining to Mr. Comstock that he was "mystified why nothing [has] been done in response to my months old request that we include the citizenship question," and that "worst of all they emphasized that they have settled with congress on the questions to be asked."  PX-88 (AR 3710). Although Mr. Comstock allowed that the "broad topics" had already been submitted to Congress as required, he assured Secretary Ross that he would arrange a meeting with DOJ to "work with Justice to get them to request" the citizenship question. *Id*.

237.     The very next day, May 3, Senior White House advisor Eric Branstad looked for a DOJ contact, connected Mr. Comstock to a number of DOJ employees with whom he met or

spoke to about the question, including, several times, the Acting Director of DOJ's Executive Office of Immigration Review. PX-84 (AR 3701); PX-51 (AR 2462); PX-537 (AR 12756). Mr. Comstock went "looking for an agency" to ask the question—not because any agency raised any issue with census data, but because Secretary Ross wanted the question added and he had to comply with the Paperwork Reduction Act (PRA). Comstock Dep. at 153:2-13, 154:2-21, 181:3–182:1, ECF. No. 103-8 (hereinafter "Comstock Dep."). Mr. Comstock testified that he did not "need to know what [the Secretary's] rationale might be, because it may or may not be one that is . . . legally-valid." *Id*. at 266:13–267:20.

238.     While Mr. Comstock was searching for an agency to submit a request to justify the addition of the citizenship question, Mr. Kobach wrote to Secretary Ross "at the direction" of Mr. Bannon, reminding Secretary Ross of the importance of excluding non-citizens from the count for apportionment purposes, and warning him that without a citizenship question "aliens who do not actually 'reside' in the United States are still counted for congressional apportionment." PX-19 (AR 763).

239.     On August 8, 2017, Secretary Ross wrote to Mr. Comstock to complain that "they seem dig [sic] in about not [asking] the citizenship question and that raises the question of where is the DOJ in their analysis?" PX-523 (AR 12476). Secretary Ross offered to call Attorney General Sessions should it become necessary to do so. *Id.*

240.     But Mr. Comstock's efforts had reached a "dead end." Comstock Dep. at 411:6-12. He had not yet secured the "request" that the Secretary needed for cover. As of September 8, DOJ had already rejected the request, Gore Dep. at 69:40-9, and the Department of Homeland Security ("DHS") could not be persuaded either, despite several phone calls with Mr. Comstock.

PX-537 (AR 12756). Mr. Comstock testified that without DOJ, "that would probably put an end to the citizenship question."  Comstock Dep. at 190:5–12.

241.    Secretary Ross followed through on his offer to call Attorney General Sessions, because five days later, Acting Assistant Attorney General John Gore reached out to Commerce, and assured them that Attorney General Sessions was available and "eager to assist," and that DOJ "can do whatever you all need us to do."[5]  PX-66 (AR 2651). However, two months later, the DOJ still had not provided Commerce with the requested letter. So an impatient Secretary Ross wrote to Peter Davidson, the General Counsel of Commerce: "Census is about to begin translating the questions into multiple languages and has let the printing contact. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must have this resolved."  PX-143 (AR 11193). Mr. Davidson reassured the Secretary that "I can brief you tomorrow ... no need for you to call."  *Id*. Two weeks later, DOJ issued the request that Secretary Ross had sought since early Spring. PX-32 (AR 1525).

242.    The Census Bureau—completely unaware that the request had originated not from the DOJ, but from Commerce (PFOF ¶ 173)—set out to study how best to meet DOJ's ostensible need for block level citizen voting age population (CVAP) data, analyzing the advantages and disadvantages of adding a citizenship question as compared to other methods of acquiring the information DOJ requested. The Census Bureau scientists concluded that ARs could provide DOJ with more accurate block-level CVAP information than adding the question, while at the

---

[5] By September 17, 2017, Attorney General Sessions and Secretary Ross had "connected," in a conversation facilitated by Mr. Gore. Gore Dep. at 95:14–112:19. Mr. Gore understood that when Attorney General Sessions called him in mid-September of 2017, he did so at Secretary Ross's behest. *Id*. at 83:16–84:6. Mr. Gore's deposition testimony confirms that DOJ did not initiate communications with Commerce regarding the citizenship question. *Id.* at 67:5–68:5.

same time avoiding the potential negative impact on voluntary cooperation with the census and the concomitant lower differential response rates. PX-1130 (AR 11646); PX-147(AR 11634); PX-22 (AR 1277).

243.    No evidence before the Secretary suggested that adding a citizenship question would improve, rather than detract from, the accuracy of citizenship data. Nonetheless, Secretary Ross continued to push to add the citizenship question no matter the hurdles he faced or the strong objections raised by the Census Bureau, legislators, and other third parties. On March 22, 2018, Secretary Ross initiated the request for the citizenship question. PX-90 (AR 3893). After working for nearly a year to convince DOJ, then DHS, then DOJ again, to provide him with cover for the Administration's decision to add the question, and to keep his ruse from the public, Secretary Ross testified under oath to the House Ways and Means Committee that "[DOJ], as you know, initiated the request for inclusion of the citizenship question." PX-480 at 55.

244.    The events leading up to Secretary Ross's announcement regarding the addition of a citizenship question lend credence to an inference of discriminatory purpose.

> **3.    *Arlington Heights* Factor 3: Defendants Departed, Procedurally and Substantively, From Past Practice, Including the Concoction of a Rationale That Does Not Bear Scrutiny.**

245.    *Arlington Heights* requires an examination of the "specific sequence of events leading up to the challenged decision," with a critical eye toward "[d]epartures from the normal procedural sequence," which may demonstrate "that improper purposes are playing a role."  429 U.S. at 267.

246.    In its examination of the route taken by legislators to pass election laws in North Carolina, for example, the Fourth Circuit adopted district court findings that the bill was rushed through the process to avoid in depth scrutiny, that it was afforded far less debate than was normally offered, and that it targeted African American voters. *N.C. State Conference of*

*NAACP*, 831 F.3d at 227–28. Finding error in the district court's "accepting the State's efforts to cast this suspicious narrative in an innocuous light," the Fourth Circuit held that such departures, even as other procedural rules were adhered to, provided "another compelling piece of the [motivation] puzzle." *Id*. at 228–29.

