**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBIN KRAVITZ, *et al.,* | |
| *Plaintiffs,* | Civil Action No. 8:18-cv-01041 |
| v. | Hon. George J. Hazel |
| U.S. DEPARTMENT OF COMMERCE, *et. al.,* *Defendants.* | |
| | |
| LA UNIÓN DEL PUEBLO ENTERO, *et al.,* | |
| *Plaintiffs,* | Civil Action No. 8:18-cv-01570 (Consolidated Case) |
| v. | |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce, *et al.,* | Hon. George J. Hazel |
| *Defendants.* | |

# DEFENDANTS' POST-TRIAL PROPOSED
# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## Table of Contents

I.     BACKGROUND ................................................................................ 6

    A.     Purpose of the Decennial Census.......................................................... 6

    B.     History of Questions on the Decennial Census...................................... 7

    C.     The American Community Survey .......................................................... 9

    D.     The Historic Performance of the Census ............................................ 10

    E.     Census Operations ............................................................................... 11

    F.     The 2020 Census.................................................................................. 13

    G.     Relevant Background Information and Qualifications ......................... 15

         i.     Organizations and Individuals ................................................ 15

         ii.     Defendants' Expert Witnesses ................................................ 16

II.    PLAINTIFFS HAVE NOT ESTABLISHED STANDING............................... 19

    A.     General Legal Standards ...................................................................... 19

    B.     Proposed Findings of Fact ................................................................... 21

         i.     There is no evidence that the Census Bureau's master address file,
from which all addresses will be counted, would be incomplete. ............ 21

         ii.     Plaintiffs have not proven the magnitude of any decrease in self-
response rate due to the citizenship question............................................ 22

         iii.     Plaintiffs have failed to prove that NRFU and imputation will be
insufficient to mitigate any potential decline in self-response rate
due to the citizenship question. ................................................................ 36

         iv.     Plaintiffs have failed to prove that the foregoing procedures will
not mitigate a potential decline in self-response rate................................ 46

         v.     Plaintiffs have not proven that rostering omissions will cause a
differential net undercount....................................................................... 48

         vi.     Plaintiffs have not proven that there will be a differential net
undercount................................................................................................ 52

|  | vii. | Plaintiff Individuals and Plaintiff Organizations' members have not proven any harm. | 61 |

|  | viii. | Plaintiffs have not proven that they would be harmed by lower-quality census data. | 100 |

|  | ix. | Plaintiff Organizations have not proven that they have reasonably diverted, or will reasonably divert, resources in response to a citizenship question. | 100 |

C. Conclusions of Law ........................................................................ 106

i. Scope of Review and Expert Evidence .................................. 106

ii. Plaintiffs have not proven a differential undercount .............. 113

iii. Plaintiffs have not proven a concrete, non-speculative injury that is certainly impending. ............................................................... 116

iv. No Associational Standing ...................................................... 119

v. Plaintiffs' have not proven that their hypothetical injuries associated with a differential net undercount are traceable to a citizenship question on the 2020 Census. .............................. 123

III. THE SECRETARY'S DECISION DID NOT VIOLATE THE ADMINSTRATIVE PROCEDURE ACT ..................................................... 136

A. General Legal Standards ................................................................. 136

B. The Scope of Review and Exclusion of Evidence ............................ 138

C. The Secretary's Decision-Making Process ...................................... 142

i. The Secretary had an initial policy preference for including a citizenship question on the 2020 Census. ................................ 143

ii. DOJ formally requests a citizenship question on the 2020 Census to improve block-level citizenship data for enforcement of the Voting Rights Act. ................................................................. 147

iii. After receiving DOJ's formal request, the Secretary engaged in a comprehensive review process. ........................................... 149

iv. The Secretary fully explained the bases of his decision. ......... 153

D. The Secretary's Decision was Not Arbitrary or Capricious ............. 159

i.  The Secretary's decision appropriately connected the facts found with the decision made ............................................................... 159

ii.  The Secretary did not fail to consider any aspect of the problem ........... 166

iii.  The citizenship question has been well tested, and the Secretary did not depart from OMB Guidelines or the Census Bureau's quality standards by deciding to include it on the 2020 Census. ............ 173

E.  Plaintiffs Cannot Prove That the Secretary's Decision was a "Pretext" ............. 183

F.  The Secretary's Decision was in Accordance with Law ................................... 185

i.  The Secretary did not violate 13 U.S.C. § 6. ......................................... 186

ii.  The Court cannot review whether the Secretary violated 13 U.S.C. § 141(f) ................................................................................................... 189

iii.  Even if the Court could review the Secretary's determinations under 13 U.S.C. § 141(f), there was no violation. .................................. 196

IV.  THE SECRETARY'S DECISION DID NOT VIOLATE THE ENUMERATION CLAUSE ............................................................................................................. 197

A.  General Legal Standard ...................................................................................... 197

B.  Scope of Review .................................................................................................. 200

C.  Plaintiffs Have Not Proven a Violation of the Enumeration Clause .................. 201

V.  THE SECRETARY DID NOT VIOLATE THE DUE PROCESS CLAUSE ............... 207

A.  General Legal Standards ...................................................................................... 207

B.  Scope of Review .................................................................................................. 209

i.  Equal protection claims are decided on the administrative record. ........ 209

ii.  Only the Secretary's intent is relevant in determining whether the decisionmaker was motivated by discriminatory animus. ...................... 210

C.  Plaintiffs Have Not Proven a Violation of the Due Process Clause .................. 211

i.  There is no evidence, in the administrative record or otherwise, that the sole decisionmaker, the Secretary, was motivated by discriminatory animus ............................................................................. 212

      ii.     There is no evidence, in the administrative record or otherwise, that the inclusion of a citizenship question will cause a disparate impact on any protected group .............................................................. 221

VI.    THERE IS NO VIABLE CLAIM UNDER 42 U.S.C. § 1985(3) ................................... 225

    A.    Proposed Conclusions of Law ............................................................ 225

        i.     Plaintiffs' § 1985(3) claim is barred by sovereign immunity. ................ 225

        ii.    Section 1985 does not authorize courts to award injunctive relief. ........ 226

        iii.   The intra-corporate conspiracy doctrine bars Plaintiffs' claim .............. 227

        iv.   If the § 1985(3) claim is viable, Plaintiffs' APA claim must be dismissed ...................................................................................... 228

    B.    Proposed Findings of Fact ................................................................. 229

VII.   THIS CASE IS NOT MOOT ....................................................................... 233

VIII.  POTENTIAL REMEDY ............................................................................ 233

    A.    Only Remand to the Agency is Appropriate if the Court Finds Any Violation of Law ............................................................................. 233

    B.    No Relief Beyond Plaintiffs with Standing ........................................ 236

Pursuant to the Court's Order, Defendants hereby submit the following proposed findings of fact and conclusions of law.

## I.   BACKGROUND

### A.   Purpose of the Decennial Census

1.     The Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers"; which requires "counting the whole number of persons in each State."   Joint Stipulations of Fact ("Joint Stips"), ECF No. 103-1, ¶ 15.   To accomplish this apportionment, the Constitution requires the federal government to conduct a census counting the total number of "persons"—with no reference to citizenship status—residing in each state. Joint Stips ¶ 14.   This census must be an "actual Enumeration" conducted every ten years.   Joint Stips ¶ 16.

2.     Through the Census Act, Congress assigned the responsibility of making this enumeration to the Secretary of Commerce.   Joint Stips ¶ 17.   The Secretary of Commerce is charged with the responsibility to take a decennial census with an actual enumeration of the United States population.   Joint Stips ¶ 18.   Thus, the central purpose of the Census Bureau in taking the decennial census is to conduct an enumeration of the total population.   Joint Stips ¶ 19.

3.     As noted above, the population data collected through the census determines the apportionment of seats in the U.S. House of Representatives among the states.   Joint Stips ¶ 32.   The population data collected through the Decennial Census also determines the number of electoral votes each state has in the Electoral College.   Joint Stips ¶ 33.   And the federal government also uses census data to allocate hundreds of billions of dollars in public funding each year, including to states and local governments.   Joint Stips ¶ 35.

4.     Approximately 132 programs used Census Bureau data to distribute hundreds of billions of dollars in funds during fiscal year 2015.   Joint Stips ¶ 36.   Included among these programs

that use census-derived data at least in part to assist in guiding distribution of federal funds are Title I educational grant funds, the Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), the Social Services Block Grant Program ("SSBG"), the Children's Health Insurance Program ("CHIP"), the Surface Transportation Block Grant Program ("STBG"), and the Medical Assistance Program ("Medicaid").  Joint Stips ¶¶ 40-45.  For each of these six programs, the federal government provides funding directly to state, or in some instances local, governmental entities, but none of these programs provides federal funding directly to any individual or nonprofit organization. Tr. 3-50:11-24 (Title I); Tr. 3-78:1–3-81:14 (WIC, SSBG, CHIP, and Medicaid); Tr. 3-31:14-17 (STBG).

      B.     <u>History of Questions on the Decennial Census</u>

     5.     Significantly, "although the initial constitutional purpose of the census was to provide a basis for apportioning representatives among the states in the Congress, it has long fulfilled many important and valuable functions for the benefit of the country."  *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019) (quoting *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982)). In particular, it "now serves as a linchpin of the federal statistical system by collecting data on the characteristics of individuals, households, and housing units throughout the country."  *Id.* (quoting D*epartment of Commerce v. United States House of Representatives*, 525 U.S. 316, 341 (1999)).

     6.     "Since 1790, the government has conducted the required 'actual Enumeration' through questions . . . about both the number and demographic backgrounds of those living in each American household."  *Id.*  This practice began with the very first census, in which Congress directed the United States Marshals serving as enumerators to ask each household questions about, among other things, "the sexes and colours of free persons" as well as the age of residents."  Act of March 1, 1790, 1 Stat. 101, 101-02 (1790).  Every decennial census questionnaire since then has included at least

some questions seeking demographic data that is not strictly necessary to accomplish the central Constitutional purpose of enumerating the population.

7.     Citizenship-related questions have been asked to some or all of the population in nearly every census since 1820, including on the long-form questionnaire from 1970–2000, which was a decennial census questionnaire. *See* PX 297 at 2-3 (Resp. to RFA No. 4); AR 646–653; Measuring America: The Decennial Censuses from 1790 to 2000, https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf ("Measuring America").[1] From 1820 to 1950, with the exception of 1840, every Decennial Census asked a question concerning citizenship or birthplace in some form. Measuring America; *see also New York v. U.S. Dep't of Commerce*, 315 F. Supp. 3d 766, 776-79 (S.D.N.Y. 2018) (providing detailed narrative of history of citizenship questions on decennial census).

8.     Beginning with the 1960 Census, a citizenship question no longer appeared on the short form questionnaire provided to every household. AR42-53. In 1960, the Census Bureau asked 25% of the population for the respondent's birthplace and that of his or her parents. It also asked all residents of New York and the foreign-born residents of Puerto Rico about citizenship – the former "at the expense of the State, to meet State constitutional requirements for State legislative apportionment" and the latter, at the request of a census advisory committee, "to permit detailed studies of migration." Measuring America, at 72-73. From at least the 1970 Decennial Census through the 2000 Decennial Census, in lieu of the short form questionnaire, the Census Bureau sent a long form questionnaire to approximately one in six households. Joint Stips ¶¶ 65-67. In the 1970, 1980,

---

[1] This document is an official publication of the Census Bureau compiling questionnaires, and the contents of the questionnaires, for decennial censuses throughout history. The Court may take judicial notice of the public contents of census questionnaires, as this Court implicitly recognized by citing to this compilation multiple times throughout its opinion denying Defendants' motion to dismiss. ECF No. 48 at 3-4.

1990, and 2000 Decennial Censuses, the long form questionnaire contained a question about citizenship status.  PX-1, AR2.

       C.     <u>The American Community Survey</u>

       9.     After the 2000 Decennial Census, the functions performed by the long form questionnaire have been replaced by the American Community Survey ("ACS").  Joint Stips ¶ 70-71. The ACS is a yearly survey of approximately 3.5 million households— approximately 1 in every 38 households—across the United States.  Joint Stips ¶ 72.  Unlike the Decennial Census, the ACS is not a complete enumeration, but rather a sample survey that is used to generate statistical estimates.  Joint Stips ¶ 81.  It is intended to provide information on characteristics of the population, and the social and economic needs of communities.  Joint Stips ¶ 80.

       10.     Because it is a sample, not an enumeration, margins of error are reported with the ACS estimates and provide a measure of the sampling error associated with each estimate.  Joint Stips ¶ 79. Although the ACS survey is conducted annually, ACS data from individual years can also be aggregated to produce multi-year estimates (commonly referred to as "1-year", "3- year" or "5-year" estimates depending on the number of years aggregated together).  Joint Stips ¶ 84.  Multi-year ACS estimates have larger sample sizes than 1-year ACS estimates. Cumulating the five-year pooled estimates yields approximately a one-in-every-eight household sample.  Joint Stips ¶ 85.  Multi-year ACS estimates also have greater levels of statistical precision for estimates concerning smaller geographical units.  Joint Stips ¶ 86.  More specifically, 1-year ACS estimates produce "[d]ata for areas with populations of 65,000+"; 1- year supplemental ACS estimates produce "[d]ata for areas with populations of 20,000+", 3-year ACS estimates produced "[d]ata for areas with populations of 20,000+" until they were discontinued after the 2011-2013 3-year estimates, and 5-year ACS estimates produce "[d]ata for all areas."  Joint Stips ¶ 87.

11.     The Census Bureau reports ACS data in "census tract[s]" and "census-block groups." Joint Stips ¶ 83.  This is in contrast to the decennial census data, which is reported down to the census block level.  Joint Stips ¶ 31.  The data collected by the ACS also allows the Census Bureau to produce estimates of Citizen Voting Age Population ("CVAP").  Joint Stips ¶ 77.

12.     CVAP data based on responses to the ACS are reported by the Census Bureau down to the census block group level.  Joint Stips ¶ 78.

13.     The ACS has also asked respondents a citizenship question since the first ACS questionnaire in 2005.  *See* PX-297 at 2-3 (Resp. to RFA No. 4); PX-1, AR 646–653; Measuring America.  The citizenship question that appears on the ACS is not a binary yes/no question, but rather asks, if a person is a citizen, whether the person was born in the United States, a U.S. territory, or abroad.  Joint Stips ¶¶ 75-76.  The citizenship question is among the approximately 50 questions that appear on the 28-page ACS questionnaire.  Joint Stips ¶ 73.  In the future, the ACS will continue to be distributed each year, as usual, and will continue to include a citizenship question.  PX-1, AR523.

D.     The Historic Performance of the Census

14.     Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the decennial census.  Joint Stips ¶ 48.  For example, although the 1990 Census undercounted the total population by approximately 1.6%, Joint Stips ¶ 57, the 1990 Census undercounted individuals identifying as Hispanic by approximately 5%, African Americans by 4.6% , and undercounted Asian American and Pacific Islanders ("AAPIs") by 2.4%.  AR11407; Joint Stips ¶ 58.  Similarly, although the 2000 Census actually overcounted the total population by approximately 0.5%, Joint Stips ¶ 57, the Census Bureau estimated a net undercount for Hispanics of 0.7%, which is not statistically different from zero, and an undercount of African Americans by 1.8%.  AR11407; Joint Stips ¶ 58.  Likewise, although the 2010 Census resulted in a statistically insignificant net overcount of the total population by

approximately 0.01%, Joint Stips ¶ 46, the 2010 Census undercounted Hispanics by 1.5%, undercounted African Americans by 2.1%, and produced an estimated net undercount of 0.08% for Asian Americans and 1.34% for Native Hawaiian and Pacific Islanders (though these last two estimates were not statistically different from zero).  AR 11407.

      E.     <u>Census Operations</u>

      15.     To conduct a person-by-person count, the Census Bureau sends a questionnaire to virtually every housing unit in the United States.  Joint Stips ¶ 20.  Any person over the age of eighteen in the United States who refuses or willfully neglects to answer any part of the Census questionnaire is subject to a fine.  Joint Stips ¶ 21; 13 U.S.C. § 221(a).

      16.     If the Census Bureau does not receive a response to the questionnaire and subsequent mailings it then sends a Census Bureau staffer known as an enumerator to the housing unit to attempt to conduct an in-person interview in order to collect the data.  This process is the first step in the Census Bureau's Non Response Follow Up ("NRFU") operation.  Joint Stips ¶ 23.  The Census Bureau devotes enormous effort and resources to the NRFU operation for the decennial census – the 2020 Decennial Census Life Cycle Cost Estimate ("LCCE") includes an estimated fiscal year 2020 cost for NRFU of approximately $1.6 billion.  AR183, AR191.  After the NRFU process is completed, the Census Bureau then counts the responses from every household, including those completed through the NRFU process, to determine the population count in each state.  Joint Stips ¶ 30.

      17.     If a third attempt to contact a household does not yield a response, the housing unit will become "proxy-eligible."  Joint Stips ¶ 26.  A proxy is someone who is not a member of the household—such as a neighbor, landlord, Postal worker, or other knowledgeable person who can provide information about the unit and the people who live there.  Joint Stips ¶ 27.  For a proxy-eligible housing unit, an enumerator will attempt three proxies after each recontact attempt that does not result in an interview.  Joint Stips ¶ 28. For the 2010 Decennial Census, after three attempts to

interview a proxy respondent, a household became eligible for "whole-person imputation" or "whole household imputation," in which the Census Bureau imputed the characteristics of the household, including in some circumstances the household member count.  Joint Stips ¶ 29.

18.     The Census Bureau has developed a range of strategies to address the differential undercount of "hard-to-count" populations—including targeted marketing and outreach efforts, partnerships with community organizations, deployment of field staff to follow up with individuals who do not respond, and retention of staff with foreign language skills.  Joint Stips ¶ 59.  In the 2000 and 2010 Censuses, the Census Bureau designed and implemented public advertising campaigns to reach hard-to-count immigrant communities, including using paid media in over a dozen different languages to improve responsiveness.  Joint Stips ¶ 60.  For the 2000 and 2010 Censuses, the Census Bureau also partnered with local businesses, faith-based groups, community organizations, elected officials, and ethnic organizations and other stakeholders to reach these communities, provide education on responding to the Census, and improve the accuracy of the count.  Joint Stips ¶ 61.

19     Hundreds of thousands of Census partners join together during the Census to carry the message forward that participating in the decennial census is safe and important. They are the trusted voices that help people understand that being included in the final count is critical for their communities.  Joint Stips ¶ 62.  Organizations that the Census Bureau has partnered with in the past to serve as trusted voices carry the message forward that participating in the decennial census is safe and important include Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), Georgia Association of Latino Elected Officials ("GALEO"), La Union del Pueblo Entero ("LUPE"), and MinKwon Center for Community Action, Inc. ("MinKwon"); and other major organizations, like the National Congress of American Indians, the National Association of Latino Elected Officials, and the National Urban League.  Joint Stips ¶ 63.

F.      The 2020 Census

20.     The 2020 Decennial Census will also be a "short form questionnaire only" census. PX-1, AR198.  For the 2020 Decennial Census, households will also be given the option to complete the questionnaire via the internet, in addition to other enumeration options such as printed questionnaires and telephone responses.  Joint Stips ¶ 22.

21.     The 2020 Decennial Census questionnaire will pose questions regarding sex, Hispanic origin, race, and relationship status.  Joint Stips ¶ 91.  More specifically, the 2020 Census short form questionnaire will include the following planned questions:  "Is this person of Hispanic, Latino, or Spanish origin?," Joint Stips ¶ 92; "What is this person's race?," Joint Stips ¶ 93; how each person in the household is related to the person filling out the questionnaire, Joint Stips ¶ 94; and "What is this person's sex?," Joint Stips ¶ 95.

22.     It will also pose a question about citizenship status.  PX-1, AR1313-20.  The text of the citizenship question to be included on the 2020 Census questionnaire as directed by Secretary Ross's March 26, 2018 memorandum (the "Citizenship Question") asks, "Is this person a citizen of the United States?," with the answer options "Yes, born in the United States"; "Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas"; "Yes, born abroad of U.S. citizen parent or parents"; "Yes, U.S. citizen by naturalization – *Print year of naturalization*"; and "No, not a U.S. citizen[.]"  Joint Stips ¶ 90.

23.     Although the goal of the 2020 Census and the 2010 Census are the same—to count everyone once, only once, and in the right place—the 2020 Census will feature key innovations designed to maximize the likelihood that this goal is achieved.  Tr. 5-101:14-5-102:15; DDX-007.  In designing the 2020 Census, the Census Bureau was charged with achieving a lower real cost per address than the 2010 Census without lowering quality.  Tr. 5-101:14-5-102:15; DDX-007.  Accordingly, to meet this charge and the overall goal, the Census Bureau has focused on four innovations:

reengineering address canvassing; optimizing self-response; utilizing administrative records and third-party data; and reengineering field operations.   Tr. 5-101:14-5-102:15; DDX-007.   This reflects a complete redesign of NRFU operations, and the difference between 2020 and 2010 NRFU operations are far more numerous than the similarities.   Tr. 5-104:22-5-105:4.

24.   For example, although the 2010 Census did not extensively use administrative records, the 2020 Census will heavily utilize administrative records during NRFU to reduce the number of enumerator visits that otherwise may be necessary per household.   Tr. 5-102:16-5-103:20.   For example, rather than have an enumerator visit a house six times to determine whether an address should be deleted or is vacant, the Census Bureau will now be able to confirm that with administrative records when they are available.   Tr. 5-102:16-5-103:20.   The Census Bureau is reasonably certain that there is a high percentage of the U.S. population for which it can build a high quality administrative record enumeration.   Tr. 5-102:16-5-103:20.   The use of administrative records is expected to reduce the NRFU workload by six percent.   Tr. 5-102:16-5-103:20.

25.   The optimizing of self-response involves the use of an Internet self-response instrument, which will be used for the first time during the 2020 Census.   Tr. 5-103:21-5-104:21.   Relatedly, the reengineering of field operations involves the use of IPhones by enumerators, which will allow enumerators to do all of the major NRFU operations, take the respondent interviews, interact with the payroll system, and interact with the training system.   Tr. 5-103:21-5-104:21.   The Internet self-response instrument will have interactivity with the IPhones used by the enumerators, and this will allow the enumerators to optimize their workload by identifying which addresses need further work and designing routes that will make their deployment much more efficient.   Tr. 5-103:21-5-104:21.   As a result of these efficiencies, the Census Bureau will be using approximately half to two-thirds as many enumerators for the 2020 Census as compared to the 2010 Census.   Tr. 5-103:21-5-104:21.

26.     These key innovations for the 2020 Census will mean that, for the first time, operations will be controlled by a control system that can be kept up-to-date on a database and used for efficient and effective enumerator deployment.  Tr. 5-104:22-5-105:14.  This will result in far less direct supervisory responsibilities for enumerators, which will allow for many more enumerators per supervisor without impeding the supervisors' job.  Tr. 5-104:22-5-105:14.  This will in turn allow the supervisors to more efficiently deploy their expertise.  Tr. 5-104:22-5-105:14.

27.     As Dr. Abowd credibly testified at trial, "[a]ll of our tests confirm that [2020 NRFU operations] will be much more effective in comparison to the standard effectiveness criteria that were used in 2010."  Tr. 5-105:15-20.  The inclusion of a citizenship question does not impact Dr. Abowd's opinion about the relative effectiveness of NRFU in 2020 as compared to 2010.  Tr. 5-105:21-25.

G.      Relevant Background Information and Qualifications

i.      **Organizations and Individuals**

28.     Defendant United States Department of Commerce (the "Commerce Department") is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  The Commerce Department is responsible for planning, designing, and implementing the 2020 decennial census. 13 U.S.C. § 4.  Joint Stips ¶ 2.  Defendant Wilbur Ross is the Secretary of the Commerce Department.  Joint Stips ¶ 3.  Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross.  Joint Stips ¶ 7.  Karen Dunn Kelley is the Presidentially-appointed Under Secretary for Economic Affairs at the U.S. Department of Commerce responsible for the operations of the Census Bureau.  Joint Stips ¶ 8.  Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross.  Joint Stips ¶ 9.  Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock.  Joint Stips ¶ 10.  David Langdon is a Policy Advisor within

the Office of Policy and Strategic Planning, reporting to Mr. Comstock.  Joint Stips ¶ 11.  Michael

Walsh was the Deputy General Counsel for the Department of Commerce from at least January 2018

through August 2018 and is currently the Chief of Staff to Secretary Ross.  Joint Stips ¶ 13.

29.     Defendant Census Bureau is an agency within, and under the jurisdiction of, the

Department of Commerce. 13 U.S.C. § 2.  The Census Bureau is the agency responsible for planning

and administering the decennial census.  Joint Stips ¶ 1.  Defendant Steven Dillingham is the Director

of the U.S. Census Bureau.  Joint Stips ¶ 4.  Dr. Ron Jarmin is the former Associate Director for

Economic Programs of the United States Census Bureau and performed the nonexclusive functions

and duties of Director or Acting Director of the Census Bureau until January 2, 2019.  Joint Stips ¶ 5.

Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi

were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question

on the 2020 Decennial Census between December 2017 and March 2018.  Joint Stips ¶ 12.

30.     John Gore became acting Assistant Attorney General for the Civil Rights Division of

the United States Department of Justice on July 28, 2018.  Gore Dep. 18:16-22, ECF No. 103-10.  Art

Gary is the general counsel of the Justice Management Division (JMD) of the Department of Justice.

Gore Dep. 47:14-17, ECF No. 103-10.  JMD is the principal organizational unit responsible for

management and administrative support of DOJ.  Gore Dep. 47:18-48:1, ECF No. 103-10.

ii.     **Defendants' Expert Witnesses**

a)     Dr. John M. Abowd

31.     Dr. John M. Abowd is Chief Scientist and the Associate Director for Research and

Methodology at the U.S. Census Bureau.  Joint Stips ¶ 6.  The Court qualified Dr. Abowd as an expert

in economics, econometrics, statistics, survey methodology, census operations, and census

procedures.  Tr. 5-7:4–11.  Dr. Abowd is impeccably credentialed.  *See* DX-45.  Plaintiffs' own expert,

John Thompson, recruited Dr. Abowd for his current post as the Census Bureau's Chief Scientist.

DX-45 at 1055. Mr. Thompson testified that he has a high opinion of Dr. Abowd as a scientist and thinks highly of his work. Tr. 1-112:5–8. And Mr. Thompson acknowledged that others in the field also think highly of Dr. Abowd's work. Tr. 1-112:9–10. Similarly, Judge Furman of the Southern District of New York commented that Dr. Abowd's "credibility, expertise, and dedication to public service" impressed the court in almost every respect. *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *65 (S.D.N.Y. Jan. 15, 2019).

<div align="center">

b)      Dr. Stuart Gurrea

</div>

32.     Dr. Stuart Gurrea is a Senior Vice President at Economists, Inc., an economics consulting firm where he has worked for the past 17 years. Tr. 4-17:12-17; Tr. 4-20:10-15. The Court qualified Dr. Gurrea as an expert in economics, quantitative analysis of economic and survey data, and impact evaluation. Tr. 4-29:1-12.

33.     Dr. Gurrea's work involves economic consulting and consists of economic analysis primarily relying on economic data. Tr. 4-20:16-23. He has worked for a variety of clients, including investment managers, decision makers, policymakers, attorneys, and government agencies in the context of assessing the implication of government programs. Tr. 4-20:16-23.

34.     In terms of government programs, Dr. Gurrea has assessed the impact of a change in a program implemented by the Department of Energy to remove spent fuel from nuclear plant facilities, including analyzing survey data, developing financial models, and assessing the economic impact of changes in the program of nuclear plant owners. Tr. 4-20:24-4-21:7. Dr. Gurrea has also analyzed a change in funding as part of a program to finance the provisions of medical services to Indian tribes. Tr. 4-20:24-4-21:10.

35.     Dr. Gurrea earned an undergraduate degree in economics from the University of Seville and earned a masters and a doctorate degree in economics at Northwestern University. Tr. 4-17:18-4-19:7. His fields of concentration include microeconomics, econometrics, and financial

<div align="center">

17

</div>

economics.  Tr. 4-18:1-7.  Microeconomics involves the analysis of individual decision-making, and econometrics is a field of economics that focuses on the application of mathematical models to the analysis of data.  Tr. 4-18:1-7.

36.     Dr. Gurrea has taken courses in statistics and survey methodology, and his studies have included the analysis of data collected through surveys.  Tr. 4-18:8-20.  Survey data is one of the main sources of data that economists rely upon, and Dr. Gurrea frequently used survey data, including data from the census, during his graduate school coursework.  Tr. 4-18:8-20; Tr. 4-19:12-14.  For example, Dr. Gurrea's dissertation used survey data from the airline industry and population data from the census to analyze market size.  Tr. 4-19:23-4-20:2.

37.     Dr. Gurrea has used surveys in a number of situations, including to assess expectations and attitudes.  Tr. 4-18:21-4-19:11.  For example, Dr. Gurrea has utilized the Livingston Survey produced by the Federal Reserve Bank of Philadelphia, which survey's economists' expectations about microeconomic variables, as well as survey data as reflected in the LIBOR Index, which asked contributing banks the rate at which they would lend money to other financial institutions overnight.  Tr. 4-18:21-4-19:11.

38.     Dr. Gurrea also has conducted his own surveys.  For example, as part of his consulting work on behalf of the American Institute of Certified Public Accountants, Dr. Gurrea designed, supervised implementation, summarized the results, and wrote a report regarding the impact of a change in legislation that would affect the scope of services to be provided by auditors to their clients.  Tr. 4-22:11-18.  This survey was prospective in nature and sought to measure future behavior.  Tr. 4-22:11-23.

39.     The principles and methods that Dr. Gurrea applies to survey data are general by definition, and are not limited to a particular industry.  Tr. 4-20:3-7.  Similarly, the principles that apply to survey design by definition are general and applicable to all kinds of surveys.  Tr. 4-22:24-4:23:3.

40.     Dr. Gurrea's work typically involves some form of impact evaluation.  Tr. 4-23:4-10.

Impact evaluation is the assessment of the effects of a change in policy or an event on outcomes of

interest.  Tr. 4-23:4-13.

41.     Dr. Gurrea has been involved in over 100 cases over the course of his professional

career, including dozens of cases in litigation.  Tr. 4-23:14-21.  He previously has testified in both

federal and state court, including in the related case in the Northern District of California challenging

the inclusion of a citizenship question on the 2020 decennial census.  Tr. 4-23:22-4:24-12.  Dr. Gurrea

was qualified as an expert by the Court in the California census case.  Tr. 4-24:21-4-25:1.

42.     Dr. Gurrea is a member of the American Economic Association, the American

Finance Association, and is an associate member of the American Bar Association.  Tr. 4-25:2-5.

## II.     PLAINTIFFS HAVE NOT ESTABLISHED STANDING

### A.     General Legal Standards

43.     Plaintiffs seeking relief in federal court must demonstrate that they have standing to

do so, including that they have "a personal stake in the outcome, distinct from a generally available

grievance about government."  *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (citations omitted).  This

"threshold requirement" ensures that judges "act *as judges,* and do not engage in policymaking properly

left to elected representatives." *Id.* (citations omitted).  At its "irreducible constitutional minimum,"

standing requires Plaintiffs to establish three elements: (1) a concrete and particularized injury-in-fact,

either actual or imminent; (2) a causal connection between the injury and defendants' challenged

conduct, such that the injury is "fairly . . . trace[able] to the challenged action of the defendant"; and

(3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of*

*Wildlife*, 504 U.S. 555, 560-61 (1992).  The standing inquiry is "especially rigorous" where "reaching

the merits of the dispute would force [the court] to decide whether an action taken by one of the other

two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).

44.     The standing requirement of "injury in fact" requires a plaintiff to establish that it "'has

sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).  The injury must be "concrete

and particularized," *Lujan*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or

'hypothetical' or otherwise speculative." *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting

*Lujan*, 504 U.S. at 560).  Thus, an alleged future injury must be "certainly impending"; "'[a]llegations

of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*,

495 U.S. 149, 158 (1990)).

45.     The "fairly traceable" prong of standing requires Plaintiffs to prove that their certainly

impending injuries "fairly can be traced to the challenged action of the defendant, and not injury that

results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare

Rights Org.*, 426 U.S. 26, 41-42 (1976).  In the census context, merely a showing of differential net

undercount[2] is not enough because "[t]he Census Bureau is not obligated, nor expected, to conduct a

perfectly accurate count of the population." *Kravitz v. United States Dep't of Commerce*, 336 F. Supp. 3d

545, 564 (D. Md. 2018).  Plaintiffs instead must prove that there will be an increase in the differential

---

[2] "Undercount" is a Census Bureau coverage measurement term.  An undercount occurs when the census enumerates a smaller number of persons or housing units in a population than indicated by an independent estimate of the size of that population.  Joint Stips ¶ 51.  The Census Bureau describes the undercounting of a particular racial or ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," or "differential net undercount," as distinct from a "net undercount" of the entire population.  Joint Stips ¶ 56.

net undercount specifically attributable to the citizenship question, and that this differential net undercount will cause a cognizable injury.

46.     As the parties invoking federal jurisdiction, Plaintiffs bear "the burden of establishing these elements" of standing by a preponderance of the "evidence adduced at trial." Defs. *of Wildlife*, 504 U.S. at 561.  If they cannot do so, the Court must refrain from addressing the merits of Plaintiffs' constitutional and statutory claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

B.     Proposed Findings of Fact

47.     The Census Bureau will perform a complete enumeration during the 2020 Census. Plaintiffs' alleged injuries are all premised upon the notion that there will be a differential net undercount of certain subpopulations as a result of the citizenship question.  As discussed at length below, the evidence does not support that assertion and, accordingly, the Court finds that Plaintiffs lack standing.

    i.     **There is no evidence that the Census Bureau's master address file, from which all addresses will be counted, would be incomplete.**

48.     The Census Bureau uses a master address file ("MAF") to determine the addresses to count in the census. Tr. 5-16:19–21.  The MAF is continuously improved and updated over the course of the decade by using in-office address canvassing and administrative records to identify all addresses where people could live.  Tr. 5-50:11–5-51:12.  The Census Bureau also utilizes extensive in-person address canvassing, Tr. 5-51:23–5-52:4, and the Local Update Census Addresses ("LUCA") operation, which "allows cooperating municipalities—and there were about 3,000 of them, covering more than 95 % of the addresses—to update [the Census Bureau's] address list with addresses that they think

should be on there and aren't, or to point out some that are on there that should be deleted." Tr. 5-50:11–5-51:12.

49.     There has been no evidenced adduced at trial that the MAF will be incomplete.

50.     Dr. Abowd testified extensively that it is not possible for an address in the MAF to go uncounted at the end of the 2020 Census. Tr.5-54:4–15; 5-101:10–13. Indeed, the Census Bureau's operational system confirms that "every address [ ] in the MAF at the end of the census has been accounted for. And that means either designated as [the] address does not exist, designated as vacant, or has [a] household count." *Id.* The Court credits Dr. Abowd's testimony, as there has been no evidence to the contrary.

> ii.    **Plaintiffs have not proven the magnitude of any decrease in self-response rate due to the citizenship question.**

>> a)    Modes of Self-Response and Full Enumeration

51.     Households may respond to the 2020 Census in three ways: online, by telephone, or by mail. Tr. 5-59:5–5-60:5. About 80% of households will first receive an invitation to fill out the census online or by phone, while the other 20% of households will receive the same invitation with a paper questionnaire on the first mailing. *Id.* If a household does not respond, it may receive up to five mailings, including a paper questionnaire on the fourth mailing. PX-372 (AR).

52.     For a household filling out the census questionnaire online, they would first enter the address or address ID, then roster the number of people in the home. Tr. 5-60:5–21. After that, a household would be prompted for the names of each person in the home, and would only then fill out characteristic information for each person in the household. *Id.* A household filling out the census questionnaire online would not reach the citizenship question until the end of the characteristic information for Person 1—the respondent himself or herself. *Id.*

53.     For a household filling out the census questionnaire by phone, the questions would be asked in the same manner as those filling it out online. Tr. 5-61:9–13. Again, a household filling out

the census questionnaire by phone would not reach the citizenship question until the end of the characteristic information for Person 1—the respondent himself or herself. *Id.*

54.     For a household filling out a multi-page paper questionnaire, the respondent would first be asked for information regarding how many people live in the household, and then the questionnaire begins asking characteristic questions about Person 1. Tr. Tr. 5-60:5–5-61:8. In the current draft of the paper questionnaire, the citizenship question appears at the bottom of the questions for Person 1. *Id.*

55.     Regardless of the how a household responds to the 2020 Census, if they simply skip the citizenship question, all of the members of that household will nonetheless be enumerated. Tr. 5-61:14–17. And if a household reaches the citizenship question and refuses to respond beyond that point, all of the members of that household will nonetheless be enumerated. Tr. 5-61:18–21. It is only if a household does not self-respond to the questionnaire at all that the household is included in the Nonresponse Followup (NRFU) workload. Tr. 5-62:4–7.

56.     The Census Bureau projects an overall self-response rate in the range of 55.5% to 65.5%, and while it uses the midpoint (60.5%) for certain purposes, it uses the low point (55.5%) for budgeting and other planning purposes. Tr. 5-79:1–12. These projections are consistent with the decades-long decline in self-response rates.

57.     While the balance of available evidence suggests that including a citizenship question on the 2020 Census potentially could lead to a lower self-response rate in households that potentially contain a noncitizen, PX-1194 at 881, the magnitude of any such decline is unknown. And Plaintiffs have failed to prove *any* decline in self-response rate for households that contain only Hispanic *citizens*, or, for that matter, citizens of any particular demographic group.

b)      Self-Response Rate Decline for Noncitizens is Unknown

58.      The Brown et al. paper is the best analysis of the citizenship question's impact on the potential decline in self-response rates for noncitizens.  PX-1194 at 897; PX-162. Using available data from the 2010 Census, the 2010 American Community Survey (ACS), and administrative records, the paper estimated a 5.8 percentage point decline in households that potentially contain a noncitizen. PX-162.  It reached this number using four steps.  First, it subtracted the response rates to the 2010 Census short-form questionnaire (without a citizenship question) from the response rates for the lengthy 2010 ACS questionnaire (with a citizenship question) for two groups—an all-citizen-household group and an every-other-household group.  PX-162, tbl. 8.  Second, it subtracted the all-citizen-household difference in response rate (–8.9) from the every-other-household difference in response rate (–0.7), which results in a raw "difference-in-differences" of –11.9.  *Id.*  Third, because there are many questions that may cause a household to forego answering the ACS, the paper performed a "decomposition" to control for certain other questions on the ACS.  Tr. 5-68:17–5-69:22; PX-162, tbl. 8.  The decline in response rates attributable to the controlled-for ACS questions is considered "explained" (–5.8) and the decline in response rates attributable to other questions— including the ACS citizenship question—is considered "unexplained."  Tr. 5-69:23–5-70:11.  Lastly, the paper updated this analysis using 2016 ACS data to model the "unexplained" portion of the foregoing analysis, resulting in a 5.8% response-rate decline for households potentially containing noncitizens.  Tr. 5-70:12–5-71:3; PX-162, tbl. 9.  There was no statistical difference between the self-response rate decline attributable to the citizenship question in 2010 as compared to 2016.  Tr. 5-71:4– 16.

59.      While 5.8% is the best available estimate of the decline in self-response rate for potential noncitizen households, PX-1194 at 901, it is far from certain.  For one, the Brown et al. paper's analysis is merely a natural experiment—which cannot assign causation to the citizenship

question—in contrast to a randomized control trial. Tr. 5-72:14–20. And even when attempting to control for certain variables in the natural experiment, the Brown et al. paper did not, and to a certain extent could not, do so. For example, the "decomposition" used by the Brown et al. paper to rule out certain ACS questions as possible causes of the decline in self-response rate, Tr. 5-69:23–5-70:11, did not rule out *all* other questions on the ACS, Tr. 5-71:23–5-72:9. It also did not rule out the cumulative effect of asking the full battery of ACS questions—many of which may be sensitive to potential noncitizen households—rather than any one question. *See* Tr. 6-38:13–6-40:18. Additionally, as discussed more fully below, the Brown et al. paper could not account for the changing macro environment. *See* Tr. 5-85:19–5-86:16. All parties agree that the analysis does not capture any changes in the macro environment after 2016. Tr. 5-124:20–5-125:3; PX-1194 at 902, 944.

60.     Importantly, a randomized control trial (RCT) could provide better data on the decline in self-response rate for potential noncitizen households. Tr. 5-72:14–20, 5-77:17–5-78:3. And the Census Bureau is not the only entity that can conduct an RCT. Tr. 5-72:21–5-73:12, 5-77:17–5-78:3. Indeed, Dr. Abowd persuasively testified that "[t]he design of such an RCT is fairly straightforward." *Id.* First, "[y]ou use the same questionnaire, you randomly assign it to either the group that gets the questionnaire with the citizenship question or the group that gets it without the citizenship question." *Id.* Second, "[i]f you're trying to test in the 2020 environment, you would have the questionnaires ask the same questions as the census and be as close to the census questionnaires as you could make them." *Id.*

61.     Plaintiffs' expert, Dr. Nancy Mathiowetz, testified that the citizenship question is a sensitive question for noncitizens. Tr. 2-97:13–2-112:10. Her testimony was based on two sources: (a) a Census Bureau policy on asking about sensitive topics during interviews (PX-876); and (b) interviews and focus group responses (PX-152, PX-158, PX-163). *See* PX-1214-5 (citing sources). However, even if the citizenship question is sensitive for noncitizens, neither of these sources

demonstrate a decline in self-response rate for potential noncitizen households, much less the magnitude of any such decline.

62. The purpose of the Census Bureau policy cited by Dr. Mathiowetz is simply to "increase[] data quality by facilitating longitudinal consistency and reducing the cognitive burden associated with recalling information from more distant periods" and to "reduce[] response burden, both cognitive burden and time burden, by minimizing the need to repeat a question answered in a previous interview and allowing the field representative to move on to follow-up questions." PX-876-1. The policy does not suggest that asking about sensitive topics is likely to reduce self-response rates to written surveys. In fact, two aspects of the policy would make little sense if the Census Bureau believed that asking sensitive questions causes a decline in self-response rate. First, the policy applies to asking sensitive questions only in *interviews*, not on *written surveys* like the decennial census. PX-876-1 ("This policy applies to dependent interviewing regardless of interview mode, including but not limited to personal visits with a field representative, computer assisted telephone interviews (CATI), and computer assisted personal interviews (CAPI)."). Second, the policy explicitly states that "the fact that a topic may be labeled as sensitive or very sensitive does not imply that questions on that topic are not allowed." PX-876-2. The Census Bureau policy thus does not suggest that the citizenship question is likely to cause a decline in the self-response rate of noncitizens, let alone attempt to quantify magnitude of any such decline.

63. Finally, Dr. Mathiowetz cited several anecdotes about how particular respondents view the citizenship question, but those anecdotes were not shown to be representative of noncitizens. Dr. Mathiowetz cited the experience of a single Census Bureau field representative who reported that a single Spanish-speaking respondent stopped responding to questions when asked about citizenship status. Tr. 2-105:2–2-106:9; PX-158-4. Dr. Mathiowetz also cited focus group responses from the 2020 Census Barriers, Attitudes, and Motivators Study (CBAMS) in which respondents said that they

*themselves* "are not afraid to answer the citizenship question" but that some *other* unidentified people (who were not part of the survey) said they "will not fill out the question or the form altogether out of fear." Tr. 2-106:10–2-107:11; PX-152-22. Finally, Dr. Mathiowetz cited CBAMS figures showing that Hispanic and foreign-born respondents were more concerned than other respondents that their census responses will be used against them, but those figures were about census responses in general and were not specific to the citizenship question. Tr. 2-108:14–2-109:3, 2-110:4–2-111:1; PX-163-6.

64.     None of Dr. Mathiowetz's cited sources support the proposition that the citizenship question is likely to cause a decline in the self-response rate of noncitizens, let alone attempt to quantify the magnitude of any such decline.[3]

65.     While the preponderance of the evidence suggests *some* decline in the self-response rate for potential noncitizen households, Plaintiffs have failed to prove the magnitude of any such decline due to the limitations in the Brown et al. paper, Plaintiffs' failure to run their own RCT, and

---

[3] Plaintiffs' expert, Terri Ann Lowenthal, testified that immigrants' fear or distrust of the government could lead them to provide false or incomplete information in response to the census. Tr. 1-127:15–23. Ms. Lowenthal further opined that the addition of the citizenship question to the census would exacerbate immigrants' fears and cause them to not respond to the census. Tr. 1-129:5–10; Lowenthal Decl. ¶ 103, ECF No. 99-5. But Ms. Lowenthal is not a sociologist or a demographer, and she did not conduct any study to form her opinions. Tr. 1-129:11–18. Instead, Ms. Lowenthal based her opinion on a 2017 study that pre-dated Secretary Ross's decision to add the citizenship question to the 2020 census. Tr. 1-127:24–129:4; *see* Lowenthal Decl. ¶ 103, ECF No. 99-5. She also based her opinion on generalized "discussions," "conversation," and "concern in the public arena from organizations representing at the ground level immigrant communities and their families about the levels of fear that already were existing but that would be exacerbated by the addition of this citizenship question." Tr. 1-127:24–128:20. But Ms. Lowenthal failed to provide any additional information about these "discussions," including, for example, what statements were made, who made the statements, or when the statements were made. *See id.* Because Ms. Lowenthal's opinion on immigrants' response rates to the census is based on a study that pre-dates the Secretary's decision and generalized "concern" from unspecified organizations, her opinion does not fit the facts of the case, is not based on sufficient facts or data, and should be given no weight. *See Williams v. Illinois*, 567 U.S. 50, 77-78 (2012) (holding that an expert can rely upon hearsay, but when the party fails to put on admissible evidence to support that hearsay, the opinion should receive no weight).

the unpersuasiveness of Dr. Mathiowetz's testimony and cited sources.  Thus, Plaintiffs have not proved that the magnitude of any decline in self-response rate will be so large as to render NRFU efforts ineffective in remedying it.  As discussed more fully below, however, Plaintiffs have also failed to prove that NRFU and imputation will not obtain an accurate census count in 2020, regardless of whether the decline in the self-response rate for noncitizens is 5.8% or otherwise.

<div align="center">c)      No Self-Response Rate Decline for Hispanic Citizens</div>

66.     Dr. Abowd convincingly testified that there is no independent evidence that the self-response rate for all-*citizen* Hispanic households, as opposed to potential noncitizen households examined in the Brown et al. paper, will decline due to the citizenship question.  Tr. 5-74:5–13.  (And there's also no evidence that the self-response rate of Asian-American *citizens*, or citizens of any other demographic group, will decline due to the citizenship question.  Tr. 5-74:14–18.)

67.     Plaintiffs unpersuasively point to the Brown et al. paper's analysis of item-nonresponse rates and breakoff rates for Hispanics, Tr. 5-129:15–5-131:4; PX-1194 at 910–917, as a reason that all-citizen Hispanic households (as opposed to potential noncitizen households) are unlikely to self-respond to the 2020 census due to the citizenship question.  As Dr. Abowd explained, however, this analysis of item-nonresponse rates and breakoff rates for Hispanics demonstrates only that Hispanics may be more likely to skip or break off at the citizenship question on the 2020 Census than non-Hispanic whites, PX-1194 at 919–920, and provides no evidence related to whether they are less likely to respond at all.  As explained above, it is undisputed that in the case of either skipping the citizenship question or breaking off the survey at the citizenship question, the household would still be counted. Tr. 5-61:14–21.

68.     Moreover, of the evidence he examined, Dr. Abowd testified that item-nonresponse rates and breakoff rates were higher for Hispanics than for non-Hispanic whites for *every single question*, including race/ethnicity.  Tr. 6-38:5– 6-40:18; PX-162, tbl. 1; AR 10395.  And both Dr. Abowd and

<div align="center">28</div>

Plaintiffs' expert Dr. Nancy Mathiowetz agree that Hispanics are sensitive to many questions other than citizenship on both the ACS and the census. Tr. 2-186:22–2-187:6, 6-40:13–18. Thus, higher Hispanic item-nonresponse rates and breakoff rates for the citizenship question say nothing about the likelihood of a decline in *self-response rate* among Hispanic *citizens* in the 2020 Census.

<div align="center">(1)   Dr. Mathiowetz's Testimony is Unpersuasive</div>

69.     For these reasons, the Court does not find the testimony of Plaintiffs' expert Dr. Nancy Mathiowetz persuasive. Dr. Mathiowetz testified that the citizenship question is a sensitive question for Hispanics. Tr. 2-97:13–2-112:10. Her opinion was based on five sources: (a) a Census Bureau policy on asking about sensitive topics during interviews (PX-876); (b) the Brown et al. paper (PX-162); (c) item non-response rates in past surveys (PX-22); (d) break-off rates in past surveys (PX-162); and (e) interviews and focus group responses (PX-152, PX-158, PX-163). *See* PX-1214-5 (citing sources). However, none of these sources demonstrate a decline in self-response rate for all-citizen Hispanic households.

70.     As discussed above, the purpose of the Census Bureau policy cited by Dr. Mathiowetz is simply to "increase[] data quality by facilitating longitudinal consistency and reducing the cognitive burden associated with recalling information from more distant periods" and to "reduce[] response burden, both cognitive burden and time burden, by minimizing the need to repeat a question answered in a previous interview and allowing the field representative to move on to follow-up questions." PX-876-1. The policy does not suggest that asking about sensitive topics is likely to reduce self-response rates to written surveys. In fact, two aspects of the policy would make little sense if the Census Bureau believed that asking sensitive questions causes a decline in self-response rate. First, the policy applies to asking sensitive questions only in *interviews*, not on *written surveys* like the decennial census. PX-876-1 ("This policy applies to dependent interviewing regardless of interview mode, including but not limited to personal visits with a field representative, computer assisted telephone interviews (CATI),

and computer assisted personal interviews (CAPI)."). Second, the policy explicitly states that "the fact that a topic may be labeled as sensitive or very sensitive does not imply that questions on that topic are not allowed." PX-876-2. The Census Bureau policy thus does not suggest that the citizenship question is likely to cause a decline in the self-response rate Hispanic citizens.

71.     The Brown et al. paper's discussion of the sensitivity of the citizenship question cited by Dr. Mathiowetz is based on item nonresponse rates and break-off rates. PX-162-10. As explained above and below, neither suggests that the citizenship question is likely to cause a decline in self-response rate for all citizen Hispanic households. Item nonresponse rates refer to people who did not respond to the citizenship question, even if they answered other questions on the survey, as Dr. Mathiowetz acknowledged. Tr. 2-185:23–2-186:1; PX-22. She acknowledged that if a person fills out the entire decennial census form but skips the citizenship question, that person would qualify as an item nonresponse on the citizenship question but would nevertheless still be counted for purposes of the census enumeration. Tr. 2-186:2–11. Likewise, breakoff rates refer to people who filled out all previous questions on the survey form and then stopped filling out the form at a particular question, as Dr. Mathiowetz also acknowledged. Tr. 2-186:12–15; PX-162-10. She acknowledged that if a person completes the first nine questions on the decennial census and then stops filling out the survey at the citizenship question, that person would nevertheless still be counted for purposes of the census enumeration. Tr. 2-186:16–21. In any event, as noted above, Dr. Mathiowetz also acknowledged that Hispanics have higher break-off rates than non-Hispanic whites not only for the citizenship question, but also for many other questions on both the ACS and decennial census. Tr. 2-186:22–2-187:6.

72.     Finally, as discussed above, Dr. Mathiowetz cited several anecdotes about how particular respondents view the citizenship question, but those anecdotes were not shown to be representative of noncitizens or Hispanics more generally. Dr. Mathiowetz cited the experience of a single Census Bureau field representative who reported that a single Spanish-speaking respondent

stopped responding to questions when asked about citizenship status.  Tr. 2-105:2–2-106:9; PX-158-4.  Dr. Mathiowetz also cited focus group responses from the 2020 Census Barriers, Attitudes, and Motivators Study (CBAMS) in which respondents said that they *themselves* "are not afraid to answer the citizenship question" but that some *other* unidentified people (who were not part of the survey) said they "will not fill out the question or the form altogether out of fear."  Tr. 2-106:10–2-107:11; PX-152-22.  Finally, Dr. Mathiowetz cited CBAMS figures showing that Hispanic and foreign-born respondents were more concerned than other respondents that their census responses will be used against them, but those figures were about census responses in general and were not specific to the citizenship question. Tr. 2-108:14–2-109:3, 2-110:4–2-111:1; PX-163-6.

73.     Dr. Mathiowetz also testified that the citizenship question will cause Hispanic self-response rates to decrease by 8 to 10 percentage points.  Tr. 2-120:6–2-124:12, 2-126:13–2-127:6.  Her testimony was based on two sources: (a) a "difference-in-differences" analysis comparing Hispanic self-response rates between the 2010 American Community Survey and the 2010 decennial census (PX-938); and (b) a difference-in-differences analysis comparing Hispanic self-response rates between the 2000 long-form and the 2000 short-form (PX-342-30, Table 12).  Tr. 2-191:6–20, 2-195:5–15; *see also* PX-1214-6.  However, she acknowledged that neither of those analyses controlled for any other potential explanations for the difference, Tr. 2-191:21–25, 2-194:19–2-195:4, 2-195:16–2-196:7, including the fact that Hispanic households are highly correlated with potential noncitizen households, Tr. 5-74:5–13 (Dr. Abowd noting that "Hispanic households are much more likely to contain a non-citizen").  Controlling for other potential explanations is critical and can significantly change the size of the observed statistical relationship between two variables.  For example, Dr. Mathiowetz acknowledged that the Brown et al. paper conducted both an *uncontrolled* and a *controlled* difference-in-differences analysis comparing noncitizen self-response rates between the 2010 American Community Survey and the 2010 decennial census.  Tr. 2-192:6–2-194:15; PX-162-38, tbl. 8.  She acknowledged

that controlling for other potential explanations—which her analysis did not do—cut the Brown et al.

paper's uncontrolled difference-in-differences estimate by half.  Tr. 2-194:16–18; PX-162-38, tbl. 8

(11.9% uncontrolled vs. 6.1% controlled).  As the government's expert, Dr. Stuart Gurrea,

convincingly explained, because Dr. Mathiowetz did not control for any other potential explanations,

her testimony that the citizenship question will cause Hispanic self-response rates to decrease by 8 to

10 percentage points was not reliable.  Tr. 4-49:8-4-51:4.

74.     Dr. Abowd's testimony only further disproves Dr. Mathowietz's calculation.  Most

significantly, Dr. Abowd confirmed that Dr. Mathiowetz's analysis did not control for any other

factors.   Tr. 5-67:2–5-68:2.    Although Dr. Mathiowetz performed a difference-in-differences

comparison, Dr. Abowd credibly explained that "not everything labeled a difference-in-difference [is]

comparable to other difference-in-differences."  Tr. 5-67:2–5-68:2.  Indeed, Dr. Mathiowetz heavily

relied on the fact that the Census Bureau performed a "similar" analysis in Table 6 of Brown et al.

paper.  Tr. 2-193:5–25, 2-208:2–9.  But, as Dr. Abowd straightforwardly explained, Table 6 did not

control for any other factors, Tr. 5-65:19–21, which is why the Brown et al. paper did *not* rely on Table

6 to calculate any potential decline in self-response rate, Tr. 5-68:3–16.

### (1)     Dr. Barreto's Opinion Poll is Not Credible

75.     Dr. Barreto's opinion poll also does not prove a decline in self-response rate for

Hispanic citizens attributable to the citizenship question.  *See* PX-696.  As Dr. Abowd persuasively

explained, Dr. Barreto's survey is not a valid indicator of any self-response rate; it is only "an indicator

in the same sense that CBAMS is an indicator about potential communication problems that the

Census Bureau expects to have in conducting the 2020 Census."  Tr. 5-75:8–5-76:17.  But "in the end,

it's a survey about what people are telling you they are going to do," not what they are actually going

to do.  *Id.*  So, "it's much more similar to [the Census Bureau's] CBAMS survey than an RCT about

what people actually do."  *Id.*  To get such actionable information, it would be most appropriate to

construct a small-scale RCT in which one group receives a census questionnaire with a citizenship question and another group receives a census questionnaire without a citizenship question.  Tr. 5-77:17–5-78:3.  Dr. Barreto did no such thing.  Tr. 5-75:8–5-76:17.

76.    Dr. Barreto's survey was also fatally flawed in numerous other respects.  For instance, Dr. Barreto's survey had a response rate of only 29%, PX-696 at 742, and he acknowledged that this response rate is "substantially lower than the response rate that the Census Bureau obtains on its own surveys," PX-696 at 742.  Setting aside the low 29% response rate Dr. Barreto also failed to control the weighting of his household-size estimates by using objective population totals.  Tr. 5-76:21–5-77:4.  Thus, as Dr. Abowd explained, Dr. Barreto's survey does not "give an accurate estimate of the household size and the population as a whole," so his conclusion—that those who will not respond to the census come from statistically bigger households—is not credible.  *Id.*

77.    And although Dr. Barreto "fielded a pilot test of [his] survey to test the efficacy" of questions, PX-696 at 741, he did not test either the wording or ordering of his first two questions, designed to measure nonresponse rates—meaning "no respondents were asked whether they would answer a census with a citizenship question without having just been asked about a census that did not include that question," PX-696 at 743.  Dr. Barreto also failed to test any alternate wording of question two, which asked respondents whether they would respond to a census conducted by the *federal government*, rather than the *Census Bureau*, PX-696 at 192, and that choice of wording—associating the request for information with the government writ large, rather than the nonpartisan, statistical Census Bureau—likely influenced respondents' choices.  In fact, Dr. Barreto stated that, in his opinion, most census respondents would view the Bureau as part of the "political administration," PX-696 at 748–50, although he provided no support for this assumption, which clearly influenced his survey design.

78.     Furthermore, Dr. Barreto opined that the citizenship question is sensitive for Latino communities and immigrant-adjacent communities, PX-696 at 750, but his survey did not allow him to distinguish between the proportion of citizens versus noncitizens in his survey who indicated they would not participate in a census containing a citizenship question, PX-696 at 751. This incongruity undermines any connection between Dr. Barreto's results and his ultimate opinions, and it is borne out by the fact that Dr. Barreto's survey found that 63.9% of African-Americans "think the Trump administration will share their information," when "the share of African Americans nationally who are immigrant or immigrant-adjacent isn't anywhere near 63 percent." PX-696 at 755.

79.     Likewise, Dr. Barreto's reliance on his own opinion poll to simulate NRFU is unsound. Indeed, his NRFU "methodology" was thoroughly debunked by Dr. Abowd, who explained that a follow-up question after several minutes in the same successful telephone interview does not remotely simulate NRFU. Tr. 5-77:8–16 ("[W]aiting a few minutes and then asking again under randomized conditions for those few minutes is not the same thing as even cutting off the interview and coming back a few weeks later and trying to interview again. That's a real Non Response Follow Up."). In other words, what Dr. Barreto described as "a simulation" that "approximates the same spirit" of NRFU, PX-696 at 689–690, is anything but the "recontact effort" Dr. Barreto portrays, PX-696 at 758:1–6. His "follow-up took place later during the same phone call," meaning Dr. Barreto "didn't actually recontact anyone at a later day or at a later time." PX-696 at 758. And his supposed simulated recontact came on the heels of "the intervening discussion about trust in the Trump administration." PX-696 at 758. It therefore is unsurprising that *every racial or ethnic group*, including those with low rates of immigrants, evidenced an increase in nonparticipation from the beginning to the end of the survey. PX-696 at 758–759.

80.     Defendants' expert, Dr. Stuart Gurrea, similarly provided credible, persuasive testimony concerning the unreliability of Dr. Barreto's interpretation of his survey results. As Dr.

Gurrea explained, Dr. Barreto's survey and his interpretation of the results contain a number of flaws that render it unreliable. More specifically, Dr. Barreto's interpretation of the survey responses does not correspond to the empirical evidence provided by the actual surveys. Tr. 4-58:24-4-59:5. First, Dr. Barreto interpreted his survey results in a way that does not correspond to the actual survey responses and, as a consequence, his undercount estimate is unreliable and overstated. Tr. 4-53:11-4-54:21; Tr. 4-57:18-24. For example, Dr. Barreto made the unwarranted assumption that 100 % of those respondents who refused to answer his survey are unwilling to participate in the 2020 Census. Tr. 4-53:11-4-56:3-17; DDX-036; DDX-037.

81.     Dr. Barreto's unwarranted assumption has quantitative significance that call into question the reliability of his conclusion. Tr. 4-56:18-4-57:17. For example, in response to question 8 of Dr. Barreto's survey, 7.36 % of responses are "no, will not participate" and 2.33 % of responses fall into a residual category and indicate a refusal to answer. Tr. 4-56:18-4-57:17; DDX-037. However, Dr. Barreto improperly assumes that 9.69 % of survey participants would be unwilling to participate in the 2020 Census in response to the inclusion of a citizenship question by combining these two categories, even though there are a number of reasons beyond the inclusion of a citizenship question why someone may choose not to respond. Tr. 4-53:11-4-57:17; DDX-037.

82.     In addition, Dr. Barreto improperly interprets his survey results to conclude that someone who is unwilling to answer the citizenship question but is otherwise willing to participate in the census will not be counted for purposes of the decennial census. Tr. 4-58:3-23; DDX-038. In other words, someone that is willing to participate in the census but unwilling to answer the citizenship question could respond with a "no" to question 8 of Dr. Barreto's survey. Tr. 4-58:3-23; DDX-038. Yet, Dr. Barreto would count this as someone who is not counted in the census at all, despite the fact that it is undisputed individuals who provide some, but not all, information in response to the decennial census will be counted. Tr. 4-58:3-23; DDX-038.

83.     Like Judge Furman, this Court finds that Dr. Barreto's opinion poll deserves minimal weight because, *inter alia*, "the study asked only about respondents' intentions to self-respond—as opposed to measuring actual behavior in the field," "the survey's response rate was only twenty-nine percent," and "the resulting data set was not weighted to match population totals." N*ew York v. United States Dep't of Commerce*, 2019 WL 190285, at *55 n.36 (S.D.N.Y. Jan. 15, 2019).

84.     Accordingly, Plaintiffs have adduced no credible evidence that there will be a decline in the self-response rate for Hispanic *citizens*, as opposed to potential noncitizen households studied by the Brown et al. paper.  The Court finds Plaintiffs' experts' calculations of such a decline fatally flawed.

      iii.    **Plaintiffs have failed to prove that NRFU and imputation will be insufficient to mitigate any potential decline in self-response rate due to the citizenship question.**

85.     Plaintiffs have failed to prove that NRFU and imputation will be insufficient to mitigate any potential decline in self-response rate due to the citizenship question.  All of the operations for the 2020 Census, discussed below, were tested throughout the decade, culminating in the 2018 End-to-End Test in Providence, Rhode Island.  5-26:8–5-27:25.  All operations—including self-response and NRFU—were successful in that End-to-End Test.  Tr. 5-28:1–5-29:15; *see* PX 297 at 22 (Resp. to RFA No. 71) (noting a successful 2018 End-to-End Test).  And although the 2018 End-to-End Test did not included a citizenship question, this is irrelevant; the 2018 End-to-End Test was meant to test operations (which it did successfully), not the content of the census questionnaire. Tr. 5-28:1–5-29:15; *see* Jarmin Dep. 305:15-19, ECF No. 103-4 (noting that the End-to-End test is not designed to test questions; rather, it tests systems and operations such as data collection and processing, the review and publication of data products, and NRFU efforts).  Put simply, the Census Bureau has conducted extensive NRFU testing, including a successful 2018 End-to-End Test, and any potential decline in the self-response rate due to the citizenship question is within the budget, planning,

and operation design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  *See* PX 297 at 22 (Resp. to RFA No. 71).  Plaintiffs have not proved otherwise.[4]

86.     Perhaps most significantly, as explained above, Plaintiffs could have conducted their own randomized control trial (RCT) that would have provided data both on the decline in self-response rate and the effectiveness of NRFU.  Tr. 5-72:14–20, 5-77:17–5-78:3.  Plaintiffs' utter failure to conduct any reliable study to demonstrate the ineffectiveness of NRFU is fatal to their standing, as they have not disproved Dr. Abowd's persuasive opinion that the Census Bureau's NRFU efforts, in conjunction with imputation, will be sufficient to obtain an accurate census count.

a)      NRFU Budget

87.     The Census Bureau will have the resources available to counteract any conceivable decline in self-response rate due to the citizenship question.  Indeed, if Congress appropriates funds in accordance with the Life Cycle Cost Estimate, the Census Bureau will have $1.5 billion to conduct

---

[4] Plaintiffs reference a Government Accountability Office (GAO) report as alleged evidence of an unsuccessful NRFU operation in the 2018 End-to-End Test.  Tr. 5-152:14–5-155:20; PX-1133.  Plaintiffs' efforts are misguided for three reasons.  First, the GAO report nowhere contradicts Dr. Abowd's unequivocal testimony that the 2018 End-to-End Test was successful, Tr. 5-28:1–5-29:15; the report simply identifies various aspect to improve.  Second and relatedly, Plaintiffs cherry pick isolated statements from the GAO report without any attempt to show that such statements in any way impact the Census Bureau's conclusion concerning the success of the 2018 End-to-End Test.  For example, Plaintiffs highlight an issue with "the [Census] Bureau's use of *progress reporting* that overstates the number of NRFU cases not needing any additional fieldwork."  PX-1133 at 2 (emphasis added).  But the GAO report later explains that such issues related to the *reporting* of the NRFU workload, not the actual effectiveness of NRFU.  Thus, the GAO report specifically notes that the Census Bureau's progress reporting system "included cases that the Bureau had unsuccessfully attempted to enumerate the maximum number of allowable times for the initial phase of NRFU being tested, even though those cases could still—*and did*—receive additional attempts during later phases of NRFU."  PX-1133 at 18 (emphasis added).  Third, like any good test, the 2018 End-to-End Test provided actionable data to improve census operations in 2020, and the GAO specifically recognized that "The [Census] Bureau is taking steps to assess and mitigate these and other issues that GAO identified."  PX-1133 at 2.  Plaintiffs' reliance upon the GAO report as evidence that NRFU will be unsuccessful during the 2020 Census is not credible.

NRFU operations, along with another $1.7 billion in contingency funding.  Tr. 5-78:17–25.  For every one percent increase or decrease in the overall self-response rate, the Census Bureau assumes $55 million will be spent or saved in NRFU operations, which is based on various parameters such as an average of three enumerator visits per household.[5]  PX-162 at 43.

88.     For a hypothetical decline in self-response rate for potential noncitizen households— i.e., a high-end estimate of 28.6% of such households in the population—this leads to only a 0.5% decline in the overall self-response rate, resulting in an extra $27.5 million in NRFU expenditures.  Tr. 5-79:13–5-80:12.  Even if the Brown et al. paper accurately predicted a 5.8% decline in self-response rate for potential noncitizen households, this leads to only a 1.5 decline in the overall self-response rate, resulting in an extra $82 million in NRFU expenditures.  Tr. 5-8:13–24.  A higher, hypothetical 10% decline in self-response rate among potential noncitizen households results in a 2.5% decline in overall response rate with an estimated $137.5 million in NRFU costs.  Tr. 5-80:25–5-81:8.  Using an analysis from Plaintiffs' own expert, Dr. O'Hare, halves the NRFU workload and concomitant costs: Dr. O'Hare estimated that only 13.9% of the population contains households with noncitizens, in contrast to Dr. Abowd's high-end estimate of 28.6%.  Tr. 5-5-81:9–23.  All foregoing estimates are far below the 55.5% overall self-response rate that serves as a basis for the Census Bureau's NRFU planning.  Tr. 5-79:1–12.  All of the foregoing estimates are far below the projected $1.7 billion in contingency funding, and this remains true even if one doubles, triples, or quadruples all estimated NRFU costs.  Tr. 5-81:24–5-82:4.

---

[5] Plaintiffs' expert Terri Ann Lowenthal opined that the addition of the citizenship question will increase the cost of the census beyond the Census Bureau's cost estimates.  Tr. 1-126:12–15; Lowenthal Decl. ¶ 135, ECF No. 99-5.  But Ms. Lowenthal admitted that she relied upon a report from the Government Accountability Office that pre-dated the addition of the citizenship question and that she does not have any way to independently judge the reliability of the Census Bureau's cost estimates.  Tr. 1-126:12–127:9.  Because Ms. Lowenthal's opinions concerning the cost of the census are not based on her own field of expertise, they should be given no weight.

b)        Partnership and Communications/Outreach

89.      For the 2020 Census, the Census Bureau will utilize a $515 million integrated partnership and communications campaign to recruit national, regional, and local partners.  Tr. 5-54:18–5-56:25.  The integrated communications and partnership campaign is run by the Census Bureau in conjunction with Young & Rubicam and other professional marketing firms.  Tr. 5-58:21–5-591, 6-34:5–6-35:9.  Both the Census Bureau and these professional marketing firms have extensive experience in this area, having designed and implemented communications and partnership campaigns for the 2000 and 2010 Censuses.  *Id.*

90.      The communications and partnership campaign will be targeted at every level of geography, "from the smallest political organizations to national partners."  Tr. 5-57:2–6.  For example, the Census Bureau, in connection with professional marketing firms, will not only advertise at the national level, but will use analytics to tailor advertising messages to small areas of geography known as census tracts, of which there are about 80,000.  Tr. 5-54:18–5-56:25, 5-58:5–7.  And using the partnership program, hundreds of thousands of census partners join together during the Census to carry the message forward that participating in the Decennial Census is safe and important.  Joint Stips ¶ 62.  They are the trusted voices that help people understand that being included in the final count is critical for their communities.  Joint Stips ¶ 62.  The Census Bureau will work with trusted partners and partnership specialists from "the smallest local groups" to cities, states, and national partners "to develop messages that overcome the barriers and provide motivation to everyone in the population to respond to the census."  *Id.*  And Dr. Abowd testified that was not aware of any trusted partners that, due to the inclusion of the citizenship question, have refused to work with the Census

Bureau to ensure full participation, nor was he aware of any trusted partners indicating that they will actively oppose participation in the census.  6-43:2–9.[6]

91.     The Census Bureau—in conjunction with its professional marketing firms—utilizes the Census Barriers Attitudes and Motivators Study (CBAMS) to inform the integrated partnership and communication program for the 2020 Census.  5-58:19–5-59:4.  CBAMS has two components: a multi-stage survey and focus groups.  Tr. 5-57:7–5-58:18.  The 42 focus groups are specifically drawn from hard-to-count populations[7] and are not meant to be representative of the general population.  Tr. 6-40:19–6-41:10.  Information from both the survey and the focus groups is then used to determine peoples' attitudes toward government and the census, and to find the motivators—*i.e.*, "what things do people say motivate them to fill out the census."  Tr. 5-57:7–5-58:18.

92.     The recent CBAMS information from hard-to-count focus groups aided this purpose by identifying certain barriers to obtaining self-responses in the 2020 Census.  *See* PX-1216.  Much of this information was already taken into account by the Census Bureau.  For example, a CBAMS report from hard-to-count focus groups notes that "citizens reported what they believed would be the reaction of undocumented immigrants, namely, that they would either skip the question or ignore the form entirely."  PX-1216 at 55.  As discussed above, however, a household would still be counted if they simply skip the citizenship question, and a household that "ignore[s] the form entirely" will simply

---

[6] This includes Plaintiffs Coalition for Humane Immigrant Rights ("CHIRLA"), Georgia Association of Latino Elected Officials ("GALEO"), La Union del Pueblo Entero ("LUPE"), and MinKwon Center for Community Action, Inc. ("MinKwon"); and other major organizations, like the National Congress of American Indians, the National Association of Latino Elected Officials, and the National Urban League.  Joint Stips ¶ 63.

[7] Some demographic groups have proven more difficult to count in the census than others. The Census Bureau refers to these groups as "hard-to-count."  Joint Stips ¶ 47.

go into NRFU. Tr. 6-41:16–25. Another statement in the CBAMS report notes that "[m]any stated that they would not complete the census, despite being citizens themselves, if people in their household did not have U.S. citizenship." PX-1216 at 55. But such households were already included in the 5.8% estimated self-response rate decline among noncitizen households calculated in the Brown et al. analysis. Tr. 6-42:1–7; *see* PX-162. And Dr. Abowd testified extensively that, even if such a decline occurs, NRFU and imputation will produce an accurate census count. *See, e.g.*, Tr. 5-98:19–5-101:13.

93.    In any event, CBAMS has fulfilled its purpose: it informed the integrated partnership and communications program by allowing the Census Bureau and professional marketing firms to "test messages and test partnership material[s] that are directly responsive to the concerns that were raised by the focus groups," thus facilitating participation in the census. 6-42:21–6-43:1.

c)    In-Person Enumerator Visits and Proxy Responses

94.    Importantly, even in the gravest hypothetical scenario, the Census Bureau will "have enough enumerators hired and onboard at the start of NRFU to conduct these operations because they were recruited based on the 55.5 percentage point lower level" estimate of self-response for the total population. Tr. 5-82:5–21. Enumerators are recruited by each area census office (of which there are 248, Tr. 5-83:4), and are selected based on various requirements, including language needs for each area and familiarity with the area's neighborhoods. Tr. 5-85:14–18. Enumerators are drawn from the communities in which they will be deployed, *id.*, helping households feel comfortable in responding and enabling enumerators to attain the most accurate census data possible. The Census Bureau hired noncitizens as enumerators for the 2010 Census, *see* PX 297 at 24 (Resp. to RFA No. 77), and it will do so again for the 2020 Census as permitted by federal law, *see* PX 297 at 23-24 (Resp. to RFA No. 76).

95.     This massive pool of enumerators is deployed in an efficient manner to best obtain

census enumerations, and can be targeted to areas with higher-than-expected NRFU workloads.  Tr.

5-82:5–21.  For the first time, the 2020 Census will employ a state-of-the-art optimizer that assigns

census enumerators to households to visit, provides the most efficient route to reach each household,

and gives enumerators the optimal times to visit each household based on statistical models of the

local area and information from other local-area visits.  Tr. 5-83:1–5-85:13, 5-90:23–5-91:15.  More

specifically, the optimizer can adjust the timing of visits to a particular address in order to reach other

members of the household who may be less reluctant to respond.  Tr. 5-90:23–5-91:15.  The optimizer

also allows field staff to identify the most effective enumerators and adjust NRFU workloads

accordingly.  *Id.*  There is no limit placed on the number of times enumerators may visit a particular

household, as the only constraint is the time available for NRFU.  Tr. 5-94:4–21.

96.     Enumerators are also trained to leave a "notice of contact" after the first unsuccessful

visit.  Tr. 5-90:8–22.  This notice alerts the household that, if they do not desire in-person visits, the

census questionnaire can be filled out online.  *Id.*  And because online responses are immediately fed

into the state-of-the-art optimizer, the household can be instantly removed from the NRFU workload

if they respond online.  Tr. 5-84:16–21.  As Dr. Abowd testified, this practice was extremely effective

in the 2018 End-to-End test, with nearly 10% of households in NRFU providing self-responses after

the "notice of contact."  Tr. 5-90:8–22.

97.     For these reasons, the Court is unpersuaded by the Brown et al. paper's statement that

"[h]ouseholds deciding not to self-respond because of the citizenship question are likely to refuse to

cooperate with enumerators coming to their door in NRFU, resulting in the use of neighbors as proxy

respondents on their behalf."  PX-162 at 41.  As discussed above, and as Dr. Abowd persuasively

testified, the Census Bureau has extensive procedures in place to obtain a full enumeration with in-

person enumerator visits, including the ability to adjust the timing of visits to a particular address in

order to reach other members of the household who may be less reluctant to respond.  Tr. 5-83:1–5-85:13, 5-90:23–5-91:15.  The Brown et al. paper's statement is also based solely on qualitative evidence, and Plaintiffs have presented no quantitative evidence of *how many* households "deciding not to self-respond" will "refuse to cooperate with enumerators coming to their door in NRFU."  *Id.*

98.     Perhaps most significantly, as explained above, Plaintiffs could have conducted their own RCT that would have provided at least some data on the effectiveness of in-person enumerators.  Tr. 5-72:14–20, 5-77:17–5-78:3.  They did not even attempt to do so.  Thus, the only credible evidence in the record is Dr. Abowd's testimony that all NRFU operations were successfully deployed in the 2018 End-to-End Test.  Tr. 5-26:8–5-29:15.  Plaintiffs' utter failure to conduct any study to demonstrate the ineffectiveness of in-person enumerators is fatal to their standing.

99.     Similarly, Plaintiffs have adduced no evidence that proxy responses will not be effective in enumerating households that do not self-respond.  Proxies are people that may be familiar with a household—like landlords, postal carriers, and neighbors—from whom the Census Bureau may accept a reliable response if a household failed to self-respond and several in-person visits have been unsuccessful.  Tr. 5-91:16–5-92:15.  It is undisputed that proxies provide lower quality data than self-response.  Tr. 5-91:16–5-92:15, 5-92:19–5-93:25.  For example, a neighbor may give the headcount of the household with no information about the characteristics of the individuals therein.  Tr. 5-91:16–25.  But, as Dr. Abowd credibly testified, "what's incomplete is the characteristics," not the accuracy of the household's headcount.  *Id.* ("The bias in the proxy, meaning whether it produces a coverage error or not, is not really a serious worry.").  Indeed, Dr. Abowd specifically testified that there is no data regarding how proxy response negatively impact a differential net undercount.  Tr. 15-94:12–15.  And the Census Bureau is not aware of any credible empirical evidence suggesting that proxies in the census provide a greater net undercount or differential net undercount in comparison to self-response or in-person interviews.  *See* PX 297 at 25 (Resp. to RFA No. 81).

100.     Yet again, as discussed above, Plaintiffs could have conducted their own small-scale RCT that would have provided data on self-response rates, in-person visits, and proxies. *See* Tr. 5-72:14–20, 5-77:17–5-78:3.  They entirely failed to do so.  Thus, the only credible evidence in the record is Dr. Abowd's testimony that all NRFU operations were successfully deployed in the 2018 End-to-End Test, and that proxy responses do not impact the accuracy of the census count.  Tr. 5-26:8–5-29:15, 5-91:16–25.  Plaintiffs' complete failure to conduct any study to demonstrate the contrary is again fatal to their standing.

d)     Administrative Records

101.     The Census Bureau will also use administrative records in NRFU to make vacant/delete determinations and to enumerate occupied housing units.  Tr. 5-95:25–5-97:16.  The Census Bureau has experimented with administrative records for decades, but will use them to enumerate individuals for the first time in the 2020 Census.  Tr. 5-102:18–5-103:20.  Administrative records are electronic records compiled by another unit of the federal government, including the Internal Revenue Service, Health and Human Services, the Bureau of Indian Affairs, the Postal Service, and the Social Security Administrations.  Tr. 5-97:3–16.

102.     If an address in the NRFU workload receives one unsuccessful in-person visit, it becomes eligible for enumeration by administrative records.  Tr. 5-95:25–5-97:16.  If high-quality administrative records exist for a household, the household may be enumerated using administrative records.  Tr. 5-97:3–16 (explaining that high-quality administrative records are verified across multiple sets of records).  If no high-quality administrative records exist for that household, the address stays in the NRFU workload for the full NRFU protocol.  Tr. 5-97:17–21.  Thus, administrative records supply a method of low-cost enumeration when high-quality administrative records are available.  Tr. 5-102:16–5-103:20.

103.    Plaintiffs could not establish that the use of administrative records will fail to capture many households that do not self-respond to the 2020 Census.  As discussed above, if no such records exist, then the full NRFU protocol will be used.  Tr. 5-97:17–21.  Indeed, Dr. Abowd persuasively testified that the Census Bureau is "reasonably certain" that it can enumerate "a high percentage of the U.S. population" using administrative records.  Tr. 5-102:18–5-103:20.  Plaintiffs have submitted no contrary evidence.

e)    Imputation

104.    The Census Bureau uses imputation to enumerate housing units that remain unresolved after the NRFU procedures (in-person interviews, administrative records, and proxy responses) are exhausted.  Tr. 5-110:24–5-11:16.  The Census Bureau's imputation process uses a statistical model to determine, based on the characteristics of nearby housing units in the master address file (like owner, rent, size, number of bedrooms, etc.), whether an address is occupied, and, if so, how many people to impute.  *Id.*  Imputation assumes the untestable proposition that households are similar to their neighbors, thus mitigating the risk that imputed households will be over- or under-counted.  Tr. 5-111:17–23.

105.    Importantly, there is no quantitative evidence that imputation systematically undercounts certain demographic groups.  Tr. 6-45:23–1.  And while there is some qualitative evidence that suggests this conclusion, the Census Bureau has taken that qualitative evidence into account in designing the imputation procedures for the 2020 Census.  Tr. 6-46:2–6-47:3.

106.    Tracing out three different scenarios, Dr. Abowd testified to the exact way in which people could be enumerated even if they do not self-respond to the 2020 Census.  Using assumptions built into the Life Cycle Cost Estimate, along with the rate of imputation from the 2010 Census, Dr. Abowd explained that, without a citizenship question, he projected that 0.38% of all households would be imputed.  Tr. 5-97:25–5-98:18.  Using these same assumptions, Dr. Abowd then applied Brown et

45

al.'s 5.8% estimate for the decline in self-response rate for potential noncitizen households, which resulted in a projected imputation of 0.40% of all households, assuming the average rate of resolution in NRFU. Tr. 5-98:19–5-99:17. Lastly, Dr. Abowd adjusted the previous scenario to assume that all households not self-responding due to a citizenship question would go through the full NRFU process, which resulted in a projected imputation of 0.60% of all households. Tr. 5-99:18–5-100:5. Importantly, in none of these scenarios would a household go uncounted simply because it did not self-respond. Tr. 5-100:14–5-101:13. Even in the worst-case scenario illustrated by Dr. Abowd, the result was simply more imputations. *Id.*

107.   So, even if an address in the MAF receives a census questionnaire, fails to self-respond, purposely avoids enumerators, does not appear in the administrative records, and is not enumerated by proxies, it is still not possible for that address to go uncounted; it would be enumerated through count imputation. Tr. 5-122:12–17.

### iv.   **Plaintiffs have failed to prove that the foregoing procedures will not mitigate a potential decline in self-response rate.**

108.   Plaintiffs' have adduced no reliable evidence, in contrast to the credible testimony by Dr. Abowd, that NRFU will not mitigate a potential decline in self-response rate. It is true that the Census Bureau has not produced credible quantitative evidence indicating whether NRFU would be sufficient to address the marginal decline in self-response caused by the citizenship question. Tr. 5-172:15–20. But it is Plaintiffs who have the burden of proof, not Defendants. *Defs. of Wildlife*, 504 U.S. at 561. To that end, Dr. Abowd unequivocally testified that there was no credible quantitative evidence, in this case or otherwise, that NRFU would *not* sufficiently address any decline in self-response caused by the citizenship question. Tr. 6-45:9–22. This failing falls on Plaintiffs, as it bears repeating that they did not attempt to perform even a simple, small-scale RCT that could simulate self-response and NRFU. Tr. 5-72:14–20, 5-77:17–5-78:3.

109.    With no Plaintiff-run RCT to provide evidence, Plaintiffs seemingly seek to demonstrate the impotence of NRFU in the 2020 Census by showing that NRFU for the ACS (called CAPI) was less successful in census tracts with greater numbers of noncitizens.  Tr. 5-176:7–5-178:10. Plaintiffs' reliance upon the CAPI procedures is unpersuasive.  As Dr. Abowd testified, unlike census NRFU, CAPI is not designed to achieve a complete and accurate count.  Tr. 6-44:14–16.  In fact, CAPI does not even follow up with every household that fails to complete the ACS; only a randomly-selected subset of households will get CAPI follow up.  Tr. 5-21:24–5-22:21.

110.    Further, CAPI generally has "very few" in-person visits, whereas the 2020 Census could have six or more in-person visits.  Tr. 6-44:17–6-45:1.  CAPI does not use administrative records for enumeration, Tr. 6-45:2–4, whereas the 2020 Census will, Tr. 5-97:3–16.  CAPI does not attempt to contact proxies such as neighbors to obtain an enumeration, Tr. 6-45:5–6, whereas the 2020 Census will, Tr. 5-91:16–5-92:15.  And CAPI does not use imputation to enumerate unresolved households, Tr. 6-45:7–8, whereas the 2020 Census will, Tr. 5-122:12–17.  The Court therefore agrees with Dr. Abowd that any comparison between CAPI and NRFU is inapt because the census, unlike the ACS, must account for every address.  Tr. 5-22:22–5-23:3.

111.    Dr. Mathiowetz's testimony fares no better.  Dr. Mathiowetz testified that the Census Bureau's non-response follow-up procedures in 2020—in-person interviews, proxy interviews, administrative records, and imputation—will not effectively count households that fail to self-respond because of the citizenship question.  Tr. 2-147:23–2-152:14.  However, she acknowledged that she did not attempt to quantify how ineffective any of those non-response follow-up procedures will be (through an RCT or otherwise).  Tr. 2-200:11–2-202:10.  Her testimony thus provides no basis to conclude how ineffective the Census Bureau's non-response follow-up procedures might be in 2020 at counting households that fail to self-respond because of the citizenship question.  And, without such a calculation in conjunction with a reliable calculation of all differential-net-undercount

components (*see, infra*), Plaintiffs cannot prove any injury as a result of a hypothetical differential net undercount.

> v. **Plaintiffs have not proven that rostering omissions will cause a differential net undercount.**

112.     Rostering omissions occur where a household responds to the census questionnaire but omits a member of the household.  Tr. 5-194:15–21.  Plaintiffs have not proved that rostering omissions, by themselves or in conjunction with a decline in self-response, will cause a differential net undercount for either noncitizen households or all-citizen Hispanic households.  As Dr. Abowd persuasively testified, there is no credible quantitative evidence that households will actually leave people off their household roster *specifically* due to the citizenship question.  Tr. 6-43:10–6-44:4.  And there is certainly no credible quantitative evidence that the number of households leaving people off their household roster specifically due to the citizenship question would be large enough to cause a differential undercount of any particular demographic group.  Tr. 6-44:5–10.  In fact, Dr. Abowd testified that all rostering studies of which he is aware "use the *census* roster as the gold standard and compare the survey rosters to it."  Tr. 5-74:19–5-75:5 (emphasis added).

113.     Even if item-nonresponse rates, breakoff rates, and a decline in self-response rates may be consistent with an incremental increase in rostering omissions for households potentially containing noncitizens, as Dr. Abowd testified, consistency is not proof.  Tr. 5-193:15–5-194:3.  And Plaintiffs have adduced no credible evidence that there *will* be an incremental increase in rostering omissions for potential noncitizen households specifically due to a citizenship question.  That is why the Census Bureau believes that such households "might be unlikely to provide a full enumeration whether or not there's a citizenship question on the census and does not have evidence of an incremental effect from the citizenship question."  30(b)(6) Dep. 394:21–396:11, ECF 103-9.  The Court agrees with Dr. Abowd's and the Census Bureau's credible testimony.

114.    Plaintiffs' expert Dr. William O'Hare testified that the Census Bureau's non-response follow-up procedures cannot mitigate rostering omissions.  Tr. 2-70:9–2-71:24.  However, Dr. O'Hare did not testify that the citizenship question is likely to *increase* the number of rostering omissions on the 2020 census.  Tr. 2-70:9–2-71:24.  Nor did he try to quantify how many rostering omissions would occur in 2020 due to the citizenship question.  Tr. 2-82:11–14. His testimony thus provides no basis to conclude that the citizenship question will cause more rostering omissions in 2020—let alone enough rostering omissions to cause higher net undercounts.

115.    Dr. Mathiowetz testified that the citizenship question is likely to cause rostering omissions in 5% of noncitizen and Hispanic households.  Tr. 2-152:15–2-160:11.  Dr. Mathiowetz's testimony was based on four sources: (a) the Brown et al. paper (PX-162); (b) a journal article by Roger Tourangeau et al. (PX-923); (c) a Census Bureau memo about respondent confidentiality concerns (PX-158); and (d) a journal article by David J. Fein (PX-394).  *See* PX-1214-12.  However, none of those sources supports the conclusion that the citizenship question is likely to increase the number of rostering omissions in noncitizen or Hispanic households—let alone by five percentage points. Instead, as Dr. Abowd credibly explained, the scientific evidence on rostering omissions does not suggest that any particular question causes rostering omissions, or that including a citizenship question on the census would cause more rostering omissions than if it were not included.  Tr. 5-109:23–11.

116.    The Brown et al. paper studied how the citizenship question would affect *self*-response rates for noncitizen households, as Dr. Mathiowetz acknowledged.  Tr. 2-187:19–25.  She recognized that it did not attempt to study the decrease in households that respond yet underreport the number of residents—i.e., rostering omissions.  Tr. 2-188:1–4.  She also acknowledged that a household that fails to self-respond at all, like those studied by the Brown et al. paper, by definition cannot commit rostering omissions.  Tr. 2-188:5–17.  The Brown et al. paper thus provides no basis to conclude how the citizenship question might affect the number of rostering omissions in noncitizen households, let

alone Hispanic households, which were not studied in the Brown et al. paper.  This was confirmed by Dr. Abowd, who supervised the drafting of the Brown et al. paper, Tr. 5-64:16–5-65:1, and testified that the authors did not conduct any analysis that would allow one to calculate the number of rostering omissions due to the citizenship question.  Tr. 5-74:19–5-75:11.

117.    The Tourangeau article studied how asking for residents' *names* affects the number of rostering omissions, as Dr. Mathiowetz acknowledged. Tr. 2-190:17–23; PX-923. She acknowledged that the article did not attempt to study how asking about residents' *citizenship status* affects the number of rostering omissions.  Tr. 2-190:24–2-191:1.  And she acknowledged that regardless of whether the 2020 census includes a citizenship question, it will ask for residents' names.  Tr. 2-191:2–5.  In addition, Dr. Mathiowetz acknowledged that in the Tourangeau study, over 90% of the respondents were black—a population that is not representative of noncitizens or Hispanics.  Tr. 2-188:18–2-190:16; PX-923-4. The Tourangeau article thus provides no basis to conclude how the citizenship question might affect the number of rostering omissions in noncitizen or Hispanic households.

118.    Dr. Gurrea's testimony confirms these shortfalls.  Dr. Mathiowetz failed to provide any basis for her reliance upon the Tourangeau article, which focused on black citizens in three urban areas in the early 1990s for support of her 5.8% undercount figure for non-citizens.  Tr. 4-46:23-4-47:19.  As Dr. Gurrea explained, there is no evidence provided by Dr. Mathiowetz or elsewhere to suggest that black citizens in three urban areas in the early 1990s are representative of noncitizens in 2020.  Tr. 4-46:23-4-47:19.  Furthermore, the article upon which Dr. Mathiowetz relied assessed an entirely different question than the issue in this case; namely, how households would respond in response to a request for providing individual names as opposed to how a response to a request for citizen status would result in underreporting.  Tr. 4-46:23-4-47:19.

119.    Dr. Mathiowetz also cited two anecdotes from a Census Bureau memo about respondent confidentiality concerns, but no evidence showed that those anecdotes were representative

of noncitizens or Hispanics more generally.  Tr. 2-153:19–2-155:17; PX-158-2.  Just as importantly, in

the two anecdotes cited by Dr. Mathiowetz, the respondents' reluctance to provide complete and

truthful information was due to concerns about *confidentiality*, not the *citizenship question*, which had not

yet been added to the 2020 census.  PX-158-2.  The Census Bureau memo about respondent

confidentiality concerns thus provides no basis to conclude how the citizenship question might affect

the number of rostering omissions in noncitizen or Hispanic households.  In any event, the memo

was a *qualitative* study, not a *quantitative* estimate of rostering omissions, as Dr. Mathiowetz recognized.

Tr. 2-156:23–2-157:4.  The Census Bureau memo thus provides no basis to estimate *how many* rostering

omissions in noncitizen or Hispanic households might be attributable to the citizenship question.

120.    Finally, Dr. Mathiowetz cited the Fein article's observation that motivational errors

(i.e., rostering omissions) were underestimated forty years ago in the 1980 census.  Tr. 2-155:18–2-

156:18; PX-394-13.  However, the Fein article did not attempt to study how a *citizenship question* (which

was not included on the 1980 Census short form) might affect rostering omissions.  PX-394-13.  Also,

the Fein article cited by Dr. Mathiowetz was a qualitative study, not a quantitative estimate of rostering

omissions, as Dr. Mathiowetz acknowledged.  Tr. 2-156:23–2-157:4.  The article thus provides no

basis to conclude how the citizenship question might affect the number of rostering omissions in

noncitizen or Hispanic households—let alone to estimate how many rostering omissions in noncitizen

or Hispanic households might be attributable to the citizenship question.

121.    Dr. Mathiowetz failed to explain why her reliance upon these sources allowed her to

reach her opinions concerning rostering errors in the 2020 Census, and the Court finds her

unexplained extrapolations of these data sources to be nothing more than *ipse dixit*.

122.    These conclusions are reinforced by the testimony of Dr. Gurrea.  As Dr. Gurrea

credibly explained at trial, Dr. Mathiowetz lacks a sufficient basis for estimating that 5% of non-citizen

households will omit non-citizens from their census questionnaire.  Tr. 4-101:20-25.  Dr. Mathiowetz

initially derived a 5% rate at which non-citizens would underreport members of their household in response to the inclusion of a citizenship question on the 2020 Census.  Tr. 4-45:15-4-46:22.  To derive this five percent rate, Dr. Mathiowetz relied upon the Brown et al. paper, PX-162, which found that the decline in *self*-responses among non-citizen households in response to the inclusion of a citizenship question would be 5.8%.  Tr. 4-45:15-4-46:22 (emphasis added).  However, as Dr. Gurrea explained, the application of the empirical evidence from the Brown et al. paper does not provide support for Dr. Mathiowetz's 5% estimate of rostering omissions.  Tr. 4-45:15-4-46:22; Tr. 4-102:1-4.  In reaching this conclusion, Dr. Gurrea looked at whether the population that is the subject of the study is representative of the population at interest, and whether the study being relied upon is addressing the same question.  Tr. 4-45:15-4-46:22.  Dr. Gurrea explained that because the Brown et al. paper only provided an estimate of the rate at which non-citizen households would be *unwilling* to participate in the census, Dr. Mathiowetz's estimate of the number of non-citizen households who would *underreport* members of their households is addressing a different question than the one presented in the Brown et al. paper.  Tr. 4-45:15-4-46:22; DDX-034.

123.    Rather than credit Dr. Mathiowetz's unreliable testimony based on incongruous sources, the Court agrees with Dr. Abowd that the scientific evidence on rostering omissions does not suggest that any particular question causes rostering omissions, or that including a citizenship question on the census would cause more rostering omissions than if it were not included.  Tr. 5-109:23–11.

vi.    **Plaintiffs have not proven that there will be a differential net undercount.**

124.    As Dr. Abowd testified extensively, differential net undercount is a complicated measurement that takes into account erroneous enumerations[8] (someone who was counted

---

[8] Erroneous enumeration is a Census Bureau coverage measurement term, and is defined by the Census Bureau as a census person or housing unit enumeration that should not have been counted

incorrectly), gross omissions (someone missed), and whole person census imputations (someone for which the Census Bureau filled in data based on nearby households). *See* Tr. 5-112:24–5-120:11. To determine a differential net undercount for any particular group, one must calculate all three variables because differential net undercount equals gross omissions, minus erroneous enumerations, minus whole person census imputations. Tr. 5-114:3–10. Plaintiffs have failed to prove that more people will be missed in the 2020 Census (*i.e.*, more gross omissions) if the self-response rate declines due to the citizenship question. But even if they had, it would only be one of the three critical pieces needed to determine a differential net undercount. And without a reliable calculation of differential net undercount, Plaintiffs cannot prove any injury.

125.   As Dr. Abowd persuasively testified, it is entirely possible that more people of a particular demographic group could be missed in the 2020 Census (*i.e.*, more gross omissions) or less people of a particular demographic group could be enumerated correctly (*i.e.*, more erroneous enumerations) without affecting a differential net undercount. Tr. 5-116:12–15. Dr. Abowd illustrated this concept with an example. Using the averages of gross omissions (7.7%), erroneous enumerations (3.9%), and whole person census imputations (2.4%) for Hispanics in the 2010 Census, PX-267 at 20, Dr. Abowd assumed that gross omissions of Hispanics would increase substantially (16.9%), erroneous enumerations of Hispanics would occur at the same rate as 2010 (resulting in 8.4%), and whole person census imputations of Hispanics would increase, but systematically miss 25% of imputed Hispanic households (9.3%). Tr. 5-118:11–5-120:11. The result of this hypothetical calculation was

---

for any of several reasons, such as, that the person or housing unit (1) is a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation. Joint Stips ¶ 53.

that there would be a differential net *overcount* of Hispanics in the 2020 Census.[9]  *Id.*  This hypothetical net overcount had nothing to do with missed Hispanics being offset by double-counted members of other demographic groups. Tr. 6-47:9–12.  The Court finds Dr. Abowd's point persuasive: Plaintiffs have not proved that erroneous enumerations (someone who was counted incorrectly), gross omissions (someone missed), and whole person census imputations (someone for which the Census Bureau filled in data based on nearby households) will all be impacted in 2020 such that they have proved a differential net undercount will result for any demographic group.

126.     Plaintiffs' appeal to the coverage measurement of the 2010 Census in an attempt to show otherwise. *See* Tr. 6-7:22–6-10:16; PX-267 at 20.  For example, Plaintiffs' seemingly reference the 1.54% net undercount of Hispanics in the 2010 Census for purported proof that NRFU and imputation are ineffective for this subpopulation.  But, as Dr. Abowd testified several times, the coverage measurement referenced by Plaintiffs, PX-260, calculated only *averages* of the relative census statistics (erroneous enumerations, gross omissions, and whole person census imputations).  Tr. 5-115:24–5-116:10, 6-47:13–6-49:8.  In other words, "[a] change in the differential net undercount from a decline in the self-response rate of noncitizen households would be a marginal change. [Plaintiffs' cited] tables don't contain marginal estimates." Tr. 6-49:2–8.  Without such marginal estimates and a concomitant calculation of the three pieces in the differential-net-undercount puzzle (erroneous enumerations, gross omissions, and whole person census imputations), Plaintiffs simply cannot prove a differential net undercount.

---

[9] "Overcount" is a Census Bureau coverage measurement term.  An overcount occurs when the census enumerates a larger number of persons or housing units in a population than indicated by an independent estimate of the size of that population.  Joint Stips ¶ 52.

127.     Even if the Court considers testimony from Drs. William P. O'Hare and Nancy Mathiowetz regarding correlations between self-response rates and differential net undercounts, the Court finds this testimony unpersuasive.

128.     Dr. O'Hare testified that there was a statistical correlation between lower self-response rates and higher net undercounts in the 1990, 2000, and 2010 decennial censuses.  Tr. 2-31:8–18, 2-40:7–2-41:13, 2-43:11–2-50:24, 2-72:9–14.  Based on that statistical correlation, he testified that if there were a 5.8 percentage-point drop in noncitizen self-response rates from the citizenship question in the 2020 census, that drop would cause a differential net undercount of noncitizens.  Tr. 2-31:19–2-32:1, 2-50:25–2-51:7,  2-53:20–2-54:3,  2-60:16–2-61:2,  2-72:14–22.     However, he acknowledged that correlation by itself does not establish causation.  Tr. 2-74:25–2-75:1.  He testified that, to establish causation, social scientists generally require that other potential explanations have been controlled.  Tr. 2-75:3–12.  He acknowledged that, in calculating the correlation between self-response rates and net undercounts in the last three decennial censuses, he did not control for other potential explanations—including English language proficiency, the frequency with which people move, household size, or type of living quarters.  Tr. 2-75:13–2-77:9.  His testimony about whether lower self-response rates cause higher net undercounts was thus unreliable.

129.     In any event, Dr. O'Hare acknowledged that he did not attempt to quantify the size of any net undercounts attributable to the 2020 citizenship question.  Tr. 2-82:4–10.  His testimony thus provides no basis to conclude how large any net undercount attributable to the 2020 census might be.

130.     Dr. O'Hare also testified that there was a statistical correlation between lower self-response rates and higher omission rates in the 2010 decennial census.  Tr. 2-48:8–2-49:5, 2-50:16–2-51:7, 2-53:20–2-54:3.  However, he acknowledged that omissions do not automatically lead to net undercounts because omissions can be offset by imputations.  Tr. 2-77:16–18, 2-78:3–10.  Indeed, in

testifying about the 2010 census data by state, he acknowledged that even though states with lower self-response rates tended to have higher omission rates, no state had a statistically significant net undercount. Tr. 2-79:23–2-80:4. Similarly, in testifying about the 2010 census data on self-responses vs. proxy responses, he acknowledged that even though proxy responses tended to have fewer correct enumerations, proxy responses also tended to have more imputations. Tr. 2-61:6–2-62:9, 2-80:5–2-81:3; PX-162-42 (Table 12). His testimony about correlations between self-response rates and omissions and about correlations between self-response rates and correct enumerations thus fail to show a correlation (let alone a causal connection) between self-response rates and net undercounts.

131.    Finally, Dr. O'Hare testified that the American Community Survey citizenship question has higher nonresponse rates among Latinos and Asians, as shown in a paper he wrote. Tr. 2-63:3–5, 2-64:23–2-65:23, 2-66:25–2:70:8; PX-340. However, he acknowledged that, as the term is used in his paper, nonresponse rates refer to *item* nonresponse rates. Tr. 2-81:4–20; PX-340-11 (Figure 1); PX-340-13 (Figure 2); PX-340-17 (Figure 4). As discussed above, item nonresponses refer to people who did not respond to the citizenship question, even if they answered other questions on the survey. Tr. 2-81:14–20. Dr. O'Hare acknowledged that if a person fills out the entire decennial census form but skips the citizenship question, that person would be considered an item nonresponse on the citizenship question but would still be counted for purposes of the census enumeration. Tr. 2-81:21–2-82:3. Dr. O'Hare's testimony about nonresponse rates thus does not suggest that the citizenship question is likely to cause higher net undercounts.

132.    For similar reasons, the Court also finds Dr. Mathiowetz's analyses unpersuasive. Dr. Mathiowetz testified that there was a statistical correlation between lower self-response rates and higher net undercounts in the 1990, 2000, and 2010 decennial censuses. Tr. 2-133:1–2-137:13, 2-139:3–2-147:22, 2-196:22–25. More specifically, she testified that a 10 percentage-point drop in self-response rates was correlated with a two percentage-point increase in the differential undercount. Tr.

2-145:1–7.   Based on that statistical correlation, she testified that any drop in self-response rates on the 2020 Census due to the citizenship question will cause higher net undercounts, notwithstanding the Census Bureau's NRFU procedures. Tr. 2-145:8–2-147:22, 2-196:13–21.   However, like Dr. O'Hare, she acknowledged that correlation by itself does not establish causation.  Tr. 2-197:1–3; 2-145:21–2-146:3.  She also acknowledged that the correlations between self-response rates and net undercounts in the last three decennial censuses on which she relied did not control for other potential explanations.  Tr. 2-197:4–2-199:2.  In addition, she acknowledged that the Census Bureau has changed its non-response follow-up procedures for 2020 as compared to the previous censuses she studied—including by using administrative records to count households that do not self-respond and by giving enumerators iPhones with software to determine the best time to attempt in-person interviews of households that did not self-respond. Tr. 2-199:3–24. Because Dr. Mathiowetz did not control for any other potential explanations, her testimony that lower self-response rates cause higher net undercounts—and that any drop in self-response rates on the 2020 census due to the citizenship question will cause higher net undercounts—was unreliable.

133.     Dr. Abowd credibly provided further reason to disregard the correlation analyses of Drs. O'Hare and Mathiowetz.   Contrary to the testimony of Plaintiffs' experts, Dr. Abowd persuasively explained that the mere correlation between lower self-response rates and higher net undercounts in recent censuses does not constitute credible quantitative evidence that lower self-response rates *cause* higher net undercounts.  Tr. 5-108:6–5-109:23, 5-110:12–21. Such methodology would not stand up to peer review in the statistical science disciplines, as Dr. Abowd noted.  Tr. 5-108:6–12.  Indeed, the flaw in their methodology, as explained above, is that the relationship between self-response rates and net undercounts is more complicated and more nuanced than a simple linear relationship.  Tr. 5-108:6–5-109:6.  Thus, given their flawed methodology, the Court finds unreliable

their conclusions that any decrease in noncitizen and Hispanic self-response rates on the 2020 census due to the citizenship question will cause differential net undercounts of those groups.

134.    Dr. Mathiowetz further testified that the citizenship question will cause at least a 2% increase in the differential undercount of noncitizens.   Tr. 2-161:12–2-167:18; PX-1214-13.   That conclusion was based on her testimony that: (a) the citizenship question, as opposed to the macroenvironment, will cause noncitizen self-response rates to decrease by 5.8 percentage points; (b) a 10 percentage-point drop in self-response rates was statistically correlated with a two percentage-point increase in the differential undercount over the past three censuses; and (c) the citizenship question will cause rostering omissions in 5% of noncitizen households.   PX-1214-13.   However, as explained above, her testimony about each of those three matters was either unreliable or unsupported by the sources she relied on.   Her conclusion that the citizenship question will cause at least a 2% increase in the differential undercount of noncitizens was thus not supported by a preponderance of admissible evidence.

135.    Dr. Mathiowetz lastly concluded that the citizenship question will cause at least a 2% increase in the differential undercount of Hispanics.   Tr. 2-167:20–2-170:14; PX-1214-14.   That conclusion was based on her testimony that: (a) the citizenship question will cause Hispanic self-response rates to decrease by 8 to 10 percentage points; (b) a 10 percentage-point drop in self-response rates was statistically correlated with a two percentage-point increase in the differential undercount over the past three censuses; and (c) the citizenship question will cause rostering omissions in 5% of Hispanic households.   PX-1214-14.   However, as explained above, her testimony about each of those three matters was either unreliable or unsupported by the sources she relied on.   Her conclusion that the citizenship question will cause at least a 2% increase in the differential undercount of Hispanics was thus not supported by a preponderance of the evidence.

136.    These conclusions are reinforced by the testimony of Dr. Gurrea. As Dr. Gurrea credibly explained at trial, Dr. Mathiowetz failed to properly utilize the results of the Brown et al. paper in performing her analysis or take into account competing explanations for the drop off rate in assessing the impact of the inclusion of a citizenship question on Hispanics. In determining the different drop off across demographic groups attributable to a citizenship question, the Brown et al. paper relies upon econometric mathematical models that control or account for other competing explanations for the drop off. Tr. 4-49:9-20. By controlling for those other competing explanations, the Brown et al. study found that the initial effect of a citizenship question is cut in half; in other words, 50% of the effect of drop off in response rates is attributable to reasons other than the citizenship question. Tr. 4-49:8-4-50:8. Yet as Dr. Gurrea correctly observed, Dr. Mathiowetz failed to take this into account in her analysis. Tr. 4-50:9-23. Specifically, Dr. Mathiowetz derived her 2% figure simply by looking at the changes in self-response rates and comparing demographic groups without controlling for these other competing explanations that may determine the propensity of different households and different ethnic groups to respond to the survey when a citizenship question is included. Tr. 4-50:9-23. Accordingly, Dr. Gurrea's opinions confirm that Dr. Mathiowetz's analysis does not permit one to attribute the effect solely to the inclusion of the citizenship question and, accordingly, her opinion concerning a two-percent estimate for Hispanics is unreliable. Tr. 4-50:9-4-51:4.

137.    In addition, the Court agrees with Dr. Gurrea's conclusion that Dr. Mathiowetz's purported difference-in-difference methodology, in which she estimated an 8.7 % drop-off rate for Hispanics, fails to corroborate her opinions and lacks validity. Tr. 4-51:5-19. As discussed above, unlike the Brown et al. paper upon which Dr. Mathiowetz purports to rely and which controls for other possible explanations for respondents' propensity to answer a question with a citizenship

question in calculating a 5.8 percentage-point decline in self-response, Dr. Mathiowetz fails to control for those other factors.  Tr. 4-51:5-19; Tr. 4-109:18-23.

138.    Moreover, the Court agrees with Dr. Gurrea that unlike the Brown et al. paper, which tracked the same households from both the ACS and decennial census groups in 2010, Dr. Mathiowetz aggregated response rates and did not account for whether respondents in the 2010 ACS group are the same as the respondents in the 2010 decennial census group.  Tr. 4-112:25-5-113:13.  By failing to do that, Dr. Mathiowetz failed to account for the possibility that the differences observed in the response rate to a questionnaire with and without a citizenship question may be attributable to other factors.  Tr. 4-112:25-5-113:13.

139.    The Court agrees with Dr. Gurrea's observation that Dr. Mathiowetz's failure to account for these factors renders her estimate unreliable, Tr. 4-51:5-25, given that the Brown et al. paper found half of the decline in self-response rate could be attributable to reasons other than a citizenship question.

140.    The cursory testimony by Plaintiffs' expert, Dr. Douglas Massey, regarding census "accuracy" is even less persuasive.  Dr. Massey opined that adding the citizenship question to the census will likely affect its accuracy.  Tr. 1-139:23–140:1.  But Dr. Massey admitted that he did not do any study on the possible effect of the citizenship question on the accuracy of the 2020 census.  Tr. 1-140:15–19, 1-143:3–10.  And although Dr. Massey stated that he "read the research of others" to form this opinion, Tr. 1-140:15–19, he did not cite to any research supporting his opinion, *see generally* Massey Decl., ECF No. 99-6.  Because Dr. Massey's testimony is not based on sufficient facts or data and is not the product of reliable principles or methods, the Court gives his opinions regarding the effect of the citizenship question on the accuracy of the census no weight.

141.    For the reasons set forth above, Plaintiffs have not proven that a differential net undercount will occur in the 2020 Census for any identifiable group. And without a reliable calculation of a differential net undercount, Plaintiffs cannot prove any cognizable injury.

       vii.    **Plaintiff Individuals and Plaintiff Organizations' members have not proven any harm.**

142.    Because Plaintiffs have not proven that a differential net undercount will occur in the 2020 Census for any identifiable group, the Court's analysis could end here. However, even assuming Plaintiffs could prove that (i) the citizenship question will cause a large enough decline in self-response rate (ii) that NRFU will not sufficiently mitigate it, and (iii) that Plaintiffs could reliably calculate not only the number of people missed, but the number of people erroneously enumerated and imputed— *i.e.*, they could reliably calculate a differential net undercount—Plaintiffs have still failed to prove any harm would result due to such a differential net undercount. For the reasons set forth below, the Court credits the persuasive testimony of Defendants' expert, Dr. Stuart Gurrea, and finds Plaintiffs purported harms not credible, unreliable, and unlikely to occur.

       a)    Mr. Brace: Undercount Scenarios, Apportionment, Redistricting, Medicaid, Transportation Funding

       (1)    Congressional Reapportionment

143.    Mr. Brace purports to offer an opinion concerning the impact of a differential undercount of certain demographic groups in the 2020 Census on the apportionment of congressional seats following the 2020 census. Tr. 2-215:7-13; ECF No. 99-1, at ¶ 9.

       (2)    Mr. Brace's Population Estimate Baseline Is Speculative and Unreliable

144.    The first step in Mr. Brace's reapportionment analysis is to develop a baseline population projection of the population of each state in the country in 2020. Tr. 2-215:14-17; ECF No. 99-1 at ¶ 14.

145.    To create his projection, Mr. Brace relied upon the annual population estimate from the Census Bureau's population estimate program, which was released on December 26, 2017.  Tr. 2-215:22-25.  Mr. Brace cautions users of this data that it is preliminary and subject to change.  Tr. 2-216:1-13.  Indeed, as discussed below, there have been substantial changes between the 2017 and 2018 estimates, and there is no basis to assume that these changes will not continue up until the actual 2020 Census.  The 2017 population estimate, which does not reflect a complete count of the population and is subject to substantial revision year-to-year, does not provide a reliable basis for Mr. Brace's impact evaluation of reapportionment (or, as discussed below, his impact evaluation concerning Medicaid funding).

146.    For example, the December 2017 population estimate does not include an estimate for U.S. military personnel serving overseas.  Tr. 2-216:18-21.  In previous censuses U.S. military personnel serving overseas have been counted by the Census Bureau and allocated to the states.  Tr. 2-216:22-2-217:1.  Overseas military personnel have been a factor in the apportionment formula over the past several decades, such as in the 2000 decennial census, where the inclusion of military personnel serving overseas in the census resulted in the switching of the final congressional seat from Utah to North Carolina.  Tr. 2-217:6-16.

147.    Another factor that can, and has, affected the accuracy of population estimates and, in turn, apportionment, are weather events such as major hurricanes.  Tr. 2-217:17-20.  An example of a hurricane impacting population estimates is Hurricane Katrina; in 2005, the Census Bureau had projected that Louisiana would gain a seat, but as a result of the loss of population in New Orleans caused by the hurricane, Louisiana actually lost a seat in the 2010 decennial census.  Tr. 2-217:21-2-218:11.

148.    There were three major hurricanes in 2017 that could have an effect on apportionment: Hurricane Harvey in Houston; Hurricane Irma in the Gulf Coast; and Hurricane Maria in Puerto Rico.

Tr. 2-218:20-2-219:3.  Each of these three hurricanes occurred after the release of the 2017 Census Bureau population estimates that Mr. Brace relies upon for his opinions.  Tr. 2-219:4-6.  Indeed, the 2018 population estimate shows that Florida's population increased by 200,000 people from the 2017 population estimate, and that Florida was now only 172,000 people short of a third congressional seat after the 2020 Census.  Tr. 2-219:22-2-220:6.  These new numbers are not reflected in Mr. Brace's population estimate, which are based on the 2017 Census Bureau population estimates.  Tr. 2-215:22-25.

149.    Major weather events such as hurricanes can also affect the racial demography of a state.  Tr. 2-218:12-15.  For example, Hurricane Katrina impacted the migration patterns of African Americans more than whites in Louisiana.  Tr. 2-218:16-19.

150.    Major economic events, such as a recession, also can have an impact on population growth patterns.  Tr. 2-220:23-25.  In fact, the 2008 recession changed population growth patterns by slowing migration, which impacted the 2010 apportionment.  Tr. 2-220:23-2-221:5.

151.    The projections in the population estimates prepared by the Census can, and have, changed from year-to-year, as reflected in the prediction of which state earns the 435th and 436th congressional seats.  For example, in the 2017 Census Bureau population estimate upon which Mr. Brace relies, California was projected to obtain the 435th congressional seat and Minnesota was projected to obtain the 436th seat.  Tr. 2-220:7-22.  Yet in the 2018 population estimate—which Mr. Brace did not rely upon for his analysis—Illinois is projected to obtain the 435th congressional seat and California is projected to obtain the 436th seat.  Tr. 2-220:7-22.[10]  Indeed, Mr. Brace reluctantly

---

[10] These changes in population projections have nothing to do with the inclusion of a citizenship question, as these projections by definition purport to be full counts of the population without regard to any potential undercount resulting from the 2020 Census.   If these populations estimates reflected an undercount, then Mr. Brace's ultimate projection would reflect double counting of the impact of a citizenship question.

acknowledged that his own company had projected that there would be even greater changes in the population estimates between 2018 and the 2020 Census.  Tr. 2-221:12-2-222:16.

152.     For these reasons, the Court finds that Mr. Brace's population estimate baseline that forms the basis for his apportionment and Medicaid projections is speculative and unreliable and, as a consequence, his ultimate projections are unreliable.

> (3)     Mr. Brace's Impact Evaluation Concerning Apportionment is Unreliable

153.     Mr. Brace purported to model three undercount scenarios in consideration of the impact on apportionment resulting from the inclusion of a citizenship question on the decennial census.  ECF No. 99-1 at ¶ 13.  Given that Mr. Brace failed to quantify the probability that any state would gain or lose a representative during reapportionment as a result of the inclusion of a citizenship question on the 2020 Census, Tr. 2-228:3-6, the Court finds that none of these scenarios are likely to occur.  In any event, for the reasons set forth below, the Court finds that none of these scenarios are credible or reliable.  And because the inputs to Mr. Brace's population undercount estimates are unreliable, the impact evaluations themselves concerning the effect on apportionment (as well as voter dilution and federal funding) based on the inclusion of a citizenship question are unreliable.  Tr. 4-59:25-4-60:19.  This same conclusion applies to the opinions of Ms. Carruth and Mr. Mingo, who, as discussed below, rely upon Mr. Brace's unreliable population estimates in reaching their conclusions.  Tr. 4-38:8-23.

> (4)     Mr. Brace's 2% Scenario

154.     The primary undercount scenario that Mr. Brace modeled for his reapportionment opinion assumed a 2% differential undercount, a number that Mr. Brace received from Dr. Mathiowetz.  Tr. 4-223:9-15.  Mr. Brace did not conduct any independent analysis to confirm either the correctness of the assumed 2% differential undercount number or the actual effectiveness of NRFU during the 2020 Census.  Tr. 2-225:20-22; Tr. 2-227:12-15.  In addition to the reasons set forth

above, the Court credits the testimony of Dr. Gurrea and Dr. Abowd that Dr. Mathiowetz's 2% differential undercount estimate is unreliable.  And because the inputs Mr. Brace has relied upon are flawed, Mr. Brace's predictions necessarily are unreliable.  Tr. 4-40:19-4-41:8; DDX-029.

155.    For the reasons set forth above, the Court finds that Mr. Brace's 2% Scenario—which relies exclusively on Dr. Mathiowetz's faulty calculation applied to his inherently speculative population estimate—is neither credible nor reliable.

(5)    Mr. Brace's 5.8% Scenario

156.    The second undercount scenario that Mr. Brace modeled for his reapportionment analysis assumed a 5.8% differential undercount, a number that was contained in the Brown et al. paper.  Tr. 4-223:16-21.  Mr. Brace did not conduct any independent analysis to confirm the correctness of the assumed 5.8% differential undercount number.  Tr. 2-225:20-22.  As discussed above, the Brown et al. paper indicated that the 5.8% figure reflects the differential self-response rate for households that contain a non-citizen.  Tr. 2-223:22-25.  Without explanation, Mr. Brace extrapolated this 5.8% figure that applied exclusively to non-citizen households to Hispanic citizen households.  Tr. 2-224:1-4.  As Dr. Gurrea credibly explained at trial, the Brown et al. paper offers no empirical basis to assume that the 5.8% differential undercount estimate for non-citizens is applicable to Hispanic citizen households.  Tr. 4-43:8-15; Tr. 4-59:6-24.  Without any basis for his extrapolation, his output based on the 5.8% differential undercount are inherently unreliable.  Tr. 4-36:20-4-37:6; Tr. 4-42:12-16.

157.    Mr. Brace's impact analysis that uses a 5.8% differential undercount is unreliable for the additional reason that it fails to consider the effect of any mitigation through NRFU and imputation.  As Dr. Gurrea pointed out, because this scenario completely ignores any mitigation resulting from NRFU efforts or imputation, it cannot accurately model the final undercount rate

because population counts will be understated and undercounts will be overstated.  Tr. 4-37:18-24; Tr. 4-42:12-16; Tr. 4-44:10-21; Tr. 4-59:6-24; DDX-031; DDX-032.

158.     The Court therefore finds that Mr. Brace's apportionment impact analysis based upon a 5.8% Scenario is neither credible nor reliable

(6)     Mr. Brace's 8.09% Scenario

159.     The third undercount scenario that Mr Brace modeled assumed an 8.09% differential undercount, a number derived from a phone survey conducted by Dr. Barreto.  Tr. 2-224:5-11.  Mr. Brace did not conduct any independent analysis to confirm the correctness of the assumed 8.09% differential undercount number.  Tr. 2-225:20-22.  The 8.09% figure derived by Dr. Barreto purports to reflect the differential drop in self-response rates for Latino households.  Tr. 2-224.  But without explanation, Mr. Brace extrapolated this 8.09% figure to non-Hispanic, non-citizen households.  Tr. 2-224:18-21.  As Dr. Gurrea explained at trial, Mr. Brace provided no empirical basis for his extrapolation of Dr. Barreto's results to non-Hispanic, non-citizen households.  Tr. 4-36:20-4-37:17; Tr. 4-42:17-4-43:1; Tr. 4-43:16-4-44:3; Tr. 4-52:24-4-53:9.  In addition to the reasons set forth above describing the deficiencies in Dr. Barreto's survey, Mr. Brace's application of Dr. Barreto's 8.09% differential undercount figure is unreliable because it completely ignores any mitigation resulting from non-response follow-up efforts or imputation and, therefore, cannot accurately model the final non-response rate because population counts will be understated and undercounts will be overstated.  Tr. 4-37:18-24; Tr. 4-42:17-4-43:1; Tr. 4-44:10-21; DDX-031; DDX-032.

160.     The unreliability of Mr. Brace's population undercount estimates (as well as the estimates of Dr. Reamer, Ms. Curruth, and Mr. Mingo, as described below), is demonstrated by Dr. Gurrea's alternative sensitivity analyses, which show no impact to federal apportionment when the NRFU success rate (before imputation) is adjusted.  Tr. 4-38:8-23; Tr. 4-39:8-21.  Dr. Gurrea utilized Mr. Brace's impact evaluation model and recalculated his predictions using an alternative scenario that

assumed a 2020 NRFU success rate of 95.58 % (2020 NRFU success rate), before imputation, which was the same as the 2010 NRFU success rate.  Tr. 4-39:8-21; Tr. 4-61:19-24.  Dr. Gurrea obtained the 2020 NRFU success rate from a Census Bureau document, DX 3.  Tr. 4-62:3-7.  Dr. Gurrea assumed that the 2020 NRFU success rate would be equally successful for all demographic groups because Plaintiffs' experts assumed a uniformly successful NRFU rate in their analyses, and Dr. Gurrea wanted to isolate the effects of one single assumption for purposes of his sensitivity analysis.  Tr. 4-63:8-19; 4-131:2-9; 4-131:14-21.

161.    Dr. Gurrea's sensitivity analysis, which does not account for imputation, demonstrated that when applying the 2020 NRFU success rate, there would be no loss in congressional seats under any of Mr. Brace's three alternative scenarios.  Tr. 4-64:25-4-65:8; DDX-041.

(7)    Intra-state Redistricting

162.    Mr. Brace performed an impact analysis concerning intra-state redistricting, modeling only Dr. Mathiowetz's 2% differential undercount rate for counties where the plaintiffs reside, which include 15 counties in 9 different states.  Tr. 2-228:15-23; ECF No. 99-1, at ¶ 26.  Because Dr. Mathiowetz's 2% differential undercount is unreliable, for all of the reasons stated above, the results of Mr. Brace's impact evaluation of intra-state redistricting necessarily are also unreliable.  Tr. 4-40:19-4-41:8; Tr. 4-59:25-4-60:19; DDX-029.

163.    As described above, Dr. Gurrea performed a sensitivity analysis, which did not account for imputation, concerning Mr. Brace's intra-state redistricting predications, and the results demonstrate that when applying the 2020 NRFU success rate to Mr. Brace's analyses, the percentage drop in any county's share of state-wide population is reduced to at most $1/10^{th}$ of one percent (or 0.1%).  Tr. 4-65:12-4-66:10; DDX-042.

164.    In response to Dr. Gurrea's critiques, Plaintiffs performed an additional analysis in which geographic units smaller than counties were examined to evaluate vote dilution.  ECF No. 99-

1, at ¶ 32.  Yet, as Mr. Brace acknowledged at trial, many states, such as Texas, have laws that dictate that counties are the appropriate boundary for considering redistricting, and it is precisely for this reason that Mr. Brace initially analyzed vote dilution at the county level.  Tr. 3-17:10-3-18:6.  Accordingly, Mr. Brace provided no factual basis to consider vote dilution at a level of geography lower than a county, particularly in light of state laws that require redistricting at the county level.

165.    In response to Dr. Gurrea's critiques, Plaintiffs also performed an additional analysis that reported Dr. Gurrea's results out to three decimal places from the two that Dr. Gurrea presented.  Tr. 2-230:22-25.  These results, reflected in PX-1195, do not show any vote dilution at a tenth of a decimal.  Tr, 2-231:1-2-232:4.  And even extended out to a hundredth of a decimal, only King County in Washington is identified as having vote dilution.  Tr. 2-232:5-8.  Indeed, five of the counties that Mr. Brace analyzed reflect dilution of .001%, including Yuma County, Todd County, El Paso County, Dallas County, and Webb County.  Tr. 2-232:9-21.  All of these results fail to take imputation into account.  Tr. 2-231:1-25.  Mr. Brace failed to run any sort of test to determine whether these results were statistically significant, and does not know whether these reported differences may be attributable to random chance rather than the inclusion of a citizenship question.  Tr. 2-232:22-2-233:4.  Moreover, Mr. Brace is not offering any opinion in this case as to how significant vote dilution would need to be to make a difference for purposes of the Voting Rights Act.  Tr. 2-223:11-16.  Similarly, Mr. Brace has not identified *any* geographic area where the percentages he has calculated would actually make a difference in terms of creating a minority-majority district.  Tr. 2-223:17-21.

(8)    Federal Funding

166.    Mr. Brace purported to offer projections for Medicaid and transportation funding that a state would receive under Dr. Mathiowetz's assumed 2% differential undercount scenario.  Dkt 99-1 at ¶¶ 41; 44.  As discussed above, because Dr. Mathiowetz's 2% calculation is unreliable, any projections based upon that scenario is equally unreliable.

167.   In addition, for his Medicaid projection, Mr. Brace utilized the same Census Bureau December 2017 population estimate that he relied upon for his apportionment opinion. Tr. 2-234:19-23.  As discussed above, the Court finds that reliance upon the December 2017 population estimate is inherently speculative and leads to unreliable projections.

168.   In response to the critiques of the government's expert, Dr. Gurrea, Mr. Brace recalculated his transportation funding projection. Tr. 2-235:11-21; PX-989.  However, Mr. Brace's recalculation does not account for imputation. Tr. 2-235:11-2-236:10.  Accordingly, the Court finds that Mr. Brace's transportation funding projection overstates any impact associated with a citizenship question and is therefore unreliable.

<div align="center">

(9)   Mr. Brace's Unreliable Undercount Scenarios Also Render Unreliable Ms. Carruth's and Mr. Mingo's analyses

</div>

169.   As discussed above, because the inputs to Mr. Brace's population undercount estimates are unreliable, the impact evaluations themselves concerning the effect on apportionment, voter dilution, and federal funding based on the inclusion of a citizenship question are unreliable.  Tr. 4-59:25-4-60:19.  This same conclusion applies to the opinions of Ms. Carruth and Mr. Mingo, who rely upon Mr. Brace's unreliable population estimates in reaching their conclusions. Tr. 4-38:8-23; Tr. 4-39:8-21.

<div align="center">

b)   Dr. Reamer: Medicaid, CHIP, WIC, SSBG

</div>

170.   Dr. Andrew Reamer offers an opinion concerning the impact of a differential undercount of non-citizens, regardless of race, ethnicity, or national original, in the 2020 Census on the amount of money states may receive under several different federal funding programs that base their funding formulas in part upon decennial census data.  ECF No. 99-8; Tr. 3-67:6-3-91:17. Specifically, Dr. Reamer has performed calculations and analysis for four different federal funding programs: (1) traditional Medicaid ("Medicaid"); (2) the State Children's Health Insurance Program ("CHIP"); (3) Supplemental Nutrition Program for Women, Infants, and Children ("WIC"); and (4)

Social Services Block Grants ("SSBG").  ECF No. 99-8 ¶¶ 17-18.  The allocation formulas that determine the amount of funding states will receive under all four of these programs use a geographic allocation formula that is based in part upon decennial census-derived data to determine the amount of funding each state receives.  ECF No. 99-8 ¶¶ 11, 14.

171.    Dr. Reamer's calculations assume that there will be a differential undercount on the 2020 Census, and that the differential undercount will take the form of either (1) a 5.8% differential undercount of all non-citizens, with no distinction made for race, ethnicity, or national origin, and no accounting the Census Bureau's non-response follow-up ("NRFU") process or (2) a 5.8% differential undercount of all non-citizens, with no distinction made for race, ethnicity or national origin, and a NRFU "success rate" of counting those who initially fail to respond of 86.63%.  ECF No. 99-8 ¶ 38.

172.    These two differential undercount scenarios used by Dr. Reamer in his calculations were provided to him by Plaintiffs' counsel.  Tr. 3-72:3-7.  They were generated by a Dr. Barnard Fraga, who was not noticed or otherwise identified by Plaintiffs as an expert in this action.[11]  Tr. 3-71:7-10.  Dr. Reamer was not aware of how these scenarios were calculated or what assumptions they were based upon when he submitted his declaration.  Tr. 3-72:8-19.  Dr. Reamer did not perform any work or analysis to analyze whether these differential undercount scenario predictions generated by Dr. Fraga and provided to him by counsel were reasonable or valid other than reading Dr. Fraga's report after Dr. Reamer had performed his calculations and submitted his declaration.  Tr. 3-72:20-3-73:1.  In particular, Dr. Reamer was not aware of what the basis was for Dr. Fraga's 86.3% NRFU success rate used in one of the two scenarios Dr. Reamer used in his calculations.  Tr. 3-75:21-24.  Dr. Reamer is not an expert on the census or survey methodology, Tr. 3-73:2-9, and offers no opinion

---

[11]    Dr. Fraga was retained and noticed by plaintiffs in other similar litigation challenging Secretary Ross's decision to include a citizenship question on the 2020 Census, *State of California et al. v. Ross et al.*, N.D. Cal. No. 18-1865, and *City of San Jose et al. v. Ross et al.*, N.D. Cal. 18-2279.

that either of these predicted undercount scenarios are likely to happen, or that if one of them did happen, that it would be attributable to the presence of a citizenship question on the 2020 Census. Tr. 3-74:2-3-75:9.

173.    This Court finds that Dr. Reamer's calculations and predictions are entitled to no weight because there is nothing in the administrative record, or the exhibits entered into evidence, including exhibits admitted only for the purposes of Federal Rule of Evidence 703, that even attempts to explain the basis for these two differential undercount scenarios generated by Dr. Fraga or why they constitute reasonable assumptions upon which Dr. Reamer can base his calculations.

174.    The Court notes that Defendants previously challenged the portion of Dr. Reamer's testimony predicting the funding loss that some states may experience under these four funding programs in the event of a differential undercount on the 2020 Census, ECF No. 114.  This Court originally took that motion under consideration, and denied the motion in an oral ruling during trial on January 24, 2019.  Tr. 3-66:15-21.  However, the Court notified the parties that "I will discuss my reasoning in more detail as part of my ultimate opinion, and I will discuss how much weight I am giving it and the like when we get to that point."  Tr. 3-66:18-20.  Defendant's motion *in limine* was denied because Dr. Reamer disclaims the notion that he is providing a prediction of what may occur. Nowhere in his declaration does he use the word "prediction" or any derivative thereof, and he refers to his calculation scenarios as "illustrations."  *See, e.g.*, ECF No. 99-8 ¶¶ 15, 35.  Accordingly, because Defendants' motion was premised upon the argument that Dr. Reamer's predictions should not be considered because they were based upon undisclosed expert testimony from Dr. Fraga, this Court denied Defendants' motion and admitted Dr. Reamer's testimony as an illustration of a potential impact two particular differential undercount scenarios on the 2020 Census could have on federal funding under these four programs.

175.     However, because Plaintiffs failed to present Dr. Fraga in this case, the Court lacks the ability to assess the underlying reliability of Dr. Reamer's analysis and, accordingly, the Court gives Dr. Reamer's analysis no weight.  The testimony offered by Dr. Reamer that purports to predict the consequences of a differential undercount on the 2020 Census has not been shown to rest upon a reliable foundation as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  In situations in which an expert's opinion relies upon projections and calculations rendered by another expert who has not been disclosed, and who the opposing party has no opportunity to challenge, it would be unfair and significantly prejudicial to accept such testimony.  *See, e.g.*, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (holding that expert testimony about lost profits should not have been considered when such testimony was based upon numbers generated by another, undisclosed expert, because "the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").

176.     This is particularly true because, as the Supreme Court has explicitly recognized, avoiding such scenarios is the purpose of Federal Rule of Evidence 703.  As a plurality opinion of the Supreme Court recognized, "[t]he Rule 703 approach, which was controversial when adopted, is based on the idea that the disclosure of basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion."  *Williams v. Illinois*, 567 U.S. 50, 78 (2012).  Then, as an illustrative example, the *Williams* Court wrote, "[f]or example, if the factfinder were to suspect that the expert relied on factual premises with no support in the record, . . . then the probativeness or credibility of the expert's opinion *would be seriously undermined*."  *Id.* (emphasis added).  The Court finally noted that "[t]he purpose of disclosing the facts on which the expert relied is to allay these fears – to show that the expert's reasoning was not illogical, and that the weight of the

expert's opinion does not depend on factual premises unsupported by the other evidence in the record…"  *Id.*  Here, this is an issue of the Plaintiffs' own making, and was avoidable and curable in a number of ways.  Plaintiffs could have noticed Dr. Fraga as an expert, of course, but they also could have simply had Dr. Reamer perform his calculations with differential undercount scenarios generated by a disclosed expert witness, such as Mr. Brace, which is what two of Plaintiffs' other funding experts did.  However, as the Supreme Court has made clear, it is improper to consider expert testimony based upon work or calculations performed by another undisclosed expert, particularly in light of Dr. Reamer's explicit admission that he testified not knowing how Dr. Fraga had performed his calculations of the differential undercount scenarios or what assumptions those calculations were based upon.  Tr. 3-72:8-19.

177.     Furthermore, even if the Court were to give weight to Dr. Reamer's calculations and analysis, the Court finds that Dr. Reamer's reliance on these projected undercount scenarios was not reasonable because they either fail to consider NRFU and imputation altogether, and thus overstate the impact of a citizenship question or rely upon unsupported mitigation assumptions.  With respect to Dr. Fraga's first scenario, Dr. Fraga's 5.8% scenario that does not account at all for the Census Bureau's NRFU process is unreasonable because, as Dr. Reamer concedes, all federal funding formulas that use any kind of decennial census-derived data use the data from the final census enumeration, not just the initial self-responses.  ECF No. 3-75:10-20.  Both plaintiffs' experts and Dr. Abowd agree that NRFU and imputation will be at least somewhat effective in reducing a potential undercount; accordingly, it is unreasonable to assume—as Dr. Reamer does—that NRFU and imputation will be 100% ineffective, and this renders Dr. Reamer's first scenario unreliable.  Tr. 4-74:11-4-75:13.

178.     As to the second differential undercount scenario, Dr. Fraga's use of an 86.63% NRFU success estimate is unreasonable given NRFU's historical success rate and the extensive measures

(bolstered by innovations in methodology) that the Census Bureau will take to enumerate every American resident in 2020. The 86.63% follow-up success rate used in the second undercount scenario from Dr. Fraga is taken from the ACS, even though, as discussed above, the follow-up efforts associated with the ACS are substantially different from the follow-up efforts associated with the decennial census, and Plaintiffs have failed to provide any empirical evidence to suggest that the follow-up efforts and success rates associated with the ACS would be a good proxy for the success of NRFU on the 2020 Census. Tr. 4-74:11-4-75:3; Tr. 4-143:16-23.

179. Notably, Dr. Fraga's estimate assumed that the entirety of the population will be counted through NRFU or imputation. Tr. 4-135:16-4-136:20. Dr. Fraga projected a population estimate and then calculated an undercount. Tr. 4-135:16-4-136:20. Because the undercount is calculated from a projection of population rather than an actual estimate of who will be counted, Dr. Fraga implicitly assume that the entire population will be counted in their baseline scenarios. Tr. 4-135:16-4-136:20. Consequently, Dr. Fraga's baseline scenarios assume that there will be no rostering errors or omissions. Tr. 4-135:16-4-136:20. In other words, the population estimate used by Dr. Fraga captures the entire United States population—regardless of whether parts of that population are undercounted, are captured by NRFU or imputation, or are part of the self-response group. Tr. 4-135:16-4-136:20.

180. This conclusion—that Dr. Reamer's opinions are unreliable—is strengthened by the testimony of Defendants' witness Dr. Stuart Gurrea, who specifically noted that Dr. Reamer's calculations, which rely upon Dr. Fraga's differential undercount scenarios that ignore imputation and either ignore or understate the effect of NRFU, are in contradiction with Dr. Reamer's testimony, which acknowledges that NRFU and imputation will have some effect on the final enumeration and any differential undercount. Tr. 4-74:11-4-75:13.

181.    Dr. Reamer's analysis involves calculating the predicted impact of a differential undercount on the 2020 Census on the amount of funding a state receives under each of these four programs.   Dr. Reamer's calculations are presented in four unnumbered tables contained in his declaration: (1) a table showing Dr. Reamer's calculations as to the impact on Medicaid, ECF No. 99-8 at 17, Table; (2) a table showing Dr. Reamer's calculations as to the impact on CHIP, ECF No. 99-8 at 20, Table; (3) a table showing Dr. Reamer's calculations as to the impact on WIC, ECF No. 99-8 at 22, Table; and (4) a table showing Dr. Reamer's calculations as to the impact on SSBG, ECF No. 99-8 at 24, Table.   Any state not appearing on these tables would have seen its funding for that particular program stay the same or actually increase had either of Dr. Fraga's undercount scenarios occurred on the 2010 Census.  Tr. 3-81:15-3-82:11. These tables show that:

- For Medicaid, Dr. Reamer calculates that seven states – Texas, Florida, Arizona, Nevada, Hawaii, Washington and Illinois – would have seen a reduction in Medicaid funding as a result of a differential undercount under either of Dr. Fraga's predicted differential undercount scenarios.  ECF No. 99-8 at 17, Table. All other states would have either seen their Medicaid funding remain the same or actually increase due to Dr. Fraga's predicted differential undercount.  Tr. 3-81:15-3-82:11.

- For CHIP, Dr. Reamer calculates that those same seven states – Texas, Florida, Arizona, Nevada, Hawaii, Washington, and Illinois – would have seen a reduction in CHIP funding as a result of Dr. Fraga's predicted differential undercount scenario that did not account for NRFU.  ECF No. 99-8 at 20, Table.  For Dr. Fraga's predicted differential undercount scenario that does account for NRFU, Dr. Reamer calculates all of those states would have lost money except for Illinois. ECF No. 99-8 at 20, Table.  All other states not listed on the table would have

either seen their CHIP funding remain the same or actually increase due to Dr. Fraga's predicted differential undercount.  Tr. 3-81:15-3-83:9.

- For WIC, Dr. Reamer calculates that eight states – California, Texas, New York, Florida, New Jersey, Nevada, Arizona, and Hawaii – would have seen a reduction in WIC funding as a result of either of Dr. Fraga's predicted differential undercount scenarios.  ECF No. 9-8 at 22, Table.  All other states not listed on the table would have seen their WIC funding increase as a result of Dr. Fraga's predicted differential undercount.  Tr. 3-81:15-3-83:9.

- For SSBG, Dr. Reamer calculates that twelve states – California, Texas, New York, Florida, New Jersey, Nevada, Arizona, Hawaii, Washington, Maryland, Illinois, and Massachusetts – would have seen a reduction in SSBG funding as a result of either of Dr. Fraga's predicted differential undercount scenarios.  ECF No. 99-8 at 24, Table.  All other states not listed on the table would have seen their SSBG funding increase a result of Dr. Fraga's predicted differential undercount.  Tr. 3-81:15-3-83:9.

182.    Dr. Gurrea's sensitivity analysis, which itself does not account for imputation, demonstrates that when applying the 2010 Decennial Census NRFU success rate to Dr. Reamer's impact calculations, the predicted impact of a differential undercount on the 2020 Census becomes insignificant:

- For traditional Medicaid funding, the largest percent reduction in funding is one one-hundredth of one percent (or 0.01%), Tr. 4-76:2-12; DDX-046;

- For the CHIP program, the largest percent reduction in federal reimbursement is one one-hundredth of one percent (or 0.01%), Tr. 4-76:14-22; DDX-0047;

- For the WIC supplemental food grants, the largest percent reduction is one one-hundredth of one percent (or 0.01%), Tr. 4-76:22-4:77:7; DDX-048; and

- For the SSBG program, the percent reduction is one one-hundredth of one percent (or 0.01%), Tr. 4-77:8-19; DDX-049.

The Court further notes that because Dr. Gurrea's sensitivity analyses do not take into account imputation themselves, once imputation is factored in, the impact of a differential undercount on the 2020 Census on funding received by states under these four programs is likely to be so minute it is essentially nonexistent.

183.    The Court also finds that Dr. Reamer's predictions about the impact a differential undercount on the 2020 Census is likely to have on these four programs is inherently speculative.  As an initial matter, Dr. Reamer acknowledges that his calculations are based upon the current funding formulas and the most recent funding amounts for these programs, which Congress could always change—in fact, he concedes that Congress has recently changed the allocation formula for CHIP. Tr. 3-86:9-3-87:17.  Dr. Reamer's methodology is also, strictly speaking, not making any prediction at all—the basis for Dr. Reamer's calculations is taking the differential undercount scenarios for the 2020 Census, generated by Dr. Fraga, then applying those to the population count numbers from the 2010 Census, and then applying those changes to the most recent funding amounts and funding formulas for these programs, which was either Fiscal Year 2015 or Fiscal Year 2016. Tr. 3-88:6–3-89-1.  As Dr. Reamer even concedes, "it's only for illustration purposes," noting that we will not know what the actual appropriations process, including funding amounts and formula, for fiscal years in which the data from the 2020 Census has been incorporated into funding for many years in the future, Tr. 3-88:16-3-89:1, making a reliable, accurate forecast practically impossible.

184.    The Court further finds that Dr. Reamer's testimony is not probative on the issue of whether any state is likely to suffer any reduction in federal funding under any program other than

Medicaid, CHIP, WIC, and SSBG.  Dr. Reamer admits and acknowledges that he is not offering any prediction as to the impact a differential undercount on the 2020 Census will have on the overall amount of federal funding received by any state.  Tr. 3-91:9-13.  While Plaintiffs attempt to offer Dr. Reamer's testimony as broadly representative of the impact a differential undercount on the 2020 Census may have on other federal funding programs, *see,* ECF No. 99-8 ¶ 36, Dr. Reamer concedes that he has not performed calculations for any federal funding program other than those four programs and Title I, about which he is not offering an opinion in this case.  Tr. 3-89:2-11.

185.    Dr. Reamer also concedes that there is only one of his "foundational datasets," the urban-rural classification, that uses exclusively decennial census data; all other datasets used in federal funding also use data other than decennial census data, and therefore can change for reasons unrelated to the decennial census.  Tr. 3-83:10-3-94:6.  According to Dr. Reamer, this reflects Congress's "recogni[tion] that the decennial numbers, on their own, are inadequate to guide the fair, equitable distribution of federal financial assistance."  ECF No. 99-8 ¶ 25.

186.    Furthermore, Dr. Reamer notes that there are approximately 2,249 federal financial assistance programs, ECF No. 99-8 ¶ 22, of which only approximately 320, or less than fifteen percent, use census-derived data to guide funding.  Tr. 3-85:24-3-86:8.  Of these 320, Dr. Reamer has focused on 24 programs that use "geographic allocation formulas," which Dr. Reamer acknowledges are "highly sensitive" to fluctuations in census-derived data.  ECF No. 99-8 ¶¶ 11-12.  And of these 24, Dr. Reamer has only focused on and performed calculations for four programs, which he concedes were chosen by Plaintiffs' counsel.  Tr. 3-89:12-19.  It is clear that Plaintiffs' counsel asked Dr. Reamer to focus on a few programs (these four programs constitute less than two-tenths of one percent of the 2,249 total federal funding formulas) that were most sensitive to changes in decennial census data, and are therefore by definition not representative of the impact a differential undercount on the 2020 Census would have on other federal funding programs.  Accordingly, the Court rejects Plaintiffs'

attempt to extrapolate Dr. Reamer's opinions to federal funding programs other than Medicaid, CHIP, WIC, and SSBG.

187.   Even in the event that states do experience a reduction in funding under any of the four programs analyzed, Dr. Reamer is unable to articulate any type of tangible harm to the organizations and individuals who are Plaintiffs in this action.   As Dr. Reamer acknowledges, all of these programs only provide funding to the states, not to localities and certainly not to organizations or individuals.  Tr. 3-78:11-3-81:14.  Therefore, no Plaintiff in this action can claim that they will suffer any loss of funding through that particular federal funding program in the event of a differential undercount on the 2020 Census.  Furthermore, Dr. Reamer offers no opinion or testimony as to the actual tangible impact a reduction in federal funding in any of these four programs may have on an organization or individual, either as a general matter or specifically as to any Plaintiff in this case.

188.   Dr. Reamer did not perform any analysis or calculations of how a differential undercount on the 2020 Census might impact the amount of federal funding any state, locality, organization, or individual would receive under any government program other than the four listed in the previous paragraph and Title I education funding (about which Dr. Reamer offers no opinion in this case), and Dr. Reamer does not offer any opinion or calculation as to the overall impact of a differential undercount on the 2020 Census on the total amount of federal funding received by any state, locality, organization or individual.  Tr. 3-89:2-11, 3-91:9-13.

189.   Accordingly, even if Dr. Reamer's reliance upon the undercount scenarios provided to him by Plaintiffs' counsel and generated by Dr. Fraga was supported by some evidence of reasonableness or validity, which it is not, his analysis fails to establish how any of the individuals and organizations that are Plaintiffs in this case would be specifically impacted by any change in funding in any of these four programs in the event of a differential undercount on the 2020 Census.  For these

reasons, Dr. Reamer's analysis, calculations, and testimony fail to establish that Plaintiffs will be negatively impacted by the inclusion of a citizenship question on the 2020 Census.

<div align="center">c)      Mr. Mingo: Transportation Funding</div>

190.      Mr. Roger Mingo offers an opinion concerning the impact of a differential undercount of certain demographic groups in the 2020 Census on the amount of money certain urbanized areas may receive under certain suballocations of the Federal Highway Administration's (a division of the United States Department of Transportation) Surface Transportation Block Grant ("STBG") Program. The STBG Program provides federal funding to urbanized areas to States and localities that can be utilized for a wide variety of transportation-related purposes. Tr. 3-27:12-3-46:14; ECF No. 99-7.

191.      Specifically, Mr. Mingo's opinion analyzes two different portions of the overall STBG allocation any urbanized area receives: (1) a set-aside that is to be used for transportation alternatives projects ("the TA set-aside suballocation"); and (2) a set-aside for transportation projects ("the STBG suballocation"). Both of these suballocations depend at least in part upon data derived from the decennial census in determining the amount of funding each urbanized area eventually receives. ECF No. 99-7 ¶ 14; Tr. 3-31:18-3-32:6.

192.      Mr. Mingo did not perform any analysis or calculations of whether, and how, any differential undercount on the 2020 Census might impact the amount of federal funding any state, locality, organization, or individual would receive under any other government program, and Mr. Mingo does not offer any opinion or calculation as to the overall impact of a differential undercount on the 2020 Census on the amount of federal funding received by any state, locality, organization, or individual. Tr. 3-30:15-20.

193.      Mr. Mingo's analysis involves calculating the predicted impact of a differential undercount on the 2020 Census on certain urbanized areas. Mr. Mingo's calculations are presented

<div align="center">80</div>

in Table 2 and Table 3 of his declaration, and show that he projects the urbanized areas he was asked to analyze by Plaintiffs' counsel will lose between $35,233 (Houston, Texas) and $348,861 (Miami, Florida) per year in STBG suballocation funds and between $1,318 (Las Vegas-Henderson, Nevada) and $30,701 (Miami, Florida) per year in TA set-aside suballocation funds per year.  ECF No. 99-7 at 10-11.

194.    Mr. Mingo further predicts that a reduction in funding received under these two suballocations in the amounts he predicts will have a negative impact on urbanized areas' capacity to undertake and finish important transportation-related projects in a timely manner.  ECF No. 99-7 ¶ 25.

195.    Mr. Mingo's calculations assume that there will be a differential undercount, and that differential undercount will take the precise form of a 2% differential undercount of the total Hispanic population, regardless of citizenship status, in the United States and a 2% differential undercount of the non-Hispanic, non-citizen population.  ECF No. 99-7 ¶ 8.

196.    The undercount scenarios used by Mr. Mingo in his calculations were generated by Mr. Brace, whose testimony is discussed above.  Tr. 3-32:7-12.  Mr. Mingo was provided the relevant numbers constituting the undercount scenario by Plaintiffs' counsel.  Tr. 3-32:19-22.  While Mr. Mingo is aware that these numbers were generated by Mr. Brace, Mr. Mingo himself has no expertise to analyze whether Mr. Brace's projections are reasonable or valid.  Tr. 3-32:23-3-33:6.  Mr. Mingo offers no opinion as to whether Mr. Brace's projected undercount scenario is a reasonable projection, or is likely to occur.  Tr. 3-33:10-13.  In fact, Mr. Mingo is not even aware of how these numbers were calculated by Mr. Brace.  Tr. 3-33:7-9.

197.    Mr. Mingo's findings resulting from his impact analysis concerning the distribution of STBG funds are unreliable because they are predicated on Mr. Brace's 2% undercount scenario, which is unreliable for the reasons discussed above.  Tr. 4-67:21-4-68:18; DDX-044.

198.     Dr. Gurrea's sensitivity analysis, which itself does not account for imputation, demonstrates that when applying the 2010 Decennial Census NRFU success rate to Mr. Mingo's impact calculations, the predicted impact of a differential undercount on the 2020 Census becomes far less significant.  Using the historical NRFU success rate, Dr. Gurrea's calculation of the estimated loss of federal STBG suballocation funds for fiscal year 2025 based on the inclusion of a citizenship question is at most 3/10ths of one percent (or .3%).  Tr. 4-67:21-4-68:18; DDX-044.  This amount represents an amount well below those calculated by Mr. Mingo.  ECF No. 99-7 at 11-12.  The Court further notes that because Dr. Gurrea's sensitivity analysis does not take into account imputation, once imputation is accounted for, it is possible that the impact of a differential undercount on the 2020 Census on federal funding received by certain urbanized areas under the STBG program is so minute it is essentially nonexistent.

199.     The Court also finds Mr. Mingo's calculations and predictions to be inherently uncertain.  Mr. Mingo's calculations for the two STBG suballocations are based upon the funding formula contained in the current authorization for the STBG program, which is set to expire after Fiscal Year 2020.  Tr. 3-34:23-3-35:7.  If the program is to continue for Fiscal Year 2021 or any time thereafter, Congress will have to pass a new authorization for the program, at which point in time Congress could decide to change the funding formula used to determine the amounts of either or both suballocations, if indeed the two suballocations still exist in the next authorization.  Tr. 3-35:8-17.  Because Mr. Mingo concedes that any data from the 2020 Census would not be incorporated into the funding formulas for these two suballocations until probably Fiscal Year 2023, Tr. 3-35:24-3-36-10, his calculations and predictions are not useful in the event that Congress does not authorize the STBG program at all, decides to alter or remove either or both of the two suballocation formulas analyzed, or change the funding formulas used for either or both of those suballocations.

200.     Mr. Mingo's calculations and predictions are also inherently uncertain because Congress could change the total funding amount for the overall STBG allocation, which, because the suballocations are calculated as a percentage of the overall allocation, would impact the amount urbanized areas receive under the suballocations. Tr. 3-37:2-11. Furthermore, population trends and changes could (and almost certainly will, in some cases) result in urbanized areas seeing their amounts of suballocation money under these two suballocations increase or decrease after the 2020 Census for reasons having nothing at all to do with a differential undercount. Tr. 3-36:11-3-37:1. As Mr. Mingo even conceded, he cannot offer any prediction as to whether the urbanized areas he analyzed will actually see an overall increase or decrease in the amount of funding received for these two suballocation programs, even if there is a differential undercount on the 2020 Census. Tr. 3-37:12-3-37:23.

201.     Mr. Mingo is also unable to articulate any type of tangible harm to the organizations and individuals who are the Plaintiffs in this action.  Mr. Mingo testified that the STBG program provides funding to state governments, with requirements (such as the two suballocations that are the subject of his calculations and analysis) that the state remit certain portions of the overall allocation to localities.   Tr. 3-31:3-13.   No individual or organization receives money from the federal government under the STBG program, and therefore none of Plaintiffs in this action can claim a loss in funding received from the government under this program. Tr. 3-31:14-17.

202.     Furthermore, while Mr. Mingo states in his declaration that he believes there is a "substantial risk" that a reduction in funding an urbanized area receives under these two suballocations "will negatively impact" that area's transportation infrastructure, ECF No. 99-7 ¶ 25, he acknowledges that the list of specific projects provided in his declaration, ECF No. 99-7 ¶¶ 27-28, were "examples of kinds of projects" that could be impacted, but he is offering no opinion as to any specific construction project, road, highway, bridge, sidewalk, trail, or any other portion of any particular

urbanized area's transportation infrastructure that will be negatively impacted by a reduction in suballocation funds. Tr. 3-38:23-3-40:1. This is particularly true given that urbanized areas have wide discretion over how they spend their suballocation funding, and can decide to begin, change, or cancel a transportation-related project for any number of reasons unrelated to funding. Tr. 3-38:6-17.

203.     Mr. Mingo also acknowledges that his analysis and calculations only cover these two suballocation portions of the overall STBG allocation. Mr. Mingo testified that these two suballocations account for slightly more than half—55% in the most recent fiscal year, and 53% in the fiscal year prior—of the amount allocated to states under the STBG program. Tr. 3-40:2-10. The amount of overall funding a state receives under the STBG program is not impacted by the decennial census data. ECF No. 99-7 ¶ 13. In the case of every state containing an urbanized area analyzed by Mr. Mingo, the amount of the overall STBG allocation that was not earmarked by the two suballocations analyzed is more than 40%. Tr. 3-40:11-17. For this amount not covered by the two suballocations, the federal government does not direct states in how to spend that funding, and the state has almost complete discretion to determine the best use of that money. Tr. 3-40:23-3-41:8. It is certainly possible that, as Mr. Mingo conceded, in the event of a reduction in the amount of suballocation funding received by an urbanized area, particularly if a specific transportation project was impacted, a state could simply decide to use a portion of the significant STBG allocation money to assist an urbanized area in making up for the reduction and completing the project in question. Tr. 3-41:24-3-42:9.

204.     Accordingly, even if Mr. Mingo's reliance upon Mr. Brace's predicted undercount scenario was supported by the record and evidence here, which it is not, his analysis fails to establish that: (1) any urbanized area will actually see a reduction in finding, in light of the need for Congress to pass a new authorization for the program which could change the funding amount for the entire STBG allocation or the funding formulas for either or both of the suballocations analyzed by Mr.

Mingo; (2) even if the new authorization contains the same funding formula, Mr. Mingo cannot show that an urbanized area would not locate another source of funding, including very possibly from the portion of the overall STBG allocation to the state that is not earmarked by the suballocation; and (3) even if there is an overall reduction in STBG funding received by an urbanized area, Mr. Mingo cannot identify any specific transportation project or even type of transportation project that would be negatively impacted.  Finally, and most importantly, in the absence of any identification of a specific impact on transportation infrastructure, Mr. Mingo also cannot identify how any of the individuals and organizations that are Plaintiffs in this case would be specifically impacted by any change in transportation funding in the event of a differential undercount on the 2020 Census.

205.    For these reasons, Mr. Mingo's analysis, calculations, and testimony fail to establish that Plaintiffs will be negatively impacted by the inclusion of a citizenship question on the 2020 Census.

d)      Ms. Carruth: Medicaid Funding

206.    Ms. Lisa Carruth offers an opinion concerning the impact of a differential undercount of certain demographic groups in the 2020 Census on the amount of money certain states may receive under the Medicaid program.  Medicaid is a program through which the United States provides federal funding to state governments in the form of reimbursements for expenditures for health care costs incurred by eligible low-income adults, children, pregnant women, and people with disabilities.  ECF No. 99-2; Tr. 3-92:11-3:112:2.

207.    Specifically, Ms. Carruth's opinions analyzes a potential impact of a differential undercount on the Federal Medical Assistance Percentage ("FMAP"), which is a percentage calculated by the Department of Health and Human Services for each state and then used to determine the amount of Medicaid expenses incurred by a state's Medicaid program that the state will be reimbursed for.  ECF No. 99-2 ¶¶ 13-14; 16; Tr. 3-96:16-22; 3-97:9-12.

208.    Ms. Carruth's analysis involves calculating the predicted impact of a differential undercount on the 2020 Census on Medicaid funding by predicting how a differential undercount on the 2020 Census would impact the FMAP score for the State of Texas at the point in time at which the data from the 2020 Census is fully incorporated into the FMAP calculation, which is Fiscal Year 2025.  ECF No. 99-2 ¶¶ 20-23.  Ms. Carruth then offers the opinion, based upon this prediction of Texas's FMAP for Fiscal Year 2025, what the impact of a differential impact on the 2020 Census would be on the State of Texas for other fiscal years, and also what the impact of a differential undercount on the 2020 Census would be on four other states – Arizona, Florida, Nevada, and New Mexico.  ECF No. 99-2 ¶¶ 19, 21.

209.    Ms. Carruth also offers an opinion as to what the consequences of a reduction in a state's FMAP that she predicts will result from a differential undercount on the 2020 Census might be, stating that there is a "substantial risk or strong likelihood that a reduction in federal Medicaid funds to a state such as Texas will negatively affect Medicaid beneficiaries' health care benefits and/or medical costs."  ECF No. 99-2 ¶ 24.  Ms. Carruth also provides several examples of measures of a reduction in coverage and medical services covered by state Medicaid programs that may result.  ECF No. 99-2 ¶¶ 25-32.

Ms. Carruth's calculations assume that there will be a differential undercount, and that differential undercount will take the precise form of a 2% differential undercount of the total Hispanic population, regardless of citizenship status, in the United States and a 2% differential undercount of the non-Hispanic, non-citizen population.  ECF No. 99-2 ¶ 20; Tr. 3-97:18-22.

210.    The undercount scenarios used by Ms. Carruth in her calculations were generated by Mr. Brace, whose testimony is discussed above.  Tr. 3-97:13-17.  Tr. 3-32:7-12.  Ms. Carruth was provided the relevant numbers constituting the undercount scenario by Plaintiffs' counsel.  Tr. 3-98:17-20.  While Ms. Carruth is aware that these numbers were generated by Mr. Brace, Ms. Carruth

herself has no expertise in census or survey methodology and has performed no analysis to analyze whether Mr. Brace's projections are reasonable or valid. Tr. 3-98:8-16. Ms. Carruth offers no opinion as to whether there will likely be a differential undercount on the 2020 Census, or, if there is, whether Mr. Brace's projected undercount scenario is a reasonable projection. Tr. 3-99:6-11. In the event there is a differential undercount on the 2020 Census, Ms. Carruth is not offering any opinion as to whether the inclusion of a citizenship question would be the cause of such a differential undercount. Tr. 3-99: 12-15. In fact, Ms. Carruth is not even aware of how these numbers were calculated by Mr. Brace, or what assumptions Mr. Brace used in coming up with his differential undercount projection. Tr. 3-97:23-3-98:7.

211. Ms. Curruth's findings resulting from her impact analysis concerning federal Medicaid funds in Texas are unreliable because they are predicated on Mr. Brace's 2% undercount scenario, which is unreliable for the reasons discussed above. Tr. 4-66:17-4-67:13; DDX-043.

212. Dr. Gurrea's sensitivity analysis, which itself does not account for imputation, demonstrates that when applying the 2010 Census NRFU success rate to Ms. Carruth's impact calculations, the predicted impact of a differential undercount on the 2020 Census becomes far less significant. Using the historical NRFU success rate, Dr. Gurrea's calculation of the estimated loss of federal Medicaid funds for the State of Texas projected for fiscal year 2025 based on the inclusion of a citizenship question is $2.89 million. Tr. 4-66:17-4-67:13; DDX-043. This amount represents an amount of 1.87% of Ms. Carruth's calculated loss of $153.84 million, and represents .0058%, less than one one-hundredth of one percent of the $50,000,000 figure Ms. Carruth used as the overall estimated amount of Texas Medicaid spending for Fiscal Year 2025. ECF No. 99-2 ¶ 22. The Court further notes that because Dr. Gurrea's sensitivity analysis does not take into account imputation, once imputation is factored in, it is possible that the impact of a differential undercount on the 2020 Census

on federal funding received by Texas under the Medicaid program will be so minute as to be essentially nonexistent.

213.     Ms. Carruth's testimony suffers from another significant flaw, in that her entire opinion is based upon a single calculation of the potential impact of a differential undercount, for a single state, Texas, for a single year, Fiscal Year 2025.  Tr. 3-111:1-6; ECF No. 99-2 ¶ 23.  Although Ms. Carruth offers the opinion that a differential undercount could have a negative impact on Texas's FMAP for other years, starting in Fiscal Year 2023, she did not perform calculations for Texas for Fiscal Year 2023, Fiscal Year 2024, or any year after Fiscal Year 2025.  Tr. 3-110: 16-25.  Ms. Carruth's calculation showed that if there is a differential undercount, and the differential undercount was the undercount predicted by Mr. Brace, that Texas's FMAP would fall from 64.14% to 63.84%, a reduction of .3%.  ECF No. 99-2 ¶ 23.  The Court finds that this calculation of a single year is not sufficient to draw broader conclusions about the overall long-term impact of a net differential undercount on the state of Texas, particularly given the relatively small size of the predicted FMAP reduction.

214.     Ms. Carruth's single calculation is even more insufficient to support her opinion that four other states – Arizona, Florida, Nevada, and New Mexico – will experience a similar reduction in their respective FMAP numbers as a result of the differential undercount on the 2020 Census predicted by Mr. Brace.  Tr. 3-106:13-3-107:7.  Ms. Carruth did not perform any calculations as to an expected reduction in FMAP for any of these four states.  Tr. 107:8-17.  Furthermore, Ms. Carruth, whose expertise is based upon her employment working exclusively within the Texas state Medicaid system, ECF No. 99-2 ¶ 2, acknowledges that she has no expertise in other states' Medicaid systems, including what services and benefits other states offer and what other (non-federal) sources of Medicaid funding other states may have.  Tr. 3-107:18-3-108:11.  Accordingly, a calculation predicting the impact a differential undercount on the 2020 Census may have on Texas for a single year is simply

far too attenuated to demonstrate that other states will experience an identical (or even similar) loss in funding.

215.     The Court also notes that the FMAP is based upon a comparison of the state's per capita income with the per capita income for the nation as a whole, on a rolling three-year basis.  ECF No. 99-2 ¶ 14.  However, the per capita income is derived in large part from the personal income for each year, which the Bureau of Economic Analysis produces.  ECF No. 99-2 ¶ 16.c.  However, Ms. Carruth concedes that she has no expertise on how that number is calculated, or how it may or may not be impacted by the census, other than to say that she believes that it comes from administrative records.  Tr. 3-109:2-19.  Ms. Carruth's calculation is also based upon an assumption that both the Texas state personal income figure and the personal income figure for the nation as a whole will continue to grow at the same rate as they have in the past five years between now and Fiscal Year 2025, though she provides no support or explanation for this assumption.  Tr. 3-110:8-15.

216.     Furthermore, while Ms. Carruth states that she believes that there is a "substantial risk or strong likelihood" that "a state such as Texas" will react to any reduction in its FMAP by taking an action that will negatively impact the health care beneficiaries covered by that state's Medicaid program receive, ECF No. 99-2, at ¶ 24, this prediction is not sufficiently supported to credibly establish that, even if this Court did find Ms. Carruth's prediction about the impact a differential undercount on the 2020 Census would have on certain states' FMAPs persuasive, it would then have a negative impact on any Plaintiffs in this case.

217.     Even in the event that (a) there is a differential undercount on the 2020 Census; and (b) that decennial census results in a reduction in a state's FMAP, Ms. Carruth has still failed to demonstrate that this would actually result in a reduction of overall funding for the program.  As Ms. Carruth concedes, a significant amount of the funding for a state's Medicaid program comes from the state government itself – in the example of Texas, over 40 % of the funding for the program is

provided by the state.  Tr. 3-105:10-16.  In the event of a reduction in a state's FMAP and corresponding reduction in federal reimbursement, such as the .3 % reduction Ms. Carruth predicts for Texas for Fiscal Year 2025, Ms. Carruth concedes that if a state could locate another source or sources of funding for the program, a state could decide not to reduce benefits or services under the program at all, and simply bear a larger cost of the program itself.  Tr. 3-105:17-23.

218.    Finally, while Ms. Carruth provides a number of examples of the types of actions states might take in response to a reduction in FMAP, she does not credibly testify that any or all of them are likely to occur.  Ms. Carruth concedes that, as long as a state complies with the governing Medicaid statutes and regulations, it has discretion to decide what coverage it provides to beneficiaries under the state Medicaid program and how medical care is provided under the program.  Tr. 3-99:23-3-100:5. Ms. Carruth also specifically concedes that for all four of the examples she provides, a state could decide to adopt such practices for any number of reasons unrelated to a change in its FMAP, and in fact Texas has either adopted or considered adopting all of these examples absent the kind of change in its FMAP Ms. Carruth is predicting.   Tr. 3-100:23-3-101:6; Tr. 3-102:8-17; Tr. 3-103:9-18; Tr. 3-104:16-21.

219.    Ms. Carruth first offers the example of a reduction in the rate the Medicaid program pays to health care providers.  ECF No. 99-2 ¶ 25; Tr. 3-100:28-22.  However, Ms. Carruth concedes that a state could make such a decision for any number of reasons unrelated to its FMAP, and that a reduction in FMAP would not require a state to reduce its reimbursement rates or involve the federal government in this decision.  Tr. 3-101:10-22.  Ms. Carruth's speculation that this might occur is further undercut by the fact that Texas's state Medicaid program did reduce its reimbursement rates to certain therapy providers starting in December 2016, a decision that was not caused by a reduction in FMAP.  Tr. 3-100:23-3-101:6.

220.    Ms. Carruth next offers the example of prior authorization, which requires a healthcare provider to obtain approval from the state Medicaid agency before providing a beneficiary with a particular course of medical care.  ECF No. 99-2 ¶ 27; Tr. 3-101:23-3-102:7.  However, Ms. Carruth concedes that a state could decide to institute prior authorization for any number of reasons unrelated to a reduction in its FMAP, and that a reduction in its FMAP would not require a state to institute prior authorization or involve the federal government in that decision.  Tr. 3-102:21-3-103:4.  Ms. Carruth's speculation that this might occur is further undercut by the fact that Texas's state Medicaid program did institute prior authorization beginning in 2018, but this was not directly caused by any change in Texas's FMAP number.  Tr. 3-102:8-17.

221.    Ms. Carruth next offers the example of eliminating benefits and services that are "optional" insofar as they are not required under the relevant Medicaid statutes and regulations.  ECF No. 99-2 ¶ 32; Tr. 3-103:5-8.  However, Ms. Carruth concedes that a state could decide to increase or decrease the range of benefits and services it offers under its Medicaid program for any number of reasons unrelated to any change in its FMAP, and that a reduction in its FMAP would not require a state to eliminate optional services or benefits or involve the federal government in that decision.  Tr. 3-103:19-3-104:7.  Ms. Carruth's opinion is further undercut by the fact that the state of Texas seriously considered eliminating an optional Medicaid service – acute care for pregnant women and infants whose federal poverty level is between 133% and 198% – for reasons that were not related to any change in Texas's FMAP.  Tr. 3-103:9-18.

222.    The fourth and final example offered by Ms. Carruth is the institution of a system of cost-sharing, which would require that beneficiaries pay premiums and/or co-pays to obtain services and benefits under that state's Medicaid program.  ECF No. 99-2 ¶ 32; Tr. 3-104:8-15.  However, Ms. Carruth concedes that a state could institute cost-sharing for any number of reasons unrelated to a change to its FMAP, and that a reduction in its FMAP does not require a state to adopt cost-sharing

or to involve the federal government in that decision. Tr. 3-104:24-3-105:9. Ms. Carruth's opinion is further undercut by the fact that the state of Texas seriously considered cost-sharing in the past, but that consideration was not directly related to any change to its FMAP. Tr. 3-104:16-21.

223.     Because Ms. Carruth has failed to establish a sufficient causal link between the hypothetical examples offered and her predicted change in Texas's FMAP for Fiscal Year 2025, the Court finds that Plaintiffs have not shown that any of these examples are likely to occur.

224.     Ms. Carruth is also unable to articulate any type of tangible harm to the organizations and individuals who are the Plaintiffs in this action. Ms. Carruth testified that the Medicaid program provides reimbursement to state governments, with certain rules and requirements governing the minimal care that a state must provide to its beneficiaries under its Medicaid program. ECF No. 99-2 ¶ 10. However, no individual or organization receives money from the federal government under the Medicaid program, and therefore none of Plaintiffs in this action can claim a loss in funding received directly from the government under this program. Tr. 3-96:2-15.

225.     Accordingly, even if Ms. Carruth's reliance upon Mr. Brace's predicted undercount scenario was supported by the record and evidence here, which it is not, her analysis fails to establish that: (1) any state's Medicaid program will actually see a reduction in services and benefits available to beneficiaries, in light of the fact that states could identify alternative sources of funding to make up for the relatively small change in FMAP; and (2) even if there is an reduction in overall funding for the state Medicaid program, Ms. Carruth cannot identify or predict any specific action a state Medicaid program is likely to take in response to the reduction in funding. Finally, and most importantly, in the absence of any identification of a specific action a state agency administering its Medicaid program is likely to take, Ms. Carruth also cannot identify how any of the individuals and organizations that are Plaintiffs in this case would be specifically impacted by any change in federal Medicaid reimbursement in the event of a predicted differential undercount on the 2020 Census.

226.     For these reasons, Ms. Carruth's analysis, calculations, and testimony fail to establish that Plaintiffs will be negatively impacted by the inclusion of a citizenship question on the 2020 Census.

e)     Dr. Gordon: Title I Funding

227.     Dr. Nora Gordon offers an opinion concerning the impact of a differential undercount of Hispanics in the 2020 Census on the amount of money certain school districts may receive under Title I, Part A of the Elementary and Secondary Education Act ("Title I"). Title I is a program administered by the Department of Education that provides federal funding to local school districts, which the school districts can utilize for a wide variety of educational purposes. Tr. 3:47-8-3:66-6; ECF No. 99-4.

228.     Specifically, Dr. Gordon's opinion analyzes four particular types of grants awarded under the Title I program: basic grants, concentration grants, targeted grants, and education finance incentive grants. ECF No. 99-4 ¶ 10. The allocation formulas that determine the amount of funding school districts will receive pursuant to these grants is contained in 20 U.S.C. §§ 6301-6578, and in part utilize data derived from the decennial census enumeration. ECF No. 99-4 ¶¶ 13-16.

229.     Dr. Gordon did not perform any analysis or calculations of whether, and how, any differential undercount on the 2020 Census might impact the amount of federal funding any state, locality, school district, organization, or individual would receive under any government program other than Title I, and Dr. Gordon does not offer any opinion or calculation as to the overall impact of a differential undercount on the 2020 Census on the total amount of federal funding received by any state, locality, school district, organization, or individual. Tr. 3-50:6-10.

230.     Dr. Gordon's analysis involves calculating the predicted impact of a differential undercount on the 2020 Census on the amount of Title I funding received by certain school districts. Dr. Gordon's calculations are presented in Table 1 of her declaration, and show that she projects that

of the school districts she was asked to analyze by Plaintiffs' counsel, between 36 and 63 of those school districts will experience some magnitude of loss in Title I funding.  ECF No. 99-4 at 11.

231.    Dr. Gordon further predicts that a reduction in funding received under the Title I program by the school districts she predicts will lose funding will have a negative impact on the quality of education offered, at least in the short-term.  ECF No. 99-4 ¶ 35.

232.    Dr. Gordon's calculations assume that there will be a differential undercount, and that the differential undercount will take the form of either a 2.0 % or 2.5 % differential undercount of all Hispanics and Latinos, regardless of citizenship status, in the United States.  Tr. 3-50:25-3-51:25.  Dr. Gordon used four different baseline undercount rates for the non-Hispanic population, including non-Hispanic non-citizens, in her calculations using the 2.0 % differential undercount rate – 0 %, 0.5 %, 1 %, and 1.5 % – and three such baseline rates in her calculations using the 2.5 % differential undercount rate – 0 %, 0.5 %, and 1 %.  Tr. 3-52:1-4, 3-57:18-21; ECF No. 99-4 at 11, Table 1.

233.    The undercount scenarios used by Dr. Gordon in her calculations were provided to her by Plaintiffs' counsel.  Tr. 3-52:5-9.  Dr. Gordon is not aware of who generated these undercount scenarios, how these scenarios were calculated, or what information they are based upon.  Tr. 3-52:10-16.  These scenarios do not appear to have been generated by Mr. Brace or any of the other experts, and appear to have been generated by Plaintiffs' counsel without any further explanation for why these were reasonable predictions for Dr. Gordon to base her calculations upon.  Dr. Gordon did not perform any work or analysis to analyze whether these differential undercount scenario predictions provided to her by counsel were reasonable or valid.  Tr. 3-52:17-19.  Dr. Gordon is not an expert on the census or survey methodology, Tr. 3-53:22-24, and offers no opinion that these predicted undercount scenarios are likely to happen, or that if they did happen, they would be attributable to the presence of a citizenship question on the 2020 Census.  Tr. 3-53:25-3-54:8.

234.   There is nothing in the administrative record, the exhibits entered into evidence, including exhibits admitted only for the purposes of Federal Rule of Evidence 703, that even attempt to explain the basis for these differential undercount scenarios or why they constitute reasonable assumptions upon which Dr. Gordon can base her calculations.  Because Dr. Gordon specifically conceded that she did not know who calculated these numbers, or how they were calculated, Tr. 3-52:5-16, no information or evidence was provided to the Court to evaluate whether or not these seven undercount scenarios were reasonable (or to Defendants to challenge through cross-examination or testimony from a competing witness).  As Dr. Gurrea explained at trial, Dr. Gordon's predications concerning Title I LEA grants are unreliable because she has not explained any empirical basis for her assumptions.  Tr. 4-77:20-4-78:5.

235.   Plaintiffs' failure to provide any evidence supporting the reasonableness of the differential undercount scenarios relied upon by Dr. Gordon in performing her calculations significantly undermines the probative value of her testimony.  As a plurality opinion of the Supreme Court recognized, having expert testimony based upon assumptions not provided is contrary to Rule 703.  *Williams v. Illinois*, 567 U.S. 50, 77–78 (2012).  As the Court noted in *Williams*, "[t]he Rule 703 approach, which was controversial when adopted, is based on the idea that the disclosure of basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion."  *Id.* at 78.  Then, as an illustrative example, the *Williams* Court wrote, "[f]or example, if the factfinder were to suspect that the expert relied on factual premises with no support in the record, . . . then the probativeness or credibility of the expert's opinion would be seriously undermined."  *Id.* (emphasis added).  The Court finally noted that "[t]he purpose of disclosing the facts on which the expert relied is to allay these fears – to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by the other evidence in the record…"  *Id.*

236.     Dr. Gordon furthermore also conceded that her calculations were not performed using the exact funding formulas set forth in the relevant statute.  Dr. Gordon made use of five separate "simplifying assumptions" in making her calculations: (1) she disregarded the statutory hold harmless provisions, which limit the amount of reduction any single district can experience; (2) she excluded Puerto Rico's share of Title I funding from the overall allocation used in her calculations; (3) she excluded the "small state minimums" from her calculations; (4) she only performed calculations using estimates of children in poverty, but excluded children who are neglected or delinquent or in the foster care system, even though such children are included in the statutory funding formulas; and (5) she did not take into account any statutory set asides for using Title I funding for administration or school improvements.  Tr. 3-54:17-3-55:19.  Dr. Gordon concedes that the use of these "simplifying assumptions" resulted in her calculations using a different estimated level of funding than the actual levels of funding used to determine Title I funding.  Tr. 3-55:20-3-56:10.

237.     One of the data sources used in Dr. Gordon's calculations is the Small Area Income and Poverty Estimates ("SAIPE"), an estimate calculated by the Census Bureau.  Tr. 3-56:11-20. SAIPE is based in part upon the ACS, which itself asks respondents whether they are citizens.  Tr. 3-56:21-3-57:3.  Dr. Gordon is not aware of whether the inclusion of a citizenship question on the ACS leads to an undercount, but did adjust her calculations for any possible differential undercount on the ACS.  Tr. 3-57:4-7.

238.     Because Dr. Gordon does not explain the basis for the differential undercount scenarios that form the basis of her calculations and predictions, and Plaintiffs have produced no evidence as to the validity or reasonableness of those differential undercount scenarios, the Court must conclude that the 2% and 2.5% differential undercount scenarios used as assumptions by Dr. Gordon are nothing more than pure speculation, and therefore unreliable.  Accordingly, Dr. Gordon's calculations and projections, which are based upon those differential undercount scenarios, necessarily

suffer from these same flaws, and this Court finds them to be speculative and unreliable. This unreliability is exacerbated by the use of simplifying assumptions such that the calculations performed by Dr. Gordon to support her conclusions do not use the actual funding formula used by the government in determining Title I funding amounts and allow for a real potential for double-counting given that, if the presence of a citizenship question causes a differential undercount, the SAIPE may already account for it because it is based upon ACS data.

239.     Dr. Gordon's predicted impact of a differential undercount on the 2020 Census on Title I funding received by school districts is relatively small. Dr. Gordon does not include the predicted amount of Title I funding that she predicts each school district will lose or what percentage of total Title I funding such a predicted loss would represent. Tr. 3-59:18-3-60:1. Dr. Gordon testified that she did calculate the predicted percentage loss of Title I funds for each of the school districts provided to her by Plaintiffs' counsel, and that none of the school districts, under any of the seven differential undercount scenarios generated by Plaintiffs' counsel, totaled more than five percent of the overall Title I funding received by the school district. 3-60:13-18.

240.     Furthermore, Dr. Gordon's predicted impact of a differential undercount on the 2020 Census on Title I funding received by school districts is very sensitive to changes in the precise amount of the differential undercount. For example, Dr. Gordon predicts that in the event of a 2 % differential undercount scenario in which the baseline undercount for the non-Hispanic population is 1.5 %, only 36 of the school districts analyzed would experience any loss of funding. ECF No. 99-4 at 11, Table 1; Tr. 3-58:7-16. However, in the event of a 2.5 % differential undercount scenario in which the baseline undercount for the non-Hispanic population is 0 %, the number of school districts that are predicted to lose any Title I funding jumps up to 63. ECF No. 99-4 at 11, Table 1; Tr. 3-57:22-3-58:5. Dr. Gordon conceded at trial that this was a significant difference. Tr. 3-58:23-3-59:12. This large change in the number of school districts predicted by Dr. Gordon to lose any Title I funding associated

with a relatively small change in the exact magnitude and nature of the differential undercount undermines the certainty of her prediction, particularly given the inherently speculative and unreliable nature of the differential undercount scenarios used in her calculations.

241.    The Court also finds Dr. Gordon's predictions about the potential impact of a differential undercount on the 2020 Census to be inherently uncertain.  Dr. Gordon's calculations of these four Title I grant programs are based upon the current funding formulas for those grants, but she acknowledges that Congress could change the funding formulas for these grants, which would change the outcome of her predictions.  Tr. 3-61:5-22.  Similarly, Dr. Gordon's calculations are based upon the current funding amounts for the Title I program, and she acknowledges that the amount of Title I funding these school districts receive would change if Congress changed the overall amount of Title I funding.  Tr. 3-60:19-3-61:4.  Dr. Gordon also concedes that there are other inputs used in the funding formulas that are not based on decennial census data, and that a change in any of those variables could impact the amount of funding these school districts receive for these Title I grants. Tr. 3-61:23-3-62:5.  Dr. Gordon's calculations are therefore not useful in the event that Congress decides to change the funding amounts or funding formulas for these Title I grants at some point between now and when data from the 2020 Census begins to be incorporated into the funding formulas.

242.    Furthermore, Dr. Gordon fails to show that a reduction in the amount of funding a school district receives pursuant to Title I will amount to a reduction in overall funding.  Dr. Gordon concedes that school districts may be able to identify other sources of funds to use on educational purposes.  Tr. 3-62:14-24, 3-63:6-13.

243.    Finally, even in the event the school districts do experience a short-term reduction in funding, Dr. Gordon is also unable to articulate any type of tangible harm to the organizations and individuals who are Plaintiffs in this action.  These Title I grants provide funding to state and local

education agencies, and, other than some private schools, Dr. Gordon testified that no Title I grant funding goes to any nonprofit organization or to any individual.  Tr. 3-50:11-24.  Therefore, no Plaintiff in this action can claim that they will suffer any loss of funding through the Title I program in the event of a differential undercount on the 2020 Census.

244.    Furthermore, while Dr. Gordon states in her declaration that she believes that any reduction in the amount of funding a school district receives under Title I is "likely to result in a reduction in education services," ECF No. 99-4 ¶ 35, she can only offer speculation that "it is reasonable to assume" that school districts may make cuts to certain education programs she provides as examples.  ECF No. 99-4 ¶ 37.  However, Dr. Gordon acknowledges that so long as school districts comply with certain basic federal rules and regulations, the school districts have wide discretion in choosing how to use their Title I funds.  ECF No. 99-4 ¶ 37; Tr. 3-63:14-3-64:2.  Accordingly, Dr. Gordon concedes that she cannot predict any specific action any school district may take that would have any potential detrimental impact on any of the organizational or individual Plaintiffs in this case. Tr. 3-64:3-6.

245.    Accordingly, even if Dr. Gordon's reliance upon the speculative predicted undercount scenarios provided to her by Plaintiffs' counsel was supported by some evidence of reasonableness or validity, which it is not, her analysis fails to establish that: (1) a school district will actually see a reduction in funding, in light of the ability of Congress to change the funding amount for Title I grants or the funding formula for Title I grants, as well as the possibility of school district's locating another source of funding; (2) Dr. Gordon cannot identify any specific education program or aspect or even the type of education program or aspect that would be negatively impacted in the event of a differential undercount, especially given that even if there is some reduction in Title I funding, Dr. Gordon concedes that it would be relatively small (in all cases for all differential undercount scenarios less than five percent).  Finally, and most importantly, in the absence of any identification of a specific impact

on education programs or services offered, Dr. Gordon also cannot identify how any of the individuals and organizations that are Plaintiffs in this case would be specifically impacted by any change in Title I funding in the event of a differential undercount on the 2020 Census.

246.    For these reasons, Dr. Gordon's analysis, calculations, and testimony fail to establish that Plaintiffs will be negatively impacted by the inclusion of a citizenship question on the 2020 Census.

### viii.    **Plaintiffs have not proven that they would be harmed by lower-quality census data.**

247.    Plaintiffs set forth no evidence that they would be harmed in any way if the citizenship question caused the quality of data generated by the census to be degraded.

### ix.    **Plaintiff Organizations have not proven that they have reasonably diverted, or will reasonably divert, resources in response to a citizenship question.**

248.    Most of the organizational plaintiffs have failed to prove that they have diverted specific resources as a direct result of the Secretary's decision to include a citizenship question on the decennial census.

249.    Although many of the organizational plaintiffs make the boilerplate, generic statement that they have had to divert resources from organizational priorities as a result of the citizenship question, *see* Block Aff., ECF No. 94-21, at ¶ 3; Gonzalez Aff., ECF No. 94-23, at ¶ 3; Tso Aff., ECF No. 94-2, at ¶ 3; Navarette Aff, ECF No. 133-4, at ¶ 3, most failed to identify any specific resources that have been diverted as a direct result of the citizenship question.

250.    For example, although Peter Block Garcia claims that as a result of the addition of the citizenship question to the 2020 census, the Latino Community Fund of Washington State (LCF) has had to rework its strategic planning and priorities to "try and understand and address community fears about the citizenship question, *see* Garcia Aff., ECF No. 94-21, at ¶ 6, he fails to identify any specific program that has been impacted through an alleged diversion of resources. *See* Garcia Aff., ECF No.

94-21, at ¶ 6 (stating without specificity that the resources that LCF is spending on understanding and mitigating the effects of the citizenship question on the 2020 census would otherwise be spent on LCF's health, civic engagement, and capacity building efforts).

251.   Similarly, although Gerardo Gonzalez claimed that the Georgia Association of Latino Elected Officials (GALEO) is already planning to increase engagement in the community, which will require substantial staff and volunteer time, thereby diverting resources from its other core programs, such as voter registration or leadership development, as a result of the citizenship question, *see* Gonzalez Aff., ECF No. 94-23, at ¶ 11, he failed to identify any specific impact on these programs as a result of the citizenship question.

252.   Elaine Tso similarly made the generalized statement that Asian Services in Action, Inc. (ASIA) plans to expend additional resources to educate the Asian American community about privacy protection for information collected by the Census Bureau, Tso Aff., 94-2, at ¶¶ 10, 12 (stating that ASIA "will be forced to divert significant resources in terms of money and staff time," without any specific identification of monetary expenditure); but she failed to identify any of those specific resources that would be expended or the specific other programs that would be impacted through the alleged expenditure of these unidentified additional resources.  For example, Ms. Tso claims that the citizenship question will require ASIA to expend more resources to explain the citizenship question and alleviate fears about immigration repercussions, *See* Tso Aff., ECF No. 94-2, at ¶ 12, without specifically identifying those resources that ASIA anticipates expending.

253.   Furthermore, many of the organizational Plaintiffs acknowledge that they would perform work associated with the census regardless of the citizenship question, but that they have started that process earlier allegedly as a result of the citizenship question.  *See* Block Aff., ECF No. 94-21, at ¶ 7 (noting that although LCF had planned on initiating and joining certain coalitions for the 2020 census regardless of the inclusion of a citizenship question, the addition of the citizenship

question required LCF to begin planning in early 2018, rather than early 2020); *See* Gonzalez Aff., ECF No. 94-23, at ¶¶ 10-11 (noting the work that GALEO would have done regardless of the citizenship question but claiming that efforts for the 2020 Census began approximately 6 months earlier than for the 2010 census); Navarette Aff., ECF No. 133-4, at ¶ 7; Tr. 1-218:4-11 (Mr. Park, stating that MinKwon did not start its 2010 census efforts until 2010); Tr. 1-215:6-1-216:13; Tr. 1-216:14-1-218:3 (Ms. Valdez-Cox, noting that LUPE started its 2020 Census outreach efforts earlier than it did in 2010). None of these organizational plaintiffs explain how starting census outreach work earlier than they otherwise would have has caused any incremental injury to their organizations.

254.     In those relatively rare circumstances where organizational plaintiffs actually do identify a particular expenditure of funds, they typically acknowledge that there are causes in addition to the citizenship question for the expenditure, such as the general political climate. For example, Ms. Valdez-Cox testified that LUPE began census outreach efforts earlier for the 2020 census than for the 2010 decennial census because "*this last two years* have been very difficult on immigrants" and "we're just going to be so much more fearful of answering and wonder about the consequences." Tr. 1-173:15-1-175:4 (emphasis added). Ms. Valdez-Cox explained that the border wall "has been a huge issue," that razor wire and the military had been sent to the border, and the Texas governor had sent the National Guard and "hundreds of TPS officers" to the area. Tr. 1-173:15-1-175:4. She further explained that fear of participating in the census resulted from the Administration's announcement that it would scrutinize those born with a midwife when renewing passports into Mexico. Tr. 1-173:15-1-175:4. Indeed, Ms. Valdez-Cox testified that there is a lot of fear and distrust of the federal government among both citizens and non-citizens in South Texas, and many LUPE members and members of the Latino community fear interacting with the government workers. Tr. 1-186:8-15. She explained that trust in the federal government is much lower today than it was in 2010, and that this is due to both the Trump Administration's policies -- such as the border wall, the rescission of DACA

and DAPA, the increased scrutiny of those with U.S. passports, and increased military presence at the border -- as well as Texas's policies towards immigration and immigrants. Tr. 1-186:16-18-187:6. Ms. Valdez-Cox acknowledged that all of these policies and activities are causing distrust in the community of the government. Tr. 1-187:7-9.

255. Mr. Park echoed those concerns, and testified that one of the biggest challenges MinKwon is facing concerning the 2020 census is "a real climate of fear, trauma." Tr. 1-214:9-1-215:5. Mr. Park believes there is currently a lot of fear and distrust in the federal government within the immigrant communities. Tr. 1-225:15-18. That fear and distrust in large part is caused by President Trump's policies, and that fear and distrust existed before Secretary Ross announced his decision in March 2018 to include a citizenship question on the decennial census. Tr. 1-225:19-1-226:3. Mr. Park believes that immigrant communities are afraid of sharing their information with the Trump Administration because the Trump Administration might share or use their personal information. Tr. 1-226:8-15. Mr. Park believes that this fear and distrust of the Trump Administration will cause some people not to respond to the 2020 census. Tr. 1-226:16-19.

256. Other organizational plaintiffs acknowledged the general political climate as contributing to their census outreach efforts. *See, e.g.,* Gonzalez Aff., ECF No. 94-23, at ¶ 11 (noting that GALEO will hire a part-time coordinator to carry out increased community outreach on the census "in light of the political climate and the addition of a citizenship question."); Tso Aff., ECF No. 94-2, at ¶ 11 (stating that the citizenship question and the current political climate has caused ASIA to hold executive committee and steering committee meetings, and that the focus of ASIA's community education efforts has changed for 2020 because of greater anxiety and fear in the communities it serves); Tso Aff., ECF No. 94-2, at ¶ 12 (claiming that due to the increased fear resulting from an anti-immigrant climate, ASIA will expend considerably more resources for the 2020 census than it did for the 2010 census). These organizations fail to identify any incremental

expenditure of resources attributable solely to the citizenship question as opposed to the general political environment.

257.    Indeed, a number of the organizational plaintiffs acknowledged that they voluntarily engaged in significant outreach efforts during previous censuses that involved substantial expenditure of resources, even though those censuses did not include a citizenship question, and that they would increase those efforts for the 2020 census even in the absence of a citizenship question.

258.    For example, during the 2010 census, LUPE worked to ensure that immigrant communities completed the census. Tr. 1-184:2-4.  It had an outreach plan for the 2010 census, including the delivery of educational materials to the community, the sending of staff and volunteers to canvass the neighborhood, and the printing of flyers. Tr. 1-184:5-18.  All of these activities cost money and were paid for by LUPE's own resources. Tr. 1-184:19-24.  LUPE engaged in all of these efforts for the 2010 decennial census even though the census did not ask a citizenship question.  Tr. 1-185:10-15.  LUPE engaged in these efforts voluntarily; it was not required to perform any of these outreach activities.  Tr. 1-184:25-1-186:5.  All of the resources that LUPE devoted to the 2010 decennial census could have been used for other activities. Tr. 1-185:6-9.  Just as in the 2010 decennial census, LUPE believes that it is important for all persons to be counted in the 2020 census.  Tr. 1-185:16-18.  And that is why LUPE will again make an effort to make sure that immigrant communities respond to the census.  Tr. 1-185:19-22.  Ms. Valdez-Cox admitted that even with the citizenship question enjoined, LUPE will continue to undertake efforts to increase response rates to the census. Tr. 1-185:23-1-186:3.  For example, LUPE will continue to engage in outreach and education activities to make sure that immigrant communities respond to the census even if the citizenship question is enjoined.  Tr. 1-186:4-7.

259.    Mr. Park testified similarly, acknowledging that MinKwon spent substantial resources on the 2010 decennial census that could have been used for other activities that MinKwon engaged

in, and that MinKwon engaged in all of these activities in 2010 even in the absence of a citizenship question on the decennial census.  Tr. 1-224:6-9, Tr. 1-224:16-21.  Indeed, MinKwon will continue to undertake efforts to boost response rates to the census even though the district court in New York has enjoined the citizenship question.  Tr. 1-225:4-10.

260.    Many of the organizational plaintiffs have failed to establish any expenditure of funds directly attributable to the citizenship question.  For example, although Mr. Garcia claims that as a result of the citizenship question, LCF and others in the Yakima/Yakima Counts coalition are working to *raise* funds to hire Native American and Latino community workers to educate community members about the census, *see* Block Aff., ECF No. 94-21, at ¶ 11 (emphasis added), he failed to identify any direct expenditure of funds by LCF or how making the decision to raise funds injures the organization.

261.    Similarly, although Mr. Navarette asserts that "PAZ has joined a number of committees as part of its efforts to combat the negative effects of the citizenship question," and that as part of the City of Phoenix steering committee, PAZ is "planning a robust door-to-door campaign to educate the community on the census in general and on the citizenship question in particular," Navarette Aff., ECF No. 133-4, at ¶ 8, he does not suggest that PAZ would not have engaged in robust door-to-door efforts to educate the community in the absence of a citizenship question, or how the inclusion of a citizenship question has increased the burden on PAZ's door-to-door efforts. Mr. Navarette further claimed that PAZ is also part of the National Strategy on the Census, a committee organized by the Fair Immigration Reform Movement, and that the "committee is planning an education campaign around the census and the citizenship question."  Navarette Aff., ECF No. 133-4, at ¶ 9.  However, Mr. Navarette fails to explain precisely what this committee is planning on doing, what PAZ's role is on the committee, or how that role has caused PAZ any cognizable harm. Mr. Navarette further contends that it will attend a meeting in March 2019 to discuss the citizenship

question, Navarette Aff., ECF No. 133-4, at ¶ 10; once again, he fails to explain how attendance at a meeting has harmed the organization.

C.    Conclusions of Law

i.    **Scope of Review and Expert Evidence**

262.    A court should not accept expert opinion testimony "that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).   The district court does not abuse its discretion in rejecting expert testimony where an analytical gap exists between the data and the expert opinion testimony. *Id.*

263.    In *Joiner*, the plaintiff, who had been a smoker and had a family history of lung cancer, alleged that he repeatedly had been exposed to dielectric fluid containing PCBs over the course of a number of years while making repairs to electrical transformers, and that the exposure contributed to his development of lung cancer.   *Id.* at 139.   In support of his theory of causation, the plaintiff presented expert testimony.   Several of plaintiff's experts relied upon studies involving infant mice who had been injected with high doses of PCBs and developed cancer in support of the conclusion that plaintiff's exposure to PCBs promoted his cancer.   *Id.* at 144.   The district court concluded that these studies could not support the experts' conclusion because the plaintiff was an adult human who had been exposed to much lower doses of PCBs, and the experts failed to explain how or why they could have extrapolated their opinions from "these seemingly far-removed animal studies." *Id.*   The Supreme Court affirmed the district court's rejection of this expert testimony and held that an expert's opinion must be sufficiently supported by the studies upon which he relies.   *Id.*   Because the animal studies were so dissimilar from the facts presented in the litigation, the district court did not abuse its discretion in rejecting the opinions.   *Id.* at 144-45.

264.    Other of plaintiff's experts relied upon four epidemiological studies to support their conclusion that plaintiff's exposure to PCBs contributed to his cancer.   *Id.* at 145.   The first of these

studies involved workers who were exposed to PCBs at a plant, but did not conclude that the PCB exposure had caused cancer among the examined workers. The Supreme Court affirmed the district court's rejection of the expert opinions that relied upon this study, and noted that because the study was unwilling to conclude that PCB exposure had caused cancer, the study could not support the experts' conclusions. *Id.* at 145.

265. The second study involved workers who were exposed to PCB, but the study could not find a statistically significant increase in lung cancer deaths. *Id.* The third study involved workers who were exposed to mineral oils, but not PCBs, and showed a statistically significant increase in lung cancer deaths. *Id.* at 146. The final study involved a group that had been exposed to PCBs as well as a number of other potential carcinogens, and experienced a statistically significant increase in lung cancer deaths. *Id.* The Supreme Court affirmed the district court's rejection of the opinions that based their conclusions on these studies and explained:

> But conclusions and methodology are not entirely district from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence *that is connected to existing data only by the ipse dixit of the expert*. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* (emphasis added).

266. Here, as discussed both above and below, a number of the studies Plaintiffs' experts rely upon to support their conclusions involve unwarranted extrapolation to very different factual circumstances, and these opinions are connected to this data solely, if at all, by the *ipse dixit* of the expert. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (rejecting expert opinion that rejected studies as "unpersuasive" without any explanation as insufficient to rebut causation and amounting to *ipse dixit*). Dr. Mathiowetz impermissibly extrapolated from the Tourangeau article's analysis of questions about residents' *names* and from the Brown et al. paper's analysis of *self-response*

*rates* to render a conclusion about how a question about *citizenship* might cause *rostering omissions*. Tr. 2-187:19–2-188:17, 2-188:18–2-191:5; PX-162; PX-923. Similarly, Mr. Brace impermissibly extrapolated from the Brown et al. paper's conclusion concerning a 5.8% difference in self-response for households that contain a non-citizen and applied that same percentage, without explanation, to Hispanic citizen households. Tr. 2-223:22-25; Tr. 2-224:1-4; Tr. 4-43:8-15; Tr. 4-59:6-24. Mr. Brace also impermissibly extrapolated from Dr. Barreto's survey results of an 8.09% differential drop in self-response rates for Latinos and applied it, without explanation, to non-Hispanic, non-citizen households. Tr. 2-224:18-21; Tr. 4-36:20-4-37:17; Tr. 4-42:17-4-43:1; Tr. 4-43:16-4-44:3; Tr. 4-52:24-4-53:9.

267.    In addition, the Court shall give no weight to the opinions from Plaintiffs' experts Dr. Nancy Mathiowetz and Dr. William O'Hare based solely on a statistical correlation because expert testimony that relies solely on correlation to show causation, without controlling for any other potential explanations, is unreliable and inadmissible. *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300 (4th Cir. 2017) ("[T]he district court concluded that [the expert's] 'methods … are questionable' and that her 'conclusions are not reliable,' primarily because [her] analysis failed to distinguish between 'correlation' and 'causation.' We agree with the district court.") (ellipsis in original) (citation omitted); *Wehling v. Sandoz Pharms. Corp.*, 162 F.3d 1158 (4th Cir. 1998) (per curiam) (unpublished) (expert testimony was properly excluded because the expert "based his opinion regarding causation primarily on the correlation in time between the administration of [one drug] to plaintiff, and the administration of [another drug]," and "[s]ince conjecture, hypothesis, subjective belief, or unsupported speculation are impermissible grounds on which to base an expert opinion, such 'expert' opinions … must be excluded"); *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537–38 (7th Cir. 1997) ("[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court.").

268.     Here, Dr. Mathiowetz's testimony that the citizenship question will cause Hispanic self-response rates to decrease by 8 to 10 % was based solely on a statistical correlation, without controlling for any other potential explanations.  Tr. 2-191:21–25, 2-194:19–2-195:4, 2-195:16–2-196:7.   Likewise, her testimony about a causal relationship between self-response rates and net undercounts was based solely on a statistical correlation between lower self-response rates and higher net undercounts in the past three censuses, without controlling for any other potential explanations. Tr. 2-133:1–2-137:13, 2-139:3–2-147:22, 2-196:22–25, 2-197:4–2-199:2.  That testimony was therefore unreliable and will be given no weight.

269.     Likewise, Dr. O'Hare's testimony about a causal relationship between self-response rates and net undercounts was based solely on a statistical correlation between lower self-response rates and higher net undercounts in the past three censuses, without controlling for other potential explanations.  Tr. 2-75:13–2-77:9.  That testimony was therefore unreliable and will be given no weight.

270.     With respect to Dr. Reamer, as discussed above, he relied on two differential undercount scenarios that were provided to him by Plaintiffs' counsel.  Tr. 3-72:3-7.  They were generated by a Dr. Barnard Fraga, who was not identified by Plaintiffs as an expert in this action.[12] Tr. 3-71:7-10.  Dr. Reamer was not aware of how these scenarios were calculated or what assumptions they were based upon when he submitted his declaration.  Tr. 3-72:8-19.  Dr. Reamer did not perform any work or analysis to analyze whether these differential undercount scenario predictions generated by Dr. Fraga and provided to him by counsel were reasonable or valid other than reading Dr. Fraga's report after Dr. Reamer had performed his calculations and submitted his declaration.  Tr. 3-72:20-3-73:1.  In particular, Dr. Reamer was not aware of what the basis was for Dr. Fraga's 86.3 % NRFU

---

[12]   Dr. Fraga was retained and noticed by plaintiffs in other similar litigation challenging Secretary Ross's decision to include a citizenship question on the 2020 Census, *State of California et al. v. Ross et al.*, N.D. Cal. No. 18-1865, and *City of San Jose et al. v. Ross et al.*, N.D. Cal. 18-2279.

success rate used in one of the two scenarios Dr. Reamer used in his calculations. Tr. 3-75:21-24. Dr. Reamer is not an expert on the census or survey methodology, Tr. 3-73:2-9, and offers no opinion that either of these predicted undercount scenarios are likely to happen, or that if one of them did happen, that it would be attributable to the presence of a citizenship question on the 2020 Census. Tr. 3-74:2-3-75:9.

271. Defendants challenged the portion of Dr. Reamer's testimony predicting the funding loss that some states may experience under these four funding programs in the event of a differential undercount on the 2020 Census, ECF No. No. 114. This Court originally took that motion under consideration, and denied the motion in an oral ruling during trial on January 24, 2019. Tr. 3-66:15-21. However, the Court notified the parties that "I will discuss my reasoning in more detail as part of my ultimate opinion, and I will discuss how much weight I am giving it and the like when we get to that point." Tr. 3-66:18-20.

272. Defendant's motion *in limine* was denied because Dr. Reamer disclaims the notion that he is providing a prediction of what may occur. Nowhere in his declaration does he use the word "prediction" or any derivative thereof, and he refers to his calculation scenarios as "illustrations." *See, e.g.*, ECF No. 99-8 ¶¶ 15, 35. Accordingly, because Defendants' motion was premised upon the argument that Dr. Reamer's predictions should not be considered because they were based upon undisclosed expert testimony from Dr. Fraga, this Court denied Defendants' motion and admitted Dr. Reamer's testimony as an illustration of a potential impact two particular differential undercount scenarios on the 2020 Census could have on federal funding under these four programs.

273. However, Defendants' argument that testimony by Dr. Reamer that actually purports to predict the consequences of a differential undercount on the 2020 Census has not been shown to rest upon a reliable foundation as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), is correct.

110

274.     In situations in which an expert's opinion relies upon projections and calculations rendered by another expert who has not been disclosed, and who the opposing party has no opportunity to challenge, it would be unfair and significantly prejudicial to accept such testimony.  *See, e.g.*, *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (holding that expert testimony about lost profits should not have been considered when such testimony was based upon numbers generated by another, undisclosed expert, because "the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.").  This is particularly true because, as the Supreme Court has explicitly recognized, avoiding such scenarios is the purpose of Federal Rule of Evidence 703.  As a plurality opinion of the Supreme Court recognized, "[t]he Rule 703 approach, which was controversial when adopted, is based on the idea that the disclosure of basis evidence can help the factfinder understand the expert's thought process and determine what weight to give to the expert's opinion." *Williams v. Illinois*, 567 U.S. 50, 78 (2012).  Then, as an illustrative example, the *Williams* Court wrote, "[f]or example, if the factfinder were to suspect that the expert relied on factual premises with no support in the record, . . . then the probativeness or credibility of the expert's opinion *would be seriously undermined.*" *Id.* (emphasis added).  The Court finally noted that "[t]he purpose of disclosing the facts on which the expert relied is to allay these fears – to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by the other evidence in the record…" *Id.*  Here, this is an issue of the Plaintiffs' own making, and was avoidable and curable in a number of ways.  Plaintiffs could have noticed Dr. Fraga as an expert, of course, but they also could have simply had Dr. Reamer perform his calculations with differential undercount scenarios generated by a disclosed expert witness, such as Mr. Brace, which is what two of Plaintiffs' other funding experts did.  However, as the Supreme Court has made clear, it

is improper to consider expert testimony based upon work or calculations performed by another undisclosed expert, particularly in light of Dr. Reamer's explicit admission that he testified not knowing how Dr. Fraga had performed his calculations of the differential undercount scenarios or what assumptions those calculations were based upon.  Tr. 3-72:8-19.

275.    The Court finds that Dr. Reamer's reliance on these projected undercount scenarios were not reasonable.  There is nothing in the administrative record, or the exhibits entered into evidence, including exhibits admitted only for the purposes of Federal Rule of Evidence 703, that even attempts to explain the basis for these two differential undercount scenarios generated by Dr. Fraga or why they constitute reasonable assumptions upon which Dr. Reamer can base his calculations.  As an initial matter, Dr. Fraga's 5.8 % scenario that does not account at all for the Census Bureau's NRFU process is unreasonable because, as Dr. Reamer concedes, all federal funding formulas that use any kind of decennial census-derived data use the data from the final census enumeration, not just the initial self-responses.  ECF No. 3-75:10-20.

276.    Lastly, three exhibits from CBAMS should also be excluded (PX-152, PX-163, and PX-1216).  Although the Court tentatively admitted those exhibits, it indicated the possibility of revisiting that decision.  Tr. 5-5-133:10–5-140:20, 2-106:10–2-110:2.  Those exhibits contain three levels of hearsay.

277.    The Court ruled that the first level of hearsay—the documents themselves—are admissible as statements of a party opponent.  Tr. 2-108:11–12.  The Court also ruled that the second level of hearsay—statements by survey respondents—is admissible under a hearsay exception.  Letter Order at 2–3, Jan. 25, 2019, ECF No. 128.  Even beyond these first two levels of hearsay, these exhibits also contain a third level of hearsay: statements by third parties to the survey respondents.

278.    For example, one of the CBAMS focus group reports states: "Most participants said that though they personally are citizens or legal residents and are not afraid to answer the citizenship

question, they know many others who will not fill out the question or the form altogether out of fear." PX-152-22 (emphasis added); *see also, e.g.*, PX-1216-65 ("'If somebody came to my house and said, "Will you fill out this form about your citizenship?" I'd say, "Sure, why not?" Because I am a citizen. But you go ahead and ask somebody else? No.'"). These kinds of statements cannot be admitted under the hearsay exception governing survey responses because they were made by third parties not participating in the survey. Statements in PX-152, PX-163, at PX-1216 by third parties not participating in the survey thus do not satisfy any hearsay exception and are inadmissible.

279.     Moreover, to be admissible under that hearsay exception, survey evidence must be "'more probative on the issue than other evidence.'" *Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 188 F.3d 501, 1999 WL 639165, at *5 (4th Cir. 1999) (unpublished) (citation omitted). Here, on the key issue for which these CBAMS surveys were offered—how the citizenship question will affect self-response rates of noncitizens and Hispanics—Plaintiffs failed to prove that the survey responses were more probative than other evidence. Specifically, the survey responses are less probative on that issue than the Brown et al. paper, which numerous witnesses called by both parties testified about extensively, and which (unlike the survey responses) undertakes a quantitative analysis that controls for many other potential explanations. *See* PX-162. The statements by survey respondents in PX-152, PX-163, and PX-1216 thus do not satisfy the hearsay exception and are inadmissible.

ii.     **Plaintiffs have not proven a differential undercount.**

280.     As an initial matter, Plaintiffs have set forth no reliable calculation of differential net undercount because they have failed to prove (1) the magnitude of any decline in self-response rate, (2) the effectiveness of NRFU efforts, (3) the effectiveness of imputation, (4) the rate of erroneous enumerations, and (5) the likelihood and magnitude of rostering omissions.

281.     First, as set forth above, Plaintiffs have set forth no reliable evidence regarding the magnitude of any decline in the self-response rate for potential noncitizen households, and have proved even less with respect to a potential decline in self-response rates for Hispanics.   Most significantly, Plaintiffs did not conduct a true RCT to provide credible quantitative evidence of the self-response rate decline.

282.     Second, as set forth above, Plaintiffs have not proved that NRFU would be ineffective. Indeed, Plaintiffs adduce no credible quantitative evidence to challenge Dr. Abowd's opinion that NRFU can effectively combat any decline in the self-response rate.   Tr. 5-123:17–21 (Dr. Abowd defining "credible quantitative evidence" as that which would "stand up to internal and exterior peer review in the relevant scientific disciplines").   Again, Plaintiffs failed to conduct their own RCT, which could have provided credible quantitative data regarding the effectiveness of NRFU.   To the extent Plaintiffs rely on qualitative studies, like CBAMS and the Brown et al. paper,[13] in an effort to establish the impact of a citizenship question on the census, such evidence should not be credited.   *See Wehling v. Sandoz Pharm. Corp.*, 162 F.3d 1158, *5 (4th Cir. 1998) (affirming district court's rejection of expert that failed to cite to peer-reviewed, controlled studies to substantiate his opinions) (unpublished); *Doe v. Ortho-Clinical Diagnostic, Inc.*, 440 F. Supp. 2d 465, 476 (M.D.N.C. 2006) ("Finally, the Court also finds that Dr. Geier's two most recent papers . . . that were presented to the Court during the hearing, have not yet been published nor peer reviewed, making their own relevance and scientific validity difficult, if not impossible, to assess."); *Chambers v. Exxon Corp.*, 81 F. Supp. 2d 661, 665 (M.D. La. 2000) (rejecting expert opinions because they "fail to present a single peer-reviewed, controlled epidemiological study that supports their causation theories."), aff'd 247 F.3d 240 (5th Cir. 2001)

---

[13] While the Brown et al. provided quantitative evidence of the decline in self-response rate for potential noncitizen households, it provided only qualitative evidence regarding the effectiveness of NRFU.   *See* Tr. 5-83:1–5-85:13, 5-90:23–5-91:15.

(affirming district court's rejection of expert testimony as unreliable where expert failed to present a single peer-reviewed, controlled study in support of opinion); *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998) (rejecting expert testimony for failure to present a single peer-reviewed, controlled study to support causation theory).

283.     The Court respectfully disagrees with Judge Furman's conclusion that "the incremental net differential decline in self-response rates among noncitizen households caused by the citizenship question, and any similar decline among Hispanics, will remain uncured by NRFU, and will thus ripen into an incremental net differential undercount of the people who live in such households." *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *64 (S.D.N.Y. 2019). Most fundamentally, this calculation assumes that NRFU will not enumerate even a *single* household through in-person visits, administrative records, or proxy responses—that is the only way a "differential decline in self-response rates" could "ripen into an incremental net differential undercount." Dr. Abowd debunked this idea several times over, testifying that it is literally not possible for a household to go uncounted; at the very least, an unresolved household will have a count imputed at the end of the 2020 Census. Tr. 5-54:4–15 (noting that the Census Bureau's operational system confirms that "every address [ ] in the MAF at the end of the census has been accounted for."), 5-101:10–13, 5-122:12–17. Even Plaintiffs do not press this theory.

284.     Further, for the reasons discussed above and below, Judge Furman overlooked the essential building blocks of differential net undercount: erroneous enumerations (someone who was counted incorrectly), gross omissions (someone missed), and whole person census imputations (someone for which the Census Bureau filled in data based on nearby households). *See* Tr. 5-112:24–5-120:11. The inquiry does not end with gross omissions. It is entirely possible that a particular demographic group will have no differential net undercount (or a net overcount) when every variable is calculated. *See* Tr. 5-118:11–5-120:11.

285.     Third, Plaintiffs have provided no credible quantitative data regarding the effectiveness of imputation.  Such data is critical here, as Dr. Abowd testified that even if imputation systematically undercounts a particular demographic group, no differential undercount may result.  Tr. 5-118:11–5-120:11, 6-47:9–12.  To the extent Plaintiffs rely on unnamed qualitative studies, such evidence cannot legally be credited.  *See Wehling*, 162 F.3d at *5; *Ortho-Clinical Diagnostic*, 440 F. Supp. 2d at 476; *Chambers*, 81 F. Supp. 2d at 665; *In re Breast Implant Litig.*, 11 F. Supp. 2d at 1228.

286.     Fourth, Plaintiffs do not even attempt to prove the rate of erroneous enumerations due to the citizenship question, a critical variable in calculating differential net undercounts.

287.     Finally, Plaintiffs have not proved the likelihood and magnitude of any rostering omissions specifically due to the citizenship question.  Again, Plaintiffs did not conduct an RCT to provide credible quantitative evidence of rostering omissions.  And without such quantitative evidence, Plaintiffs' experts' opinions are "connected to existing data only by the *ipse dixit* of the expert."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

288.     For the reasons set forth above, Plaintiffs have not proven that a differential net undercount will occur in the 2020 Census for any identifiable group.  And without a reliable calculation of differential net undercount, Plaintiffs cannot prove any injury for Plaintiffs.  *See Utah v. Evans*, 536 U.S. 452, 464 (2002).

### iii.     Plaintiffs have not proven a concrete, non-speculative injury that is certainly impending.

289.     Differential-net-undercount deficiencies aside, Plaintiffs have failed to prove a certainly impending injury as a matter of law.  In particular, the unreliable estimates of differential undercount developed by Dr. Mathiowetz were used as inputs by Mr. Brace to calculate apportionment and redistricting harm (as well as projections for Medicaid and certain transportation funding), and Mr. Brace's calculations then were in turn used as inputs in the analyses of Ms. Carruth and Mr. Mingo.  "Thus, Plaintiffs fashioned their expert testimony as a precarious house of cards with

each expert relying on conclusions which other experts were responsible for generating and verifying. Because of this, the failure of even one of Plaintiffs' experts to produce a verifiable conclusion necessarily harms the conclusions of other of Plaintiffs' experts." *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 824-25 (M.D. Pa. 1996). In the absence of credible expert testimony, Plaintiffs have failed to establish any cognizable injury.

290.    Plaintiffs' claims concerning the anticipated effect of a hypothetical differential undercount as a result of the citizenship question leading to a loss of representation, intra-state vote dilution, or loss of federal funding are too speculative to satisfy Article III's requirements. *See Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 185 (D.C. Cir. 1996) (finding lack of standing where court could not determine "what effect any methodology for counting the homeless would have on the federal funding of any particular appellant," noting that "if a more accurate count would have enlarged some of the communities' shares, it likely would have reduced the shares of other communities"); *id.* at 186 ("interstate vote dilution injury is difficult to establish"); *Strunk v. U.S. Dep't of Commerce*, Civ. A. No. 09-1295, 2010 WL 960428, at *3 (D.D.C. Mar. 15, 2010) (rejecting vote dilution claim for lack of standing where plaintiff was "but one citizen of New York and one voter in New York's 11th Congressional District"); *Ridge v. Verity*, 715 F. Supp. 1308, 1318 (W.D. Pa. 1989) (finding no standing to bring an apportionment claim when "none of the plaintiffs in this case can show which states would gain and which states would lose representation in Congress"); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 570 (D.D.C. 1980) (holding that "none of the plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" where plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" which depends, *inter alia*, on "the interplay of all other population factors which affect apportionment"); *see also Sharrow v. Brown*, 447 F.2d 94, 97 (2d Cir. 1971) (noting that plaintiff's claim of standing to challenge method of apportionment "presents difficulty" because plaintiff "would have

to show, at least approximately, the apportionment his interpretation . . . would yield, not only for

New York *but for every other State as well*") (emphasis added).

291.    Plaintiffs' claim that the decision to include a citizenship question in the 2020 Census

will result in a dilution of Plaintiffs' representation in the House of Representatives is inherently

speculative.   Plaintiffs have not, and cannot, establish that the citizenship question will affect the

number of Representatives in Congress.  *See Franklin v. Massachusetts*, 505 U.S. 788 (1992) (because the

plaintiffs had not "shown . . . that Massachusetts would have an additional Representative if the

allocation had been done using some other source of 'more accurate' data," they "d[id] not have

standing to challenge the accuracy of the data." *Id.* at 802 (plurality opinion)).

292.    The evidence adduced at trial does not show that the inclusion of the citizenship

question "will *likely* result" in a loss of representation for Plaintiffs.   Thus, Plaintiffs have fallen far

short of demonstrating an "injury in fact" that is "concrete and particularized," *Defs. of Wildlife*, 504

U.S. at 560 (citations omitted), and not "merely 'conjectural or 'hypothetical' or otherwise speculative."

*Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also*

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alleged future injury must be '*certainly impending*'";

"'[a]llegations of *possible* future injury' are not sufficient") (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

158 (1990)).

293.    Moreover, the process of apportionment itself makes any pre-census allegations as to

the distribution of representatives speculative.   Because the apportionment process is based on the

population of every state, Plaintiffs cannot establish an imminent injury here because the 2020 Census

has not yet taken place and projections of state populations will continue to change between now and

2020.    It is therefore impossible to "accurately measure" the population before the actual

measurement.  *See Fed'n for Am. Immigration Reform*, 486 F. Supp. at 570, 572 (holding "none of the

plaintiffs are able to allege that the weight of his or her vote in the next decade will be affected" when

plaintiffs "can do no more than speculate as to which states might gain and which might lose representation" depending on "the interplay of all the other population factors which affect apportionment").

294.    Lastly, as explained above, Plaintiffs proffered no evidence that they would be harmed in any way if the citizenship question caused the quality of census data to be degraded.  Thus, even assuming data-quality harm is sufficient for Article III standing, *see New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), Plaintiffs have not proved that they would be harmed by a decline in the quality of census data.

iv.    **No Associational Standing**

295.    "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of Article III standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v.* Defs. *of Wildlife*, 504 U.S. 555, 561 (1992). At trial, the facts underlying Article III standing "must be 'supported adequately by the evidence adduced at trial.'" *Id.* (citation omitted).

296.    Here, of the 26 Organizational Plaintiffs in No. 18-cv-1570, 19 of them—DHF, SVREP, MVF, LCLAA, Somos, SHC, MALC, CLLC, CLBC, API Legislative Caucus, CPLC, AZLLC, El Pueblo, MLLC, Advancing Justice-Chicago, Chelsea Collaborative, OCA-GC, Friendly House, and Four Directions—presented no evidence that they have Article III standing to sue, either on behalf of their members or on their own behalf. Those 19 Organizational Plaintiffs are therefore dismissed without prejudice for lack of standing.

a)    Standing to Sue on Behalf of Members

297.    An organization does not have Article III standing to sue on behalf of its members unless "its members would otherwise have standing to sue in their own right." *Hunt v. Wash. State*

*Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This associational standing requirement demands that the organization identify a particular affected member, not merely a "statistical probability that some of [its] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). A general reference to unidentified members is insufficient to confer standing on an organization. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.23 (1982); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. … At the very least, the identity of the party suffering an injury in fact must be firmly established.").

298.    Here, as explained above, 19 of the 26 Organizational Plaintiffs in No. 18-cv-1570 presented no evidence that they have standing to sue, either on behalf of their members or on their own behalf.

299.    Of the remaining seven Organizational Plaintiffs, six of them—LCF, GALEO, ASIA, PAZ, CHIRLA, and MinKwon—presented no evidence identifying a single member who has suffered or will suffer an injury from the inclusion of a citizenship question on the 2020 census. Those six Organizational Plaintiffs have therefore failed to prove standing to sue on behalf of their members.

300.    Only one of the 26 Organizational Plaintiffs in No. 18-cv-1570 (LUPE) presented evidence identifying a member (Juanita Valdez-Cox) who will purportedly suffer injuries from the inclusion of a citizenship question on the 2020 census. However, it is undisputed that those purported injuries—loss of federal funding for unidentified public roads and vote dilution—will not occur absent a differential net undercount in the area where Ms. Valdez-Cox lives.  As explained above, Plaintiffs have failed to prove by a preponderance of the evidence that the citizenship question will cause a differential net undercount. In addition, it is also undisputed that there will be no effect on the unidentified roads on which Ms. Valdez-Cox drives if the state and local governments responsible for

120

maintaining those roads decide to re-allocate other funds to offset any lost federal funding due to the citizenship question. LUPE has thus failed to prove that Ms. Valdez-Cox's alleged roadway injury is fairly traceable to the citizenship question, instead of the independent choices of the state and local governments responsible for maintaining those roads. LUPE has therefore failed to prove by a preponderance of the evidence that it has standing to sue on behalf of its member.

b)      Standing to Sue on Own Behalf

301.    Although an organization's expenditure of resources to avoid a harm can in certain circumstances constitute an Article III injury-in-fact, *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982), the organization cannot "simply choos[e] to spend money fixing a problem that otherwise would not affect the organization at all." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285 (3d Cir. 2014); *accord Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (organization's reallocation of resources not sufficient for standing when organization "and its programs would have been totally unaffected [by defendant's conduct] if it had simply refrained from making the re-allocation"); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (plaintiff "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending"). Instead, the organization must prove that "it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Blunt*, 767 F.3d at 285 (emphasis deleted) (citing *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)); *accord Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) (organization must show that its expenditure of resources was "a necessary link in achieving the organization's ultimate purpose" and not just a product of "unnecessary alarmism constituting a self-inflicted injury"). In other words, the organization must prove that it "*reasonably* incur[red] costs to mitigate or avoid [a] harm" that otherwise

121

would have occurred. *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017) (emphasis added), *cert. denied*, 137 S. Ct. 2307 (2017).

302.    Here, as explained above, 19 of the 26 Organizational Plaintiffs in No. 18-cv-1570 presented no evidence that they have standing to sue, either on behalf of their members or on their own behalf.

303.    Of the remaining seven Organizational Plaintiffs, four—LCF, PAZ, MinKwon, and LUPE—presented evidence of diverted organizational resources but failed to prove by a preponderance of the evidence that their diversion of resources in response to the inclusion of a citizenship question was "reasonabl[e]." *See Beck*, 848 F.3d at 275.    That is because these Organizational Plaintiffs presented no evidence that, in deciding whether to divert resources, they considered whether the Census Bureau's non-response follow-up procedures would adequately mitigate any drop in self-response rates attributable to the citizenship question and thus prevent any differential net undercount. A decision to expend resources to prevent a harm is not reasonable if it fails to consider whether existing procedures would adequately mitigate that harm in any event. These Organizational Plaintiffs thus failed to prove standing to sue on their own behalf.

304.    The other three Organizational Plaintiffs—GALEO, ASIA, CHIRLA—presented evidence of diverted organizational resources but also failed to prove by a preponderance of the evidence that their diversion of resources in response to the inclusion of a citizenship question was "reasonabl[e]." *See Beck*, 848 F.3d at 275. That is because the only supposed flaws in the Census Bureau's non-response follow-up procedures identified by these Organizational Plaintiffs related to households' willingness and ability to provide information to the Census Bureau—i.e., fear and distrust of the federal government and language barriers. However, these Organizational Plaintiffs failed to prove that language access will be a meaningful barrier in 2020 given the Census Bureau's intent to hire noncitizens as enumerators.    PX-297-23–24. Also, even if fear and distrust of the federal

government might make respondents less likely to participate in in-person interviews with enumerators, it does not affect the other non-response follow-up procedures that do not rely on respondents' participation—like administrative records and imputation. Given their failure to present evidence of any material flaws in the Census Bureau's non-response follow-up procedures motivating their diversion of resources, these Organizational Plaintiffs failed to prove standing to sue on their own behalf.

> v.  **Plaintiffs' have not proven that their hypothetical injuries associated with a differential net undercount are traceable to a citizenship question on the 2020 Census.**

305.    The Supreme Court repeatedly has "decline[d] to abandon [its] usual reluctance to endorse standing theories that rest on speculation about the decision of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). "[A] federal court [must] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury from independent action *of some third party not before the court*." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (emphasis added); *see also Warth v. Seldin*, 422 U.S. 490, 506 (1975) (finding standing lacking where alleged injury resulted from outside forces, "rather than . . . respondents' assertedly illegal acts"); *Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (stating that "a fundamental tenet of standing doctrine" is that where a third party "makes the independent decision that causes an injury, that injury is not fairly traceable" to the defendant).  In addition, mere encouragement by the defendant is insufficient to establish traceability.  *See Simon*, 426 U.S. at 42.

> a)    Unlawful Actions of Census Respondents

306.    Here, the challenged government action is the asking of a question that, if truthfully answered, would cause no injury to anyone.  To establish standing, Plaintiffs must show that the government's action threatens an imminent injury that is "fairly traceable to the challenged action."

*Bennett v. Spear*, 520 U.S. 154, 167 (1997). But Plaintiffs' alleged injuries will arise only if individuals unlawfully refuse to return the census form, a classic example of injuries that are "the result of the independent action of some third party not before the court." *Id.*

307. Plaintiffs could establish standing if the citizenship question had a "determinative or coercive effect upon the action of someone else," *id.* at 169, or if their injury was otherwise "fairly attributable to [the citizenship question] instead of to other factors," *Simon*, 426 U.S. at 44. But there is no suggestion that the government would at any point coerce anyone to not respond to the census. To the contrary, the federal government has made it a crime to refuse to answer the census. 13 U.S.C. § 221(a); *see* ECF No. 94-2, at ¶ 11 (noting that one of the Plaintiff Organizations, ASIA, will have community education efforts for the 2020 census that will focus on each individual's legal duty to complete the questionnaire and the legal ramifications for not doing so).

308. Plaintiffs' lack of standing is especially clear because any non-response to the census is based on fears that are speculative and unreasonable. There is nothing inherently wrong with asking a citizenship question, as reflected in the long history of asking this question on the census, and doing so causes no harm to any plaintiff. As the Southern District of New York recognized, "it would be illegal for the Department of Commerce to 'make any publication whereby the data furnished by any particular establishment or individual . . . can be identified.'" *New York v. Dep't of Commerce*, 2019 WL 190285, at *83 (S.D.N.Y. Jan. 15, 2019). And, as the court noted, the Census Bureau applies "'disclosure avoidance techniques' to any data to ensure that information concerning particular respondents is not identifiable." *Id.* The district court in the related census case thus properly held that it was "pure speculation to suggest that the Census Bureau will not comply with its legal obligations to ensure the privacy of respondents' data or that those legal obligations will be amended," and that, as a result, although some respondents "may be subjectively fearful that the government will misuse citizenship data obtained through the census," such speculative fears are "'insufficient to create

standing'" to challenge the citizenship question on those grounds. *Id.* (quoting *Clapper*, 568 U.S. at 417).

<div align="center">

b)      Macro Environment

</div>

309.     All parties agree that the macro environment—the economic conditions, the social environment, and the political climate, among other things—may impact the 2020 Census.  Tr. 5-85:19–5-86:7, 5-125:4–16.  But the evidence in the record amply demonstrates that the decisions of some households—particularly those containing noncitizens—may not respond to the census with or without a citizenship question based on the current macro environment.

310.     As Dr. Abowd acknowledged, the Brown et al. estimate of a 5.8% decline in self-response rate for potential noncitizen households does not take into account the macro environment after 2016.  Tr. 5-124:20–5-125:3.  And, while it is true that the current macro environment, including the political climate, could amplify the effect of a citizenship question, Tr. 5-125:17–20, it is equally likely, if not more likely, that the current macro environment will render the citizenship question a nullity: particular households may not respond to the 2020 Census with or without a citizenship question.

311.     Indeed, many of the issues Plaintiffs identify were present in Fall 2017—before DOJ requested a citizenship question, and before the Secretary made his decision to include it.  For example, Dr. Abowd testified extensively about a Census Bureau presentation in November 2017.  *See* Tr. 5-86:17–25; PX-448.  The presentation documented an "unprecedented ground swell in confidentiality and data sharing concerns, particularly among immigrants or those who live with immigrants," PX-448 at 15, and explained that field interviewers observed "increased rates of unusual respondent behaviors during pretesting and production surveys (data falsification, item non-response, break-

<div align="center">

125

</div>

offs)."[14]  PX-448 at 3.  Respondents, according to the presentation, "seemed visibly nervous."  PX-448 at 7.  One respondent said that "[t]he possibility that the Census could give my information to internal security and immigration could come and arrest me for not having documents terrifies me."  PX 448 at 8.  Another bluntly stated: "[p]articularly with our current political climate, the Latino community will not sign up because they will think that Census will pass their information on and people can come looking for them."  *Id.*  After conducting the field work that produced this presentation, one interviewer exclaimed that "[t]he politics have changed everything.  Recently."  PX-448 at 13.  As this presentation amply demonstrates, the macro environment—even before the Secretary's decision— may make potential noncitizen households reluctant to respond to the census questionnaire regardless of whether it contains a citizenship question

312.    This exact point is supported by Plaintiffs' own expert, Dr. Douglas Massey, who testified that the current macro political environment will make foreign-born individuals less likely to respond to the census *questionnaire*.  Massey Decl. ¶¶ 19–21, ECF No. 99-6 (emphasis added).  To bolster his opinion, Dr. Massey relied upon the "President's public statements" about immigrants and foreign-born individuals.  *Id.* ¶ 19.  But Dr. Massey cited only to statements made by the President *before* the Secretary decided to include a citizenship question to the 2020 Census.  Tr. 1-141:10–142:1.  Indeed, some of the statements cited by Dr. Massey were made during the presidential campaign.  Tr. 1-141:15–22; *see also* Massey Decl. ¶ 19, ECF No. 99-6.  In addition, Dr. Massey referred to unspecified "news items" concerning the government's treatment of immigrants during this Administration to show that immigrants would be fearful of providing citizenship information to the government.  Massey Decl. ¶ 20, ECF No. 99-6.  Because Dr. Massey did not cite to any specific news article, it is

---

[14] As Dr. Abowd explained, a household would still be counted in the 2020 Census if they falsified citizenship data, skipped the citizenship question (item nonresponse), or stopped answering the census at the citizenship question (breakoff).  Tr. 5-87:2–14.

not possible to discern whether the "news items" predate the Secretary's decision to include the citizenship question to the 2020 Census.  *See id.*  But in any event, Dr. Massey conceded that immigrants' fear or distrust of the Administration predates the Secretary's decision.  Tr. 1-141:9–12.

313.    There is no indication from any of the sources relied upon by Dr. Massey (and Dr. Massey does not seem to claim) that the macro political environment was caused by the Secretary's decision to include a citizenship question on the 2020 Census—indeed, the sources relied upon by Dr. Massey *predate* the Secretary's decision.   The evidence relied upon by Dr. Massey therefore only *supports* the theory that the macro political environment will make potential noncitizen households reluctant to respond to the census questionnaire regardless of whether it contains a citizenship question.

314.    Even post-decisional evidence in the record indicates that, if Plaintiffs' injuries occur at all, it will be due to the macro environment.  For example, recently-released CBAMS research from hard-to-count focus groups is rife with such evidence.  PX-1216.  One Hispanic focus group participant stated: "It doesn't matter if they ask you whether or not you're a citizen.  The first question they ask you, are you Hispanic or Latino?  And that's enough.  That's all they need.  And people are scared."  PX-1216 at 52.  Another said that "[Latinos will not participate] out of fear . . . [there] is practically a hunt [for us]."  *Id.* (alterations in original).  And while the CBAMS report notes that the citizenship question may "deter [Chinese participants] from including people in their household who were not citizens," the Census Bureau believes that households potentially containing noncitizens "might be unlikely to provide a full enumeration whether or not there's a citizenship question on the census and [it] does not have evidence of an incremental effect from the citizenship question." 30(b)(6) Dep. 394:21–396:11, ECF 103-9.  Setting aside the fact that the Census Bureau utilizes this CBAMS research to inform its integrated partnership and communications campaign to tailor outreach and encourage self-responses, 6-42:21–6-43:1, the CBAMS report merely exemplifies how

the macro environment will have a greater impact on the 2020 Census than any one question ever could.

315.     Testimony from Plaintiffs themselves confirms this conclusion.  For instance, Mr. Gonzalez believes that many members of GALEO and members of the Latino community fear interacting with government workers, which he claims stems from the Trump Administration's hostile and discriminatory actions and attitudes towards Latinos and immigrants; this includes family separation policies and increased immigration enforcement and presence.  *See* ECF No. 94-23, at ¶ 12. And Ms. Tso states that ASIA will expend considerably more resources for the 2020 census than it did for the 2010 census due in part to the anti-immigrant rhetoric that the community is seeing and hearing, which she claims has created further fear and reluctance to be countered.  *See* ECF No. 94-2, at ¶ 12.

316.     Ms. Valdez-Cox echoed these concerns and testified that LUPE began census outreach efforts earlier for the 2020 Census than for the 2010 decennial census because "*this last two years* have been very difficult on immigrants" and "we're just going to be so much more fearful of answering and wonder about the consequences."  Tr. 1-173:15–1-175:4 (emphasis added).  Ms. Valdez-Cox explained that the border wall "has been a huge issue," that razor wire and the military had been sent to the border, and the Texas governor had sent the National Guard and "hundreds of TPS officers" to the area.  Tr. 1-173:15–1-175:4.  She further explained that fear of participating in the census resulted from the Administration's announcement that it would scrutinize those born with a midwife when renewing passports into Mexico.  Tr. 1-173:15–1-175:4.  Indeed, Ms. Valdez-Cox testified that there is a lot of fear and distrust of the federal government among both citizens and non-citizens in South Texas, and many LUPE members and members of the Latino community fear interacting with the government workers.  Tr. 1-186:8–15.  She explained that trust in the federal government is much lower today than it was in 2010, and that this is due to both the Trump

Administration's policies—such as the border wall, the rescission of DACA and DAPA, the increased scrutiny of those with U.S. passports, and increased military presence at the border—as well as Texas's policies towards immigration and immigrants.  Tr. 1-186:16–18-187:6.

317.    Mr. Park similarly testified that that one of the biggest challenges MinKwon is facing concerning the 2020 Census is "a real climate of fear, trauma." Tr. 1-214:9–1-215:5.  Mr. Park believes there is currently a lot of fear and distrust in the federal government within the immigrant communities.  Tr. 1-225:15–18.  That fear and distrust in large part is caused by President Trump's policies, and that fear and distrust existed before Secretary Ross announced his decision on March 2018 to include a citizenship question on the decennial census.  Tr. 1-225:19–1-226:3.  Mr. Park believes that immigrant communities are afraid of sharing their information with the Trump Administration because the Trump Administration might share or use their personal information.  Tr. 1-226:8-15.

318.    So, while "it is fair to trace the fire to the arsonist" "[e]ven in a dry season," *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *85 (S.D.N.Y. 2019), it is not fair to trace the fire to a bystander with a dehumidifier.  Because the evidence in the record establishes that Plaintiffs' injuries—if they occur at all—will occur due to the macro environment, it is merely speculative that the Court's ruling will provide any relief.  Accordingly, this Court declines to address the merits of Plaintiffs' claims because "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and citations omitted).

c)    Independent Decisions of Third Parties Not Before the Court

(1)    Intra-State Redistricting

319.    Plaintiffs failed to prove by a preponderance of the evidence that their alleged intrastate vote dilution injury is fairly traceable to the citizenship question rather than the independent

choices of their states. Specifically, Plaintiffs' alleged intrastate vote dilution injury is fairly traceable to at least three independent choices that they assume their states will make in drawing state legislative districts after 2020.

320. First, any intrastate vote dilution would be fairly traceable to Plaintiffs' states' independent decision to use U.S. Census Bureau decennial census data—as opposed to an alternative source of population data—in post-2020 intrastate redistricting.[15] No stricture of *the federal government* requires states to use Census Bureau data in intrastate redistricting. If states instead draw their post-2020 legislative districts using some other source of population data—like their own population data, population data from a private entity, or even Census Bureau population data other than from the decennial census—Plaintiffs' intrastate voting power would be unaffected by any theoretical differential net undercount attributable to the citizenship question.

321. Second, besides the independent decision to draw state legislative districts using Census Bureau decennial census data, any intrastate vote dilution would also be fairly traceable to their states' independent decision to draw post-2020 state legislative districts based on *total* population—as opposed to *voter-eligible* population. The Supreme Court has suggested that states may constitutionally draw state legislative districts on either basis. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1126–32 (2016) (total population); *Burns v. Richardson*, 384 U.S. 73, 90 (1966) (registered-voter population). Indeed, the Supreme Court has explained that "[t]he decision to include or exclude" noncitizens and other persons not eligible to vote when drawing state legislative districts "involves *choices* about the nature

---

[15] Defendants acknowledge that the Supreme Court has found intrastate vote dilution to be fairly traceable to Census Bureau decisions about how to conduct the decennial census by virtue of the fact that some states require the use of federal decennial census population numbers for their state legislative redistricting. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 332–34 (1999). That discussion, however, was dicta because the Court had already found Article III standing based on the expected loss of a *federal congressional* representative, which involved no independent choices of state governments. *See id.* at 331–32.

of representation with which we have been shown no constitutionally founded reason to interfere." *Burns*, 384 U.S. at 92 (emphasis added). If Plaintiffs' states make a different choice after 2020 and draw their legislative districts based on *voter-eligible* population, Plaintiffs' intrastate voting power would be unaffected by any differential net undercount of noncitizens attributable to the citizenship question.

322.     Third, any intrastate vote dilution would also be fairly traceable to Plaintiffs' states' independent decision to re-draw the post-2020 state legislative districts in which Plaintiffs reside as a result of any differential net undercount attributable to the citizenship question. States may constitutionally deviate from equal populations across state legislative districts by up to 10% to accommodate districting decisions reflecting the states' history and legitimate political values. *See Brown v. Thompson*, 462 U.S. 835, 838–40, 842–44 (1983); *Connor v. Finch*, 431 U.S. 407, 418 (1977); *White v. Regester*, 412 U.S. 755, 761 (1973); *Abate v. Mundt*, 403 U.S. 182, 185 (1971). Thus, even assuming the citizenship question resulted in any differential undercounts in the areas where Plaintiffs live, if their states do not change how state legislative districts are drawn after 2020, Plaintiffs' intrastate voting power would be unaffected by any differential net undercount attributable to the citizenship question.

(2)     Funding

323.     Plaintiffs also failed to prove by a preponderance of the evidence that their alleged loss of federal funding injury is fairly traceable to the inclusion of the citizenship question of the 2020 census, rather than to the independent actions of Congress, states, localities, school districts, or schools.

324.     Plaintiffs' experts admitted that individuals and organizations are not direct recipients of federal funding concerning programs such as Medicaid, CHIP, WIC, SSBG, Title I grants, and STBG funds; rather, these funds are given directly to states, which have substantial discretion as to

how they are allocated within the state.  Tr. 3-78:11-3-81:14 (Dr. Reamer); Tr. 3-96:2-15 (Ms. Carruth); Tr. 3-31:14-17 (Mr. Mingo); Tr. 3-50:11-24 (Dr. Gordon).

325.    Plaintiffs' experts admitted that Congress could change the funding amounts for federal programs and grants.  Dr. Reamer acknowledged that his calculations concerning Medicaid, CHIP, WIC, and SSBG are based upon the current funding formulas and the most recent funding amounts for these programs, which Congress could always change—in fact, he conceded that Congress has recently changed the allocation formula for CHIP.  Tr. 3-86:9-3-87:17.  Similarly, Dr. Gordon admitted that Congress could change the funding formulas for Title I grants, and that the amount of Title I funding school districts receive would change if Congress changed the overall amount of Title I funding.  Tr. 3-60:19-3-61:22.  Likewise, Mr. Mingo admitted that Congress could change the total funding amount for the overall STBG allocation, which, because the suballocations are calculated as a percentage of the overall allocation, would impact the amount urbanized areas receive under the suballocations.  Tr. 3-37:2-11.  Mr. Mingo also admitted that if the STBG program is to continue for Fiscal Year 2021 or any time thereafter, Congress will have to pass a new authorization for the program, at which point in time Congress could decide to change the funding formula used to determine the amounts of either or both suballocations, if indeed the two suballocations still exist in the next authorization.  Tr. 3-35:8-17.

326.    Future Congressional action concerning funding for federal programs or the allocations of funds is not fairly traceable to the addition of the citizenship question on the 2020 census.  *See Simon*, 426 U.S. at 41–42; *Warth*, 422 U.S. at 506; *Doe*, 631 F.3d at 162.

327.    Plaintiffs' experts also concede that entities receiving federal funding have discretion in choosing how to use their funds.

328.    With respect to Medicaid, Ms. Carruth conceded that, as long as a state complies with the governing Medicaid statutes and regulations, it has discretion to decide what coverage it provides

to beneficiaries under the state Medicaid program and how medical care is provided under the program. Tr. 3-99:23-3-100:5. Ms. Carruth also specifically conceded that for all four of the examples she provides, a state could decide to adopt such practices for any number of reasons unrelated to a change in its Federal Medical Assistance Percentage ("FMAP"), which is a percentage calculated by the Department of Health and Human Services for each state and then used to determine the amount of Medicaid expenses incurred by a state's Medicaid program that the state will be reimbursed for. ECF No. 99-2 ¶¶ 13-14; 16; Tr. 3-96:16-22; 3-97:9-12. In fact, Texas has either adopted or considered adopting all of these examples absent the kind of change in its FMAP Ms. Carruth is predicting.

329. Ms. Carruth first offered the example of a reduction in the rate the Medicaid program pays to health care providers. ECF No. 99-2 ¶ 25; Tr. 3-100:28-22. However, Ms. Carruth conceded that a state could make such a decision for any number of reasons unrelated to its FMAP, and that a reduction in FMAP would not require a state to reduce its reimbursement rates or involve the federal government in this decision. Tr. 3-101:10-22. Ms. Carruth's speculation that this might occur is further undercut by the fact that Texas's state Medicaid program did reduce its reimbursement rates to certain therapy providers starting in December 2016, a decision that was not caused by a reduction in FMAP. Tr. 3-100:23-3-101:6.

330. Ms. Carruth next offered the example of prior authorization, which requires a healthcare provider to obtain approval from the state Medicaid agency before providing a beneficiary with a particular course of medical care. ECF No. 99-2 ¶ 27; Tr. 3-101:23-3-102:7. However, Ms. Carruth conceded that a state could decide to institute prior authorization for any number of reasons unrelated to a reduction in its FMAP, and that a reduction in its FMAP would not require a state to institute prior authorization or involve the federal government in that decision. Tr. 3-102:21-3-103:4. Ms. Carruth's speculation that this might occur is further undercut by the fact that Texas's state

Medicaid program did institute prior authorization beginning in 2018, but this was not directly caused by any change in Texas's FMAP number.  Tr. 3-102:8-17.

331.    Ms. Carruth next offered the example of eliminating benefits and services that are "optional" in so far as they are not required under the relevant Medicaid statutes and regulations.  ECF No. 99-2 ¶ 32; Tr. 3-103:5-8.  However, Ms. Carruth conceded that a state could decide to increase or decrease the range of benefits and services it offers under its Medicaid program for any number of reasons unrelated to any change in its FMAP, and that a reduction in its FMAP would not require a state to eliminate optional services or benefits or involve the federal government in that decision.  Tr. 3-103:19-3-104:7.  Ms. Carruth's opinion is further undercut by the fact that the state of Texas seriously considered eliminating an optional Medicaid service – acute care for pregnant women and infants whose federal poverty level is between 133% and 198% – for reasons that were not related to any change in Texas's FMAP.  Tr. 3-103:9-18.

332.    The fourth and final example offered by Ms. Carruth is the institution of a system of cost-sharing, which would require that beneficiaries pay premiums and/or co-pays to obtain services and benefits under that state's Medicaid program.  ECF No. 99-2 ¶ 32; Tr. 3-104:8-15.  However, Ms. Carruth conceded that a state could institute cost-sharing for any number of reasons unrelated to a change to its FMAP, and that a reduction in its FMAP does not require a state to adopt cost-sharing or to involve the federal government in that decision.  Tr. 3-104:24-3-105:9.  Ms. Carruth's opinion is further undercut by the fact that the state of Texas seriously considered cost-sharing in the past, but that consideration was not directly related to any change to its FMAP.  Tr. 3-104:16-21.

333.    Ms. Carruth also concedes that a state such as Texas could decide to increase the share of the Medicaid program funding by the statute to make up for any FMAP reduction, which would mean that a state would not have to make any significant changes to the benefits or services offered under the program.  Tr. 3-105:17-23.  But even if a State that experiences an FMAP reduction and

decides to take some action to reduce the program's costs, because Ms. Carruth has failed to establish a sufficient causal link between the hypothetical examples offered and her predicted change in Texas's FMAP for Fiscal Year 2025, Plaintiffs have not shown that any of these examples are traceable to Defendants' conduct.

334.   Accordingly, Ms. Carruth's analysis fails to establish that: (1) any state's Medicaid program will actually see a reduction in services and benefits available to beneficiaries as a result of the citizenship question, in light of the fact that states could identify alternative sources of funding to make up for the relatively small change in FMAP; and (2) even if there is an reduction in overall funding for the state Medicaid program as a result of the citizenship question, Ms. Carruth cannot identify or predict any specific action a state Medicaid program is likely to take in response to the reduction in funding.

335.   With respect to Title I funding, Dr. Gordon stated in her declaration that she believes that any reduction in the amount of funding a school district receives under Title I is "likely to result in a reduction in education services."   ECF No. 99-4 ¶ 35.   But she can only speculate that "it is reasonable to assume" that school districts may make cuts to certain education programs she provides as examples.   ECF No. 99-4 ¶ 37.   And Dr. Gordon acknowledged that, so long as school districts comply with certain basic federal rules and regulations, the school districts have wide discretion in choosing how to use their Title I funds.   ECF No. 99-4 ¶ 37; Tr. 3-63:14-3-64:2.   Accordingly, Dr. Gordon conceded that she cannot predict any specific action any school district may take that would have any potential detrimental impact on any of the organizational or individual Plaintiffs in this case. Tr. 3-64:3-6.

336.   With respect to transportation funding, setting aside congressional control of funding formulas (*see, supra*), two other independent actors make their own discretionary decisions: the state and the urbanized area.

337.     First, Mr. Mingo admits that every state containing an urbanized area has full discretion over how to spend more than 40% of its overall STBG allocation.  Tr. 3-40:11-17, 3-40:23-3-41:8. Indeed, Mr. Mingo conceded that, if suballocation funding for an urbanized area were reduced, it is certainly possible that a state could simply decide to use a portion of its discretionary STBG money to assist the urbanized area in making up for the reduction and completing any impacted transportation project.  Tr. 3-41:24-3-42:9.

338.     Second, for the less than 60% of the overall STBG allocation directed to urbanized areas by federal formulas, Mr. Mingo readily admits that urbanized areas have wide discretion over how they spend their suballocation funding; they can begin, change, or cancel a transportation-related project for any number of reasons unrelated to funding.  Tr. 3-38:6-17.  So while Mr. Mingo provides "examples of the kinds of projects" that could potentially be impacted, ECF No. 99-7 ¶¶ 27-28, he does not—and cannot—offer any opinion regarding a specific construction project, road, highway, bridge, sidewalk, trail, or any other portion of any particular urbanized area's transportation infrastructure that will be negatively impacted by a reduction in suballocation funds.  Tr. 3-38:23-3-40:1.  Those decisions are left to the urbanized area.

339.     Discretionary actions by states, localities, school districts, or schools concerning the use and allocation of federal funds are not fairly traceable to the addition of the citizenship question on the 2020 census.  *See Simon*, 426 U.S. at 41–42; *Warth*, 422 U.S. at 506; *Doe*, 631 F.3d at 162.

## III.     THE SECRETARY'S DECISION DID NOT VIOLATE THE ADMINSTRATIVE PROCEDURE ACT

### A.     General Legal Standards

340.     In deciding a claim under the APA, the question for the Court is whether the agency's decision "was the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  "Review under the APA is highly deferential," and "the agency action enjoys a presumption of validity and regularity."  *Outdoor Amusement Bus. Ass'n, Inc.*

*v. Dep't of Homeland Sec.*, 2018 WL 4361800, at *9 (D. Md. Sept. 12, 2018). The question before the Court is limited to "whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 270 (4th Cir. 2018) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)). "That requirement is satisfied when the agency's explanation is clear enough that its 'path may reasonably be discerned.'" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Bowman Transp., Inc. v. Ark-Best Freight Sys, Inc.*, 419 U.S. 281, 286 (1974)). In other words, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). And a court "is not empowered to substitute its judgment for that of the agency." *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 403 (4th Cir. 2018). The only determination is whether the agency "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *Ohio Valley Envt'l Coal., Inc. v. U.S. Army Corps of Eng'rs*, 828 F.3d 316, 321 (4th Cir. 2016).

341. The Court's review must be particularly deferential here because Plaintiffs challenge the Secretary's wide discretion over the census. "The text of the Constitution vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and "there is no basis for thinking that Congress' discretion is more limited than the text of the Constitution provides." *Wisconsin v. City of N.Y.*, 517 U.S. 1, 19 (1996) (quoting U.S. Const. art. 1, § 2, cl. 3); *see also, e.g.*, *Baldridge v. Shapiro*, 455 U.S. 345, 361 (1982) (discussing the broad congressional authority in the area of the census). Congress, in turn, "has delegated its broad authority over the census to the Secretary." *Wisconsin*, 517 U.S. at 19 (citing 13 U.S.C. § 141(a)). The Census Act authorizes the Secretary to "take a decennial census of population . . . in such form and content as he may determine" and "obtain such other census information as necessary." 13 U.S.C. 141(a); *see also, e.g.*, *Utah v. Evans*, 536 U.S. 452, 472

(2002). Given this broad grant of discretion, "so long as the Secretary's conduct of the census is 'consistent with the constitutional language and the constitutional goal of equal representation,' it is within the limits of the Constitution." *Wisconsin*, 517 U.S. at 19-20 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992)).

B.      The Scope of Review and Exclusion of Evidence[16]

342.    The Court's review of Plaintiffs' APA claim should be confined to the administrative record before the Secretary. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 436 n.2 (D. Md. 2012) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). Thus, "in an action brought under the APA, there is no material fact at issue but only a question of law." *Klock v. Kappos*, 731 F. Supp. 2d 461, 465 (E.D. Va. 2010). That is because "a court must only consider the record made before the agency at the time the agency acted" and "may look only to [the agency's] *contemporaneous* justifications in reviewing the agency action," which means that "facts and justifications for agency action provided to a reviewing court for the first time are generally not to be considered." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467-68 (4th Cir. 2013); *see also Fort Sumter Tours v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995) ("Judicial review of administrative action is generally confined to the administrative record.").

343.    For these reasons, this Court's authorization of extra-record discovery on a preliminary finding of bad faith is of no moment in determining the scope of APA review. The Supreme Court has long recognized that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government." *Vill. of Arlington*

---

[16] Because the Court sits only as an appellate tribunal with respect to Plaintiffs' APA claim, *Doe v. Tenenbaum*, 127 F. Supp. 3d 426, 436 n.2 (D. Md. 2012), and because "there is no material fact at issue but only a question of law," *Klock v. Kappos*, 731 F. Supp. 2d 461, 465 (E.D. Va. 2010), Defendants do not advance any proposed findings of fact with respect to Plaintiffs' APA claim.

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977).  And the Court has consistently made clear that the subject of a federal court's review is the administrative record before the agency, regardless how a court determines the proper contours of that record.  *See, e.g., Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*) (holding that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").  That fundamental tenet of administrative law holds true regardless whether a court orders discovery to cure purported defects in the agency's compilation of the record and to better understand the decisionmaking process.  *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 292 n.14 (D.N.M. 2015) (noting that "the only impact of the bad faith" is "its impact on the administrative record, *i.e.*, whether the agency's bad faith caused them to omit from the record material that should be in the record").  That is because, by statute, review is based on "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, and while a court may order the production of further materials to obtain the "whole record," such expansion does not alter the statutory scope of review.  *Fla Light & Power Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that "[t]he APA specifically contemplates judicial review" only on the basis of "the record the agency presents to the reviewing court").

344.    Likewise, Plaintiffs' *post hoc* expert testimony regarding the propriety of the Secretary's decision is not proper under APA review: none of this expert testimony was before the Secretary at the time of his decision. *Camp*, 411 U.S. at 142; *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 993 (9th Cir. 2014) (concluding that the district court abused its discretion "when it used several extra-record declarations to question [the agency's] scientific judgments" and "open[ed] the administrative record as a forum for the experts to debate the merits"); *see also In re United States*, 138 S. Ct. 371, 372 (2017) (Breyer, J., dissenting) (noting that testimony "cannot be deemed properly part of the administrative record…because it did not exist until after the agency decision had been made").  Indeed, courts are not permitted to "simply substitute the judgment of plaintiff's experts for that of

139

the agency's experts," *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009), nor "determine who among competing experts presents the most reliable information or reaches the most correct conclusions." *Hart & Millers Islands Area Envtl. Grp., Inc. v. Corps of Eng'rs of the U.S. Army*, 505 F. Supp. 732, 747 (D. Md. 1980) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).  Put simply, Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on *post hoc* rationalizations to defend the rationality of its actions.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).  Two of Plaintiffs' experts bear particular mention.

345.    The testimony of Plaintiffs' expert John Thompson addressed whether the administrative record supports Secretary Ross's decision to include a citizenship question on the 2020 Census. Tr. 1-106:15-20, 1-31:4–1-32:11, 1-71:10–1-105:15.  The Court could strike Mr. Thompson's testimony for this reason alone.  The Court also took under advisement the government's renewed objection to certain portions of John Thompson's testimony not contained in his expert report.  Tr. 1-112:21–1-113:25.

346.    Federal Rule of Civil Procedure 37(c)(1) explains that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) . . . , the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."  Plaintiffs do not contend that their failure to include those opinions in Mr. Thompson's expert report was substantially justified.  Instead, they contend that those opinions were fairly contained in his expert report. Tr. 1-113:4-17.  However, Mr. Thompson acknowledged on cross-examination that none of those opinions were mentioned in his expert report. Tr. 1-105:23–1-105:14.  Nor was Plaintiffs' failure to disclose those opinions harmless.  Besides failing to include those opinions in his expert report in this case, Mr. Thompson also did not testify to those opinions in the New York trial. Tr. 1-78:15-21, 1-79:11–1-80:7.

347.     Defendants thus lacked notice that Mr. Thompson would be offering those opinions in this case, preventing Defendants from arranging for timely rebuttal expert testimony on those subjects and hampering Defendants from preparing to cross-examine Mr. Thompson on those opinions.  The Court therefore strikes Mr. Thompson's testimony about: (a) purported deficiencies in the Department of Justice letter requesting inclusion of a citizenship question on the 2020 Census; (b) purported problems that the Census Bureau's disclosure avoidance procedures might pose for the Department of Justice's intended use of citizenship data; (c) whether the decision to include a citizenship question on the 2020 Census complied with OMB Statistical Policy Directives or Committee on National Statistics principles and practices; (d) whether the decision to include a citizenship question on the 2020 Census complied with 13 U.S.C. § 141; and (e) whether the decision to include a citizenship question on the 2020 Census complied with the Paperwork Reduction Act.

348.     Testimony from Plaintiffs' expert David Ely—who opined on DOJ's letter requesting a citizenship question on the 2020 Census and the validity of the letter's Voting Rights Act rationale— is also stricken.  DOJ is not a defendant in this case, and the validity of DOJ's actions is not before the Court.  When reviewing an agency's decision to rely on the views of another agency, "the critical question is whether the action agency's *reliance* was arbitrary and capricious," not whether the underlying request was itself arbitrary and capricious. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 267 (4th Cir. 2011) (emphasis added) (quoting *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006)).  And in that regard, "an action agency need not undertake a separate, independent analysis in the absence of new information not considered by the [other] agency." *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1161 (9th Cir. 1999).

349.     For this reason, Plaintiffs' expert testimony from David Ely is legally irrelevant.  Under controlling Fourth Circuit precedent, the only issue properly before the Court is whether the Secretary's decision concerning the DOJ request was reasonable.  *See Dow AgroSciences*, 637 F.3d at

267; *see also* Defs.' Mot. in Lim. #3, ECF No. 92 (describing *Dow AgroSciences* in greater detail). Whether that reliance was reasonable cannot be determined by consideration of *post hoc* expert opinions that seek to challenge the substance of DOJ's request. *See* Tr. 3-117:10–3-118:2 (Mr. Ely admitting that he is not an attorney for DOJ or otherwise, that he was not involved in the drafting of the DOJ letter, and that he was not involved in DOJ's decision-making process concerning the DOJ letter); Tr. 3-129:18-22 (Mr. Ely admitting that his views were not before Secretary Ross at the time of his decision). The Court thus strikes Mr. Ely's testimony in full.

C.     The Secretary's Decision-Making Process

350.     "The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). And as the Supreme Court has repeatedly explained, where there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp*, 411 U.S. at 143. It is thus unsurprising that review of the deliberative process leading up to an agency decision is highly unusual and disfavored.

351.     This is for two reasons. First, it is fundamental that "agency opinions, like judicial opinions, speak for themselves." *SNR Wireless License Co, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d 1021, 1043 (D.C. Cir. 2017). So, "up to the point of announcement, agency decisions are freely changeable, as are the bases of those decisions." *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1001-02 (D.C. Cir. 1999) (citation omitted). Second, review of the pre-decisional process "could hinder candid and creative exchanges regarding proposed decisions and alternatives, which might, because of the chilling effect on open discussion within agencies, lead to an overall decrease in the quality of decisions." *Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 143 (D.D.C. 2002).

352.     Nonetheless, there was nothing uncommon about the deliberative process leading up to the Secretary's decision here.  And Plaintiffs cannot show that (a) the Secretary's initial policy preferences, whatever they may have been, render his ultimate decision arbitrary and capricious, (b) that the Secretary disbelieved the reasons set forth in his decision memorandum, or (c) that the Secretary acted with an unalterably closed mind.

> ### i.     The Secretary had an initial policy preference for including a citizenship question on the 2020 Census.

353.     As the Secretary explained, shortly after his confirmation, he "began considering various fundamental issues" regarding the 2020 Census, "including funding and content," as well as schedule, contracting issues, systems readiness, and the upcoming 2018 End-to-End Test.  PX-2, AR 1321; *see, e.g.*, PX-1, AR 317-22; PX-3, AR 1416-70.

354.     These issues examined by the Secretary early in his tenure "included whether to reinstate a citizenship question," which he and his staff "thought . . . could be warranted."  PX-2, AR 1321.  Extra-record evidence corroborates this.[17]  Earl Comstock, a senior adviser to the Secretary, believed in the spring of 2017 that the reinstatement of a citizenship question could be warranted—meaning it was worthy of further investigation—because it had previously been asked on the decennial census; it is currently asked of a segment of the population on the ACS; it is asked by a number of other countries; and it would provide important information for various government programs.  Comstock Dep. 103:4-16; 108:13-20, ECF No. 103-8.  Then-Undersecretary Karen Dunn Kelley also testified that one reason a citizenship question was being discussed within the Commerce Department in the fall of 2017 was because of the Higgins Amendment, which was proposed legislation that would

---

[17] As set forth above, Defendants maintain their position that this case should be decided, if at all, on the basis of the administrative record before the Secretary and "not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*).  Nevertheless, because the Court asked the parties to address extra-record evidence in their submissions, Defendants do so here and specifically delineate between the administrative record and extra-record evidence.

have defunded the decennial census if a citizenship question were not added to the questionnaire. Kelley Dep. 107:21-110:22, ECF No. 103-6.  Plaintiffs' own expert, Mr. Ely, even admits that the issue of including a citizenship question on the decennial census had been discussed in previous censuses. Tr. 3-123:13-19.  Then-Acting Census Bureau Director Dr. Ron Jarmin agrees; he testified that there was interest in a citizenship question during the 2010 Census.  *See* Jarmin Dep. 20:5-21:15, ECF No. 103-4.

355.    There is nothing untoward about the Secretary having an initial policy preference. Indeed, courts presume that agencies approach their task of policymaking "with an open mind—but not an empty one."  *PLMRS Narrowband Corp. v. F.C.C.*, 182 F.3d 995, 1002 (D.C. Cir. 1999).  And even if the Secretary had *additional* reasons for reinstating a citizenship question or expressed interest in adding a question before hearing from DOJ, the analysis under the APA would remain unchanged. *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's conclusion").

356.    After the Secretary and his staff "thought reinstating a citizenship question could be warranted," the Secretary then questioned why a citizenship question was not on the census questionnaire and sought other general background "factual information."  *See, e.g.*, PX-3, AR 2521-22, 3699; *see also* Comstock Dep. 55:5-17, ECF No. 103-8 (explaining that, after the Secretary's confirmation in February 2017, Secretary Ross inquired as to why a citizenship question was not already on the decennial census, and Mr. Comstock said that he did not know but would check).  In fact, Census Bureau briefing material in the administrative record indicates the possibility of a citizenship question in February 2017.  PX-4, AR 8622.

357.    The notion of a citizenship question was not hidden from the Census Bureau during this time.  Acting Census Bureau Director Jarmin first learned of the possibility of a citizenship

question on the census from Plaintiffs' expert John Thompson in May 2017.  *See* Jarmin Dep. 20:5-21:15, ECF No. 103-4.  Mr. Thompson told Dr. Jarmin about the possible interest in a citizenship question because Mr. Thompson was retiring from the Census Bureau and he wanted Dr. Jarmin, who was replacing him, to be aware of some of the issues that he may encounter in the future.  *See* Jarmin Dep. 20:5-21:15, ECF No. 103-4.

358.   Rather than exercising his "virtually unlimited discretion" to simply include the citizenship question on the 2020 questionnaire in mid-2017, *see Wisconsin*, 517 U.S. at 19, the Secretary and his staff talked to other federal and state governmental officials throughout 2017, including DOJ, to see if data from a citizenship question would be useful.  PX-2, AR 1321; PX-8, AR 12756.

359.   One of these "state governmental officials" was then-Kansas Secretary of State Kris Kobach.  PX-1, AR 763-64.  Then White House advisor Steven Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to Mr. Kobach about Mr. Kobach's ideas about a possible citizenship question on the decennial census.  *See* PX-302 at 1-3 (Defs.' Suppl. Resps. to Pls.' Interrogs., No. 1).  In Mr. Kobach's view, the lack of a citizenship question on the census "impairs the federal government's ability to do a number of things accurately. *Id.*  Mr. Kobach also suggested the addition of a specific citizenship question that differentiated between noncitizens who were lawful permanent residents and other noncitizens.  *Id.*[18]  Mr. Kobach was merely "one of many people outside the Commerce Department who communicated with Secretary Ross about the citizenship question."  PX-1, AR 763-64; *see New York v. U.S. Dep't of Commerce*, No. 18-cv-2921, ECF No. 303, Order (S.D.N.Y. Sept. 6, 2018).

360.   As the informal deliberative process progressed, the Secretary and his staff also reached out to federal "governmental officials" like those in DOJ.  PX-8, AR 12756.  After some

---

[18] The Secretary rejected that proposed question in favor of the well-tested ACS citizenship question. *See, infra.*

discussions with DOJ and others, they "inquired whether [DOJ] would support, and if so would request, inclusion of a citizenship question as consistent with and useful for the enforcement of the Voting Rights Act."  PX-2, AR 1321.  Extra-record evidence from Mr. Comstock again corroborates the Secretary's account.  Mr. Comstock testified that DOJ was the entity most likely to have a specific need for the citizenship information, Comstock Dep. 153:6-13, ECF No. 103-8, because the Census Bureau told him that DOJ had requested the citizenship question in the ACS and that DOJ utilized the ACS data for Voting Rights Act purposes, Comstock Dep. 153:6-19; 192:4-20, ECF No. 103-8.  Accordingly, he asked individuals at DOJ whether it could use block-level citizenship data and, if so, informed DOJ that they would need to make a request for such information.  Comstock Dep. 297:4-19, ECF No. 103-8.[19]

361.    Surely, the record establishes that the Secretary urged his staff to move this process along.  *See, e.g.*, PX-3, AR 3710.[20]  But as Justice Gorsuch recently explained, "there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."  *In re Dep't of Commerce*, 139 S. Ct. 16 (Gorsuch, J., dissenting in part).

362.    Indeed, by early December 2017, DOJ had still not decided whether it would request a citizenship question on the 2020 Census.  Gore Dep. 147:21-148:5, ECF No. 103-10.  With only three months before census questions had to be submitted to Congress, *see* 13 U.S.C. § 141(f), Secretary Ross again spoke to Attorney General Sessions about the citizenship question.  Gore Dep.

---

[19] Mr. Comstock never requested that DOJ make a request to include a citizenship question on the decennial census.  Comstock Dep. 298:2-7, ECF No. 103-8.

[20] As Mr. Comstock explained, his note to the Secretary that "[o]n the citizenship question, we will get that in place," meant that he would present the Secretary with information and the process necessary to allow the Secretary to decide whether to pursue the inclusion of a citizenship question on the decennial census.  Comstock Dep. 152:2-16, ECF No. 103-8.

111:10-17; 112:6-10, ECF No. 103-10; *see* PX-302 at 1-3 (Defs.' Suppl. Resps. to Pls.' Interrogs., No.

1). The Attorney General made the decision to request the inclusion of a citizenship question on

either December 11 or December 12, 2017. Gore Dep. 442:13-19; 159:3-7, ECF No. 103-10.

> ii. **DOJ formally requests a citizenship question on the 2020 Census to improve block-level citizenship data for enforcement of the Voting Rights Act.**

363. On December 12, 2017, DOJ sent a letter to the Census Bureau explaining that

citizenship data is critical to its enforcement of Section 2 of the Voting Rights Act ("VRA"), and that

the decennial census would provide more useful citizenship voting age population ("CVAP") data

than the annual ACS survey. PX-1, AR 663-65. In the letter, DOJ "formally request[ed] that the

Census Bureau reinstate into the 2020 Census a question regarding citizenship." PX-1, AR 665. The

DOJ request gave four primary reasons for requesting more useful CVAP data for VRA enforcement.

364. First, using citizenship data from the ACS and total population data from the census

"means relying on two different data sets, the scope and level of detail of which vary quite

significantly." PX-1, AR 664. As then-Assistant Attorney General for the Civil Rights Division John

Gore testified, the total population data from the decennial census used for redistricting purposes is

part of what the Census Bureau refers to as the PL 94-171 data. Gore Dep. 184:3-7, ECF No. 103-

10. However, the citizenship data collected by the ACS is part of a different data set, the CVAP tables

produced by the Census Bureau. Gore Dep. 184:8-12, ECF No. 103-10. Currently, a cartographer

drawing a congressional map needs software that contains both sets of information to draw districts

that comply with the Fourteenth Amendment and with Section 2 of the VRA. Gore Dep. 184:13-

185:6, ECF No. 103-10. Those cartographers currently need to match up the two different data sets

in geography and specificity to the block level in order to perform that function. Gore Dep. 184:3-

185:6, ECF No. 103-10. However, if all of the data were available in the PL 94-171 data set, this

additional effort would be unnecessary and experts engaged in redistricting litigation, including the

analysis of alleged Section 2 violations and proposed remedial plans for proving Section 2 violations, could use a single data set to draw maps and otherwise analyze Section 2 claims.  Gore Dep. 184:3-185:14, ECF No. 103-10.

365.    Second, "[b]ecause the ACS estimates are rolling and aggregated into one-year, three-year, and five-year estimates, they do not align in time with the decennial census data."  PX-1, AR 665. For example, if using the ACS's estimated data, one could be measuring citizenship data four or five years before or after the census.  Gore Dep. 192:13-193:14, ECF No. 103-10.  Yet both courts and jurisdictions use the total population data from the census throughout the course of the decade.  Gore Dep. 192:13-193:14, ECF No. 103-10.

366.    Third, unlike the decennial census, "ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size . . . decreases."  PX-1, AR 665. Because estimates with a smaller margin of error are more precise than estimates with larger margins of error, Gore Dep. 197:5-9, ECF No. 103-10, citizenship data from the ACS is not ideal for purposes of VRA enforcement because ACS citizenship data has margins of error that increase as one typically encounters smaller geographic units,  Gore Dep. 197:10-16, ECF No. 103-10.  Mr. Gore even testified that, in one case, a court held that a one-year ACS estimate was insufficiently reliable to allow the plaintiff to proceed with a Section 2 claim based on the associated margin of error.  Gore Dep. 204:6-17; 242:21-243:4, ECF No. 103-10.  In contrast to data from the ACS, PL 94-171 data does not have sampling margins of error.  *See* PX-297 at 41 (Resps. to Pls.' RFA, No. 130).

367.    Fourth, "[c]ensus data is reported to the census block level, while the smallest unit reported in the ACS estimates is the census block group," and thus DOJ is "required to perform further estimates and to interject further uncertainty in order to approximate [CVAP] at the level of a census block, which is the fundamental building block of a redistricting plan."  PX-1, AR 665.  As the then-acting head of the Civil Rights Division explained, citizenship data at the block level, which is

the smallest unit of census geography, is necessary to bring Section 2 cases. Gore Dep. 33:2-8, ECF No. 103-10. However, the DOJ letter does not state or suggest that the inclusion of a citizenship question on the decennial census was necessary to collect CVAP data for purposes of VRA enforcement. Gore Dep. 299:8-14; 300:8-11, ECF No. 103-10. Rather, in DOJ's view, "hard count" data is preferable to available statistical estimates, such as data from the ACS, for VRA enforcement purposes. Gore Dep. 34:3-12, ECF No. 103-10.

368.   As Mr. Gore testified, DOJ seeks the best possible sources of data to analyze possible Section 2 violations and to bring appropriate Section 2 enforcement actions. Gore Dep. 24:19-25:22, ECF No. 103-10. As reflected in the DOJ letter, DOJ's position is that the decennial census questionnaire is the most appropriate vehicle for collecting CVAP data for purposes of VRA enforcement. Gore Dep. 169:22-170:5, ECF No. 103-10.

369.   DOJ's request was clear from the face of the letter and therefore DOJ later informed the Census Bureau that a meeting was unnecessary. Kelley Dep. 193:10-15, ECF No. 103-6. Dr. Jarmin, Acting Census Bureau Director at the time, agrees that the DOJ letter fully describes DOJ's request, including the need to have citizenship status added to the PL 94-171 data. *See* Jarmin Dep. 106:18-107:4, ECF No. 103-4. This is not unprecedented. For example, there have been times where the Census Bureau sought to meet with OMB on the language of the census's race/ethnicity question, yet OMB declined, stating that its written correspondence with the Census Bureau was sufficient. Kelley Dep. 193:16-22; 334:12-335:20; 336:1-6, ECF No. 103-6. Despite the lack of a meeting, the question ultimately was included on the decennial census in the format advocated by OMB. Kelley Dep. 334:12-335:20; 336:1-6, ECF No. 103-6.

      iii.   **After receiving DOJ's formal request, the Secretary engaged in a comprehensive review process.**

370.   Once the Secretary received a formal request from DOJ, he "set out to take a hard look at the request" and ensure that he "considered all facts and data relevant to the question." PX-

1, AR 1313.  This started the comprehensive review process documented in his decision memo, including: preparation by the Census Bureau of a technical review of the request, *id.*, AR 1277-85; a detailed exchange between the Commerce Department and the Census Bureau about the technical review, *id.*, AR 1286-97;  development of a fourth option, Option D, to capture some of the advantages of both Options B and C, *id.*, AR 1304-20; at least one meeting between the Secretary and Census Bureau leadership to discuss the Census Bureau's "process for reviewing the DOJ request, their data analysis, [the Secretary's] questions about accuracy and response rates, and their recommendations," *id.,* AR 1313; and wide-ranging engagement with dozens of stakeholders, *id.*, AR 763-1276.

371.    Extra-record evidence further supports the robustness of the Secretary's decisional process.  Upon receipt of the DOJ's December 2017 letter, Undersecretary Kelley concluded that there needed to be a technical and legal review, which would serve as inputs to a policy determination. Kelley Dep. 99:11-100:16, ECF No. 103-6.  The legal review was conducted by the Commerce Department's Office of General Counsel.  Kelley Dep. 99:11-100:16, ECF No. 103-6.  The technical review was conducted by the Census Bureau.  Kelley Dep. 99:11-100:16, ECF No. 103-6.

372.    Undersecretary Kelley spoke to the senior leadership at the Census Bureau upon receipt of the DOJ's December 2017 letter.  Kelley Dep. 99:11-100:16, ECF No. 103-6.  Because the questions to be included on the decennial census had to be presented to Congress by March 31, 2018, Undersecretary Kelley and Census Bureau leadership developed a schedule for the technical review working backwards from that date.  Kelley Dep. 99:11-101:22, ECF No. 103-6.  The Census Bureau leadership informed Undersecretary Kelley that a question had not been added to the decennial census in a long time, so there was a lack of precedence to follow.  Kelley Dep. 100:17-101:8; 138:10-139:7, ECF No. 103-6.  From January through March 2018, Undersecretary Kelley worked with the Census Bureau to prepare drafts and respond to various questions from Secretary Ross concerning the

150

inclusion of a citizenship question on the 2020 Decennial Census.  Kelley Dep. 154:16-21, ECF No. 103-6.[21]

373.    On January 19, 2018, Dr. Abowd transmitted a memorandum regarding the Census Bureau's technical review of three options: Alternative A (maintain the status quo), Alternative B (include a citizenship question on the 2020 Census), and Alternative C (use administrative records for citizenship data without including a citizenship question).  PX-1, AR 1277.  In this memorandum, the Census Bureau developed a cautious estimate that an additional 5.1% of households with at least one noncitizen may not self-respond to the 2020 Census questionnaire if a citizenship question were included.  PX-1, AR 1280; *see* PX-297 at 5-6 (Defs.' Resps. to Pls.' RFA, No. 13).  This was done by comparing unweighted 2010 ACS data to 2010 Decennial Census data.  *See* PX-297 at 6 (Defs.' Resps. to Pls.' RFA, No. 14).  Such analysis was based on a natural experiment that, absent a randomized controlled trial, could not definitively determine that the assign causation effect was caused by the citizenship question.  *See* PX-297 at 5-6 (Defs.' Resps. to Pls.' RFA, No. 13).

374.    After the Census Bureau prepared its January 19, 2018 memorandum considering Alternatives A, B, and C, Census Bureau leadership met with the Secretary and others at the Commerce Department to discuss those options.  Kelley Dep. 213:21-214:20, ECF No. 103-6.  This meeting included the Secretary, Acting Undersecretary Kelley, Earl Comstock, Dr. Jarmin, Dr. Abowd, Acting Census Bureau Deputy Director Dr. Enrique Lamas, and individuals from the Commerce Department's Office of General Counsel.  Kelley Dep. 221:8-222:10, ECF No. 103-6.  It was an iterative and collaborative process, with individuals posing and answering questions.  Kelley Dep. 220:3-18, ECF No. 103-6.  Secretary Ross did not express the view that a citizenship question

---

[21] Undersecretary Kelley's role was to help facilitate the Census Bureau's formulation of a recommendation to the Secretary; it was not to offer her opinions on the issue.  Kelley Dep. 155:11-156:4, ECF No. 103-6.  Accordingly, Undersecretary Kelley never took a position on the citizenship question.  Kelley Dep. 185:6-10, ECF No. 103-6.

should be added to the decennial census; rather, he asked questions and engaged in an open dialogue concerning various aspects of the Census Bureau's January memorandum. Kelley Dep. 222:17-22, ECF No. 103-6. As result of this meeting, the Commerce Department posed a list of written questions to the Census Bureau concerning various aspects of the Census Bureau's January memorandum. Kelley Dep. 213:21-214:20; 215:5-6; 215:13-16, ECF No. 103-6. There were numerous versions of the questions and responses. Kelley Dep. 224:10-17, ECF No. 103-6.

375.    During a meeting between the Commerce Department and the Census Bureau, the Secretary noted that he wanted to obtain the opinions of stakeholders that both supported and opposed the citizenship question, including, among others, local businesses, special-interest groups, academics, and former Census Bureau directors, so that he could make an objective decision. Kelley Dep. 237:15-238:9, ECF No. 103-6; *see* Jarmin Dep. 146:4:13, ECF No. 103-4 (noting that Dr. Jarmin also wanted to find a full range of opinions from stakeholders). An attempt was made to ensure a balanced list of stakeholders who both supported and opposed the question, and Undersecretary Kelley made particular efforts to ensure that those who opposed the citizenship question were included in the stakeholder discussions. Kelley Dep. 238:17-239:19, ECF No. 103-6. The Commerce Department sought the Census Bureau's input concerning the stakeholders that should be included in these discussions. Kelley Dep. 240:5-21, ECF No. 103-6. The Secretary reviewed over 50 incoming letters and emails from stakeholders, interest groups, Members of Congress, and state and local officials regarding reinstatement of a citizenship question on the 2020 Decennial Census. PX-1, AR 1313; *see id.*, AR 775-792, 794-1165, 1176-93, 1195-97, 1210-12, 1217-20, 1222-55, 1262-73; *see also id.,* PX-3, AR 1768-71, 3563-65; PX-4, AR 3915-17. He also monitored views of the public more generally, as represented in media accounts. PX-1, AR 1313; *see id.*, AR 666-733. In addition, he discussed the citizenship question with over 24 diverse, well-informed and interested parties, selected by his staff to represent a broad range of views. PX-1, AR 1313; *see id.*, AR 1194, 1198-1209, 1213-

1216, 1221, 1256-1261, 1274-76; *see also* PX-3, AR 1638, 1798, 1807-08, 1815-16, 2599-2600, 2604, 3491; PX-4, AR 8392-8467.

376.    Another result of the discussion with the Census Bureau was a proposal to consider an Alternative D, which would combine Alternative B and C.  Kelley Dep. 253:1-255:4, ECF No. 103-6.  Dr. Abowd and the Census Bureau then prepared further analyses comparing Alternative C to Alternative D.  PX-1, AR 1304, 1308.

377.    There were many other meetings between Secretary Ross and members of the Census Bureau in which the citizenship question was discussed, such as the monthly oversight committee meetings.  Kelley Dep. 279:15-280:20, ECF No. 103-6.  And, ultimately, the Census Bureau officials— including Dr. Jarmin, Dr. Abowd, Christa Jones, Dr. Lamas, and Dr. Victoria Velkoff—had an opportunity to review a draft of the Commerce Secretary's March 26, 2018 memorandum and provide feedback.  Kelley Dep. 68:10-69:14, ECF No. 103-6; *see* PX-280 at 15 (Defs.' Resps. to Pls.' Interrogs., No. 2).

378.    Although significant proposed changes to the census typically are raised in Census Bureau advisory committees such as the NAC and the Census Scientific Advisory Committee (CSAC), the citizenship question was not raised with these committees because there was not sufficient time given the March 31, 2018 congressional reporting deadline.  *See* Jarmin Dep. 255:22-256:13, ECF No. 103-4.  Nevertheless, the CSAC provided feedback at its Spring 2018 meeting.  *See* Jarmin Dep. 257:3-17, ECF No. 103-4.

iv.    **The Secretary fully explained the bases of his decision.**

a)    The Secretary's Decision-Making Process

379.    In 2018, the Secretary testified before Congress and answered specific questions related to the citizenship question without hiding any aspect of the decision-making process.  For example, in his March 20, 2018 testimony, the Secretary explained that the Department of Commerce

was "responding solely to the Department of Justice's request." PX-491. As the full context shows, that statement was in answer to questions asking whether the Department of Commerce was responding to requests from political campaigns or political parties:

> SERRANO: Should political parties and campaign politics ever factor into what is asked of every household in the country on the census?
>
> ROSS: No political party has asked us to do anything on the census. We have had a request, as everyone is aware, from the Department of Justice, to add a citizenship question to the 2020 census.
>
> SERRANO: * * * I was very disappointed to see yesterday that the Republican Party campaign to reelect the president put out an appalling e-mail specifically noting that the president wants a new citizenship question added to the census * * * . Do you disavow this campaign e-mail? * * *
>
> ROSS: I'm not familiar with the e-mail. I'm not part of the Republican campaign committee. So, I have not seen it. I have heard about it, this morning.
>
> *We are responding solely to the Department of Justice's request, not to any campaign request, not to any other political party request.* We are listening to stakeholders. Many have written to us. Some have come in to talk with me.

PX-491 (emphasis added). Viewed in context, Secretary Ross's statement simply made clear that no *outside political parties or campaigns* had made a request to which the Department of Commerce was responding. The Secretary's statement cannot reasonably be interpreted as claiming that the Department of Commerce itself (or Secretary Ross himself) had not previously considered the issue or spoken to others within the Administration about the issue.

380.    Similarly, the Secretary noted in his March 22, 2018 statement to Congress that DOJ "initiated the request for inclusion of the citizenship question.'" PX-480 at 51. But that statement was not in response to a question about *who* (be it DOJ, the Department of Commerce, or the Secretary himself) first came up with the idea of including the citizenship question; it was in response to a question about *whether* the citizenship question would be included:

> CHU: * * *  The Census Bureau of [course is] under your purview (ph), but it's been reported that the Department of Commerce is considering asking—adding a citizenship question to the 2020 Census.
>
> And there's a lot of fear by immigrant stakeholders that adding this question will create a lot of fear.  That many immigrants will fail to respond to the entire questionnaire, fearing that their legal status will come under scrutiny.  There are many that argue that the numbers reported from the census will be more inaccurate and that it will be more difficult to provide benefits and resources for low income communities who are afraid to be counted.
>
> * * *  Can you tell me whether the Department of Commerce plans to include the citizenship question in the 2020 census?
>
> ROSS: The Department of Justice, as you know, initiated the request for inclusion of the citizenship question.  We have been talking on the phone and received written correspondence from quite a lot of parties on both sides of that question.  There are many—many sub-questions about accuracy, about suppression of responses that we are taking into account.  We have not made a final decision, as yet, because it's a very important and very complicated question.

PX-480 at 50–51.  In context, the Secretary's statement was merely one of several sentences of stage-setting before his direct response ("[w]e have not made a final decision") to the question that was asked.  No reasonable listener would have understood the Secretary, in that moment, to be claiming that neither he nor anybody else in the Department of Commerce had ever discussed or considered the citizenship question before DOJ's formal request.

381.    The Secretary's May 10, 2018 statement to Congress that "the Justice Department is the one who made the request of us" is also consistent with the decision-making process described above.  2018 WL 2179074.[22]  Yet again, the context of this statement makes clear that the Secretary was merely pointing out that the VRA rationale, which his interlocutor was skeptical about, came from DOJ itself:

---

[22] *Hearing on the F.Y. 2019 Funding Request for the Department of Commerce Before the Subcomm. on Commerce, Justice, Science, and Related Agencies of the Senate Comm. on Appropriations*, 115th Cong., 2d Sess. (2018), available at 2018 WL 2179074.

LEAHY: * * *  Now, you've also marketed the citizenship question as necessary to enforce the Voting Rights Act.  [The] Justice Department hasn't brought any voting rights cases since the president took office, they don't seem to see a problem out there.  All voting rights advocates I've spoken with oppose including the question.  They say it's going to have the opposite effect and will bring about severe underrepresentation of those who they're trying to protect.  And why this sudden interest in that when the department that's supposed to enforce violations doesn't see any problems?

ROSS: Well, the Justice Department is the one who made the request of us.

2018 WL 2179074.  As is clear from this exchange, Secretary Ross was merely rebutting Senator Leahy's repeated insistence that DOJ "do[es]n't seem to see a problem" and "doesn't see any problems" with VRA enforcement by pointing out that it was DOJ "who made the request."  *Id.*  In context, the statement in no way implies that Secretary Ross himself had not previously considered including the citizenship question (whether for VRA- or non-VRA-based reasons).  And no reasonable listener could conclude he was attempting to hide anything about the process.

382.    In issuing his March 26, 2018 decision memorandum, the Secretary fully described the robust, formal process that informed his decision after he received the DOJ request, and he rationally connected the facts found with the decision to include a citizenship question on the 2020 Census.  *See infra.*  As the Secretary explained, "[f]ollowing receipt of the *DOJ request*, [he] set out to take *a hard look at the request* and ensure that [he] considered all facts and data relevant to the question."  PX-1, AR 1313 (emphasis added).  The Secretary never said that informal, deliberative discussions did not occur before the DOJ request and there is no evidence of an attempt to hide that informal process from the public.

383.    What the Secretary *did* say is that he took "a hard look at the [DOJ] request" after he received it.  Obviously, the Secretary could not examine "the request" before receiving "the request".  PX-1,   AR 1313.  Nor could anyone characterize the pre-December 2017 discussions—sporadic contact with close advisers and infrequent communications with other governmental officials—as "a

156

hard look." *See* PX-2, AR 1321.   Indeed, one of the Secretary's closest advisers, Mr. Comstock, testified that he spent little time on the citizenship question relative to the many other issues he was working on at the time.   Comstock Dep. 112:16-21, ECF No. 103-8.

384.    As with nearly all agency decisions, it is hardly unusual that an informal dialog preceded the formal review process.   And it would be perverse to draw an adverse inference from the Secretary's unrequired disclosure of these discussions in his supplemental memorandum, which was simply "intended to provide further background and context regarding [his] March 26, 2018, memorandum." PX-2, AR 1321.

385.    In the Secretary's own words, his March 26, 2018 decision memorandum "described the thorough assessment process that the Department of Commerce conducted following receipt of the DOJ letter, the evidence and arguments [he] considered, and the factors [he] weighed in making [his] decision to include the citizenship question on the 2020 Census."[23]   *Id.*   That agency opinion, like

---

[23] Plaintiffs attempt to dispute the accuracy of Secretary Ross's depiction of his discussion with Christine Pierce (Senior Vice President of Data Science for The Nielsen Company) through the submission of an affidavit from Ms. Pierce that was prepared during litigation at the request of the New York State Attorney General's Office in *New York v. United States Department of Commerce*, 1:18-cv-2921 (S.D.N.Y). This is both not credible and lacking merit.   It is not credible because Ms. Pierce's litigation-inspired affidavit comes seven months after her conversation with Secretary Ross and the public statements made concerning that conversation, it was created only at the request of plaintiffs in a related census case, and Ms. Pierce refused to testify in this case to rebut by the statements in her affidavit.   *See Reetz v. Jackson*, 176 F.R.D. 412, 415 (D.D.C. 1997) ("Statements in later-filed affidavits or declarations, often prepared by lawyers, are at the very least less reliable than deposition testimony developed through the crucible of cross-examination and a fuller exploration of the issues."); *United States v. Weindl*Weindi, 990 F. Supp. 2d 1099, 1119 (D. Mariana Islands) ("In weighing the credibility of Weindl'sWeindi's two sworn declarations, the Court takes into account that because WeindlWeindi did not testify at the hearing, his statements have not been "test[ed] in the crucible of cross-examination.").   Plaintiffs' attempt also lacks merit because Ms. Pierce's litigation-inspired affidavit is not materially inconsistent with the Secretary's March 26, 2018 memorandum and the contemporaneous notes reflecting the Secretary's conversation with Ms. Pierce.   *Compare* ECF NoDkt. 95-1 *with* PX-1, AR 1276 *and* AR 1313.   In any event, as discussed below, the Secretary's decision more than withstands arbitrary-or-capricious review whether or not the Court considers the Secretary's discussion with Ms. Pierce.

a judicial opinion, speaks for itself, *SNR Wireless License Co, LLC v. Fed. Commc'ns Comm'n*, 868 F.3d

1021, 1043 (D.C. Cir. 2017), and the Secretary's decision "must . . . stand or fall on the propriety of

[its] finding[s]." *Camp*, 411 U.S. at 143.

> b)     The Secretary's Decision

386.     More important than the decision-making process was the Secretary's actual decision.

The Secretary explained in his decision memorandum that the census is a well-accepted means of

collecting citizenship data and has a lengthy historical pedigree.  PX-1, AR 1313-20.  The Commerce

Department's review of the issue showed "that collection of citizenship data by the Census has been

a long-standing historical practice," including through regular inclusion in the decennial census

through 1950, in the long-form census through 2000, and in the ACS since 2005.  PX-1, AR 1314.  As

the Secretary observed, "the decision to collect citizenship information from Americans through the

decennial census was first made centuries ago."  PX-1, AR 1319.  Further, the inclusion of a citizenship

question is far from unusual in comparative perspective; the United Nations recommends that nations

inquire about citizenship and other countries include a citizenship question on their censuses.  PX-1,

AR 1319.

387.     The Secretary ultimately determined that the "census-block-level citizenship data

requested by DOJ [was] not available" from existing surveys conducted by the Census Bureau.  PX-

1, AR 1314.  The Secretary also reasonably accepted DOJ's determination that, because "DOJ and the

courts use CVAP data for determining violations of Section 2" of the VRA, "having these data at the

census block level will permit more effective enforcement."  PX-1, AR 1313.

388.     The Secretary thus proceeded to evaluate the available options.  PX-1, AR 1317.

Through extensive consultation with the Census Bureau, the Secretary identified four alternatives:

making no change in data collection but assisting DOJ with statistical modeling ("Option A");

reinstating a citizenship question on the decennial census ("Option B"); obtaining citizenship data

from administrative records ("Option C"); and, at the request of the Secretary after receiving the Census Bureau's initial analysis, a combination of reinstating a question on the census and utilizing administrative-record data ("Option D").  PX-1, AR 1314-17.

389.    With the goal of "obtaining complete and accurate data" on citizenship, PX-1, AR 1313, the Secretary concluded that Option D—"placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records"—would "provide DOJ with the most complete and accurate CVAP data in response to its request."  PX-1, AR 1317.

      D.      The Secretary's Decision was Not Arbitrary or Capricious

          i.      **The Secretary's decision appropriately connected the facts found with the decision made.**

390.    The Secretary considered four proposals and reasonably concluded that Option D would best provide DOJ with its requested data.  PX-1, AR 1314-17.

391.    As an initial matter, the Secretary eliminated Option A—"continue the status quo and use ACS responses" for citizenship data, *id.*, AR 1314,—because it "provide[s] no improved citizenship count, as the existing ACS sampling would still fail to obtain actual, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods."  PX-1, AR 1315.  Nobody seems to quibble with that conclusion.  Likewise, nobody takes issue with the Secretary's rejection of Option B, which was to include a citizenship question on the 2020 Census without the aid of administrative records.  PX-1, AR 1316.

392.    The Secretary's decision thus narrowed to Option C—using "administrative records rather than placing a citizenship question on the decennial census"—and Option D—using administrative records in conjunction with a citizenship question on the decennial census.  This was a straightforward policy choice that was amply supported by the administrative record.

393.    In Option C, 35 million people would need to have citizenship data statistically modeled because administrative records are not available for about 10% of the population.  PX-1, AR 1306.



394.    But only 13.8 million people would need to have their citizenship data statistically modeled with Option D.  PX-1, AR 1307; *see id.,* AR 1304-05.



395.    And for the 21.5 million people in Option D with citizenship data in administrative records and no self-response on the census, the Census Bureau would use the same approach as Option C: simply utilizing the administrative records.  PX-1, AR 1304-05.

396.    Option D also contained three categories of respondents not present in Option C: (1) those whose self-responses agreed with administrative records (263 million), (2) those whose self-responses disagreed with the administrative records (9.5 million), and (3) those who provided a self-response where the Census Bureau did not have an administrative record (22.2 million).  PX-1, AR 1307.

397.    For the 263 million people in Option D whose self-responses agreed with administrative records, *id.*, AR 1307, the Census Bureau would have *better* information than Option C because the validity of administrative records would be confirmed.

398.    For the 9.5 million people in Option D whose self-response disagreed with the administrative records, the Census Bureau has two options: (a) if administrative records are more accurate, then it could disregard self-responses, which would be no worse than Option C, or (b) if

self-responses are more accurate, then it could accept self-responses over administrative records and it would have further information regarding the inaccuracies of administrative records, which is not possible in Option C.  *See* PX-1, AR 1305.  Thus, as the Secretary recognized, "placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population." *Id.*, AR 1317.

399.   For the 22.2 million people in Option D who provided a self-response where the Census Bureau did not have an administrative record, the Census Bureau would then have citizenship information in Option D where none existed in Option C, providing more-complete citizenship data. Although some self-responses in this group would be incorrect, the Census Bureau estimated such inaccuracies for only 500,000 people. *Id.*, AR 1305.

400.   Notably, the Census Bureau itself recognized that modeling citizenship data causes "prediction error." *Id.*  "As there are more model[ed] cases in Alternative C, prediction error will be a bigger issue there." *Id.*  And while the Census Bureau acknowledged that Option D contained "response error" in which the "2020 respondent give[s] the incorrect status," it also acknowledged that "the Census Bureau cannot quantify the relative magnitude of the errors across the alternatives at this time." *Id.*

401.   So, Option D would have "response error" for about 500,000 people and "prediction error" for 13.8 million people, *id.*, AR 1305, 1307, while Option C would have "prediction error" for 35 million people.  *Id.*, AR 1305-06.  Even assuming "response error" and "prediction error" are equivalent, Option C contains such errors in citizenship data for 20.7 million *more* people than in Option D.  One could hardly question, then, the Secretary's "judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.*, AR 1317.

402.    The Secretary's analysis did not stop there, however.  The Secretary recognized that there was a possibility that asking a citizenship question could also lower the self-response rate, which would increase NRFU costs.

403.    Indeed, the Secretary used two different self-response rate analyses from the Census Bureau: one comparing the 2000 long form to the 2000 short form, and one comparing the 2010 ACS to the 2010 Census for citizen and noncitizen households.  *See* PX-1, AR 1282 (Dr. Abowd's January 19, 2018 memorandum), 1316, 1319.  Although noncitizen households had a lower self-response rate than citizen households in both studies—3.3% for the former and 5.1% for the latter—the Secretary correctly recognized the Census Bureau was "not able to isolate what percentage of decline was caused by inclusion of the citizenship question rather than some other aspect of the long form survey."[24]  *Id.*, AR 1316.

404.    This conclusion is only bolstered by extra-record evidence.  As Dr. Abowd testified, the self-response rate declines calculated in his January 19, 2018 Memorandum did not control for other factors.  Tr. 5-63:25–5-64:6.  And while Dr. Abowd's January 19 analysis withstood internal peer review in light of the expedited process at the time, further internal peer review led the Census Bureau to refine its analysis in an attempt to control for other factors (*i.e.*, the Brown et al. paper, PX-162).  Tr. 5-64:7-15, 5-68:3-16.  This later analysis was not before the Secretary in March 2018.  *See* PX-162 (dated August 6, 2018).

---

[24] The statement in Secretary Ross's March 26, 2018 memorandum that "the Census Bureau's analysis did not provide definitive, empirical support" that "adding a citizenship question could reduce response rates," is accurate.  *See* PX- 297 at 31 (Defs.' RespsResp. to Pls.' RFA, No. 95).  The Census Bureau set forth empirical evidence—derived from a natural experiment—that the self-response rate could potentially decline for identifiable subpopulations.  *Id.*  Although such evidence is probative of whether "adding a citizenship question could reduce response rates," it is not "definitive, empirical support" for that proposition.  *Id.*

405.     Other stakeholders also could not identify a material decline in response rates

attributable to a citizenship question on the 2020 Census at the time of the Secretary's decision.  They

flagged only general fears about the political climate and the possible perception that census responses

could be used for law enforcement purposes.  PX-1, AR 1317.  But as the Secretary explained, "no

one provided evidence that there are residents who would respond accurately to a decennial census

that did not contain a citizenship question but would not respond if it did."  *Id.*  Therefore, the

Secretary correctly found that "neither the Census Bureau nor the concerned stakeholders could

document that the response rate would in fact decline materially."  *Id.*, AR 1315.[25]

406.     Nonetheless, the Secretary accepted the Census Bureau's self-response rate analysis to

calculate projected NRFU costs.[26]  Using the Census Bureau's contemporaneous estimate of a 5.1%

self-response rate decline for noncitizen households, the Secretary appropriately explained that the

existing budget was more than sufficient to capture these households in NRFU:

> The Bureau provided a rough estimate that postulated that up to
> 630,000 additional households may require NRFU operations if a

---

[25] Consulting extra-record evidence reveals the accuracy of this statement.  *See* PX- 297 at 25 (Defs.' RespsResp. to Pls.' RFA, No. 83).  As used in Secretary Ross's memorandum, "materially" references the potential decline in self-response rates, estimates of the magnitude of decline, and the cost and quality implications of such estimates.  *Id.*  All Census Bureau estimates regarding a potential decline in self-response rate are within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in self-response rate.  *Id.*  For that reason, Secretary Ross's statement is not inconsistent with the Census Bureau's finding that a citizenship question to the 2020 decennial censusCensus could result in a 5.1% decrease in self-response rates among households with at least one noncitizen, or even the Census Bureau's subsequent finding that a citizenship question could lead to a 5.8% decrease in self-response rates.  *See* PX- 297 at 26 (Defs.' RespsResp. to Pls.' RFA, No. 84); at 27-28 (Defs.' RespsResp. to Pls.' RFA, No. 86); at 27 (Defs.' RespsResp. to Pls.' RFA, No. 87).

[26] The statement in Secretary Ross's March 26, 2018 memorandum that it was difficult to estimate increased costs resulting from NRFU due to "the Census Bureau and the Department's inability to determine what impact there will be on decennial survey responses," is accurate.  *See* PX- 297 at 26-27 (Defs.' RespsResp. to Pls.' RFA, No. 85).  Like other aspects of the decennial cost estimation, there is a wide range of values associated with the Census Bureau's cost estimates regarding a citizenship question.  *Id.*  Regardless, as discussed above, all Census Bureau estimates regarding a potential decline in self-response rate are within the budget, planning, and operational design of NRFU and other statistical methods used to mitigate any decrease in the initial self-response rate.  *Id.*

citizenship question is added to the 2020 decennial census.  However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

PX-1, AR 1319; *see id.,* AR 1282 (Dr. Abowd's January 19, 2018 memorandum estimating NRFU workload).  And, as the Census Bureau explained, it fully intended to count all 330 million residents of the United States in either Option C or Option D.  *Id.,* AR 1304.

407.    In sum, the Secretary faced a straightforward policy choice:

- Option C: potential errors in citizenship data for 35 million people.

- Option D: potential errors in citizenship data for 14.3 million people, the ability to compare self-responses to administrative records and determine the veracity of each, and the possibility of some uncertain decline in self-response rate that would be within the planned NRFU budget.

Given these options, and the analysis set forth above, the Secretary more than sufficiently "articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *Ohio Valley Envt'l Coal., Inc. v. U.S. Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016).

408.    While the Census Bureau conducted its own cost/benefit analysis of the available options and recommended Option A or Option C, PX-1, AR 1277, it is the Secretary's prerogative— and statutory duty—to perform that cost/benefit analysis.[27]  *See* 13 U.S.C. § 141(a).  As set forth above,

---

[27] Testimony by Plaintiffs' experts Mr. Thompson and Ms. Lowenthal are irrelevant.  Mr. Thompson, testified that Secretary Ross disregarded the Census Bureau's recommendation to use Option C instead of Option D. Tr. 1-84:13–1-90:9. However, Mr. Thompson acknowledged that administrative records do not exist for many people. Tr. 1-111:11—19. Mr. Thompson also acknowledged that for those people, citizenship data could not be obtained from administrative records. Tr. 1-111:20—22. Instead, he

he fully considered the Census Bureau's views and grappled with all relevant factors, including those highlighted by the Census Bureau. The Secretary, "like all agency heads, usually makes decisions after consulting subordinates, and those subordinates often have different views." *St. Marks Place Hous. Co. v. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 83 (D.C. Cir. 2010). And given the "virtually unlimited discretion" delegated from the Constitution to Congress, and from Congress to the Secretary, "the mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision." *Wisconsin*, 517 U.S. at 23. The only requirement under the APA is that the Secretary consider the relevant issues and provide a rational explanation for his decision. *State Farm*, 463 U.S. at 43. He did so here.

ii.   **The Secretary did not fail to consider any aspect of the problem.**

409.   The Secretary's analysis fully considered every relevant aspect of the problem. *Contra New York v. United States Dep't of Commerce*, 2019 WL 190285, at *106-08 (S.D.N.Y. Jan. 15, 2019).

a)   Ignoring DOJ's Request

410.   Judge Furman placed much emphasis on the Secretary's purported failure to consider "whether it was necessary to respond to DOJ's request at all." *Id.* at *106. But nothing in the administrative record or otherwise indicates any reason the Secretary or the Census Bureau would simply ignore DOJ's request. In the extensive back-and-forth between the Commerce Department and the Census Bureau, for example, not once did anyone raise the possibility of merely disregarding a law enforcement agency's request for more-complete information to help enforce a civil rights

---

testified that their citizenship data would have to be obtained through statistical modelling, which introduces errors. Tr. 1-111:20—24. Ms. Lowenthal opined that Secretary Ross failed to follow "well-established protocols" for adding questions to the census because he did not heed the advice of the Census Bureau's senior staff. Tr. 1-124:13—17. But Ms. Lowenthal admitted that she was aware of "at least one" other circumstance where the Secretary of Commerce has not followed the advice of Census Bureau staff. Tr. 1-124:18—23. Ms. Lowenthal further conceded that there could have been other circumstances outside the public arena when a Secretary of Commerce has disagreed with and chosen not to follow the advice of Census Bureau staff. Tr. 1-125:16—126:1.

statute. *See generally supra* PX-1—PX-4 and PX-7—PX-14 (AR 1-13023). Nor did any outside stakeholder—even those starkly opposed to the citizenship question—remotely suggest that it was appropriate to ignore DOJ's formal request. *See* PX-1, AR 763-1276.

411. Material outside the administrative record only confirms the absurdity of ignoring DOJ's letter. Not only did Dr. Abowd, the Census Bureau's Chief Scientist, testify that the DOJ letter normally would be sufficient to trigger a review process within the Census Bureau, but he further testified that the Census Bureau would *not* typically ignore another agency's request for certain data, and that the Census Bureau has *never*, to his knowledge, ignored such a request. Tr. 5-31:4-12. Plaintiffs have produced no evidence, and have never argued, that the Secretary or the Census Bureau should have simply disregarded DOJ's request. Accordingly, any suggestion that it would be consistent with the APA to simply ignore another agency's formal content request should be rejected.

### b) DOJ's Rationale

412. Judge Furman also took issue with the lack of "evidence in the Administrative Record that would support a finding that more granular CVAP data is 'necessary' for enforcement of the VRA." *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *107 (S.D.N.Y. Jan. 15, 2019). This reflects a misunderstanding of DOJ's actual request, as well as impermissible second-guessing of the rationales offered by a non-party government agency.

413. As Judge Furman himself acknowledged, DOJ's letter "does not state that [more granular CVAP data] is 'necessary' to enforce the VRA." *Id.* Nor did the Secretary characterize more-granular CVAP data as "necessary" for VRA enforcement.[28] *See* PX-1*, AR 1313-20. As set forth

---

[28] Judge Furman's observation—that 13 U.S.C. § 141(a) only allows the Secretary's collection of "other census information as necessary"—is beside the point. First, Plaintiffs have not alleged any violation of § 141(a). Second, the Secretary in fact "determined that reinstatement of a citizenship question on the 2020 decennial censusCensus is necessary to provide complete and accurate data in response to the DOJ request." PX-1, AR 1320.

above, the Secretary appropriately considered the DOJ letter for what it was: a request for more-complete information to aid VRA enforcement.

414.     Moreover, DOJ is not a defendant in this case, and the validity of DOJ's actions is not before the Court.  When reviewing an agency's decision to rely on the views of another agency, "the critical question is whether the action agency's *reliance* was arbitrary and capricious," not whether the underlying request was itself arbitrary and capricious. *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 637 F.3d 259, 267 (4th Cir. 2011) (emphasis added) (quoting *City of Tacoma v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006)).  And in that regard, "an action agency need not undertake a separate, independent analysis in the absence of new information not considered by the [other] agency." *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1161 (9th Cir. 1999).  For this reason, Plaintiffs' expert testimony from David Ely is legally irrelevant, and, as set forth above, the Court strikes his testimony.

415.     In any event, Mr. Ely's critiques of the DOJ letter are unpersuasive.  For example, although Mr. Ely opines that citizenship data from the ACS are sufficient for redistricting and Section 2 enforcement actions, ECF No. 99-3, at   ¶ 18, he acknowledged that he has not been retained by DOJ in cases in litigation since 2006, which is five years before the first five-year ACS data set was released; accordingly, in cases where Mr. Ely had been retained by DOJ in litigation, the ACS data about citizenship was not available.  Tr. 3-119:3-18.  And although DOJ investigates hundreds of Section 2 matters all around the country, not all DOJ investigations result in the filing of a complaint in district court.  Tr. 3-117:16-22.

416.     Mr. Ely largely agrees with the factual assertions in the DOJ letter; he simply second-guesses and disagrees with DOJ's judgment that block-level citizenship data would be useful for Voting Rights Act enforcement and redistricting efforts.  *See, e.g.,* Tr. 3-125:23–3-126:1; ECF No. 99-3, at ¶ 18 (stating that "it is my opinion that there is no reasonable basis for the claim that citizenship

data from the decennial Census would be 'more appropriate for use in redistricting and Section 2 litigation' than currently available data"). For example, Mr. Ely agrees with the DOJ letter's conclusion that citizenship data is needed to enforce the Voting Rights Act where evidence of the citizen voting age population of a minority group is at issue. Tr. 3-119:19-23. He further agrees with the DOJ letter that, in some circumstances, block-level citizenship data is necessary for enforcing the Voting Rights Act. Tr. 3-120:2-7. And he concedes that block-level citizenship data are needed when an illustrative district cannot be constructed by aggregating census block groups. Tr. 3-120:8-12.

417. Accordingly, Mr. Ely's disagreement with the DOJ letter simply boils down to which Census Bureau questionnaire serves as an appropriate vehicle to obtain block-level citizenship data. As reflected in the DOJ letter, DOJ believes that it is appropriate to obtain citizenship data from *both* a citizenship question on the decennial census and the ACS. *See* PX-712 at 3 (requesting that the Census Bureau include a citizenship question on the decennial census while, "[a]t the same time," requesting "that the Bureau also maintain the citizenship question on the ACS"). Mr. Ely, on the other hand, concludes that having one source of citizenship data—from the ACS—is more appropriate for litigating Section 2 cases. Whatever Mr. Ely's personal preferences may be, his opinions fail to rebut the reasonableness of DOJ's request as reflected in the DOJ letter.[29]

418. Mr. Ely also agrees with the DOJ letter that in enforcing Section 2, DOJ already uses the total population data from the census to determine compliance with the Constitution's one-person, one-vote requirement. Tr. 124:13-18. And he further agrees with the statement in the DOJ letter that using the ACS citizenship estimate means relying on two different data sets. Tr. 3-124:19-24. Mr. Ely

---

[29] It is unsurprising that Mr. Ely, who makes his livelihood as an expert witness and consultant who performs data analyses, would want to continue to rely upon the ACS exclusively to extrapolate citizenship data. ECF NoDkt. 99-3, at ¶¶ 2-7,; 19. If block-level citizenship data were available from the decennial census, presumably at least some of Mr. Ely's services would no longer be necessary.

acknowledged that he is not privy to DOJ's discussions and any challenges DOJ may have in relying on two different data sets for purposes of Section 2 enforcement. Tr. 3-125:4-15.

419.    Mr. Ely also conceded that the DOJ letter was not seeking to abandon the citizenship question on the ACS, but rather was requesting a citizenship question on the decennial census *in addition to* the continued use of a citizenship question on the ACS. Tr. 3-126:8–3-127:5. In this regard, Mr. Ely's claim that the ACS data would provide an advantage over decennial census data for Section 2 cases brought mid-to-late decade is beside the point, Tr. 3-126:2-7, as DOJ expressed its intention to utilize both data sets as appropriate under the circumstances.

420.    Mr. Ely agreed with the DOJ letter's statement that ACS estimates are reported at a 90 % confidence level. Tr. 3-127:11-13. He further agrees with the DOJ letter's conclusion that the margin of error increases as the geographic area decreases. Tr. 3-127:14-16. In fact, in his work Mr. Ely has had to split census block groups to meet the one person-one vote requirement. Tr. 3-128:3-6. In so doing, he had to use a formula to aggregate all the margins of error of the component pieces to come up with a margin of error for the district of a whole. Tr. 3-128:7-18. The need to aggregate the margins of error of the component pieces to develop a margin of error for the district as a whole would be unnecessary if block-level citizenship data were obtained from the decennial census.

421.    Under *Gingles v. Thornburg*, 478 U.S. 30 (1986), to satisfy the first precondition for a Section 2 case a plaintiff must determine whether a minority group can constitute a majority of the citizen voting-age population in a single member district. Tr. 3-120:17-25. In other words, what is relevant for purpose of the first *Gingles* precondition is determining what percentage of citizens of voting age in a district are in a particular minority group. Tr. 3-121:1-5. This could include determining the percentage of the citizen voting age population of the district who are Hispanic. Tr. 3-121:6-9.

422.     To conduct the analysis necessary to satisfy the first *Gingles* precondition, raw numbers are necessary in order to aggregate the data up to the district level and compute a percentage.  Tr. 3-121:10-14.

423.     In Mr. Ely's analyses of the first *Gingles* precondition, the raw numbers he uses are estimates because he uses the ACS as his data source.  Tr. 3-121:15-20.  However, the ACS data is not publicly available at the block level; accordingly, because of the limitations on the data contained in the ACS, individuals such as Mr. Ely have to use estimation techniques to estimate block level data. Tr. 3-122:20-24.  Because the ACS is based on a sample of the population, it is subject to sampling errors.  Tr. 3-122:1-4.  In contrast, enumeration data from the decennial census does not contain statistical margins of error or sampling errors.  Tr. 3-122:5-8.

424.     Finally, Mr. Ely's concern that courts may be reluctant to give weight to ACS data if a citizenship question is included on the census, Tr. 3-128:19-23, is without merit.  Mr. Ely acknowledged that a question about race is contained on both the decennial census and the ACS, and that where a black minority-majority district is at issue, plaintiffs use race data from the decennial census in the early years of the decade.  Tr. 3-128:24–3-129:13.  Yet Mr. Ely is unaware of any court rejecting race data from the ACS as inaccurate even though race data is also available from the decennial census.  Tr. 3-129:14-17.

c)     Disclosure Avoidance and Confidentiality Protections

425.     Judge Furman also noted that the Secretary purportedly failed to consider "the effect of the Census Bureau's confidentiality obligations and disclosure avoidance practices on the fitness of decennial census citizenship data for DOJ's stated purposes."  *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *107 (S.D.N.Y. Jan. 15, 2019).  As discussed below, it is hardly remarkable that the Secretary did not explicitly discuss this issue; it is irrelevant.

426.     There are scarcely few mentions of disclosure avoidance in the voluminous administrative record.  This is for good reason: the Census Bureau unquestioningly accepts both its Title 13 obligations to maintain the confidentiality of all respondents, and its responsibility to provide data that is fit for its intended use.[30]   Indeed, the few allusions to disclosure avoidance in the administrative record merely reference the unsurprising proposition that citizenship data produced from the census will have the same stringent confidentiality protections as other census data.  *See* PX-1, AR 1292 (noting that person-level data cannot be disclosed, but "[a]ggregates that have been processed through the Bureau's disclosure avoidance procedures can be released for public use"); PX-3, AR 2952 (email from Dr. Abowd simply noting that "[a]t some point, I suspect we . . . may need more details about how the Numident citizenship data would be incorporated into the PL94/CVAP/2020 processes and how disclosure avoidance will be handled"); PX-4, AR 6415, 7704 (explaining that CVAP data "would be protected using the new differential privacy disclosure limitation system being implemented for all 2020 Census tabulations," and that "[t]he differential privacy system provides global confidentiality protection guarantees that account for the information in all 2020 publications").   Naturally, dozens of letters from outside stakeholders contained no mention of disclosure avoidance as a potential problem.  *See* PX-1, AR 763-1276.

427.     Put simply, the Secretary did not explicitly address confidentiality protections because nobody thought, or even now thinks, that disclosure avoidance presents an issue.  Dr. Abowd, Chief Scientist of the Census Bureau, testified that avoidance disclosure techniques are applied to all levels of geography, and that the confidentiality protections extend to all data published by the Census

---

[30] The Census Bureau is barred from disclosing individual responses to decennial census questionnaires, including responses to the citizenship question, and cannot disclosure any information whereby the data furnished by any particular establishment or individual can be identified.  *See* PX- 297 at 43 (Defs.' RespsResp. to Pls.' RFA, No. 138); at 43 (Defs.' RespsResp. to Pls.' RFA, No. 139).

Bureau, not just citizenship data.  Tr. 5-32:5-25.  As noted above, private plaintiffs already use such census data—at the block level—in Section 2 enforcement actions, and there is no evidence that the Census Bureau's disclosure avoidance hinders the usefulness of that data.  Tr. 3-128:24–3-129:13.  Similarly, despite a meeting between the Census Bureau and DOJ (after the Secretary's decision) to specifically discuss disclosure avoidance, DOJ has never expressed a concern that confidentiality protections hinder its use of census data.  Tr. 5-33:1-5.[31]

428.    Arbitrary-or-capricious review under the APA focuses only on "whether the decision was based on a consideration of the *relevant* factors."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (emphasis added).  An agency is not "obligated to consider in detail each and every conceivable variation of the alternatives stated; it need only set forth those alternatives sufficiently to permit a reasoned choice."  *Coal. for Responsible Reg'l Dev. v. Coleman*, 555 F.2d 398, 400 (4th Cir. 1977). (citations omitted).  The Fourth Circuit has thus recognized what common sense dictates: the Secretary's decision cannot be deemed arbitrary or capricious because he failed to consider a topic of no concern that nobody raised.  Because disclosure avoidance was one such topic, any suggestion that the Secretary's decision should be set aside for failing to discuss this issue in his March 2018 memorandum is erroneous.

      iii.    **The citizenship question has been well tested, and the Secretary did not depart from OMB Guidelines or the Census Bureau's quality standards by deciding to include it on the 2020 Census.**

      a)    ACS Citizenship Question in the Administrative Record

429.    The citizenship question that will appear on the 2020 Census has been on the ACS since 2005.  PX-1, AR 1314.  In conducting its January 2018 analysis, the Census Bureau discovered

---

[31] Mr. Ely's speculation that the Census Bureau's avoidance disclosure techniques would result in data from the decennial census that is less reliable than the data obtained from the ACS, Tr. 3-132:2-16, thus lacks any factual basis and is flatly contradicted by the testimony of Dr. Abowd.

that "when the administrative record source indicates an individual is not a citizen, the self-report [on the ACS] is 'citizen' for no less than 23.8% of the cases, and often more than 30%." PX-1, AR 1283. The Secretary then asked numerous follow-up questions about this disagreement between self-response and administrative records. *See id.,* AR 1286-97.

430. Nonetheless, the Census Bureau advised the Secretary that because "the citizenship question is already included on the ACS," it "has already undergone the cognitive research and questionnaire testing required for new questions." PX-1, AR 1319. Thus, the Census Bureau and the Secretary were in agreement that the ACS citizenship question "has been well tested." *Id.*, AR 1314. Once again, the Secretary considered all relevant issues and connected the facts found with the decision made. The APA requires nothing more. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *Ohio Valley Envt'l Coal., Inc. v. U.S. Army Corps of Engineers*, 828 F.3d 316, 321 (4th Cir. 2016).

b) OMB Guidelines and Census Bureau Quality Standards

431. There are four OMB Statistical Policy Directives ("SPD"), each of which applies to the Census Bureau. Tr. 5-38:3–5-39:18. These SPDs do not set forth specific rules, but rather provide guidelines for agencies to implement standards and internal practices that are in conformance with the SPDs. *Id.* As part of the OMB regulatory process, the Chief Statistician of OMB reviews whether statistical products are in compliance with the SPDs. *Id.*

432. The Census Bureau set up its own quality standards that are meant to generate statistical products in conformance with all of the SPDs such that the operations of the Census Bureau following these quality standards would be expected to obtain OMB clearance without difficulty. Tr. 5-39:19–5-40:19; PX-260. As Dr. Abowd testified, the Census Bureau's quality standards are binding on neither the Secretary nor OMB. Tr. 6-37:2-16.

c)      OMB Guidelines and Census Bureau Quality Standards are Irrelevant

433.    As an initial matter, neither the OMB Guidelines nor the Census Bureau Quality Standards may serve as a basis to set aside the Secretary's well-supported decision.

434.    With respect to OMB Guidelines, the Court should not consider OMB's Statistical Policy Directives.  OMB itself has described the policy directives as merely a "framework," with the specific "policies, practices, and procedures needed to implement" left to the relevant agencies to determine based on "particular data needs, forms of data, and [the] information technology" available. *See* 79 Fed. Reg. 71610, 71613 (Dec. 2, 2014).  OMB Guidelines therefore provide no avenue for the Court to second guess the Secretary's decision, either due to a lack of ripeness or a lack of reviewability. *See* 44 U.S.C. § 3507(d)(6) ("The decision by the [OMB] Director to approve or not act upon a collection of information contained in an agency rule shall not be subject to judicial review."); *see Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 602 (E.D. Va. 2004) ("Neither the [Information Quality Act] nor the OMB Guidelines provide judicially manageable standards that would allow meaningful judicial review to determine whether an agency properly exercised its discretion."), *aff'd,* 440 F.3d 156 (4th Cir. 2006); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 47 (D.D.C. 2001) (holding that the EPA's submission to OMB of an Information Collection Request under the Paperwork Reduction Act is not judicially reviewable because the OMB Director's eventual decision would not be reviewable).

435.    Similarly, the Census Bureau Statistical Quality Standards are of no moment.  As the Fourth Circuit has explained, "there is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level." *Almy v. Sebelius*, 679 F.3d 297, 310 (4th Cir. 2012) (quoting *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003)). Accordingly, the Census Bureau—a subsidiary agency under the Department of Commerce—cannot bind the Secretary of Commerce with its quality standards.  The Secretary may freely follow or disregard them as he sees fit.

          d)       The Secretary Did Not Depart from OMB Guidelines or the Census Bureau's Quality Standards

436.    Even if the Court reviews the Secretary's decision for compliance with OMB Guidelines or the Census Bureau's quality standards, the Secretary has fully complied therewith by including the ACS citizenship question on the 2020 Census. *Contra New York v. United States Dep't of Commerce*, 2019 WL 190285, at *108-11 (S.D.N.Y. Jan. 15, 2019).

437.    The most pertinent OMB Guideline here is SPD 2, which sets forth guidelines for the life cycle of a survey instrument, from conceptualization through design execution, publication, and curation.  Tr. 5-38:3–5-39:18; *see* PX-359. Census Bureau sub-requirement A2-3.3 governs the development of questionnaire design components in compliance with SPD 2.  Tr. 5-40:17–5-41:13; PX-260 at 18-20.  This sub-requirement, and its attendant notes, specifically acknowledges that the Census Bureau operates under both budget and time constraints, which must be incorporated into decisionmaking.  PX-260 at 18-20.

438.    The note under sub-requirement A2-3.3 explains: "pretesting is not required for questions that performed adequately in another survey."  PX-260 at 18.  This is a cost-saving measure employed when senior methodologists at the Census Bureau agree that proper testing, by the Census Bureau or another agency, documents that the question performed adequately so that it may be brought into a new survey without pretesting.  Tr. 5-41:14–5-42:2; *see* PX-297 at 14-15 (Defs.' Resps. to Pls.' RFA, No. 42).

439.    Before being included on the ACS, the citizenship question that will appear on the 2020 Census underwent extensive testing, including in-the-lab cognitive testing on its own, in-the-lab cognitive testing in context, field testing, and a general evaluation of all data demonstrating that responses to the citizenship question can be reliably collected.  Tr. 5-37:16–5-38:2; *see* Jarmin Dep. 47:4-22, 140:19-141:4, ECF No. 103-4 (noting the cognitive and field testing of the ACS citizenship question).

440.     This testing, in conjunction with the 40 to 50 million households receiving the ACS questionnaire, satisfies sub-requirement A2-3.3's exception for pretesting when a question has performed adequately on another survey.  Tr. 5-42:3-6; *see* PX-297 at 19 (Defs.' Resps. to Pls.' RFA, No. 59) (the Census Bureau believes that the citizenship question has been extensively tested in the context of the ACS); *see* Jarmin Dep. 55:11-18, ECF No. 103-4 (Dr. Jarmin noting that the citizenship question that will be on the census was the same question that was on the ACS, which has been answered by between 40 and 50 million households over many years).[32]

441.     While Dr. Abowd's January 2018 analysis revealed that about 30% of responses from noncitizens to the ACS citizenship question were in disagreement with administrative records, this was the first evidence that the Census Bureau encountered suggesting any issue with the citizenship question.  Tr. 5-42:7–5-43:18; *see* PX-22 at 7, AR 1277.[33]  Nonetheless, the ACS citizenship question still meets the Census Bureau's exception for questions performing adequately on another survey because its overall answers were consistent with other ACS answers and it has an overall low item-nonresponse rate.  Tr. 5-42:7–5-43:18, 6-35:23–6-36:11.  In fact, the ACS citizenship question performs much better than some other questions on the ACS, such as income.  *See* Jarmin Dep. 62:11-62:21, ECF No. 103-4.

---

[32] During the comprehensive review process, the Commerce Department received a letter from six former Census Bureau directors who expressed concern that the citizenship question had not been adequately tested.  Kelley Dep. 243:13-22, ECF No. 103-6.  As a result of this letter, the Commerce Department had a discussion with the Census Bureau concerning the testing of the citizenship question, and the Census Bureau expressed the view that the question had been adequately tested based upon its inclusion on the American Community Survey.  Kelley Dep. 243:13-246:14, 283:5-10, 283:16-284:2, 313:13-16, ECF No. 103-6.

[33] Thus, Dr. Abowd testified that much more analysis is needed to determine how best to handle the ACS citizenship question in the future.  Tr. 5-42:7–5-43:18.

442.    Another note under sub-requirement A2-3.3 also explains that "[o]n rare occasions, cost or schedule constraints may make it infeasible to perform complete pretesting." PX-260 at 18. The note goes on to provide that in such situations, "[i]f no acceptable options for pretesting can be identified, the program manager must apply for a waiver." *Id.* Such a waiver request could be made through the Census Bureau's Methods and Standards Council, which is chaired by Dr. Abowd. Tr. 5-43:19–5-44:17. Under these circumstances, such a waiver would be granted. 30(b)(6) Dep. 165:14–166:2, ECF 103-7.

443.    The ACS citizenship question was therefore the best available choice for the 2020 Census. Tr. 5-35:17–5-37:7 ("It was the opinion of the senior survey methodologists at the Census Bureau, and I concurred in this opinion, that it should be the question that be used because it had all the testing and because neither the Census Bureau's quality standards nor the OMB's statistical policy directives required further testing if the senior methodologists at the agency concur that . . . the current question has performed adequately in a previous survey.").

444.    The current macro political environment does not affect this conclusion. While there has been no thorough testing of a citizenship question in the current macro political environment, Tr. 5-157:8-13, it is not Census Bureau practice to retest previously used questions due to changes in the macro political environment, Tr. 6-36:16-18. Such a policy would be prohibitively expensive because "[t]esting is an expensive operation." Tr. 6-36:19–6-37:1. Moreover, the Census Bureau has no reliable method of testing whether the macro political environment will have an impact on a census question because the decennial census is a nationwide survey with a huge advertising, outreach, and participation campaign that cannot be replicated on a smaller scale. *See* Jarmin Dep. 222:8-223:10, ECF No. 103-4. Accordingly, testing the citizenship question in the 2018 end-to-end test would not have provided the Census Bureau with information it does not already have; namely, that people understand the citizenship question. *See* Jarmin Dep. 222:8-223:16, ECF No. 103-4.

445.     This situation is not unprecedented. The 1970 long-form questionnaire used the Hispanic-origin question from the Current Population Survey without further pretesting. Tr. 5-44:23–5-46:3.  And the 1990 short-form questionnaire used a completely untested question regarding race. *Id.*  Neither of these questions negatively impacted their respective censuses.  *Id.*

446.     In any event, the Census Bureau's obligation is not to determine how OMB will interpret its guidelines. Tr. 5-38:3–5-39:7.  Given all available information, OMB must decide whether to clear the 2020 Census questionnaire with a citizenship question.  If OMB thinks that the questionnaire should undergo further testing, it can work with the Census Bureau to do so before approving the 2020 Census questionnaire.  Tr. 5-44:18-22.  Plaintiffs' own expert, Mr. Thompson, acknowledged that the OMB review process for the citizenship question is still ongoing. Tr. 1-110:3-7.

e)     No Other Established Processes

447.     To cover all bases, the Secretary specifically asked the Census Bureau: "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?"  PX-1, AR 1296 (Question 31).  The Census Bureau advised that, "[b]ecause no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not fee[l] bound by past precedent when considering the Department of Justices' request."  *Id.*  The Census Bureau further noted that it was "working with all relevant stakeholders to ensure that legal and regulatory requirements are filled and that questions will produce quality, useful information for the nation."  *Id.*

448.     Previous drafts of the answer to Question 31 attempted to adapt other Census Bureau procedures.[34]  For example, the process described in certain draft answers to Question 31, PX-4, AR

---

[34] The Census Bureau's initial response to this question had been the subject of discussion at a meeting involving Undersecretary Kelley and high-ranking Census Bureau personnel, at which

9867; PX-3, AR 2303-04 (referencing a "well-established process"), summarized the procedures for adding content to the ACS and provided a possible option for adapting or altering existing content on the ACS, and for altering existing content on the decennial census. *See* PX-297 at 11 (Defs.' Resps. to Pls.' RFA, No. 30); at 12 (Resp. to RFA No. 33).   Similarly, the process described elsewhere, PX-4, AR 3890-91, 3560, summarized the process for adding content to the ACS and provided a possible option for adapting that process to the decennial short form. *See* PX-297 at 11 (Defs.' Resps. to Pls.' RFA, No. 31); at 12 (Resp. to RFA No. 32).

449.    But once the Census Bureau and the Department of Commerce started to confer on the response to Questions 31 and realized that there was no process for adding such a question to the 2020 Decennial because it had not been done in recent memory, Commerce Department and Census Bureau officials—Ron Jarmin, Enrique Lamas, Burton Reist, Christa, Jones, Michael Walsh, and Sahra Park-Su—worked collaboratively to correct the statement in the draft response to Question 31 that there was a "well-established process" for adding questions to the decennial census. *See* PX-299 at 2-3 (Defs.' Resp. to Pls.' Interrogs., No. 5).

450.    Accordingly, the final version of the response to Question 31, found at PX-1, AR 1296, reflects an accurate description of the process for adding questions to the decennial census. *See* PX-297 at 13 (Defs.' Resps. to Pls.' RFA, No. 38); Park-Su Dep. 158:16-159:18, ECF No. 103-11; PX-14 (email from Census Bureau officials signing off on the final version of Question 31).   Although there is an established process for adding or altering existing content on the ACS, and for altering

---

Undersecretary Kelley requested clarification to this answer.  Park-Su Dep. 39:6-40:2, ECF No. 103-11.. In response to Undersecretary Kelley's request, the Census Bureau indicated that there is a distinction between the process for adding a question to the ACS, which had been the basis for the initial answer, and the process for adding a question to the decennial census, which would not necessarily be similar. Park-Su Dep. 39:24-40:2; 141:14-142:5, ECF No. 103-11..  In light of this discussion at the meeting, the Census Bureau agreed that the initial answer to the question was not necessarily accurate and should be revised.  Park-Su Dep. 143:4-15, ECF No. 103-11.

*existing* content on the decennial census, there is no established process for *adding* content on the decennial census short-form questionnaire. *See* PX-297 at 10-11 (Defs.' Resps. to Pls.' RFA, No. 28); at 11 (Defs.' Resps. to Pls.' RFA, No. 29; Comstock Dep. 376:11-377:16, ECF No. 103-8.

451.    Plaintiffs' experts identified no other applicable standards in this area. For example, Mr. Thompson testified that the Census Bureau did not properly test the citizenship question before including it on the 2020 Census. Tr. 1-50:5–1-61:12, 1-90:10–1-94:18, 1-95:14–1-100:6, 1-106:21-25. However, Mr. Thompson acknowledged that the only general written Census Bureau policies establishing testing procedures for questions being added to a decennial census are the Census Bureau Statistical Quality Standards. Tr. 1-108:12-18. Mr. Thompson also acknowledged that those Statistical Quality Standards contain an explicit exemption from testing requirements for questions taken from another survey. Tr. 1-108:19-23. By contrast, the citizenship question was taken from the ACS and added to the decennial census with no change to the wording of the question. Tr. 1-108:24–1-109:5. And Mr. Thompson acknowledged that the citizenship question was completely and thoroughly tested before it was added to the ACS. Tr. 1-109:6-9. As discussed above, importing the ACS citizenship question onto the 2020 Census thus did not violate any written Census Bureau testing procedures.

452.    For similar reasons, Dr. Mathiowetz's testimony in this regard is unpersuasive. Dr. Mathiowetz testified that the citizenship question was not adequately tested for the 2020 Decennial Census form. Tr. 2-170:21–2-185:2. Specifically, she testified that the inclusion of the citizenship question on the 2020 Census violated Census Bureau Statistical Quality Standard Sub-Requirement A2-3.3, which requires pretesting of data collection instruments. Tr. 2-171:15–2-177:14; PX-260 at 18. However, she acknowledged that she never expressed that view to Secretary Ross before he decided to include a citizenship question on the 2020 Census. Tr. 2-202:11-24. Also, she acknowledged that Census Bureau Statistical Quality Standard Sub-Requirement A2-3.3 does *not* require pretesting for questions that performed adequately in another survey—an exemption that

conserves agency resources by avoiding needless replication of pretesting.  Tr. 2-202:25–2-203:12.
She acknowledged that the citizenship question on the 2020 Census has the exact same wording as
the citizenship question already on the ACS.  Tr. 2-203:13-17, 2-180:13-17.  She nevertheless testified
that the pretesting exemption does not apply because of the differences between the ACS form and
the decennial census form.  Tr. 2-176:15-19, 2-177:1-14, 2-180:25–2-184:22, 2-203:18-21.  However,
she acknowledged that there are *always* differences when a question is borrowed from one survey and
added to another.  Tr. 2-203:22–2-204:6.  She also testified that the pretesting exemption does not
apply because the citizenship question was not performing adequately on the ACS.   Tr. 2-176:15-25.
However, as discussed above, the ACS citizenship question meets the Census Bureau's exception for
questions performing adequately on another survey because its answers were consistent with other
ACS answers and it has an overall low item-nonresponse rate.  Tr. 5-42:7–5-43:18, 6-35:23–6-36:11.
Dr. Mathiowetz's testimony that the citizenship question was not adequately tested was thus not
supported by a preponderance of the evidence.

453.    Mr. Thompson also testified that the inclusion of the citizenship question on the 2020
Census violated purported unwritten Census Bureau testing procedures.   Tr. 1-56:19–1-60:14.
However, the unwritten testing procedures that Mr. Thompson testified should have applied to the
citizenship question were derived from two examples in which the Census Bureau considered
changing the *wording* or *form* of questions already on the census questionnaire.  Tr. 1-56:24–1-58:3, 1-
59:14–1-60:14, 1-110:8-16.  Here, by contrast, the citizenship question being added to the 2020 Census
already appears on the ACS with the same wording.  Tr. 1-110:17-21.  As discussed above, Mr.
Thompson acknowledged that the citizenship question was completely and thoroughly tested before
it was included on the ACS.  Tr. 1-109:6-9.  Again, as discussed above, importing the ACS citizenship
question onto the 2020 Census thus did not violate any written Census Bureau testing procedures.

454.     Plaintiffs' expert, Dr. Massey, opined that "[u]nder normal procedures, [the Census Scientific Advisory Committee ("CSAC")] would have been asked, well in advance of the deadline to report the final questionnaire content to Congress, to evaluate any plan for adding a question to the decennial census and to evaluate the agency request that may have prompted the addition of the question."[35]  Massey Decl. ¶ 11, ECF No. 99-6.  As explained above, however, the citizenship question was not raised with CSAC because there was not sufficient time given the March 31, 2018 congressional reporting deadline.  *See* Jarmin Dep. 255:22-256:13, ECF No. 103-4.  Dr. Massey also conceded that the Census Bureau does not submit all changes to the census to CSAC for review.  Tr. 1-135:15-20.  Indeed, Dr. Massey was not aware of any requirement for the Census Bureau to present proposed changes to the census to CSAC for review, Tr. 1-135:24–1-136:2, nor any requirement for the Census Bureau to follow CSAC's recommendations, Tr. 1-136:21-23.  Thus, even when the Census Bureau submits proposed changes to the census to CSAC for review, the Bureau does not always follow CSAC's recommendation.  Tr. 1-136:3-23.  For example, the Census Bureau chose not to follow CSAC's recommendation concerning a change to the race and ethnicity question for the 2020 Census.  Tr. 1-136:7-20.  Dr. Massey's testimony aside, CSAC provided feedback on the citizenship question at its Spring 2018 meeting.  *See* Jarmin Dep. 257:3-17, ECF No. 103-4.

E.     Plaintiffs Cannot Prove That the Secretary's Decision was a "Pretext".

455.     The Secretary's informal, pre-decisional discussions cannot serve to invalidate his fully-supported decision.  As discussed above, it is utterly unremarkable for an agency head to enter office with predispositions toward certain policy choices.  That the Secretary thought reinstatement

---

[35] Dr. Massey has never worked for the Census Bureau.  Tr. 1-135:21—23.  Although Dr. Massey's opinion is based on his experience as a member of CSAC, he was a member of CSAC for only six years (2012–2018), which covered preparation for only the 2020 Census.  Tr. 1-135:12—14.  Because Dr. Massey's opinions regarding the "normal procedures" of adding questions to the census is based on his limited experience, they should be given little weight.

of a citizenship question "could be warranted," PX-2, AR 1321, asked his staff to explore such an action, and declined to accept some of his other staff's recommendations is neither unexpected nor evidence of improper decisionmaking. *Wisconsin*, 517 U.S. at 23 ("[T]he mere fact that the Secretary's decision overruled the views of some of his subordinates is by itself of no moment in any judicial review of his decision."). And Plaintiffs have not proven that the Secretary disbelieved the rationale set forth in his decision memorandum, nor that the Secretary acted with an unalterably closed mind.

456.     Plaintiffs cannot show, as they must, that the Secretary did not actually believe the rationale set forth in his decision memorandum. *See Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1186 (10th Cir. 2014); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2418 (2018) (upholding a facially neutral Presidential directive despite some evidence of additional motives).     To the contrary, the administrative record supports the Secretary's determination that DOJ has a "legitimate need" for citizenship information.  PX-3, AR 3710.  And, even if the Court considers extra-record evidence, Mr. Comstock testified that the Secretary would *not* have included the citizenship question if such information was useless for DOJ.  Comstock Dep. 190:5-12, ECF No. 103-8.  Put simply, if DOJ was not interested in requesting the question, the Secretary's inquiry would have ended.  Comstock Dep. 189:22-190:12, ECF No. 103-8.

457.     Nor can Plaintiffs show that the Secretary acted with an unalterably closed mind.  *Cf. Mississippi Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138, 183 (D.C. Cir. 2015).  As set forth more fully above, such an argument is belied by the Secretary's comprehensive review process after receipt of the formal DOJ request, which included an extensive back-and-forth with the Census Bureau.  *See* PX-1, AR 1304-20.  Even Dr. Abowd—who does not think the citizenship question is "a good idea," Tr. 5-123:3-6—testified that it did not appear the Secretary had made a decision by February 2018. Tr. 5-34:2–5-35:16.  And Undersecretary Kelley testified that the Secretary had not yet made a decision even as late as March 1, 2018.  Kelley Dep. 267:10-18, ECF No. 103-6.

458.    Plaintiffs' cited cases do not announce a different standard.  *See* Pls.' Opp'n to Summ. J. 34-35, ECF No. 69.  For example, in *Latecoere Int'l Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342 (11th Cir. 1994), the plaintiffs relied on evidence of bias showing that the decisionmaker did not actually believe the justification provided for a procurement decision, which flatly contradicted required criteria.  *Id.* at 1365. Here, Plaintiffs offer no evidence that the Secretary did not believe that DOJ's VRA enforcement efforts would benefit from block-level CVAP data; rather, they suggest that the Secretary may have thought about the issue before DOJ requested that data.  In *Tummino v. Torti*, 603 F. Supp. 2d 519 (E.D.N.Y. 2009), the district court concluded that the stated reasons for the agency's action were unsupported by the record.  *Id.* at 546, *amended*, *Tummino v. Hamburg*, 2013 WL 865851 (E.D.N.Y. Mar. 6, 2013).  Here, in contrast, the Secretary's rationale finds full support in the administrative record (as set forth above).

459.    The APA does not prohibit proactivity and efficiency.  As the D.C. Circuit has explained, it "would eviscerate the proper evolution of policy-making were we to disqualify every administrator who has opinions on the correct course of his agency's future actions."  *Air Transp. Ass'n of Am., Inc. v. National Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011).  And the Secretary's actions here are fully consistent with "a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, [and] cutting through red tape."  *In re Dep't of Commerce*, 139 S. Ct. 16 (Gorsuch, J.).  Plaintiffs cannot, and have not, proven otherwise.

F.    The Secretary's Decision was in Accordance with Law

460.    The APA allows courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  Such action will not be necessary here, as the Secretary has fully complied with all statutory requirements.

i.      **The Secretary did not violate 13 U.S.C. § 6.**

461.     To the extent Plaintiffs contend that Secretary Ross's decision to include a citizenship question on the 2020 Census was not in accordance with law under the APA on the theory that it violated 13 U.S.C. § 6(c), that contention has been waived. Plaintiffs did not allege a violation of—or even mention—13 U.S.C. § 6(c) in any of the six complaints filed in these cases. *See* Compl., ECF No. 1 (18-cv-1041); First Am. Compl., ECF No. 17 (18-cv-1041); Second Am. Compl., ECF No. 55-1 (18-cv-1041); Third Am. Compl., ECF No. 86 (18-cv-1041); Compl., ECF No. 1 (18-cv-1570); First Am. Compl., ECF No. 42 (18-cv-1570). Nor did Plaintiffs discuss 13 U.S.C. § 6(c) in the joint proposed pretrial order. *See* ECF No. 103 (18-cv-1041). And while the *Kravitz* Plaintiffs mentioned the § 6(c) issue in a single footnote in their summary judgment opposition, *see* ECF No. 69, at 38 n.28 (18-cv-1041), and the *LUPE* Plaintiffs mentioned it in passing in their summary judgment opposition, *see* ECF No. 85, at 43-44 (18-cv-1570), those arguments were not sufficiently developed and are thus waived. *See Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015) (argument discussed only in footnote was waived); *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to '"develop [its] argument"—even if [its] brief takes a passing shot at the issue.'") (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015)) (alterations in original).

462.     Even if Plaintiffs had not waived the argument, § 6(c) would not support vacating the Secretary's decision.  Section 6(c) provides that "[t]o the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from [federal administrative records] instead of conducting direct inquiries."  13 U.S.C. § 6(c).  In this case, there is no dispute that the Secretary intends to acquire and use available administrative records.  *See* PX-1, AR 1316 (directing the Census Bureau to obtain and use "as many … Federal and state administrative records as possible").  There is also no dispute that the available

administrative records data contain significant gaps with respect to citizenship status—specifically, administrative records do not provide citizenship information for 35 million people (some 10% of the population). PX-1, AR 1306. Thus, Plaintiffs' § 6(c) challenge boils down to the assertion that, to compensate for the undisputed gaps in the administrative records data, the Secretary should have relied on estimates of citizenship status based on statistical techniques, instead of collecting information through a citizenship question. Section 6(c) does not, however, supply any standard by which a court could evaluate that policy choice. Even if § 6(c) required the Secretary to use administrative records data where such data is available and comprehensive, where—as here—the administrative data is concededly incomplete, § 6(c) does not limit the Secretary's discretion as to how to gather the needed information.

463.    Even if § 6(c) placed a reviewable limit on the Secretary's authority, the Secretary's decision did not run afoul of any such limitation. For the reasons explained above, the Secretary reasonably concluded that the available administrative data was incomplete and that combining it with information gathered from a citizenship question would provide the Department of Justice "with the most complete and accurate [citizenship] data in response to its request." PX-1, AR 1317; *see also id.,* AR 1316 (stating that he needed a "greater level of accuracy" than the "use of administrative records alone would presently provide"). That reasonable conclusion was fully consistent with § 6(c)'s authorization to use "direct inquiries" when administrative records data fails to provide statistics "of the kind, timeliness, quality, [or] scope of the statistics required."

464.    Judge Furman's conclusion that the Secretary's decision violated 13 U.S.C. § 6(c) was based on several errors. First, and most fundamentally, Judge Furman's § 6(c) analysis was based on the erroneous determination that "the data gained from available administrative records would have been adequate [for DOJ's purposes]—indeed better." *New York v. U.S. Dep't of Commerce*, --- F. Supp. 3d ----, 2019 WL 190285, at *98 (S.D.N.Y. Jan. 15, 2019). As already explained, the conclusion that

available administrative records were adequate to the task seriously misreads the administrative record

and fails to afford the Secretary the broad deference he is owed in determining the census's content.

465.    The other reasons Judge Furman gave for concluding that the Secretary violated § 6(c)

were similarly flawed.   Judge Furman criticized the Secretary for failing to expressly "mention[],

consider[], or analyze[]" section 6(c) in his decisional memorandum and further asserted that "[a]gency

action taken in ignorance of applicable law is arbitrary and capricious."   2019 WL 190285, at *97. But

an agency's failure to cite a statutory provision, even while complying with its strictures, does not

render agency action invalid.   To the contrary, the Supreme Court has made clear that courts must

"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Nat'l*

*Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007).   The cases on which Judge Furman

relied are not to the contrary; they merely reiterate the unremarkable principle that an agency cannot

"apply the *wrong* law," *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 970 (10th Cir. 2016)

(emphasis added), or act in contravention to the "plain language of the [relevant] statute," *Richards-*

*Gebaur Airport v. FAA*, 251 F.3d 1178, 1195 (8th Cir. 2001).

466.    Judge Furman erred in suggesting that the Secretary violated § 6(c) by failing to explain

"whether or how the 'statistics' at issue are *required*—as opposed to merely desired." 2019 WL 190285,

at *97.  Section 6(c)'s statement that administrative records are to be used only if they are "consistent

with the kind, timeliness, quality and scope of the statistics *required*" cannot reasonably be interpreted

to mandate the use of administrative records unless the desired information is required by law.  If that

were true, most, if not all, of the demographic questions asked on the census would violate § 6(c)

because the Census Bureau is not statutorily required to gather specific demographic information on

the census.  Properly interpreted, the phrase "statistics required" in § 6(c) refers to the statistics that

the Secretary requires—in this case, block-level citizenship data.

467.     It would be particularly strange, moreover, to conclude that § 6(c) bars the Secretary from asking a citizenship question or other longstanding demographic questions on the census or any of the other surveys in which he conducts "direct inquiries" (like the ACS).  When Congress added § 6(c) to the Census Act in 1976, *see* Pub. L. 94-521 § 5(a), a citizenship inquiry and many other demographic questions had long been included on the decennial census for all or some of the population.  Nothing in the statute's legislative history indicates that Congress intended § 6(c) to end that practice.  And notwithstanding § 6(c), demographic questions in general and a citizenship question in particular have been included on the census or ACS since the statute's enactment in 1976 without challenge from Congress or litigants, further underscoring that the provision was not intended to limit the Secretary's authority to ask longstanding, commonplace demographic questions.  Yet, if Plaintiffs' interpretation of § 6(c) were correct, many such questions would likely be unlawful.

ii.     **The Court cannot review whether the Secretary violated 13 U.S.C. § 141(f).**

468.     Section 141(f) of the Census Act reads:

> With respect to each decennial and mid-decade census . . . the Secretary shall submit to the committees of Congress having legislative jurisdiction over the census—
>
> (1) not later than 3 years before the appropriate census date, a report containing the Secretary's determination of the subjects proposed to be included, and the types of information to be compiled, in such census;
>
> (2) not later than 2 years before the appropriate census date, a report containing the Secretary's determination of the questions proposed to be included in such census; and
>
> (3) after submission of a report under paragraph (1) or (2) of this subsection and before the appropriate census date, if the Secretary finds new circumstances exist which necessitate that the subjects, types of information, or questions contained in reports so submitted be modified, a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified.

13 U.S.C. § 141(f). The Secretary's compliance with this congressional-reporting provision is not judicially reviewable. And even if it were, the Secretary's determination of "new circumstances" under § 141(f)(3) is nonetheless unreviewable under the APA, 5 U.S.C. § 701(a)(1). Both of those judicial bars aside, the Secretary has fully satisfied § 141(f).

<p style="text-align:center">a)      Congressional Reporting Requirements are Not Justiciable</p>

469. As an initial matter, the APA "does not provide judicial review for everything done by an administrative agency," *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (quoting *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)), and the adequacy of Defendants' § 141(f) reports is not subject to judicial review. Under the APA, a plaintiff "must identify some 'agency action' that affects him in the specified fashion," *Lujan*, 497 U.S. at 882, and "agency action" is a term of art, defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Here, a report to Congress is none of the enumerated actions subject to judicial review, nor is it "the equivalent . . . thereof." *Id.* A report does not determine Plaintiffs' rights or obligations; rather, it conveys information to Congress. *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998); *see also, e.g., Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988). In any event, any purported defects in Defendants' reports do not create the sort of redressable Article III injury necessary to sustain the Court's jurisdiction: any relief addressed at a putative violation of a reporting requirement cannot be shown to have any concrete effect on Congress that would redress an alleged injury.

470. The Ninth Circuit exhaustively considered a similar reporting requirement in *Guerrero v. Clinton*, where the plaintiff sought to challenge an executive branch official's failure for six consecutive years to provide statutorily required annual reports to Congress. 157 F.3d 1190, 1191-92 (9th Cir. 1998). Notwithstanding these clear violations of the statutory text, the Ninth Circuit concluded that plaintiffs lacked a redressable injury, because "only Congress" could address the

problems plaintiff identified based on the report "and nothing that we could order with respect to the reports or their adequacy can make Congress do anything." *Id.* at 1194. In other words, the adequacy of the reports was not judicially reviewable under the APA because "no legal consequences flow from the report. No matter what it says or how much it says, the report is simply a document submitted to Congress that Congress has no obligation to consider, let alone act upon." *Id.* at 1194.

471. Here, likewise, Plaintiffs lack a redressable injury because the § 141(f) reports do not determine Plaintiffs' rights or obligations; they simply convey information to Congress. The submission (or lack thereof) of the reports does not constitute a reviewable, final agency action because no legal consequences flow from the report. *See, e.g., Renee v. Duncan*, 686 F.3d 1002, 1016-17 (9th Cir. 2012) (explaining that the courts could not redress an injury based on an alleged violation of a requirement "to file an annual report to Congress"); *Wilderness Soc'y v. Norton*, 434 F.3d 584, 591 (D.C. Cir. 2006) (declining to review agency's required submission of recommendations to the President, because "[t]here is no good reason to believe that such an order will redress [plaintiffs'] injuries"); *Guerrero*, 156 F.3d at 1196 ("[T]his issue seems to us quintessentially within the province of the political branches to resolve as part of their ongoing relationships." (quoting *Nat. Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988)); *Taylor Bay Protective Ass'n v. Adm'r, EPA*, 884 F.2d 1073, 1080-81 (8th Cir. 1989) (declining to review agency compliance with a congressional reporting provision because "nothing in the scheme indicat[es] that judicial review . . . is necessary or advisable. . . . Additionally, the nature of the agency action here is distinct from the type of agency action normally reviewable"); *United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989) (declining to review an agency's compliance with a congressional reporting requirement because "[t]his court will not scrutinize the merits or timeliness of reports intended solely for the benefit of Congress"); *Natural Resources Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318-19 (D.C. Cir. 1988) (declining to review an agency's allegedly insufficient report under a congressional reporting provision because managing the

reports should be left to Congress, and the Court "despair[ed] at formulating judicially manageable standards" to evaluate the reports on Congress's behalf); *Coll. Sports Council v. Gov't Accountability Office*, 421 F. Supp. 2d 59, 68 (D.D.C. 2006) (holding that plaintiffs could not bring an APA claim to challenge an agency's misstatements to Congress under a reporting statute because "[w]here a report is not explicitly or implicitly intended as anything more than a vehicle to inform Congress, it is for Congress alone to determine if the Report satisfies the statutory requirements it enacted" (internal quotation marks and citation omitted)).

472.    Plaintiffs' APA challenge to the Secretary's inclusion of the citizenship question— rather than the § 141(f) report itself—does not render this issue justiciable. *Contra New York v. United States Dep't of Commerce*, 2019 WL 190285, at *102 (S.D.N.Y. Jan. 15, 2019).   As this Court acknowledged, *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 552 (D. Md. 2018), the Secretary's authority to determine the census questionnaire's content derives from Census Act provisions wholly apart from § 141(f).  *See* 13 U.S.C. § 5 ("The Secretary shall prepare questionnaires, and shall determine the inquiries, and the number, form, and subdivisions thereof, for the statistics, surveys, and censuses provided for in this title."); *id.* § 141(a) ("The Secretary shall . . . take a decennial census of population . . . in such form and content as he may determine.").  It is the exercise of the Secretary's authority under those provisions of the Census Act from which legal consequences flow, not from the amorphous reporting requirements of § 141(f).

473.    Indeed, if Congress wanted to condition the census questionnaire's content on the Secretary's reports to Congress, it could have easily done so, rather than creating the separate reporting requirements of § 141(f).  *See Hodel*, 865 F.2d at 317 ("If Congress had wanted to link [the congressional reporting requirements of] section 111 to the OCSLA process, it could readily have amended OCSLA to achieve that linkage.  But amendatory language is conspicuously absent from section 111.").  In stark contrast to the Census Act, Congress has explicitly done this in other contexts,

mandating a congressional report *before* statutory authority may be exercised.  *See, e.g.*, 10 U.S.C. § 2687 ("no action may be taken to effect or implement [*inter alia*] the closure of any military installation . . . unless and until [*inter alia*] the Secretary of Defense . . . notifies the Committee on Armed Services of the Senate and the Committee on Armed Services of the House of Representatives . . ."); 25 U.S.C. § 1631(b)(1) ("no Service hospital or outpatient health care facility of the Service . . . may be closed if the Secretary has not submitted to the Congress at least 1 year prior . . . an evaluation of the impact of such proposed closure"); 50 U.S.C. § 1703(a) ("The President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted by this chapter.").  The Census Act imposes no such constraint.

474.    Legislative history confirms what the Census Act's text makes plain: it is for Congress to review the adequacy of § 141(f) reports.  As both the House and Senate Reports make clear, § 141(f) was enacted to give Congress the opportunity to "review and [provide] recommendations."  S. Rep. No. 94-1256, at 5 (1976); H. Rep. No. 94-944, at 5-6 (1976).  Nothing in the legislative history supports the novel theory that § 141(f) was meant to constrain the extraordinarily broad discretion delegated to the Secretary elsewhere in the Census Act.

475.    Although not relevant here,[36] the foregoing analysis applies regardless of whether a court is asked to review the adequacy of a report or the failure to submit a report entirely.  *Guerrero*, 157 F.3d at 1196-97 (9th Cir. 1998) (noting that the Director's failure to submit annual reports to Congress between 1989 and 1996 "cannot be redressed in any event").  In both instances, this is "a judgment peculiarly for Congress to make in carrying on its own functions in our constitutional

---

[36] Contrary to Judge Furman's suggestion, *New York v. United States Dep't of Commerce*, 2019 WL 190285, at *102 (S.D.N.Y. Jan. 15, 2019), this case does not present the question of whether a court may review the Secretary's failure to submit a § 141(f) report entirely.  As discussed below, the Secretary submitted a § 141(f)(2) report that fully satisfies § 141(f)(3); Plaintiffs simply challenge the adequacy of that report.

system, not for non-congressional parties to carry on as an ersatz proxy for Congress itself." *Hodel*, 865 F.2d at 318.

476.     Well-settled law, plain statutory text, and the Census Act's legislative history all establish the same conclusion: § 141(f) is a reporting requirement reviewable by Congress, not the Court.

> b)     Congress has Expressed Its Intent to Preclude Judicial Review under 5 U.S.C. § 701(a)(1)[37]

477.     Even if § 141(f) functions as a substantive constraint on the Secretary's authority and not a mere reporting requirement, the Secretary's determination under § 141(f)(3) is barred from review under the APA, 5 U.S.C. § 701(a)(1), because "Congress expressed an intent to prohibit judicial review" in two ways. *Webster v. Doe*, 486 U.S. 592, 599 (1988); *Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 629 n.3 (4th Cir. 2017).

478.     First, § 141(f)(3) explicitly delegates the determination of "new circumstances" to the Secretary alone.  In codifying § 141(f)(3), Congress made clear that a report was only required "if *the Secretary finds* new circumstances exist which necessitate" a modification of § 141(f)(1) or § 141(f)(2) reports.  The Census Act does not say, for example, that "the Secretary shall submit a report under § 141(f)(3) if new circumstances exist."  It specifically uses the phrase "if the Secretary finds," in conjunction with "new circumstances," to denote the exclusive use of discretion by the Secretary.  This phrasing is unique in the Census Act, even among congressional reporting requirements.  *Compare* 13 U.S.C. § 4 ("The Secretary shall perform the functions and duties imposed upon him by this title.") *and* § 131 ("The Secretary shall take, compile, and publish censuses of manufactures, of mineral industries, and of other businesses . . . in the year 1964, then in the year 1968, and every fifth year

---

[37] Although Defendants advanced this argument before Judge Furman, he entirely failed to address it.  *See generally New York v. United States Dep't of Commerce*, 2019 WL 190285, at *99-*–*103 (S.D.N.Y. Jan. 15, 2019).

thereafter.") *and* § 141(b) ("The tabulation of total population . . . shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States.") *and* § 181(b) (noting that "a report shall be submitted by the Secretary to the President of the Senate and to the Speaker of the House of Representatives" if "the Secretary is unable to produce and publish current data during any fiscal year on total population for any county and local unit of general purpose government") *with* § 141(f)(3) (calling for a congressional report "if *the Secretary finds* new circumstances exist" (emphasis added)).

479.    Second, § 141(f)(3) requires only that the Secretary inform Congress of his *modifications* to subjects, types of information, or questions, not the "new circumstances" forming the basis thereof. *See* § 141(f)(3) (requiring the Secretary to submit "a report containing the Secretary's determination of the subjects, types of information, or questions as proposed to be modified"). Congress, let alone the courts, would therefore have little basis to review the Secretary's exclusive determination of "new circumstances."

480.    Accordingly, the Court may not review the Secretary's § 141(f)(3) determinations because "Congress expressed an intent to prohibit judicial review." *Webster*, 486 U.S. at 599.[38]

---

[38] This Court's prior ruling that the Secretary's content determinations are not "committed to agency discretion by law," *Kravitz v. U.S. Dep't of Commerce*, 336 F. Supp. 3d 545, 568 (D. Md. 2018), has no applicability here for two reasons. First, the Court's analysis focused on 13 U.S.C. § 141(a), a different provision of the Census Act with different statutory text, different legislative history, different case law, and a substantive grant of authority to the Secretary. An analysis of that provision does not, and could not, speak to whether courts may review the Secretary's reporting obligations under § 141(f). Second, the Court analyzed § 141(a) under the framework of 5 U.S.C. § 701(a)(2), not § 701(a)(1). Those inquiries are entirely separate: while § 701(a)(2) focuses on whether a "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Kravitz*, 336 F. Supp. 3d at 566 (citations omitted), the inquiry under § 701(a)(1) looks at the statute's "express language," the "structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984), to determine whether "Congress expressed an intent to prohibit judicial review," *Webster*, 486 U.S. at 599.

### iii. Even if the Court could review the Secretary's determinations under 13 U.S.C. § 141(f), there was no violation.

481.     Even if judicial review were permitted, the Secretary has satisfied § 141(f)(3).  The Secretary informed Congress of both the subjects (as modified) and questions for the 2020 Decennial Census—including citizenship—through his § 141(f)(2) report, *see* PX-489.[39]  And, as explained above, there is no mandate that the Secretary inform Congress of the new circumstances triggering modifications to § 141(f)(1) subjects.  Consequently, both the letter and spirit of § 141(f)(3)—notice to Congress—are fully satisfied through the Secretary's § 141(f)(2) report.  Indeed, the House Committee on Oversight and Government Reform has held several hearings addressing the reinstatement of the citizenship question.

482.     Defendants' interpretation does not render § 141(f)(1) superfluous.  *Contra New York v. United States Dep't of Commerce*, 2019 WL 190285, at *100 (S.D.N.Y. Jan. 15, 2019).  Between the submission of a § 141(f)(1) report of census subjects and a § 141(f)(2) report of census questions, the Secretary may submit a §141(f)(3) report if he finds that new circumstances necessitate a modification of the subjects.  It is true that the § 141(f)(2) report will supersede the § 141(f)(1) report, as the census questions will necessarily fall within, or modify, the census subjects.  And after both § 141(f)(1) and § 141(f)(2) reports are submitted, *every* modification of census subjects will concomitantly result in the modification of census questions.[40]  But such was the intent of Congress when it established the submission of "subjects proposed to be included, and the types of information to be compiled" three

---

[39] Although the Secretary was not constitutionally or statutorily required to consider DOJ's request, this is irrelevant for § 141(f)(3) purposes.  If only constitutional or statutory mandate could establish "new circumstances" that "necessitate" modifications to § 141(f) reports, then § 141(f)(3) would be entirely superfluous: Congress would not need the Secretary's § 141(f)(3) report to know about constitutional or statutory changes.

[40] However, after the § 141(f)(2) report, adding or subtracting census questions within an existing subject would not require modification of the subjects set forth in the § 141(f)(1) report.

years prior to the census and the submission of specific "questions proposed to be included" two years prior to the census.  Once the latter is submitted as part of a § 141(f)(2) report, it is entirely compatible with the purposes of § 141(f) for that more-specific information to take precedence.

483.  And regardless of § 141(f)(3)'s statutory requirements, DOJ's request to the Census Bureau—and the Secretary's understanding of block-level CVAP data to enforce the Voting Rights Act—constitutes "new circumstances" justifying inclusion of an additional topic.  The Secretary had not previously been aware of DOJ's desire for citizenship data from the decennial census, at which time the Secretary's initial § 141(f)(1) report had been submitted.  Because the Census Bureau relies on other agencies to identify census data needs, "newness" is appropriately measured by information available to the Secretary.  And, as the Gary Letter explained, DOJ itself was still in the process of understanding the challenges of working with data from the 2010 Decennial Census (the first recent census not to include a long-form questionnaire with a citizenship question).  PX-1, AR 664.  Thus, "new circumstances" justified a modification of the § 141(f)(1) topics.

484.  Accordingly, even if § 141(f)(3) reports are judicially reviewable, the Secretary has acted in full accordance with this statute for the reasons set forth above.[41]

## IV.  THE SECRETARY'S DECISION DID NOT VIOLATE THE ENUMERATION CLAUSE

### A.  General Legal Standard

485.  The Enumeration Clause of the Constitution confers upon Congress (which has delegated to the Secretary of Commerce) "virtually unlimited discretion" to conduct an "actual Enumeration" of the American public every 10 years, with the primary purpose of providing a basis for apportioning political representation among the states.  *Wisconsin v. City of N.Y.*, 517 U.S. 1, 19

---

[41] The Secretary could also submit a § 141(f)(3) report any time before April 1, 2020.  *See* 13 U.S.C. § 141(f)(3) (allowing the submission of a report "before the appropriate census date").

(1996); *see also id.* at 17 (noting that the Enumeration Clause grants Congress "broad authority over the census") (citing to 13 U.S.C. § 141(a)); *Utah v. Evans*, 536 U.S. 452, 474 (2002) (writing that the Clause provides "that the 'actual Enumeration' shall take place 'in such Manner as" Congress itself 'shall by Law direct,'" and in doing so "suggest[s] the breadth of congressional methodological authority, rather than its limitation"). Furthermore, the Court has held that in enacting the Census Act, Congress essentially delegated its "virtually unlimited discretion" to the Secretary. *Wisconsin*, 517 U.S. at 19 (U.S. Const. art I § 2, cl. 3). As the Court has noted, "the wide discretion bestowed by the Constitution upon Congress, and by Congress upon him" demands a high degree of "judicial deference to the Secretary's decisions concerning the content and conduct on the decennial census. *Id.* at 22-23.

486.    The Supreme Court reviews decisions pertaining to the administration of the decennial census under the Enumeration Clause with an eye to whether the challenged decision bears "a reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census." *Wisconsin*, 517 U.S. at 20. The Supreme Court has found that the clause "suggests that the Framers expected census enumerators to seek to reach each individual household" and that the constitutional choices embodied in the Enumeration Clause "suggest a strong constitutional interest in accuracy." *Utah*, 536 U.S. at 478.

487.    In denying Defendants' motion to dismiss, this Court (a) rejected Defendants' argument that the issue was nonjusticiable under the political question doctrine, ECF No. 48, at 18-22; and (b) interpreted the foregoing authorities as setting forth a test that including a question on the decennial question could run afoul of the Enumeration Clause if the inclusion of such a question "unreasonably compromises the distributive accuracy of the census," *id* at 24 (citing *Wisconsin*, 517

U.S. at 19-20).[42]  The Court further noted that Plaintiffs' allegations concerning the inclusion of the citizenship question were different from both other demographic questions asked on the decennial census and the Census Bureau's essentially unbroken history of asking about citizenship on the decennial census from 1820 through 1950 for three reasons: (1) Plaintiffs' allegation was not merely that a differential undercount was "possible," but that it will actually occur; (2) other demographic questions have been well-tested, in contrast to the process by which the citizenship question was included in the 2020 Census; and (3) the Court was not aware of any prior demographic question that would "be viewed by a specific segment of the population as an attempt to further an administration's law enforcement objectives related to that population."  ECF No. 48, at 25-26.

488.    In denying Defendants' motion for summary judgment, this Court once again articulated the applicable standard of "whether evidence supports Plaintiffs' position that a citizenship question would unreasonably compromise the distributive accuracy of the census." ECF No. 84, at 10.  This Court denied Defendants' motion for summary judgment on the Enumeration Clause claim "[i]n light of Plaintiffs' evidence that a citizenship question will impact the distributive accuracy of the final enumeration for no reasonable purpose."  *Id.* at 11.

489.    Finally, the Court holds that the standard to be applied in deciding whether the Secretary's decision to include a citizenship question on the 2020 Census violates the Enumeration

---

[42]  Defendants continue to argue that (a) because of the "virtually unlimited discretion" to conduct the census that the Constitution confers on Congress, and Congress has delegated to the Secretary, as well as the statutory requirement in 13 U.S.C. § 141 that the Secretary must prepare reports to Congress on the proposed content of the Census, that whether the inclusion of this question violates the Enumeration Clause is a nonjusticiable political question; and (b) even to the extent this is a justiciable issue, the *Wisconsin* standard does not apply and this Court's inquiry is limited solely to determining whether the decennial census will be an actual person-by-person count, as opposed to using sampling or some other statistical method to arrive at the final enumeration.  However, for the purposes of this post-trial pleading, Defendants accept the standard adopted and applied in this Court's decision denying Defendants' motion to dismiss, ECF No. 48, at 17-26, as the applicable standard to be applied.

Clause is an objective standard.  Plaintiffs have not directed this Court to any authority, and the Court

is aware of none, for the proposition that this Court's analysis should delve into the subjective intent

of the Secretary.  And no Court to consider this issue has found that the Secretary's intent is relevant

under the Enumeration Clause.  *New York*, 315 F. Supp. 3d at 799 ("[T]here is nothing in either the

text of the Enumeration Clause itself or judicial precedent construing the Clause to suggest that the

relevant analysis turns on the subjective intent of either Congress or the Secretary."); *California, et al. v.

Ross, et al.*, 18-cv-1865 (N.D. Cal. Aug. 17, 2018), ECF No. 75, at 27 ("Plaintiffs agree that the standard

for evaluating a challenge under the Enumeration Clause is an objective one.").  Instead, the

Constitution calls only for an "actual Enumeration" of persons residing in the United States, and a

census either constitutes a proper Enumeration within the meaning of the Constitution or it does not.

Just as in other areas in which Congress is specifically conferred significant discretion by the

Constitution to legislate and regulate, this Court's inquiry is limited to whether there are "plausible

reasons" for the Secretary's actions, and if there are plausible reasons, this Court's inquiry is at an end.

*See U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612

(1960)).

B.      Scope of Review

490.    Plaintiffs' Enumeration Clause claims must be decided on the basis of the

administrative record, without consideration of extra-record evidence produced in discovery or at trial,

because the APA provides the waiver of sovereign immunity for this claim and the APA's strictures

on judicial review accordingly apply with equal force to the Enumeration Clause claims.  *See, e.g., Bellion

Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018) ("[W]hen a constitutional challenge

to agency action requires evaluating the substance of an agency's decision made on an administrative

record, that challenge must be judged on the record before the agency"); *Chiayu Chang v. U.S. Citizenship

& Immigration Servs.*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017) (summarizing cases holding that the

assertion of constitutional claims does not remove a matter from the APA's procedural strictures).

Significantly, none of the four cases involving Enumeration Clause challenges to census practices to

reach the Supreme Court—*Franklin v. Massachusetts*, 505 U.S. 788, 803-06 (1992), *Wisconsin*, *Department*

*of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999), and *Utah*—appear to have considered

extra-record evidence such as expert testimony in their consideration of the substantive challenge

brought under the Enumeration Clause.[43]

> C.    <u>Plaintiffs Have Not Proven a Violation of the Enumeration Clause</u>

491.    After careful consideration of the evidence, the Court finds that Plaintiffs have failed

to identify any evidence, in the administrative record or otherwise, that proves by a preponderance of

the evidence that the inclusion of a citizenship question on the 2020 Census unreasonably

compromises the distribute accuracy of the census.

492.    As an initial matter, Plaintiffs have not shown that the inclusion of a citizenship

question will prevent the accomplishment of an actual enumeration of the population, keeping in mind

the constitutional purpose of the census. *Wisconsin*, 517 U.S. at 20 (1996).  Nor have Plaintiffs shown

that the inclusion of a citizenship question undermines the strong constitutional interest in the

accuracy of the census.  *Utah*, 536 U.S. at 478 (2002).  To the extent that the Court's "unreasonably

compromise[s] the distributive accuracy of the census" standard, extends beyond that developed by

the Supreme Court in *Wisconsin* and *Utah*, Plaintiffs have failed to show that this standard has been

violated.

---

[43] As set forth above, this claim should be decided, if at all, on the basis of the administrative record before the Secretary and "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*).  Nevertheless, because the Court asked the parties to address extra-record evidence in their submissions, Defendants do so here and specifically delineate between the administrative record and extra-record evidence.

493.     Because including a citizenship question on the decennial census is entirely consistent with historical census practices and has been understood to be well within the scope of the Enumeration Clause for nearly 200 years, Plaintiffs cannot establish that the Secretary's decision was a violation of the Enumeration Clause.  The Supreme Court has specifically explained that historical practice is a critical factor in examining an alleged violation of the Enumeration Clause.  *See Wisconsin*, 517 U.S. at 21; *Franklin*, 505 U.S. at 803-06 (explaining the importance of historical practice in conducting the census); *Department of Commerce v. Montana*, 503 U.S. 442, 447-56 (1992) (examining the history of apportionment in deciding challenge to decennial census); *State of New York*, 315 F. Supp. 3d at 800 (recognizing that in interpreting the Enumeration Clause, significant weight is placed on historical practice.); *cf NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) (holding that "the longstanding 'practice of the government' . . . can inform our determination of 'what the law is'") (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819) and *Marbury v. Madison*, 1 Cranch 137, 177 (1803)).

494.     Plaintiffs do not and cannot dispute that a citizenship question has a lengthy historical pedigree, appearing on the census for most of the last two hundred years.  *See* ECF No. 48, at 23-24. From the very first decennial census conducted in 1790, the questionnaire contained questions about sex, age, and race.  *See* Act of March 1, 1790 ("1790 Census Act"), 1 Stat. 101, 101-02 (1790) (instructing census takers to ask each household about the age and "the sexes and colours of free persons" of residents).  Congress provided this direction in order to "assess the countries [sic] industrial and military potential," *Measuring America* at 5, a purpose not directly related to the constitutional directive to enumerate the population.  This practice has continued through the present day.  The current Census Act, enacted in 1976, contains a provision, 13 U.S.C. § 141, entitled "Population and *other census information*," (emphasis added), which delegates Congress's discretion to determine the content of the census to the Secretary.

495.     The Supreme Court has also long understood and approved of this practice as well. *See Baldridge v. Shapiro*, 455 U.S. 345, 353 & n.9 (1982) (noting that while the "initial constitutional purpose" of the decennial census was only to "provide a basis for apportioning representatives among the states in the Congress," the decennial census has from the early days of the republic "fulfill[ed] many important and valuable functions for the benefit of the country," giving the examples of "in the allocation of federal grants to states" and "provid[ing] important data for Congress and ultimately for the private sector."); *Legal Tender Cases*, 79 U.S. (12 Wall) 457, 535-36 (1870) ("Yet Congress has repeatedly directed an enumeration not only of free persons in the States but of free persons in the Territories, and not only an enumeration of persons but the collection of statistics respecting age, sex, and production. Who questions the power to do this?").

496.     Every decennial census in over two centuries of American history has therefore contained questions seeking demographic information that is not necessary or even related to the stated constitutional purpose of enumeration.  This is so even though such questions necessarily depresses the self-response rate somewhat, whether through the sensitivity of the subject matter, uncertainty about how to answer, or just the incremental burden of answering an additional question. *See New York*, 315 F. Supp. 3d at 805 ("Common sense and basic human psychology dictate that including *any* additional questions on the census – particularly questions on sensitive topics such as race, sex, employment, or health – can serve only to reduce response rates, as both the transaction costs of compliance and the likely concerns about intrusiveness increase.") (emphasis in original) (citations omitted).  However, throughout the 229-year history of including demographic questions on the decennial census that are not necessary for the enumeration and in fact are detrimental, to some degree, to the constitutional purpose of performing an enumeration for the purpose of apportionment, not a single federal court has ever held that the inclusion of such a question violates the Enumeration Clause.  *See United States v. Rickenbacker*, 309 F.2d 462, 463 (2d Cir. 1962) (Marshall,

J.); *Morales v. Daley*, 116 F. Supp. 2d 801, 803-20 (S.D. Tex. 2000); *United States v. Little*, 321 F. Supp.

388, 392 (D. Del. 1971); *United States v. Moriarity*, 106 F. 886, 891 (C.C.S.D.N.Y. 1901). Another district

court has heard an essentially identical Enumeration Clause challenge to the Secretary's decision to

include a citizenship question on the 2020 Census, and held that the Secretary's decision did not violate

the constitution. *See New York*, 315 F. Supp. 3d at 799-806.

497.    Furthermore, beyond the fact that decennial censuses have always included multiple

questions about demographic matters not related to the purpose of conducting an enumeration,

included among such questions has more often than not been a question specifically concerning

citizenship. As this Court has previously noted, "[w]ith the exception of the 1840 Census, all census

from 1820 through 1950 asked all respondents for information relating to citizenship, birthplace, or

both." ECF No. 48, at 3. Starting with the advent of the short form and long form census

questionnaires in 1970, the citizenship question no longer appeared on the short form that was sent

to everyone residing in the United States, but was instead included in the long form questionnaire sent

to a subset thereof. *Id.* at 4. After the Census Bureau ceased using the long form questionnaire in

2000, the citizenship question was included on the ACS questionnaire. *Id.* Therefore, a question

inquiring about a respondent's citizenship has been an almost constant fixture of census

questionnaires in some form for the past 200 years, and as this Court has noted, "to a certain extent,

the Secretary's inclusion of a citizenship question on the 2020 Census has the blessings of history."

*Id.* at 23.

498.    Here, particularly in light of the extensive history of both demographic questions

generally and citizenship questions specifically on census questionnaires and the Supreme Court's

explicit recognition that such questions "fulfill[] many important and valuable functions," *Baldridge*,

455 U.S. at 353, Plaintiffs have failed to meet the required burden to show that the inclusion of a

citizenship on the 2020 Census violates the Enumeration Clause. On the contrary, Defendants have

demonstrated that obtaining citizenship data serves a "reasonable purpose," ECF No. 84, at 11, because not only has the collection of citizenship data has been a long-standing historical practice in the United States for almost 200 years, ECF No. 48, at 3-4, but, as the Secretary noted in his decision memo, asking a question about citizenship is a widespread international practice among nations with a national census.  PX-1, AR1319.  Furthermore, it is undisputed that DOJ and the courts need citizenship data for investigating, litigating, and ultimately determining whether there have been violations of Section 2 of the Voting Rights Act, and that this need sometimes can include block-level citizenship data.  Tr. 3-119:19-23; Tr. 3-120:2-7.  Even if Secretary Ross failed to reasonably explain his decision to reinstate a citizenship question on the census for purposes of the Administrative Procedure Act, Plaintiffs have failed to show that the collection of citizenship data does not fulfill a reasonable purpose under the objective test applied by this Court for Enumeration Clause purposes.  *Cf. Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("Our cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution.").

499.    Furthermore, Plaintiffs have failed to demonstrate that there will be such a significant differential undercount that it rises to the level of a constitutional violation.  As an initial matter, as explained in more detail above, the Court notes that it is well-established that the decennial census may include questions that are not directly related to the constitutional purpose of a population enumeration.  To some degree, it is a virtual certainty that each of these questions has some negative impact on the purpose of conducting an enumeration by decreasing the initial self-response rates, even if by very small amounts.  *See New York*, 315 F. Supp. 3d at 805.  As this Court recognized in a previous order, "Plaintiffs' allegation that the citizenship question will affect the accuracy of the census does not automatically render the citizenship question unconstitutional.  The Census Bureau is not obligated, nor expected, to conduct a perfectly accurate count of the population."  ECF No. 48, at 23.

Here, the administrative record and the evidence at trial demonstrated that Plaintiffs have at most shown that the inclusion of a citizenship question may have a differential impact on the *initial* self-response rates among groups. However, neither apportionment nor federal funding nor any other action any federal or state government takes based upon decennial census data uses of even considers the initial self-response rates.

500. But there is no dispute that for the 2020 Census, the Census Bureau intents "to seek to reach each individual household" and count each household and person within that household as part of the decennial enumeration. *Utah*, 536 U.S. at 477. As explained in much detail elsewhere, the administrative record demonstrates that the Census Bureau has taken extensive measures, and continues to take extensive measures during 2019, to ensure that the Census Bureau can get as close as possible to an actual enumeration of all persons in the United States in the 2020 Census. *See supra* Sec. I.E.

501. Although there may in fact be an undercount on the 2020 Census, and there may be some degree of differential undercount (as there was in 2010 and other past decennial censuses that did not include a citizenship question on the short form questionnaire), this does not mean that that Plaintiffs have stated a valid Enumeration Clause claim – as this Court stated in a previous order, "despite efforts to continually improve the quality of the count, errors persist, resulting in a net undercount of the population; often disproportionately affecting some racial and ethnic minority groups. This may be the unfortunate reality of an imperfect process." ECF No. 48, at 24 (citation omitted). *See also Wisconsin*, 517 U.S. at 6 (recognizing that no census has been wholly successful in achieving goal of complete enumeration). Some of the more-recent censuses incorporated a long-form questionnaire that included a citizenship question, yet the incremental impact on accuracy created by these instruments was never determined to implicate constitutional accuracy. The facts establish that the 2020 Census will achieve both absolute and distributive accuracy within this

historical context that does not rise to the level of "unreasonably compromis[ing] the distributive accuracy of the census" to rise to the level of a constitutional claim.

502.    Finally, as explained in more detail elsewhere in this Order, the Court holds that Plaintiffs' evidence that there will be a loss of representation due to the inclusion of a citizenship question is insufficient to establish a violation of the Enumeration Clause because it is based on flawed assumptions and is speculative.  *See supra* Sec. II.B.vii.

503.    Plaintiffs have therefore failed to prove by a preponderance of the evidence that the Secretary's decision to include a citizenship question on the 2020 Census was unreasonable or that it will compromise the distribute accuracy of the census.   Accordingly, the Court concludes that Plaintiffs failed to prove the required elements of their claim.

## V.    THE SECRETARY DID NOT VIOLATE THE DUE PROCESS CLAUSE

### A.    General Legal Standards

504.    To establish a violation of the equal protection component of the Due Process Clause, Plaintiffs bear the burden of demonstrating that an "invidious discriminatory purpose was a motivating factor" behind the Secretary's decision.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp. ("Arlington Heights")*, 429 U.S. 252, 266 (1977).  To make such a showing, "proof of racially discriminatory intent or purpose is required to show a violation."  *Id.* at 265.

505.    The fact that a state action has a disparate impact is not sufficient to establish an equal protection violation, even if the disparate impact is foreseeable to the decisionmaker.  As the *Arlington Heights* Court held, "impact alone is not determinative, and the Court must look to other evidence." *Id.* at 266; *see also Thompson v. U.S. Dep't of Hous. and Urban Dev.*, 348 F. Supp. 2d 398, 412 (D. Md. 2005) ("In the context of Equal Protection, the term 'discriminatory purpose[] . . . implies more than . . . awareness of [discriminatory] consequences.'") (quoting *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (alterations in *Thompson*).  "While neither a disparate impact on members of a particular

class nor the foreseeability of this impact to policymakers suffices to ground Constitutional liability, 'actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.'" *Thompson*, 348 F. Supp. 2d at 412 (quoting *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979)).  This is particularly true where, as here, the decision is facially neutral in its applicability and any disproportionate harm is dependent upon persons in those sub groups defying their legal duty to complete the questionnaires.

506.    In making this determination as to whether a plaintiff has met its burden of showing "proof of racially discriminatory intent or purpose," the Fourth Circuit has identified several non-exclusive factors a court should consider:

> Several factors have been recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent, including: (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995); *see also Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir. 2003).

507.    When an equal protection challenge is brought to "a facially neutral statute or policy that is neutrally applied," a plaintiff must show both an "adverse effect on a protected group, and that the adoption of the statute or policy was motivated by discriminatory animus." *Williams*, 326 F.3d at 584; *see also Feeney*, 442 U.S. at 272 (holding that a facially neutral policy violates equal protection "only if [a disparate] impact can be traced to a discriminatory purpose.").  Accordingly, where a plaintiff challenging a facially neutral law "fail[s] to demonstrate that the law in any way reflects *a purpose to discriminate*," there is no equal protection violation.  *Feeney*, 442 U.S. at 280 (emphasis added); *see also*

*Trump v. Hawaii*, 138 S.Ct. 2392, 2420 (2018) (reaffirming that facially neutral policies are subject to only limited, deferential review and may not lightly be held unconstitutional).   In other words, discriminatory purpose requires "more than intent as volition or intent as awareness of consequences," and requires that the decisionmaker acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (citation omitted).

      B.    <u>Scope of Review</u>

      i.    **Equal protection claims are decided on the administrative record.**

    508.   Plaintiffs' equal protection claim should be decided on "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), because Congress did not carve out constitutional claims from the record-review procedures of the APA.   Section 706 of the APA commands that "the reviewing court shall . . . interpret constitutional[] provisions," and shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity."   5 U.S.C. § 706.   Section 706 also states explicitly that "[i]n making the foregoing determination[], the court shall review the whole record or those parts of it cited by a party."   *Id.*   Accordingly, as multiple federal courts across the country have held, § 706 by its plain and clear language restricts the review of constitutional claims to the administrative record. *See, e.g.*, *Chang v. U.S. Citizenship & Immigration Servs.*, 254 F. Supp. 3d 160, 161 (D.D.C. 2017); *see also Harkness v. Sec'y of Navy*, 858 F.3d 437, 451 n.9 (6th Cir. 2017), *cert. denied* 138 S. Ct. 2648 (June 18, 2018) (explaining that a constitutional claim "is properly reviewed on the administrative record"); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 58 F. Supp. 3d 1191, 1232-33 (D.N.M. 2014); *Evans v. Salazar*, Case No. C08-0372-JCC, 2010 WL 11565108, at *2 (W.D. Wash. July 7, 2010); *Harvard Pilgrim Health Care of New England v. Thompson*, 318 F. Supp. 2d 1, 10 (D.R.I. 2004); *Charlton Mem'l Hosp. v. Sullivan*, 816 F. Supp. 50, 51 (D. Mass. 1993).   To conclude otherwise would "incentivize every unsuccessful party to agency action to allege . . . constitutional violations in order to trade in the APA's

restrictive procedures for the more even-handed ones of the Federal Rules of Civil Procedure." *Jarita Mesa*, 58 F. Supp. 3d at 1238.

509.    Furthermore, nothing in the APA exempts particular constitutional claims or categories of constitutional claims from this record-review rule.  5 U.S.C. § 706.  Indeed, courts have routinely decided equal protection claims based on the administrative record.  *See Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 180 (3d Cir. 2014) ("Review of an equal protection claim in the context of agency action is similar to that under the APA."); *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 955 (9th Cir. 2011) (noting that "the equal protection argument can be folded into the APA argument"); *Chang*, 254 F. Supp. 3d at 162 ("The information necessary for the Court to determine whether the agency's [decision] was rational—or with respect to their APA claims, arbitrary and capricious—will, presumably, be found in the administrative record."); *Ketcham v. U.S. Nat'l Park Serv.*, 2016 WL 4268346, at *2 (D. Wyo. Mar. 29, 2016) ("To distinguish between a 'stand-alone constitutional challenge' and an 'APA challenge[]' . . . would run afoul of Congress's intent.").   While it is true that these cases did not involve allegations of suspect classifications, this distinction is immaterial for the purposes of determining the proper scope of review.[44]

  ii. **Only the Secretary's intent is relevant in determining whether the decisionmaker was motivated by discriminatory animus.**

510.    The Court's inquiry into discriminatory animus focuses on, and is limited to, whether the *decisionmaker* was motivated by invidious animus towards a particular protected group.  In *Arlington Heights*, the Supreme Court set forth various factors that may be probative of whether a decisionmaker

---

[44] As set forth above, this claim should be decided, if at all, on the basis of the administrative record before the Secretary and "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*).  Nevertheless, because the Court asked the parties to address extra-record evidence in their submissions, Defendants do so here and specifically delineate between the administrative record and extra-record evidence.

was motivated by discriminatory intent. 429 U.S. at 265-68. In doing so, the Court repeatedly emphasized that the inquiry focused on the statements and actions *of the decisionmaker*. *Id.* at 267 ("The specific sequence of events leading up to the challenged decision also may shed some light on *the decisionmaker's* purposes.") (emphasis added).; *id.* ("Substantive departures too may be relevant, particularly if the factors usually considered important *by the decisionmaker* strongly favor a decision contrary to the one reached.") (emphasis added); *id.* at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by *members of the decisionmaking body*, minutes of its meetings, or reports.") (emphasis added). Subsequent Supreme Court cases also emphasized this point. *See, e.g., City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) (noting that "statements made *by decisionmakers* or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent") (emphasis added); *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 343 (2000) (explaining the *Arlington Heights* factors, including "contemporary statements *of decisionmakers*") (emphasis added). And the Fourth Circuit has followed this straightforward approach with respect to each of the *Arlington Heights* factors. *See, e.g., Sylvia Dev. Corp.*, 48 F.3d at 819. Nothing in *Arlington Heights* or its progeny supports the notion that statements by non-decisionmakers, particularly broad, unrelated statements, can be sufficient to establish that the decisionmaker acted with discriminatory animus.

  C. <u>Plaintiffs Have Not Proven a Violation of the Due Process Clause</u>

  511. After careful consideration of the evidence, the Court finds that Plaintiffs have failed to identify any evidence, in the administrative record or otherwise, that the decisionmaker, the Secretary, was motivated by any sort of discriminatory animus in his decision to include a citizenship question on the 2020 Census. For that reason, Plaintiffs have failed to carry their burden of proving, by a preponderance of the evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the citizenship question on the 2020 Census.

i.     **There is no evidence, in the administrative record or otherwise, that the sole decisionmaker, the Secretary, was motivated by discriminatory animus.**

512.     Plaintiffs have not met their burden of showing that any of the *Arlington Heights* factors, as interpreted by the Fourth Circuit in *Sylvia Development Corporation*, are sufficient for this Court to impute any discriminatory animus motive to the Secretary.  The first of these factors is whether there is a "consistent pattern" by the decisionmaker of taking actions that "disparately impact[] members of a particular class of persons."  *Sylvia Dev. Corp.*, 48 F.3d at 819.  Here, Plaintiffs have not shown any evidence of any action other than the inclusion of a citizenship question on the 2020 Census that the Secretary has taken that allegedly disparately impacts any particular class of protected persons.  Furthermore, Plaintiffs cannot and do not dispute that the Census Bureau historically has not only welcomed the full participation of any and all classes of individuals residing in the United States, but has in fact gone to significant lengths to encouraging such participation.  The decennial census forms are printed in a variety of different languages, the Census Bureau attempts to hire enumerators with similar language and cultural backgrounds as the persons they will be enumerating, the Census Bureau uses paid media to conduct public advertising campaigns in hard-to-reach populations, and the Census Bureau works extensively with local businesses, faith-based groups, elected officials, and community organizations to reach persons from all racial, national, and citizenship backgrounds to encourage all persons living in the United States to respond to the decennial census.  Joint Stips. ¶¶ 59-63.  Plaintiffs simply have not produced any evidence that either the Secretary specifically or the Census Bureau generally and historically have any "consistent pattern" of taking actions that disparately impact any particular group or groups.

513.     Plaintiffs have also failed to show that "the historical background of the decision," *Sylvia Dev. Corp.*, 48 F.3d at 819, provides support for Plaintiffs' claim that the Secretary decided to include a citizenship question on the 2020 Census for discriminatory reasons.  As explained in more

detail in the findings of fact section discussing the history of the census, there is an extensive, nearly-unbroken history of asking respondents to census questionnaires to provide information regarding their citizenship.  As this Court has previously noted, "[w]ith the exception of the 1840 Census, all censuses from 1820 through 1950 asked all respondents for information relating to citizenship, birthplace, or both."  Mem. Op., ECF No. 48, at 3.  Starting with the advent of the separate short form and long form census questionnaires in 1970, the citizenship question no longer appeared on the short form questionnaire that was sent to everyone residing in the United States, but was instead included in the long form questionnaire that was sent to a subset thereof.  *Id.* at 4.  After the Census Bureau ceased using the long form questionnaire in 2000, the citizenship question was included on the ACS questionnaire.  *Id.*  Therefore, a question inquiring about a respondent's citizenship has been an almost constant fixture of census questionnaires in some form for the past 200 years, and this Court has previously noted, "to a certain extent, the Secretary's inclusion of a citizenship question on the 2020 Census has the blessings of history."  *Id.* at 23.  This is true even if one looks outside the United States, as the practice of asking residents about citizenship status is widespread among other nations that conduct a national census as well.  PX-1, AR1319.  To the best of the Court's knowledge, prior to the Secretary's March 26, 2018 decision, the Census Bureau's inclusion of citizenship questions on its questionnaires was never subject to any widespread or significant criticism as being in any way the result of any discriminatory animus towards any group of American residents.  Accordingly, Plaintiffs have not pointed to any evidence, either in the record or elsewhere, that would show that the "historical background" of asking about citizenship on the decennial census is evidence of any discriminatory animus on the part of the Secretary.

514.   Plaintiffs have likewise failed to prove that the third *Arlington Heights* factor, "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures," *Sylvia Dev. Corp.*, 48 F.3d at 819, shows any

213

discriminatory animus by the Secretary towards any class or group of people.  As discussed in more detail above, when the Secretary asked the Census Bureau about the process that had been used in the past to add new questions to the decennial census, the Census Bureau advised that "[b]ecause no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not fee[l] bound by past precedent when considering the Department of Justice's request."  PX-1, AR1296 (Question 31).  In other words, because the decennial census is a relatively rare event and changes to the questions contained thereon occurs rarely, there simply is no well-established "normal procedure" for adding questions to the census.

515.     Furthermore, as discussed in detail above, the Secretary's decision did not depart from any applicable OMB Guidelines or the Census Bureau's own quality standards.  Nor did Plaintiffs point to any evidence in the record or produce any evidence at trial to the contrary.  Plaintiffs' expert Mr. Thompson offered the opinion that the citizenship question was not properly tested, but conceded that the only written Census Bureau policies establishing testing procedures for questions contain an exception for questions taken from another survey.  Tr. 1-108:12-23.  Mr. Thompson also conceded that the citizenship question had been adequately tested before it was added to the ACS, and that the wording of the question on the 2020 Census is identical to the ACS question.  Tr. 1-108:24–1-109:9.  Similarly, Dr. Mathiowetz's opinion that the question was not adequately tested before the Secretary decided to include it on the 2020 Census is not persuasive in light of her concession that Census Bureau Statistical Quality Standard Sub-Requirement A2-3.3. contains an exception for questions that are performing adequately on another survey, Tr. 2-202:25–2-203:12, and the evidence at trial showed that the ACS citizenship question meets the Census Bureau's exception for questions performing adequately on another survey.  Tr. 5-42:7–5-43:18; 6-35:23–6-36:11.  Mr. Thompson's testimony that unwritten testing procedures should have applied is also unpersuasive in light of the fact that the only examples he cited in support of his opinion applied to the wording or

form of questions, Tr. 1-56:24–1-58:3; 1-59:14–1-60:14; 1-110:8-16, whereas here the question on the

2020 Census is identical in wording and form to the ACS citizenship question.  Finally, Dr. Massey's

opinion that the procedure followed was not normal because the CSAC was not consulted prior to

the Secretary's decision is not persuasive because, as Dr. Massey conceded, there is no requirement

that the Census Bureau submit all proposed changes, the Census Bureau does not submit all changes

to CSAC in practice, and, even when the Census Bureau does consult with CSAC, it is not bound by

CSAC's recommendation.  Tr. 1-135:24–1-136:2; 1-135:15-20; 1-136:3-23.

516.    Accordingly, because the evidence shows that including a new question on the

decennial census is such a rare occurrence that there is no "normal" process for doing so, this Court

can only look to whether the Secretary followed the applicable regulatory constraints and guidelines.

Because Plaintiffs have failed to show that he did not do so, Plaintiffs have not shown that there is

any "significant departure[] from normal procedure" that supports their claim that the Secretary was

motivated by discriminatory animus.

517.    The Court further holds that, even if Plaintiffs had demonstrated that the Secretary's

decision constituted a "significant departure[] from normal procedure," that alone would be

insufficient to establish that he was motivated by discriminatory animus.  Because the procedures

employed by the Secretary in reaching his ultimate decision are not in and of themselves enough to

shed any light on his motive or provide proof of a discriminatory purpose, this is not enough to prove

Plaintiffs' equal protection claim.  Another district court recently considered and rejected such an

argument under materially indistinguishable circumstances from those presented by the Plaintiffs here.

In a case involving, *inter alia*, an equal protection claim to the Secretary's decision to include a

citizenship question on the 2020 Census, the district court held that even though it found "ample

evidence of procedural irregularities and substantive departures" from the trial evidence that

supported a finding that "Secretary Ross's stated rationale was pretextual," *New York et al. v. Dep't of*

*Commerce et al.*, 2019 WL 190285 at *118 (S.D.N.Y. Jan. 15, 2019), that was insufficient to establish an equal protection violation. The court held that "for purposes of their equal protection claim, Plaintiffs must prove more than that. Specifically, they must prove what the rationale was a pretext for – and, more to the point, that it was a pretext *for discrimination* prohibited by the Due Process Clause." *Id.* (emphasis in original) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), for quotation that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason") (emphasis in *St. Mary's Honor Ctr.*). Similarly, here, even if the Court had found that Plaintiffs had shown that the Secretary's decision was pretextual due to procedural irregularities and departures, absent some showing that the Secretary's motivation for such irregularities and departures was discriminatory, Plaintiffs cannot establish an equal protection violation. As discussed below, the Court finds that Plaintiffs have failed to do so.

518.   Finally, Plaintiffs have failed to prove that the fourth and most important of the *Arlington Heights* factors, any contemporary statement or indication of discriminatory animus by the decisionmaker, *Sylvia Dev. Corp.*, 48 F.3d at 819, provides any support for their allegation that the Secretary was motivated by discriminatory animus. On the contrary, the letter sent by the Department of Justice formally requesting the inclusion of a citizenship question specifically noted that the Department was requesting up-to-date citizenship data at the census-block level so as to avoid the "wrong result" of drawing a single-member district in which a minority group constituted a majority of the voting-age population but not the majority of the citizen voting-age population. PX-1, AR663-64. The Department of Justice's request for the inclusion of the citizenship question was therefore explicitly designed to *protect*, not disadvantage, minority groups. Plaintiffs are not able to point to a single instance, either in the tens of thousands of pages constituting the expanded administrative record or in any of the extensive discovery they were permitted to engage in, of the Secretary ever articulating any other motive for including the citizenship question on the decennial census other than

to provide DOJ with the data it requested, for the reasons it was requested.  In announcing his decision to reinstate a citizenship question on the 2020 Census, the Secretary cited the Department of Justice's request for citizenship data to assist with Voting Rights Act enforcement as the sole reason and motivating factor behind his decision.  PX-1, AR 1313-20.  There was no indication of any discriminatory animus expressed in the Secretary's memo, or anywhere else in the record or evidence at trial.

519.     Nor is there any evidence whatsoever in the administrative record, or in any evidence produced during discovery or presented at trial, that the Secretary ever expressed any discriminatory animus toward any particular protected group or groups.  Plaintiffs did not identify a single statement anywhere in the extensive expanded administrative record that the Secretary ever expressed any motivation for including a citizenship question on the 2020 Census other than to assist the Department of Justice with Voting Rights Act enforcement, let alone any motive arising from any sort of discriminatory animus towards any particular group.  Indeed, Plaintiffs even seem to have conceded that Ross himself had no discriminatory animus motivating his decision, and that their theory is based entirely upon the animus of others, stating that:

> Plaintiffs allege that the intent, the pressure, the motive for the decision came from the top.  Secretary Ross did the bidding of those conspirators who were determined to depress the count of certain groups in the census . . . based on racial animus toward immigrants of color.  Neither the intent, nor the idea, began with Secretary Ross.  He carried the water of his co-conspirators…

*LUPE et al. v. Ross et al.*, No. 18-cv-01570, ECF No. 70, at 5.

520.     To the extent Plaintiffs argue that the Secretary's limited communications with Steven Bannon and/or Kris Kobach early in 2017 are somehow probative of discriminatory animus on the part of the Secretary, that argument is rejected.  The record shows that Mr. Bannon called the Secretary in Spring 2017 to ask the Secretary if he would be willing to speak to then Kansas Secretary of State

217

Kris Kobach about the possibility of including a citizenship question on the decennial census.  *See* PX-302 at 1-3 (Defs.' Suppl. Resp. to Pls.' Interrogs., No. 1).  And the record shows that the Secretary did in fact communicate with Mr. Kobach, and that Mr. Kobach encouraged the Secretary to add a citizenship question to the decennial census that also specifically asked about a respondent's immigration status.  PX-1, AR763-64.  However, this meeting and communication took place in July 2017, roughly eight months before the Secretary's decision to include a different citizenship question on the 2020 Census.

521.  Mr. Kobach also sent the Secretary a letter in February 2018, reiterating his support for the inclusion of a citizenship question on the 2020 Census.  PX-176.  Mr. Kobach also proposed a draft question, with response options, and stated that:

> This slight variation of ACS question #8 is absolutely essential if the new census question is to be maximally useful to federal state and local governments.  The variation occurs in the final two categories, which serve to separate noncitizens into lawful permanent residents versus all other categories of noncitizens.  It is important to know the number of lawful permanent residents because these individuals are part of [sic]population of continuous residents in a state, and are not temporarily present or illegally present.

PX-176 at 2.  Mr. Kobach went on to say in the letter that this alteration to the version of the citizenship question on the ACS was "important" because "[i]f a jurisdiction is experiencing lower-than-average naturalizations of lawful permanent residents, that may indicate that discrimination against such noncitizens is occurring with the effect that they are discouraged from naturalizing," and that the number of lawful permanent residents in jurisdictions is needed to "effectively plan for growth in the voting electorate."  *Id.*  However, it is also undisputed that the Secretary heard from many stakeholders and interested and concerned parties during this same time period, via conversations as well as written submissions, on the question of whether a citizenship question should be included in the 2020 Census, and Plaintiffs have pointed to no evidence in the record or elsewhere that the

Secretary considered his brief interactions with Mr. Bannon and/or Mr. Kobach to somehow be more important or relevant to his decision than any of the many other views that were expressed to him.

522.     Further, the fact that the Secretary explicitly declined to choose to adopt the wording of the question proposed by Mr. Kobach that included legal status – that Mr. Kobach had stated was "essential" and "important" – shows that any influence Mr. Bannon or Mr. Kobach may have had over the Secretary was very limited and that the Secretary at least implicitly rejected Mr. Kobach's stated rationales for including the question.  Finally, even if Plaintiffs had shown that Mr. Bannon or Mr. Kobach was somehow instrumental to the Secretary's decision, they have not shown that Mr. Kobach or Mr. Bannon was motivated by discriminatory animus.

523.     To the extent that Plaintiffs argue that they have met their burden of proving that the Secretary was motivated by discriminatory animus through the introduction of statements made by others within or connected to the administration, the Court finds that they have not done so.  Much of Plaintiffs' argument, and demonstration at trial on the issue of whether the Secretary was motivated by discriminatory animus focused almost exclusively on statements made by others, not the Secretary, to which Plaintiffs ascribe discriminatory animus.  Plaintiffs have introduced at trial, and alleged in their Complaint, *LUPE et al v. Ross et al.*, No. 18-cv-01570, ECF No. 42-1, at ¶¶ 219-254, a number of statements made by the President and others connected with the administration, through social and traditional media that Plaintiffs allege show discriminatory animus towards "Latinos, African Americans, Asian Americans, Native Americans,[45] and Non-U.S. Citizens," *id.* at 66, that they allege provide the basis for their theory of discriminatory animus.

524.     Tellingly, however, *none* of these statements were made by the Secretary, or even by anyone else at Commerce or the Census Bureau.  And Plaintiffs have failed to establish that the

---

[45]   Plaintiffs do not base their equal protection claim on any alleged discriminatory animus towards Native Americans.  *LUPE et al v. Ross et al.*, No. 18-cv-01570, ECF No. 42-1, at ¶ 371.

President was even aware of the Secretary's decision to include a citizenship question on the census before the Secretary publicly announced the decision, much less that the President directed the Secretary to make this decision. Furthermore, while Plaintiffs attempt to ascribe great significance to public statements made by the President, not a single one of these public statements concerned the census generally, or the possibility of including a citizenship question on the 2020 Census specifically.

525.    The closest thing Plaintiffs are able to point to is an email referencing the Secretary's decision to include a citizenship question on the 2020 Census that purportedly was sent from the President's re-election campaign to supporters of his candidacy before he was elected. PX-487. But Plaintiffs have not shown that the President was even aware of this communication sent by his campaign – the email references "President Trump" in the third person and is signed "Team TRUMP," and therefore does not even purport to be a communication from the President. *Id.* More importantly, however, the email is dated March 28, *after* the Secretary made his decision, and therefore could not possibly have had anything to do with the Secretary's motivation for making that decision.

526.    Nor have Plaintiffs been able to show that the Secretary was aware of *any* of these statements made by the President or other persons connected with the campaign or administration prior to the Secretary's March 26, 2018 decision, much less that the Secretary would have somehow interpreted some or all of these statements as a motivating factor in his decision to include a citizenship question on the 2020 Census. The Court notes that another district court was presented with almost identical evidence in support of an essentially identical equal protection claim and held that such evidence was not sufficient to establish discriminatory animus by the Secretary. *New York*, 2019 WL 190285 at *118. There, the Court held that "the President's statements were probative *only if* he was personally involved in Secretary Ross's decision." *Id.* (emphasis added). Ultimately, the court held:

> Plaintiffs point primarily to the motivations of 'those who influenced' Secretary Ross in the decision-making process, including Kobach, Bannon, and Attorney General Sessions. But whether or not the trial evidence would support a finding that those advisors acted with a

> discriminatory purpose, the trial evidence does not establish that they communicated such a purpose to Secretary Ross, as would be necessary to impute their discriminatory purpose to him. Similarly, Plaintiffs failed to prove a sufficient nexus between President Trump and Secretary Ross's decision to make the President's statements or policies relevant to the equal protection analysis.

*Id.* (citations omitted). Similarly, here, while Plaintiffs have produced many statements by other individuals that they argue show a discriminatory animus, in the absence of any information that such individuals were actually involved in the decisionmaking process or that Secretary Ross was even aware of their views and statements, there is simply an insufficient nexus between such statements and the Secretary's decision to conclude that the Secretary not only adopted or held such views himself, but was motivated to include a citizenship question on the 2020 Census because of such views.

527. Simply put, Plaintiffs failed to prove that general public statements made by the President or other persons about matters other than the decennial census or the possibility of including a citizenship question thereon – that the Secretary may or may not have even been aware of – somehow constitute a discriminatory animus motive on the part of the Secretary, the sole decisionmaker, and they have failed to satisfy the final *Arlington Heights* factor. Accordingly, because Plaintiffs have failed to prove *any* of the factors set forth by the Supreme Court in *Arlington Heights* and under the Fourth Circuit in *Sylvia Development Corporation* for establishing discriminatory animus, the Court finds that Plaintiffs have failed to prove an essential element of their equal protection claim.

      ii.      **There is no evidence, in the administrative record or otherwise, that the inclusion of a citizenship question will cause a disparate impact on any protected group.**

528. Furthermore, the Court also finds that Plaintiffs have failed to identify any evidence, in the administrative record or otherwise, that the inclusion of a citizenship question on the 2020 Census will cause a disparate impact on any protected group.

529.     As an initial matter, the Court notes that to the extent Plaintiffs attempt to base their equal protection claim upon allegations of discriminatory animus towards noncitizens, as they indicate in their Amended Complaint, ECF No. 42-1, at ¶ 371, that claim fails because noncitizens are not a protected class under the law.   Even if Plaintiffs had established that the inclusion of a citizenship question on the 2020 Census constitutes some sort of action that "discriminates" between citizens and noncitizens, the Federal Government makes many distinctions between citizens and noncitizens, both for privileges such as voting, jury service, and eligibility for certain types of benefits, *see, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (holding that limitation on eligibility for a federal medical insurance program was limited to citizens and long-term permanent residents did not violate Equal Protection Clause); *Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (holding Welfare Reform Act's denial of prenatal care coverage to unqualified noncitizens against Equal Protection challenge); *Moving Phones Partnership L.P. v. FCC*, 998 F.2d 1051, 1055-56 (D.C. Cir. 1993) (rejecting Equal Protection challenge to Communications Act's prohibition on business entity with noncitizens among its general partners from obtaining a radio license), as well as making noncitizens subject to certain governmental actions, most obviously exclusion and deportation, to which citizens are not subject, *see, e.g.*, *United States v. Duggan*, 743 F.2d 59, 75-76 (2d Cir. 1984) (rejecting equal protection claim to Foreign Intelligence Surveillance Act's provision of certain protections and evidentiary burdens only to citizens and legal residents).   As the Supreme Court has explained, "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. . . . The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'"  *Mathews*, 426 U.S. at 79-80.  Therefore, to set forth a valid equal protection claim here, Plaintiffs were required to prove that the Secretary was motivated by a discriminatory animus towards persons of a certain race or national origin, a burden Plaintiffs failed to meet.

530.     Furthermore, Plaintiffs failed to point to any evidence in the administrative record or at trial that rebuts the fundamental fact that the 2020 Census questionnaire, including the citizenship question, will be asked of every person residing in the United States, and a response from every person residing in the United States (a) will be vigorously sought by the Census Bureau's NRFU process in the absence of a self-response; and (b) will be recorded and tallied for the purposes of the decennial enumeration; and (c) is required by law.  Including a question asking about citizenship status on a questionnaire that is asked of everyone does not constitute "discrimination" on the basis of citizenship status any more than questions about sex or race constitute discrimination based upon those characteristics.

531.     Nor can Plaintiffs avoid this bar by simply re-framing the basis of their equal protection claim as animus towards those born outside the United States.  ECF No. 42-1, at ¶ 371. Plaintiffs are unable to distinguish how this re-casting of their claim is different from an argument that this was motivated by animus towards noncitizens.  *See Rajah v. Mukasey*, 544 F.3d 427, 438-39 (2d Cir. 2008) (rejecting equal protection challenge to government program that monitored foreign nationals from certain nations).  The proposed question asks only about citizenship status and makes no inquiry as to the legal or residency status of any noncitizen.  *See* Joint Stips. ¶ 90.  The question only asks for birthplace/place of origin for those who answer to "Yes" to the citizenship question to indicate whether they were born in the United States, born in a United States territory, born abroad to at least one U.S. citizen parent, or naturalized.  *Id.* If the Secretary was actually motivated by a discriminatory animus towards all "foreign-born persons," as Plaintiffs seem to allege, then presumably the question would target and have a discriminatory impact upon *citizens* who were born in other nations, as well as foreign-born noncitizens.  However, Plaintiffs did not produce any evidence, in either the record or in the evidence at trial, that this will even have a disparate impact on foreign-born U.S. citizens broadly, separate and apart from any particular ethnic group, let alone that the Secretary ever indicated

any animus towards all foreign-born U.S. residents.  An argument that the Secretary was motivated by discriminatory animus towards people of every national origin other than the United States, including many U.S. citizens, is circular, illogical, and contrary to the entire concept of discrimination, as well as completely unsupported by the facts in this case.

532.    The Court also finds that Plaintiffs have failed to produce any evidence whatsoever that would support an equal protection action on the basis of a discriminatory animus towards Asian-Americans.  ECF No. 42-1, at ¶ 371.  Plaintiffs cannot point to a single iota of evidence, either in the record or in the extra-record evidence presented at trial, that anyone, let alone the Secretary as the sole decisionmaker, expressed any discriminatory animus towards Asian-Americans.   Furthermore, Plaintiffs can similarly not point to any credible quantitative support for the proposition that the inclusion of a citizenship question on the 2020 Census would lead to a differential impact on self-response rates among Asian-Americans, much less that the inclusion of the citizenship question would have a differential impact on the final enumeration of Asian-Americans.  Simply put, Plaintiffs have no evidence to support any claim of discriminatory animus towards Asian-Americans.

533.    Finally, the Court also finds that Plaintiffs have failed to produce sufficient evidence that would support an equal protection action based upon a discriminatory animus towards Latinos.  ECF No. 42-1, at ¶ 371.  As noted above, Plaintiffs have no evidence that the Secretary ever expressed any animus towards Latinos, and certainly never indicated that his decision to include a citizenship question on the 2020 Census was motivated by any kind of animus, towards Latinos or any other group.  The Court also notes that the claim that the Secretary was motivated to include a citizenship question by an animus towards all Latinos, regardless of citizenship status, is difficult to understand as matter of logic given that the citizenship question asks only about citizenship, not ethnicity or national origin, and there has been a long-standing question on the decennial census that specifically asks if the respondent is "of Hispanic, Latino, or Spanish origin?"  Joint Stips. ¶ 92.

534.   Furthermore, Plaintiffs have failed to prove that the presence of a citizenship question will in fact have a harmful impact on Latinos.  Much of Plaintiffs' argument that the inclusion of a citizenship question on the 2020 Census will lead to an undercount is premised upon the Census Bureau paper estimating a 5.8 percentage point decline in initial self-response rates, PX-162.  But, in addition to the methodological issues explained above, that paper's estimate was as to noncitizens, not Latinos, so even if this Court were to find that paper a sound basis to conclude that there would be a differential undercount in the final enumeration, it would not be a differential undercount of Latinos.

535.   Plaintiffs have therefore failed to prove by a preponderance of evidence that any protected group would even be disparately impacted by the inclusion of a citizenship question Accordingly, because the evidence, in the administrative record or otherwise, demonstrates that the Secretary of Commerce's decision to include a citizenship question on the 2020 Census will not disparately impact any protected group and that the Secretary was not motivated by any discriminatory animus, the Court concludes that Plaintiffs failed to prove the required elements of their claim by a preponderance of evidence.

## VI.   THERE IS NO VIABLE CLAIM UNDER 42 U.S.C. § 1985(3)

### A.   Proposed Conclusions of Law

i.   **Plaintiffs' § 1985(3) claim is barred by sovereign immunity.**

536.   As an initial matter, Defendants maintain their position that Plaintiffs' § 1985(3) claim is barred by sovereign immunity, notwithstanding the Court's holding to the contrary in its denial of Defendants' motion to dismiss.  *See* Mem. Op. 19-21, *LUPE v. Ross*, No. 18-cv-1570, ECF No. 80. Defendants reiterate those arguments here to preserve them for future proceedings.

537.   Sovereign immunity bars cases against the federal government unless Congress has unequivocally consented to suit.  *United States v. Testan*, 424 U.S. 392, 399 (1976).  Sovereign immunity is not limited to cases naming the United States as a defendant; it also generally bars cases against

federal officials in their official capacities because the relief requested would run against the federal government as a whole. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).

538.     The United States has not as a general matter waived sovereign immunity as to 1985(3) suits. *Unimex, Inc. v. Dep't of Housing & Urban Dev.*, 594 F.2d 1060, 1061 (5th Cir. 1979) (The "United States has not consented to suit under the civil rights statutes."). Sovereign immunity thus "bars []§ 1985(3) … suits brought against the United States and its officers acting in their official capacity." *Davis v. U.S. Dep't of Justice*, 204 F.3d 723, 726 (7th Cir. 2000); *accord Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999).

539.     To be sure, such a suit against federal officers in their individual capacities might be permissible if it is alleged that the officers acted beyond their statutory powers and that the powers themselves or the manner in which they are exercised are constitutionally void. *Dugan v. Rank*, 372, U.S. 609, 621 (1963). However, Plaintiffs have made no such allegations here. More critically, Plaintiffs have sued Secretary Ross and Acting Director Jarmin in their official capacities only, not in their individual capacities. In the absence of an individual-capacity suit, section 1985(3) cannot be applicable here. Therefore, the § 1985(3) conspiracy claim is barred by sovereign immunity.

ii.     **Section 1985 does not authorize courts to award injunctive relief.**

540.     Defendants also maintain their position that Plaintiffs' claim fails as a matter of law because Plaintiffs' § 1985(3) claim seeks only injunctive relief. Section 1985(3) authorizes courts to award damages, not injunctive relief. By its terms, § 1985(3) provides only that a plaintiff "may have an action *for the recovery of damages* . . . against any one or more of the conspirators." 42 U.S.C. § 1985(3) (emphasis added). The statute says nothing about injunctive relief. This language stands in stark contrast to its companion provision, which provides for a "suit in equity, or other proper proceeding for redress," and specifies that "injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." *See* 42 U.S.C. § 1983. This provision demonstrates

clearly that Congress both considered and provided for differing remedies under the two statutory provisions; in fact, there is no ground to assume, in light of § 1985(3)'s express reference to damages in contrast to the explicit reference to injunctive relief in § 1983, that Congress in any way authorized official-capacity suits for equitable relief under the former. *See Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1078 (2018) ("[T]his Court has no license to 'disregard clear language' based on an intuition that 'Congress must have intended something broader.'"); *Dean v. United States*, 556 U.S. 568, 572 (2009) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

541.    This Court should therefore conclude that "the statutory relief available under § 1985 'is limited to the recovery of damages'" and that, in requesting only injunctive relief here, Plaintiffs' claim fails as a matter of law. *Tufano v. One Toms Point Lane Corp.*, 64 F. Supp. 2d 119, 133 (E.D.N.Y. 1999) (quoting *Cuban v. Kapoor Bros., Inc.*, 653 F. Supp. 1025, 1033 (E.D.N.Y. 1986), *aff'd*, 229 F.3d 1136 (2d Cir. 2000); *see generally Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 285 n.16 (1993) (noting that the Court "need not address whether the District Court erred by issuing an injunction, despite the language in § 1985(3) authorizing only 'an action for the recovery of damages occasioned by such injury or deprivation'" but that the impropriety of injunctive relief "was asserted by the United States as amicus").

### iii.    **The intra-corporate conspiracy doctrine bars Plaintiffs' claim**

542.    The intra-corporate conspiracy doctrine applies to § 1985(3) claims. *Buschi v. Kirven*, 775 F.2d 1240, 1251-52 (4th Cir. 1985).  Under the intra-corporate conspiracy doctrine, "there is no unlawful conspiracy when officers within a single corporate entity consult among themselves and then adopt a policy for the entity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).  The rationale for this

doctrine is that "[c]onspiracy requires an agreement . . . between or among two or more separate persons," but "[w]hen two agents of the same legal entity make an agreement in the course of their official duties . . . their acts are attributed to [the] principal," so "there has not been an agreement between two or more separate people." *Id.*

543.    Because Plaintiffs' alleged conspiracy was among federal officials within the executive branch, it cannot provide a basis for liability under § 1985(3).

iv.    **If the § 1985(3) claim is viable, Plaintiffs' APA claim must be dismissed.**

544.    If Plaintiffs may pursue a claim against federal employees in their official capacity under 42 U.S.C. § 1985(3), then their claims under the APA must be dismissed because they have an adequate alternative remedy. The APA provides that "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704; *see Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009). An alternative remedy need not provide identical relief to be adequate; rather, so long as the relief offered is of the same "genre," judicial relief under the APA is barred. *See Garcia*, 563 F.3d at 522.

545.    Here, the Court previously concluded that Section 1985(3) waived sovereign immunity to permit the Court to "enjoin the Defendants' implementation of an allegedly unconstitutional conspiracy." Mem. Op. at 20, ECF No. 80. That relief is plainly of the same "genre" as the relief Plaintiffs seek for their APA claims. *See* Am. Compl., *LUPE v. Ross*, No. 18-cv-1570, Prayer for Relief (e), ECF No. 42 (requesting that the Court "[e]njoin Defendants and their agents from including a citizenship question on the 2020 Census questionnaire and from taking any irreversible steps to include a citizenship question on the 2020 Census questionnaire.").

546.    To be sure, for the reasons stated above, Defendants respectfully disagree that Section 1985(3) waives sovereign immunity to permit official capacity claims for injunctive relief. But if the

Court disagrees and continues to permit the *LUPE* Plaintiffs to maintain the Section 1985(3) claim, it must dismiss their APA claims for lack of subject matter jurisdiction.

547.    Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

B.    Proposed Findings of Fact

548.    The *LUPE* Plaintiffs failed to meet their burden of establishing their Section 1985 conspiracy claim between Kansas Secretary of State Kris Kobach and Secretary Ross to include a citizenship question on the 2020 Decennial Census.

549.    An actionable conspiracy under § 1985(3) requires "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights"—that is, a "joint plan[] to deprive [the plaintiff] of his constitutional rights." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995).  This "burden is weighty" and cannot "amount[] to nothing more than rank speculation and conjecture." *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017).  Notably, in applying that "very high" standard, *Brissett v. Paul*, 141 F.3d 1157 (4th Cir. 1998) (unpublished), the Fourth Circuit "*has rarely, if ever*, found that a plaintiff has set forth sufficient facts to establish a section 1985 conspiracy," *Simmons*, 47 F.3d at 1377 (emphasis added).

550.    The *LUPE* Plaintiffs have failed to prove a "meeting of the minds" between Mr. Kobach and Secretary Ross to deprive Plaintiffs of their constitutional rights as required by § 1985(3). Indeed, as discussed above, Plaintiffs have failed to prove that Secretary Ross was motivated by discriminatory animus in deciding to reinstate the citizenship question.  *See supra* Sec. V.C.i.

551.    On July 14, 2017, Kansas Secretary of State Kobach sent an email to Secretary Ross noting that he was following up on a telephone call they had several months earlier concerning the fact that the decennial census did not currently contain a citizenship question. PX-1, AR 764. In Mr. Kobach's view, the absence of a citizenship question "leads to the problem that aliens who do not

actually 'reside' in the United States are still counted for congressional apportionment purposes." *Id.*

Mr. Kobach urged the Secretary to ask a question on the decennial census substantively different from

the one the Secretary ultimately decided to add:

> **Is this person a citizen of the United States?**
>
> ☐**Yes, born in the United States**
>
> ☐**Yes, born in Puerto Rico, Guam, the U.S. Virgin Islands, or Northern Marianas**
>
> ☐**Yes, born abroad of U.S. citizen parent or parents**
>
> ☐**Yes, U.S. citizen by naturalization – Print year of naturalization _____**
>
> ☐**No, not a U.S. citizen – this person is a lawful permanent resident (green card holder)**
>
> ☐**No, not a U.S. citizen – this person citizen of another country who is not a green card holder (for example holds a temporary visa or falls into another category of non-citizens)**

*Id.*

552.    The administrative record suggests that Mr. Kobach spoke to Secretary Ross about

this request on July 25, 2017.  *See* PX-588.

553.    On February 12, 2018, Mr. Kobach followed up on his earlier suggestion and wrote a

letter to Secretary Ross supporting the Department of Justice's request to reinstate a citizenship

question on the decennial census.  *See* PX-176.  In that letter, Mr. Kobach again asked that a variation

of the citizenship question currently on the ACS be placed on the decennial census.  *Id.*  Mr. Kobach

expressed his view that

> This slight variation of ACS question #8 is *absolutely essential* if the new
> census question is to be maximally useful to federal state and local
> governments.  The variation occurs in the final two categories, which
> serve to separate noncitizens into lawful permanent residents versus all
> other categories of noncitizens.  It is *important* to know the number of
> lawful permanent residents because these individuals are part of
> population of continuous residents in a state, and are not temporarily
> present or illegally present.

*See* PX-176, AR 1142 (emphasis added).  Mr. Kobach also expressed his view that a variation of the

question currently on the ACS was "important" to add to the decennial census because "[i]f a

jurisdiction is experiencing lower-than-average naturalizations of lawful permanent residents, that may indicate that discrimination against such noncitizens is occurring with the effect that they are discouraged from naturalizing," and that the number of lawful permanent residents in jurisdictions is needed to "effectively plan for growth in the voting electorate." *Id.*

554.    Ultimately, Secretary Ross did not adopt Mr. Kobach's proposed question and, accordingly, the Secretary at a minimum implicitly rejected Mr. Kobach's stated rationales for including a variation of the ACS citizenship question.   Plaintiffs failed to establish any meeting of the minds between Secretary Ross and Mr. Kobach.

555.    Other than one conversation between Mr. Kobach and Steve Bannon, there is no evidence in this case of Mr. Bannon discussing a citizenship question with anyone else within the federal government.   And that conversation between Mr. Kobach and Mr. Bannon is totally insufficient to establish a meeting of the minds to deprive plaintiffs of their constitutional rights.  The sole evidence of Mr. Bannon's involvement in this issue is that Mr. Bannon called Secretary Ross in the Spring of 2017 to ask Secretary Ross if he would be willing to speak to then-Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the decennial census.   *See* PX-302 at 1-3 (Defs.' Suppl. Resps. to Pls.' Interrogs., No. 1).   There is no evidence that Mr. Bannon was aware of any views Mr. Kobach may have had concerning a citizenship question, or that Mr. Bannon shared those views or harbored any discriminatory intent to discriminate or shared his personal views, if he had any, with Secretary Ross.

556.    Statements by others in the federal government are irrelevant in analyzing Plaintiffs' conspiracy claim—because such statements cannot form a conspiracy as a matter of law under the intra-corporate conspiracy doctrine.   However, even if such statements were considered, Plaintiffs failed to produce any probative evidence of a "meeting of the minds" to engage in a conspiracy to

deprive Plaintiffs of their constitutional rights based on the reinstatement of a citizenship question on the decennial census.

557.    Plaintiffs' reliance upon what purports to be a campaign flyer from the Trump-Pence reelection campaign, *see* PX-487, lacks any probative value for multiple reasons.[46] There is no evidence that President Trump was aware of this campaign flyer or even that he was aware of Secretary's Ross decision to include a citizenship question on the decennial census.  Indeed, there is no evidence that *anyone* within the administration was aware of, let alone approved of, this campaign flyer.  *See, e.g.*, PX-3, AR 2013_0001.  And because the Trump-Pence reelection campaign is a separate legal organization from the Administration, there is no reason to assume that the President or others in the administration saw, reviewed or approved of this purported flyer.  Similarly, there is no evidence that Secretary Ross saw a campaign flyer.

558.    For similar reasons, President Trump's tweets have no probative value concerning any issue in this case.  *See, e.g.,* PX-1139; PX-1145; PX-1149; PX-1150; PX-1156; PX-1166; and PX-1177. First, none of the President's tweets have anything to do with the census or a citizenship question. Second, four of the tweets—PX-1139; PX-1145; PX-1149; and PX-1150—were made while Donald Trump was still a candidate for president; accordingly, these tweets have no probative value.  Third, there is no evidence that Secretary Ross was aware of these tweets.  At bottom, these tweets cannot establish any "meeting of the mind" regarding a citizenship question and, accordingly, lack any probative value.

---

[46] The Court concluded that this campaign document could be authenticated by a CNN article that discussed the document, PX-1173, and therefore could be admitted not for the truth of the matter asserted, but rather that the matters in the document were stated and the relevance that might have on the listener.  Pretrial Conference Tr. 57:16—24 (Jan. 18, 2019).   Respectfully, this ruling is in tension with the Court's ruling that newspapers and related publications are hearsay and cannot be overcome through reliance on the residual exception.  *See* ECF No. 111, at 1 (holding that the articles themselves are hearsay and not subject to a hearsay exception).

559.    In sum, the *LUPE* Plaintiffs have failed to meet their "weighty" burden to prove a conspiracy under section 1985(3). *See Penley*, 876 F.3d at 658; *Brissett*, 141 F.3d at 1157; *Simmons*, 47 F.3d at 1377.

560.    Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law.

## VII.    THIS CASE IS NOT MOOT

561.    Plaintiffs' claims are not mooted by Judge Furman's entry of an injunction in *New York v. United States Dep't of Commerce*, 2019 WL 190285 (S.D.N.Y. Jan. 15, 2019). Defendants have appealed Judge Furman's decision, *see* ECF No. 576, No. 18-cv-2921, and therefore his decision is not final. Because there is still a live controversy between Plaintiffs and Defendants here, Plaintiffs' claims are not mooted by the non-final decision in another court. *See Saville v. International Bus. Machines*, 127 Fed. App'x 404, 406 (10th Cir. 2005) (holding that final judgment in related action mooted the case); *Mershel v. AFW Fabric Corp.*, 552 F.2d 471, 472 (2d Cir. 1977) (holding that application for injunctive relief was moot because of final judgment entered in parallel state action).

## VIII.    POTENTIAL REMEDY

A.    <u>Only Remand to the Agency is Appropriate if the Court Finds Any Violation of Law</u>

562.    Although 5 U.S.C. § 706(2) authorizes courts to "hold unlawful and set aside agency actions," courts have long recognized that it does not require vacatur and permits remand without vacatur instead. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n.* 988 F.2d 146, 151 (D.C. Cir. 1993) (holding that remand without vacatur was appropriate when "the consequences of vacating may be quite disruptive" and "the possibility that the [agency] may be able to justify" the decision on remand); *Nat. Res. Def. Council v. U.S. Envt'l Prot. Agency*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) ("Where an agency action is remanded for further proceedings, the determination of whether or not also to vacate

the agency action is left to the court's discretion.") (citing *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002)).

563.    "To determine if vacatur is appropriate, a court weighs the 'seriousness of the agency action's deficiency (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *NRDC v. EPA*, 676 F. Supp. 2d at 312 (quoting *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009)); *Allied-Signal*, 988 F.2d at 151. Courts examine these two factors separately, "bearing in mind that '[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (citation omitted). "[I]n circumstances where the first prong on *Allied-Signal* supports remand without vacatur, the second prong 'is only barely relevant.' In those instances, 'though the disruptive consequences of vacatur might not be great, the probability that the [agency] will be able to justify retaining [its prior decision] is sufficiently high that vacatur . . . is not appropriate." *Id.* at 108 (quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002), *opinion modified on reh'g.* 293 F.3d 537 (D.C. Cir. 2002)).

564.    In this case, both factors tip sharply in favor of remand to the agency without vacatur because the agency could correct any procedural deficiencies on remand, and vacatur would be extremely disruptive to the agency.  With respect to the first factors, courts have recognized that this is not a demanding standard, and the court must determine whether it is "conceivable" or there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. Indeed, courts have repeatedly emphasized that the remand without vacatur is appropriate even if there is only "'a non-trivial likelihood' that the [agency] will be able to state a valid legal basis for its rules," *In re Core Comm'ns, Inc.*, 531 F.3d 849, 861 (D.C. Cir. 2008) (quotation omitted), or a "significant possibility" that the agency may be able to explain itself on remand.  *Williston Basin Interstate Pipeline Co v. FERC*, 519 F.3d 497, 504 (D.C. Cir. 2008).

565.     Here, there is, at a minimum, a "serious possibility" that the Commerce Department would be able to correct any deficiencies in its justification for the reinstatement of a citizenship question on the decennial census—a question that previously had been on the census for decades. *Allied-Signal*, 988 F.2d at 151. Plaintiffs contend, among other things, that the Secretary "ignore or mischaracterized key findings by the Census Bureau" in deciding to reinstate a citizenship question. *See* ECF No. 103, at 5. Although Defendants disagree, such considerations could be addressed by the Commerce Department on remand in continued support of the reinstatement of a citizenship question on the decennial census. In short, there "is a non-trivial likelihood that the [agency] will be able to state a valid legal basis for its [decision]." *In re Core Comm'ns*, 531 at 861 (internal quotation marks omitted).

566.     In addition, the disruptive consequences of vacating the rule are substantial. Here, the undisputed evidence at trial indicates that the Census Bureau is diligently at work preparing for the 2020 Census, including working with its communication contractors and trusted partners concerning the reinstatement of a citizenship question. Vacating that decision, with the possibility that it could be reinstated on appeal, will greatly complicate that messaging strategy and inject confusion into the process.[47]

567.     Accordingly, if the Court concludes that the Secretary's decision is not supported by the administrative record or otherwise unlawful, the appropriate remedy would be to set aside that decision and remand to the agency for further consideration.

---

[47] Although the Census Bureau must finalize the 2020 decennial questionnaire by summer 2019, the agency is best placed to consider the limited time available before the 2020 decennial in deciding how to proceed.  And, as the voluminous record in this case demonstrates, the agency has already produced significant materials analyzing the inclusion of a citizenship question, and remand should therefore proceed efficiently.

B.      No Relief Beyond Plaintiffs with Standing

568.    If Plaintiffs seek broader relief in the form of an injunction that would extend beyond the Plaintiffs to this litigation, such a request should be rejected for the reasons discussed below.

569.    To establish Article III standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quotation marks omitted). "[S]tanding is not dispensed in gross," and the plaintiff must establish standing "separately for each form of relief sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quotation marks omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion."); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

570.    The Supreme Court recently reaffirmed these principles in *Gill*, 138 S. Ct. at 1916, concluding that a set of voters had not demonstrated standing to challenge alleged statewide partisan gerrymandering of Wisconsin legislative districts. The plaintiffs alleged that voters who shared their political views were disadvantaged by the way district lines were drawn statewide, and that they were therefore entitled to challenge the entire state map. *Id.* at 1924-25. But the Court concluded that a "plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact,'" and that a voter's "harm [from] the dilution of [his] vote[] . . . is district specific" because it "results from the boundaries of the particular district in which he resides." *Id.* at 1930 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). Accordingly, the Court held that "the remedy that is proper and sufficient lies in the

236

revision of the boundaries of the individual's own district," not the broader remedy of "restructuring all of the State's legislative districts." *Id.* at 1930-31. And the Court "caution[ed]" that, on remand, "'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Id.* at 1934 (quoting *Cuno*, 547 U.S. at 353); *accord id.* at 1933 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). That holding makes absolutely clear that it is the scope of the Plaintiffs' injury, and not the scope of the Defendants' challenged decision, that governs the permissible scope of an injunction under Article III.

571.    Accordingly, under fundamental Article III requirements, the Court rejects providing any relief to Plaintiffs that extends beyond the injuries they have proven they have sustained and that are directly attributable to the Defendants' conduct.

572.    But even apart from Article III's jurisdictional constraints, injunctions that go beyond a plaintiff's own injuries exceed the power of a court sitting in equity.  Several equitable principles cut decisively against such broad injunctions.

573.    *First*, paralleling the rule under Article III, the Supreme Court and Second Circuit have made clear that a court's injunctive power is limited to relief "no broader than necessary to cure the effects of the harm caused by the violation," and that courts must "mould each decree to the necessities of the particular case." *Forschner Grp. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (quoting *Perfect Fit. Indus. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir. 1981)). "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of military-wide injunction except as to individual plaintiff).

574.    *Second*, nationwide injunctions, "emerging for the first time in the 1960s and dramatically increasing in popularity only very recently,"[48] *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, J., concurring), "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Id.* at 2425.  In "'foreclosing adjudication by a number of different courts and judges,'" nationwide injunctions "deprive[] the Supreme Court of the benefit it receives from permitting multiple courts of appeals to explore a difficult question before it grants certiorari." *Los Angeles Haven Hospice*, 638 F.3d at 664 (quoting *Yamasaki*, 442 U.S. at 702); *see also Virginia Soc'y for Human Life*, 263 F.3d at 393 (permitting a court to issue a nationwide injunction "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue'" (quoting *United States v. Mendoza*, 464 U.S. 154, 160 (1984)).  That is particularly true where, as here, lawsuits challenging the Secretary's decision also have been filed in the Southern District of New York and the Northern District of California.

575.    *Third*, issuing injunctions that provide relief to non-parties subverts the class-action mechanism provided under the Federal Rules of Civil Procedure.  *See McKenzie*, 118 F.3d at 555; *Zepeda*, 753 F.2d at 727-28. The availability of nationwide injunctions without class certification creates a fundamentally inequitable asymmetry, whereby non-parties can claim the benefit of a single favorable ruling, but are not bound by a loss and can thus go to another district court to obtain another bite at

---

[48] The absence of nationwide injunctions was certainly not for lack of opportunities to seek such relief against federal enactments or policies that were facially invalid. To give a particularly stark counter-example, in the 1930s, courts issued roughly 1600 injunctions against enforcement of a single federal statutory provision. Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 434 (2017). While in some cases before traditional courts of equity, small groups of plaintiffs could join together to bring a "bill of peace" on behalf of an affiliated group, this "kind of proto-class action" was not extended to equitable relief against federal action on behalf of entirely absent, unrepresented parties. *See id.* at 426-27.

the apple.   In other words, if Plaintiffs prevail, the court issues the relief that might have been appropriate had it certified a class of all similarly situated entities; but if the federal government prevails, it gains none of the benefits of prevailing in a class action.

576.     *Finally*, and relatedly, an injunction that extends beyond a plaintiff's injury to cover potential plaintiffs nationwide undermines *Mendoza*'s holding "that nonmutual offensive collateral estoppel simply does not apply against the government."  464 U.S. at 162. That bar on non-parties' invocation of issue preclusion against the federal government is largely meaningless if the first party to obtain a favorable ruling against the government can obtain an injunction that extends to all non-parties who would otherwise be forced to relitigate the issue under *Mendoza*.

577.     The fact that Plaintiffs are bringing an APA challenge does not change this result, as the APA's text does not permit, let alone require, universal vacatur.  *Cf. Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue nationwide injunctions."); *see also Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664-65 (9th Cir. 2011) (vacating district court's grant of nationwide injunction in APA case because "[t]he Supreme Court has also suggested that nationwide injunctive relief may be inappropriate where a regulatory challenge involves important or difficult questions of law, which might benefit from development in different factual contexts and in multiple decisions by the various courts of appeals") (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) and *United States v. Mendoza*, 464 U.S. 154, 160 (1984)); *Virginia Soc'y for Human Life, Inc. v. Federal Election Comm'n*, 263 F.3d 379, 383 (4th Cir. 2001) (vacating district court's grant of nationwide injunction in APA case because it would "'thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue.'" (quoting *Mendoza*, 464 U.S. at 160)).

578.     Even where the final agency action challenged is the facial validity of a rule, the text of 5 U.S.C. 706(2) does not specify whether the decision, if found invalid, should be "set aside" *on its*

*face* or *as applied to the plaintiffs*.  In the absence of a clear and unequivocal statement in the APA that it displaces traditional rule of equity, the Court should construe the "set aside" language in section 706(2) as applying only to the Plaintiffs to this lawsuit. Indeed, the APA provides that in the absence of a special statutory review provision, the proper "form of proceeding" under the APA is a traditional suit for declaratory or injunctive relief. *See* 5 U.S.C. § 703.  Declaratory and injunctive remedies are equitable in nature and, as discussed *supra*, equitable relief traditionally has been limited to determining the rights of the parties before the court.  Moreover, the historical backdrop to the APA's enactment bolsters this reading.  The absence of nationwide injunctions before Congress's enactment of the APA in 1946 (and for over fifteen years thereafter) suggests that the APA was not originally understood to authorize courts to issue such broad relief.

579.    For these reasons, the Court rejects any request for relief that extends beyond the Plaintiffs in this lawsuit.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

*/s/ Stephen Ehrlich*
GARRETT COYLE
STEPHEN EHRLICH
COURNTEY ENLOW
MARTIN TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005

Tel.:  (202) 305-9803
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*

CC: All Counsel of Record (by ECF)