# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, *et al.* | Civil Action No. 8:18-cv-01041-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| U.S. DEPARTMENT OF COMMERCE, *et al.* | |
| *Defendants*. | |
| LA UNIÓN DEL PUEBLO ENTERO; *et al.* | Civil Action No. 8:18-cv-01570-GJH |
| *Plaintiffs*, | Hon. George J. Hazel |
| v. | |
| WILBUR L. ROSS, sued in his official capacity as U.S. Secretary of Commerce; *et al.* | |
| *Defendants*. | |

**Plaintiffs' Corrected Proposed Findings of Fact**

## Table of Contents

I.   **Parties, Witnesses, and Production of the Administrative and Extra-Record Discovery** .................................................................................................................. 1

    A.    **Plaintiffs** ............................................................................................................ 1

        1.    *Kravitz* **Plaintiffs** .............................................................................. 1

        2.    *LUPE* **Individual Plaintiffs** ............................................................ 8

        3.    *LUPE* **Organizational Plaintiffs** ..................................................... 9

    B.    **Defendants and Key Players** .......................................................................... 18

        1.    **Census Bureau** ............................................................................... 18

        2.    **Commerce Department** ................................................................... 19

        3.    **Department of Justice ("DOJ")** ..................................................... 20

        4.    **Other Key Players** .......................................................................... 21

    C.    **Witnesses** .......................................................................................................... 21

        1.    **Fact Witnesses** ............................................................................... 21

        2.    **Expert Witnesses** ........................................................................... 21

    D.    **Production of the Administrative Record and Extra-Record Discovery** ..... 24

II.   **Facts Concerning the Addition of a Citizenship Question Established by the Administrative Record Evidence** ............................................................................... 27

    A.    **Administrative Record Evidence That Secretary Ross Sought to Devise a Pretext to Add a Citizenship Question to the 2020 Census** ........................... 27

        1.    **DOJ Does Not Mention or Request a Citizenship Question on the Decennial Census in Response to Pre-2017 Census Bureau Inquiries** ......... 27

        2.    **Secretary Ross and His Senior Staff Work to Solicit a Request From Another Federal Agency** ......................................................... 28

        3.    **Continued Efforts by Secretary Ross and His Senior Staff to Obtain a Request for a Citizenship Question from Another Agency** ........................ 34

    B.    **Senior DOJ Political Appointees Become Directly Involved in Discussions of the Secretary's Request to Add a Census Citizenship Question** .................. 37

        1.    **Communications Between DOC and DOJ** ....................................... 37

2. The December 12, 2017 DOJ Letter Requesting the Addition of a Citizenship Question to the 2020 Census ........................................ 38

C. The Census Bureau's Analysis and Consistent Unanimous Recommendation Against Adding Citizenship as a Subject for the 2020 Census ................................... 40

 1. December 22, 2017 Memo Recommending Reliance on Administrative Records from Available Sources ............................................ 41

 2. January 3, 2018 Memorandum Analyzing Specific Alternatives and Reiterating the Census Bureau's Recommendation Against Addition of the Citizenship Question .............................................................. 42

 3. January 19, 2018 Census Bureau Memorandum to Secretary Ross ............ 43

 4. The March 1, 2018 Census Bureau Memo Demonstrating That Alternative C Was Objectively Superior to Alternative D in Terms of Data Quality, Cost, and Respondent Burden ..................................... 45

 5. The Commerce Department Staff's Unauthorized Revision of Census Bureau Responses to Written Questions ............................... 48

 6. DOJ's Refusal to Meet With the Census Bureau to Discuss DOJ's Request ........................................................................................... 50

D. Despite the Census Bureau's Unanimous and Repeated Recommendation Not to Add a Citizenship Question, Secretary Ross's March 26, 2018 Memorandum Announced the Addition of a Citizenship Question to the 2020 Decennial Census .................................................................... 51

 1. Objectively False Assertions ........................................................... 52

 2. Failure to Consider Other Relevant Factors .................................... 64

 3. The Absence of Empirical Evidence in the Administrative Record Disputing the Census Bureau's Technical Analysis and Conclusions ........... 65

E. Administrative Record Evidence Demonstrating Defendants' Failure to Follow Binding Agency Standards ................................................... 67

 1. The Administrative Record Demonstrates that Defendants Failed to Pre-Test the Citizenship Question as Required by OMB Directives and the Census Bureau's Statistical Quality Standards ............................... 67

 2. The Administrative Record Demonstrates that Defendants Violated Their Binding Obligation of Maximizing Response Rates While Minimizing Respondent Burden and Cost ..................................... 69

 3. The Administrative Record Demonstrates that Defendants Violated the Binding Obligation to Avoid Political Influence in Conducting Statistical Activities ........................................................................... 70

        **4.**     **The Administrative Record Demonstrates that Defendants' Failed to Follow the Census Bureau's Established Process for Adding Content**.........70

   **F.**    **Administrative Record Evidence of Pretext and Improper Purpose** ........................72

**III.**   **Extra-Record Evidence Regarding the Process for Adding the Citizenship Question**..........74

   **A.**    **The Decision to Add a Citizenship Question in the Spring of 2017** ............................74

   **B.**    **The Department of Justice's Involvement** ...................................................................77

   **C.**    **Extra-Record Evidence Regarding Census Bureau Process and Communications With Secretary Ross** ...........................................................................82

**IV.**   **Extra-Record Evidence Regarding the Propriety of the Decision to Add a Citizenship Question**...............................................................................................................84

   **A.**    **Extra-Record Evidence Confirms that the Citizenship Question Was Not Adequately Tested in Accordance with Binding Agency Standards and Established Practices** ..................................................................................................84

        **1.**     **The Importance of Pre-Testing Questionnaire Content**................................85

        **2.**     **The Census Bureau's Regular Practice of Testing Census Content and Operations** .......................................................................................................86

        **3.**     **The Failure to Pre-Test the Citizenship Question**.........................................89

        **4.**     **Neither Exception Allowing the Addition of a Question Without Testing Applies** .................................................................................................91

   **B.**    **Extra-Record Evidence Demonstrating Defendants' Failure to Limit Respondent Burden and Cost While Maximizing Response Rates** ............................92

   **C.**    **Extra-Record Evidence Demonstrating Defendants' Failure to Avoid Political Influence When Conducting Statistical Activities.**........................................93

   **D.**    **Extra-Record Evidence Supports the Census Bureau's Determination That Adding a Citizenship Question Will Reduce Self-Response Rates and Harm Data Quality** ..............................................................................................................98

   **E.**    **Extra-Record Evidence Confirms that Existing ACS Data is Sufficient for Section 2 VRA Enforcement** .....................................................................................99

   **F.**    **Extra-Record Evidence Confirms that Adding a Citizenship Question Will Not Improve Block-Level CVAP Data** .......................................................................101

**V.**   **Background on Census Operations and Coverage Measurement** ........................................103

   **A.**    **2020 Census Operations** ..........................................................................................103

   **B.**    **Census Coverage Measurement**................................................................................105

**VI.** **The Addition of a Citizenship Question to the 2020 Census Will Lead to a Differential Undercount of Hispanics and Noncitizens.** .........................................107

    **A.** **The Addition of a Citizenship Question on the 2020 Census Will Lead to a Differential Decline in Census Participation for Hispanics and Noncitizens.** .........107

        **1.** **Sensitive Questions Reduce Survey Participation.** ........................................107

        **2.** **Undisputed Evidence Establishes That a Citizenship Question Is Sensitive for Hispanic and Noncitizen Households.** ......................................109

        **3.** **Undisputed Quantitative Evidence Establishes that the Addition of a Citizenship Question Will Cause a Differential Decline in Unit Self-Response Rates for Hispanics and Noncitizens.** ..............................................116

    **B.** **The Differential Decline in Census Participation Among Hispanics and Noncitizens Caused by the Citizenship Question Will Lead to a Differential Undercount of These Subpopulations.** ........................................................126

        **1.** **There Is Undisputed Quantitative Evidence That Demographic Groups and Geographies With Lower Self-Response Rates Have Higher Undercount Rates.** ..........................................................................126

        **2.** **The Differential Decline in Self-Response Rates Caused by the Citizenship Question is Especially Likely to Lead to Differential Undercounts Because NRFU and Imputation Will Be Especially Ineffective at Mitigating the Decline in Self-Response.** ...............................131

    **C.** **Rostering Omissions Caused by the Citizenship Question Will Lead to a Differential Undercount of Hispanics and Noncitizens** ..............................151

        **1.** **There is Substantial Qualitative Evidence that a Citizenship Question Will Cause a Differential Increase in Rostering Omissions Among Hispanic and Noncitizen Households** ................................151

        **2.** **Rostering Omissions Cannot Be Mitigated by NRFU or Imputation.** ........153

**VII.** **The Citizenship Question Will Result in a Differential Undercount of Noncitizens and Hispanics of At Least Two Percentage Points.** ....................................................154

    **A.** **The Citizenship Question Will Result in a Differential Undercount of At Least Two Percentage Points for Noncitizens** ..............................................154

    **B.** **The Citizenship Question Will Result in a Differential Undercount of At Least Two Percent for Hispanics.** ..........................................................156

**VIII.** **A Differential Undercount of Hispanics and Noncitizens Caused by the Citizenship Question Will Injure Plaintiffs.** ...................................................................157

    **A.** **The Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs Through Intrastate Vote Dilution.** ..................157

**B.**    **The Differential Undercount Caused by the Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs by Depriving Certain States of a Congressional Seat.** ...................................... 164

**C.**    **The Differential Undercount Caused by the Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs by Reducing Federal Funding for Plaintiffs' States and Localities.** ............................ 165

    **1.**    **Loss in Transportation Funding** .................................................... 166

    **2.**    **Loss in Medicaid Funding** ............................................................ 168

    **3.**    **Loss in Title I Education Funding** ................................................ 171

    **4.**    **Other Funding Effects of the Citizenship Question** ..................... 173

**IX.**    **A Differential Undercount of Hispanics and Noncitizens Caused by the Citizenship Question Will Injure Organizational Plaintiffs.** ......................................... 175

**A.**    **The Citizenship Question Will Impair the Quality and Accuracy of Census Data.** ..................................................................................................... 175

**B.**    **The Citizenship Question Will Cause Organizational Plaintiffs to Divert Resources** ............................................................................................... 177

    **1.**    **LUPE** ............................................................................................. 177

    **2.**    **CHIRLA** ........................................................................................ 179

    **3.**    **LCF** ............................................................................................... 180

    **4.**    **GALEO** ......................................................................................... 181

    **5.**    **PAZ** ............................................................................................... 182

    **6.**    **ASIA** ............................................................................................. 183

    **7.**    **MINKWON** ................................................................................... 184

I.    **Parties, Witnesses, and Production of the Administrative and Extra-Record Discovery**

    A.  **Plaintiffs**

        1.  *Kravitz* **Plaintiffs**

    1.    Plaintiff Diana Alexander resides in Houston, Texas, a city located in Harris County.  Alexander Decl. Ex. A, ¶ 2, ECF No. 129-1 (hereinafter "Alexander Decl."). Alexander resides in Public Use Microdata Area ("PUMA") 4612. *See* PX-965; American Fact Finder, U.S. Census Bureau,https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?ref=addr&refresh=t# (hereinafter "American Fact Finder"). Alexander is eligible to vote and intends to vote where she resides in elections after 2020.  Alexander Decl. at ¶¶ 3-4. Houston falls within the Houston, TX urbanized area. *See* PX-961; 2010 Census Urban Area Reference Maps, U.S. Census Bureau, https://www.census.gov/geo/maps-data/maps/2010ua.html (hereinafter "2010 Census Urban Maps"). Alexander regularly drives on highways and roads in and around Houston and Harris County.  Alexander Decl. at ¶ 5.

    2.    Plaintiff Lauren Berman resides in Dallas, Texas, a city located in Dallas County. Berman Decl. Ex. B, ¶ 2, ECF No. 129-1 (hereinafter "Berman Decl.").  Berman resides in PUMA 2311. *See* PX-965; American Fact Finder. Berman is eligible to vote and intends to vote where she resides in elections after 2020. Berman Decl. at ¶¶ 3-4.

    3.    Plaintiff Sarah Bryan resides in Edinburg, Texas, a city located in Hidalgo County. Bryan Decl. Ex. C, ¶ 2, ECF No. 129-1 (hereinafter "Bryan Decl."). Bryan resides in PUMA 6804. *See* PX-965; American Fact Finder. Bryan is currently applying for United States citizenship and intends to vote where she resides in elections after 2020. Bryan Decl. at ¶¶ 3-4. Bryan has a daughter who attends Edinburg North High School, which receives funding under Title I of the Elementary and Secondary Education Act ("Title I") and is located in the Edinburg

Consolidated Independent School District. Bryan Decl. at ¶ 6; Pls' Request for Judicial Notice, ECF No. 123; Letter Order, ECF No. 128. Bryan's two daughters receive health insurance under the federal-state Medicaid program. Bryan Decl. at ¶ 5. Edinburg falls within the McAllen, TX urbanized area. *See* PX-961; 2010 Census Urban Maps. Bryan regularly drives on highways and roads in and around Edinburg and Hidalgo County, including for her daily commute to work. Bryan Decl. at ¶ 7.

4.    Plaintiff Elizabeth Buchanan resides in Los Angeles, California, a city in Los Angeles County. Buchanan Decl. Ex. D, at ¶ 2, ECF No. 129-1 (hereinafter "Buchanan Decl."). Buchanan resides in PUMA 3735.  *See* PX-965; American Fact Finder. Buchanan is eligible to vote and intends to vote where she resides in elections after 2020. Buchanan Decl. at ¶¶ 3-4. Los Angeles falls within the Los Angeles-Long Beach-Anaheim, CA urbanized area. *See* PX-961; 2010 Census Urban Maps. Buchanan has a four-year-old son who is expected to attend Annandale Elementary School, which receives Title I funding and is located in the Los Angeles Unified School District. Buchanan Decl. at ¶ 5; ECF No. 123; ECF No. 128. Buchanan regularly drives on highways and roads in and around Los Angeles County. Buchanan Decl. at ¶ 6.

5.    Plaintiff Alejandro Chavez resides in Phoenix, Arizona, a city located in Maricopa County. Chavez Decl. Ex. E, ¶ 2, ECF No. 129-1 (hereinafter "Chavez Decl."). Chavez resides in PUMA 121. *See* PX-965; American Fact Finder. Chavez is eligible to vote and intends to vote where he resides in elections after 2020. Chavez Decl. at ¶¶ 3-4. Chavez's son currently attends Encanto Elementary School, which receives Title I funding and is located in the Osborn Elementary School District. Chavez Decl. at ¶ 5; ECF No. 123; ECF No. 128. Chavez's daughter currently attends Solano Elementary School, which receives Title I funding and is located in the Osborn Elementary School District. Chavez Decl. at ¶ 6; ECF No. 123; ECF No. 128.

2

6.      Plaintiff Jacob Cunningham resides in Los Angeles, California, a city in Los Angeles County. Cunningham Decl. Ex. F, ¶ 2, ECF No. 129-1 (hereinafter "Cunningham Decl."). Cunningham resides in PUMA 3735. *See* PX-965; American Fact Finder. Cunningham is eligible to vote and intends to vote where he resides in elections after 2020. Cunningham Decl. at ¶¶ 3-4. Los Angeles falls within the Los Angeles-Long Beach-Anaheim, CA urbanized area. *See* PX-961; 2010 Census Urban Maps. Buchanan has a four-year-old son who is expected to attend Annandale Elementary School, which receives Title I funding and is located in the Los Angeles Unified School District. Cunningham Decl. at ¶ 5; ECF No. 123; ECF No. 128. Cunningham regularly drives on highways and roads in and around Los Angeles County. Cunningham Decl. at ¶ 6.

7.      Plaintiff Virginia Garcia resides in Laredo, Texas, a city in Webb County. V. Garcia Decl. Ex. G, ¶ 2, ECF No. 129-1 (hereinafter "V. Garcia Decl."). Garcia resides in PUMA 6301. *See* PX-965; American Fact Finder. Garcia is eligible to vote and intends to vote where she resides in elections after 2020.  V. Garcia Decl. ¶¶ 3-4. Laredo falls within the Laredo, TX urbanized area. *See* PX-961; 2010 Census Urban Maps. Garcia regularly drives on highways and roads in and around Laredo and Webb County. V. Garcia Decl. ¶ 5.

8.      Plaintiff Michael Kagan resides in Las Vegas, Nevada, a city in Clark County. Kagan Decl. Ex. H, ¶ 2, ECF No. 129-1 (hereinafter "Kagan Decl."). Kagan resides in PUMA 406.  *See* PX-965; American Fact Finder. Kagan is eligible to vote and intends to vote where he resides in elections after 2020. Kagan Decl. ¶¶ 3-4. Kagan's daughter attends Twin Lake Elementary School, which receives Title I funding and is located in the Clark County School District. Kagan Decl. ¶ 5; ECF No. 123; ECF No. 128. Las Vegas falls within the Las Vegas-Henderson, NV urbanized area. *See* PX-961; 2010 Census Urban Maps. Kagan regularly drives

on highways and roads in and around Las Vegas and Clark County. Kagan Decl. ¶ 6.

9.    Plaintiff Michael Kravitz resides in District Heights, Maryland, a city located in Prince George's County. M. Kravitz Decl. Ex. I, ¶ 2, ECF No. 129-1 (hereinafter "M. Kravitz Decl."). Kravitz's son recently attended, and is expected to re-enroll soon, in Andrew Jackson County, which receives Title I funding and is located in the Prince George's County Public Schools, Maryland School District. M. Kravitz Decl. ¶ 3; ECF No. 123; ECF No. 128. District Heights falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Kravitz regularly drives on highways and roads, and uses other modes of transportation, in and around District Heights and Prince George's County, including for his daily commute to work. M. Kravitz Decl. ¶ 4.

10.    Plaintiff Robyn Kravitz resides in District Heights, Maryland, a city located in Prince George's County. R. Kravitz Decl. Ex. J, ¶ 2, ECF No. 129-1. Kravitz's son recently attended, and is expected to re-enroll soon, in Andrew Jackson County, which receives Title I funding and is located in the Prince George's County Public Schools, Maryland School District. R. Kravitz Decl. ¶ 3; ECF No. 123; ECF No. 128. District Heights falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Kravitz regularly drives on highways and roads, and uses other modes of transportation, in and around District Heights and Prince George's County, including for her daily commute to work. R. Kravitz Decl. ¶ 4.

11.    Plaintiff Lazara Yoelvis Magadan resides in Miami, Florida, a city located in Miami-Dade County. Magadan Decl. Ex. K, ¶ 2, ECF No. 129-1 (hereinafter "Magadan Decl."). Magadan resides in PUMA 8619. *See* PX-965; American Fact Finder. Magadan is eligible to vote and intends to vote where she resides in elections after 2020. Magadan Decl. ¶¶ 3-4. Miami

falls within the Miami, FL urbanized area. *See* PX-961; 2010 Census Urban Maps. Magadan regularly drives on highways and roads in and around Miami and Miami-Dade County, including to drop her son to school.  Magadan Decl. ¶ 5.

12.    Plaintiff Richard McCune resides in Nogales, Arizona, a city located in Santa Cruz County. McCune Decl. Ex. L, ¶ 2, ECF No. 129-1 (hereinafter "McCune Decl."). McCune resides in PUMA 900. *See* PX-961; American Fact Finder. McCune is eligible to vote and intends to vote where he resides in elections after 2020. McCune Decl. ¶¶ 3-4.

13.    Plaintiff Jose Moreno resides in Somerton, Arizona, a city located in Yuma County. Moreno Decl. Ex. M, ¶ 2, ECF No. 129-1 (hereinafter "Moreno Decl."). Moreno resides in PUMA 700. *See* PX-965; American Fact Finder. Moreno is eligible to vote and intends to vote where he resides in elections after 2020. Moreno Decl. ¶¶ 3-4. Moreno is the Principal at Somerton Middle School, a public school that receives Title I funding. Moreno Decl. ¶ 5. He has children who attend Somerton Middle School and Tierra Del Sol Elementary School, which receive Title I funding and are located in the Somerton Elementary School District. Moreno Decl. ¶ 6; ECF No. 123; ECF No. 128.

14.    Plaintiff Catherine Nwosu resides in Hyattsville, Maryland, located in Prince George's County. C. Nwosu Decl. Ex. N, ¶ 2, ECF No. 129-1 (hereinafter "C. Nwosu Decl."). Nwosu resides in PUMA 1101. *See* PX-965; American Fact Finder. Nwosu is eligible to vote and intends to vote where she resides in elections after 2020. C. Nwosu Decl. ¶¶ 3-4. Hyattsville falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Nwosu regularly drives on highways and roads, and uses other modes of transportation, in and around Langley Park and Prince George's County, including for her daily commute to work. C. Nwosu Decl. ¶ 5.

15.    Plaintiff Nnabugwu Nwosu resides in Hyattsville, Maryland, located in Prince George's County, Maryland. N. Nwosu Decl. Ex. O, ¶ 2, ECF No. 129-1 (hereinafter "N. Nwosu Decl."). Nwosu resides in PUMA 1101. *See* PX-965; American Fact Finder. Nwosu is eligible to vote and intends to vote where he resides in elections after 2020. N. Nwosu Decl. ¶¶ 3-4. Hyattsville falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Nwosu regularly drives on highways and roads, and uses other modes of transportation, in and around Langley Park and Prince George's County, including for his daily commute to work. N. Nwosu Decl. ¶ 5.

16.    Plaintiff Maegan Ortiz resides in Los Angeles, California, a city located in Los Angeles County. Ortiz Decl. Ex. P, ¶ 2, ECF No. 129-1 (hereinafter "Ortiz Decl."). Ortiz resides in PUMA 3744. *See* PX-965; American Fact Finder. Ortiz is eligible to vote and intends to vote where she resides in elections after 2020. Ortiz Decl. ¶¶ 3-4. Ortiz's daughter attends Thomas Starr King Middle School, which receives Title I funding and is located in the Los Angeles Unified School District. Ortiz Decl. ¶ 5; ECF No. 123; ECF No. 128. Los Angeles falls within the Los Angeles-Long Beach-Anaheim, CA urbanized area. *See* PX-961; 2010 Census Urban Maps. Ortiz regularly uses public transportation in and around Los Angeles and Los Angeles County. Ortiz Decl. ¶ 6.

17.    Plaintiff T. Carter Ross resides in Hyattsville, Maryland, located in Prince George's County. Ross Decl. Ex. Q, ¶ 2, ECF No. 129-1 (hereinafter "Ross Decl."). Ross resides in PUMA 1103. *See* PX-965; American Fact Finder. Ross is eligible to vote and intends to vote where he resides in elections after 2020. Ross Decl. ¶¶ 3-4. Ross's daughter attends Hyattsville Middle School, which receives Title I funding and is located in the Prince George's County Public Schools, Maryland School District. Ross Decl. ¶ 5; ECF No. 123; ECF No. 128.

Hyattsville falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Ross regularly drives on highways and roads, and uses other modes of transportation, in and around Hyattsville and Prince George's County, including for his daily commute to work. Ross Decl. ¶ 6.

18.    Plaintiff Martha Sanchez resides in McAllen, Texas, a city located in Hidalgo County. Sanchez Decl. Ex. R, ¶ 2, ECF No. 129-1 (hereinafter "Sanchez Decl."). Sanchez resides in PUMA 6805. *See* PX-965; American Fact Finder. Sanchez is eligible to vote and intends to vote where she resides in elections after 2020. Sanchez Decl. ¶¶ 3-4. McAllen falls within the McAllen, TX urbanized area. *See* PX-961; 2010 Census Urban Maps. Sanchez regularly drives on highways and roads in and around McAllen and Hidalgo County, including for her daily commute to work. Sanchez Decl. ¶ 5.

19.    Plaintiff Sonia Casarez Shafer resides in Pharr, Texas, a city located in Hidalgo County. Shafer Decl. Ex. S, ¶ 2, ECF No. 129-1 (hereinafter "Shafer Decl."). Shafer resides in PUMA 6803.  *See* PX-965; American Fact Finder. Shafer is eligible to vote and intends to vote where she resides in elections after 2020. Shafer Decl. ¶¶ 3-4. Shafer's children attend Jaime Escalante Middle School and Southwest Early College High School, which receive Title I funding and are located in the Pharr-San Juan-Alamo Independent School District. Shafer Decl. ¶ 5; ECF No. 123; ECF No. 128. Shafer's children receive health insurance under the federal-state Medicaid program. Shafer Decl. ¶ 6. Pharr falls within the McAllen, TX urbanized area. *See* PX-961; 2010 Census Urban Maps. Shafer regularly drives on highways and roads in and around Pharr and Hidalgo County. Shafer Decl. ¶ 7.

20.    Plaintiff Joanne Wilson resides in Bowie, Maryland, a city located in Prince George's County. Wilson Decl. Ex. T, ¶ 2, ECF No. 129-1 (hereinafter "Wilson Decl."). Wilson

resides in PUMA 1105.  *See* PX-965; American Fact Finder. Wilson is eligible to vote and intends to vote where she resides in elections after 2020. Wilson Decl. ¶¶ 3-4. Bowie falls within the Maryland portion of the Washington, DC-VA-MD urbanized area. *See* PX-961; 2010 Census Urban Maps. Wilson regularly drives on highways and roads, and uses other modes of transportation, in and around Bowie and Prince George's County, including for her daily commute to work. Wilson Decl. ¶ 5.

## 2.  *LUPE* Individual Plaintiffs

21.     Juanita Valdez-Cox is a Latina voter who resides in Donna, Texas, a city in Hidalgo County. Trial Tr. (Jan. 22) at 145:21–146:1 (Valdez-Cox).  Valdez-Cox's neighborhood is low-income, majority Latino, rural, and has a high percentage of mixed-immigration status families (in which some members are non-U.S. citizens with legal status or citizens and others are not).  *Id*. at 146:4–147:2.  Donna falls within the McAllen, TX urbanized area. *See* PX-961; 2010 Census Urban Maps. Valdez-Cox is a licensed driver and regularly drives on public highways and roads in Hidalgo County.  Trial Tri. (Jan. 22) at 147:3-10 (Valdez-Cox). Valdez-Cox serves as the Executive Director of Plaintiff La Unión Del Pueblo Entero (LUPE). *Id*. at 147:11-21.

22.     Raj Mukherji is an Assemblyman in the New Jersey Legislature.  Mukherji Decl., ¶ 2, ECF No. 133-6 (hereinafter "Mukherji Decl.").  Mukherji is American of Asian-Indian origin and resides in Jersey City, New Jersey.  *Id*.  Mukherji's neighborhood, city, county, and voting district have higher proportions of Asian American, Latino, and non-U.S. citizen populations than the general American and non-U.S. citizen population in New Jersey or the United States.  *Id*. at ¶ 4. Jersey City falls within the New Jersey portion of New York-Newark, NY-NJ-CT urbanized area.  *See* 2010 Census Urban. Mukherji both regularly drives on

highways and roads in his community and uses public transportation services. Mukherji Decl. at ¶ 6.

### 3. *LUPE* Organizational Plaintiffs

23.    Fifteen Organizational Plaintiffs[1] have members who will suffer the below-described harms, *see supra* Part IX.  In addition, Organizational Plaintiffs, including non-membership organizations,[2] will be harmed because the citizenship question will frustrate their organizational missions by causing them to expend more resources to attempt to mitigate disproportionate undercounts in the communities they serve.

### a)  Plaintiff  LUPE

24.    LUPE is a membership organization and community union that was created in 1989 by César Chávez and Dolores Huerta to be a sister organization to the United Farm Workers union.  Trial Tr. (Jan. 22) at 147:22–148:24 (Valdez-Cox).  LUPE's mission is to build strong and healthy communities in the Texas Rio Grande Valley.  *Id*. at 149:25–150:24.

25.    To advance its mission, LUPE offers a variety of services to its members, including income tax assistance, citizenship classes, immigration legal services, and assistance

---

[1] Plaintiffs assert associational organizational standing on behalf of the following eight Organizational Plaintiffs with members and seven legislative caucuses:  La Unión Del Pueblo Entero (LUPE), Coalition For Humane Immigrant Rights (CHIRLA), Georgia Association of Latino Elected Officials (GALEO), Labor Council For Latin American Advancement (LCLAA), Somos Un Pueblo Unido (Somos), Promise Arizona (PAZ), Chelsea Collaborative (Chelsea), OCA-Greater Houston (OCA-GH), Texas Senate Hispanic Caucus (SHC), Texas House of Representatives Mexican American Legislative Caucus (MALC), Maryland Legislative Latino Caucus (MLLC), Arizona Latino Legislative Caucus (ALLC), California Latino Legislative Caucus (CLLC), California Asian Pacific Islander Legislative Caucus (API Caucus), and California Legislative Black Caucus (CLBC).

[2]  Plaintiff Organizations without members are the Dolores Huerta Foundation (DHF), Southwest Voter Registration Education Project (SVREP), Mi Familia Vota Education Fund (MFV), Chicanos Por La Causa (CPLC), El Pueblo, Inc., Latino Community Fund of Washington (LCF), Asian Americans Advancing Justice-Chicago (Advancing Justice-Chicago), Asia Services In Action, Inc. (ASIA), Minkwon Center For Community Action, Inc. (MinKwon), Friendly House, and Four Directions, Inc.

with social service applications.  *Id.* at 150:7–152:1.  LUPE also engages in civic engagement

work, including census outreach, candidate forums, and GOTV campaigns.  *Id.* at 150:6-18 &

165:8-10.

26.    LUPE has approximately 8,000 dues-paying members that are located principally

in Hidalgo, Cameron, Starr, and Willacy Counties.  *Id.* at 154:14-24.  The majority of LUPE

members are low-income, Spanish-speaking, identify as Latino, and live in mixed-immigration

status households.  *Id.* at 152:19–153:6, 154:25–155:6 & 158:11-15.

27.    The majority of LUPE's membership receives social service benefits, including:

Medicaid, SNAP, WIC, and Section 8 housing voucher program.  *Id.* at 158:21-159:24.  The

majority of LUPE members have children who attend Title I schools in the following school

districts:  Edinburg Consolidated Independent School District, Pharr-San Juan-Alamo

Independent School District, Hidalgo Independent School District, Rio Grande City

Consolidated School District, and Lyford Consolidated School District.  *See id.* at 159:25-161:3.

LUPE also has members whose children attend schools that receive special education grants, and

who participate in the national school lunch and breakfast programs.  *Id.* at 161:24-162:13.  The

majority of LUPE members also have children in Head Start schools (*id.* at 162:14-18), and

many receive Pell Grants (*id.* at 162:19–163:2).

28.    LUPE also has members who receive services from state and locally funded

agencies for treatment of: depression at the Texas Tropical Center, women's health and cancer

screenings at Planned Parenthood, and domestic violence services at Mujeres Unidas.  Trial Tr.

(Jan. 22) at 163:3-164:10 (Valdez-Cox).

29.    The majority of LUPE members live in *colonias* – low income, unincorporated

communities in rural areas that lack access to basic municipal infrastructure and services.  *See id.*

at 152:19-153:6 & 164:11-19.  One of the issues that LUPE has and continues to work on is advocating for use of community block development grants for necessary infrastructure improvements and installations in the *colonias*.  *Id*. at 164:20–165:7.

30.     As an organization, LUPE has an ongoing commitment to promoting engagement in the decennial census among its members and residents of Hidalgo, Starr, Cameron, and Willacy Counties.  LUPE is committed to encouraging participation in the census in large part because of the importance of ensuring an accurate count of LUPE members and the communities where they reside.  *Id*. at 165:8-167:4.

31.     In 2010, LUPE opened up its union hall and worked with the Census Bureau to assist members and the community at-large with filling out census questionnaires and with language access issues.  *Id*. at 165:11–166:10 & 168:9-15.  LUPE also worked closely with county officials to help educate the community on the importance of the census, and advocated for hiring local residents as enumerators to better reach hard-to-count residents in the *colonias*. *Id*. at 165:11–166:10 & 167:8-21.

### b) Plaintiff CHIRLA

32.     CHIRLA is a nonprofit membership organization that was founded in 1986.  Salas Decl.  ¶ 4, ECF No. 133-3 (hereinafter "Salas Decl.").  CHIRLA has eight offices in California (Los Angeles, Porterville, San Bernardino, and Sacramento) and an office in Washington D.C. *Id*.  CHIRLA is a statewide immigrant rights organization whose mission is to advance the human and civil rights of immigrants and refugees, and empower immigrants and their allies to build a more just and humane society.  *Id*.

33.     CHIRLA has approximately 12,970 members in communities across California. *Id*. at ¶ 5.  CHIRLA's membership includes Latinos, U.S. citizens, non-U.S. citizens, Deferred

Action for Childhood Arrivals (DACA) recipients, and members of mixed-immigration status families. *Id.*

34.    CHIRLA provides know-your-rights trainings, workshops, and educational literature about a variety of social services and benefits. *Id.* at ¶ 7. CHIRLA provides direct legal services, including assistance with asylum applications, U visa and T visa applications, and other protections under the Violence Against Women Act (VAWA). *Id.* CHIRLA also runs a hotline where members receive information and referrals to legal services and other resources. *Id.*

35.    CHIRLA has an ongoing commitment to promote engagement in the decennial census among its members and the communities that it serves. *Id.* at ¶ 9. In preparation for the 2010 Census, CHIRLA engaged in extensive outreach and advocacy. *Id.* For example, CHIRLA was an official Questionnaire Assistance Center (QAC) for the Census Bureau, and CHIRLA staff and volunteers canvassed door-to-door, conducted fieldwork, community outreach, community education, and policy efforts to encourage hard-to-count populations to respond to the census. *Id.* CHIRLA also partnered with Los Angeles County to do door-to-door canvassing and outreach and education at churches and schools to educate the Latino and immigrant communities on the importance of responding to the 2010 Census. *Id.*

### c) Plaintiff LCF

36.    LCF is a nonprofit organization whose mission is to invest in the Latino community to cultivate new leaders, support effective nonprofit organizations, and improve the quality of life for all residents of the State of Washington. P. Garcia Decl., ¶ 4, ECF No. 133-1 (hereinafter "P. Garcia Decl."). To achieve its mission, LCF, among other things, runs the Healthy Latino Families Initiative, through which LCF provides families with free healthcare counseling; connects underrepresented communities with healthcare-related resources and

provides education on environmental justice issues and labor standards; educates and collaborates with other nonprofit organizations to inform the community about important voting issues and to run get-out-the-vote and voter registration campaigns; and invests funds to improve access to benefits for families. *Id*.

37.    LCF is headquartered in Seattle, Washington and serves individuals who primarily reside in Yakima, Snohomish, Pierce, and King Counties. *Id*. at ¶ 5. LCF serves Latinos, U.S. citizens, and non-U.S. citizens. *Id*. LCF also serves individuals who use programs and services whose funding is based on census data, including, *e.g.*, Medicaid, Medicare, and SNAP, as well as individuals whose children attend Title I schools.

38.    LCF relies on the accuracy of decennial census data for purposes of strategic planning and communication, resource allocation, and advocacy. *Id*.

### d) Plaintiff GALEO

39.    GALEO is a nonprofit organization that is headquartered in Norcross, Georgia. Gonzalez Decl., ¶¶ 4-5, ECF No. 133-2 (hereinafter "Gonzalez Decl."). GALEO has approximately 220 members who are predominantly Latino. *Id*. at ¶ 5. GALEO members reside in Georgia, with many in metropolitan Atlanta, Gainesville, Dalton, Savannah, Columbus, Lyons, and in rural areas. *Id*.

40.    GALEO's mission is to increase Latino civic engagement and Latino leadership in Georgia. *Id*. ¶ 4. To promote civic engagement in the communities it serves GALEO conducts leadership programs, citizenship services, voter registration, voter education, census outreach, know-your-rights, and get-out-the-vote campaigns. *Id*. at ¶ 4.

41.    Most GALEO members regularly drive on public highways and roads in their communities, in metropolitan Atlanta. *Id*. at ¶ 6.

42.     GALEO relies on the accuracy of decennial census data for purposes of strategic planning and communication, resource allocation, and advocacy.  *Id*. at ¶ 4.

43.     GALEO has an ongoing commitment to promote engagement in the decennial census among its members and the communities that it serves.  *Id*. at ¶ 8.  In preparation for and during prior censuses, GALEO has worked closely with the State of Georgia and the Census Bureau to increase participation in the decennial census among the Latino population in the state. *Id*.  For example, in preparation for the 2010 Census, GALEO led the Georgia Latino Complete Count Committee ("GLCCC"), the only statewide Latino committee in the nation.  *Id*.  GALEO also conducted door-to-door public education to encourage Latinos to participate in the census. *Id*.

### e)  Plaintiff PAZ

44.     PAZ is a nonprofit, faith-based membership organization founded in 2010 that is headquartered in Phoenix, Arizona.  Navarrete Decl., ¶ 4, ECF No. 133-4 (hereinafter "Navarrete Decl.").  PAZ's mission is to build Latino and immigrant political power to ensure family unity, a path to citizenship, worker protections, and a path to equitable educational opportunities for all immigrants.  *Id*.  To achieve its mission, PAZ promotes civic engagement, provides scholarships to members and other individuals for immigration-related expenses, partners with community colleges to conduct educational and job training programs, conducts youth leadership programs, and provides assistance with applications for immigration relief.  *Id*.  To promote civic engagement, PAZ registers members and individuals to vote, educates members about important voting issues, conducts get-out-the-vote campaigns, and participates in various issue-focused advocacy.  *Id*.

14

45.     PAZ has members and serves individuals who primarily reside in Maricopa, Yuma, and Pinal Counties in Arizona.  *Id*. at ¶ 5.  Paz has 461 members, including Latinos, U.S. citizens, non-U.S. citizens, and members of mixed-immigration status families.  *Id*.

46.     PAZ has members who use programs and services whose funding is based on census data.  *Id*. at ¶ 6.  In particular, PAZ has members who receive Medicaid and WIC.  *Id*. PAZ also has members who have children who receive CHIP.[3]  *Id*.

47.     Some PAZ members receive social services from state departments that are funded by Social Services Block Grants (SSBG).  *Id*.  For example, some PAZ members in Maricopa County foster children or are themselves foster youth.  *Id*.

48.     PAZ also has members who either attend or have children who attend schools in the following districts that receive Title I funding:  Alhambra Elementary School District, Balsz Elementary School District, Isaac Elementary School District, Pendergast Elementary School District, Phoenix Elementary School District, Phoenix Union High School District, Roosevelt Elementary School District, Somerton Elementary School District, Tolleson Elementary School District, Tolleson Union High School District, and Union Elementary School District.  *Id*.

### f) Plaintiff ASIA

49.     ASIA is an Ohio nonprofit corporation that was founded in 1995 and that is headquartered in Cleveland, Ohio.  Tso Decl., ¶ 4, ECF No. 133-5 (hereinafter "Tso Decl.").  ASIA provides low-income, multilingual, and underserved Asian Americans with culturally and linguistically appropriate access to civic, health, and social services.  *Id*.  ASIA conducts considerable civic engagement work throughout Ohio, with a particular emphasis in the five

---

[3] Arizona's Medicaid program is the Arizona Health Care Cost Containment System (AHCCCS). AHCCCS also administers KidsCare, Arizona's CHIP program.

economic regions of Ohio with the highest concentrations of Asian Americans, including

Dayton, Columbus, Cincinnati, Toledo, and the Cleveland-Akron area.  *Id*. at ¶ 5.  To promote

civic engagement in the communities it serves, ASIA conducts a statewide civic engagement

program which includes voter registration, voter education, and voter turnout.  *Id*. at ¶ 4.

    50.    ASIA relies on the accuracy of the decennial census data for purposes of strategic

planning, communications, resource allocation, and advocacy.  *Id*. at ¶ 4.

    51.    ASIA serves individuals that use programs and services whose funding is

distributed based on census data.  *Id*. at ¶ 6.  Additionally, ASIA's International Community

Health Center, a Health Center Program grantee under Section 330 of the Public Health Service

Act, provides healthcare to those in Cleveland and Akron.  *Id*.  Some of the individuals that

ASIA serves receive and rely on funds from Medicaid, Medicare, SNAP, and WIC.  *Id*.  ASIA

serves individuals with children who participate in the National School Lunch Program, School

Breakfast Program, and Head Start programs.  *Id*.

    52.    ASIA has an ongoing commitment to promote participation in the decennial

census to ensure that all are counted by engaging in outreach and education with the

communities ASIA serves.  *Id*. at ¶ 7.  Given the lack of ethnic language media in Ohio, ASIA is

one of the few voices that reach Asian American communities in Ohio through the various

services it provides as well as its civic engagement work.  *Id*.

    53.    For the 2010 decennial Census, ASIA conducted extensive outreach and

engagement activities to ensure census participation by hard-to-count communities, including

minority language communities, new immigrant communities, and mixed immigration status

households.  *Id*. at ¶ 8.  For example, ASIA distributed subgrants to community organizations

serving the Asian American communities in Dayton, Columbus, Toledo, and Cincinnati; ASIA

trained community organizers, its staff, and volunteers on census outreach; and ASIA conducted local media outreach in Korean and Chinese to promote participation in the 2010 Census. *Id.*

### g) Plaintiff MinKwon

54.    MinKwon is a nonprofit, community-based organization that was founded in 1984. Trial Tr. (Jan. 22) at 194:12-16 (Park). MinKwon is located in Flushing, Queens, in New York, where there is a high immigrant and Asian-American population. *Id.* at 194:17-19. MinKwon works primarily with the low income, limited English proficient, Asian-American, and immigrant communities in New York City. *Id*. at 194:20–195:15. MinKwon's mission is to empower the Asian-American community and to work with immigrant communities to achieve social and economic justice. *Id*. at 195:16-19.

55.    MinKwon has four broad program areas, including: (1) social services assistance, including immigration services and assistance with social services benefits applications; (2) youth leadership development; (3) advocacy and organizing; and (4) civic participation and engagement. *Id*. at 195:20–196:11 & 199:6–200:14.

56.    MinKwon heavily relies on Census Bureau information and data to determine resources allocation, *id*. at 198:6-199:5, and citizen voting age population (CVAP) data to assist with its civic engagement program, *id*. at 204:12-25. Without accurate census data, MinKwon and other community organizations would not be able to do the work that they do. *Id*. at 1-198:-1-199:5.

57.    MinKwon serves individuals that use programs and services whose funding is distributed based on census data. For example, about 60% of the people that are served by the MinKwon center have an income of less than $15,000 and receive benefits such as SNAP, Medicaid, Medicare, and their children receive free lunch at school. *Id*. at 199:6-20.

58.    As part of its civic engagement work, MinKwon leads Asian Pacific Americans

Voting and Organizing to Increase Civic Engagement (APA Voice)—the only Asian American coalition doing civic engagement work in New York City. *Id*. at 203:23-204:11. MinKwon also engages in voter engagement and voter education, including hosting candidate forums, and translating voter material into Korean, Chinese, and Bangla. *Id*. at 204:11-205:6.

59.    In furtherance of its mission, MinKwon has an ongoing commitment to promote participation in the decennial census. In 2010, MinKwon engaged in extensive census outreach and advocacy. *See id*. at 205:7-212:11. For example, MinKwon applied a broad range of strategies to increase participation in the 2010 Census, including: phone banking, door knocking, and media outreach with in-language ethnic press (*e.g.*, Korean and Chinese media). *Id*. MinKwon also worked directly with the Census Bureau as a designated QAC, without receiving any substantial or financial support from the Census Bureau. *Id*. at 206:21–207:14. Additionally, MinKwon created a language hotline after community members complained that the Census Bureau's interpretation and translation services were not sufficient. *Id*. at 206:10-20.

60.    MinKwon also targeted a specific hard-to-count census tract for its 2010 Census outreach and helped place that census tract in the 96th percentile of improvement with a 33% increase in participation. *Id*. at 207:25–210:6.

### B.   Defendants and Key Players

#### 1.   Census Bureau

61.    Defendant Census Bureau is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency responsible for planning and administering the decennial census. Joint Stipulations of Fact, ¶ 1, ECF No. 103-1 (hereinafter "Joint Stips.").

62.     Until on or about January 2, 2019, Defendant Dr. Ron Jarmin performed the nonexclusive duties of Director or Acting Director of the Census Bureau. *Id.* ¶ 5. Dr. Jarmin is now the Deputy Director of the Census Bureau.[4]

63.     Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United Stated Census Bureau. *Id.* ¶ 6.

64.     During the relevant time, Dr. Enrique Lamas was performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau. PX-26 at 8 (AR 1313).[5]

65.     Burton Reist is the Chief of the Decennial Communications and Stakeholder Relations at the Census Bureau. PX-4 at 37 (AR 3772).

66.     Victoria Velkoff is Division Chief of the American Community Survey Office at the U.S. Census Bureau. PX-164 at 1.

67.     Michael Berning, J. David Brown, Misty Heggeness, Shawn Klimek, Lawrence Warren, and Moises Yi were members of the "SWAT Team" that prepared analyses of the inclusion of a citizenship question on the 2020 Decennial Census between December 2017 and March 2018. Joint Stips. ¶ 12.

## 2.  Commerce Department

68.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f). The Commerce Department is responsible for planning, designing, and implementing the 2020 Decennial Census. 13 U.S.C. § 4. *See* Joint Stips. ¶ 2.

---

[4] Dr. Steven Dillingham is now Director of the U.S. Census Bureau. Joint Stips. of Fact, ECF. No. 103-1 ¶ 4.

[5] Dr. Lamas is a named Defendant in this case. Given the appointment of Dr. Dillingham and Dr. Jarmin's corresponding move to become Deputy Director, Dr. Dillingham should be substituted as a named Defendant for Dr. Lamas.

69.    Defendant Wilbur Ross is the Secretary of Commerce. *Id.* ¶ 3.

70.    Earl Comstock is the Deputy Chief of Staff and Director of Policy, running the Office of Policy and Strategic Planning within the Office of the Secretary of Commerce, reporting directly to Secretary Ross. *Id.* ¶ 7.

71.    Karen Dunn Kelley is the presidentially-appointed Under Secretary For Economic Affairs at the U.S. Department of Commerce responsible for the operations of the Census Bureau. *Id.* ¶ 8.

72.    James W. Uthmeier is Senior Counsel to the General Counsel, Regulatory Reform Officer, Department of Commerce. PX-33 at 1 (AR 1634).

73.    Wendy Teramoto was a Senior Advisor and Chief of Staff to Secretary Ross. Joint Stips. ¶ 9.

74.    Sahra Park-Su was a Senior Policy Advisor at the Department of Commerce who reported to both Undersecretary Kelley and Earl Comstock. *Id.* ¶ 10.

75.    David Langdon is a Policy Advisor within the Office of Policy and Strategic Planning, reporting to Comstock. *Id.* ¶ 11.

76.    Tad Kassinger was the former General Counsel of the Commerce Department who is one of Secretary Ross' personal attorneys. Comstock Dep. at 226–29, ECF No.103-8 (hereinafter "Comstock Dep.").

77.    Peter Davidson is the General Counsel for the Department of Commerce. Gore Dep. 97:19-98:3, ECF No. 103-10 (hereinafter "Gore Dep.").

78.    Michael Walsh is the Deputy General Counsel for the Department of Commerce. Joint Stips. ¶ 13.

### 3.  Department of Justice ("DOJ")

79.    Jeff Sessions was Attorney General of the United States. Gore Dep. at 77:22-78:5.

80.    John Gore is the Acting Assistant Attorney General for Civil Rights at the U.S. DOJ. Gore Dep. at 18:16-22.

81.    Arthur E. Gary is General Counsel for the Justice Management Division in the U.S. PX-32 at 3 (AR 1525) (the "DOJ Letter").

### 4.  Other Key Players

82.    Stephen Bannon was the White House Chief Strategist and Senior Counselor to the President.

83.    Kris Kobach was the Kansas Secretary of State, and served as Vice Chair of the Presidential Commission on Election Integrity. PX-19 at 2 (AR 763).

84.    A. Mark Neuman was the point person for the Trump transition team on Census issues. Teramoto Dep. at 126:16–127:24, ECF No. 103-5 (hereinafter "Teramoto Dep.").

## C.  Witnesses

### 1.  Fact Witnesses

85.    Plaintiff Juanita Valdez-Cox provided testimony on behalf of Plaintiff LUPE, and John Park provided testimony on behalf of Plaintiff MinKwon. The following fact witnesses provided written affidavits: Gerardo Gonzalez (GALEO), Tony Bloch Garcia (LCF), Angelica Salas (CHIRLA), Tony Navarrete (PAZ), Elaine Tso (ASIA), and Raj Mukherji.

86.    Dr. John Abowd is the Chief Scientist and Associate Director for Research and Methodology at the United States Census Bureau. Joint Stips. ¶ 6. Dr. Abowd testified as a fact witness for Plaintiffs about his knowledge of and involvement in the addition of a citizenship question to the 2020 Decennial Census questionnaire.

### 2.  Expert Witnesses

87.    John Thompson was the Director of the United States Census Bureau from August 2013 to June 2017. He provided expert testimony on the Census Bureau and the

practices, standards, and procedures of the Bureau. Trial Tr. (Jan. 22) at 29:4:10 (Thompson).

88.    Terri Ann Lowenthal is a former staff director of the Subcommittee on Census and Population of the House Committee on Post Office and Civil Service. She has done extensive consulting related to the census. She provided expert testimony on the processes regularly employed at the Census Bureau and the federal statistical systems. Lowenthal Decl., ECF No. 99-5 (hereinafter "Lowenthal Decl."); Trial Tr. (Jan. 22) at 115:13-17 (Lowenthal).

89.    Douglas S. Massey is an internationally recognized expert in the field of demography with an extensive background in the collection, dissemination, and analysis of population statistics. He has 40 years of experience working with census and survey data. He provided expert testimony in the field of population research and demography collection, analysis of population statistics, and the role of protocols of the Census Bureau's Census Scientific Advisory Committee ("CSAC"). Massey Decl., ECF No. 99-6 (hereinafter "Massey Decl."); Trial Tr. (Jan. 22) at 134:2:12 (Massey).

90.    Dr. William O'Hare is a professional demographer and researcher with four decades of experience utilizing Census Bureau data for a variety of purposes. He provided expert testimony regarding the likelihood that reduced self-response rates would result in an undercount. Trial Tr. (Jan. 23) at 26-82 (O'Hare).

91.    Dr. Nancy Mathiowetz is an expert in survey methodology, statistical analysis and the United States decennial census. Trial Tr. (Jan 23.) at 88:9-15 (Mathiowetz). She is professor emerita at the University of Wisconsin-Milwaukee. *Id.* at 83:24-84:12. Dr. Mathiowetz has researched issues related to questionnaire design, question wording, reducing measurement error in survey questionnaires in order to obtain accurate data, and "how issues of privacy and confidentiality affect participation in the decennial census." *Id.* at 85:17-23, 87:9-

14. She provided expert testimony on the impact of the citizenship question on undercount and the inadequate testing of the decennial census questionnaire with the citizenship question. *Id.* at 88-185.

92.    Kimball Brace is president of Election Data Services, Inc. He is an expert in the areas of reapportionment, redistricting, election administration, and analysis of census and political data. He provided expert testimony regarding the impact of a differential undercount of certain demographic groups in the 2020 Decennial Census on (i) the apportionment of congressional seats, and (ii) the dilution of the votes of people living in certain counties as a result of intrastate redistricting. He also provided population and demographic projections for purposes of assessing the impact of a differential undercount on the allocation of federal funding. Brace Decl., ECF No. 99-1 (hereinafter "Brace Decl."); Trial Tr. (Jan. 23) at 213:23-214:5 (Brace).

93.    Roger D. Mingo is a consultant at R.D. Mingo and Associates who is an expert on the funding and administration of transportation programs. He provided expert testimony on the impact of a differential undercount of certain demographic groups in the 2020 Decennial Census on the allocation of federal transportation funding and administration of transportation programs. ECF No. 99-7; Trial Tr. (Jan. 24) at 26:16-29:14 (Mingo).

94.    Dr. Nora Gordon is an associate professor at Georgetown University's McCourt School of Public Policy who is an expert on the funding and administration of Title I. She provided expert testimony on the impact of a differential undercount of certain demographic groups in the 2020 Decennial Census on the allocation and administration of federal Title I funding. ECF No. 99-4; Trial Tr. (Jan. 24) at 46:19-47:25 (Gordon).

95.    Dr. Andrew Reamer is a research professor in the George Washington Institute of

Public Policy who is an expert on the relationship between census data and federal funding formulas. He provided expert testimony on the impact of a differential undercount of certain demographic groups in the 2020 Decennial Census on the allocation of federal funding. ECF No. 99-8; Trial Tr. (Jan. 24) at 66:13-67:22 (Reamer).

96.     Lisa Carruth is a consultant at Carruth and Associates and was the Director of Forecasting of the Texas Health & Human Services Commission from 2003 to 2016. She provided expert testimony on the funding and administration of the federal Medicaid program, including the impact of a differential undercount of certain demographic groups in the 2020 Decennial Census on the allocation of federal Medicaid funding and administration of state Medicaid programs. ECF No. 99-2; Trial Tr. (Jan. 24) at 91:22-93:10 (Carruth).

97.     David Ely has decades of experience providing database construction and redistricting consultation to numerous jurisdictions and has served as an expert in over 30 federal and state voting rights cases in 12 states. He provided expert testimony regarding statistical and demographic analysis relevant to redistricting and litigation under Section 2 of the Voting Rights Act ("VRA"). Ely Decl., ECF No. 99-3 (hereinafter "Ely Decl."); Trial Tr. (Jan. 24) at 114:1-5 (Ely).

### D.  Production of the Administrative Record and Extra-Record Discovery

98.     Discovery in this case was coordinated with the discovery conducted in the New York Census cases (together, the "New York Case"), two consolidated cases before Judge Jesse M. Furman of the United States District Court for the Southern District of New York, and the parallel Census cases pending before Judge Richard G. Seeborg in the United States District Court for the Northern District of California. *See New York v. U.S. Dep't of Commerce*, No. 1:18-cv-02921-JMF (S.D.N.Y.) ( "N.Y. Docket"); *State of Cal. v. Ross*, No. 3:18-cv-01865-RS (N.D.C.A 2018) ("California Docket")..

99.     Defendants produced an Administrative Record along with a certification and index on June 8, 2018 comprising a total of 1,320 pages. Notice of Filing Admin. Record Certification and Index, ECF. No. 25; PX-1 (AR 1-1320). These materials allude to but contain little documentation of internal deliberations before December 2017 or communications between the Departments of Commerce and Justice. *See* PX-1 (AR 1-1320).

100.    On June 21, 2018, Defendants supplemented the Administrative Record with a newly-released memorandum of Secretary Ross dated June 21, 2018, in which the Secretary stated, for the first time, that "[s]oon after [his] appointment as Secretary of Commerce," he had begun considering "whether to reinstate a citizenship question." PX-2 (AR 1321).  The Secretary's supplemental memorandum also acknowledged that "other senior Administration officials had previously raised" the issue with the Secretary, and that he and his staff "thought reinstating a citizenship question could be warranted, and we had various discussions with other governmental officials about reinstating a citizenship question to the Census." *Id.*

101.    The Secretary also stated in the supplemental memorandum that, "[a]s part of that deliberative process," he and his staff had "inquired whether the Department of Justice . . . would support, and if so would request, inclusion of a citizenship question as consistent with and useful for enforcement of" the Voting Rights Act of 1965 ("VRA"). *Id.* These statements contradicted previous representations that Defendants' consideration of the addition of a citizenship question to the 2020 Census questionnaire was originally prompted by a request initiated by the Department of Justice in December 2017.  PX-480 at 51.

102.    Thereafter, on July 3, 2018, the court in the New York Cases held that the original Administrative Record was deficient and ordered Defendants to produce a complete

Administrative Record. N.Y. Docket, Order, ECF No. 199 (Jul. 5, 2018); N.Y. Docket, Order, ECF No. 211 (Jul. 23, 2018).

103.    On July 23 and 27, 2018 and August 6, 2018, Defendants, pursuant to the court's orders in the New York Case, supplemented the Administrative Record. *See* Notice of Filing Supplemental Materials*, ECF. No. 46.

104.    In addition to ordering supplementation of the Administrative Record, the New York court also granted the plaintiffs limited extra-record discovery, including up to ten fact witness depositions. This Court granted Plaintiffs' request for extra-record discovery to the same extent as in the New York Case. Memorandum Opinion, ECF No. 48 at 34-35.

105.    Between August and October 2018, Defendants produced supplemental Administrative Record and other documents, in several installments. *See* PX-5 to 16.

106.    In the above-captioned cases, Plaintiffs and Defendants have stipulated as to the contents of the Administrative Record. Joint Stipulation Admitting Trial Exhibits, ECF No. 134. As supplemented by Defendants and stipulated by the parties, the Administrative Record comprises a total of more than 13,000 pages—approximately ten times the volume of the Administrative Record initially produced by Defendants. These supplemental Administrative Record productions contain, *inter alia*, additional information regarding the Secretary's and his Commerce Department staff's conduct and discussions before the December 12, 2017 letter from DOJ formally requesting the addition of a citizenship question on the 2020 Census. PX-3 (AR 1322 - 3735); PX-4 (AR 3736 - 12464).

107.    In addition to party discovery, the plaintiffs sought and obtained extra-record document discovery from DOJ. In addition, through coordinated discovery with the New York and California Census cases, a total of nine fact witnesses were deposed: John Abowd, Earl

Comstock, John Gore, Dr. Ron Jarmin, Karen Dunn Kelley, David Langdon, Mark Neuman, Sahra Park-Su, and Wendy Teramoto. Plaintiffs also deposed Dr. Abowd as a 30(b)(6) witness as a representative of Defendant Census Bureau.

108.    Plaintiffs sought, and the New York court granted Plaintiffs' motion to compel, the deposition of Secretary Ross. N.Y. Docket, ECF No. 345 (Sept. 21, 2018). However, the United States Supreme Court granted Defendants' application for a stay of the Secretary's deposition pending review. N.Y. Docket, ECF No. 392 (Oct. 23, 2018). To date, the Secretary has not been deposed, although Plaintiffs here have not withdrawn their request to take his deposition.

## II.    Facts Concerning the Addition of a Citizenship Question Established by the Administrative Record Evidence

### A.    Administrative Record Evidence That Secretary Ross Sought to Devise a Pretext to Add a Citizenship Question to the 2020 Census

#### 1.    DOJ Does Not Mention or Request a Citizenship Question on the Decennial Census in Response to Pre-2017 Census Bureau Inquiries

109.    On or about June 25, 2014, Arthur Gary of DOJ sent a letter on behalf of DOJ to the General Counsel of the Department of Commerce to convey what data DOJ uses from the census and to confirm it continued to use the data. PX-1 (AR 278).

110.    In his June 2014 letter, Gary stated that DOJ used citizenship data collected by the ACS to enforce the VRA, and that the "lowest geography" for which DOJ needed such data was the "Census block group" level. *Id.* The letter made no reference to any need by DOJ for citizenship data at the census block level for any purpose, and it did not mention the possibility of adding a citizenship question to the Decennial Census. *Id.*

111.    On or about November 4, 2016, Gary sent former Census Bureau Director John Thompson a letter regarding DOJ's potential need to amend the content of the ACS or 2020

Decennial Census questions. PX-17 (AR 311).

112.    Mr. Gary's November 2016 letter references a July 2016 letter in which he advised the Census Bureau that DOJ had no need to amend the content of the ACS. *Id.* However, his November 2016 letter did request that the Census Bureau consider adding a new topic on the ACS relating to LGBT populations. *Id.* In support of this request, DOJ attached a spreadsheet reflecting "the legal authority supporting the necessity for the collection of this information." *Id.*

113.    Mr. Gary's November 2016 letter did not refer to citizenship and did not indicate any need by DOJ for additional data concerning citizenship for any purpose. *See id.*

114.    The Census Act requires that the Department of Commerce notify Congress of the subjects to be covered by the census three years in advance of the census date. For the 2020 Decennial Census, Secretary Ross sent this report, entitled *Subjects Planned for the 2020 Census Program*, on March 28, 2017. PX-357 (AR 194).

115.    In the report, citizenship was included as a subject for the ACS. It was *not* included as a subject for the 2020 Decennial Census. *Id.*

## 2.    Secretary Ross and His Senior Staff Work to Solicit a Request From Another Federal Agency

116.    After the commencement of this litigation, the Secretary released his supplemental memorandum dated June 21, 2018, acknowledging for the first time that he had begun considering whether to add a citizenship question to the 2020 Census "[s]oon after [his] appointment as Secretary of Commerce" in early 2017. PX-2 (AR 1321); *see ¶* [35], supra. The memorandum also acknowledged that "other senior Administration officials had previously raised" the issue with him, and that he and his staff "had various discussions with other governmental officials" about it. *Id.*

117.    The Secretary agreed to add a citizenship question to the census shortly after his confirmation, no later than March of 2017. *See* PX-88 (AR 3710).

118.    Documents in the Administrative Record show that the Secretary and members of his senior staff actively pursued efforts to add citizenship as a subject for the 2020 Census long before DOJ sent its letter requesting the addition in December 2017.  By February 2, 2017, within days of the Secretary's confirmation, David Langdon, a Senior Policy Advisor who reported directly to Earl Comstock asked Comstock about his interest in congressional notification of decennial census and ACS topics and Comstock indicated that he was "<u>very</u>" interested and that the Secretary would be too. PX-30 (AR 1410) (emphasis in original).

119.    Following that conversation, Langdon set up briefings regarding those same topics during and after the transition period.  PX-31 (AR 1411); PX-79 (AR 3685); PX-80 (AR 3686).

120.    On March 10, 2017, Comstock sent Secretary Ross an email responding to a question regarding the census from Secretary Ross. PX-55 (AR 2521). Although the specific wording of the Secretary's question is not documented, Comstock's email provided the Secretary with a confirmation that "undocumented residents (aliens) in the 50 states" are "included in the apportionment population counts."  *Id at 1*. The email also included the text of a *Wall Street Journal* article titled "The Pitfalls of Counting Illegal Immigrants." *Id.*

121.    On the same day, Langdon offered to set up a briefing for Comstock to understand the congressional notification process for the decennial census. PX-79 (AR 3685).

122.    In early April 2017, White House Chief Strategist Steve Bannon contacted Secretary Ross and asked the Secretary "if he would be willing to speak to Kansas Secretary of State Kris Kobach about Secretary Kobach's ideas about a possible citizenship question on the

decennial census." PX-19 (AR 763); PX-58 (AR 2651). Thereafter, at the direction of Bannon, Kobach and Secretary Ross discussed Kobach's ideas about a possible citizenship question on the decennial census, and "the fact that the US census does not currently ask respondents about their citizenship," PX-19 at 2 (AR 764); *see also* PX-58 (AR 2651).

123.    On April 13, 2017, Comstock emailed Neuman asking when the Census Bureau must "notify Congress regarding the questions that will be on (A) the ACS and (B) the decennial Census."  PX-87 (AR 3709). The next morning, Neuman responded that the notification to Congress "relating to questionnaire content additions for 2020 Census just took place." *Id.* The Department had transmitted to Congress the Census Bureau report entitled *Subjects Planned for the 2020 Census Program* just over two weeks earlier.  However, Neuman reassured Comstock: "There will be another opportunity next year." PX-87 (AR 3709). Neuman further suggested that Comstock request that the Census Bureau provide them with "a list of response rates on ALL demographic questions currently asked on the ACS" to determine whether "certain demographic questions have lower response rates than others."  *Id*.  Neuman noted that this is something that could be provided "OFF THE SHELF."  *Id*.

124.    On April 20, 2017, the Secretary's assistant transmitted an email from the Secretary to Comstock noting that then-Census Director John Thompson had an upcoming meeting on April 29 with the Census National Advisory Committee on Racial, Ethnic and Other Populations ("NAC"), and exclaiming:  "We must get our issue resolved before this!" PX-81 (AR 3694).

125.    The next communication in the Administrative Record from the Secretary is a heavily redacted email to Comstock dated May 2, 2017. PX-88 (AR 3710). In the only unredacted portion of the email, the Secretary complained to Comstock: "Worst of all they

emphasize that they have settled with congress on the questions to be asked. I am mystified why

nothing ha[s] been done in response to *my months old request that we include the citizenship*

*question*. Why not?" *Id*. (emphasis added).

126.    The fact that by May 2, 2017, Secretary Ross's request was "months old," is

evidence that Secretary Ross agreed to add a citizenship question in the beginning of March

2017 or earlier.

127.    "I agree Secretary," Comstock responded that same day:

> On the citizenship question *we will get that in place*. . . . We need
> to work with Justice *to get them to request* that citizenship be
> added back as a census question, *and we have the court cases to
> illustrate that DOJ has a legitimate need for the question to be
> included.* I will arrange a meeting with DOJ staff this week to
> discuss."

> *Id*. (emphases added).

128.    Immediately thereafter, Comstock and other Commerce officials took steps to

implement this plan to solicit DOJ regarding the citizenship question. On May 3, 2017, one day

after Comstock advised Secretary Ross that he would get the citizenship question in place, Eric

Branstad, the Commerce Department's Senior White House Advisor, sent an email asking a

contact in the Executive Office of the President to identify the "best counterpart to reach out to at

DOJ - Regarding Census and Legislative issue." PX-84 (AR 3701). Branstad was given the name

of  the White House Liaison at DOJ, Mary Blanche Hankey, who had previously served as

legislative counsel to then-Senator Sessions. *Id.*; *see also* PX-537 (AR 12756). Branstad then

gave Comstock Hankey's contact information. PX-84 (AR 3701)..

129.    On May 4, 2017, Comstock emailed Hankey requesting a call. PX-51 (AR 2462).

As Comstock later reported to the Secretary, Hankey "worked for AG Sessions in his Senate

office, and came with him to the Department of Justice." PX-537. Comstock and Hankey met in

person "to discuss the citizenship question." At Hankey's direction, Comstock contacted James McHenry at DOJ. PX-537 (AR 12756).

130.    After speaking with Comstock "several times," however, McHenry advised Comstock that "Justice staff did not want to raise the [citizenship] question given the difficulties Justice was encountering in the press at the time (the whole Comey matter)." *Id.*

131.    Given DOJ's unwillingness to request the citizenship question, McHenry referred Comstock to Gene Hamilton at the Department of Homeland Security instead. *Id.* But after "several phone calls" with Hamilton, Comstock was told that DHS "really felt that it was best handled by [DOJ]." *Id.*

132.    At that point, after both DOJ and DHS had declined to pursue the citizenship question, Comstock asked James Uthmeier, who had recently moved from Secretary Ross's office to the Office of General Counsel, to look into "how Commerce could add the question to the Census itself." *Id.*

133.    The Secretary also involved Langdon in pushing efforts to add the citizenship question. *See* PX-150 (AR 12541). In late May 2017, Langdon met with the Secretary "all afternoon," and reported that the Secretary was interested in Census subjects and "puzzled why citizenship is not included in 2020." *Id.* Following the meeting, Langdon requested further information from Census Bureau staff, including Census Bureau Chief of Decennial Communications and Stakeholder Relations Burton Reist, regarding "the criteria used to pick topics for 2020 versus ACS. Say, citizenship." *Id.* Langdon collected this and other citizenship-related materials from Reist, including a 1988 internal DOJ memorandum asserting that the Constitution does not require counting of undocumented residents in the decennial Census. PX-618 (AR); PX-619 (AR).

134.    However, in a May 24, 2017 email to Comstock entitled "Counting of illegal immigrants," Langdon informed Comstock that the Census is required to count all persons: "Long story short is that the counting of illegal immigrants (or of the larger group of noncitizens) has a solid and fairly long legal history. . . . [there is] a Bush 41 era DOJ opinion that proposed legislation to exclude illegal aliens from the decennial census was illegal." PX-565 (COM_DIS00016563) (AR).

135.    Later on May 24, 2017, at nearly 11:00 PM, Langdon made an apparently urgent request to Acting Associate Director of the 2020 Census Lisa Blumerman to respond to his inquiry related to a citizenship question, asking for a response, "Ideally this evening."  PX-150 (AR 12541).

136.    On July 14, 2017, Kobach emailed Secretary Ross to follow up on their prior telephone discussion. PX-19 (AR 763). Kobach reminded the Secretary of their April 2017 discussion concerning the absence of a decennial Census question on citizenship and the resulting "problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes." *Id.* Kobach urged that it was "essential" to add a citizenship question to the 2020 decennial Census, and offered "any assistance that I can provide to accomplish the addition of this question." *Id.*

137.    On July 21, 2017, Kobach called and then emailed the Secretary's Chief of Staff, Wendy Teramoto, re-copying his July 14 email and noting his previous discussion about the citizenship question with the Secretary was "at the direction of Steve Bannon." *Id.*

138.    On or around July 25, 2017, Secretary Ross had a further telephone conversation with Kobach concerning the addition of a citizenship question to the 2020 Decennial Census, in

which Teramoto and Deputy Chief of Staff Israel Hernandez participated. PX(AR 764); PX-193 at 8, 40 (COM_DIS00021166, COM_DIS000211198).

139.    On the same day, Undersecretary Kelley received a briefing from Census Bureau personnel on, among other things, the process of how questions are approved to be used on the Census questionnaire. PX-28 (AR 1393); PX-29 (AR 1404).

### 3.  Continued Efforts by Secretary Ross and His Senior Staff to Obtain a Request for a Citizenship Question from Another Agency

140.    On August 8, Secretary Ross was advised by an email from Hernandez that Congressman Steve King introduced a bill to the House of Representatives seeking the addition of a question on citizenship and legal status to the census.  PX-18 (AR 317).

141.    On the same day, Secretary Ross sent an email to Comstock asking, "[W]ere you on the call this morning about Census?  They seem dig [*sic*] in about not sling [*sic*] the citizenship question and that raises the question of where is the DoJ in their analysis?" PX-97 (AR 4004). The Administrative Record does not identify who "they" in the Secretary's email refers to.  The Secretary added that if DOJ had "not come to a conclusion please let me know your contact person and I will call the AG." *Id.*

142.    Comstock responded to the Secretary that "I have two attorneys in the DoC General Counsel's office working on it." *Id.* The next day, Comstock advised the Secretary that "we are preparing a memo and full briefing for you on a citizenship question. The memo will be ready by Friday."  Comstock further admonished:  "Since this issue will go to the Supreme Court we need to be diligent in preparing the administrative record." PX-523 (AR 12476).

143.    On August 10, 2017, Secretary Ross replied by telling Comstock that "we should be very careful about everything, whether or not it is likely to end up in the SC." *Id.*  The following day, Comstock and Uthmeier exchanged edits on briefing materials regarding the

34

citizenship question and later sent the memorandum to the Secretary and Teramoto. *See* PX-50 (AR 2461); PX-146 (AR 11362). The memorandum has been withheld (and the related emails partially redacted) on the basis of attorney-client privilege. But Uthmeier told Comstock that he looked forward to discussing his "new ideas/recommendations on execution," and observed that "[u]ltimately, we do not make decisions on how the [citizenship] data will be used for apportionment, that is for Congress (or possibly the President) to decide." PX-607 (COM_DIS00018588) (AR). He added, "I think that's our hook here." *Id.*

144.     On August 21, 2017, senior Commerce Department personnel met (including Teramoto, Comstock, and the new-Commerce General Counsel Peter Davidson) regarding the citizenship question. PX-50 (AR 2461). On September 1, 2017, Secretary Ross complained to Comstock and Teramoto that he had "received no update" on "the issue of the census question." PX-45 (AR 2424); PX-96 (AR 4002). Comstock responded, "Understood. Wendy and I are working on it." PX-96 (AR 4002).

145.     On September 6, 2017, Secretary Ross and his senior staff met again to discuss the citizenship question. PX-31 (AR 1411); PX-35 (AR 1996); PX-46 (AR 2426); PX-193 (COM_DIS00021159).

146.     Mr. Uthmeier prepared a briefing book for the September 6 meeting.  PX-35 (AR 1996); PX-36 (AR 1998). This briefing book has not been provided to Plaintiffs.

147.      The next day, Comstock emailed Uthmeier and Davidson stating that Secretary Ross "would like an update on progress since the discussion yesterday regarding the citizenship question."  PX-37 (AR 2034); PX-49 (AR 2459).

148.    After receiving Uthmeier's response (which Defendants have withheld on the basis of privilege), Comstock reiterated "the Secretary is asking for progress on this."  PX-44 (AR 2395); PX-49 (AR 2459).

149.    Mr. Uthmeier responded that Davidson had been in touch with "Kassinger this evening." PX-44 (AR 2395).

150.    Davidson then wrote to Comstock, Uthmeier, and Teramoto expressing "concern[]" that the Secretary had discussed the citizenship question directly with Kobach and recommending that they contact Mark Neuman "before we do anything externally." PX-614 (COM_DIS00019687) (AR). On September 8, 2017, Uthmeier emailed Neuman to discuss "some Census legal questions for the Secretary." PX-38 (AR 2051_0001).

151.    Also on September 8, 2017, Comstock sent Secretary Ross a memorandum describing his efforts to solicit a request for a citizenship question from DOJ and DHS, and those agencies' refusal to make such a request. PX-537 (AR 12756).

152.    The memorandum summarized Comstock's prior discussions with Hankey, McHenry, and Hamilton of the Departments of Justice and Homeland Security. PX-524 (AR 12755); PX-537 (AR 12756).

153.    Mr. Comstock later forwarded that memorandum to Teramoto, PX-524 (AR 12755); PX-537 (AR 12756), presumably to prepare her for an upcoming call she was to have with DOJ regarding a citizenship question.

154.    Early afternoon on September 13, Uthmeier followed up with Neuman and they talked later that day regarding a citizenship question.  PX-145 (AR 11329); PX-592 (COM_DIS00017396) (AR).

**B. Senior DOJ Political Appointees Become Directly Involved in Discussions of the Secretary's Request to Add a Census Citizenship Question**

**1. Communications Between DOC and DOJ**

155.    In September 2017, Secretary Ross and his staff "inquired whether the Department of Justice (DOJ) would support, and if so would request, inclusion of a citizenship question." PX-2 (AR 1321).

156.    On or around September 13, 2017, John Gore, the then-Acting Assistant Attorney General for Civil Rights, emailed Teramoto to introduce himself and request a call "about a DOJ-DOC" issue. PX-59 (AR 2628); PX-60 (AR 2634). The Administrative Record does not reveal what prompted Gore to make this contact, despite DOJ's previously communicated unwillingness to request the addition of citizenship to the subjects for the 2020 Census.

157.    Over the next few days, Gore and Teramoto exchanged emails with Attorney General Sessions' assistant, Danielle Cutrona, to schedule a call between Secretary Ross and Attorney General Sessions. PX-63 (AR 2639); PX-67 (AR 2653).

158.    Regarding the substance of the call, Cutrona stated to Teramoto: "From what John [Gore] told me, it sounds like we can do whatever you all need us to do and the delay was due to a miscommunication. The AG is eager to assist." PX-67 (AR 2653); PX-68 (AR 2659).

159.    On or about September 18, 2017, Secretary Ross and Attorney General Sessions spoke about the citizenship question. PX-62 (AR 2637). On the same day, Teramoto emailed Gore, writing, "AG and Sec spoke. Please let me know when you have a minute."  PX-61 (AR 2636).

160.    On the following day, the Secretary sent an email with the subject "Census" to Davidson, which stated: "Wendy and I spoke with the AG yesterday. Please follow up so we can resolve this issue today." PX-57 (AR 2528).

37

161.    On October 8, 2017, the Secretary sent an email to Davidson with the subject line "Letter from DOJ," demanding: "What is its status[?]." PX-52 (AR 2482). Davidson responded: "I'm on the phone with Mark Neumann [*sic*] right now . . . . [H]e is giving me a readout of his meeting last week. I can give you an update via phone if you'd like." *Id.*

162.    On October 9, 2017, Aaron Willard, Department of Commerce Director of Intergovernmental Affairs, sent an email to Undersecretary Kelley under the subject line, "Notes from drive." PX-148 (R) (AR 12464). The entire contents of Willard's email state:

> 1) must come from DOJ
> 2) court cases you can hang your hat on
> 3) every Census since 1880, except 2000.

*Id.*

163.    On or about November 27, 2017, Gore called Davidson. PX-53 (AR 2496).

164.    On the same day, Secretary Ross emailed Davidson again, stating, "Census is about to begin translating the questions into multiple languages and has let the printing contract. We are out of time. Please set up a call for me tomorrow with whoever is the responsible person at Justice. We must get this resolved. WLR." PX-143 (AR 11193). Davidson responded the next morning: "I can brief you tomorrow…no need for you to call." *Id.*

## 2.  The December 12, 2017 DOJ Letter Requesting the Addition of a Citizenship Question to the 2020 Census

165.    Two weeks later, DOJ issued a letter (the "DOJ Letter") dated December 12, 2017, under Gary's signature, formally requesting that the Census Bureau "reinstate on the 2020 Census questionnaire a question regarding citizenship." PX-32 (AR 1525). The DOJ Letter asserted that citizenship data are "critical" to its enforcement of Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973. *Id.*  It noted that, from 1970 to 2000, the Census Bureau collected citizenship data through the "long form" questionnaire sent to a sample of the U.S.

population in conjunction with the decennial census. *Id.* at 2. As of the 2010 Census, the "long form" was discontinued and the ACS replaced it as the source of citizenship data used by DOJ for VRA enforcement. *Id.* The DOJ Letter claimed that the ACS "does not yield the ideal data for such purposes," noting that unlike decennial census data, ACS data is not "reported to the Census block level." *Id.* at 2-3.

166.     Though DOJ asserted that "decennial census questionnaire data regarding citizenship" would be "more appropriate for use" than ACS citizenship data, it did not claim that census citizenship data were "necessary" to the performance of its functions. *Id.* While the DOJ Letter cited certain court decisions under VRA § 2, it did not identify any case in which DOJ or any other plaintiff lost a Section 2 enforcement action due to the lack of block-level citizenship data from the decennial Census or the insufficiency of citizen voting age population ("CVAP") data based on the ACS. *See id.* Nor did the DOJ Letter claim that DOJ had been unable to or elected not to bring any VRA enforcement action due to the insufficiency of available CVAP data. In fact, the Administrative Record—and, indeed, the entire record of this case—is devoid of any evidence to support such a claim.

167.     The DOJ Letter asserted, *inter alia*, that "ACS estimates are reported at a ninety percent confidence level, and the margin of error increases as the sample size—and, thus, the geographic area—decreases.. . . By contrast, decennial census data is a full count of the population." *Id.* at 3. It further asserted that reliance on ACS estimates makes it necessary "to perform further estimates and to interject further uncertainty in order to approximate citizen voting-age population at the level of a census block." *Id.*

168.     However, the DOJ Letter reflected no awareness of the existence or potential impact of the Census Bureau's disclosure avoidance protocols on the citizenship data that could

be provided to DOJ from the decennial Census, or the relative margin of error that would be associated with such data if a decennial Census citizenship question were adopted.

169.    Moreover, the DOJ Letter's comments concerning the previous use of the decennial Census long-form questionnaire to collect citizenship data imply that DOJ believed the long-form questionnaire was superior to the ACS in the quality of the citizenship data generated before the long-form questionnaire was discontinued and fully replaced by the ACS in 2005.    *Id.* The DOJ Letter did not acknowledge that the long-form Census questionnaire was also a sample survey subject to margins of error and resulted in citizenship data reported only down to the block group level, as with the current ACS.

170.    Aside from the VRA enforcement rationale, the DOJ Letter provides no other justification for need for a citizenship question. *See* PX-32 (AR 1525).

### C.    The Census Bureau's Analysis and Consistent Unanimous Recommendation Against Adding Citizenship as a Subject for the 2020 Census

171.    Upon receiving the DOJ Letter, acting Director Jarmin and the Census Bureau's Chief Scientist,  Dr. Abowd, assembled a team of Census Bureau experts (nicknamed the "SWAT team") to evaluate the request and formulate a response. PX-74 (AR 3354); *see also* PX-22 (AR 1277); PX-102 (AR).

172.    The Administrative Record contains no evidence indicating that anyone at the Census Bureau was aware of the steps taken by the Secretary and his Commerce Department staff to get another federal agency to request the addition of citizenship to the subjects for the 2020 Census, or was informed about those steps before the DOJ Letter was sent on December 12, 2017. Nor is there any evidence in the Administrative Record indicating that any Census Bureau employee was informed by the Secretary or his staff about their direct involvement in

arranging for and developing the DOJ Letter, at any time prior to the Secretary's March 28, 2018 Memorandum announcing the decision.

173.     The Census Bureau therefore had no reason to believe the DOJ request was not legitimate, and so between December 2017 and March 2018, the SWAT team conducted extensive research and statistical analysis to provide the Secretary with the Census Bureau's expert conclusions and recommendation as to how best to meet the DOJ's asserted need for block-level citizenship data. On the basis of this research and analysis, the Census Bureau repeatedly, consistently, and unanimously recommended *against* adding a citizenship question to the 2020 Decennial Census. PX-147 (AR 11634); PX-100 (AR 5473); PX-22 (AR 1277); PX-132 (AR 9812); PX-25 (AR).

174.     In particular, the Census Bureau's expert technical analysis concluded that DOJ's stated goals with respect to VRA enforcement could be accomplished more efficiently and effectively through the use of administrative records rather than adding a citizenship question to the 2020 Census. PX-147 (AR 11634); PX-100 (AR 5473); PX-22 (AR 1277); PX-132 (AR 9812). Moreover, the expert team at the Census Bureau concluded that the addition of a citizenship question to the 2020 Census would objectively harm data quality while imposing greater expense and burden on the public than reliance on administrative records. PX-132 at 5.

### 1.   December 22, 2017 Memo Recommending Reliance on Administrative Records from Available Sources

175.     Led by Dr. Abowd, the Census Bureau SWAT team provided the Secretary with a memorandum dated December 22, 2017 (the "December 22 Memorandum"), analyzing "Alternative Sources of Citizenship Data for the 2020 Census." PX-147 (AR 11634). The December 22 Memorandum identified several sources of administrative records that the Census

Bureau concluded could provide "a more accurate measure of citizenship" in a more "cost efficient" manner than adding a citizenship question to the Decennial Census. *Id.* at 11.

176.    The December 22 Memorandum concluded that adding a citizenship question to the 2020 Decennial Census was likely to decrease self-response rates, particularly in households with noncitizens; increase costs; and produce lower quality citizenship data. *Id.* at 6-12. On the basis of this analysis of data quality, cost, and feasibility, Dr. Abowd advised Dr. Jarmin: "[W]e recommend that the citizenship data for Department of Justice Voting Rights Act enforcement be obtained through the use of administrative records and not through the addition of a question to the decennial census instrument." PX-1130 at 1 (AR 11646).

177.    In light of the December 22 Memorandum, Dr. Jarmin emailed Gary that day to convey the Census Bureau's determination, advising DOJ that "the best way to provide PL94 block-level data with citizen voting population by race and ethnicity would be through utilizing a linked file of administrative and survey data the Census Bureau already possesses." PX-71 (AR 3289). Dr. Jarmin further advised that this method of augmenting currently available ACS data "would result in higher quality data produced at lower cost" than the addition of a citizenship question to the 2020 Census. *Id.* The Census Bureau therefore recommended *against* adding a citizenship question to the 2020 Decennial Census.

### 2.    January 3, 2018 Memorandum Analyzing Specific Alternatives and Reiterating the Census Bureau's Recommendation Against Addition of the Citizenship Question

178.    After December 22, 2017, the Census Bureau experts continued to analyze both the impact of adding a citizenship question to the decennial Census and potential alternative sources of citizenship data in addition to the ACS. In a memorandum dated January 3, 2018 (the January 3 Memorandum") provided to the Secretary, Dr. Abowd elaborated on the research and analysis discussed in the December 22 Memorandum. PX-100 (AR 5473).

179.    The January 3 Memorandum presented three alternatives, designated Alternatives A, B, and C, for meeting the DOJ request. The alternatives were as follows: (A) "[m]aintain the status quo for data collection, preparation and publication"; (B) "[a]dd the citizenship question to the 2020 Census questionnaire"; and (C) do not add a citizenship question to the Decennial Census, and provide DOJ with CVAP data using available administrative records. *Id.*

180.    The January 3 Memorandum recommended adopting Alternative C, on the grounds that using administrative records while *not* adding a citizenship question would provide higher quality citizenship data to DOJ and was less costly to implement. *Id.* at 3. In particular, the Census Bureau estimated that the addition of a citizenship question would cost an additional $27.5 million and cause at least a 5.1 percentage point decline in self-response among noncitizen households, thereby leading to an estimated minimum of "154,000 *fewer* correct enumerations." *Id.* at 2.

181.    On January 4, 2018, Dr. Abowd sent an email regarding the January 3 Memorandum to multiple Census Bureau officials, advising that Dr. Jarmin "reports that he has discussed this with the Under Secretary [Karen Dunn Kelley], *and she agrees with the recommendation of Alternative C.*" PX-121 (AR 9008) (emphasis added). While Dr. Abowd noted that "Alternative A [i.e.*,* no change] remains a possibility as well," he made no mention of Alternative B [i.e., adding a citizenship question]. *Id.* at 1.

### 3.    January 19, 2018 Census Bureau Memorandum to Secretary Ross

182.    A subsequent memorandum (the "January 19 Memorandum") dated January 19, 2018, prepared by Dr. Abowd for Secretary Ross and transmitted to him "through" acting Census Bureau Director Jarmin and Undersecretary Kelley, expanded on the Census Bureau's technical analysis of Alternatives A through C. PX-22 at 1 (AR 1277). The January 19 Memorandum's conclusion was the same as that stated in the January 3 Memorandum, and advised the Secretary

43

that "Alternative C best meets DoJ's stated uses, is comparatively far less costly than Alternative B, does not increase response burden, and does not harm the quality of the census count." *Id.*

183.    Conversely, the addition of a citizenship question to the 2020 Census "is very costly, harms the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources." *Id.* The January 19 Memorandum concluded that, even if block-level CVAP data could be improved through a Census citizenship question, there would be "serious quality issues remaining" and the addition of a citizenship question would cause "[m]ajor potential quality and cost disruptions." *Id.*

184.    The January 19 Memorandum set forth the Census Bureau's conclusion based on technical analysis that a citizenship question on the 2020 Census would decrease self-response rates disproportionately among noncitizen households. *Id.* at 4-5. The Census Bureau concluded that the addition of a citizenship question to the 2020 Decennial Census would cause a 5.1 percentage point decline in self-responses from households containing at least one noncitizen. *Id.* It characterized that estimate as "conservative."  *Id.*

185.    The January 19 Memorandum noted that item nonresponse rates (i.e., nonresponse to a particular question on the questionnaire) for the citizenship question "are much greater than the comparable rates for other demographic variables like sex, birthdate/age, and race/ethnicity." *Id.* Between 2013 and 2016, item nonresponse rates of Hispanics was approximately double that of non-Hispanic whites. *Id.* Similarly, the "breakoff rate" (i.e., the rate at which households stop answering the questionnaire at a particular question) for the ACS citizenship question is far higher for Hispanic respondents (36 percent) than for non-Hispanic whites (4 percent).  *Id.* at 5.

186.    The Census Bureau's technical analysis also revealed that a high percentage of

noncitizens provide erroneous answers to the ACS citizenship question. In particular, "[i]n 2010 and 2016, individuals for whom the administrative data indicate noncitizen respond citizen in 32.7% and 34.7% of the ACS questionnaires, respectively." *Id.* at 8.

187.    Further, the material decline in noncitizen household self-response rate would result in more such households becoming subject to Non-Response Follow Up ("NRFU") procedures, and data obtained in NRFU have greater rates of erroneous enumeration and whole-person imputation. *Id.* at 5-6. Adoption of Alternative C would provide more accurate citizenship data than Alternative B, which would cause harm to the data quality of the Census count.

### 4.    The March 1, 2018 Census Bureau Memo Demonstrating That Alternative C Was Objectively Superior to Alternative D in Terms of Data Quality, Cost, and Respondent Burden

188.    On February 12, 2018, Census Bureau staff met with Secretary Ross to discuss the January 19 Memorandum. PX-127. The February 12 meeting is the only in-person meeting between Secretary Ross and Census Bureau staff concerning the citizenship question that is referenced or reflected in the Administrative Record.

189.    On February 12, 2018, Kobach sent a letter to the Secretary, formally requesting that the Secretary add the citizenship question to the 2020 Census.  PX-1 (AR 1141).

190.    Unlike his earlier requests, *see, e.g.*, PX-19 (AR 763), Kobach now endorsed the VRA enforcement rationale as a reason to add the citizenship question to the 2020 Census, and included a thinly veiled reference to his well-known obsession with voter fraud, PX-1 (AR 1141).

191.    Mr. Kobach also repeated his interest in including the question for congressional apportionment purposes, but he was not explicit about this rationale.  *Id.*  Instead, he vaguely referred to the fact that lawful immigrants "are part of the population of continuous residents in a state, and are not temporarily or illegally present," implying that undocumented immigrants are

not "residents" for purposes of apportionment.  *Id*.[6]

192.    After reviewing and conferring about the January 19 Memorandum, the Secretary directed the Census Bureau to analyze a fourth alternative, referred to in the Administrative Record as "Alternative D," which would "combin[e] Alternative B (asking the citizenship question of every household on the 2020 Census) with Alternative C (do not ask the question, link reliable administrative data on citizenship status instead)." PX-132 at 2 (AR 9812). In other words, under Alternative D, the Census Bureau would *both* add citizenship to the subjects for the 2020 Census *and* utilize data in administrative records to provide DOJ with block-level citizenship data.

193.    After conducting additional technical research and analysis, Dr. Abowd sent an additional recommendation memorandum (the "March 1 Memorandum") dated March 1, 2018, through Jarmin, Kelley, and Lamas to Secretary Ross.  The March 1 Memorandum analyzed "Alternative D" and the weaknesses of Alternative C on its own, at the Secretary's request. PX-25 (AR 1308); PX-132 (AR 9812).

194.    In the March 1 Memorandum, the Census Bureau continued to recommend against the addition of a citizenship question. *Id.* Specifically, the March 1 Memorandum concluded that Alternative D "would result in poorer quality citizenship data than Alternative C" and "[i]t would still have all the negative cost and quality implications of Alternative B" described in the January 19 Memorandum. PX-25 at 5 (AR 1312).

195.    These conclusions were based on the Census Bureau's technical findings that "inclusion of a citizenship question on the 2020 Census Questionnaire is very likely to reduce

---

[6] Kobach, who is a key author of anti-immigrant laws such as Arizona's SB 1070, *see Valle del Sol, Inc. v. Kobach*, No. 14-mc-219-JAR, 2014 WL 3818490, at *1 (D. Kan. Aug. 4, 2014), also feigned concern for discrimination against immigrants.  PX-1 (AR 1141).

self-response rate, pushing more households into Nonresponse Follow-Up (NRFU).  Not only

will this likely lead to more incorrect enumerations, but it is expected to increase the number of

persons who cannot be linked to the administrative data because NRFU PII is lower quality than

self-response data." *Id.* The Census Bureau characterized the quality of any survey data collected

through a citizenship question on the decennial Census as "suspect." *Id.*

196.    The Census Bureau elaborated on the differences between Alternative C and

Alternative D in a further memorandum titled, "Summary of Analysis of the Key Differences

Between Alternative C and Alternative D." PX-24 (AR 1304) This memorandum set forth the

Census Bureau's additional conclusion that, in comparison to Alternative C, Alternative D will

lead to a larger number of people for whom the Census cannot match an administrative record

and whose answers must be produced by a model. PX-24 (AR 1304). Further, the memorandum

explained:

> "Under Alternative C, there will be error in the administrative
> records, but we believe these to be relatively limited dues to the
> procedure following by SSA, USCIS and State. In both
> Alternative, the modeled cases will be subject to prediction error.
> … Alternative D has an additional source or error, response error.
> This is where 2020 respondent give the incorrect status.
> Statisticians often hope these error are random and cancel out.
> However, we know from prior research that citizenship status
> responses are systematically biased for a subset of noncitizens.
> Response error is only an issue in alternative D."

PX-24 at 2 (AR 1305). Because data quality would be better under Alternative C, a higher

number of individuals could be linked to more reliable administrative records than under

Alternative D. *Id.*

197.    The Census Bureau concluded that, under Alternative D, for the group of 22

million people for which the Census Bureau has both a response and administrative records, but

they do not match, the citizenship data will be less accurate than under Alternative C, due to

response errors. PX-24 (AR 1304). For 90.4% of the population, Alternative D will provide no improvement to the citizenship data available under Alternative C. *Id*. Further, for 6.7% of the population, Alternative D will produce lower quality data than Alternative C because the Census Bureau would have to use survey responses that are, generally speaking, less accurate than the imputation methods the Census Bureau would deploy under Alternative C. *Id*. And for the remaining 2.9% of the population, Alternative D creates a problem that does not exist under Alternative C, due to conflict between survey and administrative data as to citizenship. *Id*.

### 5. The Commerce Department Staff's Unauthorized Revision of Census Bureau Responses to Written Questions

198.    In January 2018, Comstock and Uthmeier prepared a set of 35 questions regarding the Census Bureau's analysis and recommendation in the January 19 memorandum. PX-545 (AR 1976). These questions were sent to the Census Bureau on January 30, 2018. PX-573 (AR 12489).

199.    The Census Bureau provided Secretary Ross with its responses to the 35 questions together with the March 1 Memorandum. PX-25 (AR 1308).  The responses to the 35 questions are consistent with and further support the Census Bureau's conclusion that Alternative C would be successful in satisfying DOJ's request. *See id*. at 11-22.

200.    One of the 35 questions, Question 31, focused on the established Census Bureau process for adding questions to the Census questionnaire. *Id.* at 21 (asking, "What was the process that was used in the past to get questions added to the decennial Census or do we have something similar where a precedent was established?").

201.    The Census Bureau's written response to Question 31 described the following "well established process":

> The Census Bureau follows a well-established process when
> adding or changing content on the census or ACS to ensure the

data fulfill legal and regulatory requirements established by Congress. Adding a question or making a change to the Decennial Census or the ACS involves extensive testing, review, and evaluation. This process ensures the change is necessary and will produce quality, useful information for the nation.

The Census Bureau and the Office of Management and Budget (OMB) have laid out a formal process for making content changes.

First, federal agencies evaluate their data needs and propose additions or changes to current questions through OMB.

In order to be included, proposals must demonstrate a clear statutory or regulatory need for data at small geographies or for small populations.

Final proposed questions result from extensive cognitive and field testing to ensure they result in proper data, with an integrity that meets the Census Bureau's high standards.

This process includes several opportunities for public comment.

The final decision is made in consultation with OMB.

*Id.* at 21-22. The procedure described above is consistent with other Census Bureau documents addressing the same subject. *See, e.g.*, PX-699 (AR 3890), PX-3 (AR 3560), PX-4 (AR 9867); PX-140 at 7.

202.    However, the Census Bureau's original response to Question 31 quoted above was not included in the Administrative Record initially produced by Defendants in the New York Case, and did not come to light until Defendants were ordered by the New York court to supplement and complete the Administrative Record.

203.    Defendants' initial, incomplete production of the Administrative Record included only a *different* version of the 35 question responses containing a far shorter response to question 31 with multiple typographical errors, as follows:

Because no new questions have been added to the Decennial Census (for nearly 20 years), the Census Bureau did not feed [*sic*] bound by past precedent when considering the Department of

49

> Justices' [*sic*] request. Rather, the Census Bureau is working with
> all relevant stakeholders to ensure that legal and regulatory
> requirements are filled and that questions will produce quality,
> useful information for the nation. As you are aware, that process is
> ongoing at your direction.

PX-1 (AR 1296).

204.    There is no evidence in the Administrative Record indicating that anyone at the

Census Bureau approved or even saw this heavily altered version of the question 31 response.[7]

### 6.  DOJ's Refusal to Meet With the Census Bureau to Discuss DOJ's Request

205.    In his December 22, 2017 email to Gary, Dr. Jarmin suggested a "meeting of

Census and DOJ technical experts to discuss the details of this proposal." PX-109 (AR 6659).

206.    On January 2, 2018, Dr. Jarmin emailed Gary at DOJ about setting up a meeting

between the Census Bureau and DOJ technical experts. PX-101 (AR 5489).

207.    On January 9, 2018, Dr. Jarmin again emailed Gary at DOJ about a meeting

between the Census Bureau and DOJ technical experts. PX-108 (AR 6629).

208.    Mr. Gary finally agreed to meet. Dr. Jarmin noted that he would bring "technical,

program and legal folks." PX-101. He requested that Gary bring "technical folks from the DOJ

side." *Id.*

209.    A meeting was scheduled for January 19, 2018, but it was cancelled by Gary three

days before it was supposed to happen. PX-124 (AR 9193).

210.    Nearly one month later, and fast approaching the deadline for reporting the

planned 2020 Decennial Census questions, on February 16, 2018, Dr. Jarmin wrote to

---

[7] There is evidence that Christa Jones at the Census Bureau said she was "fine" with an interim iteration of the response that was drafted by Mike Walsh and Sahra Park-Su, *see* PX-14 (AR 13023), but the response included in the original administrative record was revised further with no apparent Census Bureau input.

Department of Commerce and Census Bureau personnel that Gary informed him that "DOJ leadership" did not want DOJ and Census Bureau personnel to meet. PX-101 (AR 5489).

211.    The Administrative Record contains no evidence that, prior to Secretary Ross's March 26, 2018 memorandum, DOJ met with Census Bureau or Commerce Department personnel to discuss DOJ's need for citizenship data.

212.    The Administrative Record contains no evidence that, prior to Secretary Ross's March 26, 2018 memorandum, that the Census Bureau or Commerce Department had any substantive communications with DOJ to discuss DOJ's request other than Dr. Jarmin's December 22, 2017 email to Gary, an email with which Gary did not substantively engage. PX-109 (AR 6659).

> **D.   Despite the Census Bureau's Unanimous and Repeated Recommendation Not to Add a Citizenship Question, Secretary Ross's March 26, 2018 Memorandum Announced the Addition of a Citizenship Question to the 2020 Decennial Census**

213.    On March 26, 2018 Secretary Ross announced the decision to add a citizenship question to the 2020 Decennial Census in a memorandum to Undersecretary Kelley ("Ross Memo"). PX-26 (AR 1313).

214.    Specifically, Secretary Ross determined that Alternative D, which Secretary Ross referred to as "Option D," would "provide DOJ with the most complete and accurate CVAP data in response to its request." *Id.* at 5.

215.    The addition of a citizenship question to the 2020 Decennial Census was contrary to the Census Bureau's consistent and well-supported recommendation against adding a citizenship question.

216.    The Ross Memo stated that "following the receipt of the DOJ request" Secretary Ross "set out to take a hard look at the request" to ensure that he "considered all facts and data

relevant" after a "thorough assessment that included legal, program, and policy considerations." *Id.* at 1.

217.    As described in further detail below, the Ross Memo is replete with factual errors, and ignored or mischaracterized the evidence in the Administrative Record—particularly key findings by the Census Bureau regarding the consequences of adding a citizenship question and the benefits of providing DOJ citizenship data through administrative records.

### 1.  Objectively False Assertions

218.    The Ross Memo states that "[f]ollowing receipt" of the DOJ's letter on December 12, 2017, he "set out to take a hard look at the request and ensure that [he] considered all facts and data relevant to the question so that [he] could make an informed decision on how to respond." PX-26 at 1 (AR 1313).

      a.  The Ross Memo misrepresents the genesis of the request for a citizenship question. As reflected in the Administrative Record: the Secretary himself began considering the addition of a citizenship question to the 2020 Census soon after being confirmed in February 2017, PX-2 (AR 1321); PX-30 (AR 1410); the Secretary spoke with senior administration and Trump transition team officials, including Steve Bannon and Kris Kobach about the addition of the question, PX-2 (AR 1321); PX-19 (AR 763), PX-30 (AR 1410); PX-58 (AR 2561); PX-188 (COM_DIS00018615) (AR); the Secretary expressed frustration about why nothing had been done on his "months-old request" to add a citizenship question in May 2017, PX-88 (AR 3710); the Secretary's staff indicated they would "get [the citizenship question] in place, *id*.; the Secretary's staff reached out to the Department of Homeland Security and DOJ to ask them to request the citizenship question, and were rebuffed by both agencies, PX-51 (AR 2462); PX-84 (AR

3701); PX-537 (AR 12756); by August and September 2017, the Secretary and

his staff were already planning to move forward with the question, including

discussing the future need to assemble an administrative record, PX-50 (AR

2461); PX-52 (AR 2482); PX-146 (AR 11362); PX-148(R)(AR 12464); PX-523

(AR); PX-607 (AR); after the Secretary personally spoke with the Attorney

General, DOJ finally agreed to submit the letter request, PX-57 (AR); PX-62 (AR

12476); PX-97 (AR 4004). *See also* Part II.A, II.B, *supra*.

219.    The Ross Memo states that DOJ needed to obtain CVAP block level data from

decennial census data because "current data collected under the ACS are insufficient in scope,

detail, and certainty to meet its purpose." PX-26 at 1 (AR 1313). Secretary Ross further states

that the DOJ's "need for accurate citizenship data and the limited burden that the reinstatement

of the citizenship question would impose outweigh fears about a potentially lower response rate."

*Id.* at 5.

a.    Nothing in the DOJ Letter or in the Administrative Record provides evidence that

the DOJ had lost any cases or has been unable to bring any case because of the

lack of block-level CVAP data. *See* PX-32 (AR 1525); *see also* PX-1 to PX-14

(AR 1-13024)

b.    As described above, DOJ refused to meet with the Census Bureau to discuss

DOJ's request. Moreover, DOJ and the Census Bureau had no substantive

conversations about DOJ's request prior to the issuance of the Ross

Memorandum.

c.    In the absence of a meeting or substantive communications, there is no evidence

in the Administrative Record, and thus no evidence that was before Secretary

Ross, other than the DOJ letter itself, that describes the importance of block-level CVAP data for VRA enforcement.

d. Thus, there is nothing in the Administrative Record that suggests block-level CVAP data, let alone block-level CVAP data obtained from a citizenship question on the Decennial Census, is *necessary* for DOJ's VRA enforcement efforts.

220. The Ross Memo repeatedly states the Census Bureau and concerned stakeholders could not "document that the response rate would in fact decline materially" because of the citizenship question. PX-26 at 3 (AR 1315); *see also id.* at 4 ("[T]he Census Bureau's analysis did not provide definitive, empirical support" for the belief that "adding a citizenship question could reduce response rates"); *id.* at 5 ("[L]imited empirical evidence exists about whether adding a citizenship question would decrease response rates materially"); *id.* ("[N]o one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did."); *id.* ("[T]here is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination."); *id.* at 6 (referring to statement by "a former Census Bureau Director" that, "even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion").

a. The evidence in the Administrative Record uniformly indicates that the addition of a citizenship question will materially depress response rates among certain subpopulations, including households containing at least one noncitizen.

b.  The Census Bureau's technical analyses compared "the self-response rates for the same household address" on the 2010 Census and the 2010 ACS, and found that for the same universe of housing units, self response to the ACS was lower than it was to the Decennial Census. PX-22 at 4-5 (AR 1280-81); PX-102 at 6-7 (AR 5505-06). This demonstrates that even after controlling for differences between households, households were more likely to respond to the decennial census (a survey without a citizenship question) than the 2010 ACS (a survey with a citizenship question).

c.  The Census Bureau concluded that the differential decline in self-response was likely attributable *to the citizenship question*. PX-22 at 5 (AR 1281) ("[T]he only difference between citizen and noncitizen households in our studies was the presence of at least one noncitizen in noncitizen households. It is therefore a reasonable inference that a question on citizenship would lead to some decline in overall self-response because it would make the 2020 Census modestly more burdensome in the direct sense, and potentially much more burdensome in the indirect sense that it would lead to a larger decline in self-response for noncitizen households."); PX-25 at 4 (AR 1311) ("inclusion of a citizenship question on the 2020 Census questionnaire is very likely to reduce the self-response rate . . . ."); PX-100 at 2 (AR 5474) ("Our analysis of 2010 response data for both the American Community Survey and the Short-Form Census indicates that the presence of a question on citizenship suppressed response by 5.1 percentage points for these households.").

d.  The Census Bureau concluded that for households with at least one noncitizens, the magnitude of the differential decline in self-response rates would be at least 5.1 percentage points. *See, e.g.*, PX-102 at 6-7 (AR 5505-06); PX-100 (AR 5473); PX-22 at 4-5 (AR 1280-81); PX-25 at 4 (AR 1311). In fact, the Census Bureau consistently warned Secretary Ross that this estimate was conservative, and that the magnitude of the effect on self-response rates would likely be much greater. PX-100 at 2 (AR 5474) (" We also believe that the decrease in response for these households in 2020 could be greater than the 5.1 percentage points we observed during the 2010 Census"); PX-22 at 6 (AR 1282) ("Hence, the decrease in self-response for citizen households in 2020 could be much greater than the 5.1 percentage points we observed during the 2010 Census.").

e.  There is nothing in the Administrative Record that contradicts the Census Bureau's conclusions.

221.  The Ross Memo refers to discussions with an executive at the Nielsen survey agency, during which the executive indicated that Nielsen had added certain sensitive questions to short survey forms "without any appreciable decrease in response rates." PX-26 at 3 (AR 1315); *see also id.* at 6 (describing "empirical evidence" from Nielsen).

a.  The Administrative Record does not contain any of the "empirical evidence" obtained from Nielsen that is referenced in the Ross Memo. *See* PX-1 to PX-14 (AR 1-13024)..

b.  The only evidence in the Administrative Record of Secretary Ross's interactions with Nielsen—notes from a call between Secretary Ross and Christine Pierce, the Nielsen executive—contradict the Ross Memo's characterization of the

"evidence" provided by Nielsen. These notes actually indicate that "Ms. Pierce stated that her biggest concerns [sic] was that the reinstatement of a citizenship question could lead to a lower response rate . . . ." and that Pierce "noted the importance of testing questions." PX-1 (AR 1276).

222.    The Ross Memo indicates that Secretary Ross rejected Alternative C because "more than 10 percent of the American population . . . would need to have their citizenship imputed" because they could not be matched to administrative records. PX-26 at 4 (AR 1316). The Ross Memo indicates that Alternative D was selected because it could "eliminate the need for the Census Bureau to have to impute an answer for millions of people." *Id*. at 5.

a.    There is nothing in the Administrative Record to support the Secretary's conclusion that asking a citizenship question will yield better citizenship data than imputing citizenship status for those without administrative records. *See* PX-1 to PX-14 (AR 1-13024).

b.    The Administrative Record, including the Ross Memo, reflect that there is a significant rate of possibly inaccurate responses to the citizenship question. *See, e.g.*, PX-26 at 6 (AR 1318) (noting that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are noncitizens were inaccurate); *see also* PX-22 at 7-8 (AR 1283-84); PX-25 at 1 (AR 1308).

c.    The Census Bureau concluded that the high rate of inaccurate responses to the citizenship question "calls into question [the Bureau's] ability to improve upon" imputation of citizenship status under Alternative C and suggests that "survey-

collected citizenship data may not be reliable for many of the people falling in the gaps in administrative data." PX-25 at 4 (AR 1311).

    d.   The Census Bureau expects that, under Alternative D, it will still need to impute citizenships status for 13.8 million people. PX-24 at 4 (AR 1307).

    e.   The Census Bureau expects that under Alternative D, 22.2 million people who lack administrative data (and would have had their citizenship status imputed under Alternative C) will provide a response to the citizenship question. *Id*. However, the Census Bureau expects that many of these responses will be incorrect, *Id*, although it has no way of verifying or rejecting these survey responses, PX-25 at 4 (AR 1311).

    f.   There is no evidence in the Administrative Record that contradicts the Census Bureau's conclusions.

223.    The Ross Memo states that he selected Alternative D because it "would maximize the Census Bureau's ability to match the decennial census responses with administrative records." PX-26 at 4 (AR 1316).

    a.   This assertion is directly contradicted by the Census Bureau's analysis.

    b.   The Census Bureau found that because the introduction of a citizenship question under Alternative D would reduce the number of individuals who self-respond and would push more people into NRFU, it would "increase the number of persons who *cannot* be linked to the administrative data because the NRFU PII is lower quality than the self-response data." PX-25 at 4 (AR 1311) (emphasis added). Thus, the Bureau concluded that "not only are citizenship survey data of suspect quality for persons in the gaps for Alternative C, collecting these survey

data would reduce the quality of the administrative records when used in
Alternative D *by lowering the record linkage rate for persons with administrative
citizenship data*." *Id.* at 5 (emphasis added).

    c.   The Census Bureau concluded that, under Alternative C, 35.5 million people
would not be linked to administrative citizenship data. PX-24 at 3 (AR 1036).
Under Alternative D, the number of people who cannot be linked to
administrative records is 36 million. *Id.* at 4.

    d.   There is no evidence in the Administrative Record contradicting the Census
Bureau's conclusion.

224.    The Ross Memo states that the addition of a citizenship question imposes no
additional burden on citizens and there is "limited empirical evidence to support" the view that
"recipients are generally less likely to respond to a survey that contained more questions than
one that contained fewer." PX-26 at 6 (AR 1318); *see also id.* at 4 (citizenship question would be
"no additional imposition" for citizens and for the 70% of noncitizens who respond to the ACS
citizenship question accurately); *see also id.* at 6 (stating that that the reinstatement of the
citizenship question would impose a "limited burden")

    a.   To the contrary, the Census Bureau concluded "that a question on citizenship
would lead to some decline in overall self-response because it would make the
2020 Census modestly more burdensome in the direct sense, and potentially
much more burdensome in the indirect sense that it would lead to a larger decline
in self-response for noncitizen households." PX-22 at 5 (AR 1281).

b.  The Ross Memo itself acknowledges that the number of questions can impose an additional burden and reduce the likelihood of response. *See, e.g.*, PX-26 at 3-4 (AR 1315-16).

225.  The Ross Memo rejected stakeholders' views that ACS data were adequate for VRA enforcement because of the high rate of potentially inaccurate responses to the ACS citizenship question. PX-26 at 6 (AR 1318).

a.  Neither the Ross Memo, nor any other document in the Administrative Record, suggest that responses to the same citizenship question will be more accurate if the question is placed on the decennial census. *See* PX-1 to PX-14 (AR 1-13024).

b.  In fact, the Census Bureau expects that there will be significant inaccuracies in responses to the citizenship question if it is included on the 2020 Census Questionnaire. *See, e.g.*, PX-22 at 2 (AR 1278) (noting a shortcoming of Alternative B is that "[c]itizenship status is misreported at a high rate"); PX-24 at 2 (AR 1305) (noting that Alternative D introduces "an additional source of error . . . where 2020 respondent[s] give the incorrect status' and that these responses "are systematically biased for a subset of noncitizens."); PX-25 at 4 (AR 1311) (noting that certain groups of people would have a strong incentive to provide an incorrect response to a 2020 census question on citizenship).

226.  The Ross Memo repeatedly states that Alternative D will generate more "complete and accurate" "CVAP" data than Alternative C.

a.  This assertion is directly contradicted by the Census Bureau's analyses.

b.  The Census Bureau expects that the addition of a citizenship question under Alternative D would make no difference to the Census Bureau's ability to obtain

citizenship information about 298.4 million people (approximately 90% of the population), either because they do not respond to the citizenship question, or because their responses will agree with already existing administrative records. PX-24 at 4 (AR 1307)..

c.  For another 9.5 million people, the Bureau expects to get a response to the citizenship question that is inconsistent with the person's administrative record citizenship status. *Id*. For these individuals, the Bureau's historical practice has been to accept the self-reported data, even though the Bureau acknowledges that the administrative record citizenship status is more likely to be correct, especially for noncitizens. PX-24 at 2 (AR 1305); PX-25 at 4 (AR 1311). Under Alternative C, the administrative records for these individuals would be used for purposes of attributing citizenship status, thus generating more accurate data. *Id*.

d.  Finally, the Census Bureau expects that, under Alternative D, 22.2 million people will not be linked to administrative records but will provide a response to the citizenship question. PX-24 at 4 (AR 1307). In the absence of a citizenship question, some of these households could have been linked to administrative records. *See* PX-25 at 4-5 (AR 1311-12) (noting that addition of a citizenship question creates data quality issues and reduces administrative record linkage rates). For these households, the Census Bureau will accept the reported citizenship status, despite expecting "some quality issues with these responses." PX-24 at 4 (AR 1307). Under Alternative C, the Census Bureau would have imputed the citizenship status for these households using administrative records, a process it believes would likely be more accurate. *See* PX-25 at 4 (AR 1311)

61

(noting that inaccuracy of survey responses "calls into question" ability to improve upon imputation under Alternative C and "suggests that survey-collected citizenship data may not be reliable").

e.  In short, the Census Bureau found that Alternative D will generate less accurate citizenship data because (1) in light of the high rate of inaccurate responses, "citizenship survey data is of suspect quality" for noncitizens; and (2) the introduction of a citizenship question and its effects on response rates will reduce the Bureau's ability to link households to administrative data on citizenship. PX-25 at 5 (AR 1312); *see also* PX-24 at 2 (AR 1305) (noting that Alternative D introduces response error, particularly among noncitizens). As such, the Bureau concluded that "Alternative D would result in poorer quality citizenship data than Alternative C" and "would still have all the negative cost and quality implications of Alternative B." PX-25 at 5 (AR 1312); *see also* PX-22 at 9 (AR 1285) ("[T]he administrative records citizenship data would most likely have both more accurate citizen status and fewer missing individuals than would be the case for any survey-based collection method."); PX-23 at 8 (AR 1293) ("Q: Is suing sample data and administrative records sufficient for DOJ's request? A: The 2020 Census data combined with Alternative C are sufficient to meet DoJ's request. We do not anticipate using any ACS data under Alternative C."); PX-24 (AR 1304); PX-25 at 5 (AR 1312) ("Alternative D would result in poorer quality citizenship data than Alternative C."); PX-132 (AR 9812); PX-100 at 3 (AR 5475) ("Alternative C delivers higher quality data than Alternative B for DoJ's stated uses.")

f.   There is no evidence in the Administrative Record contradicting the Bureau's conclusion.

227.   The Ross Memo asserts that the "value" of generating the requested data for DOJ is of "greater importance" than any adverse effects on the Census. PX-26 at 7 (AR 1319).

a.   Under the Census Bureau's well-established process for adding decennial census questions, the agency must ensure that a requesting agency's proposal to add a question "demonstrates a clear statutory or regulatory need for data at small geographies or for small populations." PX-140 at 7 (AR 10901)

b.   There is nothing in the Administrative Record reflecting an assessment by Secretary Ross or any other Defendant of the "value" or "importance" of the DOJ's request.

c.   The DOJ Letter does not claim that the introduction of a citizenship question is necessary for VRA enforcement.

d.   The Administrative Record undermines the assertion that the requested data was of great importance to DOJ. It shows that the Commerce Department originally approached DOJ to request the question, PX-2 (AR 1321); PX-51 (AR 2462); PX-84 (AR 3701); PX-537 (AR 12756); DOJ initially refused to request the question, PX-537 (AR 12756); DOJ ultimately requested it only after the Attorney General personally spoke with Secretary Ross, PX-57 (AR 2528); PX-62 (AR 2637); PX-97 (AR 4004) ; DOJ refused to meet with the Census Bureau to discuss the request, PX-101 (AR 5489); PX-109 (AR 6659).

228.   The Ross Memo states that, to minimize any effects on response rates, the citizenship question is to be placed "last on the decennial census form." PX-26 at 8 (AR 1320).

229.    There is no evidence in the Administrative Record reflecting an assessment or testing of how the placement of the question will affect response rates.

## 2. Failure to Consider Other Relevant Factors

230.    Neither the Ross Memo nor the Administrative Record contain any discussion of the Census Bureau's disclosure avoidance procedures, or any assessment of whether the margins of error introduced by those procedures would yield block-level citizenship data that is any more accurate than the currently available ACS data. *See* Part IV.F, *infra*.

231.    The Ross Memo does not contain any discussion of the Census Bureau's Integrated Partnership and Communication Plan, NRFU operations, or count imputation process, or the ability of these operations to eliminate the decline in self response brought about by the citizenship question. *See* PX-26 (AR 1313)..

232.    The Ross Memo does not discuss the Secretary's legal obligation, under 13 U.S.C. § 6(c), "to the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required" to acquire and use information available from other governmental entities instead of conducting direct inquiries. Nor is there any other evidence in the Administrative Record indicating that Defendants considered the Secretary's obligations under § 6(c).

233.    The Ross memo does not note or otherwise discuss the Census Bureau's failure to identify citizenship as a topic on the March 31, 2017 notification to Congress pursuant to 13 U.S.C. § 141(f)(1).

234.    The Ross Memo does not discuss whether Secretary Ross made any findings of "new circumstances" which "necessitate" the addition of the citizenship question subsequent to March 2017, as required under 13 U.S.C. § 141(f)(3).

235.    There is evidence in the Administrative Record or discussed in the Ross Memo

that DOJ's asserted need for block-level CVAP data constituted a "new circumstance" arising after the March 31, 2017 subject disclosure deadline. PX-1 to PX-14 (AR 1-13024), PX-26 (AR 1313).

### 3. The Absence of Empirical Evidence in the Administrative Record Disputing the Census Bureau's Technical Analysis and Conclusions

236.    The Administrative Record is devoid of any credible expert analysis or technical research disputing the Census Bureau's analysis or conclusions with regard to, *inter alia*, the deleterious impact of a decennial Census citizenship question on Census data quality or the objective superiority of Alternative C to Alternatives B and D. Indeed, the Administrative Record contains no documented quantitative or empirical evidence or research evaluating the likely effects of a citizenship question on the quality of the 2020 Census enumeration other than that conducted by the Census Bureau in December 2017 and thereafter.

237.    In early 2018, Secretary Ross conferred with multiple outside stakeholders and received numerous written submissions regarding the citizenship question. *See See e.g.*, PX-1112 (AR 787) – 1129 (AR 3608).  However, the evidence in the Administrative Record shows that nearly all of the stakeholders who provided an opinion on the citizenship question to Secretary Ross opposed the addition of the citizenship as a subject for the 2020 Census. These stakeholders overwhelmingly reinforced the Census Bureau's recommendation against the addition. *See*, *e.g.*, PX-1 (AR 780) (letter from Senators Feinstein, Carper, Schatz, Cortez Masto, and Harris); PX-1 (AR 778) (letter from Arturo Vargas of NALEO Educational Fund); PX-1 (AR 787) (letter from American Sociological Association); PX-1 (AR 794) (letter from Census Scientific Advisory Committee ("CSAC"); PX-1 (AR 840) (letter from numerous Members of Congress); PX-1 (AR 1053) (letter from the Population Association of America); PX-1 (AR 1150) (letter from MinKwon on behalf of Asian Pacific Americans Voting & Organizing to Increase Civic

Engagement); PX-1 (AR 1222) (letter from the Latino Community Foundation); PX-116 (AR 8555) (letter from six former Census Bureau directors); PX-1116 (AR 798) (letter from the Leadership Conference on Civil and Human Rights); PX-1123 (AR 1122) (letter from various Jewish organizations); PX-1128 (AR 3605) (letter from the Constitutional Accountability Center on behalf of Asian Americans Advancing Justice, NAACP Legal Defense and Education Fund, and other organizations).Moreover, even the small number of stakeholder communications in the AR submitted in support of the citizenship question did not provide any empirical evidence or analysis challenging the Census Bureau's expert finding as to the negative consequences of adding a citizenship question to the 2020 Census questionnaire. *See, e.g.*, PX-1 (AR1079, 1129, 1161).

238.    The Administrative Record reflects that acting Director Jarmin attempted to identify stakeholders who would speak in favor of adding a citizenship question and had trouble finding any supporters. On February 13, 2018, Dr. Jarmin wrote to Michael Strain at the American Enterprise Institute (AEI) asking if someone would "speak to the pros" of adding a citizenship question because "[m]ost stakeholders will speak against the proposal." PX-70 at 2 (AR 3275). Strain declined, responding that "[n]one of my colleagues at AEI would speak favorably about the proposal." *Id.*

239.    Dr. Jarmin ultimately reported that the Census Bureau was only able to find two organizations, the Center for Immigration Studies and the Heritage Foundation, that supported the addition of the citizenship question. PX-1 (AR 1206, AR 1261); PX-4 (AR 4849), PX-113 (AR 8325). However, neither of these organizations submitted any empirical data or technical research addressing the likely impact of the addition on Census data quality or the feasibility of

meeting the request in the DOJ Letter using administrative records rather than by altering the Census questionnaire. *See id.*

### E. Administrative Record Evidence Demonstrating Defendants' Failure to Follow Binding Agency Standards

240.    The Census Bureau is a principal statistical agency within the federal statistical system. 79 Fed. Reg. 71,610, at 71,610.

241.    As a statistical agency, the Census Bureau is subject to the standards and directives of the Office of Management and Budget ("OMB") under the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501-21; 5 C.F.R. § 1320.18(c).

242.    The Census Bureau has also published its own Statistical Quality Standards, which the Bureau follows in conducting surveys. PX-260 at 5.

#### 1. The Administrative Record Demonstrates that Defendants Failed to Pre-Test the Citizenship Question as Required by OMB Directives and the Census Bureau's Statistical Quality Standards

243.    The Census Bureau is obligated to pre-test questions and questionnaires prior to administering them.

244.    One source of this obligation is OMB's Statistical Policy Directive No. 2, entitled "Standards and Guidelines for Statistical Surveys," which requires the Census Bureau, *inter alia*, to pretest the survey components, if they have not been successfully used before, to "ensure that all components of a survey function as intended when implemented *in the full-scale survey*" and that "measurement error is controlled." Office of Mgmt. and Budget, Statistical Policy Directive No. 2, *Standards and Guidelines for Statistical Surveys* at §§ 1.3, 1.4, 2.3 (2006) (PX-359); *see also* 71 Fed. Reg. 55,522 (Sept. 22, 2006) (emphasis added).

245.    The Census Bureau's Statistical Quality Standards, which implement the OMB's Statistical Policy Directives, PX-260 at 5, similarly require that "[d]ata collection instruments

and supporting materials must be pretested with respondents to identify problems (*e.g.*, problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on pretesting results." *Id.* at 18.

246.    The Statistical Quality Standards also require pretesting to be performed when "Review by cognitive experts reveals that adding pretested questions to an existing instrument may cause potential context effects" and "An existing data collection instrument has substantive modifications (e.g., existing questions are revised or new questions added)." *Id.*

247.    These Standards require this pretesting unless the Census Bureau obtains a waiver or uses a question that has "performed adequately in another survey." *Id.*.

248.    While the Ross Memo states that the citizenship question has been "well tested," PX-26 at 2 (AR 1314), there is no evidence in the Administrative Record that the citizenship question underwent any testing required by the Census Bureau's Statistical Quality Standards. There is also no evidence analyzing the type of testing the citizenship question may have undergone before it was added to the ACS.

249.    The Administrative Record contains no evidence that Defendants obtained a waiver of the applicable Census Bureau Statistical Quality Standards for adding a question.

250.    The Administrative Record does contain evidence that the citizenship question does not perform adequately on the ACS. As the Census Bureau reported to Secretary Ross, and as the Ross Memo itself acknowledges, approximately a third of respondents identified as noncitizens by administrative records reported themselves as citizens on the 2016 ACS. PX-22 at 8 (AR 1284); PX-26 at 6. In light of this finding, the Census Bureau concluded that data on citizenship obtained from the citizenship question was of "suspect quality" and "may not be reliable," particularly for noncitizens. PX-25 at 4-5 (AR 1311-12).

**2. The Administrative Record Demonstrates that Defendants Violated Their Binding Obligation of Maximizing Response Rates While Minimizing Respondent Burden and Cost**

251.    OMB's Statistical Policy Directive No. 2 requires the Census Bureau, *inter alia*, to (i) design its surveys "to achieve the highest practical rates of response, commensurate with the importance of survey uses"; and (ii) administer the survey in a way that "maximiz[es] data quality" while "minimizing respondent burden and cost." Office of Mgmt. and Budget, Statistical Policy Directive No. 2, Standards 1.3, 2.3 (PX-359).

252.    13 U.S.C. § 6(c) requires the Secretary to acquire and use pre-existing records from other government agencies "to the maximum extent possible" section instead of conducting direct inquiries in the Census.

253.    The Ross Memo does not discuss the OMB's Statistical Policy Directive No. 2 or the Secretary's obligation under 13 U.S.C. § 6(c) to use pre-existing administrative records to the maximum extent possible.

254.    The Administrative Record contains evidence that the addition of a citizenship question is not consistent with the obligation under Statistical Policy Directive No. 2 to ensure the "highest practical rates of response," while taking into account "respondent burden" and "data collection costs." OMB Statistical Policy Directive 2 at Standard 1.3, 2.3 The Administrative Record evidence uniformly demonstrates that the citizenship question will lower response rates, increase respondent burden, and impose additional costs on the administration of the 2020 Census. PX-22 (AR); PX-25 (AR).

255.    The Administrative Record further demonstrates that the Secretary's decision to add a citizenship question is inconsistent with his obligations under 13 U.S.C. § 6. The evidence uniformly establishes that pre-existing administrative records regarding citizenship exist and

69

provide better-quality data than a direct citizenship inquiry on the 2020 Census form. PX-22

(AR); PX-25(AR).

### 3. The Administrative Record Demonstrates that Defendants Violated the Binding Obligation to Avoid Political Influence in Conducting Statistical Activities

256.    OMB's Statistical Policy Directive No. 1 requires the Census Bureau to "apply

sound statistical methods to ensure statistical products are accurate," and to "produce data that

are impartial, clear, and complete and are readily perceived as such by the public." Office of

Mgmt. and Budge, Statistical Policy Directive No. 1., *Fundamental Responsibilities of Federal

Statistical Agencies and Recognized Statistical Units*, 79 Fed. Reg. 71,610, 71,615 (Dec. 2,

2014); PX-354 at 7. To guarantee such impartiality, statistical agencies including the Census

Bureau "must function in an environment that is clearly separate and autonomous from the other

administrative, regulatory, law enforcement, or policy-making activities within their respective

Departments" and "must be able to conduct statistical activities autonomously when determining

what information to collect and process." *Id.*; *see also id.* (citing PX-355 at 72, National

Research Council of the National Academy of Sciences, *Principles and Practices for a Federal

Statistical Agency*, Principle 4 ("A Federal statistical agency must be independent from political

and other undue external influence in developing, producing, and disseminating statistics."))

257.    The Administrative Record evidence demonstrates that the decision to add a

citizenship question was not an autonomous and impartial statistical decision, but rather was the

product of inappropriate political influence. *See* Part II.F, *infra*.

### 4. The Administrative Record Demonstrates that Defendants' Failed to Follow the Census Bureau's Established Process for Adding Content

258.    The Administrative Record demonstrates that the Census Bureau has a well-

established process for adding or modifying questions to the Decennial Census based on requests

from Congress or other agencies. PX-134 (AR 9865); PX-140 (AR 10895); PX-3 (AR 3560); PX-4 (AR 3890-91, 9867); PX-271.

259.    One step in this process requires that the requesting agency's proposal "demonstrate a clear statutory or regulatory need for data at small geographies or for small populations." PX-140 at 7 (AR 10895).

260.    A second step requires that a question undergo "extensive cognitive and field testing to ensure [the question] result[s] in the proper data, with an integrity that meets the Census Bureau's high standards." *Id.*; *see also* PX-134 at 7 (AR 9865); PX-3 (AR 3560); PX-4 (AR 2304, AR 3890, AR 9867); PX-271.

261.    Finally, the well-established process also requires that the decision to add a question be made in consultation with OMB and with "several opportunities for public comment." PX-140 at 7 (AR 10901); PX-134 at 7 (AR 9865).

262.    There is no evidence in the Administrative Record that the SecretaryEven the evaluated the "clear need" for the data or concluded such data collection was necessary before deciding to add a citizenship question to the 2020 Decennial Census. PX-140 at 7 (AR 10901). Indeed, the Administrative Record reveals that DOJ refused to meet with the Census Bureau to discuss the DOJ's need for the data and the Census Bureau's proposal to obtain it through administrative records. PX-101 (AR 5489); PX-109 (AR 6659).

263.    There is no evidence in the Administrative Record that the citizenship question underwent the cognitive or field testing required by the Census Bureau's well-established process.

264.    There is no evidence in the Administrative Record that Defendants discussed testing the citizenship question or the Census Bureau's concerns about the citizenship question

with the Census Bureau advisory committees, OMB, or any outside researchers.

265.    The Administrative Record contains no evidence that the Census Bureau or Department of Commerce published the citizenship question in the Federal Register for public notice and comment before Secretary Ross made the announcement that the question would be added to the Census.

### F.  Administrative Record Evidence of Pretext and Improper Purpose

266.    Even without considering the *extra*-record evidence of pretext and improper purpose by the Secretary, the Administrative Record alone establishes that the request in the DOJ Letter was pretextual, because it did not reflect the actual basis for the decision, first publicly announced in the March 26 Memorandum, to add citizenship to the subjects for the 2020 Census.

267.    The overwhelming evidence in the Administrative Record demonstrates that the decision to add a citizenship question was made well before Secretary Ross petitioned DOJ to request the addition of the question. *See* Part II.A, *supra*.

268.    The addition of a citizenship question was not motivated in any part by a desire to enhance enforcement of Section 2 of the VRA.

269.    There is substantial evidence in the Administrative Record that shows Secretary Ross was interested in adding a citizenship question for the purpose of diluting the political power of noncitizens and Hispanics by excluding them from the population count for congressional apportionment. *See* Part II.A, *supra*.

270.    For example, Secretary Ross admits that he discussed a citizenship question with "senior administration officials" before he became Secretary of Commerce; Steve Bannon, the Chief Strategist and Senior Counselor to the President, then asked him to speak with Kris Kobach, who wanted a citizenship question on the census to exclude noncitizens from the apportionment count; on May 24, 2017, following Secretary Ross's meeting with David Langdon

72

regarding the citizenship question, Langdon exchanged emails with the Census Bureau and received from them a 1988 DOJ memo about excluding "illegal immigrants" from the census count, and; by August of 2017, when Ross's staff was preparing "a memo and full briefing…on a citizenship question" (which was not disclosed in the Administrative Record), Commerce Department legal counsel emailed that their "hook" was that the Department "do[es] not make decisions on how the [citizenship] data will be used for apportionment…." PX-607. This evidence demonstrates the true motive behind adding the question. Conversely, there is no evidence in the Administrative Record suggesting that Secretary Ross acted alone, let alone that he was motivated by VRA enforcement.

271.    Moreover, when Comstock set out to find a way to justify adding a citizenship question in 2017, he did no turn to people who were responsible for VRA enforcement. Rather, he contacted James McHenry, the head of DOJ's Executive Office of Immigration Review, and Gene Hamilton at the Department of Homeland Security. PX-537 (AR 12756)..

272.    As discussed above, the Administrative Record contains no evidence indicating that Secretary Ross or anyone else in the administration assessed DOJ's true need for block-level citizenship data beyond the brief explanation included in the DOJ's December 12, 2017 letter.

273.    Prior to the March 26, 2018 announcement, the Secretary was aware that President Trump wanted to add the citizenship question to the Decennial Census. Senior DOC officials, including Comstock, ensured that the Secretary would be  prepared to answer questions on news media reports of the President's position when he testified before Congress in March, 2018. PX-78 (AR 3597).

274.    In fact, on March 19, 2018, Chase Gunter from Federal Computer Week asked Kevin Manning, who works in the Department of Commerce's Public Affairs office, whether

Commerce had any response to the Trump/Pence campaign email that "[t]he President wants the 2020 United States Census to ask people whether or not they are citizens." PX-64 (AR 2643-44); PX-3(AR 3424-25).

275.    Finally, Secretary Ross's lack of candor in his March 26, 2018 letter along with the clearly deficient production of the initial Administrative Record in this case is evidence of pretext or improper motive.

## III.    Extra-Record Evidence Regarding the Process for Adding the Citizenship Question

276.    Extra-record evidence obtained in this case provides additional context to the evidence in the Administrative Record to more fully illustrate the circumstances surrounding Secretary Ross's decision to add a citizenship question to the 2020 Decennial Census.

### A.    The Decision to Add a Citizenship Question in the Spring of 2017

277.    On March 15, 2017, Secretary Ross and Wendy Teramoto had a telephone discussion with A. Mark Neuman and Ted Kassinger about the census.  PX-193.

278.    Defendants admit that shortly thereafter Secretary Ross spoke with Steve Bannon about the citizenship question in the Spring of 2017. PX-302 at 3. During this call, Bannon asked Secretary Ross to speak with Kris Kobach about adding a citizenship question. *Id.*;PX-19 (AR 763); PX-58 (AR 2651).

279.    Secretary Ross' conversation with Kobach about adding a citizenship question to the 2020 Census came before any request from DOJ to add a citizenship question to the Decennial Census.  *See* PX-19 (AR 763), PX-58 (AR 2561), PX-1(AR 764), PX-193 at 8, 40; PX-302.

280.    Also in the Spring of 2017, Secretary Ross spoke with Attorney General Sessions regarding the citizenship question, the first of a number of such conversations. PX-302.

281.    By March 2017, Secretary Ross asked Comstock why there was no citizenship

question on the census and whether noncitizens were included in the census count. Comstock Dep. 55, 62-64.

282.    Secretary Ross agreed to add a citizenship question to the census shortly after his confirmation, no later than March of 2017.  *See* PX-88 (AR 3710); Comstock Dep. at 146:1–15.

283.    Starting in the spring of 2017, Comstock set out to come up with a "legal rationale" to support the addition of a citizenship question. Comstock Dep. 266:4-12.

284.    Comstock believed he needed to find another agency to request the addition of a citizenship question because OMB and the Paperwork Reduction Act required the Commerce Department to "justify" why a citizenship question was "need[ed]," and Comstock understood that simply saying "the Secretary wanted it" would not "clear [the] legal thresholds." *Id.* 153:6-13-154:6-11..

285.    Mr. Comstock believed that it was his job to "figure out how to carry out what my boss asks me to do" and "find a legal rationale" for the question. *Id.* at 266:4-12..

286.    Mr. Comstock believed that it did not "matter what [Secretary Ross's] particular personal perspective" was.  *Id.* at 266:4-12.

287.    Mr. Comstock never asked Secretary Ross why he wanted to add a citizenship question, and he believed the reasons why were irrelevant. *Id.* at 171:19-721; 253:13-54:17; 260.

288.    Ms. Teramoto, Secretary Ross's Chief of Staff, similarly did not know why Secretary Ross wanted to add a citizenship question. Teramoto Dep. at 32:12.

289.    Undersecretary Dunn Kelly also did not know why Secretary Ross wanted to add a citizenship question. Dunn Kelley Dep. at 39:3-16.

290.    Undersecretary Kelley said that it is "very plausible" that she knew as early as July 2017 that Secretary Ross desired to add a citizenship question. *Id.* at 45:5-12.

291.    When Comstock first contacted DOJ on May 4, 2017 to see if they would request the addition of a citizenship question, he was not seeking to promote more effective enforcement of the VRA. Comstock Dep. 167:5-72:15; *see also* PX-524 (AR 12755); PX-537 (AR 12756).

292.    The person at DOJ to whom Comstock reached out was James McHenry, who was the Director of DOJ's Executive Office of Immigration Review ("EOIR"). *See* PX-485; PX-537 (AR).

293.    Neither McHenry nor EOIR have responsibility for enforcing the VRA. *Id.*; Comstock Dep. at 270-71; Gore Dep. at 65:3-14.

294.    Mr. Comstock then contacted DHS to see if it would request the addition of a citizenship question. DHS has no responsibility for enforcement of the VRA. *See* C omstock Dep. at 276:19-277:3.

295.    As Comstock was reaching out to other agencies, Langdon, on behalf of Comstock, requested information from Census Bureau staff regarding whether and/or how the census counts noncitizens and illegal immigrants for purposes of apportionment. Langdon Dep. 174:15–184:11, ECF No. 103-12 (hereinafter "Langdon Dep.").

296.    Approximately a week after Secretary Ross spoke with Kobach about the citizenship question, PX-19 at 2 (AR 764); *see also* PX-58 (AR 2651), Congressman Mark Meadows requested a meeting with Secretary Ross. PX-567. On August 8, 2017, Congressman Meadows and Secretary Ross spoke by phone along with Comstock, Hernandez, and Teramoto. PX-193 at 9. Congressman Meadows is the Chairman of the House Freedom Caucus. It was after this call with Congressman Meadows that Secretary Ross emailed Comstock asking where DOJ was in their analysis regarding the citizenship question. PX-97 (AR 4004); Comstock Dep. 213:2–214:2.

76

**B.  The Department of Justice's Involvement**

297.    As is regular practice, the Census Bureau informed federal agencies that they should submit request for 2020 Decennial Census content to the Census Bureau by July 1, 2016. PX-1194 at 995:18-996:3.

298.    The Census Bureau did not receive a request from DOJ to add a citizenship question to the Decennial Census by the July 1, 2016 deadline. DOJ did not contact the Census Bureau about adding a citizenship question prior to December 2017. PX-1194 at 996:4-10.

299.    Prior to its December 2017 letter, DOJ had never communicated to the Census Bureau that CVAP data obtained from the ACS was not meeting DOJ's needs for VRA enforcement purposes. PX-1194 at 996:19-23; Trial Tr. (Jan. 22) (Thompson).

300.    Prior to its December 2017 letter, DOJ had not requested that a citizenship question be added to the 2020 Census. Gore Dep. at 168:21–169:8.

301.    According to Gore, around the beginning of September, Secretary Ross initiated a discussion with Attorney General Sessions regarding the addition of a citizenship question to the census. Gore Dep. at 83:16-84:1; *see also* PX-302.

302.    Attorney General Sessions then spoke with Gore about requesting the addition of a citizenship question. Gore Dep. at 74:18-75:14, 83.

303.    Mr. Gore learned from that conversation with Attorney General Sessions that Secretary Ross had initiated an earlier discussion with Attorney General Sessions regarding a citizenship question.  *Id*. at 83:16–84:1.

304.    Any discussions between the Department of Commerce and DOJ prior to September 2017 regarding the citizenship question were initiated by the Department of Commerce. *Id.* at 67-68.

305.    On September 11, 2017, Gary sent an email to Gore for more information

"regarding some concerns raised that the Secretary of Commerce raised last week with the AG relating to the 2020 Census" relating to the citizenship question. PX-648 at 2.

306.    In this email, Gary noted that he previously worked on adding "potential questions to the ACS relating to LGBTQ status, and on behalf of [DOJ] . . . signed correspondence with Census on that topic." *Id*. Gary explained that, as a part of his involvement in the 2020 census, he had not heard about "citizenship issues." *Id.*

307.    After speaking with Gore by phone, Gary writes, "My contact at Census OGC (not at the Department level) has heard nothing, and is equally puzzled about the question." *Id.*

308.    In September and October 2017, Gore spoke with Peter Davidson, James Uthmeier, and Wendy Teramoto from the Department of Commerce regarding the citizenship question. Gore Dep. at 91:18-94:3, 118:15-17.

309.    Mr. Gore was first contacted by Davidson in mid-September, and Davidson called Gore to discuss adding a citizenship question to the Decennial Census. *Id.* at 92-93, 97-98. Davidson asked Gore to reach out to Teramoto to discuss the citizenship question. *Id.* at 97:3-14.

310.    The "DOJ-DOC" issue referred to in Gore's email to Teramoto, PX-59 (AR 2628); PX-60 (AR 2634), was the addition of a citizenship question to the 2020 Decennial Census. Gore Dep. at 96:17-97:2.

311.    Over the coming days, Gore had several calls with Secretary Ross's advisors. *Id.* at 102-03; 117-19; 120-24.

312.    One of these calls was with Uthmeier, who had no experience as counsel in VRA cases, litigating Section 2 redistricting cases involving the use of CVAP data, or otherwise assessing the reliability of CVAP data used in VRA litigation. *Id.* at 117:14-18:5; 118:15-17.

313.    On September 22, 2017, Uthmeier reached out to Gore. *Id.* at 116:10–13.

314.    Mr. Gore returned Uthmeier's call, on or about September 22, 2017, and they discussed the addition of a citizenship question to the 2020 Census.  *Id*. at 117:9–118:17.

315.    Following a call with Uthmeier, Gore received Uthmeier's August 11 memorandum regarding the addition of a citizenship question along with a handwritten note from Uthmeier. *Id.* at 18:18-19:4; 123:16-24:2. The government has withheld Uthmeier's memorandum and note on the basis of privilege.

316.    DOJ relied, at least in part, on Uthmeier's input in drafting the December 12 letter requesting the addition of the citizenship question. Gore Dep. at 123-24.

317.    Mr. Gore also communicated with Neuman, who was advising the Department of Commerce on the citizenship question. *Id.* at 437-38; Comstock Dep. 155-56.

318.    On October 9, 2017, as the discussions were ongoing between the Department of Commerce and DOJ, Secretary Ross issued a press release applauding Trump Administration priorities to "swiftly return illegal entrants" and to "stop sanctuary cities, asylum abuse and chain immigration." PX-479.

319.    In October 2017, Gore, John Zadrozny of the White House Domestic Policy Council, and others from DOJ participated in a conference call regarding the addition of a citizenship question to the census. Gore Dep. at 409:19-411:19; 412:4-9.

320.    On or about November 1, 2017, Gore, a political appointee, wrote the initial draft of the December 12 DOJ letter, the letter that was ultimately signed by Gary, a career DOJ official. *Id.* at 126-27.

321.    Also on November 1, 2017, Gore emailed Chris Herren, Chief of DOJ's Voting Section, copying Ben Aguiñaga; the email had the subject: "Confidential & close Hold: Draft Letter." PX-707. In the email, Gore reiterated that the letter is "confidential and close hold." *Id.*

Gore intended that Herren not share the draft letter without Gore's approval. Gore Dep. at 130:2-20.

322.    In mid-late November 2017, Gary conferred with Attorney General Sessions' advisors regarding the draft letter. *Id.* at 141:6-14; PX-710; PX-711. The Attorney General's office requested additional time to review the letter and made changes. PX-710; PX-711.

323.    On December 8, 2017, Gore emailed Gary a draft of the letter "with leadership's final changes," and stated "With these changes, we are authorized to send.  Sending on Monday is fine."  PX-711; Gore Dep. at 145:6–147:9.

324.    Attorney General Sessions made the decision to help Secretary Ross by authorizing DOJ to request that the Census Bureau ask a citizenship question on the Census. Gore Dep. at 442.

325.    Final authorization to send the letter came from either Rachael Tucker or Robert Troester on behalf of Attorney General Sessions, probably on Tuesday, December 12, 2017. Gore Dep. at 158:7–160:4.

326.    Mr. Thompson testified that several assertions made in the December 12 letter would raise concerns if he received it when he was Census Bureau Director. He concluded that the letter alone would not be sufficient to justify adding a citizenship question to the census. Trial Tr. (Jan. 22) at 72:11-78:6 (Thompson).

327.    Mr. Gore did not believe it is necessary for DOJ's VRA enforcement efforts to collect CVAP data through the Decennial Census questionnaire. Gore Dep. at 300.

328.    Mr. Gore does not know whether the data the Census Bureau will obtain through the addition of a citizenship question will have larger or smaller margins of error, or be more

precise, than the existing data available to DOJ.  Gore Dep. at 215:15–216:19, 226:1–227:19, 232:17–233:2.

329.    Mr. Gore is not aware of any communications between DOJ and the Census Bureau about whether or not adding a citizenship question to the census would in fact produce data that has smaller margins of error than the citizenship data currently used by DOJ, due to required disclosure avoidance techniques. Gore Dep. at 228:11–20.

330.    After DOJ sent the December 12 letter formally requesting the addition of a citizenship question to the 2020 Census, members of the Census Scientific Advisory Committee (CSAC) sent a letter to Attorney General Sessions, Arthur Gary, and Secretary Ross, expressing their view that adding the question would be a serious mistake that would lower the response rate.  PX-219; PX-220.

331.    As discussed above, Dr. Jarmin and the Census Bureau repeatedly sought to meet with DOJ to discuss the details of DOJ's request so the Census Bureau could best meet DOJ's stated needs. *See* Part II.C.6, *supra*.

332.    Such a meeting is "very important" to help the Census Bureau understand exactly what the requesting agency is seeking. Trial Tr. (Jan. 22) at 54:5-15 (Thompson). He said it would be "very, very difficult, if not impossible" for the Census Bureau to proceed with appropriate review the DOJ's request without consultation with DOJ. *Id.* at 82:21-25 (Thompson).

333.    When he received Dr. Jarmin's request for a meeting, Gary told Gore. Gore Dep. 262-63. Gary also told Gore that the Census Bureau had proposed an alternative way to provide DOJ with block-level CVAP data other than through adding a citizenship question. *Id.* at 265-66.

334.    Mr. Gore told Gary that he "would think about the issue and discuss it further

with others," but Gore did not ask Gary for more details on the Census Bureau's alternative

proposal. *Id.* at 264, 268.

335.    Mr. Gore discussed this with several DOJ officials, including Attorney General

Sessions. *Id.* at 265, 268-69. Gore acknowledged that in the course of events leading to the

drafting of the December 12 Letter, he "had a conversation with AG Sessions about the question

of the use of total population or some other measure for apportionment purposes." *Id*. at 338:2–

13.

336.    In January 2018, Attorney General Sessions decided that DOJ would not pursue

the Census Bureau's alternative proposal and directed DOJ not to meet with the Census Bureau

to discuss the DOJ's request for a citizenship question. *Id*. at 271:10-272:19. On January 19,

2018, Gore informed Gary that DOJ technical staff would not meet with the Census Bureau to

discuss the alternative proposal for producing higher quality CVAP data at a lower cost. *Id*. at

273:17–274:4.

337.    In April 2018, Ben Aguiñaga drafted a briefing paper regarding the citizenship

question. PX-718; *see also* Gore Dep. at 330-333. Including in this briefing paper is a bullet

point that says, "NOT PUBLIC: In 2017, Secretary of Commerce Wilbur Ross requested that the

Justice Department send a letter requesting the addition of a citizenship question on the 2020

Census." PX-718.

### C.    Extra-Record Evidence Regarding Census Bureau Process and Communications With Secretary Ross

338.    On November 27, 2017, Secretary Ross emailed Davidson urgently asking for an

update on the citizenship question because they were "out of time." PX-143 (AR 11193)

339.    According to Dr. Jarmin, after receiving the December 12 DOJ letter, the Census

Bureau SWAT team looked into the potential of using administrative records to provide DOJ

with CVAP data because Title 13 directs the Census Bureau to use administrative records in lieu of direct collection from the American people whenever possible. Jarmin Dep. 59:9-60:7, ECF No. 103-4 (hereinafter "Jarmin Dep.).

340.    The February 12, 2018 meeting with Secretary Ross was the only meeting the Census Bureau had with the Secretary to discuss the citizenship question prior to the Secretary's March 26, 2018 memorandum. PX-1194 at 883:84.

341.    Before the meeting with Secretary Ross, Dr. Abowd met with Undersecretary Kelley to discuss the Census Bureau's recommendations. *Id.* at 883:20-884:1.

342.    During the February 12, 2018 meeting, Undersecretary Kelley did not express any disagreements with the Census Bureau's analysis and recommendations in the memo. *Id.* at 884:2-5.

343.    At the time of the February 12, 2018 meeting, Dr. Abowd did not know that Secretary Ross had requested to add a citizenship question in early 2017, and Secretary Ross did not disclose this at the meeting. *Id.* at 1017:12-21; 1045:6-12. Dr. Abowd did not learn about this until this litigation, and he was surprised by this fact. *Id.* at 1019:18-1020:5.

344.    After hearing the Census Bureau's conclusion that using administrative records rather than adding a citizenship question would best meet DOJ's stated needs, Secretary Ross asked the Census Bureau to evaluate Alternative D. *Id.* at 959:17-19; 965:25-966:5.

345.    Regarding Comstock's 35 questions for the Census Bureau, PX-545 (AR 1976), Dr. Abowd testified that the Census Bureau's initial answer to Question 31 found in PX-132 accurately summarizes the Census Bureau's formal process for adding questions to the census. PX-1194 at 1007:19-1008:8; *see also* Jarmin Dep. at 137-138.

346.    The revised response to Question 31 that was drafted by Commerce Department

political appointees is misleading. Lowenthal Decl. ¶ 90. It states, "the Census Bureau did not [feel] bound by past precedent when considering the Department of Justices' [sic] request" because "no new questions have been added to the Decennial Census (for nearly 20 years)." PX-1 (AR 1296). In reality, although the Census Bureau has not recently added questions to the Decennial Census, it has considered doing so, not adding them precisely because issues arose during the well-established process that is in place for assessing whether to add a question. Lowenthal Decl. ¶ 90.

347.    Plaintiffs' expert Douglas Massey served on the Census Scientific Advisory Committee ("CSAC") from 2012 to 2018. Massey Decl. at 11. His final meeting as a CSAC member took place on March 29-30, 2018. *Id.* at 12. For this meeting, Massey was asked to prepare comments on a Census Bureau presentation titled "Questions Planned for the 2020 Census." *Id.* Late in the afternoon on March 26, 2018, the same day Secretary Ross issued his memorandum, a Census Bureau employee emailed Massey to inform him that the presentation would not be ready in advance of the meeting. *Id.* at 13. Massey testified that this late change was unprecedented based on his time as a CSAC member. *Id.*

## IV.    Extra-Record Evidence Regarding the Propriety of the Decision to Add a Citizenship Question

### A.    Extra-Record Evidence Confirms that the Citizenship Question Was Not Adequately Tested in Accordance with Binding Agency Standards and Established Practices

348.    As discussed in Part II.E, *supra*, the  Census Bureau's Statistical Quality Standards require that "[d]ata collection instruments and supporting materials must be pretested with respondents to identify problems (*e.g.*, problems related to content, order/context effects, skip instructions, formatting, navigation, and edits) and then refined, prior to implementation, based on pretesting results." PX-260 at 8.

349.     As discussed in Part II.E, *supra*, the Bureau also has a well-established process for adding content, which includes extensive testing, consultation with OMB and advisory committees, and opportunity for public comment.

350.     Extra-record evidence provides further information regarding the importance of pre-testing, the Census Bureau's standards practices for pre-testing and evaluating census content, and the Bureau's failure to abide by those standards and practices with respect to the citizenship question.

### 1.  The Importance of Pre-Testing Questionnaire Content

351.      Pretesting is critical to the identification of problems for both respondents and interviewers with regard to question content, order/context effects, skip instructions, and formatting." PX-260 at 22.

352.     Pretesting is necessary because "[s]eemingly minor changes in question wording or sequence sometimes can affect survey responses in important and unexpected ways." PX-364 at 3.

353.     Question ordering can affect responses, and that sometimes these effects can occur in unexpected ways that can cannot be identified without pretesting. Trial Tr. (Jan. 30) at 158:12-24 (Abowd).

354.     Plaintiffs' expert Dr. Mathiowetz provided an example of how question ordering can affect response rates. When a question on race precedes a question on Hispanic origin, responses to the Hispanic origin go down because "people make the assumption that I've already told you about my race." Trial Tr. (Jan. 23) at 6-24 (Mathiowetz). When Hispanic origin precedes the race question, however, item non-response to the Hispanic origin question drops significantly. *Id.*

355.     Pretesting is necessary to identify how the wording and placement of a question

on a questionnaire can impact responses.  Trial Tr. (Jan. 22) at 50-51 (Thompson).

356.    In addition to pre-testing questionnaire content, it is important to pre-test all operations of the survey to see that they function as intended.  Trial Tr. (Jan. 22) at 53:1-13, 55:6-21 (Thompson);Trial Tr. (Jan. 23) at 174:5-12 (Mathiowetz).

357.    Finally, pre-testing must be done in all the languages in which a survey will be administered to ensure that it is properly understood because "translated terms can sometimes not mean the same thing culturally in different languages." Trial Tr. (Jan. 23) at 180:5-12 (Mathiowetz); PX-260 at 20.

358.    A testing program typically involves both cognitive testing and field testing. PX-260 at 22-23; Jan. 22 Trial Tr. 54-55 (Thompson); Jan. 23 Trial Tr. at 173 (Mathiowetz).

359.    Cognitive testing involves conducting interviews or focus groups led by a cognitive specialist using alternative questionnaire designs to see how the respondents perceive the questions.  Trial Tr. (Jan. 22) at 54:19-24 (Thompson);Trial Tr. (Jan. 23) at 173:21-174:4 (Mathiowetz); PX-260 at 20-25.

360.    Field testing involves administering the questionnaire to a representative sample of the population in the modes in which the questionnaire will be administered. Trial Tr. (Jan. 22) at 55:6-11 (Thompson);Trial Tr. (Jan. 23) at 173:6-18 (Mathiowetz).

### 2.   The Census Bureau's Regular Practice of Testing Census Content and Operations

361.    Planning for a decennial census is a decade-long process. Trial Tr. (Jan. 30) at 149:15-18 (Abowd). "Typically, [Census preparations] begin before the current census ends where the Census Bureau will plan experiments that might be relevant to the next census, and they also plan an extensive evaluation program so that they can identify potential problems in the conduct of the current census." Trial Tr. (Jan. 22) at 44:9-17 (Thompson); *see also* Lowenthal

Decl. at 21; Trial Tr. (Jan. 30) at 24:2-21 (Abowd).

362.    Throughout the decade leading up to the census, the Census Bureau engages in content testing and operational testing. Trial Tr. (Jan. 30) at 24-26 (Abowd).

363.    In addition to testing, any changes to the content of the decennial census are addressed through consultation with subject matter experts at the Census Bureau and the requesting agency, Trial Tr. (Jan. 22) at 54:1-16 (Thompson); Trial Tr. (Jan. 31) at 24:21-25:4 (Abowd): Jarmin Dep. at 33:6-34:4.

364.     Further, the Bureau typically seeks input from the Census Bureau advisory committees regarding any changes to the decennial census. Massey Decl. at 16; Jarmin Dep. at 255:22-256:6.

365.    The Census Bureau has adhered these standards and practices when evaluating whether to add new questions to prior decennial census. PX-134 (AR 9865, 9867); PX-3 (AR 3560); PX-699 (AR 3890);Trial Tr. (Jan. 22) at 56-61 (Thompson).

366.    First, prior to the 2000 Decennial Census, there was a proposal to revise the questionnaire to allow a respondent to select multiple races. Trial Tr. (Jan. 22) at 57:8-9 (Thompson). This proposal came shortly after the 1990 Census, and, in 1993, there was an announcement of a comprehensive review of the race and ethnicity questions. *Id.* at 57:15-16. This review was followed by a four-year program of cognitive and field testing that ended in 1997. The Census Bureau worked closely with OMB on this testing. *Id.* at 57:15-25; *see also* Lowenthal Decl. at 56-65.

367.     Next, after the 2000 census, the Census Bureau continued to examine race and ethnicity questions and had a hypothesis that adding an ancestry question would enhance data quality for these questions.  Trial Tr. (Jan. 22) at 58:7-13 (Thompson). To do this, the Census

Bureau looked to adding an ancestry question to the 2010 Decennial Census that had previously been on the census long form. *Id.* The Census Bureau undertook a multi-year testing program that culminated with the National Census Test in 2005. *Id.* at 58:22-23. After the results were reported to the Census Bureau advisory committees, the Census Bureau decided not to add the ancestry question because it turned out that it would reduce data quality. *Id.* at 58:24-59:13; *see also* Lowenthal Decl. at 66-81; PX-262.

368.    Finally, prior to the 2020 Decennial Census, the Census Bureau conducted extensive testing into whether it could improve the quality of race and Hispanic data by combining two questions into one. Trial Tr. (Jan. 22)at 59:20-60:10 (Thompson). This research started even before the 2010 Census and culminated in the 2015 National Content Test. *Id.* Due to inconclusive results of the testing, the Census Bureau did not change the question design. *Id.*; *see also* Lowenthal Decl. at 82-88.

369.    For the 2020 Census, the Census Bureau undertook a content review process in 2013 and 2014. Trial Tr. (Jan. 22) at 47:19-48:1 (Thompson). The citizenship question was not requested, assessed, or added as part of this process.

370.    After the initial content review process, on April 29, 2016, Lisa Blumerman, Associate Director of Decennial Census Programs, summarized the process of adding content to the census in a memorandum. This memorandum "officially document[ed] the U.S. Census Bureau's plan to develop and transmit to Congress" the questions planned for the 2020 decennial census. PX-271, at 1; *see also* PX-1194 at 121.

371.    The memorandum asked "[f]ederal agencies with known uses of the 2020 Census or ACS content" to submit any requests for data collection by July 1, 2016. It also explained that "[f]inal proposed questions are based on the results of extensive cognitive testing, field testing,

other ongoing research, and input from advisory committees." PX-271, at 3-4.

372.    Consistent with this process, all questions on the 2010 Decennial Census were field tested and were the subject of extensive cognitive testing. PX-1194 at 123.

373.    As of March 1, 2018, it was Dr. Abowd's understanding that the Census Bureau's process for adding a new question to the decennial census involves extensive pretesting, review, and evaluation. PX-1194 at 1007:7-9.

### 3.    The Failure to Pre-Test the Citizenship Question

374.    The Census Bureau has never conducted any testing of a citizenship question within the context of the entire 2020 Census questionnaire. *Id*. 997-98; Trial Tr. (Jan. 30) at 150:10-151:15 (Abowd); Jarmin Dep. at 262:6-13; Langdon Dep. at 243:7-16.

375.    Testing of the citizenship question for the 2020 Census was "not a priority" for the Census Bureau. Jarmin Dep. at 61:3-5.

376.    The 2020 Census questionnaire, including a citizenship question, has not undergone adequate cognitive testing. PX-1194 at1049:19-24; Census Bureau 30(b)(6) Dep. Vol. I 143, ECF No. 103-7 (hereinafter "Census Bureau 30(b)(6) Dep. Vol. I").

377.    The wording of the citizenship question has not been adequately tested for the 2020 Census. Jarmin Dep. at 55:1-10, 56:2-5; Lowenthal Decl. at 20.

378.    There had been no field testing of the full 2020 Census questionnaire that includes a citizenship question. PX-1194 at 997:24-998:1.

379.    At the time that Secretary Ross announced the decision to include a citizenship question on the census, there were no plans for field testing of the entire 2020 Census questionnaire, including a citizenship question. PX-1194 at 998:20-24; Census 30(b)(6) Dep. Vol. I at 26.

380.    The questionnaire used for the 2018 End-to-End Test, which was the final "dress

rehearsal" preparation for the 2020 Census, did not include a citizenship question. Trial Tr. (Jan. 22) at 47:5-8 (Thompson); Census Bureau 30(b)(6) Dep. Vol. I at 225; Jarmin Dep.at 54:18-55:10.

381.    No RCT was performed on the citizenship question for the 2020 Census before the Secretary issued his Memo. PX-1194 at 925:13-22, 1000:14-17; Census Bureau 30(b)(6) Dep. Vol. I at 115; Census Bureau 30(b)(6) Dep. Vol. II 426-430, ECF No. 103-9 (hereinafter "Census Bureau 30(b)(6) Dep. Vol. II").

382.    If the Census Bureau had performed an RCT, it would have had quantitative data that would isolate the effect of the citizenship question on how it would perform in the context of a decennial census questionnaire.  PX-1194 at 924:10-925:12, 925:23-926:7.  That would have allowed the Bureau to quantify, without qualification, the difference between the self-response rate with and without a citizenship question.  *Id.* at 925:9-15.

383.    The Census Bureau had the time, resources, and plan to conduct an RCT for the content of the citizenship question prior to printing the questionnaires for the 2020 Census.  *Id.* at 1001:6-1002:15.

384.    Individuals within the Census Bureau proposed conducting an RCT, but senior Census Bureau and Department of Commerce personnel, including Undersecretary Dunn Kelley, decided not to conduct an RCT. PX-164; PX-165; PX-1194 at 925:19-22.

385.    Any testing relating to the citizenship question that was done in connection with its placement on the ACS is insufficient for its inclusion on the 2020 Decennial Census.

386.    First, he citizenship question on the ACS was last tested in 2006. Trial Tr. (Jan. 30) at 156:18-24 (Abowd). Thus, it has been over 14 years since the question has been tested. *Id.*

387.    The macroenvironment in 2006 was different than it will be in 2020, and no

testing has been done on the citizenship question in today's macroenvironment. *Id.* at 157:5-13.

388.    The ACS and the Decennial Census are significantly different instruments.

389.    On the ACS, the citizenship question is one of approximately 70 questions, whereas on the decennial census, the citizenship question is one of 11 questions. Trial Tr. (Jan. 22) at 51:12-18 (Thompson); Trial Tr. (Jan. 23) at 181:3-7 (Mathiowetz); PX-945; PX-946.

390.    The parties agree that, as a result of the significantly shorter length of the decennial census as compared to the ACS, the citizenship question will be much more prominent on the 2020 Census than it is on the ACS. PX-162 at 46; Trial Tr. (Jan. 30) at 157:18-22 (Abowd); Trial Tr. (Jan. 22) at 51:12-18 (Thompson); Trial Tr. (Jan. 23) at 172:1-11 (Mathiowetz).

391.    Moreover, the citizenship question on the ACS is prefaced by a nativity question asking where the respondent was born. PX-945; Trial Tr. (Jan. 30) at 159:9-16 (Abowd).

392.    On the 2020 Decennial Census, the citizenship question will not be preceded by a nativity question. Trial Tr. (Jan. 30) at 159:17-21 (Abowd).

393.    The Census Bureau is not aware of any cognitive testing of the citizenship question without a preceding nativity question. *Id*. 159:22-25.

394.    The citizenship question has not been well tested. Trial Tr. (Jan. 22) at 97:7-8 (Thompson).

### 4.  Neither Exception Allowing the Addition of a Question Without Testing Applies

395.    The Bureau's Statistical Quality Standards require pretesting unless the Census Bureau obtains a waiver or uses a question that has "performed adequately in another survey." PX-260 at 18 . Obtaining a waiver or using a question that performs adequately on another survey are the only two applicable exceptions to the pre-testing requirement. If neither of these

exceptions apply, pre-testing would be required. Trial Tr. (Jan. 30) at 162:22-163:2 (Abowd).

396.    The Census Bureau did not seek a waiver to avoid pre-testing of the citizenship question on the 2020 Census. *Id*. at 162:10-16.

397.    The parties agree that the citizenship question does not perform adequately on the ACS. *Id*. at 166:23-25; Trial Tr. (Jan. 22) at 91:2-10 (Thompson); Trial Tr. (Jan. 23) at 90:7-13 (Mathiowetz).

398.    In August of 2018, the Census Bureau reported that between 30% and 37% of all people identified as noncitizens by administrative records reported themselves as citizens on the ACS. PX-162.

399.    These statistics show that the citizenship question is not performing adequately on the ACS. Trial Tr. (Jan. 22) at 99:15-21 (Thompson); Trial Tr. (Jan. 23) at 90:8-13, 126:20-25 (Mathiowetz); Trial Tr. (Jan. 30) at 166;10-25 (Abowd).

400.    There is no evidence that the citizenship question would perform better on the decennial census. Trial Tr. (Jan. 22) at 99:22-100:1 (Thompson); Trial Tr. (Jan. 30) at 163:15-20 (Abowd).

401.    In fact, there are indications that responses by noncitizens to a citizenship question on the 2020 Census may be even less accurate than they historically have been on the ACS. Trial Tr. (Jan. 30) at 163:21-164:14 (Abowd).

### B.    Extra-Record Evidence Demonstrating Defendants' Failure to Limit Respondent Burden and Cost While Maximizing Response Rates

402.    As discussed in Part II.E, *supra*, OMB Statistical Policy Directive No. 2 requires that "[a]gencies must design and administer their data collection instruments and methods in a manner that achieves the best balance between maximizing data quality and controlling measurement error while minimizing respondent burden and cost." PX-359. at 16.

403.     Further, as discussed in Part II.E, *supra*, the Secretary is obligated under 13 U.S.C. § 6 to use pre-existing administrative records instead of direct inquiries to the maximum extent possible.

404.     The Bureau's standards do not allow a question to be added simply because there is an absence of definitive evidence that it will harm responses; rather, the standards "require evidence at almost every step" and require the require the requesting agency to demonstrate that adding the question is necessary. Trial Tr. (Jan. 31) at 30:21-31:11 (Abowd).

405.     The Brown et al. Memo, which updates and extends the analyses contained in the January 19 Abowd Memo and the March 1 Abowd Memo, further confirms that adding a citizenship question will (a) reduce response rates by 5.8 percentage points for households with noncitizens, (b) increase respondent burden, (c) increase the cost of administering the census, and (d) generate poorer quality citizenship data than administrative records. PX-162.

406.     Using administrative records is consistent with the Bureau's obligation to control respondent burden and cost, while adding a citizenship question is inconsistent with this obligation. Trial Tr. (Jan. 31) 23:14-22 (Abowd).

C. **Extra-Record Evidence Demonstrating Defendants' Failure to Avoid Political Influence When Conducting Statistical Activities.**

407.     As discussed in Part II.E, OMB Statistical Policy Directive Number 1 ("OMB SPD 1") requires that statistical agencies such as the Census Bureau must be "independent from political and other undue external influence in developing, producing, and disseminating statistics" and "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy making activities." PX-354 at 4; *see also* Trial Tr. (Jan. 22) at 39:18-40:8 (Thompson); Trial Tr. (Jan. 31) at 28:15-17 (Abowd).

408.     The duty of statistical agencies to be free from political pressure is also found in

the National Academies of Sciences, Engineering, and Medicine's Principles and Practices for a

Federal Statistical Agency. PX-355; Trial Tr. (Jan. 22) at 37-38 (Thompson); Lowenthal Decl. at

98-114.

409.    The decision to add a citizenship question to the 2020 Census violates the

Bureau's obligation to conduct the Census in an environment free from political influence. Trial

Tr. (Jan. 22) at 82 (Thompson); Trial Tr. (Jan. 31) at 28 (Abowd).

410.    As Thompson testified, it was "very unusual" for the DOJ, as an agency

requesting data from the Census Bureau, to turn down a meeting to clarify its request. Trial Tr.

(Jan. 22) at 82:15-20 (Thompson).

411.    Dr. Abowd believed the Attorney General's decision to direct DOJ not to meet

with the Census Bureau was "political influence." Trial Tr. (Jan. 31) at 28:18-22 (Abowd).

412.    Dr. Abowd agreed that this political influence is "very problematic with respect

[the OMB Statistical Directive] of political independen[ce]." *Id.* at 28:23-29:3.

413.    Within days of Secretary Ross's announcement of the addition of the Citizenship

Question, the Census Bureau released a Document titled "Questions Planned for the 2020 Census

and American Community Survey," which contained the citizenship question that would be

added to the 2020 Census. PX-489 at 1. The report stated that "[a] question about a person's

citizenship is used to create statistics about citizen and noncitizen populations" and that "[t]hese

statistics are essential for enforcing the Voting Rights Act and its protections against voting

discrimination." *Id*. at 11. Notably, it claimed that a question about citizenship had been asked in

1820, 1830, 1870, and from "1890 to present." *Id.* That claim is false (citizenship did not appear

on the 2010 census at all) and is materially misleading because the citizenship question was not

asked of every household in 1960 or thereafter.

414.    Two days after Secretary Ross's March 26, 2018 memorandum, President

Trump's re-election campaign sent an email to supporters, admitting that President Trump took

part in the conspiracy by stating that he "officially mandated" the addition of a citizenship

question to the 2020 Census.  PX-487; PX-1173; *see also* PX-491 (showing Secretary Ross

claims President Trump did not direct him to add citizenship question).

415.    Secretary Ross's lack of candor in congressional testimony is evidence of the

improper motive behind the addition of a citizenship question.

416.    For example, on March 20, 2018, Secretary Ross testified before the House

Appropriations Committee.  The Secretary testified that the Department of Commerce analysis

around the citizenship question was "solely" in response "to [the] Department of Justice's

request," and not at the direction of President Trump or anyone at the White House.  PX-491.

417.    The Secretary again misled Congress on March 22, 2018, during testimony before

the House Ways and Means Committee when he claimed that the DOJ "initiated the request for

the inclusion of the citizenship question" to the 2020 Census.  PX-480 at 51.

418.    Statements made by President Trump and others in the administration provide

evidence of the true motivation for adding a citizenship question.

419.    On August 21, 2015, President Trump tweeted "How crazy - 7.5% of all births in

U.S. are to illegal immigrants, over 300,000 babies per year. This must stop. Unaffordable and

not right!"  PX-1139.

420.    On May 25, 2016, President Trump tweeted, "The protesters in New Mexico were

thugs who were flying the Mexican flag. The rally inside was big and beautiful, but outside,

criminals!"  PX-1145.

421.    On June 10, 2016, President Trump tweeted in reference to United States Senator

Elizabeth Warren, "Pocahontas is at it again! Goofy Elizabeth Warren, one of the least

productive U.S. Senators, has a nasty mouth. Hope she is V.P. choice."  PX-1150.  President

Trump has continued to repeat this slur.  PX-1166.

422.    On June 24, 2016, President Trump tweeted, "Many of the thugs that attacked the

peaceful Trump supporters in San Jose were illegals. They burned the American flag and

laughed at police."  PX-1149.

423.    On November 27, 2016, President Trump tweeted, "[i]n addition to winning the

Electoral College in a landslide, I won the popular vote if you deduct the millions of people who

voted illegally."  PX-1156.

424.    On January 25, 2017, newly-inaugurated President Trump issued two Executive

Orders: one that called for the immediate construction of a wall along the U.S.-Mexico border

and another that ordered the withholding federal funds from sanctuary cities that limited their

cooperation with federal immigration officials.  Exec. Order. No. 13767, 82 Fed. Reg. 8793 (Jan.

25, 2017)  ("Border Security and Immigration Enforcement Improvements" border wall); Exec.

Order No. 13768 § 9, 82 Fed. Reg. 8799  (Jan. 25, 2017) ("Enhancing Public Safety in the

Interior of the United States" sanctuary cities).  When delivering a speech at DHS, President

Trump cited Central American migration as a purported justification for both orders, and asserted

that the country is "in the middle of a crisis on our southern border" and condemned a so-called

"unprecedented surge" of migrants from Central America for eroding safety in the United States,

claiming that these two orders "will save thousands of lives."  PX-1159 at 3.

425.    On January 27, 2017, President Trump signed an executive order blocking

persons from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen from entering the United

States.  Executive Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017).

426.    On May 11, 2017, President Trump issued Executive Order 13799, establishing the Presidential Advisory Commission on Election Integrity that would focus on improper or fraudulent voter registration and voting. PX-530; PX-531. Mr. Kobach was appointed as the vice-chair of the Commission. PX-531.

427.    On June 13, 2017, the Acting Director of U.S. Immigrations and Customs Enforcement (ICE), Thomas Homan, testified before Congress and threatened that "every immigrant in the country without papers . . . should be uncomfortable.  You should look over your shoulder.  And you need to be worried."  PX-1162.

428.    On July 6, 2017, during a foreign policy speech delivered in Poland, President Trump expressed the need to protect "the West" and "civilization" against forces from "the South or the East" that threaten to undermine western "values," "courage," "spirit," and "will." PX-1163 at 7.

429.    On September 5, 2017, the Department of Homeland Security announced the rescission of the Deferred Action for Childhood Arrivals (DACA) program and on the same day, then-Attorney General Sessions complained that DACA "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."  PX-1165.

430.    On October 9, 2017, Secretary Ross said: "President Trump's tighter border controls have already reduced greatly the influx of illegal aliens, but he needs legislation to finish the task.  I support his request to secure our borders, swiftly return illegal entrants, stop visa fraud and overstays, sanctuary cities, asylum abuse and chain immigration, as well as exploitative employment of illegal aliens.  This will take money for more ICE officers, more federal prosecutors and more physical barriers.  That will be money well spent!"  See PX-479.

431.    In January 2018, the Census Bureau announced that it would not hire census

enumerators who are not U.S. citizens for the 2020 Decennial Census.  PX-297 at No. 76.

432.    On May 21, 2018, the White House published an article on its website regarding MS-13 that used the term "animals" to describe individuals ten times.  The article states that "President Trump's entire Administration is working tirelessly to bring these violent animals to justice."  PX-1175.

433.    On June 19, 2018, President Trump tweeted, "Democrats are the problem.  They don't care and want illegal immigrants, no matter how bad they may be, to pour into and infest our Country, like MS-13.  They can't win on their terrible policies, so they view them as potential voters!"  PX-1177.

### D. Extra-Record Evidence Supports the Census Bureau's Determination That Adding a Citizenship Question Will Reduce Self-Response Rates and Harm Data Quality

434.    The Census Bureau's consistent recommendation has been not to add a citizenship question to the 2020 Decennial Census.  PX-1194 at 879:2-8.

435.    There is no evidence in the Administrative Record that presents a technical analysis disputing the Census Bureau's determination. Trial Tr. (Jan. 22) at 89:24-90:9 (Thompson).

436.    The Census Bureau memoranda to Secretary Ross that analyzed the DOJ's requests to add a citizenship question memorialized the Census Bureau's credible, quantitative evidence that the addition of a citizenship question to the 2020 Decennial Census could be expected to lower the self-response rate in households that may contain noncitizens. PX-1194 at 881:4-10; *see also* Trial Tr. (Jan. 30) 123:11-16.

437.    The overwhelming weight of the extra-record evidence supports the Census Bureau's determination that adding a citizenship question will reduce self-response rates. *See* Part VI.A, *infra*.

438.    And, as Dr. Abowd testified, this lower self-response rate would lead to less accurate data. PX-1194 at 882:2-5.

439.    While Secretary Ross cites correspondence with a Nielsen executive, Christine Pierce, to support the view that adding a sensitive question to a survey would not reduce response rates, PX-26 at 4 (AR 1313), Pierce testified, *inter alia*, that the Ross Memo materially mischaracterizes her unrecorded telephone conversation with the Secretary, including by falsely attributing to her statements that she did not make. In particular, Pierce affirmed that she did not cite evidence that a citizenship question would not cause a decline in self-response rates, but rather expressed her "unequivocal[]" contrary concern "that a citizenship question would negatively impact self-response rates." Pierce Decl. at ¶¶ 9, 12-18.[8]

440.    On June 8, 2018, the Census Bureau published in the Federal Register a "Summary of Comments Received on the 2020 Census Federal Register Notice," reporting that 98.9 percent of the comments received opposed the addition of the citizenship question to the 2020 Census.  PX-1217.

### E.    Extra-Record Evidence Confirms that Existing ACS Data is Sufficient for Section 2 VRA Enforcement

441.    Block-level citizenship data has never been available at any point since the VRA was enacted in 1965. Ely Decl. ¶ 22.

442.    David Ely testified, "Based upon my decades of experience as an expert in Section 2 cases and the redistricting process generally, it is my opinion that there is no reasonable basis for the claim that citizenship data from the decennial Census would be 'more

---

[8] Pierce testified credibly through her affidavit, which was admitted in the New York Case after Defendants declined to have her appear for in-person cross-examination. *See* NY Trial Tr. at 473.

appropriate for use in redistricting and Section 2 litigation' than currently available data." ECF No. 99-3 at ¶ 18 (Ely).

443.    Mr. Ely continued, "Citizenship data from ACS reported at the block-group level are sufficient for redistricting and Section 2 enforcement and the unavailability of block-level citizenship data from the decennial Census has never presented an obstacle in my work as a statistical expert in this field." *Id.*

444.    Mr. Ely's testimony in this case outlines in significant detail about why existing citizenship data obtained from the ACS is more than sufficient for Section 2 enforcement, and why data from the decennial census is not necessary for VRA enforcement. As Ely explained, the material issue is the margin of error at the district level.  *Id.* ¶¶ 55, 59. Courts do not require any level of certainly about the CVAP estimates at the block level.  *Id.* Block-level citizenship data are needed only when an illustrative district cannot be constructed by aggregating census block groups.  *Id.* ¶ 60.  In the rare event that block-level citizenship data is required, courts have accepted proposed districts using a "raking factor."  *Id.* ¶ 61.  The margins of error associated with the raking factor procedure results are well-controlled and have been recognized by courts as reliable in the Section 2 context.  *Id.* ¶ 64.

445.    Mr. Ely's testimony is unrebutted.

446.    Similarly, Thompson testified that the DOJ Letter itself shows how existing ACS data is sufficient for DOJ's Section 2 enforcement purposes.

447.    In the letter, DOJ writes discusses the fact that a citizenship question used to be on the census long-form but, starting in 2010, "no census questionnaire included a question regarding citizenship" because the citizenship question was moved to the ACS, "a sampling survey." PX-32 at 2 (AR 1525).

448.    As Thompson testified, this shows a "lack of understanding" in the Census

Bureau products. Trial Tr. (Jan. 22) 74:15-16. The ACS replaced the long form and provides the

same, if not more accurate, data. *Id.* at 74:7-76:3. Thus, if the long form was sufficient for DOJ's

needs, there is no reason that the ACS would not be as well.

### F.    Extra-Record Evidence Confirms that Adding a Citizenship Question Will Not Improve Block-Level CVAP Data

449.    The Census Bureau does not know whether it will use responses to the citizenship

question to produce block-level citizen voting-age population data. PX-1194 at 1030:7-12;

Census Bureau 30(b)(6) Dep. Vol. I at 55:5-20.

450.    The Census Bureau is legally prohibited from publishing data, even for the

Department of Justice, that would enable a person or entity to be identified. PX-1194 at 1030:13-

21.

451.    The Census Bureau uses disclosure avoidance methodologies with respect to

individual responses to the Census, including to the citizenship question, in order to avoid

producing data that makes any individual identifiable. Census Bureau 30(b)(6) Dep. Vol. I at

50:6-14; PX-1194 at 1030:6-10; Trial Tr. (Jan. 22) 40:23-41:8 (Thompson).

452.    Because census blocks can contain small numbers of people, the Census Bureau

engages in disclosure avoidance procedures in every census block to prevent third parties from

potentially unmasking information about Census respondents. PX-1194 at 1031-33: Trial Tr.

(Jan. 22) 42:24-43:7.

453.    The Census Bureau has not yet set the parameters for the 2020 disclosure

avoidance system, but they have used two primary techniques in the past: household-level

swapping and synthetic noise infusion. Census Bureau 30(b)(6) Dep. Vol. I at 51; PX-1194 at

1039-41; *see also* Trial Tr. (Jan. 22) 41:15-42:2 (Thompson).

454.    In previous censuses, the Census Bureau has employed household-level swapping, meaning that the certain variables on the household record are matched to variables on a household record in a different geographic area and across census blocks. Census Bureau 30(b)(6) Dep. Vol. I at 51; PX-1194 at 1039-40.

455.    In this Census, the Census Bureau will employ synthetic noise infusion, which involves identifying sensitive responses and then using a statistical model to replace the sensitive value with a value that is sampled from the model and its error distribution. Census Bureau 30(b)(6) Dep. Vol. I at 53-54; PX-1194 at 1039-42.

456.    The Census Bureau will undertake disclosure avoidance for every census block, meaning that—except for randomly—there will not be a single census block where the citizenship data directly reflects the responses of the block inhabitants to the 2020 Decennial Census questionnaire. Census Bureau 30(b)(6) Dep. Vol. I at 67-68; PX-1194 at 1033. The block-level CVAP produced by the Census Bureau will not reflect the actual citizenship status of each individual in each census block as reported from a citizenship question on the census questionnaire. Census Bureau 30(b)(6) Dep. Vol. I at 67-68, 70-71; Ely Decl. ¶¶ 55-58, 65-67.

457.    Block-level CVAP data based on responses to a citizenship question will be estimates rather than a precise tabulation. PX-1194. at 1043-44. Thus, even with the inclusion of a citizenship question on the Census, the block-level CVAP data produced by the Census Bureau will still have margins of error associated with it. Census Bureau 30(b)(6) Dep. Vol. I at 71; PX-1194 at 1044; Ely Decl. ¶¶ 55-58, 65-67.

458.    As with ACS CVAP data currently used by DOJ, the CVAP data based on responses to a citizenship question will be estimates that will be more precise for areas with larger populations, but will be less precise, more uncertain, and will have larger margins of error

for geographic units with smaller populations. PX-1194 at 1041-42; Trial Tr. (Jan. 22) 77:4-11 (Thompson).

459.     The Census Bureau has not determined if, after disclosure avoidance, the error margins for the block level CVAP data based on information collected through the decennial enumeration will "still allow redistricting offices and the Department of Justice to use the data effectively." Census Bureau 30(b)(6) Dep. Tr. Vol. I at 100-101. The Census Bureau does not know if the CVAP produced based on responses to a citizenship question will have smaller margins of error than the ACS-based CVAP data on which DOJ currently relies. *Id.*; PX-1194 at 1044-46.

460.     There is therefore no evidence that the addition of the citizenship question will result in more accurate block-level citizenship data. Trial Tr. (Jan. 22) 76:19-77:11 (Thompson); Ely Decl. ¶¶ 65-67.

461.     Neither the DOJ Letter, nor any other evidence in the Administrative Record, demonstrates that the DOJ was aware of the impact of disclosure avoidance on block-level citizenship data. PX-32; Trial Tr. (Jan. 22) 77:12-16 (Thompson).

462.     There were no conversations between the Census Bureau and DOJ regarding this issue. PX-1194 at 1046.

463.     Dr. Abowd informed Secretary Ross of disclosure avoidance issues, but Secretary Ross nevertheless made the decision to order the inclusion of a citizenship question. PX-1194 at 1046-48.

## V.     Background on Census Operations and Coverage Measurement

### A.  2020 Census Operations

464.     For the 2020 Census, households will have the option to complete the census questionnaire by mail, via the Internet, and over the telephone. Joint Stips. ¶ 22; Trial Tr. (Jan.

23) 90:25-91:10.

465.    If the Census Bureau does not receive a response to the questionnaire and subsequent mailings (i.e. a self-response), it then sends a Census Bureau employee known as an enumerator to the housing unit to attempt to conduct an in-person interview in order to collect the data. This process is the first step in the Census Bureau's Non-Response Follow Up ("NRFU") operation. Joint Stips. ¶ 23.

466.    In the 2020 Census, the Census Bureau has proposed using administrative records to enumerate those households for which there is high quality administrative data about the household if the initial NRFU visit does not result in collecting complete data for that household. Joint Stips. ¶ 24. Administrative records have not been used to enumerate households on a wide scale in prior decennial censuses. Trial Tr. (Jan. 30) 103:8-12. If a household cannot be enumerated using high-quality administrative records, the Census Bureau plans to have enumerators attempt to re-contact the household. Joint Stips. ¶ 25.

467.    If a third attempt to contact a household does not yield a response, the housing unit will become proxy-eligible. Joint Stips. ¶ 26; Census Bureau 30(b)(6) Dep. Vol. II at 382:9-17; PX-162 at 41 n.15.

468.    A proxy is someone who is not a member of the household—such as a neighbor, landlord, postal worker, or other knowledgeable person—who can provide information about the unit and the people who live there. Joint Stips. ¶ 27; Census Bureau 30(b)(6) Dep. Vol. II at 382:9-17.

469.    For a proxy-eligible housing unit, an enumerator will attempt three proxies after each re-contact attempt that does not result in an interview. Joint Stips. ¶ 28.

470.    If a household cannot be enumerated either through self-response, in-person

104

enumerator visits, proxies, or administrative records, it will be subject to imputation. Count imputation is the process by which the Census Bureau imputes the household size of an address determined to be occupied but where no information could be collected about the occupants, even household size. Trial Tr. (Jan. 30) 111:5-11.

**B. Census Coverage Measurement**

471.    After the decennial census, the Census Bureau conducts a census coverage measurement or post-enumeration survey, the purpose of which is to determine the accuracy of the decennial census. Trial Tr. (Jan. 23) at 93:6-15; Trial Tr. (Jan. 30) 17:10-25.

472.    In order to assess the quality of the decennial census, the Census Bureau develops an independent estimate of the population against which it compares the count from the decennial census. Trial Tr. (Jan. 30) 113:25-114:2; PX-267 at 8 (AR).

473.    A net undercount occurs if the Bureau's independent estimate of the population is larger than the decennial census count. In contrast, a net overcount occurs if the Bureau's independent estimate of the population is smaller than the decennial census count. PX-267 at 8 (AR); *see also* Joint Stips. ¶¶ 51-52.

474.    The Census Bureau supplies net undercount and overcount estimates for the nation as a whole and for various demographic groups and geographic areas. *See, e.g.*, PX-267 at 20 (Table 9), 25 (Table 14) (AR); Trial Tr. (Jan. 23) 143:9-12.

475.    There are various components of decennial coverage measurement:

   a.   Correct enumerations are people who are appropriately counted in the correct place. PX-267 at 9 (AR).

   b.   Omissions are people who should have been counted in the census but were not. *Id*. at 11; Trial Tr. (Jan. 23) at 34:2-4. Omissions are obtained by subtracting

correct enumerations from the Census Bureau's independent estimate of the population. PX-267 at 11 (AR).

    c.   Erroneous enumerations are people who are included in the census but who should not have been counted for any of several reasons, such as, that the person or housing unit (1) is a duplicate of a correct enumeration; (2) is inappropriate (e.g., the person died before Census Day); or (3) is enumerated in the wrong location for the relevant tabulation. Joint Stips. ¶ 53; Trial Tr. (Jan. 23) at 34:5-15; PX-267 at 10 (AR). The most common reason for erroneous enumerations is duplication—i.e. where people are counted more than once. PX-267 at 20 (Table 9) (AR); Trial Tr. (Jan. 23) at 34:5-15.

    d.   Whole person census imputation, which includes count imputations, is the process by which all characteristics are imputed for certain census person records. PX-267 at 10-11 (AR); Joint Stips. ¶ 29.

476.    The percent net undercount can be expressed as the difference between omissions on the one hand, and the sum of erroneous enumerations and whole person imputations on the other. Trial Tr. (Jan. 30) at 117:10-13.

477.    As defined by the Census Bureau, the term "differential undercount rate" means the difference between the net undercount rate for a particular demographic or geographic domain and the net undercount rate either for another domain or for the nation. Joint Stips. ¶ 55.

478.    The Census Bureau describes the undercounting of a particular racial or ethnic group in comparison to the overall net undercount or overcount of the population as a whole as a "differential undercount," as distinct from a "net undercount" of the entire population. Joint Stips. ¶ 56.

106

VI.    **The Addition of a Citizenship Question to the 2020 Census Will Lead to a Differential Undercount of Hispanics and Noncitizens.**

A.    **The Addition of a Citizenship Question on the 2020 Census Will Lead to a Differential Decline in Census Participation for Hispanics and Noncitizens.**

1.    **Sensitive Questions Reduce Survey Participation.**

479.    The sensitivity of a question impacts response rates to the question. PX-696 at 591-92 (Barreto); PX-22 at 5 (AR 1277) (noting "nonresponse due to perceived sensitivity of the topic" as a cost of adding the citizenship question); PX-162 at 54 (finding that households that may contain noncitizens are more sensitive to the addition of a citizenship question and the "implication" of this finding is that self-response rates among this group would decline as a result of the citizenship question).

480.    Concerns about trust and confidentiality both play an important role in determining the sensitivity of a question. Trial Tr. (Jan. 23) at 98:7-23 (Mathiowetz); PX-696 at 596-600 (Barreto).

481.    Absent trust, respondents will not participate in a survey. Trust is important for surveys administered by a government agency, such as the decennial census. PX-696 at 599-601 (Barreto). Trust is particularly important with respect to the citizenship question, because "questions related to citizenship are ones that many in the Latino and immigrant community have trust issues with." *Id.* at 596, 601.

482.    When people perceive that data will not be confidential, they tend to choose not to participate. Trial Tr. (Jan. 23) at 98:7-23 (Mathiowetz).

483.    Although responses to the decennial census are confidential by law, these legal protections may do little to assuage concerns for groups, like Latinos or immigrants, who are particularly sensitive to the citizenship question in the current political environment. PX-696 at 602-04, 606-10 (Barreto); *see also* PX-462; PX-430.

484.    The macroenvironment in which a survey is administered can impact respondents' concerns about trust and confidentiality, and thus the sensitivity of a question. Trial Tr. (Jan. 23) at 97:15-22 (Mathiowetz). Where the macroenvironment creates a perception that a question is threatening, respondents will view participation as putting them at risk, and self-response rates will decline. PX-696 at 610 (Barreto).

485.    The political environment within which a Census is taken, which is a component of the macro-environment, can affect the sensitivity of the citizenship question, and thus response rates. PX-1194 at 926:21-23; Trial Tr. (Jan. 30) at 125:4-16 (Abowd).

486.    The current political environment around immigration and immigration enforcement amplifies the effect of the citizenship question on response rates as compared to 2010 and 2016. PX-1194 at 927:5-10; Trial Tr. (Jan. 30) at 125:17-24, 131:10-15 (Abowd); *see also* PX-22 at 6 (AR 1277); PX-162 at 39; Massey Decl. ¶ 20-22; Trial Tr. (Jan. 23 ) at 62:10-63:2 (O'Hare).

487.    The citizenship question has made the macroenvironment more challenging than it would have been without the question. Trial Tr. (Jan. 30) at 194:11-14 (Abowd). The citizenship question is a major challenge to the success of the 2020 Census separate and apart from the pre-existing macro-environment. *Id.* at 147:16-20.

488.    The last time an inquiry on citizenship was asked of every household in the United States was the 1950 decennial census. Trial Tr. (Jan. 30) at 131:16-23 (Abowd). The macroenvironment has changed since 1950. *Id.* at 131:25-132:1 (Abowd).

489.    The last time that the ACS citizenship question was thoroughly tested was in 2006, 14 years prior to the use of the question on the 2020 Census. Trial Tr. (Jan. 30) at 156:22-157:4 (Abowd). The macroenvironment in 2020 will be different than the macroenvironment in

2006. *Id.* at 157:5-7.

### 2. Undisputed Evidence Establishes That a Citizenship Question Is Sensitive for Hispanic and Noncitizen Households.

490.    The parties agree that the citizenship question is sensitive for Hispanics and

noncitizens. PX-22 at 5 (AR 1277); PX-162 at 54; Trial Tr. (Jan. 23) at 97:15-99:9, 112:4-21,

113:3-22 (Mathiowetz); PX-696 at 620-21 (Barreto); PX-1194 at 917:4-7; Trial Tr. (Jan. 30) at

131:5-9, 148:5-9 (Abowd); Massey Decl., ECF 99-6, ¶¶ 20-22; *see generally infra*, ¶¶ 491 - 528.

#### a)    Item Non-Response and Break-off Rates

491.    The Census Bureau has examined item non-response rates on the ACS for

different racial and ethnic groups between 2013 and 2016. PX-22 at 4 (AR 1277); PX-162 at 9-

10; PX-1194 at 905:22-906:11.

492.    Item non-response rates refer to the rate at which respondents do not answer

particular questions on a survey. PX-1194 at 905:22-906:11; Trial Tr. (Jan. 30) 129:22-24.

493.    Item non-response rates are indicative of the sensitivity of a question. Trial Tr.

(Jan 30) at 129:25-130:2.

494.    From 2013 through 2016, the item non-response rate for the citizenship question

on the ACS was more than twice as high for Hispanics as it was for non-Hispanic whites for both

the mail-in and internet response versions of the ACS. PX-22 (AR 1277); PX-162 at 8-10; PX-

1194 at 906:12-907:20; Trial Tr. (Jan. 30 ) at 130:3-12; Census Bureau 30(b)(6) Dep. Vol. II at

359:13-361.

495.    During that period, item non-response rates for Hispanics increased, while they

remained stable for non-Hispanic whites. PX-22 (AR 1277); PX-162 at 8-10.

496.    The increase in item nonresponse for the citizenship question among Hispanics is not attributable to an increase in item nonresponse to all questions. PX-162 at 9; PX-1194 at 912:10-19.

497.    For Hispanics, the item nonresponse rates for the citizenship question increased from 2013 to 2016, in contrast to other questions, such as sex. PX-162 at 9.

498.    Item non-response to the citizenship question increased between 2010 and 2016 relative to item non-response for other ACS questions, and item non-response for Hispanics and Asians is higher relative to other populations. Trial Tr. (Jan. 23) at 67:1-70:8 (O'Hare); PX-340.

499.    The Census Bureau has also examined breakoff rates from the 2016 ACS. PX-22 at 5-6 (AR 1277); PX-162 at 10.

500.    The breakoff rate is the rate at which people responding to the ACS online stop answering the survey on a particular question. PX-1194 at 913:17-24; Trial Tr. (Jan. 30) at 130:13-19 (Abowd).

501.    Breakoff rates are indicative of the sensitivity of a question. Trial Tr. (Jan. 30) at 130:20-23 (Abowd).

502.    On the 2016 ACS, breakoff rates for Hispanics at the citizenship question were more than 8 times the rate for non-Hispanic whites. PX-22 at 5-6 (AR 1277); PX-69 (AR 2737); PX-162 at 10; PX-1194 at 914:5-8; Census Bureau 30(b)(6) Dep. Vol. II at 361:6-363:4; Trial Tr. (Jan. 30) at 131:5-9 (Abowd).

503.    The difference in breakoff rates in the 2016 ACS indicate that the citizenship question is more sensitive for Hispanic than non-Hispanic whites. PX-22 at 5-6 (AR 1277); PX-162 at 10; PX-1194 at 914:9-12.

504.    Between 2016 and 2017, the breakoff rate for Hispanics at the citizenship

question increased, while it did not for non-Hispanic whites, resulting in a larger difference between the two groups. On the 2017 ACS, the Hispanic breakoff rate at the citizenship question was 12 times higher than the rate for non-Hispanic whites. PX-151 (AR 12757); PX-1194 at 916:4-917:3; Census Bureau 30(b)(6) Dep. Vol. II at 363:5-364:20.

505.    Hispanics are more sensitive to citizenship survey questions than they were a few years ago, while non-Hispanic whites are not. PX-1194 at 917:8-918:2; Census Bureau 30(b)(6) Dep. Vol. II at 366:17-369:19; Trial Tr. (Jan. 23) at 99:21 to 103:4 (Mathiowetz).

**b) CBAMS**

506.    From February through May 2018, the Census Bureau conducted the Census Barriers, Attitudes, and Motivators Study ("CBAMS"), which consisted of a survey of 50,000 households and a series of 42 focus groups. PX-1194. at 927:18-928:11; PX-163; PX-264; PX-662.

507.    The CBAMS is designed to provide the Census Bureau with reliable, actionable information about the macroenvironment and is used to inform the Census Bureau's integrated partnership and communications program. PX-1194 at 926-927; Trial Tr. (Jan. 30) at 132:20-25; Census Bureau 30(b)(6) Dep. Vol. II at 437:6-438:16.

508.    The CBAMS focus groups provide qualitative evidence about the potential effects of the citizenship question on the 2020 Census. Trial Tr. (Jan. 30) at 133:5-9 (Abowd).

509.    Subsequent to the Secretary's announcement of the addition of the citizenship question, Census Bureau researchers asked about a citizenship question in thirty out of forty-two CBAMS focus groups, including all Spanish-language focus groups. PX-152 (AR 13025); PX-163; PX-1194 at 930:16-19; PX-1216.

510.    A PowerPoint containing the CBAMS focus group findings was presented to Undersecretary Kelley and Secretary Ross in September 2018. PX-163; PX-1194 at 928:20-

929:16; Census Bureau 30(b)(6) Dep. Vol. II at 445:5-18, 448:5-17.

511.    The CBAMS focus groups demonstrated that respondents will be unwilling to participate in the 2020 Census out of fear that the citizenship question would be used for immigration enforcement. For example, for Hispanics living in the mainland United States, the citizenship question is a "determining factor" for participation in the 2020 Census. PX-152 at 22 (AR 13025). "While all participants expressed the desire to be counted, fear of deportation outweighs any benefit." *Id.*; PX-1194 at 933:23-934:7; Census 30(b)(6) Dep. Vol. II at 449:5-13, 449:21-451:9.

512.    People who are afraid of deportation will be an extremely difficult group to count. PX-1194 at 934:13-936:13.

513.    The fear of participation is particularly heightened among recent Hispanic immigrants, but naturalized and native-born Hispanic citizens also would not participate in the 2020 Census because of the citizenship question out of fear for their community and members of their households. PX-1216 at 70; Trial Tr. (Jan. 30) at 145:21-146:19 (Abowd).

514.    The CBAMS focus groups demonstrated that education efforts to dispel the notion that citizenship data from the 2020 Census will be used for deportation may be unsuccessful. PX-1216 at 70; Trial Tr. (Jan. 30) at 147:1-11; *see also* PX-152 at 22 (AR 13025) (noting that Hispanic focus group participants indicated that "there was not a single trusted voice that could mitigate their distrust of the government to uphold the promise of confidentiality").

515.    The focus group results also demonstrate that members of the Hispanic community would be more likely to self-respond if there was not a citizenship question on the 2020 Census questionnaire. PX-1194 at 936:14-937:4; PX-152 at 22 (AR 13025).

516.    The Census Bureau has concluded that the citizenship question poses a major

challenge for the success of the 2020 Census and, in particular, that the citizenship question poses a "significant" or "high" barrier to participation across the Hispanic community. PX-1216 at 64; Trial Tr. (Jan. 30) at 143:18-21, 145:15-20, 147:12-15 (Abowd); *see also* PX-1194 at 934:8-12 (Abowd) (agreeing that the focus group results indicate citizenship question is "extremely problematic" for the Hispanic population); *id.* at 944:11-14 (agreeing that Census Bureau will have "major difficulty in fielding the 2020 Census to regain the trust of the Hispanic community").

517.     The CBAMS focus groups reflected similar results for other immigrant communities. PX-1194 at 930:9-24; 938:22-939:17; 940:04-941:14; PX-1216 at 66-70.

518.     The CBAMS results further support the conclusion that the citizenship question is sensitive for Hispanic and noncitizen populations. In particular, with respect to the citizenship question, while 22% of respondents overall believed their answers will be used against them, "that estimate is higher among Hispanics, 32%, and for the foreign born, 34%, suggesting a heightened increase of concern among those two population groups." Trial Tr. (Jan. 23) at 110:4-111:1 (Mathiowetz); *see also id.* at 106:10-107:11; PX-152 (AR 13025); PX-163.

### c)  Center for Survey Measurement Memorandum

519.     In addition to the CBAMS, the Center for Survey Measurement ("CSM") at the Census Bureau also found concerns about confidentiality during focus group testing in 2017 that specifically relate to concerns about immigration and immigration enforcement. PX-136 (AR 10386); PX-448; PX-158 (AR).

520.     Researchers at the CSM summarized several issues relating to "Respondent Confidentiality Concerns" in a September 20, 2017 memorandum for the Associate Directorate for Research and Methodology at the Census Bureau, and in a subsequent November 2, 2017 presentation. PX-158 (AR); PX-448.

113

521.    The CSM memorandum reports a marked increase in concerns about confidentiality, particularly among immigrant respondents, in 2017. PX-158 (AR). In particular, researchers noted a "[r]ecent increase in respondents spontaneously expressing concerns to researchers and field staff about confidentiality and data access relating to immigration" and immigration enforcement. PX-448 at 2. The researchers also noted an "unprecedented" increase in "spontaneous mention of concerns regarding negative attitudes toward immigrants." PX-158 at 3 (AR).

522.    The researchers noted one example in which a Census Bureau interviewer was conducting a survey interview with questions about citizenship status. When asked about his year of entry, the interviewee "'shut down' and stopped responding to [the interviewer's] questions. He then walked out and left her alone in the apartment." *Id*. at 5.

523.    The researchers emphasized that such behavioral changes were recent, quoting one Census Bureau interviewer who reported that "[t]hree years ago was so much easier to get respondents compared to now because of the government changes . . . and trust factors . . . Three years ago I didn't have problems with the immigration questions." PX-448 at 13. One field representative observed that "[t]he politics have changed everything." PX-158 at 4 (AR).

524.    The CSM researchers warned that the concerns expressed in these surveys may be "even more pronounced" during the 2020 Census, because respondents are generally more willing to participate in the pretesting surveys discussed in the memo, "given that they are being paid a cash incentive for their participation and [are] being interviewed by a researcher with whom they have established rapport." *Id.* at 3.

525.    This memorandum provided further evidence of the sensitivity of the citizenship question for Hispanics and noncitizens and the issues of trust and confidentiality among this

population. Trial Tr. (Jan. 23) at 105:2-106:9 (Mathiowetz); PX-158 (AR).

### d)  Organizational Testimony

526.    Organizational Plaintiffs that conduct census outreach and advocacy also agree that based on their experience working with mixed-immigration status households  during the 2000 and 2010 decennial censuses, that the citizenship question will lead to a differential self-response in households with at least one noncitizens.  *See*, *e.g.*, P. Garcia Decl. ¶¶ 3 & 6; Gonzalez Decl. ¶¶ 3 & 12; Salas Decl. ¶¶ 3 & 14; Navarrete Decl. ¶ 3; Tso Decl., ¶¶ 3 & 10.

527.    For example, Plaintiff Juanita Valdez-Cox, Executive Director of Plaintiff LUPE provided credible and persuasive testimony that because the last two years have been difficult for immigrant communities in Hidalgo County, in particular for mixed-immigration status households, residents are "going to be so much more fearful of answering and [will] wonder about the consequences."  Trial Tr. (Jan. 22) at 173:6-175:4; *see also id*.at 179:19-180:22.  In Hidalgo County, where Ms. Valdez-Cox lives, families like her own that contain both native-born Hispanic citizens and naturalized citizens will not participate in the 2020 Census because of fear that the citizenship question could result in harm to non-U.S. citizen family and friends.  Trial Tr. (Jan. 22) at 179:19-180:22, 182:6-21.

528.    Similarly, John Park, Executive Director of Plaintiff MinKwon, provided credible and persuasive testimony that "there is a real climate of fear, trauma" and "anxiety" in the Asian American and immigrant communities that has been increased by the addition of the citizenship question making MinKwon's work of reaching hard-to-count communities increasingly difficult.  *Id*. at 214-5-218:3.

3.  **Undisputed Quantitative Evidence Establishes that the Addition of a Citizenship Question Will Cause a Differential Decline in Unit Self-Response Rates for Hispanics and Noncitizens.**

a)  **The Citizenship Question Will Result in a Differential Decline in Self-Response Rates for Noncitizen Households by At Least 5.8 Percentage Points.**

529.    The parties agree that the addition of a citizenship question will differentially reduce self-response rates among households that may contain noncitizens compared with all other households, and that the amount of that differential reduction will be at least 5.8 percentage points. *See, e.g.*, PX-22 (AR 1277); PX-162; Trial Tr. (Jan. 23) at 119:21-120:5, 163:18-21 (Mathiowetz); PX-696 at 620-21 (Barreto).

530.    The decrease in self-response rates among households with a noncitizen or a person of unknown citizenship status caused by the citizenship question could range between 5.1 and 11.9 percentage points depending on various estimates and assumptions. The best conservative estimate is that the differential decline in self-response for households that may contain a noncitizen is 5.8 percentage points. PX-162 at 38-39 (Tables 8 & 9); PX-1194 at 897:16-20; Census Bureau 30(b)(6) Dep. Vol. II at 372:2-12; *see also* Trial Tr. (Jan. 23) at 113:23-119:6, 125:12-21 (Mathiowetz).

531.    The Census Bureau has analyzed the anticipated decline in self-response rates among households with noncitizens in a series of memoranda drafted by senior technical staff at the Census Bureau under the supervision of Dr. Abowd, culminating in a White Paper that has been submitted for publication in a peer-reviewed journal. PX-1194 at 896:7-12, 948:13-949:4; Trial Tr. (Jan. 30) 129:12-14 (Abowd).

532.    Subsequent to receiving the DOJ's letter requesting the addition of a citizenship question to the 2020 Census questionnaire, a team of technical experts assembled by Dr. Abowd compiled a December 22, 2017, draft White Paper, which contained the team's preliminary

analysis of the impact of the citizenship question on response rates among households containing at least one noncitizen. PX-102 (AR 5500); PX-1194 at 896:7-12. That draft White Paper estimated a 5.1 percentage point differential decline in self-response among noncitizen households. PX-102 (AR 5500) at 6-7. It noted that "this evidence is consistent with citizenship questions being more sensitive for households with noncitizens." *Id.* at 7.

533.    The analysis contained in this December 22, 2017 draft White Paper was incorporated into a January 19, 2018 technical review of the DOJ request prepared by the Census Bureau ("January 19 Abowd Memo"). PX-22 (AR 1277); PX-1194 at 896:7-12 (Abowd). It was also incorporated into a March 1, 2018 analysis of "Alternative D" (March 1 Abowd Memo) prepared for Secretary Ross. PX-25 (AR).

534.    The January 19 Abowd Memo and March 1 Abowd Memo, which were submitted to Secretary Ross and are part of the Administrative Record, reflect the Bureau's best conservative estimate at the time that the differential decrease in self-response rates caused by the addition of a citizenship question would be 5.1 percentage points for households containing one or more noncitizens relative to all-citizen households. PX-22 (AR 1277); PX-25 (AR 1308); PX-1194 at 893:12-22; *see also* PX-297 at 96-97 (admitting that the Census Bureau found empirical evidence of a potential decline in self-response rates).

535.    The 5.1 percentage point estimate was the best available analysis that the Census Bureau was able to perform within the time frame of the Secretary's announcement of the addition of a citizenship question; reflected the consensus view of the Bureau's senior executive staff; and was sufficient to support the Bureau's recommendation that the citizenship question should not be added to the 2020 Census Questionnaire. Trial Tr. (Jan. 30) at 127:11-24 (Abowd).

536.    In arriving at the 5.1 percentage point estimate, the Census Bureau conducted a

natural experiment, comparing the change in self-response rates between the 2010 ACS, which contained a citizenship question, and the 2010 Decennial Census, which did not contain a citizenship question, for two groups: (a) households where all members of the households were citizens (as reflected by administrative records); and (b) households with at least one noncitizen (as reflected in the administrative records). PX-22 at 4 (AR 1277); PX-1194 at 891-893.

537.    Natural experiments are a well-accepted method of research in the social sciences, and constituted the best available data for purposes of planning for the 2020 Census. PX-1194 at 926:17-20; Trial Tr. (Jan. 30) at 129:6-8 (Abowd).

538.    The Bureau also conducted a similar analysis with respect to the 2000 Census, comparing the decline in self-response between the 2000 short-form, which did not contain a citizenship question, and the 2000 long-form, which did, for all-citizen households and households with at least one noncitizen. PX-22 at 4 (AR 1277); PX-162 at 40; PX-1194 at 887:16-20 (Abowd). This analysis found a differential decline in self-response rates of 3.3 percentage points for households with at least one noncitizen compared to all-citizen households in the 2000 Census. PX-22 at 4 (AR 1277); PX-162 at 40; PX-1194 at 888:7-12.

539.    The January 19 Abowd Memo warned that a 5.1 percentage point estimated differential decline in self-response for noncitizen households was "conservative," that "differences between citizen and noncitizen response rates . . . will be amplified during the 2020 Census compared to historical levels," and that the differential decrease in self-response rates in 2020 "could be much greater than the 5.1 percentage points we observed during the 2010 Census." PX-22 at 6 (AR 1277).

540.    The Bureau's calculation of a 5.1 percentage point differential decline in self-response for noncitizen households was subject to rigorous internal peer review within the

Census Bureau. Trial Tr. (Jan. 30) 64:7-15, 68:12-16.

541.    As a result of that peer review, the Bureau's analyses contained in the December 22, 2017 draft White Paper and the January 19 Abowd Memo have been updated and extended, and the most recent version of these analyses is contained in an August 6, 2018, White Paper authored by J. David Brown and other Census Bureau staff ("Brown et al. Memo"). PX-162; PX-1194 at 896:7-12, 948:13-949:3.

542.    The analysis in the Brown et al. memo is methodologically sound, provides credible quantitative evidence, and constitutes the best analysis the Bureau can do on the impact of the citizenship question. PX-1194 at 896:3-897:20; Census Bureau 30(b)(6) Dep. Vol. II at 353:19-354:4, 354:10-18, 355:3-20, 356:7-15, 357:6-11. The Census Bureau agrees with the analysis contained in the Brown et al. Memo. PX-1194 at 897:13-15 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 357:6-11.

543.    The Brown et al. Memo calculates that a conservative estimate of the differential decline in self-response among households that may contain a noncitizen as a result of the citizenship question is 5.8 percentage points. PX-162 at 39. This calculation reflects the Census Bureau's present best conservative estimate of the impact of the citizenship question on self-response for these households. PX-1194 at 894:23-895:2.

544.    In arriving at the 5.8 percentage point estimate, the Brown et al. Memo conducted a natural experiment that compared the decline in self-response rates between the 2016 ACS and the 2010 Decennial Census for all-citizen households (as confirmed by administrative records and their responses to the ACS citizenship question) and all other households (i.e., households that did contain or potentially contained noncitizens). PX-1194 at 898:2-899:6; Census 30(b)(6) Dep. Vol. II at 373:9-15; PX-162 at 38-39.

545.    The Brown et al. Memo then utilized statistical techniques to control for the burden of the longer ACS questionnaire and for other groups of questions on the ACS. Trial Tr. (Jan. 30) 68:17-71:3, 71:23-72:9 (Abowd). The 5.8 percentage point differential decline in self-response for households potentially containing noncitizens is therefore not explained by the burden caused by the greater length of the ACS questionnaire, or by certain other groups of potentially sensitive questions on the ACS. PX-162 at 38-39; Trial Tr. (Jan. 30) at 69:12-70:3 (Abowd).

546.    The Brown et al. Memo also conducted an analysis of response rates to the Survey of Income Program Participation ("SIPP"), a survey containing a citizenship question. PX-162 at 41. That analysis revealed that, in more recent time periods, noncitizens shrunk as a share of respondents. *Id.* The Bureau considers this evidence to be consistent with other evidence suggesting that households containing noncitizens or persons of unknown citizenship status are more sensitive to questions about citizenship status. Census Bureau 30(b)(6) Dep. Vol. I at 113:17-116:12; PX-162 at 40-41.

547.    The analyses of the decline in self-response attributable to the citizenship question contained in the December 22, 2017, draft White Paper, the January 19 Abowd Memo, the March 1 Abowd Memo, and the Brown et al. Memo apply to any alternative in which a citizenship question is asked on the Census short form, including Alternative D, the Secretary's chosen alternative. PX-1194 at 888:22-889:6; PX-297 at RFA-22.

548.    Plaintiffs' expert Dr. O'Hare analyzed the demographic and geographic characteristics of the noncitizen population. He found that Hispanics and Asians make up a disproportionate share of households with noncitizens. While 13.89% of the general population lived in households with at least one noncitizen, 44.9% of Hispanics and 45.6% of Asians lived

in households with at least one noncitizens. Trial Tr. (Jan. 23) at 54:4-55:5 (O'Hare). Further, of all people living in a household with at least one noncitizen, more than three quarters were Hispanic or Asian (57.5% Hispanic, 17.6% Asian). Trial Tr. (Jan. 23) 54:4-56:14 (O'Hare); PX-1082.

549.    In addition, as Dr. O'Hare testified, twelve states had a higher percentage of noncitizen households than the national average, and also had a disproportionate share of the nation's Hispanic and Asian populations. Trial Tr. (Jan. 23) at 59:14-60:15 (O'Hare).

550.    Based on this demographic analysis, Dr. O'Hare concluded that the "data shows that Hispanics and Asians are overrepresented in those households [with noncitizens] and so I think that Hispanics and Asians will get a disproportionate share of the harm caused by that addition." Trial Tr. (Jan. 23) at 59:14-61:2 (O'Hare).

> **b)  The Citizenship Question Will Result in a Differential Decline in Self-Response Rates for Hispanics by At Least 8.7 Percentage Points**

551.    The parties agree that the addition of a citizenship question will differentially reduce self-response among Hispanic households relative to all other households. Trial Tr. (Jan. 23) at 112:17-21 (Mathiowetz); PX-696 at 620-21 (Barreto); *see also* PX-1194 at 918:10-919:2; Trial Tr. (Jan. 30) 74:5-13 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 365:18-366:16; 364:21-365:6.

552.    The Census Bureau did not conduct a quantitative analysis of the impact of the addition of a citizenship question to the 2020 Census questionnaire on response rates for Hispanics. Trial Tr. (Jan. 30) at 148:5-149:2 (Abowd).

553.    This analysis was not performed, in part, because the Census Bureau did not believe that such an analysis was necessary to support its recommendation to Secretary Ross that

the a citizenship question would have adverse effects on the 2020 Census and should not be added. *Id.* at 149:9-14.

554.    Nevertheless, the item non-response and breakoff rates for Hispanics discussed above provide statistical evidence that the self-response to the 2020 Census will decline more among Hispanics than non-Hispanic whites as a result of the citizenship question. PX-1194 at 908:2-6, 910:7-13, 914:9-11, 919:12-920:10; Trial Tr. (Jan. 30) at 74:5-12 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 365:18-366:16; 364:21-365:6.

555.    There is credible quantitative evidence that the citizenship question will differentially reduce self-response rates among Hispanics by at least 8.7 percentage points. Trial Tr. (Jan. 23) at 120:12-122:25, 126:13-23 (Mathiowetz); PX-938; PX-1214.

556.    Plaintiffs' expert Dr. Mathiowetz quantified the impact of the citizenship question on self-response rates for Hispanics by comparing self-response rates to the 2010 ACS and 2010 Decennial Census forms for Hispanic and non-Hispanic households. Trial Tr. (Jan. 23) at 120:12-122:5; PX-938.

557.    Dr. Mathiowetz's method is analogous to the natural experiment conducted by the Census Bureau to determine the impact of the citizenship question on self-response rates for noncitizen households in the January 19 Abowd Memo and the Brown et al. Memo. Jan. 23 Trial Tr. 120:12-122:25 (Mathiowetz); PX-938; PX-162; PX-22 (AR 1277). Because the analyses contained in the January 19 Abowd Memo and the Brown et al. Memo relied on non-public Census Bureau data, Dr. Mathiowetz's analysis is not identical to the analyses in those memos. However, Dr. Abowd acknowledged that it comes as close to the kind of natural experiment contained in those memos as is possible based on publicly-available data. Jan. 30 Trial Tr. at 67:22-24 (Abowd).

558.    Dr. Mathiowetz's natural experiment revealed that the differential decline in self-response for Hispanic households compared to other households was 8.7 percentage points in 2010. Trial Tr. (Jan. 23) at 122:3-25; PX-938; PX-1214.

559.    A similar analysis using data from the 2000 Census revealed that the differential decline in self response for Hispanics between the 2000 Census short form (which did not ask about citizenship) and the long form (which did) was 5.1 percentage points. Trial Tr. (Jan. 23) at 123:1-124:12 (Mathiowetz); PX-342; PX-1214.

560.    Plaintiffs' expert Dr. Barreto conducted an original public opinion survey on the effect of a citizenship question on response rates. PX-696 at 590. Dr. Barreto's survey, which examined the willingness of respondents to participate in the 2020 Census, included a Randomized Control Trial ("RCT") experiment.

561.    Dr. Barreto conducted a survey of 6,309 respondents from across the United States, with an additional oversample of Latinos, and geographic oversamples in San Jose, California and Cameron County and Hidalgo County, Texas. PX-696 at 651-53; PX-669.

562.    Dr. Barreto explained surveys such as the one he performed can "reliably represent populations with millions of members" and are extensively relied on both by the federal government and in social science research more generally to understand public opinion and participation. PX-696 at 645.

563.    Dr. Barreto's survey met all the applicable criteria for ensuring accuracy and reliability that enabled him to extrapolate his results to the national population. *Id.* at 646-47. Dr. Abowd agreed that Dr. Barreto's survey was conducted according to the relevant standards in political science and was comparable to the standards that the Census Bureau uses in conducting the survey component of the CBAMS. Trial Tr. (Jan. 30) at 75:11-19.

564.    In his survey, Dr. Barreto inquired, *inter alia*, into the likelihood that a respondent would respond to a census with and without a citizenship question. PX-696 at 650-51, 661:21-662:2.

565.    Dr. Barreto's survey revealed that the drop-off rate, which reflected respondents who would participate in a census without a citizenship question but would not participate if the census included a citizenship question, was 7.14 percentage points for all respondents, but 14.1 percentage points for Latinos. PX-696 at 669-73; *see also* PX-670.

566.    Dr. Barreto's survey also showed that Latino households stated that they were unwilling to participate in the census at substantially higher rates than the national sample as a whole, even after receiving assurances that their answers would be kept confidential. Specifically, after receiving confidentiality assurances, the national drop-off rates for all respondents was 9.69 percentage points and the drop-off rate for Latinos was 16.58 percentage points. PX-696 at 674-675; *see* PX-671.

c)    **Quantitative Estimates of the Differential Decline in Response Rates Are Conservative.**

567.    The parties agree that a 5.8 percentage point estimate for the differential decline in self-response among noncitizen households is conservative. PX-162 at 39; PX-1194 at 893:3-4; Trial Tr. (Jan. 23) 119:21-120:5, 163:18-21 (Mathiowetz).

568.    The 5.8 percentage point estimate is conservative because it is based on an analysis of ACS response rates, but a citizenship question on the 2020 Census questionnaire, which is much shorter, would be more prominent. PX-162 at 39; PX-1194 at 901:22-902:4; Trial Tr. (Jan. 23) 172:1-11 (Mathiowetz). As the Brown et al. Memo observes, the "ACS contains 75 questions, so any one question is unlikely to stand out, whereas an added question will be more visible in the 2020 Census questionnaire, which contains just 10 other questions." PX-162 at 39.

569.    The greater prominence of a citizenship question on the 2020 Census questionnaire means that the question will have a larger impact on self-response as compared to the less prominent citizenship question on the ACS. PX-1194 at 902:5-10; Census Bureau 30(b)(6) Dep. Vol. II at 376:13-377:5; *see also* Trial Tr. (Jan. 23) at 119:9-15, 125:22-126:12, 172:1-11 (Mathiowetz).

570.    The 5.8 percentage point estimate is also conservative because it is based on 2016 ACS data and does not account for salient developments that might impact response rates that occurred after 2016. PX-162 at 39; PX-1194 at 902:11-23, 944-46; Trial Tr. (Jan. 30) at 124:20-125:3 (Abowd); Trial Tr. (Jan. 23) at 119:16-120:5, 125:22-126:12 (Mathiowetz). As the Brown et al. Memo observes, "the level of concern about using citizenship data for enforcement purposes may be very different in 2020 than it was in 2000 or 2010." PX-162 at 39.

571.    Similarly, Dr. Mathiowetz's estimate that the citizenship question would differentially decrease self-response among Hispanic households by 8.7 percentage points is conservative because (a) it is based on 2010 data, and thus does not reflect changes to the sensitivity of the question since 2010 and (b) the citizenship question will have relatively greater prominence on the decennial form than it does on the ACS form. Trial Tr. (Jan. 23) at 126:24-127:6 (Mathiowetz).

572.    2017 ACS breakoff rates, research from the Center for Survey Measurement ("CSM"), and the Census Barriers, Attitudes, and Motivators Study (CBAMS) focus groups, all suggest that noncitizen and Hispanic sensitivity to a citizenship question has been increasing since 2016. PX-1194 at 944:7-14; PX-151 (AR 12757) (2017 break-off rates, showing a that breakoff for citizenship was twelve times higher for Hispanics than non-Hispanic whites); PX-158 (AR) (CSM Memo reporting "unprecedented" increase in respondent confidentiality

concerns, particularly for Hispanics and noncitizens); PX-152 (AR 13025), PX-163; PX-662;

PX-1216 (CBAMS reports and PowerPoint presentations reporting heightened concerns).

      **B.**  **The Differential Decline in Census Participation Among Hispanics and Noncitizens Caused by the Citizenship Question Will Lead to a Differential Undercount of These Subpopulations.**

          **1.**  **There Is Undisputed Quantitative Evidence That Demographic Groups and Geographies With Lower Self-Response Rates Have Higher Undercount Rates.**

573.    Undisputed quantitative analyses and credible, persuasive expert testimony

establish that demographic groups and geographic areas with lower self-response rates on the

decennial census have higher net undercounts. Trial Tr. (Jan. 23) 40-51 (O'Hare); *id.* at 133-145

(Mathiowetz); PX-890; PX-891; PX-1083-1085; PX-1087; PX-1088; PX-1089; PX-1090; PX-

1091; PX-1092; PX-1214.

574.    If a household provides a self-response to the decennial census that includes every

member of the household, then that household will be counted. Conversely, if a household is not

counted in the census, then it is necessarily true that the household did not provide a self-

response that included every household member. Trial Tr. (Jan. 30) at 170:18 to 171:5.

575.    Lower self-response causes higher undercounts because lower self-response

results in more enumerations through NRFU, which generates poorer quality data and

undercounts. Trial Tr. (Jan. 23) at 50:25-51:7, 53:20-54:32 (O'Hare), 145:13-20 (Mathiowetz);

*see also* PX-22 at 1, 5-6 (AR 1277); PX-162 at 42, 43 n.60 (noting that citizenship question will

increase "enumeration errors" that may be unavoidable through NRFU fieldwork).

576.    Plaintiffs' expert Dr. Mathiowetz reviewed studies on the relationship between

self-response and coverage errors in the 1990 and 2000 censuses, and conducted her own

independent analysis of this relationship in the 2010 Census.

577.    For the 1990 Census, a report prepared by the Special Advisory Panel on the 1990

126

Census and submitted to the Secretary of the Department of Commerce ("Ericksen et al.") found that, despite the fact that there was a NRFU operation in 1990, "the pattern of undercount is . . . strongly correlated with the mail-back rate" and net undercount increases as the mail-back rate drops. PX-890 at 9; Trial Tr. (Jan. 23) at 133:1-15 (Mathiowetz) (noting that the Ericksen et al. study demonstrates "a strong relationship between what they referred to as mail-back rates or self-response and undercount"). The report concluded that, "to the extent that it fails to obtain a high mail-back rate, the Bureau cannot make a complete count." PX-890 at 10; Trial Tr. (Jan. 23) at 133:10-134:9 (Mathiowetz). Based on the Ericksen et al. study and a subsequent publication by two of the authors ("Ericksen and DeFonso"), "what's clearly evident . . . is that . . . as the mail-back rate or self-response rate declines, the undercount rate in 1990 increases." Trial Tr. (Jan. 23) 134:10-136:3 (Mathiowetz); PX-890; PX-891 at 7 (Figure 1); PX-1214 at 9.

578.    The Ericksen et al. and Ericksen and DeFonso publications also demonstrated that a 10 percentage point decline in mail-back rate was associated with an increased undercount of approximately 2 to 2.5 percentage points. PX-891 at 7 (Figure 1); PX-1214 at 9; Trial Tr. (Jan. 23) at 136:4-137:13 (Mathiowetz).

579.    For the 2000 Census, Dr. Mathiowetz reviewed a publication by the National Research Council's panel to review the 2000 Census. That study focused on the relationship between self-response, omissions, and erroneous enumerations. PX-447. The study found a negative relationship between mail return rates and omissions and erroneous enumerations. The study's authors concluded that this result confirmed the findings of Ericksen et al. with respect to the 1990 Census. *Id.* at 437; Trial Tr. (Jan. 23) at 140:1-21 (Mathiowetz).

580.    For the 2010 Census, Dr. Mathiowetz was unable to locate a published study analyzing the relationship between self-response and undercount. Trial Tr. (Jan. 23) at 140:22-

25. As such, she undertook two analyses of this relationship in the 2010 Census.

      a.  First, Dr. Mathiowetz compared the self-response and undercount rates of Hispanics and blacks against that of non-Hispanic whites. In both cases, "a difference in mail return rate [or self-response rate] of somewhere on the order of 10 to 13 percentage points yield[ed] a differential undercount rate of about two to two and a half percent, so a pattern not dissimilar to what Ericksen et al. had established in 1990." Trial Tr. (Jan. 23) at 141:11-143:1; PX-1214 at 10.

      b.  Second, Dr. Mathiowetz conducted a statistical analysis of the self-response and coverage estimates for 626 geographic areas broken down into quartiles based on self-response rate. She found that the pattern observed in prior censuses continued in 2010: as mail return rates declined, the undercount rate increased. Dr. Mathiowetz found that the differences in undercount rates between the quartiles with the lowest self-response rates and the quartiles with the highest self-response rates was statistically significant. Trial Tr. (Jan. 23) at 143:2-144:2; PX-1202; *see also id.* 210:4-12 (Mathiowetz) (discussing PX-884 at 11).

581.    Plaintiffs' expert Dr. O'Hare used data on self-response rates, net undercounts, and omissions for various demographic groups and geographies in the 1990, 2000, and 2010 censuses and calculated Pearson correlation coefficients for the relationship between self-response rates, on the one hand, and net undercount and omission rates, on the other. Trial Tr. (Jan. 23) at 40:24-41:17.

582.    For the 1990 Census, Dr. O'Hare examined self-response and net undercount rates for seven demographic groups, and found a strong, statistically significant negative correlation between self-response rates and net undercount rates—i.e., when self-response

declined, net undercount increased. Trial Tr. (Jan. 23) at 43:16-44:15; PX-1089. Dr. O'Hare also examined self-response rates and net undercount rates across states, and found a moderate negative correlation between self-response and net undercount. Trial Tr. (Jan. 23) at 44:16-45:11; PX-1090.

583.    For the 2000 Census, Dr. O'Hare again examined self-response and net undercount rates for various demographic groups and found a strong negative correlation. The magnitude of this relationship, -0.97, "is very high by social science or demographic standards, and it suggests very strongly that there's a negative correlation between self-response rates of a group and the net undercount rates of that group." Trial Tr. (Jan. 23) at 45:12-46:2; PX-1087. Dr. O'Hare also found a strong negative correlation between self-response rates and net undercount rates across states in 2000. Trial Tr. (Jan. 23) at 46:3-12; PX-1088.

584.    In the 2010 Census, Dr. O'Hare found that self-response rates were negatively correlated with undercount rates across demographic groups. The magnitude of the relationship, -0.78, "is relatively strong and is statistically significant at the 90 percent confidence interval." Trial Tr. (Jan. 23) at 46:13-23; PX-1083; PX-1092. For 2010, Dr. O'Hare also looked at the relationship between self-response and omissions across demographic groups and across states. In both cases, Dr. O'Hare found a strong negative correlation between self-response and omission rates. Trial Tr. (Jan. 23) at 48:12-49:5; PX-1084; PX-1085.

585.    Based on these analyses, Dr. O'Hare concluded that "there is a negative correlation between groups['] self response rates and census accuracy. When groups have lower self response rates, they have higher net undercounts and higher omissions." Trial Tr. (Jan. 23) at 50:16-24.

586.    The relationship between a decline in self response and an increase in net

undercount is causal. Trial Tr. (Jan. 23) at 53:20-54:3, 50:25-51:7 (O'Hare); *id.* at 143:13-145:20 (Mathiowetz).

587.    Social scientists typically look for four elements to show causation: (1) that the causal agent occurs prior in time to the thing that it is causing; (2) that there is an association or correlation between the causal agent and the thing being caused; (3) that a reasonable explanation for the relationship between the causal agent and the thing being caused can be specified; and (4) that other potential explanations have been controlled. Trial Tr. (Jan. 23) at 52:2-25 (O'Hare); *see also id.* at 145:21-146:12 (Mathiowetz).

588.    Three elements of causation are satisfied here: self-response occurs prior in time to net undercounting, the decline in self-response is moderately to highly correlated with net undercounting, and the explanation for the causal relationship is clear: "lower self-response rates of a group mean that more of that group will have to be counted in the NRFU operation of the census, and there is lots of good evidence saying the accuracy of the NRFU operation is not as good as the accuracy of the self-response rate." Trial Tr. (Jan. 23) at 52:16-25 (O'Hare); *see also id.* at 145:8-147:22 (Mathiowetz) (noting the factors that support a causal inference and describing the causal mechanism linking self-response and undercount: "once you don't have self-response, the quality of the data that you get . . . is nowhere near as good as the quality of the data that you get from self-response, and so you can see the mechanism by which a lower self-response leads to poorer quality data and a higher undercount.").

589.    The Census Bureau has acknowledged that response rates and net undercount rates may be linked. *See* PX-346 at 5 (noting that "research suggests that areas with the lowest levels of cooperation have higher levels of coverage and nonresponse error").

590.    Dr. Abowd admitted that the Census Bureau could have conducted an analysis of

the relationship between self-response and undercount as part of its analysis of the citizenship question. Trial Tr. (Jan. 31) at 6:11-14. This analysis would have relied on non-public data available only to the Census Bureau. *Id.* at 6:15-18.

591.    However, the Census Bureau did not pursue this analysis. Trial Tr. (Jan. 30) 109:2-6 (Abowd); Trial Tr. (Jan. 31) 6:22-7:11. It was within Dr. Abowd's power to recommend that such a study be pursued. *Id.* at 6:19-21.

592.    One reason that Dr. Abowd did not recommend such a study is because he did not think it was necessary to support the Census Bureau's recommendation not to add a citizenship question to the 2020 Census. *Id.* at 6:22 to 7:1. Even without this study, the Bureau remains confident in its recommendation that a citizenship question should not be added to the 2020 Census. *Id.* at 7:2-7.

593.    Defendants' expert Dr. Abowd was not aware of any quantitative studies on the relationship between self-response and net undercount as of October 2018, and did not discuss any such studies in his expert report filed in this case. Trial Tr. (Jan. 31) at 6:3-10.

### 2. The Differential Decline in Self-Response Rates Caused by the Citizenship Question is Especially Likely to Lead to Differential Undercounts Because NRFU and Imputation Will Be Especially Ineffective at Mitigating the Decline in Self-Response.

594.    Based on the Census Bureau's current best conservative estimate of a 5.8 percentage point differential decline in self-response among households that potentially contain noncitizens, the Bureau expects an increase in NRFU workload of 2.09 million households and 6.5 million persons. PX-162 at 42; *see also* PX-1194 at 894:1-895:2 (Abowd).

595.    For Hispanics, the increase in NRFU workload may be 10 to 11 million people. PX-696 at 683-86 (Barreto); PX-675; PX-676.

596.    Given the expected decline in self-response rates because of the citizenship

question, the Census Bureau's ability to obtain a complete enumeration depends on the effectiveness of NRFU and count imputation. Without NRFU and imputation, a decline in self-response would translate into an undercount. Trial Tr. (Jan. 30) at 172:6-14 (Abowd).

597.    However, there is no evidence indicating that NRFU will be sufficient to address the marginal increase in nonresponse caused by the citizenship question. Trial Tr. (Jan. 30) at 172:15-20 (Abowd).

598.    Rather, all available evidence clearly demonstrates that NRFU and imputation will not address the increase in nonresponse among Hispanic and noncitizen households as a result of the citizenship question, and in fact may exacerbate the differential undercount. *See infra* ¶¶ 599 - 691.

> ### a)  Historically, NRFU Operations Have Been Unable to Prevent Undercounts Among Hispanics and Noncitizens

599.    The Census always fails to count some people. Census 30(b)(6) Dep. Vol. I at 253:20-254:4; *see* PX-267 at 18, 20 (Tables 7 & 9) (AR). Even though every address in the Master Address File ("MAF") is accounted for in the Census, people are still missed in the census count. Trial Tr. (Jan. 31) at 14:8-10 (Abowd).

600.    In particular, some demographic groups have proven more difficult to count in past decennial censuses. These groups are referred to as "hard to count." Joint Stips. at ¶ 47. Racial and ethnic minorities, immigrant populations, and non-English speakers have historically been some of the hardest groups to count accurately in the Decennial Census. *Id.* ¶ 48.  Hispanics and noncitizens are considered hard to count. Trial Tr. (Jan. 30) at 191:10-15 (Abowd).

601.    The 1990, 2000, and 2010 Censuses all had NRFU processes, including the use of in-person enumeration, proxies, and imputation. Census Bureau 30(b)(6) Dep. Vol. II at 400:19-401:21. Nevertheless, even with these NRFU efforts, the Census Bureau was not completely

successful in remedying the omissions for certain population subgroups, including Hispanics.
Trial Tr. (Jan. 23) at 146:18 to 147:7 (Mathiowetz); PX-267 at 18 (Table 7) (AR).

602.    The post-enumeration survey conducted for the 1990 Census determined that,
following NRFU and imputation, Hispanics were undercounted by 4.99% and non-Hispanic
whites were undercounted by 0.68%, resulting in a net undercount of Hispanics of 4.31 percent.
PX-267 at 18 (Table 7) (AR).

603.    The post-enumeration survey conducted for the 2000 Census determined that,
following NRFU and imputation, Hispanics were undercounted by 0.71% and non-Hispanic
whites were overcounted by 1.13 percent, resulting in a net undercount of Hispanics of 1.84%.
PX-267 at 18 (Table 7) (AR).

604.    The post-enumeration survey completed after the 2010 Census found that neither
omissions nor the undercount was distributed evenly across racial and ethnic groups. PX-267
(AR); Census Bureau 30(b)(6) Dep. Vol. II at 401:22-402:6, 403:21-404:21. In particular, Blacks
and Hispanics had higher omission rates than non-Hispanic whites, and also a higher undercount
rate. PX-267 (AR); Census Bureau 30(b)(6) Vol. II at 404:22-406:19; Trial Tr. (Jan. 31) at 8:17-
9:22 (Abowd).

605.    Following NRFU and imputation in 2010, there was no net undercount of the total
population, but differential undercounts of specific races and ethnicities persisted. Specifically,
Hispanics were undercounted by 1.54% and non-Hispanic whites were overcounted by 0.84%,
resulting in a differential undercount of Hispanics of 2.38%. PX-267 at 20 (Table 9) (AR); Trial
Tr. (Jan. 31) at 10:9-20 (Abowd); *see also* Trial Tr. (Jan. 23) at 36:7-38:8 (O'Hare) (overall
nationwide net undercount of zero can mask undercounts of specific groups and geographies).

606.    In 2010, the undercount of Hispanics and blacks was offset by overcounting non-

Hispanic whites, generating an overall slight net overcount for the total population. Trial Tr.
(Jan. 31) at 11:15-12:21 (Abowd). As Dr. Abowd noted, if there were a net undercount of blacks
and Hispanics, but no overcount of whites, then there would be a net undercount for the overall
population. *Id.* at 11:24-12:5.

607.    In 2010, the gross omissions for Hispanics were not entirely offset by erroneous
enumerations and whole-person census imputations of Hispanics—resulting in a net undercount
of Hispanics. Trial Tr. (Jan. 31) at 10:21-24 (Abowd).

608.    The 2010 coverage evaluation revealed that the Census Bureau's various
enumeration procedures, including NRFU efforts, are more likely to miss Hispanics as compared
to non-Hispanic whites. PX-267 at 18 (Table 7) (AR); Census 30(b)(6) Dep. Vol. I at 259:1-15.

609.    The 2010 coverage evaluation revealed that the Census Bureau's various
enumeration procedures, including NRFU efforts, are more likely to miss people living in
bilingual areas compared to the U.S. population as a whole. PX-267 at 27 (AR); Census Bureau
30(b)(6) Dep. Vol. I at 261:11-16.

610.    Organizational Plaintiffs that conduct census outreach and advocacy also testified
that NRFU efforts by the Census Bureau in 2000 and 2010 were not sufficient to reach hard-to-
count communities.  *See*, *e.g.*, Gonzalez Decl. at ¶ 9; Tso Decl. at ¶ 9; Trial Tr. (Jan. 22) at
171:14-172:14 (Valdez-Cox).

611.    For example, Angelica Salas, Executive Director of Plaintiff CHIRLA, provided
credible testimony, based on her experience in 2010, that the Census Bureau's nonresponse
procedures and follow-up will not be sufficient to reach these communities that are traditionally
hard to count.  Salas Decl. at ¶ 10.  First, it is difficult for non-residents to locate and identify
non-standard addresses such as converted garages and multiple families living in a single

dwelling. *Id.* Second, language and dialect differences were a big concern in 2010 where many of the Spanish-speaking enumerators did not speak the same dialect or did not speak the indigenous languages spoken by Los Angeles County residents. *Id.* Most important is the trust issue; there is a lot of fear and distrust of the federal government, in particular fear of anyone perceived as being related to immigration enforcement, and these communities are more likely to open their doors and respond to CHIRLA staff and volunteers than they were to Census Bureau enumerators. *Id.*

   **b)  The Macro-Environment Will Make it More Difficult for NRFU Operations to Mitigate the Decline in Self-Response Rates.**

612.    The macro-environment, including the political context, affects NRFU efficacy. Census Bureau 30(b)(6) Dep. Vol. I at 314:4-315:1; Trial Tr. (Jan. 30) at 174:25-175:4 (Abowd).

613.    The parties agree that the citizenship question will exacerbate the effects of the macro-environment on the NRFU operation, and that households that choose not to self-respond because they are sensitive to the citizenship question in the present macro-environment are less likely to be enumerated in NRFU as compared to other non-responding households. Census Bureau 30(b)(6) Dep. Vol. I at 314:4-315:1; Trial Tr. (Jan. 30) at 174:25-175:4 (Abowd); PX-162 at 42-43; PX-696 at 620-22, 644:1-7, 687-89 (Barreto); Trial Tr. (Jan. 23) at 147:8-148:8, 149:20-150:20 (Mathiowetz).

614.    As Dr. Mathiowetz testified, in contrast to prior censuses where most people went into NRFU because they forgot to self-respond or did not realize there was a deadline, the inclusion of a citizenship question in the 2020 Census will "actually motivate nonresponse" and that this "intentional concealment" makes it unlikely that households that do not self-respond will respond in NRFU. Trial Tr. (Jan. 23) at 147:8-148:8 (Mathiowetz); *see also id.* 149:20-150:20 (Mathiowetz); PX-162 at 42-43; PX-1214 at 11.

615.    Similarly, the Census Bureau has concluded that households that choose not to self-respond to the census because of the citizenship question are unlikely to cooperate in NRFU. PX-162 at 41, 42 n.59, 43 n.60.  Thus, enumeration errors resulting from a decline in self-response caused by the citizenship question may be unavoidable regardless of how much money the Census Bureau spends on NRFU fieldwork. Census Bureau 30(b)(6) Dep. Vol. II at 380:16-381:13; Trial Tr. (Jan. 30) at 175:22-176:6 (Abowd). Even with unlimited resources, NRFU efforts may not eliminate undercount, because "[o]nce a household decide[s] not to cooperate, it may not be possible to obtain an accurate enumeration no matter how many times an enumerator knocks on the door." PX-162 at 43 n.60.

616.    In the present macroenvironment, NRFU could widen the differential enumeration between Hispanics and non-Hispanic whites. As Dr. Barreto explained, groups "who may not be threatened and may participate regularly with NRFU, and Latino and immigrant communities who will feel more threatened and will participate at lower rates. So whatever gap or differential we have just at the beginning in self-response, the NRFU process will seek to widen that because where it will be successful will be in those communities that already had a higher self-response rate, and Latino immigrant communities are likely to further have problems responding." PX-696 at 637:7-19.

617.    Dr. Barreto's study found that assurances of confidentiality were far less effective for Latino and immigrant respondents, suggesting that these households would be more likely to refuse to participate during NRFU operations. PX-677; PX-696 at 686:12-688:25.

618.    Other analyses performed by Dr. Barreto suggested that "the longer the census is in the field, the longer people are talking about it, the longer there's more information," more people will convert to become non-responders. This finding, he explained, is "consistent with the

social science literature . . . reviewed, which found that some people may grow suspicious of these follow-up visits and of this additional information." PX-696 at 693:21-695:20; PX-678; PX-679.

619.    The effect of the macro-environment around immigration and immigration enforcement on lower NRFU efficacy in Latino and immigrant communities is further supported by studies finding a link between concerns about immigration status and problems with enumeration through NRFU. *See* PX-430; PX-431; PX-696 at 608:2-609:22, 635:8-637:5 (Barreto).

620.    Plaintiff LCF also confirmed that community organization are concerned that the Latino and immigrant communities "will refuse to participate in the NRFU process out of fear of opening their doors to government workers."  Navarrete Decl. at ¶ 11.

### c)   The Individual Components of NRFU Will Be Especially Ineffective at Offsetting the Decline in Self-Response Caused by the Citizenship Question.

621.    There is no evidence that the various steps of NRFU are likely to be equally successful for households that choose not to self-respond because of the citizenship question as they will be for other non-responding households. Trial Tr. (Jan. 30) at 5-20:9-15 (Abowd). As Dr. Abowd admitted, even with NRFU, the citizenship question may still increase the differential undercount of particular subpopulations, such as noncitizens. Trial Tr. (Jan. 31) at 4:22-25 (Abowd).

622.    The available evidence demonstrates that each step of NRFU will be less successful at enumerating Hispanic and noncitizen households that choose not to self-respond because of the citizenship question as compared to other non-responding households. *See* Trial Tr. (Jan. 30) at 179-85 (Abowd); PX-162 at 41, 42 n.59; Census 30(b)(6) Dep. Vol. II at 252-53, 382-83, 386-87, 389-91; PX-696 at 638-643 ; Trial Tr. (Jan. 23) at 149-151 (Mathiowetz).

623.     Even if the Census Bureau's NRFU operation were equally successful for noncitizen and Hispanic households as it is for the population at large, however, the increase in noncitizen and Hispanic households subject to NRFU because of the citizenship question would result in a larger percentage of noncitizen and Hispanic households remaining un-enumerated after NRFU as compared to the general population. Trial Tr. (Jan. 30) at 200:1-9 (Abowd).

### i.     In-Person Enumerator Visits

624.     There is no evidence that someone who chooses not to respond to the 2020 Decennial Census because of a citizenship question will respond at all in a face-to-face encounter with an in-person enumerator. Census Bureau 30(b)(6) Dep. Vol. I at 251:15-21; Trial Tr. (Jan. 30) at 179:14-19, 181:6-12 (Abowd).

625.     Many of the same considerations at play in causing households not to self-respond to the Census because of a citizenship question will also be at play with respect to enumerator visits. Trial Tr. (Jan. 30) at 179:9-13 (Abowd).

626.     Qualitative evidence demonstrates that people who do not self-respond to the 2020 Census because of the citizenship question are unlikely to cooperate with an in-person enumerator. Trial Tr. (Jan. 30) at 181:13-17 (Abowd). This qualitative evidence is the best evidence that the Census Bureau has, and is sufficient for the Census Bureau to form a belief that individuals who refuse to self-respond because of the citizenship question are also more likely to refuse to cooperate with an in-person enumerator. Trial Tr. (Jan. 30) at 181:17-182:3 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 425:3-21; *see also* PX-25 at 4 (AR 1311) (recognizing "those refusing to self-respond due to the citizenship question are particularly likely to refuse to respond in NRFU as well . . . ."); PX-162 at 41, 42 n.59, 43 n.60.

627.     In addition, the Administrative Record contains an analysis of "computer-assisted personal interview" (CAPI), which is the in-person non-response followup used for the ACS.

138

PX-137 (AR 10408); PX-155 (AR 10678DRB). That analysis shows that (a) in-person follow-up enumeration has been less effective over time for all census tracts; (b) in-person follow-up enumeration has been differentially less effective in census tracts with a higher proportion of households containing a noncitizen; and (c) the differential between census tracts with a higher proportion of households containing a noncitizen and census tracts with a lower proportion of households containing a noncitizen has grown over time. Trial Tr. (Jan. 30) at 178:5-10; Census Bureau 30(b)(6) Dep. Vol. 1 at 124:19-133:17; PX-137 (AR 10408); PX-155 (AR 10678DRB).

628.    If enumerators are not able to make contact with household members, they are instructed to leave a "Notice of Visit" at the household. Trial Tr. (Jan. 30) at 90:8-15 (Abowd).

629.    There is no credible quantitative evidence that leaving a such a notice would encourage cooperation from non-responding households in the context of a citizenship question. Trial Tr. (Jan. 30) at 179:20-180:6 (Abowd).

630.    Leaving a "Notice of Visit" at a household that has chosen not to self-respond because of the citizenship question is likely to reduce the likelihood that the household will participate in the Census. Census Bureau studies have provided qualitative evidence that leaving literature on the doorstep of a non-responding household may be counterproductive. Researchers from the Census Bureau's Center for Survey Measurement recounted how, after one Census Bureau interviewer left information at the door of a Hispanic household, the household tried to move out before the interviewer could return. PX-158 at 5 (AR).

631.    As Dr. Barreto testified, "there is a very good chance that the literature that is left behind will create more anxiety and fear in many immigrant communities because it will resemble government monitoring or surveillance, leaving information that somebody from the government was at your doorstep, they're coming to try to find out your household count, your

personal information about your household, and that is a strong finding in the literature." PX-696 at 625:4-16, 629:17-630:4.

632.    Moreover, the Bureau may have trouble hiring the number of enumerators that are needed for the decennial census. Census 30(b)(6) Dep. Vol. I at 316:11-17 (noting that the macro-environment and low unemployment rates are making it difficult to hire enumerators); Lowenthal Decl. at ¶¶ 128-130 (same).

### ii.    Administrative Records

633.    For the first time in 2020, the Census Bureau plans to use high quality administrative records to enumerate individuals who do not self respond. Census Bureau 30(b)(6) Dep. Vol. II at 387. Trial Tr. (Jan. 30) at 182:13-15 (Abowd).

634.    While administrative records may provide a better source of obtaining citizenship data for individuals who have already been enumerated than asking a citizenship question, *see* PX-22 at 1-2 (AR 1277-78); PX-25 at 5 (AR 1312), administrative records will be less effective at enumerating Hispanic and noncitizen households as compared to other populations. Trial Tr. (Jan. 30) at 182-83 (Abowd); Census 30(b)(6) Dep. Vol. II at 252-53, 389-92.

635.    The same groups that will be affected by the citizenship question—i.e. Hispanics and noncitizens—tend to have gaps in the administrative records that the Census plans to use for enumeration. *Id.* at 182:22-183:1 (Abowd).

636.    Acting Director of the Census Bureau, Ron Jarmin, acknowledged that administrative records could be used to enumerate noncitizens, Hispanics, and hard-to-count populations "less of the time." Jarmin Dep. at 285-86.

637.    The Census Bureau can link Hispanics to administrative records at a lower rate than it can for non-Hispanic whites. Census Bureau 30(b)(6) Dep. Vol. II at 389:12-390:5; Trial Tr. (Jan. 30) at 183:2-5 (Abowd); *see also* Trial Tr. (Jan. 23) at 148:14-25 (Mathiowetz).

638.     Administrative records are more likely to exist for citizens than noncitizens. Census Bureau 30(b)(6) Dep. Vol. I at 252:16-253:6; Trial Tr. (Jan. 30) at 183:14-17 (Abowd).

639.     Undocumented immigrants in particular are less likely to be found in administrative records, and thus will be harder to enumerate using such records. Census Bureau 30(b)(6) Dep. Vol. II at 389-391; Trial Tr. (Jan. 30) at 183:6-9 (Abowd); *see also* Trial Tr. (Jan. 23) at 148:14-25 (Mathiowetz).

640.     As such, the Bureau expects that enumeration using administrative records will be less successful for noncitizens than for citizens. Census Bureau 30(b)(6) Dep. Vol. II at 391:21-392:4; Trial Tr. (Jan. 30) at 183:18-21 (Abowd); Jarmin Dep. at 285:1-286:20.

641.     Dr. Barreto provided credible and persuasive testimony that, because noncitizen and Hispanic households are less likely to have high quality administrative records as compared to other groups, the use of administrative records to enumerate households may exacerbate the differential undercount of Latinos relative to whites. PX-696 at 638-640.

642.     There is no evidence in the Administrative Record that populations that are likely to see an increase in nonresponse because of the citizenship question can be successfully enumerated on a wide scale using administrative records. Trial Tr. (Jan. 30) at 182:16-21 (Abowd).

### iii.     Proxies

643.     Proxies are likely to result in an under-enumeration of Hispanic and noncitizen households that choose not to self-respond to the 2020 Census because of the citizenship question. Census Bureau 30(b)(6) Dep. Vol. II at 382-83, 386-87; PX-696 at 640-43; Trial Tr. (Jan. 23) at 149-151 (Mathiowetz); Trial Tr. (Jan. 30) at 184-85 (Abowd).

644.     Proxy responses are generally more likely to result in omissions a member of a household. Census Bureau 30(b)(6) Dep. Vol. II at 382:18-383:19; Trial Tr. (Jan. 30) at 185:3-24

(Abowd); PX-339.

645.    Where a proxy enumerates a household but omits one or more household members, there are currently no protocols for the Census Bureau to enumerate the omitted household members. Trial Tr. (Jan. 30) at 185:25-186:3 (Abowd).

646.    There is no credible quantitative evidence in the Administrative Record that households that fail to respond to the Census because of a citizenship question will be enumerated through the use of proxies as successfully as other non-responding households. Trial Tr. (Jan. 30) at 184:14-19 (Abowd); *see also* PX-1 to PX-14 (AR 1-13024).

647.    Given that Census tracts with higher percentages of noncitizen households have lower ACS response rates and lower ACS CAPI success, *see* PX-137 (AR 10408); PX-155 (AR 10678DRB), the Census Bureau believes that people who live in census tracts with larger noncitizen populations will be less likely to give proxy responses than people who live in other areas. Census Bureau 30(b)(6) Dep. Vol. II at 386:2-15.

648.    Proxy responses are significantly less likely to result in a correct enumeration than responses received from a household member. PX-22 at (AR 1282) (citing PX-267 at 33 (Table 21)); *see also* PX-162 at 41-42 & Table 12.

649.    Acting Director Jarmin similarly testified that the "accuracy of NRFU responses is less than self-response and proxy response is less than NRFU response." Jarmin Dep. at 308:15-17.

650.    Dr. Barreto provided credible and persuasive testimony that proxies would not mitigate the harm of a citizenship question. As he explained, proxy responses will decline for the same reasons that self-response will decline, and proxy response information will be less accurate either because proxies do not know the underlying information, or because they will be

unwilling to provide information to the Census Bureau if they believe that there are people who would be at risk of immigration enforcement. PX-696 at 640:23-641:9. Proxies also tend to result in understatements of total household size, and, accordingly, lead to the omission of household members." PX-696 at 641:1-643:21.

651.    Dr. Mathiowetz also provided credible and persuasive testimony that proxy responses are likely to be particularly inaccurate in light of the citizenship question based on qualitative evidence suggesting that people are less willing to provide information about their neighbors. Trial Tr. (Jan. 23) at 149:1-8, 150:21-151:5 (Mathiowetz); PX-158 (AR); PX-162 at 43; PX-163; *see also* Census Bureau 30(b)(6) Vol. II at 386:16-387:10.

### d)  Imputation Will Not Offset the Decline in Self-Response Rates

652.    If the Census Bureau is unable to otherwise enumerate a household through NRFU procedures, it will "impute" the number of persons living in the household and their characteristics. Trial Tr. (Jan. 30) 111:5-11 (Abowd).

653.    Count imputation is the process by which the Census Bureau imputes the household size of an address determined to be occupied but where no information could be collected about the occupants, including household size. Trial Tr. (Jan. 30) 111:5-11 (Abowd).

654.    Imputation involves using data from households that have responded to the census to model and assign a count to non-responding households. Trial Tr. (Jan. 30) at 187:11-15 (Abowd); *see also* PX-478 at 5-7.

655.    In 2010, the Census Bureau used an imputation model known as "hot deck imputation." Trial Tr. (Jan. 30) 186:14-16 (Abowd). In 2010, imputation did not offset the omission of Hispanics in the 2010 census, resulting in a net undercount of Hispanics. PX-267 at 20 (Table 9) (AR).

656.    For 2020, the Census Bureau will probably use a variant of the "hot deck

imputation" model. Trial Tr. (Jan. 30) 186:14-187:1-10 (Abowd).

657.    There is no evidence in the Administrative Record suggesting that imputation will be more accurate in 2020 than it was in 2010. *See* PX-1 to PX-14 (AR 1-13024).

658.    The Census Bureau uses an ignorable missing data model for imputation. Trial Tr. (Jan. 30) at 189:1-13 (Abowd). An ignorable missing data model assumes that the properties of the missing data can be correctly predicted from the properties of the data collected. *Id.* at 187:16-188:3 (Abowd). In contrast, non-ignorable data means that there is a correlation between the reason the data is missing and the variable being measured. Trial Tr. (Jan. 30) at 188:7-10 (Abowd).

659.    If nonresponse correlates to a particular characteristic (i.e. the missing data is non-ignorable), then using an ignorable missing data model that is based on the responding households to impute information to non-responding households could result in bias. Trial Tr. (Jan. 30) at 189:17-22 (Abowd).

660.    As a result of the citizenship question, a larger percent of noncitizen households will end up in count imputation. Trial Tr. (Jan. 30) at 200:1-9 (Abowd). Because nonresponse to the Census is highly correlated with the citizenship question, imputation will be based on households that are disproportionately all-citizen households. Trial Tr. (Jan. 30) at 189:23-190:11 (Abowd); PX-162 at 44.

661.    Hard-to-count populations, including Hispanics and immigrants, are more likely to be imputed than other groups. Trial Tr. (Jan. 30) 191:7-15 (Abowd).

662.    Quantitative and qualitative evidence demonstrates that Hispanic and immigrant households that do not respond to the census are larger than those households that do respond. *See, e.g.*, PX-696 at 711-14, 727-30 (Barreto); PX-388; PX-389; PX-430; PX-680; PX-681.

663.    Because these non-responding households are, on average, larger than responding households, this would constitute non-ignorable missing data and, as a result, the Census Bureau's ignorable-missing data imputation model will differentially under-enumerate Hispanic and noncitizen households. Trial Tr. (Jan. 30) at 190:21-191:6 (Abowd); PX-696 at 727-734 (Barreto); PX-682; PX-683.

664.    As Dr. Barreto testified, "for multiple different demographic indicators, responding units are not statistically the same as non-responding units." PX-696 at 711:4-711:8. Specifically, households that will respond to a Census that includes a citizenship question have smaller household sizes than those that will choose not to respond. PX-680. Accordingly, responders who serve as the donor group for imputation have smaller household sizes than the non-responders whose household size would need imputing, resulting in omissions and ultimate differential undercount. PX-696 at 711:18-712:16.

665.    As Dr. Barreto explained, "the decision not to respond appears to be correlated with household size, that is, people who are the most anxious and nervous and not willing to respond have larger household sizes that cannot be accounted for by other demographic differences. This is consistent with the literature that suggested that people would be more fearful if they had other relatives who were noncitizens and others living in the house. So when the imputation model is applied at the very end of the process, there will be more Latino and immigrant households in need of imputation, first of all, because of the lower self-response and because of the lesser success of NRFU. So when we get to the imputation component, this model suggests that there will be a larger miss, disproportionately larger miss of Latino household sizes leading to a net undercount." PX-696 at 733:7-733:24 (Barreto).

666.    Moreover, Dr. Barreto's survey showed that non-respondents will be

geographically clustered in zip codes that have high Latino and immigrant populations, further challenging the ability of an imputation model to adequately or accurately address non-response. PX-696 at 713:1-714:5; PX-681.

667.    Analyses by federal government agencies and academic researchers have found that Hispanic and noncitizen households are more likely to live in larger, more complex households than citizen or non-Hispanic white households. PX-388 at 21, 23 (Figures 13 & 14); PX-389 at 12-13; PX-430 at 5-6. Census Bureau research has linked complex and large households to census omissions in previous censuses. PX-389 at 12-13; PX-394 at 10-11; PX-430 at 5-6.

668.    Dr. Barreto created an imputation model designed to mimic the imputation model historically used by the Census Bureau and set forth in PX-478. PX-696 at 725:18-726:7. This model uses "nearest neighbors" to impute household count for non-responding households; it controls for similar housing type, characteristics, and geographic proximity. PX-696 at 718:20-721:21; PX-661.

669.    Dr. Barreto's imputation model reflects that, on a national level, since responding households tend to be smaller than those that do not respond, imputation would undercount households by an average of 0.32 persons per household. PX-696 at 727:3-729:12; PX-682. However, for Latino households, imputation misses approximately 0.75 persons per household on average.

670.    Dr. Barreto provided credible and persuasive testimony that imputation may exacerbate the net differential undercount of Latinos and immigrants because "the imputation estimates will be less accurate and they will be too small in Latino and immigrant communities. So while they will come up with a number, it will continue to underestimate[] the true count."

PX-696 at 707:21-709:11. This conclusion is consistent with social science research concerning imputation in Latino and immigrant communities. PX-696 at 717:5-718:1; PX-389.

671.    Dr. Mathiowetz provided credible and persuasive testimony that because Hispanic and noncitizen households tend to be more complex and larger, using data from other households to impute the count to non-responding Hispanic and noncitizen households will likely result in an underenumeration of the size of those households. Trial Tr. (Jan. 23) at 149:9-19, 151:11 to 152:3 (Mathiowetz); PX-389.

672.    Qualitative evidence, including ethnographic and other studies performed by the Census Bureau, confirms that "count imputation disadvantages hard-to-count populations," which include Hispanics and noncitizens, *id.* at 191:10-25

673.    The Census Bureau believes that whole-person imputations are not very accurate. Census Bureau 30(b)(6) Dep. Vol. I at 253:7-15.

e)    **The Integrated Partnership and Communications Plan Will Not Eliminate the Effect of the Citizenship Question**

674.    The Integrated Partnership & Communication Plan, including the "trusted voices" campaign, is a key component of enumerating households that are reluctant to self-respond to the 2020 Census. In particular, the success of the NRFU program hinges in part on the Integrated Partnership and Communications Plan. Trial Tr. (Jan. 30) at 192:12-18 (Abowd).

675.    There is no evidence in the Administrative Record about Defendants' planned integrated communications or partnership campaign for the 2020 Decennial Census. PX-1 to PX-14 (AR 1-13024).

676.    There is no evidence in the Administrative Record that Defendants' planned integrated communications and partnership campaign will mitigate the expected reduction in self response due to the addition of a citizenship question, or that it will foster cooperation with

147

NRFU or mitigate or eliminate the undercount due to the addition of a citizenship question. PX-1 to PX-14 (AR).

677.    The Ross Memo does not cite or otherwise discuss the impact of the integrated communications and partnership program. PX-26 (AR 1313).

678.    The Census Bureau cannot eliminate the effect of adding a citizenship question through the Integrated Partnership and Communications Plan. Trial Tr. (Jan. 30) at 147:1-11; 170:10-13, 193:10-14 (Abowd); PX-1216 at 70; PX-152 at 22.

679.    Qualitative evidence demonstrates that education efforts aimed at overcoming barriers to Census participation may not be effective for certain groups in light of the citizenship question. Trial Tr. (Jan. 30) at 147:1-11 (Abowd). For example, Hispanic participants in the 2020 CBAMS focus groups expressed the concern that education efforts may not be successful at overcoming the community's fears that data generated from a citizenship question on the decennial census would be used for immigration enforcement purposes. PX-1216 at 70. In addition, focus group participants indicated that there was not a single trusted voice that could mitigate their distrust of the government to uphold the promise of confidentiality. PX-152 at 22.

680.    Dr. Abowd acknowledged that the Census Bureau's trusted voices opposed the addition of a citizenship question. Trial Tr. (Jan. 30) at 170:10-13 (Abowd).

681.    Several Organizational Plaintiffs that have in the past and plan to work with the Census Bureau in 2020 have likewise expressed their opposition to the addition of the citizenship question.  *See*, *e.g.*, P. Garcia Decl. at ¶ 3; Gonzalez Decl. at ¶ 3; Salas Decl. at ¶ 3; Navarrete Decl. at ¶ 3; Tso Decl. at ¶ 3; Trial Tr. (Jan. 22) 181:5-182:5 (Valdez-Cox); *id*. at 1-215:9-1-216:13 (Park).

682.    The Administrative Record includes materials reflecting the opposition of the

National Association of Latino Elected Officials (NALEO), the Leadership Conference on Civil and Human Rights, and many other census partners, to the addition of a citizenship question. PX-1 (AR 773-75, 778-79, 1239-40).

683.    If there were a citizenship question on the 2020 Census, the trusted partners that the Census Bureau relies on to carry forth the message that it is important to participate in the census will have a more difficult time communicating that message. PX-1194 at 937:16-23 (Abowd); Trial Tr. (Jan. 30) at 193:1-4 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 453:10-17.

684.    As a result of the citizenship question, the Bureau's trusted partners will need to expend additional resources to get out the message that participating in the Census is safe. Trial Tr. (Jan. 30) at 193:5-9 (Abowd); *see also* PX-696 at 699:3-699:10 (Barreto).

685.    Several Organizational Plaintiffs that have in the past and plan to work with the Census Bureau in 2020 face additional challenges and must devote additional resources to convincing the immigrant community to participate in the 2020 Census in light of the citizenship question.  *See, e.g.*, P. Garcia Decl. at ¶¶ 6-11; Gonzalez Decl. at ¶¶ 9-13; Salas Decl. at ¶¶ 10-15; Navarrete Decl. at ¶¶ 7-11; Tso Decl. at ¶¶ 9-12; Trial Tr. (Jan. 22) at 173:6-178:7 (Valdez-Cox); *id*. at 214:5-218:11 (Park).

### f)   The 2020 NRFU Operation Has Not Been Tested to Account for a Citizenship Question

686.    While Defendants have asserted that the Census Bureau's NRFU operations will be sufficient to offset the decline in self-response induced by the citizenship question, the record evidence described above demonstrates that NRFU will be ineffective to address the decline in self-response among Hispanics and noncitizens caused by the citizenship question. *See* Part VIB.2, *supra*.

687.    The Administrative Record contains no evidence regarding the testing or efficacy of NRFU operations to address the decline in self-response from a citizenship question. *See* PX-1 to PX-14 (AR 1-13024).

688.    The Census Bureau's decade-long testing program for the 2020 Census has included numerous tests of the NRFU operations. These tests are used to inform NRFU staffing levels, the number of area field offices, the adequacy of in-person enumerator training, and various other NRFU protocols, such as the use of administrative records to reduce the NRFU workload. Census 30(b)(6) Dep. Vol. I at 198-201.

689.    To date, the Census Bureau has not conducted any testing of the efficacy of NRFU operations with a citizenship question. Census 30(b)(6) Dep. Vol. I at 198-201; Trial Tr. (Jan. 30) 173:4-7 (Abowd). Thus, the testing of the various components of NRFU have not accounted for a citizenship question. Census Bureau 30(b)(6) Dep. Vol. I at 200:9-201:10.

690.    The Census Bureau has encountered challenges in preparations for the 2020 Census NRFU operation. For example, the Census Bureau recently completed the peak operations component of its End-to-End test for the 2020 Census. The End-to-End test is the Bureau's "last chance to test enumeration procedures for peak field operations under census-like conditions before 2020." PX-1133 at 2; *see also* Trial Tr. (Jan. 30) at 151:23-25 (Abowd). The peak operations component tests the readiness of the Bureau's systems related to self response and NRFU. Trial Tr. (Jan. 30) at 151:19-22 (Abowd).

691.    While prior censuses have run the peak operations component of the End-to-End test at multiple locations, for 2020, the peak operation test was only done at one location due to limited funding. Trial Tr. (Jan. 30) at 156:5-15 (Abowd). A Government Accountability Office report on that one test found that the Bureau "experienced operational issues during

implementation of the Non-Response Follow-Up (NRFU) process" and that the Bureau's field workforce "was not fully prepared to face all of the enumeration challenges." PX-1133 at 2. The Department of Commerce agreed with the GAO's findings. *Id.*

      **C.** **Rostering Omissions Caused by the Citizenship Question Will Lead to a Differential Undercount of Hispanics and Noncitizens**

          **1.** **There is Substantial Qualitative Evidence that a Citizenship Question Will Cause a Differential Increase in Rostering Omissions Among Hispanic and Noncitizen Households**

692.    The addition of a citizenship question to the 2020 Census will lead more noncitizen and Hispanic households to conceal household members by omitting them from the household roster. Trial Tr. (Jan. 23) 156-60 (Mathiowetz); Trial Tr. (Jan. 30) 193-94 (Abowd); PX-158 at 2 (AR); PX-1216 at 63.

693.    When a household fills out a census form but omits one or more household members who should have been enumerated on the census form, that is referred to as a rostering error or rostering omission. Trial Tr. (Jan. 23) at 70:19-23 (Mathiowetz).

694.    The Census has historically undercounted Hispanics in part because of the failure of Hispanic households to provide a response for every member of their households. Census Bureau 30(b)(6) Dep. Vol. II at 394:7-20.

695.    Census Bureau and other academic research demonstrate that a desire to conceal household members is a primary cause of rostering omissions. Trial Tr. (Jan. 23) at 155:18-156:18 (Mathiowetz).

696.    For example, a study by Tourangeau et al. examined the effect that de-anonymizing a survey (and thus making it more sensitive) had on responses to the survey, particularly among African American respondents. PX-923. The study found that when a roster was anonymous (and thus less sensitive), there was approximately a 5 percentage point increase

in the number of usual residents enumerated for a household. PX-923 at 8-10. The study's authors concluded that concealment, rather than confusion about the survey, likely explained the omission of household members from the de-anonymized survey. PX-923 at 15; Trial Tr. (Jan. 23) at 156:19-159:21 (Mathiowetz). The Tourangeau et al. study demonstrated how increasing the sensitivity of a survey could impact rostering omissions and provides a parallel to what the addition of a sensitive citizenship question would do to responses on the 2020 Census. Trial Tr. (Jan. 23) at 159:1-21 (Mathiowetz).

697.    The Census Bureau has acknowledged a significant problem with young children being left off of the household roster, particularly for Hispanic households. PX-339; PX-346. As Dr. O'Hare testified, 80 to 85% of young children who were missed in the 2010 census were missed due to rostering omissions. Trial Tr. (Jan. 23) at 70:24-71:8 (O'Hare). The Bureau has found that one reason for this omission is that "[f]ear of government, political factors, or respondent fatigue may cause a household respondent to intentionally leave a child off the roster." PX-346 at 6.

698.    Ms. Salas testified that an issue encountered by CHIRLA in Los Angeles County is that Hispanic residents living in non-standard residences (*e.g.*, multiple families living in a single dwelling) were fearful that information provided to the Census Bureau would be shared with their landlords and used for eviction purposes.  Salas Decl. ¶ 10.

699.    The Census Bureau's quantitative research, including item non-response rates, break-off rates, unit non-response, is consistent with the notion that a citizenship question may "cause an incremental increase in the number of households that respond to the census but don't provide a response for every member of the household." Census 30(b)(6) Dep. Vol. II at 396:2-11; Trial Tr. (Jan. 30) at 193:22-194:3 (Abowd).

700.    There is qualitative evidence demonstrating that the addition of a citizenship question to the 2020 Census will lead to an increase in rostering omissions. Trial Tr. (Jan. 30) at 194:15-18 (Abowd).

701.    Participants in the CBAMS focus groups indicated that the citizenship question would lead them to omit noncitizen household members from their census responses. PX-1216 at 63.

702.    Census Bureau field staff have reported multiple instances of Spanish-speaking survey respondents intentionally omitting household members from the roster due to concerns about immigration status. *See* PX-158 at 2 (AR). As the Bureau staff reported, "this level of deliberate falsification of the household roster, and spontaneous mention of concerns regarding negative attitudes towards immigrants, is largely unprecedented in the usability interviews that CSM has been conducting since 2014 in preparation for the 2020 Census." *Id.* at 3. Such encounters illustrate the likely effect of the citizenship question on rostering omissions. Trial Tr. (Jan. 23) at 153:19-155:7 (Mathiowetz).

703.    Based on the evidence from these studies, and the data on decline in unit non-response for noncitizen and Hispanic households, it is likely that the addition of a citizenship question to the 2020 Census would lead to at least a 5 percentage point rostering error rate increase for noncitizens and Hispanics. Trial Tr. (Jan. 23) at 159:22-160:11 (Mathiowetz).

## 2.    Rostering Omissions Cannot Be Mitigated by NRFU or Imputation.

704.    If a household self-responds but omits one or more household members from the roster, there is no current protocol to enumerate the omitted members: there will be no further attempt to enumerate the omitted member through in-person enumerator visits, administrative records, proxies, or imputation. Census 30(b)(6) Dep. Vol. II at 396-399, 459:21-460:15; Trial Tr. (Jan. 23) at 71:9-24 (O'Hare); *id.* at 160:12-20 (Mathiowetz); Trial Tr. (Jan. 30) at 194:19-

195:25 (Abowd); PX-410.

705.    Because households that choose not to self-respond to the 2020 Census because of the citizenship question are also likely to avoid in-person enumerators, the Bureau expects to make increased use of proxies to enumerate these non-responding households. PX-162 at 42 n.59.

706.    Proxy enumerations are more likely to result in rostering omissions. Trial Tr. (Jan. 30) at 185:7-24 (Abowd); Census Bureau 30(b)(6) Dep. Vol. II at 382:22-383:3; *see also* PX-339 at 23.

707.    Where a proxy enumerates a non-responding household but omits a member of that household, there are no current protocols to enumerate the omitted household member. Trial Tr. (Jan. 30) at 185:25-186:3 (Abowd).

**VII.    The Citizenship Question Will Result in a Differential Undercount of Noncitizens and Hispanics of At Least Two Percentage Points.**

708.    It is highly likely that the magnitude of the differential undercount of Hispanic and noncitizen households that will result from the addition of a citizenship question will be at least two percentage points. Trial Tr. (Jan. 23) 162-170; PX-1214 at 13-14.

**A.    The Citizenship Question Will Result in a Differential Undercount of At Least Two Percentage Points for Noncitizens**

709.    For noncitizen households, the introduction of a citizenship question will lead to a differential undercount of at least 2 percentage points. Trial Tr. (Jan. 23) at 162:17-167:11 (Mathiowetz); PX-1214 at 13.

710.    Dr. Mathiowetz first estimated the undercount of noncitizen households based on a decline in unit self response—i.e., the failure to respond to the census entirely. Dr. Mathiowetz used the relationship between self-response and undercount observed in recent decennial censuses—i.e., that a 10 percentage point drop in self-response was associated with a 2

percentage point increase in undercount—to calculate that the 5.8 percentage point drop in self-response calculated in the Brown et al Memo would translate to a 1.2 percentage point increase in undercount due to unit non-response. Trial Tr. (Jan. 23) 164:15-21 (Mathiowetz); PX-1214 at 13.

711.    Next, Dr. Mathiowetz estimated the undercount of noncitizen households based on rostering omissions. Based on the Census Bureau's estimate of a 60.5% self-response rate for the general population and a 5.8 percentage point decline in self-response for noncitizen households, that the self-response rate for noncitizens will be 54.7%. For the 54.7% of noncitizen households (19.7 million households) that are expected to respond to the 2020 Census with a citizenship question, she further focused on households with at least one adult citizen living with a noncitizen, a universe of 10.7 million households. For these households, Dr. Mathiowetz applied the 5 percentage point rostering error rate she calculated from Tourengau et al. and other Census Bureau data, and determined that roughly 2% of the noncitizen population will be undercounted through rostering omissions. Trial Tr. (Jan. 23) 163:9-164:13, 165:11-166:19 (Mathiowetz); PX-1214 at 13.

712.    Putting these two figures together (1.2% + 2%), yielded a differential undercount of 3.2 percentage points for noncitizen households as a result of the citizenship question. However, to be conservative, Dr. Mathiowetz estimated that the differential undercount of noncitizens will be at least 2 percentage points. Trial Tr. (Jan. 23) at 166:25-167:11 (Mathiowetz)..

713.    Dr. Mathiowetz's conservative estimate of a differential undercount of noncitizens of at least 2% is reliable, credible, and persuasive.

**B. The Citizenship Question Will Result in a Differential Undercount of At Least Two Percent for Hispanics.**

714.    The addition of a citizenship question will lead to a differential undercount of Hispanics of at least 2 percentage points. Trial Tr. (Jan. 23) at 167:20-170:14 (Mathiowetz); PX-1214 at 14.

715.    First, Dr. Mathiowetz determined the differential undercount of Hispanics attributable to an increase in unit nonresponse among Hispanics caused by the citizenship question. Based on an 8.7 percentage points decline in self-response that she calculated from 2010 Census and ACS data, and the fact that a 10 percentage point decline in self-response has historically been associated with a 2 percentage point increase in undercount, Dr. Mathiowetz calculated that the differential undercount of Hispanics attributable to a decline in self-response would be approximately 1.7 percentage points. Trial Tr. (Jan. 23) at 169:7-14 (Mathiowetz); PX-1214 at 14.

716.    Next, Dr. Mathiowetz calculated the differential undercount of Hispanics attributable to rostering omissions. Drawing on the Census Bureau's expected nationals self-response rate of 60.5% and her calculation that the decline in self-response among Hispanics will be 8.7 percentage points, Dr. Mathiowetz calculated that the Hispanic self-response rate will be 51.8%. From this 51.8%, Dr. Mathiowetz focused only on those households with a Hispanic head of household, and calculated that approximately 0.8% of the Hispanic population will be omitted through rostering omissions. Trial Tr. (Jan. 23) at 168:1-170:7 (Mathiowetz); PX-1214 at 14.

717.    Putting these two figures together (1.7% + 0.8%), Dr. Mathiowetz estimated the citizenship question would result in a differential undercount of Hispanics of 2.5 percentage points. However, to be conservative, she estimated that the magnitude of the differential

undercount would be at least 2 percentage points. Trial Tr. (Jan. 23) at 170:8-14.

718.    Dr. Mathiowetz's conservative estimate of a differential undercount of noncitizens of at least 2% is reliable, credible, and persuasive.

719.    As Dr. Mathiowetz emphasized, she used conservative assumptions at various points in her calculations and, as a result, her prediction of a 2 percentage point differential undercount of Hispanics and noncitizens is likely to be conservative. Trial Tr. (Jan. 23) at 165:3-10, 165:16-166:5, 167:7-11, 168:6-19, 169:18-25 (Mathiowetz).

## VIII.    A Differential Undercount of Hispanics and Noncitizens Caused by the Citizenship Question Will Injure Plaintiffs.

720.    The evidence shows that the addition of a citizenship question to the 2020 Census will cause a differential undercount of Hispanics and noncitizens that will lead to several types of injuries for individual Plaintiffs and for members of organizational Plaintiffs. First, it will cause vote dilution due to intrastate congressional and state legislative redistricting. Second, it will cause the malapportionment of congressional districts. Third, it will cause a loss of federal funds that will harm Plaintiffs.

### A.    The Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs Through Intrastate Vote Dilution.

721.    The following states in which Plaintiffs reside use decennial census population counts to draw congressional and state legislative districts of equal population: Arizona (where Plaintiffs Alejandro Chavez, Richard McCune, Jose Moreno, and PAZ members reside), California (where Plaintiffs Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, and CHIRLA members reside), Florida (where Plaintiff Lazara Yoelvis Magadan resides), Maryland (where Plaintiffs Robyn Kravitz, Michael Kravitz, Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, and Joanne Wilson reside), Nevada (where Plaintiff Michael Kagan resides), New Jersey (where Plaintiff Raj Mukherji resides), and Texas (where Plaintiffs Diana Alexander,

Lauren Berman, Sarah Bryan, Virginia Garcia, Martha Sanchez, Sonia Casarez Shafer, Juanita

Valdez-Cox, and LUPE members reside). *See* Ariz. Const. art. 4, Pt. 2, § 1 (3); Cal. Const. art.

21, §1; Nev. Const. art. 15, § 13; Fla. Stat. § 11.031(1);  Md. Code Ann., Elec. Law § 8-701; N.J.

Const. art. 4, § 2 ¶¶ 1, 3; Tex. Const. art. 3, § 26; *see also Georgia v. Ashcroft*, 539 U.S. 461, 488

n.2 (2003) ("When the decennial census numbers are released, States must redistrict to account

for any changes or shifts in population."); *Dep't of Commerce v. U.S. House of Representatives*,

525 U.S. 316, 334 (1999) ("States use the population numbers generated by the federal decennial

census for federal congressional redistricting."); Chavez Decl. ¶ 2; McCune Decl. ¶ 2; Moreno

Decl. ¶ 2; Buchanan Decl. ¶ 2; Cunningham Decl. ¶ 2; Ortiz Decl. ¶ 2; Magadan Decl. ¶ 2; R.

Kravitz Decl. ¶ 2; M. Kravitz Decl. ¶ 2; C. Nwosu Decl. ¶ 2; N. Nwosu Decl. ¶ 2; Ross Decl. ¶ 2;

Wilson Decl. ¶ 2; Kagan Decl. ¶ 2; Mukherji Decl. ¶2; Alexander Decl. ¶ 2; Berman Decl. ¶ 2;

Bryan Decl. ¶ 2; Garcia Decl. ¶ 2; Sanchez Decl. ¶ 2; Shafer Decl. ¶ 2; Salas Decl. ¶ 5; Navarrete

Decl. ¶ 5; Trial Tr. (Jan. 22) 146:1 & 154:14-24 (Valdez-Cox).

722.    Many of these states utilize county boundaries in drawing congressional and state

legislative district boundaries. *See, e.g.*, Ariz. Const. art. 4, Pt. 2 § 1 (14); Cal. Const. art. 21, §

2(d)(4); N.J. Const., art. 4, § 2, ¶ 3; Tex. Const. art. 3 § 26.

723.    A PUMA is a Public Use Microdata Area. PUMAs nest within states, contain at

least 100,000 people but no more than 200,000 people wherever possible, are built on census

tracts and counties, and are used for disseminating ACS period estimates. PX-972.

724.    If there is a differential undercount of Hispanics and/or noncitizens, a county or

PUMA that has a higher percentage of Hispanics and noncitizens relative to the rest of the state

will experience a differential undercount relative to the rest of the state, and will suffer a

reduction in its statewide share of the decennial census population count. *See* Brace Decl. Ex. 1,

¶¶ 11, 30-31, 35, ECF No. 99-1 (Hereinafter "Brace Decl."); Trial Tr. (Jan. 23) at 236:22-239:19 (Brace).

725.    Plaintiffs' expert Kimball Brace provided reasonable, reliable, and credible calculations of the likely population and demographic composition in 2020 of the counties, PUMAs, and states in which individual Plaintiffs and members of organizational Plaintiffs reside. *See* Brace Decl. ¶¶ 14-16, 28, 31, 34; PX-955; PX-965; PX-968; PX-974; PX-975; Trial Tr. (Jan. 23) at 242:10-246:23 (Brace). Defendants provided no evidence disputing Brace's population and demographic projections. Trial Tr. (Jan. 29) at 116:15-117:8 (Gurrea).

726.    As set forth below, several counties and PUMAs in which individual Plaintiffs and members of organizational Plaintiffs reside will have higher percentages of Hispanic and noncitizen residents relative to the rest of the state as of April 1, 2020.

  a.    In Arizona: Maricopa County (where Plaintiff Alejandro Chavez and PAZ members reside), Santa Cruz County (where Plaintiff Richard McCune resides), Yuma County (where Plaintiff Jose Moreno and PAZ members reside), and PUMAs 121 (where Plaintiff Alejandro Chavez resides) and 700 (where Plaintiff Jose Moreno resides). *See* PX-955; PX-965; PX-975; Chavez Decl. ¶ 2; McCune Decl. ¶ 2; Moreno Decl. ¶ 2; Navarrete Decl. ¶ 5.

  b.    In California: Los Angeles County (where Plaintiffs Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz and CHIRLA members reside) and PUMAs 3735 (where Plaintiffs Elizabeth Buchanan and Jacob Cunningham reside) and 3744 (where Plaintiff Maegan Ortiz resides). *See* PX-955; PX-965; PX-975; Buchanan Decl. ¶ 2; Cunningham Decl. ¶ 2; Ortiz Decl. ¶ 2; Salas Decl. ¶ 5.

  c.    In Florida: Miami-Dade County and PUMA 8619 (where Plaintiff Lazara Yoelvis

Magadan resides). *See* PX-955; PX-965; PX-975; Magadan Decl. ¶ 2.

d.  In Maryland: Prince George's County (where Plaintiffs T. Carter Ross, Robyn
Kravitz, Michael Kravitz, Catherine Nwosu, Nnabugwu Nwosu, and Joanne
Wilson reside) and PUMAs 1101 (where Plaintiffs Catherine Nwosu and
Nnabugwu Nwosu resides) and 1103 (where Plaintiff T. Carter Ross resides). *See*
PX-955; PX-965; PX-975; Ross Decl. ¶ 2; R. Kravitz Decl. ¶ 2; M. Kravitz Decl.
¶ 2; C. Nwosu Decl. ¶ 2; N. Nwosu Decl. ¶ 2; Wilson Decl. ¶ 2.

e.  In Nevada: Clark County and PUMA 406 (where Plaintiff Michael Kagan
resides). *See* PX-955; PX-965; PX-975; Kagan Decl. ¶ 2.

f.  In New Jersey: Hudson County and PUMA 601 (where Plaintiff Raj Mukherji
resides). *See* PX-955; PX-965; PX-975; Mukherji Decl. ¶2.

g.  In Texas: Dallas County (where Plaintiff Lauren Berman resides), Harris County
(where Plaintiffs Diana Alexander resides), Hidalgo County (where Plaintiffs
Martha Sanchez, Sarah Bryan, Sonia Casarez Shafer, Juanita Valdez-Cox, and
LUPE members reside), Webb County (where Plaintiff Virginia Garcia resides),
and PUMAs 2311 (where Plaintiff Lauren Berman resides), 4612 (where Plaintiff
Diana Alexander resides), 6804 (where Plaintiff Sarah Bryan resides), 6805
(where Plaintiff Martha Sanchez resides), 6803 (where Plaintiff Sonia Casarez
Shafer resides), and 6301 (where Plaintiff Virginia Garcia resides). *See* PX-955;
PX-965; PX-975; Berman Decl. ¶ 2; Alexander Decl. ¶ 2; Sanchez Decl. ¶ 2;
Bryan Decl. ¶ 2; Shafer Decl. ¶ 2; Garcia Decl. ¶ 2; Trial Tr. (Jan. 22) 146:1 &
154:14-24 (Valdez-Cox).

727.  A differential undercount of Hispanics and/or noncitizens of any magnitude will

cause all of the counties and PUMAs listed in paragraphs above to suffer a differential undercount relative to the rest of their respective states, which will lead to a reduction in each of the counties' and PUMAs' statewide share of the decennial census population count. Brace Decl. ¶¶ 11, 30-31, 35; Trial Tr. (Jan. 23) at 236:22 -239:19 (Brace).

728.    A differential undercount of Hispanics and/or noncitizens of any magnitude will therefore lead to the following individual Plaintiffs, who reside in one of the counties and PUMAs listed in paragraphs 726(a) to (n) above, being drawn into congressional and state legislative districts that are overpopulated relative to the other districts in the state: Alejandro Chavez, Jose Moreno, Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherine Nwosu, Nnabugwu Nwosu, T. Carter Ross, Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez, Sonia Casarez Shafer, and Virginia Garcia.

729.    Brace performed several reliable and credible calculations, utilizing various differential undercount rate assumptions, to illustrate the effect of a differential undercount on the statewide share of the population for counties and PUMAs in which Plaintiffs reside. *See* Brace Decl. ¶¶ 26-40; PX-955; PX-965; PX-968, PX-974; PX-975; PX-1195. Defendants did not present any evidence disputing Brace's calculations. Trial Tr. (Jan. 29) at 20:20-121:18 (Gurrea).

730.    The most appropriate measure for assessing whether there is intrastate vote dilution is whether there is a negative percentage change in the statewide share of the population for a particular county or PUMA. Trial Tr. (Jan. 24) 18:7-21:7 (Brace). If a county or a PUMA has a small share of the overall statewide population, the absolute change in the statewide population share could be very small even with a large differential undercount in that area that dilutes the votes of residents of that area. *Id.*

161

731.     A 2% differential undercount of Hispanics and noncitizens will result in a negative shift in each of the following counties' and PUMAs' share of their statewide decennial census count relative to their actual statewide share of the population: Maricopa County, AZ; Santa Cruz County, AZ; Yuma County, AZ; Los Angeles County, CA; Miami-Dade County, FL; Prince George's County, MD; Clark County, NV; Hudson County, NJ; Dallas County, TX; Harris County, TX; Hidalgo County, TX; Webb County, TX; PUMAs 121, 900, and 700 in Arizona; PUMAs 3735 and 3744 in California; PUMA 8619 in Florida; PUMAs 1101 and 1103 in Maryland; PUMA 406 in Nevada; PUMA 601 in New Jersey; and PUMAs 2311, 4612, 6804, 6805, 6803, and 6301 in Texas. Brace Decl. ¶ 30; PX-955; PX-965. As a result, the following individual Plaintiffs who reside in one of these counties and PUMAs will be drawn into congressional and state legislative districts that are overpopulated relative to the other districts in the state, thereby causing them to suffer vote dilution: Alejandro Chavez, Jose Moreno, Richard McCune, Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherin Nwosu, Nnabugwu Nwosu, T. Carter Ross, Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez, Sonia Casarez Shafer, and Virginia Garcia.

732.     A 2% differential undercount of Hispanics, noncitizens, and individuals living in noncitizen households will result in a negative shift in each of the following PUMAs' share of its statewide decennial census count relative to its actual statewide share of the population: 121, 900, and 700 in Arizona; 3735 and 3744 in California; 8619 in Florida; 1105, 1101, and 1103 in Maryland; 406 in Nevada; 601 in New Jersey; and 2311, 4612, 6804, 6805, 6803, and 6301 in Texas. Brace Decl. ¶ 34; PX-968. Under this undercount scenario, the following individual Plaintiffs who reside in one of these PUMAs will be drawn into congressional and state

legislative districts that are overpopulated relative to the other districts in the state, thereby causing them to suffer vote dilution: Alejandro Chavez, Jose Moreno, Richard McCune, Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherin Nwosu, Nnabugwu Nwosu, T. Carter Ross, Joanne Wilson, Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez, Sonia Casarez Shafer, and Virginia Garcia.

733.    A 0.08% differential undercount of individuals living in noncitizen households (i.e., a 5.8% drop in self-response, mitigated by the Historical NRFU Rate of 98.58%) will result in a negative shift in each of the following PUMAs' share of its statewide decennial census count relative to its actual statewide share of the population: 121, 900, and 700 in Arizona; 3735 and 3744 in California; 8619 in Florida; 1105, 1101, and 1103 in Maryland; 406 in Nevada; 601 in New Jersey; and 2311, 4612, 6804, 6805, 6803, and 6301 in Texas. Brace Decl. ¶ 39; PX-974. This undercount scenario assumes that the citizenship question would cause only a 5.8% differential drop in self-response among noncitizen households and that 98.58% of this differential drop would be mitigated through NRFU operations. Under this undercount scenario, the following individual Plaintiffs who reside in one of these PUMAs will be drawn into congressional and state legislative districts that are overpopulated relative to the other districts in the state, thereby causing them to suffer vote dilution: Alejandro Chavez, Jose Moreno, Richard McCune, Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherin Nwosu, Nnabugwu Nwosu, T. Carter Ross, Joanne Wilson, Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez, Sonia Casarez Shafer, and Virginia Garcia.

734.    A 0.5% differential undercount of noncitizens due to rostering omissions would

result in a negative shift in each of the following PUMAs' share of its statewide decennial census count relative to its actual statewide share of the population: 121 and 700 in Arizona; 3735 and 3744 in California; 8619 in Florida; 1105, 1101, and 1103 in Maryland; 406 in Nevada; 601 in New Jersey; and 2311, 4612, 6804, 6805, 6803, and 6301 in Texas. Brace Decl. ¶ 40; PX-975. This undercount scenario assumes that NRFU operations would be entirely successful in mitigating any differential drop in self-response to the Census, but that noncitizens would experience a small differential increase in rostering omissions. Brace Decl. ¶ 40. Under this undercount scenario, the following individual Plaintiffs who reside in one of these counties will be drawn into Congressional and state legislative districts that are overpopulated relative to the other districts in the state, thereby causing them to suffer vote dilution: Alejandro Chavez, Jose Moreno, Richard McCune, Elizabeth Buchanan, Jacob Cunningham, Maegan Ortiz, Lazara Yoelvis Magadan, Catherin Nwosu, Nnabugwu Nwosu, T. Carter Ross, Joanne Wilson, Michael Kagan, Raj Mukherji, Lauren Berman, Diana Alexander, Sarah Bryan, Martha Sanchez, Sonia Casarez Shafer, and Virginia Garcia.

### B. The Differential Undercount Caused by the Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs by Depriving Certain States of a Congressional Seat.

735.    Brace provided reasonable, reliable, and credible calculations of the likely population and demographic composition of each state in 2020 when the Decennial Census is conducted. Brace Decl. ¶¶ 14-16, 21; PX-951 to PX-954; Trial Tr. (Jan. 23) at 241:22-242:9 (Brace); Trial Tr. (Jan. 24) at 8:17-15:12 (Brace). Defendants provided no evidence disputing those population projections. Trial Tr. (Jan. 29) at 116:15-117:8 (Gurrea).

736.    Apportionment of the 435 seats in the House of Representatives is done through the Method of Equal Proportions, which was adopted by Congress in 1941. Brace Decl. ¶ 18.

737.    Using this apportionment method and Brace's population projections, a 2%

differential undercount of Hispanics and noncitizens will cause California to lose a congressional seat in the reapportionment process that follows the 2020 Census. Brace Decl. ¶ 22; PX-952. A differential undercount of Hispanics and noncitizens as low as 1.56% will cause California to lose a congressional seat in the reapportionment process that follows the 2020 Census. Brace Decl. ¶ 22.

738.    A 5.8% differential undercount of Hispanics and noncitizens will cause California and Texas to lose a congressional seat, and a 8.09% differential undercount of Hispanics and noncitizens will cause Arizona, California, and Texas to lose a congressional seat. Brace Decl. ¶ 23; PX-953 and PX-954.

### C. The Differential Undercount Caused by the Citizenship Question Will Injure Individual Plaintiffs and Members of Organizational Plaintiffs by Reducing Federal Funding for Plaintiffs' States and Localities.

739.    A differential undercount of Hispanics and noncitizens will cause states, localities, and their residents to lose access to federal funding from domestic financial assistance programs that allocate funding based on census-tied geographic formulas.

740.    A large number of federal domestic financial assistance programs— including the Surface Transportation Block Grant ("STBG") Program, Medicaid, Title I of the Elementary and Secondary Education Act of 1965 ("Title I"), State Children's Health Insurance Program ("CHIP"), Supplemental Nutrition Program for Women, Infant, and Children ("WIC"), and Social Services Block Grants ("SSBG")— rely on decennial census data to allocate money. Reamer Decl. Ex. 8, ¶¶ 10, 17-18, ECF No. 99-8 (hereinafter "Reamer Decl."); Mingo Decl. Ex. 7, ¶ 13, ECF. No. 99-7 (hereinafter "Mingo Decl."); Gordon Decl. Ex. 4, ¶ 14, ECF No. 99-4 (hereinafter "Gordon Decl."); PX-329. In fiscal year 2017, for example, at least 320 federal programs used census-derived data to distribute approximately $900 billion. Reamer Decl. ¶ 10.

741.    Federal programs that allocate funds based on census-derived data are highly

sensitive to inaccuracies in those data. *Id.* ¶ 12. These programs include formulas based on state per capita income ("PCI") relative to U.S. PCI and those that rely, in whole or part, on state share of a U.S. population total ("state-share programs"). *Id.* ¶ 11. Even modest geographic differences in census accuracy will lead to measurable changes in funds distribution. *Id.* Of the 24 large federal financial assistance programs Plaintiffs' expert Dr. Andrew Reamer identified, not one has previously halted the use of state-share and PCI-based funding formulas, even temporarily. *Id.* ¶ 20.

### 1.  Loss in Transportation Funding

742.    The STBG Program  distributes funds to states and localities to assist with the planning and construction of transportation projects and transportation alternatives. Mingo Decl. ¶ 10.

743.    Although the distribution of STBG funds to a state does not depend on decennial census data, the intrastate distribution of those STBG funds does. *Id.* ¶ 13. Each state must distribute approximately half of the STBG funds it receives to different areas of the state based on population, as determined by the most recent decennial census. *Id.* This distribution of funds is referred to as a suballocation. This intrastate suballocation of federal-aid highway funds (currently called the STBG Program) has been population-based for 45 years, and is not expected to change in the foreseeable future. *Id.*

744.    Every urbanized area with a population over 200,000 receives federal STBG suballocation funds (for transportation projects) and federal transportation alternative set-aside ("TA set-aside") suballocation funds (for transportation alternative projects) that must be used in that urbanized area. *Id.* ¶ 15. In both the STBG suballocation and the TA set-aside suballocation, the proportion of the state's suballocation funds distributed to an urbanized area with a population over 200,000 is equal to (1) the total population of that urbanized area, divided by (2)

the total population of the state, as determined by the most recent decennial census. *Id.*

745.    A differential undercount of the population of an urbanized area with a population over 200,000 relative to the state as a whole will result in reduced federal transportation funding for the urbanized area under the STBG Program, including the TA set-aside, for the entire decade following the census. *Id.* ¶¶ 7, 20.

746.    It is very unlikely that a state would provide a particular urbanized area with extra funding out of the state's general STBG allocation funds to make up for a funding shortfall. Trial Tr. (Jan. 24) at 45:14-46:13 (Mingo).

747.    Plaintiffs' expert Kimball Brace calculated the likely population and demographic composition in 2020 of the urbanized areas and states in which Plaintiffs reside, as well as the 2020 Census counts for each of these areas with a 2% undercount of Hispanics and noncitizens. Brace Decl. ¶¶ 44-46; PX-961; PX-962; PX-991; PX-992.  All of these urbanized areas are projected to have a total population over 200,000. *See* PX-961. Brace's population projections for the 2020 population, as reflected in PX-961, PX-962, PX-991, and PX-992, are reasonable, reliable, and credible, particularly with respect to whether an urbanized area will have higher percentages of Hispanic and noncitizen residents relative to the rest of the state. Brace Decl. ¶¶ 14-16, 44-46; Trial Tr. (Jan. 23) at 242:10-246:23 (Brace). Defendants provided no evidence disputing these projections. Trial Tr. (Jan. 29) at 116:15-117:8 (Gurrea).

748.    The following urbanized areas in which individual Plaintiffs reside will have higher percentages of Hispanic and noncitizen residents relative to the rest of the state as of April 1, 2020: Los Angeles-Long Beach-Anaheim, California; Miami, Florida; Atlanta, Georgia; the Maryland portion of Washington, DC-VA-MD; Las Vegas-Henderson, Nevada; the New Jersey portion of New York-Newark, NY-NJ-CT; Houston, Texas; Laredo, Texas; and McAllen, Texas.

PX-961; PX-962; PX-991; PX-992. A differential undercount of Hispanics and/or noncitizens of any magnitude will cause all of these urbanized areas to suffer a differential undercount relative to the rest of their respective states, which will result in reduced federal transportation funding for the urbanized area under the STBG Program, including the TA set-aside, for the entire decade following the 2020 Census. Mingo Decl. ¶¶ 7, 20.

749.    Using Brace's population projections, Plaintiffs' expert Roger Mingo calculated the approximate loss in STBG suballocation funding and TA set-aside suballocation funding that a 2% differential undercount of Hispanics and noncitizens will cause for the following urbanized areas following the 2020 Census: Los Angeles-Long Beach-Anaheim, California; Miami, Florida; Atlanta, Georgia; the Maryland portion of Washington, DC-VA-MD; Las Vegas-Henderson, Nevada; the New Jersey portion of New York-Newark, NY-NJ-CT; Houston, Texas; Laredo, Texas; and McAllen, Texas. Mingo Decl. ¶ 8, Tables 2 and 3. The loss in funding for some of these urbanized areas would amount to millions of dollars over ten years. *Id.*, Tables 2 and 3.

750.    Mingo's calculations are reasonable, reliable, and credible. Defendants did not present any evidence disputing Mingo's calculations.

751.    There is a substantial risk that such a reduction in STBG funding will negatively affect one or more of the roads, highways, bridges, sidewalks, trails, or other structures in that urbanized area. *Id.* ¶¶ 8-9, 25-28. Such a reduction is almost certain to delay, eliminate, or change the scope of a transportation or transportation-alternative project of the type covered by the STBG Program in that urbanized area. *Id.*

## 2.  Loss in Medicaid Funding

752.    The allocation of federal Medicaid funds depends on decennial census data. Carruth Decl. Ex. 2, ¶ 17, ECF No. 99-2 (hereinafter "Carruth Decl."). A state administers its

Medicaid program, which is jointly funded by the federal government and the state. *Id.* ¶ 10. Medicaid provides health coverage to millions of Americans, including eligible low-income adults, children, pregnant women, and people with disabilities. *Id.*

753. The federal government reimburses state Medicaid expenditures, on a quarterly basis, based on the state's FMAP. *Id.* ¶ 13. The statutory formula to calculate a state's FMAP compares (1) the state's PCI over the three most recent years for which data are available to (2) the U.S. PCI over the three most recent years for which data are available. *Id.* ¶ 14. The higher the state's PCI is relative to the national average, the lower its FMAP and, therefore, the lower its federal reimbursement for Medicaid spending. *Id.* This statutory formula has been in place for more than 50 years and is not expected to change. *Id.*

754. A state's PCI is calculated as (1) the state's personal income, divided by (2) the state's population. *Id.* ¶ 17. A state's population is derived from the Census Bureau's annual midyear (July 1) Population Estimates, which are based on the most recent decennial census. *Id.* A state's population will be artificially low if state residents are not counted by the decennial census. *Id.*

755. Similarly, the U.S. PCI is calculated as (1) the U.S. personal income, divided by (2) the U.S. population. *Id.* ¶ 18. The sources used to determine state personal income and state population are also used to determine the U.S. personal income and U.S. population. *Id.*

756. Thus, an undercount on the decennial census in a state relative to the U.S. as a whole will falsely inflate the state's PCI relative to the U.S. PCI. *Id.* ¶ 19. This will result in a lower FMAP and, therefore, reduced federal Medicaid funding for the state until the next decennial census is fully phased into the FMAP calculations, provided that the state's FMAP is above the statutory minimum of 50. *Id.*

757.    Even a 0.01% reduction in a state's FMAP poses a substantial risk that Medicaid beneficiaries' health care benefits and/or medical costs will be negatively affected, provided that the state's FMAP is above the statutory minimum of 50. *Id.* The FMAPs for Arizona, Florida, Nevada, New Mexico, and Texas are well above 50.  *See* PX-803. If a state's FMAP is reduced, it is unlikely that a state like Texas would use state funds to make up for the lost federal funds and continue the status quo of benefits and services offered through its Medicaid program. Trial Tr. (Jan. 24) at 105:17-23 (Carruth).

758.    Brace calculated the likely population and demographic composition in July 1 of 2020-2022 of each state, as well as the Census's Population Estimates for each state for July 1 of each year assuming a 2% undercount of Hispanics and noncitizens. Brace Decl. ¶¶ 14-16, 41-43; PX-958 to PX-960. Brace's projections are reasonable, reliable, and credible, particularly with respect to whether a state will have higher percentages of Hispanic and noncitizen residents relative to the rest of the U.S. Brace Decl. ¶¶ 14-16, 44-46; Trial Tr. (Jan. 23) at 242:10-246:23 (Brace). Defendants provided no evidence disputing those population projections. Trial Tr. (Jan. 29) at 116:15-117:8 (Gurrea).

759.    Using these population projections, Plaintiffs' expert Lisa Carruth calculated that a 2% differential undercount of Hispanics and noncitizens will cause the following states to lose federal Medicaid funding for several years following the 2020 Census: Arizona, Florida, Nevada, New Mexico, and Texas. Carruth Decl. ¶¶ 8, 21. Texas would lose more than $150 million in just a single year.  *Id.* ¶ 23.  Ms. Carruth's calculations are reasonable, reliable, and credible.

760.    There is a substantial risk that a reduction in federal Medicaid funds will negatively affect Medicaid beneficiaries' health care benefits and/or medical costs. *Id.* ¶¶ 9, 24-32.

### 3.  Loss in Title I Education Funding

761.    Title I is the single largest federal funding stream for compensatory elementary and secondary education. Gordon Decl. ¶ 10. School districts use Title I funds to support educationally disadvantaged students. *Id.* ¶ 11. Title I directs funds to school districts through four separate grant programs: basic grants, concentration grants, targeted grants, and education finance incentive grants. *Id.* ¶ 10. Though these grants each have their own formula determining district-level allocations, a school district treats the sum of funds distributed through the four formulas as a single funding source. *Id.*

762.    The allocation formula for each of these four grants is set forth in the statute codified at 20 U.S.C. §§ 6301-6578. *Id.* ¶ 12. The formula for each grant describes what share of annual appropriations each school district will get by comparing the characteristics of the school district to all other districts eligible for that particular grant.  *Id.* A school district's "eligibility count" is a key input in each of the four formulas determining the amount of Title I funds, or the allocation, that the district will receive each year from the federal government. *Id.* ¶ 13. The eligibility count is the number of school-aged (5-17 years old) children residing in the school district who are either in poverty, neglected or delinquent, or under the care of the foster care system. In practice, the vast majority of eligible children are determined by child poverty counts. *Id.*

763.    Annual estimates of the number of school-aged children in poverty in each school district are provided by the Census Bureau's Small Area Income Poverty Estimates ("SAIPE"). *Id.* ¶ 14. These estimates are derived by applying the poverty rate for the school district (or its component pieces) to the estimate of all school-aged children in the district (or its component pieces) provided by the Census Bureau's annual Population Estimates, which are based on decennial census counts of the number of school-aged children. *Id.* An undercount on the

decennial census of the school-aged children residing in a school district relative to other school districts nationwide will erroneously deflate the school district's "eligibility count" relative to the "eligibility count" of other districts. *Id.*

764.    Using the rules set out in Title I's four distinct formulas, Plaintiffs' expert Dr. Nora Gordon estimated the effect on district-level Title I allocations of a 2% and 2.5% differential undercount of Hispanics relative to the rest of the population under a range of undercount scenarios. For each of the undercount scenarios examined, Dr. Gordon's analysis shows that many of the Plaintiffs' school districts would experience a decline in Title I funding dollars as a consequence of including the citizenship question on the 2020 Census questionnaire. *Id.* ¶ 8.

765.    A 2% differential undercount of Hispanics will cause a number of school districts to lose Title I funds. Gordon Decl. ¶ 33 (Table 1). The precise number of school districts that would lose funding depends on the absolute undercount of the Hispanic and non-Hispanic population that would be caused by the citizenship question. *Id.* Even under the assumptions generating the most limited impact (a 3.5% undercount for Hispanics and a 1.5% undercount for the rest of the population),  the following districts where Plaintiffs reside and/or their children attend school would experience a loss in funding: Alhambra Elementary District, Balsz Elementary District, Isaac Elementary District, Roosevelt Elementary District, Somerton Elementary District, and Union Elementary District in Arizona; Clark County School District in Nevada; Edinburg Consolidated Independent School District, Hidalgo Independent School District, Lyford Consolidated Independent School District, Pharr-San Juan-Alamo Independent School District, and Rio Grande City Consolidated Independent School District in Texas. *Id*; PX-

844.  In the case of the Clark County School District, the loss in funding would exceed $500,000 for a single year.  PX-844.

766.    A 2.5% differential undercount of Hispanics will cause even more school districts in which Plaintiffs or members of organizational Plaintiffs reside to lose Title I education funding. Gordon Decl. ¶ 33.

767.    Dr. Dr. Gordon's calculations are reasonable, reliable, and credible.  Defendants did not present any evidence disputing Dr. Gordon's calculations.

768.    It is highly likely that the immediate effect of a reduction in a school district's Title I funding would be a reduction in educational services available to students in the school district. Gordon Decl. ¶ 9.

### 4.  Other Funding Effects of the Citizenship Question

769.    Plaintiffs' expert Dr. Andrew Reamer testified that, for programs with allocation formulas based on a state's population or PCI relative to the U.S., a differential decennial census undercount of noncitizens—even a differential undercount as low as 0.1 percentage points—would lead to measurable fiscal loss for states with percentages of noncitizens above the nationwide average. Reamer Decl. ¶¶ 19-20.

770.    To illustrate his opinion, Dr. Reamer analyzed the estimated effect of (1) a 5.8 percent differential undercount of noncitizens, and (2) a 5.8 percent differential non-response rate for noncitizens, mitigated by a 86.63 percent NRFU success rate, on four funding formulas: Medicaid, CHIP, WIC, and SSBG. *Id.* ¶¶ 36-38. Dr. Reamer applied each of the two undercount scenarios as though it had occurred during the 2010 decennial Census, showing that a differential undercount of noncitizens would have caused several of Plaintiffs' states to lose federal funding under the four funding formulas. *Id.* ¶ 15.

771.    CHIP provides health insurance to certain low-income children. 42 C.F.R. §

457.609.  Similar to Medicaid, the federal government reimburses state CHIP expenditures based on the FMAP reimbursement formula, which takes into account a state's PCI. *Id.* ¶ 39.

772.    WIC provides certain low-income pregnant, breastfeeding and postpartum women, infants, and children to age 5 with supplemental nutritious foods, nutrition education, and health and social services. *Id.* ¶¶ 63, 70; *see also* 7 C.F.R. §§ 246.7 & 246.16. SSBG funds a range of social services. Reamer Decl. ¶ 71. Under the WIC and SSBG programs, federal funds are allocated to states based on the state's share of the U.S. population (for WIC, the share of infants and children ages 1-4 at or below 185 percent of poverty; for SSBG, the total population). *Id.* ¶ 39.

773.    Each of the following states would have lost Medicaid funds under both undercount scenarios Dr. Reamer analyzed: Texas, Florida, Arizona, Nevada, Hawaii, Washington, and Illinois. *Id.* ¶¶ 50-51.

774.    Each of the following states would have lost CHIP funds under both undercount scenarios Dr. Reamer analyzed: Texas, Florida, Nevada, Hawaii, Arizona, and Washington.  *Id.* ¶¶ 61-62.

775.    Each of the following states would have lost WIC funds under both undercount scenarios Dr. Reamer analyzed: California, Texas, New York, Florida, New Jersey, Nevada, Arizona, and Hawaii. *Id.* ¶¶ 69-70.

776.    Each of the following  states would have lost SSBG funds under both undercount scenarios Dr. Reamer analyzed: California, Texas, New York, Florida, New Jersey, Nevada, Arizona, Hawaii, Washington, Maryland, Illinois, and Massachusetts. *Id.* ¶¶ 74-75.

777.    Dr. Reamer's calculations are reasonable, reliable, and credible. Defendants did

not present any evidence disputing Dr. Reamer's calculations.[9]

IX.    **A Differential Undercount of Hispanics and Noncitizens Caused by the Citizenship Question Will Injure Organizational Plaintiffs.**

A.    **The Citizenship Question Will Impair the Quality and Accuracy of Census Data.**

778.    The Census Bureau has determined that the addition of a citizenship question to the 2020 Census will damage the quality of census data collected separate and apart from the damage to the count.

779.    In the January 19 Abowd Memo, the Bureau concluded that the citizenship question would harm the quality of the census data because it will lower self-response rates and increase the NRFU workload, which will "degrade data quality because data obtained from NRFU have greater erroneous enumeration and whole-person imputation rates." PX-22 at 5 (AR 1281).

780.    As the January 19 Abowd Memo noted, one reason for the decline in data quality is that data on households that choose not to self respond because of the census is "much more likely to be collected from a proxy rather than a household member and, when they do come from a household member, that person has less accurate information than self-responders." *Id.* at 6.

781.    The March 1 Abowd Memo similarly concluded that a citizenship question will reduce data quality. PX-25 at 4-5 (AR 1311-12).

782.    The Brown et al. Memo also concluded that "[a] drop in the self-response rate from adding a citizenship question in Alternative B (obtaining citizenship from the 2020 Census

---

[9] Defendants attacked Dr. Reamer's use of undercount scenarios provided by Dr. Bernard Fraga in *California v. Dep't of Commerce*, Case No. 3:18-cv-01865. *See* ECF No. 114. This court ruled against Defendant's *Motion in Limine* on January 24, 2019. Trial Tr. (Jan. 24) at 66:15–21.

only) and D (obtaining citizenship from the 2020 Census and administrative records) results in increased costs in the Nonresponse Follow-Up (NRFU) operation and affects the quality of the population count." PX-162 at 41.

783.    The Census Bureau concedes that whole-person imputation is not very accurate. Census Bureau 30(b)(6) Dep. Vol. I at 253:7-15; Trial Tr. (Jan. 31) at 21:12-19 (Abowd); *see also* Trial Tr. (Jan. 31) at 48:12-16 (Abowd) (Census Bureau treats whole-person imputations as an error).

784.    Dr. Abowd agrees that adding a citizenship question will harm the quality of data collected in the 2020 Census, and the Census Bureau has consistently recommended against adding a citizenship question because of its adverse data quality effects. PX-1194 at 881:19-882:5, 885:17-21, 952:23-953:14; Trial Tr. (Jan. 31) at 19:9-18 (Abowd). Dr. Abowd acknowledged that, from a data quality perspective, it would be preferable to have a self-response than to obtain a response through a NRFU enumerator, a proxy, administrative records, or imputation. Trial Tr. (Jan. 30) at 48:25-49:1, 92:19-94:11, 179:4-8, 182:8-12, 184:10-13, 186:10-13 (Abowd).

785.    The degradation of census data quality caused by the citizenship question will not be mitigated. Trial Tr. (Jan. 31) at 21:2-19 (Abowd).

786.    The degradation of census data quality will have far reaching consequences. Census data form the backbone of statistical analyses done by various government agencies and private entities. Trial Tr. (Jan. 31) at 19:19-22 (Abowd). These census data are used to develop population estimates for the United States, which in turn are used as weights for most of the surveys conducted by the Census Bureau and other government agencies, including the ACS and the Survey of Income and Program Participation ("SIPP"). *Id.* at 19:23-20:16. Thus, the

degradation of census data quality will introduce errors into the population estimates, and in turn will propagate these errors into the survey weights of every survey product that uses these estimates. *Id.* at 17-21.

787.    Dr. Abowd acknowledged that if an entity relied on one of these surveys, such as the ACS or SIPP, to allocate resources, the degradation of census data quality could impact the agency's ability to accurately allocate resources. *Id.* at 20:22-21:1.

788.    Several Organizational Plaintiffs rely on the accuracy of census data for purposes of strategic planning and communication, resource allocation, and advocacy.  *See*, e.g., Garcia Decl. at ¶ 5; Gonzalez Decl. at ¶ 4; Tso Decl. at ¶ 4; Trial Tr. (Jan. 22) at 1-198:6-1-199:5 & 1-204:12-25 (Park).  For example, MinKwon heavily relies on data from the Census Bureau for every single report that they produce and "all of the community organizations that [MinKwon] work[s] with, including the MinKwon Center, [] couldn't do what [they] do without all of the [census] data."  Trial Tr. (Jan. 22) at 198:6-199:5 (Park).

789.    The degradation of census data quality would impact these organizations' ability to accurately allocate their limited resources. Trial Tr. (Jan. 31) at 20:22-21:1 (Abowd).

### B.  The Citizenship Question Will Cause Organizational Plaintiffs to Divert Resources

790.    The evidence establishes that adding a citizenship question to the decennial census will cause several types of harms to Organizational Plaintiffs.  Organizational Plaintiffs have and will continue to be forced to devote more of their limited resources to outreach and advocacy around the 2020 Census that includes a citizenship question than they would have done if the citizenship question was not added.

### 1.  LUPE

791.    As a result of the addition of the citizenship question to the 2020 decennial

census, LUPE has already begun and will continue to increase its census outreach and advocacy. Trial Tr. (Jan. 22) at 175:5–176:3 (Valdez-Cox).  Since the decision to add the citizenship question was announced, LUPE began receiving calls and inquiries about the citizenship question.  *Id*. at 172:21–173:5.

792.    Due to the widespread concerns that LUPE members have expressed to LUPE about the citizenship question, LUPE has increased its census outreach for the 2020 decennial census.  *Id*. at 173:6-175:4 ("where we live in is so different… and we have very real reasons to be afraid and very real reasons to, when we see – if we're going to see that citizenship question on there… we're just going to be much more fearful of answering and wonder about the consequences."); *see also id.* at 179:17–182:5.

793.    LUPE has already and will continue to divert resources to mitigate the impact of the addition of the citizenship question to the 2020 decennial census.  *See*, *e.g.*, *id*. at 175:14–176:3.  For example, LUPE has diverted staff time away from advocacy and education around Texas Senate Bill 4 (SB 4) to community education on the importance of the census and the repercussions of not responding to the census.  *Id*.  The addition of the citizenship question has also impacted all of LUPE's core programs in that staff is forced to divert resources from other core programs—such as income tax filing, assistance with social service benefit applications, and community organizing—to responding to concerns about the citizenship question and educating members on the importance of responding to the census.  *Id*. at 176:17–178:7.  LUPE has diverted social media resources to mitigating the impact of the citizenship question.  *Id*. Additionally, instead of having candidate forums or forums on other issues, LUPE has organized community forums on the census and the impact of an undercount.  *Id*. at 168:4-8.

794.    In addition to diverting staff time and resources to mitigate the impact of the

citizenship question, LUPE has also applied for additional grants to increase its census outreach and advocacy.  *Id*. at 177:14–178:7.

795.    But for the addition of the citizenship question, LUPE would be using its limited resources on advocacy around driver's licenses for immigrants and on mitigating the impact of SB 4 in Texas. *Id*. at 178:8–179:1.

## 2.  CHIRLA

796.    CHIRLA has already begun working with its members and the Latino community as a whole to increase participation in the census and to mitigate the impact of the addition of the citizenship question.  Salas Decl. at ¶ 12.

797.    As a result of the addition of the citizenship question, CHIRLA has been forced to divert significant resources in terms of money and staff time.  *Id*. at ¶ 13.  CHIRLA has begun its census outreach and advocacy at least a year earlier than it did in preparation for the 2010 decennial census.  *Id*.  CHIRLA will hire census dedicated staff of a minimum of five members that are dedicated to census outreach and advocacy, thereby diverting resources from its other core programs.  *Id*.  To do so, CHIRLA will have to seek additional grants and other private funding because CHIRLA has to hire staff and start its census outreach and advocacy a year earlier than usual.  *Id*.

798.    All of CHIRLA's other core programs have been impacted because staff time has already been diverted from all of CHIRLA's program areas and is being instead used on mitigating the impact of the citizenship question.  *Id*.  In response to the addition of the citizenship question, CHIRLA has experienced a significant increase in phone calls to its call center and questions from its members and other California residents who seek information about the implications of the citizenship question.  *Id*. at ¶ 14.  As a result, CHIRLA has been

forced to train staff on how to field hotline calls and questions from members and the public at large.  *Id*. at ¶ 13.

799.    Not only has CHIRLA been forced to divert staff time to complete count committees, but staff time in every program department is being impacted as well.  *Id*. at ¶ 13. For example, at this juncture, a substantial portion of staff time would be focused around criminal justice and higher education advocacy but CHIRLA cannot do this work because of the need to divert staff time to census outreach, education, and advocacy.  *Id*.  Census outreach, education, and advocacy would normally be an outreach campaign that is limited to one or two departments, but because of the addition of the citizenship question, it has become priority campaign that involves staff time and resources from every department.  *Id*.

800.    Due to an increase of fear and distrust of the Trump Administration, that has been exacerbated by the addition of the citizenship question to the 2020 decennial census, CHIRLA anticipates that its outreach will be significantly more challenging than it was in 2000 and 2010, thus CHIRLA expects that it will need to expend considerably more resources to convince the communities that it serves to respond to the 2020 Census.  *Id*. at ¶¶ 14-16.  Consequently, CHIRLA will have less money to use towards fulfilling its mission.  *Id*. at ¶ 15.

### 3.  LCF

801.    As a result of the addition of the citizenship question to the 2020 decennial census, LCF has had to rework its strategic planning and priorities to try to understand and address community fears about the citizenship question.  Garcia Decl. at ¶ 6.  Consequently, LCF has shifted to more home-based engagement approaches, which are more time consuming.  *Id*. The resources that LCF is spending on understanding and mitigating the effects of the citizenship question on the 2020 decennial census would otherwise be spent on LCF's health, civic engagement, and capacity building efforts.  *Id*.

802.    In response to the addition of a citizenship question to the 2020 decennial census, LCF began to organize and participate in meetings with other stakeholders to address the question.  *Id*. at ¶ 7.  LCF was forced to divert even more employee time and resources to these meetings and away from its core programs.  *Id*.

803.    LCF has also participated in various state and local-level government committees to combat the negative effects of the citizenship question.  *Id*.  Although LCF planned to initiate and join coalitions around the 2020 decennial census, the addition of the citizenship questions required LCF and other partner organizations to begin planning in early 2018, as opposed to early 2020.  *Id*.

804.    LCF is also part of the Yakama/Yakima Counts coalition.  *Id*. at ¶ 8. The coalition aims to combat the negative effects of the addition of the citizenship question on response rates by engaging The Yakama Nation and residents of Yakima County.  *Id*.  As a result of the addition of a citizenship question to the 2020 decennial census, there is a lack of trust by many in these communities of government employees, including Census Bureau employees, and of organizations partnering with government entities.  *Id*.  To address this problem, Yakama/Yakima Counts plans to hire Native American and Latino community workers to educate community members about the census.  *Id*.  The coalition estimates that their efforts will cost $300,000, and coalition members, including LCF, are working hard to raise these funds.  *Id*.

### 4.  GALEO

805.    GALEO has already begun working with its members and the Latino community as whole to increase participation in the census and to mitigate the impact of the addition of the citizenship question.  Gonzalez Decl. at ¶ 10.

806.    GALEO is educating community members about the decennial census and the importance of being counted, and GALEO plans to increase these efforts and its outreach.  *Id*.

GALEO will again lead the GLCCC and in that capacity will work to mitigate the historic undercount of the Latinos and non-U.S. citizens in Georgia. *Id*. In this leadership role, GALEO plans to convene the GLCCC earlier than it did in 2010, and to begin its work educating the public before the end of 2018. *Id*. Due to a decrease in federal funding for the census, GALEO is advocating and applying for additional funding from private funders for census outreach for its own operations and those of the GLCCC. *Id*.

807.    As a result of the addition of the citizenship question, GALEO will be forced to divert significant resources in terms of money and staff time. *Id*. at ¶ 11. GALEO will begin its census outreach and advocacy about six months earlier than it did in preparation for the 2010 decennial census. *Id*. GALEO is already planning to increase engagement in the community, which will require substantial staff and volunteer time, thereby diverting resources from its other core programs, such as voter registration or leadership development. *Id*. GALEO will hire a part-time coordinator to carry out increased community outreach on the census. *Id*. But for the addition to the citizenship question, GALEO would have used this funding toward its voter registration, naturalization, and leadership development programs. *Id*.

808.    GALEO anticipates that its outreach will be significantly more challenging than it was in 2010 and expects that it will need to expend considerably more resources to convince the communities that it serves to respond to the 2020 Census. *Id*. at ¶ 13. This diversion of resources means that GALEO will have less money to use towards civic engagement and leadership development. *Id*.

### 5.  PAZ

809.    As a result of the addition of the citizenship question to the 2020 Census, PAZ has had to rework its strategic planning and priorities to try to understand and address community fears about the citizenship question. Navarrete Decl. at ¶ 7. PAZ did not plan to begin its census

outreach efforts in earnest until early 2020.  *Id.*  Because of the addition of the citizenship

question, however, PAZ had to start planning for its census outreach efforts in 2018.  *Id.*

810.    In order to mitigate the impact of the citizenship question, PAZ has extensive

census outreach and advocacy planned.  *Id.* at ¶¶ 7-11.  For example, PAZ has joined the City of

Phoenix steering committee, *id.* at ¶ 8; the National Strategy on the census, a committee

organized by the Fair Immigration Reform Movement, *id.* at ¶ 9; PAZ is also an affiliate member

of UnidosUS, a national network of community-based organizations that serve the Latino

population across the country, *id.* at ¶ 10; and PAZ is working with the Census Bureau on

outreach, *id.* at ¶ 11.

811.    The resources that PAZ is spending on understanding and mitigating the effects of

the citizenship question on the 2020 Census would otherwise be spent on PAZ's 2019

naturalization and civic engagement efforts.  *Id.* at ¶ 7.

### 6.  ASIA

812.    The inclusion of the citizenship question on the 2020 decennial census, in

combination with the Trump Administration's anti-immigrant rhetoric and policies, has made

mixed status families that ASIA serves even more hesitant to interact with the government.  Tso

Decl. at ¶ 10.  As a result, ASIA is planning to expend additional resources to educate the Asian

American community about the privacy protections for information collected by the census.  *Id.*

813.    As a result of the addition of the citizenship question and the current political

climate, in preparation for the 2020 decennial census, ASIA has already held executive

committee and steering committee meetings with a coalition of non-profit organizations.  *Id.* at ¶

11.  ASIA has made a commitment to engage in the 2020 decennial census and has identified

participation in the census as a high priority for the organization.  *Id.*  ASIA plans to engage in

community outreach, training, education, and field work.  *Id.*

814.    As a result of the addition of the citizenship question, ASIA will be forced to divert significant resources in terms of money and staff time.  *Id*. at ¶ 12.  A citizenship question on the 2020 decennial census form will require ASIA to expend even more resources to explain the presence of the citizenship question itself, how to answer the citizenship question, and alleviate fears about immigration repercussions.  *Id*.  Additionally, ASIA will commit additional volunteer and staff hours to fully explain the complicated legal parameters of participating in the census, including legal penalties for not participating in the census and the need to fill out the form for all family members regardless of their immigration status.  *Id*.

### 7.  MINKWON

815.    Due to the current political climate, there is a lot of fear among immigrant communities and those that live with and near immigrants, and in combination with the citizenship question, MinKwon has been forced to start its census outreach and advocacy two years before the 2020 decennial census—as opposed to the year that the census happens, as is MinKwon's usual timeline.  *See* Trial Tr. (Jan. 22) at 214:5–218:11 (Park).

816.    MinKwon began its work to try to mitigate the impact of the citizenship question in about January 2018 when the question became a real possibility.  *Id*.  For example, MinKwon, together with the eighteen organizations that comprise APA Voice, drafted a letter on behalf of all of the APA organizations doing civic engagement in New York City to Secretary Ross urging him to not include the citizenship question because of the question's potential harm in creating a differential undercount for the Asian American community.  *Id*. at 215:9-216:13.  Additionally, MinKwon has joined the New York Counts 2020 coalition, held a press conference around the citizenship question, and appeared in media discussing the impact of the citizenship question.  *Id*. at 216:14–218:3.

817.    As a result of the addition of the citizenship question, MinKwon has been forced

to divert its limited resources to mitigate the impact of the citizenship question. For example, MinKwon recently hired an additional full-time staff member in its civic participation program, and but for the citizenship question, MinKwon would not have hired this position. *Id*. at 218:24–219:13. MinKwon will additionally be forced to divert resources from its other core program areas to its census outreach, which will frustrate MinKwon's mission because it will impede MinKwon's ability to achieve and maximize its efforts in MinKwon's other core areas. *Id*. at 219:21–221:22.

Dated: February 18, 2019                      Respectfully Submitted,

                                              /s/ Daniel Grant (Bar. No. 19659)
                                              /s/ Denise Hulett

                                              **COVINGTON & BURLING LLP**
                                              Shankar Duraiswamy*
                                              José E. Arvelo*
                                              Dustin Cho*
                                              Amee Frodle*
                                              Daniel Grant (Bar. No. 19659)
                                              Bianca Nunes*
                                              Tina M. Thomas*

                                              One CityCenter
                                              850 Tenth Street, NW
                                              Washington, D.C. 20001-4956
                                              Tel: (202) 662-6000
                                              Fax: (202) 662-6302
                                              dgrant@cov.com
                                              sduraiswamy@cov.com
                                              jarvelo@cov.com
                                              dcho@cov.com
                                              afrodle@cov.com
                                              bnunes@cov.com
                                              tthomas@cov.com

                                              P. Benjamin Duke*

The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 8411000
Fax: (212) 841-1010
pbduke@cov.com

Lawrence A. Hobel*
Karun Tilak*
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
ktilak@cov.com

*Attorneys for Kravitz Plaintiffs*

*\*Admitted pro hac vice*
*+Pro hac vice application forthcoming*

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz+
Nina Perales +
Denise Hulett
Andrea Senteno
Burth G. López
Tanya G. Pellegrini
Julia A. Gomez

1016 16th Street NW, Suite 100
Washington, DC 20036
Phone: (202) 293-2828
tsaenz@maldef.org
nperales@maldef.org
dhulett@maldef.org
asenteno@maldef.org
blopez@maldef.org
tpellegrini@maldef.org
jgomez@maldef.org

*Attorneys for LUPE Plaintiffs*

**ASIAN AMERICANS ADVANCING JUSTICE |**

186

**AAJC**
John C. Yang*
Terry Ao Minnis (Bar No. 20547)
Niyati Shah*

1620 L Street, NW, Suite 1050
Washington, DC 20036
Phone: (202) 815-1098
Facsimile: (202) 296-2318
jyang@advancingjustice-aajc.org
tminnis@advancingjustice-aajc.org
nshah@advancingjustice-aajc.org

*Attorneys for LUPE Plaintiffs*