**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBYN KRAVITZ, *et al.*, | |
| Plaintiffs, | |
| v. | No. 8:18-cv-1041-GJH |
| U.S. DEPARTMENT OF COMMERCE, *et al.*, | |
| Defendants. | |
| | |
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | |
| Plaintiffs, | |
| v. | No. 8:18-cv-1570-GJH |
| WILBUR L. ROSS, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' RULE 60(b)(2) MOTION FOR
RELIEF FROM FINAL JUDGMENT & REQUEST FOR INDICATIVE RULING
UNDER RULE 62.1(a)**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STANDARD OF REVIEW ....................................................................................................4

ARGUMENT ..........................................................................................................................5

I.     Plaintiffs' "new evidence" does not meet the essential requirement for relief under Rule 60(b)(2) because it is neither material nor likely to change the outcome..........................6

     A.     Plaintiffs' "newly discovered evidence" has nothing to do with the Secretary's allegedly discriminatory motive. ........................................................................................7

     B.     The Court rejected Plaintiffs' prior efforts to impute animus to Secretary Ross, foreclosing their latest theory.........................................................................................9

     C.     Plaintiffs' § 1985 claim fails because their "newly discovered evidence" cannot show that alleged conspirators shared the same conspiratorial objective........16

II.     Plaintiffs' "newly discovered evidence" is neither "new" nor "evidence." ..............................18

     A.     Plaintiffs' "evidence" is not "new" because it was, or could have been, discovered with due diligence. ........................................................................................18

     B.     Plaintiffs' "new evidence" is not "evidence" because it is inadmissible.....................22

III.     Defendants would suffer unfair prejudice if Plaintiffs were granted relief...............................25

CONCLUSION.......................................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Almy v. Sebelius*,
  749 F. Supp. 2d 315 (D. Md. 2010), *aff'd*, 679 F.3d 297 (4th Cir. 2012).................................................5

*Benavidez v. Irving Indep. Sch. Dist.*,
  690 F. Supp. 2d 451 (N.D. Tex. 2010) ........................................................................................15

*Boryan v. United States*,
  884 F.2d 767 (4th Cir. 1989) ....................................................................................... 5, 6, 19

*Brainard v. Am. Skandia Life Assur. Corp.*,
  432 F.3d 655 (6th Cir. 2005) ......................................................................................................24

*Buschi v. Kirven*,
  775 F.2d 1240 (4th Cir. 1985) ....................................................................................................18

*Camp v. Pitts*,
  411 U.S. 138 (1973) ....................................................................................................................10

*Clayton v. Nationwide Mut. Ins. Co.*,
  260 F. Supp. 3d 514 (D.S.C. 2017) ............................................................................................28

*Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones*,
  213 F. Supp. 2d 1106 (C.D. Cal. 2001) .......................................................................................8

*Compton v. Alton S.S. Co.*,
  608 F.2d 96 (4th Cir. 1979) ..................................................................................................... 4, 5

*Disney Enter., Inc. v. Sarelli*,
  322 F. Supp. 3d 413 (S.D.N.Y. 2018) ........................................................................................24

*Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*,
  993 F.2d 46 (4th Cir. 1993) ................................................................................................. 5, 6, 26

*Fabela v. City of Farmers Branch*,
  2012 WL 3135545 (N.D. Tex. Aug. 2, 2012) ............................................................................15

*Facey v. Dae Sung Corp.*,
  992 F. Supp. 2d 536 (D. Md. 2014) ...........................................................................................18

*Foster v. BNP Residential Properties Limited P'ship*,
  2008 WL 11348323 (D.S.C. Apr. 28, 2008)...............................................................................23

*Gichner v. Antonio Troiano Tile & Marble Co.*,
  410 F.2d 238 (D.C. Cir. 1969) ...................................................................................................25

*Giles v. Ashcroft*,
   193 F. Supp. 2d 258 (D.D.C. 2002) ........................................................................8

*Gordon v. Richmond Pub. Sch.*,
   2013 WL 4829296 (E.D. Va. Sept. 10, 2013) ........................................................4

*Horowitz v. Fed. Ins. Co.*,
   2017 WL 5624789 (D. Md. Nov. 22, 2017), *aff'd*, 733 F. App'x 105 (4th Cir. 2018) ........................5

*In re Burnley*,
   988 F.2d 1 (4th Cir. 1992) ......................................................................5, 6, 19, 23

*Jordan v. United States*,
   2019 WL 2297453, at (D.S.C. May 30, 2019) ........................................................5

*Kravitz v. U.S. Dep't of Commerce*,
   366 F. Supp. 3d 681 (D. Md. 2019) ................................................................*passim*

*Lyons v. Jefferson Bank & Tr.*,
   994 F.2d 716 (10th Cir. 1993) ..............................................................................23

*Martal Cosmetics, Ltd. v. Int'l Beauty Exch.*,
   2007 WL 2126091 (E.D.N.Y. July 24, 2007) ......................................................20

*Martin v. Boyce*,
   2000 WL 1264148 (M.D.N.C. July 20, 2000) ......................................................18

*Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*,
   201 F. Supp. 3d 1006 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) ......................14

*Nat'l Credit Union Admin. Bd. v. Gray*,
   1 F.3d 262 (4th Cir. 1993) ......................................................................................5

*Nemaizer v. Baker*,
   793 F.2d 58 (2d Cir. 1986) ..................................................................................23

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ..................................................................14

*Orr v. Bank of Am., NT & SA*,
   285 F.3d 764 (9th Cir. 2002) ................................................................................24

*Orraca v. Augustine*,
   2014 WL 4265917 (W.D.N.Y. Aug. 27, 2014) ......................................................24

*Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*,
   148 F.3d 396 (4th Cir. 1998) ..................................................................................4

*Penley v. McDowell Cty. Bd. of Educ.,*
   876 F.3d 646 (4th Cir. 2017) ................................................................................ 17, 18

*Shafiiq v. Obama,*
   951 F. Supp. 2d 13 (D.D.C. 2013) ................................................................................23

*Shell Trademark Mgmt BV & Motiva Enters. v. Ray Thomas Petroleum Co.,*
   642 F. Supp. 2d 493 (W.D.N.C. 2009) ................................................................................24

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ................................................................................16

*Simmons v. Poe,*
   47 F.3d 1370 (4th Cir. 1995) ................................................................................17

*Simon v. Eastern Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976) ................................................................................9

*Terrebonne Par. NAACP v. Jindal,*
   154 F. Supp. 3d 354 (M.D. La. 2015) ................................................................................8

*United States v. Int'l Bhd. of Teamsters,*
   247 F.3d 370 (2d Cir. 2001) ................................................................................23

*United States v. McGaughey,*
   977 F.2d 1067 (7th Cir. 1992) ................................................................................23

*United States v. Powers,*
   59 F.3d 1460 (4th Cir. 1995) ................................................................................26

*United States v. Williams,*
   674 F.2d 310 (4th Cir. 1982) ................................................................................4

*Victors v. Kronmiller,*
   2009 WL 971448 (D. Md. Apr. 8, 2009), *aff'd*, 397 F. App'x 893 (4th Cir. 2010) ................................18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................................15

*Waddell v. Hendry Cty. Sheriff's Office,*
   329 F.3d 1300 (11th Cir. 2003) ................................................................................22

*Werner v. Carbo,*
   731 F.2d 204 (4th Cir. 1984) ................................................................................5

*Wright v. North Carolina,*
   787 F.3d 256 (4th Cir. 2015) ................................................................................8

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ................................................................................................................18

## **RULES**

Fed. R. Civ. P. 60 ............................................................................................................... 5, 27

Fed. R. Civ. P. 62.1 ....................................................................................................................4

Fed. R. Evid. 804 ......................................................................................................................25

Fed. R. Evid. 805 ......................................................................................................................26

