A-2

"The Use of Citizen Voting Age Population in Redistricting.docx"

# THE USE OF CITIZEN VOTING AGE POPULATION IN REDISTRICTING[1]

This study comments on the practicality of the use of citizen voting age population (CVAP) as a basis for achieving population equality for legislative redistricting. What this means in practice is that the total CVAP for a state would be divided by the number of legislative districts to be redistricted in order to compute an idea district population for each single-member district. Each district's variance from this ideal district population would be used to calculate both the least and most populous district and also to compute the total percentage deviation (or "high to low") for a redistricting plan as a whole. Compliance with the federal "one person, one vote" standard would thus be determined on the basis of CVAP as opposed to total population (TPOP), as is presently the case. The use of CVAP is not a new concept, but as of this date, federal courts have not held that it is permissible to use CVAP as a standard for legislative redistricting.

In Hawaii, courts have ruled that registered voters may be used as a population base for legislative redistricting. This practice was adopted to remove non-resident military personnel from the redistricting population base, and to avoid the creation of legislative districts with extremely high percentages of non-registered adults. The courts, however, have also mandated that the TPOPs in the districts must be closely related to the district deviations based on registered voters. Appendix 1 discusses these court rulings in more detail. This practice is still tied to total population.

In addition, the removal of prison inmates housed from other states has been allowed in 3 states in the 2010 redistricting cycle (Delaware, Maryland and New York). This practice, often referred to as "prisoner adjustment" also moves the counts for domestic inmates in state prisons to the location where they lived before being incarcerated (prisoners not from out-of-state). Democrat allies are now lobbying the Census Bureau to include this practice in the 2010 Decennial. Prisoner adjustment is generally believed to be favorable to the Democrats,

---

[1] This study does not constitute professional legal advice and is not intended to be substituted in place of advice from qualified legal counsel.

but may, in some states, be less favorable to minorities. This, of course depends on the locations of the prisons. This practice, however, is still tied to total population.

As of today, the use of CVAP is limited to an evaluation of minority voting strength in districts protected by the mandates of the Federal Voting Rights Act (sometimes, also, to evaluate compliance with state and local civil rights provisions), and is most commonly used to determine the ability of Latino voters to have equal opportunities to elect their preferred candidates of choice in newly enacted districts.

The use of CVAP in redistricting has always been difficult. In decennial censuses prior to 2010, a citizenship question was included in the long form questionnaire which was distributed to approximately one in seven households. This information, however, was not available until after most states had already completed their line-drawing process.

For several reasons, the Bureau of the Census decided to discontinue the use of the long form questionnaire for the 2010 Decennial Census and to depend exclusively on the short form Questionnaire, which did not include a question on citizenship. The two primary reasons given for this change were cost savings and an increase in the initial percentage of questionnaires returned by mail.

As a replacement to the long form questionnaire, the Census Bureau instituted the American Community Survey. To quote the Census Bureau: "The American Community Survey (ACS) is an ongoing survey that provides vital information on a yearly basis about our nation and its people. Information from the survey generates data that help determine how more than $400 billion in federal and state funds are distributed each year." Each year, about 3.5+ million households receive very detailed questionnaires of which about 2.2 million are successfully returned. This represents a 62% return rate.

In the version of the ACS data used for redistricting in this cycle, the questionnaires from 5 years were compiled together into a report released in late 2010. This included the samples collected in 2005 through 2009. The number of questionnaires included in the 2005 through

2009 sample was about 9.5 million. By comparison, about 16.2 million households would have received a Long-Form Questionnaire had its use been continued in the 2010 Decennial Census. This means that the accuracy of the ACS sample is significantly lower than the long form sample would have been. In addition, the use of a 5-year rolling sample was much less reflective of the actual characteristics of the population at the time of the actual 2010 Decennial Enumeration. which would have been a one-time snapshot taken in mid-2010 (April to August). Even if a majority of the justices on the U. S. Supreme Court are sympathetic to the use of CVAP, it is not probable, in my judgment, that they will accept a rolling 5-year survey in lieu of an actual full enumeration for use in redistricting or reapportionment.

Another issue with use of the ACS in redistricting is that the accuracy for small units of geography is extremely poor. This is particularly true for Census Tracts and Census Block Groups. In some cases the confidence interval for a Block Group exceeds the actual range of the data, creating negative numbers for the low point of the confidence interval.

