## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ROBYN KRAVITZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF COMMERCE,<br>*et al.*,<br><br>Defendants. | No. 8:18-cv-1041-GJH |

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO,<br>*et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR L. ROSS, in his official capacity as<br>Secretary of Commerce, *et al.*,<br><br>Defendants. | No. 8:18-cv-1570-GJH |

**DEFENDANTS' SURREPLY TO PLAINTIFFS' RULE 60(b)(2) MOTION FOR RELIEF FROM FINAL JUDGMENT & REQUEST FOR INDICATIVE RULING UNDER RULE 62.1(a)**

## INTRODUCTION

Having failed to "connect the dots between the President and [then-Kansas Secretary of State Kris] Kobach's views" and "the Secretary's final decision," Plaintiffs continue to provide more "dots" without the requisite "connect[ions]." *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 712 (D. Md. 2019). In support of their Rule 60(b) motion, Plaintiffs floated a new theory: a deceased private citizen named Dr. Thomas Hofeller left behind several hard drives and thumb drives, one of which contained an unpublished 2015 study (concerning the use of citizen voting age population (CVAP) rather than total population for redistricting) that allegedly evinced discriminatory animus against Hispanics, and this alleged animus somehow meandered its way through four people (Hofeller, A. Mark Neuman, John Gore, and Secretary Ross) and four documents (the 2015 Hofeller study, the Neuman Letter, the Gary Letter, and the Secretary's decisional memorandum) to infect the Secretary's final decision. Defendants have debunked that theory, both at each link in the "causal" chain and in the aggregate.

In reply, Plaintiffs raise yet another theory—as meritless as its predecessors—involving an entirely new player: Christa Jones, a career Census Bureau official, communicated with Hofeller in 2015, thus somehow "refut[ing] Defendants' contention that no link between Hofeller and the Secretary can be shown." Pls.' Reply at 3. That bizarre claim fails on multiple levels. *First*, the fact that a career Census Bureau employee communicated with Hofeller about topics unrelated to his secret 2015 study during the Obama Administration is probative of nothing, much less any connection between Hofeller's allegedly discriminatory motives and the Secretary's final decision. *Second*, Plaintiffs previously argued, and this Court found, that the Census Bureau—where Jones works for the Deputy Director—"*repeatedly, consistently, and unanimously recommended against adding a citizenship question* to the 2020 Decennial Census." *Kravitz*, 366 F. Supp. 3d at 699 (emphasis added). It would make no sense to transfer Hofeller's allegedly discriminatory intent to the Secretary through the Census Bureau's

recommendation *against* including the citizenship question.  *Finally*, even that illogical leap would still not substantiate Plaintiffs' theory that "the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus."  *Kravitz* 366 F. Supp. 3d at 754.  After all, the alleged discrimination would occur only if *States* decided, for discriminatory reasons, to redistrict using CVAP rather than total population—a decision over which Secretary Ross exercises no authority whatsoever.

Plaintiffs' newest attempt to establish the provenance of their "newly discovered evidence" is similarly meritless.  Their arguments on this issue only further underscore that they failed to ask appropriate deposition questions to elicit their desired information, and their newest declarations do nothing to refute that their attached exhibits remain unauthenticated, hearsay, and inadmissible.

Plaintiffs also incorrectly claim that "relief extending beyond June 30, 2019 will not automatically cause unfair prejudice to Defendants" because census questionnaires can be finalized as late as October 31, 2019.  Pls.' Reply at 19.  That contention is wrong and contradicted by the record, which clearly demonstrates that "changes to the paper questionnaire after June of 2019[ ] would impair the Census Bureau's ability to timely administer the 2020 census."  PX-1194 at 1023:2–19.  Indeed, Plaintiffs dilatory tactics underscore the inequities in the relief they now seek.  For they now concede that they have known about this new "evidence" *for months*, attaching a declaration and deposition testimony demonstrating that their co-counsel acquired the Hofeller materials three months ago.  That was almost a month *before* this Court's final judgment, which means Plaintiffs had ample opportunity to bring this supposedly "new" information to the Court's attention *before* the last minute and *before* the Supreme Court heard oral argument in the related New York case.  Plaintiffs' delay highlights the prejudice to Defendants from granting their eleventh-hour request and their motion should be denied on this basis alone.

