**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
Southern Division

| | | |
|---|---|---|
| **ROBYN KRAVITZ**, *et al.*, | * | |
| Plaintiffs, | * | Case No.: GJH-18-1041 |
| v. | * | |
| **UNITED STATES DEPARTMENT OF COMMERCE**, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **LA UNIÓN DEL PUEBLO ENTERO**, *et al.*, | | |
| Plaintiffs, | * | Case No.: GJH-18-1570 |
| v. | * | |
| **WILBUR ROSS**, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

In these related cases, Plaintiffs challenged Commerce Secretary Wilbur Ross's decision to include a citizenship question on the 2020 Census. Plaintiffs claimed the decision was arbitrary and capricious in violation of the Administrative Procedure Act (APA), unconstitutional in violation of the Constitution's Enumeration Clause and the equal protection guarantee of the Due Process Clause of the Fifth Amendment (Equal Protection claim), and made as part of a

1

conspiracy to violate their civil rights in violation of 42 U.S.C. § 1985.[1] After a six-day bench trial, on April 5, 2019, this Court entered judgment in favor of the Plaintiffs on their claims arising under the Administrative Procedure Act and the Enumeration Clause. ECF No. 155.[2] The Court also permanently enjoined Defendants from including a citizenship question on the 2020 Census. *Id.* However, the Court entered judgment for Defendants on Plaintiffs' Equal Protection claim and on the *LUPE* Plaintiffs' 42 U.S.C. § 1985(3) claim. *Id.*

On June 3, 2019, Plaintiffs filed a Rule 60(b)(2) Motion for Relief from Final Judgment, alleging that newly-discovered evidence entitled them to judgment on their Equal Protection and § 1985 claims. ECF No. 162. Because an appeal is pending and this Court only retains limited jurisdiction over a Rule 60(b) motion, Plaintiffs also requested that the Court "issue an indicative ruling under Fed. R. Civ. P. 62.1 stating that a Rule 60(b) motion raises a substantial issue or would be granted." *Id.* at 9 (quoting Fourth Circuit Appellate Procedure Guide (Dec. 2018) at 22–23).

After a hearing, ECF No. 169, the Court entered an Order on June 19, 2019, granting Plaintiffs' Motion for an Indicative Ruling Under Rule 62.1(a) and concluding that Plaintiffs' Rule 60(b)(2) Motion raises a substantial issue. ECF No. 174. This Memorandum Opinion explains that Order.

## I. STANDARD OF REVIEW

Plaintiffs ultimately seek relief from the Court's Final Judgment entered in favor of Defendants on Plaintiffs' claims based on the equal protection guarantee of the Fifth Amendment Due Process Clause and, for the LUPE Plaintiffs only, § 1985. To obtain relief under Rule 60(b), a party must show that its motion is timely, that the motion raises a meritorious claim or defense,

---

[1] Only the *LUPE* Plaintiffs alleged the § 1985 claim.
[2] Unless otherwise noted, all citations to the docket are to the lead Case: No. 18-CV-1041.

and that the opposing party would not be unfairly prejudiced by having the judgment set aside. *See Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993) (quoting *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987)). When Rule 60(b)(2) is applicable, as here, a party must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2).

This Court retains limited jurisdiction to consider a motion for relief under Rule 60(b) even though an appeal is pending. *See Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 891 (4th Cir. 1999) ("[W]hen a Rule 60(b) motion is filed while a judgment is on appeal, the district court has jurisdiction to entertain the motion, and should do so promptly."). Specifically, pursuant to Rule 62.1, the Court may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue. Fed. R. Civ. P. 62.1; s*ee also* Fourth Circuit Appellate Procedure Guide (Dec. 2018) at 22–23.

## II. DISCUSSION

This Court previously concluded that the Secretary's articulated reason for adding a citizenship question to the 2020 Census—to improve Voting Rights Act (VRA) enforcement—was a pretext. ECF No. 154 at 108. However, the Court held that based on the trial record, Secretary's Ross's actual rationale remained, to some extent, a mystery. *Id.* at 42, 112. Plaintiffs now claim that new evidence sheds additional light on Secretary Ross's real reasoning.

Specifically, new evidence shows that a longtime partisan redistricting strategist, Dr. Thomas Hofeller, played a potentially significant role in concocting the Defendants' pretextual rationale for adding the citizenship question, and that Dr. Hofeller had concluded in 2015 that adding a citizenship question would facilitate redistricting methods "advantageous to

3

Republicans and Non-Hispanic Whites." ECF No. 162-3 at 68, 125–126, 128. Before fully exploring the meaning of this new evidence, it is useful, for context, to first review the evidence established at trial.

