**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBYN KRAVITZ, *et al.* | Case No.: GJH-18-1041 |
| *Plaintiffs*, | |
| v. | Hon. George J. Hazel |
| UNITED STATES DEPARTMENT OF COMMERCE, *et al.* | |
| *Defendants*. | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
APPLICATION FOR AWARD OF ATTORNEYS' FEES**

# TABLE OF CONTENTS

I.  Plaintiffs Should Receive an Award of Fees at Prevailing Market Rates Under § 2412(b) Because Defendants Acted in Bad Faith. .......................................... 4

    A.  Defendants Acted in Bad Faith. ......................................................................... 5

    B.  Plaintiffs Are Entitled to Recover Prevailing Market Rates. ......................... 11

II.  Even Absent a Finding of Bad Faith, Plaintiffs Are Entitled to an Award of Attorney's Fees Under 28 U.S.C. § 2412(d), at the Statutory Rate Plus a Cost-of-Living Increase. ............................................................................................... 13

    A.  The Government's Position Was Not "Substantially Justified," Nor Are There Any Special Circumstances That Would Make an Award Here Unjust. ................................................................................................. 14

    B.  The Applicable Statutory Capped Rate for Plaintiffs' Counsel Should Be Increased by Applying a Cost-of-Living Adjustment to the Base Rate. ........................................................................................................... 15

III.  The Hours Expended By Plaintiffs' Counsel and the Fees Requested Are Reasonable. ........................................................................................................... 17

IV.  Plaintiffs' Submitted Costs and Other Expenses Are Reasonable. ........................... 19

## INTRODUCTION

After extensive, high-intensity litigation including a consolidated trial and significant post-trial proceedings before this Court, the *Kravitz* plaintiffs ("Plaintiffs") prevailed outright against Defendants as a matter of law, and achieved this lawsuit's fundamental objective:  to enjoin Defendants from inquiring about citizenship as part of the 2020 decennial Census.  The *Kravitz* plaintiffs' pro bono counsel, Covington & Burling LLP ("Covington"), devoted thousands of hours of its lawyers' time and bore substantial costs incurred in this effort.

As pro bono counsel to indisputably "prevailing parties" under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, Covington is clearly entitled—at a minimum—to a fee award equal to its total timekeeper hours times the EAJA statutory rate plus a standard cost-of-living increase, as well as its litigation-related costs in full.  *Id.* § 2412(d).  There can be no doubt that Defendants' position in this litigation was not "substantially justified" under EAJA § 2412(d).  This Court ruled*, inter alia*, that the Secretary's stated reasons for adding the citizenship question were a fabricated "pretext," Dkt. ECF No. 154 at *97–98, and the U.S. Supreme Court agreed that his rationale was so "contrived" as to be unsustainable under the Administrative Procedure Act ("APA"), *Dep't of Commerce v. New York*, __ U.S. __ at *28 (June 27, 2019) (slip opinion). Almost by definition, a spurious, pretextual justification for an agency action lacks any "substantial[]" foundation.

Plaintiffs respectfully submit, however, that the willfulness and severity of Defendants' misconduct in adopting and then defending the Secretary's unlawful action easily meets the high standard of "bad faith" supporting an award of Covington's fees, pursuant to EAJA § 2412(b), at the higher, prevailing market rates for private attorneys.  The Secretary of Commerce took his unlawful action willfully—in the face of the unanimous contrary recommendation of the sitting

3

Director of the U.S. Census Bureau, its Chief Scientist, and other Census Bureau experts—and

then misled both Congress and the public about the true impetus for the decision.  Defendants

compounded this manipulation and corruption of the administrative process with attempts in this

litigation to improperly curate the administrative record and insulate the Secretary's real reasons for

the decision from effective review. As described further below, the circumstances of this case amply

warrant this Court's award of fees to Covington at prevailing market rates pursuant to § 2412(b).

Covington' firm policy requires that any fees it receives as a result of its pro bono

representation of Plaintiffs here shall be donated to charitable public interest or legal services

organizations, after a portion is deducted to help cover expenses in pro bono matters. *See* Decl.

of Shankar Duraiswamy ¶ 23.  This fee award will thus serve to vindicate and promote the public

interest.  Based on the supporting declarations and documents submitted with this motion, and

for the reasons explained below, Plaintiffs respectfully request an award of fees and expenses

pursuant to EAJA § 2412(b), in the amount of $7,256,747.66.  At a minimum, Plaintiffs are

entitled to recover Covington's fees and expenses under § 2412(d), in the amount of

$2,791,142.50.

## ARGUMENT

### I.     Plaintiffs Should Receive an Award of Fees at Prevailing Market Rates Under § 2412(b) Because Defendants Acted in Bad Faith.