247.    Had the procedure for adding a question to the decennial census proceeded normally, there would have been a request by an agency for data, the Census Bureau would have considered the request and determined how to provide the most accurate data at the least cost that best fit the needs of the requesting agency, the question would have undergone extensive testing, the Census Bureau would have made a recommendation to the Secretary of Commerce, and the Secretary would have then included the question in his report to Congress on the subjects to be covered by March 28, 2017. The process would have begun early to mid-decade. There would have been no need for secrecy or prevarication by the Secretary. *See* PFOF § IV.A.

248.    Instead, the "request" came not from an agency needing data, but from Mr. Kobach and Trump Administration officials who wanted to exclude noncitizens, primarily immigrants of color, from the apportionment base used for redistricting. *See* PFOF § IV.C.

249.    In order to provide the Secretary and the Administration with the appearance of procedural compliance, Attorney General Sessions, at the Secretary's request, provided a rationale for adding the citizenship question to the Census. *See* PFOF § III.E. 5.

250.    Mr. Gore drafted the request, received edits from junior political appointees and Attorney General Sessions' advisors, none of whom had experience in Voting Rights Act (VRA) cases or in assessing the reliability of CVAP data, and received final authorization from Attorney General Sessions. Gore Dep. at 127:3-17, 133:13–142:7, 157:22–160:18; PFOF § III.B.

251.     Ten days after the DOJ request, Acting Census Bureau Director Ron Jarmin, per standard practice, invited DOJ to discuss the Census Bureau's recommendation that a linked file of administrative and survey data already in the possession of the Census Bureau would provide the data the DOJ requested, and would "result in higher quality data produced at a lower cost." PX-71 (AR 3289). But Attorney General Sessions, in a move that was "very unusual" for the DOJ, and one that Dr. Abowd believed constituted problematic "political influence," directed his staff not to attend. Trial Tr. (Jan. 22) at 82:15-20; Trial Tr. (Jan. 31) at 28:18–29:3.

252.     Secretary Ross then ignored advice and analysis provided by the Census Bureau that the addition of the citizenship question would lower response rates and data quality, ignored years of prior practice by failing to test new content, failed to comply with the congressional reporting requirements and data-gathering constraints in the Census Act, and failed to comply with the PRA. PFOF § IV.A.3.

253.     All the while, Census Bureau experts thought the "request" from DOJ, a request that had never been made previously, was legitimate, and were not told that Commerce was behind the DOJ request. PFOF ¶ 173.

254.     The secrecy did not end there. Secretary testified in Congress on March 20, 2018 that although he had heard about the Trump campaign email seeking support for the addition of a citizenship question PX 78 (AR 3597). Comstock emailed requesting that the Secretary be made aware of the campaign mailer and prepared to respond  The Census Bureau's analysis was "solely" in response to the DOJ request, and not at the direction of anyone at the White House. PX-491.

255.    Two days later, on March 22, 2018, Secretary Ross continued the ruse by testifying again before Congress that DOJ "initiated" the process to add the citizenship question. PX 480 at 51.

256.    Even after the lawsuits challenging the addition of the citizenship question were filed, as recently as April of this last year, DOJ and Commerce took pains to hide the fact that Secretary Ross had demanded that DOJ send the request. A series of talking points used by Attorney General Sessions to prepare for *his* Congressional testimony on the topic of the census begins with the following reminder: "**NOT PUBLIC**: In 2017, Secretary of Commerce Wilbur Ross requested that the Justice Department send a letter requesting the addition of a citizenship question on the 2020 Census." PX-718; Gore Dep. at 330:10–333:4. Attorney General Sessions literally prepared himself to conceal from Congress the steps Secretary Ross had taken to provide himself with an after-the-fact motive for adding the question.

257.    The Ross Memo itself misrepresents the origin of the request for the addition of a citizenship question, attributing the initiation of the request and all that followed to the DOJ Letter. The Memorandum misrepresents the Census Bureau's findings, stating that it could not "document that the response rate would in fact decline materially" because of the citizenship question, when that is undeniably what the Census Bureau did provide—a differential decline in self-response likely attributable to the citizenship question. question. PX-26 at 3 (AR 1315); *see also id.* at 4; PX-22 at 5 (AR 1277).

258.    The Ross Memo also falsely reports that an executive at the Nielsen agency confirmed that adding sensitive questions to short survey forms could be done "without any appreciable decrease in response rates." *Id.* at 3. The Nielsen executive, Christine Pierce, credibly refutes Ross's representation, as she told Secretary Ross "unequivocally" of her concern

that "a citizenship question would negatively impact self-response rates." Pierce Decl. at ¶ 9. at

every step, Defendants concealed the true nature of this process, the identity of their co-

conspirators, and the true reasons leading to the DOJ Letter and the Ross Memo. Had their

motives truly been moored in a desire to enable the DOJ to effectively enforce the VRA, they

would not have had to be secretive, to cover up, and to prevaricate.

259.     The departures from normal procedures, the rush to cut corners, and the

suspicious withholding of information regarding Defendants' initial motivation driving the

addition of the citizenship question "provide[] another compelling piece of the puzzle" of

Defendants discriminatory motivation. *N.C. State Conference of NAACP,* 831 F.3d at 229.

> **4.      *Arlington Heights* Factor 4: The Record Contains Contemporary
> Statements by Those Involved in Ensuring That the Secretary Carried
> out the Administration's Intent to Discriminate Against Immigrant
> Communities of Color.**

260.     *Arlington Heights'* fourth factor requires evidence of "contemporary statements"

by those deciding the issue. 429 U.S. at 266–68. As the Court previously noted, the

contemporary statements by President Trump and members of his administration, while "not

made specifically in relation to the citizenship question they are nonetheless relevant to

understanding the administration's motivations. After all, 'discriminatory intent is rarely

susceptible to direct proof.'"  *LUPE*, 2018 WL 5885528, at 9 (quoting *Hayden v. Paterson,* 594

F.3d 150, 153 (2d Cir. 2010)); *see also Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276–77

(E.D.N.Y. 2018) (showing statements made by President Trump that allegedly suggest that he is

prejudiced against Latinos are found "sufficiently racially charged, recurring, and troubling as to

raise a plausible inference that the decision to end the DACA program was substantially

motivated by discriminatory animus"); *Mullen v. Princess Anne Volunteer Fire Co., Inc.*, 853

F.2d 1130, 1133 (4th Cir. 1988) ("Racial slurs represent the conscious evocation of those

stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate.").

261.    The record is replete with statements that are so vile they leave no doubt as to President Trump's belief that immigrant communities of color are criminal and relatively worthless. *See* PFOF § IV.C. As another court recently recognized, "there is evidence that President Trump harbors an animus against non-white, non-European aliens which influenced" his decision to revoke protected status from individuals from Haiti, Sudan, El Salvador, and Nicaragua. *Ramos v. Nielsen*, No. 18-CV-01554-EMC, 2018 WL 4778285, at *17 (N.D. Cal. Oct. 3, 2018).