## **OTHER AUTHORITIES**

Justin Levitt, *Democracy on the High Wire: Citizen Commission Implementation of the Voting Rights Act*,
   46 U.C. Davis L. Rev. 1041 (2013) ........................................................................................15

Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count*,
   32 Cardozo L. Rev. 755 (2011) ...............................................................................................15

## INTRODUCTION

After 10 months of litigation, nearly two weeks of trial, and an order granting their requested relief in full—removal of a citizenship question from the 2020 Census—Plaintiffs have returned to Court seeking to reopen the record on their equal protection and § 1985 claims.  They justify this extraordinary request with two documents purportedly found on hard drives belonging to a now-deceased redistricting specialist named Dr. Thomas Hofeller.   One of these documents is an inscrutable paragraph allegedly from 2017 and seemingly related to the Voting Rights Act (VRA); the other is alleged to be a 2015 study by Hofeller observing that "[a] switch to the use of citizen voting age population [(CVAP)] as the [ ] population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," and "a disadvantage for the Democrats."  Pls.' Rule 60(b)(2) Mot., Ex. 1 at Ex. D p. 7, 9, ECF No. 162 ("Pls.' Mot.").  There is no evidence that the 2015 Hofeller study made its way to Secretary Ross (or anyone else in the government) and nothing in either document even arguably suggests that Secretary Ross harbored a discriminatory motive for including a citizenship question on the 2020 Census.   So there is no basis to revisit this Court's prior determination that it could not "connect the dots" between the Secretary's decision and evidence of third parties' animus.  *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 712, 754 (D. Md. 2019).

Rule 60(b) imposes a high bar to reopening a closed case, and Plaintiffs' last-ditch effort fails each of its requirements.  Their "new evidence" is not material and it would not produce a new outcome; their "new evidence" is neither "new" nor "evidence"; and their "new evidence" could have been revealed, and probed, during discovery if Plaintiffs had exercised due diligence.  Granting their motion would also cause unfair prejudice to Defendants by providing last-second relief on an entirely new theory of liability that has never before been, and can no longer be, litigated before the deadline for finalizing census questionnaires.   Each of these reasons provides a sufficient basis to deny Plaintiffs' motion.

Most fundamentally, Plaintiffs cannot show that the two "new" documents would have produced a different outcome.  This is true on two levels.  *First*, the 2015 Hofeller study simply analyzes the use of CVAP in redistricting.  Whatever the merits of that redistricting issue, it has literally nothing to do with census response rates at all, let alone Plaintiffs' theory that "the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus."  *Kravitz* 366 F. Supp. 3d at 754.  This "new evidence" would therefore not change the outcome of Plaintiffs' equal protection claim.  That is alone sufficient to resolve this motion because, as this Court recognized, Plaintiffs' § 1985 claim rises and falls with their equal protection claim.  *Id.* at 753.

*Second*, even if Hofeller's 2015 study demonstrated any relevant animus, Plaintiffs' effort to "connect the dots" between Secretary Ross's decision and a secret study recovered from a private citizen's personal hard drive, fails at every attempted connection.  Specifically, Plaintiffs seek to impute a "discriminatory" motive to Secretary Ross through the following chain: (1) one of Hofeller's hard drives contained the unpublished 2015 study (discussing the use of CVAP rather than total population for redistricting) that evinces discriminatory animus against Hispanics; (2) those hard drives contained a separate, unrelated document (purportedly created in 2017, two years after the study) that contains a paragraph about the VRA and evinces no discriminatory animus; (3) that 2017 paragraph also appears in a draft letter (Neuman Letter) that A. Mark Neuman, an outside advisor to the Commerce Department, provided to then-Acting Assistant Attorney General John Gore in the Department of Justice; (5) Gore drafted a different letter (Gary Letter) to the Census Bureau, which (i) bore no resemblance to the Neuman Letter, (ii) did not contain any language from the 2017 document, and (iii) explained that data from the American Community Survey (ACS) is not "ideal" for VRA purposes; and (6) the Secretary decided to include a citizenship question on the 2020 Census to aid VRA enforcement.  As this multi-link chain makes clear, Plaintiffs' latest effort to show animus is purely

imaginary.  Among other deficiencies, Plaintiffs have not established (1) any connection between the 2015 Hofeller study and the 2017 Neuman Letter, which are separate documents concerning disparate subjects that were written years apart; (2) any connection between the Neuman Letter and the entirely different Gary Letter; or (3) any evidence that any official at the Commerce Department or the Department of Justice had ever read, reviewed, or even heard about the unpublished 2015 Hofeller study before its recent appearance in this litigation.

The Court has already considered and rejected a much more direct effort by Plaintiffs to impute animus to Secretary Ross.  Specifically, the Court declined to impute animus to Secretary Ross despite Plaintiffs adducing "some evidence" that then-Kansas Secretary of State Kris Kobach—who *did* communicate directly with Secretary Ross—"harbor[ed] discriminatory animus towards noncitizens" and that his "desire for a citizenship question may have been motivated by that animus." *Kravitz*, 366 F. Supp. 3d, at 754.  That rationale applies tenfold to Plaintiffs' latest theory that the Court should impute animus to Secretary Ross based on an unpublished 2015 study by a private citizen, despite there being literally no evidence that Secretary Ross (or anyone else in the government) was aware of that study, its findings, or its theories.

Meritless theories and attenuated events aside, Plaintiffs also cannot overcome the other requirements of Rule 60(b)(2).  Most clearly, Plaintiffs argue that the Hofeller documents are "newly discovered evidence," but these documents are neither "new" nor "evidence."  This information is not "new" because it could have been discovered with due diligence.  Plaintiffs had more than adequate notice of Hofeller's (peripheral) role in this case and had adequate opportunity to probe it further.  Plaintiffs' failure to do so is entirely their fault and cannot supply a basis for a do-over at the eleventh hour.  Nor are the Hofeller documents "evidence" given that they are unauthenticated, hearsay, and ultimately inadmissible.

3

Finally, Plaintiffs' requested relief would cause unfair prejudice to Defendants in several ways and should be denied on that basis, too. Because the "newly discovered evidence" is relevant only to the use of CVAP in redistricting—not the undercount theory that has been the heart of Plaintiffs' case from day one—the Court would be granting last-second relief premised on a dramatic shift in the entire theory of this year-long case. That prejudice is unfair both on its own terms and because it would effectively foreclose Defendants from appealing this Court's ruling before the June 30, 2019 deadline for finalizing census questionnaires.

Given that Plaintiffs' application fails at every turn, the Court should not issue an indicative ruling that it would enter judgment for Plaintiffs. *See* Fed. R. Civ. P. 62.1(a)(3). For the same reasons, there is no "substantial issue" here; only a substantial amount of ink. *See id.* Plaintiffs' motion should be denied under Rule 62.1(a)(2).

<h2 style="text-align:center">STANDARD OF REVIEW</h2>

The relief provided by Rule 60(b) is an "extraordinary" remedy, "only to be invoked upon a showing of exceptional circumstance." *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979). "Rule 60(b) of the Federal Rules of Civil Procedure has invested federal courts with the power in certain restricted circumstances to vacate judgments whenever such action is appropriate to accomplish justice." *Id.* at 101–02 (quotations omitted). But "[w]here the motion is nothing more than a request that the district court change its mind . . . it is not authorized by Rule 60(b)." *United States v. Williams*, 674 F.2d 310, 313 (4th Cir. 1982). Moreover, "such motions 'may not be used . . . to raise arguments which could have been raised prior to the issuance of the judgment.'" *Gordon v. Richmond Pub. Sch.*, 2013 WL 4829296, at *2 (E.D. Va. Sept. 10, 2013) (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)). The Fourth Circuit has further cautioned that "[t]he remedy provided by the Rule . . . is extraordinary and is only to be invoked upon a showing of exceptional circumstances." *Compton*, 608 F.2d at 102.