Another problem with the ACS data is that the units of geography by which the ACS is compiled is different from the geographic units used in redistricting. Almost all states are using Census Voting Districts (VTDs) are preferred as the basic geographic building blocks for creating new districts. VTD boundaries generally follow precinct boundaries. ACS data are simply not available for VTDs, and any estimates of CVAP populations for VTDs would be even more inaccurate than the ACS estimates for Census Tracts and Block Groups.

For those states in which CVAP estimates for legislative districts have been compiled, determinations have been required to compute the percentage of each Census Block Group's population which is in each legislative or congressional district. The CVAP statistics have been summed for all the block groups which have either 50% or 75% of their population in an individual district and these estimates have been imputed to the total adult populations of the districts. The Texas Legislative Counsel's report (Appendix 3), contains the confidence intervals for the estimated of Texas House district are generally from 2 to 3 percent.

In many states, such as Texas, experienced redistricting experts have relied much more on the use of ethnic surname matches against the registered voter file to determine Latino voting strength, rather than estimates of the percentage of adult citizens who are Latino. Of course, since the population base for compliance with the one person, one vote rule has been TPOP, ethnic surname and CVAP estimates have only been used as indices of probable district election performance for Latino candidates.

Another issue to consider is whether or not CVAP, or just total citizen population (CPOP), would be the proper base, should the U. S. Supreme Court determine that citizenship should replace TPOP, which is presently in use. So far, courts have not even accepted the use of total voting age population (TVAP or VAP) as a redistricting standard, so it would be a high leap from TPOP to CVAP as the new standard.

All this leads to a possible conclusion that without a congressional mandate for the United States Census Bureau to add a citizenship question to the 2020 Decennial Census form, or such a mandate from the Supreme Court, the relief sought in the *Evenwel* case is functionally unworkable.

The other important topic to address are the political ramifications of using CVAP as the redistricting population standard for one person, one vote compliance. Would the gain of GOP voting strength be worth the alienation of Latino voters who will perceive a switch to CVAP as an attempt to diminish their voting strength? That, however, is not the subject of this study.

By mutual agreement, a study of the effect of using CVAP instead of TPOP as the redistricting population basis for drafting a plan for the Texas State House of Representatives has been commissioned. Demographic information on the current 150 State House districts has been obtained from the website of the Texas Legislative Council. Since State House districts are roughly equal in population they are appropriate for such an examination.

A spreadsheet containing information on each of the 150 State House districts in Texas has been compiled. There is one row for each district and each row contains 15 columns of geographic, demographic and political information for each individual district. This spreadsheet has been sorted in 6 different orders which make up Tables 2 through 7. The column header by which the table is sorted is shaded purple. An explanation of each of the 15 columns can be found in Appendix 2.

    Table 2 is sorted by district number (Column A).

    Table 7 is sorted by the population deviation measured in terms of TPOP (Column M).

    Table 3 is sorted by the population deviation measured in terms of CVAP (Column O).

The population deviations for the current districts, as measured in terms of TPOP, ranges from 4.83% above to -5.02% below the idea district population (Table 7. Column M). The ideal population is the sum of the base population (either TPOP or CVAP) divided by the total number of districts. The range of deviation from the most to least populated district is 9.85% (total deviation), which is below the 9.99% range acceptable under the provisions of the United States Supreme Court's "one person, one vote" rule. The deviations of the 2003 House district could have been lower. They are as high as they are because Texas' Constitution has special provisions for the redistricting of it State House of Representatives which mandate keeping districts within whole counties or groups of whole counties. These provisions, however, may, to some extent, fall by the wayside as a result of the current federal court lawsuit challenging Texas' adherence to the Voting Rights Act in its latest redistricting (2003).

When CVAP is used as the population base, the population deviations for the current State House districts increase in range from a high of 20.47% to a low of -40.38% with a total deviation of 60.85% (Table 3, Column O),. This deviation is clearly unacceptable under the "one person, one vote" rule. If the Supreme Court were to impose CVAP as the proper

population base, and mandate its application to the districts for 2016, a radical redrawing of the State House districts would be required.

## POLITICAL AND DEMOGRAPHIC EFFECTS OF USING CVAP

There are several general rules related to redistricting in general which should be discussed at this point:

1. First, the party which controls the actual line-drawing process, in most instances, possesses a huge advantage which outweighs almost all other factors influencing the redistricting process. This would be equally true if the population base were to be shifted from TPOP to CVAP.