At the end of the day, Plaintiffs have offered yet another convoluted path to impute the purportedly discriminatory motives of others to the Secretary that is just as meritless as its predecessors. This time, the chimerical scheme to discriminate against Hispanic voters was purportedly developed during the Obama Administration by Hofeller and transferred to a career Census Bureau official long before Secretary Ross took office. But as with Plaintiffs' Kobach-President theory that the Court already rejected, and as with Plaintiffs' Hofeller-Neuman-Gore theory that Defendants have refuted, this new Hofeller-Jones theory brings Plaintiffs no closer to "demonstrating [that] the Secretary was actually persuaded to make his decision based on discriminatory animus." *Kravitz*, 366 F. Supp. 3d at 712.

## ARGUMENT

### I.   Plaintiffs' "evidence" concerning career Census Bureau official Christa Jones is as flawed and irrelevant as their other "newly discovered evidence."

While Plaintiffs initially stress that the private communications between Hofeller and career Census Bureau official Christa Jones[1] "refute[] Defendants' contention that no link between Hofeller and the Secretary can be shown," Pls.' Reply at 3, they never explain this bold assertion. That is likely because the Hofeller-Jones communications show nothing at all. They do not prove any connection between Hofeller's allegedly discriminatory motives and Jones (or the Census Bureau), and they certainly do not prove any connection between the Census Bureau—which repeatedly, consistently, and unanimously recommended *against* a citizenship question—and the Secretary.

Plaintiffs first identify a 2015 email from Jones to Hofeller that is utterly unremarkable. In that email, Jones notes a Federal Register notice about the Census Bureau's 2015 Content Test—which tests the wording and placement of census questions—and she says that "[p]ublic comments

---

[1] Jones is Chief of Staff to Deputy Director Ron Jarmin. Between the December 2017 Gary Letter and the Secretary's March 2018 decision to include a citizenship question, Jones was Chief of Staff to then-Acting Director Jarmin.

[are] highly useful in this context," so it may "be an opportunity to mention citizenship." Pls.' Reply Ex. A-21. This makes sense because the Federal Register notice specially solicited comments on "ways to enhance the quality, utility, and clarity of the information to be collected." Proposed Information Collection, Comment Request, 2015 National Content Test, 79 Fed. Reg. 71377-01 (Dec. 2014). This also makes sense because Plaintiffs argued, and the Court found, that this was the *exact type of testing* that the Secretary should have conducted before including a citizenship question on the 2020 Census. *See Kravitz*, 366 F. Supp. 3d at 710–11, 747 (criticizing the lack of pretesting and concluding that "the Secretary gave no consideration whatsoever to the specific wording of the proposed citizenship question or the impact of overall questionnaire design"). It is audacious for Plaintiffs to now argue that Jones's email to Hofeller—noting an opportunity for *public* comment on a Content Test for which *Plaintiffs themselves* advocated—somehow imputes Hofeller's allegedly discriminatory motives to Jones (or anyone else) over two years before Secretary Ross took office.

Plaintiffs next identify a similarly unremarkable two-email chain from 2010 to show that Jones "was also on emails discussing redistricting with Hofeller and various other Republican operatives." Pls.' Reply at 3 (citing Pls.' Reply Ex. A-19). The subject of this email chain is "Redistricting Article"; Hofeller commented that the unattached and unknown article is "[a] little slanted, but it touches many of the bases," and Michael Smith replied that he "can live with it." Pls.' Reply Ex. A-19. That is it. Far from evidencing any connection between Hofeller's allegedly discriminatory motives and Jones, the email conveys almost no information at all. It does not describe the content of the "Redistricting Article." It does not convey Hofeller's substantive views on redistricting (or whether they align with Plaintiffs' new discriminatory-motive theory). And it does not convey Jones's views on anything, since she was merely "cc'd" as a passive recipient of the email. In fact, other than exposing Plaintiffs' guilt-by-association approach to evidence, this email has no relevance at all.