### A. Trial Record

The Court previously found that evidence in the Trial Record demonstrated that persons around Secretary Ross had an interest in whether undocumented immigrants are counted in the Census for apportionment purposes, and that the Secretary did look at that issue. Secretary Ross's activity in this regard included conversations with Chief White House Strategist Steve Bannon who asked the Secretary to speak to Kansas Secretary of State Kris Kobach about adding a citizenship question to the Census. PX-19 (AR 763); PX-58 (AR 2651). Thereafter, complying with Bannon's request, Kobach and Secretary Ross discussed Kobach's ideas about adding a citizenship question to the Census, and "the fact that the US census does not currently ask respondents about their citizenship." PX-19 at 2 (AR 764). Secretary Ross and Kobach also discussed the potential effect adding "one simple question" to the Census would have on "congressional apportionment." *Id.* Kobach expressed concern that the lack of a citizenship question "leads to the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes," but he did not mention the VRA rationale. *Id.*

Additionally, Deputy Chief of Staff and Director of Policy Earl Comstock emailed the Secretary an article entitled "The Pitfalls of Counting Illegal Immigrants" in response to the Secretary's inquiry into whether undocumented people were counted for apportionment purposes on March 10, 2017, shortly after the Secretary's confirmation. PX-55 (AR 2521); Comstock Dep. at 62:13–64:4, 65:5-8. "Potentially" that same day, Secretary Ross made what he later

4

would term his "months old request" that a citizenship question be added to the 2020 Census. Comstock Dep. 146: 1-15; *see* also PX-88 (AR 3710).

The Trial Record also included emails from President Trump's re-election campaign crediting the President with mandating the addition of the citizenship question and various statements and tweets by candidate, President-elect and President Trump, demonstrating his animus towards immigrants and his concern about political power being wielded by undocumented immigrants. PX-64 (AR 2643–44); PX-3 (AR 3424–25); PX-1139; PX-1145; PX-1149; PX-1156; PX-1177.

Thus, at the close of trial, Plaintiffs had presented evidence that individuals in Secretary Ross's orbit, including the President and Mr. Kobach, did harbor discriminatory animus towards non-citizens.[3] They had also presented substantial evidence, which the Court adopted, that the VRA rationale was not Secretary Ross's original or actual motivation. Ultimately though, the Court could not, by a preponderance of the evidence, connect the dots between the President and Mr. Kobach's views, the Secretary's failure to disclose his real rationale, and the Secretary's final decision and entered judgment in favor of Defendants on the Equal Protection claim and the § 1985 Claim.

With this backdrop, the Court turns to the newly discovered evidence.

B. **Newly Discovered Evidence**

Plaintiffs point primarily to two pieces of evidence in their Motion: an unpublished 2015 study by Dr. Thomas Hofeller discussing the use of citizen voting-age population (CVAP) data for redistricting purposes and a paragraph found in Dr. Hofeller's files that was identical to a

---

[3] Outside of showing that a citizenship question is likely to disparately impact Hispanics, the Court found that Plaintiffs, at that time, had not provided any evidence that Secretary Ross was motivated by animus towards Hispanics/Latinos.

paragraph in an early draft of a letter that would serve as the pretextual basis for the citizenship question. The Court will discuss each in turn.

In the newly-discovered unpublished 2015 study, Dr. Hofeller explained how a switch from the current norm of drawing legislative districts of equal total population pursuant to *Wesberry v. Sanders*, 376 U.S. 1 (1964) to using CVAP data for redistricting purposes could shift political power in favor of white voters and away from Hispanic voters. ECF No. 162-3 at 60–108. To generate the CVAP data necessary to make this switch—a change that would "be advantageous to Republicans and Non-Hispanic Whites"—Dr. Hofeller concluded that a citizenship question would need to be added to the 2020 Census. *Id.* at 68.

Dr. Hofeller acknowledged that a change from redistricting based on total population to CVAP would be a "radical departure" that might alienate Hispanic voters. *Id.* at 67. He noted that further research should address whether "the gain of GOP voting strength" from the use of CVAP data would be "worth the alienation of Latino voters who will perceive the switch" as an "attempt to diminish their voting strength." *Id.* at 63. Dr. Hofeller did not want the 2015 report to be attributed to him "either directly or indirectly" because of the role he played as an expert witness in redistricting cases. *Id.* at 56–57.