Section 2412(b) of the EAJA provides that the Court may award reasonable fees and

expenses to the "prevailing party" in an action against the United States, which "shall be liable

for such fees and expenses to the same extent that any other party would be liable under the

common law . . . ." 28 U.S.C. § 2412(b); *see also* § 2412(d) (providing for award of attorneys'

fees and expenses to the "prevailing party").  Because Plaintiffs achieved the critical objective of

their lawsuit—preventing Defendants from inquiring about citizenship as part of the 2020

decennial Census—it is beyond dispute that the *Kravitz* and *LUPE* plaintiffs are the "prevailing parties" in this litigation. *See Shalala v. Schaefer*, 509 U.S. 292, 302 (1993) (noting that a prevailing party needs only to have obtained success "'on any significant issue in litigation which achieve[d] some of the benefit . . . sought in bringing the suit'") (quoting *Hudson, Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92 (1989)); *see also Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 966 (D.C. Cir. 2004) (plaintiffs who obtained permanent injunction securing "the precise relief [they] sought" were "prevailing parties").

Moreover, it is well-recognized that the common law allows the award of attorneys' fees where the losing party has acted in bad faith. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257–60 (1975); *Hyatt v. Shalala*, 6 F.3d 250, 254 (4th Cir. 1993). As prevailing parties, Plaintiffs are therefore entitled to an award of fees under § 2412(b) based on prevailing market rates, if this Court finds that the government acted in bad faith. *See Hyatt v. Shalala*, 6 F.3d 250, 254 (4th Cir. 1993); *Sullivan v. Sullivan*, 958 F.2d 574, 577 n.8 (4th Cir. 1992). In light of this Court's prior factual findings, and because the record in this case as a whole is replete with proof of Defendants' egregious bad-faith conduct and improper behavior, a fee award to Plaintiffs' counsel under § 2412(b) should be granted here.

### A.    Defendants Acted in Bad Faith.

A finding of bad faith under § 2412(b) is a factual determination within the discretion of this Court. *See Hyatt*, 6F.3d at 255 (affirming "bad faith" determination under "clearly erroneous" standard). In contrast to the standard under EAJA § 2412(d), *see* part II below, Plaintiffs bear the burden of establishing Defendants' bad faith for purposes of § 2412(b). *See NC Alliance*, 151 F. Supp. 2d at 674.

Bad faith conduct may be found when an agency, "'confronted with a clear statutory or judicially imposed duty towards another, is so recalcitrant in performing that duty that the

injured party is forced to undertake otherwise unnecessary litigation to vindicate plain legal rights.'" *N. Carolina All. for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 674 (M.D.N.C. 2001) (hereinafter, "*NC Alliance*") (quoting *Amer. Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 220 (D.C. Cir. 1991)); *see also Hyatt v. Shalala*, 6 F.3d 250, 255 (4th Cir. 1993) (upholding bad-faith finding where agency repeatedly failed to comply with controlling circuit precedent). Courts have awarded fees under § 2412(b) on the basis of underlying bad-faith action by an agency leading to the litigation, as well as bad-faith conduct in the context of the litigation itself. *See Nepera Chem., Inc. v. Sea-Land Serv., Inc.*, 794 F.2d 688, 701 n.102 (D.C. Cir. 1986) (citing as support, *inter alia*, *Rolax v. Atlantic Coast Line R.R.*, 186 F.2d 473, 481 (4th Cir. 1951)); *cf.* EAJA § 2412(d)(2)(D) (defining "position of the United States" to include both litigation position and "the action or failure to act by the agency upon which the civil action is based"). *But see Lamb Eng'g & Const. Co. v. Nebraska Pub. Power Dist.*, 103 F.3d 1422, 1435 (8th Cir. 1997) (finding that awards of attorney's fees cannot be based on the bad faith of the pre-litigation conduct).

Indeed, "it is clear that [through EAJA], Congress intended to address governmental misconduct whether that conduct preceded litigation, compelling a private party to take legal action, or occurred in the context of an ongoing case through prosecution or defense of unreasonable positions." *Roanoke River Basin Ass'n v. Hudson*, 991 F.2d 132, 138 (4th Cir. 1993). For example, the district court in *NC Alliance* found that the Federal Highway Administration ("FHWA") had acted in bad faith by approving a proposed a record of decision ("ROD") one day after its submission, in "complete disregard" of a statutory requirement that the agency take a "hard look" at the proposal's environmental consequences. *See* 151 F. Supp.2d at 676. The evidence established that the agency had deliberately breached the "hard look"

requirement to accelerate approval and avoid the consequences of an upcoming announcement of non-conformity with the Clean Air Act. *See id.* at 675.  The district court found that a fee award under § 2412(b) was warranted in light of the agency's "bad faith in performing a statutorily imposed duty."  *Id.* at 676.  Similarly, in *Hyatt* the Fourth Circuit upheld a fee award under § 2412(b) based upon the district court's determination that the Secretary of Health and Human Services' was not "'marginally justifiable, and it may fairly be characterized as outrageous, at best*, both *before this case was filed* and during the course of this suit . . . .'" 6 F.3d at 255 (quoting district court).  In each of the foregoing cases, the court's bad-faith determination was clearly anchored in the agency's underlying conduct.