262.    Also relevant are anti-immigrant statements by President Trump and current and former Administration officials. PFOF § IV.C. For example, on May 21, 2018, the White House published an article on its website regarding MS-13 that used the term "animals" no less than ten time to describe individuals attempting to enter the country. PX-1175.

263.    On May 25, 2016, President Trump tweeted, "The protesters in New Mexico were thugs who were flying the Mexican flag. The rally inside was big and beautiful, but outside, criminals!"  PX-1145. On July 6, 2017, during a foreign policy speech delivered in Poland, President Trump expressed the need to protect "the West" and "civilization" against forces from "the South or the East" that threaten to undermine western "values," "courage," "spirit," and "will."  PX-1163.

264.    Even more relevant to the issue at hand are statements demonstrating either an obsession with purported noncitizen voting, or statements connecting immigration to partisan interests. These kinds of pronouncements are consistent with statements from Mr. Kobach and

internal Commerce emails that evince a clear intent to exclude immigrants from political

representation. *See* PFOF § IV.C.

265.     On November 27, 2016, President Trump tweeted, "[i]n addition to winning the

Electoral College in a landslide, I won the popular vote if you deduct the millions of people who

voted illegally."  PX-1156.

266.     The district court in *New York*, 2019 WL 190285, at *118, found that the

plaintiffs there had failed to prove that Secretary Ross acted with a racially discriminatory

purpose, or that those who influenced him (Kobach, Bannon, Sessions) communicated their

discriminatory purpose to him, and that plaintiffs failed to prove a connection between President

Trump and the addition of the citizenship question to make President Trump's racially hostile

statements relevant. *Id*. In particular, the court found that the email establishing that nexus at the

motion to dismiss stage, *U.S. Dep't of Commerce,* 315 F. Supp. 3d  810—the email from

Trump's reelection campaign announcing that he "officially mandated" the decision—was

excluded at trial. *New York*, 2019 WL 190285, at *118.

267.     However, the evidence in this case includes the email issued by the Trump

campaign two days after the issuance of the Ross Memorandum, claiming credit for the addition

of the question and that President Trump "officially mandated" the addition of the question. PX-

487; PX-1173. The AR in this case also contains a pitch from the Trump campaign sent to

Commerce officials *less than a week prior* to the March 26 announcement, a pitch that read,

"The President wants the 2020 United States Census to ask people whether or not they are

citizens."  PX-3 at 2107 (AR 3424).

268.     There is substantial evidence that Secretary Ross was well aware of and likely

shared the motivation to dilute the political representation of noncitizens through the addition of

the citizenship question. Mr. Kobach and Secretary Ross discussed the fact that the lack of a

citizenship question "leads to the problem that aliens . . . are still counted for apportionment

purposes."  PX-19 (AR 763). On May 24, 2017, following Secretary Ross's meeting with David

Langdon regarding the citizenship question, Mr. Langdon exchanged emails with the Census

Bureau and received from them a 1988 DOJ memo about excluding "illegal immigrants" from

the census count, and by August of 2017, when Secretary Ross's staff was preparing "a memo

and full briefing . . . on a citizenship question" (a memo that was not disclosed in the AR),

Commerce Department legal counsel emailed that their "hook" was that the Department "do[es]

not make decisions on how the [citizenship] data will be used for apportionment . . . ." PFOF ¶

143. On October 9, 2017, as the discussions were ongoing between the Department of

Commerce and DOJ, Secretary Ross issued a press release applauding Trump Administration

priorities to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse and chain

immigration."  PX-479.

269.    Whether one views the landscape as one in which Secretary Ross was part of a

larger group that together made the decision to add a citizenship question early in 2017, or one in

which Trump Administration officials "mandated" that Secretary Ross add the question and sent

him off to find a justification for doing so, Plaintiffs have produced direct and plausible

evidence, supported by documentation, that Secretary Ross did not act alone. *See* PFOF §§ II.E,

IV.C.

270.    When multiple officials influence a final decision, the relevant inquiry is whether

the decision was "tainted with discriminatory intent even if the decisionmakers personally have

no strong views on the matter."  *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37,

49 (2d Cir. 1997) (superseded on other grounds by *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163,

171 n.7 (2d Cir. 2001)); *see also Batalla Vidal*, 291 F. Supp. 3d at 279 (holding that there is still liability for intentional discrimination when a "biased individual manipulates a non-biased decision-maker into taking discriminatory action"); *Ramos*, 2018 WL 4778285, at *16 (granting preliminary injunction and noting "even if the DHS Secretary or Acting Secretary did not personally harbor animus . . ., their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process") (internal quotation and citation omitted); *see also Centro Presente v. U.S. Dep't of Homeland Sec.,* No. 18-10340, 2018 WL 3543535, at 14 n.3 (Jul. 23, 2018) (explaining that although the "cat's paw" principle originates in the employment discrimination context, "nothing in the reasoning of those opinions makes them inapplicable in a constitutional context").

271.    Notably, one of the men with whom the remarks originate is the President, who chooses, directs, and demands loyalty from his Cabinet, and if taken at his word, "mandated" the addition of the question. PX-487; PX-1173.

272.    The Fourth Circuit recognizes that officials acting in their official capacities "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority. Even individuals acting from invidious motivations realize the unattractiveness of their prejudices when faced with their perpetuation in the public record. It is only in private conversation, with individuals assumed to share their bigotry, that open statements of discrimination are made, so it is rare that these statements can be captured for purposes of proving racial discrimination in a case such as this." *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1064 (4th Cir. 1982).

273.    In this case, those "private conversations" were with Attorney General Sessions, several of Attorney General Sessions' key immigration aides, Mr. Bannon, and Mr. Kobach—the

individuals who played a major role in the decision, and who did so with discriminatory motives. PFOF § II.A.  The evidence shows that these individuals made statements that either demean or target immigrant communities of color, and that Mr. Kobach pushed for the citizenship question as a way to neutralize the growing political power of these communities. For all of these reasons, the President's statements do properly contribute to the *Arlington Heights* inquiry and can raise an inference of discriminatory motive for the addition of the citizenship question. The "nexus" between President Trump that was found wanting in *New York,* 2019 WL 190285, at 118, is established here.