"The consideration of Rule 60(b) motions proceeds in two stages." *Nat'l Credit Union Admin.*

*Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993); *Horowitz v. Fed. Ins. Co.*, 2017 WL 5624789, at *1 (D. Md.

Nov. 22, 2017), *aff'd*, 733 F. App'x 105 (4th Cir. 2018).   The movant must first establish "timeliness, a

meritorious [claim], a lack of unfair prejudice to the opposing party, and exceptional circumstances."

*Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (quoting *Werner v. Carbo*,

731 F.2d 204, 207 (4th Cir. 1984)).   "Once the movant has met the threshold showings, he must satisfy

one of the six enumerated grounds for relief under Rule 60(b)."   *Nat'l Credit Union Admin. Bd.*, 1 F.3d

at 266.

Plaintiffs invoke only Rule 60(b)(2), which governs the standards for relief from the judgment

on the basis of newly discovered evidence. Fed. R. Civ. P. 60(b)(2).   To be granted relief under Rule

60(b)(2), the movant must demonstrate:

> (1) the evidence is newly discovered since the judgment was entered; (2) due diligence
> on the part of the movant to discover the new evidence has been exercised; (3) the
> evidence is not merely cumulative or impeaching; (4) the evidence is material; and
> (5) the evidence is such that is likely to produce a new outcome if the case were retried,
> or is such that would require the judgment to be amended.

*Boryan v. United States*, 884 F.2d 767, 771 (4th Cir. 1989); *Jordan v. United States*, 2019 WL 2297453, at *1

(D.S.C. May 30, 2019).   These grounds "must be clearly substantiated by adequate proof."   *In re Burnley*,

988 F.2d 1, 3 (4th Cir. 1992) (citations omitted); *Almy v. Sebelius*, 749 F. Supp. 2d 315, 338 (D. Md.

2010), *aff'd,* 679 F.3d 297 (4th Cir. 2012).

## ARGUMENT

Plaintiffs fail at every step of the Rule 60(b)(2) analysis.   Their unprecedented discriminatory-

motive theory fails on its face, so they cannot establish a meritorious claim, they cannot show that the

"new evidence" is material, and they cannot show that the "new evidence" would produce a different

outcome. *See Dowell*, 993 F.2d at 48; *Boryan*, 884 F.2d at 771.   On the merits, the "new evidence" does

not evince discriminatory animus and, even if it did, it has literally nothing to do with Plaintiffs' actual

theory that "the Secretary's decision was made for the purpose of depressing immigrant response." *Kravitz*, 366 F. Supp. 3d at 754. Moreover, this Court already rejected a less-attenuated version of the same imputed-animus argument Plaintiffs advance now: it found no equal protection violation even when Plaintiffs adduced "some evidence" that Kobach, who communicated directly with Secretary Ross, "harbor[ed] discriminatory animus towards noncitizens" and that his "desire for a citizenship question may have been motivated by that animus." *Kravitz*, 366 F. Supp. 3d at 754 (deemphasized). If this direct Kobach-Secretary connection was not enough for liability, then the convoluted Hofeller-Secretary "connection"—traced through four people and four documents—cannot impose liability either.

Beyond the merits, Plaintiffs fail the rest of Rule 60(b)'s requirements and their motion should be denied on those bases, too. Foremost, their "new evidence" is inadmissible, cumulative of old evidence, and to the extent any information is "new," it could have been discovered with due diligence. *See Boryan*, 884 F.2d at 771; *In re Burnley*, 988 F.2d at 3. In addition, Rule 60(b) relief would cause unfair prejudice to Defendants by allowing Plaintiffs to completely reinvent their theory of liability mere days or weeks before 2020 Census questionnaires must be finalized, a timetable on which it would be impossible to litigate this entirely new theory of animus. *See Boryan*, 884 F.2d at 771. For all these reasons, Plaintiffs have come nowhere close to showing "exceptional circumstances" that justify the "extraordinary" relief authorized by Rule 60(b). *See Dowell*, 993 F.2d at 48.

I.   **Plaintiffs' "new evidence" does not meet the essential requirement for relief under Rule 60(b)(2) because it is neither material nor likely to change the outcome.**

Plaintiffs' motion fails at the outset because their "new evidence" is unavailing on at least three levels. *First*, neither of the Hofeller documents evince discriminatory animus. Not even Plaintiffs argue that the VRA paragraph exhibits animus, and the 2015 Hofeller study of state-level redistricting has literally nothing to do with Plaintiffs' actual theory that "the Secretary's decision was made for the purpose of depressing immigrant response" *in the census*. *Kravitz*, 366 F. Supp. 3d at 754. *Second*, this

Court already considered and rejected a less convoluted version of the same argument—that a third party's animus can be imputed to Secretary Ross absent any evidence that the Secretary himself shared that animus. If Plaintiffs could not prevail on that evidence, their latest conjectural web surrounding Hofeller is also meritless. *Finally*, Plaintiffs' allegations debunk their own § 1985 conspiracy claim because they do not even allege, much less prove, that the supposed conspirators shared a common objective.

A.  Plaintiffs' "newly discovered evidence" has nothing to do with the Secretary's allegedly discriminatory motive.

Plaintiffs' purported "new evidence" of discrimination—the unpublished 2015 Hofeller study—is completely irrelevant to their equal protection claims. As Plaintiffs admit, the 2015 Hofeller study simply recognized that "[a] switch to the use of citizen voting age population as the [ ] population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites," Pls.' Mot. at 5 (quoting Pls.' Ex. 1 at Ex. D p. 9), and that "[u]se of CVAP would clearly be a disadvantage for the Democrats," Pls.' Ex. 1 at Ex. D p. 7. Those statements demonstrate no discriminatory animus against anyone; they are empirical observations—which Plaintiffs do not dispute—about the likely impact of States using CVAP for redistricting. Hofeller himself acknowledged that it is "important" to address "the political ramifications of using CVAP as the redistricting population standard," and he queried whether "the gain of GOP voting strength [would] be worth the alienation of Latino voters who will perceive a switch to CVAP as an attempt to diminish their voting strength." *Id.* at 4. But that question, he recognized, was "not the subject of [his] study." *Id.* Far from evincing discriminatory intent, Hofeller's work appears to have been a simple empirical research project.

And even if the 2015 Hofeller study had demonstrated a discriminatory rationale for using CVAP to conduct state-level redistricting, that is utterly irrelevant. Plaintiffs' theory is *not* that the citizenship question will harm them *because it will enable the use of CVAP* in redistricting; it is that the citizenship question harms them by causing a differential undercount in certain populations *regardless*

*of how future redistricting is done. See Kravitz,* 366 F. Supp. 3d at 754 (holding that Plaintiffs had not proved "by a preponderance of the evidence that the Secretary's decision was made for the purpose of *depressing immigrant response* and motivated by discriminatory animus" (emphasis added)); *see also* Pls.' Corrected Conclusions of Law, at ¶¶ 219–28, ECF No. 151-2 ("Pls.' Post-Trial Br.") (arguing that "[d]emonstration of the disproportionate impact of the addition of a citizenship question is sufficient to establish one of the circumstances supporting a finding of discriminatory intent"); *id.* ¶ 290 (arguing that various people conspired "to add a citizenship question to the 2020 Census to reduce response rates of people of color and immigrants"). Hofeller's study does not address that issue.