2. Second, redistricting has often been described as a "game of margins". Many times a shift of two or three precincts into or out of a district can significantly alter the political characteristic of that district. As an example, if a district is solidly Democratic and the Republicans are drawing the plan, the Republican will almost always add additional heavily Democratic precincts to that district to improve their advantage in surrounding districts. On the other hand, if Democrats are doing the line drawing, they will often submerge heavily Republican precincts into a strong Democratic district to improve their chances of electing Democrats in the surrounding districts.

These factors would also apply for Texas if CVAP were to become the new population base. In the case of Texas redistricting, the ability of the party in power to overcome a switch to CVAP would be somewhat limited in State House redistricting because of the mandate to keep counties intact – particularly if the Democrats regained control.

Table 4, which sorts the existing House districts by percent Hispanic CVAP, demonstrates that considerable population would have to be added to a majority of the Latino districts to bring their populations up to acceptable levels of deviation (Table 4, Column H). There are

presently 35 districts with HCVAP percentages over 40. As a whole, those 35 districts only contain sufficient HCVAP populations to comprise 30.1 districts (See the green shading on Table 4). As would be expected, the remaining 115 districts have sufficient combined HCVAP populations to comprise 119.6 districts.

Table 6 sorts the districts by the political party of the incumbent State House members (See Table 6, Column C). The 97 GOP districts have sufficient CVAP populations to actually form 103.2 districts, while the 53 Democrat districts only have sufficient CVAP population to comprise 46.8 districts. Use of CVAP would clearly be a disadvantage for the Democrats.

Since all of the Republican and Democrat districts are not located in two distinct areas, it is helpful to examine the effects of switching from TPOP to CVAP as the population base by regions. Texas has been divided into 13 regions comprised of whole State House Districts. Those regions are show on Maps 1 and 2. The regions are:

1. Dallas-Ft Worth and suburbs (3 regions)
2. Houston and its suburbs (2 regions)
3. Austin and its suburbs (1 region)
4. San Antonio and its suburbs (1 region)
5. El Paso County (1 region)
6. The Rio Grande Valley and South Texas (1 region)
7. The area southeast of Houston (1 region)
8. The northeast area of Texas (1 region)
9. The central area of the State, roughly between DFW, Austin and Houston (1 region)
10. The areas of West-Central and Western Texas (1 region).

These regions certainly are not in any way official, but are sufficient for this redistricting analysis.

The data for these 13 regions may be found on Table 5 (which is sorted first by Column B and then by Column A) and demonstrates some interesting characteristics. This table compares

the number of projected CVAP-based districts which would be contained in these 13 regions to the number of actual Texas State House districts presently located within them (the 2003 House Plan). The combined CVAP district deviations within each region have been summed to determine the number of districts each region would be entitle to using CVAP as the population base. These data are summarized on Table 8, and correspond to the green-shaded areas on Table 5 (found in Column O at the bottom of the section for each region).

The use of CVAP as the population based would cause a loss of relative population (and, thus districts) in the Greater Dallas/Ft. Worth Area (-.7 districts overall), with the greatest loss in Dallas County (1.7 districts). Harris County and its suburbs would lose relative population (1.7 districts overall), with a loss of 1.9 districts being slightly offset by the gain in the surrounding suburban counties. The greatest loss would be in South Texas, El Paso and the Rio Grande Valley which would lose 2.6 districts overall. All other regions of the State would enjoy relative gains in population, with the greatest gains being in Central as well as West Texas' rural and semi-rural counties.

Even within the individual regions (Using Table 5), an inspection of the CVAP deviation percentages of Republican versus Democratic districts shows that the Democratic CVAP deviations are generally negative and the GOP deviations are generally positive. The means that Democratic districts could geographically expand to absorb additional high Democrat precincts from adjacent Republican districts, strengthening the adjoining GOP districts.

## CONCLUSIONS

- A shift from a redistricting population based determined using total population to adult population is radical departure from the federal "one person, one vote" rule presently used in the United States.

- Without a question on citizenship being included on the 2020 Decennial Census questionnaire, the use of citizen voting age population is functionally unworkable.

- The Obama Administration and congressional Democrats would probably be extremely hostile to the addition of a citizenship question on the 2020 Decennial Census questionnaire.

- The chances of a U. S. Supreme Court's mandate to add a citizenship question to the 2020 Decennial Census are not high.

- A switch to the use of citizen voting age population as the redistricting population base for redistricting would be advantageous to Republicans and Non-Hispanic Whites.

- A proposal to use CVAP can be expected to provoke a high degree of resistance from Democrats and the major minority groups in the nation.