Plaintiffs also attach, but barely discuss, three other mundane emails from Jones to Hofeller: one from 2015 inviting Hofeller to dinner at Ramparts Tavern, a restaurant in suburban Alexandria, Pls.' Reply Ex. A-22, and two others from 2010 discussing general aspects of the 2010 Census, Pls.' Reply Exs. A-18, A-20.   Plaintiffs do not even attempt to argue that these emails demonstrate Hofeller's allegedly discriminatory redistricting motives or Jones's assent to any similar ideas. Indeed, even a cursory review of the Jones-Hofeller emails—again, all of which were sent during the Obama Administration and thus pre-date Secretary Ross's tenure by years—reveals absolutely no information about Hofeller's alleged interest in using CVAP for redistricting to disadvantage Hispanics, let alone any evidence that Jones (or anyone else in government) knew, understood, or agreed with these purported motives.

Plaintiffs' attempt to link the (innocuous) views of Jones and the Census Bureau to Secretary Ross is even more fatuous, most obviously because "the Census Bureau repeatedly, consistently, and unanimously recommended *against* adding a citizenship question to the 2020 Decennial Census." *Kravitz*, 366 F. Supp. 3d at 699 (emphasis added).   This included not only Jones, but Jones's immediate boss—then-Acting Director Ron Jarmin—who "emailed Gary . . . to convey the Census Bureau's determination that 'the best way to' achieve DOJ's stated goal 'would be through utilizing a linked file of administrative and survey data,'" not a citizenship question.   *Id.* (quoting PX-71 (AR 3289)).   It would make no sense to impute Hofeller's allegedly discriminatory intent to the Secretary on the theory that this motive reached the Secretary through the Census Bureau's recommendation *against* a citizenship question.   The record is clear that the Secretary then independently examined and *overruled* the Census Bureau's recommendation.[2]

---

[2] This is true even under the "cat's paw principle" of discriminatory motive that Plaintiffs previously raised, *see* Pls.' Corrected Conclusions of Law, at ¶ 271, ECF No. 151-2, which imparts liability where a "nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker

Plaintiffs' contrary conclusion relies on the non sequitur that Jones participated "in the review and approval of the Commerce Department's revisions to the list of 35 questions," and "was also involved in the search for stakeholders who would support the citizenship question." Pls.' Reply at 3. Unsurprisingly, Plaintiffs do not (and cannot) explain how the "review and approval of the Commerce Department's revisions to the list of 35 questions" is connected in any way to Hofeller's purportedly discriminatory motive to use CVAP in redistricting. And Plaintiffs' make much of Jones "search[ing] for stakeholders who would support the citizenship question," like "Mark Kirkorian and Steven Camarotta of the Center of Immigration Studies," Pls.' Reply at 3. But the reason for her search is explained by then-Acting Director Jarmin earlier in the exact email chain Plaintiffs cite:

> We are trying to set up some meetings for Secretary Ross to discuss the proposed citizenship question on the 2020 Census with interested stakeholders. Most stakeholders will speak against the proposal. We're looking to find someone thoughtful who can speak to the pros of adding such a question or perhaps addressing the fundamental data need some other way (e.g., admin records).

AR 8325. Jones, in other words, was acting at the direction of Jarmin, who, as noted above, *opposed* the citizenship question. There is nothing nefarious about seeking to present both sides of an issue for the Secretary's consideration. Indeed, Jones also facilitated calls with Hermann Habermann and Robert Groves, two former Census Bureau officials who *opposed* the citizenship question. *See* AR 1638. Yet Plaintiffs do not impute Habermann and Groves's views to Jones, the Census Bureau, or the Secretary.