The significance of this study found in Dr. Hofeller's files is made manifest through evidence previously placed in the record. Existing evidence showed that Dr. Hofeller was "the first person that said something" to Mark Neuman about adding a citizenship question to the 2020 Census. ECF No. 162-4 at 51:7–16.[4] Hofeller and Neuman were "good friends" for decades, *id.* at 137:11–12, and they spoke several times about the citizenship question during the

---

[4] Pin cites to deposition transcripts refer to the page numbers generated by the transcripts rather than the page number generated by the ECF system.

Presidential transition when Neuman was serving as the point person for all issues related to the Census. *Id.* at 37:16–22; ECF No. 154 at 9; *id.* at 14 (quoting PX-614).

Neuman played an outsized role in advising Secretary Ross and his staff on census-related decisions. *See e.g.*, PX-87 (AR 3709); PX-614 (COM_DIS00019687) (AR); PX-38 (AR 2051_0001); PX-145 (AR 11329); PX-592 (COM_DIS00017396) (AR); PX-52 (AR 2482); PX-193. After serving as the point person for all issues related to the Census during the Presidential transition in 2016 and 2017, Neuman went on to serve as a "trusted advisor" to Secretary Ross on Census issues. ECF No. 154 at 9; *id.* at 14 (quoting PX-614).

When Secretary Ross complained in May 2017 that nothing had been done about his "months-old request to add a citizenship question," see ECF No. 154 at 10, his chief of staff asked whether she should try to set up another meeting with Neuman, and Ross responded that they should try to "stick Neuman in there to fact find." PX-83. On September 7, 2017, the Department of Commerce's general counsel, Peter Davidson, expressed "concern" about contacting Kansas Secretary of State Kris Kobach about Census matters, and instead recommended that the team "set up a meeting with" someone "trusted" like Neuman before doing "anything externally." PX-614 at 3 (COM_DIS00019687) (AR). Days later, on September 13, 2017, John Gore, the then-Acting Assistant Attorney General for Civil Rights, first connected with Department of Commerce staff about the citizenship question issue. PX-68 (AR 2659); PX-59 (AR 2628); PX-60 (AR 2634) Once Gore—the political appointee who would go on to ghostwrite DOJ's request—had been recruited to solicit the addition of a citizenship question, Neuman communicated with him about the pretextual rationale upon which DOJ could base its request. PX-52; ECF No. 103-10 at 437–38; *See also* ECF No. 103-8 at 155–56.

And that leads to the significance of the second key piece of newly discovered evidence. It now appears that Dr. Hofeller worked with Neuman to concoct the VRA pretext that Neuman then provided to Gore on the Secretary's behalf. ECF No. 162-3 at 2; ECF No. 162-4 at 112:5-11; PX-52 (AR 2482). At a meeting arranged by the Department of Commerce's in-house counsel, Neuman handed Gore a draft letter that could serve as a template to request inclusion of a citizenship question on the 2020 Census. ECF No. 162-3 at 118. The template included a paragraph setting forth the pretextual VRA enforcement rationale. *Id.* at 125. A copy of this same paragraph was found in Dr. Hofeller's files, indicating that he may have drafted the paragraph that was later incorporated into Neuman's template. *Id.* at 128.

Secretary Ross was aware of Neuman's role as a go-between and specifically of the meeting at which Neuman handed Gore the template DOJ letter apparently co-written with Dr. Hofeller. PX-52 (AR 2482). When the Secretary asked Davidson about the "Letter from DoJ" in an October 8, 2017 email, Davidson replied that he was "on the phone with Mark Neuman right now" getting a "readout of his meeting last week." *Id.* He offered to give the Secretary "an update via phone," *id.*, to which the Secretary responded, "please call me." *Id.*

Plaintiffs' new evidence potentially connects the dots between a discriminatory purpose—diluting Hispanics' political power—and Secretary Ross's decision. The evidence suggests that Dr. Hofeller was motivated to recommend the addition of a citizenship question to the 2020 Census to advantage Republicans by diminishing Hispanics' political power. ECF No. 162-3 at 68. Taken together with existing evidence, it appears that Dr. Hofeller was involved in the creation of the pretextual VRA rationale and worked with Neuman, Secretary Ross's "trusted advisor," PX-614, to drive the addition of a citizenship question. ECF No. 162-3 at 2–5; PX-52 (AR 2482). Dr. Hofeller's close relationship with Neuman, the fact that they had early

8

discussions about adding the citizenship question and his apparent work with Neuman in crafting the VRA pretext all point to a possible, if not likely, conclusion that the decisionmakers adopted Dr. Hofeller's discriminatory purpose for adding the citizenship question. In this way, a connection between Dr. Hofeller's motive and the decisionmakers' motivations may be less attenuated than any connection between evidence of Kris Kobach's motivations and the Secretary and his staff's intent.