Defendants will doubtless protest that a finding of bad faith under § 2412(b) is "punitive" and reserved for "exceptional cases and for dominating reasons of justice," which require "more than a showing of a weak or legally inadequate case." *United States v. Bailey*, No. 1:11-CR-00010-MR-DLH, 2015 WL 1893610, at *35 (W.D.N.C. Apr. 27, 2015) (quoting *F.T.C. v. Kuykendall*, 466 F.3d 1149, 1152 (10th Cir. 2006)) (internal quotation marks omitted).  But it is no overstatement or hyperbole to say that the Secretary acted "'wantonly . . . or for other improper reasons,'" *id.* (quoting *Kuykendall*, 466 F.3d at 1152), in manufacturing—"contriv[ing]"—a spurious request for the citizenship question and then dissimulating before Congress in an effort to evade inquiry into the true impetus for his decision. The enormity of Defendants' bad faith in necessitating Plaintiffs' filing of this litigation permeates the entire case, even if the professional conduct of the Department of Justice attorneys charged with defending it was generally honorable. Plaintiffs respectfully submit that the circumstances of this case are exceptional and easily satisfy even the demanding standard of § 2412(b).

This Court is already steeped in the factual proof supporting the Court's previous finding of bad faith by Defendants, and Plaintiffs do not repeat every chapter and verse here. The evidence concerning the conduct of the Secretary and senior Commerce Department officials that led to the challenged agency action reveal a Cabinet-level secretary abdicating his statutory responsibility to disclose the true basis for his decision, and a deliberate and concerted effort to devise a spurious façade to conceal it. As this Court previously found, the Department of Justice's request to add the citizenship question was a mere pretext, and the Secretary's failure to disclose the true motive for the decision crossed the high threshold of bad faith. Dkt. ECF No. 154 at *97–98 ("The Court is now able to conclude that its previous threshold finding of bad-faith has matured into a factual finding of bad faith or pretext."). The Supreme Court agreed, holding that the stated rationale for the decision was "contrived," and plaintiffs had made the "strong showing of bad faith or improper behavior" required to obtain extra-record discovery. *Dep't of Commerce v. New York*, __ U.S. __ at *24–25, 28 (June 27, 2019) (slip opinion). As these prior rulings reflect, the odor of bad faith permeates the record of Defendants' actions in this case.

Indeed, the record demonstrates that Secretary was willing to resort again and again to improper means in order to put the citizenship question on the 2020 decennial Census:

- The Secretary claimed that the decision was made in response to a request from DOJ. Dkt. ECF No. 154, ⁋ 5. In fact, it was revealed during litigation that the decision was made first by the Secretary and that Commerce Department officials *then* embarked on a months-long campaign to get another government agency to formally request the addition of a citizenship question so that they could conceal their true motives for the action. *See* Dkt. ECF No. 154, ⁋ 9–20, 54–58.

- When the DOJ finally agreed after the Secretary personally intervened and met with Attorney General Sessions, the stated rationale—that the citizenship question *specifically* was needed to enforce the Voting Rights Act, rather than some other avenue of getting more specific data—was counter to DOJ personnel's longstanding, unimpaired enforcement of the VRA using the current data available. *See* Dkt. ECF No. 154, ⁋ 20–

21, 56.

- When Census Bureau staff attempted to discuss solutions with DOJ that might obviate the need to modify the Census questionnaire to meet the DOJ's stated request, the Secretary and the Attorney General prevented them from doing so.  Dkt. ECF No. 154, ⁋ 28, 62–64.

- Throughout this litigation and before Congress, the Secretary continued to perpetuate the lie that DOJ had "initiated" the request, to which he had merely responded.  *See* Dkt. ECF No. 154, ⁋ 53, citing PX-491, PX-480.

- In his quest to add the citizenship question to the census, the Secretary flagrantly disregarded established procedures and practices for testing and validating new census questions, thereby putting the accuracy and validity of the decennial census at risk.  Dkt. ECF No. 154, ⁋ 65–68.