274.    Further, even if Secretary Ross had not displayed an anti-immigrant bias, the bias of the Trump Administration is relevant because the Secretary acted on it. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty., Md.*, No. 18-1450, 2019 WL 469715, at 5 (4th Cir. Feb. 7, 2019) ("Particularly relevant to this case, a government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves.") (citing  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985)); *Marks v. City of Chesapeake*, 883 F.2d 308, 311–13 (4th Cir. 1989). This court can infer impermissible bias where, as here, expressions of anti-immigrant bias and discriminatory purpose were followed by irregularities in procedure for implementing a change to the Census questionnaire. *Jesus Christ is the Answer Ministries, Inc.,* 2019 WL 469715, at 6, (citing *Smith*, 682 F.2d at 1066).

275.    The evidence supports the conclusion that the addition of the citizenship question was done for an improper purpose—to decrease the political power of immigrants of color, and Latino and Asian citizens who live in proximity to immigrants of color. Federal officials acting

on a race-based motivation engage in intentional race discrimination in violation of the Due

Process Clause of the Fifth Amendment to the U.S. Constitution.

   **C.     The Non-Racial Motivations Claimed by Defendants Cannot Alone Explain the Decision To Add a Citizenship Question to the 2020 Census.**

   276.    Now that Plaintiffs have established that race was a factor that motivated

Defendants' decision to add a citizenship question, the burden shifts to Defendants to

demonstrate that the question would have been added absent the discriminatory motive. *Hunter*

*v. Underwood*, 471 U.S. 222, 228 (1985); *Arlington Heights*, 429 U.S. at 271 n.21; *N.C. State*

*Conference of NAACP*, 831 F.3d 204 at 233.

   277.    The Fourth Circuit cautions that at this stage, a district court must not examine the

proffered rationale through a "rational basis-like lens," because simply finding that the proffered

reasons are "plausible" or "not unreasonable" is "a far cry from [a] finding that" the question

would have been added without impermissible racial considerations. *N.C. State Conference of*

*NAACP*, 831 F.3d at 234 (internal quotations and citation omitted).

   278.    Because "racial discrimination is not just another competing consideration," a

court must do much more than review the proffered rationale for "arbitrariness or irrationality."

*Arlington Heights,* 429 U.S. at 265–66. Given that the evidence in this case establishes that

Defendants were motivated by racial considerations, judicial deference of the kind accorded to

governmental decisionmaking under the APA is not warranted here. *Id.* at 235.

   279.    Upon the shifting of the burden, the court assesses whether or not the question

would have been added without a discriminatory motive by considering the government's

interest in adding the question, and how well the addition of the question serves that interest.

*N.C. State Conference of NAACP*, 831 F.3d at 233 (citing *Hunter,* 471 U.S. at 228–33); *Mhany*

*Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 614 (2d Cir. 2016) (considering "whether [non-

racial] concerns were sufficiently strong to cancel out any discriminatory animus" after shifting the burden under *Arlington Heights* in a Fair Housing Act claim).

280.    Defendants' claimed interest here is provided by the DOJ Letter expressing a request, not a need, but a request for block level citizenship data that DOJ claims would be "more appropriate for use in redistricting and in Section 2 litigation than ACS []estimates," and assumes would be best provided by adding a citizenship question to the decennial Census. PX-32 at 3 (AR 1527). For the reasons explained above, the addition of the citizenship question is based on a pretextual interest, and even if it weren't, the addition of the question does not serve that interest.

281.    DOJ's request for block level data for voting rights enforcement is inherently suspect, because the evidence is uncontested that Secretary Ross asked the DOJ to provide him with a justification, after having been rejected once by DOJ and subsequently by DHS. *See* PFOF § II. A. That fact alone renders the rationale offered by the DOJ dubious. Moroever, it is clear from the record that not only does the DOJ nothave a genuine need for the data it requests, Secretary Ross and AG Sessions refused to meet with the Census Bureau to determine whether adding the question would serve the DOJ's interest in obtaining the data. Indeed, the evidence demonstrates that it would not.

282.    The Fourth Circuit found that similar evidence of pretextual and/or ineffective voting restrictions in the challenged election law amounted to a "troubling mismatch" with the legislature's proffered justifications. *N.C. State Conference of NAACP*, 831 F.3d at 235–238. The *North Carolina State Conference of NAACP* Court found it significant that the General Assembly disregarded the recommendations of the State Board of Elections. *Id.* at 235–237. Similarly, Secretary Ross rejected the analysis provided by the Census Bureau experts who

continue to recommend that the question not be added to the 2020 Census because of the inaccuracies it will cause.  PFOF §§ II.C, II.D.

283.    North Carolina justified the elimination of same-day voting as a way to avoid the administrative burdens, a concern the court found to be "real."  *N.C. State Conference of NAACP*, 831 F.3d at 237. However, the complete elimination of same-day registration was not drawn carefully to accomplish the State's objections, particularly when it "had before it alternative proposals that would have remedied the problem without abolishing the popular program." *Id*. Similarly, Secretary Ross had before him an alternative that would have better addressed the request of the DOJ, and both he and Attorney General Sessions rejected the alternative without any justification whatsoever.

284.    Finally, the *McCrory* court found at least one rationale for the State's action, that it abolished out-of-precinct voting to "permit election officials to conduct elections in a timely and efficient manner," to be a "post hoc rationalization" that provided "little evidence as to the actual motivations of the legislature."  *Id*. 237-38 (internal quotations and citation omitted). The Fourth Circuit further found that as to the provision eliminating preregistration, the "General Assembly contrived a problem in order to impose a solution." *Id.* at 238. Here, while the proffered justification was not first offered during litigation, it was most certainly sought in anticipation of litigation, and under these circumstances the DOJ's request can be reasonably interpreted as a "contrived problem in order to impose a solution" that was cemented in early 2017. *Id*.; *see Miss. U. for Women v. Hogan*, 458 U.S. 718, 730 (1982) ("Thus, we conclude that, although the State recited a 'benign, compensatory purpose,' it failed to establish that the alleged objective is the actual purpose underlying the discriminatory classification.").