Indeed, had Plaintiffs challenged the citizenship question on the grounds that it would facilitate States' optional use of CVAP in redistricting—as opposed to causing an undercount in certain populations—their claims would have failed. Merely asking the citizenship question cannot have any discriminatory effect on redistricting unless *States* use the citizenship data in the discriminatory ways. And if the States do so, Plaintiffs could sue their respective States (or the relevant State officials). *See Wright v. North Carolina,* 787 F.3d 256, 263 (4th Cir. 2015); *Terrebonne Par. NAACP v. Jindal,* 154 F. Supp. 3d 354, 363 (M.D. La. 2015); *Giles v. Ashcroft,* 193 F. Supp. 2d 258, 267 (D.D.C. 2002); *Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones,* 213 F. Supp. 2d 1106, 1108 (C.D. Cal. 2001). Equal-protection principles do not invalidate the Secretary's inclusion of a citizenship question on the census simply because States may or may not impermissibly utilize census data in redistricting years later. Had Plaintiffs pursued such a theory, they also would have likely lacked standing because their purported harm would be traceable to States' own independent redistricting decisions, not the Secretary's decision to reinstate a citizenship question. *See Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976).

That is presumably why Plaintiffs challenged the citizenship question on the ground that it would purportedly harm the accuracy of the census, rather than because it could enable States to use

CVAP in redistricting.  And that is precisely why Plaintiffs' current motion is self-defeating: the record actually demonstrates the need for *accurate* census data in redistricting.  Even Hofeller said so.  When asked the "substance" of his conversations with Hofeller "about the citizenship question," Neuman testified:

> Well, [Hofeller] talked about how block level data was -- and, again, block level data is an obsession with him, because block level data means that you can draw the most accurate districts.  And so, again, his focus was always on block level data, and always on, "Mark, you need to make sure that we take a good census, that the administration doesn't skimp on the budget," because a good census is good for what he does.

Defs.' Ex. D, Neuman Dep. 138:3–16.  Given that Hofeller stressed the importance of an accurate census, transferring Hofeller's intent to the Secretary (laundered through Neuman and Gore) cannot support Plaintiffs' equal protection claim *as they pled and tried this case*—*i.e.*, based on "depressing immigrant response." *Kravitz*, 366 F. Supp. 3d at 754.

In short, the 2015 Hofeller study does not support Plaintiffs' theory of animus and thus could not change the outcome.  The 2015 Hofeller study concerned only the use of CVAP in state-level redistricting; it says nothing about census accuracy.  That alone resolves this motion because Plaintiffs' § 1985 claim "rises and falls with their Equal Protection claim." *Id.* at 753.

B.  <u>The Court rejected Plaintiffs' prior efforts to impute animus to Secretary Ross, foreclosing their latest theory.</u>

Following lengthy proceedings, this Court rejected Plaintiffs' prior effort to impute animus to Secretary Ross.  And Plaintiffs offer no reason to think their new, far-more-attenuated theory would change the outcome.  As the Court explained after trial, Plaintiffs "offered little, if any evidence, showing Secretary Ross harbors animus towards Hispanics or that such animus impacted his decision." *Kravitz*, 366 F. Supp. 3d at 754.[1]  Previously, Plaintiffs attempted to establish the Secretary's

---

[1] Defendants maintain their position that Plaintiffs' due process claim should be decided, if at all, on the basis of the administrative record before the Secretary and "not some new record made

discriminatory motive through the allegedly discriminatory views of "other individuals, including the President and Secretary Kobach." *Id.* Plaintiffs offered evidence that the Secretary had spoken directly with Kobach about the citizenship question, and that the President's reelection campaign had sent an email about the citizenship question:



*id.* at 694, 712. Plaintiffs then argued that the views of these third parties—Kobach and the President—provided sufficient basis to impute animus to Secretary Ross. This theory only went so far: Plaintiffs had adduced "some evidence" that Kobach—who communicated directly with Secretary Ross—"harbor[ed] discriminatory animus towards noncitizens" and his "desire for a citizenship question may have been motivated by that animus." *Kravitz*, 366 F. Supp. 3d at 754 (deemphasized). But this Court nonetheless found that "Plaintiffs [did] not sufficiently tie[] those views to *Secretary Ross's* decision." *Id.* at 754 (emphasis added).

Plaintiffs are now seeking to reopen this case with a far-more-attenuated theory than the one this Court rejected. Specifically, Plaintiffs now contend that (1) the unpublished 2015 Hofeller study

---

initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (*per curiam*). Nonetheless, Plaintiffs' Rule 60(b) motion should be denied even if the Court considers this extra-record evidence.

(discussing the use of CVAP rather than total population for redistricting) evinces discriminatory animus against Hispanics; (2) there is an unrelated VRA paragraph in a completely different document from 2017 also purportedly found on one of Hofeller's hard drives (a document that Plaintiffs do not allege evidences discriminatory animus); (3) that paragraph also appears in the Neuman Letter given to Gore; (4) Gore drafted the Gary Letter—which bore no resemblance to the Neuman Letter, which did *not* contain any language from the 2017 document found on Hofeller's hard drive, and which explained that ACS citizenship data is not "ideal" for VRA purposes—that was sent to the Census Bureau; and (5) the Secretary decided to include a citizenship question on the 2020 Census to obtain better data for VRA enforcement.  *See* Pls.' Mot. at 5–8.



It is on that absurd basis that Plaintiffs seek to impute animus to the Secretary.  But far from establishing "a clear through-line" of discriminatory motive from the 2015 Hofeller study to the Secretary's 2018 decision, *id.* at 10, these facts reveal no connection whatsoever.  It is impossible to see how Hofeller's "discriminatory motive" (gleaned from an unseen document concerning *redistricting*, not the accuracy of the census) could somehow be imputed to the Secretary through a cryptic paragraph in a separate document also appearing in the Neuman Letter, then through Gore's receipt

11

of the Neuman Letter, then through the Gary Letter sent to the Census Bureau (which did not include that inscrutable paragraph), and then through the Secretary's independent decision to reinstate a citizenship question.  If the direct Kobach-Secretary connection was not enough for liability, then the circuitous Hofeller-Secretary "connection" cannot impose liability either.

A closer examination only further demonstrates that the purported chain fails at every link. The first disconnect is Plaintiffs' attempt to tie the 2015 Hofeller study to the 2017 Neuman Letter by way of a separate VRA paragraph allegedly found on Hofeller's hard drive.  Other than their mutual presence on Hofeller's hard drives, there is no apparent connection between the 2015 study and the 2017 draft paragraph.  Not only are those documents distinct in substance and form—one addresses redistricting; the other seemingly addresses the VRA—but they were penned two years apart.  And although this paragraph appears verbatim in both Hofeller's standalone document and the Neuman Letter, Plaintiffs offer no competent evidence establishing the provenance of the Hofeller paragraph, let alone that Hofeller (a) wrote it or (b) transmitted it to Neuman.  Neuman's own testimony underscores this uncertainty.  In response to a question about who "provided" the letter to him, Neuman testified: "I'm not sure which version this is.  Again, I'm familiar with the letter.  I'm not sure who the original author is.  I'm sure that I looked at it.  I might have commented on it, but I'm not sure who wr[ote] a first—a first template, as it were."  Defs.' Ex. D, Neuman Dep. 280:8–15.

Plaintiffs also fail to establish any transferred intent between Hofeller and Neuman.  Views that Hofeller allegedly expressed in an unpublished 2015 study are not evidence of what he told Neuman years later.  In fact, when asked the "substance" of his conversations with Hofeller "about the citizenship question," Neuman testified that Hofeller simply wanted to "take a good census" and confirm that "the administration doesn't skimp on the budget."  Defs.' Ex. D, Neuman Dep. 138:3– 16.  Neuman went on to testify extensively about Hofeller but never mentioned any discussion of using block-level census data for CVAP redistricting (*i.e.*, the subject of the 2015 Hofeller study).  *See*,

*e.g.*, *id.* at 33:2–10, 36:19–45:14, 51:7–53:3, 55:9–59:6, 64:18–67:14, 89:11–90:13, 100:18–101:7, 136:17–139:3, 143:13–144:6.  To the contrary, Neuman testified—under oath—that he wanted to "maximize[]" representation for the "Latino community," not dilute it.  *Id.* at 142:3–23.