---

into taking action against the plaintiff," *Kregler v. City of New York*, 987 F. Supp. 2d 357, 365 (S.D.N.Y. 2013) (citation omitted). As Defendants have argued, this doctrine does not apply to the equal protection component of the Due Process Clause, but even if it did, Plaintiffs' theory would fail. *See Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 383 (7th Cir. 2011) ("Under any formulation of the cat's paw standard, the chain of causation can be broken if the unbiased decisionmaker conducts a meaningful and independent investigation of the information being supplied by the biased [individual]."); *Kregler v. City of New York*, 987 F. Supp. 2d 357, 368 (S.D.N.Y. 2013) ("[Plaintiff's] theory that [Person A] gave information to [Person B] that was tainted by [impermissible] animus, and that [Person B] in turn provided information to [the decisionmaker] which was also tainted, strains the cat's paw theory beyond existing case law.").

This Court already rejected a less-attenuated version of the same imputed-animus arguments Plaintiffs advance now: there was no equal protection violation even when the Court found that Plaintiffs adduced "some evidence" that Kobach, who communicated directly with Secretary Ross, "harbor[ed] discriminatory animus towards noncitizens" and that his "desire for a citizenship question may have been motivated by that animus." *Kravitz*, 366 F. Supp. 3d at 754 (deemphasized). If this direct Kobach-Secretary connection was not enough for liability, then the convoluted Hofeller-Secretary "connection"—traced through either Neuman and Gore, or Jones—cannot impose liability either.

In any event, this discussion is entirely academic because Hofeller's views on the use of CVAP in redistricting (discriminatory or not) have nothing to do with census response rates, let alone Plaintiffs' theory that "the Secretary's decision was made for the purpose of depressing immigrant response and motivated by discriminatory animus." *Kravitz* 366 F. Supp. 3d at 754. Plaintiffs counter that their equal protection claim hinges on Secretary Ross's intent to deprive Hispanics of political representation more generally,[3] and "the citizenship question could enable this outcome by excluding certain populations from the census count *and* by excluding them from the redistricting." Pls.' Reply at 5. This misses the point entirely.

If Plaintiffs' theory is—as it has been from the beginning—that the Secretary harbored a discriminatory motive to *depress the census response rates* of certain households, then the Secretary would be a proper defendant. But that theory cannot be established with reference to Hofeller's "discriminatory" motive to *use CVAP for redistricting*. If, on the other hand, Plaintiffs' theory is that the citizenship question could help States exclude Hispanics in redistricting, then the Court may not

---

[3] Plaintiffs also mention a discriminatory motive to deprive noncitizens of political representation. Pls.' Reply at 5. But as Defendants previously explained, noncitizens are not a protected class for equal-protection purposes. *See* Defs.' Post-Trial Br. ¶ 529, ECF 150.

impose liability on the Secretary because there is no discriminatory effect unless *States* use the citizenship data in discriminatory ways. And if States do so, Plaintiffs could sue their respective States (or the relevant State officials), not the Secretary. *See* Defs.' Opp'n at 8; Pls.' Reply at 4–5 (citing *N.C. State Conference of NAACP* for the proposition that a *legislature's* practice of targeting voters "constituted racial discrimination" "[e]ven if done for partisan ends"). The tension between these two discriminatory-motive theories is further demonstrated by Hofeller's claimed need for *accurate* census data in redistricting, which would be endangered by a depressed response rate. *See* Defs.' Opp'n Ex. D, Neuman Dep. 56:7–20 (Neuman describing a conversation with Hofeller where he explained that "after the long-form data went away in 2000," the "quality of block level citizen voting age population had now diminished"); 138:3–16 (Neuman describing a conversation with Hofeller where he explained that "a good census is good for what he does"). So Plaintiffs cannot surreptitiously reframe the discriminatory-motive inquiry as an abstract intent to deprive Hispanics of political representation.