The Court is unconvinced by Defendants' argument that Plaintiffs' Rule 60(b) Motion must fail because the newly-discovered evidence supports an entirely different theory than the one advanced at trial. First, the new evidence that decisionmakers may have been originally motivated to add a citizenship question to allow for the use of CVAP data for redistricting purposes because of that change's effect on Hispanic political power does not conflict with Plaintiffs' trial theory that Defendants were also motivated to add the question so that Hispanics and noncitizens would be undercounted. Instead, these methods of depriving Hispanics and/or non-citizens of equal representation are entirely complementary. Whether the ultimate goal was accomplished by causing an undercount of Hispanics and non-citizens or by creating and then using a data set (CVAP) that was less likely to include them, the discriminatory purpose was the same.

Further, accepting for the sake of argument that the newly-discovered evidence supports an entirely different theory about the decisionmakers' discriminatory purpose, it still provides additional force to Plaintiffs' original theory. At trial, evidence was provided that Kobach, motivated by discriminatory animus, spoke to Ross about adding a citizenship question; the Trump campaign, with the backdrop of many statements and tweets demonstrating discriminatory animus by the President, sought to take credit for the citizenship question; and

Secretary Ross was provided reading material regarding the pitfalls of counting illegal immigrants in the Census, a problem that would be mitigated by adding a citizenship question. Ultimately, the Court found that this evidence still fell just short of establishing discriminatory intent by a preponderance of the evidence. However, even if Dr. Hofeller's study evidences a different approach, the fact that yet another person was providing input into the decision-making process that was based in discriminatory purpose, with no counterbalancing reasoning other than one the Court found to be pretext, provides more weight to Plaintiffs' position that Defendants' ultimate motivation in adding the citizenship question was discriminatory. Additionally, there is a basis to conclude that Dr. Hofeller's views directly impacted the decision. Thus, at the very least, Plaintiffs have raised a substantial issue.

### C. Additional Defense Arguments

In addition to challenging the import of the evidence, Defendants raise additional questions, to which the Court now turns.

1. Does the Motion comply with Rule 60(b)?

In addition to raising a meritorious claim, to comply with Rule 60(b), the movant must demonstrate that the opposing party would not be unfairly prejudiced and that the motion is timely. *Nat'l Credit Union Admin Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993).

Regarding Defendants' claim that they will suffer unfair prejudice if the judgment is set aside, the Court is sensitive to Defendants' deadlines. However, Defendants' deadlines affect Plaintiffs' ability to obtain relief and appellate review just as much as they impact Defendants'. Further, an appeal is currently pending before the Fourth Circuit and is not yet ripe, meaning whether Defendants were waiting for a ruling by this Court or by the Fourth Circuit, their deadlines could come and go under either circumstance. Finally, because this Court previously

concluded that, on his path to adding a citizenship question, Secretary Ross bulldozed over the Census Bureau's standards and procedures for adding questions, at times entirely ignoring the Bureau's rules, ECF No. 154 at 100–108, any prejudice that Defendants now face is partially of their own making. Taken together, the Court cannot conclude that Defendants would be unfairly prejudiced by having the judgment set aside.