If the above facts in the trial record were not enough, additional explosive evidence emerged

after trial strongly indicating that the Secretary's true motive was in fact based on

unconstitutional, discriminatory animus.  Dkt. ECF No. 175 at *3–4, 5–10; ECF No. 162-1.  This

evidence was powerful and disturbing enough for this Court to grant Plaintiffs' 60(b) motion and

obtain a partial remand from the Fourth Circuit to conduct further proceedings on Plaintiffs'

Equal Protection Clause claim. *See* Dkt. ECF No. 174.  As this Court noted, "it is becoming

difficult to avoid seeing that which is increasingly clear. As more puzzle pieces are placed on the

mat, a disturbing picture of the decisionmakers' motives takes shape."  Dkt. ECF No. 175 at *13.

Throughout this litigation, the government continued to defend Defendants' actions by

pretending that the pretextual justification was real or—without any plausible legal

justification—irrelevant.  Although Defendants were well aware that the decision was initially

made for other reasons, they continued to argue in court that the decision was made because of

DOJ's request.  The government continued to argue that the VRA rationale was valid unless

Plaintiffs could prove that Ross disbelieved it, but refused to make Secretary Ross available to

testify about what he believed.  *See* Defendants' Opposition to Plaintiffs' Motion to Compel

Defendants to Produce Secretary of Commerce Wilbur L. Ross, Jr. for Deposition, ECF No. 320, No. 18-cv-2921, *State of New York, et al., v. U.S. Department of Commerce, et al.* (Sept. 13, 2018).  Additionally, throughout the litigation, the Government insisted that Secretary Ross was the sole decisionmaker, and was able to defeat attempts to obtain discovery of third parties on this basis.  *See* Defendants' Opposition to Plaintiffs' Letter Seeking Leave to Depose a Third-Party, Kansas Secretary of State Kris Kobach, ECF No. 300, No. 18-cv-2921, *State of New York, et al., v. U.S. Department of Commerce, et al.* (Sept. 13, 2018).  As became abundantly clear after the Supreme Court's decision, the President and presumably others were very much involved in the decisionmaking around this issue.  Unable to defend the indefensible, the government resorted to impermissible post hoc rationales for the Secretary's decision that were not reflected in the contemporaneous record or the Secretary's decision memo.  Dkt. ECF No. 154 at *102.

Defendants made these arguments even while the government made concerted efforts to shield from discovery Defendants' real reasons for adding the citizenship question. The Government initially put forward a meager administrative record that kept hidden the behind-the-scenes machinations that led to the DOJ request. *See* Findings of Fact, *State of New York v. U.S. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. January 15, 2019), ECF No. 574 at *29–30. They made overbroad privilege assertions, with several of those claims ultimately being rejected by the district court. *See* Hearing, *State of New York v. U.S. Dep't of Commerce*, No. 18-CV-2921, at 9:19–10:18 (Sept. 14, 2018).  They tried to argue that Mark Neuman was both an unconnected third party who should not be deposed, and also a trusted advisor to Secretary Ross, entitling him to assert the deliberative process privilege over his communications with other

Commerce Department officials. *See* Pretrial Conference, *State of New York v. U.S. Dep't of Commerce*, No. 18-CV-2921, at 8:10–18 (Nov. 1, 2018).

Perhaps most egregiously, the government repeatedly represented to this Court, and to the Supreme Court and other district courts presiding over parallel cases, that June 30, 2019 was the drop-dead deadline for determining census questionnaire content; but it then effectively discarded that claim once the Supreme Court had issued its decision. *See* Dkt. ECF No. 164 at 2; Dkt. ECF No. 166 at 10, 32; Dkt. ECF No. 168-1 at 3; Petition for a Writ of Certiorari Before Judgment, *Dep't of Commerce v. New York*, at *13–14 (asserting that "the government *must* finalize the decennial census questionnaire for printing by the end of June 2019") (emphasis added). Just one day after Defendants' counsel represented to this Court that the census questionnaire had gone to print without the citizenship question and the case was over, that representation was contradicted as "fake news" and the roller coaster started yet again. This kind of whipsaw litigation tactic only compounded the bad faith instantiated by the Secretary's original decision.

**B.      Plaintiffs Are Entitled to Recover Prevailing Market Rates.**

Because the Government acted in bad faith, Plaintiffs are entitled to fees at prevailing market rates. *Sullivan v. Sullivan*, 958 F.2d 574, 577 n.8 (4th Cir. 1992). The Court looks to "the prevailing market rates in the relevant community for the type of work for which [Plaintiffs] seek[] an award," as shown by attorney affidavits or other evidence. *EEOC v. Freeman*, 126 F. Supp. 3d 560, 575 (D. Md. 2015). The actual market rates for Plaintiffs' counsel that are generally paid by clients are set forth in the declaration of Shankar Duraiswamy. *See* Decl. of Shankar Duraiswamy ¶¶ 2–15. These rates are the prevailing rates in the legal market for attorneys and legal professionals at Covington and other large and respected law firms engaging in highly complex litigation like this case. *See* Decl. of Shankar Duraiswamy ¶ 16.