285.     Supreme Court Justice Gorsuch, writing to concur in part and dissent in part on the Court's response to an application for stay (of a New York district court order compelling the deposition of Secretary Ross) presented to Justice Ginsburg and referred by her to the Court, expressed his view of the bad faith allegations that form the basis for this case. Justice Gorsuch opined that "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape." *In re Dep't of Commerce,* 139 S. Ct. 16, 17 (2018) (Gorsuch, J.). No matter how commonplace racial animus and prevarication has become in our political discourse, the Constitution remains a guard against their manifestation by public officials who make official decisions that affect the lives of those who are targeted. It is indeed "unusual" for a cabinet member to manipulate laws and disregard the best available advice in order to serve a discriminatory end. It must be considered unusual for two cabinet members to conspire to manufacture facially neutral justifications to serve those ends, to lie to Congress about the true motivations that proceeded, by months, the ones offered to Congress and to the courts. It is not simple red tape-cutting for an agency to be forced to abandon all safeguards to ensure the accuracy of a constitutionally required census of the population that will affect political representation and basic federal funding for the next decade.

286.     Defendants have demonstrated neither the genuineness of their interest in obtaining block level data in order to more effectively enforce the VRA, nor that the addition of the citizenship question serves that interest. Defendants have failed to carry their burden to demonstrate that the citizenship question would have been added absent the discriminatory motive. *Hunter*, 471 U.S. at 228; *Arlington Heights,* 429 U.S. at 271 n.21; *N.C. State Conference of NAACP*, 831 F.3d 204 at 233.

**V.      Defendants' Actions Violate Section 1985.**

287.    42 U.S.C. § 1985(3) provides:

If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

288.    To establish a claim under § 1985(3) for conspiracy to deny equal protection of the law, a plaintiff must show: "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Plaintiffs have established most of these elements by successfully establishing their equal protection claim. *See LUPE*, 2018 WL 5885528, at *11. The only element that remains is whether a "conspiracy" exists.

289.    To prove a § 1985 "conspiracy," a plaintiff "must show an agreement or a 'meeting of the minds' by defendants to violate the [plaintiff's] constitutional rights," *Simmons*, 47 F.3d at 1377, and the plaintiff must "come forward with specific circumstantial evidence" that reasonably leads to the inference "that each member of the alleged conspiracy shared the same conspiratorial objective," *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017) (internal quotations omitted). A plaintiff need not produce direct evidence of a meeting of the minds, *id.*, nor does a plaintiff need to show that there was an express agreement among all the conspirators. *Simmons*, 47 F.3d at 1376. Instead, a plaintiff must only show that the participants in the conspiracy shared "the general conspiratorial objective . . . [I]t simply must be shown that there was a 'single plan, the essential nature and general scope of which [was] known to each person who is to be held

responsible for its consequences.'" *Id.* at 1378 (quoting *Lenard v. Argento*, 699 F.2d 874, 882–83 (7th Cir. 1983) (citations omitted)).

290.    Here, the trial record establishes that the conspirators share the same general objective to add a citizenship question to the 2020 Census to reduce response rates of people of color and immigrants, and thus exclude them from congressional apportionment and redistricting and "achieve [the conspirators'] unconstitutional goal of reducing their political power." *Kravitz*, 2018 WL 6830226, at *9. Members of the Trump Administration, Mr. Kobach, the Secretary, and members of the DOJ agreed to add a citizenship question for this unlawful purpose and began planning to add the question in early 2017. *See* PFOF §§ II.A, III.A.  After consulting with Mr. Bannon and Mr. Kobach, the Secretary used the Department of Commerce to facilitate the conspiracy by directing staff to research the exclusion of immigrants from apportionment and the manner in which to add a citizenship question to the census. *See, e.g.*, *id*.

291.    The Secretary and the Department of Commerce then solicited the assistance of first the DOJ and then DHS, *see, e.g.*, PFOF ¶¶ 69, 159; PX-84 (AR 3701); PX-88 (AR 3710); PX-537 (AR 1256), before they finally secured the participation of the DOJ, PX-67 (AR 2653); PX-68 (AR 2659); PX-97 (AR 4004), including Attorney General Sessions who informed the Secretary that the was "eager to assist," PX-67 (AR 2653); PX-68 (AR 2659); *see also* PX-62 (AR 2637). The Secretary, through the Department of Commerce, then coordinated with Attorney General Sessions, other members of the DOJ, and the White House to fabricate a "need" for the citizenship question. *See, e.g.*, PX-143 (AR 11193); Gore Dep. at 137:4–8, 409:19–411:19, 412:4-9. During the process, Acting Assistant Attorney General Gore drafted the DOJ Letter and "had a conversation with Attorney General Sessions about the question of the use of total population or some other measure for apportionment purposes." *Id*. at 338:2–13. Attorney General Sessions

ultimately made the decision on behalf of the DOJ to make the "request," *id*. at 442:13–19, and he gave final approval to send the letter, *id*. at 158:12-19, 158:21-159:2. All this work was conducted with an understanding that the conspirators would have to ignore proper procedures to add a question to the 2020 Census and would thus have to eventually defend their unlawful decision all the way to the Supreme Court. *See, e.g.*, PX-523 (AR 12476); PX-607 (AR).

292.    Without their knowledge, the Secretary used the Census Bureau to continue to facilitate the conspiracy. The Secretary directed the Bureau to look into the DOJ request, PX-74 (AR 3354), and the DOJ ignored invitations from the Bureau to meet to discuss their request, *see, e.g.*, PX-71 (AR 3289); PX-197; Gore Dep. at 271:20–272:19, 273:17–274:9. The Secretary ultimately included the conspiracy's predetermined conclusion in the Ross Memo: that the Bureau must add a citizenship question to the 2020 Census. Ross Memo. In issuing the Ross Memo, the Secretary completely ignored the findings of the Bureau that showed that the addition of the citizenship question would lower the response rates of Latino and noncitizen households. *See, e.g.*, PX-22 (AR 1277) at 4–5; PX-147 (AR 11634) at 6–12.

293.    After the Secretary issued the Ross Memo, the Trump Administration publicly admitted its role in the conspiracy. PX-487; PX-1173. The Secretary has continued to facilitate the conspiracy even after the Ross Memo, and he and his co-conspirators have attempted to conceal the continued existence of the conspiracy. *See, e.g.*, PX-49. For example, April 2018 talking points used by Attorney General Sessions to prepare for his testimony before a congressional committee remind him that that the fact that the Secretary asked the DOJ to provide him with a pretextual request for a citizenship question was "**NOT PUBLIC**," and thus presumably to be hidden from the congressional committee. PX-718. And, after early discovery in this and related litigation showed that the DOJ did not, in fact, initiate the request for a citizenship question, the Secretary

was forced to issue a supplement to the Ross Memo, admitting that he began considering the addition of a citizenship question well before the DOJ request. PX-2 (AR 1321).