Plaintiffs also offer no evidence to connect the Neuman Letter provided to Gore with the separate Gary Letter that Gore drafted, which ultimately went to the Census Bureau.  While it is true that Gore received the *Neuman Letter*, Plaintiffs provide no evidence that this document in any way influenced Gore's drafting of the entirely separate *Gary Letter*.  Testimony in the record proves the opposite: Gore explained that he "wrote the first draft of the letter" from DOJ, Defs.' Ex. C, Gore Dep. 127:12–17, and Neuman said that he "wasn't a part of the drafting process."  Defs.' Ex. D, Neuman Dep. 114:19–20.  Everyone seems to agree on this point.  *See* Pls.' Post-Trial Br. ¶ 291, ECF No. 151-1 ("Acting Assistant Attorney General Gore drafted the DOJ Letter"); *see New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 555 (S.D.N.Y. 2019) (describing Gore's drafting process with no mention of the Neuman Letter).  That makes sense because even a cursory review of both documents reveals that they are completely different in substance, language, and form.  *Compare* Defs.' Ex. B at 4–5, Neuman Letter *with* Defs.' Ex. A, Gary Letter.  As Neuman testified, the Neuman Letter is "very different" from the Gary Letter.  Defs.' Ex. D, Neuman Dep. 280:23-24.  So any suggestion that the Neuman Letter constituted a "draft" of the Gary Letter is false.  Indeed, Plaintiffs have had the Neuman Letter for *months*, yet never previously suggested that it bore any resemblance to the Gary Letter or served as its initial draft.  *See infra* Section III.A.

Plaintiffs also offer absolutely nothing to connect the allegedly "discriminatory" ideas expressed in the 2015 Hofeller study with the Gary Letter drafted by Gore.  Plaintiffs provide no evidence that Gore ever read, received, or was even aware of the existence of that unpublished study, much less that he had any such awareness when drafting the Gary Letter.  Nor can they, because this evidence does not exist.  To the extent the 2015 Hofeller study and the Gary Letter highlight similar

problems with ACS data,[2] that is entirely unsurprising: those issues are widely known, and have been discussed in case law and academic literature for years. *See, e.g., Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1030 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018); *Fabela v. City of Farmers Branch*, 2012 WL 3135545, at *7 (N.D. Tex. Aug. 2, 2012); *Benavidez* v. *Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 457-458 (N.D. Tex. 2010); Justin Levitt, *Democracy on the High Wire: Citizen Commission Implementation of the Voting Rights Act*, 46 U.C. Davis L. Rev. 1041, 1109 n.116 (2013); Nathaniel Persily, *The Law of the Census: How to Count, What to Count, Whom to Count, and Where to Count*, 32 Cardozo L. Rev. 755, 776–77 (2011).  Indeed, the Gary Letter's discussion of the downsides of ACS citizenship data bears just as much, if not more, resemblance to briefs filed in *Evenwel v. Abbott*—the Supreme Court's 2016 decision concerning CVAP in redistricting—than it does to the 2015 Hofeller study.  *See* Defs.' Ex. E.  Gore even testified that he reviewed briefs in that case. Defs.' Ex. C, Gore Dep. 339:13–340:4.  Yet it would be absurd to impute the various intentions of the authors of those briefs to Gore based on any linguistic or structural similarities.  And it is equally absurd to impute the malicious intent (if any) of Hofeller—expressed in a secret study stored on his personal hard drive—to Gore via the separate Neuman Letter.

Finally, even if the factual underpinnings of Plaintiffs' "causal" chain had not been thoroughly debunked, their transferred-intent theory of discriminatory motive would fail as a matter of law.  It is beyond dispute that only the Secretary's intent is relevant to Plaintiffs' equal protection claims.  *See Kravitz*, 366 F. Supp. 3d at 753 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)) ("Plaintiffs bear the burden of demonstrating that an 'invidious discriminatory purpose

---

[2] Plaintiffs claim that "the DOJ Letter contains many similarities to the Neuman-Hofeller letter." Pls.' Mot. at 6 n.2.  Defendants assume this is a typographical error because the two documents could not be more different.  *Compare* Defs.' Ex. B at 4–5, Neuman Letter *with* Defs.' Ex. A, Gary Letter.  To the extent Plaintiffs meant that the Gary Letter "contains many similarities" to the 2015 Hofeller study, Defendants address that argument in the accompanying text.

was a motivating factor' behind the *Secretary's* decision." (emphasis added)); *id.* (recognizing that a "showing of disparate impact . . . is relevant to prove that the *decisionmaker* acted with a forbidden purpose" (emphasis added)). Yet not even Plaintiffs allege that Secretary Ross was aware of Hofeller's unpublished 2015 study or its ideas; their discriminatory-motive theory depends entirely on the subjective desires of others.

Plaintiffs' attempt to trace Hofeller's "discriminatory" intent through four people (Hofeller, Neuman, Gore, and the Secretary) and four documents (the 2015 Hofeller study, the Neuman Letter, the Gary Letter, and the Secretary's decisional memorandum) stretches the discriminatory-motive inquiry beyond its breaking point.[3] And while a "discriminatory purpose may often be inferred from the totality of the relevant facts," *id.* (citations omitted), the "relevant facts" cannot include the purported discriminatory animus of an individual (Hofeller) who talked to another individual (Neuman) who talked to another individual (Gore) who never talked to the decisionmaker (Secretary Ross).[4] That conception of equal protection liability is absurd and would invalidate every government

---

[3] Plaintiffs seemingly try a new strategy in this motion: attempting to impute Neuman's/Gore's allegedly discriminatory motivations to the Secretary given that "[t]he October 2017 Neuman-Gore meeting, at which Neuman gave Gore the draft letter, was arranged by the Commerce Department's in-house counsel." Pls.' Mot. at 7. This is not new information. Neuman testified at his deposition that his meeting with Gore was at the request of James Uthmeier, then an attorney in the General Counsel's office at the Commerce Department, and Neuman further testified that he did not know "who originally had the idea" but that he thought it was "someone at the Commerce Department." Defs.' Ex. D, Neuman Dep. 112:5–25, 113:1–22. In any event, Plaintiffs' newfound emphasis is a red herring. This Court previously precluded Plaintiffs' attempt to impute the President's motivations to Secretary Ross simply because White House Chief Strategist Steve Bannon asked the Secretary to speak with Kobach. *See Kravitz*, 366 F. Supp. 3d at 754. This rationale similarly bars Plaintiffs' attempt to impute Neuman's/Gore's motivations to the Secretary simply because the Commerce Department's in-house counsel arranged the meeting.

[4] Gore's testimony concerning Secretary Ross's intent went no further than the Secretary's decisional memorandum. *See, e.g.,* Defs.' Ex. C, Gore Dep. 36:8–22, 37:1–22, 38:1–8, 41:8–16, 42:13–22, 43:1–3, 284:17–22, 285:1–15, 317:4–22, 318:1–8. When asked if he "ever discussed the issue of the citizenship question with Secretary Ross," Gore responded: "No." *Id.* at 89:22, 90:1–2. When asked if he was "consulted by Secretary Ross regarding whether the Department of Justice would

action as the result of innocuous contact with allegedly discriminatory individuals thrice removed. *Cf. Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C. Cir. 1981).

      C.      <u>Plaintiffs' § 1985 claim fails because their "newly discovered evidence" cannot show that alleged conspirators shared the same conspiratorial objective.</u>

Plaintiffs § 1985 conspiracy claim fails[5] for this same basic reasons as their equal protection claim: Plaintiffs' new information comes nowhere close to showing the meeting of the minds required to establish a conspiracy. An actionable conspiracy under § 1985(3) requires "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). Plaintiffs must therefore prove "that each member of the alleged conspiracy shared the same conspiratorial objective." *Penley v. McDowell Cty. Bd. of Educ.*, 876 F.3d 646, 658 (4th Cir. 2017). This "burden is weighty," *id.*, and the Fourth Circuit "has *rarely, if ever*, found sufficient facts to establish a section 1985 conspiracy," *Simmons*, 47 F.3d at 1377 (emphasis added). Plaintiffs have again failed to adduce such facts, instead relying on what is essentially a conspiracy theory with a rotating cast of characters.