## II.    Plaintiffs' latest attempt to produce "newly discovered" admissible evidence is unavailing.

Defendants previously explained that Plaintiffs' information is not "new" because Plaintiffs could have discovered it with due diligence. Defs.' Opp'n at 18–22. Plaintiffs' counter with only further proof that they failed to ask appropriate deposition questions to elicit their desired information, and they still fail to identify a single question that Neuman misleadingly answered in light of the "new" Hofeller documents. *See* Pls.' Reply at 13–15. Plaintiffs' motion should be rejected for this reason alone.

Defendants also explained that Plaintiffs failed to authenticate the unpublished 2015 study or the draft paragraph (or any of the other Hofeller-related documents attached to their motion), either through an attorney declaration or otherwise. Defs.' Opp'n at 22–25. In recognition of that reality, Plaintiffs now attempt to authenticate these documents through the May 17, 2019 deposition testimony of Hofeller's estranged daughter and the declaration of an employee of a digital forensics

firm (the Matthews Declaration).  Plaintiffs' belated attempts to authenticate their "new evidence" again miss the mark.

As an initial matter, Stephanie Hofeller's deposition in an unrelated state court case is inadmissible hearsay, and cannot be used as a basis to authenticate Plaintiffs' alleged "newly discovered evidence."  Plaintiffs claim that her deposition testimony is admissible under Federal Rule of Evidence 804(b)(1) because the defendants in that state court redistricting challenge had the same motive as Defendants to develop her testimony.  In support of that claim, Plaintiffs rely upon the Fourth Circuit's decision in *Horne v. Owens-Corning-Fiberglass Corp.*, 4 F.3d 276, 283 (4th Cir. 1993).  Pls' Reply at 16, n.15.  But *Horne* actually confirms that the deposition transcript is inadmissible hearsay.  In *Horne*, the Fourth Circuit explained that Rule 804(b)(1) applies where there is a similarity in proceedings rather than a privity between the parties in separate proceedings.  *Horne*, 4 F.3d at 283 ("Rather than pointing to factual and legal differences in proceedings, such as those detailed in *Lohrmann [v. Pittsburg Corning Corp.*,782 F.2d 1156 (4th Cir. 1995)], Horne contends that the other claimants are not predecessors in interest because they have no relationship to Horne.")  Here, there can be no reasonable dispute that there are numerous factual and legal differences between a challenge to the inclusion of a citizenship question on the decennial census, at issue in this case, and a state court challenge to redistricting in North Carolina, which was the subject of Ms. Hofeller's deposition.  *See Lohrmann*, 782 F.2d at 1161 (holding that a deposition taken in an earlier case concerning hazards to workers exposed to raw asbestos was not admissible under Rule 804(b)(1) in a case brought by a pipefitter alleging health effects from exposure to asbestos after it had been processed).  Accordingly, Plaintiffs may not rely upon Ms. Hofeller's deposition testimony to authenticate any of Plaintiffs' alleged newly discovered evidence.

But even if Ms. Hofeller's deposition transcript could satisfy a hearsay exception, at most, Plaintiffs have established that hard drives and thumb drives were found in Hofeller's home after his

death.  They have not established the authenticity of any documents *in* the devices allegedly found in Hofeller's home.  For example, all the Matthews Declaration establishes is that more than three months ago, his firm received from Arnold & Porter—counsel for plaintiffs in the New York census case—certain external hard drives and thumb drives sent by Ms. Hofeller.  *See generally* Matthews Decl. ¶¶ 1–17, ECF No. 167-1.  The Matthews declaration cannot (and does not purport to) establish the authenticity of the *contents* of those hard drives and thumb drives.  Nor does Ms. Hofeller's deposition.[4] All that Ms. Hofeller's deposition establishes is that she found assorted hard drives and thumb drives in the house owned by her parents, and that she sent them to Arnold & Porter on March 13, 2019— more than three months ago (and almost a month before the Court entered final judgment in this case).  Pls.' Reply Ex. A-4, S. Hofeller Dep. 13:15–14:13.