Additionally, Plaintiffs' Motion is timely. This Court entered judgment on April 5, 2019, and Plaintiffs could not reasonably have obtained this evidence prior to or within 28 days of that judgment, despite their diligent discovery efforts. Neuman mentioned at his deposition, which was taken on the last day of fact discovery, that Dr. Hofeller was the first person to raise the citizenship question issue with him, ECF No. 162-4 at 51:7–16, but he may have misled Plaintiffs about the nature of Hofeller's role, ECF No. 162-4 at 138:3–15; *id.* at 143:25–144:6; *id.* at 54:11-56:24. Neuman represented at his deposition that the "substance" of his conversations with Dr. Hofeller were limited to encouragement that "block level data" was necessary to "draw the most accurate districts" and requests that the administration not "skimp on the budget." ECF No. 162-4 at 138:3–15. Neuman also testified that he did not rely on Dr. Hofeller for "expertise on the Voting Rights Act." *Id.* at 143:25–144:6. The new evidence casts doubt on the plausibility of this testimony. Similarly, Neuman also suggested that Hofeller's interest in obtaining citizenship data from the Census was to create Latino-majority voting districts, ECF No. 162-4 at 54:11-56:24, which is unlikely in light of Hofeller's 2015 study. Neuman further testified that he "wasn't part of the drafting process of the [DOJ] letter." *Id.* at 114:15–21. The newly-discovered evidence indicating that Neuman and Hofeller collaborated to draft a template DOJ letter calls the credibility of this testimony into question. Thus, it is possible

11

that if Neuman had testified more accurately, Plaintiffs would have had the necessary motivation to pursue the material now at issue.

Defendants argue that Plaintiffs had access to the Hofeller documents on March 13, 2019. ECF No. 168-1 at 11. That is inaccurate. The large law firm representing the New York Plaintiffs had access to the documents because of their work on an unrelated case on March 13, 2019. ECF No. 162-3 at 2; *see also* ECF No. 167-1 ¶¶ 1–5. They had no reason to search the documents for terms relevant to this action. *Id.* When the documents were subsequently identified as relevant to the New York plaintiffs, those plaintiffs filed the New York Motion, publicly revealing the new evidence's existence for the first time. *Id.* at 2–5. Days later, the Plaintiffs here filed their motion. In sum, Plaintiffs have demonstrated that the newly-discovered evidence could not have been discovered with reasonable diligence in time to raise the evidence at trial or to move for a new trial under Rule 59(b). Fed. R. Civ. P. 60(b)(2).

2. Is the evidence admissible?

Defendants' argument that the newly-discovered evidence is clearly inadmissible also fails. To authenticate the documents found on Dr. Hofeller's computer, Plaintiffs have provided the deposition testimony of Dr. Hofeller's daughter taken in the unrelated North Carolina litigation. ECF No. 167-28. That testimony establishes how Ms. Hofeller came into possession of the documents. *Id.* at 20. Given her distant location, Ms. Hofeller is an unavailable declarant and her prior sworn testimony is likely admissible under Rule 804(b)(1) because the parties cross-examining her in the unrelated North Carolina action had a similar motive to question her on authentication issues as the Defendants here. Fed. R. Evid. 804(b)(1); *see also Horne v. Owens-Corning-Fiberglas Corp.*, 4 F.3d 276, 283 (4th Cir. 1993) (holding that district court's introduction of past deposition testimony was proper even though plaintiff was not a party to the

prior litigation and noting that "privity is not the gravamen" of Rule 804(b)(1)). It is irrelevant that the North Carolina action is factually unrelated to this case because Ms. Hofeller's deposition testimony served the same purpose in that case as it would here.

The newly-discovered documents are also not barred by the rule against hearsay. Plaintiffs would not be admitting either of the key documents for their truth but rather to show the motive or intent behind the citizenship question.

* * *

The Court did not arrive at its previous findings—that Secretary Ross's articulated reasoning was pretextual and that the overall decision to add a citizenship question was arbitrary and capricious—lightly; instead, careful consideration of the evidence compelled those conclusions. The question of whether the Secretary's true reasoning was driven by discriminatory animus is similarly weighty. But, here as well, it is becoming difficult to avoid seeing that which is increasingly clear. As more puzzle pieces are placed on the mat, a disturbing picture of the decisionmakers' motives takes shape.

The Court recognizes that because of the unique procedural posture of this and related cases, this Opinion and the Order it supports may well be moot by the time it is read by anyone other than the Court's own staff. Nonetheless, pursuant to Rule 62.1, the Court finds a substantial issue has been raised. If the case is remanded, the Court will reopen discovery for no more than 45 days, order an expedited evidentiary hearing, and provide a speedy ruling.

## III. CONCLUSION

For the foregoing reasons, on June 19, 2019, the Court granted Plaintiffs' Motion for an Indicative Ruling Under Rule 62.1(a), finding Plaintiffs' Rule 60(b) Motion raises a substantial issue.

Dated: June 24, 2019

/s/
GEORGE J. HAZEL
United States District Judge