The prevailing market rates applicable in this case are higher than the guidelines rates that are set forth in Appendix B of this Court's Local Rules.  Those guidelines rates, although "presumptively reasonable," "are non-binding" and should be adjusted as appropriate.  *Freeman*, 126 F. Supp. 3d at 575.  Specifically, the guidelines rates should be adjusted based on the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243–44 (4th Cir. 2009).

These adjustment factors strongly favor rates for Plaintiffs' counsel in this case that are well above the Appendix B guideline rates.

- *The amount in controversy and the results obtained.* — Plaintiffs' counsel obtained the precise relief sought by Plaintiffs: a permanent injunction of the government's unlawful action.  The effective "amount in controversy" was enormous, including a decade of intrastate vote dilution, U.S. congressional malapportionment, and billions of dollars in federal funding.  *See* Dkt. 154 at 61–81.  Courts have concluded that the degree of success obtained is "the most critical factor" in determining the reasonableness of an award of attorneys' fees.  *Lipenga v. Kambalame*, No. GJH-14-3980, 2017 WL 2493101 at *3 (D. Md. June 8, 2017) (citing *Ford v. Rigidply Rafters, Inc.*, 999 F. Supp. 647, 651 (D. Md. 1998)).

- *The novelty and difficulty of the questions raised, and the skill required to properly perform the legal services rendered.* — This case presented an historic challenge to a scheme, cloaked by pretext and obfuscation, to warp the once-in-a-decade census.  Plaintiffs' counsel needed legal mastery of an array of complex constitutional and statutory issues, including justiciability, political questions, Article III standing, the Enumeration Clause, and numerous issues under the Administrative Procedure Act — many of which were novel and were not directly controlled by prior precedent involving this unique fact pattern.  Plaintiffs' counsel also needed technical mastery of complex

scientific and statistical issues, including regression analyses, data imputation, survey methodology, and population projections.

- *The time limitations imposed by the client or circumstances.* — The litigation timeline in this case was extremely compressed for a case of this magnitude and complexity: less than one year from the filing of the complaint through fact and expert discovery, trial, and judgment.

- *The attorney's opportunity costs in pressing the instant litigation.* — The substantial time that Plaintiffs' counsel dedicated to this case limited their ability to handle additional, paid work at Plaintiffs' counsel's customary rates. Plaintiffs' counsel dedicated thousands of hours to this case.

- *The customary fee for like work, and the experience, reputation and ability of the attorney.* — Covington is a highly regarded firm with expertise in complex litigation. Plaintiffs' counsel's customary fees are substantially higher than the Appendix B guidelines rates. Courts in this district often adjust rates above the guidelines in cases involving complex issues and skilled attorneys whose customary rates are higher. *See E.E.O.C. v. Freeman*, 126 F. Supp. 3d 560, 576 (D. Md. 2015); *Life Technologies Corp. v. Life Technologies Corp.*, No. 10-cv-3527, 2012 WL 4748080 (D. Md. Oct. 2, 2012) (allowing rates above the Guidelines where the increase is "commensurate with the expertise, skills, and customary fees of the attorneys at a large, private law firm").

The twelve factors that the Court must use for guidance in determining the appropriate rates overwhelmingly establish that the reasonable and prevailing market rates for this case are well above the guidelines rates. At a minimum, the Court should apply the rates in the *Laffey* Matrix used by the U.S. Attorney's Office for the District of Columbia, given that Plaintiffs' counsel are based in Washington, D.C. *See* Duraiswamy Decl. Exhibit 5.

II.     **Even Absent a Finding of Bad Faith, Plaintiffs Are Entitled to an Award of Attorney's Fees Under 28 U.S.C. § 2412(d), at the Statutory Rate Plus a Cost-of-Living Increase.**

As set forth above, the record in this case squarely supports a finding of bad faith under § 2412(b), entitling Plaintiffs to recover attorneys' fees at the prevailing market rates. However, even if this Court declines to make such a finding, Plaintiffs are nonetheless entitled to recover

their attorney's fees under 28 U.S.C. § 2412(d), at the statutory rate plus an appropriate cost-of-living increase.

> ### A.       The Government's Position Was Not "Substantially Justified," Nor Are There Any Special Circumstances That Would Make an Award Here Unjust.