294.   Courts have consistently found that this type of concerted activity supports the finding of a conspiracy. In *National Organization for Women v. Operation Rescue*, for example, a district court found that the conspirators had engaged in a conspiracy when they "combined with each other . . . to plan, organize, coordinate, and carry out [ ] demonstrations" to accomplish their unlawful purpose. 726 F. Supp. 1483, 1492 (E.D. Va. 1989), *aff'd*, 914 F.2d 582, 585–86 (4th Cir. 1990), *overruled on other grounds by Bray v. Alexandria Women's Health Clinic*, 506 U.S. 623, 274 (1993) (holding that § 1985(3) does not prohibit a conspiracy to obstruct access to abortion clinics). Similarly, in *New York State National Organization for Women v. Terry*, the Second Circuit affirmed the district court's findings that defendants engaged in a conspiracy, noting that "[d]efendants agreed with other individuals to engage in unlawful activity," that "defendants facilitated the conspiracy by providing transportation and accommodation to participants," and that defendant Operation Rescue disseminated literature that encouraged the public to participate in the unlawful activity. 888 F.2d 1339, 1359 (2d Cir. 1989).

295.   Taken alone, the Secretary meeting and communicating with stakeholders and members of other departments may appear to be no more than part of a policymaking process. Even acts, however, "done for a legitimate purpose in furtherance of a conspiracy may, together with other evidence, be evidence of a conspiratorial purpose." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1547 (9th Cir. 1989) (citing *Braverman v. United States*, 317 U.S. 49, 53 (1942)); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946) (noting that, in the anti-trust context, "[a]cts done to give effect to the conspiracy may be in themselves wholly innocent acts"). Importantly, here, the record reflects that the purpose of these

meetings and communications were to facilitate and conceal the conspiracy to violate the constitutional rights of people of color and immigrants. The facts in the trial record, taken together, leave no doubt that the Secretary, Mr. Kobach, members of the Trump Administration, and members of the DOJ are engaged in an unlawful conspiracy.

> **A.   Sovereign Immunity Does Not Bar a Finding of a § 1985(3) Violation.**

296.   Sovereign immunity bars cases against the federal government unless Congress has unequivocally consented to suit or an exception applies. *United States v. Testan*, 424 U.S. 392, 399 (1976); *Dugan v. Rank*, 372 U.S. 609, 621 (1963).

297.   In general, a claim against a federal official for acts performed within his or her official capacity amounts to an action against the sovereign and is barred by sovereign immunity. *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir.1983). As the Court has explained, however, "there may be suits for injunctive relief against officers of the sovereign that are not barred by sovereign immunity." *LUPE*, 2018 WL 5885528, at \*11 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Federal officials may be sued for injunctive relief if their actions go beyond their statutory power, or if their actions are within the scope of their official authority but are exercised in a constitutionally void manner. *Dugan*, 372 U.S. at 621. In these situations, "[a]lthough the officer's power to act may be conferred in form, 'the grant is lacking in substance because of its constitutional invalidity.'" *Int'l Fed''n of Prof'l & Tech. Eng'rs v. United States*, 934 F. Supp. 2d 816, 820 (D. Md. 2013) (citing *Larson*, 337 U.S. at 690).

298.   The APA further to permits suits for injunctive relief against federal agencies, officers, and employees. *See* 5 U.S.C. § 702; *see also Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C. Cir. 1981) (noting that the amendments to the APA were intended to eliminate "the

sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity") (internal quotation marks omitted).

299.    The Court has already found that the relief sought by Plaintiffs—"enjoining the Defendants' implementation of an [ ] unconstitutional conspiracy—is precisely the type of claim that is not barred by sovereign immunity." *LUPE*, 2018 WL 5885528, at *10. Further, Defendants do not have a sovereign immunity defense because Plaintiffs seek an injunction to prevent the conspirators from continuing their conspiracy, as permitted under the APA.

**B.      The Intracorporate Conspiracy Doctrine Does Not Preclude Plaintiffs' § 1985(3) Claim.**

300.    The intracorporate conspiracy doctrine is an antitrust principle that provides that "there is no unlawful conspiracy when officers within a *single* corporate entity consult among themselves and then adopt a policy for the entity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (emphasis added). The Supreme Court has explicitly declined to decide whether the intracorporate conspiracy doctrine applies to civil rights conspiracies generally, much less to conspiracies involving public officials specifically. *Id.* (acknowledging that the Supreme Court "has not given its approval to [the intracorporate conspiracy] doctrine in the specific context of § 1985(3)").

301.    Even if the intracorporate conspiracy doctrine applied to § 1985(3) conspiracies, Defendants' prior invocations of this doctrine is "misplaced" because one of the co-conspirators, Mr. Kobach, was not employed by the federal government when the conspiracy began, and there is no evidence that Mr. Kobach is now employed by a federal or state government. *See LUPE*, 2018 WL 5885528, at *12 n.7 ("At the time . . . Mr. Kobach [ ] conspired with Defendants and others . . . he was not part of the same governmental body as Defendants.").

302.    Further, "[i]ndividuals are not immune from liability under [§] 1985(3) merely because the same corporation employs them," and they remain liable for their "unauthorized acts

in furtherance of [the] conspiracy." *Hodgin v. Jefferson*, 446 F. Supp. 804, 807 (D. Md. 1978); *see also Buschi v. Kirven*, 775 F.2d 1240, 1251–52 (4th Cir. 1985) (same). Courts have routinely found that this exception applies in cases like the instant case where an employee, such as the Secretary, engages in conduct that is unauthorized, such as violating the APA by, among other things, fabricating a pretextual reason to add a citizenship question to the 2020 Census, issuing a memo to add the question without following proper procedures, then concealing the real reason for adding the question from Congress. In *Hodgin*, for example, the Fourth Circuit found that the exception to the intracorporate conspiracy doctrine applied under much less egregious circumstances. *See* 446 F. Supp. at 807. There, plaintiff alleged that the defendant officer ignored the stated policies of the defendant company, and his actions were therefore unauthorized by the company. *Id.* Likewise, in *Chavez v. McIntyre*, a district court found that the exception applied where the plaintiff alleged that defendant police officers engaged in unauthorized acts when they conspired to violate plaintiff's constitutional rights by subjecting him to unreasonable and excessive force. 424 F. Supp. 2d 858, 862(W.D. Va. 2006).

303.    Thus, even if the Court finds that the intracorporate conspiracy doctrine applies to civil rights conspiracies, the doctrine is inapplicable here because Mr. Kobach is not part of the same government body as the other conspirators, and because the actions of the defendant conspirators are unauthorized.