This Court already rejected Plaintiffs' effort to show a conspiracy, *Kravitz*, 366 F. Supp. 3d at 754, and nothing in their "new evidence" would produce a different outcome now. At trial, Plaintiffs argued that "[m]embers of the Trump Administration, [then-Kansas Secretary of State Kris] Kobach, the Secretary, and members of the DOJ agreed to add a citizenship question." Pls.' Post-Trial Br. ¶ 290. Plaintiffs have now added Neuman and Hofeller to the mix based on the "newly discovered"

---

support or request the inclusion of a citizenship question on the decennial census," Gore responded: "No." *Id.* at 90:10–15.

    [5] As this Court has recognized, rejecting Plaintiffs' equal protection claim is sufficient to defeat their § 1985 claim. *Kravitz*, 366 F. Supp. 3d at 753. Defendants also maintain that § 1985 does not authorize courts to award injunctive relief, that this claim is barred by sovereign immunity, and, if not so barred, Plaintiffs cannot maintain their APA claims because they have an adequate alternative remedy. *See* Defs.' Post-Trial Br. ¶¶ 536–47, ECF 150.

2015 Hofeller study.  Pls.' Mot. at 18.  But these additions cannot salvage their meritless § 1985 claim because, even under Plaintiffs' own theory, none of the conspirators share the same objective.  Kobach wanted to add a citizenship question to "to address the problem of counting immigrants for *Congressional apportionment* purposes."  Pls.' Mot. at 15 (emphasis added).  The Executive Branch officials[6] supposedly desired a citizenship question "to reduce response rates of people of color and immigrants."  Pls.' Post-Trial Br. ¶ 290.  And Hofeller/Neuman purportedly sought a citizenship question to enable States' "discriminatory" use of CVAP for redistricting after the census.  Pls.' Mot. at 5–6.  These assorted goals are far from the "same conspiratorial objective" and thus cannot support a § 1985 claim.  *Penley*, 876 F.3d at 658; *see supra*, Section I.A. (explaining that the use of CVAP for "discriminatory" redistricting is incompatible with the goal of depressing census response rates).  That ends the inquiry.

Courts in this circuit have routinely rejected § 1985 claims on similar grounds.  *See, e.g.*, *Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536 (D. Md. 2014) (dismissing § 1985(3) claim where plaintiff alleged that two of the putative conspirators were motivated by a retaliatory interest rather than discriminatory animus, leaving only one conspirator with an allegedly illicit purpose); *Victors v. Kronmiller*, 2009 WL 971448, at *9 (D. Md. Apr. 8, 2009) (dismissing a § 1985 claim where there was no "direct or circumstantial evidence of an agreement to deprive plaintiffs of their constitutional rights"), *aff'd,* 397 F. App'x 893 (4th Cir. 2010); *Martin v. Boyce*, 2000 WL 1264148, at*7 (M.D.N.C. July 20, 2000) (dismissing claim where "no more than one member of the alleged conspiracy had a racist motive" because "when only one conspirator is motivated by a forbidden purposes, there can be no meeting

---

[6] The intra-corporate conspiracy doctrine applies to § 1985 claims.  *Buschi v. Kirven*, 775 F.2d 1240, 1251-52 (4th Cir. 1985).  So members of the Executive Branch—"the Secretary," "members of the Trump Administration," and "members of the DOJ," Pls.' Mot. at 18—cannot conspire with each other because "there is no unlawful conspiracy when officers within a single [ ] entity consult among themselves and then adopt a policy for the entity."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

of the minds, no agreement to deprive another of the equal protection of the laws because of his race"). This Court should thus reject Plaintiffs' § 1985 claim—again.

## II.     Plaintiffs' "newly discovered evidence" is neither "new" nor "evidence."

Aside from Plaintiffs' fatuous theory on the merits, their Rule 60(b)(2) motion also fails because their "new evidence" is inadmissible, cumulative of old evidence, and in any event could have been discovered with due diligence. *See Boryan*, 884 F.2d at 771; *In re Burnley*, 988 F.2d at 3. This provides an independent basis to deny their request for eleventh-hour relief.

A.     <u>Plaintiffs' "evidence" is not "new" because it was, or could have been, discovered with due diligence.</u>

Plaintiffs' information is not "new" evidence because Plaintiffs could have discovered it with due diligence. They attempt to sidestep this failure by claiming that Neuman provided misleading deposition testimony, which hindered their ability to discover "Hofeller's significant role in promoting the addition of the citizenship question." Pls.' Mot. at 20. But Plaintiffs' that theory is viable only if the Court *already believes* Plaintiffs' unsupported assertions that Hofeller had a "significant role in promoting the addition of the citizenship question," and therefore *assumes* that Neuman provided untruthful testimony. That is pure tautology: Neuman misrepresented Hofeller's role because he was concealing Hofeller's role. Contrary to Plaintiffs' circular logic, the only competent evidence in the record—nearly 14 hours of sworn testimony from Neuman and Gore—is fully consistent and demonstrates the unexciting truth: Hofeller played little, if any, role in advocating for a citizenship question.[7] Plaintiffs fail to identify a single question that was misleadingly answered in light of the "new" documents themselves, as opposed to erroneous inferences from those documents.

---

[7] Although Defendants address Plaintiffs' groundless assertions about Neuman's testimony, Neuman was not a governmental employee and the government did not represent him in this litigation. Indeed, Neuman retained private counsel and routinely disregarded the government's

Much of Plaintiffs' unfounded conjecture about Hofeller's role hinges on the cryptic VRA paragraph (supposedly found among Hofeller's files) that also appears in the Neuman Letter.  From this, they surmise that Neuman's deposition testimony "mischaracterized Dr. Hofeller's substantive involvement."[8]  Pls.' Mot. at 20.  But if Plaintiffs did not receive the information they now desire, that is the product of their own deposition decisions.  In fact, Neuman was discussing the Neuman Letter's authorship when Plaintiffs' counsel cut him off:  "I don't—I don't want—I don't—I'm not asking you to tell me about who the original author was or anything."  Defs.' Ex. D, Neuman Dep. 281:23–25.  It is quite extraordinary for Plaintiffs to now complain about Neuman's failure to tell them something they instructed him not to tell them.  *See Martal Cosmetics, Ltd. v. Int'l Beauty Exch.*, 2007 WL 2126091, at *6–7 (E.D.N.Y. July 24, 2007) (finding that because a party failed to take depositions or ask certain questions, that party "cannot now be heard to complain about the consequences of their indolence").  And Plaintiffs did not lack for opportunity; Neuman testified at length about Hofeller and the discussions they had about redistricting and the census.  *See, e.g., id.* at 33:2–10, 36:19–45:14, 51:7–53:3, 55:9–59:6, 64:18–67:14, 89:11–90:13, 100:18–101:7, 136:17–139:3, 143:13–144:6.  In short, Plaintiffs were well aware of Hofeller's connection to Neuman.  If they had wanted to know more, they could have questioned Neuman further.  They did not.

---

instructions not to answer certain deposition questions on the basis of privilege. *See, e.g.*, Defs.' Ex. D, Neuman Dep. 124:15–126:23, 273:18–274:5.

[8] Plaintiffs similarly quibble with Neuman's testimony that he did not rely on Hofeller for "expertise on the Voting Rights Act."  Pls. Mot. at 19.  But even if the author of the Neuman Letter purportedly excerpted from Hofeller's (unauthenticated) document, one nonsensical paragraph does not mean that the author of the Neuman Letter—much less Neuman himself—relied on Hofeller as an "expert."  And in any event, this conjecture is contradicted by the evidence.  In response to a question about who "provided" the letter to him, Neuman testified: "I'm not sure which version this is.  Again, I'm familiar with the letter.  I'm not sure who the original author is.  I'm sure that I looked at it.  I might have commented on it, but I'm not sure who wr[ote] a first—a first template, as it were."  Defs.' Ex. D, Neuman Dep. 280:11–15.