For example, Ms. Hofeller testified that she could recognize "a couple" of the devices from when she was living with her parents, but did not identify which ones.  *Id.* at 24:16–24.  She further acknowledged she "didn't spend a lot of time looking at [her] father's work files," *id.* at 49:25–40:11; *id.* at 83:12–15, and she provided no testimony to explain how she would have been familiar with any of these documents.  Indeed, she testified that her father's business associate, Dale Oldham, had taken one laptop from her father's house, and that she couldn't say whether he had taken everything that belonged to him.  *Id.* at 73:2–12.  In short, Plaintiffs belated attempts to authenticate their "new evidence" fare no better than their original efforts.

Similarly, Plaintiffs have failed to establish the admissibility of the Kobach and Gore transcribed interview summaries, as these summaries reflect hearsay within hearsay under Rule 805. Plaintiffs contend that the summaries are admissible under Rule 803(8)(A)(iii) because they are "factual findings from a legally authorized investigation."  Pls' Reply at 17.  But Plaintiffs wholly ignore Rule

---

[4] For this reason, the Matthews Declaration cannot authenticate any of the documents allegedly found on the portable hard drives and attached as Exhibits A-1 to A-22 to his declaration.

803(8)(B), which also requires that the source of the information (or other circumstances) show that the evidence is trustworthy.   As reflected in Exhibit H to Defendants' opposition, however, the Department of Justice has identified numerous material factual inaccuracies contained in the summary of Gore's transcribed interview—inaccuracies that Plaintiffs do not even attempt to dispute—that seriously call into question the veracity of these summaries.  With respect to Kobach's transcribed interview, Defendants do not have access to that transcript, so we have no way of knowing whether the summary is accurate.  But given the numerous misstatements in Gore's summary, and the fact that this summary was prepared by the same majority staff as Gore's summary, it would be reasonable to conclude that similar errors occurred.   Avoiding such uncertainty is precisely why the rule against hearsay exists.

Plaintiffs' argument that Kobach's testimony summarized by the majority staff is admissible under Rule 804(b)(1) is also meritless.   First, the transcribed interview is not under oath, and it is not a trial, hearing, or lawful deposition given under Rule 804(b)(1)   *See* Fed. R. Evid. 804(b)(1) (stating that former testimony is an exception to the hearsay rule where it was given at a trial, hearing, or lawful deposition); Weinstein's Federal Evidence (2d ed.), § 804.04[1][a] (explaining that statements are sufficiently trustworthy under Rule 804(b)(1) because "the statement was given under oath, is usually in writing, was given under circumstances suggesting the need for care and accuracy, and was subject to an adequate opportunity for cross examination").   Second, Plaintiffs do not even suggest that Defendants had an opportunity to develop Kobach's testimony, either during the Oversight Committee's transcribed interview or elsewhere.   Nor could they, since the government did not participate in Kobach's transcribed interview at all.   Accordingly, Plaintiffs have failed to meet their

burden of establishing the admissibility of either the Kobach or Gore transcribed interview summaries.[5]

### III.    Defendants would suffer unfair prejudice if Plaintiffs were granted relief.

Defendants also previously explained that Plaintiffs' motion should be denied because their requested relief would cause unfair prejudice to Defendants. Defs.' Opp'n at 25–26. One of several reasons for this unfair prejudice is that Defendants would be effectively foreclosed from appellate review of this Court's decision before the June 30, 2019 deadline for finalizing census questionnaires. *Id.* at 26. In response, Plaintiffs do nothing to dispel Defendants' concerns. *See* Pls.' Reply at 18–20. Most startlingly, however, Plaintiffs now claim that "relief extending beyond June 30, 2019 will not automatically cause unfair prejudice to Defendants" because census questionnaires can be finalized as late as October 31, 2019. Pls.' Reply at 19.