As prevailing parties in this action, Plaintiffs are entitled to an award of attorney's fees and other expenses under § 2412(d) of the EAJA, "unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).[1] Defendants, not Plaintiffs, bear the burden of demonstrating that their its position was substantially justified or that special circumstances exist that would make an award unjust. *See United States v. 515 Granby, LLC*, 736 F.3d 309, 316 (4th Cir. 2013).

"Substantially justified" means "'justified to a degree that could satisfy a reasonable person' or having a 'reasonable basis both in law and fact.'" *Hyatt v. Barnhart*, 315 F.3d 239, 244 (4th Cir. 2002) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). Moreover, under § 2412(d)(1)(B), "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought." In determining "whether the government acted reasonably in causing the litigation or in taking a stance during the litigation," the Court must consider the "totality of the circumstances." *Id.; Roanoke River Basin,* 991 F.2d at 139. The government's position must be substantially justified on both the facts and the law.  *Hill v. Colvin*, No. GLR-14-2872, 2015 WL 5895786, at *3 (D. Md. Oct. 5, 2015).

---

[1] As set forth in the attached declarations, Plaintiffs are individuals whose net worth did not exceed $2,000,000 when this lawsuit was filed, and therefore qualify for a fee award under § 2412(d).  *See* Duraiswamy Decl., Ex. 6.

Furthermore, "when the government's unjustified prelitigation position forces a lawsuit, the petitioner may recover fees under the EAJA for the entire suit, even if the government's litigation position was reasonable." *United States v. 515 Granby, LLC*, 736 F.3d 309, 316 (4th Cir. 2013) (citing *Thompson v. Sullivan*, 980 F.2d 280, 281 (4th Cir. 1992)). While the ultimate rulings in the case on the merits do not conclusively establish lack of substantial justification, they "are the most powerful available indicators of the strength, hence reasonableness, of the ultimately rejected position" and must be taken into account when determining whether the government's position was substantially justified. *Acosta v. Ameriguard Sec. Servs., Inc.*, No. CV-1S-3484, 2019 WL 498846, at *2 (D. Md. Feb. 8, 2019).

Here, Defendants cannot possibly establish a substantial justification for the Secretary's attempt to shoehorn a citizenship question into the 2020 Census questionnaire, or for the government's unsuccessful efforts to defend the blatant pretext advanced by Defendants as the purported basis for his action. As set forth in detail in part I.A. above, the Secretary's decision to add the citizenship question was hatched in an incubator of bad faith: even if this Court concludes that the proven artifice and dissimulation that led to that decision, and the tortuous and transparent arguments that Defendants offered to explain it, are not enough to constitute "bad faith" for purposes of § 2412(b), Defendant cannot plausibly contend that the government's position in this case was substantially justified. A fee award is therefore mandatory under § 2412(d).

### B.     The Applicable Statutory Capped Rate for Plaintiffs' Counsel Should Be Increased by Applying a Cost-of-Living Adjustment to the Base Rate.

Under § 2412(d), the recoverable rate for attorneys' fees is capped at a base rate of $125 adjusted upward to account for "an increase in the cost of living or a special factor," if the Court concludes that such a higher fee is justified.  28 U.S.C. § 2412(d)(2)(A).  Because the statutory

base rate was set more than 20 years ago, in March 1996, courts routinely approve cost-of-living adjustments. *See, e.g.*, *Hyatt v. Barnhart*, 315 F.3d 239, 251 n.4 (4th Cir. 2002); *Acosta v. Ameriguard Sec. Servs., Inc.*, No. CV-1S-3484, 2019 WL 498846, at *3 (D. Md. Feb. 8, 2019). This Court should likewise apply a cost-of-living adjustment here.

A standard cost-of-living adjustment results in statutory capped rates of $206.25 for services performed in 2018 and $208.47 for services performed in 2019. These cost-of-living adjustments for 2018 and 2019 are determined by comparing the consumer price index ("CPI") when and where the relevant work was done with the average U.S. consumer price index when the $125 base rate took effect. *See generally Peterson v. Astrue*, No. CIV.A. 1:04CV76, 2008 WL 183726, at *8 (N.D. W. Va. Jan. 18, 2008); *see also Acosta v. Ameriguard Sec. Servs., Inc.*, No. CV JKB-1S-3484, 2019 WL 498846, at *3 (D. Md. Feb. 8, 2019) (calculating cost-of-living increased based on the CPI Inflation Calculator provided by the Department of Labor).