## VI.    Remedies

### A.    Enumeration Clause

304.    Defendants violated the Enumeration Clause for the reasons explained above. Defendants' violation of the Enumeration Clause harms Plaintiffs for the reasons explained above. Defendants' violation has caused and will continue to cause ongoing, irreparable harm to Plaintiffs.

305.    Accordingly, Plaintiffs are entitled to a declaratory judgment, under 28 U.S.C. §§ 2201 and 2202, that including the citizenship question on the 2020 Census questionnaire violates Article I, Section 2, Clause 3 of the U.S. Constitution.

306.    Plaintiffs also seek to permanently enjoin Defendants from placing the citizenship question on the 2020 Census questionnaire. A plaintiff seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156-57. Because the government is a party, and "the government's interest is the public interest," the last two factors merge. *Pursuing Am. Greatness v. Fed. Election Cmm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

307.    If the citizenship question is added to the 2020 Census questionnaire, Plaintiffs have suffered or will suffer harm in the form of vote dilution, lost funding across federal programs that allocate funds based on census data, diversion of resources and frustration of organizational missions, and degradation of census data that is relied upon for organizational work. Each of these harms would be irreparable—and without any adequate remedy at law. *Cf., e.g.*, *Dep't of Commerce*, 525 U.S. at 344 (holding that the prospective loss of representation in Congress warrants injunctive relief); *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 423 (9th Cir. 1991) (noting that where the measure of injury defies calculation, damages will not provide an adequate remedy at law). Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action. On the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S.*

*v. Newby*, 838 F.3d. 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted). As is relevant to the facts here, "the public interest . . . requires obedience . . . to the requirement that Congress be fairly apportioned, based on accurate census figures." *Carey*, 637 F.2d at 839.

308.   These harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief. *See Dep't of Commerce*, 525 U.S. at 344; *Gilder*, 936 F.2d at 423.

309.   Finally, the balance of the hardships and the public interest weighs heavily in favor of an injunction. Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years. In contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

## B.   APA Claim

### 1.   Plaintiffs are entitled to vacatur of the decision without remand.

310.   "[O]rdinarily, when a regulation is not promulgated in compliance with the APA, the regulation is invalid" and must be vacated. *All. for the Wild Rockies v. U.S. Forest Serv.*, 2018 WL 5316129 (9th Cir. Oct. 25, 2018) (quotations omitted); *see also Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (successful APA challenger "is entitled to relief under that statute, which normally will be a vacatur of the agency's [decision]").

311.   Vacatur properly reflects the sound principle that an agency action that violates the APA "'cannot be afforded the force and effect of law,' and therefore is void." *Air India v. Brien*, No. 00-cv-1707, 2002 WL 34923740, at *14 (E.D.N.Y. Feb. 14, 2002) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979)).

312.   Vacatur an appropriate remedy under the APA both when an agency acts contrary to law, *e.g., Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1261 (D.C. Cir. 2007) (vacating rule

that "conflicts with the plain meaning" of statute), and when an agency action is arbitrary and capricious, *e.g., Camp*, 411 U.S. at 143 ("If [the agency's] finding is not sustainable on the AR made, then the [agency's] decision must be vacated . . . .").

313.   Although courts may remand to the agency after invalidating an improper determination, courts have also not hesitated to vacate agency actions without remand when they are taken in violation of statutory or procedural requirements. *See, e.g., Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018); *Clean Air Council v. Pruitt*, 862 F.3d 1, 14 (D.C. Cir. 2017).

314.   Such a disposition reflects the fact that statutory or procedural violations can be so fundamental as to render the agency's basic choice—and not merely its particular articulation of that choice—"substantively fatal." *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990); *see also Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur warranted when "such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand").

315.   Remand is also unnecessary if this Court concludes that the Secretary's stated rationale for the citizenship question is arbitrary and capricious, because the Secretary has never suggested an alternative basis for his decision. *See Crown Cork & Seal Co. v. Nat. Labor Relations Bd.*, 36 F.3d 1130, 1142-43 (D.C Cir. 1994) (remand unnecessary when National Labor Relations Board "suggested no alternative bases for upholding" its determination); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) ("No remand for further administrative proceedings is warranted because the EPA did not suggest in the rulemaking under review that there is any alternative basis in the record" for its decision.).

316.    Further, § 6(c) of Title 13 requires the Defendants to use ARs rather than add the citizenship question to the Census. The decision to do otherwise was therefore "substantively fatal." *See Int'l Union*, 920 F.2d at 967. There would be no purpose in remanding the decision to the Secretary because adoption of the same rule would be exceedingly "unlikely." *See Pollinator Stewardship Council*, 806 F.3d at 532. For the Secretary to make the same decision without re-violating section 6(c) and the APA, some new evidence would have to come to light in the decision-making process that would suddenly render the use of ARs inferior to a citizenship question given the "kind, timeliness, quality and scope" of the data required. There is no evidence suggesting that this is a reasonable possibility.

### 2.    Plaintiffs are entitled to a permanent injunction.

317.    The decision to grant injunctive relief under the APA is "controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted); *see, e.g., Planned Parenthood of N.Y. City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 342-43 (S.D.N.Y 2018) (applying equitable factors for permanent injunction in APA challenge to agency decision). All of these factors counsel in favor of an injunction here.

318.    An injunction prohibiting an agency from taking an action is appropriate where the court has found that action to be contrary to law under the APA. *See Planned Parenthood*, 337 F. Supp. 3d at 343; *League of Women Voters*, 838 F.3d at 12.

319.    Under such circumstances, an injunction properly prohibits "the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12 (preliminary injunction), and ensures that the agency complies with the law going forward, *see Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 330 (D.D.C. 2015), *aff'd*, 827 F.3d 70 (D.C. Cir. 2016) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

320.    Plaintiffs have proven that the Secretary's decision is contrary to law and that any attempt to institute a citizenship question on the 2020 Census now would also be unlawful. Similar cases show that an injunction is in the public interest in these circumstances. *See Dep't of Commerce*, 525 U.S. at 344; *Carey*, 637 F.2d at 839.

321.    An injunction may also be appropriate when an agency decision is arbitrary and capricious if the agency cannot plausibly remedy the defect and plaintiffs will suffer irreparable injury from the agency's futile remedial efforts.

322.    An injunction is particularly advisable here because, as Defendants themselves have repeatedly represented, there is little time remaining to conduct further testing or analysis before Defendants must print the 2020 census questionnaire in June 2019.

323.    At the same time, any efforts by Defendants to continue pursuing the citizenship question would risk inflicting further irreparable harm on Plaintiffs.