Plaintiffs' contention that they "did not learn about [Neuman providing Gore the Neuman Letter] until well after the conclusion of trial in this case," is equally unavailing.  To begin, both the Department of Justice and Neuman produced the Neuman Letter in full during discovery.  *See* Defs.' Ex. B at 4–5, Defs.' Email Attaching Neuman Letter.  And in the cover email to Plaintiffs' counsel, Defendants expressly said:  "These materials were collected from John Gore" "in hard copy."  *Id.* at 3.  So Plaintiffs have known since at least October 23, 2018 that Gore had the Neuman Letter, which belies their claim that they learned that fact only recently.  *See id.*

Plaintiffs also deposed both Neuman and Gore *after* receiving the Neuman Letter in discovery and thus had every opportunity to ask questions about that document.  For Gore's part, he did not testify that Neuman gave him a draft of the Neuman Letter.  But again, that is because *Plaintiffs did not ask him about it.*  Gore disclosed that he talked to Neuman while drafting the Gary Letter.  *See* Defs.' Ex. C, Gore Dep. 437:20–438:13.  When Plaintiffs asked for the substance of that conversation, the government appropriately asserted deliberative-process privilege—an assertion that Plaintiffs chose not to challenge.  *Id.* at 437:14–20.  And instead of following up to ask whether Neuman gave Gore any materials, Plaintiffs simply moved on to other topics.  *Id.* at 437:22–438:13.

For Neuman's part, Plaintiffs asked him what he gave to Gore, and Neuman answered:  "Mainly the—mainly a copy of the—of the letter from the Obama Administration, Justice Department, to the Census Bureau on the issue of adding a question on the ACS."  Defs.' Ex. D, Neuman Dep. 123:25–124:3.  After asking some follow-up questions about that document, *id.* at 124:4–126:16, counsel moved on to another topic, *see id.* at 126:19–20.  Plaintiffs' counsel never asked *what else*, if anything, Neuman gave Gore beyond the Obama-era document.  Neuman's failure to inform Plaintiffs that he also gave Gore a copy of the Neuman Letter is thus traceable to Plaintiffs' less-than-thorough deposition questioning, not Neuman.  *See Waddell v. Hendry Cty. Sheriff's Office*, 329

F.3d 1300, 1310 (11th Cir. 2003) (denying Rule 60(b)(2) motion where "[i]t was Plaintiffs' tactical decisions, not fraud by Defendants, that prevented Plaintiffs from fully presenting their case").

Plaintiffs also take issue with Neuman's testimony that he "wasn't part of the drafting process of the [Gary] letter," and that he "denied that his October 2017 meeting with Gore was about a 'letter from DOJ regarding the citizenship question.'" Pls.' Mot. at 20. The first part of Plaintiffs' contention is unequivocally true: as explained above, everyone seems to agree that Gore drafted the Gary Letter, and Plaintiffs provide no evidence that the Neuman Letter had any impact on Gore's drafting process. *See supra* Section II. As for the second part, Plaintiffs selectively quote Neuman's response to one question asking what the Gore-Neuman meeting was "about." *See* Defs.' Ex. D, Neuman Dep. 273:10–21. In fact, Neuman testified at several points during his deposition that he discussed a citizenship question (and a DOJ letter to the Census Bureau) with Gore. *See, e.g., id.* at 110:5–8, 114:15–23, 123:20–124:3.

Plaintiffs further protest Neuman's testimony that "Hofeller's interest in obtaining citizenship data from the decennial census was for the purposes of creating Latino-majority voting districts," and they argue that "Neuman failed to disclose that Hofeller's detailed [2015] study recommended the inclusion of a citizenship question to benefit 'Republicans and Non-Hispanic Whites.'" Pls.' Mot. at 19. But the views Hofeller expressed in a 2015 study have no bearing on what he told Neuman years later. And Neuman specifically testified that "maximizing" representation for the "Latino community" was his goal, not anything he gleaned from Hofeller. *See* Defs.' Ex. D, Neuman Dep. 142:3–23 ("My point about maximization is my word. I want Latino representation to be maximized."). Plaintiffs also present no evidence, or any reason to assume, that Hofeller provided his unpublished 2015 study to Neuman. To the contrary, Plaintiffs present evidence that the 2015 Hofeller study was intended solely for his then-client and "would not be attributed [to him] either directly or indirectly." Pls.' Ex. 1 at Ex. C p. 2.

21

As the evidence makes clear, there were no "evident misrepresentations and omissions" by Neuman (or Gore, for that matter), Pls.' Mot. at 20; only deposition questioning that elicited unremarkable testimony.  Plaintiffs' claim that they were "hardly on notice" of Hofeller's (peripheral) role in this case, *id.*, is thus disingenuous and contradicted by the record.  Plaintiffs could have availed themselves of various discovery mechanisms months ago if it was necessary to obtain the (irrelevant) Hofeller documents at issue.  But because they, "through negligence or a tactical decision, fail[ed] to present evidence that was available, [they] may not find refuge under Rule 60(b)(2) by finding substantially similar evidence from a newly discovered source."  *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 728 (10th Cir. 1993); *see Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("[A]n attorney's failure to evaluate carefully the legal consequences of a chosen course of action provides no basis for relief from a judgment.").  For these reasons, too, their Rule 60(b)(2) motion should be rejected.

B.    Plaintiffs' "new evidence" is not "evidence" because it is inadmissible.

In addition to not being "newly discovered," Plaintiffs have not met their burden of showing that their motion is "clearly substantiated by adequate proof."  *In re Burnley*, 988 F.2d 1, 3 (4th Cir. 1992).  That is because Rule 60(b)(2) relief may only be granted if the "newly discovered evidence" is admissible.  *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001); *United States v. McGaughey*, 977 F.2d 1067, 1075 (7th Cir. 1992) *Shafiiq v. Obama*, 951 F. Supp. 2d 13, 17 (D.D.C. 2013); *Foster v. BNP Residential Properties Limited P'ship*, 2008 WL 11348323, *8 (D.S.C. Apr. 28, 2008) (denying Rule 60(b)(2) motion where alleged newly discovered information was inadmissible hearsay).  More specifically, Plaintiffs have failed to properly authenticate the 2015 Hofeller study and standalone VRA paragraph purportedly authored by Hofeller, failed to demonstrate that they fall within a hearsay exception, and failed to demonstrate the relevance of these documents to their equal protection and § 1985 claims.

Plaintiffs do not contend that any exhibits attached to their motion are self-authenticating and, indeed, it is apparent from the face of the exhibits that they are not.  Plaintiffs attempt to authenticate the documents attached to their motion through the declaration of an attorney in this case.  Although in some circumstances an attorney declaration may be sufficient to authenticate discovery produced in the underlying litigation, particularly discovery produced from the opposing party's files, *see, e.g., Shell Trademark Mgmt BV & Motiva Enters. v. Ray Thomas Petroleum Co.*, 642 F. Supp. 2d 493, 510-11 (W.D.N.C. 2009) (collecting cases), Plaintiffs' counsel has failed to identify any personal knowledge sufficient to authenticate documents allegedly received from third parties, such as the documents identified in Plaintiffs' motion.  *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (affirming exclusion of attorney declaration seeking to authenticate documents without personal knowledge); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002) (rejecting attorney declaration seeking to authenticate documents for lack of personal knowledge); *Disney Enter., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 443 (S.D.N.Y. 2018) (rejecting attorney declaration seeking to authenticate screenshots and videos using boilerplate statement that it was "based on personal knowledge" because it was apparent that the attorney lacked personal knowledge of the documents); *Orraca v. Augustine*, 2014 WL 4265917, *4 (W.D.N.Y. Aug. 27, 2014) (rejecting attorney declaration seeking to authenticate documents because attorney lacked personal knowledge).