That novel proposition is contradicted by the record in this and parallel litigation. As Judge Furman recognized, "time is of the essence because the Census Bureau needs to finalize the 2020 questionnaire by June of this year." *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 517 (S.D.N.Y. 2019). The undisputed record confirms this reality. As Dr. John Abowd—the Census Bureau's Chief Scientist—testified, "under the current budget" "changes to the paper questionnaire after June of 2019[ ] would impair the Census Bureau's ability to timely administer the 2020 census." PX-1194 at 1023:2–19. It was only "[w]ith exceptional effort and *additional* resources" that the questionnaire could be finalized in October 2019. *See* 30(b)(6) Dep. Designations 438:13–439:8, ECF No. 103-9 (emphasis added). Moreover, the original vendor selected to print census questionnaires

---

[5] Plaintiffs further claim that the excerpts of Gore's transcript contained in the summary are admissible under Rule 801(d)(2)(B), arguing without any support that the Commerce Department has adopted Gore's statements as true. Pls.' Reply at 17. Plaintiffs do not explain how that manifestation has been demonstrated by the Commerce Department, or how the Commerce Department would even know Gore's statements are accurate. The Gore summary therefore reflects inadmissible hearsay within hearsay.

filed for bankruptcy, forcing the Government Publishing Office to procure new bids for the printing contract.[6]  The winning bid for this contract was based on a June 2019 contractual deadline to finalize the questionnaires because the new printer needs sufficient time to acquire additional production capacity.  So an October 2019 deadline is even more infeasible now than when Dr. Abowd testified that it would require "exceptional effort and additional resources."  *Id.*

Finally, Plaintiffs' latest filing now confirms the inequities of the relief that they seek, since it is now clear that their co-counsel in the New York census cases waited almost *three months*—if not longer—before bringing the Hofeller documents to the Court's attention.  *See* Matthews Decl. ¶ 4 (acknowledging receipt on March 13, 2019); Pls.' Reply Ex. A-4, S. Hofeller Dep. 13:15–14:13 (Stephanie Hofeller testifying that she sent her father's hard drives to New York plaintiffs' counsel on March 13, 2019).  Indeed, it is now clear that Plaintiffs could have accessed this information at least one month *before* the Court entered judgment in this case.  Thus, the current time crunch is of Plaintiffs' own making.  This only further highlights the unfair prejudice of granting their eleventh-hour request for relief.

## CONCLUSION

Nothing in Plaintiffs' reply, or the new documents attached thereto, warrant extraordinary relief under Rule 60(b).  The Court should deny Plaintiffs' Rule 60(b) motion.

---

[6] *See* United States Government Publishing Office, "GPO Awards New Contract for 2020 U.S. Census Materials," www.gpo.gov/who-we-are/news-media/news-and-press-releases/gpo-awards-new-contract-for-2020-US-Census-material (Jan. 8, 2019); United States Census Bureau, "Census Bureau's Statement on 2020 Census Printing and Mailing Contract," www.census.gov/newsroom/press-releases/2018/2020-printing-cenveo.html (Aug. 3, 2018).

DATED: June 17, 2019                    Respectfully submitted,

                                        JOSEPH H. HUNT
                                        Assistant Attorney General

                                        JAMES M. BURNHAM
                                        Deputy Assistant Attorney General

                                        JOHN R. GRIFFITHS
                                        Director, Federal Programs Branch

                                        JOSHUA E. GARDNER
                                        Special Counsel, Federal Programs Branch

                                        /s/ Stephen Ehrlich
                                        GARRETT COYLE
                                        STEPHEN EHRLICH
                                        COURTNEY ENLOW
                                        MARTIN M. TOMLINSON
                                        Trial Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Washington, DC  20005
                                        Tel.:  (202) 305-9803
                                        Email:  stephen.ehrlich@usdoj.gov

                                        *Counsel for Defendants*