Here, the relevant economic geography is the Washington-Arlington-Alexandria, DC-MD-VA-WV metropolitan statistical area, for which the U.S. Department of Labor's Bureau of Labor Statistics maintains historical tables of the Consumer Price Index for All Urban Consumers ("CPI-U").  All but three of Plaintiffs' attorneys worked at Covington's Washington, D.C. office, *see* Duraiswamy Decl. ¶¶ 2–15, and the proceedings were in Greenbelt, Maryland. Both of these locations are within the Washington-Arlington-Alexandria, DC-MD-VA-WV metropolitan statistical area.[2]  Plaintiffs' attorneys performed legal services on this matter in 2018 and 2019.  *See id.*

---

[2] *See, e.g.*, Revised Delineations of Metropolitan Statistical Areas, Micropolitan Statistical Areas, and Combined Statistical Areas, and Guidance on Uses of the Delineations of These Areas, OMB Bulletin No. 18-04, at 70 (Sept. 14, 2018), *available at* https://www.whitehouse.gov/wp-content/uploads/2018/09/Bulletin-18-04.pdf.

Accordingly, the cost-of-living increase is calculated as follows:

- The average Washington/Greenbelt CPI-U figures for 2018 and 2019, respectively, are 261.37 and 264.176.  *See* Duraiswamy Decl., Ex. 4.

- The average U.S. CPI-U in March 1996 was 156.9.  *See* Duraiswamy Decl., Ex. 4.

- Dividing the applicable 2018 and 2019 CPI-U figures by the 1996 CPI-U results in adjustment factors of 1.6658 for 2018 and 1.6837 for 2019.

- Multiplying those adjustment factors by the base statutory rate of $125 results in the cost-of-living adjusted statutory rates for the relevant years: $208.22 for 2018 and $210.46 for 2019.  *See id.*

These adjusted statutory caps should be applied to the hours expended by each of Plaintiffs' billing attorneys and legal professionals.  Once adjusted, the statutory rate is still well below the market hourly rates in Washington, D.C., even for the least experienced of Plaintiffs' attorneys.  *See* Duraiswamy Decl. ¶¶ 2–15 (noting Covington attorneys' and legal professionals' standard billing rates ranging from $255 to $1120 per hour); *see also id.*, Ex. 4 (matrix of reasonable hourly rates prepared by the Civil Division of the U.S. Attorney's Office for the District of Columbia for 2015–2019).

### III.    The Hours Expended By Plaintiffs' Counsel and the Fees Requested Are Reasonable.

The Supreme Court has explained that where, as here, "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."  *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983); *see also Hyatt v. Barnhart*, 315 F.3d 239, 254 (4th Cir. 2002) ("The extent of a plaintiff's success is an important factor to consider when determining the reasonableness of the fees requested.").  Here, the complexity and far-reaching significance of this case fully warranted the substantial number

of hours Plaintiffs' counsel expended, and they achieved a complete victory in overturning the challenged agency action and preserving the integrity of the 2020 Census questionnaire.

Moreover, Plaintiffs' counsel has made a number of downward adjustments to the number of hours requested that reflect the exercise of billing judgment and to comply with the principles set forth in Appendix B of the Local Rules.  In making these adjustments, a conservative approach was taken, often resulting in downward adjustments even when such adjustments were, in the billing judgment of the supervising partner, not necessary.  *See* Duraiswamy Decl. ¶¶ 20–22 (explaining downward adjustments in greater detail).  In total, Plaintiffs' counsel spent more than 10,700 hours on this case.  *Id.* ¶ 18.  After the aforementioned substantial voluntary adjustments, Plaintiffs' counsel is requesting attorney's fees for a total of 9,423.70 hours on this case, which is approximately a 12% reduction from the hours Plaintiffs' counsel actually spent.  These hours are plainly reasonable given the case's complexity, its stakes, and its successful outcome.

The reasonableness of the time spent in order to achieve a successful outcome in this complex and important case is underscored by the following factors:

- The case involved complex and novel legal arguments on an array of important constitutional and statutory issues, which were highly contested and had to be considered from every angle, given the certainty of close scrutiny — not only by skilled attorneys at the Department of Justice, the White House and, the Department of Commerce, but also by an array of other interested parties, including state solicitors general, activist organizations, and other potential amici curiae.

- The case involved complex technical arguments on an array of factual issues, which required Plaintiffs' counsel to develop a sufficient understanding of sophisticated statistical models, survey methodology, Census operations, population projections, determinants of funding under complex federal programs, and numerous other issues.

- The case involved an expedited timeline to meet the government's unalterable deadline for printing Census forms, and required multiple rounds of review of the Administrative Record because the government repeatedly and inexplicably produced only selected portions of the record rather than the entire record.

- Plaintiffs' core litigation team included twelve attorneys because, in part, of the financial constraints placed on any attorney performing work pro bono. Because their attorneys have been working on a pro bono basis, with no certainty of recovery and potentially subject to EAJA fee caps, Plaintiffs' Covington attorneys were required to balance their work on this case with their work for paying clients, which resulted in spreading the work among a number of attorneys.