324.    These harms cannot be compensated with monetary damages or otherwise redressed absent injunctive relief. *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 411 (9th Cir. 2015).

325.    The balance of the hardships also weighs heavily in favor of an injunction. Defendants will suffer little, if any, hardship from having to comply with the law or to forgo futile attempts to reinstate a citizenship question, particularly when no such question has appeared on the decennial census for nearly seventy years. By contrast, Plaintiffs and the public will suffer widespread and irreparable harm absent an injunction.

326.    The appropriate scope of an injunction in this case is nationwide.

327.    Nationwide relief is the usual course in an APA action because "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are

vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see* 5 U.S.C. § 706(2)(A).

328.    An order vacating the Secretary's decision under the APA thus inherently has nationwide application, without implicating concerns about the power of courts to issue nationwide injunctive relief. *See NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.3 (D.D.C. 2018) (order setting aside agency decision under APA did not implicate any concerns about nationwide injunctions).

329.    A nationwide injunction would make sense in this context because the decision to add a citizenship question itself was nationwide in application; it involves a single questionnaire that will be used through the country during the 2020 Census. *Cf. Texas v. United States*, 809 F.3d 134, 187-88 (5th Cir. 2015) (affirming nationwide injunction for uniform immigration rules).

### 3.    Plaintiffs are entitled to a declaratory judgment.

330.    The Court should also enter declaratory judgment that Defendants' decision to add a citizenship question to the census is not in accordance with law, beyond statutory authority, and is arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706.

331.    The Court should further enter declaratory judgment that Defendants have not met and cannot meet their requirements under § 141 and § 6 of the Census Act, and that the decision to add a citizenship question violates the APA for this reason as well. 5 U.S.C. § 706.

### C.    Due Process Clause

332.    Plaintiffs request that the Court enjoin the addition of the citizenship question. "[O]fficial actions motivated by discriminatory intent 'ha[ve] no legitimacy at all under our Constitution . . . .'" *N.C. State Conference of NAACP*, 831 F.3d at 239–40 (citing *City of Richmond v. United States*, 422 U.S. 358, 378  (1975). The proper remedy is therefore invalidation of the action authorizing the addition of a citizenship question to the decennial census. *Id.*; *see also Hunter*, 471 U.S. at 229 (under an Arlington Heights analysis, a facially neutral Alabama

constitutional provision was properly invalidated because it was enacted with the intent of disenfranchising Black voters.)

### D. Section 1985 Claim

333. Injunctive relief is available under § 1985(3). The Court has already found that Defendants' arguments that § 1985(3) prohibits injunctive relief are "not persuasive." *LUPE*, 2018 WL 5885528, at *12 n.7 (citing *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979)).

334. Congress need not expressly authorize a court to enjoin unlawful acts. *See Sterk v. Redbox Auto. Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012) (holding that "when all that a plaintiff seeks is to enjoin an unlawful act, there is no need for express statutory authorization" from Congress). Instead, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano*, 442 U.S. at 705; *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 608 (1966) (holding that courts retain authority under All Writs Act "[i]n the absence of explicit direction from Congress"); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1094 (9th Cir. 2010) (holding that "a statute should not be construed to displace a courts' traditional equitable powers absent the clearest command to the contrary") (alteration and internal quotations omitted).

335. Congress did not make a clear command to divest district courts of their equitable powers when it enacted § 1985(3). *See* 42 U.S.C. § 1985(3); *see also Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970) (implied overruling on other grounds recognized by *Blair v. Page Aircraft Maintenance*, 467 F.2d 815 (5th Cir. 1972)) (holding that the power to issue an injunction "is available to a trial court in an action brought under Section 1985, even though that section refers in precise terms only to a suit for damages"); *Action v. Gannon*, 450 F.2d 1227, 1237–38 (8th Cir. 1971) (en banc) (in holding that injunctive relief is available under § 1985(3), reasoning that "jurisdiction of the federal courts to issue injunction to protect rights safeguarded

by the Constitution is well established . . . . [f]ederal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available"); *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir. 1992) (holding that the district court had the power to issue a preliminary injunction in a § 1985(3) case, but affirming the district court's denial of an injunction on other grounds). The Court thus retains the power to enjoin Defendants from continuing their § 1985(3) conspiracy to add a citizenship question to the 2020 Census for their discriminatory purpose.

Dated: February 14, 2019                     Respectfully Submitted,


                                             /s/ Daniel Grant (Bar. No. 19659)
                                             /s/ Denise Hulett

                                             **COVINGTON & BURLING LLP**
                                             Shankar Duraiswamy*
                                             José E. Arvelo*
                                             Dustin Cho*
                                             Amee Frodle*
                                             Daniel Grant (Bar. No. 19659)
                                             Bianca Nunes*
                                             Tina M. Thomas*

                                             One CityCenter
                                             850 Tenth Street, NW
                                             Washington, D.C. 20001-4956
                                             Tel: (202) 662-6000
                                             Fax: (202) 662-6302
                                             dgrant@cov.com
                                             sduraiswamy@cov.com
                                             jarvelo@cov.com
                                             dcho@cov.com
                                             afrodle@cov.com
                                             bnunes@cov.com
                                             tthomas@cov.com

                                             P. Benjamin Duke*

The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 8411000
Fax: (212) 841-1010
pbduke@cov.com

Lawrence A. Hobel*
Karun Tilak*
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
ktilak@cov.com

*Attorneys for Kravitz Plaintiffs*

*\*Admitted pro hac vice*
*+Pro hac vice application forthcoming*

**MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND**
Thomas A. Saenz+
Nina Perales +
Denise Hulett
Andrea Senteno
Burth G. López
Tanya G. Pellegrini
Julia A. Gomez

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
tsaenz@maldef.org
nperales@maldef.org
dhulett@maldef.org
asenteno@maldef.org
blopez@maldef.org
tpellegrini@maldef.org
jgomez@maldef.org

*Attorneys for LUPE Plaintiffs*

**ASIAN AMERICANS ADVANCING JUSTICE |**

112

**AAJC**
John C. Yang*
Terry Ao Minnis (Bar No. 20547)
Niyati Shah*

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
jyang@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org

*Attorneys for LUPE Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on this 14th day of February, 2019, I caused a copy of the foregoing

document to be sent to all parties receiving CM/ECF notices in this case.


By:     /s/ *Daniel Grant*

Daniel Grant - DC 19659
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW Washington,
D.C. 20001-4956
Tel: (202) 662-5851
Fax: (202) 778-5851