Plaintiffs also appear to concede that the study and paragraph purportedly authored by Hofeller lack authentication, claiming that they "can be authenticated by Stephanie Lizon, Dr. Hofeller's daughter."  Pls' Mot. 10, n.4.  Setting aside the dubious proposition that Hofeller's estranged daughter can authenticate these documents, which she collected long after her father's death, it is Plaintiffs' burden in moving for Rule 60(b)(2) relief to identify admissible, newly discovered evidence.  Plaintiffs' tacit acknowledgement that they have failed to do so dooms their motion.

Equally fatal to Plaintiffs' motion is that the two Hofeller documents constitute inadmissible hearsay. Plaintiffs tacitly concede that they are relying upon the unpublished Hofeller study and draft paragraph for the truth of the matters asserted therein, but argue, without any legal support, that these documents are admissible as statements against interest of an unavailable witness under Federal Rule of Evidence 804(b)(3). *See* Pls' Mot. at 10, n.4. In particular, Plaintiffs contend that the statements in these documents are against Hofeller's interest because they reveal that the purpose of including a citizenship question was not for VRA enforcement. Setting aside that these documents express no such purpose or intent, Plaintiffs have failed to establish that any statement in these two documents is against Hofeller's interest.

Pursuant to Rule 804(b)(3)(A), a statement is against a declarant's interest when "a reasonable person in the declarant's position would have made [it] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability." *See* Fed. R. Evid. 804(b)(3)(A). Moreover, "[a] statement is against pecuniary or proprietary interest when it threatens the loss of employment, or reduces the chances for future employment, or entails possible civil liability." *Gichner v. Antonio Troiano Tile & Marble Co.*, 410 F.2d 238, 242 (D.C. Cir. 1969). Here, Plaintiffs fail to explain how the statements contained in the unpublished 2015 study or standalone VRA paragraph would threaten a loss of employment or reduce the chances for future employment. There is also no basis to conclude that these statements would result in possible civil or criminal liability for anything. Indeed, it is evident from Plaintiffs' own (inadmissible) documents that the preparation of the draft study was *in furtherance* of his financial interests. *See* Pls' Ex. 1 at Ex. C p. 1 ("I've sent your invoice for processing to our accountant."). In short, Plaintiffs have failed to meet their burden of establishing a hearsay exception for the unpublished 2015 study or VRA paragraph.

24

Lastly, as discussed *supra*, neither the purported 2015 Hofeller study nor the standalone paragraph supposedly authored by Hofeller is legally relevant to establish the intent of Secretary Ross in deciding to include the citizenship question, or to whether he allegedly conspired to deprive anyone of a constitutional right. Accordingly, these two documents also are inadmissible under Federal Rule of Evidence 401.[9] *See United States v. Powers*, 59 F.3d 1460, 1470 (4th Cir. 1995) (affirming exclusion of irrelevant information at trial as inadmissible). That deficiency provides an independently sufficient basis to deny Plaintiffs' motion.

## III.   Defendants would suffer unfair prejudice if Plaintiffs were granted relief.

Finally, Rule 60(b) relief is inappropriate where, as here, the opposing party would be unfairly prejudiced. *Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993). As discussed above, the "new" Hofeller documents are relevant only if Plaintiffs are seeking to dramatically shift the theory of their case. *See supra* Section I.A. All legal bases of Plaintiffs' standing and claims throughout this case have been premised on the idea that a citizenship question will undercount certain

---

[9] In addition to failing to provide an evidentiary basis to consider the two documents that purport to be authored by Hofeller, Plaintiffs have failed to provide any evidentiary basis for the Court to consider Plaintiffs' Exhibits 1 and 13. Plaintiffs' counsel admits in his declaration that he lacks personal knowledge sufficient to authenticate the exhibits referenced in Plaintiffs' motion. *See* ECF No. 162-2, ¶ 1 (stating that he has "personal knowledge of the facts set forth herein *or believe them to be true based on my experience or upon personal information provided to me by others*[.]" (emphasis added)). With respect to Plaintiffs' Exhibit 1, although the Court likely can take judicial notice of the *fact* that plaintiffs in the New York census case have filed a motion to show cause, because the facts in that motion are contested, *see* Defs' Ex. G, Plaintiffs must establish an evidentiary basis for the Court to consider the contents of that filing, including its attachments. For example, Exhibit C in Plaintiffs' Exhibit 1 purports to be an email between two non-parties. This email, to the extent it is offered for the truth of the matter asserted, is hearsay (at least with respect to the statements by Stephanie Edelman), and lacks authentication. Similarly, Exhibit F in Plaintiffs' Exhibit 1 purports to be a summary by the majority staff of the U.S. House of Representatives Oversight Committee's transcribed interview of Gore. Plaintiffs have failed to properly authenticate this exhibit, and this summary of a transcribed interview constitutes hearsay within hearsay. *See* Fed. R. Evid. 805. In addition, this summary inaccurately describes Gore's testimony during his transcribed interview. *See* Defs.' Ex. H, DOJ Ltr. to Rep. Cummings (identifying inaccuracies in the House's summary of Gore's the transcribed interview).

groups. So it would be utterly unfair to Defendants if the Court were to grant Plaintiffs' untimely Rule 60(b) request on the theory that this is now a CVAP-redistricting case rather than a census-undercount case. This is especially true because Plaintiffs could have found all the "newly discovered evidence" at issue had they simply conducted more-thorough depositions.

If that unfair prejudice were not enough, Defendants would also be effectively foreclosed from appellate review of this Court's decision before the June 30, 2019 deadline for finalizing census questionnaires. *See* 30(b)(6) Dep. Designations 438:13–439:8, ECF 103-9. As a result, Defendants would be enjoined from including the citizenship question on the 2020 Census even if the Supreme Court were to rule in their favor, and thus would be required to seek an extraordinary stay pending appeal that must be briefed and decided in a matter of days. The unfairness of that prejudice is further highlighted by Plaintiffs' concurrent appellate tactics: while they seek to reopen their equal protection claim here, they are simultaneously requesting that the Fourth Circuit "enter an order invalidating the addition of the citizenship question *without* remand to the district court." Defs.' Ex F, Appellant Br. at 40 (emphasis added). It is difficult to imagine a more unfair and more prejudicial conclusion to this year-long census saga.

## CONCLUSION

Plaintiffs' Rule 60(b) motion should be summarily rejected. Plaintiffs make a passing request for "limited" discovery to "supplement the record in order to enable the Court to reconsider its prior ruling." Pls' Mot. at 1-2, 9. That half-hearted request also should be denied. Plaintiffs cite no authority that would permit this Court to order discovery in this closed case, either in aid of resolving a Rule 60(b)(2) motion or more generally, while the Court's final judgment is on appeal. But even if such authority exists, Plaintiffs' conclusory request for discovery, devoid of detail or legal support, is insufficient to obtain such relief. *See Clayton v. Nationwide Mut. Ins. Co.*, 260 F. Supp. 3d 514, 521 (D.S.C. 2017) ("The court has no obligation to fashion arguments for a party or to further develop a

party's argument when it is wholly conclusory, unexplained, and unadorned with citation to legal authority."). This Court has devoted substantial judicial resources to this case and has rendered its decision. There is no basis to revisit that decision now.

DATED: June 10, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JOHN R. GRIFFITHS
Director, Federal Programs Branch

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

/s/ Stephen Ehrlich
GARRETT COYLE
STEPHEN EHRLICH
COURTNEY ENLOW
MARTIN M. TOMLINSON
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC  20005
Tel.:  (202) 305-9803
Email:  stephen.ehrlich@usdoj.gov

*Counsel for Defendants*