- Because Covington's representation in this case is pro bono, Covington policy requires that any fees that Covington recovers in a pro bono case must be donated to charitable public interest or legal services organizations after the deduction of amounts necessary to cover expenses in the instant case and contribute to expenses incurred in the firm's other pro bono matters. *See* Duraiswamy Decl. ¶ 23.

In light of the foregoing, the requested 9,423.70 hours are reasonable. Therefore, Plaintiffs respectfully request, as detailed in Exhibit 1 to Mr. Duraiswamy's declaration, $6,436,840 in fees under § 2412(b) should the Court find that Defendants acted in bad faith. At a minimum, Plaintiffs are entitled $1,971,233.84 in fees under § 2412(d), as detailed in Exhibit 2 to Mr. Duraiswamy's declaration.

## IV.    Plaintiffs' Submitted Costs and Other Expenses Are Reasonable.

Under the EAJA, Plaintiffs are also entitled to an award of reasonable costs and other expenses. Such expenses include the reasonable expenses of expert witnesses and the reasonable cost of any "study, analysis, engineering report, test, or project" necessary to preparing Plaintiffs' case. 28 U.S.C. § 2412(d)(2)(A). The EAJA provides that "no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States." 28 U.S.C. § 2412(d)(2)(A). Here, the government's expert witness, Dr. Stuart Gurrea, was compensated at a rate of $575/hour. Rule 26(A)(2)(B) Expert Report and Declaration of Stuart D. Gurrea, Ph.D, at *2 (October 19, 2018). Almost all of Plaintiffs' experts were compensated at a lower rate, and Plaintiffs have applied that rate as a cap for those who were not. *See* Duraiswamy Decl., Ex. 7.

Cost awards may include travel, printing, telephone calls, delivery services, and fees for the court reporter, the clerk, and witnesses.  *See* 28 U.S.C. § 2412(a)(1); 28 U.S.C. § 1920; *see, e.g.*, *United States v. McHan*, 11 F. App'x 304, 306 (4th Cir. 2001).  Reasonable travel costs, including airfare and hotel rooms, may be reimbursed under the EAJA.  *See Bunn v. Bowen*, 637 F. Supp. 464, 477 & n.20 (E.D.N.C. 1986) (citing *Int'l Woodworkers of Am., AFL-CIO, Local 3-98 v. Donovan*, 769 F.2d 1388, 1392 (9th Cir. 1985), *amended*, 792 F.2d 762 (9th Cir. 1985)); *Int'l Woodworkers*, 769 F.2d at 1392 (affirming an "award of costs for telephone calls, postage, air courier and attorney travel expenses" because "awards of such costs—costs that are ordinarily billed to a client—are routine under all other fee statutes" and "noting that the expenses enumerated in Section 2412(d)(2)(A) are set forth as examples, not as an exclusive list"); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 100 Fed. Cl. 750, 769 (2011) (awarding costs of "airfare, lodging, and food expenses for [] three attorneys").  In an exercise of their billing judgment, Plaintiffs have removed meals and certain transportation costs from their list of costs and are not seeking reimbursement for such costs.[3]

In sum, Plaintiffs' counsel are requesting $819,907.66 in actual costs and expenses.  These costs and other expenses are reasonable and Plaintiffs' counsel should be fully reimbursed for those amounts.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court award Plaintiffs' attorneys' fees, expenses, and costs in the amount of $7,256,747.66 as set forth above and in the accompanying declaration and exhibits.

---

[3] Note that Plaintiffs' expert witness costs were paid by the National Redistricting Foundation ("NRF"), a 501(c)(3) organization.  Accordingly, any recovery for expert costs will be reimbursed to NRF.

Dated: August 15, 2019

Respectfully Submitted,
/s/ Daniel Grant (Bar. No. 19659)

**COVINGTON & BURLING LLP**
Shankar Duraiswamy*
José E. Arvelo*
Dustin Cho*
Amee Frodle*
Daniel Grant (Bar. No. 19659)
Bianca Nunes*
Tina M. Thomas*

One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
jarvelo@cov.com
dcho@cov.com
afrodle@cov.com
bnunes@cov.com
tthomas@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 8411000
Fax: (212) 841-1010
pbduke@cov.com

Lawrence A. Hobel*
COVINGTON & BURLING LLP
Salesforce Tower, 415 Mission Street
San Francisco, CA 94105-2533
Tel: (415) 591-6000
Fax: (415) 591-6091
lhobel@cov.com
*Attorneys for Kravitz Plaintiffs*